# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL FAIR HOUSING ALLIANCE           *
1101 Vermont Ave. NW
Washington, DC 20005,                    *

HOUSING OPPORTUNITIES PROJECT FOR        *
EXCELLENCE, INC.
11501 NW 2nd Ave.                        *
Miami, FL 33168,
                                         *
METRO FAIR HOUSING SERVICES, INC.               Case No.:  1:18-CV-1919
215 Lakewood Way, S.W., Suite 106        *
Atlanta, GA 30315,
                                         *
NORTH TEXAS FAIR HOUSING CENTER
8625 King George Drive                   *
Dallas, TX 75235,
                                         *
FAIR HOUSING CENTER OF WEST
MICHIGAN                                 *
20 Hall St. SE
Grand Rapids, MI 49507,                  *

FAIR HOUSING CONTINUUM, INC.             *
4760 US-1
Melbourne, FL 32935,                     *

SOUTH SUBURBAN HOUSING CENTER            *
18220 Harwood Ave. # 1
Homewood, IL 60430,                      *

H.O.P.E. INC. D/B/A HOPE FAIR HOUSING    *
CENTER
202 W. Willow Ave.                       *
Wheaton, IL 60187,
                                         *
METROPOLITAN MILWAUKEE FAIR
HOUSING COUNCIL                          *
759 N. Milwaukee St. #500
Milwaukee, WI 53202,                     *

FAIR HOUSING CENTER OF CENTRAL           *
INDIANA
445 N. Pennsylvania St. #811             *
Indianapolis, IN 46204,

DENVER METRO FAIR HOUSING CENTER      *
3280 N. Downing Street B
Denver, CO 80205,                                        *

FAIR HOUSING OPPORTUNITIES OF          *
NORTHWEST OHIO, INC. D/B/A TOLEDO
FAIR HOUSING CENTER                           *
432 N. Superior Street
Toledo, OH 43604,                                     *

GREATER NEW ORLEANS FAIR HOUSING     *
ACTION CENTER, INC.
404 S. Jefferson Davis Pkwy                     *
New Orleans, LA 70119,

                                                              *
FAIR HOUSING ADVOCATES OF NORTHERN
CALIFORNIA                                             *
1314 Lincoln Ave. Ste. A
San Rafael, CA 94901,                              *

HOUSING RESEARCH AND ADVOCACY      *
CENTER D/B/A FAIR HOUSING CENTER FOR
RIGHTS AND RESEARCH                          *
2728 Euclid Ave.
Cleveland, OH 44115,                               *

FAIR HOUSING CENTER OF NORTHERN      *
ALABAMA
1728 3rd Ave. N # 400C                             *
Birmingham, AL 35203,
                                                              *
MIAMI VALLEY FAIR HOUSING CENTER
505 Riverside Drive                                   *
Dayton, OH 45405,
                                                              *
CONNECTICUT FAIR HOUSING CENTER
60 F J Popieluszko Court                          *
Hartford, CT 06106,
                                                              *
FAIR HOUSING COUNCIL OF GREATER SAN
ANTONIO                                                 *
4414 Centerview Dr. #229
San Antonio, TX 78228,                            *

FAIR HOUSING CENTER OF THE GREATER          *
PALM BEACHES, INC.
1300 W Lantana Rd. Ste. 200                  *
Lake Worth, FL 33462,
                                             *

WANDA ONAFUWA
4712 Amberley Avenue                         *
Baltimore, MD 21229
(Baltimore City),                            *

CHEVELLE BUSHNELL                            *
6086 S. Hil Mar Circle
District Heights, MD 20747                   *
(Prince George's County),
                                             *
and
                                             *
JALEN BUSHNELL
6086 S. Hil Mar Circle                       *
District Heights, MD 20747
(Prince George's County),                    *

                            Plaintiffs,      *

                    v.                       *

BANK OF AMERICA, NATIONAL                    *
ASSOCIATION
100 North Tryon Street                       *
Charlotte, N.C. 28255
                                             *
        Serve on:
        The Corporation Trust, Inc.          *
        2405 York Road, Suite 201
        Lutherville Timonium, MD 21093,      *

BANK OF AMERICA CORP.                        *
100 North Tryon Street
Charlotte, N.C. 28255                        *

        Serve on:                            *
        The Corporation Trust, Inc.
        2405 York Road, Suite 201            *
        Lutherville Timonium, MD 21093,
                                             *
and

3

```
                                            *
SAFEGUARD PROPERTIES MANAGEMENT,
LLC                                         *
2711 Centerville Road
Wilmington, DE 19808                        *

            Serve on:                       *
            CSC-Lawyers Incorporating Service
            Company                         *
            7 St. Paul Street, Suite 820
            Baltimore, MD 21202,            *

                    Defendants.             *

*   *   *   *   *   *   *   *   *   *   *   *
```

## COMPLAINT AND DEMAND FOR JURY TRIAL

### I.    INTRODUCTION AND SUMMARY OF CLAIMS

1.    This complaint is filed under the Fair Housing Act of 1968, as amended, 42

U.S.C. § 3601, *et seq.*, and common law, for compensatory and injunctive relief arising out of

Defendants' racially discriminatory conduct affecting communities of color in numerous cities

around the country.  The case arises from overwhelming objective evidence that Defendants

discriminated against communities of color in 37 metropolitan areas in the exterior maintenance

and marketing of properties owned by Bank of America after foreclosure.  Defendants' actions

have had a devastating impact on these communities, and, despite being advised of the problem

on numerous occasions, Defendants have refused to alter their behavior.  Plaintiffs' claims are

based on intentional discrimination, including Defendants' intentional discriminatory acts,

Defendants' responsibility for the intentional acts of their agents, and Defendants' deliberate

indifference to the discriminatory effect of their and/or their agents' acts.  Plaintiffs' claims are

also based on disparate impact, as Defendants' policies and practices have a disparate impact

because of race and national origin. The Individual Plaintiffs (Wanda Onafuwa, Chevelle Bushnell, and Jalen Bushnell) also bring private nuisance claims against Defendants.

2.      The Organizational Plaintiffs, National Fair Housing Alliance, Housing Opportunities Project for Excellence, Inc., Metro Fair Housing Services, Inc., North Texas Fair Housing Center, Fair Housing Center of West Michigan, Fair Housing Continuum, Inc., South Suburban Housing Center, H.O.P.E., Inc. d/b/a HOPE Fair Housing Center, Metropolitan Milwaukee Fair Housing Council, Fair Housing Center of Central Indiana, Denver Metro Fair Housing Center, Fair Housing Opportunities of Northwest Ohio, Inc. d/b/a Toledo Fair Housing Center, Greater New Orleans Fair Housing Action Center, Fair Housing Advocates of Northern California, Fair Housing Center for Rights & Research, Fair Housing Center of Northern Alabama, The Miami Valley Fair Housing Center, Connecticut Fair Housing Center, Fair Housing Council of Greater San Antonio, and Fair Housing Center of the Greater Palm Beaches, Inc. ("the Organizational Plaintiffs"), are private, non-profit fair housing organizations dedicated to ending housing discrimination and to promoting residential integration in their communities and around the nation.  The Organizational Plaintiffs work to eliminate housing discrimination and to ensure equal housing opportunity for all persons through education, outreach, membership services, public policy initiatives, advocacy, investigation of fair housing complaints and violations, investment in neighborhood community development and stabilization projects, and fair housing enforcement.

3.      Plaintiffs Wanda Onafuwa, Chevelle Bushnell, and Jalen Bushnell ("the Individual Plaintiffs") are Maryland residents and African-American homeowners in minority communities who live next door to properties that were owned and/or poorly maintained by

Defendants.  The Individual Plaintiffs have been damaged by Defendants' discrimination in failing to properly maintain and market those properties.

4.      At all times material to the allegations in this Complaint, Defendants Bank of America, National Association ("Bank of America, N.A.") and Bank of America Corp. (together, the "Bank of America Defendants")[1] are or were the owners of record of thousands of foreclosed homes in metropolitan areas across the country, commonly referred to as "REO" or "Real Estate Owned" properties ("the Bank of America REO properties" or "Bank of America-owned homes").[2]  At all relevant times, Defendant Safeguard Properties Management, LLC ("Safeguard") has provided, and continues to provide, property preservation and maintenance and other services for all or almost all Bank of America REO properties.

5.      In the wake of the national foreclosure crisis, and in response to complaints, public outcry, and industry trends and observations regarding the maintenance of foreclosed properties in African-American and Latino communities, the Organizational Plaintiffs investigated and examined the routine exterior maintenance and marketing of Bank of America-owned homes with the purpose of determining whether particular neighborhoods in certain cities were being treated equally, regardless of the racial composition of the neighborhoods.  Between 2009 and the present and using traditional and sound fair housing testing methodologies, the Organizational Plaintiffs conducted a comprehensive investigation of Defendants' activities related to foreclosed properties in middle- and working-class neighborhoods in communities of

---

[1] Each reference to Bank of America in this Complaint refers collectively to Bank of America, N.A, Bank of America Corp., and any other subsidiary or division of these entities that plays a role in owning, preserving, maintaining, or selling REO properties.  This includes BAC Home Loan Servicing, LP, which was merged with and into Bank of America, N.A. in July 2011, and Countrywide Financial Corporation and Merrill Lynch, both of which Bank of America acquired in 2008.

[2] Bank of America, N.A. obtained title to the vast majority of the dwellings at issue in this Complaint after mortgages owned by Bank of America went into default and foreclosure.  In a few instances, the Bank of America is or was the owner of record as trustee.

color (predominantly African-American and Latino neighborhoods) and in middle- and working-class neighborhoods in predominantly white communities in the metropolitan areas that are the subject of this Complaint.

6.     During the course of the investigation, the Organizational Plaintiffs examined 1,677 properties owned by Bank of America after foreclosure, collected evidence on 37 objective aspects of the routine exterior maintenance of each property investigated, and accumulated over 35,400 photographs of the pertinent conditions of those properties, such as unsecured doors; damage to steps, handrails, windows, and fences; graffiti; the accumulation of trash and mail; and overgrown grass and shrubbery.  The Organizational Plaintiffs' investigation also documented marketing deficiencies, such as the failure to post or maintain appropriate "For Sale" signage, permitting negative signage and warnings to deter prospective owner-occupant buyers (e.g. "Bank-owned," "Auction," or "Foreclosed" signs), failure to identify on the bank-owned home a real estate agent or broker or point of contact, failure to adequately display property listings on Realtor or Multiple Listing Services or other websites, and displaying on-line or other auction sites in different states in lieu of utilizing a local real estate agent or company familiar with the neighborhood.  The Organizational Plaintiffs' investigation revealed that there are significant disparities in the routine exterior maintenance and marketing of the Bank of America-owned homes in communities of color as compared to white communities.

7.     The Organizational Plaintiffs' investigation of the properties in these metropolitan areas indicates that Defendants treated properties differently depending upon the racial/ethnic composition of the neighborhoods in which they were located.  In each of the 37 metropolitan areas examined, the Bank of America-owned homes located in predominantly white census block groups were better-maintained and exhibited fewer objective routine maintenance and

marketing deficiencies than the Bank of America-owned homes located in neighborhoods comprised primarily of African Americans and/or Latinos.  Across the board, properties located in communities of color were much more likely to have numerous objective routine maintenance and marketing deficiencies than the Bank of America-owned homes located in white areas. Accordingly, in each of the metropolitan areas and across the country, the Organizational Plaintiffs revealed a systemic and particularized pattern of differential treatment by Defendants in maintaining and marketing REO properties on the basis of race, color, and/or national origin.

8.    The disparities documented between the maintenance of the Bank of America REO properties in white communities and the Bank of America REO properties in communities of color are stark, highly probative, and statistically significant.

9.    As a result of Defendants' discriminatory conduct and perpetuation of residential segregation, municipalities, individuals, neighbors, and homeowners in the communities served by the Organizational Plaintiffs, including the Individual Plaintiffs, have been: (a) denied housing opportunities and had housing made unavailable; (b) subjected to deteriorating and dilapidated living conditions in their neighborhoods; (c) denied opportunities for neighborhood stabilization and economic recovery; and (d) harmed in the value of their home investments.

10.    As a result of Defendants' failure to properly maintain and market REOs in communities of color, the Individual Plaintiffs have also suffered damage to their homes and experienced emotional distress and mental anguish.

11.    Defendants' systemic and particularized practice of maintaining and marketing bank-owned homes in a state of disrepair in communities of color, while maintaining and marketing similar homes in predominantly white communities in materially better condition, violates the Fair Housing Act, 42 U.S.C. §§ 3604(a), (b), (c) and (d), § 3605, § 3617, and HUD's

implementing regulations. Defendants' discriminatory conduct has also had the effect of perpetuating segregation, in violation if the Fair Housing Act. Defendants' discriminatory conduct has also caused substantial and unreasonable interference with the Individual Plaintiffs' use and enjoyment of their homes, creating a private nuisance.

12.    Defendants' conduct has caused particularized and concrete injury to the Organizational Plaintiffs. Defendants' discriminatory practices of failing to maintain and effectively market bank-owned homes have interfered with the Organizational Plaintiffs' activities and programs designed to promote compliance with fair housing laws, and have frustrated the Organizational Plaintiffs' missions by perpetuating the unlawful discrimination and segregation they use their limited resources to dismantle. The Organizational Plaintiffs' purposes and interests fall squarely within the zone of interests protected by the Fair Housing Act. Defendants' discriminatory behavior has caused the Organizational Plaintiffs to divert substantial time and resources away from their usual activities and instead to detecting, investigating, and counteracting Defendants' unlawful conduct, and engaging in outreach and education efforts specifically to address Defendants' ongoing discrimination. These efforts go above and beyond the Organizational Plaintiffs' normal operational activities and expenses.

## II.    JURISDICTION

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367, 2201, and 2202, and 42 U.S.C. § 3613(a).

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants do business in this District, Defendants are subject to personal jurisdiction in this District, a substantial part of the events giving rise to these claims occurred in this District, and a substantial portion of the property that is the subject of these claims is located in this District.

15.     Organizational Plaintiffs National Fair Housing Alliance, Housing Opportunities Project for Excellence, Inc., Metro Fair Housing Services, Inc., North Texas Fair Housing Center, Fair Housing Center of West Michigan, Fair Housing Continuum, Inc., South Suburban Housing Center, H.O.P.E. Inc. d/b/a HOPE Fair Housing Center, Metropolitan Milwaukee Fair Housing Council, Fair Housing Center of Central Indiana, Denver Metro Fair Housing Center, Fair Housing Opportunities of Northwest Ohio, Inc. d/b/a Toledo Fair Housing Center, Greater New Orleans Fair Housing Action Center, Fair Housing Advocates of Northern California, Fair Housing Center for Rights & Research, The Miami Valley Fair Housing Center, and Fair Housing Center of the Greater Palm Beaches, Inc. filed an administrative housing discrimination complaint with the U.S. Department of Housing and Urban Development Office of Fair Housing and Equal Opportunity ("HUD FHEO") concerning Defendants' conduct.  The first complaint was filed on September 25, 2012, and it was subsequently amended to update the results of the Organizational Plaintiffs' ongoing investigation on October 10, 2012, October 23, 2012, September 25, 2013, November 14, 2013, September 30, 2014, and August 31, 2016.  This complaint presently remains pending at HUD FHEO.[3]

### III.    PARTIES

### A.    PLAINTIFFS

16.     Plaintiff National Fair Housing Alliance ("NFHA") is a national, nonprofit public service organization founded in 1988 and incorporated under the laws of the Commonwealth of

---

[3] The original administrative complaint was filed by National Fair Housing Alliance, Housing Opportunities Project for Excellence, Inc., Metro Fair Housing Services, Inc., Miami Valley Fair Housing Center, North Texas Fair Housing Center, and Fair Housing Center of Western Michigan.  During subsequent amendments, other Organizational Plaintiffs joined the complaint as complainants and added evidence regarding Defendants' discrimination in other cities.  The only Organizational Plaintiffs who are not Complainants in the HUD administrative action are the Fair Housing Center of Northern Alabama, the Fair Housing Council of Greater San Antonio, and the Connecticut Fair Housing Center.

Virginia with its principal place of business at 1101 Vermont Avenue NW, Suite 710,

Washington, D.C. 20005.  NFHA is a nationwide alliance of private, nonprofit, fair housing

organizations, including organizations in 30 states and the District of Columbia.  NFHA is the

only national organization dedicated solely to ending housing discrimination and promoting

residential integration and neighborhood stabilization.  NFHA works throughout the United

States to eliminate housing discrimination and to ensure equal opportunity for all people through

leadership, education and outreach, membership services, public policy initiatives, advocacy,

intake and referral or investigations of allegations of housing discrimination, investigation of fair

housing violations, investment in community development and stabilization projects, and

enforcement.  One of NFHA's goals is the elimination of segregation in housing and the

promotion of residential integration.  NFHA has launched numerous educational campaigns to

address housing discrimination designed to teach both consumers and housing, lending, and

insurance professionals about equality of treatment of neighborhoods, the negative consequences

that flow from racial steering and redlining, and the benefits of residential diversity.  For

instance, NFHA implemented a community development program by providing grants to

homeowners and persons living in rental properties to renovate homes to make them accessible

to persons with disabilities, and to senior homeowners in Washington, D.C.'s African-American

neighborhoods to bring their homes up to code so that their homes would be safe and could

qualify for replacement coverage from homeowner's insurance companies.  This program was

expanded to several states and added grant assistance to veterans with disabilities.  NFHA's most

recent program, the Inclusive Communities grant program, was implemented in 2013 and

provides grants to ameliorate some of the adverse effects of discriminatory practices prevalent

during and after the foreclosure crisis.  Focusing on predominantly African-American and Latino

neighborhoods and clients, these grants promote homeownership through direct down payment and closing cost assistance, funding for emergency repairs, grants to homeowners to prevent foreclosure to preserve existing homeownership, and home renovation programs to reduce neighborhood blight.  The grants also provide accessible housing opportunities for people with disabilities and facilitate general quality of life improvements to support greenspace development, pocket parks, and fresh food access.

17.    Plaintiff Housing Opportunities Project for Excellence, Inc. ("HOPE, Inc.") is the first nonprofit fair housing agency organized in the state of Florida.  HOPE, Inc.'s mission is to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida.  One of HOPE, Inc.'s goals is the elimination of segregation in housing and the promotion of residential integration.  HOPE, Inc. has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  HOPE, Inc.'s Inclusive Communities Programs include providing grants to local non-profits to conduct homeownership training workshops and down payment assistance and repairs, including making homes accessible for persons with disabilities.  In partnership with churches, government, and corporations, HOPE, Inc.'s grants helped transform an empty lot into a park and garden area.

18.    Plaintiff Metro Fair Housing Services, Inc. ("Metro") is a private, nonprofit fair housing organization whose primary purpose is to prevent housing discrimination in the metropolitan Atlanta area and throughout the state of Georgia.  Metro was founded in 1974 to promote social justice and eliminate housing and lending inequities for all people, including those with disabilities, through leadership, education and outreach, public policy advocacy, and enforcement.  One of Metro's goals is the elimination of segregation in housing and the promotion of residential

integration.  Metro has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

19.    Plaintiff North Texas Fair Housing Center ("NTFHC") is a nonprofit organization dedicated to eliminating housing discrimination in North Texas.  The organization provides counseling, discrimination complaint investigation, and outreach and education programs with the goal of ensuring that all persons have the opportunity to secure the housing they desire and can afford.  One of NTFHC's goals is the elimination of segregation in housing and the promotion of residential integration.  NTFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  NTFHC offers grants to persons with disabilities so that they can remain in their homes by making them safe and accessible.

20.    Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a private, non-profit fair housing organization committed to providing comprehensive fair housing services, including education, outreach, research, advocacy, and enforcement.  FHCWM serves 12 counties in western Michigan.  Through education, research, and advocacy, FHCWM prevents housing discrimination, removes barriers that allow it to persist, and restores housing choice when discrimination happens.  FHCWM has launched multiple educational activities to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

21.    Plaintiff Fair Housing Continuum, Inc. ("the Continuum") is a private, nonprofit fair housing agency dedicated to the elimination of housing discrimination in Florida.  The Continuum serves Brevard, Indian River, Seminole, Osceola, Orange, and Volusia Counties. One of the Continuum's goals is the elimination of segregation in housing and the promotion of residential integration.  The Continuum has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  The Continuum has an Inclusive Communities Program that provides grants for down payments, loan reduction, and home rehabilitation and modification to support homeownership and neighborhood stabilization.  If the buyer is a veteran, active duty military, disabled, or willing to be the owner-occupant of a home in a distressed neighborhood, the Continuum will provide a grant to assist with the purchase or building of a home.

22.    Plaintiff South Suburban Housing Center ("SSHC") is a nonprofit community organization that primarily serves the south metropolitan Chicago area, including underserved areas of northwest Indiana.  SSHC is dedicated to eliminating all forms of discrimination in the housing market through the operation of fair housing enforcement and affirmative housing counseling programs to foster stable, racially and economically diverse communities.  SSHC's primary goal is the elimination of segregation in housing and the promotion of residential integration through expanding housing and mortgage lending choices.  SSHC has launched multiple educational activities to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  SSHC

provides grants in recovering communities of color to first-time homebuyers to purchase

housing, to persons in housing payment distress allowing them to stabilize home ownership, and

to persons forced to rent due to displacement caused by foreclosure.

23.     Plaintiff H.O.P.E. Inc. d/b/a HOPE Fair Housing Center ("HOPE FHC"),

established in 1968, is the oldest fair housing center in Illinois.  HOPE FHC primarily serves 30

counties in Northern and North Central Illinois.  HOPE FHC works to end the negative effects of

housing discrimination and segregation because of race, color, religion, national origin, sex,

disability, familial status, or any other characteristic protected under federal, state, or local laws.

One of HOPE FHC's goals is the elimination of segregation in housing and the promotion of

residential integration.  HOPE FHC has launched multiple educational campaigns to address

housing discrimination designed to teach both consumers and housing professionals about

equality of treatment of neighborhoods, the negative consequences that flow from racial steering,

and the benefits of residential diversity.  HOPE FHC's inclusive community development

initiatives have provided grants to renovate homes, down payment and closing cost assistance,

community enhancement initiatives, offered rent assistance to homeless families, created

marketing materials to affirmatively market communities of color, and provided homebuying

counseling

24.     Plaintiff Metropolitan Milwaukee Fair Housing Council ("MMFHC"), established

in 1977, is a private, nonprofit organization that operates a full-service fair housing program.

MMFHC serves numerous counties in Wisconsin.  The purpose of MMFHC is to promote fair

housing throughout the State of Wisconsin by combating illegal housing discrimination and by

creating and maintaining racially and economically integrated housing patterns.  One of

MMFHC's goals is the elimination of segregation in housing and the promotion of residential

integration.  MMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  MMFHC's inclusive communities projects include providing grants to neighborhood non-profit partners to expand access to affordable and responsible homeownership while improving neighborhoods that were damaged by the foreclosure crisis.

25.     Plaintiff Fair Housing Center of Central Indiana ("FHCCI") is a private, nonprofit fair housing organization based in Indianapolis, Indiana and primarily serving 24 counties in Central Indiana.  FHCCI's mission is to ensure equal housing opportunities by eliminating housing discrimination through advocacy, enforcement, education, and outreach.  One of FHCCI's goals is the elimination of segregation in housing and the promotion of residential integration.  FHCCI has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  FHCCI's inclusive communities work includes connecting neighborhood partners to help, serve, revitalize, stimulate, and invest resources to rebuild an affordable, safe, and vital community.  In its targeted neighborhoods, FHCCI has funded acquisition and major rehabilitation of single-family homes to be sold to owner-occupants.  It has previously provided grants to ensure rehabilitated homes are accessible and grants for persons with disabilities to afford them full access to their homes and yards.  Grants are also used to modify and improve pocket parks to beautify neighborhoods and provide recreational space, among other activities for neighborhood vitalization.

26.     Plaintiff Denver Metro Fair Housing Center ("DMFHC"), established in 2012, is

a private, nonprofit fair housing enforcement agency serving six Denver Metro Counties: Adams,

Arapahoe, Broomfield, Denver, Douglas, and Jefferson.  DMFHC is dedicated to eliminating

housing discrimination and promoting housing choice for all through education, advocacy, and

enforcement of fair housing laws.  DMFHC's goals include the elimination of segregation in

housing and the promotion of residential integration.  DMFHC has launched multiple

educational campaigns to address housing discrimination designed to teach both consumers and

housing professionals about equality of treatment of neighborhoods, the negative consequences

that flow from racial steering, and the benefits of residential diversity.  DMFHC established the

Fair Housing Action Fund to promote neighborhood development and stabilization.  The Fund

has supported construction of new homes in partnership with Habitat for Humanity and other

local nonprofits and it provides grants for critical repair of existing homes, including grants to

make homes and apartments accessible.

27.     Plaintiff Fair Housing Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair

Housing Center ("TFHC") is a non-profit public service agency organized under the laws of the

State of Ohio, with its principal place of business in Toledo, Ohio.  The purposes of TFHC are to

identify and eliminate all forms of unlawful discrimination in housing in the greater Toledo area,

including discriminatory advertising, marketing, sales, and lending practices; to educate the

public about housing discrimination laws, discriminatory housing practices, and the availability

of administrative and legal remedies to challenge discriminatory practices; to provide counseling

and referral services to the public with respect to housing discrimination matters; and to expand

equal housing opportunities for all persons.  TFHC operated the MLK Inclusive Communities

Program from 2014 through 2015 to provide grants to help homeowners in African-American

and Latino neighborhoods with roof replacement and other renovations to their homes to stabilize neighborhoods and remove blight. TFHC also provided emergency mortgage assistance grants and foreclosure prevention counseling to homeowners in communities of color to become and remain current on their mortgage payments. Finally, through the MLK Inclusive Communities Program, TFHC partnered with Ability Center of Greater Toledo to provide home accessibility modification grants to homeowners with disabilities to allow them to age in place and/or to fully enjoy their dwellings.

28.    Plaintiff Greater New Orleans Fair Housing Action Center, Inc. ("GNOFHAC") is a private, nonprofit civil rights organization established in 1995. For more than 20 years, GNOFHAC has been dedicated to eradicating housing discrimination throughout Southeast Louisiana. Its service area now includes the entire state of Louisiana. GNOFHAC has been responsible for fighting housing discrimination that arose in the wake of Hurricane Katrina and, in recent years, from the effects of the economic recession. One of GNOFHAC's goals is the elimination of segregation in housing and the promotion of residential integration. GNOFHAC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. GNOFHAC's Inclusive Communities Program has been instrumental in addressing longstanding patterns of segregation and promoting fair housing choice in the metropolitan Baton Rouge area through activities designed to stabilize poor and minority neighborhoods impacted by predatory lending and high foreclosure rates, and to support affordable rental housing and homeownership opportunities in communities of color.

29.     Plaintiff Fair Housing Advocates of Northern California ("FHANC") (formerly Fair Housing of Marin) is a nonprofit fair housing organization incorporated under the laws of the State of California with its principal place of business in San Rafael, California.  FHANC's primary objectives are: to promote equal opportunity in the renting, purchasing, financing, and advertising of housing; to educate persons regarding federal and state fair housing laws; to promote racially integrated communities and neighborhood diversity; and to eliminate discriminatory housing practices.  It is engaged in several different activities to further its mission of promoting equal housing opportunities and educating communities on the value of diversity, including: education programs in schools and in the community regarding fair housing and diversity; training programs for real estate professionals; pre-purchase education for homebuyers; advocacy for affordable housing; and foreclosure prevention and fair housing counseling.  FHANC also provides grants to homeowners and renters to make their living space accessible and to promote integration.

30.     Plaintiff Housing Research and Advocacy Center d/b/a Fair Housing Center for Rights and Research ("FHCRR") is a private, non-profit organization incorporated under the laws of Ohio and located in Cleveland, Ohio.  Its mission is to protect and expand fair housing rights, eliminate housing discrimination, and promote integrated communities.  In furthering this goal, FHCRR provides counseling, guidance, and support to individuals who encounter discrimination in their search for housing.  This may include investigation of their complaints.  FHCRR also engages in activities designed to encourage fair housing practices by educating consumers regarding their rights and professionals regarding their responsibilities under the Fair Housing Act, and by working with elected and government representatives to protect and improve fair housing laws.  FHCRR also conducts research into housing and lending patterns

and related fair housing matters throughout Northeast Ohio to educate government officials, individuals who work in the housing industry, and the public as a whole regarding housing discrimination and segregation.

31.    Plaintiff Fair Housing Center of Northern Alabama ("FHCNA") is a private, nonprofit corporation located in Birmingham, Alabama.  FHCNA seeks to ensure that all who seek housing are given fair and equal access to housing of their choice based upon their ability to acquire.  FHCNA works to eliminate housing discrimination and to ensure equal housing opportunity for all people in northern Alabama through education, outreach, public policy initiatives, advocacy, and enforcement.  FHCNA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

32.    Plaintiff Miami Valley Fair Housing Center ("MVFHC") is a private, nonprofit corporation based in Dayton, Ohio.  MVFHC recognizes the importance of "home" as a component of the American dream and seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under state or local laws.  One of MVFHC's goals is the elimination of segregation in housing and the promotion of residential integration.  MVFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

33.    Plaintiff Connecticut Fair Housing Center ("CFHC") is a nonprofit organization dedicated to ensuring that all people have equal access to housing opportunities in Connecticut.

CFHC provides investigative and legal services to those who believe that they have been the victims of housing discrimination and additionally works with state and local government, as well as housing providers, to promote compliance with federal fair housing laws.  One of CFHC's goals is the elimination of segregation in housing and the promotion of residential integration.  CFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

34.     Plaintiff Fair Housing Council of Greater San Antonio ("FHCGSA") is a private, nonprofit corporation based in San Antonio, Texas, and serving 37 counties in South Texas. FHCGSA is dedicated to eliminating discriminatory housing practices, promoting residential integration, and advancing accessible and affordable housing in South Texas.  To advance its mission, FHCGSA provides various programs and services which include, but are not limited to, investigating housing discrimination complaints through various investigative strategies including systemic surveys and testing, providing housing counseling to consumers, submitting reasonable accommodation and modification requests to housing providers on behalf of consumers with disabilities, maintaining a Directory of Accessible Housing, implementing educational social media campaigns to combat housing discrimination, and conducting various education and outreach activities for housing consumers, housing providers, community groups, and government agencies and officials, among others.

35.     Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. ("FHCGPB") is a nonprofit corporation dedicated to ensuring fair and affordable housing opportunities for all people by promoting culturally diverse communities through open housing and the elimination of

all barriers to that goal.  FHCGPB's primary purpose is the elimination of housing discrimination

on the basis of race, color, national origin, religion, sex, familial status, disability, marital status,

age, sexual orientation, and gender identity or expression throughout the Greater Palm Beaches

area.  FHCGPB seeks the eradication and elimination of direct and indirect obstacles that limit

full access to the housing market throughout Florida and seeks to end unlawful housing

discrimination through enforcement, education, public awareness, and helping victims enforce

their rights.  One of FHCGPB's goals is the elimination of segregation in housing and the

promotion of residential integration.  FHCGPB has launched multiple educational campaigns to

address housing discrimination designed to teach both consumers and housing professionals

about equality of treatment of neighborhoods, the negative consequences that flow from racial

steering, and the benefits of residential diversity.

36.     Plaintiff Wanda Onafuwa is a resident of Baltimore, Maryland.  She has owned

her home located at 4712 Amberley Avenue, Baltimore, Maryland, 21229, for approximately 23

years.  On information and belief, in or about September 2016, Bank of America began the

process of foreclosing on the property located at 4714 Amberley Avenue, Baltimore, Maryland,

21229 ("4714 Amberley"), which is the house immediately next door to Ms. Onafuwa's

residence.  Bank of America, N.A. became owner of 4714 Amberley on or about February 27,

2017, and sold the property on or about March 20, 2018.  During the time that Bank of America,

N.A. owned 4714 Amberley, Defendants failed to adequately care for and maintain the property,

which caused damage to Ms. Onafuwa, her home, and her neighborhood.

37.     Plaintiff Chevelle Bushnell is a resident of Prince George's County, Maryland.

She has owned her home located at 6086 S. Hil Mar Circle, District Heights, Maryland, 20747,

for approximately 28 years.  On information and belief, in or about August 2014, Bank of

America began the process of foreclosing on the property located at 6088 S. Hil Mar Circle, District Heights, Maryland, 20747 ("6088 S. Hil Mar"), which is the house immediately next door to Ms. Bushnell's residence.  Bank of America, N.A. became owner of 6088 S. Hil Mar on or about July 20, 2015, and transferred the property to the United States Department of Housing and Urban Development on or about April 29, 2016.  During the time that Bank of America, N.A. owned 6088 S. Hil Mar, Defendants failed to adequately care for, secure, and maintain the property, which caused damage to Ms. Bushnell, her home, and her neighborhood.

38.     Plaintiff Jalen Bushnell is the son of Chevelle Bushnell.  Mr. Bushnell has lived with Ms. Bushnell at 6086 S. Hil Mar Circle, District Heights, Maryland, 20747, for all of his 24 years, except for a period in 2010-13 when he lived part-time with his father.  Defendants' failure to adequately care for, secure, and maintain the property located at 6088 S. Hil Mar caused damage to Mr. Bushnell.

**B.     DEFENDANTS**

39.     Defendant Bank of America, N.A. is a wholly-owned subsidiary of Bank of America Corp. and the entity through which Bank of America Corp. conducts its banking activities.  Defendant Bank of America Corp. is a publicly-traded financial holding company that provides a range of financial services and products in the United States and abroad.  Bank of America Corp. is a Delaware corporation with its principal place of business in Charlotte, North Carolina and is one of the world's largest financial institutions.  The Bank of America Defendants own and maintain REO properties in metropolitan areas in Washington, D.C./Prince George's County, MD; Baltimore, MD; Richmond, Oakland, and Concord, CA; Grand Rapids, MI; Atlanta, GA; Dayton, OH; Columbus, OH; Miami, FL; Dallas, TX; Orlando, FL; Chicago, IL; Milwaukee, WI; Indianapolis, IN; Denver, CO; Memphis, TN; Philadelphia, PA; Toledo,

OH; Kansas City, MO; New Orleans, LA; Vallejo, CA; Cleveland, OH; Suburban Detroit, MI; Gary, IN; Minneapolis, MN; Newark, NJ; Tampa, FL; Hartford, CT; New Haven, CT; Waterbury, CT; Fort Worth, TX; Louisville, KY; Muskegon, MI; Providence, RI; San Antonio, TX; West Palm Beach, FL; Baton Rouge, LA; and Birmingham, AL.  Plaintiffs allege that the Bank of America Defendants engaged in a pattern and practice of discrimination in maintaining and marketing bank-owned homes in white communities more favorably than similar bank-owned homes located in predominantly African-American and Latino neighborhoods in the same metropolitan area.  During the time period of this Complaint, the Bank of America Defendants have contracted with Safeguard to provide property maintenance services for most of the homes owned or controlled by the Bank of America Defendants.

40.    Defendant Safeguard Properties Management, LLC ("Safeguard") is a Delaware limited liability company registered to do business in the State of Maryland.  At all times relevant to this Complaint, Safeguard has conducted business in this District and in the metropolitan areas that are the subject of this Complaint directly and/or through its operating contractors.  Safeguard's business activities include providing services and products related to the management, preservation, maintenance, and marketing of REO properties.  Plaintiffs allege that Safeguard has engaged in a pattern and practice of discrimination through the discriminatory performance of routine maintenance activities with regard to Bank of America-owned homes in communities of color as compared to white communities.

## IV.    FACTS

### A.  BACKGROUND OF DISCRIMINATION AGAINST MINORITY NEIGHBORHOODS AND COMMUNITIES OF COLOR (HISTORICAL CONTEXT OF DEFENDANTS' VIOLATIONS)

41.    The failure to maintain real estate owned by banks in minority communities is a continuation of the well-documented history of residential discrimination against minorities and minority neighborhoods in this country by many financial institutions.  First mortgages were withheld from neighborhoods of color by redlining; more recently, neighborhoods of color were targeted for expensive, predatory, and unfair mortgages; and now a few financial institutions, like Bank of America, are allowing bank-owned homes in neighborhoods of color to deteriorate, become eyesores, create health and safety hazards, and lose value due to lack of routine maintenance.  Defendants' failure to take the minimal actions necessary to maintain and monitor bank-owned homes in African-American and Latino communities equally to bank-owned homes in white communities occurred with full knowledge that their actions and omissions would severely harm minority communities – the very communities that have been repeatedly damaged by discriminatory housing practices and conditions in the past.

42.    Discrimination against persons of color by financial institutions and mortgage lenders is entrenched.  For much of the 20th century, banks did not issue mortgages in minority neighborhoods, literally drawing a red line around these neighborhoods on lending maps and thereby forcing minority homebuyers into the high-price lending arms of finance companies, hard money lenders, and land contracts.

43.    Although the Fair Housing Act of 1968 sought to eliminate these practices, decades later communities of color still lacked access to sound and fair lending products

available to white communities.  As such, these minority communities were ripe for exploitation by predatory lenders during the subprime lending boom of the 1990s and early 2000s.

44.     During this period some lenders and investment banks, including the Bank of America Defendants, sought to profit from the exploding mortgage securitization business. When a residential mortgage is securitized, the original mortgage note is sold immediately to an investment bank, which pools the mortgage with thousands of others to create a Residential Mortgage-Backed Security.  This security is then sold to investors, including hedge funds.

45.     Bank of America played key funding and trustee roles in the securitized loan pools that fueled the lending boom.[4]

46.     To profit from this market, certain lenders sought to expand markets for subprime mortgage products.  These lenders pushed subprime mortgage products, with increasingly unfavorable and risky loan terms, in minority neighborhoods ("reverse redlining").

47.     With reverse redlining, borrowers in neighborhoods of color who qualified for prime loans were deliberately steered into more onerous subprime and predatory loans.  As a result, borrowers who would have been able to keep up with mortgage payments under the terms of a less expensive prime loan became unable to make the more demanding payments required by subprime loans with adjustable rate mortgage ("ARM") terms that raised the monthly mortgage payment every six months.  These types of loans were called "exploding ARMs" because monthly payments would double and even triple within a year.  This practice caused foreclosures and eventual vacancies in properties that otherwise would have remained occupied had the borrowers been given prime loans for which they qualified.

---

[4] Lindsey, Thompson, Cohen, Williamson, *Why Responsible Mortgage Lending Is a Fair Housing Issue*, National Consumer Law Center, n.34 (2012).

48.     During the subprime boom, African-American and Latino borrowers were nearly twice as likely as white borrowers to have one or more "high risk" features or conditions in their loans, such as higher interest rates, teaser rates, interest-only mortgages, adjustable rates, or a prepayment penalty.  Even after controlling for factors such as credit scores and income, African-American and Latino home buyers were 80% and 70% more likely, respectively, to receive a subprime loan than white home buyers.

49.     In 2003, subprime lending accounted for 8% of all mortgage lending, including home refinancing.  By 2006, subprime lending accounted for 28% of the market.  The disparate subprime lending to persons of color was reflected in Home Mortgage Disclosure Act ("HMDA") data.

50.     One of the lenders most involved with pushing subprime mortgage products, and the eventual fallout that resulted, was Countrywide Financial, which Bank of America acquired in 2008.

51.     The subprime lending boom collapsed in 2008, leading to an unprecedented foreclosure crisis.  The crisis hit minority communities especially hard.  During the first years of the crisis, African-Americans and Latinos were nearly 50% more likely to be facing foreclosure than whites, regardless of income.  Foreclosure rates were also directly related to residential segregation:  the more segregated a metropolitan area, the higher its foreclosure rate.  Lenders and investors, such as the Bank of America Defendants, became reluctant owners of properties in communities of color that were disproportionately affected by the foreclosure crisis.

52.     The foreclosure crisis continues to have significant effects across the country. Since mid-2007, more than 7.5 million foreclosures have been completed and 5 million

properties are reported to be substantially underwater, meaning that owners owe 25% more on their mortgages than their homes are worth.

53.     The large volume of foreclosures created a large inventory of vacant homes possessed by banks.  These REO properties surfaced in unprecedented numbers in communities of color after the foreclosure crisis hit.  REO properties present a substantial obstacle for recovery in the communities in which they are located, which suffer negative effects such as a depleted tax base, neighborhood blight, health and safety concerns, and decreased market values, resulting in wealth loss for homeowners who live near foreclosed homes.

54.     Because African-American and Latino homeowners faced disproportionately adverse actions on their loans, the neighborhoods and communities they lived in disproportionately felt the impact.  Estimates are that families affected by nearby foreclosures have lost or will lose a total of 8.8% of their home value.  For residents in African-American or Latino communities, that number doubles to 16% of home value.  The total loss in home equity stripped from communities of color is estimated to be approximately $1.1 trillion.

55.     The Defendants in this case knew or should have known the foregoing facts, including that a large proportion of the Bank of America-owned homes were in neighborhoods of color.  Against this historical backdrop, Defendants are now allowing REO properties in minority communities to deteriorate due to a lack of proper routine exterior maintenance and marketing, causing more damage to these communities.

B.    **DEFENDANTS' REO MAINTENANCE AND MARKETING CONDUCT DISCRIMINATES AGAINST COMMUNITIES OF COLOR**

1.    **Bank of America's Ownership and Defendants' Obligations Relating to REO Properties**

56.    Bank of America is one of the Big Four banks in the United States (along with Citigroup, JPMorgan Chase, and Wells Fargo), as well as one of the largest companies in the world. The Bank of America Defendants engage in a wide variety of banking and financial services activities, including those related to consumer real estate services such as mortgage lending and packaging, refinancing, home equity lines of credit, and home equity loans.[5]

57.    When a mortgage owned by Bank of America goes into default and foreclosure, Bank of America eventually obtains title to the dwelling securing the mortgage. The property is thereafter referred to as a Real Estate Owned or "REO" dwelling. As a consequence of the foreclosure crisis, Bank of America has obtained title to hundreds of thousands of REO dwellings across the country covered by the Fair Housing Act.

58.    Once Bank of America becomes the owner of an REO property, it assumes all duties and responsibilities of ownership, including routine exterior maintenance, while the property is marketed for sale. As a property owner, Bank of America has an affirmative duty to

---

[5] Bank of America also has been one of the financial institutions with the greatest involvement in the formation and development of mortgage-backed securities transactions. One of the parties to mortgage-backed securities transactions is a trustee, who typically receives the assets in exchange for certificates issued to investors evidencing beneficial interests in the assets. Relevant to the properties at issue in this Complaint, the Bank of America Defendants have at times acted in this capacity. The trustee in an asset-backed securities transaction is the legal owner of the assets underlying the transaction for the benefit of the holders of the asset-backed securities. Foreclosure and other legal actions with respect to trust properties must be brought in the name of the trustee as the legal owner of the loans. Any claims against the trust must be brought against the trustee as the trust's legal representative. When a foreclosure occurs on a property that has been packaged under the security, the trustee becomes the legal owner of record of the property and becomes responsible for all legal obligations as owner. Thus, the Bank of America Defendants are liable for any REO dwellings for which they hold title as trustee. As Safeguard has acted as the property preservation company for Bank of America REOs for which the Bank of America Defendants serve as trustee, and thus as Bank of America's agent, Safeguard is liable for any discrimination in the maintenance and marketing of those properties, as well.

know the conditions existing at the foreclosed properties to which it holds title, to maintain all such properties in compliance with all applicable laws, and to take all actions necessary to prevent or abate any unlawful conditions at such properties.

59.     As legal owner of the home, Bank of America is required under the Fair Housing Act to maintain all REO properties, regardless of their location, without regard to race, color, religion, sex, disability, familial status, or national origin.  This responsibility is non-delegable under the Fair Housing Act, whether or not there has been a contractual designation of maintenance and marketing responsibilities to a preservation management company such as Safeguard.

60.     Other parties tasked with preserving and maintaining an REO property, such as Safeguard, also bear responsibility for complying with local laws and regulations and the requirements of the Fair Housing Act.

61.     According to the Federal Reserve Board, "[i]institutions should have policies and procedures in place to ensure that properties are maintained in compliance with federal, state and local laws, including laws governing health and safety, property preservation, fair housing, and property registration…. Further, institutions engaging third-party vendors to carry out functions related to these requirements should ensure that vendors maintain appropriate compliance controls.  Reliance on third-party vendors does not relieve an institution of its compliance responsibilities or liability."  Federal Reserve, Q&As re REOs, No. 20.

62.     Under standard industry practice, the routine exterior maintenance that Defendants are required to perform on all REO properties is objectively measurable, verifiable, and externally visible.  Such maintenance activities include, but are not limited to, mowing, edging, and weeding; trimming shrubs and trees; removing snow, trash, and debris; securing

doors and windows; repairing or replacing loose handrails and steps; and covering holes in the

dwelling.  These routine exterior maintenance functions must be addressed readily and regularly

at every bank-owned home, regardless of the age or value of the property.

63.    There is no public data available to identify when a property preservation

company (and its subcontractors or agents) has been contractually retained for any specific REO

property titled in the name of a bank.  REO owners do not make this information available to the

public.   It is not retrievable from tax or land records.

### 2.    The Organizational Plaintiffs' Investigation of Defendants' Exterior Maintenance and Marketing of Properties

64.    In the aftermath of the foreclosure crisis, the Organizational Plaintiffs received

complaints and concerns regarding the maintenance and marketing of REO properties in

communities of color and became aware of the existence of serious inequities in the manner in

which REO properties in communities of color were maintained and marketed as compared to

the maintenance and marketing of REO properties in white communities.  Consistent with their

missions, the Organizational Plaintiffs acted to investigate the existence and scope of this

problem.

65.    In one of the most extensive fair housing testing programs conducted under the

Fair Housing Act, the Organizational Plaintiffs investigated Defendants' maintenance and

marketing of Bank of America-owned homes in certain metropolitan areas from 2011 to May

2018.[6]  The Organizational Plaintiffs' investigation was conducted in the following metropolitan

areas: Washington, D.C./Prince George's County, MD; Baltimore, MD; Richmond, Oakland,

and Concord, CA; Grand Rapids, MI; Atlanta, GA; Dayton, OH; Columbus, OH; Miami, FL;

---

[6] NFHA first documented differing maintenance between Bank of America-owned homes in communities of color as opposed to white communities in 2009, and immediately notified Bank of America of its findings.

Dallas, TX; Orlando, FL; Chicago, IL; Milwaukee, WI; Indianapolis, IN; Denver, CO; Memphis,

TN; Philadelphia, PA; Toledo, OH; Kansas City, MO; New Orleans, LA; Vallejo, CA;

Cleveland, OH; Suburban Detroit, MI; Gary, IN; Minneapolis, MN; Newark, NJ; Tampa, FL;

Hartford, CT; New Haven, CT;  Waterbury, CT; Fort Worth, TX; Louisville, KY; Muskegon,

MI; Providence, RI; San Antonio, TX; West Palm Beach, FL; Baton Rouge, LA; and

Birmingham, AL.

     66.    The investigation included 1,677 residential dwellings covered by the Fair

Housing Act.  For purposes of this Complaint and the statistical analyses set out below,

"predominantly white neighborhoods" refers to those census block groups with more than 50%

non-Hispanic white residents, and the phrase "communities of color" refers to census block

groups with less than 50% non-Hispanic white residents.

     67.    In each of these metropolitan areas, the Organizational Plaintiffs identified the zip

codes within the metropolitan area that were racially concentrated (e.g. predominantly white or

communities of color) with the highest foreclosure rates.  From those zip codes, the

Organizational Plaintiffs chose the zip codes with high homeownership rates that qualified as

working- or middle-class neighborhoods, based on comparing the zip codes' median income to

those of the metropolitan statistical area and the state.  The Organizational Plaintiffs then

inspected all (100%) of the Bank of America-owned homes in those zip codes within the same

relative time period, unless the properties appeared to be occupied, someone at the property said

they were the new owners, or work was actively occurring at the time of the site visits.  The

exclusion of properties where work was ongoing was to avoid recording adverse conditions that

might be temporary or related to the work being conducted by a new owner.

68.     Bank of America's ownership of the properties was determined by using county property records, records kept by the clerks of courts, RealtyTrac, Bank of America's REO listing website, and other database sources.  Because county recorders occasionally delay recording ownership titles, the data was also crosschecked with other records to verify the ownership of the homes.

69.     The Organizational Plaintiffs evaluated Defendants' maintenance and marketing of these properties according to specific and objective routine exterior maintenance requirements that are standard in the REO property preservation industry and clearly visible by exterior inspection.  The Organizational Plaintiffs' checklist of possible exterior deficiencies is based on standard industry practice as to what constitutes "routine" maintenance, or "minimal" property safety conditions, and is consistent with Freddie Mac requirements, as well as the policies of other banking institutions with REO properties.

70.     All properties can be equally maintained in terms of these routine exterior maintenance requirements, whatever other issues a particular property may have (e.g., interior renovation or other non-routine repair needs), and there is no justification for not conducting routine exterior maintenance.  Thus, no reason exists to expect racial disparities in terms of the observed routine exterior maintenance of properties.  At the same time, exterior maintenance failures drastically affect property sales rates and values of not only the REO property, but also neighboring properties, as well as neighborhood quality of life.

71.     The Organizational Plaintiffs' investigators observed, documented, and photographed the routine exterior maintenance and marketing conditions of the Bank of America-owned homes with respect to over three dozen exterior features.  The Organizational Plaintiffs examined the Bank of America REO properties for the following maintenance or

marketing categories: curb appeal, structure, signage and occupancy, paint and siding, gutters, water damage, and utilities.  Curb appeal factors included trash and/or debris, accumulated mail, overgrown or dead grass, accumulated dead leaves, overgrown or dead shrubbery, invasive plants, and broken or missing mailboxes.  Structural factors included unsecured, broken, or boarded doors, damaged steps or handrails, unsecured, broken, or boarded windows, damaged roofs, damaged fences, holes in the structure of the home, and wood rot.  Signage and occupancy factors included trespassing or warning signs, signage marketing the home as a distressed property, the absence of a professional "for sale" sign, broken or discarded signage, and unauthorized occupancy of the REO property.  Paint and siding factors included peeling or chipped paint, missing or damaged siding, missing or damaged shutters, and graffiti.  Gutter and downspout factors included missing or out of place gutters or downspouts, broken or hanging gutters, and obstructed gutters.  Water damage factors included water damage and the presence of mold, algae, or discoloration.  Utility factors included utilities that were exposed, damaged, or missing.  The Organizational Plaintiffs also utilized a miscellaneous factor under each category for any maintenance or marketing issue that did not fall into any of the other factors (e.g. failure to shovel snow, an unsecured and undrained swimming pool, or dead animals on the property).

72.     To ensure consistency, investigators were thoroughly trained and provided with examples and field terminology.  Training included classroom and field investigations where new investigators were accompanied by NFHA staff or experienced staff from the local fair housing center.  NFHA staff taught investigators how to evaluate a deficiency, complete forms, take photographs, and upload all photos into a central database.  Investigators utilized a glossary of terminology developed by NFHA and its partners at the beginning of this investigation, with

pictures and descriptions to illustrate various examples for documenting deficiencies. The glossary accounted for and illustrated variations in severity for certain deficiency criteria.

73.    The investigators also photographed the routine exterior maintenance and marketing conditions observed. The investigators took photographs of the front of each property, both sides of the property, and the back view of the property when access was available. Whether or not deficiencies were documented, these photographs were taken in order to show the state of REO maintenance at the time of the visit. Investigators also took photographs of the homes across the street and on both sides of the Bank of America-owned home to provide context regarding general routine maintenance of homes in the neighborhood. The investigators' reports and pictures were uploaded into a central database, and each property was assigned a neighborhood designation based on racial or ethnic makeup of the census block group where the address was located.

74.    The Organizational Plaintiffs' tests were conducted over time at different Bank of America-owned homes. In addition, the Organizational Plaintiffs allowed a period of time for the property to be owned by Bank of America so initial maintenance and security could be performed. This grace period provided Bank of America the opportunity to complete its initial maintenance procedures and bring the home up to sale condition standards, as well as to compensate for any routine exterior maintenance problems in the condition of the home at the time the bank took possession.

75.    The Organizational Plaintiffs designed and implemented their testing to assess whether any patterns of differing treatment were apparent across a particular metropolitan area between predominately white neighborhoods and neighborhoods that were predominantly

African-American and/or Latino, as well as whether, when aggregated, the evidence showed a pattern of differing treatment.

76.     The unequal and poor routine exterior maintenance and marketing of the Bank of America-owned homes in communities of color directly caused and resulted in the various harms alleged in this Complaint.

### 3.    Summary of the Overall Results of the Organizational Plaintiffs' Investigation (Aggregate National Findings)

77.     The Organizational Plaintiffs' investigation of Bank of America's REO properties across the nation establishes that Defendants and their agents knowingly and purposefully treated properties differently depending on the racial composition of the neighborhoods in which the properties were located.  In each of the metropolitan areas identified in this Complaint, the REO properties located in predominantly white neighborhoods were better maintained and exhibited fewer maintenance deficiencies than the REO properties located in communities of color. Moreover, the exterior maintenance and marketing deficiencies observed in communities of color were significantly worse than those observed in predominantly white neighborhoods.

78.     In their totality, the data and pictures collected by the Organizational Plaintiffs establish that Defendants failed to perform adequate routine exterior maintenance and marketing of the Bank of America REO properties in communities of color, thereby leaving those Bank of America-owned homes in a state of neglect, while satisfactorily performing routine exterior maintenance and marketing of the Bank of America REO properties in white neighborhoods, thereby leaving those Bank of America-owned homes in a materially better condition.  The Organizational Plaintiffs' testing results support an inference that the differences in exterior maintenance in predominantly African-American and Latino communities and predominantly white communities were not the result of chance or happenstance, but rather were caused by

36

Defendants' intent to treat predominantly African-American and Latino neighborhoods differently. The Organizational Plaintiffs have provided Bank of America with photographic evidence clearly showing the failed maintenance in specific neighborhoods of color compared with standard maintenance in white neighborhoods in the same cities/metro area – and even within the same census tracts – yet Bank of America still has refused to change its policies or practices. And regardless of Defendants' intent, the results of the Organizational Plaintiffs' investigation support a finding that Defendants' policies and practices actually and predictably caused the resulting discriminatory effects experienced by neighborhoods of color.

79.    Examples of Defendants' disparate maintenance and marketing based upon the predominant race or national origin of a neighborhood include the following aggregate findings:

a)    45.0 % of the Bank of America REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 11.0% of the Bank of America REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

b)    91.1% of the Bank of America REO properties in communities of color had five or more maintenance or marketing deficiencies, while only 60.5% of the Bank of America REO properties in predominantly white neighborhoods had five or more maintenance or marketing deficiencies.

c)    64.4% of the Bank of America REO properties in communities of color had trash or debris visible on the property, while only 31.4% of the Bank of America REO properties in predominantly white neighborhoods had trash visible on the property.

d)    53.3% of the Bank of America REO properties in communities of color had overgrown grass or dead leaves, while only 37.5% of the Bank of America REO properties in predominantly white neighborhoods had overgrown grass or dead leaves.

e)    52.5% of the Bank of America REO properties in communities of color had overgrown or dead shrubbery, while only 35.4% of the Bank of America REO properties in predominantly white neighborhoods had overgrown or dead shrubbery.

f)    37.0% of the Bank of America REO properties in communities of color had unsecured or broken doors, while only 16.2% of the Bank of America REO properties in predominantly white neighborhoods had unsecured or broken doors.

g)    49.6% of the Bank of America REO properties in communities of color had damaged, boarded, or unsecured windows, while only 23.5% of the Bank of America REO properties in white neighborhoods had damaged, boarded or unsecured windows.

80.    On an aggregate basis across the communities investigated, the disparities between the routine exterior maintenance and marketing of Bank of America-owned homes in communities of color and the routine exterior maintenance and marketing of Bank of America-owned homes in predominantly white neighborhoods are substantial and statistically significant.

81.    Defendants' racially discriminatory treatment of the Bank of America REO properties is prevalent in each of the cities included herein.  In each of the metropolitan areas identified in this Complaint, the REO properties located in predominantly white neighborhoods

were better maintained and exhibited fewer routine exterior maintenance and marketing deficiencies than the REO properties located in communities of color.

82.     Defendants' racially discriminatory treatment of REO properties is continuous throughout the period of the Organizational Plaintiffs' investigation.  Whether analyzed on a year-to-year basis or over the entire period of the investigation, the same pattern of discriminatory treatment is evident.  From 2011 through 2018, Defendants' continuous practice had the purpose and effect of providing inferior routine exterior maintenance and marketing to REO properties in communities of color, while providing better routine exterior maintenance and marketing to REO properties in predominantly white neighborhoods.

83.     Statistical analysis of the Organizational Plaintiffs' evidence shows a large difference in the average number of exterior maintenance and marketing deficiencies between communities of color and predominantly white neighborhoods, with Bank of America REO properties in communities of color having on average 9.1 deficiencies, while Bank of America REO properties in predominantly white neighborhoods have on average 6.4 deficiencies.



84.    Similarly, the average number of deficiencies in neighborhoods that are over 75%

minority is 9.4, the average in neighborhoods that are 25-75% minority is 7.6, and the average in

neighborhoods that are less than 25% minority is only 5.9.



Total Deficiencies (n=1,465)

85.    Further demonstrating the role of race in Defendants' REO maintenance efforts,

properties with a large number of deficiencies were disproportionately concentrated in

communities of color:  46% of properties in communities of color, but only 17% of those in

predominantly white neighborhoods, had ten or more deficiencies.



86.    Similarly, 48% of properties in communities that are over 75% minority had ten

or more deficiencies and 28% of properties in communities that are 25-75% minority had ten or

more deficiencies, while only 13% of properties that are less than 25% minority had ten or more

deficiencies.



87.    The disparities in the maintenance and marketing of the Bank of America-owned

homes are not explained by non-racial factors.  The Organizational Plaintiffs have conducted a

regression analysis taking into account and controlling for non-racial factors (prior sales dates

and prices, additional property transfer history, local crime statistics, local housing market data,

property age, dwelling size, lot size, the length of time from ownership until the Organizational

Plaintiffs' site visit, and property values) that indicates that routine exterior maintenance and

marketing deficiencies at the Bank of America REO properties in communities of color remain

higher by a statistically significant margin as compared to Bank of America REO properties in

predominantly white neighborhoods.[7]

---

[7] All of the disparities identified in paragraphs 88 through 91 are statistically significant at a 99% confidence level (p<0.001) based on a two-tailed t-test.

88.     The disparities in maintenance at Bank of America-owned homes are consistent in metropolitan areas regardless of their location in the country.  Whether analyzed on a national or a metropolitan area basis, the same pattern of discriminatory treatment is evident.  The consistent and repetitive pattern of discriminatory treatment across cities and throughout the period of the Organizational Plaintiffs' investigation indicates that Defendants' practices are the intended and purposeful result of Defendants' intentional behavior and/or the result of policies and practices set at a management level with responsibility for Defendants' policies nationwide.

89.     These statistical disparities are merely representative of the numerous forms of data and observational evidence collected by the Organizational Plaintiffs establishing the differential treatment by Defendants of communities of color as compared to predominantly white neighborhoods.

90.     Additionally, these statistical disparities are confirmed by the experiences of the Individual Plaintiffs Ms. Onafuwa and the Bushnells, who live next to properties in Maryland that were previously Bank of America-owned homes and who have been harmed by Defendants' poor maintenance of those REOs.

91.     No valid business purposes are served by, or constitute valid excuses for, Defendants' differing maintenance of REO properties based on neighborhood racial composition.

92.     The disparities identified above flow directly from Defendants' discriminatory conduct.  They are traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision.  They are directly related to the zone of interests protected by the Fair Housing Act.

**4. Comparisons of Similarly Situated REO Properties in Specific Cities Demonstrate that Defendants Have Engaged in a Pattern and Practice of Systemic Racial Discrimination in the Cities Served by the Organizational Plaintiffs**

93.     In 37 metropolitan areas, the Organizational Plaintiffs examined Bank of America-owned homes in predominantly white communities and in communities of color that were similarly situated, observed during the same time period, and serviced by Safeguard. Depending on the racial composition of the communities in which they were located, those properties differed strikingly in the level of maintenance they had received.  This pattern remained the same across all 37 metropolitan areas.  Taken together, it is clear that Defendants maintained and treated such properties differently based on the racial composition of the neighborhood.  Defendants' discrimination is exemplified by, but not limited to, the following comparisons of similarly situated properties:

*Baltimore, MD*

94.     In Baltimore, MD:

a.  On November 21, 2017, NFHA visited a Bank of America REO property located at 1232 West Lombard Street, Baltimore, MD, 21223. This property is in a census block group with a white population of 62.03%.  This property had three maintenance deficiencies: a missing for-sale sign, leaves in the window well, and a missing lower downspout.



b.  On November 21, 2017, NFHA visited a Bank of America REO property located at 4714 Amberley Avenue, Baltimore, MD, 21229, next door to Ms. Onafuwa's house.  This property is in a census block group with an African-American population of



93.95%.  This property had six maintenance deficits: a missing for-sale sign, marketed as distressed with an auction sign, boarded windows front and back, trash, leaves, and a missing downspout.



c.  In August 2017, prior to NFHA's investigation of 4714 Amberley, the City of Baltimore condemned and demolished the collapsing, rat-infested garage at the property.  Defendants also routinely failed to conduct basic maintenance at 4714 Amberley, such as cutting the grass and cleaning up trash and debris in the front and back yards, as demonstrated by the following photos taken by Ms. Onafuwa and her neighbors.

   

*Baton Rouge, LA*

95.    In Baton Rouge, LA:

    a.    On May 7, 2013, GNOFHAC visited a Bank of America REO property located at 4044 Meadow Ridge Dr., Baton Rouge, LA, 70817.  This property is in a census block group with a white population of 83.22%.  This property had only one maintenance deficit: a missing for-sale sign.

    b.    On May 8, 2013, GNOFHAC visited a Bank of America REO property located at 6987 Rio Dr., Baton Rouge, LA, 70812.  This property is in a census block group with an African-American population of 85.36%.  This property had 13 deficiencies: accumulated mail, uncapped electrical cables, a missing for-sale sign, overgrown grass, invasive weeds, overgrown shrubbery, trash around the property, missing planks on the deck, and an uncovered hole where a light fixture had been with dangling wires.

*Birmingham, AL*

96.    In Birmingham, AL:

    a.    On June 12, 2016, FHCNA visited a Bank of America REO property located at 8801 Sharit Dairy Road, Gardendale, AL, 35071.  This property is in a census block group with a white population of 96.55%.

This property had three maintenance deficiencies: a missing for-sale sign, accumulated mail, and overgrown shrubs.

b. On June 12, 2016, FHCNA visited a Bank of America REO property located at 8020 5th Avenue South, Birmingham, AL, 35206.  This property is in a census block group with an African-American population of 79.55%.  This property had 10 deficiencies: an unsecured door, trash, a missing for-sale sign, dirt instead of grass in the yard, overgrown shrubbery, invasive weeds, damaged fence, peeling paint, and unprotected electrical utilities.  The door had a lockbox, but it was unlocked.





*Chicago, IL*

97.    In Chicago, IL:

a. On October 4, 2013, HOPE FHC visited a Bank of America REO property located at 2311 Brookwood Ct., Aurora, Il, 60504.  This property is in a census block group with a white population of 67.61%.  This property had only one maintenance deficiency: an out-of-place downspout.



46

b. On October 4, 2013, HOPE FHC visited a Bank of America REO property located at 921 Talma St., Aurora, Il, 60505.  This property is in a census block group with a Latino population of 77.4%.  The neighbors' homes were well maintained.  This Bank of America REO had 13 maintenance deficits: boarded windows, uncovered broken windows, trash in the backyard, a missing fencing/gate, a missing/broken shutter, invasive plants, an ajar back door, missing utility meters, and overgrown shrubbery.



*Denver, CO*

98.    In Denver, CO:

a. On October 7, 2014, DMFHC visited a Bank of America REO property located at 15064 East Crestridge Drive, Centennial, CO, 80015.  This property is in a census block group with a white population of 73.32%.  This property had only two maintenance deficiencies: a missing for-sale sign and a screen left in the window well.



b.  On October 9, 2014, DMFHC visited a Bank of America REO property

located at 13821

Randolph Place,

Denver, CO,

80239.  This



property is in a census block group with a Latino

population of 67.12%.  This property had 13

maintenance deficiencies: a cracked window, broken

basement windows, excessive amounts of

trash/debris, a graffiti-covered shed, overgrown



weeds, overgrown grass, and trash in window wells with a broken window.

*Fort Worth, TX*

99.  In Fort Worth, TX:

a.  On February 2, 2016, NTFHC visited a Bank of America REO property

located at 4668 Feathercrest Drive, Fort

Worth, TX, 76137.  This property is in a

census block group with a white population of

52.29%.  This property had three maintenance

deficiencies: a missing for-sale sign, some dead grass, and chipped paint on

the garage trim.

b.  On February 2, 2016, NTFHC visited a Bank of America REO property

located at 5549 Eisenhower Drive, Fort Worth, TX, 76112.  This property is

in a census block group with an African-American population of 98.52%.

This property had nine maintenance deficiencies: a missing for-sale sign, a broken light fixture, overgrown grass, invasive weeds, boarded windows, and exposed/uncapped electrical lines.

 

*Grand Rapids, MI*

100.    In Grand Rapids, MI:

    a.    On August 14, 2013, FHCWM visited a Bank of America REO property located at 457 Mae-Thy, Wyoming, MI, 49548.  This property is in a census block group with a white population of 62.45%. This property had only one maintenance deficit: a missing for-sale sign.



    b.    On August 14, 2013, FHCWM visited a Bank of America REO property located at 1325 Dickinson St SE, Grand Rapids, MI 49507.  This property is in a census block group with an African-American population of 51.77%.  This property had nine maintenance deficiencies: a missing for-sale sign, trash, accumulated mail, overgrown shrubbery,

 

damaged siding, chipped paint, dead leaves, and a boarded window pane on the storm door.

*West Palm Beach, FL*

101.   In West Palm Beach, FL:

a.   On January 21, 2014, FHCGPB visited Defendant's REO property located at 219 Bilbao Street, Royal Palm Beach FL 33411.  This property is in a census block group with a White population of 51.7%. This property had five maintenance deficiencies: trash and debris, overgrown shrubbery, missing shutters, missing gutters, and pervasive mold.

b.   On January 21, 2014, FHCGPB visited Defendant's REO property located at 905 Bunker Road, West Palm Beach FL 33405.  This property is in a census block group with a non-White population of 76.6%. This property had 10 maintenance deficits: trash and debris, an uncovered and undrained pool, broken and boarded windows, a damaged roof, no   "for sale" sign, ripped window screens, eviction signage, peeling and chipped paint, pervasive mold, and exposed or tampered-with utilities.

50

*Newark, NJ*

102.    In Newark, NJ:

    a.    On August 4, 2015, NFHA visited Defendant's REO property located at 16 Van Wagoner Avenue, Clinton NJ 07013. This property is a census block group with a White population of 69.2%.  This property had three maintenance deficiencies: trash and debris, overgrown or dead shrubbery, and a damaged roof.



    b.    On August 5, 2015, NFHA visited Defendant's REO property located at 147 7th Avenue, Roselle NJ 07203.   This property is in a census block group with an African American population of 57.1%.  This property had 12 deficiencies: trash and debris, accumulated mail, overgrown grass or dead leaves, overgrown or dead shrubbery, invasive plants, unsecured doors, boarded windows, a damaged fence, no "for sale" sign, peeling and chipped paint, missing gutters, and obstructed gutters.





*Providence, RI*

103.    In Providence, RI:

    a.    On July 8, 2015, NFHA visited Defendant's REO property located at 108 Rome Avenue, Providence RI 02908.  This property is in a census block group with a

White population of 69.5%.  This property had

four maintenance deficiencies: missing handrails,

no "for sale" sign, peeling and chipped paint, and

missing gutters.



b.  On July 8, 2015, NFHA visited Defendant's REO property located at 118-120

Progress Avenue,

Providence RI 02909.  This

property is in a census

block group with a Latino

population of 66.5%.  This




property had 13 maintenance deficits: trash and

debris, accumulated mail, overgrown or dead

shrubbery, invasive plants, fireworks debris left in

the yard, unsecured and boarded doors, wood rot, no

"for sale" sign, graffiti, peeling and chipped paint,



damaged siding, missing gutters, and exposed or tampered-with utilities.

## C.  THE ORGANIZATIONAL PLAINTIFFS INFORMED DEFENDANTS OF THE RACIALLY DISPARATE CONDITION OF THE BANK OF AMERICA REO PROPERTIES, BUT DEFENDANTS HAVE NOT ALTERED THEIR DISCRIMINATORY BEHAVIOR

104.    When the National Fair Housing Alliance initially decided to look into the issue

of maintenance of bank-owned homes, it examined REOs owned by Bank of America and two

other entities.  NFHA then contacted each entity and shared information and photographs

demonstrating the nature and extent of the difference in treatment of REO properties in

neighborhoods of color as compared to white neighborhoods, and provided each entity with

recommendations for correcting the discriminatory treatment.  Only one of those entities

(Freddie Mac) decided to review its REO maintenance, which resulted in the company

implementing major changes to guarantee that routine exterior maintenance would be conducted

at every Freddie Mac-owned home, regardless of neighborhood.  After many meetings with

high-level representatives and counsel from Bank of America over 18 months in 2009 and 2010,

it became clear that Bank of America would not improve its REO maintenance practices or

polices.  NFHA then decided to expand its investigations of Bank of America-owned homes,

working with the other Organizational Plaintiffs.  The results of these additional investigations

confirm that there has been no change in the pattern of disparities between maintenance and

marketing of REO properties in predominantly white neighborhoods as compared to

neighborhoods of color

105.    As part of its investigation efforts, in 2011 NFHA held a national webinar-based

news conference and released a report analyzing and describing the discriminatory maintenance

and marketing of white and non-white REO properties, as well as offering recommendations that

would minimize or eliminate discriminatory issues of differing treatment.  The release of this

comprehensive report placed Defendants on notice again that their discriminatory conduct and

practices violate the Fair Housing Act.  NFHA released additional comprehensive reports

addressing these issues in 2012 and 2014.

106.    The Organizational Plaintiffs also alerted the Bank of America Defendants that

their discriminatory conduct and practices violate the Fair Housing Act through the previously

mentioned HUD administrative complaint filed on September 25, 2012, and amended on October

10, 2012, October 23, 2012, September 25, 2013, November 14, 2013, September 30, 2014, and

August 31, 2016.

107.     On information and belief, at all times since 2012, the Bank of America

Defendants have kept Safeguard informed regarding the Organizational Plaintiffs' findings,

contentions, and allegations.  Additionally, since NFHA named Bank of America in the reports

released in 2012 and 2014, Safeguard has been aware of the Organizational Plaintiffs' findings,

as Safeguard is the preservation management company for nearly all Bank of America-owned

homes.

108.     Despite the Organizational Plaintiffs' attempts to persuade the Bank of America

Defendants to voluntarily comply with the Fair Housing Act, the Bank of America Defendants

and Safeguard did not and have not changed their behavior.  With deliberate indifference to the

purpose and effects of their discriminatory policies, practices, and conduct, Defendants have

continued to maintain Bank of America-owned homes in a discriminatory manner based on the

predominant race and national origin of neighborhoods, as evidenced by the most recent

investigations conducted in November 2017 and May 2018.  Defendants' discriminatory

maintenance and marketing of REO properties in communities of color violates the rights of

homeowners and residents in these neighborhoods, causes particularized and concrete injury to

these homeowners and residents, and otherwise makes housing unavailable in communities of

color.

### D.  DEFENDANTS HAVE ENGAGED IN A PATTERN AND PRACTICE OF SYSTEMIC AND INTENTIONAL RACE DISCRIMINATION IN EACH OF THE CITIES SERVED BY THE ORGANIZATIONAL PLAINTIFFS

109.     A "pattern or practice" of discrimination refers to systemic intentional

discrimination affecting a large group of persons.  Statistical evidence of a sufficiently gross

disparity over time between the affected population and the general population may establish an

inference of intentional discrimination.

110.    To prove systemic discrimination, a plaintiff must show that the discrimination was the defendant's standard operating procedure, more than the mere occurrence of isolated or sporadic discriminatory acts.  A plaintiff can establish that discrimination was the defendant's standard operating procedure by, among other things, presenting statistical evidence of similarly situated persons not in the protected class who were treated better than those in the protected class.

111.    The Organizational Plaintiffs' findings by metropolitan area reveal Defendants' systemic pattern and practice of providing manifestly inferior routine exterior maintenance and marketing services for REO properties in African-American and Latino communities, thereby discriminating on the basis of race and national origin.  The extensive testing evidence generated by the Organizational Plaintiffs displays a clear and consistent pattern and regular practice of differing routine exterior maintenance and marketing based on neighborhood racial composition. There is no business or other justification for this conduct.

112.    Defendants' policies, practices, and intentional conduct actually and predictably caused the gross statistical disparities in the maintenance and marketing of properties in neighborhoods with different racial and ethnic compositions.

113.    The differences in routine exterior maintenance and marketing at the Bank of America REO properties are consistent in metropolitan areas regardless of their location in the country.  Whether analyzed on a national or metropolitan area basis, the same pattern and practice of discriminatory treatment is evident.  The consistent and repetitive pattern of discriminatory treatment across cities and over the span of time indicates that practices resulting in discrimination at the Bank of America REO properties were approved, occurred, or condoned at a high level of management.

114.    Defendants failed to comply with state and local laws regarding property maintenance, in that the Organizational Plaintiffs' observations of various deficiencies during their investigation of the Bank of America-owned homes included many examples of conduct typically violating local codes and ordinances.  Indeed, the garage of the Bank of America-owned home next door to Plaintiff Wanda Onafuwa's home was in such poor condition that the City of Baltimore condemned and demolished the building, after Defendants ignored requests from Ms. Onafuwa and her neighbors to deal with the garage.

115.     In communities of color, Defendants deviated from well-established practices concerning property maintenance and preservation, which include upkeep of the routine exterior maintenance items the Organizational Plaintiffs visually investigated during their testing of Bank of America-owned homes.

116.    Appendix A to this Complaint, incorporated herein by reference, sets forth the Organizational Plaintiffs' detailed findings by Metropolitan Area and violation type.

117.    In every metropolitan area except for Dayton, Ohio and Hartford, Connecticut, there were substantially more REO properties in white neighborhoods than in neighborhoods of color that had fewer than five routine exterior maintenance or marketing deficiencies.

118.    In all areas, there were substantially more REO properties in neighborhoods of color than in predominantly white neighborhoods that had more than 10 deficiencies.

119.    In many cities, certain REO properties in neighborhoods of color had more than 15 deficiencies (a condition seen far less often in white communities).

120.    The Organizational Plaintiffs investigated Bank of America REO properties in the following metropolitan areas and found substantial differing treatment and disparities in properties as between neighborhoods of color and white neighborhoods with respect to the

number of properties (a) having fewer than five deficiencies, (b) having more than five

deficiencies, and (c) having more than 10 deficiencies, as follows:

| Metropolitan Area / City | # of Bank of America REOs Investigated | More White REOs with Less than 5 Deficiencies | More Non-White REOs with More than 5 Deficiencies | More Non-White REOs with More than 10 Deficiencies |
|---|---|---|---|---|
| Atlanta, Georgia | 116 | X | X | X |
| Baltimore, Maryland | 62 | X | X | X |
| Baton Rouge, Louisiana | 33 | X | X | X |
| Birmingham, Alabama | 29 | X | X | X |
| Chicago, Illinois | 90 | X | X | X |
| Cleveland, Ohio | 23 | X | X | X |
| Columbus, Ohio | 40 | X | X | X |
| Dallas, Texas | 88 | X | X | X |
| Dayton, Ohio | 39 | | | X |
| Denver, Colorado | 65 | X | X | X |
| Detroit, Michigan | 51 | X | X | X |
| Fort Worth, Texas | 15 | X | X | X |
| Gary, Indiana | 22 | X | X | X |
| Grand Rapids, Michigan | 134 | X | X | X |
| Greater Palm Beaches, FL | 25 | X | X | X |
| Hartford, Connecticut | 15 | | | X |
| Indianapolis, Indiana | 24 | X | X | X |
| Kansas City, Missouri | 28 | X | X | X |
| Louisville, Kentucky | 31 | X | X | X |
| Memphis, Tennessee | 50 | X | X | X |
| Miami / Ft Lauderdale, FL | 43 | X | X | X |
| Milwaukee, Wisconsin | 134 | X | X | X |
| Minneapolis, Minnesota | 20 | X | X | X |
| Muskegon, Michigan | 28 | X | X | X |
| New Haven, Connecticut | 16 | X | X | X |
| New Orleans, Louisiana | 33 | X | X | X |
| Newark, New Jersey | 34 | X | X | X |
| Oakland, Richmond, & Concord, California | 61 | X | X | X |
| Orlando, Florida | 38 | X | X | X |
| Philadelphia, Pennsylvania | 65 | X | X | X |
| Providence, Rhode Island | 12 | X | X | X |
| San Antonio, Texas | 23 | X | X | X |
| Tampa, Florida | 42 | X | X | X |
| Toledo, Ohio | 44 | X | X | X |
| Vallejo, California | 24 | X | X | X |

| | | | | |
|---|---|---|---|---|
| Washington, D.C. & Prince George's Cty., MD | 63 | X | X | X |
| Waterbury, Connecticut | 17 | X | | X |

## E. DEFENDANTS HAVE ACTED WITH DISCRIMINATORY INTENT

121.    Fair housing testing evidence, by itself or in conjunction with other evidence, is a well-established method of proving discrimination in cases alleging violations of the Fair Housing Act.  The facts revealed by fair housing testing evidence may be sufficient on their own to establish intentional discrimination, as they are in this case.

122.    Intentional discrimination occurs when a defendant acts, at least in part, because of the actual or perceived race or national origin of the alleged targets of discriminatory treatment.  Various factors are probative of intent to discriminate, including, but not limited to, statistics demonstrating a clear pattern unexplainable on grounds other than discriminatory ones, the historical background of a decision, the specific sequence of events leading up to the challenged decision, and the defendant's departures from its normal procedures or substantive considerations.  Evidence of a consistent pattern of actions that have a much greater harm on persons of color than on white persons is highly probative.

123.    Defendants committed intentional discrimination by acting and/or failing to act on the basis of race and national origin in their provision of inferior and unequal routine exterior maintenance and marketing to Bank of America REO properties in communities of color.  This intentional discrimination is evidenced by various facts including, but not limited, to the following:

a.    The severity and pervasiveness of the disparities between the maintenance and marketing of Bank of America REO properties in communities of color and the

58

maintenance and marketing of Bank of America REO properties in white neighborhoods, as found by the comparative testing described above;

b.      The absence of credible, non-pretextual explanations for the disparities other than race;

c.      Defendants' knowledge of systemic racial disparities between the maintenance and marketing of Bank of America REO properties in communities of color and the maintenance and marketing of Bank of America REO properties in white neighborhoods, and their refusal to take responsive actions;

d.      Defendants' failure to comply with state and local laws governing property maintenance in African-American and Latino communities;

e.      Defendants' lack of responsiveness to complaints regarding REO maintenance in communities of color;

f.      Statistical analysis controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until the Organizational Plaintiffs' site visit, and property value), which indicates that routine exterior maintenance and marketing deficiencies at Bank of America REO properties in communities of color cannot be explained on the basis of factors other than race;

g.      Defendants' knowledge of the foreseeable and continuing consequences of Defendants' conduct on communities of color;

h.      Defendants' deviation in communities of color from well-established standards and practices regarding exterior property maintenance;

i.      Evidence of prior intentional discriminatory conduct by Defendants toward

African-Americans and Latinos including, but not limited to, predatory loan practices,

which created the conditions based upon which the discriminatory conduct in this case

could occur;

j.      Defendants' knowledge of the historical and continuing pattern of discrimination

against African Americans and Latinos by the financial and property service provider

industries, including Defendants;

k.      Evidence of a general pattern of intentional unlawful conduct and corrupt

corporate culture with respect to Bank of America extending to such matters as race

discrimination in lending and hiring, money laundering, market rigging, securities fraud,

violating United States Government-imposed sanctions, and concealing financial losses.

124.    This is not the first time Defendants have been found to have acted unlawfully in

the housing finance context.  In 2011, Bank of America paid $335 million to settle charges that

Countrywide Financial Corporation, which Bank of America acquired in 2008, had discriminated

against minority customers by charging them higher fees and interest rates on mortgages.

125.    In 2014, Bank of America reached a $16.65 billion settlement with the

Department of Justice – the largest civil settlement with a single entity in U.S. history – to

resolve claims that Bank of America and its subsidiaries Countrywide Financial Corporation and

Merrill Lynch misled investors in their packaging, marketing, sale, arrangement, structuring, and

issuance of mortgage-backed securities (RMBS), committed fraud related to collateralized debt

obligations (CDOs), and engaged in improper underwriting and origination of mortgage loans.

126.    Safeguard has faced claims across the country that it has illegally entered people's

homes, removed their belongings, and locked them out before the foreclosure process is

complete.  The Illinois attorney general settled a suit against Safeguard regarding these practices for $1 million in June 2015, and Safeguard settled a similar suit with the attorney general of Maryland in August of the same year.

127.    Moreover, the evidence establishing that Defendants' policies and practices have a disparate impact on communities of color is also highly probative of Defendants' motives, because "a racial imbalance is often a telltale sign of purposeful discrimination."  *Int'l Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 339-40 n.20 (1977).  Evidence of a disproportionate outcome can provide an important starting point in establishing a claim of intentional discrimination.  Thus, Defendants' maintenance policies and practices, discussed below, are also relevant to Plaintiffs' claim that Defendants' inferior and inadequate maintenance disproportionately occurring in communities of color is intentional.

## F.   DEFENDANTS' REO MAINTENANCE AND MARKETING POLICIES AND PRACTICES HAVE A DISPROPORTIONATELY DISCRIMINATORY IMPACT ON COMMUNITIES OF COLOR

128.    Policies and practices based on race-neutral factors may cause an unjustified adverse impact on homeowners in communities of color.  In this case, the pervasiveness of the discriminatory conditions relating to the Bank of America REO properties indicates that Defendants operate under policies and practices regarding the maintenance of REO properties that have an unjustified adverse disparate impact on communities of color.

129.    The Bank of America Defendants have adopted a uniform policy of outsourcing to third parties compliance with the statutory and common law obligations that are placed on owners of real property, without appropriate monitoring or review.

130.    The Bank of America Defendants have a policy of not investigating or assessing the fitness or ability of the retained third parties to act in compliance with obligations imposed under the Fair Housing Act.

131.    The Bank of America Defendants have a policy of not providing guidance, oversight, or review of the activities left to the discretion of retained third parties.

132.    The foregoing policies have a disproportionately adverse impact on communities of color, as shown by the statistical disparities and regression analysis described in this complaint.  These policies have operated in combination with the known higher foreclosure rates in neighborhoods of color resulting from predatory lending to minority borrowers during the subprime lending boom.  The policies and practices of the Bank of America Defendants have adversely impacted communities of color by causing retention of unqualified and unsupervised third parties who lack incentives to comply with legal obligations regarding the maintenance of the Bank of America properties in communities of color and who are unsupervised and unmonitored by a property owner in the performance of their duties.

133.    No valid business purposes are served by the foregoing policies, and there is no business justification for failing to undertake basic maintenance of REO properties on a regular basis in communities of color.

134.    Based on available information, it appears that the Bank of America Defendants have employed other standard policies and practices in connection with the operation of their businesses that have a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color.  For example, the Bank of America Defendants have deliberately outsourced routine exterior maintenance work to a large national company without community ties, knowledge, or expertise to service REO properties in communities of color.

135.     Further, the Organizational Plaintiffs' data establishes that Bank of America based exterior maintenance of REO properties on the age and/or the value of the properties. Policies and practices based on the age or value of residential property can result in an adverse impact in communities of color, which HUD and other federal financial regulatory agencies noted as early as 1994.  The Bank of America Defendants' maintenance practices and policies that are linked to an REO property's age and/or value cause inferior maintenance to occur disproportionately in communities of color.

136.     Defendant Safeguard also appears to have employed standard policies and practices in the operation of its business that have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color, although the details of their policies are not publicly disseminated.  Based on available information, it appears that these policies include:

    a.   Adopting and following the Bank of America policy of outsourcing REO maintenance to third parties without appropriate monitoring or review;

    b.   Adopting and following the Bank of America policy of basing exterior maintenance practices and policies on the age and/or value of an REO property;

    c.   Employing arbitrary methods of allocating resources to the maintenance of REO properties;

    d.   Avoiding customary real estate brokers, listings, and channels in favor of Internet sites used primarily for auctions and by investors, with the predictable result of cash sales or bulk sales to investors, which adversely impact neighborhoods of color by decreasing sales to homeowner-occupants; and

      e.    Allowing third-party contractors and lower-level employees to exercise very significant levels of discretion with inappropriately minimal input or oversight from Defendants.

137.    Separately and in combination, Defendants' maintenance policies and practices are a cause of inferior and inadequate maintenance disproportionately occurring in communities of color.

138.    The parameters of these policies are material to this litigation and constitute proper subjects of discovery.  Based upon the pervasiveness of the discriminatory conditions relating to the Bank of America REO properties, there is a substantial likelihood that additional policies and practices of Defendants have a disproportionately adverse impact on communities of color.

## G.  DEFENDANTS' DISCRIMINATORY MAINTENANCE AND MARKETING OF REO PROPERTIES PERPETUATES SEGREGATION

139.    One of the fundamental purposes of the Fair Housing Act is to eliminate segregated housing patterns and to increase integration.

140.    The "dissimilarity index" is a well-recognized standard for evaluating a community's level of segregation.  The index measures whether one particular racial group is distributed across census tracts in a metropolitan area in the same way as another racial group.  A high dissimilarity index indicates that the two groups tend to live in different tracts.  The index ranges from 0 to 100.  A value of 60 or more is considered a very high level of segregation.  It means that 60% (or more) of the members of one group who reside in the area would need to move to a different tract within that area for the two groups to be equally distributed.  Values between 40 and 50 demonstrate a moderate level of segregation, and values of 30 or below indicate a low level of segregation.

141.    The cities in which the Organizational Plaintiffs investigated Defendants'
maintenance of the Bank of America REO properties are in metropolitan areas that are racially
segregated, as indicated by having the following dissimilarity indices:[8]

| Metropolitan Area | 2010 Black-White Dissimilarity Index | 2010 Hispanic-White Dissimilarity Index |
|---|---|---|
| Atlanta, Georgia | 58.4 | 49.4 |
| Baltimore, Maryland | 64.3 | 39.8 |
| Baton Rouge, Louisiana | 57.2 | 32.7 |
| Birmingham, Alabama | 65.2 | 44.5 |
| Chicago, Illinois | 75.2 | 56.3 |
| Cleveland, Ohio | 72.6 | 52.3 |
| Columbus, Ohio | 60.0 | 41.4 |
| Dallas, Texas | 55.5 | 50.3 |
| Dayton, Ohio | 63.3 | 27.3 |
| Denver, Colorado | 59.4 | 48.8 |
| Detroit, Michigan | 79.6 | 51.8 |
| Fort Worth, Texas | 56.3 | 45.6 |
| Gary, Indiana | 76.8 | 43.7 |
| Grand Rapids, Michigan | 61.4 | 50.4 |
| Greater Palm Beaches, Florida | 57.3 | 42.6 |
| Hartford, Connecticut | 62.3 | 58.4 |
| Indianapolis, Indiana | 64.5 | 47.3 |
| Kansas City, Missouri | 58.6 | 44.4 |
| Louisville, Kentucky | 56.2 | 38.7 |
| Memphis, Tennessee | 62.2 | 50.7 |
| Miami, Florida | 64.0 | 57.4 |
| Milwaukee, Wisconsin | 79.6 | 57.0 |
| Minneapolis, Minnesota | 50.2 | 42.5 |
| Muskegon, Michigan | 71.2 | 30.4 |
| New Haven, Connecticut | 62.2 | 54.4 |
| New Orleans, Louisiana | 63.3 | 38.3 |
| Newark, New Jersey | 78.0 | 62.6 |
| Oakland, Richmond, and Concord, California | 56.6 | 48.3 |
| Orlando, Florida | 49.3 | 40.2 |
| Philadelphia, Pennsylvania | 67.0 | 55.1 |
| Providence, Rhode Island | 50.8 | 60.1 |
| San Antonio, Texas | 47.7 | 46.1 |
| Toledo, Ohio | 63.2 | 31.4 |

[8] Source: https://s4.ad.brown.edu/projects/diversity/segregation2010/.

| | | |
|---|---|---|
| Tampa, Florida | 54.3 | 40.7 |
| Vallejo, California | 41.5 | 29.2 |
| Washington, D.C. & Prince George's County, Maryland | 61.0 | 48.3 |
| Waterbury, Connecticut | 39.0 | 44.8 |

142.    The cities in which the Defendants' maintenance and marketing of Bank of America REO properties were investigated are moderately or highly segregated under the dissimilarity index measure.  The fact of high rates of segregation in these cities was known to Defendants.

143.    By failing to maintain and market REO dwellings in communities of color according to the same standards they employ for REO dwellings in predominantly white neighborhoods, Defendants have perpetuated segregation in several ways.

144.    This failure to maintain and market REO dwellings in communities of color according to the same standards employed in predominantly white neighborhoods has stigmatized communities of color as less desirable than predominantly white communities.  The prospects for integration in the affected communities have been reduced because buyers are deterred from purchasing properties in neighborhoods with poorly maintained REO properties, leaving the segregated racial composition of these neighborhoods unchanged.

145.    The existence of poorly maintained REO dwellings in minority neighborhoods diminishes home values for surrounding homeowners.  Lower home values in communities of color restrict the ability of minority homeowners to move to majority-white or integrated neighborhoods by reducing the equity they can utilize to buy a new home.

146.    As a result of Defendants' discriminatory maintenance and marketing of the Bank of America REO properties, Defendants have thwarted Congressional efforts to eradicate

segregated housing patterns, and neighborhood residents have been deprived of the social, economic, and professional benefits of living in an integrated community.

## V.     INJURIES CAUSED BY DEFENDANTS' BEHAVIOR

147.     Based on local complaints and information received from neighbors of bank-owned homes, as well as their own observations, and consistent with their missions, the Organizational Plaintiffs investigated the maintenance and marketing of REO properties and determined that a larger, systemic problem existed.  Prior to pursuing administrative action or litigation directed toward this problem, Plaintiff NFHA published and disseminated reports describing the Organizational Plaintiffs' findings and held news conferences in the hope that Defendants would voluntarily undertake remedial actions.

148.     As described in more detail below, the failure of Defendants to respond to this situation has led the Organizational Plaintiffs to incur substantial expenditures and damages that might have otherwise been avoided.

149.     Defendants' failure to properly maintain and market REO properties in communities of color has also harmed Ms. Onafuwa and the Bushnells by causing physical damage to their homes, as well as causing them emotional distress and mental anguish due to the insecurity and danger of living next door to neglected, vacant properties.

## A.  INJURY TO THE ORGANIZATIONAL PLAINTIFFS

150.     Defendants' unlawful, discriminatory conduct has proximately caused injury to each of the Organizational Plaintiffs by: (a) undermining the Organizational Plaintiffs' education, advocacy, and training programs designed to promote fair housing and fair lending; (b) requiring the Organizational Plaintiffs to divert scarce resources away from their usual activities and instead to devote substantial time to evaluating properties, reviewing data,

interviewing witnesses, engaging in an education and outreach campaign, and developing educational materials to identify and address Defendants' racially discriminatory maintenance practices; (c) frustrating the Organizational Plaintiffs' mission of increasing fair housing for all Americans and in all neighborhoods, regardless of race, color, or national origin; (d) frustrating the Organizational Plaintiffs' mission of eliminating racial segregation in their communities; (e) harming the communities that the Organizational Plaintiffs serve; and (f) impeding the Organizational Plaintiffs' community investment programs designed to stabilize neighborhoods of color and increase home ownership for all persons in these same neighborhoods.

151.    By causing the Organizational Plaintiffs to expend substantial time and resources investigating and counteracting Defendants' unlawful conduct, Defendants have harmed the Organizational Plaintiffs economically by forcing them to divert resources away from their usual education, counseling, investigation, and capacity-building activities and services.  As Defendants' discriminatory activities persist, addressing and counteracting Defendants' discriminatory conduct will continue to require a substantial diversion of resources by the Organizational Plaintiffs away from their usual activities.

152.    To identify and counteract Defendants' discriminatory conduct, the Organizational Plaintiffs had to divert scarce resources and time away from other projects and programs.  These expenditures were not initially included in the Organizational Plaintiffs' budgets.  As a result, each Organizational Plaintiff had to pull resources away from other planned and budgeted projects to garner the resources necessary to counteract Defendants' behavior.  New grant applications had to be refocused from longstanding needs to address the immediate problems caused by Defendants' failure to maintain Bank of America-owned homes in minority neighborhoods.

153.    Because of the measures the Organizational Plaintiffs were forced to take to identify and counteract Defendants' discriminatory practices, the Organizational Plaintiffs were forced to delay, suspend, or forego other existing programs or projects.  For example, NFHA had to forego conducting sales investigations to combat racial steering because staff was needed to conduct REO investigations across the country.  Despite this effect on the Organizational Plaintiffs' other programs and services, the Organizational Plaintiffs nevertheless diverted resources to these counteractive measures because, if left unaddressed, Defendants' discriminatory policies and practices would detrimentally impact the Organizational Plaintiffs' communities and the constituents they serve.

154.    Defendants' discriminatory conduct has also injured the Organizational Plaintiffs economically by hindering the Organizational Plaintiffs' community investment efforts.  Over a course of years, the Organizational Plaintiffs have provided millions of dollars to promote residential integration and increase home ownership and accessible housing through grant programs to local housing non-profit organizations in communities included within this Complaint.  The Organizational Plaintiffs also provided funding through non-profit organizations to neighborhoods in cities that are part of this Complaint to conduct education and outreach regarding REO best practices, to foster home ownership, to assist with rebuilding predominantly African-American and Latino neighborhoods affected by the foreclosure crisis, to promote diverse, inclusive communities, and to provide employment opportunities for persons living in these neighborhoods.  These funds have been leveraged to obtain additional corporate funding and foundation grants for the same communities of color.  These efforts have allowed homeowners to remain in their homes through foreclosure prevention or home repair grants, have rehabilitated abandoned or blighted dwellings, and have made housing units accessible to

persons with disabilities, including veterans.  The funds have also been used to establish pocket parks and implement neighborhood beautification programs to make communities desirable and the focus of increased interest by real estate agents.

155.    These financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America-owned homes in the same communities.

156.    In an effort to address and attempt to counteract the effects of Defendants' discriminatory conduct prior to the filing of this action, each of the Organizational Plaintiffs engaged in community outreach and public efforts to raise awareness of these discriminatory practices in the communities they serve.

157.    The diversion and expenditure of financial resources and staff time included, but was not limited to:  time and costs associated with drafting and distributing educational materials; mailing costs and graphic design expenses; travel time and expenses; and staff hours diverted from other work to conduct research activities.

158.    The foregoing injuries have caused the Organizational Plaintiffs to incur costs that are above and beyond their normal operational activities and costs.

159.    The foregoing injuries that the Organizational Plaintiffs have suffered as a result of Defendants' conduct fall within the zone of interests protected by the Fair Housing Act.

**B.  INJURIES TO INDIVIDUAL ORGANIZATIONAL PLAINTIFFS**

160.    Each Organizational Plaintiff has suffered particularized and concrete injuries caused by Defendants' discriminatory conduct.

**Plaintiff National Fair Housing Alliance**

161.    Over the course of eight years, Plaintiff NFHA has conducted hundreds of tests of Bank of America REO properties across the nation.  NFHA has also conducted joint inspections with all of the other Organizational Plaintiffs listed below.  In total, NFHA has expended over 6,630 hours on its investigation into Defendants' discriminatory maintenance and marketing of the Bank of America REO properties and resulting from and attributable to Defendants' conduct.

162.    This expenditure of time and resources meant that NFHA diverted time and resources away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused NFHA to forego opportunities, including executing new fair housing advocacy projects and investigations, conducting additional consulting and training of housing providers, applying for new grants and funding sources, attending conferences, and engaging in professional staff development.

163.    In addition, NFHA engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. NFHA's efforts include:  meeting with local, state, and federal government officials (including the Federal Reserve Board, legislators, and at least ten local governments/jurisdictions); authoring and distributing reports about discrimination in the maintenance of REO properties, which were subsequently provided to local and state governments; presenting numerous fair housing trainings regarding REO maintenance to real estate professionals and bank employees; planning and sponsoring a national conference on REO maintenance; and serving as keynote speaker and making presentations on numerous panels regarding the economic impact of discriminatory REO maintenance.

164.    Defendants' actions have also frustrated the mission and purpose of NFHA.  As described in greater detail above, NFHA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices impede its efforts and frustrate its mission.

165.    Finally, NFHA has expended more than $5.5 million of its own funds to engage in community development, home ownership promotion, and neighborhood stabilization efforts across the nation.  NFHA's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in those communities.

**Plaintiff Housing Opportunities Project for Excellence, Inc.**

166.    Plaintiff Housing Opportunities Project for Excellence, Inc. conducted approximately 44 tests of Bank of America-owned homes and expended over 215 hours investigating Bank of America's REO properties.  (HOPE, Inc. spent 82 hours on on-site visits to the properties and 79 hours uploading of photos into database.  The remaining 55 hours represent time spent on activities such as strategy and planning, education, outreach, and awareness, staff training, and administration and management.)

167.    As a result of this expenditure of time and resources, HOPE, Inc. was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forego opportunities including resource development, public policy advocacy, identifying opportunities to educate underserved and un-served populations, utilizing research and technology to identify discriminatory trends in housing, and furtherance of the organization's Strategic Plan.

168.     In addition, HOPE, Inc. engaged in significant community outreach and public efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include:  preparation and publication of newsletter articles promoting community awareness; engaging with media engagement to raise awareness of REO-related issues; and educational presentations inclusive of REO-related topics, including homebuyer/foreclosure prevention workshops, housing provider trainings, and local (Miami-Dade and Broward County) and statewide (Florida) fair housing workshops.

**Plaintiff Metro Fair Housing Services, Inc.**

169.     Plaintiff Metro Fair Housing Services, Inc. conducted approximately 112 tests of Bank of America-owned homes over the course of five years and expended over 423 hours investigating Bank of America's REO properties.

170.     As a result of this expenditure of time and resources, Metro was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming.  Defendants discriminatory conduct caused Plaintiff to forego opportunities including: consulting opportunities, conferences/education/staff development, coalition meetings, and funding applications.

171.     In addition, Metro engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendants' conduct.  Plaintiff's efforts include:  organizing and conducting trainings for jurisdictional staff, housing providers, real estate agents, and consumers in the metropolitan region; meeting with local code or government officials regarding REO maintenance; preparing and publishing brochures/reports; participating in community events, including the annual fair housing events, partnership fairs,

workshops and professional education and outreach; and engaging with media to raise awareness of REO-related issues.

172.    Defendants' actions have also frustrated the mission and purpose of Metro.  As described in greater detail above, Metro's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance directly impedes its efforts and frustrates its mission.

173.    Finally, Metro has also expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undetermined by the existence of deteriorating and poorly maintained Bank of America properties in those communities.

**Plaintiff North Texas Fair Housing Center**

174.    Plaintiff North Texas Fair Housing Center conducted inspections of Bank of America REO properties across the greater Dallas-Fort Worth metropolitan region, expending over 247 hours throughout the course of the investigation and resulting from and attributable to Defendants' conduct.

175.    As a result of this expenditure of time and resources, NTFHC diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including expanded forms of outreach and coalition-building, professional staff development, and new funding applications.

176.    In addition, NTFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct.  Plaintiff's efforts include: organizing and conducting trainings for social service providers and

property management personnel in the Dallas-Fort Worth region; meeting with local government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures; creating public service announcements and advertising in local print and radio; designing specialized mailings; participating in community events, including community resource fairs; and engaging with media to raise awareness of REO-related issues.

177.    Defendants' actions have also frustrated the mission and purpose of NTFHC.  As described in greater detail above, NTFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

178.    NTFHC has also spent its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater Dallas-Fort Worth region.

**Plaintiff Fair Housing Center of West Michigan**

179.    Plaintiff Fair Housing Center of West Michigan conducted inspections of Bank of America REO properties across the Western Michigan region, expending over 290 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

180.    As a result of this expenditure of time and resources, FHCWM diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused FHCWM to forego

opportunities, including community meetings and collaborative efforts, consulting opportunities, conferences and staff development, other systemic investigations, and applications for funding.

181.    In addition, FHCWM engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: holding workshops regarding REO issues at its Fair Housing Luncheon & Workshop Series; meeting with local code or government officials regarding REO maintenance; meeting with local service providers, stakeholders, and community groups; preparing and publishing newsletters; participating in community events; and engaging with media to raise awareness of REO-related issues.

182.    Defendants' actions have also frustrated the mission and purpose of FHCWM.  As described in greater detail above, FHCWM's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

183.    Finally, FHCWM has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the Western Michigan region.

**Plaintiff Fair Housing Continuum, Inc.**

184.    Plaintiff Fair Housing Continuum, Inc. conducted 92 tests of Bank of America REO properties in the central Florida region, expending over 643 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

185.    As a result of this expenditure of time and resources, the Continuum diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused Fair Housing Continuum to forego opportunities, including: systemic testing programs; individual complaint enforcement; new or additional fair housing investigations; professional staff recruitment and development; and new contracts.

186.    In addition, the Continuum engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include 189 presentations or speaking engagements related to REO issues from July 2013 through April 2018, as well as engaging with media to raise awareness of REO-related issues.

187.    Defendants' actions have also frustrated the mission and purpose of the Continuum.  As described in greater detail above, the Continuum's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Plaintiff South Suburban Housing Center**

188.    Plaintiff South Suburban Housing Center conducted inspections of Bank of America REO properties across the greater Chicago metropolitan area, and the Gary, northwest Indiana area, expending over 264 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

189.    As a result of this expenditure of time and resources, SSHC diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused Plaintiff to forego

opportunities, including additional fair housing complaint intakes and investigations, fair housing

presentations for the general public and housing providers, counseling and advocacy on behalf of

mortgage-distressed discrimination victims, and expanded forms of outreach and coalition-

building.

190.    In addition, SSHC has engaged in significant community outreach and public

education efforts to address and attempt to counteract the effects of Defendants' conduct.

Plaintiff's efforts include conducting REO-related presentations and meetings with municipal

and county officials, community organizations, housing providers, individual realtors and

realtors' associations, lending institutions, community service agencies, faith-based institutions,

and homeowners and residents of communities affected by discriminatory REO maintenance and

marketing practices.

191.    Defendants' actions have also frustrated the mission and purpose of SSHC.  As

described in greater detail above, SSHC's mission is to ensure equal housing opportunities and to

fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance

practices directly impede its efforts and frustrate its mission.

192.    Finally, SSHC has expended its own funds to engage in community development,

homeownership promotion, and neighborhood stabilization efforts, including down payment

assistance and mortgage distress assistance programs.  Plaintiff's financial investments have

been and are continuing to be undermined by the existence of deteriorating and poorly

maintained Bank of America REO properties in communities of color in the greater Chicago and

Gary, Indiana metropolitan areas.

**Plaintiff HOPE Fair Housing Center**

193.    Plaintiff HOPE Fair Housing Center conducted inspections of Bank of America REO properties across the greater Chicago metropolitan region, expending over 436 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

194.    As a result of this expenditure of time and resources, HOPE FHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including consulting opportunities, new funding applications, professional staff development, and community and coalition meetings.

195.    In addition, HOPE FHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for a regional coalition of housing providers, non-profit service providers and government staff in the greater Chicago metropolitan region; meeting with local code or government officials regarding REO maintenance in Elgin and other local municipalities; meeting with local service providers and real estate trade organizations; preparing and publishing brochures/reports; designing targeted websites and specialized mailings; participating in community events, including the Chicago Urban League Homebuyers Fair; and engaging with media to raise awareness of REO-related issues.

196.    Defendants' actions have also frustrated the mission and purpose of HOPE FHC. As described in greater detail above, HOPE FHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

197.    Finally, HOPE FHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater Chicago metropolitan region.

**Plaintiff Metropolitan Milwaukee Fair Housing Council**

198.    Plaintiff Metropolitan Milwaukee Fair Housing Council conducted inspections of Bank of America REO properties across the greater Milwaukee metropolitan area, expending over 299 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

199.    As a result of this expenditure of time and resources, MMFHC diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including fair lending outreach and education, fair housing outreach and education, fair housing investigations, data collection activities, and housing industry trainings.

200.    In addition, MMFHC engaged in community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct.  Plaintiff's efforts include conducting REO-related presentations and meetings with government officials, community organizations, academic institutions, housing providers, individual realtors and realtors' associations, neighborhood associations, lending institutions, community activists, faith-based institutions, and homeowners and residents of neighborhoods affected by discriminatory REO maintenance and marketing practices.

201.    Defendants' actions have also frustrated the mission and purpose of MMFHC.  As described in greater detail above, MMFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Plaintiff Fair Housing Center of Central Indiana**

202.    Plaintiff Fair Housing Center of Central Indiana, Inc. conducted inspections of Bank of America REO properties across the greater Indianapolis metropolitan region, expending over 181 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

203.    As a result of this expenditure of time and resources, FHCCI diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including fair housing training opportunities, new funding applications, professional staff development, and expanded forms of education and outreach.

204.    In addition, FHCCI engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct.  FHCCI's efforts include: organizing and conducting trainings for community development and neighborhood organizations in the greater Indianapolis region; meeting with local community development organizations and government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; creating public service announcements for local print and radio; designing specialized mailings; and engaging with media to raise awareness of REO-related issues and answer media related inquiries.

205.    Defendants' actions have also frustrated the mission and purpose of FHCCI.  As described in greater detail above, FHCCI's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

206.    Finally, FHCCI has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater Indianapolis metropolitan region.

**Plaintiff Denver Metro Fair Housing Center**

207.    Plaintiff Denver Metro Fair Housing Center conducted inspections of Bank of America REO properties across the greater Denver metropolitan area, expending over 262 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

208.    As a result of this expenditure of time and resources, DMFHC diverted limited resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities including consulting and training opportunities, new funding applications, professional staff development, and new or additional fair housing investigations.

209.    In addition, DMFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. DMFHC's efforts include: organizing and conducting trainings regarding REO maintenance for housing providers, municipal housing employees, HUD housing counseling agency staff, and the

general public in the greater Denver Metro region; meeting with local government officials

regarding REO issues, including the Denver Regional Council of Governments, City and County

of Denver, City of Aurora, and the State of Colorado Division of Housing; preparing and

publishing brochures/reports; creating public service announcements and advertising; designing

specialized mailings; participating in community events, including the Montbello 50th

Anniversary Fair; and engaging with media to raise awareness for REO-related issues.

210.    Defendants' actions have also frustrated the mission and purpose of DMFHC.  As

described in greater detail above, DMFHC's mission is to ensure equal housing opportunities and

to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance

practices directly impede its efforts and frustrate its mission.

211.    Finally, DMFHC has expended its own funds to engage in community

development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's

financial investments have been and are continuing to be undermined by the existence of

deteriorating and poorly maintained Bank of America REO properties in communities of color in

the greater Denver metropolitan region.

**Plaintiff Fair Housing Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair Housing Center**

212.    Plaintiff Toledo Fair Housing Center conducted inspections of Bank of America

REO properties across the greater Toledo metropolitan area, expending over 49 hours throughout

the course of this investigation and resulting from and attributable to Defendants' conduct.

213.    As a result of this expenditure of time and resources, TFHC diverted resources

and time away from other intended projects and programs and was required to delay, suspend, or

even cancel such programming.  Defendants' discriminatory conduct caused Plaintiff to forgo

opportunities, including providing fair housing training to community partners, attending

conferences and other forms of professional staff development, and advocating for housing discrimination victims.

214.    In addition, TFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include:  organizing and conducting trainings for housing industry professionals and the general public in the Northwest Ohio region; meeting with government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; participating in community events and meetings; engaging with media to raise awareness of REO-related issues; interviewing neighbors; and participating in neighborhood beautification and revitalization efforts.

215.    Defendants' actions have also frustrated the mission and purpose of TFHC.  As described in greater detail above, TFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

216.    Finally, TFHC has expended its own funds to engage in community development, homeownership promotion, neighborhood stabilization, foreclosure prevention, and beautification efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater Toledo metropolitan region.

**Plaintiff Greater New Orleans Fair Housing Action Center, Inc.**

217.    Plaintiff Greater New Orleans Fair Housing Action Center, Inc. conducted inspections of Bank of America REO properties across the New Orleans and Baton Rouge

metropolitan areas, expending over 225 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

218.    As a result of this expenditure of time and resources, GNOFHAC diverted resources and time away from other intended projects and programs, and was required to delay or suspend such programming.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including presenting fair housing courses, and to delay work related to its annual outreach and education events, as well as planned investigations.

219.    In addition, GNOFHAC engaged in significant community outreach and public efforts to address and attempt to counteract the effects of Defendants' conduct.  GNOFHAC's efforts include: organizing and conducting trainings to groups of service providers in the Greater New Orleans area, including meeting with BlightsOut, an organization dedicated to eradicating blight; meeting with government officials regarding REO maintenance; creating public service announcements and advertising in local print and radio; participating in community events, including the Mission Possible Conference with over 100 conference attendees; and engaging with media to raise awareness of REO-related issues.

220.    Defendants' actions have also frustrated the mission and purpose of GNOFHAC. As described in greater detail above, GNOFHAC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

221.    Finally, GNOFHAC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of

deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater New Orleans metropolitan region.

**Plaintiff Fair Housing Advocates of Northern California**

222.    Plaintiff Fair Housing Advocates of Northern California conducted inspections of Bank of America REO properties across the greater Solano and Contra Costa counties, expending over 450 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

223.    As a result of this expenditure of time and resources, FHANC diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including consulting opportunities, professional staff development, coalition and advocacy meetings, work on local and regional housing policies, expansion of fair housing programs, and new or additional funding applications. This includes $10,000 per year in funding from Bank of America that FHANC had been receiving for its foreclosure prevention program, as FHANC was no longer able to apply for funding due to conflict of interest.

224.    In addition, FHANC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include:  meeting with government officials regarding REO maintenance, including visits to senators and representatives on Capitol Hill; communicating with City of Vallejo attorney (working on a Neighborhood Stabilization program) about Bank of America REOs; meeting with local service providers such as Housing and Economic Rights Advocates; creating and distributing public service announcements and conducting radio campaigns; publishing advertisements in local newspapers; sending specialized mailings to neighbors of

REO properties; participating in community events; and engaging with media to raise awareness of REO-related issues.

225.    Defendants' actions have also frustrated the mission and purpose of FHANC.  As described in greater detail above, FHANC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

226.    Finally, FHANC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including foreclosure prevention, counseling, and education.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in neighborhoods of color in the greater Solano and Contra Costa counties.

**Plaintiff Fair Housing Center for Rights & Research**

227.    Plaintiff Fair Housing Center for Rights & Research conducted inspections of Bank of America Bank REO properties across the greater Cleveland metropolitan area between December 2013 and February 2017, expending over 87 hours over the course of this investigation and resulting from and attributable to Defendants' conduct.

228.    As a result of this expenditure of time and resources, FHCRR diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such activities.

229.    In addition, FHCRR engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct.  FHCRR's efforts include the discussion of REO maintenance issues in more than 250

presentations to housing providers and real estate agents in Northeast Ohio and engaging with media to raise awareness of REO-related issues.

230.    Defendants' actions have also frustrated the mission and purpose of FHCRR.  As described in greater detail above, FHCRR's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Plaintiff Fair Housing Center of Northern Alabama**

231.    Plaintiff Fair Housing Center of Northern Alabama has an expressed purpose of eradicating housing discrimination in the twenty-nine counties it services through education, outreach, and enforcement.  The poorly maintained and deteriorating REO properties of Bank of America in FHCNA's service area have frustrated its mission.

232.    Over a period of one year, FHCNA tested 15 of Bank of America's REO properties and expended 27 hours in its investigation.  Due to staff size and already scheduled activities, this investigation continues to frustrate FHCNA's mission.

233.    In response, FHCNA's education and outreach activities increased in an effort to counteract the negative effects of Defendants' actions.  FHCNA participated in and conducted eight additional education and outreach trainings for community groups and housing providers. It increased its distribution of literature and increased its media campaign, all to override the negative impact of Bank of America's REO properties in its communities.

234.    Due to the size of its staff and the need to increase activities in addressing these properties, it became necessary to divert FHCNA's already limited resources. FHCNA had to cancel and reschedule community presentations to address other concerns, missed deadline dates

for submitting new proposals for community funds, and increased the cost of its media campaign to address this issue.

235.    Bank of America's lack of properly maintaining its REO properties has and will continue to frustrate the mission of FHCNA and will continue to cause a need for the diversion of resources until these properties are maintained in a safe and sanitary manner that will support the communities in which they are located.

**Plaintiff Miami Valley Fair Housing Center**

236.    Plaintiff Miami Valley Fair Housing Center conducted approximately 68 tests of Bank of America REO properties over the course of seven years and expended over 198 hours investigating Bank of America's REO properties resulting from and attributable to Defendants' conduct.

237.    As a result of this expenditure of time and resources, MVFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forego opportunities including: consulting opportunities, staff development, coalition meetings, and funding applications.

238.    In addition, MVFHC engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for real estate agents, property managers, municipal government employees, and the general public in the Miami Valley region; meeting with local code or government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and

specialized mailings; participating in community events, including a three-hour presentation as

part of the 2015 Fair Housing Month event in April, presentations to the Latino Connection, the

Dayton Area Realtists, Catholic Social Services, the Dayton Mortgage Broker's Association, and

the Ahiska Turkish American Community Center; engaging with media to raise awareness of

REO-related issues; and promoting MVFHC's Inclusive Community Fund (ICF) in an attempt to

stabilize the communities of color that have been disproportionately impacted by foreclosure and

REO properties that are not properly maintained and marketed.

239.    Finally, MVFHC has also expended its own funds to engage in community

development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's

financial investments have been and are continuing to be undermined by the existence of

deteriorating and poorly maintained Bank of America REO properties in those communities.

240.    Defendants' actions have also frustrated the mission and purpose of MVFHC.  As

described in greater detail above, MVFHC's mission is to ensure equal housing opportunities and

to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance

practices directly impede its efforts and frustrate its mission.

**Plaintiff Connecticut Fair Housing Center**

241.    Plaintiff Connecticut Fair Housing Center conducted approximately 64 tests and

took 998 pictures of Bank of America REO properties over the course of five years and

expended over 128 hours investigating Bank of America's REO properties resulting from and

attributable to Defendants' conduct.

242.    As a result of this expenditure of time and resources, CFHC was forced to divert

resources and time away from other intended projects and programs, and to delay, suspend, or

even cancel such programming.  Some of the tasks which CFHC was unable to do over years

included systemic testing of landlords who denied applicants based on the criminal records, systemic race investigations of landlords in towns where there are high numbers of police stops, and mortgage lending discrimination investigations.  Defendants' discriminatory conduct caused CFHC to forego opportunities including: consulting opportunities, staff development, recruitment of interns and new Board members, and funding applications.

243.    In addition, CFHC engaged in significant community outreach and public efforts to address and attempt to counteract the effects of Defendants' conduct.  CFHC's education and outreach efforts have taken approximately 30 hours and include: creating and reviewing mandatory fair housing curricula for real estate agents renewing their licenses and ensuring that the courses included information on non-discriminatory marketing of REO properties; answering requests for information and working with Connecticut municipalities with extensive blight on the issues surrounding REO properties and the parties responsible for REO maintenance; working with and responding to requests for information from Connecticut legislators trying to address the blight caused by REO properties; and networking with affordable housing providers to determine whether the blight caused by REO properties could be addressed by turning those properties into affordable housing.

244.    Defendants' actions have also frustrated the mission and purpose of CFHC.  As described in greater detail above, CFHC's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Plaintiff Fair Housing Council of Greater San Antonio**

245.    Plaintiff Fair Housing Council of Greater San Antonio conducted approximately 30 tests of Bank of America REO properties over the course of two years and expended over 262

hours investigating Bank of America's REO properties and implementing counteractive measures resulting from and attributable to Defendants' conduct.

246.    As a result of this expenditure of time and resources, FHCGSA was forced to divert resources and time away from other intended projects and programs.  Defendants' discriminatory conduct caused FHCGSA to forego opportunities and planned activities including: implementing education and outreach campaigns, updating its Directory of Accessible Housing, recruiting new testers and Board Members, conducting staff development activities, and applying for new grants, and funding sources.

247.    In addition, FHCGSA engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendants' conduct, including submitting 31 neighbor surveys, distributing educational REO fliers to consumers at community events, posting paid advertisements on social media regarding REO issues, and sharing informative articles regarding Bank of America REO practices on social media.

248.    Defendants' actions have also frustrated the mission and purpose of FHCGSA. As described in greater detail above, FHCGSA's mission is to ensure equal housing opportunities and to fight unlawful discrimination and segregation.  Defendants' discriminatory maintenance practices directly impede its efforts and frustrate its mission.

**Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc.**

249.    Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. conducted approximately 26 tests of Bank of America-owned homes over the course of three years and expended over 92 hours investigating Bank of America's REO properties.

250.    As a result of this expenditure of time and resources the FHCGPB was forced to divert resources and time away from other intended projects and programs, suspend, or even

cancel such programming.  Defendants' discriminatory conduct caused FHCGPB to forego opportunities, including fair housing education consulting opportunities with housing providers and municipalities, funding applications for education and outreach media campaigns, and anti-predatory lending efforts.

251.     In addition, the FHCGPB engaged in significant community outreach and public efforts to address and attempt to counteract the effects of Defendants' conduct.  FHCGPB's efforts included workshops, disseminating anti-discrimination literature, and counseling citizens of the Greater Palm Beaches on their fair housing rights under federal, Florida, and local fair housing laws.  FHCGPB conducted 21 workshops for nine community service providers and local housing providers regarding REO maintenance.

252.     FHCGPB's mission continues to be frustrated and undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in the communities it serves.

### C.     INJURIES TO INDIVIDUAL PLAINTIFFS

253.     Each Individual Plaintiff has suffered particularized and concrete injuries caused by Defendants' discriminatory conduct.

**Wanda Onafuwa**

254.     Plaintiff Wanda Onafuwa bought her home in the Tremont neighborhood of Baltimore City in 1988 and has lived there ever since.

255.     Ms. Onafuwa lives with her sister, Valerie Stewart, and their mother.  Ms. Stewart moved in with Ms. Onafuwa in October of 2016 to help her care for their mother, who is in the advanced stages of Alzheimer's disease.

256.    Ms. Onafuwa knows her neighbors, including the previous owner of the house next door to her at 4714 Amberley.

257.    In 2016, the family who had previously lived at 4714 Amberley moved out, after which the brother of the owner of 4714 Amberley moved in.

258.    Unbeknownst to Ms. Onafuwa and her neighbors, Bank of America filed a foreclosure action against the owner of 4714 Amberley on or about September 23, 2016.  Bank of America purchased 4714 Amberley at auction on or about February 17, 2017.  The deed for 4714 Amberley was transferred to Bank of America on or about August 7, 2017

259.    Despite Bank of America's purchase of 4714 Amberley, it allowed the previous owner's brother to continue to illegally live in the house until August 2017.  On information and belief, the squatter stole electricity from Ms. Onafuwa's neighbor living at 4716 Amberley Avenue.  He also contributed to the trash accumulating on the outside of the property.

260.    In late 2016 or early 2017, Ms. Onafuwa learned that 4714 Amberley was in foreclosure.  The property continued to deteriorate.  On or about February 13, 2017, 4714 Amberley's fence fell on Ms. Stewart's car and damaged it.  The fence remained broken on the ground for some time.

261.    Ms. Onafuwa and her neighbors also became very concerned about the garage at 4714 Amberley, which was in terrible condition and had become a haven for rats.  Due to the deteriorating garage, Ms. Onafuwa and her saw rats in their yards and alley on a regular basis for the first time since moving into their homes.  Also, in early 2017 a wind storm caused the metal roof on the garage to fly up, and Ms. Onafuwa worried that the roof could detach from the garage and injure someone.

94

262.    Due to their concerns about the condition of 4714 Amberley, and especially the garage on that property, Ms. Onafuwa and her neighbors began contacting Baltimore City officials in early 2017.  On or about January 25, 2017, the City issued several citations for the condition of the property, giving the owner until February 24, 2017, to remediate the violations.

263.    The conditions at 4714 Amberley did not improve, and on or about March 10, 2017, the City posted an Emergency Condemnation and Demolition Notice on the garage.  The City eventually boarded up the garage.

264.    Ms. Onafuwa had had problems with water coming into her basement from the side where 4714 Amberley is located since 2016, and these problems persisted and became worse in 2017.  In the spring or early summer of 2017, Ms. Onafuwa paid a contractor to patch the cement and repair the gutters at 4714 Amberley to try to abate the water damage to her home, but she continued to have water in her basement.

265.    In or about the spring of 2017, Ms. Onafuwa saw a notice posted on the garage of 4714 Amberley indicating that Bank of America owned the property.  She called Bank of America to ask that it address the cause of the water in her basement.  The customer service representative for Bank of America indicated that she would forward Ms. Onafuwa's complaint to the mortgage preservation department.

266.    Ms. Onafuwa and her neighbors also contacted Safeguard to voice their concerns about the state of 4714 Amberley and to request that Defendants remediate the dilapidated garage and the associated rodent problem, remove the squatter, and mow the grass.  A Safeguard representative e-mailed in response: "The decision for the garage has to be reviewed by the bank. Same decision regarding the grass."

267.    On or about June 26, 2017, Ms. Onafuwa paid an exterminator to address the rat problem outside her house, stemming from 4714 Amberley.

268.    On or about July 14, 2017, because she had received no response from Bank of America, Ms. Onafuwa requested that Baltimore City officials assist her with removing the squatter from 4714 Amberley and getting relief from the water entering her basement.

269.    In July 2017, the City of Baltimore demolished the garage at 4714 Amberley. After the demolition of the garage, a large amount of trash and debris remained on the property.

270.    On or about August 15, 2017, employees of the Baltimore Department of Housing boarded up the house at 4714 Amberley.  The squatter returned shortly thereafter to remove his belongings, and the City re-secured the house after he left.  After the City boarded and secured 4714 Amberley, Ms. Onafuwa ceased having problems with water in her basement.

271.    Throughout August and September 2017, Ms. Onafuwa and her neighbors continued to contact Safeguard, asking that Defendants remove the trash left after the demolition of the garage, exterminate the rats, and mow the grass.  On or about August 14, 2017, a Safeguard representative e-mailed in response: "Please be advised that we are still working with our client to address your concerns regarding the squatters and detached garage that is fallen.  As soon as our client is able to approve for us to address work we will have our contractors out to the property to provide bids to address any issues they find."  On or about September 27, 2017, in response to a complaint from Ms. Onafuwa's neighbor regarding the continuing rat problem, a Safeguard representative e-mailed: "At this time, the City has boarded the property and we have no access.  Our contractor did advise of a rodent issue on the exterior which was sent to our client to review."

272.    In or about October 2017, Safeguard sent workers to 4714 Amberley to gut and clean the property.

273.    On or about March 20, 2018, Bank of America sold 4714 Amberley.

274.    Defendants' failure to maintain 4714 Amberley has caused Ms. Onafuwa monetary damages, as well as emotional distress and mental anguish.  Ms. Onafuwa's damages include, but are not limited to: spending her own money to mitigate the effects from living next door to an unsecured and dilapidated vacant property; the fear and anxiety precipitated by an infestation of rats in her community that she had never before experienced; the distress resulting from the water that entered her basement from 4714 Amberley; and the worry that she would not be able to sell her own home for a fair price upon her retirement.

**Chevelle and Jalen Bushnell**

275.    Chevelle Bushnell bought her townhome in District Heights, Prince George's County, Maryland when it was built in 1990 and has lived there ever since.

276.    Jalen Bushnell, who is now 24, has lived in the home his entire life, except for time he spent with his father weekdays during high school and time he spent away at college.

277.    In or around 2010, the previous owners of the house next to Ms. Bushnell, located at 6088 S. Hil Mar, abandoned the home.  On information and belief, they did so in response to Bank of America, the mortgage holder on the house, threatening foreclosure.

278.    In January 2013, Ms. Bushnell's home was broken into.  The perpetrators kicked in her front door and stole personal property belonging to her and Mr. Bushnell, causing damages and losses valued at over $1,500.  The police officers who responded to Ms. Bushnell's 911 call after the break-in said it had likely occurred due to 6088 S. Hil Mar sitting vacant next door to her.

279.    In August 2013, Ms. Bushnell's home was broken into again while Ms. Bushnell was at work.  This time, the perpetrators broke through her bedroom wall from a room in 6088 S. Hil Mar.  The perpetrators ransacked Ms. Bushnell's bedroom and again stole personal property belonging to her and Mr. Bushnell.  The damages and losses from this second break-in exceeded $3,000.

280.    In or about March 2014, thieves again attempted to break through Ms. Bushnell's bedroom wall from 6088 S. Hil Mar.  Mr. Bushnell was home at the time and saw approximately four people enter 6088 S. Hil Mar, after which he heard banging on the wall of Ms. Bushnell's bedroom and called the police.  By the time the police arrived, the perpetrators had left.

281.    As a result of the multiple break-ins to her house due to 6088 S. Hil Mar being vacant, Ms. Bushnell bought a doorbell with a camera, a security system, and heavy-duty security doors.

282.    Bank of America filed a foreclosure action against the owner of 6088 S. Hil Mar on or about August 14, 2014 – four years after it had first been abandoned – and purchased the house on or about February 5, 2015.

283.    On or about November 5, 2015, in response to an inquiry from an acquaintance of Ms. Bushnell, Bank of America's REO Vendor Management stated that 6088 S. Hil Mar "is not a property being marketed by Bank of America."

284.    After Bank of America became responsible for 6088 S. Hil Mar, the property was frequently unsecured, with doors and windows left open.  Ms. Bushnell and Mr. Bushnell continued to hear people inside 6088 S. Hill Mar periodically, as well.  This made them very uncomfortable due to the break-ins they had experienced from people accessing their home from 6088 S. Hil Mar.

285.    As recently as early February 2017, 6088 S. Hil Mar was unsecured, the door having been kicked in.

286.    On or about February 14, 2017, Ms. Bushnell contacted Safeguard regarding the door to 6088 S. Hil Mar being unsecured.  Safeguard responded that it had "generated a work order sending a vendor out to secure the property."

287.    During the time that Bank of America owned 6088 S. Hil Mar, the outside of the house also remained uncared for.  Weeds grew up the walls, the yard was not maintained, and there were holes in the structure.

288.    Due to holes in the side and roof of 6088 S. Hil Mar and in the attic between the vacant house and Ms. Bushnell's home, Ms. Bushnell had problems with squirrels entering her attic.  On or about February 22, 2017, Ms. Bushnell hired a trapping service to trap these squirrels and prevent them from entering her attic again.  The trapping service informed Ms. Bushnell that the squirrels were entering from 6088 S. Hil Mar and that she could have problems with squirrels again unless Bank of America repaired 6088 S. Hil Mar.

289.    On or about February 23, 2017, Ms. Bushnell contacted Safeguard to ask that it fix the holes in 6088 S. Hil Mar so that she would not have any more problems with squirrels in her attic.  When she did not receive a response by March 6, 2017, Ms. Bushnell contacted Safeguard again.  On or about the same date, Safeguard responded that Ms. Bushnell's "email was sent to the client and bids are being obtained."

290.    On or about June 16, 2017, Bank of America conveyed title to 6088 S. Hil Mar to the U.S. Department of Housing and Urban Development.

291.    As a result of Defendants' failure to properly maintain 6088 S. Hil Mar, Ms. Bushnell has had to spend her own money to remediate problems stemming from rodents

entering her attic.  Ms. Bushnell and Mr. Bushnell have also experienced emotional harm from living next door to an unsecured property.  The Bushnells know from experience the danger associated with living next to a vacant house that is not properly secured and monitored. Defendants' failure to meet even the most basic aspects of their REO maintenance responsibilities by properly securing 6088 S. Hil Mar and ensuring that it remained secure caused the Bushnells monetary and emotional damages, including anxiety, fear, and stress.

292.    The proper maintenance and marketing of REO dwellings is vital to the stability of neighborhoods and to the economic, social, physical, and emotional well-being of their residents.  REO properties that are poorly maintained have significant, negative effects on a neighborhood, affecting the health and safety of surrounding residents and otherwise interfering with the rights of homeowners in communities of color to enjoy their homes in a manner free of discrimination.  Academic and government reports acknowledge the negative effects of neglected vacant properties on nearby homeowners, neighborhoods, and local governments.[9]

293.    REO properties that are poorly maintained lead to increased crime.  A home with unsecured doors, broken windows, overgrown grass, or trash around the property signals to vandals and thieves that the property is abandoned and makes the home and neighborhood a target for illegal activity.

294.    REO properties that are poorly maintained create health and safety issues, leading to an increase in accidents, rodent and insect infestations, and decay.  According to a report by the American Heart Association, living near a foreclosed home can also increase a person's blood pressure "due in part to unhealthy stress from residents' perception that their own

---

[9] *See, e.g.*, Government Accountability Office, Vacant Properties:  Growing Number Increases Communities' Costs and Challenges, GAO-12-34 (Nov. 4, 2011), *available at* http://www.gao.gov/products/GAO-12-34).

properties are less valuable, their streets less attractive or safe and their neighborhoods less stable."[10]

295.    REO properties that are poorly maintained and marketed stigmatize communities and significantly diminish home values for surrounding homeowners. Failure to carry out basic maintenance of REO properties decreases the likelihood of timely sales and decreases the value and sale price of REO properties, which, in turn, decreases property values in the neighborhood. Homes that appear abandoned and look unsightly due to poor maintenance often deter real estate agents from showing the REO properties or surrounding homes to owner-occupant homebuyers. As shoddy maintenance and neglect result in deteriorating appearances and physical conditions for REO properties, their availability for sale is adversely affected, constraining housing options in impacted communities.

296.    Poor maintenance and marketing of an REO property also make the property significantly more likely to end up in the hands of an investor rather than an owner-occupant. Investor-purchased REOs often result in a number of negative outcomes for the surrounding area, including a decrease in property values and a higher risk of abandonment. Communities with high investor ownership are more likely to have increasingly high rental rates, to become less stable communities, and to afford fewer opportunities for owner-occupied purchases. Investor-owned properties detrimentally affect property values and encourage divestment in neighborhoods.

297.    In addition, when Bank of America auctions a property rather than selling it on the traditional market, the buyer is required to pay in cash. This model is designed to attract primarily investors who have cash resources for purchase. The typical owner-occupant buyer

---

[10] See Mariana Arcaya, et al., *Effects of Proximate Foreclosed Properties on Individuals' Systolic Blood Pressure in Massachusetts, 1987–2008*, Circulation, June 3, 2014, at 2262, available at http://circ.ahajournals.org/content/129/22/2262.

must secure a mortgage loan, which limits such purchases of Bank of America-owned foreclosures.

298.    For instance, based upon NFHA's review of property records for the sale outcomes of 79 properties in Memphis, Tennessee, 70% of REO properties that were poorly maintained (i.e., had 10 or more maintenance or marketing deficiencies) were sold to investors, while only 46% of well-maintained homes went to investors.  In communities of color, homes that were poorly maintained and marketed were significantly more likely to have been sold to investors as opposed to owner-occupants.

299.    Considering this data together with neighborhood race, of the REOs in communities of color in Memphis, 70% went to investors, while only 18% in white communities were sold to investors.  Only 24% of the REOs in communities of color went to owner-occupants, while 78% of REOs in predominantly white communities were purchased directly by owner-occupants.

300.    Poorly maintained foreclosure properties also impose a heavy burden on local municipalities in terms of code violations and other public safety issues.  Local governments are forced to spend millions of dollars to address code violations, perform maintenance mitigation because of dangerous blighted conditions, demolish unsafe structures, and identify and contact those responsible for the vacant properties.  A study prepared for the Homeownership Preservation Foundation documents that the amount spent by local governments on vacant and unmaintained properties averaged $5,358 per property per year.[11]

---

[11] *See* William C. Apgar and Mark Duda, *Collateral Damages: The Municipal Impact of Today's Mortgage Foreclosure Boom*, Homeownership Preservation Foundation, May 11, 2005, *available at* http://www.communityprogress.net/filebin/pdf/nvpc_trnsfr/Apgar_Duda_collateraldamage.pdf.

**D.  INJURIES CAUSED BY DEFENDANTS' CONDUCT CONTINUE**

301.    Until remedied, Defendants' unlawful, discriminatory actions will continue to injure Plaintiffs by, *inter alia*: (a) interfering with the Organizational Plaintiffs' efforts and programs intended to bring about equality of opportunity in housing; (b) requiring the commitment of scarce resources, including substantial staff time and funding, to counteract Defendants' discriminatory conduct in the communities identified above, thus diverting resources away from the Organizational Plaintiffs' usual activities and services, such as education, outreach, and counseling; (c) frustrating the Organizational Plaintiffs' missions and purposes of promoting the equal availability of housing to all persons without regard to any protected category, including race and the racial composition of a neighborhood; (d) frustrating the Organizational Plaintiffs' missions and purposes of promoting racial integration and eliminating racial segregation in their communities; (e) impeding the numerous accomplishments of the Organizational Plaintiffs' investment programs; (f) perpetuating segregation in the Individual Plaintiffs' communities; (g) forcing the Individual Plaintiffs to expend their own financial resources to mitigate damage to their homes precipitated by Defendants' failure to maintain the REO properties next door; and (h) causing the Individual Plaintiffs emotional distress and mental anguish from the stress, fear, and anxiety of living next door to an unsecured, unmaintained REO property.

302.    All of these injuries flow directly from Defendants' conduct.  All of these injuries are fairly traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision.  The injuries suffered by Plaintiffs fall directly within the zone of interests protected by the Fair Housing Act.

### E.    CONTINUING VIOLATION

303.    Defendants engaged in the conduct alleged herein on a continuing and ongoing basis from at least June 2009 to the present.  Defendants' alleged conduct involves discriminatory violations that injured Plaintiffs within the two-year Fair Housing Act statute of limitations and the evidence in this investigation that occurred prior to the two-year statute of limitations is of a similar pattern to the evidence put forward within the statute of limitations period.  The two-year statute of limitations period has been tolling under the pending HUD administrative complaint since its filing on September 25, 2012.

## VI.    PLAINTIFFS' CLAIMS

304.    Plaintiffs adopt and re-allege each of the preceding paragraphs of this Complaint as to each count set forth below.

305.    The Bank of America properties investigated by the Organizational Plaintiffs are "dwelling[s]" within the meaning of 42 U.S.C. § 3602(b).

306.    The term "person" in the Fair Housing Act is defined to include "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries."  42 U.S.C. § 3602(d).

307.    Under the express provisions of the Fair Housing Act and applicable agency principles, banks, trustees, investors, servicers, and any other responsible contractors or vendors must maintain and market REO properties without regard to the race or national origin of the residents of a neighborhood.  It is unlawful to treat a neighborhood or its residents differently because of the race or national origin of the residents.

**Count I – Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a)**
**(All Plaintiffs v. All Defendants)**

308.    The allegations in the preceding paragraphs are incorporated as if stated here.

309.    Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]" 42 U.S.C. § 3604(a).  HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development."  24 C.F.R. § 100.70(a).  Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin . . . of persons in a community, neighborhood or development."  24 C.F.R. § 100.70(c)(1).

310.    The discriminatory provision of maintenance and marketing services to the Bank of America REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable; (2) by discouraging buyers from looking at or purchasing the property; and (3) by interfering with the closing of a sale where the appraisal does not support the loan amount requested.

311.    Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

312.    Defendants' policies and practices, including: (a) the policy of the Bank of America Defendants to outsource their responsibilities as real property owners to third parties retained by the Bank of America Defendants to maintain those properties without guidance, oversight, or review of the activities of those third parties; (b) Safeguard's policy of outsourcing REO maintenance to third parties without appropriate monitoring or review; and (c) Defendants'

policy of basing routine, exterior REO maintenance on the age and value of a property, have had

an unlawful disproportionate impact on communities of color.

313.    Accordingly, Defendants have discriminated in the marketing and sale of, or

otherwise made unavailable or denied, dwellings to persons because of race or national origin, in

violation of 42 U.S.C. § 3604(a) and its implementing regulations, 24 C.F.R. § 100.70(a) and (c).

**Count II – Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b)**
**(All Plaintiffs v. All Defendants)**

314.    The allegations in the preceding paragraphs are incorporated as if stated here.

315.    Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against

any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the

provision of services or facilities in connection therewith, because of race or national origin.  42

U.S.C. § 3604(b).

316.    HUD's regulations implementing § 3604(b) specify that "[p]rohibited actions

under this section include, but are not limited to . . . failing or delaying maintenance or repairs of

sale or rental dwellings" because of race or national origin.  24 C.F.R. § 100.65.

317.    The maintenance of REO properties constitutes "the provision of services" in

connection with dwellings.  Moreover, sales transactions involving poorly maintained REOs in

communities of color result in the transfer of title to the dwelling under less favorable "terms"

and "conditions" that place on buyers the responsibility of remedying delayed maintenance and

upkeep of the property to avoid code violations.

318.    Defendants' conduct constitutes intentional discrimination on the basis of race

and national origin.

319.    Defendants' policies and practices, including: (a) the policy of the Bank of

America Defendants to outsource their responsibilities as real property owners to third parties

retained by the Bank of America Defendants to maintain those properties without guidance, oversight, or review of the activities of those third parties; (b) Safeguard's policy of outsourcing REO maintenance to third parties without appropriate monitoring or review; and (c) Defendants' policy of basing routine, exterior REO maintenance on the age and value of a property, have had an unlawful disproportionate impact on communities of color.

320.    Accordingly, Defendants have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. § 3604(b) and its implementing regulation, 24 C.F.R. § 100.65.

### Count III – Section 805 of the Fair Housing Act, 42 U.S.C. § 3605
### (All Plaintiffs v. All Defendants)

321.    The allegations in the preceding paragraphs are incorporated as if stated here.

322.    Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction because of race or national origin.  42 U.S.C. § 3605.

323.    Defendants are persons whose business includes engaging in residential real estate-related transactions.

324.    As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates significant barriers to the sale or purchase of these properties.

325.    Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

326.    Defendants' policies and practices, including: (a) the policy of the Bank of America Defendants to outsource their responsibilities as real property owners to third parties retained by the Bank of America Defendants to maintain those properties without guidance, oversight, or review of the activities of those third parties; (b) Safeguard's policy of outsourcing REO maintenance to third parties without appropriate monitoring or review; and (c) Defendants' policy of basing routine, exterior REO maintenance on the age and value of a property, have had an unlawful disproportionate impact on communities of color.

327.    Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of 42 U.S.C. § 3605.

### Count IV – Perpetuation of Segregation in Violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* (All Plaintiffs v. All Defendants)

328.    The allegations in the preceding paragraphs are incorporated as if stated here.

329.    Discriminatory conduct that perpetuates or furthers segregation also violates the Fair Housing Act.

330.    HUD's regulations implementing the Fair Housing Act state that "[a] practice has a discriminatory effect where it…creates, increases, reinforces, or perpetuates segregated housing patterns because of race[.]"  24 C.F.R. § 100.500(a).

331.    Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods. As a proximate and foreseeable consequence of such conduct, white buyers are discouraged from purchasing homes in the affected communities of color.

332.    Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners.  This, in turn, restricts the ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

333.    Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

334.    Defendants' policies and practices, including the policy of the Bank of America Defendants to disavow and abrogate their responsibilities as real property owners, without guidance, oversight, or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

335.    Accordingly, Defendants' conduct and practices that perpetuate and encourage patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and its implementing regulation, 24 C.F.R. § 100.500(a).

### Count V – Section 818 of the Fair Housing Act, 42 U.S.C. § 3617
### (All Plaintiffs v. All Defendants)

336.    The allegations in the preceding paragraphs are incorporated as if stated here.

337.    Section 818 of the Fair Housing Act makes it unlawful, among other things, to "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by" other provisions of the Act.  42 U.S.C. § 3617.

338.    Persons living in communities adversely affected by Defendants' practices and conduct have seen their property values and enjoyment of their homes diminished.  By poorly maintaining and marketing REO properties in predominantly minority communities, Defendants have interfered with the rights of neighboring residents and homeowners (predominantly persons of color) to use and enjoy their homes and communities.

339.    The health and safety risks caused by Defendants with respect to the Bank of America REO properties in communities of color and the deleterious effects of those properties on their surrounding neighborhoods create an unhealthy and hostile living environment for neighborhood residents.

340.    Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

341.    Defendants' policies and practices have had an unlawful disproportionate impact on communities of color.

342.    Accordingly, Defendants have interfered with the exercise of rights granted or protected by the Fair Housing Act, in violation of 42 U.S.C. § 3617.

### Count VI – Private Nuisance
### (Wanda Onafuwa v. All Defendants)

343.    The allegations in the preceding paragraphs are incorporated as if stated here.

344.    Bank of America owned the house located at 4714 Amberley Avenue, Baltimore, Maryland, 21229, next door to Ms. Onafuwa, from on or about February 17, 2017, to on or about March 20, 2018.

345.    During Bank of America's ownership of 4714 Amberley, its neglect of that property caused Ms. Onafuwa to suffer from rats on her property, water entering her basement, and the negative effects of living next door to a property with a condemned garage, accumulated trash, unmown grass, unsecured windows and doors, and the presence of a squatter.

346.    The conditions at 4714 Amberley during Bank of America's ownership caused substantial and unreasonable interference with Ms. Onafuwa's use and enjoyment of her home.

347.    The interference was so substantially unreasonable that Ms. Onafuwa suffered a diminution in her use and enjoyment of her property.

110

348.    Defendants' conduct in failing to properly maintain 4714 Amberley constituted a nuisance.

349.    As a proximate result of this nuisance, Ms. Onafuwa has suffered injuries, including damage to her home, emotional distress, and mental anguish.

### Count VII – Private Nuisance
### (Chevelle and Jalen Bushnell v. All Defendants)

350.    The allegations in the preceding paragraphs are incorporated as if stated here.

351.    Bank of America owned the house located at 6088 S. Hil Mar Circle, District Heights, Maryland, 20747, next door to the Bushnell's home, from on or about February 5, 2015, to on or about June 16, 2017.

352.    During the time when Bank of America owned 6088 S. Hil Mar, the property was often unsecured, and the Bushnells could hear people inside the property.  The house was also uncared for, with an unmaintained yard, weeds growing up the walls, and holes in the structure that permitted rodents to enter the Bushnells' attic.

353.    The conditions at 6088 S. Hil Mar caused substantial and unreasonable interference with the Bushnells' use and enjoyment of their home.

354.    The interference was so substantially unreasonable that the Bushnells suffered a diminution in the use of their property.

355.    Defendants' conduct in failing to properly maintain 6088 S. Hil Mar constitutes a nuisance.

356.    As a proximate result of this nuisance, the Bushnells have suffered injuries, including the costs of extermination for the rodents in their attic, emotional distress, and mental anguish.

## VII.    JURY TRIAL DEMANDED

357.    Plaintiffs hereby demand a jury trial on all counts.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court grant judgment in their favor and against Defendants as follows:

a)    Declare, pursuant to 28 U.S.C. § 2201, that the conduct of Defendants in the maintenance of the Bank of America REO properties in communities of color, as alleged herein, violates the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and the applicable regulations;

b)    Enjoin, pursuant to 42 U.S.C. § 3613(c)(1), Defendants, their officers, directors, employees, agents, successors, assigns, and all other persons in active concert or participation with any of them, both temporarily during the pendency of this action and permanently, from violating the Fair Housing Act;

c)    Award such damages as would fully compensate Plaintiffs for their injuries caused by Defendants' discriminatory housing practices and conduct, pursuant to 42 U.S.C. § 3613(c)(1);

d)    Award such damages as would fully compensate the Individual Plaintiffs for their injuries caused by the nuisance created by Defendants;

e)    Award such punitive damages against Defendants as is proper under the law, pursuant to 42 U.S.C. § 3613(c)(1);

f)    Award Plaintiffs their costs and attorneys' fees incurred herein, pursuant to 42 U.S.C. § 3613(c)(2); and

g)    Award Plaintiffs such other relief as this Court deems just and proper.

112

Respectfully submitted,

Andrew D. Freeman
Jean M. Zachariasiewicz
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
Phone: 410-962-1030
Fax: 410-385-0869
adf@browngold.com
jmz@browngold.com

*Attorneys for Plaintiffs*

June 26, 2018