# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL FAIR HOUSING
ALLIANCE, *et al.*,

      *Plaintiffs*,

v.

BANK OF AMERICA, N.A., *et al.*,

      *Defendants*.

Case No.: 1:18-CV-1919

**MEMORANDUM IN SUPPORT OF BANK OF AMERICA, N.A.'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF THE NATIONAL FAIR HOUSING ALLIANCE AND THE OTHER ORGANIZATIONAL PLAINTIFFS**

# **TABLE OF CONTENTS**

Page

STATEMENT OF FACTS ..................................................................................................... 4

   A. Plaintiffs' Inspection Strategy .................................................................................. 4

   B. Plaintiffs' Field Inspection Reports ......................................................................... 6

   C. Plaintiffs' Administrative Complaints and the HUD Ruling .................................... 7

   D. Plaintiffs' Complaint and the Motion to Dismiss .................................................. 10

   E. The Fact Discovery Record ..................................................................................... 11

      1. There was no disparity in BANA's actual maintenance work. .................................. 11

      2. Plaintiffs' inspections showed nothing about property maintenance. ...................... 11

      3. Plaintiffs are comparing properties that are not similarly situated. ......................... 14

      4. Plaintiffs' inspection criteria deviated from industry standards. .............................. 15

      5. Plaintiffs' ratings are subjective, tainted, and not replicable. ................................... 16

      6. The "regression analysis" does not show what Plaintiffs claimed. .......................... 22

      7. Plaintiffs manipulated their survey results and shredded key evidence. .................. 24

   F. The Expert Discovery Record .................................................................................. 25

STANDARD OF LAW ........................................................................................................ 25

ARGUMENT ....................................................................................................................... 26

I.  Plaintiffs Have No Evidence of Disparate Impact. ....................................................... 26

   A. There Is No Evidence of a Statistical Disparity ...................................................... 26

      1. Plaintiffs do not have a representative or comparable group of properties. ............. 27

      2. Plaintiffs fail to compare similarly situated properties. ........................................... 29

      3. The alleged deficiencies are based on invalid inspection criteria. ........................... 30

      4. Plaintiffs collected no data on maintenance work over time. .................................. 32

      5. Plaintiffs' ratings were subjective, unreliable, and unscientific. ............................. 34

      6. Plaintiffs' statistics are inadmissible hearsay. ......................................................... 35

   B. Rugh's Repeatedly Modified "Regression Analysis" Cannot Save Plaintiffs' Claims. ..................................................................................................................... 37

      1. A regression analysis cannot turn bad data into good data. ..................................... 37

      2. The regression analysis furnishes no evidence of discrimination. ........................... 38

   C. Plaintiffs Cannot Satisfy the FHA's "Robust Causality" and "Policy" Elements. .......... 41

      1. Plaintiffs have no "robust causation" evidence. ...................................................... 41

    2.   Plaintiffs have no robust evidence of "arbitrary, artificial, and unnecessary" policies causing the purported disparity. ................................................................. 45

II.  Plaintiffs Have No Evidence of Disparate Treatment........................................................... 50

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Anderson v. Westinghouse Savannah River Co.*,
   406 F.3d 248 (4th Cir. 2005) ..................................................................29, 40

*Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*,
   328 F.3d 309 (7th Cir. 2003) ............................................................................30

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..........................................................................................25

*City of L.A. v. Bank of Am. Corp.*,
   691 F. App'x 464 (9th Cir. 2017) ................................................................41, 46

*City of L.A. v. Wells Fargo & Co.*,
   No. 13-9007, 2015 WL 4398858 (C.D. Cal. July 17, 2015),
   *aff'd*, 691 F. App'x 453 (9th Cir. 2017)...........................................................46

*Cooper v. Southern Co.*,
   390 F.3d 695 (11th Cir. 2004) ..........................................................................36

*Darensburg v. Metro. Transp. Comm'n*,
   611 F. Supp. 2d 994 (N.D. Cal. 2009),
   *aff'd*, 636 F.3d 511 (9th Cir. 2011)..................................................................30

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)....................................................................................16, 37

*Diamond v. T. Rowe Price Assocs., Inc.*,
   852 F. Supp. 372 (D. Md. 1994).......................................................................50

*Donnelly v. R.I. Bd. of Govs. for Higher Educ.*,
   929 F. Supp. 583 (D.R.I. 1996).....................................................................4, 30

*EEOC v. Freeman*,
   778 F.3d 463 (4th Cir. 2015) ............................................................................27

*EEOC v. IBM*,
   583 F. Supp. 875 (D. Md. 1984)........................................................................40

*EEOC v. Sears, Roebuck & Co*,
   628 F. Supp. 1264 (N.D. Ill. 1986) ..............................................................35, 40

*Ewell v. NBA Props.*,
   94 F. Supp. 3d 612 (D.N.J. 2015) .....................................................................27

*Frazier v. Consolidated Rail Corp.*,
    851 F.2d 1447 (D.C. Cir. 1988) ..........................................................................27

*Hawkins v. Leggett*,
    955 F. Supp. 2d 474 (D. Md. 2013) ....................................................................50

*Hicks v. Ferreyra*,
    396 F. Supp. 3d 564 (D. Md. 2019) ....................................................................36

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
    920 F.3d 890 (5th Cir. 2019) ..............................................................................41

*Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*,
    No. 08-0546, 2016 WL 4494322 (N.D. Tex. Aug. 26, 2016)..............................48

*Maddox v. Claytor*,
    764 F.2d 1539 (11th Cir. 1985) ..........................................................................37

*Nat'l Fair Housing Alliance v. U.S. Bank N.A.*,
    No. 01-12-0283-8, Determination of No Reasonable Cause (HUD Jan. 8, 2016) .......... *passim*

*Piper v. J.R. Simplot Co.*,
    24 F.3d 248 (9th Cir. 1994) ................................................................................50

*Sheikh v. Rabin*,
    565 F. App'x 512 (7th Cir. 2014) ........................................................................29

*Smith v. City of Jackson*,
    544 U.S. 228 (2005)............................................................................................26

*Smith v. Verizon Wash., D.C. Inc.*,
    No. 11-1301, 2013 WL 1316391 (D. Md. Mar. 28, 2013),
    *aff'd*, 539 F. App'x 128 (4th Cir. 2013)........................................................25, 41

*Suburban Mortg. Assocs., Inc. v. Springhill Health Servs., Inc.*,
    993 F.2d 229 (4th Cir. 1993) ..............................................................................25

*Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Proj., Inc.*,
    576 U.S. 519 (2015)..................................................................................... *passim*

*Valentino v. United States Postal Service*,
    674 F.2d 56 (D.C. Cir. 1982) ..............................................................................40

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989)............................................................................................35

**Statutes, Rules, & Regulations**

42 U.S.C. § 3610.........................................................................................................8

24 C.F.R. § 100.500 ...........................................................................................26, 49

Fed. R. Evid. 803 ......................................................................................................36

Fed. R. Evid. 801 ......................................................................................................36

Fed. R. Civ. P. 12 .......................................................................................................1

Fed. R. Civ. P. 30 .......................................................................................................2

Grand Rapids Bldg. Maint. Code § 8.209 ................................................................6

Milwaukee Bldg. Maint. Ord. 275-32 .......................................................................6

W. Palm Beach Code of Ord. § 18-214 .....................................................................6

For more than a decade, the National Fair Housing Alliance (NFHA) and other Organizational Plaintiffs have wrongly accused Bank of America, N.A. (BANA) of violating the Fair Housing Act in its maintenance of real-estate owned (REO) properties in certain cities. Six years ago, however, the U.S. Department of Housing and Urban Development, the federal agency responsible for enforcing the FHA and setting standards for REO maintenance, concluded that the property-inspection methods Plaintiffs employed to make that serious accusation were not capable of evidencing discrimination. HUD ruled that Plaintiffs' investigative methods—*i.e.*, the methods that form the statistical basis of Plaintiffs' FHA disparate-impact and disparate-treatment claims here—suffered from a host of patent defects that rendered it too flawed and unreliable to sustain such claims or raise an inference of discrimination. *See NFHA v. U.S. Bank N.A.*, No. 01-12-0283-8, Determination of No Reasonable Cause (HUD Jan. 8, 2016) (Exhibit 1).[1]

In response to HUD's conclusions, Plaintiffs withdrew the complaint against BANA they had filed with HUD and re-filed it in this Court. At the hearing on BANA's motion to dismiss (ECF No. 44-1, 57), this Court noted that HUD's ruling in *U.S. Bank* on Plaintiffs' methods "intuitively made sense" and stated "valid criticism[s] of this investigation." ECF No. 63 at 21–22. But the Court declined to dismiss, determining that it was premature to assess the propriety of Plaintiffs' investigation methodology at the Rule 12(b)(6) stage. *See* ECF No. 66. The Court, however, made clear it did not envision litigating and resolving this case through mini-trials in which the parties and Court would "analyze all 1,700 properties [in Plaintiffs' investigation] and sit here and look at properties and so forth." ECF No. 63 at 47. Instead, the Court wanted "a way of getting just the causality, the validity of these statistics, the statistical analysis in front of me." *Id*. Accordingly, over Plaintiffs' objections, the Court ordered phased discovery towards a

---

[1] Exhibit citations refer to the Exhibits to the concurrently filed Declaration of Keith Levenberg.

threshold dispositive motion raising "[s]pecific challenges to [Plaintiffs'] methodology" for satisfying the FHA's "robust causality" element. ECF Nos. 115, 117.

The Court's case-management plan for bringing this case to an efficient resolution, based on the validity (or invalidity) of Plaintiffs' investigative and statistical methods, has worked. The fact and expert evidence the Court lacked at the dismissal stage about what Plaintiffs *really* found and what conclusions their inspections and statistical analyses were capable of supporting is now part of an undisputed record. That record, which includes ten expert reports, Rule 30(b)(6) testimony from all parties, and testimony from several of Plaintiffs' property inspectors, confirms Plaintiffs' investigation and statistics were tainted by the same fatal flaws HUD catalogued in *U.S. Bank*, plus several more (equally fatal) flaws. There is thus no reason to go to another stage where the parties and the Court must "analyze all 1,700 properties." ECF No. 63 at 47. The Court doesn't *need* 1,700 mini-trials to find Plaintiffs' methods fundamentally incapable of raising a triable issue on the "statistical disparity," "robust causation," and "arbitrary, artificial, and unnecessary policy" elements of Plaintiffs' claims. *Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Proj., Inc.,* 576 U.S. 519 (2015). Summary judgment in BANA's favor is now warranted.

A threshold reason for summary judgment is that there simply is *no reliable and admissible evidence of any statistical disparity*, because Plaintiffs destroyed their records of their property visits—the raw data on which any statistics are based. It is undisputed that in packaging their statistical data for public and judicial use, Plaintiffs' routine practice was to alter the results of their field inspections, then to destroy the original inspection reports in paper shredders. *See* ECF No. 153. It is clear, based on isolated originals that survived the shredders, that the field reports and the statistical database record of those reports are materially different. Plaintiffs thus have no reliable or admissible statistical or other evidence of the conditions at any property.

Independently, the undisputed record also shows that Plaintiffs' assertions of an unlawful

disparity rest entirely on invalid investigative methods, and so prove nothing. The methods are

infected by the same the same flaws HUD found in *U.S. Bank* (and then some):

- **Plaintiffs' single-point-in-time inspections showed nothing about Defendants' maintenance work.** Plaintiffs inspected each property only once. But "'[m]aintenance' is an ongoing, two dimensional process" that happens "over the course of time," and "a single test visit does nothing to show whether the condition of a property is improving or deteriorating." *U.S. Bank*, *supra*, at 3–4, 19. Consequently, myriad alleged "defects" were remedied within days or even *hours* of Plaintiffs' inspections.

- **Plaintiffs were not comparing similarly situated properties.** To evidence a disparity in the way properties are maintained, HUD concluded, Plaintiffs must compare properties similarly situated along such dimensions as "property value at the time of bank acquisition," "property condition at the point of acquisition," and "neighborhood characteristics" such as "crime rate," "local zoning ordinances," "neighborhood income," and "environmental characteristics." *Id*. at 24. But Plaintiffs now concede they did no analysis of whether any property was similarly situated to any other. And, indeed, neither the properties nor the neighborhoods Plaintiffs selected for study were similarly situated to each other on any of the relevant dimensions identified by HUD.

- **BANA spent *more* on maintenance in majority-minority neighborhoods than in majority-white neighborhoods.** BANA spent an average of ▮▮▮▮▮ on exterior maintenance in the majority-white neighborhoods at issue and ▮▮▮▮▮—38% more— in the majority minority neighborhoods. "[D]iscrimination cannot be shown against a minority group when that group is treated demonstrably better than the majority group to which it is being compared." *Id*. at 14 n.1.

- **The legally required maintenance actions are "far shorter and significantly different" than Plaintiffs' inspection criteria.** *Id*. at 5. Plaintiffs' list "focused on the appearance of the home," while the legal and contractual requirements are directed to "health and safety." *Id*. at 6. Plaintiffs' own property-preservation expert admitted that Plaintiffs claim "deficits" at hundreds of properties that BANA had no obligation or permission to remedy because they raised no health-and-safety concerns.

- **Plaintiffs' ratings were subjective and incapable of replication.** In evaluating Plaintiffs' own field-inspection photographs during their depositions, Plaintiffs' field inspectors were unable to rate the property conditions consistently with each other or with Plaintiffs' existing ratings. Plaintiffs' own property-preservation expert did not even rate numerous photographs he reviewed consistently with Plaintiffs' ratings.

These and numerous other flaws detailed below—both individually and collectively—are fatal to

Plaintiffs' effort to evidence a statistical disparity.

Plaintiffs also lack evidence on the other essential elements of a disparate-impact claim.

Plaintiffs have no evidence of any "arbitrary, artificial and unnecessary" BANA policies that can be shown through "robust" evidence to have *caused* any disparity. Robust causation cannot be shown in disparate-impact cases unless evidence linking a defendant's actions and a statistical disparity is strong. Here, it is non-existent. Nor can Plaintiffs save their FHA claims with their alternative disparate-treatment theory. As the Court already recognized, Plaintiffs make no claims of discriminatory intent "beyond the statistics themselves." ECF No. 66 at 15 n.8. Statistics too flawed to show a disparate impact cannot clear the *higher* bar for intentional-discrimination claims as a matter of law. And there remains *no* evidence that BANA had any discriminatory intent.

For these and other reasons set forth below, the Court should enter summary judgment for BANA on the Organizational Plaintiffs' claims.[2]

## STATEMENT OF FACTS

### A.    Plaintiffs' Inspection Strategy

On April 11, 2011, NFHA released a report (Ex. 58) accusing lenders of racial discrimination in their maintenance of REO properties. Six weeks later, NFHA began inspecting the BANA REOs at issue in this lawsuit. The inspections ran from May 25, 2011 to May 21, 2018. Ex. 15. Plaintiffs alleged in their Complaint that they ultimately inspected 1,677 BANA REOs in 37 metropolitan areas. Compl. ¶ 66. But they later admitted that several hundred of the properties were included erroneously because BANA didn't own them at the relevant time. Ex. 35. Presently, 1,405 of the original 1,677 properties are at issue. Ex. 14 at 2. Of those 1,405 properties, 302 are located in the six "Phase II MSAs" that have been the subject of property-specific discovery under the Court's phased case-management orders—Baltimore, Washington, D.C., New Haven, Ft. Worth, Memphis, and Milwaukee. *See* Ex. 15.

---

[2] Defendant Safeguard Properties Management is also moving for summary judgment. Safeguard's arguments and evidence also support this motion, and BANA incorporates them by reference.

Plaintiffs were very particular about where to do their inspections. They originally claimed they defined each "metropolitan area" to "correspond with the Metropolitan Statistical Areas [MSAs] as defined by the 2010 U.S. Census." Ex. 30 at 3–4. That turned out not to be true. What they actually did was to start drawing boundaries around "neighborhoods in the center of the metropolitan area," and "then move out from the center in concentric circles." Ex. 31 at 7. "Mov[ing] out from the center" was necessary because Plaintiffs' criteria for picking properties to inspect often left them with no properties in majority-white tracts. Ex. 17 at 72:8–73:4. But as soon as Plaintiffs found some minimal number of "white properties" to serve as purported comparators, they stopped looking for more and went no further in the MSA. *Id.* at 76:15–78:13.

Separately, even within their limited geographic circles, Plaintiffs excluded zip codes they deemed "very low income" or "very high income" (albeit with no "hard and fast" standard for either threshold) and excluded zip codes that did not have "the highest foreclosure rates." *Id.* at 61:12–62:21. But this did not have the effect of letting them compare like-with-like. Instead, they mostly ended up comparing properties in lower-income majority-minority tracts in city centers with properties in higher-income majority-white tracts in close suburbs, while excluding areas further out in each MSA where lower-income majority-white tracts and higher-income majority-minority tracts are more frequently found. Ex. 2 at ¶¶ 96–98 & App'x 5. As reflected in the maps depicting the location of each inspected property, the final geographic dispersion bears no resemblance to the Census-defined MSAs or any other definition of those metropolitan areas. *Id*.

Plaintiffs alleged they "inspected all (100%) of the Bank of America-owned homes in [their selected] zip codes within the same relative time period," except those where "work was actively occurring at the time of the site visits" or where they observed an occupant. Compl. ¶ 67. As the hedging language indicates, Plaintiffs did not inspect anywhere near "100%" of Bank of America's REOs on any citywide or areawide basis. Rather, because they inspected different cities at different

times, they only caught the REOs they were aware of at each respective time. Ultimately, within the six Phase II MSAs, there were at least ███ properties in BANA's REO portfolio within the relevant 2011–2018 time frame. Ex. 45. Plaintiffs inspected 302 (about ███ of them).

## B.    Plaintiffs' Field Inspection Reports

Plaintiffs' field inspectors conducted the site visits using a report form NFHA created listing thirty-one specified criteria and an additional six "miscellaneous" criteria. *E.g.*, Ex. 47 at 60. NFHA made up the criteria itself, and concededly did not account for any maintenance requirements actually applicable to BANA such as those imposed by local ordinances, government agencies like HUD, or the government-sponsored entities Fannie Mae and Freddie Mac. Ex. 17 at 129:19–24; Ex. 34 at 2–3. Thus, Plaintiffs' criteria differed significantly from the actual requirements. For example, Plaintiffs told their inspectors to give deficits for "boarded doors" or "boarded windows." Compl. ¶ 71. But many municipal ordinances required door and window boarding.[3] Plaintiffs also told their inspectors to give deficits for "peeling or chipped paint." Compl. ¶ 71. But investor requirements do not even permit BANA to paint property exteriors without special permission. Ex. 44 at 316951. And Plaintiffs penalized properties when they didn't have a "For Sale" sign, even on properties that *weren't for sale* because BANA was obliged to convey them to HUD, for sale by HUD. Ex. 2 at ¶ 112.

In single-day training sessions, Plaintiffs told the field inspectors—Plaintiffs' employees— that they were being dispatched to collect evidence to support Plaintiffs' claims of discriminatory property maintenance. Ex. 17 at 177:9–179:8. None of the inspectors had any experience in property maintenance, and they were given only the vaguest instructions on Plaintiffs' criteria. For example, a PowerPoint slide in NFHA's training defined "overgrown grass" as "high grass." Ex.

---

[3] *E.g.*, Milwaukee Bldg. Maint. Ord. 275-32(7)(a-1); Grand Rapids Bldg. Maint. Code § 8.209; Aurora, Ill. Code of Ord. § 12-504(e); W. Palm Beach Code of Ord. § 18-214(c)(2).

48 at 5148. Another slide defined "overgrown shrubbery" as "overgrown shrubs." *Id.* at 5150. Likewise, while "accumulated" mail was listed as a potential deficit, there was no "hard and fast" rule for how much mail it takes to qualify as "accumulated." *Id.* at 5147. The only criteria was that there be "multiple pieces" of mail (though that did not stop Plaintiffs' inspectors from checking the box on account of a single postcard). Ex. 17 at 122:6–9, 125:12–20. Ultimately, Plaintiffs relied on their inspectors to use their subjective judgment and apply each criterion on the basis of whatever they thought was "reasonable." *Id.* at 117:1-3, 118:20–21, 121:2–7, 125:14–18, 126:8–10, 129:8–11, 132:8–11, 137:15–17, 139:5–6, 140:13–15, 165:18–21, 166:5–9.

After the one-day "training," inspectors were dispatched in pairs or groups with blank inspection report forms to complete and cameras to photograph each alleged "deficit." Inspectors often disagreed on what qualified as a deficit and had to debate how to mark their official scores. Ex. 24 at 97:5–98:11. Plaintiffs collected the original reports and had other staffers input the scores to a database. Ex. 17 at 168:10–172:25. But the staffers could (and regularly *did*) alter the field results if they saw fit based on their own assessments of the photos. *Id.* at 169:4–8, 170:3–24; Ex. 24 at 39:21–22, 42:15–19. Then, Plaintiffs' general practice was to shred the original inspection reports, so there is no way to tell how many ratings deviate from the inspectors' original field ratings. Ex. 24 at 244:22–245:8, 247:5-11; Ex. 32 at 12–14 (No. 18); ECF No. 153-1 (detailing Plaintiffs' intentional destruction of the inspection reports).

The changes to the results did not end there. NFHA executives continued to alter the scores in the database months or years after the initial data entry. Ex. 17 at 170:3–24. In addition to any scoring changes during the initial data inputting, 24.4% of the Phase II properties' scores were altered at some later point in time—sometimes multiple times. Ex. 3 at ¶ 68.

## C.    Plaintiffs' Administrative Complaints and the HUD Ruling

Before filing their claims here, Plaintiffs pursued them as administrative complaints before

HUD. NFHA and five other Plaintiffs filed their first complaint against BANA with HUD on September 25, 2012, covering eight cities. Ex. 28. As additional organizations joined the campaign, more complaints were filed to include more Plaintiffs, until all but four of the current Plaintiffs and corresponding cities were represented. *See* ECF No. 44-1 at 32. HUD was statutorily required to investigate Plaintiffs' administrative complaints (*see* 42 U.S.C. § 3610(g)(1)), and did so over a period of six years. Compl. ¶ 15. HUD never made any finding of discrimination.

On January 8, 2016, HUD issued a ruling in Plaintiffs' substantially identical action against U.S. Bank. It concluded that Plaintiffs' investigation methodology was incapable of "provid[ing] sufficient facts to assert [] a[n] [FHA] claim." *U.S. Bank*, *supra*, at 3–5. The ruling was founded on a detailed and comprehensive critique of Plaintiffs' investigation methods as well as HUD's observations of relevant facts specific to some of the subject properties. *Id.*

First, HUD rejected the notion that "visit[ing] each property once" could show "a lack of maintenance." *Id.* at 3. HUD found it invalid to equate this "single point in time" snapshot of property conditions with tests in other contexts, such as "a single visit to a landlord":

> A claim that a landlord refuses to rent, or steers, can be proven based on a single instance because the discriminatory act occurred during that specific interaction. In the allegations here—that the Bank discriminated by failing to maintain properties—the disparate treatment does not take place at a single point in time, but over the course of time (the discrimination is 'two-dimensional' rather than one-dimensional). Any testing sufficient to prove disparate treatment due to a lack of maintenance must likewise be two-dimensional (occur over time). . . . The facts presented are claimed to show the condition of a given property—but only on a single day. Just as it takes time for a property to fall into ill-repair, so too does it take time to address the maintenance needs of a property and bring it up to a habitable condition. 'Maintenance' is an ongoing, two dimensional process, and a single test visit does nothing to show whether the condition of a property is improving or deteriorating.

*Id.* at 3–4. HUD further emphasized that Plaintiffs' single-point-in-time snapshots "do not take into account the condition of the properties at the time they came into Respondents' possession" or "the level or lack of upkeep by the mortgagor." *Id.* at 19.

Second, HUD compared Plaintiffs' inspection criteria with the actual contractual and "legal obligations" governing REO maintenance—and found that they were inspecting for the wrong things, because "the list of contractually obligatory maintenance actions ('MAs') is far shorter and significantly different than [Plaintiffs'] list of deficiencies." *Id*. at 4–5. U.S. Bank "did not," in fact, "have legal obligations to address many of" the aesthetic criteria on Plaintiffs' list, because the actual requirements focus on "health and safety concerns." *Id*. at 5–6. Further, Plaintiffs "mark[ed] as deficiencies acts that the Bank was legally obligated to perform"—for example, marking "board[ed] windows" and vacancy signage as deficits "without taking into account that, in some cases, municipalities require these." *Id*. at 5.

Third, HUD conducted a property-level analysis "for any evidence of differential treatment." *Id*. at 8. It found the opposite—that U.S. Bank spent more money in the majority-minority neighborhoods than in the majority-white neighborhoods. *Id*. at 9, 13, 16, 17, 22. Importantly, this analysis required HUD to locate "properties that were similarly situated and eligible for a comparative analysis," based on multiple factors:

> [A]t a minimum, similarly situated REOs would require: (1) similar property value at the time of bank acquisition; (2) similar property condition at the point of acquisition; (3) similar time in private ownership (since mortgage issuance); (4) similar time in possession of Respondent; and (5) similar age of property. In addition, any analysis would also have to control for neighborhood characteristics such as: (1) crime rate; (2) local zoning ordinances; (3) neighborhood income; and (4) environmental characteristics.

*Id*. at 6–7, 24. Further, comparators must be located "in the same MSA" "because each MSA has its own municipal codes governing foreclosed properties" and other "unique" characteristics. *Id*. at 21. HUD ultimately found very few REO properties that were similarly situated enough to allow fair comparisons. But when it found differences in maintenance work, it found them easily explained by properties' being "acquired in different condition" from their comparators. *Id*. at 15.

Recognizing that their administrative complaint against BANA was based on the same

invalid investigation methods, Plaintiffs withdrew it and re-filed it in this Court.

**D.    Plaintiffs' Complaint and the Motion to Dismiss**

Plaintiffs filed the operative Complaint in this Court on June 26, 2018. They purport to assert FHA claims based on inspections of a small and unrepresentative sample of BANA REOs in 37 MSAs. With the investigation as the only "statistical evidence" in support of their claims, Plaintiffs alleged that their inspections revealed an "average 9.1 deficiencies" for REOs in majority-minority tracts and an "average 6.4 deficiencies" for REOs in majority-white tracts—a "disparity" of 2.7. Compl. ¶ 83. Plaintiffs claimed they "conducted a regression analysis taking into account and controlling for non-racial factors" and concluded that this small disparity "cannot be explained on the basis of factors other than race." Compl. ¶¶ 87, 123(f).

Bank of America moved to dismiss the Complaint on the same grounds HUD relied on in *U.S. Bank*, among others. The Court agreed HUD had made "valid criticism[s]" of Plaintiffs' methods, but found it premature to rule on the validity of Plaintiffs' investigation methods at the dismissal stage. ECF No. 66 at 21–22.

Discovery has proceeded in phases. In November 2019, the Court approved a stipulated case management order defining Phase I as focused on (i) resolving disputes on which REOs belong in the case and (ii) the parties' respective records on the subject REOs in six sample MSAs. ECF No. 83. Plaintiffs wanted the next phase to cover property-level records for the inspected REOs in all 37 MSAs. Over Plaintiffs' objections, the Court entered a case-management order with a different vision. ECF Nos. 115, 117. Phase II, consistent with the Court's comments at the dismissal hearing, would focus on Plaintiffs' "methodology and validity of the theories on which the plaintiffs' experts' conclusions are based." ECF Nos. 63 at 47, 115 at 1. The Court explained:

> The defendants have raised significant challenges to the expert opinions on which the critical element of "robust causality" must be supported. Specific challenges to methodology have been raised, from the beginning of this litigation, that do not obviously

depend on a factual analysis of all the properties in the 37 metropolitan areas.

*Id.* at 1. The order thus contemplated that the parties would complete discovery on Plaintiffs'

investigative and analytical methods and test their validity by reference to property records for the

Phase II MSAs, and then Defendants would present threshold dispositive motions addressing those

methods and the robust causality element of Plaintiffs' disparate-impact claims. *Id.*; ECF No. 117.

## E.    The Fact Discovery Record

Consistent with the Court's Orders, the record produced over the two phases of discovery

to date includes property-level data and maintenance records for REOs in the six Phase II MSAs,

plus documents and testimony on BANA's policies and practices for supervising its maintenance

vendors and ensuring each property is managed according to applicable legal and investor

requirements. This record establishes many undisputed material facts demonstrating that

Plaintiffs' methodology does not and is not capable of evidencing discrimination.

### 1.    There was no disparity in BANA's actual maintenance work.

BANA spent ▮ more money maintaining properties in majority-minority neighborhoods

than majority-white neighborhoods—an average of ▮ in majority-minority neighborhoods

compared to ▮ in majority-white neighborhoods. Ex. 2 at ¶ 103.

### 2.    Plaintiffs' inspections showed nothing about property maintenance.

The records on the Phase II properties confirm HUD's critique that a one-dimensional

snapshot of conditions "on a single day" does not (and cannot) speak to Defendants' maintenance

of REOs over time. *U.S. Bank*, *supra*, at 3–4. Illustrative—but by no means exhaustive—examples

of how Plaintiffs gave improper deficits in majority-minority communities include the following.

- Plaintiffs visited ▮ in Capitol Heights on December 29, 2011 and are claiming it had ▮ deficiencies. *See* Ex. 15.[4] These reflect the disrepair the

---

[4] All of these "claimed" deficiencies are those *now* claimed in Plaintiffs' database. As a result of Plaintiffs' shredding original inspection reports, BANA does not and cannot know how they differ from the deficits the field inspectors claimed at the time of the inspections. *See* ECF No. 155-1.

property was in when BANA acquired it, evidenced by an as-is appraisal of $45,000 compared to an as-repaired appraisal of $100,000. Ex. 40 at 30053; Ex. 11 at ¶ 36 & Table 2. But BANA could not access the property to do repairs because of a holdover occupant who refused to vacate. The eviction process did not conclude until six months after Plaintiffs' inspection. After that, BANA spent $79,862 on external repairs. *Id.* (By Plaintiffs' own standards, this property should have been disqualified from their investigation because of the occupant. Compl. ¶ 67.)

- Plaintiffs visited ███████████ in Capitol Heights on June 17, 2011 and are claiming ██ deficiencies. Ex. 15. Again, BANA had no ability to remedy these at the time of inspection because the property was occupied and the holdover was not evicted for another four months. Ex. 11 at ¶ 36 & Table 2.

- Among the deficits Plaintiffs claim at ████████████ in Milwaukee is "unauthorized occupancy," apparently assigned on the basis of a car seen on premises. Ex. 15; Ex. 16 at 56304. It's unclear why Plaintiffs were assigning deficits for "unauthorized occupancy" while also claiming to exclude "properties [that] appeared to be occupied" from their investigation. Compl. ¶ 67. Regardless, the property was indeed occupied by a holdover not evicted until after Plaintiffs' inspection, precluding work on the property. Ex. 59 at 84224–25.

- Plaintiffs visited ████████████ in Baltimore on September 16, 2013, three and a half months after the foreclosure, and are claiming ██ deficits, including a miscellaneous structural deficit. Ex. 15. The "structural" issue arose from a pre-existing caved-in roof causing extensive damage, requiring approval from HUD to exceed expenditure limits. Ex. 11 ¶ 37(b). HUD's approval for the repair did not come until two weeks after Plaintiffs' inspection. *Id.*

- Plaintiffs visited ████████████ in Washington, D.C. on June 24, 2011 and are claiming ██ deficits. Ex. 15. The property had been damaged by a vandalism incident four days prior, delaying a sale of the property that was supposed to close on that day. Ex. 37 (row 14173). The buyer requested a price reduction instead of having BANA repair the damage and the sale closed in July 2011. *Id.* (rows 14193, 14252–54).

- Plaintiffs visited ████████████. in Milwaukee on October 3, 2012 and are claiming ██ deficits. Ex. 15. The reason they had been unaddressed is because BANA had made an agreement to donate the property in "as-is" condition, with the donation scheduled to close October 22, 2012. Ex. 11 ¶ 37(e). Similarly, Plaintiffs visited ████████████ in Milwaukee on September 17, 2012 and gave it ██ deficits, including a missing "for sale" sign. Ex. 15. There was no "for sale" sign because the property wasn't for sale. It had been slated for demolition and donation to the city. Ex. 37 (rows 22853, 22857–58).

- Plaintiffs visited ████████████ in Milwaukee on October 7, 2015 and are claiming deficits for a missing for-sale sign and overgrown grass. Ex. 15. Again, there was no for-sale sign was because the property wasn't for sale. It had a tenant residing there who had told BANA several months earlier to stop doing maintenance work because he would handle it. Ex. 36. (Again, this should have disqualified the property

under Plaintiffs' own criteria. *See* Compl. ¶ 67.)

- Tenants also occupied ▮▮▮▮▮▮. in Memphis until March 31, 2016, three weeks shy of Plaintiffs' April 20, 2016 visit. They had been paying rent to the prior mortgagor for the previous ten years and kept a "large Rottweiler [chained] by [the] front door." Ex. 37 (rows 136879, 136786–87). No repairs could be done until they vacated, including a roof repair BANA deemed necessary in a March 2 inspection which led to Plaintiffs giving it a "damaged roof" deficiency on April 20. Ex. 15. The roof repair commenced two days later, on April 22. Ex. 46.

- Plaintiffs visited ▮▮▮▮▮▮ in Camp Springs, Maryland on October 26, 2017 and are claiming a deficit for trash on the property. Ex. 15. BANA performed a debris removal the day of Plaintiffs' visit. If Plaintiffs' visit had come a few hours later, they would have seen the work in progress and excluded it from the case under their own inspection criteria. *See* Compl. ¶ 67. If Plaintiffs' visit had come a day later, the deficiency they claim would have been gone. Ex. 15; Ex. 11 at 36 & Table 2.

- Plaintiffs visited ▮▮▮▮▮▮ in Washington, D.C. on November 18, 2011 and are claiming a deficit for "trash" on the property. Occupants had only vacated it eight days earlier. Defendants began debris removal and repairs the same day Plaintiffs visited. *Id.* Again, if Plaintiffs' visit had come just a few hours later, they would have seen the work in progress and excluded the property under their own inspection criteria.

- Plaintiffs visited ▮▮▮▮▮▮ in Capitol Heights on May 24, 2016 and claim 11 deficiencies. *See* Ex. 52. Again, the arbitrary timing of their visit dictated the result. Repair work was performed the day of Plaintiffs' visit, so, again, the property could have ended up excluded if Plaintiffs had arrived at a different time of day. BANA had spent $10,000 repairing the property over the prior four months and another $54,000 after Plaintiffs' visit. *See* Ex. 41 at 73835.

- Plaintiffs gave dozens of properties deficits for overgrown grass solely by visiting late in the monthly lawnmowing cycle, with the next lawnmowing occurring mere hours or days after their visit—*e.g.*, ▮▮▮▮▮▮ in Suitland, Maryland (assessed for uncut grass May 24, 2016; grass cut that same day), ▮▮▮▮▮▮ in Memphis (assessed for uncut grass April 22, 2016; grass cut April 26), and ▮▮▮▮▮▮ in Baltimore (assessed for uncut grass June 23, 2017; grass cut June 28). Ex. 15; Ex. 57. At ▮▮▮▮▮▮ in Ft. Worth, Safeguard cut the grass on August 31, 2013, performed an inspection on September 11 in which it confirmed the "grass is mowed" at "4 inches high," and cut the grass again on September 21. Ex. 56 at 348897. Four days shy of the latter cut, on September 17, Plaintiffs came and are claiming a deficit for overgrown grass. Ex. 15.

- Plaintiffs are claiming deficits for trash at dozens of properties just days before trash was cleared out—*e.g.*, ▮▮▮▮▮▮ (assessed for trash November 23, 2015, trash removed November 28), ▮▮▮▮▮▮ in Milwaukee (assessed for trash August 14, 2013, trash removed August 17), and ▮▮▮▮▮▮. in Memphis (assessed for trash on February 7, 2017, trash removed February 10). Ex. 15; Ex. 57.

- Yard work was done on numerous properties within days of Plaintiffs' claiming a variety of yard-related deficits—*e.g.*, ███████████ in Milwaukee (assessed for "overgrown grass and leaves" and "invasive plants" on May 24, 2016; yard work done May 25), ████████ in West Haven (assessed for "overgrown grass and leaves" and "overgrown or dead shrubbery" on May 15, 2018; yard work done May 16), and █████████████ in Memphis (assessed for "invasive plants" April 20, 2016, yard work done April 22), █████████████ in Milwaukee (assessed for overgrown shrubs September 28, 2016, shrubs trimmed October 11), ████ in Baltimore (assessed for leaves on January 20, 2016, leaves removed February 6), and ███████████ (assessed for overgrown grass and leaves on April 22, 2016, grass cut and leaves removed *the same day*). Ex. 15; Ex. 16 at 8497, 10533; Ex. 38; Ex. 46; Ex. 53 at 4503.

Safeguard's motion identifies dozens more properties where Plaintiffs' single-point-in-time snapshots (i) resulted in misleading assessments about the maintenance work Defendants were actually doing and (ii) failed to account for the timing and causes (*e.g.*, vandalism) of conditions Plaintiffs erroneously labeled as maintenance defects. *See* Safeguard Br., Part I.A.5.

###    3.    Plaintiffs are comparing properties that are not similarly situated.

While Plaintiffs' Complaint alleged their investigation was based on "comparisons of similarly situated properties" (Compl. ¶ 93 *et seq*), they have since admitted they "did not conduct any [] analysis" on whether "any Subject Property was similarly situated to any other Subject Property." Ex. 32 at 7–8 (No. 14). Instead, their claim of a disparity is based on comparing every property with every other one and ignoring vast dissimilarities across all of the factors HUD deemed relevant to whether properties are valid comparators. *See U.S. Bank*, *supra*, at 24.

These factors *matter*. Research on the effects of foreclosure has shown that property conditions tend to deteriorate in the period between a default and foreclosure, because financially distressed homeowners defer maintenance to prioritize basic necessities and have no incentive to devote resources to properties they expect to lose to foreclosure. Ex. 4 at ¶¶ 30–31. "Deficits" in property conditions are therefore common. Comparing like with like thus requires some way to know what "deficits" BANA inherited. *See U.S. Bank*, *supra*, at 19, 24.

One source of record data of how many problems BANA inherited are appraisals on the properties in the Phase II MSAs, which provide valuations on both an "as-is" (*i.e.*, without doing any repairs) and "as-repaired" basis (*i.e.*, what the properties would be worth with the pre-existing defects remedied). The available appraisal records reveal that the median difference between as-is and as-repaired values was three times larger for the properties in the majority-minority tracts Plaintiffs selected for inspection than in the majority-white tracts, indicating those properties came to BANA with more pre-existing defects. Ex. 2 at ¶¶ 96–98 & Table 9. This should not be surprising given Plaintiffs' choice to compare lower-income urban areas with older housing stock and high foreclosure rates (with attendant vacancy and vandalism problems) to newer housing stock in higher-income suburbs. The conditions of such housing stock prior to entry into REO do not speak to discrimination in maintenance *after* acquisition by BANA.

Neighborhood factors confirm this. Within Plaintiffs' selected portions of the Phase II MSAs, the median property value for the subject properties in majority-minority neighborhoods was $36,000. *Id.* at ¶¶ 96–98. The median property value for the subject properties in majority-white tracts was $115,000. *Id.* at ¶¶ 96–98. 81.2% of the majority-minority census tracts were "low/moderate income" and 18.8% were "middle/upper income." *Id.* at ¶¶ 71–80 & Table 7. By contrast, 27.3% of the majority-white census tracts were "low/moderate income" and 72.7% were "middle/upper income." *Id.* at 71–80 & Table 7. Plaintiffs investigation thus indisputably did not compare properties similarly situated across the relevant criteria HUD identified in *U.S. Bank*.

### 4.    Plaintiffs' inspection criteria deviated from industry standards.

Plaintiffs expressly based their inspection criteria on "curb appeal" factors—"aesthetic qualities"—that they believed would make a property more attractive from the outside. Compl. ¶ 71; *U.S. Bank*, *supra*, at 4–5. But, as Plaintiffs' property preservation expert admits, the applicable legal and investor requirements for REO maintenance are concerned with "health and

safety" issues, not "aesthetic qualities" or "curb appeal." Ex. 8 at App'x 3.[5] They are tailored to getting houses out of REO status quickly, and to that end are focused on bringing the property to a baseline "conveyance condition." Ex. 29. Plaintiffs thus indisputably assessed deficits for aesthetic property conditions Defendants had no contractual or legal obligation to address. HUD, for example, "will not reimburse . . . for property improvements, such as stripping peeling paint and repainting. . . . The GSEs [Fannie Mae and Freddie Mac] follow the same approach." Ex. 5 at ¶ 61. But Plaintiffs nevertheless treated "peeling or chipped paint" as a deficit. Compl. ¶¶ 71, 96.

Plaintiffs' own property-maintenance expert agreed that, out of Plaintiffs' 37 criteria, 23 of them either always or often fell outside the scope of what Defendants were obligated—or even authorized—to do. Ex. 8 at App'x 3. For example, aesthetic issues like dead grass, broken mailboxes, missing shutters, and peeling paint were always outside the scope. *Id.* Other issues depended on property-specific circumstances Plaintiffs' inspections made no attempt to account for—for example, exterior mold only needs to be addressed if it is affecting the interior; invasive plants only if they threaten the building's "structural integrity." *Id.*

### 5.    Plaintiffs' ratings are subjective, biased, not replicable, and not scientific.

When Plaintiffs trained their inspectors how to rate properties, they told them exactly what they were expected to find: more deficits in majority-minority neighborhoods and fewer in majority-white neighborhoods. This tainted their study by inviting biased ratings—either through overt bias or subconscious confirmation bias—and contravened scientific best practices which "recommend[] that individuals responsible for collecting information be blind to the sponsor and purpose of the survey." Ex. 3 at ¶ 78 (citing Shari S. Diamond, "Reference Guide on Survey Research," *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 67 (3d ed. 2011)).

---

[5] BANA does not concede that any of Plaintiffs' purported experts meet the *Daubert* standards for qualification and reserves all rights to file *Daubert* motions to the extent Plaintiffs rely on them.

This is not merely a theoretical problem. The biases towards reaching the conclusions Plaintiffs were determined to reach before any inspections commenced are documented in Plaintiffs' own paper trail. Their ratings and photos demonstrate that their field inspectors routinely failed to give similar conditions similar ratings, couldn't ultimately agree on their own ratings, magnified the pettiest deviations from triple-mint condition to multiply the deficit count in majority-minority communities, and gave deficits in majority-minority neighborhoods for conditions they overlooked in majority-white neighborhoods:

**PLAINTIFFS PENALIZED PROPERTIES IN MAJORITY-MINORITY NEIGHBORHOODS FOR THE SAME CONDITIONS THEY OVERLOOKED IN MAJORITY-WHITE NEIGHBORHOODS**



Plaintiffs gave a deficit for "accumulated mail" in a majority-minority neighborhood based on a single postcard. Ex. 16 at 11231 ▮▮▮▮▮▮▮▮▮▮▮▮▮



Plaintiffs did *not* give an accumulated-mail deficit to this mailbox in a nearby majority-white neighborhood. *Id.* at 20182 (▮▮▮▮▮▮ .).



Plaintiffs gave an "overgrown shrubbery" deficit to the foliage by the window in a majority–minority neighborhood. *Id.* at 16067 ▮▮▮▮▮▮▮▮▮▮▮▮ .).



Plaintiffs gave no deficits to these shrubs in a majority-white neighborhood. *Id.* at 15662 ▮▮▮▮▮▮▮▮▮▮ . Their own expert disagreed and gave it multiple deficits Plaintiffs did not. Ex. 27 at 299:22–302:9.





Plaintiffs gave the doorframe above a "chipped paint" deficit in a majority–minority neighborhood of Southeast D.C. (The "chipped paint" might be the gray spot by the steps.) Ex. 16 at 31601 ███████

Plaintiffs gave *no* deficiencies to the chipped doorframe above in a majority-white neighborhood of Baltimore. *Id.* at 18940 ██████





In a majority-minority tract of West Haven, Plaintiffs gave this deck a structural deficit, commenting: "deck and boards are old." Id. at 20218 ███████████

Plaintiffs gave *no* deficits to the remnants of the deck above in a majority-white tract in nearby Waterbury. *Id.* at 11822 ██████

 

**Plaintiffs gave an "overgrown grass" deficit to the lawn above in a majority–minority tract.** *Id.* at 1764 (██████████████)

**Plaintiffs gave *no* deficits to the lawn above in a majority-white tract.** *Id.* at 2222 ████ ████████████

The record also shows Plaintiffs' taking advantage of their unfettered discretion and open-ended "miscellaneous" categories to assign prolific deficits to minority-neighborhood properties on the basis of invented problems:

**PLAINTIFFS INFLATE THEIR "DISPARITY" WITH INVENTED DEFICITS IN MAJORITY-MINORITY COMMUNITIES**

 

**Finding nothing else to criticize about the above Georgian row house in a majority-minority tract of Baltimore, Plaintiffs gave a "chipped paint" deficit to the minor wear on the doorframe.** *Id.* at 30582 (████████████████████████.); Ex. 50 (prop. ID 634). **Their own maintenance expert would later admit Defendants had no obligation to refresh chipped paint.** *See* **Ex. 8 at App'x 3.**



**Two pieces of mail invisible until Plaintiffs opened the mailbox earned the property above an "accumulated mail" deficit. Ex. 16 at 11292 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.); Ex 50 (prop. ID 11605).**



**Plaintiffs called this a "damaged fence." Ex. 16 at 3464 (▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.); Ex 50 (prop. ID 1076). Their own maintenance expert disagreed. He said, "[T]his does not cause a safety, security, or preservation issue. . . . I wouldn't do anything from a preservation and maintenance standpoint." Ex. 27 at 281:7–21.**



**Plaintiffs decided the photo above depicts a "long crack up entire side of house," and gave it a "miscellaneous" deficit. Ex. 16 at 26505 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex 50 (prop. ID 4219). It isn't a "crack"; it's the way the house was built.**



**Plaintiffs gave a "water damage" deficit to the siding above. Ex. 16 at 19377 ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Their own expert disagreed and mentioned nothing about water damage in his review of the photo. Ex. 27 at 324:9–326:5.**



**Plaintiffs gave the homes above and right deficits for "damaged siding," for no discernible reason other than an apparent mistaken belief that siding panels should run the entire span of a house with no seams. Ex. 16 at 4004, 19300███████████████ ███████████ ; Ex. 50 (prop. IDs 1134, 1581). Their own expert says siding only has to be addressed if it poses a safety concern. Ex. 8 at App'x 8.**

Plaintiffs' ratings were so subjective, unreliable, and unscientific that they were not replicable. BANA asked two of Plaintiffs' inspector witnesses, Rachel Scalise and Lisa Govoni, to evaluate properties based on the photographs Plaintiffs took and opine on what they should be rated. Scalise and Govoni weren't without clues on how to mirror Plaintiffs' official ratings, since Plaintiffs only took pictures of conditions they found deficient, not those they found compliant, so wherever there is a photo, Plaintiffs probably found a deficit. Nonetheless, of a set of 69 photos of various property conditions, Scalise rated 24 of them differently from Plaintiffs' official ratings, Govoni rated 33 of them differently, and Scalise and Govoni rated 26 of the 69 differently from each other. *Compare* Ex. 15 *with* Ex. 18 at 76:9–181:11, Ex. 24 at 127:3–231:1.

Then, on another set where BANA asked Scalise and Govoni to review every photograph Plaintiffs took of eight different properties, they almost always failed to reach results consistent with Plaintiffs' official ratings or with each other:[6]

---

[6] *Compare* Ex. 18 at 77:21–99:22 *with* Ex. 24 at 127:3–138:11; Ex. 18 at 119:2–125:3 *with* Ex. 24

| Property Address | Current Alleged Official Deficits | Scalise Deficits | Govoni Deficits |
|---|---|---|---|
| | | 7 | 3 |
| | | 4 | 4 |
| | | 8 | 5 |
| | | 5 | 6 |
| | | 3 | 5 |
| | | 6 | 5 |
| | | 11 | 9 |
| | | 5 | 6 |

Plaintiffs' inspectors tried to excuse this performance by claiming it was impossible to rate properties based on photos without actually being there. *E.g.*, Ex. 18 at 63:21–64:8; Ex. 24 at 195:13–17. That only confirms that Plaintiffs' after-the-fact alterations of the original inspection results based on *their* reviews of the photos makes the final results even less reliable.

> 6.      **The "regression analysis" does not show what Plaintiffs claimed.**

At the pleading stage, Plaintiffs' main response to BANA's challenges to their investigation was to rely on their "regression analysis." *See* ECF No. 55, *passim*. They said there was a disparity of 2.7 purported "deficits" and that the "regression analysis" proved it could not be "explained by non-racial factors." Compl. ¶¶ 83, 87. That assertion was and remains false.

In the original regression analysis Plaintiffs referenced, Plaintiffs' purported expert Jacob Rugh actually found at least 35% of the alleged disparity easily explained by non-racial factors like property age, bringing the purported disparity Plaintiffs could not "explain by non-racial factors" to under 2. Ex. 10 at 40 & Table 16. But this analysis did not even cover all of the properties at issue. It covered only 1,194 properties in 26 of the 37 MSAs. Ex. 2 at ¶¶ 24, 36. When BANA's expert David Skanderson replicated Rugh's analysis across the full universe and added

---

at 139:1–145:20; Ex. 18 at 125:9–131:15 *with* Ex. 24 at 145:21–155:8; Ex. 18 at 131:16–136:17 *with* Ex. 24 at 155:10–163:3; Ex. 18 at 140:20–146:15 *with* Ex. 24 at 163:5–168:16 ; Ex. 18 at 146:16–149:16 *with* Ex. 24 at 168:18–175:2; Ex. 18 at 149:17–154:4 *with* Ex. 24 at 175:3–183:1; Ex. 18 at 154:5–157:21 *with* Ex. 24 at 183:3–187:10.

just two more variables to control for neighborhood characteristics that Rugh erroneously omitted from his analysis, the disparity dropped to 1.22. *Id.* at ¶¶ 128–29.

To avoid discovery into Rugh's original (and incomplete) regression analysis that formed the basis for the allegations in the Complaint, Plaintiffs stipulated that they would not rely on it any longer. Ex. 35. Instead, between January 2022 and March 2022, Plaintiffs produced a series of revised and corrected regression analyses. The new analysis Plaintiffs produced on February 14 covered only 932 properties in 27 metropolitan areas, because Rugh chose to exclude areas with too "small [a] sample size" and admitted he lacked data on his regression variables in certain other locations. Ex. 9 at 40 & Table 16. In this limited analysis, the portion of the alleged disparity Rugh claimed was unexplained by his non-racial variables was 1.97. *Id.* at 4.

On March 4, 2022, Rugh produced a supplemental expert report stating he had revised his analysis after Plaintiffs "directed" him—apparently contrary to his own judgment—"to use the [full] list of 1,405 properties," and found "a gap in average observed deficiencies of 3.1 between majority white and non-white census tracts," "53%" of which was "not explained by any factor other than race." Ex. 14 at 1, 2. That equates to an unexplained disparity of 1.64. In the supplement, Rugh also described doing a separate regression on the subset of properties he called the "Unedited Properties"—a mere 430 properties where Plaintiffs were not (yet) caught manipulating the inspection results—and claimed the "adjusted racial gap" was similar, at 1.65. *Id.* 3.

Beyond the undisputed fact that Rugh's analyses do not support the broad assertions Plaintiffs made to the Court at the pleadings stage, they indisputably do not control for what HUD said must be controlled for to compare similarly situated properties in the context of Plaintiffs' property inspection methodology. Some of the important variables emphasized by HUD that would provide non-race based explanations for the differences Plaintiffs purported to have observed—*e.g.*, "property value at the time of bank acquisition," "property condition at the point of

acquisition," and "local zoning ordinances"—indisputably were not accounted for in any of Rugh's

analyses. *Compare U.S. Bank*, *supra*, at 24, *with* Ex 14 at 4. Others, like "neighborhood income"

and "crime rate," were accounted for only in crude and unreliable ways. For example, the only

crime statistic Rugh factored in was a binary value for whether or not the property was in an area

with a top 10% burglary rate. Ex. 9 at 9 & Table 3. But the burglary data he used were on the

citywide level, not the level of individual tracts on which this case is based. So Rugh was assigning

every tract in a city the *same* burglary rate, further smoothing out the differences by factoring in

only whether a rate was in the top 10% or not, and then declaring that property conditions on the

tract level couldn't be correlated with differences in burglary rates. Ex. 12 at ¶ 21 & Ex. 1.

### 7. Plaintiffs manipulated their survey results and shredded key evidence.

As detailed in BANA's spoliation motion (ECF No. 155-1), after collecting the inspection

reports for each property, Plaintiffs' staff members were authorized to alter the results—*i.e.*,

adding deficits, removing deficits, or changing deficits—before inputting them in their database.

Then, Plaintiffs routinely shredded the original reports. NFHA said "shredding the [reports] was

part of its routine practice." Ex. 32 at 13. This practice spoliated 92.2% of the original reports for

properties in the six Phase II MSAs and at least 750 (and likely more) of the REO properties

Plaintiffs inspected. Ex. 52. The result is that neither Defendants nor this Court has any idea how

Plaintiffs' field inspectors originally rated these properties, whether the original inspection results

(the entire predicate for this lawsuit) revealed any disparity at all, or the scope of how Plaintiffs

may have altered the results to advance their claims. *See* Ex. 50; Ex. 51. It is, however, undisputed

that an indeterminate number of the final property inspection ratings that now form the basis of

this lawsuit differ from the original ratings assigned by the field inspectors, based on the after-the-

fact, unilateral decision-making of NFHA staff members—none of whom have any expertise or

experience in REO property maintenance. Ex. 17 at 168:16–175:17.

These after-the-fact changes naturally affected the final statistics. For example, one of the only surviving reports for properties in the Phase II MSAs reveals that Plaintiffs' employees only completed about half the report when they "investigated" ████████ in a majority-minority tract in Waterbury, Connecticut. *See* Ex. 47. Yet Plaintiffs' database reflects significantly more deficits for this property than the deficits in the incomplete report. *Compare* Ex. 47 *with* Ex. 50. & Ex. 51. By contrast, when Plaintiffs visited ███████████ in a majority-white tract in Fort Worth, Texas, the surviving report shows them recording deficits for "trash" and "trespass and warning signs" that do not appear in the database. *Compare* Ex. 49 *with* Ex. 50. & Ex. 51.

Similarly, for the 24.4% of properties in Phase II MSAs where the inspections ratings were changed one or more times after their initial data upload (*id.* at ¶ 68), the changes weren't neutral. Plaintiffs were more than twice as likely to alter the results in majority-white neighborhoods than in majority-minority tracts. *Id.* at ¶ 68. The result was to remove more defects they had assigned in majority-white tracts and thus increase the alleged statistical disparity. Ex. 12 at ¶ 51.

## F.     The Expert Discovery Record

The above discusses only some of the fundamental flaws in Plaintiffs' investigation methods that render them incapable of evidencing discrimination or, for that matter, any statistical disparity. The full scope is detailed in the expert reports of **David M. Skanderson, Ph.D.** (Ex. 2) and **Justin McCrary, Ph.D.** (Ex. 3) filed in support of this Motion.

## <u>STANDARD OF LAW</u>

Because Plaintiffs have the burden of proof, Defendants need only "point[] out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to Plaintiffs to produce competent evidence a "reasonable jury" could rely on to find they satisfied their burden on each element of their claims. *Smith v. Verizon Wash., D.C. Inc.*, No. 11-1301, 2013 WL 1316391, at *4 (D. Md. Mar. 28, 2013),

*aff'd*, 539 F. App'x 128 (4th Cir. 2013); *see also Suburban Mortg. Assocs., Inc. v. Springhill Health Servs., Inc.*, 993 F.2d 229 (4th Cir. 1993). Plaintiffs cannot meet that burden here.

## ARGUMENT

The FHA has been construed to allow claims under either a disparate impact or treatment theory. *See Inclusive Communities*, 576 U.S. at 541.[7] The former—Plaintiffs' main theory here—requires Plaintiffs to prove (1) a "statistical disparity" between minorities and "similarly situated individuals not part of the protected class," (2) an "artificial, arbitrary, and unnecessary" policy of the defendant, and (3) "robust causality" establishing that the "defendant's policy or policies caus[ed] that disparity." *Inclusive Communities*, 576 U.S. at 541–43; 24 C.F.R. § 100.500(d)(2)(i). The undisputed facts demonstrate that Plaintiffs have no competent, admissible evidence to carry their burden on any of these elements. Meanwhile, disparate treatment requires evidence of "discriminatory intent or motive," and Plaintiffs have none of that, either. *Id.* at 524; ECF No. 66 at 15 n.8. Defendants are thus entitled to summary judgment on Plaintiffs' FHA claims.

## I.    PLAINTIFFS HAVE NO EVIDENCE OF DISPARATE IMPACT.

The only evidence proffered of a statistical disparity flows from Plaintiffs' "investigation." But the undisputed facts show that this ratings project is wholly unreliable and unscientific, and suffers from the same defects HUD concluded render it incapable of evidencing a disparity. Plaintiffs also have no evidence to establish the requisite robust causality between the alleged disparity and any claimed policy or practice.

### A.    There Is No Evidence of a Statistical Disparity.

Statistics purporting to measure a statistical disparity are only competent and relevant if

---

[7] In the event of future appeals, BANA preserves the argument that "[t]he Fair Housing Act does not create disparate-impact liability," *Inclusive Communities*, 576 U.S. at 558 (Alito, J., dissenting), because it governs actions taken "because of" a protected characteristic, not mere effects. *See Smith v. City of Jackson*, 544 U.S. 228, 236 (2005).

they measure the right thing, and measure it reliably. As "the leading commentators on the use of statistical analysis in discrimination litigation have warned," "the accuracy of the inferences [statistics] suggest . . . can be no greater than the validity of the basic research and design methodology that produced the measure." *Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1452–53 (D.C. Cir. 1988). Here, the relevant thing to measure is Defendants' maintenance of the subject REO properties "over the course of time." *U.S. Bank*, *supra*, at 3. This measure *must* be disentangled from any measurement of the condition the properties were in "at the point of acquisition," *id.* at 24, because the FHA "protects defendants from being held liable for racial disparities they did not create." *Inclusive Communities*, 576 U.S. at 542. Here, the undisputed record establishes that Plaintiffs did not measure the right thing and, even if they had, did not take relevant or reliable measurements or disentangle those measurements from pre-existing property conditions. Any one of these problems is enough to render Plaintiffs' methods fatally flawed and incapable of evidencing the alleged statistical disparity. Collectively, this is not even a close case.

**1. Plaintiffs do not have a representative or comparable group of properties.**

The 1,405 REO properties that now comprise Plaintiffs' investigation are not a random or representative sample of BANA's REO portfolio on a nationwide level, and are not even a random or representative sample of BANA's REO portfolio in the metropolitan areas Plaintiffs chose to investigate. A "sample . . . not representative of the population at large" is not capable of evidencing discrimination" as a matter of law. *Frazier*, 851 F.2d at 1452; *see also*, *e.g.*, *EEOC v. Freeman*, 778 F.3d 463 (4th Cir. 2015) (affirming ruling that "cherry-picked" data produced "a meaningless, skewed statistic" betraying a "theory in search of facts to support it"); *Ewell v. NBA Props.*, 94 F. Supp. 3d 612, 628 (D.N.J. 2015) ("numerical disparity has no significance . . . because the sample . . . cannot be evaluated as if it were a random sample"). That is the case here. Plaintiffs have no evidence that their sample is representative of anything—let alone BANA's

REO population in any MSA they investigated.

The record evidence is that Plaintiffs carefully selected a population skewed towards (i) low-income minority neighborhoods in city enters with average property values of $36,000 and (ii) higher-income white neighborhoods in suburbs with average property values of $115,000. Ex. 2 ¶ 96.[8] Plaintiffs *could* have found both (i) lower-income majority-white areas more economically comparable to the lower-income majority-minority areas they were inspecting and (ii) higher-income majority-minority suburbs more comparable to the higher-income majority-white suburbs they were inspecting. But with few exceptions, they excluded such areas from their investigation. Ex. 2 at App'x 5. For example, in the Oakland MSA, Plaintiffs left vast swaths of higher-income majority-minority Census tracts unexplored, but crossed San Francisco Bay to add two properties in wealthy, 85%-white Marin County to their data set. *Id.* at ¶ 64 & App'x 5.

In response to the showing of BANA's experts that Plaintiffs' selection of properties to inspect was not representative of BANA's nationwide portfolio, Plaintiffs proffered a report from their own purported expert opining that "the purpose of the investigation . . . was never to extrapolate findings to locations beyond those sampled." Ex. 6 at 23–24. This is contrary to Plaintiffs' repeated "representat[ions] to the court" that it was proffering its study as a "nationwide investigation." ECF No. 66 at 11 n.6. It is thus now undisputed that Plaintiffs are *not* claiming discrimination on a "nationwide" basis or even on a citywide basis in the selected MSAs, but only among the particular properties selected for inspection. As set forth below, however, their methods are not even suitable for this limited purpose.

---

[8] Across the 1,405 REOs now at issue, ▪▪ (or approximately ▪▪▪) were located in majority-minority tracts and ▪▪ (or approximately ▪▪▪) were located in majority-white tracts. Ex. 15. Plaintiffs' statistical evidence is thus based on more than twice as many properties in majority-minority tracts than in majority-white tracts, which is not representative of the population. The Phase II MSA properties are even more lopsided, with approximately ▪▪▪ located in majority-minority tracts and 20% located in majority-white tracts. *Id.*

### 2.    Plaintiffs fail to compare similarly situated properties.

Plaintiffs' investigation did not make any attempt to identify or compare similarly situated properties. Plaintiffs' Complaint alleged otherwise, purporting to describe ten pairs of similarly-situated properties (Compl. ¶¶ 93–103), but Plaintiffs never specified what criteria made them similarly situated. Then, in discovery, Plaintiffs admitted that they "did not conduct any [] analysis" on whether "any Subject Property was similarly situated to any other Subject Property." Ex. 32 at 7–8 (No. 14). This, too, is fatal to Plaintiffs' disparate-impact claims as a matter of law.

"[T]o evaluate whether or not there is [a] disparate impact . . . , similarly situated [groups] must be compared." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 262 (4th Cir. 2005). That means subjects "identical or directly comparable in all material respects" other than membership in a protected class. *Sheikh v. Rabin*, 565 F. App'x 512, 516 (7th Cir. 2014). In the context of this case, assessing whether properties were "similarly situated in most material respects" other than the racial composition of the neighborhood in which they were located required consideration of a host of factors. As HUD determined in *U.S. Bank*, these factors include, for example, the contracts governing the maintenance BANA was required and authorized to complete (*e.g.*, "FHA insured" properties are governed by different requirements from others) and applicable local laws and ordinances. *See* Background, *supra*, Part B. And they also included factors such as "property value at the time of bank acquisition," "property condition at the point of acquisition," "time in private ownership (since mortgage issuance)," "time in possession of [the bank]," "age of [the] propert[ies]," and "neighborhood characteristics" such as "crime rate," "neighborhood income," and "environmental characteristics." *U.S. Bank*, *supra*, at 7, 12 n.25, 24.

The undisputed record evidence is that the properties Plaintiffs selected to generate the alleged statistical disparity are not similarly situated across these and other relevant factors. Indeed, it is undisputed that Plaintiffs did not even consider or attempt to control for most of these factors

in their analysis. *See* Ex. 2, *passim*; Ex. 9 at 9, 40 & Tables 3, 16. Where Plaintiffs' investigation indisputably rests on comparisons of properties that are not similarly situated, their statistical analysis is, by definition, "akin to comparing 'apples and oranges.'" *Donnelly v. R.I. Bd. of Govs. for Higher Educ.*, 929 F. Supp. 583, 591 (D.R.I. 1996); *accord*, *e.g.*, *Darensburg v. Metro. Transp. Comm'n*, 611 F. Supp. 2d 994, 1047-51 (N.D. Cal. 2009), *aff'd*, 636 F.3d 511 (9th Cir. 2011) (finding that Plaintiffs failed to meet their statistical burden where "significant differences" between comparators presented "the proverbial 'apples and oranges' issue"); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 319–20 (7th Cir. 2003) ("In order to be considered, the statistics must . . . include only other [subjects] who were similarly situated").

### 3.    The alleged deficiencies are based on invalid inspection criteria.

Plaintiffs cannot validly or accurately measure a disparity in the performance of property maintenance when their inspection criteria indisputably included a host of items having nothing to do with property maintenance. *U.S. Bank*, *supra*, at 5. Simply put, Plaintiffs measured the wrong things. Indeed, as their property preservation expert concedes, Plaintiffs' inspection criteria do not correlate to the various contractual, legal, and other requirements governing BANA's REO maintenance activities. Ex. 7 App'x 3.

Plaintiffs' inspection criteria focused on aesthetic considerations like "curb appeal" (Compl. ¶ 71) when the actual focus of REO maintenance and the applicable maintenance requirements is on "health and safety concerns." *U.S. Bank*, *supra*, at 6. As Plaintiffs' own property maintenance expert admitted, Defendants were not actually responsible for addressing most of the conditions that Plaintiffs cited as deficits because they posed no health or safety risks. Ex. 7 App'x 3. He found some of Plaintiffs' criteria categorically invalid, and others dependent on the context of the particular property, based on whether it rose to the level of a health-and-safety (as opposed to an aesthetic or "curb appeal") issue. *Id*. Thus, Plaintiffs gave deficits for numerous things

Defendants were under no obligation to fix, like dead grass, broken mailboxes, and chipped paint. *Id*. Plaintiffs also gave properties deficits for other conditions without making any assessment of whether the condition was a health-and-safety issue (of the kind Plaintiffs' expert testified Defendants had an obligation to remedy) or merely a "curb appeal" issue (of the kind Defendants concededly had no obligation to remedy). Ex. 7 App'x 3. And Plaintiffs gave properties deficits for conditions *required by law* to secure properties—for example, penalizing boarded windows without regard to the fact that "some municipalities require that owners of vacant properties board . . . broken windows." *U.S. Bank*, *supra*, at 5; *see also supra n*.3 (citing ordinances requiring window boarding). Ratings about deficits that do not (and cannot) reflect BANA's actual maintenance of REO properties do not (and cannot) generate relevant, reliable, and accurate evidence of a statistical disparity in REO maintenance.

To the contrary, inaccurate and irrelevant ratings criteria produce inaccurate and unreliable statistical evidence. For example, at ███████████████████████████, Plaintiffs rated the property in the majority-minority neighborhood in worse condition solely on account of some chipped paint on a doorframe. Then Plaintiffs' own expert admitted that chipped paint was "outside" Defendants' maintenance obligations. Ex. 7 App'x 3. Thus, the resulting "disparity" between the two properties' ratings didn't reflect any actual disparity in BANA's maintenance of the two properties—the only disparity arises from one pre-existing defect BANA had no obligation to remedy. As HUD reasoned in *U.S. Bank*, if there is a "deficiency" Defendants would not have addressed at *any* property, its presence at one property does not mean Defendants were responsible for it and its absence at another "does not mean that [Defendants] have made . . . a repair at that property." *U.S. Bank*, *supra*, at 20.

In total, Plaintiffs assigned ███ invalid chipped-paint deficits to more than half ███████ the properties in majority-minority tracts they inspected (compared to ███ invalid chipped-paint

deficits on ▮▮▮ of properties in majority-white tracts), so the invalid deficit artificially inflated the alleged "disparity." Ex. 15. Plaintiffs assigned hundreds more invalid deficits in other categories their own expert admitted BANA wasn't obliged to remedy, including:

- damaged siding (▮ deficits on ▮ of majority-minority properties; ▮ deficits on ▮▮ of majority-white properties);

- wood rot (▮ deficits on ▮▮ of majority-minority properties; ▮ deficits on ▮▮ of majority-white properties);

- broken mailboxes (▮ deficits on 9% of majority-minority properties; ▮ deficits on ▮▮ of majority-white properties);

- invasive plants (▮ deficits on 37.8% of majority-minority properties; ▮ deficits on ▮▮ of majority-white properties);

- dead grass (▮ deficits on ▮▮ of majority-minority properties; ▮ deficits on ▮▮ of majority-white properties); and

- small amount of mold (▮ deficits on ▮▮ of majority-minority properties; ▮ deficits on ▮▮ of majority-white properties). *Id.*

All these invalid "deficits" artificially inflated the purported disparity.

### 4. Plaintiffs collected no data on maintenance work over time.

Plaintiffs' inspections were also incapable of producing relevant and reliable evidence of a statistical disparity in REO property maintenance based on the numerous flaws associated with their decision to visit each property only once and capture its condition at that single point in time.

As HUD concluded (and common sense confirms), maintenance is an ongoing activity that cannot be meaningfully assessed in a single visit. *U.S Bank*, *supra*, at 3–4, 19–20. The undisputed record evidence shows REO maintenance is affected by a host of factors Plaintiffs' investigation made no attempt to account for. For example, holdover occupants preclude maintenance until they are legally removed or voluntarily depart. *See* Background, *supra*, Part E.2. And some maintenance work requires third-party approvals that take time to obtain. *Id*. Plaintiffs thus blamed BANA for numerous conditions it had no ability to address at the time of their inspections.

Further, Plaintiffs regularly cited deficits that were remedied within mere hours or days. *See id.*; Safeguard Br., Part I.A.5. Those deficits arise solely from the arbitrary timing of Plaintiffs' inspections in relation to ongoing maintenance work, not from any defective maintenance.

Finally, a single inspection precludes the inspector from making *any* determinations about which conditions were related to Defendants' maintenance work and which were inherited from prior owners. *U.S. Bank*, *supra*, at 19. In *U.S. Bank*, HUD emphasized the "property condition at the point of acquisition" (*id.* at 24) as one of the most critical variables to account for in assessing property maintenance and ruled that Plaintiffs' "single point in time" inspections "do[] nothing to show whether the condition of a property is improving or deteriorating." *Id.* at 3–4.

At the motion-to-dismiss stage, Plaintiffs tried to defend their single-point-in-time inspections by arguing that Defendants were obliged to remedy every pre-existing condition even if they did not cause them. *See* ECF No. 55 at 38. That argument will not serve Plaintiffs now. At the outset, it violates *Inclusive Communities*' holding that the FHA "protects defendants from being held liable for racial disparities they did not create." 576 U.S. at 542. In addition, *two* of Plaintiffs' own experts disavowed it. Deavay Tyler, their maintenance expert, disagrees that Defendants were obliged to remediate dead grass, invasive plants, chipped paint, missing window shutters, and numerous other purported "deficiencies." Ex. 8 App'x 3. And Rugh, Plaintiffs' statistics expert, admitted it is "important" to account for "the initial conditions of the property" to understand "the determinants of the observed disparities"—*i.e.*, whether they were determined by a "variation in property maintenance" or by other factors like "wear and tear" on older properties predating BANA's ownership. Ex. 23 at 40:10–49:7; *see also id.* at 207:11–214:9 (testimony that if Rugh had data on the prior mortgagor's economic circumstances, he would have included them in his analysis because it relates to "the resources that the homeowner has to . . . devote to maintenance"). But he admitted that "[b]ased on the data that we have"—*i.e.*, the data yielded by

Plaintiffs' deficient single-point-in-time inspections—"it's just not possible for us to know when" any given condition arose. *Id.* at 49:2–4.

This is not an *inherent* limitation that would apply to *any* lawsuit over property maintenance—it is purely an artifact of Plaintiffs' deficient methods and their purposeful decision to "visit[] each property once," "on a single day." *U.S. Bank*, *supra*, at 3. Plaintiffs' own expert admitted that if they had collected data from multiple points in time, he would have made use of that data set to paint the two-dimensional picture HUD found lacking. Ex. 23 at 236:1–237:19. The only reason he didn't do so is that Plaintiffs didn't collect the data. *Id.* at 238:7–10.

**5.    Plaintiffs' ratings were subjective, unreliable, and unscientific.**

On top of surveying a skewed population with no similarly situated comparators with invalid inspection criteria at a single point in time, Plaintiffs' *application* of those criteria was subjective, unscientific, and not replicable. This is unsurprising, because Plaintiffs "told [their] investigators the conclusion of the study before they even visited a single property." Ex. 3 ¶ 76. It is well-established in scientific literature that when investigators know in advance the results they are expected to reach, "they may knowingly or unknowingly influence study conclusions by recording observations in a way that advances the purpose of a study." *Id*. at ¶ 77; Ex. 2 ¶ 108. And this effect is especially pronounced in "trials with subjective outcomes," like Plaintiffs' investigation here. *Id.* at ¶ 82 & n.110. Again, these are not merely theoretical problems. There is no other explanation for how Plaintiffs penalized majority-minority neighborhoods for the same conditions they ignored in majority-white neighborhoods. *See* Background, *supra*, Part E.5.

Plaintiffs' inspectors had no standard other than their own gut feelings to make such subjective calls as how high grass or shrubs can grow before they are "overgrown";[9] how much

---

[9] "I don't think that I would mark this, though, as overgrown. It's just longer than the one next to it, so, no," one of Plaintiffs' inspectors testified about a lawn another inspector deemed overgrown.

mail constitutes "accumulated mail"; what shrubbery is "invasive" versus merely decorative, like ivy climbing a brick wall;[10] and which of the infinite number of things that can possibly happen to a house should be flagged as "miscellaneous" problems. And, in fact, Plaintiffs' inspectors frequently disagreed on all of these things. Ex. 18 at 97:14–98:3; Ex 24. at 111:18–112:3. Thus, their criteria were "not capable of uniform application by different inspectors evaluating different properties at different times," and their results could not be replicated, which is essential to scientific validity. Ex. 3 ¶¶ 69–74.

To base a discrimination claim on *one's own* collection of data, a plaintiff must be scrupulous about collecting it in the most above-board, objective, and scientific manner possible. Plaintiffs here have done the opposite. That is fatal. The burden of establishing a statistical disparity at this stage of the litigation rests on Plaintiffs. *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 650 (1989). They cannot carry that burden when they could have repeated their "investigation" a hundred times and reached a hundred different results.

### 6.    Plaintiffs' statistics are inadmissible hearsay.

Without the original inspection reports, Plaintiffs' only evidence of the purported statistical disparity comes from their database. But it is undisputed that the database does not reflect what the original reports said, and Plaintiffs admittedly changed the results in the input process (and, for some properties, at later times). *See* Background, *supra,* Part E.7. Plaintiffs cannot base a discrimination claim on their field inspections when there is no reliable record evidence of what the inspection reports even said. *See, e.g., EEOC v. Sears, Roebuck & Co,* 628 F. Supp. 1264, 1347–48 (N.D. Ill. 1986) ("meaningful results cannot be obtained" from analyses where

---

Ex. 24 at 191:20–192:2.

[10] One inspector felt that ivy climbing a wall might qualify as invasive, but not always. When? "I don't know," she said. "I'm not a horticulturer [*sic*]." Ex. 18 at 132:10–21.

underlying "data was inaccurately recorded"; "Thus, it is very likely that a significant part of the [] disparities . . . are the result of missing data, not discrimination[.]").

Plaintiffs also cannot rely on their "database" in lieu of the original reports because it is inadmissible hearsay—out-of-court statements by Plaintiffs introduced to prove the truth of the claims other employees of Plaintiffs made in their now-spoliated inspection reports. *See* FED. R. EVID. 801–02. A party cannot defeat summary judgment with hearsay. *See, e.g., Hicks v. Ferreyra*, 396 F. Supp. 3d 564, 572 (D. Md. 2019). Recognizing this problem, Plaintiffs have sought to characterize the database as a "business record." Ex. 32 at 13 (No. 18). But the business-record hearsay exception requires some "trustworthiness" that the "source of information" accurately reflects the original "act, event, condition, [or] opinion." FED. R. EVID. 803(6), (6)(E). The database does not qualify because it is undisputed that it does *not* consistently reflect the conditions recorded in the original inspection reports. Rather, the deficits were recorded in the database after-the-fact by NFHA staff members who at times recorded what the original reports said, and at times did not, and at times changed the number of deficits at a later date, and at times did not, and then shredded the evidence.[11]

*    *    *

Any one of these methodological flaws on its own is more than sufficient to invalidate Plaintiffs' claims to have reliably counted actual maintenance "deficits" and, by extension, to have found a disparity in the deficit count. When mounted on top of each other, they demonstrate conclusively that there is no triable question of a statistical disparity. *See, e.g., Cooper v. Southern Co.*, 390 F.3d 695, 718 (11th Cir. 2004) (affirming summary judgment to defendant because

---

[11] Even if Plaintiffs' investigation evidence and derivative statistical disparity evidence is not excluded as inadmissible hearsay (as it should be), this Court should draw an inference that the shredded reports reflected no statistical disparity at all. *See* ECF 153-1 at 23–24.

plaintiffs' "methodological deficiencies rendered it 'impossible to determine what the gaps were, whether they were statistically significant, or whether factors other than race were involved'").

**B.    Rugh's Repeatedly Modified "Regression Analysis" Cannot Save Plaintiffs' Claims.**

Plaintiffs cannot save their unreliable and unscientific investigation methodology through their ever-shifting regression analysis. The regression analysis's *own* methods are so poorly grounded in scientific practice that any effort to rely on it could not survive the gatekeeping standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**1.    A regression analysis cannot turn bad data into good data.**

As a threshold matter, Plaintiffs have not even reached the point where it is legitimate to introduce a regression analysis in the first place. A regression analysis "measures the probability that the calculated disparity could occur randomly—but the analysis in no way validates the calculation of the disparity itself. If the tested disparity is based on erroneous assumptions or suffers from flaws in the underlying data, then [the regression] analysis is foredoomed to yield an equally faulty result." *Maddox v. Claytor*, 764 F.2d 1539, 1552 (11th Cir. 1985). That is the case here. As already shown, "the calculation of the disparity itself" (*id.*) is irrevocably tainted by selection bias, confirmation bias, invalid inspection criteria, unreliable data, unscientific methods, data manipulation, record destruction, subjectivity, and irreproducible results.

Rugh confirmed that he had only been engaged by Plaintiffs for his expertise in running statistical regressions—he has no expertise in property maintenance and no opinion on whether Plaintiffs' inspection criteria were valid or whether the inspections were done in a valid way. Ex. 23 at 22:6–29:6. So, every opinion he offers about the causes of the disparity rests on mere *assumptions*—not conclusions or even informed opinions—that the manner in which Defendants were maintaining properties was validly measured. Since it wasn't, the Court does not even need to consider what Rugh's regression analyses do or don't show. But even if the Court were to reach

that issue, the analysis does not do the heavy lifting Plaintiffs need it to do.

## 2.    The regression analysis furnishes no evidence of discrimination.

As detailed above (Background Part E.6), Rugh's regression analysis is actually a series of analyses with multiple corrections and revisions. None of them were run against the full population of REO properties at issue. The original was based on 1,194 of the 1,677 BANA REO properties Plaintiffs claimed to have inspected in the Complaint. Ex. 2 ¶ 36. The revised version was based on 932 of the properties remaining after Plaintiffs admitted that they erroneously included more than 270 properties in their investigation that had no connection to BANA at the time of Plaintiffs' inspection, and Rugh omitted many more for sample-sizing reasons. Ex. 9 at 40 & Table 16. A supplemental version was done on 430 of the 1,405 properties where Plaintiffs did not alter the inspection results after the initial data entry. Ex. 14 at 3. The final iterations found a small disparity of around 1.65 "deficits" purportedly unexplained by the variables in Rugh's model. *Id.* at 1–3.

But this finding gets Plaintiffs nowhere because the undisputed evidence is that Rugh's analyses made no attempt to control for, among other things, the condition the properties were in when BANA obtained them as nondiscriminatory explanatory factors for the alleged statistical disparity. As HUD concluded in *U.S. Bank*, the "property condition at the point of acquisition" is among the "minimum" variables a regression analysis would have to control for to evidence anything about how properties were maintained *after* the point of acquisition. *U.S. Bank*, *supra*, at 24. Rugh's analyses did not do so. Some of his control variables were aimed at attempting to address prior property condition in an indirect manner because he lacked the necessary data to do so directly. For example, Rugh admitted the most "important" explanatory variable was "the age of the home," because properties acquire "wear and tear a[s] things becom[e] older"—in other words, preexisting conditions not resulting from Defendants' maintenance practices. Ex. 23 at 40:10–41:8. Rugh also explained that he included economic variables in his analysis as part of an

effort to account for the economic situation of "the prior occupants of the property," because the "resources" the prior occupants had would be "related" to how much they were able to invest in maintaining the property. *Id.* at 207:11–213:21. There is no purpose to any of this analysis if the condition of the property when BANA acquired it is not a necessary variable to control for in determining whether there are non-racial factors to explain the alleged statistical disparity. That is also why Rugh admitted that if he'd had data on two-point-in-time inspections instead of single-point-in-time inspections, he would have incorporated that data into his analysis. *Id.* at 236:17–21.

The fatal issue is that the variables Rugh used in lieu of data on actual property conditions do not (and cannot) indicate whether a property had any of the purported defects on Plaintiffs' list when BANA acquired it—or whether a property experienced any of the myriad events that can cause defects *during* the REO period and whether those defects were addressed in a reasonable time. Plaintiff thus indisputably did not control for the "minimum" regression analysis variables HUD concluded were necessary for such an analysis to inform the discrimination inquiry. Plaintiffs could have attempted to control for the necessary variables by doing multiple-point-in-time inspections, to assess the "property condition at the point of acquisition" and whether it was "improving or deteriorating" "over time." *U.S. Bank*, *supra*, at 3, 24. But again they indisputably did not. Plaintiffs say the reason they didn't do so this was a matter of "cost"—more visits would have consumed more of their "budget." Ex. 7 at 20–21. That is an admission that Plaintiffs do not have the necessary admissible evidence to establish a genuine dispute about whether the "disparities" they purportedly observed could "be explained by non-racial factors."

Regardless, the record evidence on property condition at the time of acquisition—the data BANA produced on property appraisals in the Phase II MSAs and the delta between their "as-is" and "as-repaired" conditions—demonstrates that there *are* non-racial explanations for the alleged disparity. That evidence confirms that the properties in majority-minority neighborhoods were in

substantially worse condition at the time of acquisition than the properties in majority-white neighborhoods, demonstrating that Plaintiffs' inspections identified pre-existing inequalities in the housing stock, not maintenance disparities. Rugh did not, however, consider this data set in his analyses. Indeed, when it was shown to him at his deposition, it was the first time he had ever seen it. He admitted it was "of interest" and affirmed that he would have used it as a variable in his analysis if he'd been aware of it. Ex. 23 at 90:7–93:5; *see also id.* at 84:3–11. It is thus undisputed that relevant data belying Plaintiffs' claims were not considered in Rugh's regression analyses.

A statistical model that is "unable to adjust for important unmeasurable variables" like the above "illustrates an[] important limitation of regression analyses. Although these analyses can provide useful information in some cases, when applied to analyze highly complex matters, . . . their results can be of limited value." *Sears*, 628 F. Supp. at 1348. The law in this Circuit is consistent. A "regression analysis utilized in the [] discrimination context 'must include all the major factors' which influence the challenged action." *Anderson*, 406 F.3d at 262. "Ignoring key variables may render the results of a multiple regression analysis useless." *EEOC v. IBM*, 583 F. Supp. 875, 906 (D. Md. 1984).[12] That is the case here. There is no dispute that property-specific factors unaccounted for in Rugh's regression variables—*e.g.*, property condition at time of acquisition—are important, explanatory, non-racial factors for the conditions Plaintiffs purportedly observed from their inspections.[13] Under those circumstances, Plaintiffs' bold assertion that Rugh's analysis can offer no explanation for some portion of the purported disparity

---

[12] *See also, e.g., Valentino v. United States Postal Service*, 674 F.2d 56, 71 (D.C. Cir. 1982) ("Because [the] regression model ignores information central to understanding the causal relationships at issue, the district court could not accept her 'centerpiece' proof as adequate to raise an inference that [] discrimination accounts for [the] differences") (footnote omitted).

[13] BANA's experts detail other property-specific factors that provide non-racial explanations for the claimed disparity. *See, e.g.*, Ex. 2, *passim*; Ex. 3 ¶¶ 29–61; Ex. 4 ¶¶ 41–45; Ex. 11 ¶¶ 34–39; Ex. 12 ¶¶ 11–24.

other than race merely speaks to the limitations of his analysis, not an *actual* absence of explanatory factors.

## C.     Plaintiffs Cannot Satisfy the FHA's "Robust Causality" and "Policy" Elements.

To avoid summary judgment, Plaintiffs also must demonstrate that a genuine dispute of fact exists as to the "robust causality" element of their claims. That element requires Plaintiffs to produce robust evidence of "a defendant's policy or policies *causing* the disparity." *Inclusive Communities*, 576 U.S. at 542 (emphasis added). That means, as this Court previously held, that Plaintiffs must "specifically show[] that each challenged practice has a significantly disparate impact on the protected class." ECF No. 66 at 19 (quoting *Reyes v. Waples Mobile Home Park LP*, 903 F.3d 415, 525 (4th Cir. 2018). With no reliable evidence of a statistical disparity, it necessarily follows that the requisite robust causation is also lacking. But even if Plaintiffs had reliable evidence of a disparity (and they do not), BANA is still entitled to summary judgment because Plaintiffs cannot "point to" any BANA "policy or policies causing that disparity." *Inclusive Communities*, *supra*.

### 1.     Plaintiffs have no "robust causation" evidence.

Plaintiffs cannot, as a matter of law, sustain their burden on the "robust causation" element through theory or evidence of a potential correlation between a policy and a statistical disparity. *See Smith*, 2013 WL 1316391, at *8 ("Merely alleging a disparate impact or pointing to a generalized policy that leads to a disparate impact is not enough."), *aff'd*, 539 F. App'x 128 (4th Cir. 2013); *Inclusive Cmtys. Proj., Inc. v. Lincoln Prop. Co*., 920 F.3d 890, 906 (5th Cir. 2019) (rejecting claim where plaintiffs' claims were "conclusory rather than descriptive of how the defendants' policy actually caused a disparate impact"). Instead, to avoid summary judgment, Plaintiffs need robust and specific evidence (not just any evidence) of causation demonstrating a genuine dispute of fact for trial. ECF No. 66 at 19; *City of L.A. v. Bank of Am. Corp.*, 691 F. App'x

464, 465 (9th Cir. 2017) (plaintiff must "demonstrate *how* the [] policies [a]re causally connected in a 'robust' way to the racial disparity"). They have none. *None* of Plaintiffs' four experts offers any opinion that a single alleged policy caused the purported disparity. Instead, as purported evidentiary support for the robust causality element, Plaintiffs rely on Rugh's assertion that "most of the racial disparity" was "unexplained by anything other than race." Ex. 10 at 3. This is insufficient to establish a genuine dispute of fact for two main reasons.

First, Rugh's analysis is not capable of supporting this blanket statement. He is not saying that the purported disparity is unexplained by "*anything*" other than race—as he allows elsewhere, the most he can say is that it is unexplained by "[t]he variables *controlled for in [his] regression analysis.*" *Id.* (emphasis added). That is not robust evidence that any of Defendants' alleged policies caused the purported disparity. And, as already shown, HUD already determined that the variables Rugh used are insufficient to leave race as the only remaining explanation. *See supra* Part I.B.2. Variables *not* controlled for in Rugh's regression analysis—like preexisting property conditions, holdover occupants preventing the completion of maintenance work, and delayed approvals from the agencies that must sign off on all repairs above the minimum allowables— indisputably provide non-racial explanations for myriad alleged "deficits." *See supra* n.13.

Second, Rugh's language—which was obviously deliberately chosen, as he uses the same formulation consistently—is very careful *not* to attribute the alleged disparity to racial discrimination in REO maintenance (much less any specific maintenance policy); it merely claims that the disparity correlates with "race" in general. Ex. 10 at 3. That purported correlation is insufficient to avoid summary judgment because (again) it demonstrates nothing about whether Defendants' alleged REO maintenance policies caused the alleged disparity. And the purported correlation cannot do that work because all of the parties' experts agree that differences in residents' financial resources can explain differences in property conditions in the neighborhoods

-42-

Plaintiffs inspected, and that differences in financial resources also correlate with race. *Id.* at 35. Thus, all sorts of disparities might exist that are generally explained by "race," but all that means is that they are explainable by lamentable pre-existing social inequalities correlated with race—not Defendants' alleged REO maintenance policies. But the burden Plaintiffs carry is to connect the claimed disparity to *discriminatory property maintenance policies*, not to "race" in general or to the wide variety of pre-existing social inequities correlated with race. Since the latter is all Plaintiffs offer, their claims fail as a matter of law. *Inclusive Communities*, 576 U.S. at 542.

For example, Rugh found that property vacancy rates—one of the variables he left out of his regression analysis until BANA's experts identified the oversight—were capable of explaining some of the differences in property conditions from one neighborhood to the next. Ex. 10 at 34–35. But he insisted vacancy rates were "not a race-neutral control variable" because there are "reasons vacancy rates are higher in non-white tracts relat[ing] directly to prior racial disparities"—for example, "historical mortgage redlining from the 1930s to the 1970s has been shown to have *caused* a significant reduction in population, housing values, and rents in majority non-white tracts." *Id.* at 35. That is the point. Wealth disparities resulting from historical mortgage redlining from the 1930s to the 1970s are a shameful legacy but they have nothing to do with Defendants' practices for maintaining REO properties in the 2010s. Thus, a mere correlation with "race" generally, as distinct from racially discriminatory maintenance practices, is insufficient as a matter of law to serve as the predicate for Plaintiffs' claims. *Inclusive Communities*, *supra*.

The analysis done by Defendants' experts in identifying non-discriminatory factors explaining the purported disparity dovetails with Rugh's concessions here. For example, BANA's expert economist McCrary reviewed "[d]ata from the national American Housing Survey ('AHS')"—"a biannual survey conducted by the U.S. Census Bureau" and sponsored by HUD—which "establish that property condition varies based on sociodemographic and property-specific

characteristics that often differ (sometimes markedly) across neighborhoods." Ex. 3 ¶ 40. In particular, "[t]he AHS measures nine variables related to specific 'external building conditions,'" "including 'broken windows,' 'boarded up windows,' 'hole in roof,' and 'missing bricks, siding, or other outside wall material,'" which are among the same deficits Plaintiffs tried to measure. *Id*. The AHS data reflects that the deficits tend to increase as homeowner income declines, and that Hispanics and African-Americans experience these defects more frequently than white homeowners. *Id*. at App'x 1–2. Thus, when Plaintiffs observed similar issues in the inspected REO properties, they had *no way of knowing* whether they were observing the effects of Defendants' maintenance practices or observing "differences in housing stock quality alone" that predated— and had nothing to do with—Defendants' maintenance practices. *Id*. at ¶ 44.

Plaintiffs' failure to evidence the robust causal connection the FHA requires is also dramatically illustrated in a "placebo test" McCrary ran on Rugh's regression model—*i.e.*, he replicated the model and ran the same equations based on the same variables, but instead of testing their correlation with Plaintiffs' deficit count, tested their correlation with the year each property was built, a factor that "could not possibly be the result of Defendants' alleged discriminatory maintenance practices." Ex. 12 at ¶ 23 & Ex. 2. The result was that Rugh's model "would lead one to erroneously conclude that Defendants' alleged discriminatory conduct *caused* properties in majority minority neighborhoods to be built an average of ███████ than properties in majority white neighborhoods." *Id*. That result is, of course, impossible, and demonstrates that Plaintiffs' regression analysis is attributing conditions to Defendants' maintenance practices that those practices indisputably did not cause and *could* not have caused. An analysis that does that cannot create a genuine dispute of fact for trial.

**2.    Plaintiffs have no robust evidence of "arbitrary, artificial, and unnecessary" policies causing the purported disparity.**

Plaintiffs also cannot draw the robust causal link between Defendants' policies and the claimed disparity because, as demonstrated below and in Safeguard's motion (at Part I.B–C), they have no evidence of any arbitrary, artificial or unnecessary policy. At the outset, *there is no evidence of the original policies alleged in the Complaint.* There, Plaintiffs alleged two policies: (i) an alleged policy of "bas[ing] exterior maintenance . . . on the age and/or the value of the properties" (Compl. ¶ 135); and (ii) "outsourcing" maintenance functions "without appropriate monitoring or review" (Compl. ¶ 129). Plaintiffs have no documentary evidence of either policy, because neither one actually exists. As to the first, multiple witnesses were unequivocal:

> Q.  [A]re there any Bank of America property preservation decisions that are based on the age of the home?
> A.  No.
> Q.  And are there any Bank of America property preservation decisions based on the value of the home? . . .
> A.  No.

Ex. 22 at 251:22 – 252:13 (objections omitted); *accord* Ex. 19 at 72:6–9; Ex. 25 at 87:11–15; Ex. 21 at 51:15–52:2.

As to the second, the record evidence is that BANA supervised Safeguard intensely with multiple separate layers of oversight. Safeguard became BANA's exclusive maintenance vendor in late 2012 under a contract requiring ███████████████████████████████ ███████████████████████████████████████████. Ex. 55; Ex. 25 at 55:19–14; Ex. 39; Ex. 43. Safeguard was required to ██████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████. Ex. 25 at 54:9–19, 57:8–17. Safeguard was obligated to █████████████████████████. *Id.* at 75:8–15; Ex. 19 at 346:6–347:20. There was an entire department at BANA whose sole function

was to supervise Safeguard's performance. *Id.* at 19:18-22, 80:1–81:2. BANA also █████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████. Ex. 19 at 51:21–55:15. Safeguard, in turn, had robust processes for monitoring

and auditing its own subcontractors. *See* Safeguard Br. Part I.B.1.

Recognizing the absence of evidence of the originally claimed policies, Plaintiffs disclosed a new laundry list of policies purportedly causing the alleged disparity at the end of Phase II discovery period. Ex. 32 at 10 (No. 16). But again Plaintiffs have no evidence of these alleged policies or the requisite robust causality between them and the alleged statistical disparity.

**Practice No. 1** and **Practice No. 3** repeated Plaintiffs' prior assertions that Safeguard lacked "sufficient guidance, oversight," "monitoring or review," which, as already shown, is contrary to reams of undisputed record evidence.

**Practice No. 2** is a supposed "failure to investigate or assess the ability of [Defendants'] vendors and agents to comply with their legal obligations under the Fair Housing Act" (later mirrored in **Practice No. 9**, a supposed "practice of not providing effective, comprehensive, and accurate fair housing training"). This is not policy; at best, it describes the "lack of a policy." *City of L.A. v. Wells Fargo & Co.*, No. 13-9007, 2015 WL 4398858, at *8 (C.D. Cal. July 17, 2015), *aff'd*, 691 F. App'x 453 (9th Cir. 2017); *see also City of L.A. v. Bank of Am.*, 691 F. App'x at 465. That is insufficient as a matter of law because "[t]here is no authority that suggests that disparate impact claims are designed to impose new policies on private actors. Guidance from the Supreme Court is unambiguous that disparate impact claims must solely seek to *remove* barriers. . . . Without identifying an actual policy that creates a barrier, the [plaintiff] cannot [bring] its disparate impact claim." *Wells Fargo*, 2015 WL 4398858, at *8. Moreover, Plaintiffs furnish no explanation of

what "legal obligations" any "vendor[]" or "agent[]" breached that would have been prevented by "fair housing training," as would be necessary to establish the requisite robust causal link.

**Practice No. 4** repeats Plaintiffs' claims of a policy of "basing [] maintenance and marketing practices on the age and/or value of REO properties," of which, again, there is zero record evidence and ample undisputed record evidence that no such policy exists.

**Practice No. 5** complains that Safeguard (not BANA) "paid its vendors very little" and gave them "the incentive to cut corners where they thought it would go unnoticed, which was typically in communities of color." The record furnishes no evidence of this practice nor connects it to any of the REO properties Plaintiffs inspected. Nor have Plaintiffs ever produced any evidence to substantiate this alleged practice—*i.e.*, evidence of the alleged (but never identified) "incentives" or evidence that other companies were paying more for than Safeguard for the same services. The only record evidence is that Safeguard paid its vendors competitive market rates. *See* Safeguard Br. Part I.B.3.

**Practice No. 6** is a supposed "policy of granting a high degree of discretion to asset managers to make decisions about how to maintain, preserve, and market REO properties, which led asset managers to rely heavily on real estate agents for information about the neighborhoods in which the properties were located and to make decisions about maintenance, preservation, and marketing of REOs without sufficient guidance from BANA." Again, however, Plaintiffs have no record evidence for any of this, primarily because the actual evidence is that FHA, Freddie Mac, Fannie Mae and other investors provide the applicable guidance and requirements for maintaining REO properties. "Asset managers" were outside contractors tasked with handling the sale of REO properties—for properties BANA dispositioned through sales channels—and in that role were expected to ███████████████████████████████████████. *See generally* Ex. 21. The only asset manager who testified in this case said he worked with "asset managers that

were on the [BANA] side that oversaw our work," followed "policies and procedures [from] BANA that outlined the work that we needed to do on those properties," underwent "compliance" and "fair housing" "training" from BANA, and were limited in the dollar value of repair work they could approve without it being "escalated up to [BANA] for review with their management team." Ex. 21 at 22:22–23:2, 30:5–15, 44:5–13. This is the very opposite of lacking "guidance." In any event, as noted, whether a property even had an asset manager involved with it depends on its disposition channel, and none of Plaintiffs' experts did any analysis of how deficits were distributed among properties with asset managers as distinct from those without.

And even if the alleged policy existed, the robust causal connection does not, not least because of the limited scope of asset-manager involvement with the subject properties. Further, Plaintiffs have the records from ███████████████████████████████████ ███████████████████████████████████. Not one of their experts has cited it as a factor in the purported "disparity." Further, merely complaining about "discretion" is insufficient because it is not a "specific" policy and does not "isolate[] and identif[y] the specific practice that caused the disparity." *Inclusive Cmtys. Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 08-0546, 2016 WL 4494322, at *6 (N.D. Tex. Aug. 26, 2016).

**Practice No. 7** is an assertion that Safeguard (not BANA) had a "policy of permitting its vendors to make decisions regarding property preservation and maintenance based on whether the property is located in what the vendor deems a 'high crime' or 'high vandalism' area." This is an audacious misrepresentation of the record. The insinuation Plaintiffs are making is that "high crime" or "high vandalism" areas received *less* maintenance attention from Defendants. But Plaintiffs know this is not true because when they tried to get a witness to admit to this, he told them the opposite—the only reason vandalism in an area would be noted would be to ensure it got *more* attention "to secure the property." Ex. 22 at 187:5–16. The theory fails for another

fundamental reason as well: Plaintiffs' own expert found that crime rates had no statistically significant relationship to the alleged disparity. Ex. 9 at 25. If there were a robust causal relationship between crime rates and deficient maintenance, he would have found a robust correlation between crime rates and maintenance deficits, not a statistically insignificant one.

**Practice No. 8** concerns "[t]he frequency with which BANA and Safeguard permit windows to be boarded, instead of reglazed, in communities of color versus white communities." Plaintiffs have no evidence of this "frequency"—none of their inspection criteria were capable of assessing whether a window had been reglazed, nor did they ever analyze work orders to determine this. And as already noted, window-boarding was a function of local laws and ordinances, not something it was within Defendants' power to "permit" or refuse even if they wanted to. *See supra* n.3; 24 C.F.R. § 100.500(d)(2)(iii) (FHA disparate impact claim may not be based on a "policy or practice [] reasonably necessary to comply with a third party requirement").

Lastly, well after the close of Phase II fact discovery, Plaintiffs purported to supplement their discovery responses to claim a **Practice No. 10**: "adherence to the national model of property preservation, maintenance, and marketing, which relies on a centralized operation that contracts out its preservation, maintenance, and marketing obligations to vendors and subcontractors, does not place emphasis on the quality of the work completed, and relies heavily on photographs as a method of validating the quality of work, rather than on unannounced, in-person verification." Ex. 33 at 8. Unpacking this lengthy statement shows that it is just a combination of the other non-existent practices they complained of, now given the label "national model." As already shown, it is undisputed that Bank of America *did* conduct "unannounced, in-person" quality control of its vendors' work through multiple independent auditors and had multiple layers of oversight and review of "the quality of the work completed."

## II.    PLAINTIFFS HAVE NO EVIDENCE OF DISPARATE TREATMENT.

This Court already remarked that "the nature of the plaintiffs' claims seems closer to a disparate impact theory" because they made "[n]o allegations of intent or motive," beyond statistics. ECF No. 66 at 15 n.8. That hasn't changed. Plaintiffs have no evidence of any discriminatory intent. All Plaintiffs have are the defective and manipulated statistics that are incapable of evidencing discrimination. But "[i]n the Fourth Circuit, . . . statistical evidence alone is insufficient to raise an inference of discriminatory intent in a disparate treatment case." *Diamond v. T. Rowe Price Assocs., Inc.*, 852 F. Supp. 372, 408 & n.172 (D. Md. 1994); *see also Hawkins v. Leggett*, 955 F. Supp. 2d 474, 492 (D. Md. 2013) ("a mere statistical disparity is generally insufficient to prove disparate treatment"). That is particularly so where the purported disparity is as small as what Plaintiffs allege here—just 1.65 out of 37 criteria. *See*, *e.g.*, *Piper v. J.R. Simplot Co.*, 24 F.3d 248 (9th Cir. 1994) (statistics that "fall[] far short of showing a 'stark' pattern" insufficient to evidence intentional discrimination). The Court should enter summary judgment.

Respectfully submitted this 13th day of May, 2021,

/s/ Ava E. Lias-Booker
Ava E. Lias-Booker (No. 05022)
Melissa Martinez (No. 28975)
McGuire Woods LLP
500 E. Pratt St., Ste. 1000
Baltimore, Md. 21202
Tel.: (410) 659-4430
Fax: (410) 659-4558
alias-booker@mcguirewoods.com
mmartinez@mcguirewoods.com

/s/ Thomas M. Hefferon
Thomas M. Hefferon (No. 15109)
Brooks R. Brown (*pro hac vice*)
Anthony M. Alexis (*pro hac vice*)
Keith Levenberg (No. 11957)
Goodwin Procter LLP
901 New York Ave., N.W.
Washington, D.C. 20001
Tel.: (202) 346-4248
Fax: (202) 346-4444
thefferon@goodwinlaw.com
bbrown@goodwinlaw.com
aalexis@goodwinlaw.com
klevenberg@goodwinlaw.com

*Counsel for Defendant Bank of America, N.A.*