## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. CCB-18-1919 |
| BANK OF AMERICA, N.A., *et al.*, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................v

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

I.    Plaintiffs' investigation of Bank of America REOs in 37 metropolitan areas was
      well designed to uncover discriminatory maintenance and marketing practices...........3

      A.    Plaintiffs' 37 REO evaluation criteria appropriately assessed curb appeal.......4

      B.    All investigators participated in NFHA's comprehensive two-day
            training program...........................................................................................6

      C.    The methods NFHA used to select metropolitan areas, neighborhoods,
            and properties to investigate comport with principles of fair housing
            testing and social science research..................................................................7

            1.    NFHA appropriately selected metropolitan areas.................................7

            2.    NFHA appropriately selected neighborhoods and properties. ............8

      D.    Plaintiffs' data collection and recordation methods were sound under
            both principles of traditional fair housing testing and scientific research. .......9

      E.    NFHA performed careful quality control. ........................................................10

II.   Plaintiffs' investigation revealed significant disparities in Defendants'
      maintenance and marketing of REOs between communities of color and
      majority-white communities..............................................................................11

III.  Dr. Rugh's analyses demonstrate that the racial disparity in maintenance and
      marketing deficiencies remains statistically and practically significant even after
      controlling for numerous alternative explanations. ..........................................12

IV.   Defendants failed to take corrective action once notified of Plaintiffs' findings........15

STANDARD OF REVIEW ....................................................................................................16

ARGUMENT ........................................................................................................................16

I.    HUD's *U.S. Bank* determination has no precedential value and is not entitled
      to deference. .................................................................................................16

II.     Plaintiffs have put forth ample evidence establishing that Defendants' policies
and procedures disparately impacted communities of color, precluding
summary judgment. ...........................................................................................18

    A.     Plaintiffs' evidence of a stark racial disparity in Defendants' exterior
maintenance and marketing of REOs derives from a methodologically-
sound investigation. .............................................................................19

        1.     Plaintiffs selected sufficiently comparable neighborhoods to
investigate given real-world housing patterns, and their
subsequent regression analysis controlled for relevant differences. ..23

        2.     The 37 criteria Plaintiffs evaluated accurately reflect curb appeal
and mirror Defendants' own expectations for their maintenance
and marketing work. ..............................................................................26

        3.     Plaintiffs' decision to capture data at a single point in time is a
widely used practice, and the evidence demonstrates that
Plaintiffs' findings are representative of longer-term deficiencies. ....29

            a)     The deficiencies Plaintiffs identified were not short-lived. ...30

            b)     If Defendants equitably approved bids, Plaintiffs would
not have found a disparity in exterior maintenance and
marketing. ...................................................................................33

            c)     The initial condition of the property does not explain the
racial disparity and does not discredit the investigation.........34

        4.     Plaintiffs' data collection was reasonable, practical, and reliable........35

        5.     Plaintiffs' quality-control process was an asset to the investigation,
not a source of bias that would render the database records
inadmissible. ..........................................................................................40

    B.     Although Defendants have prematurely raised the issue, Plaintiffs have
sufficient evidence of Defendants' policies and procedures that
disparately impact communities of color............................................................42

        1.     Defendants adhered to the national model of property
preservation, maintenance, and marketing. ............................................43

        2.     Defendants' policies and practices gave employees and vendors
too much discretion or failed to require appropriate supervision
of employees and vendors......................................................................47

            a)     Defendants failed to provide sufficient guidance,
oversight, and/or review of REO maintenance,
preservation, and marketing activities that they handled

internally or contracted out and often left to the discretion of third parties. .......................................................................48

b)     Defendants outsourced compliance with legal obligations regarding REO maintenance, preservation, and marketing to third parties without appropriate monitoring or review. ..48

c)     Bank of America's policy of granting a high degree of discretion to asset managers to make decisions about how to maintain, preserve, and market REO properties led asset managers to rely heavily on real estate agents for information about neighborhoods and to make decisions about maintenance, preservation, and marketing of REOs without sufficient guidance from Bank of America. .............52

d)     Bank of America delegated REO property maintenance and preservation to Safeguard, which paid its vendors very little, had trouble recruiting and retaining vendors, and gave vendors the incentive to cut corners where they thought it would go unnoticed—typically in communities of color. .......................................................................54

e)     Defendants did not provide effective, comprehensive, and accurate fair housing training on how to maintain, preserve, and market REO properties in accordance with fair housing laws to their staff and vendors. ...........................56

f)     Defendants failed to investigate or assess the ability of their vendors and agents to comply with their legal obligations under the Fair Housing Act. ..................................56

3.     Defendants' maintenance policies and practices disparately impacted communities of color. ............................................57

a)     Safeguard permitted its vendors to make decisions regarding property preservation and maintenance based on whether the property was located in what the vendor deemed a "high crime" or "high vandalism" area. ..................57

b)     Defendants more frequently permitted windows to be boarded, instead of reglazed, in communities of color than in majority-white communities. .......................................59

c)     Defendants made decisions regarding the maintenance and marketing of REOs based on the age and/or value of the property. ...............................................................60

C.    Plaintiffs' expert's regression analysis isolates neighborhood racial composition as the leading explanation for the disparity in deficiencies and thus establishes robust causality. ..................................................62

1.    Defendants' new explanatory theories fail to eclipse race as the leading explanation of the observed disparity in deficiencies. ...........65

a)    Preexisting property conditions .................................65

b)    Holdover occupants .................................67

2.    The deficiencies Defendants contest do not drive Plaintiffs' results. ..................................................67

3.    Defendants mischaracterize Dr. Rugh's use of crime data. ...............68

4.    Dr. Rugh's analysis establishes robust causation. ...............................69

III.    Plaintiffs have produced sufficient evidence of Defendants' disparate treatment of REO properties in communities of color. ...................................................71

A.    Defendants' standard operating procedure was to maintain and market REOs in communities of color in worse condition than REOs in majority-white communities. ...................................................71

B.    Plaintiffs have established disparate treatment through the *McDonnell Douglas* framework. ...................................................74

C.    The totality of circumstances/*Arlington Heights* factors further support Plaintiffs' disparate treatment claims ...................................................74

IV.    Safeguard's accounting of the properties for which it is responsible is unreliable, incorrect, and, even if accepted, not outcome-determinative. ...................................75

CONCLUSION ...................................................80

## TABLE OF AUTHORITIES

**Cases**

*A.L.M. ex rel. Moore v. Bd. of Managers of Vireum Schoolhouse Condo.*,
  No. 17-cv-07385 (NSR), 2019 WL 3532178 (S.D.N.Y. Aug. 2, 2019) ................................ 73

*Acosta v. Ingerman & Horwitz, L.L.C.*,
  No. WDQ-14-1605, 2015 WL 795108 (D. Md. Feb. 24, 2015) .................................... 23, 24

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................... 16

*Atkins v. Robinson*,
  545 F. Supp. 852 (E.D. Va. 1982) ............................................................................... 58

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.*,
  818 F.3d 493 (9th Cir. 2016) ...................................................................................... 54

*Barnett v. W. T. Grant Co.*,
  518 F.2d 543 (4th Cir. 1975) ........................................................................... 47–48, 61

*Bazemore v. Friday*,
  478 U.S. 385 (1986) ............................................................................................. 18, 62

*Bloch v. Frischholz*,
  587 F.3d 771 (7th Cir. 2009) ...................................................................................... 73

*Brown v. Nucor Corp.*,
  785 F.3d 895 (4th Cir. 2015) ................................................................... 43, 47, 48, 56

*Brown v. Pfeiffer*,
  No. 19-cv-3132(WMW/KMM), 2020 WL 6146614 (D. Minn. Oct. 20, 2020) .............................. 73

*City of Phila. v. Wells Fargo & Co.*,
  No. 17-2203, 2018 WL 424451 (E.D. Pa. Jan. 16, 2018) ...................................... 47

*Cnty. of Cook v. Bank of Am. Corp.*,
  No. 14 C 2280, 2018 WL 1561725 (N.D. Ill. Mar. 30, 2018) ............................... 43

*Cnty. of Cook v. HSBC N. Am. Holdings Inc.*,
  136 F. Supp. 3d 952 (N.D. Ill. 2015) ........................................................................... 47

*Coleman v. Donahoe*,
  667 F.3d 835 (7th Cir. 2012) ...................................................................................... 26

*Cook v. CSX Transp. Corp.*,
  988 F.2d 507 (4th Cir. 1993) ...................................................................................... 23

*Corey v. Sec'y, U.S. Dep't of Hous. & Urb. Dev. ex rel. Walker*,
  719 F.3d 322 (4th Cir. 2013) ................................................................................. 71, 74

*Cox v. Babcock & Wilcox Co.*,
  471 F.2d 13 (4th Cir. 1972) ........................................................................................ 17

*De Medina v. Reinhardt*,
  686 F.2d 997 (D.C. Cir. 1982) .................................................................................... 29

*Donnelly v. Rhode Island Bd. of Governors for Higher Educ.*,
   929 F. Supp. 583 (D.R.I. 1996) .................................................................23

*Dothard v. Rawlinson*,
   433 U.S. 321 (1977) ...............................................................................22, 24

*E.E.O.C. v. Freeman*,
   778 F.3d 463 (4th Cir. 2015) ...................................................................63

*E.E.O.C. v. Gen. Tel. Co. of Nw., Inc.*,
   885 F.2d 575 (9th Cir. 1989) ...............................................................62, 64

*Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*,
   388 F. Supp. 3d 145 (E.D.N.Y. 2019) .......................................................70

*Frazier v. Consolidated Rail Corp.*,
   851 F.2d 1447 (D.C. Cir. 1988) .................................................................69

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*,
   648 F. Supp. 2d 805 (E.D. La. 2009) ....................................................53, 58

*Hartman v. Wick*,
   600 F. Supp. 361 (D.D.C. 1984) ...............................................................29

*Haynes v. Waste Connections, Inc.*,
   922 F.3d 219 (4th Cir. 2019) ...................................................................23

*Haywood v. Locke*,
   387 F. App'x 355 (4th Cir. 2010) .............................................................23

*Heights Cmty. Congress v. Hilltop Realty, Inc.*,
   629 F. Supp. 1232 (N.D. Ohio 1983) ........................................................37

*Humphries v. CBOCS West, Inc.*,
   474 F.3d 387 (7th Cir. 2007) ...................................................................24

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977) .................................................................................71

*Jackson v. VHS Detroit Receiving Hosp., Inc.*,
   814 F.3d 769 (6th Cir. 2016) ...................................................................24

*Jacobs v. N.C. Admin. Off. of the Cts.*,
   780 F.3d 562 (4th Cir. 2015) .............................................................19–20

*Lissau v. S. Food Serv., Inc.*,
   159 F.3d 177 (4th Cir. 1998) ...................................................................57

*Maddox v. Claytor*,
   764 F.2d 1539 (11th Cir. 1985) ................................................................63

*McDonald v. Verble*,
   622 F.2d 1227 (6th Cir. 1980) ..................................................................36

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973) .............................................................................71, 74

*McReynolds v. Merrill Lynch,*
   672 F.3d 482 (7th Cir. 2012)..............................................................................................47

*Metro. St. Louis Equal Hous. Opportunity Council v. Gordon A. Gundaker Real Est. Co.,*
   132 F. Supp. 2d 1210 (E.D. Mo. 2001) ............................................................ 20–21, 35, 37

*Mitchell v. DCX, Inc.,*
   274 F. Supp. 2d 33 (D.D.C. 2003) .....................................................................................16

*Moore v. Devine,*
   767 F.2d 1541 (11th Cir. 1985)..........................................................................................17

*Morrison v. Nissan Co.,*
   601 F.2d 139 (4th Cir. 1979) ..............................................................................................16

*Movement for Opportunity & Equal. v. Gen. Motors Corp.,*
   622 F.2d 1235 (7th Cir. 1980).............................................................................................29

*Nat'l Fair Hous. All. v. Bank of Am., N.A.,*
   401 F. Supp. 3d 619 (D. Md. 2019) ..............................................................................passim

*Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.,*
   No. 18 CV 839, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019)............................................34

*Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n ("Fannie Mae"),*
   294 F. Supp. 3d 940 (N.D. Cal. 2018) ........................................................................... 47, 48

*Ramos v. H.U.D.,*
   No. 96 CIV. 5552 (MGC), 1997 WL 589008 (S.D.N.Y. Sept. 19, 1997)......................17–18

*Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133 (2000) ...........................................................................................................16

*Reyes v. Waples Mobile Home Park Ltd. P'ship,*
   903 F.3d 415 (4th Cir. 2018) ................................................................................18, 19, 42

*Richardson v. Howard,*
   712 F.2d 319 (7th Cir. 1983) ..........................................................................................37–38

*Robinson v. 12 Lofts Realty, Inc.,*
   610 F.2d 1032 (2d Cir. 1979) ...............................................................................................1

*Sheikh v. Rabin,*
   565 F. App'x 512 (7th Cir. 2014) ........................................................................................23

*Smith v. Town of Clarkton,*
   682 F.2d 1055 (4th Cir. 1982)...................................................................... 53, 54, 58, 72

*Sobel v. Yeshiva Univ.,*
   839 F.2d 18 (2d Cir. 1988) ........................................................................................... 62, 64

*Telesca v. Long Island Hous. Partners, Inc.,*
   443 F. Supp. 2d 397 (E.D.N.Y. 2006) .................................................................................17

*Texas Dep't of Cmty. Affairs v. Burdine,*
   450 U.S. 248 (1981) ...........................................................................................................18

*Texas Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
 576 U.S. 519 (2015) ............................................................................ 18, 42, 43, 70

*Thompson v. U.S. Dep't of Hous. & Urban Dev.,*
 348 F. Supp. 2d 398 (D. Md. 2005) ............................................................ 74

*Trafficante v. Metro. Life Ins. Co.,*
 409 U.S. 205 (1972) ................................................................................ 73

*U.S. v. E. River Hous. Corp.,*
 90 F. Supp. 3d 118 (S.D.N.Y. 2015) ........................................................... 17

*United States v. Guardado-Diaz,*
 737 F. App'x 119 (4th Cir. 2018) .............................................................. 41

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
 429 U.S. 252 (1977) ..................................................................... 71, 74, 75

*Wal-Mart Stores, Inc. v. Dukes,*
 564 U.S. 338 (2011) ................................................................................ 47

*Watson v. Fort Worth Bank & Tr.,*
 487 U.S. 977 (1988) ........................................................... 19, 43, 48, 61

*Wetzel v. Glen St. Andrew Living Cmty., LLC,*
 901 F.3d 856 (7th Cir. 2018) ..................................................................... 73

*Wharton v. Knefel,*
 562 F.2d 550 (8th Cir. 1977) ..................................................................... 35

*Williams v. Poretsky Mgmt.,*
 955 F. Supp. 490 (D. Md. 1996) ................................................................. 16

*Woods-Drake v. Lundy,*
 667 F.2d 1198 (5th Cir. 1982) .................................................................... 20

*Zeus Enters., Inc. v. Alphin Aircraft, Inc.,*
 190 F.3d 238 (4th Cir. 1999) ..................................................................... 41

*Zuch v. Hussey,*
 394 F. Supp. 1028 (E.D. Mich. 1975) ......................................................... 21

*Zuch v. John H. Hussey Co.,*
 547 F.2d 1168 (6th Cir. 1977) .................................................................... 21

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................... 16

Fed. R. Evid. 803 ........................................................................................ 41

**Regulations**

24 C.F.R. § 100.7 ........................................................................................ 73

**Statutes**

42 U.S.C. § 3613 ........................................................................................ 18

Milwaukee, Wis. Code of Ordinances § 200-51.7-7 ................................................................50

Milwaukee, Wis. Code of Ordinances § 275-32-7 ................................................................50

**Other Authorities**

Andre M. Perry & David Harshbarger, *America's Formerly Redlined Neighborhoods Have Changed, and so Must Solutions to Rectify Them*, The Brookings Institution (Oct. 14, 2019), https://www.brookings.edu/research/americas-formerly-redlines-areas-changed-so-must-solutions ................................................................ 26, 70

Marcia L. McCormick, *Stereotypes as Channels and the Social Model of Discrimination*, 36 St. Louis U. Pub. L. Rev. 19 (2017) ................................................................61

*NFHA v. U.S. Bank*, No. 01-12-0283-8 (HUD Jan. 8, 2016) ................................................................ 1, 16, 18

Robert S. Adler, *Flawed Thinking: Addressing Decision Biases in Negotiation*, 20 Ohio St. J. on Disp. Resol. 683 (2005) ................................................................61

## INTRODUCTION

Despite three years of discovery and multiple expert witnesses, Defendants cannot show that any factor or combination of factors other than the race or ethnicity of the neighborhoods in which properties are located explains the stark racial disparity between Defendants' exterior maintenance and marketing of real-estate owned properties ("REOs") in majority-white neighborhoods and communities of color.[1] With no persuasive evidence adduced in discovery, Defendants' arguments (and their heavy reliance on the U.S. Department of Housing and Urban Development's admittedly non-precedential *NFHA v. U.S. Bank* determination) remain largely the same as those in their motions to dismiss. Despite the troves of data they possess for each property, Defendants fail to provide any competing statistics or regression analyses to rebut Plaintiffs' consistent findings that, no matter how the data is sliced, or which potential race-neutral explanations are considered and controlled for, Defendants maintained and marketed REOs in majority-white neighborhoods significantly better than in communities of color. "[A] Fair Housing Act claim cannot be defeated by a defendant which relies on merely hypothetical reasons for the plaintiff's rejection." *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1040 (2d Cir. 1979). But that is what Defendants attempt to do here.

Plaintiffs' evidence establishes that Defendants' policies and practices have disparately impacted communities of color, without legitimate justification. As experts in fair housing testing and social science methodology conclude, Plaintiffs designed and implemented their investigation in a methodologically sound manner, consistent with both traditional fair housing enforcement investigations and social science research methodology, rendering their findings credible and compelling. Defendants critique Plaintiffs' deficiency criteria while using the same criteria to assess

---

[1] Throughout this memorandum, Plaintiffs use "communities of color" to refer to the majority African-American, Latino, and non-white neighborhoods included in their investigation.

their own performance. Their attempts to show bias or inconsistency in Plaintiffs' approach are unsupported—and typically belied by—the evidence. Although this phase of discovery was not intended to focus on Defendants' policies and practices, Plaintiffs have nonetheless adduced ample evidence of ten different policies and practices that disparately impacted communities of color. And the multiple analyses, including regression analyses, conducted by Plaintiffs' statistical expert, Jacob S. Rugh, Ph.D., establish that the racial disparity in maintenance and marketing Plaintiffs found cannot be explained by any combination of the 40 non-racial variables considered (including those posited by Defendants' experts)—findings Defendants do not and cannot rebut. Plaintiffs have therefore refuted Defendants' unsupported hypotheses that the racial disparity results from factors beyond their control, like local crime, homeowner neglect, or poverty rates, or is purely a result of imperfectly matched comparator neighborhoods that differ by income and homeownership rates (all factors Dr. Rugh analyzed). As such, the evidence supports Plaintiffs' disparate impact claim under the Fair Housing Act.

Plaintiffs have also uncovered sufficient evidence that discriminatory maintenance and marketing conduct was Defendants' standard operating procedure from which a jury could find disparate treatment. A former Safeguard Properties Management, LLC ("Safeguard") vendor of seven years attests that, in communities of color, vendors cut corners and their work was held to a lower standard, with a Safeguard employee even coaching him on how to be paid in full for incomplete work. His experience is supported by the ample use of racially coded, but factually unsupported, language that Bank of America, N.A. ("BANA") asset managers, real estate agents, and Safeguard vendors used to describe homes in communities of color. Defendants' decision to take no investigative or remedial action of any sort in response to learning of Plaintiffs' investigation findings as early as 2012, also shows their unwillingness to deviate from their discriminatory standard operating procedure even when confronted with evidence of its racially disparate effects.

Finally, Safeguard's attempt to limit its liability to roughly half of the properties at issue should be rejected as factually incorrect and based on data too unreliable for summary judgment. Even if the Court were to accept this data, because the same racial disparities remain after excluding the properties for which Safeguard disclaims responsibility, Safeguard's arguments are irrelevant for resolving the present motions.

## STATEMENT OF FACTS

I.  **Plaintiffs' investigation of Bank of America REOs in 37 metropolitan areas was well designed to uncover discriminatory maintenance and marketing practices.**

In 2009, following reports from various stakeholders that, in the wake of the national foreclosure crisis, banks were not properly maintaining REOs (properties on which banks had foreclosed and for the maintenance of which they were responsible) in communities of color, the Organizational Plaintiffs set out to investigate whether there were disparities in the exterior maintenance and marketing of REOs between communities of color and majority-white neighborhoods. Ex. 5, Smith Decl. ¶¶ 1, 3. To do so, Plaintiffs developed "a well-thought-out, thorough, large-scale enforcement test" to evaluate the routine exterior maintenance and marketing of BANA REOs. Ex. 2-A, Expert Rep. of Michael Fetters (Jan. 7, 2022) at 21. Plaintiffs did not intend the investigation to be a sociological research study of discrimination, but rather a series of well-designed fair housing tests with the goal of answering one question: Does the racial makeup of the neighborhood affect the level of maintenance and marketing of BANA's REO properties in violation of the federal Fair Housing Act?

**A.  Plaintiffs' 37 REO evaluation criteria appropriately assessed curb appeal.**

The REO evaluation form Plaintiffs used to conduct their investigation contained 37 criteria that assessed routine exterior maintenance and the overall curb appeal[2] of each property.[3] These criteria included: trash, accumulated mail, overgrown grass or accumulated leaves, overgrown or dead shrubbery, dead grass, invasive plants, broken mailbox, unsecured/broken doors and locks, damaged steps and handrails, damaged windows (broken or boarded), damaged roof, damaged fence, holes in the exterior structure, wood rot, graffiti, peeling/chipped paint, damaged siding, missing shutters, missing/out-of-place gutters, broken/hanging gutters, obstructed gutters, water damage, mold, and exposed or tampered-with utilities. Ex. 5-A, REO Evaluation Form. Plaintiffs also evaluated marketing and occupancy criteria, including whether there were unauthorized occupants in a property and whether a property had a "for sale" sign. *Id.*

Plaintiffs' and Safeguard's expert witnesses agreed that many of these criteria are sometimes or always within the industry standards relevant to property preservation and maintenance vendors like Safeguard. Ex. 3-A, Expert Rep. of D. Tyler (Jan. 7, 2022) at Ex. 3. These industry standards are a floor, not a ceiling.[4] BANA and Safeguard routinely addressed exterior maintenance issues beyond

---

[2] BANA describes "curb appeal" as "the aesthetic pleasing to the eye of what a house looks like—from the outside." Ex. 13, BANA 30(b)(6) Dep. (Silvey) 257:4-15. Similarly, Safeguard's CFO describes it as whether the house is "appealing" when "looking at the house from the curb" and notes that it is a "general real estate term." Ex. 4, Iafigliola Dep. 265:5-15.

[3] NFHA first created a version of the REO evaluation form in 2009, "using common sense, knowledge, and experience regarding how an owner maintains a house and how real estate is marketed to homebuyers." Ex. 5, ¶ 5. Between 2009 and 2010, NFHA refined the REO Evaluation Form after speaking with real estate and property preservation and maintenance industry stakeholders, as well as fair housing organizations piloting the forms. *Id.* NFHA finalized the REO Evaluation Form in 2010 and used it moving forward for its investigation into disparities in REO maintenance, including sharing it with the other Organizational Plaintiffs so they could participate in the investigation. *Id.*

[4] As Mr. Tyler explained, industry standards "only encompass what a P&M [Property & Maintenance] vendor would typically be responsible for preserving and maintaining; they do not

the minimum requirements, and BANA marketed its REOs to potential purchasers as well. *See* Ex.

3-B, at 16 (explaining that banks and servicers may go beyond the baseline scope of duties of a

vendor like Safeguard).

In May 2012, early in Plaintiffs' investigation, NFHA received a copy of BANA's own REO

Inspection Checklist. Ex. 5, ¶¶ 7–8. The significant overlap between BANA's and Plaintiffs' criteria

validated that NFHA's checklist accurately captured the type of items BANA and its agents

considered when maintaining and marketing their REOs. *Id.* ¶ 8 & Ex. 5-B-3, BANA's REO

Inspection Checklist. BANA's "Inspection Items" include: ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████ Ex. 5-B-3. Notably, BANA's internal checklist included items beyond the "industry

standards" minimum discussed above (*e.g.*, ███████████████████, among others). Ex.

3-A, at Ex. 3. BANA's property maintenance checklist emphasizes that an REO property should ██

████████████████████████████████████████████████

███████████████ and ███████████████████████ Ex. 5-B-3. BANA's

checklist also evaluated whether the █████████████████████████████████

█████████████████████ Ex. 5-B-3.

---

extend to items that the owner or servicer is responsible for" and "banks and servicers may require
additional preservation, maintenance, and even repair for REO properties that may normally be
outside the scope of P&M vendors' routine work requirements." Ex. 3-B, Supp. Rep. of D. Tyler
(Mar. 10, 2022) ¶ 29. Safeguard work orders provided detailed instructions from clients (such as
BANA) on work vendors were authorized or required to perform on a property, including when to
submit bids for work. Ex. 4, 76:8–77:12. One Safeguard client required vendors to pressure wash the
exterior of its properties to remove dirt and debris, which went beyond the industry standards. *Id.*
77:1–12.

In 2012 and 2013, BANA's inspections of Safeguard's work on its REOs included whether



Exs. 17–20 ███████████████ tab within each spreadsheet).

Under the ███████████ category, inspectors indicated if there was ████████████

███████████████████████████████ *Id.* BANA's inspectors even indicated in

the comments if there was █████████████████████████████

██████ (among other things). *Id.* BANA's own documents require health and safety issues to be

mitigated within ████████, Ex. 5, ¶ 9 & Ex. 5-B-4, BANA's REO Vendor Training, which is

consistent with Mr. Tyler's expert opinion, Ex. 3-A, ¶¶ 26, 36.

### B. All investigators participated in NFHA's comprehensive two-day training program.

NFHA—known in the fair housing testing field for the quality of its training programs[5]—

designed and implemented a rigorous training program for all the fair housing center staff members

who would be conducting the investigation to train them on the 37 criteria and how to evaluate the

REOs. Ex. 1, Augustine Decl. ¶ 14. The program included a two-day in-person training at the outset

and ongoing training and support provided through webinars and consultations with NFHA staff.

*Id.* ¶¶ 14, 16.

Before Plaintiffs' investigators evaluated REOs in the field, they attended a one-day

classroom training led by some combination of NFHA's then-Associate Director of Enforcement,

---

[5] "NFHA's training programs are so distinguished that approximately 72% of all HUD Fair Housing Initiatives Program grantees rely on NFHA's training in whole or in part to train their testers." Ex. 6-A, Expert Rep. of P. Kisch (Jan. 7, 2022) at 11 (citing Kenneth Temkin, *et al.*, U.S. Dep't of Housing & Urb. Dev., Study of the Fair Housing Initiatives Program 49 (2011)).

Lindsay Augustine,[6] former Senior Project Coordinator and Director of Inclusive Communities,

Shanti Abedin, and former President and Chief Executive Officer, Shanna Smith. *Id.* ¶ 14. They

provided background on the purpose of the investigation and instructions for identifying each of the

37 individual deficiencies on the checklist using a reasonable-person standard. *Id.* They utilized

PowerPoint presentations that included photo examples of what would and would not count as a

deficiency in each of the 37 criteria, along with a glossary of relevant terms. *Id.* ¶ 14; & Ex. 1-A,

NFHA REO Investigation Training PowerPoint. The trainers also instructed trainees on how to

systematically assess each property using the checklist and applying a consensus approach to scoring

field observations by reaching agreement with their partners about potential deficiencies.[7] Ex. 1, ¶

14. Trainees further learned how to properly photograph the deficiencies observed. *Id.*

¶¶ 15, 18 & Ex. 1-B, NFHA REO Investigation Photo Protocols.

 The day after the classroom training, all trainees went into the field with experienced

investigators for a full day of shadowing. *Id.* ¶ 15. This field training offered additional practice

documenting deficiencies (*e.g.*, what constitutes overgrown grass or shrubs) by using the checklist

and taking photos, with immediate feedback from an experienced investigator. *Id.* ¶ 15.

  **C.  The methods NFHA used to select metropolitan areas, neighborhoods, and properties to investigate comport with principles of fair housing testing and social science research.**

   **1.  NFHA appropriately selected metropolitan areas.**

 NFHA selected the metropolitan areas to investigate using three criteria, with a goal of

identifying areas with a high concentration of REOs. Ex. 1, ¶ 3; Ex. 2-A, at 11. First, NFHA

---

[6] Ms. Augustine is now NFHA's Senior Associate Director of Enforcement. Ex. 1, ¶ 1.

[7] Trainees were also instructed to take current conditions into consideration when completing the checklists. Ex. 1, ¶ 14. For example, if it had snowed the morning of the visit and the neighboring properties still had snow on their sidewalks, testers should not give a deficiency for lingering snow.

selected metro areas that had high foreclosure rates relative to the rest of the country.[8] Ex. 1, ¶ 3. This approach comports with traditional fair housing testing because it targeted "areas with high levels of opportunity to discriminate." Ex. 6-A, at 13–14. Second, because the investigation sought to assess whether a neighborhood's racial composition drove disparities in maintenance and marketing, NFHA relied on the Brown University Dissimilarity Index to identify highly segregated metro areas. Ex. 1, ¶ 4. This type of "matched-comparison sampling" strategy is commonly used in qualitative research. Ex. 2-A, at 12 & n.43. Third, NFHA considered whether a local partner organization had the resources to investigate the metro area, and, if not, whether NFHA had sufficient resources to investigate the area itself. Ex. 1, ¶ 5.

### 2. NFHA appropriately selected neighborhoods and properties.

Once it had identified the 37 metropolitan areas, NFHA selected the neighborhoods and properties investigators would visit in a way that best isolated race. First, NFHA identified the zip codes within the selected metro areas that were racially concentrated and had the highest foreclosure rates. Ex. 1, ¶¶ 7–9. NFHA determined the racial composition of zip codes using 2010 Census data, with a 50.1% cutoff to designate neighborhoods majority-white or majority-African-American, Latino, and non-white. *Id.* ¶ 8. Second, Plaintiffs selected working- or middle-class neighborhoods by comparing each zip code's median income to those of the metro areas and the state and identifying zip codes with high homeownership rates (typically at least 40%).[9] *Id.*, ¶ 10. NFHA excluded neighborhoods that were either disproportionately high or low income in comparison to the median income of the state. *Id.* ¶ 10. Because majority-white neighborhoods tend to be further

---

[8] BANA similarly focused on the cities with the most REOs for their own property inspections. Ex. 8, 246:16–247:8.

[9] "The rate may have varied because home ownership rates do vary across and within major metropolitan areas." Ex. 2-A, at 14.

from city centers, Plaintiffs used a "concentric circles methodology" to gradually move out, in circles, from city centers to systematically identify a sufficient number of majority-white neighborhoods and properties to serve as comparators. *Id.* ¶ 12. Because of the history of segregation and redlining and the reality of unequal distribution of neighborhoods, this methodology represented "the best and most practical option for finding comparator neighborhoods." Ex. 2-A, at 13. With only a few standardized, across-the-board exceptions,[10] Plaintiffs then inspected all the BANA-owned homes in those zip codes at the time of their visit. Ex. 1, ¶ 13.

### D. Plaintiffs' data collection and recordation methods were sound under both principles of traditional fair housing testing and scientific research.

Plaintiffs employed a single-point-in-time approach, investigating each of the REOs they evaluated once.[11] Ex. 1, ¶ 17. Investigators in the field followed a consistent data collection protocol, as NFHA trained them to do, regardless of where the property was located. *Id.* As discussed above, investigators evaluated properties in teams of at least two, reaching a consensus on whether a property condition qualified as a deficiency before marking it on their evaluation forms. *Id.*. NFHA trained investigators to photograph all four sides of every property, the neighboring properties, and any deficiencies observed. *Id.* ¶ 18.

---

[10] Plaintiffs did not evaluate REOs that: (1) appeared to be currently occupied by the former homeowners or tenants; (2) appeared to be actively undergoing maintenance work when the evaluators arrived; (3) BANA had not owned for more than 30 days (the grace period Plaintiffs gave Defendants to remedy any preservation and maintenance issues for properties that were not actively being marketed for sale); and (4) were vacant lots or apartment buildings. Ex. 1, ¶ 13. BANA's expert confirmed that because this practice was applied equally in all neighborhoods, excluding these properties should not have impacted the results of the investigation. Ex. 9, 108:16–111:8.

[11] On rare occasions, a property may have been visited twice because it was an REO at the time of two separate visits. In a very small number of cases, NFHA visited properties a second time to informally observe any changes in the condition of the property. In either case, scoring from only the first visit was recorded in the database. Ex. 1, ¶ 17, n.5.

After investigators completed their property evaluations, they returned to their offices, where they or a colleague uploaded the photographs and checklist data into a central REO database. *Id.* ¶ 19. To enter the checklist data, staff members uploaded a photograph of the property and either: (1) selected the deficiency associated with the photograph; or (2) entered a description of the what the photograph captured (*i.e.*, the side of the house). *Id.* ¶ 19 & Ex.1-C, at NFHA 004961. Thus, every deficiency in the database has an accompanying uploaded photograph that includes a description or an indication of whether the item is a deficiency, or both, and a space for comments. *See* Ex.1, ¶ 19. Because the REO database is the final system of record for all the evaluations, NFHA instructed the other Organizational Plaintiffs to follow their own, internal data-retention policies regarding the retention of the paper evaluation forms once relevant information was uploaded to the database. *Id.* ¶ 24.

### E. NFHA performed careful quality control.

NFHA employed a rigorous quality-control process to strengthen the reliability of the investigation results. *See* Ex. 2-A, at 18, 30. NFHA staff members Lindsay Augustine and Shanti Abedin routinely reviewed evaluation data and photographs uploaded by local partner organizations for standardization—especially where evaluators were newer. Ex. 1, ¶ 25. In their careful and collaborative review, Ms. Augustine and Ms. Abedin would sometimes add or delete deficiencies based on the photographic evidence, but typically their edits did not result in any change to the property's total number of deficiencies. *Id.* For example, they often changed the orientation of photographs (*e.g.*, rotated a photo that was upside down), edited the descriptions associated with photographs, or reclassified a deficiency (*e.g.*, moving a "miscellaneous" deficiency to a more apt

category).[12] Ex. 1, ¶ 25. This quality control process allowed NFHA to ensure that deficiencies were recorded in a standard way across metro areas.

## II. Plaintiffs' investigation revealed significant disparities in Defendants' maintenance and marketing of REOs between communities of color and majority-white communities.

In each metropolitan area examined, Plaintiffs' investigation revealed that Defendants' REOs in majority-white communities were maintained in a much better condition and were more effectively marketed than REOs in communities of color. Plaintiffs found an average of 3.06 more deficiencies among properties in communities of color than in majority-white communities (6.14 deficiencies versus 9.20 deficiencies respectively).[13] Ex. 7-A, Expert Rep. of J. Rugh (Feb. 14, 2022) at 2. This difference is both statistically and practically significant.[14] *Id.* at 6. Moreover, REO properties in communities of color were 3.3 times more likely to exhibit 11 or more exterior maintenance and marketing deficiencies than those in majority-white communities (33.6% versus 10.2%), whereas REO properties in majority-white communities were 2.9 times more likely to exhibit 5 or fewer deficiencies than those in communities of color (47.1% versus 16.3%). *Id.* This

---

[12] Any alteration—even adjustments to the orientation of a photograph or the addition of notes later in the day after a lunchbreak—appear as an edit in the database. Ex. 1, ¶ 25 & Ex. 1-J, PLAINTIFFS 073312. Of the 134 Phase I properties with database edits made more than 24 hours after the initial entry or within 24 hours, but by a different person than had initially created the entry—indicating a quality control edit had been made—fewer than half of the properties (63) had changes affecting their total number of deficiencies. Ex. 94, Duckworth Decl. ¶¶ 2–14; Ex. 94-A ("Phase One, Edited" tab). Sixty of these 134 properties had no changes to scoring at all. Ex. 94, ¶ 14; Ex. 94-A.

[13] Differences between the analyses of findings discussed herein and those referred to in the Complaint stem from the parties narrowing the number of properties at issue in the case to 1,405.

[14] Dr. Rugh measures the practical significance of the difference in property deficiencies for white versus non-white tracts by the Cohen's *d* statistic. "Cohen's *d* helps researchers ascertain whether a highly statistically significant difference . . . is practically significant or substantially meaningful. . . . In other words, practically speaking, is the difference or effect of non-white tract status little to none, small, medium, or large?" Ex. 7-A, at 6–7; *see also* Ex. 7-B, Supp. Expert Rep. of J. Rugh (Mar. 4, 2022) at 12–14.

finding of fewer deficiencies among REO properties in majority-white communities persists in each

metro area Plaintiffs investigated and across all but two of the individual deficiency categories

(miscellaneous gutter and water damage deficiencies—both only 1.1% more prevalent in majority-

white communities). Ex. 1-F, Investigation Findings.

Defendants' assertion that they spent more money maintaining REOs in communities of

color is irrelevant. *See* BANA Summ. J. Mem. ("BANA Mem.") at 11, ECF No. 167-1; Safeguard

Summ J. Mem. ("SG Mem.") at 29, ECF No. 171. As Plaintiffs' property preservation and

maintenance expert explained, the total amount Defendants spent on maintenance "does not

indicate the quality of maintenance performed." Ex. 3-A, at 22. Greater amounts of money could

have been spent on poorly maintained houses in communities of color if they were in Defendants'

inventory for longer times, if more expensive repairs became necessary due to neglect (*e.g.*, an

unaddressed leaky roof leads to extensive mold damage), or vendors billed for unnecessary work

within the allowable amounts that did not require approval. *Id.* at 22–23.

### III.     Dr. Rugh's analyses demonstrate that the racial disparity in maintenance and marketing deficiencies remains statistically and practically significant even after controlling for numerous alternative explanations.

Plaintiffs' statistics expert, Professor Jacob Rugh, performed a series of analyses of Plaintiffs'

evaluation data, including regression analyses,[15] to determine whether the racial disparity in observed

deficiencies could be explained by non-racial factors. Ex. 7-A, at 1–2, 7–8. In other words, would

controlling for non-racial factors reduce the association between neighborhood racial composition

---

[15] A regression analysis is "a common statistical technique for estimating the association or effect of one explanatory factor on an outcome when controlling for or accounting for multiple other explanatory factors or variables." Ex. 7-A, at 2 n.5. In the context of this case, regression is a "way to measure the strength of an explanatory factor, such as majority non-white tract status, and its association or effect on an outcome, such as total average REO property deficiencies, after controlling for other explanatory factors or variables, such as the age of the property, local crime rates, etc." *Id.*

and the number of deficiencies below the point of statistical significance? Dr. Rugh analyzed 40

non-racial potential explanatory factors, including factors posited by Defendants' experts, such as

property age, poverty level, crime rates, home value, distance from city center (urban versus

suburban), time of year of Plaintiffs' inspection, lot size, length of time BANA had held the REO at

the time of Plaintiffs' inspection, whether and for how long the previous owner remained in the

property after the foreclosure sale, and time elapsed between the previous owner's delinquency on

mortgage payments and the foreclosure sale, in addition to controlling for differences between

metropolitan areas.[16] Ex. 7-A, at 9, 16–38; Ex. 7-B, at 4–7. Dr. Rugh found that no single variable or

combination of variables explained more than 39% of the racial disparity—leaving 61% of the

variation in deficiencies unexplained by anything other than neighborhood racial composition. Ex.

7-A, at 39. The regression analyses never reduced the racial disparity in deficiencies below 1.97, a

disparity that is both statistically and practically significant.[17] *Id.* at 10, 39.

These results remained regardless of which sub-group of properties or deficiencies Dr. Rugh

analyzed. In response to Defendants' experts' concern about sample size within each metropolitan

area, Dr. Rugh eliminated metro areas with fewer than 30 REO properties in one step of his

regression analysis and found the racial disparity increased a small amount. *Id.* at 40–41. To test

Defendants' speculative theory that Plaintiffs' quality-control edits were designed to widen the racial

disparity, Dr. Rugh ran a regression analysis excluding properties for which information or photos in

the investigation database were edited more than a day after first being entered, or where data was

---

[16] These differences include: "variation in state and local laws, weather patterns (which affect vegetation growth, mold, water damage, and other pertinent indicators), and any other unobservable differences." Ex. 7-A-3, at 15–16.

[17] Dr. Rugh also ran a regression analysis for only those properties for which BANA does not dispute responsibility. Ex. 7-A, at 40–41. Again, the same statistically and practically significant racial disparity held steady (the resulting racial gap in average deficiencies actually widened slightly from 1.97 to 2.09). *Id.*

changed on the same day as initially entered, but by a different person (thus potentially indicating a change to scoring, rather than someone simply taking a short break while uploading).[18] Ex. 7-B, at 3–4. He found the same strong pattern of statistically significant, racially disparate results in this smaller sample of unedited properties. *Id.*

Dr. Rugh also isolated or removed certain deficiencies to determine any potential effect on the disparity. He analyzed only the overgrown grass/accumulated leaves and trash deficiencies (which are unrelated to the original condition of the home and are undisputedly within BANA's and Safeguard's scope of responsibility) to see if the racial disparity persisted. Ex. 7-A, at 13–16; Ex. 5 to Nov. Bryar Rep., ECF No. 171-3 at 48. He found that even for just these two deficiencies, the results were statistically and practically significant.[19] Ex. 7-A, at 13–16. In response to Defendants' concerns about Plaintiffs scoring allegedly legally-required items as deficiencies, Dr. Rugh further analyzed the data removing: (1) boarded-door-or-window[20] deficiencies for all properties where local law could be read to require boarding for vacant homes,[21] and (2) all warning/no trespass sign deficiencies across the entire data set. Ex. 11, AM Rugh Dep. 247:2–249:19; Ex. 12, PM Rugh Dep.

---

[18] This information about edits comes from an export of the REO database, produced to Defendants, that shows all photograph entries and information, including descriptions associated with photographs, the most recent edit to each photograph (and thus each deficiency) and information about who initially entered the data and who later edited it. Ex. 1, ¶ 33 & Ex. 1-J.

[19] Dr. Rugh also reviewed differences in overgrown grass/leaves among properties located in the Sunbelt (Southern and Southwestern states) during warmer months, and found the racial disparity increased substantially, with 60.7% of properties in majority non-white areas marked with an overgrown grass/leaves deficiency versus only 25.9% in majority-white areas. Ex. 7-A, at 13–14.

[20] Although the damaged windows and unsecured/broken doors deficiencies include both broken and boarded windows and doors, Ms. Augustine reviewed the photographs associated with these deficiencies to separate out properties marked negatively for boarding versus for broken windows or unsecured/broken doors. Ex. 1, ¶ 31 & Ex. 1-H, RUGH 000010.

[21] *See* Ex. 10 (compilation of laws governing boarding of homes in localities with REOs in this case).

54:11–57:5. The racial-disparity result was still statistically and practically significant.[22] Ex. 11, 248:7–12, 249:10–19. Indeed, in reviewing the data, Dr. Rugh found that no single deficiency drove the resulting racial disparity. *Id.* at 242:5–243:6, 243:20–245:14.

Throughout his analyses, Dr. Rugh used the largest number of properties, within the final list of 1,405, for which he had necessary data. *See* Ex. 7-B, at 19–20. For example, because Dr. Rugh was able to collect data for all properties regarding year built, time of year Plaintiffs evaluated each property, and changes in zip code home prices, he was able to control for these variables against the full set of 1,405 properties. Ex. 7-A, at 10. Because he did not have data regarding lot size, land value, and previous REO sale history for all 1,405 properties, however, he ran these variables against a subset of 1,255 properties for which he had this data. *Id.* at 10 & Ex. 7-A-3 at 1. As he added more variables to the regression analysis, the number of properties analyzed decreased to reflect available data.[23] Ex. 7-A at 10, 40.

## IV.     Defendants failed to take corrective action once notified of Plaintiffs' findings.

As its investigation progressed and racial disparities in maintenance and marketing became evident, NFHA informed BANA of the results of its investigation. Ex. 5, ¶ 6. Yet BANA took no substantive action in response, beyond meeting with NFHA representatives in 2012 and 2013. *See* Ex. 91, BANA's Suppl. Resp. to Pls.' Interrog. No. 13. BANA did not conduct its own investigation into Plaintiffs' findings, change any of its policies or practices, or analyze maintenance or preservation work by zip code, Census Block, or any other Census data. Ex. 13, 265:19–267:17; *see*

---

[22] This result is not surprising: Defendants' expert David Skanderson agreed that Plaintiffs' inclusion of a deficiency for something required by law (or by the investor) would affect the scoring of properties in both majority-white and non-white neighborhoods. Ex. 9, 165:2–14.

[23] Defendants failed to provide necessary and relevant data for all 1,405 properties. *See* Ex. 7-A, at 19 (Defendants provided first-time vacancy date data for only 162 properties) & 20 (Defendants provided the foreclosure repossession date for only 226 properties, but Dr. Rugh supplemented with publicly available information to obtain data for a total of 1,002 properties).

Ex. 14, Safeguard 30(b)(6) Dep. 384:4–385:6. Safeguard was also aware of NFHA's investigation and aware that the investigation included Safeguard-managed properties, but it, too, took no action in response. Ex. 14, 75:16–77:12, 334:10–337:9, 340:18–341:10.

## STANDARD OF REVIEW

Contrary to Defendants' assertions, the burden is on them to show that, when viewing all facts in the light most favorable to Plaintiffs, "there is no genuine dispute as to any material fact and the [Defendants are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court may not weigh the evidence, make credibility determinations, or determine the truth of the matter, but instead is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 248; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Summary judgment is inappropriate, even where there is no dispute as to the basic facts, if the parties disagree on the inferences that may be drawn from the undisputed facts." *Williams v. Poretsky Mgmt.*, 955 F. Supp. 490, 494 (D. Md. 1996) (citing *Morrison v. Nissan Co.*, 601 F.2d 139, 141 (4th Cir. 1979)). Particularly "[w]here discriminatory intent and disparate treatment are at issue, courts should be cautious in granting summary judgment, because questions of intent and disparate treatment are difficult questions of fact often left to the jury." *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 39 (D.D.C. 2003) (citations omitted).

## ARGUMENT

I.    **HUD's *U.S. Bank* determination has no precedential value and is not entitled to deference.**

As an initial matter, this Court should reject Defendants' repeated suggestions that a HUD determination in a different case is entitled to any special weight or deference. Defendants' arguments rely heavily on *NFHA v. U.S. Bank*, No. 01-12-0283-8 (HUD Jan. 8, 2016), but HUD recently made clear that its "determinations of no reasonable cause are not intended to serve as and should not be used as precedent." Ex. 93-B, July 5, 2022 Letter from HUD Deputy Ass't Sec'y for

Enforcement L. Grosso to L. Rice; *see* Ex. 93, Rice Decl. ¶ 8. Nor should these determinations

"serve as a statement of [HUD] policy." Ex. 93-B. HUD also noted that the *U.S. Bank*

determination "was subject to a subsequent request for reconsideration challenging the factual and

legal analysis supporting the determination," which HUD "was actively evaluating" when the request

was withdrawn. *Id.*

Not only do HUD determinations have no precedential value (particularly in different cases),

but they are afforded no more weight than any other evidence. *See Moore v. Devine*, 767 F.2d 1541,

1550–51 (11th Cir. 1985), *modified*, 780 F.2d 1559 (11th Cir. 1986) (explaining that a court is not

obliged to address administrative agency findings in a discrimination case and instead should

"*independently* determine" the merits of each claim). Rather than rely on or defer to the findings of an

administrative agency—particularly findings reached without discovery, a hearing, or opportunity for

the charging party to address the respondent's arguments or evidence[24]—district courts review the

evidence *de novo. See Telesca v. Long Island Hous. Partners, Inc.*, 443 F. Supp. 2d 397 (E.D.N.Y. 2006);

*U.S. v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 153–54 (S.D.N.Y. 2015) (explaining that

administrative findings reached without any form of hearing or discovery do not afford parties a full

and fair opportunity to be heard and thus do not bind the court in any way). The Fourth Circuit has

even condoned a district court's refusal to admit administrative agency records into evidence. *Cox v.*

*Babcock & Wilcox Co.*, 471 F.2d 13, 15 (4th Cir. 1972). Furthermore, under the Fair Housing Act

("FHA"), which "permits a plaintiff to initiate suit in federal court regardless of whether or not

HUD determines that reasonable cause exists," and without needing to first exhaust administrative

remedies through HUD, there is even less reason to afford any weight to a HUD finding. *Ramos v.*

---

[24] *See* Ex. 5, ¶ 11 (outlining HUD's failure to offer NFHA a full and fair opportunity to respond to U.S. Bank's arguments and evidence before issuing its findings).

*H.U.D.*, No. 96 CIV. 5552 (MGC), 1997 WL 589008, at *3 (S.D.N.Y. Sept. 19, 1997); 42 U.S.C. § 3613(a)(2). Accordingly, the Court should not give any weight or deference to the HUD *NFHA v. U.S. Bank* determination.

**II.     Plaintiffs have put forth ample evidence establishing that Defendants' policies and procedures disparately impacted communities of color, precluding summary judgment.**

Disparate impact claims "challenge[ ] practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 421 (4th Cir. 2018) (quoting *Texas Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 524 (2015)). Courts analyze such claims under a three-step, burden-shifting framework.[25] The plaintiffs must first demonstrate "a robust causal connection between the defendants' challenged policy and the disparate impact on the protected class." *Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 631 (D. Md. 2019) (quoting *Reyes*, 903 F.3d at 424.) The burden then shifts to the defendants to "state and explain the valid interest served by their policies." *Id.* at 632 (citing *Reyes*, 903 F.3d at 424). Finally, the burden shifts back to the plaintiffs to show that the defendants' interests "could be served by another practice that has a less discriminatory effect." *Id.* (citing *Reyes*, 903 F.3d at 424). Plaintiffs "need not prove discrimination with scientific certainty; rather, [their] burden is to prove discrimination by a preponderance of the evidence." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring—but speaking for Court per curiam) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981)).

Here, Defendants argue only that Plaintiffs have failed to meet their burden under the first step, claiming that Plaintiffs' investigation methodology is flawed and that Plaintiffs have failed to

---

[25] This burden-shifting framework mirrors HUD's disparate-impact regulations. *See* 24 C.F.R. § 100.500.

identify Defendants' offending policies and practices or establish the requisite causal connection. BANA Mem. at 26; SG Mem. at 9. Plaintiffs, therefore, need only demonstrate that there is sufficient evidence, viewed in the light most favorable to them, to establish "a robust causal connection" between Defendants' challenged policies and procedures and the disparate impact on communities of color. *Reyes*, 903 F.3d at 424. To establish robust causality, Plaintiffs may "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion [complained of] because of their membership in a protected group." *Id.* at 424 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994–95 (1988)).

Plaintiffs' statistical evidence "is precisely the kind of statistical evidence of disparate effects that is cognizable under the FHA." *Nat'l Fair Hous. All.*, 401 F. Supp. 3d at 637. Contrary to Defendants' assertions, Plaintiffs' statistical evidence derives from a methodologically sound investigation in line with traditional fair housing enforcement and—although it need not be—social science research. Defendants' critiques go to the weight of Plaintiffs' evidence, which should be decided by a jury, not on summary judgment. Finally, Plaintiffs have identified Defendants' policies and practices that led to the racially disparate outcome and performed a regression analysis ruling out myriad alternative non-racial explanations for the disparity. Plaintiffs' evidence is more than sufficient to establish their disparate impact claim, precluding an award of summary judgment.

### A. Plaintiffs' evidence of a stark racial disparity in Defendants' exterior maintenance and marketing of REOs derives from a methodologically-sound investigation.

As described above, Plaintiffs' investigation revealed a substantial racial disparity, statistically and practically significant, in the exterior maintenance and marketing of Defendants' REOs. *Supra* Facts Section II; Ex. 7-A, at 6. Unable to escape the significance of these clear findings of racially disparate maintenance and marketing, Defendants instead attempt to discredit them by attacking the methodology of the underlying investigation. Defendants' arguments, however, are both inappropriate at the summary judgment stage and ultimately unavailing. First, because courts

19

"cannot weigh the evidence" at summary judgment, *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d

562, 569 (4th Cir. 2015), Defendants' various critiques of Plaintiffs' methodology are arguments

more appropriately directed toward the jury, which, in weighing all the evidence, can decide whether

Plaintiffs' findings should be afforded less weight because of Defendants' concerns, *see Metro. St.*

*Louis Equal Hous. Opportunity Council v. Gordon A. Gundaker Real Est. Co.*, 132 F. Supp. 2d 1210, 1212

(E.D. Mo. 2001) (holding that despite "numerous issues" with the "design and execution of the

tests," because the "execution of each test is factual evidence which stands or falls on the credibility

of the witnesses" the court was precluded from entering summary judgment). Defendants have

offered no reason for deciding highly factual issues (such as whether neighborhoods were

comparable enough or the initial condition of the property sufficiently taken into account) as a

matter of law, and none exists.

Second, Defendants' critiques are unavailing. Plaintiffs designed and implemented a

methodologically-sound enforcement investigation. Many of Defendants' criticisms boil down to

their invented requirement that Plaintiffs' investigation definitively rule out all other potential

contributing factors to the observed racial disparity—from variations in income to local crime rates.

Under the FHA, however, race need only be a significant factor—not the sole factor—for a denial

of housing. *Woods-Drake v. Lundy*, 667 F.2d 1198, 1202 (5th Cir. 1982). And the impractical (and

often impossible) requirements Defendants attempt to impose on Plaintiffs' investigation (*e.g.*,

identical, rather than similar, comparators, investigators masked to the investigation's purposes, and

reliance on information solely within Defendants' possession) have never been required of fair

housing enforcement efforts. Ex. 6-A, at 4, 14–18. Indeed, plaintiffs can rely on the results of their

fair housing tests in proving claims of discrimination without first subjecting their testing

methodology to the more rigorous requirements for expert testimony under Federal Rule of

Evidence 702. *See Gundaker*, 132 F. Supp. 2d at 1211–2 (declining to exclude evidence of a fair

housing test even though the testing protocol "failed to meet the scientific validity and reliability standards of Rule 702"). As fair housing enforcement expert Pamela Kisch explained, "a fair housing enforcement investigation is not designed to be, nor does it need to be, a research study," and imposing such a standard would "frustrate the purpose of the FHA and harm fair housing efforts."[26] Ex. 6-A, at 13, 19–21.

Nevertheless, even when held to scientific research standards, Plaintiffs' investigation methodology is sound. Dr. Michael Fetters, an expert in social science research methodology, carefully reviewed the design, implementation, and handling of data in Plaintiffs' investigation. Ex. 2-A, at 1–3, 9–21. He concluded that Plaintiffs' investigation "would qualify as a rigorous and compelling mixed methods study," "capable of producing credible, valid, and compelling findings of evidence" of exterior maintenance and marketing disparities on the basis of neighborhood racial composition. *Id.* at 4, 31. As a co-editor-in-chief of the premier journal in the field of mixed methods research methodology, Dr. Fetters was "confident this investigation could be written up for publication in an academic journal, pass through the peer review process, and be published as a respectable, compelling, and influential study." *Id.* at 1, 23. As Dr. Fetters explained, Defendants' "critiques are based on infeasible expectations regarding collection of data in the field and the necessary funding and human resources involved in such investigations" and "mischaracterized or exaggerated 'design flaws' that should have no meaningful effect on the results." *Id.* at 4. They also

---

[26] Testing by fair housing organizations is critical to uncovering discrimination and enforcing the FHA and should not be undermined by inappropriate and impossible-in-practice standards. *Zuch v. Hussey*, 394 F. Supp. 1028, 1051 (E.D. Mich. 1975), *aff'd and remanded sub nom. Zuch v. John H. Hussey Co.*, 547 F.2d 1168 (6th Cir. 1977) (observing that "evidence gathered by a tester may, in many cases, be the only competent evidence available to prove that the defendant has engaged in unlawful conduct" under the FHA, given that defendants rarely "admit[] [their] illegal conduct or . . . sufficiently publicize[] it so as to make testers unnecessary").

"fail[ed] to appreciate the robust procedures plaintiffs adopted to produce credible, valid, and compelling findings." *Id.*

Notably, Defendants' critiques of Plaintiffs' methodology ignore that Plaintiffs are "not required to exhaust every possible source of evidence" when a jury could conclude from Plaintiffs' evidence that discrimination is more likely than not, as it could here. *Dothard v. Rawlinson*, 433 U.S. 321, 331 (1977). Where a defendant complains about "fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own." *Id.* Defendants have not done so here. Instead, Defendants rely on a small, cherry-picked list of examples to attempt to rebut the broad statistical evidence of racial discrimination that Plaintiffs have put forward.

Defendants and their experts have also failed to identify any better way Plaintiffs could have conducted their investigation. Ex. 15, McCrary Dep. 183:3–16 ("It's not for me to say what plaintiffs should have done. It's for me to respond to what it is that plaintiffs did do and to ask what kinds of interpretations that methodology admits."); Ex. 16, Bryar Dep. 132:4–14 (stating that he had no opinion on how Plaintiffs should have designed their investigation differently). Indeed, BANA expert Dr. Justin McCrary stated that he believed a longitudinal study is required to assess REO maintenance deficiencies, but when asked if he could design one, testified that he did not know. Ex. 15, 75:19–76:13, 79:5–15. Similarly, Safeguard contends that Plaintiffs should have followed Safeguard's vendors around as they performed their work so the investigators could evaluate properties just after work was completed. SG Mem. at 21–22; Ex 16, 129:2–130:7. Not only would such an approach be impractical (requiring coordination with the target of the investigation), but it would have "compromised the quality of the data," Ex. 2-A, at 27, and "rendered the testing a far less objective measure of true conditions on the ground" by providing "advanced notice" of the visits to Defendants, Ex. 6-A, at 15. Defendants' critiques of Plaintiffs' methodology only create genuine disputes of material fact.

1.  **Plaintiffs selected sufficiently comparable neighborhoods to investigate given real-world housing patterns, and their subsequent regression analysis controlled for relevant differences.**

Plaintiffs selected sufficiently comparable communities of color and majority-white neighborhoods to investigate. Although Defendants complain about differences in age of housing stock, distance from city center, income, vacancy rates, and property values between majority-white and non-white neighborhoods (BANA Mem. at 27–30; SG Mem. at 30–31), Dr. Rugh controlled for these very factors in his regression analyses and concluded that they do not explain the disparity in deficiencies to the same degree as neighborhood racial composition. Ex. 7-A, at 9, 16–38. It is also unclear why any of these differences would have contributed to disparities in deficiencies such as overgrown grass or trash on the lawn. As one of BANA's experts agreed, a neighborhood's income level would not affect the length of the grass. Ex. 9, Skanderson Dep. 67:12–68:20.

The Fourth Circuit has made clear that comparators "need not be an exact match."[27] *Haywood v. Locke*, 387 F. App'x 355, 360 (4th Cir. 2010); *see also Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (noting that a comparison between groups "will never involve precisely the same set of [facts] occurring over the same period of time and under the same sets of circumstances) (quoting *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)); *Acosta v. Ingerman & Horwitz, L.L.C.*, No. WDQ-14-1605, 2015 WL 795108, at *4 (D. Md. Feb. 24, 2015) (noting that requiring comparators to match in every respect "would forestall any comparator analysis in . . . which a plaintiff did not have an exact counterpart"). Comparators need only be

---

[27] BANA cites to unpublished and out-of-circuit cases to argue that the properties must be "identical or directly comparable in all material respects" or not "apples to oranges," but the cases are readily distinguishable. *See Sheikh v. Rabin*, 565 F. App'x 512, 516 (7th Cir. 2014) (citation omitted) (finding that the plaintiff had not presented evidence of any comparators at all, despite claiming that some existed); *Donnelly v. Rhode Island Bd. of Governors for Higher Educ.*, 929 F. Supp. 583, 591 (D.R.I. 1996), *aff'd*, 110 F.3d 2 (1st Cir. 1997) (finding comparators in the lowest-paid tier versus the highest-paid tier was "apples to oranges" when evaluating discrimination in employment compensation).

similar in "all of the *relevant* aspects." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 777

(6th Cir. 2016). The critical question is: "[A]re there enough common features between the

[comparators] to allow a meaningful comparison?" *Acosta*, 2015 WL 795108, at *4 (quoting

*Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). The answer in this case is

undeniably "yes."

Here, Plaintiffs have succeeded in isolating the critical independent variable—race—through

their neighborhood and property selection process. *See supra*, Facts Section I.C.2. Although it was

impossible for NFHA to find neighborhoods and properties that were identical in all ways except

race, it used a systematic approach to identify targets that were similar in all relevant ways. *See*

*Jackson*, 814 F.3d at 777. Ms. Kisch—who has 30 years of experience designing enforcement tests—

explained that NFHA's selection of comparable properties in majority-white and majority-minority

communities was similar to other fair housing enforcement tests where testers of different races are

sent to the same rental office. Ex. 6-A, at 14. Although fair housing organizations try to make the

testers as comparable as possible, "there are criteria that [they] cannot control for like the personality

or likeability of the testers." *Id.* Similarly, "NFHA selected criteria that would ensure the comparable

properties were similar enough to isolate race as a factor in the properties' maintenance." *Id.*; *see*

Ex. 2-A, at 25 ("Given social realities, in the big picture, the plaintiffs have identified the best

possible, or, at a minimum, appropriately comparable communities within the chosen cities."). Had

there been neighborhoods or properties in the selected metro areas that were more comparable in

the other ways Defendants identify—income levels, age of housing stock, location from city

center—surely Defendants would have put them forward.[28] *See Dothard*, 433 U.S. at 331. They did

---

[28] BANA contends that "Plaintiffs did not inspect anywhere near '100%' of Bank of America's
REOs on any citywide or areawide basis" because there were additional REOs in the BANA

not. *See, e.g.*, Ex. 9, 111:9–112:4 (BANA expert Dr. Skanderson admitting he never assessed whether there were better-matched neighborhoods for comparison).

In addition to comporting with traditional fair housing testing standards, because Plaintiffs "used a consistent approach and procedures" to identify comparable neighborhoods, "and were transparent about that approach," their sample selection "would be well accepted in social science research."[29] Ex. 2-A, at 25. Defendants' insistence on the selection of neighborhoods and properties identical in all ways except race "fail[s] to consider real world conditions," and is thus unreasonable from a social science research perspective.[30] *Id.* Because of "wide-spread systemic segregation,"[31] including the lingering effects of redlining, communities of color tend to be "more economically disadvantaged," than majority-white communities, with "lower median household income, lower

---

portfolio in metropolitan areas at a different time period than when Plaintiffs visited. BANA Mem. at 5–6. Plaintiffs did not set out to investigate every REO that existed in every identified metro area from 2011 through 2018. Such a requirement would be infeasible, requiring NFHA to return to a metro area every time BANA added a new REO to its inventory, but before it was sold or conveyed to HUD.

[29] Defendants' critiques about the representativeness of Plaintiffs' sample inaccurately assume that the intention of Plaintiffs' investigation was to extrapolate findings in the selected metropolitan areas to all BANA REOs nationwide (or to all REOs within each metro area). This is not so. Plaintiffs' references to their "nationwide" investigation refer only to its inclusion of 37 metropolitan areas located throughout the country. Therefore, Defendants' critiques about the representativeness of Plaintiffs' sample are irrelevant (as conceded by BANA's expert). Ex. 9, 57:21–59:7. Because Plaintiffs investigated properties that met NFHA's inclusion criteria, "[t]he lack of a 'representative sample' does not preclude plaintiffs from identifying a recurrent and consistent pattern of discriminatory practices among the neighborhoods sampled in all 37 metropolitan areas." Ex. 2-A, at 24.

[30] This is unsurprising considering that Defendants' research expert Dr. McCrary has little-to-no experience in designing field research, let alone research into the condition of residential housing across different types of communities. Ex. 15, 23:3–13, 149:21–150:14.

[31] Ex. 6-A, at 14 (citing John R. Logan and Brian J. Stults, *The Persistence of Segregation in the Metropolis: New Findings from the 2020 Census*, Diversity and Disparities Project, Brown University (2021), https://s4.ad.brown.edu/Projects/Diversity).

home values, older housing stock."[32] Thus, requiring fair housing groups to find properties or

neighborhoods that are identical comparators would thwart enforcement of the FHA for the claims

at issue in this case and in others, such as those seeking to uncover appraisal bias between properties

in majority-white and non-white neighborhoods.[33]

Defendants are free to argue to the jury that non-racial differences between neighborhoods

caused the disparity in the exterior condition of REOs—as they have unsuccessfully argued here—

but these differences offer no basis for throwing out the entire enforcement investigation as a matter

of law. *See Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012) ("Whether a comparator is

similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only

when no reasonable fact-finder could find that plaintiffs have met their burden on the issue."

(citation omitted)).

### 2. The 37 criteria Plaintiffs evaluated accurately reflect curb appeal and mirror Defendants' own expectations for their maintenance and marketing work.

To assess whether Defendants were making housing "unavailable" in communities of color

through poor upkeep and marketing, Plaintiffs properly evaluated each REO against a standardized

list of 37 criteria capturing the property's curb appeal and marketing. *See supra* Facts Section I.A.

Plaintiffs did not limit their criteria to only the minimum requirements under "the various

contractual, legal, and other requirements governing BANA's REO maintenance activities," (BANA

Mem. at 30) but, instead, relied on their years of experience and contacts in the real estate and

property preservation and maintenance industries to develop criteria that would best assess an

---

[32] Andre M. Perry & David Harshbarger, *America's Formerly Redlined Neighborhoods Have Changed, and so Must Solutions to Rectify Them*, The Brookings Institution (Oct. 14, 2019), https://www.brookings.edu/research/americas-formerly-redlines-areas-changed-so-must-solutions.

[33] "If plaintiffs had excluded all metropolitan areas exhibiting [ ] income inequality, they may not have had a sufficient number of cities or properties to investigate." Ex. 2-A, at 25.

REO's curb appeal, within the parameters of the kind of work Defendants perform on their REOs (for example, Plaintiffs' criteria did not expect Defendants to undertake cosmetic renovations). *See* Ex. 5, ¶¶ 5, 8.

Plaintiffs' criteria mirror the standards to which Defendants attempted to hold themselves. As previously discussed, BANA's own REO Inspection Checklist significantly overlaps with Plaintiffs' criteria, including criteria Defendants now claim to be beyond industry standards, such as an ████████████████████████ Ex. 5-B-3; *supra* Facts Section I.A. At the beginning of Plaintiffs' investigation, BANA's inspections of Safeguard's work on its REOs included several of the criteria Plaintiffs included in their evaluations. Exs. 17–20 ("REO Inspection Detail" tab within each spreadsheet); *supra* Facts Section I.A. In addition, the Inspection Checklist from Safeguard's June 2012 contract with BANA lists multiple criteria that substantially overlap with Plaintiffs' investigation criteria. Ex. 21 at S1242–S1245; *supra* Facts Section I.A. Plaintiffs' criteria are, therefore, in line with Defendants' own standards for the maintenance and marketing of their properties.

Although Defendants contend that they were unfairly assessed for criteria beyond the baseline industry standards, they regularly went above and beyond these industry standards on certain properties, particularly those properties in majority-white neighborhoods. For example, while Safeguard's expert claims that industry standards require roofs to be repaired only if the damage causes water to leak into the property (Nov. Bryar Rep., ECF No. 171-3 at 48),[34] BANA regularly repaired roofs without evidence of leaks—and did so more frequently in majority-white neighborhoods. BANA hired third-party auditors to evaluate conditions in its REOs. Ex. 8, BANA 30(b)(6) Dep. (Priesmeyer) at 245:13–20. In BANA's spreadsheets summarizing the results of these

---

[34] Plaintiffs' property preservation and maintenance expert disputes this point. Ex. 3-A-3 at 5.

third-party audits, several were described as having tarps covering or in place of roofs. Ex. 1, ¶ 34 &

Ex. 1-K, Third Party Quality Control Data. Of these tarped properties, in majority-white

communities, 27% had bids submitted to repair the roof (and all had a roof, albeit a damaged one).

Ex. 1-K. Two of these properties had no mention of any leak or water pooling. *Id.* at rows 14 and

98. In communities of color, however, only 16% of tarped properties had bids submitted to repair

the roof (and two of the three properties for which bids were submitted had no roof at all—if those

two properties are removed, then 5% had a bid submitted). *Id.* Although two tarped properties in

communities of color had descriptions of leaks, Defendants did not obtain roof repair bids. *Id.* at

rows 75 and 616.

In short, NFHA's careful selection of evaluative criteria accurately reflects the standards that

Defendants impose upon themselves. Defendants are free to remove deficiencies they believe to

have been improperly included and see if doing so reduces or eliminates the racial gap in disparities.

Their failure to do so speaks volumes—particularly where Plaintiffs have performed analyses

eliminating certain deficiencies (such as those Defendants maintain were legal requirements) or

isolating only overgrown grass/leaves and trash and found that the racial disparity continues to

remain statistically and practically significant.[35] *See supra* Facts Section III. Defendants have failed to

establish that Plaintiffs' investigation criteria—either in whole or in part—were inappropriate as a

matter of law.

---

[35] Although BANA accuses Plaintiffs of using "miscellaneous" categories on the evaluation form to
assign more deficiencies to REOs in communities of color (BANA Mem. at 19), the data reveals just
the opposite. The only two categories of deficiencies that were present more often in white
communities were miscellaneous gutter and miscellaneous water damage deficiencies (each only
1.1% higher in white communities). Ex. 1-F. The "miscellaneous" categories are clearly not driving
the racial disparity here.

**3. Plaintiffs' decision to capture data at a single point in time is a widely used practice, and the evidence demonstrates that Plaintiffs' findings are representative of longer-term deficiencies.**

Defendants and their experts rely heavily on the proposition that "maintenance is an ongoing activity that cannot be meaningfully assessed in a single visit." BANA Mem. at 32. Yet because Plaintiffs applied the single-point-in-time approach consistently across all neighborhoods without knowledge of when maintenance was scheduled, "there is no [non-discriminatory] reason why [the investigation] would have produced more deficiencies in communities of color as compared to majority-white communities," Ex. 6-A, at 15–16, or why Plaintiffs' evaluations would have been more likely to occur just before scheduled maintenance only in communities of color. *See* Ex. 2-A, at 27. Defendants have not offered any colorable explanation to the contrary. Why, for example, would overgrown grass consistently be present more frequently at homes in communities of color than in majority-white neighborhoods?

Many discriminatory behaviors are "ongoing," and relying on a snapshot of a defendant's behavior is standard in testing methodology in both fair housing and employment discrimination cases. Ex. 6-A, at 15 (fair housing); *Movement for Opportunity & Equal. v. Gen. Motors Corp.*, 622 F.2d 1235, 1244–45 (7th Cir. 1980) (employment discrimination). Courts have rejected requiring more than a point-in-time analysis because it would impose an "inappropriately high standard of precision." *Hartman v. Wick*, 600 F. Supp. 361, 372 (D.D.C. 1984) (quoting *De Medina v. Reinhardt*, 686 F.2d 997, 1007 (D.C. Cir. 1982) (declining to grant summary judgment to defendants "where reasonable experts could disagree" on the best methodology for determining a disparity)).

Defendants could try to rebut Plaintiffs' single-point-in-time statistics with a more longitudinal analysis, but when they fail to do so, their critique of the point-in-time data is deficient. *See id.* at 373–74 (considering defense expert's statistics and analysis and concluding that it was insufficient to rebut the plaintiffs' prima facie case of discrimination using their own statistical

evidence). Defendants have failed to put forward any statistical analysis of their own, nor have they identified any case law to support their argument. Instead, they cherry-pick examples of maintenance occurring just after Plaintiffs' visit, but do not—and cannot—argue that this occurred with any greater frequency in communities of color. Taking the evidence in a light most favorable to Plaintiffs, the single-visit protocol was more than sufficient to serve the purpose of their investigation. Ex. 2-A, at 27 (opining that "NFHA's point-in-time analysis was appropriate in assessing the level of maintenance applied to properties"). For the sake of completeness, however, Plaintiffs address each of Defendants' flawed arguments against Plaintiffs' single-point-in-time approach below.

### a) The deficiencies Plaintiffs identified were not short-lived.

Defendants' cherry-picked lists of properties intended to demonstrate that they remedied deficiencies shortly after Plaintiffs' visits are unavailing. First, many of their examples actually show the opposite. For example, of the properties Safeguard chose to highlight to prove that it removed trash identified in the investigation soon after Plaintiffs' visits, six involve lags of more than two months between Plaintiffs' visits and trash removal. *See* SG Mem. at 26 (2225 W. Burleigh St.; 3069 Mayfield Ave.; 3272 N. Richards St.; 3806 Kerfield Dr.; 47 Shelton Ave.; and 5104 Oakland Way). One, 3272 N. Richards St., had trash festering on the property for more than six months. *Id.* The examples BANA provides fare no better. In one, BANA claims that because Safeguard visited 907 Abel Ave., Capitol Heights, MD, soon after Plaintiffs' May 24, 2016 evaluation, Plaintiffs' "arbitrary timing," rather than Defendants' conduct, explains the 11 deficiencies observed. BANA Mem. at 13. Safeguard's work orders, however, show that many of these deficiencies had existed at least six months earlier and persisted beyond Safeguard's May 24, 2016 maintenance. *Compare* Ex. 22, Dec. 14, 2015 Work Order at SG 217762 (identifying ███████████████████████████████████ ███████████████████████████████████████████████████████████████████████,

██████████████████████████████████████████████████████████████

████████, *with* Ex. 23, May 27, 2016 Work Order at SG 218819 (including photographs showing

████████████████████████████████████████████████████, among other

issues).

       Second, Defendants' examples do not explain why Plaintiffs would have found deficiencies

just before they were resolved in communities of color more frequently than in majority-white

communities. Plaintiffs' property preservation and maintenance expert notes that "there is no reason

why there would be more pending work orders for problems identified in majority African-

American and Latino neighborhoods than in majority-white neighborhoods." Ex. 3-A, at 23.

Defendants' examples are no substitute for a statistical showing or logical explanation for this

disparity.

       Finally, Plaintiffs can also point to individual examples where the evidence shows that the

deficiencies they identified were often repeated or extended problems:

- 3201 Lakeland St., Fort Worth, TX (Latino community): Plaintiffs identified overgrown grass and shrubbery during their September 17, 2013 visit. Ex. 1-E, REO Database Export. At least three months earlier, in June, ███████████████████████████████████████ ████████████, Ex. 24, at SG00069379, an issue documented in Safeguard's photographs of this property from April 8, 2013, as well, Ex. 25, SG00065880.



- 3517 Juneway, Baltimore, MD (African-American community): Plaintiffs identified overgrown grass and shrubbery and invasive plants during their November 2017 visit. Ex. 1-

E. In March 2017, BANA approved a Safeguard bid to ███████████████ ████████████████████████████████████ Ex. 26-
SG00098218. BANA's documents also describe the grass and/or shrubbery as ███████
████████████████ in August 2017. Ex. 27 at row 9413 (loan no. ████████). In September
2017, a real estate agent visited the property and indicated that ██████████████████
████████████████████ *Id.* at row 9435.

- 4306 Knight Arnold Rd., Memphis, TN (African-American community): Plaintiffs identified
  graffiti (among other issues) during their April 9, 2016 evaluation. Ex. 1-E. This same racist
  graffiti is visible on Defendants' work orders from October 28, 2014 (Ex. 28 at
  SG00162807) through May 10, 2016. Ex. 29 at SG00173251. BANA ████████████████
  ██████████ Ex. 30, BANA-NFHA-LIT_0039029:



  (Right) Photograph from Plaintiffs' Apr. 4, 2016 visit. Ex. 31.

- 4878 W Chesterwood Ct., Memphis, TN (African-American community): Plaintiffs
  identified graffiti (among other issues) during their May 21, 2013 evaluation. Ex. 1-E. This
  same racially-charged graffiti is visible from May 30, 2012, until at least June 19, 2013, in
  Defendants' work orders:



  (Right) Photograph from NFHA's visit on May 21, 2013. Ex. 33, PLAINTIFFS 025655.



- 6088 S. Hil Mar Cir., Baltimore, MD (African-American community): Plaintiffs identified, among other things, holes in the structure, wood rot, and unsecure/broken doors during their May 19, 2016 evaluation. Ex. 1-E. Chevelle and Jalen Bushnell, Individual Plaintiffs and the owners of the adjacent property, contacted BANA in early 2015 about the property being unsecured with doors and windows left open and contacted Safeguard in February 2017, when squirrels made their way to their attic through holes in 6088 S. Hil Mar Cir. Ex. 35, Bushnell Decl. ¶¶ 12–15. The Bushnells contacted Safeguard again in March 2017 when the problems remained unresolved. *Id.* ¶ 15. Had NFHA visited the property several times in 2016 and 2017, the evaluations would have been the same.

### b) If Defendants equitably approved bids, Plaintiffs would not have found a disparity in exterior maintenance and marketing.

Defendants contend that the single-point-in-time approach is unreliable because "some maintenance work requires third-party approvals that take time to obtain." BANA Mem. at 32; *see* SG Mem. at 21. They claim that this purported lag in bid approval time "indisputably provide[s] [a] non-racial explanation[]" for the disparity in deficiencies. BANA Mem. at 42. But, again, Defendants fail to explain why such a lag would impact properties in communities of color more than those in majority-white communities, even though they possess all the data on how long approvals (and denials) took. If there were a greater lag in approving bids in communities of color, that would suggest that racial discrimination was at work, and there is evidence that was the case here. For example, it is not clear why, in a majority-white community, Defendants took only nine days

(including New Year's Day) to complete trash removal following a neighbor complaint and bid process[36] but, in a community of color, took 65 days to do the same following a neighbor complaint (and subsequent follow-up complaints as the trash continued to fester on the property).[37]

### c) The initial condition of the property does not explain the racial disparity and does not discredit the investigation.

Defendants argue that Plaintiffs should have considered the condition of the property at the time BANA acquired it—but they have not provided Plaintiffs with sufficient information to do so, nor, beyond two individual property examples in BANA's brief (BANA Mem. at 11–12) have they used the information they possess to rebut Plaintiffs' claims. More importantly, Defendants overlook that "because Plaintiffs' investigation was restricted to routine exterior maintenance that Defendants were required to perform . . . the initial condition of the house upon transfer of possession is not as relevant in this case." *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 CV 839, 2019 WL 5963633, at *14 (N.D. Ill. Nov. 13, 2019).

In addition, to give Defendants time to remedy any exterior maintenance issues that existed when an REO came into BANA's possession, Plaintiffs did not visit any property that had been in BANA's possession for fewer than 30 days (unless actively marketed for sale earlier). Ex. 1, ¶ 13. Plaintiffs' property and preservation expert opined that even certain deficiencies requiring bids to be submitted and approved should still be completed within 30 days of a property entering Defendants' inventory. Ex. 3-A, at 16. Many other types of maintenance can and should be addressed much sooner—particularly health and safety issues (like an unsecured entry point), which should be addressed within 24 hours. *Id.* at 15–16. And routine maintenance, such as cutting grass and

---

[36] ██████████████████████████████████████ *See* Ex. 36 at SG00458040 & SG00458176.

[37] ██████████████████████████████████████ *See* Ex. 37 at SG00231324 & SG00232891.

removing trash, should be completed on a regular basis regardless of the initial condition of the property. *Id.* ¶ 13(a); Ex. 3-B, ¶¶ 7, 10.

### 4. Plaintiffs' data collection was reasonable, practical, and reliable.

BANA's criticism of Plaintiffs' scoring of properties as "subjective, unreliable, and unscientific" (BANA Mem. at 21) reveals its misunderstanding of fair housing enforcement investigations and social science research methods. No court has ever required that fair housing testing be "scientific"; reliance on tester evidence is a well-established practice. *Gundaker*, 132 F. Supp. 2d at 1212 ("'Tester evidence' is factual evidence" and "[i]t is up to a jury to assess the credibility of the testers and agents, and ultimately, the credibility of the information contained in the forms."); *see Wharton v. Knefel*, 562 F.2d 550, 554, 554 n.18 (8th Cir. 1977) (holding that the use of tester evidence is "well established," "uniformly accepted," and "necessary"). A requirement that fair-housing testing meet scientific research standards would thwart enforcement efforts and realization of the FHA's goals. Ex. 6-A, at 19.

Even when scrutinized under a scientific lens, however, Plaintiffs' data collection methods were well-designed and implemented to produce "credible, valid, and compelling" findings. Ex. 2-A, at 28–31. Plaintiffs took several steps to ensure properties were evaluated in a consistent manner and in the most objective way possible. First, they used defined criteria, on which investigators were trained, to score the properties. "[T]he use of an observational checklist" was "an attempt to provide an objective measure of a highly complex phenomenon of interest." *Id.* at 29. Second, at least two investigators evaluated each property using a "consensus approach" in which the investigators had to reach agreement on whether a finding qualified as a deficiency—a scientific approach BANA mischaracterizes as "inspectors frequently disagree[ing]." *Id.*; BANA Mem. at 35. Third, investigators were required to provide photographic evidence of each deficiency. Fourth, NFHA employed an

intensive quality-control process to ensure properties were scored consistently. *See supra* Fact Section I.E.

Defendants rely heavily on deposition testimony from a former NFHA employee and an employee at Metropolitan Milwaukee Fair Housing Council ("MMFHC"), both of whom worked briefly on the investigation a decade ago, to argue that Plaintiffs' REO evaluation criteria are subjective and unreliable. BANA Mem. at 21–22; SG Mem. at 11–12.[38] The former employee, Lisa Govoni, worked at NFHA for one year between 2011 and 2012 and had little recollection of the training or her role in the investigation more than ten years prior. Ex. 38, Govoni Dep. at 21:12–20, 27:7–28:3, 29:19–41:1. Rachel Scalise, an executive assistant at MMFHC, similarly had not been trained on evaluative criteria since 2012, and only evaluated properties over the course of one month that year. Ex. 39, Scalise Dep. at 28:18–29:1; Ex. 7-C (filtering column AR shows all evaluations conducted by Ms. Scalise, with date in column D). How these witnesses identified deficiencies from photographs alone during their depositions, more than ten years after their training on how to evaluate REOs—which did not involve scoring properties based on photographs—and without the benefit of another trained individual with whom they could consult in real-time, does not accurately reflect how they performed in the field when they were freshly trained and assisted by at least one other evaluator. At their depositions, the witnesses were also given no context, including whether the photograph was of an at-issue property or a neighboring property or whether it was intended to

---

[38] Contrary to BANA's assertions, investigators did not need experience in REOs or property maintenance to properly assess whether the properties had deficiencies. BANA Mem. at 6. NFHA thoroughly trained testers on all the deficiencies. Nonetheless, courts do not require testers to be trained, and have admitted testing evidence where the testers were completely untrained. *See, e.g.*, *McDonald v. Verble*, 622 F.2d 1227, 1229 (6th Cir. 1980). Further, the investigation sought to assess how Defendants' maintenance practices affected curb appeal and discouraged buyers from purchasing REOs—"so it would make sense to use lay people to elicit the observations of an average person that a property might be marketed towards." Ex. 6-A, at 17.

show a specific deficiency or just a side of the house. Defendants now attempt to mislead the Court

by presenting the results of these pop quizzes as indicative of how the property evaluations were

actually conducted.[39]

Even if the Court were to consider these misleading pop-quiz results, because investigators

are fact witnesses, the issues BANA raises go to these witnesses' credibility, which is for the jury to

decide. *See, e.g.*, *Heights Cmty. Congress v. Hilltop Realty, Inc.*, 629 F. Supp. 1232, 1292–93 (N.D. Ohio

1983), *aff'd in relevant part*, 774 F.2d 135, 139–141 (6th Cir. 1985); *Gundaker*, 132 F. Supp. 2d at 1212.

Whether investigators marked deficiencies appropriately is an issue of fact and not an issue that can

be resolved on summary judgment.

Finally, the "blinding" of investigators that Defendants claim is required is unnecessary,

impractical, and inappropriate in the context of a fair housing investigation (Ex. 6-A, at 16–17)[40] and

in the context of a social science observational study. Ex. 2-A, at 28–29. Plaintiffs "utilized sufficient

strategies to mitigate the effects of such bias and produce reliable results," even though it is

impractical and impossible to eliminate all bias in field investigations. *Id.* And, in fair housing

investigations, "[t]esters are not sent out to *find* discrimination," but "to observe and report on their

observations so fair housing staff can determine *if* there is evidence of discrimination." Ex. 6-A at

18; *see also Richardson v. Howard*, 712 F.2d 319, 321–22 (7th Cir. 1983) (stating that a tester's

---

[39] For example, BANA relies on poorly-lit photographs to argue that Plaintiffs erred in marking 1104 Consideration Ln., Landover, MD for water damage and damaged siding. BANA Mem. at 20–21. Yet their own documentation confirms that this property had ███████████████ within a week of Plaintiffs' visit. Ex. 40, BANA-NFHA-LIT_0241534.

[40] In fair housing investigations, fair housing groups commonly use their employees, who are familiar with the purpose of the investigation, as testers. Ex. 6-A at 16–17. "Testers are routinely told that they may be called upon to testify in court about their work as a tester," so, in practice, "bias would only creep in if testers were willing to lie or perjure themselves in service to one small part of a fair housing investigation." *Id.* at 17–18.

"professional status" is not grounds to question their credibility, and testers are "more likely to be careful and dispassionate observers of the events"). Therefore, Plaintiffs' investigators had "no indication of which criteria could be used in a complaint or how the information would be used." Ex. 6-A at 18. Ms. Kisch, who has resolved more than 95 fair housing lawsuits and conducts 130 test parts for HUD each year, testified that Plaintiffs' approach is valid in fair housing enforcement investigations. *Id.*; *see also Richardson*, 712 F.2d at 321 ("It is frequently difficult to develop proof in discrimination cases and the evidence provided by testers is frequently valuable, if not indispensable.").

While Defendants may try to demonstrate that lack of masking resulted in biased scoring, they have not done so. As Dr. Fetters explained, Plaintiffs have been transparent about the design of their investigation, enabling Defendants to replicate it with a new sample of REOs if they so chose. Ex. 2-A, at 31. Defendants could also review Plaintiffs' extensive photo documentation, which includes more than 30,000 photographs for more than 1,400 properties,[41] rescore deficiencies, and see if the racial disparity in observed deficiencies is eliminated (or declines below the point of statistical significance). *See id.* Instead, Defendants point to only five sets of comparator photographs (ten in total, or 0.03% of all the photographs produced) in an attempt to establish sufficient bias in scoring to justify discarding the results of this investigation as a matter of law—and even these five examples are inaccurate, incomplete, and misleading. BANA Mem. at 17–19:

- BANA includes a photograph of the peeling/chipped paint on the door of 1232 W. Lombard St., Baltimore, MD—a property in a majority-white neighborhood—and chastises Plaintiffs for failing to identify the chipped paint as a deficiency. *Id.* at 18. But NFHA did indeed mark peeling/chipped paint as a deficiency and associated it with this exact photo. Ex. 1-E at row 1384; Ex. 1-J at row 30274 (property ID 13495).

---

[41] Ex. 92, Weber Decl. ¶ 2.

- BANA argues that Plaintiffs were biased for failing to mark "the remnants of the deck" as a deficiency at 162 Sprucedale Dr., Waterbury, CT (located in a majority-white community), but marking it as a deficiency for a property in a community of color (89 Eileen Rd., West Haven, CT). BANA Mem. at 18. But again, BANA is mistaken. Although the notes for 89 Eileen Rd. state that the deck and its boards are old, there is no deficiency marked for that. Ex. 41, CFHC 000100; Ex. 1-J at rows 30763, 30765 (property ID 13652) (showing no deficiency associated with photographs of deck and boards). Rather, the photograph associated with the "Structural: Miscellaneous" deficit that BANA must be referring to is of a deformed window frame. Ex. 1- J at row 30764.



Ex. 42, PLAINTIFFS 65417 (described as "235197.jpg" in Ex. 1-J)

- BANA argues that Plaintiffs were biased for giving an "overgrown grass" deficiency to 3507 Edgewood Rd., Baltimore, MD—a property in a community of color—by showing only one view of the house. BANA Mem. at 19. The photographs below, however, support the "overgrown grass" deficiency. Indeed, Defendants ███████████████████████ ████████████████████ before Plaintiffs' visit. Ex. 43 at SG00169361:



(Ex. 44, PLAINTIFFS 54414)                    (Ex. 45, PLAINTIFFS 54420)

- BANA posits that bias was at play for considering the shrubs overgrown at 5819 Waycross Rd., Baltimore, MD (located in a community of color), but fails to include photographs of the back of the house that are described in the database as "Overgrown shrubbery" and that support such a finding. Ex. 1-J at row 29750 (property ID 13308).

 

(Ex. 46, PLAINTIFFS 16069)    (Ex. 47, PLAINTIFFS 16071)

Defendants' failure to offer any evidence of systemic bias in Plaintiffs' scoring "further supports the effectiveness of the precautions NFHA took to produce reliable, unbiased results." Ex. 2-A, at 31.

### 5. Plaintiffs' quality-control process was an asset to the investigation, not a source of bias that would render the database records inadmissible.

Defendants claim that Plaintiffs' quality-control process, whereby two senior NFHA staff members carefully reviewed, corrected, and standardized evaluation data based on the photographic evidence, somehow renders the results of the investigation too biased or unreliable as a matter of law. BANA Mem. at 35–36; SG Mem. at 12. BANA further maintains that this quality-control process, as well as decisions by certain Plaintiffs to save all relevant information from the handwritten evaluation forms only in the database, rather than retain the redundant forms themselves, transforms Plaintiffs' database records into inadmissible hearsay. BANA Mem. at 36. Neither of these attempts to discredit Plaintiffs' strong findings of discrimination has any merit.

First, Plaintiffs' quality-control process, *supra* Facts Section I.E, was "consistent" and "a strength of the investigation," Ex. 2-A, at 18. The process ensured that the scoring of deficiencies was supported by the photographic evidence and thus "constitutes an added layer of care" that "represents a methodologically sound and acceptable approach to ensure that the recorded findings reflected as best as possible the 'objective reality' on the ground." *Id.* at 30. As with their claim of

40

investigator bias, Defendants have failed to offer any evidence that NFHA staff used the quality-control process to alter deficiencies in ways not supported by the photographic evidence.

Second, Plaintiffs' investigation database records are admissible business records pursuant to Federal Rule of Evidence 803(6). Defendants do not dispute that the database records satisfy the first four elements of the business records exception,[42] *i.e.*, they are records of NFHA's regularly conducted investigation activity, and are therefore "presumptively admissible." *United States v. Guardado-Diaz*, 737 F. App'x 119, 122 (4th Cir. 2018). Instead, BANA argues only that the database is not trustworthy under Rule 803(6)'s final requirement, because: (1) Plaintiffs followed their document retention policies and disposed of the handwritten evaluation forms *after* uploading all relevant information to the database; and (2) the two NFHA employees with database editing privileges made quality-control edits based on the photographic evidence. BANA Mem. at 36. As discussed above and in Plaintiffs' opposition to Defendants' spoliation motion filed contemporaneously with the present memorandum, however, Defendants have made no showing of bias or prejudice in the manner in which Plaintiffs preserved the investigation findings and performed quality control of their results to ensure their accuracy. They have therefore failed to meet their burden of proving that the database records are untrustworthy and thus inadmissible as business records. *See Guardado-Diaz*, 737 F. App'x at 122 ("The party opposing admission has the burden to establish unreliability." (quoting *Zeus Enters., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 241 (4th Cir. 1999))).

---

[42] Fed. R. Evid. 803(6)(A)–(D).

**B. Although Defendants have prematurely raised the issue, Plaintiffs have sufficient evidence of Defendants' policies and procedures that disparately impact communities of color.**

As a threshold matter, Defendants' policies and practices are not relevant to the threshold issues of the methodology and validity of Plaintiffs' investigation and regression analyses that Defendants sought to brief in their motions for summary judgment. *See* Mem. & Order at 1, Nov. 2, 2020, ECF No. 115. In its November 2, 2020 Order, the Court's description of the threshold issues to be briefed at summary judgment did not include Defendants' policies and practices. *Id.* Because the parties are engaged in phased discovery, the parties were limited to five depositions per side during Phase II. *See* Phase II Case Mgmt. Order at 2, ECF No. 117. This limitation constrained Plaintiffs' ability to acquire testimony from Defendants' current and former employees and contractors regarding Defendants' unwritten policies and practices that have a disparate impact on communities of color. Accordingly, this issue should be left for the next phase of discovery.

Notwithstanding this limitation, Plaintiffs have sufficient evidence to establish that communities of color were "disproportionately affected by [Defendants'] challenged polic[ies]." *Reyes*, 903 F.3d at 429–430.[43] Defendants erroneously contend that Plaintiffs must point to an official policy of Defendants (*i.e.*, "documentary evidence") to establish their disparate impact claim. BANA Mem. at 45. Yet *Inclusive Communities* only requires Plaintiffs to identify a policy *or practice* that created an artificial, arbitrary, or unnecessary barrier—official or unofficial; it does not impose a

---

[43] If the Court does not believe that Plaintiffs have offered sufficient evidence of Defendants' offending policies and practices at this stage in the litigation, however, Plaintiffs respectfully request that, pursuant to Federal Rule of Civil Procedure 56(d), they be permitted to engage in additional discovery, specifically depositions of Defendants' current and former employees and contractors, before the Court makes a final determination on this issue on summary judgment. *See* Ex. 92, ¶¶ 7–9.

"documentary evidence" requirement.[44] 576 U.S. at 542; *see also Brown v. Nucor Corp.*, 785 F.3d 895, 915 (4th Cir. 2015) ("Disparate impact liability requires the identification of a specific . . . *practice* that caused racially disparate results."). All Plaintiffs must do is "[identify] the specific . . . practices that are allegedly responsible for any observed statistical disparities." *Cnty. of Cook v. Bank of Am. Corp.*, No. 14 C 2280, 2018 WL 1561725, at *9 (N.D. Ill. Mar. 30, 2018) (citing *Watson*, 487 U.S. at 994). In identifying a collection of policies and practices that, separately or together, have disparately impacted communities of color, Plaintiffs have satisfied this standard.

Through discovery, Plaintiffs have identified ten policies, practices, and procedures— including the four originally listed in their Complaint[45]—that disparately impact communities of color. They are grouped into three main categories below.

1. **Defendants adhered to the national model of property preservation, maintenance, and marketing.**

Defendants adhered to the national model of property preservation, maintenance, and marketing, which relies on a centralized operation that contracts out its preservation, maintenance, and marketing obligations to vendors and subcontractors; does not emphasize the quality of the work completed; and relies heavily on photographs as a method of validating the quality of work, rather than on in-person verification. Ex. 3-B, at 6–7. The local model, by contrast, employs a "boots-on-the ground" approach to property preservation and maintenance, with the bank hiring vendors from the local community; regular in-person property visits by all relevant stakeholders,

---

[44] Even a one-time decision can be considered a policy under certain circumstances. *Inclusive Communities*, 576 U.S. at 543.

[45] These four are: (1) "outsourcing to third parties compliance with the statutory and common law obligations that are placed on owners of real property, without appropriate monitoring or review," Compl. ¶ 129, ECF No. 1; (2) failing to investigate or assess "the fitness or ability of retained third parties" to comply with fair housing obligations, *id.* ¶ 130; (3) failing to provide "guidance, oversight, or review of the activities left to the discretion of retained third parties," *id.* ¶ 131; and (4) basing maintenance practices "on the age and/or the value of properties." *id.* ¶ 135.

43

including real estate agents, who collaborate with each other; and the use of unannounced, monthly in-person quality-control inspections to ensure that properties are safe, secure, and preserved. *Id.* at 6. The record demonstrates that Defendants follow the national model, with heavy reliance on photographic verification of the condition of the properties and the work performed (or not) and infrequent inspections that vendors were typically notified of in advance. Ex. 48 at SG00192122–24; Ex. 49 at SG00257915; *see also* Ex. 50 at SG00191739 ███████████████████████████ ██████████████████████████████████████████████████████; Ex. 49 at SG00257906; Ex. 4, Iafigliola Dep. at 102:1–18.

Although Safeguard says that its Order Auditors reviewed every completed work order, they relied entirely on vendors' photo documentation in doing so. SG Mem. at 34–35; Ex. 4, 101:4–102:18. The record is replete with examples of photographs vendors submitted to Safeguard failing to comply with Safeguard's own photo standards and of the Order Auditors failing to spot shoddy, incomplete, and unnecessary preservation and maintenance work. For example, at 1367 Hyde Park Blvd., Memphis, TN, Safeguard's vendor did not board the windows in compliance with Safeguard's standards (as admitted by Safeguard's former Vice President of Operations, Vendor Management, and Quality Assurance and current Chief Financial Officer, Joe Iafigliola, Ex. 4, 278:11–282:11, leaving breachable openings that would allow unauthorized access to the property, as demonstrated by the vendors' photos, *see* Ex. 51 at SG00486945–50, SG00487072, SG00487085, SG00487091. The vendor certified: ███████████████████████████████████████ ███████████████████████████████████████████████████████████████

Ex. 51 at SG00487111. Safeguard's Order Auditors failed to catch and remedy this issue.[46]

---

[46] Mr. Tyler details additional examples of this phenomenon in his report. Ex. 3-A, at ¶¶ 28–29, p. 11 n.1, p. 13 n.3, p. 15 n.5.

Safeguard's heavy reliance on photographic instead of in-person verification also means that vendors could use "creative photography" to obscure necessary work or make it look like they performed work that was not actually completed. Ex. 4, 98:15–99:17; Ex. 3-A, 20–21 (discussing examples of creative photography from Safeguard's work orders); *see also* Ex. 52, Chappell Decl. ¶ 12. Mr. Iafigliola admitted that creative photography is an issue in the preservation and maintenance industry and that instances of creative photography can be difficult to detect because "the vendors are only going to show you what they want [you] to see." Ex. 4, 99:6–17. This dependence on photographic review resulted in Defendants failing to detect obvious preservation and maintenance issues.

In addition to heavy reliance on photographic verification, Safeguard rarely conducts in-person assessments of its vendors' work, and when it does, vendors are informed of the visit beforehand. Safeguard sends quality-control inspectors to properties only on a "sample basis" to determine whether vendors are trying to bill for work they have not performed. *Id.* 99:18–21. Safeguard's Field Quality Control Representatives give vendors advanced notice that they are coming to the area to review their recently completed work—typically four-to-six days before their visits. *Id.* 120:11–17, 122:9–125:14; 143:8–144:8. Providing advanced notice gives the vendors time to correct their recently completed work orders, which undermines Safeguard's ability to assess the quality of vendors' work when they do not know they are being watched. Ex. 3-B, at 11–12.

Under the national model, Safeguard emphasizes completing work orders on time over the quality of work performed. For example, if a vendor does quality work but works too slowly, Safeguard may let the vendor go because clients are "very heavily focused on on-time performance," Ex. 4, 57:19–59:1, as opposed to the quality of the work.

In contracting with Safeguard to be its exclusive maintenance and preservation vendor for REOs (BANA Mem. at 45), BANA has also chosen the national model of property preservation and

maintenance over the local model. *See* Ex. 53, Silvey Dep. 22:9–21 (explaining that BANA moved from using several vendors to only Safeguard because "[c]entralizing it, having one was much more manageable"). BANA's contract with Safeguard measured "the timeliness of the work being completed," as opposed to the quality. *Id.* at 24:6–22; Ex. 54 at BANA-NFHA-LIT_0011407–08.

BANA similarly contracted out the management of the sale and disposition of REOs to third-party asset-management companies, such as Skyhill, that managed the marketing of REO properties nationwide. Ex. 55, Montelongo Dep. 32:3–11. Asset manager responsibilities included "[w]orking with realtors, title companies, closing companies, reviewing appraisals, broker price opinions, establishing list prices, executing contracts, executing extensions, releases[, and] negotiating offers." *Id.* 31:9–21. BANA assigned asset managers properties through a task-based electronic system called "Equator," through which they initially received only the address of the property. *Id.* 33:20–34:10, 37:1–38:4, 41:4–14. The asset manager then assigned a listing agent based on how quickly they complete their work in Equator and on proximity to property. *Id.* 38:19–39:13. Unlike the local model, which relies on collaboration between the preservation and maintenance vendor, asset manager, and listing agent to ensure an REO is properly maintained, BANA's third-party asset managers barely interacted with Safeguard. *Id.* 42:14–20. Instead, asset managers decided which cosmetic preservation and maintenance work to approve based on "market conditions," such as housing values and buyer type—not from a review of conditions on the ground. *Id.* 47:21–48:4, 48:14–21. For properties pending conveyance to HUD, BANA relied solely on Safeguard's photos to determine whether the property was in conveyance condition. Ex. 13, 89:4–18. BANA contracted out its quality-control inspections to national third-party companies. *Id.* 166:21–167:5.

As the evidence demonstrates and Plaintiffs' property maintenance and preservation expert, Deavay Tyler, opined, "the national model leads to insufficient quality control and monitoring of property condition." Ex. 3-B, at 6. As Mr. Tyler and former Safeguard vendor Justin Chappell have

both explained, when quality control is poor and there are financial incentives to cut corners, properties in communities of color tend to be neglected more often, due to vendors' belief that their subpar work is less likely to go reported in those neighborhoods. Ex. 3-A, at 17; Ex. 52, at ¶¶ 14–18; Ex. 56, 118:20–120:11.

> **2.    Defendants' policies and practices gave employees and vendors too much discretion or failed to require appropriate supervision of employees and vendors.**

Not only does affirmative conduct provide the basis for disparate impact liability, but inaction can provide the basis for it as well. *Nat'l Fair Hous. All.*, 401 F. Supp. 3d at 633; *see also Brown*, 785 F.3d at 916–17. This inaction includes the undue delegation of authority or discretion to employees and contractors. *Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n* ("*Fannie Mae*"), 294 F. Supp. 3d 940, 948 (N.D. Cal. 2018) (concluding that policies of "delegation of discretion" are sufficient to establish a disparate impact claim); *Cnty. of Cook v. HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d 952, 967 (N.D. Ill. 2015) (noting that "a discretionary policy could be the basis for a disparate impact claim"); *McReynolds v. Merrill Lynch*, 672 F.3d 482, 488–90 (7th Cir. 2012) (permitting a disparate impact challenge to a discretionary policy (allowing brokers to form their own teams) that could result in racial discrimination); *City of Phila. v. Wells Fargo & Co.*, No. 17-2203, 2018 WL 424451, at *4 (E.D. Pa. Jan. 16, 2018) ("[A] policy that gives a defendant's employees discretion *can* be the basis for a disparate impact claim.").

As this Court has already noted "[a] policy that gives employees discretion exercised in a common or consistent manner can provide the basis for a disparate impact claim." *Nat'l Fair Hous. All.*, 401 F. Supp. 3d at 632. This is because "an employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination." *Brown*, 785 F.3d at 916 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 (2011)). This type of discretionary decisionmaking has the "capacity for masking racial

biases," *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 550 (4th Cir. 1975), and allows employees'

"subconscious stereotypes and prejudices" to go unchecked, *Watson*, 487 U.S. at 990.

Similarly, the failure to properly supervise employees and contractors can provide the basis

for disparate impact liability. *See Brown*, 785 F.3d at 917; *Fannie Mae*, 294 F. Supp. 3d at 948

(concluding that policies of "failure to supervise and differential maintenances based on the [REO]

properties' age and value" suffice to establish a disparate impact claim).

Plaintiffs have identified six policies and procedures that involve giving too much discretion

or failing to properly supervise employees and vendors and had a disparate impact on the

maintenance and marketing of REOs in communities of color:

> **a) Defendants failed to provide sufficient guidance, oversight, and/or
> review of REO maintenance, preservation, and marketing activities
> that they handled internally or contracted out and often left to the
> discretion of third parties.**
>
> **&**
>
> **b) Defendants outsourced compliance with legal obligations regarding
> REO maintenance, preservation, and marketing to third parties
> without appropriate monitoring or review.**

Although BANA claims that it "intensely" supervised Safeguard with "multiple separate

layers of oversight," (BANA Mem. at 45), the record demonstrates that this supervision was minimal

and ineffective. The asset managers responsible for ensuring that REO properties were preserved,

maintained, marketed, and ultimately sold barely interacted with Safeguard or its vendors. Ex. 55,

42:14–20. Asset managers only saw photographs from appraisals or photographs that listing agents

took in connection with broker price opinions ("BPOs"); they never saw Safeguard photographs or

work orders. *Id.* 42:22–43:18.

The review of vendor photographs was entirely left up to Safeguard's Order Auditors, who,

as discussed above, *supra* pp. 44–45, often missed or overlooked obvious issues that could have (and

should have) been addressed immediately. For example, when Plaintiffs evaluated 4878 West

Chesterwood Ct., Memphis, TN, on May 21, 2013, they observed overgrown grass and leaves, overgrown or dead shrubs, damaged windows, and unaddressed profane and racist graffiti. Ex. 1-E. While Safeguard claims that ███████████████████████████████████████████████ ██████████████████████ Ex. 57, SG00487214, because Safeguard's vendor did not provide photographs of the rear of the property (as required per Safeguard's photo standards), there is no way to confirm that the lawn services were actually completed. *Compare* Ex. 58, PLAINTIFFS 025660–25666 (Plaintiffs' photos of rear of property), *with* Ex. 59, SG00487211–13 (Safeguard's May 25, 2013 work order photos).

With regard to the profane and racist graffiti on the property (depicted *supra* pp. 32-33, even though BANA's May 24, 2013 work order requested that ████████████████, Safeguard contends that ████████████████████████████████████████████████████████ Ex. 57. Safeguard's grass-cut vendor's photos, however, clearly show the graffiti on the property as of May 25, 2013, Ex. 59, and the graffiti remained visible in work order photos from May 31, June 7, June 13, and June 18, 2013, Ex. 60 at SG00415860, SG00415862, SG00415865, SG0041562–650, SG00415698, SG00415701, SG00415703, SG00415904, SG00415907–12. Safeguard's Order Auditors either did not review any of these photos or overlooked the graffiti during their review. Safeguard's work orders are replete with evidence of preservation and maintenance issues like those at 4878 Chesterwood Ct. that Safeguard Order Auditors either missed or failed to address. *See, e.g.*, Ex. 3-A, 28-31, 42(c), 43(a)–(b).

In addition to these ineffective "audits" of photographs and the problematic preannounced visits described above, *supra* pp. 44–45, Safeguard's internal quality control relied on its vendors to perform quality-control inspections of their own work. Ex. 14, 265:9–266:5. Although vendors are supposed to send someone who did not complete the work to review it, Safeguard has no way of verifying that vendors followed this procedure. *Id.* Regardless of whether the procedure was

followed, the evidence shows that this method of self-review was ineffective: vendors certified that their work complied with Safeguard's standards, Ex. 51 at SG00487111, when the photos readily showed otherwise, Ex. 51 at SG00486945–50, SG00487072, SG00487085, SG00487091; *see* Ex. 4, 278:11–282:7.

Safeguard also relied on its vendors to know and follow local laws and ordinances, Ex. 4, 150:15–151:9; 168:18–169:5; 169:12–170:7, and except for vacant property registration laws, Safeguard did not take any independent action to learn about these local laws and ordinances. *Id.* 151:3–6; Ex. 13, 135:13–21 (stating that BANA delegated to Safeguard the responsibility to register vacant properties and that registration depends on the locality). For example, Defendants erroneously claim that Milwaukee's window-boarding ordinance required boarding of windows on vacant homes. SG Mem. at 15; BANA Mem. at 6 n.3. Yet Milwaukee's boarding ordinance *permits*, but does not *require*, the boarding of vacant homes. Milwaukee, Wis. Code of Ordinances § 200-51.7-7 ("[P]roperties [are] to be maintained in sound condition and good repair and prevent rain from entering the building, *or* the opening shall be secured in accordance with § 275-32-7 [permitting boarding].") (emphasis added). If a property is boarded, the boards must be painted green, the color of the house, or the color of the trim. *Id.* § 275-32-7-a-5. But the house that Safeguard claims was boarded in compliance with Milwaukee's boarding ordinance, 2421-2423 North 21st St., was secured with unpainted boards (and was that way for years). Ex. 61, SG00488202 (Safeguard rebuttal to NFHA evaluation, stating that house was boarded ███████████████████████); Ex. 62, PLAINTIFFS 005298. Thus, Defendants' delegation of their preservation and maintenance obligations, without appropriate supervision, led them to violate local law.

Although BANA contracted with third-party companies to inspect the properties that Safeguard was tasked with preserving and maintaining, Ex. 53, 38:18–39:10, it had no process in place to ensure that issues detected through inspections were addressed, *id.* at 80:1–81:15. Brandon

Silvey, the BANA employee tasked with overseeing Safeguard's contractual performance, left review of the third-party quality-control inspection results to an employee, whom he "trusts" would follow up with Safeguard with any issues. *Id.* 21:3–16, 80:1–81:15. But this trust resulted in preservation and maintenance issues going unaddressed. Indeed, properties often "passed" their inspections, despite notes from the third-party inspectors describing unaddressed preservation and maintenance issues.

For example, on June 1, 2015, Plaintiffs evaluated 2421-2423 North 21st St., Milwaukee, WI, located in an African-American neighborhood, and observed the following deficiencies: trash, overgrown or dead shrubbery, unsecured/broken doors and locks, boarded window, holes, miscellaneous (structure), graffiti, damaged siding, missing/out of place gutters, and exposed or tampered with utilities. Ex. 1-E. On March 8, 2017—almost two years later—BANA's third-party inspectors evaluated the property and gave it a ███ even though the property was in ███ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ Ex. 1-K at row 3156. In several of the inspection criteria columns where inspectors usually provide yes/no answers, the answers say ███ and the ████████████ question is answered ███ notwithstanding the inspector's notes indicating that ██████████████ *Id.* This is not an isolated example—the third-party inspection spreadsheets are replete with examples of properties receiving a "pass," despite significant problems described in notes. *Id.* (see rows 5786, 6280, 5065, for example).

As previously noted, Defendants' poor quality control and supervision were more likely to adversely affect properties in communities of color in light of the discretion given to vendors and their belief that poor quality (or non-existent) work was less likely to be uncovered in these neighborhoods. Ex. 3-A, at 17; Ex. 52, ¶¶ 14–18; Ex. 56, 118:20–120:11.

c) **Bank of America's policy of granting a high degree of discretion to asset managers to make decisions about how to maintain, preserve, and market REO properties led asset managers to rely heavily on real estate agents for information about neighborhoods and to make decisions about maintenance, preservation, and marketing of REOs without sufficient guidance from Bank of America.**

BANA took a similar hands-off approach to delegating authority to its third-party asset managers, granting them a high degree of discretion to make decisions about how to maintain, preserve, and market the REOs to which they were assigned. Ex. 8, 77:21–79:16. The Senior Asset Manager, a BANA employee, was primarily responsible for managing the third-party asset management company, but did not directly manage the preservation, maintenance, and marketing of the REOs. *Id.* When an REO entered BANA's inventory, it was assigned to a third-party asset manager, typically not located close to the property, who was tasked with creating a marketing plan for the property, which included, among other things, ███████████████████████████ ███████████████████ Ex. 63 at BANA-NFHA-LIT_0289220; Ex. 55, 32:3-5. BANA did not give the asset managers any guidance on information to consider when developing a marketing plan for an REO. Ex. 8, 130:2–133:16. Instead, the asset manager simply █████████████████████ ██████████████████████████████████████████ Ex. 63 at BANA-NFHA-LIT_0289220. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████[47] Ex. 63 at BANA-NFHA-LIT_0289220.

As Sergio Montelongo, one of BANA's third-party asset managers testified, asset managers approved or denied bids based on "market conditions" and "anticipated buyer type." Ex. 55, 47:21–

---

[47] With regard to preservation and maintenance, Safeguard was authorized to address health and safety issues, but for cosmetic repairs, asset managers had discretion to approve or deny bids up to a certain amount, with BANA making decisions for higher amount bids. Ex. 55, 43:22–48:4.

48:2; 48:14–21. Under BANA policy, asset managers were to consider: ██████████ ████████████████████████████████████████████████████████████████████ Ex. 63 at BANA-NFHA-LIT_0289220. The policy does not, however, provide any guidance on how much weight to give any of these items. *Id.* Because the third-party asset managers were far removed from the properties they managed—only reviewing photos sent by real estate agents—they relied heavily on these agents for property information pertinent to approving or denying bids. Ex. 55, 42:22–43:18; 43:22–48:13. Yet communications from these agents were often infected with racial bias and coded language, in violation of the FHA. *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 648 F. Supp. 2d 805, 812 (E.D. La. 2009) ("[R]eferences to 'crime,' 'blight,' and 'quality of life' are similar to the types of expressions that courts in similar situations have found to be nothing more than 'camouflaged racial expressions.'" (quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982))).

One real estate agent sent an email to the asset manager describing a majority African-American neighborhood in Prince George's County, MD, home to 6724 Vermont Ct., as having ██ ██████████████████████████████ Ex. 27,[48] at row 3088. Conversely, another agent wrote that 1663 Whitewater Rd., Memphis, TN, a property in a majority-white area, was in a ████████████ ████████████████████████████████████████████████████████████████ Ex. 27, at row 6907 (loan no. ████████). Yet the local burglary rate for 6724 Vermont Ct. was only 8.75, compared to a rate of 16.57 for 1663 Whitewater Road. Ex. 7-C at column IW, rows 187 & 1075.

In describing 1705 Edmondson Ave., located in a majority African-American neighborhood in Baltimore City, one realtor wrote that the neighborhood was ██████████████████████

---

[48] This spreadsheet (BANA-NFHA-LIT_0011432), Exhibit 216 to Mr. Montelongo's deposition, contains email communications, including those between realtors and asset managers, routed through the Equator system. Ex. 55, 60:7–78:6.

because ███████████████████████████████████████████████████

████████ Ex. 27 at row 9042 (loan no. ████████). The agent therefore recommended ████████

███████████████████████████████████████████████████

████████████████ *Id.* Just like a statement about "the type of people" who used single-family

homes as multi-family dwellings creating a "low cost, high crime neighborhood," *Ave. 6E Invs., LLC*

*v. City of Yuma, Ariz.*, 818 F.3d 493, 506–07 (9th Cir. 2016), these unsubstantiated comments about

crime and subsidized housing are imbued with racism, *see Smith*, 682 F.2d at 1066 (affirming that

statements about "undesirables," and concerns about personal safety due to "new" people are

"camouflaged racial expressions").

It is not difficult to connect how giving asset managers a high degree of discretion, but

limited guidance on how to weigh various sources of information, and then directing them to accept

property information almost exclusively from real estate agents who often harbored their own racial

biases, would contribute to decisions that resulted in fewer bid approvals and lower sales prices for

properties in communities of color.

   d) **Bank of America delegated REO property maintenance and preservation to Safeguard, which paid its vendors very little, had trouble recruiting and retaining vendors, and gave vendors the incentive to cut corners where they thought it would go unnoticed— typically in communities of color.**

In 2012, BANA delegated its responsibility for REO preservation and maintenance to

Safeguard exclusively. BANA Mem. at 45. Safeguard, in turn, paid its vendors—who performed the

preservation and maintenance work—very little, which gave vendors the incentive to cut corners

where they thought it would go unnoticed (typically in communities of color), and made it difficult

for Safeguard to recruit and retain vendors. As Mr. Chappell, a former Safeguard vendor of seven

years, attested, Safeguard paid a fair rate for "approximately 10% of the work" and "the rest of it

was underpaid." Ex. 52, ¶ 11. For example, Safeguard would want his company "to cut one acre of

grass for a price that would not cover the cost of the job." *Id.* Other property preservation companies, by contrast, would "pay more for the same type of job, and sometimes even twice as much." *Id.* ¶ 12. In the property preservation and maintenance industry, Safeguard was "notorious for not paying enough for the work it ordered and for refusing to pay contractors for work that was done." *Id.* ¶ 22.

Indeed, Mr. Iafigliola, admitted that up to half of vendors would voluntarily stop working for Safeguard within the first year of being onboarded because "they weren't making enough money and would rather do something else." Ex. 4, 40:10–41:19. This underpayment also "motivated contractors to cut corners." Ex. 52, ¶ 13. Mr. Chappell has described how both a fellow Safeguard vendor and a Safeguard vendor account manager explained to him how to cut corners by not cutting the grass completely and taking photos that made it look like he had. *Id.* ¶¶ 14, 19. Mr. Iafigliola confirmed the use of this "creative photography" technique, in which vendors would cut two strips of lawn but take a picture to make it look like the entire lawn had been cut. Ex. 4, 98:12–99:5. Mr. Chappell's fellow vendor also advised him that there were "certain neighborhoods" in which he could get away with cutting corners. Ex. 52, ¶ 14. Over time, Mr. Chappell observed that this technique for cutting corners was used more often in communities of color than in majority-white ones. *Id.* ¶¶ 15–17.

Plaintiffs' property preservation expert, Deavay Tyler, confirms Mr. Chappell's experience. Mr. Tyler observed that when there are financial incentives to cut corners because vendors are not being adequately compensated, "they may disproportionately do so in majority-Black or majority-Latino neighborhoods, where they may believe that their neglect is less likely to be reported." Ex. 3-A, at 17. Thus, BANA's delegation of REO preservation and maintenance to a company that underpaid its vendors disparately impacted the quality of work performed in communities of color.

e) **Defendants did not provide effective, comprehensive, and accurate fair housing training on how to maintain, preserve, and market REO properties in accordance with fair housing laws to their staff and vendors.**

&

f) **Defendants failed to investigate or assess the ability of their vendors and agents to comply with their legal obligations under the Fair Housing Act.**

Neither BANA nor Safeguard trained its employees or vendors on how to maintain, preserve, and market REOs in compliance with fair housing laws. Mr. Iafigliola testified that Safeguard "[doesn't] really train [its vendors], because they're not [Safeguard's] employees." Ex. 4, 180:5–181:19. Mr. Chappell confirms that although Safeguard provided some online training, this training "did not include any training on non-discrimination or fair-housing or fair-lending laws." Ex. 52, ¶ 6. BANA admitted that even after learning of the results of Plaintiffs' investigation, it did not develop any new training on how to maintain REO properties equitably. Ex. 13, 269:7–270:1.

Similarly, Safeguard—and, in turn, BANA—maintained a practice of failing to investigate or assess the ability of their vendors and agents to comply with their legal obligations under the FHA. Mr. Iafigliola acknowledged that Safeguard did not ensure that vendors' preservation and maintenance work complied with the Fair Housing Act. Ex. 4, 173:7–14; 182:12–183:3. While Safeguard shared "best practices" with its vendors about other preservation and maintenance issues, it did not share any related to fair housing obligations. *Id.*

This failure to ensure that vendors understood how to perform their work in accordance with fair housing law, and to assess their compliance, was, at least for Safeguard, a deliberate policy decision and, for BANA, a practice. Both policies and practices involving failures to take proper action can form the basis of a disparate impact claim. *See Brown*, 785 F.3d 916–17; *Nat'l Fair Hous. All.*, 401 F. Supp. 3d at 633. A jury could readily connect the dots between a failure to educate those performing maintenance work of their responsibilities under fair housing law and failure to monitor

their compliance and those same vendors' disparate maintenance of properties based on

neighborhood racial composition. *See Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 182–83 (4th Cir.

1998) (holding that a failure to have an anti-harassment policy in place supports a finding of liability

for sexual harassment).

>    **3.    Defendants' maintenance policies and practices disparately impacted
>    communities of color.**
>
>    >    **a)    Safeguard permitted its vendors to make decisions regarding property
>    >    preservation and maintenance based on whether the property was
>    >    located in what the vendor deemed a "high crime" or "high
>    >    vandalism" area.**

Safeguard's work orders reflecting its preservation and maintenance work on REOs are

replete with references to the properties being in "high crime" or "high vandalism" areas. *See*

Exs. 65–78 (examples of work orders in communities of color that mention "high crime" and "high

vandalism"). Some even note "high drug/gang activity," despite the lack of relevance to

maintenance work or the condition of the home. *See* Ex. 65 at ███████████████; Ex. 73;

Ex. 74 at ████████████; Ex. 76; Ex. 77 at ████████. Safeguard did not collect data

or other documentation from its vendors regarding crime rates. *See* Ex. 4, 235:20–236:6; Ex. 13,

87:5–8 (Mr. Iafigliola discussing a Safeguard work order that required vendors to submit evidence of

high vandalism and testifying that he had not seen any). Instead, Safeguard relied entirely on its

vendors (untrained in fair housing law) to determine whether a property was in a "high crime" or

"high vandalism" area. Ex. 14, 197:12–199:3 (stating that vendors determine whether a property is in

a high vandalism area and that Safeguard is not aware of any data used in this determination); Ex. 4,

235:9–237:16 ("I don't recall seeing [documentation related to vandalism rates].)" BANA also did

not confirm that the "high vandalism" designation on Safeguard work orders correlated with high

crime rates. Ex. 13, 99:12–16.

These descriptors (without any supporting crime data or documentation) are nothing more than "camouflaged racial expressions." *Greater New Orleans Fair Hous. Action Ctr.*, 648 F. Supp. 2d at 812 (quoting *Smith*, 682 F.2d at 1066); *see also Atkins v. Robinson*, 545 F. Supp. 852, 871–72 (E.D. Va. 1982) (concluding that a statement by a member of the county board of supervisors that "she feared [a low-income housing development] 'would degenerate to slum-like conditions, with an abundance of crime'" to be a "veiled reference[ ] to race"). Safeguard claims that HUD policy requires it to solicit these descriptions, but HUD policy requires documentation of crime rates or a history of vandalism at the property. Ex. 79, U.S. Dep't Housing & Urban Dev., Questions and Answers: ML 2010-18 Updated Property & Preservation (P&P) Requirements and Cost Procedures at Question 59 (2013); Ex. 80 at SG00129573–74 (████████ ████████████████████████████████████████ ████████████████████████████████████████████ HUD does not say these descriptors can simply be based on an individual's subjective assessment of the crime rate.

This policy led to properties in low-crime communities of color receiving high-crime designations—and Plaintiffs found that such properties had a high number of deficiencies. For example, 3804 Norfolk Ave., Baltimore, MD, located in a community of color, had repeated mentions of "high crime" on work orders. Ex. 74. Yet the actual crime rate (based on the local burglary rate per 1,000 people pulled by Plaintiffs' statistical expert) was low, 1.73, compared to the national average between 2010 and 2020 of 5.13.[49] Ex. 7-A, ¶ 3 & Ex. 7-C at column IX, row 1003. Similarly, 6088 South Hil Mar Cir., also in a community of color and located next door to Individual

---

[49] FBI, Crime Data Explorer, https://crime-data-explorer.app.cloud.gov/pages/explorer /crime/crime-trend (in "Trend of Violent Crime from 2010 to 2020" section, select "Burglary" under "Crime Select" box and "download" to create spreadsheet of all burglary rates between 2010 and 2020, the average of which is 513, or 5.13 when divided by 100 to obtain the burglary rate per 1,000 people).

Plaintiffs Chevelle and Jalen Bushnell's home, had repeated mentions of "high crime" on work

orders, but the crime rate was 3.63—also below the national average. Ex. 78; Ex. 7-A, ¶ 3 & Ex. 7-C

at column IW, row 1110. Both of these properties also had high numbers of deficiencies—16 and 13

respectively. Ex. 7-C at column F, rows 1003, 1110. The high number of deficiencies for properties

with these designations is not surprising given that Safeguard encouraged windows to be boarded in

███████████████████████  Ex. 81 at SG00251053.

> **b) Defendants more frequently permitted windows to be boarded, instead of reglazed, in communities of color than in majority-white communities.**

Defendants claim that they followed local ordinances with regard to the boarding of

windows, but local jurisdictions often did not mandate the boarding of vacant properties. *See* Ex. 10.

Instead, most local ordinances gave Defendants the option to board or reglaze (*i.e.*, put a new pane

of glass in) broken windows—and the data shows that windows were boarded more frequently than

communities of color than in majority-white communities. For example, in Baltimore City,

properties in communities of color were 2.5 times more likely to have their windows boarded than

in majority-white communities (of the 14 properties with boarded windows in Baltimore City, 13 of

them were in African-American neighborhoods). Ex. 1 ¶ 31 & Ex. 1-H, RUGH 000010. Milwaukee

is even worse—out of 48 properties with boarded windows, only one of them was in a majority-

white neighborhood, meaning properties in communities of color were seven times more likely to be

boarded. Ex. 1-H. And this is not because windows did not break in majority-white communities.

2937 N. 67th Street, for instance, a property in a majority-white community in Milwaukee, had

████████████████████████████████████████████████████████

██████████████████████████  Ex. 82, SG00303938.

Defendants were well aware of the adverse impact that boarded windows had on curb appeal

and neighboring homes. In its REO Training for vendors, Safeguard explains that using alternatives

to boarding ███████████████████████████████████████████ and ███████████

███████████████████████████████████████████████████████████████

██████ Ex. 49 at SG00257863. When the owner of a home next door to an REO in a majority-

white community, 3028 N. 77th St., Milwaukee, WI, asked BANA to ███████████████

████████████████████████████████████████████████████████████████

██████████ Ex. 83 at BANA-NFHA-LIT_0038310.

### c) Defendants made decisions regarding the maintenance and marketing of REOs based on the age and/or value of the property.

BANA gave asset managers discretion in deciding whether to repair a property or market it

as-is. Ex. 63 at BANA-NFHA-LIT_0289220. Pursuant to this policy, asset managers were to

consider ████████████████████████████████████████████████ in

deciding whether to submit bids for recommended repairs on REOs or to market the property as-is.

*Id.* In considering ████████████████ asset managers treated homes in neighborhoods with

older housing stock more negatively. Ex. 64 (deciding to market a property █████ and noting as a

████████████ that ██████████████████████████████████████

██████████████████████).

The decision to market a property as-is had serious repercussions: Defendants would often

neglect basic maintenance tasks for these properties. *See, e.g.,* BANA Mem. at 12 (justifying the

existence of ten deficiencies for 4202 West Hampton Ave., located in a community of color in

Milwaukee, based on BANA's plan to donate the property in as-is condition more than two weeks

later). For instance, BANA decided to sell 1705 Edmondson Ave., Baltimore, MD ████, and the

property was, at one point, in ████████████ Ex. 84, BANA-NFHA-LIT_0007263. For more

than five months, BANA ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ Exs. 85 & 86. Because communities of color had higher rates of REOs, using ██████████████████ to determine whether to repair a property or market it as-is devalued the REO properties in communities of color and caused other properties in the same neighborhood to be devalued.

Safeguard, in turn, had its vendors—including grass-cut vendors—list their own valuation of the properties. *See, e.g.*, Ex. 87 (work orders valuing one property, in a majority African-American neighborhood, anywhere from █████████████████████████ with no linear trend and with the lowest value appearing on a work order describing the area as "declining"); Ex. 88 (work orders valuing one property haphazardly from ███████████████████████ ████); Ex. 89 (work orders valuing one property haphazardly from █████████████████ ████). Defendants have been unable to identify any legitimate purpose for this practice or any training vendors received. Ex. 4, at 227:8–228:5 (Mr. Iafigliola stating that he is "not sure" what vendors' valuations were based on, as they were not done by someone "who would have the credentials to make such a value determination," and he does not remember "ever seeing [the valuations] used for anything"); Ex. 8, at 143:2–20 (BANA does not use the vendors' valuations for any reason). Asking vendors to think about a property's value on a completely subjective basis invites bias to drive this determination and, in turn, the quality of work vendors will subsequently perform. *See Watson*, 487 U.S. at 990; *Barnett*, 518 F.2d at 550; *see also* Robert S. Adler, *Flawed Thinking: Addressing Decision Biases in Negotiation*, 20 Ohio St. J. on Disp. Resol. 683, 774 (2005) (discussing research finding that "people's expectations determine their behavior"); Marcia L. McCormick, *Stereotypes as Channels and the Social Model of Discrimination*, 36 St. Louis U. Pub. L. Rev. 19, 27 (2017) (discussing research finding that reminder of negative stereotype impacts performance).

\*   \*   \*

Each of these policies and practices disparately impacted the maintenance and marketing of REOs in communities of color. Defendants do not even attempt to argue that they were anything other than arbitrary, artificial, or unnecessary.

### C. Plaintiffs' expert's regression analysis isolates neighborhood racial composition as the leading explanation for the disparity in deficiencies and thus establishes robust causality.

Plaintiffs' regression analysis is more than sufficient to establish robust causality.[50] A regression analysis need not include "all measurable variables thought to have an effect"—including only the "major factors" is acceptable evidence of discrimination. *Bazemore*, 478 U.S. at 400. The failure to include variables "will affect the analysis' probativeness, not its admissibility." *Id.* If Defendants wish to demonstrate that Plaintiffs' regression analysis is unreliable, *Bazemore* requires that they must "do more than simply point out possible flaws in the proponent's statistical analyses in order to rebut the inference of discrimination raised by the statistical evidence." *E.E.O.C. v. Gen. Tel. Co. of Nw., Inc.*, 885 F.2d 575, 579 (9th Cir. 1989). Defendants also cannot "simply propose alternative variables without justifying their inclusion." *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 35 (2d Cir. 1988).

Here, Plaintiffs' statistical expert analyzed 40 non-racial potential explanatory factors, but none of those factors explained the disparity in REO maintenance and marketing more than race—and the results remained statistically and practically significant through regression analyses

---

[50] Plaintiffs also have demonstrated that Defendants' behavior has proximately caused the harm to communities of color and thus the Plaintiffs. *See Nat'l Fair Hous. All. v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 637 (D. Md. 2019)) ("To assess proximate causation in this case, the first step is to isolate the alleged harms incurred."). As discussed by this Court, Plaintiffs have sufficiently alleged—and Defendants do not contest—the harm that Defendants' conduct caused communities of color by rendering housing unavailable under the meaning of the FHA. *Id.*

controlling for numerous combinations of factors.[51] This Court previously held that Plaintiffs'

statistical evidence was "precisely the kind of statistical evidence of disparate effects that is

cognizable under the FHA." *Nat'l Fair Hous. All.*, 401 F. Supp. 3d at 637. Since the Court's decision,

Dr. Rugh has performed additional regression and other statistical analyses as described above.[52] *See*

*supra* Fact Section III. He has analyzed whether the racial disparity in maintenance and marketing

deficiencies could be attributed to non-racial factors like property crime; neighborhood income; the

age, size, and value of housing stock; suburban/urban location; time of year evaluated; and the

length of time between homeowner default and foreclosure. *Id.* Whether reviewing the entire data

set or subgroups of properties and deficiencies, he repeatedly found that no single factor or

combination of factors eliminates the statistically and practically significant racial disparity in

deficiencies. *Id.* Defendants have now had ample time, and assistance from multiple experts, to poke

holes in Plaintiffs' regression analysis, offer their own competing analysis, or otherwise demonstrate

that a factor other than neighborhood racial composition accounts for the disparity in deficiencies.

They have come up empty.

---

[51] Defendants' reliance on *Maddox v. Claytor*, 764 F.2d 1539 (11th Cir. 1985), to argue that the Court should disregard Dr. Rugh's analysis is misplaced. In *Maddox*, the appellate court found that the district court's factual findings rejecting the respective experts' opinions were not clearly erroneous because the plaintiffs' expert examined racial disparities at stages of the hiring process not at issue in the case. *Maddox*, 764 F.2d at 1552-55. The present case, however, in which material factual disputes are not to be resolved at this stage, involves analyses that look precisely at the issues at hand: the number of exterior maintenance and marketing deficiencies observed by neighborhood racial composition, as well as a host of potential alternative explanations—including those posited by Defendants—for the resulting disparity. Furthermore, unlike in *Maddox*, Defendants here have offered no alternative analysis demonstrating that any factor explains the disparity more than race. *Id.* at 1555–56.

[52] BANA cites *E.E.O.C. v. Freeman*, 778 F.3d 463 (4th Cir. 2015), for the proposition that the Court cannot rely on the results of Dr. Rugh's regression analysis, but this case is readily distinguishable. In *Freeman*, the court excluded the expert's analysis because "[t]he sheer number of mistakes and omissions . . . render[ed] it 'outside the range where experts might reasonably differ'"). *Id.* at 467 (citation omitted). That is not the case here. BANA's own expert testified that any errors in Dr. Rugh's analysis—if there were any—likely had little to no impact on his results. Ex. 9, 90:18–91:16.

While Defendants' expert David Skanderson observed that the majority non-white neighborhoods in Plaintiffs' sample had lower owner-occupancy rates, higher property-vacancy rates, higher foreclosure rates, lower average income levels, a higher share of households in poverty, and higher population density than the majority-white neighborhoods, he found that only the poverty and vacancy rates explained part of the disparity in deficiencies in any statistically-significant way. Ex. 9, 142:3–145:2. Yet when Dr. Rugh included these variables in his regression analysis, he found that they did not reduce the explanatory power of neighborhood racial composition below a statistically significant level—nor does either factor explain the disparity anywhere close to the degree that race does. Ex. 7-A, 27–34.[53] Dr. Skanderson conceded that it is possible that the disparity in deficiencies between majority-white and non-white communities that remains in Dr. Rugh's analysis after controlling for all the included variables is indeed based on neighborhood racial composition. Ex. 9, 146:3–16.

Put simply, Defendants speculate about alternative explanations without any supporting data and mischaracterize Dr. Rugh's analyses. Notably, despite possessing the same data as Plaintiffs (and likely more), Defendants do not offer any alternative analyses showing that any combination of non-racial factors eliminates the statistically significant racial disparity in deficiencies observed. *See id.* 164:1–14. This is insufficient for a grant of summary judgment. *See Gen. Tel. Co. of Nw.*, 885 F.2d at 579; *Sobel*, 839 F.2d at 35.

---

[53] For the same reason, BANA's argument that the American Housing Survey data shows that declining homeowner income—rather than Defendants' maintenance practices—caused the disparity in deficiencies, has already been rebutted by their own expert, who controlled for income and poverty rates, Ex. 9, 142:3–145:2, and by Dr. Rugh, who did the same, Ex. 7-A, 27-34; Ex. 11, 173:13–174:2, 175:9–20, 176:2–177:3, 178:5–9.

1.    **Defendants' new explanatory theories fail to eclipse race as the leading explanation of the observed disparity in deficiencies.**

With Dr. Skanderson's proposed alternative explanations for the disparity eliminated, Defendants turn to new theories, asserting that "preexisting property conditions, holdover occupants preventing the completion of maintenance work, and delayed approvals from the agencies that must sign off on all repairs above the minimum allowables . . . indisputably provide non-racial explanations" for the disparity in deficiencies. BANA Mem. at 42. Yet Defendants provide no concrete evidence (such as their own statistical analysis) that any of these factors explains the disparity more than or anywhere close to the effect of race; nor do they address Dr. Rugh's analyses rebutting their explanatory power or Dr. Skanderson's testimony confirming the inability to statistically control for some of these variables given the lack of information at hand. Plaintiffs have already explained why delayed bid approvals would not have created the observed disparity—unless the bid approval process was also infected with racial bias. *Supra* Section II.A.3.b. Similarly, preexisting property conditions and holdover occupants also fail to explain the disparity to the same extent as race.

a)    **Preexisting property conditions**

Defendants have failed to identify how preexisting property conditions could have been included in a statistical analysis, nor have they conducted any such analysis of their own.[54] Although Defendants point to appraisal information they claim is indicative of initial property condition,[55]

---

[54] In fact, when BANA's expert, Dr. McCrary, was asked about what he reviewed to evaluate initial property conditions, he testified that he did not recall looking at any BANA or Safeguard photographs of properties in this case. Ex. 15, at 158:19–159:11.

[55] Appraisal data is also a poor proxy for determining which exterior maintenance deficiencies BANA and Safeguard inherited instead of created. First, unless the property is occupied and only an external appraisal can be performed, appraisal data does not distinguish between interior and exterior property condition. *See* Ex. 8, 127:4–21. Second, appraisal information at the time a

BANA's expert admitted that there was not a sufficient quantity of this appraisal (or BPO) data produced to use in a regression analysis. Ex. 9, 147:16–153:5, 223:5–21.[56] Defendants have identified no other source of data on initial property condition that could be used in a regression analysis.

Furthermore, Dr. Rugh performed several analyses to determine if the disparity was driven by preexisting property condition. First, he analyzed whether the number of deficiencies decreased the longer BANA held the property as an REO—since it would have more time to repair preexisting exterior damage. Ex. 7-A, at 17–22. He found that the longer Defendants were responsible for the REO, the more deficiencies were identified across both white and non-white tracts—and that the racial disparity persisted in each length of time evaluated. *Id.* This is consistent with research finding that property conditions tend to deteriorate under bank ownership (not remain stable or improve). *Id.* at 22–23. Based on Dr. Rugh's findings, initial property condition does not appear to drive the number of deficiencies Plaintiffs observed.

Second, Dr. Rugh found the same racial disparity trends when isolating two deficiencies clearly unrelated to the preexisting property condition: overgrown grass/accumulated leaves and trash. *Id.* at 13–16. Inheriting a property with overgrown grass or trash on the lawn is no excuse for

---

property became bank-owned does not reveal whether Defendants also neglected their maintenance duties in communities of color when they were responsible for maintaining homes in the pre-foreclosure period once the mortgagor defaulted and vacated the home. Ex. 13, 16:22–20:16. Third, there is growing consensus that appraisals are affected by racial bias and thus are not a race-neutral indicator of preexisting property condition. *See* Interagency Task Force on Property Appraisal and Valuation Equity, *Action Plan to Advance Property Appraisal and Valuation Equity* at 12–18 (Mar. 2022) (providing overview of recent research uncovering racial bias in appraisals), https://pave.hud.gov/sites/pave.hud.gov/files/documents/PAVEActionPlan.pdf.

[56] Although BANA highlights Dr. Rugh's testimony that appraisal data would be of interest, it omits his further testimony—consistent with Dr. Skanderson's—that "there are too few values," to include in a regression analysis. Ex. 11, 95:1–10.

these deficiencies remaining more than 30 days after the property entered Defendants' REO portfolio. Ex. 3-A, at ¶¶ 35, 37.

### b) Holdover occupants

Dr. Rugh also evaluated the potential effect of holdover occupants on observed deficiencies in two ways and concluded that these occupants were not driving the disparity. First, Dr. Rugh observed that holdover occupants possibly remained in the home on or after Plaintiffs' visit date in only 6% of the properties for which Defendants provided vacancy data and that this percentage was the same in both white and non-white tracts. Ex. 7-A, at 17–19. Given the low incidence of occupancy at the time of inspection and the equal proportion across white and non-white tracts, he concluded that this holdover occupancy "is unrelated to observed disparities by tract racial composition." *Id.* at 17–18. Second, using the vacancy data provided by Defendants, he analyzed whether occupants remaining in the home after the foreclosure sale resulted in a higher number of deficiencies. *Id.* Dr. Rugh found the reverse to be true—the number of deficiencies actually decreased. *Id.*

### 2. The deficiencies Defendants contest do not drive Plaintiffs' results.

Defendants' complaints about being penalized for peeling paint, allegedly legally required instances of boarding, and (for properties being conveyed to HUD) absent "for sale" signs, ignore the depth of the racial disparity in the data. As Dr. Rugh has testified, no single deficiency drives the racial disparity. Ex. 11, 242:5–243:6, 243:20–245:14. Thus, the racial disparity in this case does not hinge on the peeling paint deficiency (or any other individual deficiency Plaintiffs identified). Indeed, all but two miscellaneous deficiency categories were disproportionately more present in communities of color. Ex. 1-F. Also, as previously noted, the racial disparity remained nearly unchanged when Dr. Rugh eliminated boarded doors and windows deficiencies for all properties where local law could be read to require boarding for vacant homes and all warning/no trespass sign deficiencies. Ex. 11,

247:2–249:19; Ex. 12, 54:11–57:5. Finally, because nearly the same proportion of properties in majority-white versus non-white communities were to be conveyed to HUD, scoring the absence of a "for sale" sign as a deficiency for these properties would have affected majority-white and non-white tracts the same. Ex. 7-B, at 20–22. Indeed, removing the "for sale" sign missing deficiency from these properties leaves the racial disparity nearly unchanged. Ex. 1, ¶ 32 & Ex. 1-I, FHA/VA Loan Analysis of "For Sale" Sign Missing.

### 3. Defendants mischaracterize Dr. Rugh's use of crime data.

With no evidence to support their speculative theories about alternative causes for the racial disparity in deficiencies—and no basis for rebutting Dr. Rugh's careful analyses dispelling the explanatory power of their various theories—Defendants are left to misrepresent Dr. Rugh's work. BANA misstates how Dr. Rugh used crime data in his analyses. First, Dr. Rugh did not use city-level crime data across the board, as BANA contends. *See* BANA Mem. at 24. For about 63% of properties, he used crime data below the city-level (such as from police districts). Ex. 7-B, at 17. He used city-level data for the remainder of properties—largely those in smaller cities—only where this data was not available at a more granular geographical level. *Id.* at 14–17 & Table S7.

Second, BANA incorrectly claims that Dr. Rugh used only a binary value to indicate whether a property was located in an area with a high-crime rate. BANA Mem. at 24. While Dr. Rugh used the binary value in his initial regression analysis (based on his previous findings that there was no relationship between deficiencies and burglary rates below the top 10%), in response to Defendants' experts' criticisms, he ran the burglary rate several other ways, including linearly (using the specific burglary rate associated with each property), in his supplemental report. Ex. 7-A, at Ex. 3 at 19–21 & Fig. E-2; Ex. 7-B, at 14. He continued to find that the burglary rate did not explain the observed disparity in deficiencies between majority-white and non-white neighborhoods in any statistically-significant way. *Id.* at 14. Notably, Defendants' experts had access to all of Dr. Rugh's crime data

(and could have gathered their own competing crime data). If analyzing crime data a different way would have explained away the racial disparity, Defendants would have offered this evidence.

### 4. Dr. Rugh's analysis establishes robust causation.

BANA's argument that Plaintiffs cannot establish causation because Dr. Rugh himself has not connected why the deficiencies evaluated relate to Defendants' maintenance and marketing practices ignores that Plaintiffs have offered a plethora of evidence beyond Dr. Rugh's report establishing this connection, including through Defendants' own policies and property-level documents and through the expert reports of Deavay Tyler. *See supra* Facts Section I.A. Furthermore, experts in fair housing testing and social science methodology have reviewed Plaintiffs' methodology and opined that their investigation was well designed to uncover racial disparities in maintenance and marketing caused by Defendants' policies and practices.[57] *See supra* Section II.A. For Dr. Rugh's part, in controlling for potential alternative explanations for the disparity (poverty levels, local property crime, holdover occupants damaging the property, delinquent homeowners failing to maintain the property before foreclosure, etc.), he has further established the unlikeliness that something other than Defendants' practices caused the observed racial disparity.

BANA attempts to create confusion through its expert Dr. McCrary's "placebo test," which it claims undermines the use of Dr. Rugh's regression analysis to establish causation by demonstrating that his analysis could be distorted to allege that BANA caused houses in communities of color to be older. BANA Mem. at 44. The "placebo test" substitutes home age in

---

[57] *Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447 (D.C. Cir. 1988), on which BANA relies to attack the credibility of Plaintiffs' statistical analysis and property "sample," is inapposite. In *Frazier*, the plaintiff chose to present otherwise valid statistical evidence without expert testimony, so the statistics were not "made meaningful to the finder of fact." *Id.* at 1453.

place of number of deficiencies. *Id.* The problem with this, of course, is that while the deficiencies included in Plaintiffs' evaluation stem directly from the sort of maintenance and marketing work Defendants regularly conduct (and the standards they hold themselves to for this work), *see supra* Facts Section I.A. Defendants' practices do not involve changing the ages of homes. Although it is not surprising, given the history of racially discriminatory housing practices in the United States,[58] that the age of housing stock is correlated with neighborhood racial composition, this correlation disproves nothing. Dr. Rugh found—and Defendants offer no evidence to rebut—that while the age of housing stock is the factor that comes closest to explaining the disparity in deficiencies after race, it fails to explain the disparity anywhere close to the amount that race does, nor does it—either on its own or in concert with other variables—eliminate or decrease the racial disparity below a statistically-significant level. Ex. 7-A, at 11.[59]

Thus, Plaintiffs have established the robust causality necessary to demonstrate that that they are not holding Defendants "liable for racial disparities they did not create." *Inclusive Communities*, 576 U.S. at 542. Although Defendants have raised none, any concerns about credibility or the weight of Dr. Rugh's statistical analysis are issues for a jury. *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 175–76 (E.D.N.Y. 2019) (finding that while defendants sufficiently challenged the underlying methodology and the statistical expert relied on "inferences," summary judgment was inappropriate, as it is the role of a jury to determine what weight to afford an expert's conclusions).

---

[58] *See, e.g.*, Perry & Harshbarger, *supra* note 32 (discussing that cities with history of redlining tend to have "older housing stock").

[59] Safeguard's assertion that Dr. Rugh could not answer how "much weight the regression analysis would give to the age of the property," (Safeguard Mem. at 45) misrepresents his testimony and report clearly explaining how he factored the age of the property into the regression analyses and found that it explained only about 7% of the disparity. Ex. 12, 18:16–19:5; Ex. 7-A, at 11 & Ex. 7-A-3 at 3–4.

### III.    Plaintiffs have produced sufficient evidence of Defendants' disparate treatment of REO properties in communities of color.

Because the evidence demonstrates that "racial discrimination was [Defendants'] standard operating procedure," rather than "isolated" or "sporadic" acts of racially discriminatory maintenance and marketing, a reasonable juror is likely to conclude that Defendants violated the FHA through their disparate treatment of properties in communities of color. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). Plaintiffs have adduced both direct and circumstantial evidence of this discriminatory standard operating procedure and can also establish disparate treatment indirectly through the *McDonnell Douglas* burden-shifting framework. *See Corey v. Sec'y, U.S. Dep't of Hous. & Urb. Dev. ex rel. Walker*, 719 F.3d 322, 325 (4th Cir. 2013). Plaintiffs can further establish Defendants' disparate treatment based on the totality of the circumstances. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–268 (1977).

### A.    Defendants' standard operating procedure was to maintain and market REOs in communities of color in worse condition than REOs in majority-white communities.

The record in this case provides sufficient direct and circumstantial evidence that maintaining and marketing REOs worse in communities of color than in majority-white communities was Defendants' standard operating procedure—not an anomaly. Former Safeguard vendor Mr. Chappell attests that "[j]obs in predominantly African-American or Latino areas were not held to the same standard by Safeguard as in whiter areas." Ex. 52, ¶ 18. While in communities of color, "a contractor could do jobs more quickly and less thoroughly," in majority-white neighborhoods "contractors had to do all the work that was required for the same amount of money." *Id.* One of Safeguard's own employees even coached Mr. Chappell on how to cut a perimeter of the grass around the house and take pictures closer to the house to make it look like he had completed the grass cut so he could be paid in full for the work. *Id.* ¶ 19. This happened more frequently in communities of color than in majority-white neighborhoods. *Id.* ¶ 16. The stark

statistical disparity in maintenance and marketing deficiencies Plaintiffs' investigation uncovered supports Mr. Chappell's firsthand experience.

The property-level documents Defendants produced also provide evidence of disparate treatment in the form of racially coded language used by asset managers, Safeguard vendors, and local real estate agents. There are repeated mentions of REOs in communities of color being located in "high vandalism," "high crime," and even "high drug/high gang activity" areas, *see, e.g.,* Exs. 65–78, when crime statistics do not support these statements, *see supra* Section II.B.3.a (discussing 3804 Norfolk Ave. and 6088 S. Hil Mar Cir. receiving numerous "high crime" designations even though the local burglary rates were below the national average). Although there are reasons a property preservation company would need to know if there were data showing an increased likelihood of a home being vandalized or broken into, it is unclear what utility labeling a property as being in a "high drug/high gang activity" area would have for Defendants' vendors' preservation and maintenance work (drugs nearby would not cause a gutter to be misplaced or the grass to grow faster). BANA relied on these arbitrary evaluations in deciding how to market properties. For example, even where a ███████████████████████████████ 3636 Wilshire Rd., Memphis, TN, an asset manager used a ███████████████████████████████████ ████████████████████████████████████████████████████████████ ███████ Ex. 90 at BANA-NFHA-LIT_0004561. His recommendation was accepted. *Id.* In the absence of any data supporting the designations or legitimate reasons for including them, these statements are nothing more than "camouflaged racial expressions." *Smith*, 682 F.2d at 1066.

Furthermore, the record demonstrates that even after both Defendants learned of NFHA's findings of significant racial disparities in their maintenance and marketing activities, they made the decision to do nothing. HUD's regulations interpreting the FHA make clear that "[f]ailing to take prompt action to correct and end a discriminatory housing practice," of an employee, agent, or

third-party, where the defendant "knew or should have known of the discriminatory conduct," and, in the case of a third-party, "had the power to correct it," renders the defendant liable under the FHA. 24 C.F.R. § 100.7(a)(1)(ii)-(iii)[60]; *see Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 864 (7th Cir. 2018) ("[T]he duty not to discriminate in housing conditions encompasses the duty not to permit *known* harassment on *protected* grounds."). Although Plaintiffs informed BANA of their findings early in their investigation, Ex 5, ¶¶ 6–7, all BANA did in response was to meet with NFHA in 2012 and 2013—but no substantive action followed, *see* Ex. 91, BANA's Suppl. Resp. to Pls.' Interrog. No. 13; Ex. 8, 252:14–253:5.

Safeguard was also aware of Plaintiffs' investigation and findings (and that it included Safeguard managed assets), but similarly chose to do nothing in response. Ex. 14, 75:16–77:12. Even though Safeguard typically conducts audits when it uncovers inconsistencies around vendors' preservation and maintenance work, it elected to conduct no such audit upon learning of Plaintiffs' allegations in this case or in the HUD complaint. *Id.* 334:10–337:9. Neither BANA nor Safeguard analyzed their maintenance and preservation work by zip code, Census Block, or using any other Census data to investigate Plaintiffs' findings further. *Id.* 340:18–341:10, 384:4–385:6; Ex. 13, 265:19–267:17. Defendants' failure to act on—or even investigate—Plaintiffs' findings of discrimination amount to disparate treatment of communities of color, part of Defendants' standard operating procedures.

---

[60] HUD's regulations are entitled to *Chevron* deference. *See Brown v. Pfeiffer*, No. 19-cv-3132(WMW/KMM), 2020 WL 6146614, at *3 (D. Minn. Oct. 20, 2020); *A.L.M.* ex rel. *Moore v. Bd. of Managers of Vireum Schoolhouse Condo.*, No. 17-cv-07385 (NSR), 2019 WL 3532178, at *7 n.7 (S.D.N.Y. Aug. 2, 2019), *aff'd*, 2021 WL 5121137 (2d Cir. Nov. 4, 2021). At a minimum, "[t]he Supreme Court has nonetheless recognized that HUD's views about the meaning of the FHA are entitled to 'great weight.'" *Bloch v. Frischholz*, 587 F.3d 771, 781 (7th Cir. 2009) (en banc) (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 210 (1972)).

**B.    Plaintiffs have established disparate treatment through the *McDonnell Douglas* framework.**

Plaintiffs can also establish disparate treatment through the *McDonnell Douglas* burden-shifting framework. *See Corey*, 719 F.3d at 325. Under this framework, once Plaintiffs have stated a prima facie case under the FHA (here, that Defendants maintained and marketed REOs in communities of color worse than in majority-white communities), the burden shifts to Defendants to articulate "a legitimate, nondiscriminatory reason" for the observed racial disparity. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Plaintiffs can then establish that this articulated reason is simply a pretext for racial discrimination. *Id.* at 804. In this case, Defendants have hypothesized about a number of potential non-racial causes for the racial disparity in deficiencies (local crime and vacancy rates, holdover occupants, etc.)—yet Dr. Rugh has found, following careful analysis, that the stark racial disparity remains even after controlling for these non-racial factors. *Supra* Section II.C. Based on this evidence, a jury would likely conclude that Defendants' proffered alternative explanations for the disparity are pretextual.

**C.    The totality of circumstances/*Arlington Heights* factors further support Plaintiffs' disparate treatment claims.**

Plaintiffs can also prove discriminatory intent based on the totality of the circumstances. *See Arlington Heights*, 429 U.S. at 266–68 (considering intent under the totality of the circumstances for an Equal Protection claim); *see also Thompson v. U.S. Dep't of Hous.* & *Urban Dev.*, 348 F. Supp. 2d 398, 417 (D. Md. 2005) (finding that "intent" under the FHA "is defined consistently with the definition used in Equal Protection cases"). The factors courts consider to determine whether discrimination was a motivating factor of the defendants' actions may include: whether the impact of the action "bears more heavily on one race than another"; whether there is a "clear pattern, unexplainable on grounds other than race" that emerges from the effect of the defendant's action; the "historical background" of the action; the sequence of events leading up to the defendant's action; departures

from normal procedures; and substantive departures, "particularly if the factors usually considered

important by the decisionmaker strongly favor a decision contrary to the one reached." *Arlington*

*Heights*, 429 U.S at 266–67.

Here, an abundance of evidence satisfies the *Arlington Heights* factors. First, both the data

Plaintiffs gathered and the regression analysis of that data demonstrate that Defendants'

maintenance and marketing practices adversely affected communities of color and that

neighborhood racial composition is the leading explanation for the observed disparity in

deficiencies. *Supra* Fact Sections II–III. Second, despite being informed early on of Plaintiffs'

findings, Defendants chose to take no action to investigate or change their conduct. *Supra* Fact

Section IV. Third, Defendants deviated from industry standards and their own internal policies and

procedures in communities of color. *Supra* Sections II.B.1 & II.B.3.a-c. Fourth, Defendants have

failed to provide any credible non-racial explanations for the disparities Plaintiffs found or for their

conduct. *Supra* Section II.C. This evidence, taken in a light most favorable to Plaintiffs, suffices to

withstand summary judgment on Plaintiffs' disparate treatment claims.

IV. **Safeguard's accounting of the properties for which it is responsible is unreliable,
incorrect, and, even if accepted, not outcome-determinative.**

Given the unreliability of Safeguard's recordkeeping to date and the necessity of property-

level documents to determine the extent of Safeguard's responsibility for properties in this case,

Safeguard's claim that it is responsible for only 778[61] of the 1,405 properties at issue should not be

accepted at this stage of the litigation. Defendants have only produced responsive property-level

---

[61] While Safeguard does not provide a list of only those properties it does not dispute, Plaintiffs
determined there are 778 such properties by examining Exhibit 10 to Michael Greenbaum's
declaration, ECF No. 171-13.

documents for properties in Phase I cities[62] for which they do not dispute responsibility. Ultimately, however, even accepting Safeguard's claims of limited responsibility, the same racially discriminatory patterns persist among the 778 undisputed properties.

Safeguard and Plaintiffs worked to try to resolve the status of disputed properties over the course of several months—during which time Safeguard's positions frequently changed after Plaintiffs presented documents contradicting Safeguard's claims about its work history on various properties. Ex. 92, Weber Decl. ¶¶ 10–14, 20–21. In numerous cases, Safeguard claimed to have no record of a property, only to have Plaintiffs confront that erroneous claim with records of Safeguard involvement produced by BANA. *See id.* ¶¶ 20–21 & Ex. 92-Q (spreadsheet identifying discrepancies in Safeguard's positions over time). For example, Safeguard initially maintained that it had no record of services for 3272 N. Richards St., Milwaukee, WI, and had performed no exterior maintenance on 2576 South 34th St., Milwaukee, WI. Ex. 92, ¶ 20 & Ex. 92-Q. After Plaintiffs confronted Safeguard with evidence from BANA's document production of its exterior maintenance work performed on both properties around the time of Plaintiffs' visit, however, Safeguard admitted responsibility for both. Ex. 92, ¶ 20 & Ex. 92-Q. In response to requests for admission, Safeguard further confirmed responsibility for both properties. Ex. 92, ¶ 20 & Ex. 92-Q. Yet in its summary judgment motion, it appears to once again dispute responsibility by claiming no record of exterior maintenance work performed on either property. *See* ECF No. 171-13, Ex. 10 to Safeguard Ex. 12, Greenbaum Decl. Safeguard has not explained this contradiction or why it is now disclaiming responsibility for 12

---

[62] Although Defendants refer to the six metropolitan areas currently at issue as "Phase II" areas, Defs.' Mem. at 6, ECF No. 153-1, the parties designated their respective metropolitan areas as part of Phase I of discovery. Stip. Init. Case Mgmt. Order ¶ 3, ECF No. 83. Accordingly, Plaintiffs use the term "Phase I" to describe properties within the six metropolitan areas the parties chose to conduct in-depth discovery into during the initial phases of discovery.

other properties for which it previously conceded responsibility in response to Plaintiffs' Requests for Admission. Ex. 92, ¶ 24; Ex. 92-Q.

Of the 185 Phase I properties for which Safeguard conceded responsibility in response to Plaintiffs' Requests for Admission, it had previously claimed that: (1) it had no record of any work performed for BANA for 15 properties; (2) it had performed no exterior maintenance work for six properties; (3) it had performed exterior maintenance work only after Plaintiffs' visit for one property; and (4) it had stopped performing any exterior maintenance more than two months before Plaintiffs' visit for four properties. *See* Ex. 92, ¶ 21 & Ex. 92-Q.

Given Safeguard's track record of inaccurate records for properties formerly in its portfolio, it is critical that Plaintiffs have access to all responsive property-level documents for these properties from BANA before any determination about Safeguard's responsibility can be made. Therefore, pursuant to Federal Rule of Civil Procedure 56(d), the status of properties beyond Phase I should be decided only after Plaintiffs have an opportunity for full discovery into property-level documents for those properties. *See* Ex. 92, ¶ 22.

With respect to Phase I properties, Safeguard's record-keeping continues to suffer from mistakes and internal inconsistencies. While Safeguard states that it disputes responsibility for 45 Phase I properties, SG Mem. at 28, Exhibit 10 to Mr. Greenbaum's declaration ("Exhibit 10") indicates that it disputes responsibility for 58 Phase I properties. *See* Ex. 92, ¶ 23 & Ex. 92-Q. For 15 properties, Exhibit 6 to Mr. Greenbaum's declaration (which, he claims, ███████████████ ████████████████████████████████████████████████████████████ ECF No. 171-13, Greenbaum Decl. ¶ 43), upon which Safeguard relies for its disputed property classifications for Phase I properties, conflicts with the property dispute status information listed in Exhibit 10

(which, Mr. Greenbaum claims, ███████████████████████████████████

████████████ for the properties, *id.* ¶ 42). Ex. 92, ¶ 23 & Ex. 92-Q.[63] With respect to the 58 Phase I

properties for which Safeguard disclaims responsibility in Exhibit 10, it has already admitted

responsibility for 14 of these properties. Ex. 92, ¶ 24 & Ex. 92-Q. For the remaining 44, disputed

issues of material fact prevent the status of these properties from being decided at this stage.

BANA does not dispute that ten of these 44 properties were in its REO portfolio at the time

of Plaintiffs' evaluation. Ex. 92, ¶ 25 & Ex. 92-Q. Plaintiffs evaluated six of these properties after

2012, when Safeguard became BANA's exclusive exterior maintenance provider. BANA Mem. at 45;

Ex. 92, ¶ 25 & Ex. 92-Q. Thus, a reasonable juror would likely find Safeguard responsible for the

exterior maintenance of these properties at the time of Plaintiffs' evaluation. For the four properties

evaluated in 2011 and 2012, Safeguard either admits to performing exterior maintenance on the

properties before Plaintiffs' evaluation (and there is no evidence suggesting that BANA changed

vendors) and/or BANA's records show that exterior maintenance on the property continued

throughout the time of Plaintiffs' evaluation. Ex 92, ¶ 26. For the remaining 34 properties for which

BANA disputes responsibility as well, in December 2021, Plaintiffs provided BANA with

documentation—from public records, its investigation, and from Safeguard—linking BANA to each

of these properties at the time of Plaintiffs' investigation. *Id.* ¶ 27 & Ex. 92-P. Yet BANA never

responded. Ex 92, ¶ 27. Because Plaintiffs have evidence that these properties were in BANA's

REO portfolio at the time of Plaintiffs' evaluation, a reasonable juror could find that Safeguard was

the vendor responsible for exterior maintenance—particularly for the 23 properties in this group

---

[63] Safeguard also erroneously states that there are 227 properties out of the 1,333 Plaintiffs attribute to Safeguard that are located in Phase I cities. Safeguard Mem. 28. In reality, there are 230 such properties—Safeguard leaves out four properties and lists one property twice. *See* Ex. 92, ¶ 19 & Ex. 92-Q.

evaluated after 2012, once Safeguard was BANA's exclusive exterior maintenance vendor for REOs. Ex. 92-Q.

Nevertheless, the status of these 34 properties—as well as the 148 non-Phase I properties both Defendants also dispute—is irrelevant to the outcome here. Dr. Rugh ran a regression analysis for only the 672 properties for which BANA does not dispute responsibility. Ex. 7-A, at 40–41. This analysis thus excludes the 182 properties that both Defendants dispute.[64] Dr. Rugh found the same statistically and practically significant racial disparity held steady in this smaller sample. *Id.* Excluding the properties both Defendants dispute does not change the racially disparate outcome here. If it did, Defendants would have performed their own analysis demonstrating that, which they have failed to do.

Finally, even excluding every property Safeguard now disputes (including those for which it previously admitted responsibility) does not change the racially disparate outcome. *See* Ex. 1, ¶ 30 & Ex. 1-G, Deficiency Analysis of Safeguard Undisputed Properties. The racial disparity in deficiencies persists within the group of 778 properties for which Safeguard admits responsibility:

- 41.4% of the REO properties in predominantly-white neighborhoods had fewer than five maintenance or marketing deficiencies, while only 8.0% of the REO properties in neighborhoods of color had fewer than five maintenance or marketing deficiencies.

- 92.0% of REO properties in neighborhoods of color had five or more marketing or maintenance deficiencies, while only 58.6% of the REO properties in predominantly-white neighborhoods had five or more marketing or maintenance deficiencies.

- 43.6% of REO properties in neighborhoods of color had ten or more marketing or maintenance deficiencies, while only 8.4% of the REO properties in predominantly-white neighborhoods had ten or more marketing or maintenance deficiencies.

---

[64] The two additional properties that Safeguard now disputes, despite its previous admission of responsibility, are also disputed by BANA, Ex. 92-Q, so Dr. Rugh excluded them from his analysis of 672 properties.

Ex. 1-G. Indeed, this racial disparity is present within each individual deficiency category for which

Safeguard admits it was always or sometimes responsible. *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motions for Summary Judgment in their entirety.

Dated: July 15, 2022                                    Respectfully submitted,


                                                         */s/  Andrew D. Freeman*
                                                        Andrew D. Freeman (Fed. Bar No. 03867)
                                                        Jessica P. Weber (Fed. Bar No. 17893)
                                                        Monica R. Basche (Fed. Bar No. 20476)
                                                        Lauren A. DiMartino (Fed. Bar No. 22046)
                                                        Brown, Goldstein & Levy, LLP
                                                        120 East Baltimore Street, Suite 2500
                                                        Baltimore, MD 21202
                                                        Phone: 410-962-1030
                                                        Fax: 410-385-0869
                                                        adf@browngold.com
                                                        jweber@browngold.com
                                                        mbasche@browngold.com
                                                        ldimartino@browngold.com

                                                        Morgan Williams (*pro hac vice*)
                                                        National Fair Housing Alliance
                                                        1101 Vermont Avenue, NW, Suite 710
                                                        Washington, DC  20005
                                                        Phone: 202-898-1661
                                                        mwilliams@nationalfairhousing.org

                                                        *Counsel for Plaintiffs*