# Exhibit 5

DocuSign Envelope ID: F0E29FB4-845C-4287-B2DC-80EE838B7500

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

NATIONAL FAIR                           *
HOUSING ALLIANCE, *et al.*,
                                        *
      Plaintiffs,
                                        *
v.                                      *        Civil Action No. CCB-18-1919

BANK OF AMERICA, N.A., *et al.*,        *

      Defendants.             *


\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### <u>DECLARATION OF SHANNA L. SMITH</u>

     I, Shanna L. Smith, am over the age of 18 years and competent to testify as to the matters set forth in this Declaration. All statements herein are based on my personal knowledge.

     1.     I retired from my position as President and Chief Executive Officer of the National Fair Housing Alliance ("NFHA") in May 2018. I had worked there since its founding in 1990. I am currently President Emeritus of NFHA and a non-voting member of the Board.

     2.     In 2009, I was approached by fair housing, real estate, and property preservation industry professionals regarding their concerns about banks' failure to properly maintain and market real-estate-owned properties ("REOs") in communities of color to the same standards the banks were maintaining REOs in majority-white communities. Because of the recent foreclosure crisis, their concerns and the possible impact on affected communities were urgent.

     3.     After some preliminary investigative work, I contacted Bank of America in June 2009 to tell them about our concerns regarding its failure to maintain its REO inventory in communities of color to the same standard it did in majority-white communities. We scheduled a

DocuSign Envelope ID: F0E29FB4-845C-4287-B2DC-80EE838B7500

phone call and I shared the results of our preliminary investigation, but Bank of America was unwilling to change its policies or practices.

4.      NFHA then developed a large-scale investigation into Bank of America's routine exterior maintenance and marketing practices to determine whether the bank was maintaining and marketing REOs in majority-white communities better than in communities of color.

5.      In 2009, to operationalize and standardize the investigation, we developed a list of 37 criteria that assessed routine exterior maintenance, marketing, and the overall curb appeal of each property. We created this list using common sense, knowledge, and experience regarding how an owner maintains a house and how real estate is marketed to homebuyers. Between 2009 and 2010, after speaking with real estate and property preservation and maintenance industry stakeholders and fair housing organizations piloting the forms, we refined these criteria further. We also developed a checklist of these criteria for investigators to use in the field—the REO Evaluation Form—and shared this form with the other fair housing organizations that participated in the REO investigation to use when evaluating REOs. A true and accurate copy of the REO Evaluation Form is attached hereto as Exhibit A. I understand it was produced to Defendants as NFHA 003174.

6.      In January 2012, I spoke with Ken Wade, the Senior Community Affairs Executive of Global Marketing & Corporate Affairs at Bank of America at the time, about our REO investigation and our findings to date indicating racial disparities in Bank of America's maintenance and marketing of REOs.

7.      In May 2012, I met with Mr. Wade, in addition to other Bank of America employees, to discuss our findings further and learn more about Bank of America's processes for maintaining and marketing REOs. In advance of that meeting, Mr. Wade emailed me several

DocuSign Envelope ID: F0E29FB4-845C-4287-B2DC-80EE838B7500

documents to assist in NFHA's understanding of Bank of America's REO preservation, maintenance, and marketing practices. Attached hereto as Exhibit B is a true and accurate copy of this email and its seven attachments (Exhibits B-1 to B-7).

8.      Among the documents attached to Mr. Wade's email was a copy of Bank of America's "REO Inspection Checklist." Ex. B-3. This checklist confirmed that our list of 37 criteria indeed mirrored the type of items Bank of America and its vendors considered when maintaining and marketing their REOs.

9.      A copy of Bank of America's REO vendor training was also attached to Mr. Wade's email. Ex. B-4.

10.     Throughout the REO investigation, NFHA followed its investigation document retention protocol, which was in practice since NFHA's founding in 1990 and became a formal, written policy in 2006. This protocol was informed and validated by my 40-plus years of experience in fair housing testing and litigation. For instance, in a fair housing case I was involved in in the mid-1970s, a defendant argued in court that my fair housing organization should have retained testers' notes from the field. In response, Judge Don J. Young, a former judge of the U.S. District Court for the Northern District of Ohio, stated that there were no evidentiary issues with my organization's practice of discarding investigation notes after the creation of a final report. He interpreted our practices as being similar to those of FBI agents— they go out into the field, interview people, and take notes from which they write their final report. Ultimately, the final reports are retained, while the notes are not. Further, over the course of my tenure as Executive Director of the Toledo Fair Housing Center (1975–1990) and as CEO of NFHA (1990–2018), HUD Regional Offices and Headquarters have inquired about and

accepted our investigation document retention protocol in awarding us grants for investigative work.

11.    In June 2012, NFHA filed a complaint against U.S. Bank with the U.S. Department of Housing and Urban Development ("HUD") based on the preliminary investigation into U.S. Bank's REO maintenance and marketing practices. During the investigation process, HUD Region 1 failed to follow the HUD investigation manual. NFHA did not have the opportunity to review or respond to any of the evidence put forward by U.S. Bank, nor was the requisite "Final Interview" conducted—which would have allowed NFHA the opportunity to review and respond to U.S. Bank's evidence and arguments and to provide rebuttal arguments. We did not get a full and fair opportunity to respond to U.S. Bank's arguments and evidence prior to a determination being issued. NFHA filed a Request for Reconsideration based on these points (among others), but ultimately withdrew its request.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 7/14/2022

DocuSigned by:

Shanna L. Smith

4

# EXHIBIT A

# REO Field Evaluation Form

| Address | | |
|---|---|---|
| Date/Time | | |
| Evaluator(s) | | |

| Initial Pictures | |
|---|---|
| Street view of house (wide view to include entire house | |
| Picture to include EVAL property and house to left | |
| Picture to include EVAL property and house to right | |
| Picture of house across the street from EVAL property | |
| Picture of address | |

| Neighboring Properties |
|---|
| |

| Curb Appeal (20 points) | Y/N |
|---|---|
| Trash | |
| Mail Accumulated | |
| Overgrown Grass or Leaves | |
| Overgrown or Dead Shrubbery | |
| Dead Grass (by percentage) | |
| Invasive Plants (by percentage) | |
| Broken Mailbox | |
| Miscellaneous | |
| **Total** | |

| Structure (25 points) | Y/N |
|---|---|
| Unsecured/Broken Doors and Locks | |
| Damaged Steps and Handrails | |
| Damaged Windows (Broken, Boarded) | |
| Damaged Roof | |
| Damaged Fence | |
| Holes | |
| Wood Rot | |
| Miscellaneous | |
| **Total** | |

| Signage & Occupancy (15 points) | Y/N |
|---|---|
| Trespassing or Warning Signs | |
| Marketed as Distressed Property | |
| "For Sale" Sign Missing | |
| Broken and Discarded Signage | |
| Unauthorized Occupancy | |
| Miscellaneous | |
| **Total** | |

| Paint/Siding (10 points) | Y/N |
|---|---|
| Graffiti | |
| Peeling/Chipped Paint | |
| Damaged Siding | |
| Missing Shutters (not attached/secure) | |
| Miscellaneous | |
| **Total** | |

| Gutters (16 points) | Y/N |
|---|---|
| Missing/Out of Place | |
| Broken/Hanging | |
| Obstructed | |
| Miscellaneous | |
| **Total** | |

| Water Damage (13 points) | Y/N |
|---|---|
| Water Damage | |
| Mold  (By Severity) | |
| Miscellaneous | |
| **Total** | |

| Utilities (1 point) | Y/N |
|---|---|
| Exposed or Tampered With | |
| **Total** | |

| **Overall Score** | |
|---|---|

| Mold Severity Index | | Invasive Plants | |
|---|---|---|---|
| no mold | 6 | 0-10% | 2 |
| small amount of mold | 3 | 10%-50% | 1 |
| pervasive mold | 0 | 50% or more | 0 |

| Dead Grass | |
|---|---|
| 0-10% | 2 |
| 10%-50% | 1 |
| 50% or more | 0 |

| Notes: |
|---|
| |

# EXHIBIT B

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal

Filed Under Seal