# Exhibit 52

DocuSign Envelope ID: D2E49245-531E-466C-B6F4-539BFB75E53B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| NATIONAL FAIR | * | |
| HOUSING ALLIANCE, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. CCB-18-01919 |
| BANK OF AMERICA, N.A., *et al.*, | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF JUSTIN CHAPPELL

I, Justin Chappell, am over the age of 18 years and competent to testify as to the matters set forth in this Declaration. All statements herein are based on my personal knowledge.

1.    I am a Black man and the owner of Bama's Landscaping LLC, located south of Dallas in Texas.

2.    Bama's Landscaping has landscaping contracts with several major local businesses, including a hospital, restaurants, and a convenience store.

3.    Bama's Landscaping contracted to do work for Safeguard Properties Management, LLC from approximately 2013 to 2020.

4.    Bama's Landscaping did lawn maintenance for properties maintained by Safeguard throughout Texas.

5.    The properties Bama's Landscaping worked on included REO properties. Bank of America was one of the banks whose properties Bama's Landscaping maintained for Safeguard.

6.    Safeguard provided some online training but did not include any training on non-discrimination or fair-housing or fair-lending laws.

DocuSign Envelope ID: D2E49245-531E-466C-B6F4-539BFB75E53B

7.     I would receive assignments from Safeguard via e-mail or through my vendor account manager. Safeguard pre-authorized some work to be done on a schedule, like biweekly grass cuts. All work required a work order.

8.     Safeguard did quality control on our work. Usually this was done more frequently at the beginning of the year than the end of the year.

9.     Safeguard divided Texas up into different geographic zones with different prices for work done in different zones. I negotiated with my Safeguard vendor account manager to determine how much Safeguard would pay for a specific type of job in a particular zone.

10.    Bama's Landscaping had to submit photos to Safeguard as proof that it had completed the requested lawn maintenance to get paid. The photos were sent to Safeguard via Safeguard's online app.

11.    The amount Safeguard paid for lawn maintenance was unreasonable. Only approximately 10% of the work I did was paid at a fair rate, and the rest of it was underpaid. For example, Safeguard would want Bama's Landscaping to cut one acre of grass for a price that would not cover the costs of the job.

12.    By contrast, other national property preservation companies that I have worked for pay more for the same type of job, and sometimes even twice as much.

13.    Because Safeguard did not pay enough, it motivated contractors to cut corners.

14.    When I first started working for Safeguard, another Safeguard vendor I knew took me out in the field to show me how to complete work for Safeguard. He showed me how to mow a sufficient perimeter around a home and to take photos demonstrating a grass cut that would be enough to get paid, while not cutting the full lawn. He explained that this was one way to deal with the problem of Safeguard not paying enough for vendors to do a complete job. He also made

DocuSign Envelope ID: D2E49245-531E-466C-B6F4-539BFB75E53B

clear to me that in certain neighborhoods Safeguard would be watching my work more, but in other neighborhoods I could get away with cutting corners.

15.     As I began to do lawn maintenance on Safeguard properties, I noticed that lawns in African-American and Latino neighborhoods were often cut as the other vendor had shown me, with a perimeter close to the house properly maintained but the grass along the property line much longer.

16.     I observed that contractors cut corners more often in predominantly African-American or Latino neighborhoods than in predominantly white neighborhoods. This is most likely because, in my experience, white neighbors were more likely to complain to Safeguard.

17.     Safeguard would send a contractor back to redo work in whiter neighborhoods if the work was not done satisfactorily. If this happened, Safeguard would send an email and put the work order back into a contractor's queue in the online app. It would also ask for more pictures of the completed work. Over my seven years of working with Safeguard, I noticed that this only occurred in predominantly white neighborhoods. I cannot recall being asked to redo work in predominantly African-American or Latino neighborhoods.

18.     Jobs in predominantly African-American or Latino areas were not held to the same standard by Safeguard as in whiter areas. In predominantly African-American or Latino areas, a contractor could do jobs more quickly and less thoroughly. In whiter areas, contractors had to do all the work that was required for the same amount of money.

19.     When I first started working for Safeguard, a vendor account manager told me to never do more work than I was paid for—meaning if Safeguard is only paying me $35, I should only do $35 worth of work. Like the vendor who first showed me how to do work for Safeguard, the vendor account manager also explained to me how to cut a perimeter of the grass around a

3

house and take pictures closer in to get paid for a full job.

20.     Based on this and other conversations I have had with other vendors and Safeguard employees, I believe that Safeguard was aware that contractors tended to cut corners in African-American and Latino neighborhoods in ways that they did not in white neighborhoods.

21.     Safeguard has a bad reputation among vendors, with many vendors reporting negative experiences and complaints to each other and online.

22.     Safeguard is notorious for not paying enough for the work it orders and for refusing to pay contractors for work that was done.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 4/6/2022

DocuSign by:

2301CC0389E0410...

Justin Chappell