# EXHIBIT 31

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| NATIONAL FAIR<br>HOUSING ALLIANCE, *et al.*, | * |
| | * |
| Plaintiffs, | * |
| v. | *    Civil Action No. CCB-18-01919 |
| BANK OF AMERICA, N.A., *et al.*, | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFFS' AMENDED AND SUPPLEMENTAL ANSWERS TO**
**BANK OF AMERICA, N.A.'S FIRST SET OF INTERROGATORIES TO PLAINTIFFS**

Plaintiffs National Fair Housing Alliance, Connecticut Fair Housing Center, Metropolitan Milwaukee Fair Housing Council, and North Texas Fair Housing Center, by and through their undersigned counsel, submit these Amended and Supplemental Answers to Bank of America, N.A.'s First Set of Interrogatories to Plaintiffs.

**GENERAL STATEMENT AND OBJECTIONS**

The information provided in these Amended and Supplemental Answers is done so in accordance with the provisions and intent of the Federal Rules of Civil Procedure, which require the disclosure of non-privileged facts within the recipient's custody or control that may contain information relevant to claims or defenses or lead to the discovery of relevant and admissible evidence.

By providing the information requested, Plaintiffs do not waive any objections to its admission into evidence, nor do they submit to the instructions and definitions listed at the beginning of the Interrogatories, except as those instructions and definitions specifically conform to the requirements of the Federal Rules and the applicable case law.

The word usage and sentence structure herein may be that of the attorney assisting in the preparation of these Amended and Supplemental Answers, and thus they do not necessarily purport to be the precise language of the executing parties. The Amended and Supplemental Answers set forth herein are based upon information that has been collected and/or reviewed for the purpose of responding to these Interrogatories.

Plaintiffs' objections and answers to the Interrogatories are based on information now available to them. Plaintiffs reserve the right to amend, modify, or further supplement these objections and answers if they obtain additional responsive information.

Plaintiffs object to each Interrogatory insofar as it calls for the disclosure of information: (1) protected by the attorney-client privilege; (2) protected as attorney work product; (3) that is trial preparation material; or (4) that was prepared in anticipation of litigation.

Plaintiffs further object to each Interrogatory insofar as it calls for information that is beyond the scope of the Parties' Stipulated Initial Case Management Order, ECF No. 83.

As used in these Answers the following terms have the following meanings:

- "Initial Phase Plaintiffs" refers to National Fair Housing Alliance ("NFHA"), Connecticut Fair Housing Center, Metropolitan Milwaukee Fair Housing Council, and North Texas Fair Housing Center.

- "REO Investigation Database" refers to the database created and maintained by the Miami Valley Fair Housing Center and used by all the Organizational Plaintiffs to store data gathered during the REO investigation. The totality of the information contained in the REO Investigation Database for each of the 37 metropolitan areas investigated forms the basis for the statistical analyses

performed by the Organizational Plaintiffs and the related allegations in the
Complaint.

- "Survey Tool" refers to the routine exterior maintenance checklist NFHA
  developed to gather data for the REO investigation.

- "REO" properties refers to residential foreclosure properties for which Bank of
  America was the owner of record.

Subject to and without waiver of the above general qualifications and objections which
are hereby incorporated into each answer, Initial Phase Plaintiffs respond to Defendant Bank of
America, N.A.'s First Set of Interrogatories as follows:

## AMENDED AND SUPPLEMENTAL ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1

Identify and describe all criteria You used, and all underlying data and information You
relied on, to categorize areas of each Initial Phase City as a "community of color," a
"predominantly African-American and Latino neighborhood[]," a "white community," a
"predominantly white community," or an "integrated community," however those terms are used
in the Complaint and/or in Your analysis of the data referenced in the Complaint.

### AMENDED ANSWER TO INTERROGATORY NO. 1

Initial Phase Plaintiffs object to this request to the extent that Bank of America has access
equal to that of Initial Phase Plaintiffs to all data in the public domain (*e.g.*, U.S. Census data).
Subject to and without waiver of this objection, Initial Phase Plaintiffs state the following:

Initial Phase Plaintiffs refer Defendant to ¶ 66 of their Complaint, ECF No. 1, which
details how the Organizational Plaintiffs describe the criteria they used to categorize a property
in an Initial Phase City as being located in a "predominantly white neighborhood" or in a
"community of color," which was based on 2010 U.S. **Census** data. NFHA downloaded 2010
racial demographic data from the U.S. **Census** website and then employed ArcGIS (specifically
ArcMap, the desktop version of ArcGIS, a continually updated GIS mapping software) to

conduct an analysis that determined the **Census** block group in which an REO property was located. If an REO property was located in a **Census** block group that was >50.0% white, it was designated as being located in a predominantly white neighborhood; if an REO property was located in a **Census** block group that was >50.0% African-American/non-white, it was designated as being located in a majority African-American/non-white neighborhood.

## SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 1

In determining racial categories for properties investigated, NFHA defined "white" using Census data from the "White Alone, Not Hispanic or Latino" category. NFHA defined "African-American" and "Latino" using Census data from categories of the same name. Other non-white racial categories, such as Asian, were described as "majority non-white." For each REO property that was investigated, NFHA categorized it as white, African-American, Latino, or majority non-white, but ultimately when Plaintiffs conducted their analysis of the REO investigation data, they combined African-American, Latino, and majority non-white properties as those in "communities of color."

To categorize a property as located in a predominantly white neighborhood or a community of color, NFHA staff first downloaded 2010 U.S. Census racial demographic data from https://data.census.gov/ for each of the block groups in the metropolitan areas at issue in the Complaint. Using that data, they overlaid zip code boundaries to determine whether a zip code was predominantly white or predominantly non-white, using the cut-off of 50.1%. (NFHA staff mapped block group data with zip codes overlaid so they could identify any nuanced patterns of segregation throughout a zip code.) Thus, if the racial makeup of a zip code was 50.1% or more white it was categorized as "predominantly white," and if a zip code was 50.1% or more non-white it was categorized as a "community of color." Out of those zip codes, NFHA staff used

RealtyTrac to identify the zip codes with high foreclosure rates, as compared to the relevant county and state foreclosure rates and the foreclosure rate in the United States as a whole. From that subset, NFHA staff identified the zip codes with high homeownership rates that qualified as working- or middle-class. (To qualify as having a "high" homeownership rate, NFHA staff looked for at least a 40% rate of owner-occupancy, but in most zip codes the rate was much higher.) NFHA obtained state-wide homeownership rates from the Census and compared the rates in the chosen zip codes (based on Census data) to statewide rates to determine the zip codes with higher homeownership rates. NFHA staff determined whether a zip code was working- or middle-class by comparing the median income in the zip code to the median income of the state. *See* Compl. ¶ 67.

Having identified the zip codes in each metropolitan area that were (1) predominantly white or non-white, (2) with high foreclosure rates, (3) with high homeownership rates, and (4) that were working- or middle-class, NFHA staff then used county property records, records kept by the clerks of courts, RealtyTrac, Zillow, Bank of America's REO listing website, REO auction websites, and confidential data obtained pursuant to a contract with CoreLogic to identify all of the REO properties within those zip codes. *See id.* ¶ 68. NFHA staff then used Census data downloaded from https://data.census.gov/ to categorize the REO property's neighborhood based on the racial makeup of the Census block group within which the REO property was located. If the Census block group was 50.1% or more white, the REO property was categorized as being in a predominantly white neighborhood. If the Census block group was 50.1% or more African-American and/or Latino, the REO property was categorized as being in a predominantly non-white neighborhood.

The NFHA staff involved in categorizing the racial makeup of neighborhoods in the

metropolitan areas at issue were Shanna Smith, President & CEO; Lisa Rice, Executive Vice

President; Shanti Abedin, Director of Inclusive Communities; Lindsay Augustine, Associate

Director of Enforcement & Investigations; Lisa Govoni, Lending Investigation Specialist; and

Pablo Zatarain, Project Coordinator.

* * * * *

## INTERROGATORY NO. 2

Describe what you consider to be the specific borders or geographic delimitations of each of the Initial Phase City "metropolitan areas" and identify all factors You considered in arriving at those delimitations.

## AMENDED ANSWER TO INTERROGATORY NO. 2

The metropolitan areas of the Initial Phase Cities correspond with the Metropolitan

Statistical Areas as defined by the 2010 U.S. Census, with the exception of one property in the

DC/Prince George's County, **MD** metropolitan area, which is located at 2506 Ambling Circle,

Crofton, Maryland 21114. NFHA included this property as a similarly situated white comparator

property.

## SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 2

31 of the 37 metropolitan areas in Plaintiffs' Complaint correspond with Metropolitan

Statistical Areas ("MSA") as defined by the U.S. Census. Those metropolitan areas are:

Baltimore, MD; Richmond, Oakland, and Concord, CA; Grand Rapids, MI; Atlanta, GA;

Dayton, OH; Columbus, OH; Miami, FL; Dallas, TX; Orlando, FL; Chicago, IL; Milwaukee,

WI; Indianapolis, IN; Denver, CO; Memphis, TN; Philadelphia, PA; Toledo, OH; Kansas City,

MO; New Orleans, LA; Vallejo, CA; Cleveland, OH; Suburban Detroit, MI; Minneapolis, MN;

Newark, NJ; Tampa, FL; Hartford, CT; New Haven, CT; Louisville, KY; Providence, RI; San

Antonio, TX; Baton Rouge, LA; and Birmingham, AL.

Of the remaining six metropolitan areas, five of them—Fort Worth, TX; Gary, IN; Muskegon, MI; Waterbury, CT; and West Palm Beach, FL—are within the Census-defined MSA. Fort Worth, TX is part of the Dallas/Fort Worth MSA; Gary, IN is part of the Chicago, IL MSA; Muskegon, MI is part of the Grand Rapids, MI MSA; Waterbury, CT is part of the New Haven, CT MSA; and West Palm Beach, FL is part of the Miami, FL MSA.

In general, after Plaintiffs chose a metropolitan area to investigate, they began by selecting REO properties located in neighborhoods in the center of the metropolitan area. They would then move out from the center in concentric circles to identify additional REO properties to investigate. The Initial Phase Plaintiffs also used their local knowledge to assess the boundaries of metropolitan areas. For instance, while the Census considers Dallas and Fort Worth, Texas to be one metropolitan area, representatives of the North Texas Fair Housing Center know, based on their location and experience, whether residents would consider a neighborhood to be located in Dallas or Fort Worth.

Only one metropolitan area in Plaintiffs' Complaint, Washington, DC/Prince George's County, MD, includes a property that does not fall into a corresponding Census MSA—a single property in Anne Arundel County, in a predominantly white neighborhood, that is part of the Census's Baltimore MSA (2506 Ambling Circle, Crofton, Maryland 21114). Plaintiffs agree to remove that property from the Washington, DC/Prince George's County, MD metropolitan area and add it to the Baltimore, MD metropolitan area for purposes of any analysis moving forward.

\* \* \* \* \*

## INTERROGATORY NO. 3

Identify the specific Organizational Plaintiff(s) and persons (*e.g.*, employee, contractor, associate, or agent of that Organizational Plaintiff or, where applicable, of any other entity) which or who conducted any inspection of any of the Initial Discovery Properties and, in the case

of each person, his or her connection to or status with each [O]rganizational Plaintiff at the time of each inspection.

## AMENDED ANSWER TO INTERROGATORY NO. 3

- Baltimore, MD:

  - o  Organizational Plaintiff: National Fair Housing Alliance

  - o  Persons: Shanti Abedin, Director of Inclusive Communities; Lindsay Augustine, Associate Director of Enforcement & Investigations; Maria Dewees, Research Assistant; Lisa Govoni, Lending Investigation Specialist; Justin Monteiro, Director of Enforcement & Investigations; Maria Moreno, Associate Director of Enforcement; Michael Parker, Intern; Shanna Smith, President & CEO; Ashley Washington, Intern; Courtney **Winston**, Intern; Pablo Zatarain, Project Coordinator.

- Fort Worth, TX:

  - o  Organizational Plaintiff: North Texas Fair Housing Center

  - o  Persons: Frances Espinoza, Executive Director; Mari Bower, **Fair Housing** Coordinator; Janay Bender (Rosenthal), Tester/Surveyor.

- Memphis, TN:

  - o  Organizational Plaintiff: National Fair Housing Alliance

  - o  Persons: Shanti Abedin, Director of Inclusive Communities; Lindsay Augustine, Associate Director of Enforcement & Investigations; Rachael Deane, Associate Director of Enforcement; Madeline Hoffman, Associate Vice President of Compliance; Justin Monteiro, Director of Enforcement & Investigations.

- Milwaukee, WI:

  - o  Organizational Plaintiff: Metropolitan Milwaukee Fair Housing Council

- o Persons: William Tisdale, President and CEO; Carla Wertheim, Executive Vice President; Sarah Aragon, Program Assistant; Felita Daniels-Ashley, Senior Program Coordinator; Megan Wanke, Administrator – Administrative Services; Rachel Scalise, Executive Assistant; Christine Schneider, Investigator; Caitlin Taylor, Investigator; Celest Walker, Support Services Coordinator; Lemuel Eaton, Senior Program Coordinator; **Shanti Abedin, Director of Inclusive Communities  (**NFHA**)**; Lindsay Augustine, Associate Director of Enforcement & Investigations (NFHA).

- New Haven, CT:
  - o Organizational Plaintiff: Connecticut Fair Housing Center
  - o Persons: Erin Kemple, Executive Director; Maria Cuerda, Testing Coordinator; **Claudia (Dresser) Gonzalez, Testing Coordinator;** John McGrath, Staff Attorney; **Melvin Kelley, Staff Attorney;** James Dresser, Testing Coordinator.

- Washington, DC/**Prince George's County, MD**:
  - o Organizational Plaintiff: National Fair Housing Alliance
  - o Persons: Shanti Abedin, Director of Inclusive Communities; Nisha Arekapudi, Intern; Lindsay Augustine, Associate Director of Enforcement & Investigations; Pamela Bond, Director of Communications; Rachael Deane, Associate Director of Enforcement; Sherill Frost-Brown, Vice President of Member Services & Community Development; Debby Goldberg, Vice President of Housing Policy; Lisa Govoni, Lending Investigation Specialist; Quisharn Hamilton, Fair Housing / Fair Lending Specialist; Madeline Hoffman, Associate Vice President of Compliance; Brynn Madway, Project Coordinator; Justin Montiero, Director of

Enforcement & Investigations; Maria Moreno, Associate Director of

Enforcement; Michael Parker, Intern; Jamila Shand, Intern; Shanna Smith,

President & CEO; **Ashlee** Washington, Intern; Pablo Zatarain, Project

Coordinator.

\* \* \* \* \*

### INTERROGATORY NO. 4

Identify each property in the Initial Phase Cities that You or Your inspectors visited or planned to visit but did not include in the Subject Property List because "work was ongoing" as alleged in Paragraph 67 of the Complaint, or for any other reason.

### AMENDED ANSWER TO INTERROGATORY NO. 4

**Plaintiffs have produced a list of properties they visited or planned to visit in the**

**Initial Phase Cities but did not include in the Subject Property List at**

**PLAINTIFFS_036852–03686.**

\* \* \* \* \*

### INTERROGATORY NO. 5

Identify and describe all criteria You used, and all underlying data and information You relied on, to evaluate the "level of segregation" of each Initial Phase City or portions thereof as alleged in Paragraph 140 of the Complaint.

### AMENDED ANSWER TO INTERROGATORY NO. 5

Initial Phase Plaintiffs object to this request to the extent that Bank of America has access

equal to that of Initial Phase Plaintiffs to all data in the public domain (*e.g.*, U.S. Census data).

Subject to and without waiver of this objection, Initial Phase Plaintiffs state the following:

Initial Phase Plaintiffs refer Defendant to ¶ 140 of their Complaint, ECF No. 1, which

details that Plaintiffs used the dissimilarity index from Brown University (located at

https://s4.ad.brown.edu/projects/diversity/segregation2010/Default.aspx) to evaluate the level of

segregation in an Initial Phase City or portion thereof. NFHA used 2010 U.S. Census **block**

**group** data to determine whether a property was in a predominantly white neighborhood or a

community of color, and then applied the dissimilarity index to the metropolitan areas selected

for the investigations to determine the level of segregation.

\*   \*   \*   \*   \*

## INTERROGATORY NO. 6

Identify and cite all laws, regulations, ordinances, rules, or guidelines (whether from government agencies, government-sponsored entities, or private mortgage-market participants) You considered in making Your determination of what "routine exterior maintenance … Defendants [we]re required to perform" on the Initial Discovery Properties "[u]nder standard industry practice," as alleged in Paragraph 62 of the Complaint, including but not limited to the "Freddie Mac requirements" and "policies of other banking institutions" referenced in Paragraph 69 of the Complaint.

## AMENDED ANSWER TO INTERROGATORY NO. 6

NFHA first created a routine exterior maintenance checklist in 2009 using common

sense, knowledge, and experience regarding how an owner maintains a house. **In 2009 and**

**2010, through a range of experiences with various housing industry stakeholders as well as**

**through review of industry materials regarding REO maintenance, NFHA learned industry**

**standards that it used to refine its checklist**. In 2010, NFHA finalized its Survey Tool, which

is consistent with Fannie Mae and Freddie Mac's REO maintenance policies. NFHA used the

final version of the Survey Tool from 2010 onward without change, including sharing it with the

other Organizational Plaintiffs so they could participate in the REO investigation.

## SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 6

The NFHA staff involved in creating and refining the exterior maintenance checklist and

Survey Tool were Shanna Smith, President & CEO; Lisa Rice, Executive Vice President; and

Shanti Abedin, Director of Inclusive Communities.

\*   \*   \*   \*   \*

11

## INTERROGATORY NO. 8

Identify and describe each type of Document You generated in the course of performing Your inspections of the Initial Discovery Properties.

## AMENDED ANSWER TO INTERROGATORY NO. 8

**NFHA obtained confidential property data pursuant to a contract with CoreLogic, which NFHA used in generating lists of REO properties to investigate. Documents containing that confidential property data have been produced and marked "Confidential."**

NFHA generated the following Documents for all Organizational Plaintiffs:

- Lists of REO properties to investigate in an Excel spreadsheet, which included the street address, city, zip code, and lender name for each property. Supporting documents for these lists could include:

    o Maps or driving directions;

    o Website screenshots or video screen recordings;

    o Proprietary property record lists from a proprietary data source;

    o City or county property records; and

    o Property screenshots or Excel spreadsheets (Zillow, RealtyTrac, etc.).

Initial Phase Plaintiffs generated the following documents:

- <u>Baltimore, MD</u>:

    o Maps of the driving course for REO properties to be investigated;

    o Electronic Survey Tool form for each property inspection;

    o Photographs that correspond with each property inspection;

    o Property entry in the REO Investigation Database, copying the Survey Tool results and attaching photos;

- o  Time records documenting the time spent investigating the Initial Discovery Properties; and

- o  Neighbor surveys of neighbors of Initial Discovery Properties investigated.

- Fort Worth, TX:

  - o  Completed Survey Tool for each address investigated in hard copy form;

  - o  Photographs that correspond with each property inspection;

  - o  Property entry in the REO Investigation Database, copying the Survey Tool results and attaching photos;

  - o  Time records documenting the time spent investigating the Initial Discovery Properties; and

  - o  Neighbor surveys of neighbors of Initial Discovery Properties investigated.

- Memphis, TN:

  - o  Electronic Survey Tool form for each property inspection;

  - o  Photographs that correspond with each property inspection;

  - o  Property entry in the REO Investigation Database, copying the Survey Tool results and attaching photos;

  - o  Time records documenting the time spent investigating the Initial Discovery Properties; and

  - o  Neighbor surveys of neighbors of Initial Discovery Properties investigated.

- Milwaukee, WI:

  - o  Electronic Survey Tool form for each property inspection;

  - o  Photographs that correspond with each property inspection;

- o Property entry in the REO Investigation Database, copying the Survey Tool results and attaching photos;

- o Internal electronic scoring Excel spreadsheet recording the Survey Tool score, with the exception of the following properties:

    - 4033 N. Montreal Street, Milwaukee, WI 53216;

    - 5715 N. 41st Street, Milwaukee, WI 53209

    - 2028 S. 20th Street, Milwaukee, WI 53204

    - 2219 W. Burnham Street, Milwaukee, WI 53204

    - 3114 W. Clybourn Street, Milwaukee, WI 53208

    - 2357 S. 34th Street, Milwaukee, WI 53215

    - 1911 S. 16th Street, Milwaukee, WI 53204

    - 2823 S. Clement Avenue, Milwaukee, WI 53207

    - 3800 N. 60th Street, Milwaukee, WI 53216;

- o Internal electronic scoring Excel spreadsheet recording surveys of neighbors of the Initial Discovery Properties;

- o Neighbor surveys and interview narratives of neighbors of Initial Discovery Properties investigated, with the exception of the following properties:

    - Addresses with no neighbor survey:

        - 6715 N. 53rd Street, Milwaukee, WI 53223;

        - 6994 W. Medford Avenue, Milwaukee, WI 53218;

        - 4861 N. 47th Street, Milwaukee, WI 53218;

        - 4646 N. 66th Street, Milwaukee WI 53218;

        - 4202 W. Hampton Avenue, Milwaukee WI 53209;

- 3334 N. 28th Street, Milwaukee, WI 53216;

- 2518 S. 62nd Street, Milwaukee, WI 53219;

- 2724 N. 53rd Street, Milwaukee, WI 53210;

- 2065 S. 35th Street, Milwaukee, WI 53215;

- 1623 N. 20th Street, Milwaukee, WI 53205;

- 1644 S. 18th Street, Milwaukee, WI 53215;

- 2028 S. 73rd Street, West Allis, WI 53219;

  - Addresses with no interview narrative:

    - 2410 N. Sherman Boulevard, Milwaukee WI 53210;

    - 3114 W. Clybourn Street, Milwaukee, WI 53208;

    - 4202 W. Hampton Avenue, Milwaukee, WI 53209;

    - 6013 W. Stevenson Street, Milwaukee, WI 53213;

    - 6994 W. Medford Avenue, Milwaukee, WI 53218;

    - 8624 W. Hampton Avenue, Milwaukee, WI 53225;

  - Additional spreadsheets related to investigations of REO properties; and

  - Time records documenting the time spent investigating the Initial Discovery Properties.

- New Haven, CT:

  - Photographs that correspond with each property inspection;

  - Property entry in the REO Investigation Database, copying the Survey Tool results and attaching photos; and

  - Time records documenting the time spent investigating the Initial Discovery Properties.

15

- <u>Washington, DC/**Prince George's County, MD**</u>:

    o   Electronic Survey Tool form for each property inspection;

    o   Photographs that correspond with each property inspection;

    o   Property entry in the REO Investigation Database, copying the Survey Tool results and attaching photos;

    o   Time records documenting the time spent investigating the Initial Discovery Properties; and

    o   Neighbor surveys of neighbors of Initial Discovery Properties investigated.

*   *   *   *   *

16

## **Verification**

I HEREBY AFFIRM under the penalty of perjury that the information contained herein is true to the best of my knowledge, information, and belief.

Lisa Rice, National Fair Housing Alliance

William Tisdale, Metropolitan Milwaukee Fair Housing Council

Frances Espinoza, North Texas Fair Housing Center

Erin Kemple, Connecticut Fair Housing Center

*/s/ Jean M. Zachariasiewicz*

Jean M. Zachariasiewicz (Fed. Bar No. 19734)
Andrew D. Freeman (Fed. Bar No. 03867)
Monica R. Basche (Fed. Bar No. 20476)
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
adf@browngold.com
jmz@browngold.com
mbasche@browngold.com

*/s/ Morgan Williams*

Morgan Williams (pro hac vice)
NATIONAL FAIR HOUSING ALLIANCE
1101 Vermont Avenue, NW, Suite 710
Washington, DC  20005
Phone: 202-898-1661
mwilliams@nationalfairhousing.org

*Counsel for Plaintiffs*

Dated:  July 24, 2020

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 24, 2020, copies of the foregoing Plaintiffs' Amended

and Supplemental Answers to Defendant Bank of America, N.A.'s First Set of Interrogatories to

Plaintiffs were served by email on:

Ava E. Lias-Booker (Fed. Bar No. 05022)
Melissa O. Martinez (Fed. Bar No. 28975)
MCGUIRE WOODS LLP
500 East Pratt Street, Suite 1000
Baltimore, Maryland 21202
Phone: 410-659-4430
Fax: 410-659-4599
alias-booker@mcguirewoods.com
mmartinez@mcguirewoods.com

Anthony M. Alexis, Sr. (pro hac vice)
Brooks R. Brown (pro hac vice)
Keith Eric Levenberg (Fed. Bar No. 11957)
Thomas M. Hefferon (Fed. Bar No. 15109)
GOODWIN PROCTOR LLP
901 New York Avenue, NW
Washington, DC 20001
Phone: 202-346-4000
Fax: 202-346-4444
aalexis@goodwinlaw.com
bbrown@goodwinlaw.com
klevenberg@goodwinlaw.com
thefferon@goodwinlaw.com

*Counsel for Defendant Bank of America, N.A.*

and

Maryan Alexander (Fed. Bar No. 29158)
WILSON ELSER MOSKOWITZ &
DICKER LLP
500 East Pratt Street, Suite 600
Baltimore, Maryland
Phone: 410-962-7385
Fax: 410-962-8758
maryan.alexander@wilsonelser.com

David M. Holmes (pro hac vice)
Jacob Graham (pro hac vice)

WILSON ELSER MOSKOWITZ &
DICKER LLP
55 W. Monroe Street, Suite 3800
Chicago, IL 60603
Phone: 312-821-6119
Fax: 312-704-1522
david.holmes@wilsonelser.com

*Counsel for Defendant Safeguard Properties Management, LLC*

 */s/ Jean M. Zachariasiewicz*
Jean M. Zachariasiewicz