# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL FAIR HOUSING
ALLIANCE, *et al.*,

       *Plaintiffs*,

v.

BANK OF AMERICA, N.A., *et al.*,

       *Defendants*.

Case No.: 1:18-CV-1919

**REPLY MEMORANDUM IN SUPPORT OF BANK OF AMERICA, N.A.'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF THE NATIONAL FAIR HOUSING ALLIANCE AND THE OTHER ORGANIZATIONAL PLAINTIFFS**

## TABLE OF CONTENTS

Page

ARGUMENT ............................................................................................................ 4

I.    PLAINTIFFS' EFFORTS TO SHIFT THEIR BURDEN ARE WITHOUT MERIT. ......... 4

II.    PLAINTIFFS HAVE NO VIABLE EVIDENCE OF A STATISTICAL DISPARITY. ..... 6

    A.    Plaintiffs Do Not Answer HUD's Rejection of Their Flawed Methods. .................... 6

    B.    Plaintiffs' Spoliation Leaves Them With No Evidence of Their Inspection Results. .................................................................................................................... 8

    C.    Plaintiffs Skewed their Sample Population to Manufacture a Disparity and to Avoid Comparing Similarly Situated Properties. ......................................... 9

    D.    Plaintiffs Applied Invalid Inspection Criteria. ......................................... 13

        1.    Plaintiffs' inspection criteria do not "mirror" Defendants' standards. ............. 13

        2.    Plaintiffs improperly blamed Defendants for inherited conditions.................. 16

        3.    Plaintiffs' claimed "deficiencies" were subjective, inconsistent, irreplicable, and often just wrong. ................................................................ 18

        4.    Plaintiffs' effort to revise mistaken "deficiencies" is untimely and unavailing.................................................................................................. 22

    E.    Plaintiffs' Effort to Claim a Disparity in Roof Repair Illuminates Multiple Fatal Problems with their Investigation Methodology............................... 24

        1.    Plaintiffs rely on irrelevant evidence on properties not at issue. ..................... 24

        2.    The data do not support Plaintiffs' assertions of discriminatory roof repairs.................................................................................................... 25

III.    PLAINTIFFS FAIL TO CARRY THEIR BURDEN ON "ROBUST CAUSALITY." ..... 27

IV.    PLAINTIFFS HAVE NO EVIDENCE OF DISCRIMINATORY INTENT. ................... 32

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Westinghouse Savannah River Co.*,
    406 F.3d 248 (4th Cir. 2005) ...................................................................................10

*Ave. 6E Invs., LLC v. City of Yuma*,
    217 F. Supp. 3d 1040 (D. Ariz. 2017) ........................................................................6

*Bank of Am. Corp. v. City of Miami*,
    137 S. Ct. 1296 (2017)...............................................................................................28

*Barrett v. Badger Ladder, LLC*,
    No. 15-0339, 2017 U.S. Dist. LEXIS 15366 (D.N.H. Feb. 3, 2017).......................23

*Beattie v. United States*,
    756 F.2d 91 (D.C. Cir. 1984).....................................................................................31

*Beyer v. Anchor Insulation Co.*,
    238 F. Supp. 3d 270 (D. Conn. 2017).........................................................................18

*Bradley v. City of Lynn*,
    443 F. Supp. 2d 145 (D. Mass. 2006) ..........................................................................6

*Carlton & Harris Chiropractic Inc. v. PDR Network, LLC*,
    982 F.3d 258 (4th Cir. 2020) .......................................................................................7

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).....................................................................................................5

*City of L.A. v. Wells Fargo & Co.*,
    No. 13-9007, 2015 WL 4398858 (C.D. Cal. July 17, 2015), *aff'd*, 691 F.
    App'x 453 (9th Cir. 2017) ......................................................................................6, 30

*Cnty. of Cook v. Bank of Am. Corp.*,
    No. 14-2280, 2022 WL 408299 (N.D. Ill. Feb. 10, 2022) ........................................28

*Cnty. of Cook v. HSBC N. Am. Holdings, Inc.*,
    314 F. Supp. 3d 950 (N.D. Ill. 2018) ..........................................................................6

*Davis v. Cintas Corp.*,
    717 F.3d 476 (6th Cir. 2013) .......................................................................................6

*EEOC v. Darden Rests., Inc.*,
    143 F. Supp. 3d 1274 (S.D. Fla. 2015) ........................................................................6

*EEOC v. Joe's Stone Crab, Inc.*,
   220 F.3d 1263 (11th Cir. 2000) ....................................................................6

*Evans v. Techs. Apps. & Serv. Co.*,
   80 F.3d 954 (4th Cir. 1996) ......................................................................16

*FCC v. Fox TV Stations, Inc.*,
   556 U.S. 502 (2009).................................................................................13

*Holley v. N.C. Dep't of Admin.*,
   846 F. Supp. 2d 416 (E.D.N.C. 2012)......................................................30

*Int'l B'hood of Teamsters v. United States*,
   431 U.S. 324 (1977).............................................................................34, 35

*Kehler v. Bridgestone Ams. Tire Ops., LLC*,
   No. 15-0127, 2016 WL 6080230 (D. Wyo. Aug. 3, 2016).......................23

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973).................................................................................34

*Md. Shall Issue, Inc. v. Hogan*,
   No. 16-1311, 2021 WL 3172273 (D. Md. July 27, 2021) .......................12

*Meyer v. Holley*,
   537 U.S. 280 (2003).................................................................................30

*Minebea Co. v. Papst*,
   231 F.R.D. 3 (D.D.C. 2005).....................................................................23

*Owle v. Solomon*,
   No. 16-0025, 2017 WL 2262419 (W.D.N.C. May 23, 2017)...................30

*Ruffin v. Shaw Indus., Inc.*,
   149 F.3d 294 (4th Cir. 1998) ...................................................................18

*Sheikh v. Rabin*,
   565 F. App'x 512 (7th Cir. 2014) ............................................................11

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)...................................................................................7

*Sprint/United Mgmt. Co. v. Mendelsohn*,
   552 U.S. 379 (2008).................................................................................30

*Teply v. Mobil Oil Corp.*,
   859 F.2d 375 (5th Cir. 1988) .....................................................................5

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Proj., Inc.*,
    576 U.S. 519 (2015)......................................................................................17, 27, 30, 31

*Wickersham v. Ford Motor Co.*,
    738 F. App'x 127 (4th Cir. 2018) ....................................................................................31

**Rules**

FED. R. CIV. P. 26...............................................................................................................23

FED. R. CIV. P. 30........................................................................................................19, 27

FED. R. CIV. P. 37...............................................................................................................23

FED. R. CIV. P. 56..........................................................................................................5, 30

FED. R. EVID. 401..............................................................................................................29

FED. R. EVID. 403..............................................................................................................30

**Other Sources**

*Bank of America Announces $1 Billion/4-Year Commitment to Support Economic*
    *Opportunity Initiatives* (June 2, 2020) ...........................................................................32

Douglas S. Massey & Jacob S. Rugh, "The Intersections of Race and Class: Zoning,
    Affordable Housing, and Segregation in U.S. Metropolitan Areas," *in* Gregory D.
    Squires, ed., The Fight for Fair Housing: Causes, Consequences, and Future
    Implications of the 1968 Federal Fair Housing Act (2017) ...............................................4

Michael Quinn Patton, *Qualitative Research & Evaluations Methods* (4th ed.  2015)................10

R.K. Yin, *Qualitative Research from Start to Finish* (2011)........................................................10

After nearly three years of discovery, Plaintiffs have failed to produce any evidence establishing (i) a statistical disparity or the critical element of "robust causality" required to maintain their claim of disparate impact in the maintenance of REO properties, or (ii) any disparate treatment of such properties.[1] This is not surprising. Fundamental defects in Plaintiffs' methodology—many already recognized by HUD—are now confirmed by undisputed record evidence. The record establishes that Plaintiffs applied their own subjective criteria to an unrepresentative sampling of properties after just one single-point-in-time inspection of each. Such methods are not a valid way of measuring how Defendants maintained those properties, much less of generating evidence of discrimination.

This Court phased discovery to focus on Plaintiffs' methods as a threshold matter because if their investigation cannot clear the threshold of methodological soundness (and it cannot), their claims fail as a matter of law and undisputed fact, without needing to wade into the details of whether each of Plaintiffs' 37 criteria was properly applied and evaluated as to 1,405 properties (51,985 factual questions). Likewise, if Plaintiffs cannot build the "robust" causal link the Supreme Court required between an identifiable policy of the Defendants and the disparate maintenance work Plaintiffs allege given intensive discovery into Defendants' policies and property records (and they cannot), then there are no factual disputes that can preclude summary judgment.

In a revealing line of their Opposition ("Opp.," ECF No. 182), Plaintiffs say that summary

---

[1] Defined terms and short forms in this Reply have the same meaning as in BANA's opening brief, ECF No. 167-1 ("Mot."). References to Exhibits 1 to 60 refer to those Exhibits filed with BANA's opening brief. References to Exhibits 61 and thereafter refer to Exhibits to the Declaration of Angelica Rankins, filed with this Reply. In the space available, this Reply does not and cannot endeavor to correct every distortion of the record evidence or applicable law set forth in Plaintiffs' Opposition but instead focuses on those most material to the matters before the Court. BANA reserves all rights to address other matters in the context of any future proceedings or as the Court deems appropriate. As with its opening brief, BANA also incorporates and joins in Safeguard's reply arguments and evidence to the extent applicable, rather than restating them here.

judgment is unwarranted because the "appropriate[ness]" of their investigators' ratings "is an issue of fact and not an issue that can be resolved on summary judgment." Opp. at 37. In other words, they want to re-litigate the Court's case-management orders and do exactly what this Court *didn't* want to do—ignore the soundness of their methods as a threshold matter and make this case about 51,985 individual issues and "30,000 photographs." *Id*. at 38. But the Court does not need to evaluate 30,000 photographs for the presence or absence of an alleged "defect" if (as is indisputably the case) the "defect" does not reflect Defendants' maintenance work at all because Plaintiffs assigned it without regard to whether it was there when BANA acquired the property, or whether BANA had the obligation, opportunity, or legal right to address it (*e.g.*, respectively, "defects" amounting to purely aesthetic complaints, "defects" arising just before Plaintiffs' arbitrarily timed inspections, or "defects" requiring investor approval or local permits to address).

Throughout their 80-page Opposition, Plaintiffs seek to avoid summary judgment by trying to shift their burdens to Defendants. Instead of coming forward with evidence that their methods are capable of producing reliable, accurate, and replicable property ratings evidencing a real disparity in maintenance across the 1,405 REOs at issue, Plaintiffs pretend the alleged disparity is a given and that it is Defendants' burden to "explain" it. That is not where the burden lies on this Motion, and Plaintiffs wholly fail to address the numerous explanations Defendants *did* furnish of how Plaintiffs' methods yielded unreliable and irreplicable results. The substantial record before the Court confirms that the disparity Plaintiffs allege does not reflect a valid measure of the maintenance work Defendants were doing *or* of the work they were obliged to do, but that Plaintiffs generated the "disparity" by (i) sampling a skewed REO property population predisposed—by reasons of geography and economics, *not* race—to exhibit the patterns Plaintiffs were hoping to find, (ii) excluding from the population properties located anywhere Plaintiffs might collect data supporting the contrary conclusion, (iii) using inapplicable and subjective

inspection criteria—and doing so inconsistently; (iv) ignoring the condition the properties were in when they became REOs, and (v) altering the ratings of their field inspectors after-the-fact and then spoliating the original reports in paper shredders, so there is no evidence in the record of what the "disparity" revealed by their investigators actually was, or if there was even one at all.

Plaintiffs try to minimize these issues by saying they are "the same as those [raised] in [Defendants'] motions to dismiss" (Opp. at 1), as if it were irrelevant that the undisputed record confirms at the summary-judgment stage what this Court already deemed "valid criticism[s] of this investigation" at the dismissal stage. ECF No. 63 at 22. But it's simply not true that this Motion presents the same issues as Defendants' motions to dismiss. Fatal defects not even suspected at that time have emerged. Plaintiffs' own factual and legal theories have also changed. And the supposed "disparity" has gone down every time Plaintiffs' purported statistics expert, Jacob Rugh, revised his analysis. The supposed disparity Plaintiffs call "stark" (Opp. at 1) and demand BANA "explain" now stands at an average difference of about 1.64 "defects" across an alleged 37 potential defects. That's even before accounting for undisputed evidence, including concessions of Plaintiffs' own maintenance expert, that thousands of those deficits were categorically improper. Ultimately, the indisputable record evidence demonstrates that the "disparity" Plaintiffs saw is the product of their own flawed observations. There is nothing else to explain.

Beyond the indisputable defects in Plaintiffs' methods, BANA is also entitled to summary judgment because Plaintiffs have no evidence of the requisite "robust" causal connection between any of Defendants' policies and the alleged disparity. The so-called "policies" Plaintiffs describe in an effort to carry this burden variously lack any evidence that they exist at all or lack evidence of any connection to the properties at issue or the alleged disparity. Because of this, Plaintiffs try to fill the evidentiary gap with a single hearsay-based declaration they improperly generated after the close of discovery. In it, a former Texas landscaper disgruntled over being fired by Safeguard

for "fraud" for failing to do work he told Safeguard he had done conveniently endorses Plaintiffs' theory that his own confessed misdeeds supply the requisite causal link. But his claims, even if credited, cannot create a genuine factual dispute as a matter of the law of causation, and for the more basic reasons that he did not actually work on any of the properties at issue in this case or work in any of the other 35 MSAs at issue beyond Dallas/Fort Worth.

Three years of discovery also generated no evidence of discriminatory intent capable of sustaining Plaintiffs' disparate-treatment claim. But instead of abandoning it, Plaintiffs invite the Court to read discriminatory intent "coded" into perfectly innocuous statements. The Court should decline the invitation. With years of opportunities to substantiate their claims, Plaintiffs' failure to do so at this stage is sufficient for this Court to conclude it need not wait any longer to enter summary judgment in Defendants' favor.

## ARGUMENT

## I.    PLAINTIFFS' EFFORTS TO SHIFT THEIR BURDEN ARE WITHOUT MERIT.

Plaintiffs' purported statistical expert believes the Fair Housing Act is "weak" because it "place[s] the burden of proof" on plaintiffs alleging discrimination, instead of allowing the mere accusation of discrimination to shift the burden to the defendant to prove it *didn't* discriminate.[2] Plaintiffs' Opposition is similarly written as though the parties' burdens were flipped:

- In response to HUD's ruling that single-point-in-time inspections are incapable of attributing property defects to Defendants' maintenance practices as opposed to preexisting conditions, Plaintiffs argue, "Defendants could try to rebut Plaintiffs' single-point-in-time statistics with a more longitudinal analysis, but when they fail to do so, their critique of the point-in-time data is deficient." Opp. at 29.

- In response to Defendants' showing that Plaintiffs failed to perform any comparative analysis of similarly situated properties or neighborhoods, Plaintiffs say, "Had there

---

[2] Douglas S. Massey & Jacob S. Rugh, "The Intersections of Race and Class: Zoning, Affordable Housing, and Segregation in U.S. Metropolitan Areas," *in* Gregory D. Squires, ed., The Fight for Fair Housing: Causes, Consequences, and Future Implications of the 1968 Federal Fair Housing Act 257 (2017).

been neighborhoods or properties in the selected metro areas that were more comparable in the [] ways Defendants identify . . . surely Defendants would have put them forward." *Id*. at 24.

- In response to HUD's ruling that Plaintiffs' inspection criteria did not align with applicable requirements, Plaintiffs argue, "Defendants are free to remove deficiencies they believe to have been improperly included and see if doing so reduces or eliminates the racial gap in disparities [*sic*]. Their failure to do so speaks volumes." *Id*. at 28.

- Relatedly, Plaintiffs say, "Defendants could also review Plaintiffs' extensive photo documentation, which includes more than 30,000 photographs for more than 1,400 properties, rescore deficiencies, and see if the racial disparity in observed deficiencies is eliminated." *Id*. at 38 (footnote omitted).

- In response to Defendants' exposing the limitations and flaws in their purported expert's "regression analysis," Plaintiffs argue, "Defendants do not offer any alternative [regression] analyses showing that any combination of non-racial factors eliminates the [alleged] disparity." *Id*. at 64.

These arguments misstate the applicable burdens. As Plaintiffs acknowledge elsewhere (and as this Court already stated), the burden of evidencing "a robust causal connection between the defendants' challenged policy and [a] disparate impact on the protected class" rests squarely on Plaintiffs—not Defendants. *Id*. at 18. Rule 56 also places the burden on Plaintiffs: "[T]he party moving for summary judgment need not disprove its opponent's claims, but need show only that the party who bears the burden of proof has adduced no evidence to support an element essential to its case." *Teply v. Mobil Oil Corp*., 859 F.2d 375, 379 (5th Cir. 1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). So it is simply not true that Defendants must produce alternative statistics, alternative criteria for compiling those statistics, or alternative regression models to prevail on their summary judgment motions.

This conclusion is reinforced by the Court's phased Scheduling Order. That Order did not envision that Defendants "rescore" "30,000 photographs" or audit 51,985 ratings "to remove deficiencies they believe to have been improperly included." Opp. at 28, 38. To the contrary, the Court made clear that this phase is about addressing "[s]pecific challenges to [Plaintiffs']

methodology . . . that do not obviously depend on a factual analysis of all the properties in the 37

metropolitan areas." ECF No. 115 at 1. That is what Defendants have presented.

## II.    PLAINTIFFS HAVE NO VIABLE EVIDENCE OF A STATISTICAL DISPARITY.

This is not the typical disparate-impact case where a plaintiff mines an existing source of

objective data to contest allegedly unequal outcomes—*e.g.*, hiring or labor-market statistics, or

lending or Home Mortgage Disclosure Act data.[3] Here, Plaintiffs generated the raw data

*themselves* through their field inspections for the sole purpose of bringing this lawsuit. The issue

before the Court is not merely whether the data show a statistical disparity in maintenance work,

but whether the data were collected with reliable methods capable of evidencing that work in the

first place. In its Motion, BANA demonstrated many reasons why they are not, including those

HUD already found dispositive in *NFHA v. U.S. Bank N.A.*, No. 01-12-0283-8 (HUD Jan. 8, 2016)

(Ex. 1). Plaintiffs' efforts to defend their methods, and evade HUD's ruling, are unavailing.

### A.    Plaintiffs Do Not Answer HUD's Rejection of Their Flawed Methods.

In *U.S. Bank*, HUD identified numerous methodological and evidentiary defects in the

same investigation at issue here in ruling that it "does nothing to show" how properties were

maintained, much less evidence discriminatory maintenance. *Id.* at 4. Plaintiffs, HUD ruled,

applied the wrong inspection criteria, compared properties that weren't similarly situated, ignored

the conditions properties were in when they became REOs, and limited themselves to single-point-

in-time snapshots when maintenance, by definition, is ongoing and cannot be observed in a day.

---

[3] *E.g.*, *Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000); *EEOC v. Darden Rests., Inc.*, 143 F. Supp. 3d 1274 (S.D. Fla. 2015); *Bradley v. City of Lynn*, 443 F. Supp. 2d 145 (D. Mass. 2006); *City of L.A. v. Wells Fargo & Co.*, No. 13-9007, 2015 WL 4398858 (C.D. Cal. July 17, 2015), *aff'd*, 691 F. App'x 453 (9th Cir. 2017); *Cnty. of Cook v. HSBC N. Am. Holdings, Inc.*, 314 F. Supp. 3d 950 (N.D. Ill. 2018); *Ave. 6E Invs., LLC v. City of Yuma*, 217 F. Supp. 3d 1040 (D. Ariz. 2017).



Take for example Property 1 and Property 2. This chart illustrates the condition of these properties on the Y-axis, and time on the X-axis. Although Property 1 (dashed line) is in better condition at the time photographs of it are taken, it is receiving less maintenance and falling into worse condition. Meanwhile Property 2 (solid line) is in worse condition at the time of the photographs, yet maintenance is taking place that will bring this second property into better condition over time. Point in time sampling only addresses one dimension of analysis.

*Id.* & *passim.* In HUD's example above, Plaintiffs' single inspection captured property conditions early in the properties' REO phase but failed to capture that the one acquired in worse condition was actually receiving more maintenance attention. That methodological error is not merely theoretical. Plaintiffs do not and cannot dispute that the properties in majority-minority tracts they inspected were in worse condition on average when they became REOs, and that BANA spent ▮% *more* maintaining them than it did in the majority-white tracts. *See* Ex. 2 ¶¶ 94–106.

Rather than produce any evidence or other basis to dispute HUD's careful analysis, Plaintiffs urge the Court to ignore it. After Defendants filed their motions on May 13, 2022, Plaintiffs telephoned HUD and obtained a letter, dated July 5, 2022, in which HUD Deputy Assistant Secretary Lynn Grosso wrote NFHA to state that a Determination of No Reasonable Cause is "not intended to serve as and should not be used as precedent." Opp. Ex. 93-B.

This letter does nothing to undermine any of Defendants' references to *U.S. Bank* or its persuasiveness. Defendants never cited *U.S. Bank* as binding precedent or relied on it for anything more than its "power to persuade"—but here, its power to persuade is *substantial* based on "the thoroughness evident in the agency's consideration," "the validity of its reasoning," and HUD's "expertness" in the relevant area. *Carlton & Harris Chiropractic Inc. v. PDR Network, LLC*, 982 F.3d 258, 264 (4th Cir. 2020) (citing, *e.g.*, *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

HUD's ruling comprehensively addressed *the exact same investigation* that is the subject of the current lawsuit, and HUD's expertise is highly relevant here since it is not only charged with administering and enforcing the FHA, but with establishing the REO maintenance requirements applicable to most of the properties at issue. *See* Ex. 29.

HUD's *U.S. Bank* ruling is even more persuasive and credible in light of NFHA's *very* close relationship to HUD. In addition to securing the Grasso letter on short notice, Plaintiffs boast that "72% of all HUD Fair Housing Initiative Program grantees rely on NFHA's training in whole or in part." Opp. at 6 n.5. HUD also sponsors ad campaigns in "cooperation" and "partnership" with NFHA, and NFHA lobbies for increases to HUD's funding. *See* Exs. 61–63. For HUD to reject Plaintiffs' claims and criticize them for the "mistake of equating" "traditional [FHA] testing" with the methods necessary to investigate maintenance work on hundreds of REOs (*U.S. Bank*, *supra*, at 3, 24), HUD must have been *thoroughly* persuaded of the defects in Plaintiffs' methods. Plaintiffs furnish no reason to conclude that HUD's assessment of Plaintiffs' investigation and claims was somehow deficient. They merely say they had moved for reconsideration. Opp. at 17. But then they withdrew their own request for reconsideration to bring this lawsuit, so they are in no position to rely on the assumption that reconsideration would have led to any different result.

**B.    Plaintiffs' Spoliation Leaves Them With No Evidence of Their Inspection Results.**

Plaintiffs base their claims of a disparity on "deficiencies" their inspectors purportedly observed and recorded on inspection reports during their single-point-in-time field inspections of 1,405 REO properties. But Plaintiffs admit they no longer have the bulk of the reports or any other records of the deficiencies their inspectors recorded at each property because Plaintiffs' "routine" practice was to alter the results after-the-fact in their property inspection database and then destroy the inspectors' reports in paper shredders. *See* Mot. at 7, 24–25, 35–36. That practice renders the purported investigation results inadmissible as a matter of law. *See id.* & ECF Nos. 153, 195.

Plaintiffs try to defend their practice (and the resulting spoliation of material evidence) by calling it a "quality-control process" and "a strength of the investigation." Opp. at 40. Plaintiffs mischaracterize the issue. The notion of "quality control" refers solely to Plaintiffs' practice of altering their inspectors' conclusions after-the-fact using the photographs to make "correct[ions]." *Id*. But BANA's objection is not to that practice standing alone. The objection is to doing so and *then destroying original reports and data* such that there is no record of what defects Plaintiffs' field inspectors did and didn't record during their inspections. Nothing about making "corrections" for the purported sake of quality control justifies spoliating the data and records containing the original results. The spoliation is the material issue, not the "corrections." But the "corrections" are relevant because they mean that Plaintiffs' manipulated property inspection database does not accurately reflect their inspectors' original results. And *that* is significant because it means Plaintiffs cannot rely on that database as admissible evidence. *See* Mot. at 35–36.

## C.    Plaintiffs Skewed their Sample Population to Manufacture a Disparity and to Avoid Comparing Similarly Situated Properties.

In their Complaint, Plaintiffs described their efforts to select properties to investigate in words chosen to leave the Court with the impression that they had visited every BANA REO within each Census-defined MSAs at issue. *See* Mot. at 5–6. It is now undisputed they did not. They were ruthlessly selective in choosing Census tracts to include, sometimes based on arbitrary criteria and sometimes based on criteria with no discernible purpose other than to skew the population in ways likely to support their claims. *See* Mot. at 27–28. In no instance was this justified by any generally accepted standard of scientific practice, which is why Plaintiffs strenuously protest that their methodology should not have to clear the bar of being "scientific." *E.g.*, Opp. at 35.

Plaintiffs do not dispute that they excluded large parts of every MSA at issue (and many entire cities) from their investigation based on matters of convenience such as "whether a local

partner organization had the resources to investigate the metro area" and how close neighborhoods were to the "center." Opp. at 8–9.[4] Nor do they dispute purposely excluding properties that wouldn't support their allegations by, for example, excluding a dozen properties within the six Initial Phase cities from their sample because they observed ongoing maintenance work—in a case alleging failures to do maintenance work. Ex. 64. Nor do Plaintiffs dispute excluding areas that would have allowed similarly situated comparisons. Their "concentric circles methodology" involved "gradually mov[ing] out in circles, from city centers," then stopping as soon as they found a bare minimum of "majority-white neighborhoods . . . to serve as comparators." Opp. at 9. The resulting "comparators," however, were apples and oranges. The undisputed record evidence confirms that the end result was a population in which Plaintiffs compared "low/moderate income" majority-minority Census tracts with "middle/upper income" majority-white Census tracts with median property values more than three times as high. Mot. at 15, 28.

Beyond this, Plaintiffs also do not dispute their failure to show that *any* property or geographic area they inspected was similarly situated to *any* other one. Nor could they. They expressly admitted they did not ██████████████████ to ████████████████████ ██████ Ex. 32 at 7–8; *see* Mot. at 29. This is enough by itself to warrant summary judgment because "to evaluate whether or not there is disparate impact," "similarly situated [groups] must be compared." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 263 (4th Cir. 2005).

Recognizing this, Plaintiffs erect a straw man to battle. They accuse Defendants of "attempt[ing] to impose on Plaintiffs' investigation" "the impractical (and often impossible)

---

[4] In social-science research, this is called "convenience sampling"—*e.g.*, "interviewing whoever happens to be at a place during a site visit . . . or studying a village because it is near the main road." Michael Quinn Patton, *Qualitative Research & Evaluations Methods* 309 (4th ed. 2015). Convenience sampling "is likely to produce an unknown degree of incompleteness" and "an unwanted degree of bias," making an investigation "largely useless." *Id.* (quoting R.K. Yin, *Qualitative Research from Start to Finish* 88 (2011)).

requirements" of "identical, rather than similar, comparators." Opp. at 20. Then they rest on their purported expert's *ipse dixit* opinion that even if not "identical," the 1,405 properties at issue "were similar enough to isolate race as a factor in the properties' maintenance." *Id*. at 24. Plaintiffs cannot simultaneously admit to conducting *no* analysis on the "similarly situated" element while asking the Court to credit an unsupported assertion that literally every property is "similar enough." And contrary to Plaintiffs' protestations, Defendants have not demanded "identical" comparators—the full quote from the case Defendants cited was "identical *or* directly comparable in all material respects." *Sheikh v. Rabin*, 565 F. App'x 512, 516 (7th Cir. 2014) (emphasis added). Plaintiffs by their own admission have not, and cannot, cite properties comparable in *any* material respect.

The "minimum" material points of comparison HUD identified to call properties "similarly situated REOs" were: "(1) similar property value at the time of bank acquisition; (2) similar property condition at the point of acquisition; (3) similar time in private ownership (since mortgage issuance); (4) similar time in possession of [the bank]; and (5) similar age of property," in addition to "control[ling] for neighborhood characteristics such as: (a) crime rate; (b) local zoning ordinances; (c) neighborhood income; and (d) environmental characteristics." *U.S. Bank*, *supra*, at 24. Defendants are entitled to summary judgment because Plaintiffs do not dispute that their investigation did not account for all of these minimum criteria, and as to most of them did not even try. For example, Plaintiffs raise no dispute about their failure to account for property conditions at the point of acquisition, and likewise leave undisputed the expert analysis showing that they were comparing majority-minority tracts with median property values of $36,000 to majority-white tracts with median property values of $115,000. Mot. at 15; Ex. 2 ¶¶ 96–98.

Instead, Plaintiffs argue that their failure to analyze similarly situated comparators is excusable because finding them would have been "impossible." Opp. at 24. Majority-minority neighborhoods, they say, "tend to be 'more economically disadvantaged' . . . with 'lower median

household income, lower home values, older housing stock.'" *Id*. at 25–26. This general assertion about average tendencies furnishes no evidence of the non-existence of valid comparators on the level of *individual* properties or tracts. It also *confirms* Defendants' arguments about how essential it is to control for differences in income and property values. In any event, Plaintiffs cite no data supporting their notion that finding similarly situated comparators would have been "impossible," only the *ipse dixit* of their purported expert Pamela Kisch, which is inadmissible. *See*, *e.g.*, *Md. Shall Issue, Inc. v. Hogan*, No. 16-1311, 2021 WL 3172273, at *4 (D. Md. July 27, 2021).

Meanwhile, BANA's expert economist David Skanderson showed that numerous economically disadvantaged majority-white tracts and higher-income majority-minority tracts were excluded from Plaintiffs' investigation *despite* coming within the "concentric circles" they otherwise saw fit to include. Mot. at 5; Ex. 2 ¶¶ 96–98 & App'x 5. Plaintiffs make no response to this showing. More precisely, out of ███ BANA REOs to choose from in the Phase II MSAs, Plaintiffs inspected only 302, yet there were ███ they did *not* inspect in low- and moderate-income majority-white tracts or middle- and upper-income majority-minority tracts. *See* Mot. at 6; Ex. 45; Ex. 65. If Plaintiffs could not find similarly situated comparators, it was due to their own decision to exclude these properties—not the theorized "impossibility" of finding them. Thus, there is no evidence that the alleged statistical disparity would remain if the comparators were limited to those that passed even a low bar of similarity. It is not necessary to require "identical" comparators (Opp. at 20) to expose this fundamental defect in Plaintiffs' methods.

Plaintiffs' other tactic for evading the similarly situated requirement is to present isolated anecdotes without corresponding comparators. (Defendants, of course, rely on anecdotal cases as well, but it takes far fewer anecdotes to falsify a claim than to confirm it.) For example, Plaintiffs display photographs of "profane" graffiti at two properties in majority-minority tracts. Opp. at 32–33; Ex. 8 ¶ 28. They complain that the graffiti was not removed and a bid to remove one of them

was denied. *Id*. But that does not evidence a disparity unless Plaintiffs can cite valid comparative examples of graffiti being removed in majority-white tracts. And they do not do so. To the contrary, one of the properties they cited for graffiti in a majority-white tract depicts a four-letter term recognizable from the FCC's infamous "seven dirty words"—*see FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 545 (2009)—and it was not removed, either. *See* Ex. 66 at 22445 (████████████ ████████████ ).

Rather than find similarly situated properties, Plaintiffs rely on their purported expert's regression analysis as though it were capable of making all the material dissimilarities vanish. BANA has already addressed how this analysis is irrelevant if the alleged disparity was not validly measured in the first place, and how it doesn't actually control for most of the dissimilarities that HUD (and the analysis of Defendants' experts) found material. BANA refers the Court to its *Daubert* motion, filed today, for a fuller (though far from exhaustive) discussion of these failings.

**D.    Plaintiffs Applied Invalid Inspection Criteria.**

**1.    Plaintiffs' inspection criteria do not "mirror" Defendants' standards.**

It is undisputed that Plaintiffs assigned "deficiencies" for purely aesthetic property improvements BANA was under no obligation to make. *See* Mot. at 15–16. It is *also* undisputed that these invalid "deficiencies" were used to inflate the alleged disparity. *See id*. at 30–32. Rather than dispute any of this, Plaintiffs seek to avoid summary judgement by (i) insinuating that BANA's practice was to "go beyond the baseline scope of duties" and perform aesthetic improvements, but only in majority-white Census tracts, and (ii) asserting that their inspection criteria "mirror" BANA's own standards. Opp. at 5, 27. There is no record support for either claim.

Plaintiffs purport to ground these assertions on an "REO Inspection Checklist" they obtained "[i]n May 2012, early in Plaintiffs' investigation," which lists a variety of "Inspection Items," including aesthetic issues like ████████████████████ Opp. at 5, 27.

Based on this, Plaintiffs assert that Defendants considered themselves obliged to go "beyond" industry standards and address aesthetic issues. *Id.* But the document does not (and cannot) support that assertion. As a threshold matter, the checklist has nothing to do with maintenance standards. It was part of a 2011 contract for property *inspections*—not maintenance. *See* Ex. 67 at 191431. A subsequent 2012 contract engaging Safeguard for property maintenance sets forth BANA's actual requirements for those services, and those requirements (and BANA's audits of Safeguard based on them) concern ███████████████████ not mere "curb appeal." *See* Ex. 25 at 55:8–57:4; Ex. 68 at 32:12–33:5; Ex. 69. That Plaintiffs cite nothing more recent than a document dating to "early" in their investigation is also revealing, because in 2012 the inspection checklist was amended to eliminate the ██████████████ item. Ex. 70.

While relying on one irrelevant and out-of-date checklist, Plaintiffs tellingly ignore a discovery record containing volumes of written policies reflecting BANA's maintenance standards over an extended period. *None* support Plaintiffs' assertion that BANA undertook property improvements beyond legal, investor, and insurer requirements purely for the sake of "curb appeal," rather than health and safety. Importantly, these standards vary by investor, jurisdiction, and other property-specific criteria and were not static over the relevant period of time. So a fixed, unchanging set of 37 criteria over an eight-year period is *inherently* misaligned with Defendants' actual obligations.

For example, BANA produced over a hundred different versions of its Property Inspection and Preservation policy. *See* Exs. 71–75. None reference refreshing chipped paint, fixing mailboxes, or replacing siding for aesthetic improvement (*see* Opp. at 27), despite setting forth specific requirements on health-and-safety issues like ████████████████████ Exs. 71–75. The same is true of the "Bank Property Standards" (BPS) for facilitating quality-control inspections of Safeguard's work. *See* Ex. 76 at 22463; Ex. 77 at 416184. They assess mostly safety

conditions such as "█████████████████████," "███████████

█████████████," or "███████████████

██████." Ex. 78 at 186151. They ensure that a "███████" does not ████████

████████████ (*id.*), but do not consider purely aesthetic issues like the "███████



██████" that Plaintiffs called a "deficiency" at

██ ██████ ██████ █████

█████, at left. Ex. 66 at 69293; Ex. 50

at 73312. Similarly, other BPS criteria reflect

requirements imposed by investors or state

and local law, such as whether "██████

████████," "████████," "█████████████████,"

and "█████████████████." *Compare, e.g.*, Ex. 78 at 186151, *with* Ex. 29 (2016 HUD

investor guidelines), Ex. 79 at 248783 (Fannie Mae), Ex. 80 at 188384 (Freddie Mac). Less than

half overlap with Plaintiffs' criteria. *Compare* Ex. 78 at 186151 *with* Ex. 15.

Plaintiffs' assertion that their criteria "mirror" Defendants' standards (Opp. at 27) also

ignores the significant ways in which those standards vary based on the manner in which BANA

is required to disposition the property. Properties BANA markets as REOs go through different

channels, subject to different policies, than properties BANA is only obliged to return to

"conveyance condition" for maintenance and marketing by HUD. But the latter applied to the

majority of the properties at issue. Ex. 5 ¶ 17. HUD's statement of its conveyance-condition

requirements effective in 2010 defined those standards as (i) remedying damages from "fire, flood,

earthquake, hurricane, tornado, [] mortgagee neglect," or "boiler explosion"; (ii) securing and

winterizing the property; (iii) maintaining the lawn; (iv) removing interior and exterior debris and

personal property; and remediating "mold resulting from the mortgagee's failure to protect and

preserve." Ex. 81; Ex. 5 ¶ 43 & n.31. Only a few of these overlap with Plaintiffs' 37 criteria.

HUD amended its conveyance-condition standards in 2016. *See* Ex. 29. The 2016 revision added several new requirements, including repairing damages from "theft and vandalism," ensuring roofs "are free of active leaks," clearing "drainage system[s]," keeping "fences" "upright . . . with no missing panels or sections," and remedying pest infestations." *Id.*, *passim*. This somewhat increased the overlap with Plaintiffs' criteria, but nowhere near the point of "mirror[ing]" them. Opp. at 27. Purely aesthetic criteria like chipped paint, broken mailboxes, mail in the box, and damaged siding remain absent from the HUD standards. Marketing criteria like "a professional 'for sale' sign" (Compl. ¶ 71) obviously remain absent too because properties slated for conveyance to HUD are not "for sale" by BANA. This misalignment is enough to warrant summary judgment standing alone, because Plaintiffs have no evidence whether there is any disparity if only the applicable health-and-safety criteria are accounted for.

Ultimately, if Defendants really performed tasks "beyond" their obligations in majority-white neighborhoods, then Plaintiffs would have evidence of that actually happening. They have access to BANA's maintenance records, Safeguard's work orders, and breakdowns to the penny of every maintenance expenditure on hundreds of REO properties, but do not and cannot cite any of them to substantiate their claims about the work Defendants were doing. A party cannot avoid summary judgment through bald assertions unsupported by the record. *See*, *e.g.*, *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

### 2.    Plaintiffs improperly blamed Defendants for inherited conditions.

Plaintiffs' investigation is also incapable of evidencing a maintenance disparity because it indisputably made no attempt to distinguish between preexisting defects attributable to the prior homeowners and defects for which Defendants were responsible and had sufficient time to address. Instead, Plaintiffs assumed both that (i) BANA was obliged to fix property conditions it did not

cause, and (ii) "within 30 days of a property entering Defendants' inventory" is sufficient time to do so. Opp. at 34. These assumptions are insufficient to avoid summary judgment. As a matter of law, the FHA "protects defendants from being held liable for [] disparities they did not create." *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Proj., Inc.*, 576 U.S. 519, 542 (2015). HUD's rule is also that the mortgagee "is not held liable for damage to the property by waste committed by the borrower." Ex. 29 at 3.

So, BANA can only be responsible for conditions it was both responsible to address and had sufficient time to address. But the record discloses numerous maintenance tasks Defendants undertook which could not be completed in 30 days for reasons and practical realities entirely beyond their control. These include, for example, properties where:



Exs. 82, 83. Plaintiffs' methodology indisputably made no attempt to account for these and other issues, and so, in violation of *Inclusive Communities* and HUD's own requirements, seeks to hold Defendants liable for conditions they inherited, did not cause, and could not address.

Plaintiffs' cursory argument that their failure to account for "[t]he initial condition of the propert[ies] . . . does not discredit the investigation" (Opp. at 34) is unavailing on multiple levels. Plaintiffs improperly blamed Defendants for conditions they did not cause, improperly assumed Defendants were obligated to fix them, and improperly assumed that in every instance, this obligation—regardless where it falls on the spectrum between mowing a lawn, completing the legal process to evict squatters, and securing permits—can be discharged inside of a month. Notably, Plaintiffs argued at the dismissal stage that a property's "initial condition" was "irrelevant" because BANA was obliged to bring every property to mint condition immediately, even if that meant treating them unequally. *See* ECF No. 55 at 38. Plaintiffs no longer argue this, nor could they: their purported statistics expert agrees with Defendants that initial conditions are *very* relevant (*see* Mot. at 33), so the only issue remaining is whether Plaintiffs have adequately accounted for them. Their failure to do so is beyond dispute.

### 3. Plaintiffs' claimed "deficiencies" were subjective, inconsistent, irreplicable, and often just wrong.

An important criterion in evaluating the reliability of any study is that its "results must be capable of replication." *Beyer v. Anchor Insulation Co.*, 238 F. Supp. 3d 270, 281 (D. Conn. 2017); *accord Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 297–99 (4th Cir. 1998) (stating that "a 'key question' in determining whether a technique can be considered reliable scientific knowledge is whether it has been tested and independently validated or replicated," and striking test methodology as unreliable because "plaintiffs have presented no evidence that the [] test methodology has been independently replicated"). Plaintiffs do not dispute that their subjective property ratings failed the replication test when BANA asked Plaintiffs' inspectors how they would rate a variety of Plaintiffs' photographs. *See* Mot. at 21–22.

Instead, they first try to excuse the inconsistent results by claiming that asking their

inspectors to "identif[y] deficiencies from photographs alone . . . does not accurately reflect how they performed in the field." Opp. at 36. This excuse cannot withstand scrutiny in the face of the undisputed fact that Plaintiffs themselves altered the inspection results in their litigation database after inspectors returned from the field, based on NFHA executives' efforts to identify deficiencies from photographs alone. *See* Mot. at 7. Plaintiffs cannot have it both ways.

Plaintiffs next try to excuse their replication problem by contending that their inspectors did not have the benefit of having recently undergone Plaintiffs' "training" when they were asked to review Plaintiffs' photographs at their depositions. This excuse rings hollow given the record evidence of what the "training" actually entailed, characterized by slides like the below unhelpfully defining "████████████" as "█████████," or the "██████████" slide that first suggests ██████████████, then includes a photo of ████████████ ██████ as an example of a deficiency:



Ex. 48 at 5147, 5150. Plaintiffs' Rule 30(b)(6) witness was questioned at length about the instructions accompanying these slides and described the mail instructions as follows:

> [Y]ou know, it would have been what a reasonable person would consider to be accumulated mail. . . . We would have told them, again, as I mentioned to—you know, to be fair and to be reasonable and it's not one tiny little piece of mail, you know, it's when it's—you know, when it's actually accumulating and it's multiple pieces and it's visible. So, again, it wasn't one or two or three. We didn't have a hard and fast number.

Ex. 17 at 120:1–125:20. In other words, here and elsewhere (*e.g.*, *id.* at 116:11–119:20; 128:15–131:17), Plaintiffs established subjective criteria, then trained their inspectors to apply them subjectively—after telling them that defective maintenance in majority-minority tracts was what they were expected to find. There is nothing about this "training" that Plaintiffs' inspectors needed to have fresh in mind to opine whether a picture of a mailbox shows accumulated mail. The testimony of Plaintiffs' purported fair housing testing "expert" (Kisch) is consistent: "█████████████ ████████████████████████████████████████████████," she said. "█ ███████████████████." Ex. 85 at 94:5–95:2. If expertise was unnecessary, then Plaintiffs' "training" was also unnecessary. In the end, the failure to replicate the ratings produced by Plaintiffs' methods remains undisputed.

BANA also identified numerous "deficiencies" Plaintiffs gave properties in majority-minority tracts to inflate their disparity that either (i) they did not treat the same when the same condition was shown on a property located in a majority-white tract, or (ii) could not be justified on their own terms. *See* Mot. at 17–21. Plaintiffs only try to raise disputes on a few of them, but again the record evidence undermines their effort. For example, they contend that the grass at ███ █████████ was indeed high enough to call overgrown. Opp. at 39. But that was not the opinion of their inspector, who looked at the same picture and said she would not "give this property any deficiencies for overgrown grass." Ex. 24 at 130:3–8. Then, Plaintiffs deny assigning a deficiency for "old" "deck and boards" at ████████████, claiming the "'Structural: Miscellaneous' deficit that BANA must be referring to is of a deformed window frame." Opp. at 39. But again the record evidence is contrary: it confirms that Plaintiffs assigned *both* deficiencies. In one of the few inspection reports to survive Plaintiffs' paper shredders, the inspector at ███████ ███ assigned both a "████████████████████████ *and* a █████████████████████, and Plaintiffs' litigation database still shows them claiming both deficiencies. Exs. 50, 51, 106.

Regardless, the examples shown in BANA's opening brief were demonstrative—far from exhaustive. More are below. The pattern is precisely what one would expect when one tells investigators exactly what they are expected to find as part of their "training."

**MORE INVALID "DEFICIENCIES" MANUFACTURING THE ALLEGED DISPARITY**



A single envelope is treated as "accumulated mail" in a majority-minority tract. Ex. 66 at 28869 (███████████████). But Plaintiffs' representative testified that their inspectors were trained that it would not be "reasonable" to treat "one piece of mail" as "accumulated mail." Ex. 17 at 121:5–18.



This lawn in a majority-minority tract is freshly cut, but not quite green enough for Plaintiffs, who scored it as "dead grass." Ex. 66 at 29007 (███████████████). Their own expert concedes this is not a deficiency because ████████████████████████ Ex. 8 at 11.



Plaintiffs assign a "trash" deficiency in a majority-minority tract over a single flyer blown to the curb. Ex. 66 at 29102 (███████████████████████). But Plaintiffs testified that they trained their inspectors not to score this a deficiency. Ex. 17 at 116:11–119:3 ("trash" is "not . . . one chip bag that blew in from the street on an otherwise pristine lawn. We're talking about, you know, accumulations of trash significant enough to be an eyesore.").



Plaintiffs say this photo depicts a "damaged roof" in a majority-minority tract. No actual roof damage is shown. Ex. 66 at 29012 (██████████████████████).

Faced with such examples, Plaintiffs retort that "[w]hether investigators marked deficiencies appropriately is an issue of fact and not an issue that can be resolved on summary judgment." Opp. at 37. That misapprehends the issue before the Court in context of the threshold motion it requested. The issue at this stage is not precisely how many of the 51,985 potential defects were graded right or wrong. The issue is whether Plaintiffs' methodology is reliable, replicable, and capable of grading properties accurately and consistently. The concrete examples Defendants have put forward of concededly erroneous, inconsistent, or irreplicable ratings, and "trainings" that told inspectors what to find but furnished no objective standards at all, show that Plaintiffs' data collection methods were unreliable and irreplicable, without the need for 1,405 mini-trials that put at issue the accuracy of every last one of the 51,985 individual data points.

### 4. Plaintiffs' effort to revise mistaken "deficiencies" is untimely and unavailing.

In addition to claiming "deficiencies" for issues that was neither BANA's obligation nor practice to address, Plaintiffs assigned even more "deficiencies" for issues BANA was not even *permitted* to address. One example was penalizing boarded windows without regard to the fact that it is often mandatory. *See* Mot. at 6, 31; *U.S. Bank*, *supra*, at 5. Plaintiffs admit this error, but try to fix it by arguing: "In response to Defendants' concerns about Plaintiffs scoring allegedly legally-required items as deficiencies, Dr. Rugh further analyzed the data removing (1) boarded-door-or-window deficiencies for all properties where local law could be read to require boarding for vacant homes, and (2) all warning/no trespass sign deficiencies." Opp. at 14 (footnotes omitted). Plaintiffs claim that even with these changes, the "disparity" remained. *Id*. at 15.

This effort to revise the ratings and statistical analysis on which their whole case is based is improper. The revised analysis (at least the *fifth* revision to Rugh's original regression analysis) is not set forth in any of Rugh's reports; Plaintiffs rely solely on Rugh's oblique account of it in his deposition testimony. Opp. at 15. But Plaintiffs are not entitled to rely on opinions "not

disclosed in [the] expert's report." *Barrett v. Badger Ladder, LLC*, No. 15-0339, 2017 U.S. Dist. LEXIS 15366, at *13 (D.N.H. Feb. 3, 2017) (collecting cases); Fed. R. Civ. P. 26(a)(2)(B)(i), 37(c)(1). And expert-disclosure supplements are allowed to address information "not available at the time of the initial report"—not for the purpose of trying "to 'deepen' or 'strengthen' [the] expert's prior rule 26(a)(2)(B) report." *Minebea Co. v. Papst*, 231 F.R.D. 3, 6 (D.D.C. 2005); *Kehler v. Bridgestone Ams. Tire Ops., LLC*, No. 15-0127, 2016 WL 6080230, at *30 (D. Wyo. Aug. 3, 2016). Plaintiffs say Rugh's latest analysis comes "[i]n response to Defendants' concerns" (Opp. at 14), but Defendants raised those "concerns" on the record over *four years ago*. ECF No. 44-1 at 2. So the new analysis is an impermissible effort to bandage Plaintiffs' weaknesses, not a response to anything newly argued in BANA's Motion.

Even if the Court were to give weight to Plaintiffs' assertions that their invalidly assigned window-boarding and signage deficiencies played no "significant" (Opp. at 15) role in the alleged disparity (and it should not), it does not cure the methodological defects associated with Plaintiffs' labeling of legally required or permitted actions as maintenance defects. First, the window-boarding and signage criteria are not the only criteria that licensed Plaintiffs to assign "deficiencies" for things BANA was legally required to do. For example, Plaintiffs argue in their brief that tarping a roof instead of installing a new roof is a deficiency (Opp. at 27–28), and indeed Plaintiffs gave numerous deficiencies to tarped roofs. *E.g.*, Exs. 50, 66 at 9696, 22206, 28248. But roof-tarping is also mandated by local laws and agency guidelines, and Plaintiffs furnish no evidence that the tarping they cited as defects was not required. *E.g.*, Ex. 84. Lastly, Plaintiffs still carry the burden of linking the purported disparity to an actual policy or practice, and one of the supposed practices Plaintiffs rely on is the alleged "frequency with which [BANA] and Safeguard permit windows to be boarded." Ex. 32 at 10–11. Revising their scores to eliminate window-boarding deficits severs the causal chain between this practice and the purported disparity.

**E.    Plaintiffs' Effort to Claim a Disparity in Roof Repair Illuminates Multiple Fatal Problems with their Investigation Methodology.**

As part of their effort to defend the validity of their inspection methodology and criteria, Plaintiffs argue that it was appropriate for them to assign defects for every form of roof damage notwithstanding Defendants' showing "that industry standards require roofs to be repaired only if the damage causes water to leak into the property." Opp. at 27 (citing Ex. 5 at 48). Plaintiffs argue (again) that it was Defendants' practice to go beyond this baseline standard and claim "BANA regularly repaired roofs without evidence of leaks—and did so more frequently in majority-white neighborhoods." Opp. at 27. But again the record evidence does not support their claim. This is significant because Plaintiffs' roof-repair claim is literally the *only* effort in their entire Opposition to support their claims of a statistical disparity with any of the volumes of maintenance records and data Defendants produced in discovery at substantial burden and expense over the last three years. And yet the data Plaintiffs cite—presumably what they deemed the strongest support for their claims—show the opposite of what they claim and do not even concern the properties at issue.

**1.    Plaintiffs rely on irrelevant evidence on properties not at issue.**

In making their claims about roof repairs BANA supposedly did or did not do, Plaintiffs rely on an Exhibit they pasted together combining 30 BANA spreadsheets summarizing the results of its third-party auditors' property inspections. Opp. Ex. 1-K. The combined Exhibit covers 3,293 unique properties in 1,840 municipalities across all 50 states and the District of Columbia. *Id.* By way of comparison, Plaintiffs' 1,405 properties are in 214 municipalities in 23 states (Ex. 86), and there is almost no overlap between the 3,293 represented in the audit reports and Plaintiffs' 1,405.

Of the Exhibit's 3,293 properties, Plaintiffs focus on "several" "described as having tarps covering or in place of roofs." Opp. at 28. While they say these properties support their argument, Plaintiffs do not state how many or which properties comprise the "several." But a review of the

Exhibit—summarized in the attached Appendix summarizing the key text on each property from Plaintiffs' Exhibit—discloses 85 properties with some reference to the roof being tarped (64 in majority-white tracts and 21 in majority-minority tracts). Importantly, only two of the 85 (█████ ███████████████████████████████████) are among the 1,405 properties at issue (and Plaintiffs did not even assign a roof deficiency to the latter). Their "evidence" thus has nothing to do with 99% of the properties at issue. Plaintiffs themselves maintain that this case is not about "locations beyond those sampled." Ex. 6 at 24. But their evidence is almost exclusively about locations beyond those sampled, and so is not relevant and cannot furnish grounds to deny summary judgment.

> **2.    The data do not support Plaintiffs' assertions of discriminatory roof repairs.**

Even if evidence on properties not at issue were relevant (and it is not), it does not support Plaintiffs. Based on these dozens of properties not even at issue in this case, Plaintiffs assert that "27%" of the tarped properties in majority-white tracts "had bids submitted to repair the roof," compared to "only 16%" in majority-minority tracts. Opp. at 28. Plaintiffs again do not specify what properties comprise these 27% and 16%, respectively. Nor does their Exhibit support those calculations. When the Exhibit notes a roof bid or work order, it is often indeterminate whether it covers a repair or merely a re-tarp.[5] Counting only properties for which the notes specifically indicate a roof *repair* bid, 10 out of 64 in majority-white tracts qualify (15.6%) and 4 of 21 in majority-minority tracts qualify (19%)—the opposite of a disparity. *See* App'x.

Plaintiffs further assert that BANA obtained bids for roof repairs on "[t]wo" properties in majority-white tracts despite there being "no mention of any leak or water pooling." Opp. at 28.

---

[5] *E.g.,* ██████████████ (citing bid "to address roof"), ██████████████ (same), █████ ██████ ("bids provided"), ████████ ("bid present"), ████████████ ("roof bid provided"), ████████████ ("Order . . . open for roof bid").

Plaintiffs neglect to mention there was at least one property in a majority-minority tract *also* with a roof-repair bid submitted despite no mention of any leak or water pooling (███████). Thus, Plaintiffs' sampling shows that properties in majority-minority tracts without active leaks were *more* likely to get repair bids (1 property out of 21 compared to 2 out of 64). Opp. at 28.

Plaintiffs next assert that "two tarped properties in [majority-minority tracts] had descriptions of leaks" but "Defendants did not obtain roof repair bids." Opp. at 28. The point is not substantiated by the Exhibit because the cited "rows 75 and 616" do not mention any roof issues, much less leaks. Regardless, Plaintiffs *again* neglect to furnish the essential comparative information vis-à-vis majority-white tracts. Multiple properties in majority-white tracts *also* had descriptions of leaks with no roof-repair bids referenced.[6]

Beyond this, Plaintiffs' assertion that "BANA regularly repaired roofs . . . in majority-white neighborhoods" does not follow from their Exhibit, which only indicates whether repair bids were "submitted," not whether they were *approved*. Opp. at 27–28. In fact, most of the properties Plaintiffs assumed were "repaired" in majority-white tracts merely on account of a bid submission actually had the bids *denied*.[7] Moreover, Plaintiffs appear to have been selective in the audit documents they chose to present to this Court. Additional audit spreadsheets in the record which they did *not* include in Exhibit 1-K cover more properties (and more roofs). *E.g.*, Exs. 87, 88. In contrast to Plaintiffs' complaints about the two properties in majority-minority tracts where Defendants allegedly failed to repair leaky roofs, in the spreadsheets Plaintiffs *didn't* exhibit, both

---

[6] *E.g.*, ███████ ("roof above enclosed porch leaks"), ███████ ("roof is tarped but still leaks"), ███████ ("roof/ceiling leak . . . no bid for roof repair"), ███████ ("There is a major roof leak"; "I was getting rained on. . . ."), 211 Cloverleaf Rd. ("Roof need[s] . . . tarp[]," "[c]eiling has a leak"). Opp. Ex. 1-K.

[7] *E.g.*, Ex. 89 (███████), Exs. 90–92 (███████), Exs. 93–94 (███████), Exs. 95–96 (███████).

repair denials on leaky roofs are in majority-white tracts.[8]

In sum, Plaintiffs' error-ridden analysis of the roof data is demonstrative of multiple defects infecting their investigatory methodology. It shows the effect of Plaintiffs' skewed population sample, where alleged roof damage in majority-minority tracts outnumber roof damage in majority-white tracts 4 to 1. Ex. 86 (161 out of 204). In contrast, in the representative sampling used for BANA's auditing, the ratio is nearly flipped (21 out of 85). *See* Opp. Ex. 1-K & App'x. In addition, Plaintiffs' practice of relying on single-point-in-time snapshots has once *again* led them to unwarranted conclusions proven wrong by the three-dimensional timeline.

## III.    PLAINTIFFS FAIL TO CARRY THEIR BURDEN ON "ROBUST CAUSALITY."

Independently of their obligation to evidence a racial disparity, Plaintiffs must show a "robust causal" connection "to a defendant's policy or policies causing that disparity." *Inclusive Communities*, 576 U.S. at 542. Recognizing their inability to do so, Plaintiffs' primary argument is that it is "premature" of Defendants to raise the matter. Opp. at 42. Plaintiffs offer no cogent rationale why. The Court's case-management Order clearly contemplated discovery on "the critical element of 'robust causality'" in the opening phases of this case. ECF No. 115 at 1. And while Plaintiffs complain that "the parties were limited to five depositions per side during Phase II" (Opp. at 42), they spent all five depositions inquiring into Defendants' policies. In their Rule 30(b)(6) deposition notice, Topic #1, #3, #4, #5, #6, #7, #8, #10, #11, #12, #13, #14, #16, #17, and #19 *all* concerned "[p]olicies, practices, or procedures." *See* Ex. 97. So Plaintiffs' failure to satisfy the FHA's "robust causality" requirement is not for lack of opportunity, it's for lack of evidence.

Plaintiffs' own opposition, with its Exhibit documenting independent audits on thousands

---

[8] *See* Ex. 87 at row 920 ██████████████████████████████████ ██████████████████); Ex. 88 at row 401 (████████████████ ████████).

of properties (Opp. Ex. 1-K), negates their conclusory claims of insufficient "oversight" and their opposition's equally conclusory protest that oversight was "minimal and ineffective." Opp. at 48. Plaintiffs also do not respond substantively to BANA's undisputed evidence on the lack of a *causal* connection between the purported "policies" and the alleged disparity. For example, Plaintiffs alleged a policy of giving too much discretion to third-party "asset managers." BANA demonstrated that most of the properties at issue didn't even have asset managers because asset managers are only assigned to REOs marketed by BANA, not those disposed of through other channels like reconveyance to HUD. *See* Mot. at 47. Notwithstanding this undisputed fact, Plaintiffs repeat a litany of (unfounded) complaints about the third-party asset managers without even addressing the fundamental point that asset managers cannot supply the requisite "robust causality" if, as the undisputed record shows, they didn't even work on most of the properties at issue. *See* Opp. at 52–54. (And Plaintiffs have furnished no evidence on whether the purported disparity even exists among the properties they did work on.)

The alleged "policies" are also insufficient as a matter of law because they not only lack a connection to the purported disparity, they lack any connection to each other. "[P]roximate causation" under the FHA requires Plaintiffs to prove "interconnected elements of a unified effort," not merely a series of "disjoin[ed] . . . components." *Cnty. of Cook v. Bank of Am. Corp.*, 2022 WL 408299, at *4 (citing *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017)). The disconnected "policies" Plaintiffs cobbled together reflect an investigation that improperly treated the claimed disparity as a given and robust causality as just a box to check for litigation purposes.

Recognizing the evidentiary gap they have to fill, after the close of discovery, Plaintiffs disclosed a surprise witness in the form of a declaration signed by Justin Chappell, who identified himself as "a Black man and the owner of Bama's Landscaping LLC," a former Safeguard subcontractor who worked solely in Texas. Opp. Ex. 52 ¶ 1. Plaintiffs proffered the declaration as

ostensible evidence of the existence of a single one of the policies to which they hope to attribute the supposed disparity, *viz.*, No. 5: Safeguard's allegedly paying its vendors too little. Chappell says Safeguard underpaid him, so he started "cut[ting] corners" and submitting photographs cropped to hide the work he'd left undone—but only in majority-minority communities because he figured "white neighbors were more likely to complain." *Id.* at ¶¶ 11, 13, 14, 16.

Chappell worked for Safeguard for seven years and as late as 2020 told them, "I love working with Safeguard." Ex. 98 at 54:21–55:1. He described his company as a "███████ ████████" and testified to █████████████████████████████ *Id.* at 173:2; Ex. 99. At his high point, he was handling █████████ and boasted that ██████████ Ex. 100. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ Ex. 101; Ex. 98 at 144:19–145:10, 157:15. █████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████ Ex. 102. His declaration echoing Plaintiffs' claims in their lawsuit against Safeguard and BANA eventually followed. But this employment dispute cannot generate a genuine issue of fact on the robust causality element of the claims for a host of reasons.

As a threshold matter, it does not even satisfy the baseline relevance standard for admissibility (FED. R. EVID. 401) because Chappell *did not work on a single one of the 1,405 REO properties at issue* and only worked in the Dallas/Ft. Worth MSA**.** Plaintiffs represented to this Court that this case is not about "locations beyond those sampled" and that they are making no claims about whether the 1,405 properties in the sample are "representative" of any others. Ex. 6 at 23–24. But Chappell has no connection to any of those properties, and Plaintiffs have no

evidence Chappell's claims apply to anyone who *did* work on one of the 1,405 REOs at issue or in any of the other 35 MSAs. Plaintiffs have no evidence about Safeguard's pay rates in those MSAs or how it compares to anybody else's. Chappell's claims of discrimination untethered to *Plaintiffs'* claims of discrimination in this case has "infinitesimal (at best)" "probative value" but an "equivalently high" "prejudicial effect" because "[t]hey are likely to confuse or mislead jurors as to the only race discrimination claim in this case." *Holley v. N.C. Dep't of Admin.*, 846 F. Supp. 2d 416, 434 (E.D.N.C. 2012) (citing FED. R. EVID. 403; *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 380, 383–84 (2008)).[9]

Beyond this, Chappell's testimony falls short of establishing robust causality as a matter of law. Even if his complaints about *Safeguard's* pay could somehow be construed as relating to a *BANA* policy (which Plaintiffs do not even try to argue), "[g]uidance from the Supreme Court is unambiguous that disparate impact claims must solely seek to remove barriers." *City of L.A.*, 2015 WL 4398858, at *8; *see Inclusive Communities*, 576 U.S. at 521 ("Policies . . . are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'"). Chappell's complaints about Safeguard's landscaping rates do not describe a "barrier," much less an "artificial" and "arbitrary" one, merely the routine sort of operational matters as to which the Supreme Court said there is no basis to "inject racial considerations." *Id*.

Further, the FHA was "legislate[d] against a legal background of ordinary tort-related vicarious liability rules." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). The "ordinary" law of causation requires "(1) causation-in-fact, and (2) legal cause, which is . . . determined by looking

---

[9] Chappell's declaration also fails to satisfy the requirement that a party opposing summary judgment come forward with evidence admissible at trial. *See* FED. R. CIV. P. 56(c)(2), (4). As further detailed in Safeguard's reply, Chappell's declaration is full of hearsay, impermissible opinion, and unsupported assertions based on "the reports of others" instead of "personal observation." *Owle v. Solomon*, No. 16-0025, 2017 WL 2262419, at *3 (W.D.N.C. May 23, 2017).

to the natural and probable consequences of the defendant's act or omission." *Wickersham v. Ford Motor Co.*, 738 F. App'x 127, 131 (4th Cir. 2018). A "natural and probable consequence" of underpaying landscapers—if that is even true—is that they would go work elsewhere. Or, if they "cut corners" like Chappell, that they would do so across all properties. It is *not* a ████████ ████████ that contractors will, as Chappell confesses, ███████ ████████████████████████████████████████████████████ ████████████████████████████ Opp. Ex. 52 ¶ 14; Ex. 98 at 93:2–11. "[A]s a general matter in tort law," Chappell's unilateral conduct breaks the causal chain. *Beattie v. United States*, 756 F.2d 91, 138 (D.C. Cir. 1984). A contrary result would set a precedent holding racial discrimination the "natural and probable consequence" of grievances as commonplace as believing one is underpaid, inviting exactly the sort of "abusive disparate-impact claims" *Inclusive Communities* forecloses. 576 U.S. at 522.

Moreover, the full context of Chappell's history with Safeguard actually rebuts more of Plaintiffs' alleged policies than it supports. Chappell tries to support Plaintiffs on their alleged Policy #5 (Safeguard "paid its vendors very little"), but only by undercutting Plaintiffs' claims on Policy #10 (the use of a "national" maintenance vendor)—Chappell says the *other* national vendors are fine, so his grievance is just with his profit margin, not with the so-called "national model." *See* Mot. at 47, 49; Opp. Ex. 52 ¶ 12. Likewise, Chappell's complaints about Safeguard's auditing his work and regular demands he re-do subpar work negate Plaintiffs' alleged Policy #1 and #3, their assertions that vendor supervision was "minimal and ineffective." Opp. at 48. Plaintiffs cannot rely on Chappell's confessed corner-cutting and efforts to defraud Safeguard against the undisputed background where Chappell was fired *precisely for the "corner-cutting" and fraud he confesses to in his testimony*.

And Chappell contributes no concrete facts about the supposed policies he is proffered to

support. Saying other national vendors paid him better than Safeguard is not a substitute for actual evidence of what each paid for equivalent work, of which Plaintiffs have none. Nor can Chappell even speak to what pay scales applied beyond Texas. Confessing to leaving so much work undone he regularly failed his audits does not substitute for evidence that anybody else was doing this and getting away with it. There were *thousands* of Safeguard subcontractors Plaintiffs could have— and very likely did—contact in hopes of securing supporting evidence. That they only found a single one to endorse their claims speaks volumes.

## IV.    PLAINTIFFS HAVE NO EVIDENCE OF DISCRIMINATORY INTENT.

This Court already stated that this case did not resemble a disparate-treatment case because they had no evidence of discriminatory intent. ECF No. 66 at 15 n.8. Undaunted, Plaintiffs devote a section of their brief to libelous claims that "racial discrimination was Defendants' standard operating procedure." Opp. at 71 *et seq.* BANA proudly serves diverse communities across the country and its commitment to racial equity initiatives is second to none. *See*, *e.g.*, *Bank of America Announces $1 Billion/4-Year Commitment to Support Economic Opportunity Initiatives* (June 2, 2020), available at *https://newsroom.bankofamerica.com/press-releases/bank-america-announces-four-year-1-billion-commitment-supporting-economic* ("$1 billion" for "communities of color that have experienced a greater impact from the health crisis"). Needless to say, Plaintiffs make their claims of discriminatory animus with zero evidence.

Their primary argument, after recycling their improper reliance on the Chappell declaration which cannot even carry them over the lower disparate-impact bar, is to accuse *third party* "asset managers, Safeguard vendors, and local real estate agents" of using "racially coded language." Opp. at 72. The first example they cite are some work orders saying ████████████ was in a "high crime," "high vandalism" area of Baltimore. Plaintiffs call this a "racially coded" phrase on the asserted ground that the crime rate around █████████ was actually "low." *Id*. at 58. Plaintiffs

have no evidence of this, because it isn't true. The work orders Plaintiffs complain about date from 2013. In 2012 alone, there were seven murders within five blocks of this address, according to the *Baltimore Sun*'s homicide tracker. *See https://homicides.news.baltimoresun.com/?range=2012*



(at left). So Plaintiffs' assertion that only racial animus can explain references to the area's "high crime" is manifestly false, and says more about the unreliability of their crime data—limited to burglary statistics—than it says about the neighborhood.

Plaintiffs also cite their unreliable crime data to complain about Safeguard's description of the area as "high vandalism." Safeguard's description was well-founded. In 2013, BANA had to spend ███ to ████████████ at the property because a ████████████ ████████████ Ex. 103 at 76052. In 2014, the property was ████████████ Ex. 104 at 76492. In 2015, ████████████ and ████. Ex. 105 at 82888. The vandalism problem at this property is indisputable—and Plaintiffs' failure to account for it is a fatal flaw.

More fundamentally, accusations of "coded language" (Opp. at 72) do not establish a connection to a single maintenance task improperly neglected. The best Plaintiffs muster is to assert that BANA accepted an asset manager's advice to "accept[] [a] $5,000-$10,000 loss" marketing ████████████ in Memphis as an REO as-is instead of bringing it to conveyance condition for resale by HUD, allegedly because it was adjudged to be in a "high risk" area. *Id.* & Opp. Ex. 90. Plaintiffs omit mentioning the context that the property *couldn't* be repaired at that time because it was occupied, requiring eviction proceedings. *See* Opp. Ex. 90. The context of the asset manager's suggestion to market the property as-is was that it could be marketed ████ ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ Opp. Ex. 90 at 4562, 4564. The context of the "high risk" description was that Memphis properties, "██ ████████████████" become "██████████████████████████████████ ████████████████████" *Id*. One can second-guess the business decision—the property failed to find a buyer and was disposed of as a donation a few weeks after Plaintiffs' visit—but Plaintiffs have no evidence it was motivated by racial animus as opposed to a genuine cost/benefit analysis. Plaintiffs' *own* evidence shows otherwise. One of the properties they cite in their roof-repair Exhibit, ██████████████ had the same business decision made as ████████████—and it is in a 76% white tract. *See* Opp. Ex. 1-K; Ex. 89 ("repair may not be cost effective. Recommend selling as-is . . . Target: renovation, and cash buyers").

Plaintiffs' invocation of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Int'l B'hood of Teamsters v. United States*, 431 U.S. 324 (1977), do not advance their case. In Plaintiffs' own formulation, *McDonnell Douglas* requires them *first* to "state[] a prima facie case" of disparate maintenance. Opp. at 74. But that is exactly the case Plaintiffs failed to make for disparate-impact purposes because of the myriad methodological flaws tainting their statistical evidence. In any event, Plaintiffs' effort to complete the next two steps—identifying "legitimate, nondiscriminatory reason[s]" for the alleged disparity and showing they are just a pretext—rests on their unsupported contention that their "regression analysis" rebutted all "potential non-racial causes" for the disparity. Opp. at 74–75. BANA has already addressed the reasons Plaintiffs' regression analysis doesn't come close to doing so. The most obvious nondiscriminatory reason for the conditions Plaintiffs observed was the condition the properties were in when BANA got them, and nothing in the regression analysis accounted for this, much less revealed it as a "pretext."

*Teamsters* is even less availing. It requires Plaintiffs to submit evidence "that racial discrimination was the company's standard operating procedure—the regular rather than the

unusual practice." 431 U.S. at 336. That burden was carried in *Teamsters* by evidence that the defendant hadn't hired a single African-American until about two years before the lawsuit. *Id*. at 337. Plaintiffs here have nothing even approaching that sort of evidence. That ends the inquiry.

## **CONCLUSION**

For the reasons set forth above and in Defendants' opening briefing, and on the basis of the undisputed record before the Court, BANA respectfully asks this Court to enter summary judgment in its favor.

Respectfully submitted this 12th day of September, 2022,

<table>
<tr><td>

/s/ *Ava E. Lias-Booker*
Ava E. Lias-Booker (No. 05022)
Melissa Martinez (No. 28975)
MCGUIRE WOODS LLP
500 E. Pratt St., Ste. 1000
Baltimore, Md. 21202
Tel.: (410) 659-4430
Fax: (410) 659-4558
alias-booker@mcguirewoods.com
mmartinez@mcguirewoods.com

</td><td>

/s/ *Thomas M. Hefferon*
Thomas M. Hefferon (No. 15109)
Brooks R. Brown (*pro hac vice*)
Anthony M. Alexis (*pro hac vice*)
Keith Levenberg (No. 11957)
GOODWIN PROCTER LLP
901 New York Ave., N.W.
Washington, D.C. 20001
Tel.: (202) 346-4248
Fax: (202) 346-4444
thefferon@goodwinlaw.com
bbrown@goodwinlaw.com
aalexis@goodwinlaw.com
klevenberg@goodwinlaw.com

</td></tr>
</table>

*Counsel for Defendant Bank of America, N.A.*

**APPENDIX**

**PROPERTIES IN PLAINTIFFS' EXHIBIT 1-K DESCRIBED AS HAVING ROOF TARPS**

| # | Property | Municipality | Tarping notes | Reference to current or prior leak damage | Roof repair bid noted? | Reference to repair bid |
|---|---|---|---|---|---|---|
| | | | **PROPERTIES IN TRACTS CLASSIFIED BY PLAINTIFFS AS MAJORITY-WHITE** | | | |
| 1 | ███ | ███ | "Old tarp is present" | | No | |
| 2 | ███ | ███ | "There is two tarp on the roof" | | No | |
| 3 | ███ | ███ | "tarp on roof" | | No | |
| 4 | ███ | ███ | "roof is tarped" | | No | |
| 5 | ███ | ███ | "roof above enclosed porch … is tarped" | "roof above enclosed porch leaks" | No | |
| 6 | ███ | ███ | "roof was tarped by SG on 10/15/15 … tarp needs to be re secured" | "Water leaks and mold present" | Yes | "roof … has been bid to be repaired" |
| 7 | ███ | ███ | "roof tarp" | | No | |
| 8 | ███ | ███ | "tarp on the front roof shingles" | | No | |
| 9 | ███ | ███ | "blue tarp on the roof" | | No | |
| 10 | ███ | ███ | "tarped" | "roof leak," "water in basement[,] mold in living room" | No | |
| 11 | ███ | ███ | "roof is tarped" | "roof … still leaks and the walls and floors are falling apart from moisture" | No | "[work order] opened to … tarp roof" |
| 12 | ███ | ███ | "tarp covering part of the roof" | | No | |
| 13 | ███ | ███ | "roof tarped" | "ceiling with water stains" | No | |
| 14 | ███ | ███ | "tarp on the roof" | No | No | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 15 | ███ | ███ | "roof tarped" | "mold in rotting ceilings" | No | |
| 16 | ███ | ███ | "bid to tarp" | "roof/ceiling leak, active water leak" | No | |
| 17 | ███ | ███ | "roof is tarped" | "water stains and ceiling damage from roof leaks" | No | |
| 18 | ███ | ███ | "missing shingles so needs tarp" | | No | |
| 19 | ███ | ███ | "right roof has a tarp" | | No | "bid . . . to tarp roof" |
| 20 | ███ | ███ | "tarp present" | | No | |
| 21 | ███ | ███ | "tarp on the roof" | | No | |
| 22 | ███ | ███ | "roof is tarped" | "there is mold present" | No | |
| 23 | ███ | ███ | "roof is tarped" | | No | |
| 24 | ███ | ███ | "TARPED ROOF" | | No | |
| 25 | ███ | ███ | "Tarp on roof" | | Yes | "Bid to repair roof was submitted 12/29/16; await[i]ng client decision" |
| 26 | ███ | ███ | "tarp needs to be replaced" | "Roof is poor and has a leak in a sky light on the right rear" | Maybe | "valid bid present to address roof" |
| 27 | ███ | ███ | "tarp on roof" | | No | |
| 28 | ███ | ███ | "Roof was tarped and tarp is coming loose," "tarp's not functional" | | Maybe | "[work order] to address roof" |
| 29 | ███ | ███ | "tarp on the roof" | "mold made me sick to where I needed to use my inhaler" | No | |
| 30 | ███ | ███ | "tarp around the chimney" | "discoloration on the ceilings from water leaks" | No | |

| 31 | ▮▮▮▮ | ▮▮▮▮ | "tarp on the roof" | "there is evidence of water leaking in the house" | Maybe | "roof tarp and valid bid present" |
|----|------|------|------|------|------|------|
| 32 | ▮▮▮▮ | ▮▮▮▮ | "tarp on part of the roof" | "water in basement" | No | |
| 33 | ▮▮▮▮ | ▮▮▮▮ | "tarp on roof" | "deep water standing in basement" | Yes | "bid provided to replace roof" |
| 34 | ▮▮▮▮ | | "tarp on the roof" | "water is still leaking in the home. There is standing water in the bathroom and the foundation has sank down under the bathroom" | Maybe | "roof bid provided" |
| 35 | ▮▮▮▮ | ▮▮▮▮ | "roof is tarped" | | No | |
| 36 | ▮▮▮▮ | ▮▮▮▮ | "roof has a tarp over it" | "Mold was present in the ceiling" | Yes | "bid provided for roof replacement" |
| 37 | ▮▮▮▮ | ▮▮▮▮ | "roof was tarped" | "There is a major roof leak in the garage and the utility room. I was getting rained on" | No | |
| 38 | ▮▮▮▮ | ▮▮▮▮ | "Roof is totally tarped and the ceiling has all been removed" | | Maybe | "bids provided" |
| 39 | ▮▮▮▮ | ▮▮▮▮ | "Roof has been tarped"<br><br>"The front roof is missing the tarp" | "The roof is leaking in the living room" | Yes | "there is a bid in CARDS to replace roof," "bid is not active" |
| 40 | ▮▮▮▮ | ▮▮▮▮ | "Old tarp on roof" | | No | |
| 41 | ▮▮▮▮ | ▮▮▮▮ | "roof is covered with tarp" | "Water damages on the fascia" | No | |
| 42 | ▮▮▮▮ | ▮▮▮▮ | "Roof need replaced/tarped" | "Ceiling has a leak in the living room" | No | |

| 43 | ███ | ███ | "roof is tarped" | | Yes | "Roof tarped and bids have been provided to address" |
|---|---|---|---|---|---|---|
| 44 | ███ | ███ | "roof has been tarped" | | No | |
| 45 | ███ | ███ | "roof has been tarped" | "water damage noted [] in the dining room around the skylight" | No | |
| 46 | ███ | ███ | "Roof originally reported tarped as of 6/29/17" | | Yes | "Order has been created to obtain bid to repair" [but were only tarping] |
| 47 | ███ | ███ | "ROOF TARP HAS KEPT INTERIOR IN GOOD CONDITION" | | No | |
| 48 | ███ | ███ | "Roof tarp is shredded" | | No | |
| 49 | ███ | ███ | "roof has been tarped" | "no interior damages noted from leaking roof" | No | |
| 50 | ███ | ███ | "Roof tarped" | "water damage and [] wet carpet" | No | |
| 51 | ███ | ███ | "tarp on roof is ripped" | | Yes | "bid provided to address roof damages" |
| 52 | ███ | ███ | "tarp on a portion of the roof" | | No | |
| 53 | ███ | ███ | "large tarp on the roof of the garage" | | Yes | "bid provided for … repair roof," "roof is beyond repair" |
| 54 | ███ | ███ | "roof currently tarped" | | Maybe | "Order … open for roof bid" |
| 55 | ███ | ███ | "Roof has been tarp[ed]" | | No | |
| 56 | ███ | ███ | "portion of the back roof is tarped" | "Leaking roof and chipping and peeling interior paint" | No | |

| | | | "bids to replace roof tarp are in CARDS" | "significant drywall mold/mildew," "wall and ceiling drywall integrity compromised," "holes in roof" | No: | "bids to replace roof tarp are in CARDS" |
|---|---|---|---|---|---|---|
| 57 | ██████ | ██████ | "bids to replace roof tarp are in CARDS" | "significant drywall mold/mildew," "wall and ceiling drywall integrity compromised," "holes in roof" | No: | "bids to replace roof tarp are in CARDS" |
| 58 | ██████ | ██████ | "Tarp over roof" | "Roof leaks. Home smells moldy." | No | |
| 59 | ██████ | ██████ | "tarp on rear addition roof" | | No | |
| 60 | ██████ | ██████ | "right roof has a tarp" | | No | |
| 61 | ██████ | ██████ | "roof is tarped off" | "Hole in the roof in the front bedroom," "mold damage in the area affected by roof damage from Hurricane Irma" | Maybe | "Order … placed for bid to address roof" |
| 62 | ██████ | ██████ | "roof is tarped with half the tarp gone" | No | No | |
| 63 | ██████ | ██████ | "bad roof with a tarp on it" | "tarp is not keeping the rain out … large puddle of water" | Yes | "bid to repair roof has been provided" |
| 64 | ██████ | ██████ | " BLUE TARP IS COVERING A PORTION OF THE ROOF" | "THERE MAY HAVE BEEN A LEAK AT SOME POINT" | No | |
| **PROPERTIES IN TRACTS CLASSIFIED BY PLAINTIFFS AS MAJORITY-MINORITY** | | | | | | |
| 1 | ██████ | ██████ | "roof is tarped in the back" | "signs of old leak in the house" | Yes | "Bid provided for roof replacement" |
| 2 | ██████ | ██████ | "torn roof tarp coming apart | "Roof leaking- Roof is at end of life cycle. Interior has active leaks" | No | |
| 3 | ██████ | ██████ | "entire roof is covered with tarp" | | Yes | "bid in cards to repair damage[d] roof" |

| 4 | ███████████ | ███████ | "torn up roof tarp" | | No | "bids have been provided to demo" |
|---|---|---|---|---|---|---|
| 5 | ███████ | ███████ | "roof is tarped" | | No | |
| 6 | ██████ | ███████ | "entire roof has a tarp" | | No | |
| 7 | ████████ | ███████ | "3 tarps on the roof" | "wood on the interior is damage[d] d[ue] to the roof" | No | |
| 8 | █████████ | ███████ | "tarp on the roof… coming loose in the wind" | "small leak in the upstairs bathroom" | Maybe | "Order … open to have … hazards addressed" |
| 9 | ███████ | ███████ | "front roof is tarped" | "signs of water damage on the ceiling" | No | |
| 10 | ████████ | █████████ | ▌Tarp on roof" | | No | |
| 11 | ████████ | ███████ | "roof is tarped" | | No | |
| 12 | █████████ | █████████ | "Roof is covered with tarp" | "House has strong mold smell" | No | |
| 13 | █████████ | █████████ | "TARP NO ROOF" | "WATER IN SIDE THE P[R]OPERTY" | Yes | "bid provided for roof & mold" |
| 14 | ████████ | ███████ | "roof has been tarped" | "active leaks," "water damage throughout the house" | Yes | "bids provided for roof & mold issues" |
| 16 | █████████ | █████ | "tarp on the roof" | | No | |
| 17 | ████████ | █████ | "Roof has a tarp on it" | | No | |
| 18 | █████████ | █████ | "roof is currently tarped" | | No | |
| 20 | █████ | █████ | "tarp on roof" | | No | |
| 21 | █████ | █████ | "roof tarped" | | No | |
| 22 | ████████ | █████ | "part of roof is tarped" | | No | |
| 23 | █████████ | ███████ | "roof … has been tarped" | "front left corner … is rotting … allowing water … into the house" | Maybe | "Property has just moved to REO and bids previously provided have been requested" |