## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, et al., | |
| v. | Civil Action No. SAG-18-1919 |
| BANK OF AMERICA, N.A., et al. | |

### MEMORANDUM OPINION

A collection of fair housing advocacy groups and individual plaintiffs filed this lawsuit against Bank of America, N.A. and Safeguard Properties Management, LLC for their allegedly discriminatory maintenance and marketing of real estate owned properties in the wake of the 2008 financial crisis. The plaintiffs' case is predicated on a proprietary investigation of properties owned by Bank of America and serviced by Safeguard in 37 cities between 2011 and 2018. The plaintiffs' study purports to demonstrate a statistically significant racial disparity in the defendants' management of real estate owned properties, which, in the plaintiffs' view, evinces disparate impact and disparate treatment in violation of the Fair Housing Act. Given the centrality of their study to the claims in this case, the plaintiffs supply at least four expert witnesses to opine on the validity of the investigation and to interpret its results. The defendants move to exclude the opinions of each of those four experts, as well as the opinion of National Fair Housing Alliance Senior Associate Director of Enforcement Lindsay Augustine. Safeguard's Mot. to Strike, ECF 205; BANA's Mot. to Strike, ECF 206. The motions are fully briefed, and no oral argument is

necessary. *See* Local Rule 105.6 (D. Md. 2021). For the reasons explained below, the motions to exclude experts will be granted in part and denied in part.[1]

## I.      BACKGROUND

The factual background to this case has been detailed in two prior opinions, so only a short summary is necessary here. *See* Mem., ECF 66; Mem., ECF 226. Following the 2008 mortgage crisis, Bank of America assumed ownership of foreclosed properties across the country, many of which it engaged Safeguard to service on its behalf. Properties under this ownership structure are referred to as "real estate owned properties" or "REOs."

The plaintiffs, a group of fair housing organizations assembled by the National Fair Housing Alliance, or "NFHA," claim that as early as 2009, they started fielding complaints that the defendants were failing to hold REOs in minority communities to the same standard as those in white communities. Decl. of Lindsay Augustine ¶ 2, ECF 184-1 ("Augustine Decl."). "As a result of those concerns, NFHA developed a large-scale investigation to determine whether the racial makeup of a neighborhood had an impact on the quality of [the defendants'] maintenance and marketing of REO properties." *Id.* The investigation found, in the plaintiffs' view, a "substantial and statistically significant" disparity "between the routine exterior maintenance and marketing of Bank of America-owned homes in communities of color and the routine exterior maintenance and marketing of Bank of America-owned homes in predominantly white

---

[1] The parties' summary judgment motions remain pending and will be addressed separately. In conjunction with this motion, the defendants filed an unopposed motion to seal certain items, ECF 224, which will be granted. Additionally, Safeguard incorrectly filed its memorandum in support of its motion to exclude expert opinions under a separate docket entry, ECF 203, instead of simply attaching it as an exhibit to its motion, ECF 205. The memorandum has been considered in this Court's adjudication of the motion.

neighborhoods" that cannot be "explained by non-racial factors." *See* Compl. ¶¶ 65, 80, 87, ECF 1.

To reach this conclusion, NFHA measured the number of observed "deficiencies" in REOs in white and non-white communities, ultimately finding "an average of 3.06 more deficiencies among properties in non-white tracts than in white tracts." Rugh Report at 2, ECF 208-2. A "deficiency," for purposes of this case, is the presence of one of 37 criteria developed by the plaintiffs as a proxy for the quality of "routine exterior maintenance, marketing, and [] overall curb appeal of" a particular property. Decl. of Shanna L. Smith, ECF 184-3 ("Smith Decl."). For example, a property might accrue deficiencies for exhibiting features like overgrown grass, damaged steps, missing "For Sale" signs, or other similar problems. *Id.* at Ex. A. The more deficiencies visible on a property, the worse its score. And, on the plaintiffs' theory, the greater the disparity between average deficiencies of REOs in white and non-white neighborhoods, the stronger the evidence of disparate impact and disparate treatment.

As this overview suggests, the plaintiffs' top-line conclusions are the product of a bottoms-up approach. First, the plaintiffs identified 37 metropolitan areas with high foreclosure rates across the United States in which to conduct their study. Augustine Decl. ¶¶ 3-12. Next, they developed the 37 criteria against which to score each property. Smith Decl. ¶¶ 3-5. They then dispatched teams of trained investigators to the field to evaluate the deficiencies on pre-identified REOs. Augustine Decl. ¶¶ 14-17. Investigators visited each property in pairs, tallied each observed deficiency on an evaluation form, and photographed each deficiency to document their conclusions. *Id.* ¶ 17. After completing an assignment, investigators returned to a local field office to upload the evaluation results and supporting photographic evidence to a centralized database.

*Id.* ¶ 19. NFHA executives reviewed these uploads for quality control purposes, and in some cases edited the results for accuracy and standardization. *Id.* ¶ 25. Once the results for each of the 1,405 properties currently at issue were uploaded, the plaintiffs analyzed them to compare the effectiveness of the defendants' property maintenance and marketing between white and minority neighborhoods. *Id.* ¶¶ 26-30.

The plaintiffs have retained at least four experts to offer opinions in support of the investigation at the heart of their case. Dr. Michael D. Fetters, M.D., M.P.H., M.A., opined "on the mixed methods methodology used by the plaintiffs to conduct their investigation." Fetters Report at 4, ECF 206-2. Fair Housing Center of Southeast & Mid Michigan Executive Director Pamela A. Kisch offered opinions on the "use of testers and the role of fair housing organizations in uncovering illegal discrimination" and the "design and execution of fair housing tests." Kisch Report at 2, ECF 206-3. Brigham Young University Professor Dr. Jacob S. Rugh, Ph.D., provided a regression analysis for the purpose of attributing the plaintiffs' observed disparities to potential causal factors, concluding that the racial disparity in deficiencies "is highly statistically significant, practically significant, and is not fully explained by" any variable other than race. Rugh Report at 2-3, ECF 208-2. Finally, former A&D Property Services, Inc., Executive Vice President and Chief Financial Officer Deavay Tyler provided a report applying his expertise in the "preservation and maintenance of REOs and post-foreclosure HUD properties, including industry standards, policies, and procedures," to the defendants' management of the REOs at issue in this case. Tyler Report at 2-3, ECF 183-3 Ex. A.

In addition to proffering these formal expert reports, the plaintiffs also introduced the declaration of NFHA Senior Associate Director of Enforcement Lindsay Augustine. Augustine

Decl. ¶ 1. In her declaration, Ms. Augustine explained under oath the plaintiffs' investigation methodology and provided an analysis of the study's results in Microsoft Excel. *See generally* Augustine Decl.

The defendants now seek to exclude the opinions of each of the plaintiffs' proffered experts. They also ask this Court to exclude Ms. Augustine's data analysis as improper testimony for a lay witness.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. A qualified expert may give testimony if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The trial court's core duty under Rule 702 is to ensure that proposed expert testimony is both "reliable" and "relevant." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court provided five non-exhaustive factors to guide courts in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique or theory has gained "general acceptance." 509 U.S. at 592-94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x

448, 452 (4th Cir. 2010).[2] Ultimately, however, the inquiry is "a flexible one," with the relevant factors varying with the needs of each case. *Daubert*, 509 U.S. at 594.

For an expert's proffered testimony to be sufficiently reliable, it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)). The analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and not supported by the record," is inadmissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

For an expert opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591). Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Anderson v. Home Depot U.S.A., Inc.*, No. 14-cv-2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Anderson*, 2017 WL 2189508, at *3 (quoting *Main St. Am. Grp. v.*

---

[2] Unpublished opinions are cited for the persuasiveness of their reasoning only, not for precedential value.

*Sears, Roebuck, & Co.*, No. 08-cv-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n.10.

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). It falls to the court to balance these interests and decide whether the disputed expert testimony "has greater potential to mislead than to enlighten." *Id.*

## III.   DISCUSSION

The defendants move to exclude the testimony of Dr. Fetters, Ms. Kisch, Dr. Rugh, Mr. Tyler, and Ms. Augustine. This Court addresses the admissibility of each witness's testimony in turn.

### A.  Dr. Fetters

Dr. Michael D. Fetters, M.D., M.P.H., M.A., is the Director of the Mixed Methods Program at the University of Michigan, where he is also a professor of family medicine. Fetters Report at 1. He has served as the Co-Editor in Chief of the *Journal of Mixed Methods Research* since 2015. *Id.* His academic work focuses on social science research methodology, and he has "published over 200 peer reviewed papers and over 50 book chapters, articles, and commentaries," as well as two books, with "two additional books [] under contract." *Id.* at 1-2. The plaintiffs retained Dr. Fetters to apply his expertise in social science research methodology design, sampling,

implementation, and interpretation, as well as mixed methods research methodology, to the context of this case. *Id.* at 2-3.

Dr. Fetters offered three principal opinions: (1) "NFHA conducted a well-designed investigation that would qualify as a rigorous and compelling mixed methods study"; (2) the defendants' experts' critiques of the study mistakenly assumed that the results were intended to be extrapolated to the defendants' entire nationwide stock of REOs; and (3) the "defendants' experts" critiques of the investigation's "methodological design flaws" were "unwarranted." *Id.* at 4-5.

The defendants move to exclude Dr. Fetters's testimony in full because they believe his expertise in mixed methods research methodology—"an approach to investigation featuring the 'integration of qualitative and quantitative approaches,'" *id.* at 5—is irrelevant to this lawsuit which, in their view, relies only upon quantitative, and not qualitative, data, Mem. in Support of BANA Mot. to Strike at 5-6, ECF 208-1 ("BANA Mem."). The plaintiffs, however, offered Dr. Fetters first and foremost as an expert on "[s]ocial science research methodology." Fetters Report at 3. That is precisely the expertise Dr. Fetters's report contributes. And based on his position at the University of Michigan, his extensive scholarship across sociological disciplines, and his position leading an influential social sciences journal, he is well-positioned to provide it. Dr. Fetters's ultimate specialization within the sub-discipline of mixed methods research does not preclude him from opining on general social science methods in which he also has expertise and which are prerequisites to his area of specialization.

Even if Rule 702 confined Dr. Fetters to opining on mixed methods research methodology, the second field of expertise in which he was offered, this Court would still admit his testimony in this case. The mixed methods approach "is 'one generally employed in the social sciences.'" *Coal.*

*for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 295 F. Supp. 3d 540, 553 (D. Md. 2017) (citing *United States v. Hammoud*, 381 F.3d 316, 337 (4th Cir. 2004) (en banc)). As Dr. Fetters has explained in both his report and in his scholarship, "mixed methods research may choose to emphasize one component of the research more strongly than the other." Fetters Report at 8. Some studies are "qualitatively driven"; others are "quantitatively driven." *Id.* (citing Michael D. Fetters, *The Mixed Methods Research Workbook: Activities for Designing, Implementing, and Publishing Projects* 212 (2020)). Alternatively, a "large-scale project[] may focus initially on one component," and later on another, so that ultimately results "may be disseminated" as "empirical mixed methods reports, empirical quantitative only reports, [or] empirical qualitative reports." *Id.*; *cf. Coal. for Equity & Excellence*, 295 F. Supp. 3d at 553-54. Likewise, a mixed methods approach may involve initial data collection via qualitative methods, for example, interviews, followed by a subsequent quantitative assessment of the broader research questions identified in the initial phase. National Institutes of Health, *Best Practices for Mixed Methods Research in the Health Sciences* 5 (2011), https://obssr.od.nih.gov/sites/obssr/files/Best_Practices_for_Mixed_Methods_Research.pdf.[3]

The defendants here do not seem to dispute that the plaintiffs initially deployed a mixed methods investigation that collected both qualitative and quantitative data, but instead argue that because the qualitative data does not ultimately form "the basis for Plaintiffs' claims," the quantitative portion of the investigation can no longer be classified under the mixed methods

---

[3] The National Institutes of Health selected Dr. Fetters as a member of its "Working Group of 18 individuals" convened to identify best practices "on how to rigorously develop and evaluate mixed methods research applications." *Id.* at 1, 36.

rubric. *See* BANA Mem. at 6. That ex-post reclassification is illogical. For one, Dr. Fetters is opining on the study design as a whole—not interpreting the quantitative results in isolation. For another, the quantitative elements of a mixed methods study remain derivative of a mixed methods study even when presented independently. Finally, the plaintiffs' ultimate emphasis on quantitative data is perfectly consistent with the "iterative" process that defines mixed methods research. *See Coal. for Equity & Excellence*, 295 F. Supp. 3d at 553-54; Fetters Report at 8. Dr. Fetters is thus qualified to provide his opinions in this case both as a product of his general social sciences expertise and his specific concentration in mixed methods research.

As an alternative to excluding Dr. Fetters's testimony in full, the defendants ask the court to exclude certain specific instances of commentary that, even granting his suitability to testify on social science research methodology generally and mixed methods study design specifically, they believe still exceed the scope of his expertise. *See* BANA Mem. at 6-7. Here, however, the defendants quarrel with the conclusions Dr. Fetters reached applying his expertise to the facts at hand. This goes "to [the] weight" of Dr. Fetters' testimony, not its "admissibility," which the defendants may attack through "[v]igorous cross-examination" at trial—not exclusion altogether. *Coal. for Equity & Excellence*, 295 F. Supp. 3d at 555.

For all these reasons, the defendants' motions to exclude the expert testimony of Dr. Fetters will be denied.

### B.  Ms. Kisch

Pamela A. Kisch is "the Executive Director of the Fair Housing Center of Southeast & Mid Michigan ('FHC'), which [she] helped to found." Kisch Report at 1. She has held the position of Executive Director "for nearly 30 years." *Id.* During her tenure she has "assisted in successfully

resolving 95 fair housing lawsuits," most of which "relied on testing evidence." *Id.* In that role, she vetted whether particular "testing evidence[] was sufficient to proceed to litigation," and she has had her methodologies approved by both the U.S. Department of Housing and Urban Development ("HUD") and the U.S. Department of Justice ("DOJ"). *Id.* HUD also contracts with her organization to conduct fair housing tests. *Id.* Ms. Kisch was retained as an expert on the "use of testers and the role of fair housing organizations in uncovering illegal discrimination" and the "design and execution of fair housing tests." *Id.* at 2.

Ms. Kisch offered four central opinions in this case: (1) "Testing for enforcement purposes comports with the meaning and intent of the FHA;" (2) "Plaintiffs' investigation is consistent with traditional enforcement testing and furthers the goals of the FHA;" (3) "social science methodological principles are not required to prove discrimination under the FHA;" and (4) "[r]equiring FHA testing to comport with social science methodological principles, in the manner suggested by Defendants' experts, would frustrate the purpose of the FHA and harm fair housing efforts." *Id.* at 3-4.

As for Ms. Kisch's first opinion, the defendants characterize her testimony that enforcement testing fulfills the purposes of the FHA as an improper legal conclusion. "Expert testimony that merely states a legal conclusion is" inadmissible because it is unlikely to aid the jury in resolving factual disputes. *United States v. Barile*, 286 F.3d 749, 760 & n.7 (4th Cir. 2002). The Fourth Circuit has made clear "that it does not help the jury for an expert to give testimony that "states a legal standard or draws a legal conclusion by applying law to the facts." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011). Some problematic testimony,

however, "can be more carefully phrased to elicit similar information yet avoid a response that constitutes a mere legal conclusion." *Barile*, 286 F.3d at 760.

Ms. Kisch's opinion on the goals of the FHA contains improper legal conclusions, but only in part. The bulk of Ms. Kisch's opinion on the role of testing under the FHA provides historical background on the evolution of FHA claims, explains the variety of ways in which testing is conducted in FHA lawsuits, and contextualizes the role of fair housing organizations in adducing evidence of housing discrimination. *See* Kisch Report at 2-11. This is proper, relevant expert testimony and Ms. Kisch is well-qualified to provide it. The opinion does, however, stray to the province of legal conclusions in some discrete instances. Specifically, Ms. Kisch opines on "the meaning," "intent," and "goals of the FHA," and states further that "HUD, the Department of Justice, and the courts do not require research-based testing to demonstrate violations of the FHA." *Id.* at 2. These are legal conclusions that Ms. Kisch may not offer.

Moving to her second opinion, the defendants contend that Ms. Kisch is unqualified to testify about the relationship between the plaintiffs' investigation and traditional FHA testing because, in their view, this case depends upon sophisticated statistical analysis too atypical of traditional FHA testing to fall within the scope of Ms. Kisch's expertise. In advancing this argument, the defendants overread Ms. Kisch's testimony as opining on the validity of the plaintiffs' *results*, rather than accepting that she merely discusses a subset of their *methods*, which she then compares—and contrasts—with traditional approaches to FHA testing. In particular, Ms. Kisch compares the plaintiffs' methods of conducting training, documenting survey results, and utilizing checklists to similar methods deployed in other fair housing testing. *Id.* at 11-13. These limited and specific opinions require no special expertise in statistics and are squarely within Ms.

Kisch's domain. Ms. Kisch also candidly explains that, because of the plaintiffs' objectives, their "investigation varies from most" FHA tests. *Id.* at 12. That candor is a feature of her testimony—not a bug—and the opinions she offers are limited to the components of the investigation that do mirror the traditional fair housing tests in which she has extensive expertise. The motions to strike this portion of Ms. Kisch's testimony will be denied.

The defendants attack Ms. Kisch's third opinion—that "social science methodological principles are not required to prove discrimination under the FHA"—as another improper legal conclusion. Kisch Report at 3-4. To reiterate, expert "testimony that [] states a legal conclusion is" inadmissible, but often "can be more carefully phrased to . . . avoid a response that constitutes a mere legal conclusion." *Barile*, 286 F.3d at 760. That is the case here. To the extent Ms. Kisch purports to opine, prospectively, on what is "required" to prevail in an FHA claim, her testimony is inadmissible. Kisch Report at 3, 13-19. Most of her testimony, however, discusses testing that, in her experience, has been successful in the past, and compares it to the plaintiffs' investigation. *Id.* at 13-19. Ms. Kisch will be permitted to offer such testimony about the testing conducted in other cases, but must stop short of characterizing it as sufficient to satisfy the FHA or prove discrimination, lest she "invade[] the province of the jury" by telling it "how the verdict should read." *Offill*, 666 F.3d at 175 (quoting Weinstein's Federal Evidence § 704.04[2][a] (2d ed. 2003)).

Finally, the defendants object to Ms. Kisch's testimony that subjecting FHA testing to scientific standards "would frustrate the purpose of the FHA" as again offering an improper legal conclusion. Kisch Report at 4. Here too, Ms. Kisch's top-line conclusion is phrased as an improper legal conclusion, but most of her testimony remains admissible. Ms. Kisch's opinion on this point is, in fact, devoted to explaining how "[f]air housing enforcement efforts would be thwarted if

their testing were required to comport with the rigor of scientific methods." *Id.* at 19; *see id.* at 19-21. This conclusion, and the testimony about the practical constraints of FHA testing that supports it, is admissible. *See id.* at 19-21. Ms. Kisch need only refrain from tying it to the purpose of the FHA or other legal opinions.

In sum, the motions to strike Ms. Kisch's legal conclusions will be granted, but the motions will be denied in all other respects.

### C. Dr. Rugh

Dr. Jacob S. Rugh, Ph.D., is "an Associate Professor of Sociology at Brigham Young University," where he has taught "for nearly ten years." Rugh Report at 1. He teaches both undergraduate and graduate students "in urban sociology, race and ethnicity, and related subjects." *Id.* Dr. Rugh holds a "Ph.D. from Princeton University in interdisciplinary Urban Policy in Public Affairs with an emphasis in the sociology, economics, and public policy dimensions of the 2008 housing foreclosure crisis." *Id.* He is experienced "in using geospatial methods, georeferenced data, and geographic information software and systems of maps, and [has] published work on these subjects." *Id.* More broadly, his academic research has been cited over 2,000 times, including by state and federal courts. *Id.* Some of that work earned him "the John Hope Franklin prize for Best Article on Race, Racism, and the Law from the Law and Society Association in 2016." *Id.* The plaintiffs retained Dr. Rugh to analyze racial disparities in housing and provide statistical and econometric analysis. *Id.* at 1-2.

Dr. Rugh provides the key opinion on the results of the plaintiffs' investigation that forms the basis for their disparate impact and disparate treatment claims. Dr. Rugh's report explains that among "the properties investigated by NFHA, there was an average of 3.06 more deficiencies

among properties in non-white tracts than in white tracts." *Id.* at 2. He also found that in "nonwhite

tracts, REO properties [were] 3.3 times as likely to exhibit a high number" of "deficiencies than

properties in white tracts," and that "properties in white tracts were 2.9 times as likely to exhibit a

low number" of "deficiencies as in non-white tracts." *Id.* He concluded that this racial discrepancy

was "highly statistically significant, practically significant, and" could be explained only by race.

Indeed, in controlling for as many as "40 other variables," he found "no variable or set of variables

that eliminates or comes close to accounting for the racial disparity." *Id.*; *see id.* at 3-4.

Dr. Rugh used the plaintiffs' deficiency data, collected through their in-person evaluations,

to conduct his analysis. He measured statistical significance using a p-value of 0.001 (in other

words, the odds the disparity is due to chance is less than one in one thousand) and assessed

practical significance using Cohen's *d*, which he calculated as .86 (that is, the disparity amounted

to almost a full standard deviation—a large effect). *Id.* at 6-7. Dr. Rugh then employed a regression

analysis to measure the strength of race as "an explanatory factor" in the outcome of the plaintiffs'

investigation. *Id.* at 7.[4] After conducting his analysis, Dr. Rugh concluded that "no other variable

or set of variables"—besides race—"can account for most of the racial difference in deficiencies

between white and non-white tracts." Rugh Report at 10; *see id.* at 7-17. Race, he found, explained

78% of the disparity in deficiencies—a statistically and practically significant difference. *See id.*

at 10. Dr. Rugh later complemented his initial report with a revised report and a supplemental

---

[4] A regression analysis is "a statistical tool used to understand the relationship between two or
more variables" that "is often employed in the analysis of data about competing explanations for
the relationships among a number of explanatory variables." *In re Titanium Dioxide Antitrust
Litig.*, No. 10-cv-0318, 2013 WL 1855980, at *14 n. 14 (D. Md. May 1, 2013) (citing Daniel L.
Rubinfeld, *Reference Guide on Multiple Regression, in Reference Manual on Scientific
Evidence* 305 (Fed. Judicial Ctr., 3d ed. 2011)).

report in which his ultimate conclusions that race is a statistically and practically significant factor in the disparity between deficiencies in white and non-white tracts remained the same. *See* Rugh Revised Report, ECF 208-3; Rugh Supplemental Report, ECF 208-4.

The defendants object to Dr. Rugh's opinion on several fronts, mostly emphasizing arguments also contained in their pending motions for summary judgment. Specifically, the defendants say (1) the data Dr. Rugh relied upon is too flawed to rule in race as the cause of any observed racial disparity; (2) the variables Dr. Rugh controlled for are too incomplete to rule out non-racial factors as causing any observed racial disparity; and (3) even assuming the validity of Dr. Rugh's analysis, he failed to connect any observed racial disparity to the defendants' specific policies. BANA Mem. at 19-34. Safeguard adds that even if Dr. Rugh's opinion is admissible against Bank of America, it is inadmissible against Safeguard because it fails to isolate the properties Bank of America hired Safeguard to service from the ones it did not. Mem. in Support of Safeguard Mot. to Strike at 17-20, ECF 203 ("Safeguard Mem.").

As the defendants' motions for summary judgment make clear, the objections they raise to Dr. Rugh's testimony here are more appropriately reserved for summary judgment or, potentially, trial. The thrust of the defendants' criticism is that the plaintiffs' dataset was too flawed, and the breadth of variables Dr. Rugh considered too narrow, to adequately support his opinion. But under "*Daubert*, a court evaluates the methodology or reasoning that the proffered scientific or technical expert uses"—it "does not evaluate the conclusion itself." *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003) (citing *Freeman v. Case Corp.,* 118 F.3d 1011, 1016 n.6 (4th Cir. 1997)). And the defendants do not dispute the technical validity of regression analysis generally or Dr. Rugh's application of the technique specifically. Instead, they simply argue that his

"calculations," however accurate, "do not support his conclusion." *See id.* That "is a challenge to the proper weight to be given to" Dr. Rugh's testimony, "not to its admissibility." *Id.*[5]

The defendants' argument that Dr. Rugh failed to connect the observed racial disparity to the defendants' policies is also more appropriate for summary judgment. After all, Dr. Rugh did not purport to opine on the defendants' specific policies, and the plaintiffs "do not rely on Dr. Rugh to causally connect the deficiencies they observed with Defendants' maintenance and marketing practices." Opp. to BANA Mot. at 33, ECF 218. An expert opinion, of course, "need not prove the [proponents'] entire case" to be admissible. *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *14. Dr. Rugh's restraint from opining on particular policies is therefore no basis for excluding his testimony.

Finally, Safeguard's assertion that Dr. Rugh's testimony cannot be admitted against it also fails under *Daubert* because it does not address the validity of Dr. Rugh's methodology. That is particularly true in this phase of the litigation, which is specifically "directed at the methodology and validity of the theories on which the plaintiffs' experts' conclusions are based." Mem. & Order, ECF 115; *see* Phase II Case Management Order, ECF 117. Safeguard's argument is also predicated

---

[5] The defendants make forceful objections to the plaintiffs' investigation methodology, but this is certainly not a case in which an expert relied "entirely on unverified data, upon which no reasonable expert would rely" such that exclusion is warranted. *See Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137 (M.D. Pa. 2015) (capitalization altered). Similarly, "'while the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said' that the analysis must be deemed inadmissible." *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *15 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., joined by all other members of the court, concurring)) (brackets omitted). Instead, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore*, 478 U.S. at 400.

on its contention that it is responsible only for 794 of the properties in the plaintiffs' database, which remains a disputed fact—the plaintiffs still "hold Safeguard responsible" for 1,333 properties. Opp. to Safeguard Mot. at 22, ECF 220; *see* Safeguard Mem. at 19.

For each of these reasons, the defendants' motions to strike the testimony of Dr. Rugh will be denied.

### D.  Mr. Tyler

Deavay Tyler has a decade of experience in the property preservation and maintenance industry, serving as the Executive Vice President and Chief Financial Officer for A&D Property Services, Inc., for over nine years. Tyler Report at 1. A&D Property Services "is a property preservation and maintenance company servicing over 8,000 properties in the Greater Chicagoland Area" that "worked as a prime contractor for government-sponsored enterprises (GSEs), banks, and municipalities that were responsible for preserving and maintaining properties after borrowers had defaulted on their loans and after foreclosure, when they became real estate owned (REO) properties or properties awaiting conveyance back to the U.S. Department of Housing and Urban Development (HUD)." *Id.* A&D Property Services worked with Bank of America for around four months in 2011, but ultimately stopped doing business with them. Mr. Tyler was retained "to offer expert opinions on the preservation and maintenance of REOs and post-foreclosure HUD properties, including industry standards, policies, and procedures." *Id.* at 2. He produced two reports, an initial report and a supplemental report.

Mr. Tyler offered six central opinions in his initial expert report. To summarize, he opined that: (1) the plaintiffs' REO evaluation criteria corresponded to industry standards; (2) the plaintiffs properly documented marketing and maintenance deficiencies; (3) the defendants should

have resolved many of the deficiencies the plaintiffs recorded; (4) the defendants' quality control was inadequate, especially in neighborhoods the defendants believed would generate fewer complaints; (5) total maintenance expenditures on a property do not necessarily correlate with the quality of maintenance to that property; and (6) the plaintiffs' point-in-time investigation methodology cannot explain the observed racial disparity in property deficiencies. *Id.* at 2-4. The defendants object to Tyler offering the final three opinions in his initial report. Safeguard Mem. at 7-13.

Mr. Tyler offered six more categories of opinions in his supplemental expert report. Tyler Suppl. Report at 1-2, ECF 183-3 Ex. B. Specifically, he testified that: (1) many of the plaintiffs' REO evaluation criteria were independent of a property's condition at the time the defendants assumed responsibility of the property; (2) the plaintiffs' REO evaluation criteria are independent of the "features of the neighborhood"; (3) vandalism and weather do not explain most of the deficiencies the plaintiffs observed; (4) the "national model of property preservation and maintenance followed by Bank of America" is inferior to the "local model"; (5) Mr. Bryar "lack[s] experience in the property preservation and maintenance industry"; and (6) banks and servicers may have more maintenance and marketing responsibilities than typical property preservation and maintenance vendors. *Id.* at 1-2. The defendants move to strike all but the second and fifth of these opinions. Safeguard Mem. at 13-17. The court now addresses in turn each of the seven opinions the defendants seek to exclude.

First, the defendants move to strike Mr. Tyler's opinion that their quality control was insufficient, particularly in areas where they seem to believe neighbors may be less likely to

complain. *Id.* at 7. Specifically, they seek to strike the opinion Mr. Tyler offers in paragraph 42(b) and the second sentence of paragraph 9(d). *Id.* at 7-8.

In paragraph 42(b), Mr. Tyler opines that vendor self-assessments are an unreliable quality control mechanism and that he reviewed photographs of the defendants' properties that evinced problems a "robust quality control process should have caught." Tyler Report at 18. Mr. Tyler's opinion that self-assessments are an inadequate quality control method is properly based on his industry experience, as is his opinion that a more effective quality control process would have caught the deficiencies he observed. The defendants are free to challenge these conclusions, but their disagreement with them is no basis for exclusion. The motions to strike paragraph 42(b) will be denied.

The second sentence of paragraph 9(d) states that the defendants' quality control issues are "particularly evident in areas where they apparently believe neighbors are less likely to complain." *Id.* at 3. In his deposition, Mr. Tyler explained that this opinion was informed by his experience working with vendors who have prior "property and preservation maintenance experience" generally, not on any materials related to the defendants specifically. Tyler Dep. at 123:10-17, ECF 220-1. Without any defendant-specific evidence to form the basis for this opinion, the court cannot conclude it "is based on sufficient facts or data." Fed. R. Evid. 702(b). The motions to strike the second sentence of paragraph 9(d) will be granted.

Second, the defendants move to strike Mr. Tyler's opinion in paragraph 9(e) that maintenance expenditures do not correspond to maintenance quality, along with related opinions in Section E about the defendants' quality assurance measures. Safeguard Mem. at 9-13. Mr. Tyler's opinion as to maintenance expenditures, like his opinion on the influence of neighborhood

characteristics on quality control, is based only on his industry experience and not on defendant-specific information. *See* Opp. to Safeguard Mot. at 13. That is too generalized a basis for ascribing malfeasance to the specific defendants here. *See* Fed. R. Evid. 702(b); *cf.* Fed. R. Evid. 404. Similarly, in Section E Mr. Tyler testifies that comparatively low financial compensation incentivizes vendors "to cut corners." Tyler Rep. 16-17. Mr. Tyler, however, was "not aware of what Bank of America paid its" servicers, or "what Safeguard pays its subcontractors." *Id.* at 16. Without knowledge of the defendants' actual financial incentives, Mr. Tyler cannot opine on how those financial arrangements may have influenced their behavior. *See* Fed. R. Evid. 702(b). Finally, Mr. Tyler's opinions in paragraph 43 that the defendants' employees engaged in "creative photography" to omit maintenance issues from their reports, and his "three theories . . . as to why," are equally speculative. The court will therefore grant the motions to strike paragraphs 9(e), 38-40, and 43.

Third, the defendants move to strike Mr. Tyler's opinion on the propriety of the defendants' point-in-time investigations as lacking a sufficient basis. Safeguard Mem. at 10. Here again, Mr. Tyler's opinion is based only upon "his years of industry experience." Opp. to Safeguard Mot. at 14. That general industry knowledge, however, does not equip him with specialized experience for opining on which variables actually influenced disparities between the specific housing tracts at issue in this case. Fed. R. Evid. 702(a)-(b). The motions to strike the testimony in paragraph 9(f) and Section G will be granted.

Fourth, and now turning to Mr. Tyler's supplemental report, the defendants move to strike the opinion that "many" of the plaintiffs' REO evaluation criteria are unrelated to property condition at the point of acquisition or should have been addressed within 30 days. Safeguard

Mem. at 13-14. Mr. Tyler's use of the word "many" to characterize his findings—the defendants' principal objection to that portion of his opinion—is a conclusion the defendants are free to challenge on cross-examination, not a ground for exclusion. And his opinion on industry standards for addressing certain criteria is amply supported by his experience and expertise. The defendants' motions to strike this portion of Mr. Tyler's testimony will be denied.

Fifth, the defendants object to Mr. Tyler's opinion that vandalism and weather do not adequately explain the observed racial disparities in deficiencies. This portion of Mr. Tyler's opinion is based on "common sense." Tyler Suppl. Report at 5. But "expert testimony does not help where the jury has no need for an opinion because the jury can easily reach reliable conclusions based on common sense, common experience, the jury's own perceptions, or simple logic." 29 Victor J. Gold, *Federal Practice and Procedure (Wright & Miller)* § 6265.2 & n.14 (2d ed. Apr. 2022); *accord United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995). The plaintiffs fail to explain why expert testimony is needed to supply these commonsense arguments to the jury, so the defendants' motions to strike paragraphs 3 and 10 of Mr. Tyler's report will be granted.

Sixth, the defendants seek exclusion of Mr. Tyler's opinion that the national model of property preservation and maintenance is inferior to the local model. Safeguard Mem. at 14-17. As a threshold matter, this opinion in Mr. Tyler's supplemental report responds to opinions the defendants introduced through Mr. Bryar and is thus proper material for a supplemental report. *See* Tyler Suppl. Rep. at Ex. 1. The testimony is also relevant because it relates to a policy the plaintiffs raise as a possible cause of the alleged racial disparities at issue in this case. As for the merits, Mr. Tyler's testimony is properly based upon his experience and expertise in the property preservation and maintenance industry and his application of that knowledge to evidence he was

provided. The defendants' objections are to Mr. Tyler's conclusions alone and thus provide no basis for excluding his opinion. The motions to strike paragraphs 11-19 of Mr. Tyler's report will be denied.

Finally, the defendants move to exclude Mr. Tyler's testimony that his prior opinion on industry standards is limited to standards in the property preservation and maintenance industry and does not extend to the distinct standards of the property servicing industry. Safeguard Mem. at 17. Mr. Tyler is perfectly well-qualified to explain the differences between the two industries and to articulate the specific application of opinions that he himself has furnished. The motions to exclude Section D of Mr. Tyler's supplemental report will be denied.

All told, this Court will grant the defendants' motions to strike the second sentence of paragraph 9(d); paragraphs 9(e), 9(f), 38-40, and 43; and Section G of Mr. Tyler's initial report, and paragraphs 3 and 10 of his supplemental report. The motions to strike Mr. Tyler's opinions in all other respects will be denied.

### E.  Ms. Augustine

Lindsay K. Augustine is NFHA's Senior Associate Director of Enforcement. Augustine Decl. ¶ 1. She was central to designing and implementing the plaintiffs' investigation in this case. *See generally* Augustine Decl. The plaintiffs did not offer Ms. Augustine as an expert witness, but instead introduced her as a lay witness who, through her declaration, testified about the development and execution of the plaintiffs' investigation. *See id.*

Nevertheless, the defendants move to strike a portion of Ms. Augustine's declaration as improper expert testimony. Safeguard Mem. at 20-23. They argue that, notwithstanding her presentation as a lay witness, she purports to introduce evidence only admissible through an expert.

As such, the defendants say, the plaintiffs' introduction of her testimony after the expert witness deadline is untimely, her failure to provide an expert report is improper, and for both these reasons, the defendants are prejudiced. Moreover, the defendants contend, her testimony is flawed and unreliable.

The defendants specifically object to paragraph 30 and Exhibit G of Ms. Augustine's declaration. *Id.* at 20. In paragraph 30, Ms. Augustine explains that she used Microsoft Excel to isolate the 778 REOs for which Safeguard admits responsibility and analyzed the racial disparities in observed deficiencies among those properties. Augustine Decl. ¶¶ 28, 30. She then narrowed the results to show the disparity when controlling for "the individual deficiencies that Safeguard's expert, Marcel Bryar, agrees are within industry standards." *Id.* ¶ 30. She provided these results in Exhibit G. *Id.* The defendants characterize this as expert—rather than lay—witness testimony because Ms. Augustine "conducted a separate analysis based on data collected during this litigation and relied upon Safeguard's expert, Marcel Bryar, in assessing certain criteria to use in her analysis." Safeguard Mem. at 21.

Lay witness testimony is governed by Federal Rule of Evidence 701. Rule 701 permits lay witness testimony if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Although the distinction between lay and expert testimony "can be a fine one, the key to Rule 701 lay opinion testimony is that it must arise from the personal knowledge or firsthand perception of the witness." *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 575 (4th Cir. 2017), *as amended* (Mar. 7, 2017) (internal quotation marks and citation omitted).

Ms. Augustine's declaration fits comfortably within Rule 701's parameters. First, Ms. Augustine's testimony is based upon her own data analysis of figures with which she had "first-hand experience on the job." *Id.* Second, distilling the plaintiffs' data into summary form, as Exhibit G does, is the only logical means of communicating the factual results of the plaintiffs' investigation to a jury. Third, simple data manipulation in Microsoft Excel, like that required to produce Exhibit G, does not require the kind of expert training Rules 701 and 702 contemplate. Finally, Ms. Augustine may have sliced the data in response to anticipated objections she expected the defendants would rely on expert testimony to raise, but her analysis continued to rest solely upon primary source data gathered in the course of her employment and thus well-within the realm of lay witness testimony. The defendants are free to test Ms. Augustine's lay conclusions throughout this litigation, but their motions to strike her declaration will be denied.

## IV.    CONCLUSION

For the reasons explained above, this Court will deny the motions to strike the testimony of Dr. Fetters, Dr. Rugh, and Ms. Augustine. It will grant the motions to strike the legal conclusions contained in Ms. Kisch's opinion, specifically her testimony on the meaning, intent, goals, and requirements of the FHA, but will deny the motions to strike her opinion in all other respects. Finally, this Court will grant the defendants' motions to strike the second sentence of paragraph 9(d); paragraphs 9(e), 9(f), 38-40, and 43; and Section G of Mr. Tyler's initial report, and their motions to strike paragraphs 3 and 10 of his supplemental report, but deny their motions to strike Mr. Tyler's opinion in all other respects. A separate order follows.

 __2/8/2023__                                                     _____/s/_____
Date                                                             Stephanie A. Gallagher
                                                                 United States District Judge