## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL FAIR HOUSING
ALLIANCE, *et al.*,

      *Plaintiffs*,

  v.

BANK OF AMERICA, N.A., *et al.*,

      *Defendants*.

Case No.: 1:18–CV–1919

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT ON AVAILABLE REMEDIES

# TABLE OF CONTENTS

Page

BACKGROUND ........................................................................................................... 4

A.  Plaintiffs' Lawsuits ............................................................................................ 4

B.  Procedural History ............................................................................................. 6

C.  The Summary Judgment Record ....................................................................... 8

    1.  Alleged community harms ........................................................................... 8

    2.  Alleged organizational harms ................................................................... 11

STANDARD OF LAW ............................................................................................... 15

ARGUMENT ............................................................................................................... 15

I.  $56 Million in Gratuitous, Add-On Damages Can Be Eliminated Right Away. .................. 17

II.  There Is No Evidence Plaintiffs Were  Forced to Divert $3 Million in Resources. .............. 19

    A.  There is no "diversion of resources" from Plaintiffs' own voluntary decision to make Bank of America a target of its routine litigation activities. ................................. 20

        1.  Plaintiffs were not "forced" to invest in this lawsuit. ................................ 20

        2.  Litigation expenses are not diverted resources ........................................ 26

        3.  Resources spent on Plaintiffs' regular activities are not diverted resources. .......... 28

    B.  Even if not barred outright, the inflated $3 million diversion claim should be reduced. ............... 28

        1.  Government grants earmarked for one purpose can't have been "diverted" from other purposes. ............... 29

        2.  Plaintiffs are not entitled to be paid at fictitious, inflated rates. .............................. 31

        3.  Plaintiffs are not entitled to have Defendants pay them for time they spent on other projects and other parties. ............... 33

III.  Plaintiffs' Alleged Mission Frustrations Are Speculative, Unsupported by Any Record Evidence, and Beyond the Realm of Proximate Causation. ............... 39

    A.  The alleged harms fail the Supreme Court's proximate causation test. .......................... 40

    B.  The "prospective" activities Plaintiffs ask to be paid for are purely speculative. ............ 44

IV.  Injunctive Relief Is Unavailable Here ................................................................. 46

V.  The Damages Record and Current State of the Law Warrant Revisiting the Court's 2019 Personal Jurisdiction Analysis. ............... 49

CONCLUSION .......................................................................................................... 51

APPENDIX A ........................................................................................................ A-1

APPENDIX B ........................................................................................................ B-1

APPENDIX C ......................................................................................................................C-1

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*,
  870 F. Supp. 2d 415 (D. Md. 2012) ............................................ 49

*Am. Diabetes Ass'n v. U.S. Dep't of the Army*,
  938 F.3d 1147 (9th Cir. 2019) .................................................. 20

*Argonaut Ins. Co. v. Wolverine Constr., Inc.*,
  976 F. Supp. 2d 646 (D. Md. 2013) ............................................ 35

*Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd.*,
  160 F.3d 433 (8th Cir. 1998) .................................................. 38

*ASPCA v. Feld Ent., Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) .................................................. 20

*Bank of Am. Corp. v. City of Miami*,
  581 U.S. 189 (2017) ................................................ 6, 40, 41, 43

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
  582 U.S. 255 (2017) .......................................................... 49, 50

*Burger King Corp. v. Mason*,
  710 F.2d 1480 (11th Cir. 1983) ............................................... 37

*CASA de Md., Inc. v. Trump*,
  971 F.3d 220 (4th Cir. 2020) .......................................... 16, 22, 46

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................... 15, 24, 41

*Chavez v. Ill. State Police*,
  1999 U.S. Dist. LEXIS 9145 (N.D. Ill. June 11, 1999) ......................... 48

*City of Chi. v. Matchmaker Real Est. Sales Ctr., Inc.*,
  982 F.2d 1086 (7th Cir. 1992) ................................................ 18

*City of Oakland v. Wells Fargo & Co.*,
  14 F.4th 1030 (9th Cir. 2021) .............................................. 30, 41

*City of S. Miami v. Governor*,
  65 F.4th 631 (11th Cir. 2023) ........................................ 21, 25, 44

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ........................................................... 22, 43, 44

*Cnty. of Cook v. Bank of Am. Corp.*,
    78 F.4th 970 (7th Cir. 2023) ................................................... 43

*Cnty. of Cook v. HSBC N. Am. Holdings, Inc.*
    314 F. Supp. 3d 950 (N.D. Ill. 2018) ........................................ 41

*Comm. for Idaho's High Desert, Inc. v. Yost*,
    92 F.3d 814 (9th Cir. 1996) ................................................... 36

*County of Cook v. Wells Fargo & Co.*,
    314 F. Supp. 3d 975 (N.D. Ill. 2018) ........................................ 43

*Disability L. Ctr. v. SG Blvd. Multifamily LLC*,
    2023 WL 7343567 (D. Utah Nov. 7, 2023) ................................ 28

*eBay Inc. v. MercExcahnge, L.L.C.*,
    547 U.S. 388 (2006) .......................................................... 47, 48

*Ellen C. v. Kijakazi*,
    2023 WL 4490457 (D. Md. July 12, 2023) (Gallagher, J.)................. 35

*Equal Rights Ctr. v. Post Props., Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011)............................................. 20, 26

*Equal Rts. Ctr. v. Equity Residential*,
    798 F. Supp. 2d 707 (D. Md. 2011) .......................................... 15

*Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*,
    28 F.3d 1268 (D.C. Cir. 1994)............................................. 21, 27

*Fair Hous. Council of Or. v. Travelers Home & Marine Ins. Co.*,
    2016 WL 7423414 (D. Or. Dec. 2, 2016) .................................... 27

*Fair Hous. Council of Suburban Phila. v. Main Line Times*,
    141 F.3d 439 (3d Cir. 1998) ............................................... 15, 25

*Fair Housing of Marin v. Combs*,
    2000 WL 365029 (N.D. Cal. Mar. 29, 2000) .......................... 31, 32, 34

*Ferris v. Haymore*,
    967 F.2d 946 (4th Cir. 1992) ................................................. 39

*Freedom's Path at Dayton v. Dayton Metro. Hous. Auth.*,
    2022 WL 1697937 (S.D. Ohio May 26, 2022)................................ 30

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................................ *passim*

*Helicopteros Nacionales de Colom., S.A. v. Hall*,
    466 U.S. 408 (1984) ...................................................................................................... 49

*Hernandez v. Equifax Info. Servs. LLC*,
    2020 WL 4584249 (W.D.N.C. Aug. 10, 2020) ............................................................ 50

*Hetzel v. Cnty. of Prince William*,
    89 F.3d 169 (4th Cir. 1996) ......................................................................................... 31

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
    152 F. Supp. 3d 503 (E.D. Va. 2015) ........................................................................... 36

*Hunt v. Aldi, Inc.*,
    2020 WL 1248944 (D. Md. Mar. 16, 2020) ................................................................. 50

*In Defense of Animals v. Sanderson Farms, Inc.*,
    2021 WL 4243391 (N.D. Cal. Sept. 17, 2021) .......................................................21, 24

*Jermaine G. v. Kijakazi*,
    2023 WL 5346140 (D. Md. Aug. 21, 2023) ................................................................. 35

*Johnson v. City of Annapolis*,
    2023 WL 3390823 (D. Md. May 11, 2023)................................................................... 42

*Know Your IX v. DeVos*,
    2020 WL 6150935 (D. Md. Oct. 20, 2020) .................................................................. 22

*Knowledge Ecology Int'l v. NIH*,
    2019 WL 1585285 (D. Md. Apr. 11, 2019) .................................................................. 28

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
    624 F.3d 1083 (9th Cir. 2010) .................................................................................20, 23

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*,
    82 F.4th 345 (5th Cir. 2023) ................................................................................ *passim*

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ............................................................................... *passim*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ...................................................................................................... 40

*Lincoln v. Ford Motor Co.*,
    2020 WL 5820985 (D. Md. Sept. 29, 2020)................................................................. 50

*Lloyd v. Presby's Inspired Life*,
    251 F. Supp. 3d 891 (E.D. Pa. 2017) ................................................... 26

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................... 15, 44, 45

*Matarese v. Archstone Cmtys., LLC*,
    468 F. App'x 283 (4th Cir. 2012) ................................................... 31

*Matarese v. Archstone Pentagon City*,
    795 F. Supp. 2d 402 (E.D. Va. 2011) ................................................... 31

*Mey v. DIRECTV, LLC*,
    2021 WL 6882423 (N.D.W. Va. Feb. 25, 2021) ................................................... 50

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ................................................... 46

*Moya v. U.S. Dep't of Homeland Sec.*,
    975 F.3d 120 (2d Cir. 2020) ................................................... 46

*N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*,
    2024 WL 21646 (M.D.N.C. Jan. 2, 2024) ................................................... 46

*N.D. Fair Hous. Council, Inc. v. Allen*,
    319 F. Supp. 2d 972 (D.N.D. 2004) ................................................... 34

*Napoli-Bosse v. Gen. Motors LLC*,
    453 F. Supp. 3d 536 (D. Conn. 2020) ................................................... 50

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ................................................... 20

*Neal v. United States*,
    599 F. Supp. 3d 270 (D. Md. 2022) ................................................... 35

*Nease v. Ford Motor Co.*,
    848 F.3d 219 (4th Cir. 2017) ................................................... 25

*Newman v. Direct Energy, L.P.*,
    2023 WL 2914788 (D. Md. Apr. 12, 2023) (Gallagher, J.) ................................................... 50

*NFHA v. Deutsche Bank Nat'l Tr.*,
    2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) ................................................... *passim*

*Norris v. PNC Bank, N.A.*,
    2023 WL 3688335 (D. Md. May 26, 2023) ................................................... 35

*In re Outsidewall Tire Litig.*,
    52 F. Supp. 3d 777 (E.D. Va. 2014) ..................................................................... 36

*Prison Legal News v. Nw. Reg'l Jail Auth.*,
    2019 WL 4786054 (W.D. Va. Sept. 30, 2019) ...................................................... 45

*Richards v. NewRez LLC*,
    2021 WL 1060286 (D. Md. Mar. 18, 2021) .......................................................... 50

*S.M.B. v. W. Va. Reg'l Jail & Corr. Facility Auth.*,
    2017 WL 3841894 (S.D.W. Va. Sept. 1, 2017) .................................................... 18

*Saunders v. Gen. Servs. Corp.*,
    659 F. Supp. 1042 (E.D. Va. 1987) ...................................................................... 31

*Shelby Advocs. for Valid Elections v. Hargett*,
    947 F.3d 977 (6th Cir. 2020) ............................................................................... 44

*Sill v. AVSX Techs., LLC*,
    2018 WL 564397 (D.S.C. Jan. 26, 2018) ............................................................. 37

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ............................................................................................... 21

*Smith v. Verizon Wash., D.C. Inc.*,
    2013 WL 1316391 (D. Md. Mar. 28, 2013),
    *aff'd*, 539 F. App'x 128 (4th Cir. 2013) .............................................................. 15

*Speight v. Labor Source, LLC*,
    2022 WL 1164415 (E.D.N.C. Apr. 19, 2022) ...................................................... 50

*United States v. SSM Props., LLC*,
    619 F. Supp. 3d 602 (S.D. Miss. 2022) ............................................................... 26

*Velasquez Flores v. Elite Com. Cleaning, LLC*,
    2024 WL 916250 (D. Md. Mar. 1, 2024) ............................................................. 36

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
    257 F.3d 256 (2d Cir. 2001) ................................................................................ 25

*Walker v. City of Lakewood*,
    272 F.3d 1114 (9th Cir. 2001) ............................................................................. 20

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................. 48

**Statutes & Rules**

15 U.S.C. § 15 ............................................................................................................... 18

18 U.S.C. § 1964 ......................................................................................................... 17

42 U.S.C. § 3613 ................................................................................................... 17, 26

FED. R. CIV. P. 56 ................................................................................................. 15, 28

Over a decade ago, National Fair Housing Alliance executives decided to accuse the mortgage industry of discrimination based on the varying conditions of foreclosed REO properties.[1] The investigation they did to try substantiating this accusation has been detailed to the Court before, and is not at issue in this phase of the case. This motion concerns the extraordinary damages Plaintiffs claim and the unprecedented relief they seek. These damages are not cognizable as a matter of law, unsupported by any actual evidence, and if not foreclosed categorically are vastly inflated. Defendants thus respectfully ask this Court to grant this motion in whole or in part, and limit any future proceedings in this case to what—if anything—is legitimately in controversy.

A core principle that must guide the Court's analysis is that Plaintiffs' standing to seek relief in this Court hinges on "the same inquiry" applicable to any private plaintiff—whether they can show concrete harm to themselves, not merely "a setback to [their] abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). At a hearing last year, the Court tried to get answers from Plaintiffs on what injuries they were claiming and how they arrived at those figures. All Plaintiffs offered is that they "intend to have an expert opine" on it and that they had one "in mind." ECF No. 242-1 at 5–7. Nonetheless, they were confident that the expert would ratify their claims to have suffered damages "in the tens of millions" of dollars. *Id*. at 21–22.

We now know that Plaintiffs' professed confidence came about because the "expert" they had in mind is one of the Plaintiffs' own founders and former executive director and general counsel, Stacey Seicshnaydre. *See* Ex. 6 at 1. Her opinion calling Plaintiffs' damages theories "appropriate and reasonable" and "estimat[ing] total damages" of $75,817,728 is the precarious capstone of the discovery record Plaintiffs produced on their alleged harms and their associated

---

[1] This and other abbreviations used in this brief, such as the names of Plaintiffs' organizations, have the same meanings as in Plaintiffs' complaint and the parties' prior briefs.

legal theories over the past year. *Id*. at 3, 36.[2]

Plaintiffs divide those theories into two buckets: "diversion of resources" and "frustration of mission." With the former, Plaintiffs seek to be paid for the time they spent suing Defendants instead of doing other things. With the latter, Plaintiffs seek to be paid to do other things in the future, most lacking any connection to their claims here. When Plaintiffs previewed these two theories at the status conference last year, the Court said it was "a little bit confused" how they "differ[]." ECF No. 242-1 at 6. This Court is not alone in its confusion. The Court in Plaintiffs' similar lawsuit against Deutsche Bank also remarked that the "frustration of mission" category "closely resembles 'diversion of resources'—to the extent it differs, it is because it would be more difficult to measure" and "may be an unnecessary extension of the 'diversion of resources' category." *NFHA v. Deutsche Bank Nat'l Tr.*, 2019 WL 5963633, at *7 (N.D. Ill. Nov. 13, 2019). For this reason, the *Deutsche Bank* Court dismissed multiple claims of injury under the "frustration of mission" theory at the Rule 12(b)(6) stage. *Id*. at *7–8.

This Court can—and should—do at least that much on the summary-judgment record now before it. What Plaintiffs have produced in discovery, including their own expert reports, undermines their claims of harm in multiple fundamental ways that together can dispose of most or all of the amount in controversy here. Especially illustrative is the answer Plaintiffs finally contrived to the question the Court posed about how, exactly, the "diversion of resources" and "frustration of mission" theories differ. It turns out the main difference is orders of magnitude of money. Their diverted resources, they say, are worth $2,974,771. Ex. 6 at 21. Nonetheless, they

---

[2] Defendants will be moving to exclude this opinion and the opinions of Plaintiffs' three other purported damages experts for failure to meet the *Daubert* standard for admissibility on the schedule set by the Court (ECF No. 282 at 2). Of course, if those motions are granted, then the case for granting the instant motion will be even stronger, since, as Plaintiffs previously told the Court, their damages claims rest almost entirely on the purported expert opinions.

seek a staggering $72,842,957 for their allegedly frustrated "mission." *Id*. at 36. In other words, in a lawsuit founded on the "time and resources" Plaintiffs were supposedly "forced" to expend, the sum total of those alleged expenditures doesn't exceed $3 million. Compl. (ECF No. 1), *passim*.

Even that $3 million is vastly inflated, but not to the same extravagant degree as the $73 million. Seicshnaydre says the $73 million is supposed to "make [Plaintiffs] whole and restore the effectiveness of Plaintiffs' services." Ex. 6 at 36. But by her own account, most of it has nothing to do *either* with Plaintiffs' services or with making them "whole." For example, the lion's share of the $73 million—a $50 million line item—is a demand to award Plaintiffs "a multiplier of the REO maintenance [] budget reflecting what Defendants spent" on "the 1,405 at-issue properties." *Id*. at 31. Bank of America spent $32,903,235 maintaining those properties, so Seicshnaydre multiples that sum by an arbitrary 150% and says Plaintiffs are entitled to $49,354,852. *Id*. There is no basis in law, logic, or fact for any of this. There is no sense in which Plaintiffs' alleged losses are tied to what Bank of America spent, as opposed to what *Plaintiffs* spent. This groundless theory also produces the absurd result that "if BANA had spent *nothing* on maintenance, performed *no* upkeep on any REO properties, and left them in a severely *worse* condition than the conditions Plaintiffs allege as misconduct, then [Plaintiff's] approach by definition would result in $0 in damages." Ex. 1 ¶ 56. And the *more* Defendants spent, the more Plaintiffs would claim in damages, even though more spending would presumably mean fewer of the complained-of "deficiencies."

Even the $3 million figure sought as "diversion of resources" lacks a foothold on solid ground. Courts that have accepted this theory of harm have based the recovery on staff time actually spent, at its actual cost. But Plaintiffs ask Defendants to pay for numerous non-compensable activities, including work they did on *other* lawsuits and various routine activities that have nothing to do with this case—and further ask them to do so at fictitious, inflated rates

that mark up their employees' actual cost by as much as 464%. Ex. 1 ¶ 46.

What's more, Plaintiffs' claims that they were "forced" to expend resources that they could have spent on other things turns out to be untrue. They were not "forced" to do anything. At every step, the path taken by Plaintiffs to this courthouse was a product of their voluntary, discretionary decisions. And once they made those decisions, they financed them in large part with government grants earmarked for that purpose. This was not money they could have lawfully spent on other things, even if they wanted to—it is money they never would have had in the first place if they hadn't sought and obtained grants with those strings attached. Now, having received government money restricted for this purpose, they seek to double-dip and demand recompense of that money not for the government's coffers, but for their own. The law does not allow this.

Defendants thus respectfully submit that summary judgment on Plaintiffs' monetary damages claims is appropriate—if not in full, then at least in large part. The equitable relief they seek can be disposed of even more easily. The most fundamental prerequisite for equitable relief is a harm not compensable with money damages. But the broad scope of Plaintiffs' money demand leaves them without a single variety of harm where they have not calculated a money award they say will "make [them] whole." Ex. 6 at 21. That concession that this case is all about money forecloses the demand for equitable relief. Judgment should issue accordingly.

## BACKGROUND

### A.    Plaintiffs' Lawsuits

NFHA and its affiliated Plaintiffs describe their organizational missions as working to eliminate housing discrimination. Compl. ¶ 12. In 2009, NFHA says it became "concerned" that foreclosed properties in "predominantly black neighborhoods" were in poor condition and "decided to investigate." Ex. 39 at 8, 11. They obtained a grant from Fannie Mae to finance this "pilot investigation" and another grant from the U.S. Department of Housing & Urban

Development to expand the investigation to involve CFHC and the MVFHC, two other Plaintiffs here. Ex. 66. NFHA then published a pamphlet purporting to have found their "concerns" of discriminatory maintenance validated. *See id*.

In April 2012, NFHA and five affiliated groups filed an administrative complaint with HUD accusing Wells Fargo of discriminatory REO maintenance. Ex. 47 at 2, ¶ 1. Similar complaints followed against U.S. Bank, Bank of America, Deutsche Bank, and Fannie Mae. *See NFHA v. U.S. Bank, N.A.*, No. 01-12-0283-8, Det. of No Reasonable Cause at 1 (HUD Jan. 8, 2016) (ECF No. 167-6); Ex. 46. Wells Fargo settled in 2013. *See* Ex. 47. NFHA pursued the remaining complaints with HUD, regularly amending them to add more organizations as complainants and putting properties in more cities at issue.

HUD had every institutional incentive to find the complaints meritorious considering that it had funded the underlying investigation. But that is not what happened. On January 8, 2016, HUD ruled, in *NFHA v. U.S. Bank*, that Plaintiffs' investigation "does nothing to show . . . that properties in minority and white neighborhoods were maintained differently" and that "there is no reasonable cause to believe that Respondents engaged in a pattern or practice of discriminatory treatment." ECF No. 167-6 at 4, 30. Plaintiffs responded by withdrawing their remaining HUD complaints and refiling them as federal lawsuits: *NFHA v. Fannie Mae* in the Northern District of California, *NFHA v. Deutsche Bank* in the Northern District of Illinois, and the instant *NFHA v. Bank of America* case in this Court, filed June 26, 2018.

At the pleading stage, the *Deutsche Bank* Court rejected as a matter of law many of the same damages theories Plaintiffs advance here. *See* 2019 WL 5963633, at *7. There, as here, Plaintiffs alleged they "suffered damages by their need to divert resources away from existing programs" to fund their REO investigation, and that "their organizational mission" was

"frustrated." *Id*. at *6–7. The Court allowed Plaintiffs to seek their "costs" in pursuing their REO investigation under the "diversion of resources" theory, but largely gutted the "frustration of mission" theory. "[T]his category closely resembles 'diversion of resources,'" it held, and "to the extent it differs, it is because it would be more difficult to measure the amount of damages Plaintiffs incurred in their mission and programs being 'frustrated' and 'undermined.'" *Id*. at *7. The Court specifically "excluded" two categories that could not be used to measure damages.

First, it held that Plaintiffs could not recover "millions of dollars" they claimed to have "invested" in programming in the subject neighborhoods because the alleged "loss of economic value" was fatally indirect and "derivative of any number of external factors as well as the conduct of other homeowners and lenders." *Id*. at *7. Second, it barred Plaintiffs from "recover[ing] damages for harms to minority neighborhoods" such as "diminished property values, safety, habitability, housing opportunities, lending opportunities, and community redevelopment." *Id*. at *8. "This collection of harms," the Court held, "is not sufficiently directly related to Defendants' conduct to satisfy proximate cause under the FHA" and "are precisely the 'ripples' that [the Supreme Court] cautions 'flow far beyond a defendant's misconduct,' which risk massive and complex damages litigation, and involve too many intricate, uncertain inquiries to establish proximate cause." *Id*. at *8 (quoting *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 202 (2017); brackets omitted).

The *Fannie Mae* case also went into discovery until Fannie Mae settled it in January 2022. Ex. 46. Plaintiffs agreed to use a portion of the settlement money "to address community needs, as determined by Plaintiffs," and spent the remainder on their own salaries and overhead. *Id*. ¶ 10; *see also* Ex. 42 at 159.

**B.    Procedural History**

This case and *Deutsche Bank* are the only two cases that were not either abandoned by

Plaintiffs or settled by defendants. On March 24, 2023, this Court denied Defendants' motion for summary judgment relating to Plaintiffs' investigative methodology. ECF No. 235 at 20. But in doing so it announced a significant limitation on the scope of Plaintiffs' claims. The Court took Plaintiffs at their word that they were only complaining about the 1,405 properties they visited, not seeking "to extrapolate findings . . . to all BANA REOs nationwide (or to all REOs within each metro area)." *Id*. at 18. That meant "defendants may ultimately seek to limit the extent of the available remedy based on the scope of the plaintiffs' investigation." *Id*. The Court also noted that its "ruling that the plaintiffs' methodology and validity survive summary judgment . . . does not necessarily foreclose subsequent motions for summary judgment on other issues." *Id*. at 16 n.4. Several such issues, including the aforementioned "extent of the available remedy," were mentioned in the opinion and discussed in greater depth at an April 11, 2023 status conference. *See* ECF No. 242-1 at 4.

At the conference, Plaintiffs told the Court the damages they seek "fall into a couple of categories"—(i) "diversion of resources," based on "the costs incurred in the investigation, including potentially salaries of employees who would otherwise be doing other things," and (ii) "frustration of mission," based on the alleged "harm that's happened and how it's frustrated the purposes of the organization." *Id*. at 4–5. The Court said it was "a little bit confused how that differs from diversion of resources." *Id*. at 6. Plaintiffs told the Court it was different because they were seeking compensation for how their "goals" were "set back by the discriminatory conduct, apart from just the resources they invested in the investigation, because they exist to promote racial integration, racial equity; and by harming these communities that the organizations advocate on behalf of, that sets back the mission." *Id*. at 6–7. They promised they had "an expert in mind" who "can kind of explain, in a more detailed way, ways to assign damages to the theory of frustration

of corporate purpose." *Id*. at 7. They professed confidence the expert would value those damages "in the tens of millions," though they couldn't yet explain how. *Id*. at 22.

On April 28, 2023, the Court entered a case management order for another phase of discovery focusing on "[a]ny issues relevant to the Plaintiffs' claimed damages, the legal remedies to which the Plaintiffs claim to be entitled, including any non-monetary relief sought, and the legal or factual theories underlying those claimed damages or remedies." ECF No. 251 at 1. The order further contemplated another round of summary judgment motions. *Id*. at 3. Following several months of discovery, the Court invited "motions on Plaintiffs' damages theories" and "motions on Steps Two and Three of the *McDonnell Douglas* test." ECF No. 277 at 1.

## C.    The Summary Judgment Record

The record produced over the most recent phase of discovery presents the first opportunity to test whether the myriad harms alleged in Plaintiffs' complaint actually have evidentiary support. They do not. Plaintiffs claim two categories of harm: alleged harms to the communities Plaintiffs claim to serve, and alleged harms to themselves. Both are critical to Plaintiffs' case. Without harms to themselves, they have no Article III standing to sue. Without harms to others, they have no statutory claim, and the only injury from their decision to spend money on this litigation is a self-inflicted one and not something they can ask Defendants to recompense as a matter of law.

### 1.    Alleged community harms

In their Complaint, in an effort to plead the statutory elements of their FHA claims, Plaintiffs accused Defendants of "diminish[ing]" the "property values" of "neighboring residents and homeowners," "discouraging buyers from looking at or purchasing the property," "interfering with the closing of a sale," causing sales "under less favorable 'terms' and 'conditions,'" and "perpetuat[ing] segregated housing patterns" by "discourag[ing]" "white buyers . . . from purchasing homes in the affected communities." Compl. ¶¶ 310–38.

Bank of America asked Plaintiffs to produce all evidence they had that any of these things had actually happened. Plaintiffs objected and produced nothing, contending that they would "make expert reports available on these topics" later on. Ex. 9 at 3, 5, and 6. Plaintiffs disclosed their experts on October 6, 2023. Despite Plaintiffs' promises that these disclosures would evidence the community harms they claimed in their Complaint, none of them actually do. Instead, the three reports Plaintiffs produced on this subject are limited to opining that the alleged harms theoretically *could* have happened, without even trying to suggest that any of them actually *did*.

Purported expert **Albert Poche** is a former code-enforcement officer in New Orleans. Ex. 7, Ex. 1 thereto at 1. Plaintiffs proffer him as an expert on "blighted and distressed properties" to offer the opinion that such properties "negatively impact their surrounding communities by decreasing neighboring property values." *Id*. at 1–2. But Poche has no opinion on whether any of the properties at issue in this case qualify as "blighted" or "distressed." *See id.*, *passim,* & Ex. 45 at 176. Nor could he, since he has not reviewed a single record pertaining to any of the properties at issue in this case. Ex. 7 at 2 and Ex. 2 thereto.

Purported expert **Elizabeth Korver-Glenn** is a sociology professor at Washington University in St. Louis. Plaintiffs proffer her to opine that property conditions "affect[s] home values within their surrounding communities" because of the "sales comparison approach" used in "the residential appraisal process." Ex. 4 at 3. Korver-Glenn is not licensed or trained in appraising, has no idea whether or how any properties at issue in this case were used in appraisals on surrounding properties, and has not reviewed a single record pertaining to any of the properties at issue in this case. Ex. 4 at 3.

Purported expert **JoAnne Poole** is a Baltimore-area "REALTOR®[]." Ex. 5 at 1. Plaintiffs proffer her for her opinion that "[a] poorly maintained home decreases . . . the sales prices for

homes in the neighboring community." *Id*. at 3. But Poole has no opinion whether any of the properties at issue qualify as "poorly maintained." *Id*. at 2–3. She has not reviewed any sales or market data on any of the neighborhoods at issue. *Id*. She has not reviewed any records pertaining to any of the properties at issue in this case, either (except for two lines pertaining to a single property, taken out of context from a spreadsheet Plaintiffs' counsel pointed her to). *See* Ex. 5 at 10–11; Ex. 68; Ex. 69; Ex. 70.

In sum, each of these purported experts makes sweeping conclusions about what *could*, hypothetically and theoretically, have happened in the local real-estate markets at issue. None of them make any claims—nor have they studied any of the data or records that could let them make any such claims—that any of these things *actually did* happen. But assertions like these are empirically testable. Plaintiffs could have found an expert to test them, but they did not even try.

Defendants did. Economist **Morris Davis** holds a Chair in Real Estate at Rutgers Business School. Ex. 3, App'x A thereto, at 1. He undertook to test whether any of the market effects Plaintiffs' experts speculated about actually happened. To do this, he analyzed publicly available sales data against the data produced in this litigation on the properties at issue. Specifically, he compared market data on Census block groups containing Bank of America REOs with a control group of nearby Census block groups within the same Census tract *without* any Bank of America REOs. *Id*. ¶ 76. "[I]f the alleged poor maintenance of BOA REO properties had the negative effects on neighborhoods that Dr. Korver-Glenn, Mr. Poche, and Ms. Poole hypothesize," Davis explains, "then we would expect to see such negative effects in the data when directly comparing" the two groups. *Id*. ¶ 77. In fact, the data showed the opposite. Trends in "home values in the two groups of neighborhoods were similar," but property values in the neighborhoods with Bank of America REOs "increased by approximately $100 during the BOA ownership period, whereas the average

median home values for nearby neighborhoods without a BOA REO property *declined* by nearly $1,100." *Id*. ¶¶ 85, 87. "These results," Davis concluded, "directly refute Dr. Korver-Glenn, Mr. Poche, and Ms. Poole's claims and demonstrate the importance of validating and supporting hypotheses with empirical results." *Id*. ¶ 87.

Importantly, this record evidence is one-sided and not in dispute—this is not a battle of experts. Plaintiffs have made naked assertions about the housing market, without looking at any data. The unrebutted Davis report, based on studied data, is the only evidence in the record on whether the community harms claimed by Plaintiffs ever actually happened.

### 2.     Alleged organizational harms

Plaintiffs base their damages claims on allegations that they were "forced" to "divert[] resources" from their regular activities to investigate Defendants and "counteract" the alleged discrimination. Compl. ¶ 153. Plaintiffs have produced records of these allegedly "diverted" funds. They have not produced *any* evidence, though, that the expenditure was "forced" as opposed to a wholly voluntary investment, funded in large part by government grants.

The only place Plaintiffs have ever spoken of being "forced" into investigating REOs is in their legal pleadings. Elsewhere, they have consistently spoken of it in terms of something they *decided* to do. "[T]he National Fair Housing Alliance decided to investigate whether or not banks maintained and marketed REO properties in a discriminatory way," NFHA wrote in its 2011 publication. Ex. 66 at 4. "[T]here were a couple of years in which we decided that we wanted to focus on REO investigations," NFHA's president Lisa Rice testified on NFHA's behalf as recently as 2024. Ex. 42 at 97. Rice said NFHA made that decision because the REO investigation was "important." But asked why NFHA decided to pursue the REO investigation instead of the other projects to which they say they could have devoted the same resources, Rice said those projects were "equally important" and the REO investigation was "not more important." *Id*. at 47–53. So

NFHA was not forced to choose one over the other.

Whatever their reasons, Plaintiffs did invest resources in the "investigation" and ensuing lawsuits. Records they produced of their alleged employee time and expenses value that investment at $2,974,771. Ex. 1 ¶ 22. The lion's share is NFHA's, which claims over $2.1 million in time and expenses, with the other Plaintiffs' claims as low as $16,234 (FHCNA), topping out at $138,323 (HOPE FHC). None of the numbers, however, are anywhere near Plaintiffs' *actual* investments. They inflated the figures in various ways:

- **Plaintiffs inflated the actual costs of their employees.** They assigned their employees fictitious "consulting rates"—most of whom never did any "consulting"—and seek to be paid at these inflated rates rather than the cost of their actual salary and benefits. For example, NTFHC director Frances Espinoza is paid $71 an hour, but NTFHC seeks to recover a $400-an-hour "consulting rate" for her time, a 464% markup. Ex. 1 ¶ 46. Espinoza never did any "consulting" and NTFHC's financial records show the entire organization has not collected a single dollar in "consulting" revenue. Ex. 2 ¶ 49.

- **Plaintiffs seek to double-dip and get paid back money they were already paid.** The predicate for their damages plea is that they "diverted time and resources away from other intended projects" to investigate REOs. Compl. ¶ 162. That assumes that "100% of the staff time devoted to this investigation and litigation was diverted from other projects," but that assumption is false, explains NYU Nonprofit Financial Management professor and expert **Thad Calabrese**. Ex. 2 ¶ 33. As non-profit organizations, Plaintiffs "have two buckets of resources—without restrictions or conditions and with restrictions or conditions. Only those without restrictions or conditions would be available to be diverted." *Id*. But it turns out Plaintiffs funded this case with hundreds of thousands of dollars in HUD grants they sought and obtained to fund this lawsuit, which they were *required* to use for that purpose. *See*, *e.g.*, Ex. 59, 62, 63, 65.

- **Plaintiffs seek to charge Defendants for their work on *other lawsuits*.** Plaintiffs didn't keep track of the time they spent on each servicer specifically among the five they sued, so they allocated "33 percent" of their time to Bank of America and the remaining thirds to Deutsche Bank and Fannie Mae. Ex. 40 at 129; Ex. 41 at 77. But Plaintiffs had also sued U.S. Bank (and lost) and Wells Fargo (which settled). By dividing their hours by three instead of five, Plaintiffs are charging Defendants for one case they lost and another case they were already paid for. Plaintiffs also inexplicably seek to charge Defendants for numerous tasks their time log expressly attributes to "Fannie Mae" and other non-parties. *See* Ex. 16 at 25, 38, 67-70, 76-77, 101-03, 105, 121-22, 126-27, 129, 137-38, 142, 147, 159, and 163.

- **Plaintiffs seek to charge Defendants for purely legal expenses.** Litigation expenses are not cognizable as actual damages as a general rule, but Plaintiffs seek to recover for time

they spent on discovery requests, legal research, motion papers, and court orders—pure litigation tasks having nothing to do with the underlying investigation. Plaintiffs even ask to be paid for time spent on the evidence-spoliation motion they *lost*. *See* Ex. 10, 16. Plaintiffs also seek to be paid tens of thousands of dollars for cobbling together and editing the time logs they proffer as evidence of their "diverted" time. *See*, *e.g.*, Ex. 15 at 5-6. So Plaintiffs are not only asking Defendants to pay for the time they spent trying (and failing) to avoid sanctions for their *prior* evidence spoliation, they are asking Defendants to pay for the time they spent creating *new* evidence, neither of which, of course, can be blamed on Defendants' REO maintenance practices.

Plaintiffs do not attempt to justify this by reference to any legal standard or accounting or economic methodology, but rather proffer their own former executive director and current law professor **Stacey Seicshnaydre** as an "expert" to opine—on no foundation other than her say-so—that she

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

Seicshnaydre also purports to offer a calculation of Plaintiffs' second category of organizational damages, the "frustration of mission" theory—again without reference to any accepted standard or methodology beyond her personal say-so. Validating this Court's and the *Deutsche Bank* Court's concern that this theory mainly just inflates and double-counts the alleged diversion damages (*see* ECF No. 242-1 at 6; *Deutsche Bank*, *supra*), Seicshnaydre admits they are

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████████████



The value Seicshnaydre attached to the alleged mission frustrations does not derive from a single penny out of Plaintiffs' pocket. Ex. 1 ¶¶ 28–31. The bulk of it, the $50 million based on *Defendants'* maintenance expenditures, has no relationship whatsoever to Plaintiffs' position either in the real world or the but-for world. *Id*. ¶¶ 52–56. The remainder are based on arbitrary figures not even tethered to the financial considerations that Seicshnaydre *herself* said a factfinder should consider, but instead based on the unsupported assumption that Defendants are somehow obliged to fund an arbitrary 33% increase to Plaintiffs' operating budgets for an arbitrary 5 years. *Id*. ¶¶

57–63. Multiple categories fueling this increase double-count the damages Plaintiffs already claimed under the resource-diversion category, such as where Plaintiffs ask recompense for the alleged frustration of being "forced to divert resources." *Id*. ¶¶ 64–67.

Neither the money damages Plaintiffs seek, nor the injunctive relief (which requires an injury that can't be remedied with monetary damages—the opposite of what Plaintiffs claim here) are available on this record as a matter of law.

**STANDARD OF LAW**

Summary judgment is due when "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Where Plaintiffs have the burden of proof, Defendants need only "point[] out . . . an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to Plaintiffs to produce competent evidence a "reasonable jury" could rely on to find they satisfied their burden on each element of their claims. *Smith v. Verizon Wash., D.C. Inc*., 2013 WL 1316391, at *4 (D. Md. Mar. 28, 2013), *aff'd*, 539 F. App'x 128 (4th Cir. 2013). At this stage, a plaintiff "can no longer rest on mere allegations, but rather must cite to 'particular parts of materials in the record' that, taken as true, show that 'a fact … cannot be or is genuinely disputed.'" *Equal Rts. Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 719 (D. Md. 2011).

**ARGUMENT**

Even assuming Plaintiffs could prevail on the merits (and they cannot), their ability to recover hinges on "the same inquiry as in the case of an individual"—they must show a "concrete and demonstrable injury" to themselves as organizations, not "simply a setback to [their] abstract social interests." *Havens*, 455 U.S. at 378–79; *accord*, *e.g.*, *Lane v. Holder*, 703 F.3d 668, 674 (4th

Cir. 2012) (citing *Havens*).[3] Plaintiffs have repeatedly invoked *Havens* as the root of their "diversion of resources" and "frustration of mission" theories. *See*, *e.g.*, ECF No. 242-1 at 6. In *Havens*, fair-housing organization HOME brought suit with three "testers" alleging the defendant steered African-American rental applicants from its apartments. 455 U.S. at 369. HOME claimed injury because it "had to devote significant resources to identify and counteract the defendant's . . . practices," which "frustrated the organization's counseling and referral services" aimed at placing rental applicants in housing. *Id*. at 369, 379. The Supreme Court held that the "injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id*. at 379.

In an effort to achieve the same result, Plaintiffs make the same allegations of having to "expend substantial time and resources investigating and counteracting" Defendants' alleged discrimination. Compl. ¶ 151. And the Seicshnaydre report purporting to quantify their damages cites *Havens* throughout in opining that the injuries they claim are legally "compensable." Ex. 6 at 4, 9, 10, 21. Both give "*Havens Realty* an essentially boundless reading that wrongly br[ings] the case into stark tension with core precepts of standing doctrine"—and, by extension, core precepts of what is cognizable as damages at any stage of litigation. *CASA de Md., Inc. v. Trump*, 971 F.3d 220, 239 (4th Cir. 2020) (reh'g *en banc* granted, appeal dismissed before reh'g).

Plaintiffs value the money they spent at $2,974,771, and the alleged "frustration" to their policy mission at $72,842,957. Plaintiffs also make demands for injunctive relief, notwithstanding their claims that money will "make [them] whole." Ex. 6 at 36. But both *Havens* and its progeny

---

[3] *See also*, *e.g.*, *Fair Hous. Council of Suburban Phila. v. Main Line Times*, 141 F.3d 439, 443–44 (3d Cir. 1998) (organization may bring suit under the FHA "only where the organization itself is able to demonstrate that it has suffered injury in fact") (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572–73 (1992)).

make clear it takes much more for an organization to establish a cognizable injury than merely having its employees spend time preparing for a lawsuit. Against this background, Plaintiffs' claims for monetary damages and injunctive relief are legally and factually defective.

## I.

### $56 Million in Gratuitous, Add-On Damages Can Be Eliminated Right Away.

Before the Court even needs to consider the law around Plaintiffs' "diversion of resources" and "frustration of mission" theories, it can easily dispose of the lowest-hanging fruit: $55,854,852 sought by Plaintiffs nominally in the latter category, but not legitimately tethered to *either* theory.

$32,903,235 of the $55,854,852 represents the amount Bank of America spent maintaining the subject properties. *See* Ex. 1 ¶¶ 51–56; Ex. 2 ¶ 83. This figure has (and can have) no connection whatsoever to any harms suffered by Plaintiffs or anyone else. To the contrary, its relationship to the alleged harms is *inverse*. As Prof. Calabrese notes,

> Prof. Seicshnaydre's calculation contain[s] peculiarly perverse incentives, resulting from Prof. Seicshnaydre's decision to base the amount Plaintiffs seek to collect on "expenditures made by the Defendants," rather than the Plaintiffs. Under this approach, the more the Defendants spent on maintenance, the more they are penalized. If the Defendants had spent $0 maintaining any properties—which presumably would have left the properties and neighborhoods in far worse condition than claimed—then the Defendants would be subject to $0 for damages.

Ex. 2 ¶ 83 (footnotes and brackets omitted). And if Defendants had spent dramatically more money eliminating every "defect" Plaintiffs complain about, this measure of damages would somehow have them claiming *more* harm rather than less. This makes no sense at all. Plaintiffs have no factual or legal basis to claim they were somehow injured by the money Defendants spent doing the very maintenance work Plaintiffs say they were obligated to do. The Court should thus issue summary judgment denying the $33 million plea.

For the same reason, it should also grant summary judgment for Defendants denying the

███████████████████████████████████████████████████████████████████

There is no legal basis for doing this. The FHA limits prevailing plaintiffs to "actual and punitive damages"; it is not a statute like RICO or the Sherman Act that allows a multiplier of actual damages. *Compare* 42 U.S.C. § 3613(c)(1) ("actual" damages) with 18 U.S.C. § 1964(c) ("threefold the damages"); 15 U.S.C. § 15(a) (same). The Court need go no further than the "conspicuous absence" of statutory authorization and the "*expressio unius*" maxim to grant summary judgment on ███████████████████████████ *S.M.B. v. W. Va. Reg'l Jail & Corr. Facility Auth.*, 2017 WL 3841894, at *4 (S.D.W. Va. Sept. 1, 2017); *see also*, *e.g.*, *City of Chi. v. Matchmaker Real Est. Sales Ctr., Inc.*, 982 F.2d 1086, 1099 (7th Cir. 1992).

Beyond this $16,451,617 add-on, Plaintiffs also claim a total of $6,500,000 in random other add-ons. Ex. 1 ¶ 22. Plaintiffs arrived at the figure by coming up with arbitrary sums they claim are somehow necessary to compensate them for the ████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████ There is again no legal basis nor any precedent for doing this. Plaintiffs simply have Seicshnaydre asserting in *ipse dixit* fashion ████████████████████████████████ ████████████████████████████████████████████████████████████with no rationale offered either for the number itself or for awarding a flat rate to each Plaintiff when they make vastly different underlying damages claims (*e.g.*, with NFHA claiming over $2.1 million in "diverted resources" and FHCNA claiming only $16,234). *Id.* at 33; Ex. 1 ¶ 38. As another example, Seicshnaydre declares that a ████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Again,

-18-

Seicshnaydre offers no rationale beyond her *ipse dixit* either for the figure itself or why the figure should remain at a flat ███████ amount regardless how many Plaintiffs—if *any*—have "documented" the activities supposedly justifying the add-on. In brief, the only rationale for the ██████ in add-ons is that Seicshnaydre made them up.

The Court can, and should, grant summary judgment right out of the gate at least as to the groundless $33 million based on Bank of America's expenditures and the equally groundless $23 million flowing from arbitrary multipliers and add-ons untethered to any law or record evidence.

## II.

### There Is No Evidence Plaintiffs Were Forced to Divert $3 Million in Resources.

The alleged "diversion of resources" is legally groundless, in whole or in part, in multiple respects. Plaintiffs base the theory on allegations that they "were forced" to take measures "to identify and counteract Defendants' discriminatory practices," thus requiring their staff to "forego" other projects. Compl. ¶ 153. They try to support these allegations with logs, created and edited years after the fact for purposes of this litigation, purporting to document the hours their employees spent on tasks related to their REO lawsuits and multiplying that time by (inflated) hourly rates, for a total of $2,974,771 in alleged damages. *See* Ex. 6 at 36. Then they again proffer their own founder and current law professor Seicshnaydre as an "expert" to opine that the time logs and inflated rates are "reasonable." Ex. 6 at 3.

The record evidence and legal bases for these claims are lacking at every step. As a threshold matter, there is no evidence Plaintiffs were "forced" to do anything. The record evidence is that Plaintiffs made a voluntary choice to invest in this and the other lawsuits. That choice is not something *Havens* and its progeny regard as a compensable injury. At a more granular level, the various tactics used to inflate the time and resources they spent to maximize their damages claim are also unsustainable as a matter of law and undisputed fact.

**A.    There is no "diversion of resources" from Plaintiffs' own voluntary decision to make Bank of America a target of its routine litigation activities.**

Money is fungible—every dollar spent on one thing is by definition a dollar not spent on something else. But that triviality is not enough to make out a diversion of resources as a matter of law. Courts have recognized several requirements meant to limit such recoveries to resources *actually* diverted. For one thing, the expense must indeed be forced—resulting from "actions taken by the defendant" and not "from the organization's own budgetary choices." *Lane*, 703 F.3d at 675 (citation and brackets omitted). "[E]xpenses that are substantively related to future litigation do not suffice." *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 351 (5th Cir. 2023).[4] And the expense must entail "alter[ing] their resource allocation," not "simply going about their 'business as usual.'" *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019) (citation omitted).[5] Plaintiffs' alleged "diversion" of their resources fails these tests. The record evidence is that this lawsuit was one of many purely voluntary projects Plaintiffs pursued as part of their routine activities.

**1.    Plaintiffs were not "forced" to invest in this lawsuit.**

"[A]n organization's diversion of resources to litigation or to investigation in anticipation of litigation is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact." *ASPCA v. Feld Ent., Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). That is so for at least two reasons. First, an organization's litigation expenses are not an independent injury. *See, e.g.*, *Nat'l Taxpayers*

---

[4] *Accord, e.g.*, *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) ("diversion of resources to litigation or investigation in anticipation of litigation does not constitute an injury in fact"); *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) ("An organization . . . cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all."); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001) ("standing must be established independent of the lawsuit filed by the plaintiff").

[5] *Accord, e.g.*, *Azalea Garden*, 82 F.4th at 351 ("The organization's purportedly injurious counteractions must differ from its routine activities.") (cleaned up) (citation omitted).

*Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.") (citation omitted). More fundamentally, the "mere expense" may flow "not from any actions taken by the defendant, but rather from the organization's own budgetary choices." *Lane*, 703 F.3d at 675 (quoting *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)) (brackets omitted).[6] Evidence that the expense was forced by the defendant's actions is essential.

"[T]here are numerous cases making clear the organization must be forced into acting." *In Defense of Animals v. Sanderson Farms, Inc.*, 2021 WL 4243391, at *4 (N.D. Cal. Sept. 17, 2021). As that court summarized the case law:

> If the defendant's conduct did not force the plaintiff to divert resources, the only injury comes from the plaintiff's own actions. This self-inflicted injury would not be fairly traceable to the defendant. . . . Even a large new campaign is not enough if the organization is not forced to undertake it.

*Id*. at *4. "To determine that an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation . . . suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concerns with a subject that could be affected by an adjudication.'" *Lane*, 703 F.3d at 675 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 (1976)) (brackets omitted). That is where *Havens* draws the line.

Plaintiff LFHAC recently had the Fifth Circuit reject its claims of diversion of resources

---

[6] *See also*, *e.g.*, *Azalea Garden*, 82 F.4th at 351 ("[N]ot every diversion of resources rises to an injury sufficient to confer standing. . . . [E]xpenses that are substantively related to future litigation do not suffice."); *City of S. Miami v. Governor*, 65 F.4th 631, 638–39 (11th Cir. 2023) (organization cannot "establish standing under a diversion-of-resources theory . . . by inflicting harm on itself. . . ."); *BMC*, 28 F.3d at 1276 ("The diversion of resources to testing might well harm the [plaintiff's] other programs, for money spent on testing is money that is not spent on other things. But this particular harm is self-inflicted; it results not from any actions taken by [the defendant], but rather from the [plaintiff's] own budgetary choices.").

under circumstances strikingly similar to those at issue here. Its complaint in *Azalea Garden*, *supra* n.5, alleged that it "performed a focused investigation" to "confirm Defendant's discriminatory []" practices," thus "divert[ing] its investigative resources from other investigative projects and activities in furtherance of its mission," and "also dedicated resources" to "education and outreach activities" "counteracting the effects of Defendant's discrimination." 82 F.4th at 351–52 (internal quotation marks omitted). The Fifth Circuit held "that 'diverting' resources from one core mission activity to another, i.e., prioritizing which 'on-mission' projects, out of many potential activities, an entity chooses to pursue, does not suffice—organizations daily must choose which activities to fund, staff, and prioritize." *Id*. at 355. There was no diversion because "using testers to investigate *is* its routine activity." *Id*. at 352.

The same appears in the record here. NFHA, for example, claims to have "sidelined" a real-estate sales investigation and other items on its agenda to invest resources in their REO investigation. But nothing in NFHA's account of how it reached these decisions reflects being forced to do one over the other. To the contrary, NFHA's president testified:

> [I]t's not a matter that one issue was less important than the other or that one topic was more important than the other. Eliminating discrimination in the real estate sales space is as important as eliminating discrimination in the lending space as is—you know, that is as important as eliminating discrimination in the REO space. They're all equally important.
>
> We did not have the resources to do them all. So we had to make a decision about what we were going to prioritize and focus on.

Ex. 42 at 47–48. "Decisions" are not forced actions. Decisions about what "to prioritize" as between multiple "equally important" items on the agenda are squarely within what all organizations "daily" do in making their "own budgetary choices." *Azalea Garden*, *Lane*; *supra*; *accord*, *e.g.*, *Know Your IX v. DeVos*, 2020 WL 6150935, at *5 (D. Md. Oct. 20, 2020) ("A voluntary budgetary decision, however well-intentioned, does not constitute Article III injury, in no small part because holding otherwise would give carte blanche for any organization to

'manufacture standing by choosing to make expenditures' about its public policy of choice.")
(quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013); *CASA*, 971 F.3d at 239).

The record further establishes that much of what Plaintiffs chose to forego was not foregone
for lack of resources, but for lack of interest. NFHA produced a multipage bullet-point list of
projects it claims to have been "forced to forego" because of the resources they invested in its REO
investigation. Ex. 8 at 33–38. But when Plaintiffs collected millions from Wells Fargo and Fannie
Mae, they didn't use any of that money to pursue those projects. *See* Ex. 42 at 158 ("Q. Was any
of the money that you collected from Fannie May used to pay for the projects that you had
sidelined? A. I do not believe so. Not that I can recall.") (objection omitted). While organizations
with limited resources necessarily have to make decisions about what to prioritize, Plaintiffs'
indifference to those projects even when their resources became bountiful confirms that their
decision to bring these lawsuits did not come at the expense of those projects.

Another Plaintiff's rationale for how it was "forced" into suing Defendants takes the
opposite tack, but is just as unavailing—CFHC claims it is "forced" into basically *everything* it
does. *See* Ex. 41 at 148–49 ("[W]e are forced to do much of the work that we do. We're forced by
the attitudes of society and the actions of people when they mistreat people based on their protected
class status."). That is just another plea to license damages claims for perceived harms to "abstract
social interests." *Havens*, *supra*. It would "imply[]that any sincere plaintiff could bootstrap
standing by expending its resources in response to actions of another," which "would not comport
with the case or controversy requirement of Article III of the Constitution." *Lane*, 703 F.3d at 675
(citation omitted). It also does not comport with one oft-stated litmus test for organizational harm,
that "[a]n organization may sue only if it was forced to choose between suffering an injury and
diverting resources to counteract that injury." *Lake Forest*, 624 F.3d at 1088 n.4. Third parties

-23-

getting "mistreat[ed]," in CFHC's parlance, does not inflict an injury on CFHC, and nothing but its "abstract social interests" forces it to respond.

Plaintiffs' diversion theory boils down to a claim that because they purport to combat discrimination, any discrimination they see "forces" them to act. That falls short of the *Havens* standard for reasons already discussed:

> Their argument is an organization has standing by virtue of investigating conduct or starting a new campaign against someone who frustrates its general mission. Yet this would effectively nullify the constitutional requirements for standing. Just as an individual cannot gin up standing by researching and tweeting about something that indirectly makes his or her life harder, neither can an organization.

*Sanderson*, 2021 WL 4243391, at *4. But the theory is also unavailing for another, equally fundamental reason—Plaintiffs have no evidence the alleged discriminatory effects that supposedly forced them into acting ever actually happened.

Plaintiffs alleged they were forced to combat harms to the communities they claim to serve like "diminish[ed]" "property values," buyers "discourag[ed]" from purchasing properties, and the "perpetuat[ion]" of "segregated housing patterns" because "white buyers are discouraged from purchasing homes in the affected communities." Compl. ¶¶ 310–38. In response to Bank of America's discovery requests to produce all the evidence Plaintiffs had of these supposed harms, Plaintiffs produced nothing, objecting that Defendants would have to wait for "expert reports . . . on these topics." Ex. 9 at 3, 5, 6. But the reports Plaintiffs produced didn't end up furnishing any evidence on any of these topics, either. The absence of record evidence on these supposed harms suffices in itself to warrant summary judgment. *See*, *e..g*, *Celotex*, 477 U.S. at 325 ("absence of evidence to support the nonmoving party's case" discharges moving party's burden).

Nonetheless, Defendants did not leave the record there, and engaged a real-estate expert to test whether any of Plaintiffs' claims of harm to the surrounding neighborhoods were validated by the market data. They weren't. *See* Ex. 3. This uncontroverted evidence is fatal to Plaintiffs' claims

to have been "forced" to expend resources. "To prove injury in fact based on an organization's diversion of resources to protect individuals from harm, the organizational plaintiff must prove *both* that it has diverted its resources *and* [an] injury to the identifiable community that the organization seeks to protect." *City of S. Miami*, 65 F.4th at 638–39 (emphasis added). But Plaintiffs provided no evidence of the claimed diminished property values and other supposed harms in the communities allegedly affected by Bank of America's REOs. And Prof. Davis's empirical analysis showed the opposite. *See* Ex. 3 ¶ 69 *et seq.* Accordingly, the only "injury" is a self-inflicted one produced by Plaintiffs' voluntary choice to pursue litigation, not Defendants' actions. The absence of any record evidence establishing this is dispositive, and warrants summary judgment. *See*, *e.g.*, *Main Line*, 141 F.3d at 443 (affirming a Rule 50 judgment as a matter of law to the defendant on plaintiff's claim for "diversion of resources" damages because "[t]he evidence submitted … did not show . . . any adverse effects upon families seeking housing").

The opinions of Plaintiffs' purported experts that poor REO maintenance *could* have caused some community harms in certain circumstances cannot substitute for evidence that those circumstances were actually present and the hypothesized harms actually happened. *See*, *e.g.*, *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001) ("[E]xpert testimony rooted in hypothetical assumptions cannot substitute for actual market data."); *accord*, *e.g.*, *Nease v. Ford Motor Co.*, 848 F.3d 219, 232 (4th Cir. 2017) ("Although [an expert's] theory is plausible and may even be right, it is no more than a hypothesis, and it thus is not knowledge. . . . [S]cientific methodology involves generating hypotheses and testing them to see if they can be falsified. [The expert] presented a hypothesis only—he failed to validate it with testing.") (citation and internal quotation marks omitted). Indeed, that is the same evidentiary failure that proved dispositive in *Main Line*. *See* 141 F.3d at 443 ("evidence offered was probative only as to the effect

of discriminatory advertising *generally*," not the "specific advertisements" at issue).

Lastly, at the very least, even if there were some basis for finding Plaintiffs were compelled to do something when they commenced their investigation, that does not mean *continuing* to sink resources into it forever is equally compelled. Plaintiffs filed their complaints starting in 2012, but in January 2016, they received HUD's *U.S. Bank* ruling rejecting their allegations and legal theories. At that point, they were faced with a choice to keep litigating or to accept that HUD was right and they were wrong. Plaintiffs originally set about appealing the *U.S. Bank* ruling, but then they changed their mind and withdrew their appeal. *See* ECF No. 183-93, Ex. B thereto. Plaintiffs had every right to re-file against U.S. Bank in federal court, but didn't.[7] That was their choice to make. By the same token, re-filing in federal court against Bank of America was *also* a choice, not anything they were "forced" to do—else they would have re-filed against U.S. Bank, too. Out of the $3 million Plaintiffs seek in alleged diversion damages, $1,071,477.62 postdates the U.S. Bank decision, when it was a purely optional expenditure. If the Court does not grant summary judgment on the diversion claim in full, it should grant partial summary judgment at least to this extent.

### 2.    Litigation expenses are not diverted resources.

Notwithstanding Plaintiffs' conclusory allegations in their Complaint that they seek to recover resources invested in "counteracting" unlawful conduct (Compl. ¶ 151), the "counteracting" activities evident from the record are functionally limited to this lawsuit. Most entries on their time logs either relate to litigation tasks expressly (with entries like "Review . . . motion to dismiss response") or relate to the property visits intended to support the lawsuit. Ex. 16

---

[7] *See* 42 U.S.C. § 3613(a); *United States v. SSM Props., LLC*, 619 F. Supp. 3d 602, 605 (S.D. Miss. 2022) ("Notwithstanding HUD's dismissal, the complainants were permitted to commence a civil action in federal district court."); *Lloyd v. Presby's Inspired Life*, 251 F. Supp. 3d 891, 896 n. 7 (E.D. Pa. 2017) ("HUD's determination of no probable cause with respect to Plaintiff's HUD complaint does not prevent Plaintiff from bringing a civil action in this Court with respect to the same claims.").

at 180. This Court already held those visits were conducted in anticipation of litigation (*see* ECF No. 226 at 8–9), and there is ample precedent that investigations in anticipation of litigation are litigation expenses, not cognizable as diverted resources. *See*, *e.g.*, *Post Props.*, 633 F.3d at 1140 (drawing no distinction between "litigation" and "investigation in anticipation of litigation"); *Fair Hous. Council of Or. v. Travelers Home & Marine Ins. Co.*, 2016 WL 7423414, at *5 (D. Or. Dec. 2, 2016) ("FHCO's testing costs cannot support Article III standing. This is particularly true given that plaintiff appears to have conceded that its testing of defendants was conducted exclusively for litigation purposes.").

There is an obvious rationale for this. For organizations like Plaintiffs, "litigation is not simply a cost center," "but a revenue center." Ex. 2 ¶ 17. Their largest source of revenue is government grants. Their second largest source of revenue is litigation settlements. *See* Ex. 50 at 354, 362; Ex. 51 at 397, 406.

Like a law firm that works on contingency, they allocate resources based on what is likely to give them a return on investment. *See* Ex. 2 ¶ 17 (citing, *e.g.*, Plaintiff Fair Housing Continuum, Inc.'s statement that "[t]he biggest lesson learned during the past two grants, is that systemic testing uses a significant amount of tests on one housing provider . . . but generates a large enforcement return ($1.4 million for community reinvestment)"). If such investments were enough to make out a claim for damages, "then any public interest law firm would always have automatic standing to bring suit. But we know that's not right." *Azalea Garden*, 82 F.4th at 357 (Ho, J., concurring) (citing *BMC*, 28 F.3d at 1277). It would also violate the settled rule that the injury standard for an organizational plaintiff is the same as for anyone else. *Havens*, 455 U.S. at 378. Every litigant does a pre-suit investigation. Plaintiffs have no special right to make that investigation the root of their damages claims.

edit

### 3. Resources spent on Plaintiffs' regular activities are not diverted resources.

Prof. Calabrese, who literally wrote the book (multiple books) on nonprofit financial management, has explained that funds "used *for* their intended purpose" by organizations like Plaintiffs cannot be considered to have been diverted *from* their intended purpose. Ex. 2 ¶ 16 (emphasis added). What is true as a matter of nonprofit management is also true as a matter of law. An organization cannot be injured by doing an "investigation [that] does not differ from its routine activities." *Azalea Garden*, 82 F.4th at 352.[8] The record evidence shows that Plaintiffs "fundraise specifically for investigation and litigation." Ex. 2 ¶ 16. By Plaintiffs' own account, if they hadn't spent money investigating REOs, they would have spent money on another investigation and lawsuit. Like the plaintiff in *Azalea Garden* (also a Plaintiff here), investigations and lawsuits are things they regularly do. *Compare* 82 F.4th at 352 (where plaintiff routinely "engages in testing and other investigations of housing discrimination," this investigation "does not differ from its routine activities in the slightest") (cleaned up) *with* Ex. 2 ¶ 16 n.10 (collecting NFHA descriptions of its routine litigation efforts); *accord, e.g.*, *Knowledge Ecology Int'l v. NIH*, 2019 WL 1585285, at *6 (D. Md. Apr. 11, 2019) (finding plaintiff's injury "manufactured" because its "core purpose as an organization is pursuing precisely the type of advocacy it undertook here" and "[a]ny resources [it] spent on this specific case and the underlying events . . . seem very much in line with [its] core mission rather than a diversion of resources away from it").

### B. Even if not barred outright, the inflated $3 million diversion claim should be reduced.

Summary judgment can be granted on an entire claim or on any "part of [a] claim." Fed. R. Civ. P. 56(a). Thus, even if the Court withholds summary judgment in full, it should at least

---

[8] *See also, e.g.*, *Disability L. Ctr. v. SG Blvd. Multifamily LLC*, 2023 WL 7343567, at *5 (D. Utah Nov. 7, 2023) ("monitoring and testing properties fall within Plaintiff's 'regular' activities and therefore do not constitute a diversion of its resources").

grant summary judgment as to those parts of the damages claims that are indisputably inflated.

**1. Government grants earmarked for one purpose can't have been "diverted" from other purposes.**

The premise of Plaintiffs' damages claims is that they could have spent the money they invested in this case on anything else. But that's not quite true. As Prof. Calabrese relates, "In the not-for-profit context, only resources that are without restrictions or conditions can be diverted at the discretion of the organization," but "nearly 50% of Plaintiffs' revenues come from government grants which likely contain conditions restricting the use of granted funds." Ex. 2 ¶ 13. Thus, to establish a *diverted* resource, Plaintiffs would first have to "show that the resources devoted to this investigation were *available* for other purposes." *Id*. ¶ 33 (emphasis added).

But the record evidence shows that isn't true for a large proportion of what Plaintiffs seek to recover. When Plaintiffs decided to investigate REOs, they sought grants to do it. It began with a $100,000 grant from Fannie Mae. Ex. 42 at 16-17. Plaintiffs then got multiple grants from HUD:



Of the $2,033,329.72 NFHA seeks in "diversion" damages, ███████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████ NFHA was required to (and repeatedly committed to) spend all of this money on the projects HUD approved, and NFHA wouldn't have had the money in the first place if HUD didn't earmark it for those projects. Neither the grant money nor the matching funds Plaintiffs had to put up as conditions of the grants were "diverted" from NFHA's supposedly "foregone" projects, because they could not have been used for those projects without violating the terms of the grants. *See, e.g.*, *Freedom's Path at Dayton v. Dayton Metro. Hous. Auth.*, 2022 WL 1697937, at *3 (S.D. Ohio May 26, 2022) ("There is no scenario in which [plaintiff] would have received these funds without the corresponding requirement that they actually spend them on [] this project. Thus, these are not recoverable as damages.").

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████

These unsupported assertions are unavailing. There is nothing "exotic" about enforcing Supreme Court precedent limiting organizational damages to money actually diverted from other activities. That does not create any "form of immunity"—just because Plaintiffs lack cognizable injuries doesn't mean *every* potential FHA plaintiff does.[9] ██████████████████████████

---

[9] *See, e.g.*, *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1041 (9th Cir. 2021) ("directly injured victims . . . can sue individually and are incentivized to do so. . . . It also bears noting that the Department of Justice ('DOJ') can sue to enforce the FHA, . . . and that [HUD] can refer certain

███████████████████████████████████████████

████████████████████████████ Whether to give a grant is up to HUD. HUD does not rubber-stamp every grant application Plaintiffs submit. Some get rejected. *See* Ex. 42 at 97–98. Plaintiffs are not entitled to an inference that HUD would have funded whatever "other . . . services" for which they might have sought a grant but for their decision to prioritize their REO complaints.

### 2.    Plaintiffs are not entitled to be paid at fictitious, inflated rates.

Plaintiffs value their purportedly diverted resources at $2,974,772, consisting of an alleged $2,843,395 in employee time and $131,377 in expenses. Ex. 1 ¶ 38. While Plaintiffs represent the employee time as their "hourly rates," Ex. 6 at 13, this is not actually true. Plaintiffs inflated their employees' compensation to a degree ranging from 88% to 464% by tabulating their time based on fictitious "consulting rates" rather than what they are actually paid. Ex. 1 ¶ 46. For example, the actual compensation cost of NTFHC executive director Frances Espinoza is $71 an hour, but Plaintiffs seek $400 an hour in damages for her time, the record 464% markup. Ex. 1 ¶ 46. NFHA president Shanna Smith gets a 203% markup, from $149 in actual hourly compensation to a $450-an-hour "consulting rate." *Id*. HOPE executive director Anne Houghtaling is marked up 428% from $76 to $400, while MMFHC president Bill Tisdale is marked up 59% from $94 to $150. *Id*.

This inflation of Plaintiffs' alleged damages is impermissible on several levels. Monetary damages under the FHA must be "compensatory," based on "the actual injury incurred." *Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 444 (E.D. Va. 2011) (quoting *Hetzel v. Cnty. of Prince William*, 89 F.3d 169, 173 (4th Cir. 1996)), *aff'd in part, vacated in part sub nom. Matarese v. Archstone Cmtys., LLC*, 468 F. App'x 283 (4th Cir. 2012). Accordingly, employee time under a diversion-of-resources theory is valued at an "hourly rate" reflecting "the employees' salary, fringe

---

FHA enforcement matters to the DOJ").

benefits, and a portion of office overhead." *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1060 (E.D. Va. 1987). Plaintiffs are not allowed to make up whatever numbers they think are "reasonable"—which is Seicshnaydre's only justification for the inflation—because that goes beyond the compensatory. Ex. 6 at 13. Seicshnaydre—again wearing her attorney-hat under the pretense of offering expert testimony—cites *Fair Housing of Marin v. Combs*, 2000 WL 365029, at *3 (N.D. Cal. Mar. 29, 2000), as precedent for this. But *Combs* allowed the plaintiff to recover billing rates on a record where "the remarkable fact . . . is that the [actual] *pro rata* and billing rates are so close," and amounted to a modest $12,179 in case costs. *Id* at *3. The record here is the opposite—a massive markup not justified by any principle beyond a self-interested purported expert's *ipse dixit* statement of what she considers "reasonable." Defendants' comparison of Plaintiffs' actual employee compensation costs against their "consulting rates" shows that this alone inflated their diversion claim by at least $782,396.67. *See* Ex. 20-38. (Plaintiffs refused to disclose actual compensation for most employees, so the actual inflation is even higher.)

In addition to being inflated, Plaintiffs' "consulting rates" are also fictitious. Not only do they inflate the actual cost of Plaintiffs' employees, *they inflate their actual consulting rates*— when Plaintiffs' employees *do* get hired out for consulting (which is rarely), their rates are lower than the "consulting rates" claimed as damages. Ex. 1 ¶ 49. DMFHC, for example, seeks to recover a $250 "consulting rate" for its executive director Arturo Alvarado's time during a period when his actual outside billing rate ranged from $123.31 to $181.51—an inflation between 38% and 103%. Ex. 1 ¶ 49. MVFHC contracted its president Jim McCarthy to consult at $125 to $175 an hour, but seeks a $250-an-hour consulting rate for him now. Ex. 1 at 20. Multiple other employees consult at roughly half the price they now claim as consulting rates. *See* Ex. 71 at 15, Ex. 72 at 15, Ex. 73 at 20, Ex. 74 at 18, Ex. 75 at 20.

But, as noted, most of these rates are never actually charged. Most Plaintiffs never collected more than a few thousand dollars in consulting revenue every year. Ex. 2 ¶ 49. Six of them collected zero consulting dollars over the entire 2008-to-2020 period. Ex. 2 ¶ 49. Another eight of them can claim a mere 0.3% to 1.7% of their revenues from consulting. Ex. 2 ¶ 49. Espinoza, who seeks a $400-an-hour consulting rate, has never actually served as a consultant to anyone. Ex. 40 at 18–20, 23–24. There is no legal or factual basis to value Plaintiffs' time at "consulting rates" when there is no record evidence that they would actually have spent any time consulting at those rates if not "diverted" to this lawsuit. And there is no such evidence. The undisputed record is to the contrary. The inflated rates are thus neither compensatory nor tethered to any "lost opportunity," and so are unavailable as a matter of law.

### 3.    Plaintiffs are not entitled to have Defendants pay them for time they spent on other projects and other parties.

As already shown, the only damages cognizable are those that "result . . . from [] actions taken by the defendant." *Lane*, 703 F.3d at 675 (cleaned up). But Plaintiffs claim damages for time they indisputably spent on actions not attributable to Defendants or to their claims here.

<u>First</u>, Plaintiffs padded their time logs with numerous entries for tasks manifestly unrelated to their claims, their investigation, or REOs in general. FHANC, HOPE, and TFHC each seek to recover for time spent on tasks related to predatory lending. Ex. 18 at 14, 15, 21, 38, 49; Ex. 14 at 6, 13, 14; Ex. 17 at 1. This case has nothing to do with predatory lending. NFHA claims diversion damages for time spent inspecting properties in Phoenix, Arizona. Ex. 16 at 13. There are no properties at issue in this case in Arizona. *See* Compl. ¶ 120. FHCRR claims 80 hours spent referring "community members to community resources for down payment assistance, housing counseling, code enforcement, and emergency assistance." Ex. 12 at 4. FHCCI claims diversion damages for attending the "Marian University President's Appreciation Dinner" and for some task

related to home modifications for the "Harrison Family." Ex. 11 at 2. HOPE claims diversion

damages for meeting with a celebrity lawyer who has no involvement in this case. Ex. 13 at 9.

MMFHC seeks to be paid for a staffer's time to "[g]et snacks." Ex. 19 at 2. Multiple Plaintiffs ask

Bank of America to pay them for tasks related to their "Fannie complaint." *E.g.*, Ex. 16 at 159.

**Appendix A** to this brief collects $68,918.30 worth of non-compensable, off-topic tasks appearing

on Plaintiffs' time logs. *See Combs*, 2000 WL 365029, at *3 (denying diversion damages for a task

that was "not a result of [the defendant's] conduct").[10]

Related to this are tasks whose relationship to this litigation is tangential at best, but which

Plaintiffs would have done with or without this lawsuit and which thus don't satisfy the legal

requirement of being proximately caused by anything Defendants did. For example, CFHC seeks

to be paid for a "mandatory fair housing presentation" it gives to Connecticut realtors. Since it is

*mandatory*, CFHC would be doing it whether or not they had any grievance against Defendants,

but they nonetheless claim it as diverted resources because they added a single slide to a 102-page

PowerPoint presentation otherwise wholly unrelated to REOs stating, "Treat REO properties the

same regardless of who lives in the neighborhood." Ex. 48 at 523. Such a cursory addition does

not convert otherwise off-topic presentations into "educational materials to identify and address []

racially discriminatory maintenance" (Compl. ¶ 150), nor do they turn a "mandatory" activity that

was a routine practice of the Plaintiffs into something "result[ing]" from Defendants' actions.

*Lane*, *supra*; *see also*, *e.g.*, *N.D. Fair Hous. Council, Inc. v. Allen*, 319 F. Supp. 2d 972, 978–79

(D.N.D. 2004) (rejecting damages for tasks where "the Council has not persuaded the Court it

---

[10] These Appendices are based on Defendants' thorough review of Plaintiffs' time logs. Because that review was necessarily limited by how Plaintiffs presented each entry (often too vaguely to discern the actual task involved, as set forth further below), the Court should regard the entries presented as illustrative rather than exhaustive. Defendants reserve the right to identify future entries in each challenged category if necessary and appropriate at a later time.

would have never engaged in such efforts had it not been for the actions of the Defendants"; "Such an expenditure is consistent with the Fair Housing Council's stated purpose of education and assisting the public, but not clearly traceable to the Defendants' alleged misconduct.").

Second, there are an even larger number of entries that may or may not have anything to do with this litigation, but are too vague to tell. Knowing they would seek reimbursement in this and other matters, Plaintiffs *could* (and should) have logged their hours in a way that indicated which of their activities and lawsuits each task relates to, but they did not. Instead, years after the fact, Plaintiffs went back through their time entries to decide which ones to claim as related to this case. Likewise, Plaintiffs *could* (and should) have described those tasks in a way that makes the connection to this case and the nature of the task clear, but in too many cases they did not do that, either. Instead, their time logs are packed with vague entries with no facial connection to this case, with descriptions like "Review emails," "Moving emails to folder," "Setting up user account," and "Internet research"; single-word entries like "conference," "communication," "travel," "administration," or "meeting"; and dozens of entries like "Met with RS" that record meeting attendants but not the subject matter. **Appendix B** to this brief collects $603,617.18 worth of similarly vague entries. None carry Plaintiffs' burden to prove economic damages "with reasonable certainty." *Neal v. United States*, 599 F. Supp. 3d 270 (D. Md. 2022) (collecting cases); *Norris v. PNC Bank, N.A.*, 2023 WL 3688335, at *17 (D. Md. May 26, 2023).

Plaintiffs tried to justify their pleas to be paid for their time at inflated rates by analogy to attorneys' fees. *See* Ex. 6 at 13, n.16. Consistent with this, the Court should require them to evidence their time under the same standards applicable to attorney-fee awards. And attorney-fee awards are reduced "[w]hen an attorney provides vague or incomplete documentation." *Jermaine*

*G. v. Kijakazi*, 2023 WL 5346140, at *6 (D. Md. Aug. 21, 2023)).[11] Vague entries get stricken, because they "impede courts from assessing the reasonableness of the time spent on a task." *Velasquez Flores v. Elite Com. Cleaning, LLC*, 2024 WL 916250, at *5 (D. Md. Mar. 1, 2024). Plaintiffs' task descriptions are at least as vague as those courts have stricken. *See, e.g.*, *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 152 F. Supp. 3d 503, 520 n.28 (E.D. Va. 2015) (striking vague entries like "Fact research" and "consider complaint"); *In re Outsidewall Tire Litig.*, 52 F. Supp. 3d 777, 789 (E.D. Va. 2014) (striking vague entries like "document review" and "work on discovery").

<u>Third</u>, even if Plaintiffs' diversion-of-resources claim is not foreclosed wholesale as an improper attempt to claim litigation expenses as damages, at the very least the entries that relate to specific tasks on the lawsuit itself, as opposed to Plaintiffs' organizational activities, should not be awarded. **Appendix C** totals $375,778.75 in alleged damages Plaintiffs attribute to pure litigation tasks like "Discovery," "doc review," "Review . . . motion to dismiss response," "Bank of America discovery document prep," "30b6 [*sic*] deposition subpoena review," "deposition discussion," and so on. Ex. 16, *passim*.

Included in this is Plaintiffs' attempt to get paid at least $19,247.50 for time spent opposing the motion for sanctions for their evidence spoliation, which they *lost*—both via entries expressly referencing the motion and, in NFHA's case, entries misleadingly labeled "Bank of America REO Discovery" during a period when no discovery was occurring, but Plaintiffs were seeking to avoid sanctions. *See, e.g.*, App'x C, Ex. 16 at 5. Just as remarkably, $56,502.50 in damages are sought

---

[11] *Accord, e.g.*, *Argonaut Ins. Co. v. Wolverine Constr., Inc.*, 976 F. Supp. 2d 646, 657 (D. Md. 2013); *Ellen C. v. Kijakazi*, 2023 WL 4490457, at *2 (D. Md. July 12, 2023) ("reduc[ing] the requested hours" because "[l]itigants take their chances by submitting fee applications that are too vague to permit the district court to determine whether the hours claimed were reasonably spent.") (Gallagher, J.) (citation omitted).

for time they spent trawling through their records to create and edit the time logs that are supposed to evidence their damages now, thus seeking to shift onto the Defendants the costs of their inability to evidence their damages with their original, contemporaneous records. *E.g.*, Ex. 15 at 5–7. Defendants are aware of no precedent to award damages for time spent logging time.

But *none* of these litigation expenses are cognizable as damages. *See*, *e.g.*, *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (rejecting plaintiff's claim to recover "hours that representatives of [plaintiff] have had to spend on this lawsuit" as damages, because "[i]t is therefore clear that the amounts [plaintiff] was alleging as damages were simply costs of litigation. No authority suggests that a plaintiff's time spent in litigation over trademark infringement is compensable as damages for the infringement"). There is nothing in the FHA that makes Plaintiffs' claims an exotic exception to this rule. The general rule is that attorneys' fees are recoverable only as a "cost, as opposed to an element of damages," and only where a statute allows for it. *Sill v. AVSX Techs., LLC*, 2018 WL 564397, at *4 (D.S.C. Jan. 26, 2018). It would be incongruous indeed if attorneys' fees on, *e.g.*, "discovery" and "doc review" could only be sought with a Rule 54(d) fee motion but Plaintiffs' time on the same tasks were compensable as actual damages. That goes doubly so for the employees on Plaintiffs' time logs who are in-house attorneys, since "[a]ttorney's fees for the services of in-house counsel are not recoverable" at all. *Burger King Corp. v. Mason*, 710 F.2d 1480, 1498 (11th Cir. 1983).

Fourth, Plaintiffs didn't account for their own mistakes in inspecting the wrong properties. They based this lawsuit on 1,677 properties they claimed were Bank of America–owned. Compl. ¶ 6. Then it turned out many of them were *not*. Plaintiffs have (so far) conceded that Bank of America had no responsibility for 273 properties out of the original 1,677 and that Safeguard had

no responsibility for 346 of them.[12] But Plaintiffs still ask Defendants to compensate them for the time they wasted inspecting these erroneously included properties. Plaintiffs' mistakes are not Defendants' fault. This time is not compensable. (And it is considerable—with at least 16.3% of the properties inspected in error, a proportionate reduction in Plaintiffs' diversion damages would reduce them by at least $484,265.)

Fifth, the way Plaintiffs divided their time as between their various lawsuits seeks to make Bank of America pay for the time they spent on lawsuits against *other* defendants whose cases Plaintiffs either lost or settled. That's because most entries on Plaintiffs' time logs are not connected to any specific defendant among the numerous parties they sued. An entry like "Property visits" could refer to Bank of America properties—or U.S. Bank's, Wells Fargo's, Deutsche Bank's, Fannie Mae's, or someone else's entirely. Entries on what Plaintiffs call "General REO" time do not relate to anyone's properties in particular but on tasks Plaintiffs broadly attribute to all of them, like staff meetings. Ex. 44 at 46. To address this, Plaintiffs came up with various formulas for deciding how much time to attribute to Bank of America. The idea was to take the time they spent on each REO task and assign Bank of America some fraction of it. But instead of charging Bank of America, one of five servicers they sued, for an even fifth of their general time, they ask Bank of America to pay for a *third*—removing Wells Fargo and U.S. Bank from the equation under the rationale that they never brought federal lawsuits against those two. *See* Ex. 42 at 244 ("because we filed three lawsuits, we divided by three"); Ex. 41 at 79–80 (attributing time only to "the [three] entities that ultimately were subject to these enforcement actions" because "[w]e decided that was the appropriate measure"); Ex. 40 at 129, 136 ("whatever percentage that is, is what it is, but, you

---

[12] Defendants' responsibility for additional properties is still in dispute. In Safeguard's case, that covers more than 550 of the 1,331 properties remaining.

know, I'm saying a third."). Of course, that's because they *lost* their claims against U.S. Bank and settled with Wells Fargo, so Plaintiffs are claiming Bank of America should be responsible for paying them for time they spent on one lawsuit they lost and another lawsuit for which they were already paid a settlement. Ex. 47. This is improper, as a diversion-of-resources claim requires evidence of "the resources, if any, that were expended" on the defendant "in particular." *Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd.*, 160 F.3d 433, 434–35 (8th Cir. 1998).

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███ this lawsuit is against Bank of America and Safeguard only. It concerns 1,405 Bank of America properties, not anyone else's. The servicers in the other matters are not joint tortfeasors. That doctrine applies "where multiple defendants are responsible for a single tort." *Ferris v. Haymore*, 967 F.2d 946, 956 (4th Cir. 1992). Plaintiffs' claims against U.S. Bank, Fannie Mae, Wells Fargo, and Deutsche Bank concern different properties and do not arise from one "tort."

## III.

**Plaintiffs' Alleged Mission Frustrations Are Speculative, Unsupported by Any Record Evidence, and Beyond the Realm of Proximate Causation.**

This Court and the *Deutsche Bank* Court each had trouble figuring out the precise difference between the damages Plaintiffs claim for supposedly foregoing their other projects and the damages they claim for their supposedly frustrated "mission," since their mission *is* their projects. *See* ECF No. 242-1 at 6; *Deutsche Bank*, 2019 WL 5963633, at *7. ████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████    So the *Deutsche Bank* Court was prescient in observing that this theory only differs from "diversion of resources" in being "more difficult to measure." 2019 WL 5963633, at *7. It also differs in presenting fatal proximate-causation problems due to the speculative and indirect nature of the harms alleged. *See id.* at *8.

## A.    The alleged harms fail the Supreme Court's proximate causation test.

In *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189 (2017), the Supreme Court considered FHA damages in light of the "well established principle" that "in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause." *Id.* at 201 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014)). The Court explained that the FHA "bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct," because "[t]he housing market is interconnected with economic and social life. A violation of the FHA may, therefore, be expected to cause ripples of harm to flow far beyond the defendant's misconduct. Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel." *Id.* at 202 (internal citations and quotation marks omitted). Thus, "proximate cause under the FHA requires some direct relation between the injury asserted and the injurious conduct alleged," with "direct relation" meaning that the chain of causation generally does not extend "beyond the first step." *Id.* at 202–203 (internal quotation marks omitted).

Seicshnaydre's account of the supposed harms for which Plaintiffs seek compensation under the "frustration of mission" theory makes it clear that they are precisely the "ripples" "too remote" from anything Defendants did to be cognizable as damages. ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

None of these assertions about ██████████████████████████████████████

are supported with any data or factual evidence of any kind (and certainly none specific to the subject properties and locations). There is no evidence that would give a jury any basis to measure how ███████████████████ or by whom, much less how this affects housing demand. This absence of evidence alone requires summary judgment. *See Celotex*, *supra*. And the only record evidence here, presented by the only person to have actually studied any market data, found that property values ████████████████████████████████████████ ██████████████████████████████████

But even setting aside the dearth of evidence, Plaintiffs' theory would not satisfy the *City of Miami* proximate-causation test even *with* competent supporting evidence. "[C]onsumer demand" dictated by "decentralized decisions" of prospective homebuyers influenced by

-41-

"stereotypes" is the essence of an indirect causal effect too many concentric ripples removed from any act of the Defendants to count. *See*, *e.g.*, *City of Oakland*, 14 F.4th at 1040 ("The chain becomes even more attenuated when variables of property value . . . are piled on top of a cascading number of independent variables."); *Cnty. of Cook v. HSBC N. Am. Holdings, Inc.* 314 F. Supp. 3d 950, 964 (N.D. Ill. 2018) (dismissing claim based on "diminishment in a property's value post-foreclosure" because "this introduces significant concerns about measuring the diminishment in value attributable to HSBC's conduct, as opposed to other external factors, such as the state of the general real estate market and the demand for houses on a neighborhood by neighborhood basis"); *Deutsche Bank*, 2019 WL 5963633, at *8 (alleged "harms to minority neighborhoods" like "diminished property values" and "housing opportunities" are "not sufficiently directly related to Defendants' conduct to satisfy proximate cause under the FHA").

Plaintiffs try to avoid suffering the same outcome they suffered in *Deutsche Bank* by seeking compensation for *their own* future programming ostensibly to *remedy* the alleged harms to minority neighborhoods, rather than directly for those alleged harms themselves. This does not eliminate the problem—it compounds it, adding one more step to the causal chain. To prevail, Plaintiffs would not only need to evidence the ███████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ █████████████████████████████████████████████

Plaintiffs have no evidence of any of this—no data on consumer behavior, no data on the causal link to Bank of America REOs, no data disaggregating any effects of those REOs from other area houses, and no data nor even any method for calculating the ███████████████████████

████████████████████████████████████████████ But even if these

things could be evidenced, they are still five or six ripples and myriad intervening actions and

actors away from the challenged maintenance work. "The injury requirement is not satisfied by a

plaintiff's reliance on a 'highly attenuated chain of possibilities,' or 'speculation about the

unfettered choices made by independent actors not before the court.'" *Johnson v. City of Annapolis*,

2023 WL 3390823, at *11 (D. Md. May 11, 2023) (quoting *Clapper*, 568 U.S. at 410, 414).

In analogous circumstances, where a plaintiff sought to recover costs of public services

(as opposed to Plaintiffs' private services) allegedly prompted by discriminatory lending practices,

the court in *County of Cook v. Wells Fargo & Co.* ruled that the "demand for those county services

depends on numerous intervening factors" and thus "it could not be established with the necessary

rigor what fraction of the increase (if any) in demand for those county services was attributable to

Wells Fargo[]." 314 F. Supp. 3d 975, 989 (N.D. Ill. 2018). The court further ruled:

> [T]he alleged "segregative effect of Wells Fargo's actions[]" . . . is a harm too far removed
> from Wells' Fargo's [] practice to satisfy the proximate cause analysis. The racial character
> of Cook County neighborhoods depends on numerous variables—including individual
> preferences for diversity in housing, the history of both governmental and private efforts
> to maintain (and then to dismantle) residential segregation, and continuing racial disparities
> in income and wealth. Isolating the effect of Wells Fargo's [] practice on patterns of racial
> segregation in Cook County would require the very kind of "massive and complex damages
> litigation" against which the Supreme Court has strongly cautioned.

*Id.* at 990 (citation and brackets omitted); *accord Cnty. of Cook v. Bank of Am. Corp.*, 78 F.4th 970,

971-72 (7th Cir. 2023) (claims to recover service expenses ensuing from "vacant properties"

"seek[] a remedy for effects that extend *way* beyond 'the first step'"). The same variables and

intervening factors are in play here. The entirety of Plaintiffs' "frustration of mission" claim is

based on the claimed (but not evidenced) future need for "services" to address alleged social ills

that Plaintiffs admit exist independently of anything they attribute to Defendants. The Court should

reject this theory as foreclosed by *Miami*, *Clapper*, and their progeny.

**B.** **The "prospective" activities Plaintiffs ask to be paid for are purely speculative.**

Plaintiffs' frustration-of-mission theory fails for the independent reason that by its own terms, Plaintiffs are not seeking to recover for any injuries they have actually incurred, but rather for expenses they contend (without evidence) they will incur in the future. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████    ███████████████

"[A]n organization can no more spend its way into standing based on speculative fears of future harm than an individual can. The harm must be concrete and imminent." *City of S. Miami*, 65 F.4th at 639 (quoting *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 982 (6th Cir. 2020) (internal quotation marks omitted)); *accord, e.g.*, *Clapper*, 568 U.S at 402 (no injury from "choosing to make expenditures based on hypothetical future harm that is not certainly impending"). Here, Plaintiffs offer even less—they have not even *endeavored* to "spend [their] way" into recovering programmatic expenses as damages, but instead merely insisted that they *will* spend money on unspecified programs going forward five years into the future. Such claims of "'possible future injury' are not sufficient." *Clapper*, 568 U.S. at 409.

Both the prospect Plaintiffs will actually invest money in these activities, and the prospect those activities will actually redress the supposed harms to Plaintiffs' "mission" as the law requires, are purely speculative. *See Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision.") (citation and internal quotation marks omitted). So too are the arbitrary dollar values Seicshnaydre assigns to them. Plaintiffs budget for all their activities so the actual cost of any program can be calculated to the penny, but Seicshnaydre didn't consider any of these budgets in opining on how much Plaintiffs should be paid for future programs or what future programs they might pursue. Ex. 43 at 154–55. This is fatal. *See*, *e.g.*, *Prison Legal News v. Nw. Reg'l Jail Auth.*, 2019 WL 4786054, at *6 (W.D. Va. Sept. 30, 2019) (rejecting claim that plaintiff "will need to expend resources to educate the community and eradicate the adverse effects of defendants' [] actions" because "the extent of such efforts [is] left unstated").

It is also relevant that while Plaintiffs say they "engag[e] in outreach and education efforts specifically to address Defendants' ongoing discrimination" (Compl. ¶ 12), there is no record evidence they have actually done so, or that any such future "efforts" will really relate to the Defendants as opposed to Plaintiffs' routine activities. The purported "education" evidence includes the single sentence added to a 102-page PowerPoint presentation giving the substance-free instruction, "Treat REO properties the same regardless of who lives in the neighborhood." Ex. 48 at 523. It also includes activities like FHCWM's coloring book for kids aged 6 to 8 that tells them that "[w]hen Henrietta Hen, Nick Hare, and Doctor Fox learn that a pig is moving into their building, they are appalled," and teaches them about being "kind and welcoming to other people" by coloring cutouts of cartoon animals and pasting them in an apartment building together. Ex. 49.

Plaintiffs regard any dollar they spend on *anything* as going towards redressing *any* act of discrimination (*see* Ex. 40 at 205–09), but the law requires more than that. Plaintiffs need record evidence that the damages they seek will redress the actual harms alleged. *See Lujan*, *supra*. They offer none. To the contrary, the alleged harms for which Plaintiffs seek redress—"future actions"

-45-

they say they will help them achieve their "bold mission" (Ex. 6 at 3, 9)—are harms that by Plaintiffs' own account haven't even happened yet and *won't* happen unless the Court awards them the money to fund those actions, as if this case were a grant application rather than a lawsuit. But if Defendants had really compelled Plaintiffs to make these expenses, they would have made them already. Defendants are entitled to summary judgment on these damages on that basis alone.

██████████████████████████████████████████

████████████████████████████ "Organizational injury, properly understood, is measured against a group's ability to *operate* as an organization, not its theoretical ability to *effectuate* its objectives in its ideal world." *CASA*, 971 F.3d 220 at 239; *N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections*, 2024 WL 21646, at *8 (M.D.N.C. Jan. 2, 2024) (same; quoting *CASA*); *see also*, *e.g.*, *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 137 (2d Cir. 2020) (Jacobs, J., concurring) (warning against "conflat[ing] (a) failure to maximize efficiency and success in the group's mission with (b) a diversion of resources from that mission."). Plaintiffs' expenditures towards their professed missions are already accounted for (and then some) in their purported diversion-of-resources damages. The degree to which they succeed in achieving those missions is neither measurable nor compensable. It is just another way of describing the "abstract social interests" that are not recoverable under *Havens*. 455 U.S. at 378–79.

## IV.

### Injunctive Relief Is Unavailable Here.

In addition to the $76 million, Plaintiffs also seek an injunction requiring Defendants to change their practices for maintaining REOs in various ways that align with Plaintiffs' preferences rather than the requirements actually issued by HUD. *See* Ex. 7 at 7–10. Plaintiffs also demand Defendants be ordered to hire Plaintiffs to train all their employees "on fair housing law" at Plaintiffs' inflated hourly rates. *Id.* at 9. None of this is available as a matter of law.

-46-

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). It may issue only where a plaintiff can show, *inter alia*, that Plaintiffs have "an irreparable injury" and that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay Inc. v. MercExcahnge, L.L.C.*, 547 U.S. 388, 391 (2006). Plaintiff's demand for an injunction fails right out of the gate, because they are already on record documenting how they can be made "whole" with monetary damages. Ex. 6 at 36. Even the speculative *future* injuries they claim—the customary predicate for an injunction—have been quantified and claimed in dollar figures. There is thus no irreparable harm to sustain injunctive relief here.

Additionally, this Court foresaw that "the defendants may ultimately seek to limit the extent of the available remedy based on the scope of the plaintiffs' investigation." ECF No. 235 at 18. The plea for injunctive relief is an aspect of Plaintiffs' case where the scope of their investigation forecloses the remedy sought. Bank of America previously moved for summary judgment on the ground that the 1,405 properties at issue were unrepresentative of their metropolitan areas and its REO portfolio overall, and were instead carefully selected by Plaintiffs to exhibit disparities in property conditions. In response, Plaintiffs conceded "[t]he lack of a 'representative sample'" and insisted it did not *have* to be representative because "NFHA did not set out to extrapolate its findings to every REO property within the metropolitan areas included—simply those that met its inclusion criteria and were observed." ECF No. 167-11 at 24. The consequence of this is that the "available remedy" must also be limited to consequences Plaintiffs can prove to have flowed from those 1,405 properties that "were observed." ECF No. 235 at 18.

Plaintiffs base their injunctive-relief demand on the asserted need "to ensure that violations do not recur" (Ex. 6 at 2), but there is no factual or legal basis for supposing that any harms to

Plaintiffs will "recur" in the 1,405 properties they observed. And neither the law nor the scope of their claims lets them seek an injunction on the speculative prospect that FHA violations will occur on other properties not part of this case, on which Plaintiffs expended no resources. That would violate the constitutional limitation that a plaintiff must assert its "own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The available remedies are limited by the fact that this is a lawsuit about 1,405 properties, not a class action where Plaintiffs press claims in a representative capacity. *See*, *e.g.*, *Chavez v. Ill. State Police*, 1999 U.S. Dist. LEXIS 9145, at *14 n.3 (N.D. Ill. June 11, 1999) ("without class certification, the named plaintiffs cannot seek an injunction that, in effect, grants relief to individuals other than themselves").

Finally, injunctive relief requires "that the public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391. Forcing Defendants to adhere to NFHA's notions of how REO properties should be maintained, rather than HUD's, the federal agency that establishes the actual requirements, would manifestly disserve the public interest. About three quarters of the properties at issue in this case were mortgaged with FHA-insured loans subject to HUD's maintenance requirements. ECF No. 167-10 ¶ 15. NFHA was not even familiar with what those requirements were when it decided to accuse Defendants of falling short of them. S*ee id*. Now Plaintiffs ask this Court to issue an injunction "[e]xpand[ing] the types of allowable expenses for exterior-maintenance work," apparently to compel Defendants to address conditions Plaintiffs consider defects but HUD does not. Ex. 8 at 8. Even setting aside that HUD is not before this Court and cannot be compelled to expand its list of allowable expenses, NFHA has no factual or legal basis to claim that its notions of how to maintain foreclosed properties are more capable of serving the public interest than the standards of a democratically accountable public agency.

## V.

### The Damages Record and Current State of the Law Warrant
### Revisiting the Court's 2019 Personal Jurisdiction Analysis.

Defendants challenged Plaintiffs' claims to personal jurisdiction at the outset of this case. *See* ECF No. 44-1 at 30–32. The problem is their decision to sue in Maryland, where none of the organizational Plaintiffs are located and whose only connection to this case is that NFHA inspected some properties in Baltimore and Prince George's County. Personal jurisdiction must arise from "the defendant's contacts with the forum" and must be established for *each Plaintiff* independently of the other ones. *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984); *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 264 (2017).

Judge Blake based jurisdiction in 2019 on allegations that "the claims pled here by nonresidents involve injuries that occurred in Maryland and harm to Marylanders." ECF No. 66 at 11. But however much that ruling might have been justifiable at the pleading stage, it is no longer supported by the record and the Court can and should assess it anew. *See, e.g.*, *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 870 F. Supp. 2d 415, 421 (D. Md. 2012) ("When a defendant asserts that the court lacks personal jurisdiction in a summary judgment motion after the close of discovery, . . . the plaintiff must support its *prima facie* showing with an averment of facts that, if credited by the trier, would suffice to establish jurisdiction").

None of the organizational Plaintiffs are Maryland entities. And it is now established that none except NFHA claims any "injuries that occurred in Maryland." *Id*. Plaintiffs did not collectively invest resources inspecting properties in Maryland. Only NFHA did. CFHC inspected properties in Connecticut, NTFHC inspected properties in Texas, and so on. The "resources" each Plaintiff seeks to recover under their "diversion of resources" theory are resources they expended in their respective home states. The "programming" each Plaintiff seeks to be paid to do under

-49-

their "frustration of mission" theory is programming in their respective home states. *See* Ex. 6 at 2 (asserting that "Plaintiffs' damages [were] sustained . . . within Plaintiffs' service areas").

Judge Blake also predicated the Court's original ruling on uncertainty whether "*Bristol-Myers* applies to federal question actions in federal court." ECF No. 66 at 11. There is no more uncertainty. "[T]he vast majority of district courts to have addressed the question have concluded that *Bristol-Myers* does govern actions in federal courts." *Napoli-Bosse v. Gen. Motors LLC*, 453 F. Supp. 3d 536, 541–42 (D. Conn. 2020). That includes courts in this Circuit, which followed "the majority of federal courts" in "requir[ing] each named plaintiff . . . to demonstrate personal jurisdiction," beginning with Chief Judge Bredar. *Lincoln v. Ford Motor Co.*, 2020 WL 5820985, at *5 (D. Md. Sept. 29, 2020). These cases have repeatedly held that out-of-state plaintiffs can't "bootstrap[] [their] claims to those of [a] co-plaintiff" to establish personal jurisdiction. *Richards v. NewRez LLC*, 2021 WL 1060286, at *17 (D. Md. Mar. 18, 2021).[13] In *Newman v. Direct Energy, L.P.*, 2023 WL 2914788, at *4 (D. Md. Apr. 12, 2023) (Gallagher, J.), this Court, citing *Bristol-Myers*, "transferred a case to the defendant's home district to address . . . the potential for a lack of personal jurisdiction over the claims of putative class members with no connection to the named plaintiff's chosen forum." The same applies to the nonresident plaintiffs here. The rest of the organizational Plaintiffs couldn't have sued in this District *without* NFHA and the two individual plaintiffs, and doing so *with* NFHA and the individual plaintiffs changes nothing. Summary judgment against these Plaintiffs for lack of personal jurisdiction is therefore warranted.

---

[13] *Accord, e.g.*, *Speight v. Labor Source, LLC*, 2022 WL 1164415, at *5 (E.D.N.C. Apr. 19, 2022) (following *Bristol-Myers*' holding that "[t]he mere fact that *other* plaintiffs in the action . . . allegedly sustained the same injuries as did the nonresident-plaintiffs does not allow specific jurisdiction over the nonresident-plaintiffs") (cleaned up); *Mey v. DIRECTV, LLC*, 2021 WL 6882423 (N.D.W. Va. Feb. 25, 2021); *Hunt v. Aldi, Inc.*, 2020 WL 1248944, at *7 (D. Md. Mar. 16, 2020); *Hernandez v. Equifax Info. Servs. LLC*, 2020 WL 4584249 (W.D.N.C. Aug. 10, 2020).

## CONCLUSION

For the above-stated reasons, Defendants respectfully submit that summary judgment is due in full or in part.

Dated: April 19, 2024                              Respectfully submitted,

/s/ Ava E. Lias-Booker                             /s/ Thomas M. Hefferon
Ava E. Lias-Booker (No. 05022)                     Thomas M. Hefferon (No. 15109)
Melissa Martinez (No. 28975)                       Brooks R. Brown (*pro hac vice*)
MCGUIRE WOODS LLP                                  Keith Levenberg (No. 11957)
500 E. Pratt St., Ste. 1000                        GOODWIN PROCTER LLP
Baltimore, Md. 21202                               1900 N St. N.W.
Tel.: (410) 659-4430                               Washington, D.C. 20036
Fax: (410) 659-4558                                Tel.: (202) 346-4248
alias-booker@mcguirewoods.com                      Fax: (202) 346-4444
mmartinez@mcguirewoods.com                         thefferon@goodwinlaw.com
                                                   bbrown@goodwinlaw.com
                                                   klevenberg@goodwinlaw.com

*Counsel for Defendant Bank of America, N.A.*

/s/ Maryan Alexander                               /s/ David Holmes
Maryan Alexander (No. 29158)                       David Holmes (*pro hac vice*)
WILSON, ELSER, MOSKOWITZ, EDELMAN &                WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP                                         DICKER LLP
500 E. Pratt St., Ste. 600                         55 W. Monroe
Baltimore, Md. 21202-3173                          Chicago, Ill. 60603
Tel.: (410) 962-7385                               Tel.: (312) 704-0550
Fax: (410) 962-8758                                Fax: (312) 704-1522
Maryan.alexander@wilsonelser.com                   David.Holmes@wilsonelser.com

*Counsel for Defendant Safeguard Properties Management, LLC*

## **APPENDICES FOLLOW**

## APPENDIX A

### $68,918.30 IN FACIALLY IRRELEVANT ACTIVITIES ON PLAINTIFFS' TIME LOGS

| Party | Time entry narrative | Entry frequency | Total hours | Total money |
|---|---|---|---|---|
| NFHA | Administration; REO - Phoenix | 4 | 7.00 | $2,800.00 |
| NFHA | Travel; Phoenix Property Tours | 1 | 2.70 | $540.00 |
| NFHA | Travel; Phoenix travel | 1 | 2.70 | $540.00 |
| NFHA | Research; Phoenix research REO | 1 | 0.30 | $60.00 |
| NFHA | Research; collecting Phoenix data | 2 | 0.60 | $120.00 |
| NFHA | Logistics; Phoenix/Atlanta planning | 2 | 0.70 | $140.00 |
| NFHA | Research; prep for Phoenix trip | 2 | 0.90 | $180.00 |
| NFHA | Travel; travel to and from Phoenix REO | 2 | 5.20 | $1,040.00 |
| NFHA | Investigation; REO intake - Phoenix | 2 | 3.60 | $720.00 |
| NFHA | Administration; analyzing data for REO call on Fannie Mae FSVs | 3 | 5.00 | $1,000.00 |
| NFHA | Administration; budgets for settlement | 3 | 7.00 | $2,800.00 |
| NFHA | Administration; Fannie | 2 | 2.30 | $920.00 |
| NFHA | Administration; Fannie Mae | 1 | 0.50 | $200.00 |
| NFHA | Administration; Fannie Mae REO investigations | 2 | 3.80 | $760.00 |
| NFHA | Administration; Minneapolis - Fannie Mae - REO - Investigation | 2 | 1.30 | $260.00 |
| NFHA | Administration; Nontraditional credit verification FHA/Fannie/Freddie Chart Creation | 2 | 1.20 | $240.00 |
| NFHA | Administration; preparing for Fannie meeting on FSVs | 1 | 1.00 | $200.00 |
| NFHA | Administration; radio show REO-rental-sex harass-trends | 1 | 0.70 | $280.00 |
| NFHA | Administration; REO meeting on Deutsche Us Bank and Fannie Mae FSVs | 1 | 0.70 | $140.00 |
| NFHA | Administration; review Fannie complaint | 1 | 2.00 | $800.00 |
| NFHA | Administration; Roscoe BOA REO | 2 | 4.00 | $1,800.00 |
| NFHA | Administration; Safeguard/Fannie Mae research | 1 | 1.00 | $200.00 |
| NFHA | Administration; uploading data from PHX | 5 | 1.20 | $1,160.00 |
| NFHA | Administration; work on sttlemn budgets | 4 | 3.80 | $1,500.00 |
| NFHA | Analysis; Fannie FSV Analysis | 1 | 6.50 | $1,300.00 |

| NFHA | Analysis; Fannie Mae REO analysis - CT, IL, OH, GA, CA, WI, TX, FL | 1 | 5.00 | $1,000.00 |
| NFHA | Analysis; Fannie Mae REO analysis - OH | 1 | 1.50 | $300.00 |
| NFHA | Analysis; Fannie vendor analysis | 1 | 3.00 | $600.00 |
| NFHA | Investigation; Bank of America BAC REO Investigations Tucson | 2 | 6.80 | $1,350.00 |
| NFHA | Investigation; Fannie Mae Newark REO investigations | 1 | 2.50 | $500.00 |
| NFHA | Investigation; REO Fannie | 1 | 4.20 | $840.00 |
| NFHA | Investigation; REO in San Fran | 3 | 6.50 | $1,300.00 |
| NFHA | Investigation; REO in San Francisco | 1 | 0.10 | $20.00 |
| NFHA | Investigation; REO intake - Phoenix | 2 | 3.60 | $720.00 |
| NFHA | Investigation; REO site visits, PHX | 6 | 1.70 | $340.00 |
| NFHA | Investigation; REO witn Fannie property | 1 | 1.00 | $200.00 |
| NFHA | Logistics; Phoenix uploading | 2 | 2.10 | $420.00 |
| NFHA | Paralegal Interviews | 2 | 1.60 | $400.00 |
| NFHA | Paralegal Resume review & admin | 7 | 2.10 | $525.00 |
| NFHA | Phone Calls; Fannie Mae & Safeguard call w/ IL broker and vendor | 1 | 1.00 | $200.00 |
| NFHA | REO Fannie Freddie research Baltimore | 2 | 0.17 | $51.88 |
| NFHA | REO Paralegal Resume review | 1 | 0.70 | $175.00 |
| NFHA | Research; Charlotte REO planning | 1 | 0.30 | $60.00 |
| NFHA | Research; Charlotte REO research | 1 | 0.30 | $60.00 |
| NFHA | Research; compiling Fannie Mae FSV evidence/briefing | 2 | 4.00 | $800.00 |
| NFHA | Research; DC % PG Co Fannie Mae REO research | 1 | 1.00 | $200.00 |
| NFHA | Research; reading OIG Fannie Freddie Vendor report | 1 | 0.70 | $140.00 |
| NFHA | Research; Richmond VA REO list | 4 | 1.90 | $380.00 |
| NFHA | Research; Safeguard/Fannie Mae REO Numbers and background info | 2 | 1.30 | $260.00 |
| NFHA | Review; Fannie Mae FSV review | 1 | 2.50 | $500.00 |
| NFHA | Review; Fannie Mae/Safeguard Updates | 1 | 4.50 | $900.00 |
| NFHA | Review; Fannie Mae/ Safeguard Updates | 1 | 2.00 | $400.00 |
| NFHA | Travel; PHX travel | 2 | 5.40 | $1,080.00 |
| NFHA | Travel; to and from SF | 2 | 3.40 | $680.00 |
| NFHA | Travel; travel, REO Phoenix | 2 | 5.40 | $1,080.00 |
| NFHA | Travel; travel, SF REO Trip | 3 | 8.00 | $1,600.00 |

| NFHA | Writing/development of materials; Fannie Mae Chicago Realtor mapping | 1 | 2.00 | $400.00 |
|------|------|------|------|------|
| NFHA | Writing/development of materials; photo exhibit for Fannie Mae compliant | 1 | 6.50 | $1,300.00 |
| NFHA | Writing/development of materials; updating REO chapter with WF settlement info | 1 | 0.20 | $40.00 |
| FHCRR | emails:  invitation to serve on Housing & Investment Advisory Committee | 1 | 0.08 | $14.58 |
| FHCRR | Outreach: accepting offer to serve on Housing & Investment Advisory Committee | 1 | 0.08 | $14.58 |
| FHCRR | emails: Coordination by email re: HIAB Accessible and Affordable Housing Working Group | 1 | 0.08 | $14.58 |
| FHCRR | emails: HIAB | 1 | 0.08 | $14.58 |
| FHCRR | emails: HIAB - Accessible & Affordable Housing Working Group | 1 | 0.08 | $14.58 |
| FHCRR | emails: HIAB - Review of documents in preparation for call to discuss working group. | 1 | 0.08 | $14.58 |
| FHCRR | emails: HIAB 10-year housing plan | 1 | 0.08 | $14.58 |
| FHCRR | emails: HIAB coordination | 4 | 0.32 | $58.33 |
| FHCRR | emails: HIAB emails and doodle poll | 1 | 0.08 | $14.58 |
| FHCRR | emails: HIAB meeting coordination for today's meeting and next week's. | 1 | 0.08 | $14.58 |
| FHCRR | emails: HIAB RE: Accessibility data for Cleveland | 1 | 0.17 | $29.16 |
| FHCRR | emails: HIAB re: serving as a co-convener of the housing accessibility and affordability working group | 1 | 0.08 | $14.58 |
| FHCRR | Meeting: HIAB | 1 | 0.50 | $87.49 |
| FHCRR | Meeting: HIAB - Prep meeting w/Akira Drake Rodriguez & Chris Alvarado. Following call added holds to calendar for initial group meeting. | 1 | 0.17 | $29.16 |
| FHCRR | Meeting: HIAB Accessible & Affordable Housing Working Group | 1 | 0.42 | $72.91 |
| FHCRR | Meeting: HIAB meeting | 1 | 0.50 | $87.49 |
| FHCRR | Meeting: HIAB meeting to rank priorities. | 1 | 0.17 | $29.16 |

| FHCRR | Meeting: HIAB meeting w/Chris Alvarez | 1 | 0.33 | $58.33 |
|---|---|---|---|---|
| FHCRR | Meeting: HIAB w/Akira Drake & Chris Alvarado | 1 | 0.17 | $29.16 |
| FHCRR | Meeting: Prep for and participation in HIAB Accessible & Affordable Housing Working Group | 1 | 0.58 | $102.07 |
| FHCRR | Research: HIAB - Conducted research to generate list of various potential stakeholders for participation in Accessible & Affordable Housing Working Group | 1 | 0.25 | $43.75 |
| FHCRR | Writing/Editing: Contributed suggestions for committee members and topics for them to address using Google Form for HIAB. | 1 | 0.17 | $29.16 |
| FHCRR | Writing/Editing: HIAB | 1 | 0.17 | $29.16 |
| FHCRR | Phone call: 962 Referrals of community members to community resources for downpayment assistance, housing counseling, code enforcement, and emergency assistance; Diversion includes an estimated 15 minutes per inquiry and referral. Billed at the rate of $100/hour as the hourly billing rates of the staff members engaged in this work ranges from $50/hour for Interns to $200/hour for the Executive Director. Staff most frequently engaged in this work bill at $175, $150, $125, and $50 per hour. Multiplied by 33% of all REO activity allocated to the Bank of America case. | 1 | 80.17 | $8,016.67 |
| HOPEFHC | Education and outreach; DuPage NAACP dinner, logistics | 3 | 0.24 | $96.00 |
| HOPEFHC | Education and outreach; Mainstreet Realtor Association | 1 | 0.17 | $68.00 |
| HOPEFHC | Education and outreach; Pat Trombolli, Real Estate Education assistance | 1 | 0.17 | $68.00 |
| HOPEFHC | Education and outreach; emails - DuPage event | 3 | 0.24 | $96.00 |
| HOPEFHC | Provide training/conference; Rachana - lending school, logistics | 1 | 0.25 | $100.00 |

| HOPEFHC | Education and outreach; Neighborhood Program, anti-steering/segregation | 1 | 0.17 | $68.00 |
| HOPEFHC | Education and outreach; DuPage Neighborhood Show - Toni, contacts | 4 | 1.08 | $432.00 |
| HOPEFHC | Education and outreach; DuPage Neighborhood Show - Fred, NAR, Pam - Main Street | 2 | 0.66 | $164.00 |
| HOPEFHC | Review; Calls, meetings, timesheets, expenses | 5 | 5.75 | $2,300.00 |
| HOPEFHC | Education and outreach; City of Joliet - Alfredo Malesio, AI, follow up | 4 | 1.08 | $432.00 |
| HOPEFHC | e-mails; Corporate Recruiter - Fair Lending position, outreach | 3 | 1.50 | $600.00 |
| HOPEFHC | Education and outreach; local lender/CRA contacts, CIL, National Association of Hispanic Real Estate Professional, etc. | 2 | 0.41 | $164.00 |
| HOPEFHC | Education and outreach; Peoria - Tri-County CDBG event, emails | 1 | 0.17 | $68.00 |
| HOPEFHC | Education and outreach; DuPage Co Mortgage Relief event - materials, preparation, attendance | 2 | 1.82 | $728.00 |
| HOPEFHC | E & O; Justin Voccola - re: Chicago, lending info | 3 | 1.25 | $500.00 |
| HOPEFHC | Education and outreach; DuPage Financial Literacy meeting | 1 | 0.99 | $396.00 |
| HOPEFHC | Phone Calls; Grady Norwood - Westside Development | 2 | 1.25 | $500.00 |
| HOPEFHC | Education and outreach; Protecting Tenants in Foreclosure Act - extensions, research, advocacy | 1 | 0.17 | $68.00 |
| HOPEFHC | Education and outreach; IL Attorney General re: FHA state pricing issue | 1 | 0.17 | $68.00 |
| HOPEFHC | Education and outreach; Jesse Hoyt - Illinois Coalition for Immigrant and Refugee Rights | 1 | 0.08 | $32.00 |
| HOPEFHC | Education and outreach; IL Attorney General settlement, ways to leverage with Mortgage Rescue Component | 1 | 0.83 | $332.00 |
| HOPEFHC | Education and outreach; HOPE event, artist outreach, social media | 3 | 1.66 | $664.00 |

| | | | | |
|---|---|---|---|---|
| HOPEFHC | Provide training/conference; Regional Neighborhood Network AFFH presentation proposal | 1 | 0.99 | $198.00 |
| HOPEFHC | Education and outreach; Chicago Urban League Homeownership event | 1 | 0.83 | $166.00 |
| HOPEFHC | Investigation; Chicago lending practices, research | 1 | 0.50 | $200.00 |
| HOPEFHC | Litigation; Diversion, Journyx, E & O time for counsel | 1 | 0.50 | $200.00 |
| HOPEFHC | Education and outreach: lending brochure | 2 | 0.34 | $136.00 |
| HOPEFHC | Intake: Ulisses Alonza-Maywood | 4 | 1.50 | $600.00 |
| METRO | Training Homebuyer Education Seminar | 1 | 0.10 | $15.00 |
| METRO | Pulled database to enter diversion data | 1 | 8.00 | $1,200.00 |
| METRO | Metro model training outline for CE credit in realty trainings | 1 | 0.50 | $75.00 |
| FHANC | Email from re: safety meeting | 1 | 0.10 | $25.00 |
| FHANC | Review video frm S. Smith | 1 | 0.10 | $25.00 |
| FHANC | Produce and send 2 email marketing emails on predatory lending and loan modification scams on 11/26/2013. | 1 | 0.10 | $10.00 |
| FHANC | Email from Caroline Peattie with article on predatory lending | 1 | 0.10 | $10.00 |
| FHANC | BOA Charitable Foundation webinar on neighborhood revitalization | 1 | 0.10 | $10.00 |
| FHANC | NMSF one-year update webinar | 1 | 0.10 | $10.00 |
| FHANC | Email from Caroline Peattie with article from Center for Responsible Lending | 1 | 0.10 | $10.00 |
| FHANC | Meeting with Caroline Peattie to discuss revitalization | 1 | 0.10 | $25.00 |
| FHANC | Email to/from Caroline Peattie re: notes on Solano County revitalization efforts | 1 | 0.10 | $25.00 |
| FHANC | Presentation to SparkPoint Marin on predatory lending and foreclosure prevention | 1 | 0.10 | $10.00 |
| FHANC | Pre-purchase Workshop | 9 | 0.90 | $56.50 |
| FHANC | Intro to Homebuying Workshop | 2 | 0.20 | $13.30 |
| FHANC | Meeting with Jessica Tankersley to discuss revitalization | 1 | 0.10 | $25.00 |

| FHANC | Prepare proposal for California Attorney General's National Mortgage Settlement Funds: Consumer Assistance Grant, including creating grant budget, communicating with CAG's office, working with subcontractor (Sparkpoint), and leveraging from NFHA and LSNC. | 1 | 0.10 | $13.20 |
|---|---|---|---|---|
| TFHC | Community Relief Fund Presentation | 1 | 0.20 | $70.00 |
| TFHC | Attend press conf. for MLK Inclusive Communities | 1 | 0.30 | $105.00 |
| TFHC | REO Community Relief Funds meeting in Chicago | 2 | 4.00 | $1,400.00 |
| TFHC | Discuss lending concerns with Pete Gerken | 1 | 0.30 | $105.00 |
| TFHC | Phone call with Shanti Abedin of NFHA regarding community relief funds report and website | 1 | 0.20 | $70.00 |
| TFHC | Summary of MLK programs and updates to flyer and figures | 1 | 0.30 | $105.00 |
| TFHC | Scheduling call with Shanti regarding MLK program for NFHA's report for conference | 1 | 0.10 | $35.00 |
| HOPE | Review complaint and work on diversion log | 1 | 1.00 | $250.00 |
| HOPE | Attorney meeting with Crump law | 1 | 2.00 | $500.00 |
| FHCNA | Reset password for Jackie (Jason Collins / Lindsey Augustine | 1 | 0.17 | $20.83 |
| DMFHC | DOJ/AG | 1 | 0.67 | $166.67 |
| CFHC | Training; real estate commission re: mandatory FH training | 2 | 1.60 | $391.88 |
| CFHC | Education: preparing for training; Emailing with CREC re: details of training | 1 | 0.50 | $173.25 |
| CFHC | Education: Provider training; train the trainers for real estate agents | 1 | 1.40 | $567.60 |
| CFHC | Education: Provider training; training for real estate trainers on the fair housing laws | 1 | 1.30 | $462.00 |
| CFHC | Education and Outreach; Work on Kaplan Curriculum | 1 | 0.30 | $105.60 |

| CFHC | Respond to emails; Emails back and forth re: Kaplan course | 1 | 0.10 | $52.80 |
|---|---|---|---|---|
| CFHC | Outreach: Developing outreach materials; editing materials for real estate agents | 1 | 0.80 | $316.80 |
| CFHC | Administrative: Research; review of McKissock on-line real estate class | 1 | 0.50 | $198.00 |
| CFHC | Consultation with: outside colleague; emails with Kelly Harvey re: changes to mandatory real estate course and request to review a complaint she received | 1 | 0.10 | $39.60 |
| FHCCI | Wells Fargo settlement related press referencing REOs overall | 1 | 2.50 | $625.00 |
| FHCCI | Hearts & Hands of Indiana Remaking 914 Holmes Ave Event plus travel time | 1 | 0.70 | $175.00 |
| FHCCI | Harrison Family Home Mod Project Site Evaluation | 1 | 0.50 | $125.00 |
| FHCCI | Hearts & Hands of Indiana Annual Event plus travel time | 1 | 0.80 | $200.00 |
| FHCCI | King Park Development Corporation Meeting | 2 | 1.20 | $181.00 |
| FHCCI | Processed NFHA payment $250 | | | |
| FHCCI | Counteraction; Elkhart Lending Training | 1 | 1.00 | $200.00 |
| FHCCI | Mapleton-Fall Creek 3025 Park Ave Site Viewing | 1 | 0.30 | $75.00 |
| FHCCI | Mapleton-Fall Creek 3153 Park Ave Site View | 1 | 0.30 | $75.00 |
| FHCCI | Mapleton-Fall Creek 3127 Park Ave Dedication | 1 | 0.30 | $75.00 |
| FHCCI | Mapleton-Fall Creek Dev Corp Meeting | 2 | 1.00 | $165.00 |
| FHCCI | Marian University President's Appreciaton Dinner | 1 | 0.80 | $200.00 |
| FHCWM | FHCWM staff (LK) sent out a media advisory regarding fair housing enforcement activities, specifically against AMS. | 1 | 4.00 | $800.00 |
| CONTINUUM | Community Housing Initiative (CHI )1st time homebuyers in Melbourne, FL | 1 | 0.10 | $6.88 |
| CONTINUUM | Community Housing Initiative (CHI) 1st time homebuyers class in Melbourne, FL | 66 | 3.60 | $533.50 |

| | | | | |
|---|---|---|---|---|
| CONTINUUM | Community Housing Initiative (CHI) 1st time homebuyers in Melbourne, FL | 4 | 0.20 | $27.50 |
| CONTINUUM | Community Housing Initiative (CHI)1st time homebuyers class in Melbourne, FL | 4 | 0.20 | $31.63 |
| CONTINUUM | Hands of Central FL 1st time homebuyers classes in Orlando, FL | 42 | 2.30 | $338.25 |
| CONTINUUM | Webinar for Veterans, recorded in Plaintiff's office | 2 | 0.10 | $16.50 |
| CONTINUUM | Workshop with the Mid-Florida Housing Partnership in Daytona Beach, FL | 3 | 0.30 | $24.75 |
| MVFHC | Development, develop scripts to delete records and photos | 1 | 0.40 | $100.00 |
| MVFHC | Discussions with City of Dayton about BoA's programs being offered to City directly | 1 | 0.50 | $125.00 |
| MVFHC | String of emails with Nan Whaley regarding BoA's contact with Dayton and BoA's desire to assist Dayton through BoA's Community Assistance Partnership program. | 1 | 0.50 | $125.00 |
| MVFHC | Review email from N. Whaley on BoA offer to partner with City of Dayton through BoA's Community Assistance Partnership program. | 1 | 0.25 | $62.50 |
| MMFHC | Get snacks for NFHA training | 1 | 0.20 | $15.00 |
| MMFHC | Review American Fact Finder | 1 | 0.17 | $12.50 |
| MMFHC | Internet research | 2 | 0.33 | $25.00 |
| MMFHC | Pull new Fannie props | 1 | 0.19 | $14.12 |
| MMFHC | Fannie #s for BT + CW | 1 | 0.17 | $16.67 |
| MMFHC | Review American Fact Finder website | 1 | 0.83 | $62.50 |
| LAFHAC | Compiled diversion information for discovery requests. | 6 | 5.59 | $978.25 |
| **TOTAL** | | | | **$68,918.30** |

**APPENDIX B**

$603,617.18 IN VAGUE ENTRIES ON PLAINTIFFS' TIME LOGS

| Party | Time entry narrative | Entry frequency | Total hours | Total money |
|-------|---------------------|-----------------|-------------|-------------|
| NFHA | Accounts Payable; | 1 | 1.5 | $675.00 |
| NFHA | Accounts Payable; BOA | 3 | 1.1 | $450.00 |
| NFHA | Accounts Payable; BOA cities | 2 | 4 | $1,800.00 |
| NFHA | Accounts Payable; MTD | 4 | 5 | $2,250.00 |
| NFHA | Administration;  call B Senhauser | 1 | 0.5 | $200.00 |
| NFHA | Administration; agenda & mtg | 1 | 2 | $800.00 |
| NFHA | Administration; American Banker | 5 | 3 | $1,200.00 |
| NFHA | Administration; Am Banker | 3 | 1.5 | $600.00 |
| NFHA | Administration; AMS | 3 | 1.1 | $440.00 |
| NFHA | Adminstration; ARELLO | 7 | 2.3 | $920.00 |
| NFHA | Administration; assisted Shanti Abedin | 1 | 0.3 | $8.58 |
| NFHA | Adminstration; Asst. Shanna w/ proj. | 1 | 5 | $150.20 |
| NFHA | Administration; Asst. Shanna | 2 | 4.5 | $135.18 |
| NFHA | Administration; asst. Lindsay Augustine | 1 | 0.2 | $6.31 |
| NFHA | Administration; Atlanta | 8 | 7.6 | $3,040.00 |
| NFHA | Administration; auctions | 2 | 1 | $400.00 |
| NFHA | Administration; auction issues | 1 | 1 | $400.00 |
| NFHA | Administraion; Baltimore reporter | 1 | 0.3 | $120.00 |
| NFHA | Administration; bac | 4 | 16 | $6,400.00 |
| NFHA | Administration; BAC | 2 | 6 | $2,400.00 |
| NFHA | Administration; Bank of America | 85 | 113.5 | $46,838.00 |
| NFHA | Administration; Bank of Ameica REO | 1 | 1 | $400.00 |
| NFHA | Administration; Bank of America - REO | 4 | 4.2 | $800.00 |
| NFHA | Administration; Bank of America Call | 1 | 0.5 | $24.32 |
| NFHA | Administration; Bank of America communications | 9 | 13 | $1,118.42 |
| NFHA | Administration; Bank of America REO INvestigations | 1 | 0.3 | $50.00 |
| NFHA | Administration; Bank of America REO investigations | 3 | 3.6 | $700.00 |
| NFHA | Administration; Bank of America REO | 88 | 90.9 | $38,279.00 |
| NFHA | Administration; Black appraisers | 2 | 0.9 | $405.00 |
| NFHA | Administration; boa (or BOA) | 49 | 66.8 | $26,700.00 |
| NFHA | Administration; BOA - REO | 4 | 4 | $1,600.00 |
| NFHA | Administration; BoA auctions issues | 1 | 1 | $400.00 |
| NFHA | Administration; BoA follow up | 4 | 7.5 | $3,000.00 |
| NFHA | Administration; BoA Perry | 1 | 0.3 | $100.00 |

| NFHA | Administration; Meeting with Shanna | 1 | 1.5 | $72.96 |
|------|-------------------------------------|---|-----|--------|
| NFHA | Administration; BOA Meeting and notes | 2 | 1.5 | $72.96 |
| NFHA | Administration; BOA REO (or reo) | 14 | 17.5 | $7,225.00 |
| NFHA | Administration; BOA REO Larkins | 1 | 0.3 | $100.00 |
| NFHA | Administration; BOA REO planning | 7 | 11.3 | $4,500.00 |
| NFHA | Administration; BOA REO review evidence | 3 | 3.5 | $1,400.00 |
| NFHA | Administration; BOA review evidence | 4 | 7 | $2,800.00 |
| NFHA | Administration; BoFA | 1 | 3 | $1,200.00 |
| NFHA | Administration; BOFA - REO | 5 | 3.5 | $1,200.00 |
| NFHA | Administration; BOFA REO Case | 1 | 1 | $400.00 |
| NFHA | Administration: BoFA REO | 7 | 18.5 | $8,325.00 |
| NFHA | Administration; budgets for settlement | 3 | 7 | $2,800.00 |
| NFHA | Administration; CAC REO | 2 | 0.4 | $160.00 |
| NFHA | Administration; CAC | 2 | 4.7 | $2,600.00 |
| NFHA | Administration; call | 2 | 1.7 | $680.00 |
| NFHA | Administration; call REO | 3 | 1.3 | $520.00 |
| NFHA | Administration; call and follow up | 2 | 1.5 | $600.00 |
| NFHA | Administration; call-REO trust | 1 | 0.3 | $120.00 |
| NFHA | Administration; chapter REO | 1 | 1 | $400.00 |
| NFHA | Administration; Communications | 8 | 28.5 | $940.50 |
| NFHA | Administration; comms - REO Report | 22 | 15.6 | $496.20 |
| NFHA | Administration; comms | 15 | 32.5 | $1,039.80 |
| NFHA | Administration; compiling REO meetings/outreach | 3 | 3.8 | $760.00 |
| NFHA | Administration; conf call w partners | 1 | 1.8 | $700.00 |
| NFHA | Administration; conf call with partners | 1 | 1.3 | $500.00 |
| NFHA | Administration; conference call and prep for call | 2 | 2 | $800.00 |
| NFHA | Administration; CoreLogic | 1 | 0.2 | $80.00 |
| NFHA | Administration; damages | 1 | 1 | $400.00 |
| NFHA | Administration; Damages | 1 | 0.5 | $200.00 |
| NFHA | Administration; default | 24 | 63.5 | $4,471.70 |
| NFHA | Administration; details | 1 | 1.5 | $600.00 |
| NFHA | Administration; discuss issues | 1 | 0.5 | $200.00 |
| NFHA | Administration; education REO | 4 | 1.3 | $520.00 |
| NFHA | Administration; enter comments | 50 | 43.6 | $7,540.50 |
| NFHA | Administration; EnterComments | 9 | 10 | $4,000.00 |
| NFHA | Administration; evidence | 1 | 1.5 | $600.00 |
| NFHA | Administrtation; Expert | 1 | 0.5 | $200.00 |
| NFHA | Administration; FHS PPT | 2 | 2.6 | $520.00 |
| NFHA | Administration; glossary | 1 | 0.3 | $120.00 |
| NFHA | Administration; GW program | 2 | 1 | $400.00 |

| NFHA | Administration; Health impact | 1 | 0.8 | $300.00 |
|---|---|---|---|---|
| NFHA | Administration; health impact and housing | 2 | 1.5 | $600.00 |
| NFHA | Administration; HUD and prep | 2 | 4 | $1,600.00 |
| NFHA | Administration; HUD meeting | 3 | 2 | $800.00 |
| NFHA | Administration; investigation review | 3 | 6.5 | $2,600.00 |
| NFHA | Administration; John Marshall | 2 | 4.7 | $1,880.00 |
| NFHA | Administration; meeting-planning | 4 | 1.6 | $640.00 |
| NFHA | Administration; mtg | 3 | 3.5 | $1,400.00 |
| NFHA | Administration; mtg update BoA | 3 | 1.8 | $700.00 |
| NFHA | Administration; negotiations | 10 | 18 | $7,200.00 |
| NFHA | Administration; Oakland issues | 3 | 2 | $800.00 |
| NFHA | Administration; Open Communities | 1 | 0.3 | $120.00 |
| NFHA | Administration; partners | 4 | 4.5 | $1,800.00 |
| NFHA | Administration; partner call and follow up | 4 | 8.5 | $3,400.00 |
| NFHA | Administration; planning | 4 | 6.5 | $2,600.00 |
| NFHA | Administration; planning partners | 3 | 0.6 | $240.00 |
| NFHA | Administration;  prep and meeting | 5 | 9 | $3,600.00 |
| NFHA | Administration; powerpoint | 1 | 4 | $1,600.00 |
| NFHA | Administration; preparing evidence and ppt | 5 | 26 | $10,400.00 |
| NFHA | Administration; pre-qual issues | 2 | 3.5 | $1,400.00 |
| NFHA | Administration; press club REO | 3 | 0.4 | $160.00 |
| NFHA | Administration; reallocation | 1 | 0.3 | $120.00 |
| NFHA | Administration; REO | 65 | 72.5 | $9,080.80 |
| NFHA | Administration; REO - Bank of America | 4 | 3.3 | $422.07 |
| NFHA | Administration; REO - Am Banker | 8 | 7.9 | $679.65 |
| NFHA | Administration; REO - discovery discussion | 1 | 0.2 | $50.00 |
| NFHA | Administration; REO - Ed & Comm | 3 | 0.4 | $13.92 |
| NFHA | Administration; REO - Ed & Comm. | 36 | 7 | $231.40 |
| NFHA | Administration; REO - Ed & Comm. project | 6 | 1.5 | $47.31 |
| NFHA | Administration; REO - Ed & Outreach | 2 | 0.5 | $15.02 |
| NFHA | Administration; REO - Ed. & Comm | 4 | 0.5 | $17.40 |
| NFHA | Administration; REO - Ed. & Comm. | 117 | 25.9 | $846.10 |
| NFHA | Administration; REO - Ed. & Comm. data entry | 1 | 0.1 | $3.58 |
| NFHA | Administration; REO - Ed. & Comm. project | 12 | 2.8 | $89.40 |
| NFHA | Administration; REO - Ed. & Comm.. | 2 | 0.2 | $6.96 |
| NFHA | Administration; REO - general | 1 | 0.7 | $140.00 |
| NFHA | Administration; REO American Banker | 1 | 0.5 | $200.00 |

-B-3-

| | | | | |
|---|---|---|---|---|
| NFHA | Administration; REO analysis | 7 | 16.8 | $3,360.00 |
| NFHA | Administration; REO Audit | 1 | 0.5 | $21.23 |
| NFHA | Administration: REO B of A | 28 | 71.5 | $6,107.60 |
| NFHA | Administration; REO bank of America--bushboys | 1 | 3.5 | $1,400.00 |
| NFHA | Administration; REO BOA | 1 | 0.3 | $100.00 |
| NFHA | Administration; REO Bank of America | 10 | 14.3 | $5,450.00 |
| NFHA | Administration; REO BoA US Bank | 3 | 2.5 | $1,000.00 |
| NFHA | Administration; REO Call | 2 | 0.7 | $280.00 |
| NFHA | Administration; REO chapter | 1 | 1.3 | $520.00 |
| NFHA | Administration; REO comms | 6 | 1.5 | $48.53 |
| NFHA | Administration; REO conference | 5 | 12.1 | $4,840.00 |
| NFHA | Administration; REO counteracting chapter | 4 | 3.2 | $1,280.00 |
| NFHA | Administration; REO Database | 48 | 86.7 | $17,340.00 |
| NFHA | Administration; REO Database - working with Lindsay Augustine | 2 | 1 | $200.00 |
| NFHA | Administration; REO discussion (or Discussion) | 2 | 1 | $38.50 |
| NFHA | Administration; REO -Ed. & Comm. | 1 | 0.1 | $3.48 |
| NFHA | Administration; REO Ed & Comm. | 7 | 2.5 | $78.85 |
| NFHA | Administration; REO Ed & Comm | 8 | 2.7 | $85.16 |
| NFHA | Administration; REO Ed. & Outreach | 5 | 1.8 | $56.78 |
| NFHA | Administration; REO Education and Outreach | 1 | 0.2 | $17.21 |
| NFHA | Administration; REO education planning | 2 | 0.5 | $200.00 |
| NFHA | Administration; REO future of rental housing | 2 | 2.7 | $1,080.00 |
| NFHA | Administration; REO General | 2 | 1.3 | $520.00 |
| NFHA | Administration; REO logistics | 3 | 1 | $200.00 |
| NFHA | Administration; REO issues | 4 | 4.7 | $1,880.00 |
| NFHA | Administration: REO letters | 1 | 1 | $84.71 |
| NFHA | Administration; REO jmls | 1 | 1.3 | $120.00 |
| NFHA | Administration; REO meeting | 5 | 8.7 | $2,864.27 |
| NFHA | Administration; REO methodology | 2 | 0.9 | $360.00 |
| NFHA | Administration; REO partners call | 1 | 0.3 | $60.00 |
| NFHA | Administration; REO partners new | 2 | 0.6 | $240.00 |
| NFHA | Administration; REO planning | 2 | 1.6 | $320.00 |
| NFHA | Administration; REO prep | 3 | 4.1 | $820.00 |
| NFHA | Adminsitration; REO project | 2 | 1.6 | $43.42 |
| NFHA | Administration; REO presentation | 2 | 1.4 | $420.00 |
| NFHA | Administration; REO Project Management | 5 | 1.9 | $760.00 |

| NFHA | Adminstration; REO Report | 34 | 51 | $12,069.10 |
|------|---------------------------|-----|------|------------|
| NFHA | Administratin; REO research | 12 | 13.1 | $2,620.00 |
| NFHA | Adminstration; REO research - CA | 2 | 4.7 | $940.00 |
| NFHA | Administration; REO research - PA | 2 | 2.9 | $580.00 |
| NFHA | Administration: REO review | 2 | 0.6 | $240.00 |
| NFHA | Administration; REO solutions | 2 | 0.2 | $80.00 |
| NFHA | Administration; REO review Bank of America | 7 | 7.5 | $3,000.00 |
| NFHA | Administration; REO Short video/quotes | 4 | 1.7 | $340.00 |
| NFHA | Administration; REO travel | 2 | 3.4 | $1,360.00 |
| NFHA | Administration; REO trust | 2 | 0.6 | $240.00 |
| NFHA | Administration; REO tv | 1 | 0.7 | $280.00 |
| NFHA | Adminstration; report | 2 | 1.4 | $560.00 |
| NFHA | Administration; response | 1 | 2.5 | $1,000.00 |
| NFHA | Administration; review | 1 | 1 | $450.00 |
| NFHA | Adminstration; review and planning | 1 | 2 | $800.00 |
| NFHA | Administration; review plan | 1 | 3 | $1,200.00 |
| NFHA | Administration; reviewing evidence | 4 | 9 | $3,600.00 |
| NFHA | Administration; review REO | 5 | 1.6 | $640.00 |
| NFHA | Administration; Safeguard | 4 | 3 | $1,200.00 |
| NFHA | Administration; Safeguard-BAC- | 1 | 8 | $3,200.00 |
| NFHA | Administration; session & prep | 1 | 1 | $400.00 |
| NFHA | Administration; strategies | 5 | 2.8 | $1,120.00 |
| NFHA | Administration; Strategies Bank of America REO | 2 | 3.5 | $1,400.00 |
| NFHA | Administration; travel | 2 | 2.6 | $1,040.00 |
| NFHA | Analysis; REO analysis | 7 | 6 | $1,200.00 |
| NFHA | Analysis; SC, PA analysis | 1 | 5 | $1,000.00 |
| NFHA | Analysis; Safeguard analysis | 3 | 3.3 | $660.00 |
| NFHA | Attend Training/Conference; REO | 1 | 0.7 | $27.79 |
| NFHA | Bank of America | 34 | 39.8 | $19,900.00 |
| NFHA | BofA - REO | 1 | 0.5 | $225.00 |
| NFHA | BoA review | 3 | 2.3 | $230.00 |
| NFHA | BoA Review call | 2 | 1.5 | $150.00 |
| NFHA | BoA calls | 1 | 1 | $100.00 |
| NFHA | BoA Declaration | 3 | 4 | $400.00 |
| NFHA | BoA REO database work | 1 | 1 | $500.00 |
| NFHA | BGL Database | 1 | 1 | $250.00 |
| NFHA | BOA | 9 | 9.8 | $4,900.00 |
| NFHA | BOA REO | 3 | 2.8 | $1,400.00 |
| NFHA | Checking in re: B of A | 1 | 0.3 | $67.50 |
| NFHA | Education and Outreach; REO website content | 1 | 0.3 | $60.00 |

-B-5-

| NFHA | E-mails; REO partner email | 1 | 0.5 | $100.00 |
| NFHA | E-mails; email to Milwaukee | 1 | 0.1 | $20.00 |
| NFHA | E-mails; REO group e-mail list | 1 | 0.1 | $20.00 |
| NFHA | Investigation; Bank of America REO | 6 | 5.6 | $974.27 |
| NFHA | Investigation; REO Project | 8 | 2.6 | $1,000.00 |
| NFHA | Meeting; b of a (or B of A) | 3 | 6 | $1,200.00 |
| NFHA | Meeting; Bank of America | 3 | 2 | $800.00 |
| NFHA | Meeting; BoA Conference Call | 2 | 3 | $600.00 |
| NFHA | Meeting; BofA prep call/mtg | 1 | 2 | $400.00 |
| NFHA | Meeting; Conference call | 1 | 1 | $200.00 |
| NFHA | Meeting; Conference call w/ members | 1 | 1 | $200.00 |
| NFHA | Meeting; enforcement meeting | 4 | 1.2 | $240.00 |
| NFHA | Meeting; REO call | 1 | 0.3 | $60.00 |
| NFHA | Meeting; REO conference Call | 2 | 0.8 | $160.00 |
| NFHA | Meeting; REO meeting | 18 | 9.7 | $1,940.00 |
| NFHA | Meeting; Staff meeting | 1 | 0.5 | $100.00 |
| NFHA | Paralegal job description | 1 | 0.3 | $75.00 |
| NFHA | NFHA et al. v. BOA | 1 | 0.3 | $150.00 |
| NFHA | Phone Calls; BofA call | 1 | 1 | $200.00 |
| NFHA | Phone Calls; BofA call w/ members | 1 | 1.5 | $300.00 |
| NFHA | Phone Calls; BofA Conference call | 1 | 0.5 | $100.00 |
| NFHA | Phone Calls; BofA member call | 1 | 1 | $200.00 |
| NFHA | Phone Calls; conference call | 1 | 1.3 | $250.00 |
| NFHA | Project Management; PEI/REO | 4 | 10.1 | $2,020.00 |
| NFHA | Provide Training/Conference; enter comments | 1 | 1.3 | $260.00 |
| NFHA | Research; Bank of America | 3 | 5.5 | $1,100.00 |
| NFHA | Research; REO research | 51 | 62.3 | $12,460.00 |
| NFHA | Review; Bank of America REO | 1 | 0.8 | $150.00 |
| NFHA | TEI-102 | 6 | 48 | $12,000.00 |
| NFHA | TEI-105 | 22 | 169.5 | $42,375.00 |
| NFHA | TEI-128 | 5 | 40 | $10,000.00 |
| NFHA | TEI-136 | 4 | 20 | $5,000.00 |
| NFHA | TEI-71 | 7 | 48 | $12,000.00 |
| NFHA | TEI-71,TEI-73 | 9 | 72 | $18,000.00 |
| NFHA | TEI-85 | 8 | 64 | $16,000.00 |
| MMFHC | Call w BT, CW, MW | 1 | 0.1 | $7.50 |
| MMFHC | Call w BT, MW, RS | 3 | 0.5 | $75.00 |
| MMFHC | Call w CW, BT, RS | 1 | 0.1 | $7.50 |
| MMFHC | Call w NFHA | 10 | 3.74 | $295.83 |
| MMFHC | Call w NFHA and BT | 1 | 0.13 | $20.00 |
| MMFHC | Call w NFHA, BT | 1 | 0.2 | $30.00 |
| MMFHC | Call w NFHA, BT CW LE RS | 1 | 1 | $75.00 |

| MMFHC | Call w NFHA, BT, CW, LE | 1 | 0.43 | $32.50 |
| MMFHC | Call w NFHA , BT, CW, LE, MW | 1 | 1 | $75.00 |
| MMFHC | Call w NFHA, BT, CW, LE, RS, FDA | 1 | 1 | $150.00 |
| MMFHC | Call w NFHA, BT, FDA | 1 | 0.2 | $15.00 |
| MMFHC | Call w NFHA, BT, LE | 1 | 0.33 | $25.00 |
| MMFHC | Call w NFHA, BT, LE, RS, MW | 1 | 1.3 | $195.00 |
| MMFHC | Call w NFHA, BT, RS, LE | 1 | 0.43 | $65.00 |
| MMFHC | Call w NFHA, CW, RS, LE | 1 | 0.43 | $65.00 |
| MMFHC | Call w NFHA, LE RS | 1 | 0.1 | $7.50 |
| MMFHC | Call w NFAH, met w BT, LE, RS | 1 | 1.2 | $180.00 |
| MMFHC | Call w/CW, RS, MS | 1 | 0.1 | $15.00 |
| MMFHC | Call w/NFHA | 1 | 0.13 | $10.00 |
| MMFHC | Call w/NFHA, RS, CW, LE, MW | 1 | 1 | $150.00 |
| MMFHC | Call w/NFHA, RS, MW | 1 | 0.17 | $12.50 |
| MMFHC | Call with CW/Individual | 1 | 0.4 | $30.00 |
| MMFHC | Call with MW | 1 | 0.1 | $15.00 |
| MMFHC | Call with NFHA | 1 | 0.1 | $7.50 |
| MMFHC | Call with NFHA & CW | 1 | 0.3 | $22.50 |
| MMFHC | Call with NFHA and CW | 1 | 0.2 | $30.00 |
| MMFHC | Called NFHA | 1 | 0.07 | $5.00 |
| MMFHC | Check recent entries | 1 | 0.06 | $4.71 |
| MMFHC | City database | 1 | 0.17 | $12.50 |
| MMFHC | City of Milwaukee property webstie | 2 | 0.66 | $50.00 |
| MMFHC | City of Milwaukee property database | 1 | 0.33 | $25.00 |
| MMFHC | City of Milwaukee database | 1 | 0.33 | $25.00 |
| MMFHC | City of Milwaukee property ownership website | 2 | 0.66 | $50.00 |
| MMFHC | Community contact research | 1 | 0.67 | $50.00 |
| MMFHC | Conf call with NFHA, MW | 1 | 0.7 | $52.50 |
| MMFHC | Conference call w/NFHA, MW, RS | 1 | 0.1 | $7.50 |
| MMFHC | Consult w NFHA | 7 | 0.76 | $57.50 |
| MMFHC | Consult w NFHA, LE, MW | 1 | 0.07 | $5.00 |
| MMFHC | Consult w NFHA, MW, RS | 1 | 0.07 | $5.00 |
| MMFHC | Consult with NFHA, RS, LE | 1 | 0.07 | $5.00 |
| MMFHC | Consult with NFHA | 1 | 0.07 | $5.00 |
| MMFHC | Contact list meeting | 1 | 0.17 | $12.50 |
| MMFHC | Data entry/file maintenance | 1 | 1 | $50.00 |
| MMFHC | Database work | 20 | 4.46 | $308.73 |
| MMFHC | Discuss w CW | 1 | 0.07 | $5.00 |
| MMFHC | Drive to/from office | 1 | 0.43 | $21.67 |
| MMFHC | Elec score sheets | 1 | 0.31 | $23.53 |
| MMFHC | Elec score sheets/uploading | 1 | 0.56 | $42.36 |
| MMFHC | Elec score sheets/sorting photos | 1 | 0.19 | $14.12 |

| MMFHC | Email review w CW | 1 | 0.1 | $15.00 |
|---|---|---|---|---|
| MMFHC | Email review w BT | 1 | 0.1 | $15.00 |
| MMFHC | Emails w/ CW | 1 | 0.1 | $7.50 |
| MMFHC | Email to RS + LE | 1 | 0.1 | $7.50 |
| MMFHC | Emails w NFHA | 1 | 0.1 | $7.50 |
| MMFHC | Emails with CW | 1 | 0.07 | $5.00 |
| MMFHC | Emails with LE | 1 | 0.07 | $5.00 |
| MMFHC | Emails w/NFHA & CW | 1 | 0.07 | $5.00 |
| MMFHC | Finalzied d-base login | 1 | 0.1 | $7.50 |
| MMFHC | Finalize flyer | 1 | 0.17 | $12.50 |
| MMFHC | Follow up w/ DNS | 1 | 0.07 | $5.00 |
| MMFHC | Internet research | 2 | 0.34 | $25.00 |
| MMFHC | Individual | 55 | 54.3 | $5,197.50 |
| MMFHC | In-office training | 5 | 1.65 | $108.34 |
| MMFHC | Logs/expenses after field work | 1 | 0.1 | $7.50 |
| MMFHC | Multiple addresses | 1 | 3.4 | $510.00 |
| MMFHC | New List | 1 | 0.5 | $50.00 |
| MMFHC | NFHA conference call | 1 | 0.27 | $20.00 |
| MMFHC | NFHA Conf Call | 1 | 1 | $75.00 |
| MMFHC | Organize hard copies | 1 | 0.27 | $20.00 |
| MMFHC | Ownership checks | 2 | 0.42 | $31.06 |
| MMFHC | Meet w/BT, CW, RS, FDA | 1 | 0.1 | $7.50 |
| MMFHC | Meet w/RS | 1 | 0.07 | $5.00 |
| MMFHC | Meet w RS | 1 | 0.17 | $12.50 |
| MMFHC | Meet with BT & MW | 2 | 0.2 | $15.00 |
| MMFHC | Meet with BT, CW, RS, MW | 3 | 1.06 | $80.00 |
| MMFHC | Meet with BT, CW | 1 | 0.07 | $5.00 |
| MMFHC | Meet with CW | 1 | 0.07 | $10.00 |
| MMFHC | Meet BT, CW, MW, RS, FDA | 1 | 0.4 | $30.00 |
| MMFHC | Meet with CW, BPS, MW | 1 | 0.17 | $12.50 |
| MMFHC | Meet with CW, LE, MW | 2 | 0.34 | $33.34 |
| MMFHC | Meet with CW, LE, MW | 1 | 0.07 | $10.00 |
| MMFHC | Meet with CW, LE, MW, RS, FDA | 1 | 0.4 | $60.00 |
| MMFHC | Meet with CW, DR, MW, LE, RS, FDA | 1 | 0.2 | $30.00 |
| MMFHC | Meet with LE and MW | 1 | 0.07 | $10.00 |
| MMFHC | Meet with LE & RS | 1 | 0.17 | $25.00 |
| MMFHC | Meet with CW, MW, RS | 1 | 0.4 | $60.00 |
| MMFHC | Meet with CW, LE, RS, HFNA call | 1 | 1.2 | $180.00 |
| MMFHC | Meet with CW, LE, RS | 1 | 0.4 | $60.00 |
| MMFHC | Meet with CW, LE, RS, FDA | 1 | 0.1 | $15.00 |
| MMFHC | Meet with CW, LE, RS, MW | 1 | 0.8 | $120.00 |
| MMFHC | Meet with MW | 3 | 0.24 | $30.00 |
| MMFHC | Meet with MW, LE | 1 | 0.1 | $15.00 |

| MMFHC | Meet with MW and CW | 1 | 0.27 | $40.00 |
| MMFHC | Meet with MW and LE | 1 | 0.1 | $15.00 |
| MMFHC | Meet with LE, CW, & RS | 1 | 0.2 | $30.00 |
| MMFHC | Meet with LE, CW, RS | 1 | 0.1 | $15.00 |
| MMFHC | Meet with LE, RS< CW, FDA, MW | 1 | 0.3 | $45.00 |
| MMFHC | Meet with NFHA, BT, CW, RS, FDA | 1 | 1.2 | $90.00 |
| MMFHC | Meet with MW, RS, LE, BT, CW, FDA | 1 | 0.2 | $20.00 |
| MMFHC | Meet with MW, RS, LE, BT, CW, FDA | 1 | 0.2 | $20.00 |
| MMFHC | Meeting re: REO project | 2 | 0.4 | $40.00 |
| MMFHC | Meet with REO project staff | 1 | 0.13 | $20.00 |
| MMFHC | Meet with RS | 1 | 0.07 | $5.00 |
| MMFHC | Meeting with REO Staff | 2 | 0.4 | $60.00 |
| MMFHC | Meeting with BT, MW, FDA, RS | 1 | 0.27 | $20.00 |
| MMFHC | Meeting OE and CW | 1 | 0.07 | $10.00 |
| MMFHC | Meeting w/ MW & Leif from Harambes | 1 | 0.67 | $66.67 |
| MMFHC | Met w BT & MW | 3 | 0.41 | $53.34 |
| MMFHC | Met w BT | 5 | 1.31 | $185.00 |
| MMFHC | Met w BT and OE | 1 | 0.07 | $10.00 |
| MMFHC | Met with BT & LE | 2 | 0.14 | $16.67 |
| MMFHC | Met w MW, CW, BT | 1 | 0.03 | $2.50 |
| MMFHC | Met w BT CW LE RS | 3 | 1.06 | $80.00 |
| MMFHC | Met w BT CW RS | 1 | 0.13 | $10.00 |
| MMFHC | Met w BT CW LE RS FDA | 1 | 0.4 | $30.00 |
| MMFHC | Met w BT CW FDA RS LE | 1 | 0.5 | $37.50 |
| MMFHC | Met w BT CW RS LE | 1 | 0.8 | $60.00 |
| MMFHC | Met w BT FDA RS CW LE | 1 | 0.07 | $5.00 |
| MMFHC | Met w BT LE | 1 | 0.07 | $5.00 |
| MMFHC | Met w BT, CE, LE, MW | 1 | 0.13 | $10.00 |
| MMFHC | Met w BT, CW, RS, MW | 2 | 0.54 | $60.00 |
| MMFHC | Met w BT, CW, ES, FDA, MW, DR | 1 | 0.07 | $5.00 |
| MMFHC | Met w BT, CW, FDA, LE | 1 | 0.33 | $25.00 |
| MMFHC | Met w BT, CW, FDA, LE, MW | 1 | 0.3 | $22.50 |
| MMFHC | Met w BT, CW, FDA, LE, RS, DR | 1 | 0.07 | $5.00 |
| MMFHC | Met w BT, CW, FDA, LE, RS, MW | 1 | 0.33 | $33.33 |
| MMFHC | Met w BT, CW, FDA, RS, LE | 2 | 0.43 | $32.50 |
| MMFHC | Met w BT, CW, FDA, RS, MW | 1 | 0.1 | $7.50 |
| MMFHC | Met w BT, CW, LE | 6 | 1.43 | $107.50 |
| MMFHC | Met w BT, CW, LE, & MW | 1 | 0.3 | $22.50 |
| MMFHC | Met w BT, CW, LE, FDA, ES, DR, MW | 1 | 0.07 | $5.00 |
| MMFHC | Met w BT, CW, LE, FDA, RS | 1 | 0.7 | $52.50 |
| MMFHC | Met w BT, CW, LE, MW | 9 | 2.24 | $167.50 |
| MMFHC | Met w BT, CW, LE, RS | 11 | 2.56 | $200.83 |
| MMFHC | Met w BT, CW, LE, RS, FDA | 1 | 0.4 | $30.00 |

| MMFHC | Met w BT, CW, LE, RS, FDA, DR | 2 | 0.4 | $30.00 |
|---|---|---|---|---|
| MMFHC | Met w BT, CW, LE, RS, MW | 1 | 0.3 | $30.00 |
| MMFHC | Met w BT, CW, MW | 4 | 0.63 | $47.50 |
| MMFHC | Met w BT, CW, MW, FDA, LE | 2 | 0.57 | $42.50 |
| MMFHC | Met w BT, CW, MW, LE | 5 | 1.06 | $80.00 |
| MMFHC | Met w BT, CW, MW, LE, FDA | 1 | 0.4 | $30.00 |
| MMFHC | Met w BT, CW, MW, RS | 6 | 1.7 | $134.16 |
| MMFHC | Met w BT, CW, MW, RS, FDA | 1 | 0.33 | $25.00 |
| MMFHC | Met w BT, CW, RS | 4 | 0.8 | $64.17 |
| MMFHC | Met w BT, CW, RS (part), and LE | 1 | 0.07 | $5.00 |
| MMFHC | Met w BT, CW, RS (plus prep) | 1 | 0.23 | $17.50 |
| MMFHC | Met w BT, CW, RS, FDA | 1 | 0.33 | $25.00 |
| MMFHC | Met w BT, CW, RS, FDA, LE | 1 | 0.3 | $22.50 |
| MMFHC | Met w BT, CW, RS, LE | 1 | 1.17 | $87.30 |
| MMFHC | Met w BT, CW, RS, LE, FDA | 1 | 0.3 | $22.50 |
| MMFHC | Met w BT, CW, RS, MW | 5 | 1.07 | $100.00 |
| MMFHC | Met w BT, CW, RS, MW, FDA | 1 | 0.3 | $22.50 |
| MMFHC | Met w BT, DR, MW, ES, LE, CW, RS | 1 | 0.07 | $6.67 |
| MMFHC | Met w BT, FDA | 1 | 0.5 | $37.50 |
| MMFHC | Met w BT, FDA, RS, LE, MW | 1 | 0.07 | $10.00 |
| MMFHC | Met w BT, LE | 1 | 0.17 | $12.50 |
| MMFHC | Met w BT, LE, CW, MW | 1 | 0.13 | $6.67 |
| MMFHC | Met w BT, LE, FDA, MW, RS | 2 | 0.63 | $95.00 |
| MMFHC | Met w BT, LE, MW | 1 | 0.07 | $10.00 |
| MMFHC | Met w BT, LE, MW, FDA | 1 | 0.7 | $52.50 |
| MMFHC | Met w BT, LE, MW, RS | 4 | 0.67 | $100.00 |
| MMFHC | Met w BT, LE, RS | 8 | 1.7 | $235.00 |
| MMFHC | Met w BT, LE, RS, CW | 2 | 0.4 | $30.00 |
| MMFHC | Met w BT, LE, RS, FDA | 1 | 0.33 | $50.00 |
| MMFHC | Met w BT, LE, RS, FDA, MW | 2 | 0.7 | $105.00 |
| MMFHC | Met w BT, LE, RS, MW | 6 | 2.33 | $350.00 |
| MMFHC | Met w BT, LE, RS, MW, FDA | 3 | 1.6 | $240.00 |
| MMFHC | Met w BT, MW, CW, LE | 1 | 0.8 | $60.00 |
| MMFHC | Met w BT, MW, LE | 2 | 0.27 | $20.00 |
| MMFHC | Met w BT, MW, LE, FDA, RS | 1 | 0.1 | $15.00 |
| MMFHC | Met w BT, MW, LE, RS | 4 | 1.4 | $210.00 |
| MMFHC | Met w BT, MW, RS | 4 | 17.3 | $50.00 |
| MMFHC | Met w BT, MW, RS, LE | 1 | 0.8 | $120.00 |
| MMFHC | Met w BT, prep for mtg, etc. | 1 | 1 | $150.00 |
| MMFHC | Met w BT, RS, FDA, LE | 1 | 0.1 | $15.00 |
| MMFHC | Met w BT, RS, LE | 1 | 0.27 | $20.00 |
| MMFHC | Met w BT, RS, LE, ES, DR, FDA, MW | 1 | 0.07 | $10.00 |
| MMFHC | Met w CT & MW | 1 | 0.2 | $15.00 |

| MMFHC | Met w CT & RS | 1 | 0.2 | $20.00 |
|---|---|---|---|---|
| MMFHC | Met w CW | 10 | 0.9 | $75.00 |
| MMFHC | Met w CW & DR | 1 | 0.23 | $17.50 |
| MMFHC | Met w CW & RS | 2 | 0.3 | $25.83 |
| MMFHC | Met w CW BT FDA RS LE | 1 | 0.07 | $5.00 |
| MMFHC | Met w CW LE | 1 | 0.07 | $5.00 |
| MMFHC | Met w CW LE BPS | 2 | 0.34 | $12.50 |
| MMFHC | Met w CW RS | 1 | 0.07 | $5.00 |
| MMFHC | Met w CW RS LE | 1 | 0.23 | $17.50 |
| MMFHC | Met w CW, FDA, BT, LE | 1 | 0.1 | $7.50 |
| MMFHC | Met w CW, FDA, RS, LE, MW | 1 | 0.07 | $10.00 |
| MMFHC | Met w CW, LE | 1 | 0.2 | $15.00 |
| MMFHC | Met w CW, LE, FDA, MW, RS | 1 | 0.33 | $50.00 |
| MMFHC | Met w CW, LE, FDA, RS | 1 | 0.23 | $17.50 |
| MMFHC | Met w CW, LE, MW | 1 | 0.2 | $30.00 |
| MMFHC | Met w CW, LE, MW, RS | 2 | 0.2 | $30.00 |
| MMFHC | Met w CW, LE, RS | 5 | 0.9 | $122.50 |
| MMFHC | Met w CW, LE, RS, & MW | 2 | 0.7 | $105.00 |
| MMFHC | Met w CW, LE, RS, FDA | 1 | 0.33 | $50.00 |
| MMFHC | Met w CW, LE, RS, FDA, ES, DR | 1 | 0.07 | $10.00 |
| MMFHC | Met w CW, LE, RS, FDA, MW | 1 | 0.3 | $45.00 |
| MMFHC | Met w CW, LE, RS, MW | 9 | 2.43 | $355.00 |
| MMFHC | Met w CW, MW | 2 | 0.3 | $28.33 |
| MMFHC | Met w CW, MW, LE | 3 | 0.4 | $25.50 |
| MMFHC | Met w CW, MW, LE, RS | 2 | 0.87 | $130.00 |
| MMFHC | Met w CW, MW, RS | 3 | 0.3 | $37.50 |
| MMFHC | Met w CW, RS, MW | 1 | 0.07 | $5.00 |
| MMFHC | Met w FDA | 3 | 1.17 | $87.50 |
| MMFHC | Met w LE | 24 | 5.6 | $413.33 |
| MMFHC | Met w LE & CW | 1 | 0.17 | $12.50 |
| MMFHC | Met w LE & MW | 3 | 0.24 | 27.5 |
| MMFHC | Met w LE & RS | 2 | 0.27 | $35.00 |
| MMFHC | Met w LE, CW, BT | 2 | 0.4 | $30.00 |
| MMFHC | Met w LE, CW, MW, RS | 1 | 0.33 | $50.00 |
| MMFHC | Met w LE, FDA, CW, MW, BT | 1 | 0.33 | $25.00 |
| MMFHC | Met w LE, FDA, MW, CW | 1 | 0.23 | $17.50 |
| MMFHC | Met w LE, MW, RS | 1 | 0.23 | $35.00 |
| MMFHC | Met w LE, RS | 2 | 0.27 | $35.00 |
| MMFHC | Met w LE, RS, MW | 1 | 0.07 | $10.00 |
| MMFHC | Met w LE, RS, NFHA | 1 | 0.13 | $10.00 |
| MMFHC | Met w Leif O, LE | 1 | 0.33 | $33.33 |
| MMFHC | Met w Leif O, MW | 1 | 0.33 | $33.33 |
| MMFHC | Met w MW | 14 | 1.2 | $140.00 |

| MMFHC | Met w MW & CW | 1 | 0.13 | $10.00 |
| MMFHC | Met w MW & DR | 1 | 0.23 | $35.00 |
| MMFHC | Met w MW & LE | 1 | 0.07 | $10.00 |
| MMFHC | Met w MW & RS | 3 | 0.43 | $40.00 |
| MMFHC | Met w MW and NFHA | 1 | 0.13 | $10.00 |
| MMFHC | Met w MW, BT, CW, FDA, LE | 1 | 0.3 | $22.50 |
| MMFHC | Met w MW, BT, RS | 1 | 0.13 | $20.00 |
| MMFHC | Met w MW, CW, LE, BT | 1 | 0.1 | $7.50 |
| MMFHC | Met w MW, LE | 2 | 0.13 | $10.00 |
| MMFHC | Met w MW, LE, BPS | 2 | 0.34 | $50.00 |
| MMFHC | Met w MW, LE, RS | 2 | 0.27 | $40.00 |
| MMFHC | Met w MW, LE, RS, FDA | 1 | 0.23 | $35.00 |
| MMFHC | Met w MW, RS | 1 | 0.07 | $10.00 |
| MMFHC | Met w NFHA, BT, RS, MW, CW | 1 | 1.3 | $97.50 |
| MMFHC | Met w NFHA, CW, LE, MW | 1 | 0.17 | $12.50 |
| MMFHC | Met w NFHA, CW, LE, RS | 1 | 0.17 | $12.50 |
| MMFHC | Met w NFHA, CW, MW, RS | 1 | 0.17 | $12.50 |
| MMFHC | Met w NFHA, MW, LE, RS | 1 | 0.17 | $25.00 |
| MMFHC | Met w NFHA, MW, RS | 1 | 0.13 | $10.00 |
| MMFHC | Met w REO staff | 2 | 0.3 | $24.17 |
| MMFHC | Met w REO staff - left early | 1 | 0.23 | $17.50 |
| MMFHC | Met w RS | 12 | 2.2 | $177.50 |
| MMFHC | Met w RS & NFHA | 1 | 1.3 | $97.50 |
| MMFHC | Met w RS LE | 1 | 0.1 | $7.50 |
| MMFHC | Met w RS, LE, MW | 1 | 0.2 | $30.00 |
| MMFHC | Met w RS, MW | 3 | 0.2 | $15.00 |
| MMFHC | Met w/ BT, CW, LE, RS | 2 | 0.27 | $20.00 |
| MMFHC | Met w/ LE | 1 | 0.07 | $5.00 |
| MMFHC | Met w/ LE, RS, MW, BT | 1 | 0.13 | $20.00 |
| MMFHC | Met w/BT & MW | 1 | 0.07 | $5.00 |
| MMFHC | Met w/BT, CW, LE | 1 | 0.4 | $30.00 |
| MMFHC | Met w/BT, CW, LE, RS | 1 | 0.13 | $10.00 |
| MMFHC | Met w/BT, CW, MW | 1 | 0.4 | $30.00 |
| MMFHC | Met w/BT, CW, MW, RS, LE | 1 | 0.07 | $6.67 |
| MMFHC | Met w/BT, CW, RS | 3 | 0.7 | $52.50 |
| MMFHC | Met w/BT, CW, RS, FDA, MW | 1 | 0.4 | $30.00 |
| MMFHC | Met w/BT, LE, MW, RS | 1 | 0.13 | $20.00 |
| MMFHC | Met w/BT, LE, RS, CW, MW | 1 | 0.4 | $40.00 |
| MMFHC | Met w/BT, LE, RS, MW | 1 | 0.13 | $20.00 |
| MMFHC | Met w/BT, MW, LE | 1 | 0.4 | $60.00 |
| MMFHC | Met w/BT, RS, & NFHA | 1 | 0.2 | $20.00 |
| MMFHC | Met w/BT, RS, CW | 1 | 0.2 | $15.00 |
| MMFHC | Met w/BT, RS, CW, MW, FDA | 1 | 0.7 | $52.50 |

| MMFHC | Met w/CW, LE, MW, RS | 3 | 0.66 | $100.00 |
| MMFHC | Met w/CW, LE, RS, MW | 1 | 0.17 | $25.00 |
| MMFHC | Met w/CW, LE, RS, MW, and FDA | 1 | 0.1 | $15.00 |
| MMFHC | Met w/CW, MW | 1 | 0.07 | $5.00 |
| MMFHC | Met w/CW, RS, BT, LE | 1 | 0.1 | $10.00 |
| MMFHC | Met w/CW, RS, MW | 1 | 0.23 | $17.50 |
| MMFHC | Met w/DR | 2 | 0.3 | $22.50 |
| MMFHC | Met w/FDA, MW, RS, BT, CW | 1 | 0.07 | $5.00 |
| MMFHC | Met w/LE | 1 | 0.1 | $10.00 |
| MMFHC | Met w/LE & NFHA | 1 | 1.3 | $97.50 |
| MMFHC | Met w/LE, CW, MW, FDA, DR | 1 | 0.23 | $17.50 |
| MMFHC | Met w/MW | 1 | 0.03 | $2.50 |
| MMFHC | Met w/MW, LE, RS | 1 | 0.1 | $15.00 |
| MMFHC | Met w/RS | 6 | 1.84 | $137.50 |
| MMFHC | Met w/RS, BT | 1 | 0.17 | $12.50 |
| MMFHC | Met w/RS, CW, BT, LE, MW, FDA | 1 | 0.4 | $40.00 |
| MMFHC | Met w/RS, CW, LE, MW | 1 | 0.23 | $23.33 |
| MMFHC | Met w/RS, FDA, BT, CW, MW | 2 | 0.6 | $52.50 |
| MMFHC | Met w/staff | 1 | 0.17 | $16.67 |
| MMFHC | Met with BT & RS | 1 | 0.5 | $50.00 |
| MMFHC | Met with BT and LE | 1 | 0.07 | $6.67 |
| MMFHC | Met with BT, CW, LE, RS, MW | 1 | 0.1 | $10.00 |
| MMFHC | Met with BT, CW, MW, RS | 1 | 1 | $75.00 |
| MMFHC | Met with BT, CW, RS, LE, MW | 1 | 0.5 | $37.50 |
| MMFHC | Met with BT, CW, RS, MW, FDA | 1 | 0.23 | $17.50 |
| MMFHC | Met with BT, CW, RS, MW, FDA, DR | 1 | 0.2 | $15.00 |
| MMFHC | Met with BT, MW, RS, CW | 2 | 0.4 | $30.00 |
| MMFHC | Met with CW | 2 | 1.03 | $152.50 |
| MMFHC | Met with CW & RS | 1 | 0.2 | $15.00 |
| MMFHC | Met with CW, MW, LE, RS, FDA | 2 | 1.2 | $180.00 |
| MMFHC | Met with CW, MW, RS, FDA | 1 | 0.23 | $17.50 |
| MMFHC | Met with FDA, RS, NFHA | 1 | 0.2 | $30.00 |
| MMFHC | Met with LE | 1 | 0.2 | $20.00 |
| MMFHC | Met with LE & BT | 1 | 0.3 | $22.50 |
| MMFHC | Met with RS & BT | 1 | 0.3 | $22.50 |
| MMFHC | Met with RS & LE | 1 | 0.3 | $45.00 |
| MMFHC | Met with RS, FDA | 1 | 0.5 | $75.00 |
| MMFHC | Mt w BT | 2 | 0.2 | 15 |
| MMFHC | Mt w BT & CW | 1 | 0.27 | $20.00 |
| MMFHC | Mt w BT & LE | 1 | 0.1 | $7.50 |
| MMFHC | Mt w BT LE | 1 | 0.1 | $7.50 |
| MMFHC | Mt with RS, REO computer | 1 | 0.33 | $25.00 |
| MMFHC | Mtg w NFHA, MW | 2 | 0.3 | $30.00 |

| MMFHC | prep for mtg | 2 | 0.27 | $20.00 |
|-------|--------------|---|------|--------|
| MMFHC | PP revisions | 1 | 0.33 | $25.00 |
| MMFHC | Prep for meeting | 1 | 0.17 | $16.67 |
| MMFHC | Print/copy flyers | 1 | 0.1 | $7.50 |
| MMFHC | Presentation | 1 | 0.67 | $50.00 |
| MMFHC | Presentation Prep | 1 | 0.13 | $13.33 |
| MMFHC | REO database | 3 | 0.7 | $51.77 |
| MMFHC | Register of Deeds | 1 | 0.29 | $21.65 |
| MMFHC | Race data | 15 | 11.97 | $897.50 |
| MMFHC | Refresher training | 6 | 1.38 | $105.00 |
| MMFHC | REO database | 3 | 0.7 | $51.77 |
| MMFHC | REO staff meeting | 3 | 0.83 | $95.00 |
| MMFHC | REO staff mtg | 4 | 1.7 | $138.33 |
| DMFHC | Admin Planning | 3 | 6.01 | $1,500.01 |
| DMFHC | AFFH Summitt | 2 | 2 | $375.00 |
| DMFHC | Annie Gardner - Senator Bennett | 1 | 0.33 | $83.33 |
| DMFHC | City of Aurora Staff | 1 | 1 | $250.00 |
| DMFHC | City of Denver Staff | 1 | 0.67 | $166.67 |
| DMFHC | Congressional Meetings | 1 | 0.67 | $166.67 |
| DMFHC | Councilman Paul Lopez | 1 | 0.67 | $166.67 |
| DMFHC | Councilman Rafael Espinosa | 1 | 0.67 | $166.67 |
| DMFHC | Data entry | 22 | 15.57 | $1,489.67 |
| DMFHC | Data entry & analysis | 13 | 9.66 | $1,056.67 |
| DMFHC | Data entry & organization | 9 | 9.07 | $817.50 |
| DMFHC | DOH - Pat Cole | 1 | 1.33 | $333.33 |
| DMFHC | DOH - Susan Niner | 1 | 0.67 | $166.67 |
| DMFHC | DOJ/AG | 1 | 0.67 | $166.67 |
| DMFHC | DORA/DOLA | 1 | 0.33 | $83.33 |
| DMFHC | Entering data & Analysis | 4 | 2.91 | $262.50 |
| DMFHC | Investigation Analysis | 9 | 8.33 | $2,083.33 |
| DMFHC | Office of HOPE Erik Solivan | 1 | 0.67 | $166.67 |
| DMFHC | Prep Maps and Sites | 1 | 0.17 | $15.00 |
| DMFHC | Press Conference | 1 | 0.67 | $166.67 |
| DMFHC | REO - Bank of America:Outreach, Discussion | 1 | 0.5 | $125.00 |
| DMFHC | REO - Bank of America:Outreach, Discussion PP | 1 | 1.5 | $375.00 |
| DMFHC | REO - Bank of America:Outreach, Media | 5 | 6.5 | $1,500.00 |
| DMFHC | REO - Bank of America:Outreach, Media Reporter | 1 | 1 | $250.00 |
| DMFHC | REO - Bank of America:Outreach/Education, Media | 1 | 0.5 | $125.00 |

| | | | | |
|---|---|---|---|---|
| DMFHC | REO - Bank of America:Outreach/Education, Webinar News Conference | 2 | 3 | $510.00 |
| DMFHC | Testing | 3 | 5 | $716.67 |
| DMFHC | Tricia Stephens - Cognresswoman DeGette | 1 | 0.33 | $83.33 |
| DMFHC | Uploading and Data Entry | 5 | 2.5 | $225.00 |
| NTFHC | Exchanged emails with Shanti | 1 | 0.25 | $100.05 |
| FHCWM | BOA GR REO | 1 | 1.5 | $180.00 |
| FHCWM | REO Casework | 4 | 1.25 | $210.00 |
| FHCWM | REO emails- BOA | 3 | 0.75 | $90.00 |
| FHCWM | REO Conference Call | 1 | 1 | $120.00 |
| FHCWM | REO emails | 22 | 5.75 | $930.00 |
| FHCWM | REO investigative research | 2 | 1 | $200.00 |
| FHCWM | REO phone call | 3 | 1.5 | $210.00 |
| HOPEFHC | Accounts Payable; REO's | 1 | 4 | $800.00 |
| HOPEFHC | Chicagoland REOs | 2 | 1.07 | $214.00 |
| HOPEFHC | E & O; neighbor outreach | 2 | 1.5 | $600.00 |
| HOPEFHC | e-mails; Planning, updates | 1 | 0.5 | $200.00 |
| HOPEFHC | e-mails; Partner updates | 1 | 0.5 | $200.00 |
| HOPEFHC | Litigation; Retainer, board | 1 | 0.5 | $200.00 |
| HOPEFHC | Litigation; Review docs, status | 1 | 0.5 | $200.00 |
| HOPEFHC | Litigation; Status, motions, updates | 1 | 0.5 | $200.00 |
| HOPEFHC | Meeting; Conference calls - partners | 2 | 1.25 | $500.00 |
| HOPEFHC | Meeting; NFHA Conference call BOA | 1 | 1 | $200.00 |
| HOPEFHC | Meeting; Conference call | 3 | 1.5 | $600.00 |
| HOPEFHC | Meeting; Conference call, updates | 4 | 2 | $800.00 |
| HOPEFHC | Meeting; Partner conf call, updates | 5 | 3.25 | $1,300.00 |
| HOPEFHC | Meeting; partner conference call | 3 | 1 | $400.00 |
| HOPEFHC | Phone Calls; REO Call | 1 | 1.33 | $199.50 |
| HOPEFHC | Research;  REO research | 1 | 1 | $200.00 |
| FHCRR | Meeting: April 2013 program planning | 1 | 0.5 | $99.99 |
| FHCRR | Correspondence: FL program - Rose Zitello, Mary Helen Petrus | 1 | 0.17 | $33.33 |
| FHCRR | emails: Planning | 1 | 0.25 | $50.00 |
| FHCRR | Correspondence: RON | 1 | 0.42 | $83.33 |
| FHCRR | REO Meeting: | 1 | 0.67 | $133.32 |
| FHCRR | Correspondence: Meeting notice | 1 | 0.17 | $33.33 |
| FHCRR | Board of Directors: NFHA REO | 1 | 0.25 | $50.00 |
| FHCRR | REO Research | 10 | 16.42 | $1,900.80 |
| FHCRR | reo emails | 3 | 0.25 | $38.39 |
| FHCRR | Property and Research | 1 | 1.96 | $294.61 |
| FHCRR | REO Planning | 1 | 1.43 | $214.29 |

| FHCRR | ALC re: VAPAC; FF | 1 | 0.08 | $16.67 |
|---|---|---|---|---|
| FHCRR | Call with Frank Ford | 1 | 0.13 | $25.00 |
| FHCRR | Call w/ FIF re: VAPAC | 1 | 0.08 | $16.67 |
| FHCRR | conference: | 1 | 2.83 | $424.96 |
| FHCRR | communication: | 2 | 0.16 | $25.00 |
| FHCRR | Conference call: | 1 | 0.75 | $150.00 |
| FHCRR | database | 1 | 0.17 | $25.00 |
| FHCRR | emails: | 1 | 0.25 | $37.50 |
| FHCRR | emails: HIAB | 1 | 0.08 | $14.58 |
| FHCRR | emails: Cleveland HIAC | 2 | 0.16 | $29.16 |
| FHCRR | emails: F.Ford | 1 | 0.08 | $16.67 |
| FHCRR | email for VAPAC | 1 | 0.13 | $15.63 |
| FHCRR | emails to VAPAC | 1 | 0.08 | $12.50 |
| FHCRR | Frank Ford | 1 | 0.08 | $16.67 |
| FHCRR | FIF re:vapac | 1 | 0.04 | $8.33 |
| FHCRR | FIF and VAPAC Ex Emty | 1 | 0.25 | $50.00 |
| FHCRR | Investor data VAPAC | 1 | 0.21 | $26.04 |
| FHCRR | Invesetor DATA-VAPAC | 1 | 0.04 | $5.21 |
| FHCRR | Keniray, Kris: Discovery | 3 | 10.75 | $1,881.25 |
| FHCRR | Meeting: | 1 | 0.33 | $33.33 |
| FHCRR | Meeting : kak | 1 | 0.08 | $16.67 |
| FHCRR | Meeting: GCRC | 12 | 10.42 | $1,562.38 |
| FHCRR | Meeting: GCRC meeting | 1 | 0.83 | $83.33 |
| FHCRR | Meeting: VAPAC Investor committee | 1 | 0.75 | $112.49 |
| FHCRR | Meeting: VAPAC | 4 | 2.58 | $424.96 |
| FHCRR | Meeting: Cleveland HIAC | 1 | 0.67 | $116.66 |
| FHCRR | Meeting: HIAB | 1 | 0.5 | $87.49 |
| FHCRR | Meeting: Cleveland HIAC | 1 | 0.67 | $116.66 |
| FHCRR | Meeting: HIAC interview with research team. | 1 | 0.17 | $29.16 |
| FHCRR | Meeting: Frank Ford | 1 | 0.5 | $99.99 |
| FHCRR | Meeting: VAPAC Executive Cmty | 1 | 0.33 | $66.66 |
| FHCRR | Meeting: VAPAC exec cmty | 1 | 0.5 | $99.99 |
| FHCRR | Natalie Prochaska CLT - VAPAC | 1 | 0.08 | $10.42 |
| FHCRR | Outreach: Cleveland HIAC | 1 | 0.08 | $14.58 |
| FHCRR | Staff Education: read article shared with Cleveland HIAC | 1 | 0.08 | $14.58 |
| FHCRR | Phone call: Frank Ford | 1 | 0.17 | $33.33 |
| FHCRR | Phone call: F.Ford | 1 | 0.08 | $16.67 |
| FHCRR | prep: REO | 1 | 0.07 | $10.72 |
| FHCRR | photos | 1 | 1.23 | $184.62 |
| FHCRR | photo and log | 1 | 0.36 | $53.59 |
| FHCRR | sort photos | 1 | 1.79 | $267.86 |

| FHCRR | travel | 1 | 1.5 | $224.98 |
|-------|--------|---|-----|---------|
| FHCRR | Travel and reception: | 1 | 2.33 | $349.97 |
| FHCRR | VAPAC | 1 | 0.04 | $5.21 |
| FHCRR | VAPAC article | 1 | 0.08 | $16.67 |
| FHCRR | VAPAC articles | 1 | 0.08 | $16.67 |
| FHCRR | VAPAC Meeting | 22 | 6.67 | $1,039.61 |
| FHCRR | VAPAC meeting - | 1 | 0.08 | $10.42 |
| FHCRR | VAPAC Mtg | 1 | 0.33 | $41.67 |
| FHCRR | VAPAC Executive Cmty | 1 | 0.21 | $41.67 |
| FHCRR | VAPAC - Tax Working Group | 1 | 0.29 | $36.46 |
| FHCRR | VAPAC Staff Education | 1 | 0.33 | $66.67 |
| FHCRR | VAPAC Reading | 1 | 0.33 | $41.67 |
| FHCRR | VAPAC reading | 1 | 0.17 | $20.83 |
| FHCRR | VAPAC Research | 2 | 0.66 | $83.33 |
| FHCRR | Work on Ad Case: | 1 | 0.25 | $50.00 |
| FHCRR | Work on agency case | 1 | 0.25 | $37.50 |
| FHCRR | Work on agency case: | 2 | 0.5 | $100.00 |
| FHCRR | Work on agency case: Case correspondence. | 1 | 0.25 | $43.75 |
| FHCRR | Work on agency case: case correspondence | 1 | 0.25 | $50.00 |
| FHCRR | Work on agency case: w/CAP | 1 | 0.25 | $37.50 |
| FHCRR | Work on agency case: w/DH and PDS. | 1 | 0.08 | $14.58 |
| FHCRR | Work on agency case: w/KAK | 1 | 0.25 | $50.00 |
| FHCRR | Work on agency case: Webinar | 1 | 1 | $100.00 |
| FHCRR | Writing/Editing: GCRC | 1 | 0.5 | $50.00 |
| FHCRR | Writing/Editing: HIAB | 1 | 0.17 | $29.16 |
| HOPE | BOA file reivew | 1 | 0.3 | $75.00 |
| HOPE | BOA meeting prep | 2 | 2 | $500.00 |
| HOPE | BOA Negotations | 1 | 1 | $250.00 |
| HOPE | BOA partners call | 6 | 4.8 | $1,200.00 |
| HOPE | BOA partner update | 1 | 0.3 | $75.00 |
| HOPE | BOA partner call (excluding wells) | 1 | 0.5 | $125.00 |
| HOPE | BOA partner update call | 1 | 0.5 | $125.00 |
| HOPE | BOA partner call | 2 | 2 | $500.00 |
| HOPE | BOA test prep | 14 | 7.1 | $1,485.00 |
| HOPE | Doc review | 1 | 0.3 | $75.00 |
| HOPE | Discovery | 3 | 7.5 | $1,875.00 |
| HOPE | NFHA BOA Update | 1 | 0.5 | $125.00 |
| HOPE | Partner call- BOA | 1 | 1 | $250.00 |
| HOPE | Partner communication | 4 | 1.1 | $275.00 |
| HOPE | Conference call and prep | 1 | 1 | $250.00 |
| HOPE | Partner response to BOA | 1 | 0.5 | $125.00 |

| HOPE | Review- discovery | 1 | 0.3 | $125.00 |
|------|-------------------|---|-----|---------|
| FHANC | Email with S. Glanz re: tests | 1 | 1 | $25.00 |
| FHANC | Email to/from Jessica Tankersly re: job posting | 1 | 0.1 | $25.00 |
| FHANC | Email to/from Carolina Peattie re: job posting | 1 | 0.1 | $25.00 |
| FHANC | Post Job in Craigslist | 1 | 0.1 | $25.00 |
| FHANC | CRC/BofA mtng | 1 | 5 | $375.00 |
| FHANC | Email from re; safety meeting | 1 | 0.1 | $25.00 |
| FHANC | Discussion w/ Shanti Abedin re: questions | 1 | 0.1 | $25.00 |
| FHANC | Review video frm S. Smith | 1 | 0.1 | $25.00 |
| FHANC | Email from Shanti re Video link | 1 | 0.1 | $10.00 |
| FHANC | Emails with Caroline Peattie and Bob Stalker | 2 | 0.2 | $20.00 |
| FHANC | Review Draft of powerpoint in PDF | 1 | 0.2 | $50.00 |
| FHANC | Emails re NFHA et al re call | 1 | 0.1 | $10.00 |
| FHANC | News conference | 1 | 1 | $250.00 |
| FHANC | Emails from Nawed | 1 | 0.1 | $10.00 |
| FHANC | Emails w/Beth, Shanti, Lindsay | 1 | 0.2 | $50.00 |
| FHANC | Emails w/ Shanti, Lindsay | 1 | 0.2 | $50.00 |
| FHANC | Strategizing with Ray Zamudio | 1 | 0.1 | $25.00 |
| FHANC | Strategizing with Caroline Peattie | 2 | 0.2 | $35.00 |
| FHANC | Baltimore REO conference | 3 | 0.3 | $30.00 |
| FHANC | Call with Shanna, CP | 1 | 0.3 | $30.00 |
| FHANC | Convo. w/ Shanna | 1 | 0.3 | $75.00 |
| FHANC | Convo with Lindsay | 1 | 0.5 | $50.00 |
| FHANC | Strategizing/analyzing data | 1 | 0.5 | $125.00 |
| FHANC | Call w/ Lindsay | 1 | 0.5 | $125.00 |
| FHANC | Press release | 1 | 1 | $250.00 |
| FHANC | Convo w/ Shanna | 1 | 0.8 | $200.00 |
| FHANC | Emails to/from Shanna re: PPT | 1 | 0.3 | $75.00 |
| FHANC | Edited PPT | 1 | 1 | $250.00 |
| FHANC | Press conference | 1 | 1 | $250.00 |
| FHANC | Webinar news conference | 1 | 1 | $250.00 |
| FHANC | Case file update | 1 | 0.1 | $5.00 |
| FHANC | Email from Caroline Peattie | 6 | 0.6 | $55.00 |
| FHANC | Email from Stefanie Taylor | 3 | 0.3 | $30.00 |
| FHANC | Convert Attachments to PDFS | 1 | 0.1 | $3.30 |
| FHANC | Meeting with Caroline Peattie | 1 | 0.1 | $3.30 |
| FHANC | email from CP | 1 | 0.1 | $30.00 |
| FHANC | Preparing documents/emails to upload | 6 | 0.6 | $19.80 |
| FHANC | Discussion of BOA REO | 1 | 0.5 | $50.00 |

| | | | | |
|---|---|---|---|---|
| FHANC | Discussion with Noelle re: BOA REO | 1 | 0.5 | $200.00 |
| FHANC | Review of docs needed | 1 | 0.5 | $200.00 |
| FHANC | Uploading files to dropbox | 1 | 0.2 | $80.00 |
| FHANC | Scanning and editing PDF for Caroline | 1 | 0.3 | $30.00 |
| FHANC | Reformatting email file to EML | 1 | 0.2 | $20.00 |
| FHANC | Draft & review ltr to firm with CP & CE | 1 | 0.8 | $80.00 |
| FHANC | Creating google sheet | 1 | 0.2 | $10.00 |
| FHANC | Update timesheet on google docs | 1 | 0.2 | $10.00 |
| FHANC | retrieve emails/update timesheet for JTS/CS on google docs | 1 | 2 | $100.00 |
| FHCCI | Marion County Alliance of Neighborhood Associations Meeting plus travel time | 1 | 0.5 | $125.00 |
| FHCCI | REO Misc | 9 | 7.8 | $1,950.00 |
| FHCCI | Amandula Anderson of Northeast CDC | 1 | 0.3 | $75.00 |
| FHCCI | Indy Star press on NFHA REO Report | 1 | 0.2 | $50.00 |
| FHCCI | Great Places 2020 Vitality Committee | 2 | 1.2 | $300.00 |
| FHCCI | Processed NFHA Payment | 1 | 0.3 | $75.00 |
| FHCCI | Uploaded docs to Box; Email to Nowmee | 1 | 0.8 | $200.00 |
| FHCCI | Reviewed court docs | 1 | 0.3 | $75.00 |
| FHCCI | File clean up and organizing | 1 | 0.5 | $125.00 |
| FHCCI | Moving emails to folder | 1 | 0.8 | $76.00 |
| FHCCI | Searching file archives | 1 | 1 | $95.00 |
| FHCCI | Discovery items | 1 | 1.3 | $325.00 |
| FHCCI | Discovery prep, Brady call, and related | 1 | 1.8 | $450.00 |
| MVFHC | Administrative, travel to mtg | 1 | 2.3 | $264.50 |
| MVFHC | Conf call on with BoA | 1 | 1 | $250.00 |
| MVFHC | conf call with REO partners | 1 | 1 | $250.00 |
| MVFHC | conf call with partners | 1 | 1 | $250.00 |
| MVFHC | Development, develop scripts to delete records and photos | 1 | 0.4 | $100.00 |
| MVFHC | Database support | 1 | 0.3 | $45.00 |
| MVFHC | Discovery | 2 | 2.2 | $506.00 |
| MVFHC | Discovery & Interrogatories | 1 | 3.5 | $875.00 |
| MVFHC | email on BOA pres | 1 | 0.5 | $125.00 |
| MVFHC | Email from Shanti | 1 | 0.25 | $62.50 |
| MVFHC | Email from Lindsay: | 1 | 0.25 | $62.50 |
| MVFHC | Internet, research REO and PRI | 1 | 1.3 | $149.50 |
| MVFHC | Review email from Shanna | 1 | 0.25 | $62.50 |
| MVFHC | User support, troubleshoot database | 1 | 0.1 | $15.00 |
| MVFHC | User support | 31 | 4 | $600.00 |
| TFHC | data processing | 1 | 0.3 | $75.00 |
| TFHC | Case review | 3 | 1.1 | $305.00 |

| TFHC | Reo - Activities | 1 | 0.3 | $75.00 |
|---|---|---|---|---|
| TFHC | REO activities (or Activities) | 25 | 4.7 | $1,490.00 |
| TFHC | REO Report (or report) | 2 | 1.1 | $365.00 |
| TFHC | REO setup | 1 | 0.2 | $70.00 |
| TFHC | Reviewed REOs | 1 | 0.2 | $30.00 |
| TFHC | Uploading information. | 1 | 0.2 | $75.00 |
| CFHC | REO; REO discovery | 1 | 0.4 | $120.00 |
| CFHC | REO; doc coding | 2 | 1.6 | $480.00 |
| CFHC | REO; REO responses | 1 | 1.3 | $390.00 |
| CFHC | REO; work on REO responses | 1 | 0.9 | $270.00 |
| CFHC | Work on test assignments; | 1 | 0.8 | $103.90 |
| SSHC | 73 Emails x 15 mins./email | 1 | 18.25 | $1,368.75 |
| SSHC | SS/Conf call | 3 | 2.5 | $625.00 |
| LAFHAC | call w/ shanti | 1 | 0.33 | $53.80 |
| LAFHAC | call w/ NFHA | 2 | 1.33 | $277.80 |
| LAFHAC | community development call | 1 | 0.17 | $38.25 |
| LAFHAC | Check in with EO and EC | 1 | 0.08 | $14.00 |
| LAFHAC | NFHA REO Call | 2 | 1.33 | $99.75 |
| LAFHAC | partner press call | 1 | 0.33 | $74.25 |
| LAFHAC | Partner press call | 1 | 0.33 | $74.25 |
| LAFHAC | REO boA call | 1 | 1 | $225.00 |
| LAFHAC | REO write-up | 1 | 0.5 | $42.50 |
| LAFHAC | Saved PDFs of emails to server | 1 | 0.31 | $54.25 |
| METRO | News interview | 1 | 1 | $150.00 |
| METRO | NFHA conference call | 2 | 1.3 | $195.00 |
| METRO | REO Conference Call | 2 | 2 | $93.19 |
| METRO | Review of BANA documents | 1 | 4 | $600.00 |
| FHCNA | Reset password for Jackie (Jason collins / Lindsey Augustine | 1 | 0.17 | $20.83 |
| FHCNA | Setting up user account | 1 | 2 | $250.00 |
| FHCNA | Review expert reports | 1 | 0.33 | $83.33 |
| FHCNA | Read opinions | 1 | 0.33 | $83.33 |
| FHCNA | Read Press Release updates for Bank of America | 2 | 0.34 | $62.50 |
| FHCNA | NFHA V Bana Discovery | 1 | 0.25 | $62.50 |
| FHCNA | NFHA & Advocates submit Comment Letter | 2 | 1.16 | $218.75 |
| FHCGPB | Developed materials as part of counteractive education & outreach campaign | 1 | 1.3 | $390.00 |
| CONTINUUM | Goodwill Industries of Kissimmee | 2 | 0.1 | $13.76 |
| **TOTAL** | | | | **$603,617.18** |

**APPENDIX C**

$375,778.75 IN PURE LITIGATION TASKS ON PLAINTIFFS' TIME LOGS
(INCLUDING $56,502.50 CREATING THE TIME LOGS THEMSELVES,
AND $19,247.50 RELATED TO THE SANCTIONS FOR THEIR EVIDENCE SPOLIATION)

| Party | Time entry narrative | Entry frequency | Total hours | Total money |
|-------|---------------------|-----------------|-------------|-------------|
| CFHC | Testing: REO testing; diversion and frustration log | 1 | 1.30 | $520.00 |
| CFHC | Administrative: Conference call; call re: BOA complaint | 1 | 0.50 | $200.00 |
| CFHC | Case Work: Review case; work on diversion log for BOA case REO case | 2 | 1.00 | $400.00 |
| CFHC | Case Work: Pleadings and motions; review response to doc request and interrogatories for BOA; sign and send | 1 | 0.30 | $120.00 |
| CFHC | Administrative; search for paperwork in BOA litigation | 1 | 0.40 | $160.00 |
| CFHC | Case Work: Analyze client file for legal claims; discuss REO files with MC; review files and separate out BOA files | 2 | 5.00 | $2,000.00 |
| CFHC | Case Work: Analyze client file for legal claims; work on labeling all REO sheets | 2 | 0.60 | $124.68 |
| CFHC | Case Work: Analyze client file for legal claims; work on producing docs for BOA case REO | 1 | 2.00 | $800.00 |
| CFHC | Case Work: Analyze client file for legal claims; sort REO evaluation sheets; give to Caitlin to finish sorting; copy BOA sheets | 2 | 2.00 | $800.00 |
| CFHC | Administrative: Conference call; call re: BOA case; need to check timesheets and make sure they are all BOA specific | 1 | 0.50 | $200.00 |
| CFHC | Consultation with: CFHC Staff (Case Discussion); conf w/erin re discovery in REO case | 1 | 0.10 | $35.00 |
| CFHC | Case Work: Pleadings and motions; work on diversion log for BOA REO cases | 1 | 2.00 | $800.00 |
| CFHC | Administrative: Respond to emails; outline work on timesheets, etc. for BOA | 1 | 0.20 | $80.00 |
| CFHC | Administrative: Respond to emails; emails re: BOA litigation and timekeeping | 1 | 0.30 | $120.00 |

| CFHC | Discovery: Respond to Discovery; look through all property evaluation sheets looking for missing evaluations for BOA REO case | 1 | 0.50 | $200.00 |
|------|------|---|------|---------|
| CFHC | Consultation with: CFHC Staff (Case Discussion); eK quetsions re: REO case and discovery | 1 | 0.30 | $82.50 |
| CFHC | Consultation with: CFHC Staff; w ek / w sk re discovery response in reo case | 1 | 0.10 | $40.00 |
| CFHC | Discovery: Respond to Discovery; w ek and w sk re responding to discovery in reo case | 1 | 0.30 | $120.00 |
| CFHC | Discovery: Respond to Discovery; w SK re reo discovery responses | 1 | 0.20 | $80.00 |
| CFHC | Consultation with: CFHC Staff; Call with EK REO cases | 1 | 0.30 | $30.00 |
| CFHC | Case Work: Legal Research; reo emails with case filings for review before thursday meeting | 1 | 0.20 | $66.00 |
| CFHC | Case Work: Legal Research; reo decision on spoliation motion | 1 | 0.50 | $250.00 |
| CFHC | Fair Housing: Federal - Other; REO plaintiffs meeting | 1 | 0.40 | $198.00 |
| CFHC | Consultation with: CFHC Staff; Call w/ GK, JL to disucs REO case as well as other office-related issues. | 1 | 0.40 | $130.00 |
| CFHC | Consultation with: CFHC Staff; Call w/ GK, PH to discuss REO litigation. | 1 | 0.40 | $130.00 |
| CFHC | Case Work: Legal Research; review ruling on MSJ in BoA REO case | 1 | 0.30 | $97.50 |
| CFHC | REO; BANA discovery requests | 1 | 0.70 | $350.00 |
| CFHC | Case Work; NFHA v BofA REO discovery | 1 | 0.40 | $200.00 |
| CFHC | Case Work; review bank of am reo materials | 1 | 1.00 | $500.00 |
| CFHC | REO; review docs in REO to prep for meeting | 1 | 0.20 | $60.00 |
| CFHC | REO; w DL re BANA RFP responses | 1 | 0.40 | $200.00 |
| CFHC | Consultation with: CFHC Staff; call w GK re REO discovery | 3 | 0.90 | $270.00 |
| CFHC | REO; working w DL on BANA discovery | 1 | 0.70 | $350.00 |
| CFHC | REO; BANA document search | 1 | 1.00 | $500.00 |
| CFHC | REO; search for docs; upolads - BANA | 1 | 2.50 | $1,250.00 |

| CFHC | Consultation with: CFHC Staff; call w GK re REO discovery | 2 | 0.50 | $150.00 |
|------|------|------|------|------|
| CFHC | REO; Discovery responses and working on spreadsheet - BANA | 1 | 3.50 | $1,750.00 |
| CFHC | REO; REO discovery | 1 | 0.40 | $120.00 |
| CFHC | REO; call w GK to go over REO responses | | 0.30 | $90.00 |
| CFHC | REO; confer w DL; review spreadsheets re diversion log and rfps | 1 | 0.30 | $150.00 |
| CFHC | REO; w DL re RFP | 1 | 0.20 | $100.00 |
| CFHC | REO; call w GK re responding to REO discovery | 1 | 0.70 | $210.00 |
| CFHC | REO; wrap my head around REO discovery; start putting together grant files to produce | 1 | 4.20 | $1,260.00 |
| CFHC | REO; BANA discovery w DL | 1 | 0.40 | $200.00 |
| CFHC | REO; call w GK re REO discovery | 1 | 0.40 | $120.00 |
| CFHC | REO; review and discuss REO rog response (w GK) | 1 | 0.20 | $60.00 |
| CFHC | REO; conf w/GK re discovery response, review and revise same. | 1 | 0.40 | $160.00 |
| CFHC | REO; RFP and ROG responses for BANA REO | 1 | 2.00 | $1,000.00 |
| CFHC | REO; call w GK re REO responses | 1 | 0.30 | $90.00 |
| CFHC | REO; doc coding | 1 | 1.60 | $480.00 |
| CFHC | REO; REO responses | 1 | 1.30 | $390.00 |
| CFHC | REO; work on REO responses | 1 | 0.90 | $270.00 |
| CFHC | REO; finish discovery review | 1 | 1.50 | $450.00 |
| CFHC | REO: REO discovery send to GK | 1 | 2.00 | $600.00 |
| DMFHC | REO - Bank of America:Investigation, Amend Complaint | 1 | 0.50 | $125.00 |
| DMFHC | REO - Bank of America:Investigation, Expert Witness & Partner Email | 1 | 0.50 | $125.00 |
| DMFHC | REO - Bank of America:Investigation, Complaint | 1 | 0.50 | $125.00 |
| DMFHC | REO - Bank of America:Investigation, Complaint Management | 3 | 2.00 | $750.00 |
| FHANC | Documenting time | 1 | 0.10 | $25.00 |
| FHANC | Documentation of time | 2 | 0.10 | $35.00 |
| | | | | |
| FHANC | Creating excel timesheet | 1 | 0.20 | $10.00 |
| FHANC | Calculating past investigative work and time spent | 4 | 9.40 | $470.00 |
| FHANC | Updating time sheet and onto combined timesheet | 2 | 1.50 | $375.00 |

| FHANC | Add time to timesheet | 1 | 0.60 | $30.00 |
|---|---|---|---|---|
| FHANC | Reviewed Ray Zamudio emails for timekeeping | 12 | 1.20 | $39.60 |
| FHANC | Review emails, timesheets | 1 | 0.10 | $11.55 |
| FHANC | Disc. w/ Annya re: updating diversion | 2 | 0.40 | $90.00 |
| FHANC | Create/update Diversion and General Reimbursements Spreadsheet | 1 | 2.00 | $200.00 |
| FHANC | Updated time sheets | 1 | 0.70 | $210.00 |
| FHANC | Updating timesheet, reviewing others | 1 | 2.00 | $700.00 |
| FHANC | Sort BOA REO email and assign hours | 5 | 3.40 | $340.00 |
| FHANC | Sort BOA REO email, assign + cross check hours | 1 | 1.00 | $100.00 |
| FHANC | Meeting w/ Caroline re: tasks to update on timesheets and emails | 1 | 0.80 | $80.00 |
| FHANC | Noelle updated timesheets and review email threads for mentions of conferences/meetings | 1 | 1.30 | $130.00 |
| FHANC | Call with Caroline, clarify timekeeping | 1 | 0.30 | $30.00 |
| FHANC | Review emails, prep time | 1 | 1.20 | $120.00 |
| FHANC | Documenting/updating timesheets, calculating expenses, coordinating uploads with Annya | 1 | 0.10 | $11.55 |
| FHANC | Documenting/updating timesheets, calculating expenses, coordinating uploads with Caroline Peattie | 4 | 0.40 | $13.20 |
| FHANC | Emails to/from Taryn re: retainer | 1 | 0.20 | $50.00 |
| FHANC | Email from CP re Fwd REO investigation complaint | 1 | 0.10 | $10.00 |
| FHANC | Email to/from Shanna re: BOA Complaint, copying Jessica | 1 | 0.10 | $25.00 |
| FHANC | Email to Shanna re: follow up BOA Complaint | 1 | 0.10 | $25.00 |
| FHANC | Emails w Jennifer Kreager and Stephanie Choi (CAG) re: complaint | 1 | 0.50 | $125.00 |
| FHANC | Email from CP re: reporting BofA complaint to CAG | 1 | 0.10 | $25.00 |
| FHANC | Email to Jessica re: Reporting BofA complaint to CAG | 1 | 0.10 | $25.00 |
| FHANC | Email from Caroline Peattie to Jessica Tankersley replying to inquiry on pending suits | 1 | 0.10 | $25.00 |
| FHANC | Emails w/ Shanna & Lisa re: lost BofA funding due to conflict of interest issue | 1 | 0.10 | $25.00 |
| FHANC | Email w/CP and DB re complaint | 1 | 0.20 | $25.00 |
| FHANC | Email w/CP, CS and DB re complaint | 1 | 0.20 | $10.00 |

| FHANC | Emai to/from Craig and Denise re: possible neighbors to speak with for complaint | 1 | 0.20 | $25.00 |
|---|---|---|---|---|
| FHANC | Case file update | 1 | 0.10 | $5.00 |
| FHANC | Email from Caroline Peattie about preparing for case | 1 | 0.10 | $25.00 |
| FHANC | Email to/from CP re: draft complaint | 1 | 0.20 | $25.00 |
| FHANC | Email to/from Casey re: draft complaint | 1 | 0.20 | $10.00 |
| FHANC | Conversation w/ CP re: draft complaint | 1 | 0.20 | $25.00 |
| FHANC | Conversation w/ Casey re: draft complaint | 1 | 0.20 | $25.00 |
| FHANC | Email to/from Lindsay & Michael (NBC) re: REO resources, news releases, complaints, and previous settlements | 1 | 0.10 | $8.25 |
| FHANC | Timesheets/Discovery Documents | 1 | 1.00 | $100.00 |
| FHANC | Preparing documents/emails to upload | 6 | 0.60 | $19.80 |
| FHANC | Discussion of BofA case at FHANC board meeting | 1 | 0.20 | $70.00 |
| FHANC | Inclusion of Bank of America case in Comment Letter to HUD on its proposed Disparate Impact rule | 1 | 0.20 | $70.00 |
| FHANC | Discussion of BofA REO case w/ legislative offices on Capitol Hill as part of discussion of Disparate Impact | 1 | 0.30 | $105.00 |
| FHANC | Discussion with Caroline and preparations re: discovery responses | 1 | 1.00 | $5.00 |
| FHANC | Creation of Interrogatory and RFP Response Word doc | 1 | 0.80 | $5.00 |
| FHANC | Discussion with Jillian and preparations re: discovery responses | 1 | 1.00 | $25.00 |
| FHANC | Gathering info/docs for discovery request | 1 | 1.50 | $10.00 |
| FHANC | Review of docs needed | 1 | 0.50 | $10.00 |
| FHANC | Discussion with Caroline re: uploading emails and Excel doc | 2 | 0.70 | $70.00 |
| FHANC | Discussion with Noelle re: uploading emails and Excel doc | 3 | 1.00 | $400.00 |
| FHANC | Find documentation of expenses, enter, and upload to dropbox | 1 | 0.20 | $25.00 |
| FHANC | Discussion with Caroline re: Exporting email files to folder for conversion | 1 | 0.20 | $20.00 |
| FHANC | Reformatting email file to EML | 1 | 0.20 | $165.00 |

| FHANC | Upload re-converted email files and timesheets to Dropbox | 1 | 0.20 | $20.00 |
|---|---|---|---|---|
| FHANC | Discussion with Noelle re: Exporting email files to folder for conversion | 1 | 0.20 | $80.00 |
| FHANC | Discussion with Caroline Peattie re: info needed for BofA interrogatories | 1 | 0.30 | $10.00 |
| FHANC | C.Peattie email request to produce any responsive docs; found files, returned via email | 1 | 0.30 | $10.00 |
| FHANC | Locate archived property records reimbursements receipts for A.Maskey | 1 | 0.30 | $25.00 |
| FHCCI | Damage calculation and diversion notes | 1 | 3.25 | $825.00 |
| FHCCI | Review of court decision | 1 | 0.30 | $75.00 |
| FHCCI | Review of amended complaint | 1 | 1.00 | $250.00 |
| FHCCI | Reviewed court decision | 2 | 2.00 | $500.00 |
| FHCCI | File clean up and organizing | 1 | 0.50 | $125.00 |
| FHCCI | Reviewing items for discovery response | 1 | 0.30 | $75.00 |
| FHCCI | Reviewing timesheet entries - scanning for discovery needs | 1 | 1.00 | $250.00 |
| FHCCI | Work on time log and damages costs spreadsheet | 1 | 1.30 | $325.00 |
| FHCCI | Redoing time log and damages costs spreadsheet (split time) | 1 | 1.30 | $325.00 |
| FHCCI | Reviewed court docs | 1 | 0.30 | $75.00 |
| FHCCI | Review of rulings and email to staff | 1 | 0.30 | $75.00 |
| FHCCI | review rulings | 1 | 0.50 | $37.50 |
| FHCCI | Discovery items | 1 | 1.30 | $325.00 |
| FHCCI | Discovery prep, Brady call, and related | 1 | 1.80 | $450.00 |
| FHCCI | Work on CV for discovery purposes; discussion with Amy | 1 | 1.00 | $90.00 |
| FHGSA | Read & responded to Lindsay's email for a joint call to Isabel Ramirez; reviewed schedule | 1 | 0.33 | $66.67 |
| FHGSA | Participated in conference call with Lindsay Augustine and Isabel Ramirez regarding declaration | 1 | 0.42 | $83.33 |
| FHGSA | Read Lindsay's email and attachments re changes to Isabel Ramirez's declaration; follow-up questions, etc. | 1 | 1.00 | $200.00 |
| FHGSA | Read & responded to emails by Lindsay and Jean re additional edits to Isabel's declaration | 1 | 1.00 | $200.00 |
| FHGSA | Prepared and participated in Special Board Meeting re Board authorization to | 1 | 3.00 | $600.00 |

| | file/settle lawsuit against Bank of America | | | |
|---|---|---|---|---|
| FHGSA | Read Shanna's emails re need to submit diversion documents; met with Roxann to discuss compiling time & expenses into Excel document by May 25th | 1 | 0.50 | $100.00 |
| FHGSA | Pulled various documents needed for calculating staff time & expenses | 2 | 3.00 | $600.00 |
| FHGSA | Reviewed and updated Excel case log/expense tally | 4 | 22.50 | $2,812.50 |
| FHGSA | Entered information from case logs into Excel case log | 1 | 10.00 | $2,000.00 |
| FHGSA | Reviewed email from Morgan Williams re reply to Motion to Dismiss; reviewed surreply | 1 | 0.50 | $62.50 |
| FHGSA | Reviewed email from Katherine E. Garvey re document retention | 1 | 0.75 | $93.75 |
| FHGSA | Reviewed email from Jean Zachariasiewicz re court's opinion re Motion to Dismiss | 1 | 0.67 | $83.33 |
| FHGSA | Reviewed, reformatted and updated Excel case log/expense tally | 1 | 3.00 | $375.00 |
| FHGSA | Reviewed, edited and updated Excel case log/expense tally | 1 | 2.50 | $312.50 |
| FHGSA | Reviewed email from Jean Zachariasiewicz re discovery progress; reviewed attachments | 1 | 1.00 | $125.00 |
| FHGSA | Reviewed email from Lisa Rice re REO expert witness fees | 1 | 0.08 | $10.42 |
| FHGSA | Reviewed email from Katherine Garvey re case update; reviewed letter to Plaintiffs | 1 | 0.50 | $62.50 |
| FHGSA | Reviewed email from Lisa Rice re case cost contribution | 1 | 0.17 | $20.83 |
| FHGSA | Reviewed recent filings, motions, etc. | 1 | 0.67 | $83.75 |
| FHGSA | Reviewed recent filings, motions, etc. | 1 | 0.25 | $31.25 |
| FHGSA | Reviewed spoliation motion decision | 1 | 0.38 | $47.50 |
| FHGSA | Reviewed opinion defendants motion to dismiss | 1 | 0.58 | $72.50 |
| FHGSA | Reviewed interrogatories | 1 | 0.17 | $21.25 |
| FHGSA | Reviewed case log/expense tally sheet | 1 | 1.00 | $125.00 |
| FHGSA | Reviewed case log/expense tally sheet; pulled docs | 1 | 2.00 | $250.00 |

| FHGSA | Pulled docs for case; scanned and uploaded docs; reviewed Excel log/expense tally | 1 | 5.50 | $687.50 |
|---|---|---|---|---|
| FHCNA | Researched and compiled information for diversion log. | 1 | 7.00 | $875.00 |
| FHCNA | Researched and compiled information for diversion log | 1 | 6.00 | $1,500.00 |
| FHCNA | Request for Bank of America Diversion Documents - NFHA | 1 | 0.50 | $125.00 |
| FHCNA | FHCNA Staff Update on Bank America Case | 3 | 3.00 | $525.00 |
| FHCNA | NFHA & Advocates submit Comment Letter | 2 | 1.17 | $218.75 |
| FHCNA | Review expert reports | 1 | 0.33 | $83.33 |
| FHCNA | Reviewed summary judgment and spoliation opposition briefs | 1 | 0.33 | $83.33 |
| FHCNA | Review Summary judgement & spoliation oppositions filed. | 1 | 0.17 | $41.67 |
| FHCNA | Read opinions | 1 | 0.33 | $83.33 |
| FHCNA | NFHA V Bana Discovery | 1 | 0.25 | $62.50 |
| FHCNA | Reviewed & Approval of Bank of America Interrogatories & REP's | 1 | 1.50 | $375.00 |
| FHCNA | Researched and compiled information for diversion log | 2 | 13.00 | $2,375.00 |
| FHCRR | Work on agency case: Finished collecting and compiling records to document diversion of resources. | 1 | 4.50 | $787.50 |
| FHCRR | Work on agency case: Correspondence w/Attys. Added appt. to Outlook calendar. | 1 | 0.25 | $43.75 |
| FHCRR | Work on agency case: TC w/Attys and partners. | 1 | 0.75 | $131.25 |
| FHCRR | Work on agency case: Began collecting records to document diversion. | 3 | 1.25 | $218.75 |
| FHCRR | Work on agency case: Reviewed case correspondence. | 1 | 0.25 | $43.75 |
| FHCRR | Work on agency case: | 2 | 0.50 | $100.00 |
| FHCRR | Work on agency case: Shared details w/all staff following program meeting. Followed up with instruction by email re FHCRR v Bank of America - Litigation Hold | 1 | 0.25 | $43.75 |
| FHCRR | Work on agency case: Scanning files. | 1 | 0.25 | $43.75 |
| FHCRR | Work on agency case: Organizing scanned electronic records. | 1 | 0.25 | $43.75 |

| FHCRR | Work on agency case: Case correspondence. | 2 | 0.50 | $93.75 |
|---|---|---|---|---|
| FHCRR | Work on agency case: Reviewed case correspondence from atty. | 1 | 0.25 | $43.75 |
| FHCRR | Work on agency case: Case mgmt discussion w/CAP. | 1 | 0.25 | $43.75 |
| FHCRR | Work on agency case: Case mgmt discussion w/CAP | 1 | 175.00 | $43.75 |
| FHCRR | Pleasants, Carrie: Discovery with KAK | 2 | 1.50 | $300.00 |
| FHCRR | Keniray, Kris: Discovery | 3 | 10.75 | $1,881.25 |
| FHCRR | Keniray, Kris: re: discovery w/CAP | 1 | 0.50 | $87.50 |
| FHCWM | REO: Worked on diversion information | 3 | 2.33 | $280.00 |
| FHCWM | Casework: Gathered information from QuickBooks. | 1 | 0.08 | $9.90 |
| FHCWM | BOA Case review. Discussion with MZH and GC. | 1 | 0.25 | $30.00 |
| FHCWM | Reviewed draft complaint. | 1 | 0.25 | $30.00 |
| FHCWM | Casework: Review of discovery request | 1 | 0.08 | $10.00 |
| FHCWM | Casework: Discovery information | 1 | 1.17 | $140.00 |
| FHCWM | Casework: Worked on scanning files for discovery | 1 | 0.33 | $33.33 |
| FHCWM | Casework: Work on discovery request | 1 | 1.50 | $180.00 |
| FHCWM | REO Casework | 4 | 1.25 | $210.00 |
| HOPE | Review complaint and work on diversion log | 1 | 1.00 | $250.00 |
| HOPE | Work on BOA diversion | 2 | 6.40 | $1,600.00 |
| HOPE | Diversion, summary of costs  compiled | 1 | 1.00 | $250.00 |
| HOPE | Doc review | 1 | 0.30 | $75.00 |
| HOPE | Doc review- final release | 1 | 0.20 | $50.00 |
| HOPE | Doc review- BOA motion to Dismiss | 1 | 0.50 | $125.00 |
| HOPE | Doc review- BOA and Safeguard responses | 1 | 1.00 | $250.00 |
| HOPE | Doc review- Reply to Responses | 1 | 0.50 | $125.00 |
| HOPE | BOA file review | 1 | 0.30 | $75.00 |
| HOPE | Discovery | 3 | 7.50 | $1,875.00 |
| HOPE | BOA discovery call | 1 | 0.50 | $125.00 |
| HOPE |  Review- discovery | 1 | 0.30 | $125.00 |
| HOPE | Partner communication- litigation costs | 1 | 0.20 | $50.00 |
| HOPE | Doc review- litigation update | 3 | 2.00 | $600.00 |
| HOPEFHC | Review; Calls, meetings, timesheets, expenses | 5 | 5.75 | $2,300.00 |
| HOPEFHC | Litigation; Respond to 3rd party subpoena request, review docs | 2 | 0.75 | $300.00 |
| HOPEFHC | Litigation; Retainer, board | 1 | 0.50 | $200.00 |

| HOPEFHC | Litigation; Review docs, records, counsel comms, board approval | 2 | 1.50 | $600.00 |
|---------|---------|---|------|---------|
| HOPEFHC | Litigation; Review docs, status | 1 | 0.50 | $200.00 |
| HOPEFHC | Litigation; Review filing from atty, updates | 1 | 0.50 | $200.00 |
| HOPEFHC | Litigation; Status, motions, updates | 1 | 0.50 | $200.00 |
| HOPEFHC | Litigation; Diversion calc, info | 1 | 0.25 | $100.00 |
| HOPEFHC | Litigation; Diversion, Journyx, E & O time for counsel | 1 | 0.50 | $200.00 |
| HOPEFHC | Litigation; Cook County REO visits | 2 | 4.00 | $600.00 |
| HOPEFHC | Litigation; Discovery related activities | 3 | 4.00 | $1,000.00 |
| HOPEFHC | Litigation; Discovery related meetings and activities | 5 | 9.50 | $2,250.00 |
| HOPEFHC | Litigation; Discovery Request | 2 | 6.00 | $1,500.00 |
| HOPEFHC | Litigation; Motions, partner/counsel calls | 3 | 2.50 | $1,000.00 |
| HOPEFHC | Litigation; MSJ Decision, review | 1 | 0.50 | $200.00 |
| LAFHAC | Compiled diversion information for discovery requests. | 6 | 5.59 | $978.25 |
| METRO | Research and compile records to determine diversion costs | 1 | 2.00 | $300.00 |
| METRO | development of diversion log | 1 | 5.00 | $750.00 |
| METRO | preparation and meeting with Gail on diversion | 1 | 4.00 | $600.00 |
| METRO | meeting with Joyce on diversion and zoom with NFHA | 1 | 2.00 | $300.00 |
| METRO | updating diversion log | 5 | 25.00 | $3,750.00 |
| METRO | updating diversion log; review & approval of discovery response | 1 | 5.00 | $750.00 |
| METRO | review decision on spoilation & expert record | 1 | 1.00 | $150.00 |
| METRO | Pulled database to enter diversion data | 1 | 8.00 | $1,200.00 |
| METRO | review expert reports | 1 | 1.00 | $150.00 |
| METRO | forwarded expert reports to Joyce for case discussion | 1 | 1.50 | $225.00 |
| METRO | review expert reports  to discuss case with Gail | 1 | 1.50 | $225.00 |
| METRO | review of pending motions & confer with Joyce | 1 | 2.00 | $300.00 |
| METRO | review of pending motions & confer with Gail | 1 | 2.00 | $300.00 |
| METRO | review  summary judgement motions | 1 | 0.50 | $75.00 |
| METRO | review opposition response to summary judgment | 1 | 0.50 | $75.00 |
| METRO | review recent motions/activity | 1 | 0.50 | $75.00 |
| METRO | further review of recent filings | 2 | 1.00 | $150.00 |

| METRO | review decision on spoilation & expert record | 1 | 1.00 | $150.00 |
|---|---|---|---|---|
| METRO | review decision on summary judgement | 1 | 1.00 | $150.00 |
| METRO | review of case management order | 1 | 1.00 | $150.00 |
| METRO | review discovery requests | 1 | 1.00 | $150.00 |
| METRO | draft discovery responses | 1 | 1.00 | $150.00 |
| METRO | case update on phase III discovery | 1 | 1.00 | $150.00 |
| METRO | review discovery requests and response drafts | 2 | 3.00 | $450.00 |
| METRO | review & approval of discovery response | 1 | 1.00 | $150.00 |
| MMFHC | Reconcile time logs | 1 | 0.50 | $37.50 |
| MVFHC | Work on calculations for diversion, email to Shanna | 1 | 1.50 | $375.00 |
| MVFHC | Review Plaintiffs' Opposition filings to Defendants' Motions for Summary Judgment and Motions for Spoliation. | 1 | 1.75 | $437.50 |
| MVFHC | Phone call, discuss discovery and documenting time | 1 | 0.20 | $23.00 |
| MVFHC | Meeting, with DL re: database, timesheets, hours | 1 | 0.10 | $11.50 |
| MVFHC | w/ DL on accessing that part of database, working on repairing a report that includes dates to compare with timesheets to ensure collect all appropriate hours. | 1 | 0.25 | $28.75 |
| MVFHC | checking timesheet entries, confirming which properties were BoA | 1 | 1.50 | $172.50 |
| MVFHC | Meeting, with JC re: lender names and determining time | 1 | 0.10 | $11.50 |
| MVFHC | Administrative, review working time invested on investigation | 1 | 0.50 | $57.50 |
| MVFHC | asking JC if could get report from db with lender names to help determine time. | 1 | 0.25 | $28.75 |
| MVFHC | working time invested on investigation. | 1 | 1.50 | $172.50 |
| MVFHC | Research, review timesheets, breakdown hours | 1 | 0.70 | $80.50 |
| MVFHC | ask JC to pull lenders with REO locations for COFHA. Ask JC and DL to verify how their timesheet entries are marked. | 1 | 0.25 | $28.75 |
| MVFHC | checking timesheet entries and reo assessments for those attributable to BoA, mostly finish KZ's entries, start TC. | 1 | 0.75 | $86.25 |

| MVFHC | reviewing TT and TC timesheets, breaking down hours appropriate for inclusion, some additional review of KZ's time. | 1 | 2.00 | $230.00 |
|---|---|---|---|---|
| MVFHC | Research,review timesheets | 1 | 0.50 | $57.50 |
| MVFHC | additional review of timesheets for inclusion. Added in JMC's time | 1 | 1.50 | $172.50 |
| MVFHC | Administrative, add hours, check in re: timesheets | 1 | 0.20 | $23.00 |
| MVFHC | adding in JC's hours. Check in with IT dept. on timesheets. | 1 | 0.50 | $57.50 |
| MVFHC | Administrative, add additional time, double-check figures | 1 | 0.30 | $34.50 |
| MVFHC | Discovery, work on education documents re: REO dispositions | 1 | 2.70 | $621.00 |
| MVFHC | Research, work on discovery | 1 | 0.40 | $46.00 |
| MVFHC | Research, review/save correspondence | 1 | 0.80 | $92.00 |
| MVFHC | Administrative, remind DL re: saving correspondence | 1 | 0.10 | $11.50 |
| MVFHC | Research, save JMC related email correspondence | 1 | 1.30 | $149.50 |
| MVFHC | Research, save REO correspondence | 1 | 0.70 | $80.50 |
| MVFHC | Meeting, with DL re: how to access and search REO correspondence | 1 | 0.10 | $11.50 |
| MVFHC | Administrative, discuss litigation discovery | 1 | 1.10 | $126.50 |
| MVFHC | Discovery, save Jim's old emails | 2 | 1.30 | $149.50 |
| MVFHC | Discovery, start review of KZ gmail correspondence | 1 | 0.30 | $34.50 |
| MVFHC | Discovery, review email and save KZ correspondence | 1 | 0.20 | $23.00 |
| MVFHC | Meeting, with JMC re: hourly breakdown | 1 | 0.10 | $11.50 |
| MVFHC | w/ JMC on hourly breakdown | 1 | 0.25 | $28.75 |
| MVFHC | Review Federal Complaint filed on 06/26/2018. | 1 | 1.75 | $437.50 |
| MVFHC | Discovery | 2 | 2.30 | $506.00 |
| MVFHC | Administrative, preparehard drive for FedEx shipment | 1 | 0.20 | $50.00 |
| MVFHC | Dsicovery, review Karl's emails | 1 | 0.60 | $69.00 |
| MVFHC | Discovery, complete AMS gmail search | 1 | 0.20 | $19.17 |
| MVFHC | Discovery, save Anita's Outlook correspondence | 1 | 0.70 | $76.67 |
| MVFHC | Meeting, with JC re: searching emails | 1 | 0.10 | $11.50 |
| MVFHC | Discovery, save KZ Outlook correspondence | 1 | 0.30 | $38.33 |

| MVFHC | Review Plaintiffs' Opposition to Defendants' Motion to Dismiss | 1 | 1.00 | $250.00 |
|---|---|---|---|---|
| MVFHC | Discovery, complete JMC Outlook search | 1 | 0.60 | $69.00 |
| MVFHC | Read defendants' reply briefs | 1 | 0.75 | $187.50 |
| MVFHC | String of emails between plaintiffs responding to the Judge's Opinion. | 1 | 0.25 | $62.50 |
| MVFHC | Read Judge's Blake's Decision | 1 | 0.50 | $125.00 |
| MVFHC | Email to local elected officials, colleagues and community activists re decision on BOA's and SG's MTDs | 1 | 0.25 | $62.50 |
| MVFHC | Email from Lisa Rice re retaining expert witnesses | 1 | 0.25 | $62.50 |
| MVFHC | Read Motions for Summary Judgment filed by Defendants | 1 | 1.25 | $312.50 |
| MVFHC | Review Plaintiffs' Opposition filings to Defendants' Motions for Summary Judgment and Motions for Spoliation. | 1 | 1.75 | $437.50 |
| MVFHC | Read News Release from NFH re: summary judgment briefing | 1 | 0.25 | $62.50 |
| MVFHC | Review Judge Gallagher's Memorandum Opinion on Defendants' Motion for Summary Judgment - denied in all respects. | 1 | 1.00 | $250.00 |
| MVFHC | Email to MVFHC Board of Directors and Staff re: denial of defendants' motions for summary judgment | 1 | 0.25 | $62.50 |
| MVFHC | Email to MVFHC Board of Directors re: denial of defendants' motions for summary judgment | 1 | 0.25 | $62.50 |
| MVFHC | Work on discovery requests and interrogatories. | 4 | 3.50 | $875.00 |
| MVFHC | Work on discovery | 1 | 3.25 | $812.50 |
| MVFHC | Discovery & Interrogatories | 1 | 3.50 | $875.00 |
| SSHC | SS gave status on case with projected filing date in Fed Ct | 1 | 0.50 | $125.00 |
| SSHC | SS email requesting proirity given to BoA diversion info | 1 | 0.25 | $62.50 |
| SSHC | Review of draft complt | 1 | 0.75 | $187.50 |
| SSHC | Review of filed complt and appendix | 1 | 1.00 | $250.00 |
| SSHC | Review M/dismiss opposition | 1 | 0.50 | $125.00 |

-C-13-

| | | | | |
|---|---|---|---|---|
| SSHC | Review of m/dismiss briefs | 1 | 1.00 | $250.00 |
| SSHC | Judge m/dismiss denial decision review | 1 | 1.00 | $250.00 |
| SSHC | JZ request for damage/diversion info reviewed | 1 | 0.50 | $125.00 |
| SSHC | Compilation of diversion costs | 1 | 2.50 | $625.00 |
| SSHC | phased discovery Def requests reviewed | 1 | 0.50 | $125.00 |
| SSHC | Review of Dfts Sum Jud briefs | 1 | 0.50 | $125.00 |
| SSHC | Dfts reply to sum jud/spoilation opposition, review | 1 | 1.00 | $250.00 |
| SSHC | Review of lastest filings | 1 | 0.50 | $125.00 |
| SSHC | Receipt of recent filings | 1 | 0.25 | $62.50 |
| SSHC | Recent rulings on spoilation & expert witnesses reviewed | 1 | 0.50 | $125.00 |
| SSHC | Opinion denying Dfts m/sum jud, review | 1 | 0.50 | $125.00 |
| SSHC | Case update, RE court management order and memo reviewed | 1 | 0.50 | $125.00 |
| SSHC | Phase III discovery requests reveiwed | 1 | 0.25 | $62.50 |
| SSHC | Compiling draft responses to Phase III int/doc requests | 1 | 4.50 | $1,125.00 |
| SSHC | Compiling Phase III responses, updating diversion of resource/time records | 2 | 6.00 | $1,500.00 |
| SSHC | Rulings sent for JT reveiw | 1 | 0.25 | $62.50 |
| SSHC | Accumulated documentation/diversion of resources staff time expended | 1 | 8.00 | $2,000.00 |
| SSHC | Review Plfts sum jud/spoilation opposition | 1 | 0.50 | $125.00 |
| TFHC | Transferred time sheets from LM to correct case number. | 1 | 0.30 | $45.00 |
| TFHC | began compiling diversion log | 1 | 0.80 | $187.50 |
| TFHC | diversion log | 1 | 1.00 | $250.00 |
| TFHC | worked on diversion log | 3 | 3.30 | $825.00 |
| TFHC | Case review | 3 | 1.10 | $305.00 |
| TFHC | update at case review meeting | 4 | 1.20 | $240.00 |
| TFHC | Worked on discovery responses | 2 | 3.00 | $1,050.00 |
| TFHC | Updated Damages Spreadsheet | 1 | 0.30 | |
| | | | | |
| NFHA | Litigation; travel research: Dallas and Milwaukee | 1 | 0.30 | $60.00 |
| NFHA | Administration; Reporters on REO cities and litigation | 1 | 0.50 | $200.00 |
| NFHA | Litigation; Bank of America motion to dismiss hearing - Baltimore, MD | 1 | 7.00 | $1,575.00 |
| NFHA | Reviewing REO testing and litigation information to get up to speed | 6 | 9.60 | $2,160.00 |

| NFHA | Accounts Payable; Bank of America cities complaint | 1 | 450.00 | $450.00 |
|------|------|------|------|------|
| NFHA | Accounts Payable; BOA call review brief | 2 | 2.00 | $900.00 |
| NFHA | Accounts Payable; BOA time diversion | 5 | 2.30 | $1,012.50 |
| NFHA | Accounts Payable; MTD | 4 | 5.00 | $2,250.00 |
| NFHA | Accounts Payable; REO Calendar Scanning | 3 | 1.50 | $64.85 |
| NFHA | Accounts Payable; reviewing draft complaint | 1 | 0.50 | $225.00 |
| NFHA | Administration; Bank of America discovery document prep | 12 | 32.30 | $7,256.25 |
| NFHA | Administration; Bank of America Partner Call Log - Discovery prep | 2 | 4.00 | $900.00 |
| NFHA | Administration; BOA REO filing | 2 | 1.30 | $675.00 |
| NFHA | Administration; BOA time review | 9 | 27.00 | $12,150.00 |
| NFHA | Administration; diversion numbers | 2 | 1.00 | $400.00 |
| NFHA | Administration; Drafting REO amended complaint | 1 | 2.00 | $400.00 |
| NFHA | Administration; planning amended complaint | 6 | 6.00 | $2,400.00 |
| NFHA | Administration; planning amendments to REO complaints | 1 | 0.20 | $80.00 |
| NFHA | Administration; prep for filing | 1 | 2.00 | $800.00 |
| NFHA | Administration; preparing PPTs for filing amended HUD complaint | 2 | 8.00 | $3,200.00 |
| NFHA | Administration; Supreme Court BOA Decision - Meeting, Statement and Press | 4 | 8.00 | $389.12 |
| NFHA | Administration; Updating REO complaint draft | 2 | 3.00 | $600.00 |
| NFHA | Analysis; Indianapolis REO analysis for BofA complaint amendment | 1 | 1.00 | $200.00 |
| NFHA | B of A discovery and doc review discussion | 2 | 2.30 | $517.50 |
| NFHA | B of A doc review | 24 | 140.80 | $31,680.00 |
| NFHA | Bank of America adv NFHA-schedule prep & depo | 6 | 3.80 | $380.00 |
| NFHA | Bank of America REO - 30b6 deposition subpoena review | 1 | 1.00 | $250.00 |
| NFHA | Bank of America REO 30(b)(6) deposition | 1 | 6.30 | $1,575.00 |
| NFHA | Bank of America REO Discovery | 243 | 457.60 | $114,400.00 |
| NFHA | Bank of America REO Discovery - property record review | 3 | 7.00 | $17,500.00 |

| NFHA | Bank of America REO diversion log | 2 | 3.00 | $850.00 |
|---|---|---|---|---|
| NFHA | BoA Declaration | 3 | 4.00 | $400.00 |
| NFHA | BoA Disputed Properties Review | 1 | 0.50 | $50.00 |
| NFHA | BoA Doc review | 7 | 21.50 | $21,500.00 |
| NFHA | BoA Doc Review review | 1 | 1.00 | $100.00 |
| NFHA | Investigation; Exhibits A & B for amended complaint IL, WI, IN | 1 | 4.00 | $800.00 |
| NFHA | Phone Calls; Bank of America REO complaint review | 3 | 4.00 | $950.00 |
| NFHA | Phone Calls; Conference call re: BofA Complaint | 1 | 2.30 | $450.00 |
| NFHA | Phone Calls; John & Leslie @ SS CHicago re: BofA REO amended complaint | 1 | 0.80 | $150.00 |
| NFHA | Phone Calls; Milwaukee Phone call re: BofA amended complaint | 2 | 1.30 | $250.00 |
| NFHA | Phone Calls; Milwaukee phone call to review BAC complaint data | 1 | 1.00 | $200.00 |
| NFHA | REO Discovery - travel expense review | 1 | 1.20 | $300.00 |
| NFHA | REO Discovery staffing check-in | 1 | 0.20 | $50.00 |
| NFHA | REO discovery staffing discussions | 2 | 0.40 | $180.00 |
| NFHA | REO Email Search terms - file admin | 1 | 0.20 | $50.00 |
| NFHA | Review; Bank of America - motion to dismiss response | 3 | 6.50 | $1,462.50 |
| NFHA | Review; Bank of America amended complaint review | 2 | 2.30 | $450.00 |
| NFHA | Review; Bank of America Documents to Request in Discovery review | 5 | 6.80 | $1,687.50 |
| NFHA | Review; Bank of America Property Record Review | 21 | 123.50 | $30,875.00 |
| NFHA | Review; Bank of America REO case review for attorneys | 1 | 1.60 | $375.00 |
| NFHA | Review; Bank of America REO Complaint Review | 7 | 24.00 | $5,400.00 |
| NFHA | Review; Bank of America REO data review | 6 | 12.50 | $2,500.00 |
| NFHA | Review; Bank of America REO Discovery | 8 | 10.80 | $2,687.50 |
| NFHA | Review; Bank of America REO diversion log | 1 | 2.00 | $500.00 |
| NFHA | Review; REO evidence review for damages | 6 | 7.40 | $1,850.00 |
| **TOTAL** | | | | **$375,778.75** |