**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. SAG-18-1919 |
| BANK OF AMERICA, N.A., *et al.*, | |
| Defendants. | |

**PLAINTIFF FAIR HOUSING ORGANIZATIONS' OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON AVAILABLE REMEDIES**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................iii

TABLE OF ABBREVIATIONS....................................................................................................xi

INTRODUCTION ............................................................................................................................1

BACKGROUND AND STATEMENT OF FACTS.....................................................................3

I.      This Court has already held that, like the plaintiff in *Havens*, the FHOs' injuries, if
        proven, entitle them to diversion-of-resources and frustration-of-mission damages. ...............3

II.     The evidence establishes that the FHOs' expenditure of time and resources to
        investigate Defendants' discriminatory conduct and enforce the FHA has perceptibly
        depleted their limited resources to provide counseling, testing, and referral services. .............4

III.    The evidence establishes that the FHOs' missions to increase equal access to
        housing, eliminate neighborhood segregation and destabilization, eradicate
        discrimination, and promote fair housing were frustrated by Defendants'
        discriminatory maintenance and marketing of REOs.................................................................6

        A.      Investigating and counteracting Defendants' REO discrimination impaired
                the FHOs' missions by causing them to forego other meaningful
                opportunities. ..........................................................................................................7

        B.      The programs the FHOs implemented with REO settlement funds exemplify
                the type of work necessary to remedy Defendants' frustration of their
                missions......................................................................................................................8

IV.     The FHOs seek injunctive relief to remedy the harm Defendants caused and to
        prevent future discrimination. ....................................................................................................9

STANDARD OF REVIEW............................................................................................................10

ARGUMENT.................................................................................................................................10

I.      The FHOs have diverted significant resources to identify and counteract Defendants'
        discriminatory maintenance and marketing of REOs, and, if liability is established, are
        entitled to compensation for that diversion. .............................................................................12

        A.      Because the FHOs diverted resources in response to discrimination that
                impaired their missions, they are entitled to compensation for this injury.................13

        B.      The FHOs may claim diversion-of-resources damages even though the
                activities are part of their ordinary practices.................................................................16

C.    Defendants' quibbles with individual diversion log entries are classic disputes of fact.............................................................................................................18

D.    In the Fourth Circuit, the time the FHOs spent on litigation activities is compensable as diversion-of-resources damages..............................................20

E.    Defendants are not entitled to an offset of damages because the FHOs received grant money or settlement funds from unrelated entities...............................22

F.    The hourly rates the FHOs claim are reasonable and compensable...........................24

II.    Defendants' discrimination frustrated the FHOs' missions to eradicate discrimination and promote equal housing, integration, and neighborhood stabilization. ...........................25

A.    Defendants' discrimination directly harmed the FHOs' missions. .............................27

B.    The FHOs' frustration-of-mission damages may be determined by a jury based on trial evidence and with guidance from an expert on FHOs. .......................32

1.    Impairment of the FHOs' broader missions of overcoming neighborhood stereotypes to achieve housing choice and integration. ..........38

2.    Impairment of programs designed to train and marshal the housing industry to market and invest in neighborhoods equally. ...............................39

3.    Impairment of services designed to increase access to homeownership and promote equalization and stabilization of neighborhoods.......................39

4.    Diminishment of past complaint-based and community outreach services..................................................................................................42

III.    A finding of liability would entitle the FHOs to injunctive relief. .............................44

IV.    This Court should continue to exercise personal jurisdiction over Defendants.....................47

CONCLUSION...................................................................................................................50

# TABLE OF AUTHORITIES

## Cases

*Access Living of Metro. Chi., Inc. v. City of Chicago,*
  372 F. Supp. 3d 663 (N.D. Ill. 2019) ............................................................. 11, 16

*Akouri v. Fla. Dep't of Transp.,*
  408 F.3d 1338 (11th Cir. 2005)...................................................................... 33–34

*Animal Legal Def. Fund v. U.S. Dep't of Agric.,*
  223 F. Supp. 3d 1008 (C.D. Cal. 2016) ............................................................. 14

*Arizona v. California,*
  460 U.S. 605 (1983)............................................................................................ 47

*ASPCA v. Feld Ent., Inc.,*
  659 F.3d 13 (D.C. Cir. 2011) ............................................................................. 14

*Ass'n of Cmty. Cancer Ctrs. v. Azar,*
  509 F. Supp. 3d 482 (D. Md. 2020) ................................................................... 11

*Balt. Neighborhoods, Inc. v. LOB, Inc.,*
  92 F. Supp. 2d 456 (D. Md. 2000) ...............................................................*passim*

*Bank of Am. Corp. v. City of Miami,*
  581 U.S. 189 (2017)............................................................................................ 28

*Barker v. Niles Bolton Assocs..,*
  316 F. App'x 933 (11th Cir. 2009) ..................................................................... 34

*Bd. of Educ. of Frederick Cnty. v. I.S.* ex rel. *Summers,*
  358 F. Supp. 2d 462 (D. Md. 2005) ................................................................... 20

*Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.,*
  181 F.3d 435 (3d Cir. 1999) ............................................................................... 49

*Blum v. Stenson,*
  465 U.S. 886 (1984)............................................................................................ 24

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.,*
  582 U.S. 255 (2017)............................................................................................ 48

*Carter v. Wallace & Gale Asbestos Settlement Tr.,*
  439 Md. 333 (2014) ............................................................................................ 24

*CASA de Md., Inc. v. Trump,*
  971 F.3d 220 (4th Cir. 2020)......................................................................... 11, 14

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................................... 10

*Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.,*
    236 F.3d 629 (11th Cir. 2000) ............................................................................................... 28

*Centro de la Comunidad Hispanade Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017) ................................................................................................... 27

*CFHC v. CoreLogic Rental Prop. Sols., LLC,*
    478 F. Supp. 3d 259 (D. Conn. 2020) ..........................................................................*passim*

*Christianson v. Colt Indus. Operating Corp.,*
    486 U.S. 800 (1988) ............................................................................................................... 13

*City of Chicago v. Matchmaker Real Est. Sales Ctr., Inc.,*
    982 F.2d 1086 (7th Cir. 1992) ......................................................................................... 12, 38

*City of Oakland v. Wells Fargo & Co.,*
    14 F.4th 1030 (9th Cir. 2021) ............................................................................................... 28

*Cmty. House, Inc. v. City of Boise,*
    No. 1:05-CV-00283-CWD, 2014 WL 345630 (D. Idaho Jan. 30, 2014) ...................... 10, 34, 36, 37

*Cnty. of Cook v. Bank of Am. Corp.,*
    78 F.4th 970 (7th Cir. 2023) ................................................................................................. 28

*Cnty. of Cook v. HSBC N. Am. Holdings Inc.,*
    314 F. Supp. 3d 950 (N.D. Ill. 2018) ................................................................................... 28

*Cousins v. Bray,*
    297 F. Supp. 2d 1027 (S.D. Ohio 2003) .............................................................................. 44

*Ctr. for Soc. Change, Inc. v. Morgan Prop. Mgmt. Co.,*
    No. 1:19-cv-0734, 2019 WL 1118066 (D. Md. Mar. 11, 2019) ........................................... 44

*Days Inns Worldwide, Inc. v. Patel,*
    No. 04-2259, 2005 WL 4655381 (S.D. Cal. Feb. 7, 2005) ................................................... 33

*Douglass v. Hustler Mag., Inc.,*
    769 F.2d 1128 (7th Cir. 1985) ............................................................................................... 23

*E.E.O.C. v. Consol Energy, Inc.,*
    860 F.3d 131 (4th Cir. 2017) ................................................................................................. 23

*Equal Rights Ctr. v. Post Props., Inc.,*
    633 F.3d 1136 (D.C. Cir. 2011) ............................................................................................ 15

*Equal Rts. Ctr. v. AvalonBay Cmtys., Inc.*,
No. 0502626, 2009 WL 1153397 (D. Md. Mar. 23, 2009) ....................................13, 14, 15

*Equal Rts. Ctr. v. Camden Prop. Tr.*,
No. 07-2357, 2008 WL 8922896 (D. Md. Sept. 22, 2008)....................................10, 17, 25

*Equal Rts. Ctr. v. Equity Residential*,
483 F. Supp. 2d 482 (D. Md. 2007) ................................................................................13

*Equal Rts. Ctr. v. Equity Residential*,
798 F. Supp. 2d 707 (D. Md. 2011) ........................................................................*passim*

*ESAB Grp., Inc. v. Centricut, Inc.*,
126 F.3d 617 (4th Cir. 1997)..........................................................................................50

*Fair Hous. Council of Or. v. Travelers Home & Marine Ins. Co.*,
No. 3:15-CV-00925, 2016 WL 7423414 (D. Or. Dec. 2, 2016)........................................21

*Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*,
210 F. App'x 469 (6th Cir. 2006) ..............................................................................*passim*

*Fair Hous. Just. Ctr., Inc. v. Cuomo*,
No. 18-CV-3196, 2019 WL 4805550 (S.D.N.Y. Sept. 30, 2019)......................................16

*Fair Hous. Just. Ctr., Inc. v. Pelican Mgmt., Inc.*,
2023 WL 6390159 (S.D.N.Y. Sept. 29, 2023) .................................................. 26, 35, 45–46

*Fair Hous. of Marin v. Combs*,
No. C 97-1247, 2000 WL 365029 (N.D. Cal. Mar. 29, 2000) .................................20, 24, 25

*FHCCI v. M&J Mgmt. Co.*,
No. 1:22-CV-00612, 2024 WL 3859997 (S.D. Ind. Aug. 19, 2024)............................ 17, 43

*FHCCI v. Smitley*,
No. 1:16-CV-880, 2018 WL 3237860 (S.D. Ind. July 3, 2018)...............................10, 12, 27

*Fountainhead Title Grp. Corp. v. Courthouse Search of N. Va.*,
122 F. App'x 10 (4th Cir. 2005) ....................................................................................23

*Freedom's Path at Dayton v. Dayton Metropolitan Housing Authority*,
No. 3:16-cv-466, 2022 WL 1697937 (S.D. Ohio May 26, 2022) ......................................22

*Gay-Straight All. Network v. Visalia Unified Sch. Dist.*,
262 F. Supp. 2d 1088 (E.D. Cal. 2001) ..........................................................................28

*Gerber v. Riordan*,
649 F.3d 514 (6th Cir. 2011)..........................................................................................49

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) ........................................................................................33

*Gladstone Realtors v. Vill. of Bellwood,*
    441 U.S. 91 (1979) ..........................................................................................31

*H.O.P.E., Inc. v. Eden Mgmt. LLC,*
    128 F. Supp. 3d 1066 (N.D. Ill. 2015) ......................................................11, 16

*Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.,*
    82 F.3d 1533 (10th Cir. 1996) .......................................................................33

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ................................................................................*passim*

*Hazle v. Crofoot,*
    727 F.3d 983 (9th Cir. 2013) .........................................................................24

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) ........................................................................................20

*Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.,*
    755 F.2d 599 (7th Cir. 1985) .........................................................................34

*Hous. Works, Inc. v. Turner,*
    No. 00CIV.1122, 2004 WL 2101900 (S.D.N.Y. Sept. 15, 2004) ..........33, 34, 35

*Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co.,*
    No. 99-4042, 2000 WL 147392 (10th Cir. 2000) ...........................................49

*In re Continental Ill. Sec. Litig.,*
    962 F.2d 566 (7th Cir. 1992) .........................................................................24

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,*
    456 U.S. 694 (1982) ........................................................................................49

*Int'l Union, United Mine Workers of Am. v. CONSOL Energy, Inc.,*
    465 F. Supp. 3d 556 (S.D.W. Va. 2020) ........................................................50

*Jimenez v. Tsai,*
    No. 5:16-CV-04434, 2017 WL 4877442 (N.D. Cal. Oct. 30, 2017) ................10

*Johnson v. City of Annapolis,*
    No. CCB-21-1074, 2023 WL 3390823 (D. Md. May 11, 2023) .......................28

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC,*
    82 F.4th 345 (5th Cir. 2023) ...........................................................14, 16, 17, 18

*Lane v. Holder,*
  703 F.3d 668 (4th Cir. 2012) ................................................................................14

*Libertarian Party of Va. v. Judd,*
  718 F.3d 308 (4th Cir. 2013) ................................................................................10

*Marable v. Walker,*
  704 F.2d 1219 (11th Cir. 1983) ............................................................................33

*Mayor of Baltimore v. Azar,*
  973 F.3d 258, (4th Cir. 2020) ..............................................................................45

*McCardell v. HUD,*
  794 F.3d 510 (5th Cir. 2015) ................................................................................31

*McDermott, Inc. v. AmClyde,*
  511 U.S. 202 (1994) .............................................................................................23

*Mont. Fair Hous., Inc. v. City of Bozeman,*
  No. 09-90-BU-RFC-CSO, 2011 WL 7279295 (D. Mont. Dec. 7, 2011),
  R. & R. adopted, No. CV 09-90-BU-DLC, 2012 WL 461814
  (D. Mont. Feb. 13, 2012) ....................................................................................15

*Moseke v. Miller & Smith, Inc.,*
  202 F. Supp. 2d 492 (E.D. Va. 2002) .......................................................17, 20, 21

*Murphy v. Nat'l R.R. Passenger Corp.,*
  547 F.2d 816 (4th Cir. 1977) ...............................................................................34

*MVFHC v. Connor Grp.,*
  805 F. Supp. 2d 396 (S.D. Ohio 2011) ................................................................22

*NFHA v. Bank of Am., N.A.,*
  401 F. Supp. 3d 619 (D. Md. 2019) ..............................................................*passim*

*NFHA v. Bank of Am., N.A.,*
  No. SAG-18-1919, 2023 WL 2633636 (D. Md. Mar. 24, 2023) ....................... 3, 35

*NFHA v. Deutsche Bank Nat'l Tr.,*
  No. 18 CV 839, 2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) ............................27

*NFHA v. Prudential Ins. Co. of Am.,*
  208 F. Supp. 2d 46 (D.D.C. 2002) ................................................................ 20, 22

*NFHA v. Travelers Indem. Co.,*
  261 F. Supp. 3d 20 (D.D.C. 2017) ................................................................ 14, 18

*NFHA. v. Deutsche Bank,*
  No. 18 C 0839, 2018 WL 6045216 (N.D. Ill. Nov. 19, 2018).............................27

*Oxford House, Inc. v. City of Salisbury*,
  No. 1:17-cv-01978, 2018 WL 3127158 (D. Md. June 26, 2018)............................................28–29, 32

*PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*,
  260 F.3d 453 (5th Cir. 2001)...........................................................................................................49

*Phillips v. Hunter Trails Cmty. Ass'n*,
  685 F.2d 184 (7th Cir. 1982)..........................................................................................................23

*Pinchback v. Armistead Homes Corp.*,
  907 F.2d 1447 (4th Cir. 1990)........................................................................................................23

*Ragin v. Harry Macklowe Real Estate Co.*,
  6 F.3d 898 (2d Cir. 1993) .............................................................................................................21

*S. Cal. Hous. Rts. Ctr. v. Krug*,
  564 F. Supp. 2d 1138 (C.D. Cal. 2007) ..........................................................10, 12–13, 22, 36

*Sandford v. R. L. Coleman Realty Co.*,
  573 F.2d 173 (4th Cir. 1978).........................................................................................................46

*Saunders v. Gen. Servs. Corp.*,
  659 F. Supp. 1042 (E.D. Va. 1987).........................................................................................*passim*

*Sierra Club v. Morton*,
  405 U.S. 727 (1972)..........................................................................................................................4

*Skydive Az. Inc. v. Quattrocchi*,
  704 F. Supp. 2d 841 (D. Ariz. 2010).............................................................................................33

*Sloan v. Gen. Motors LLC*,
  287 F. Supp. 3d 840 (N.D. Cal. 2018)..........................................................................................48

*Smith v. Pac. Props. & Dev. Corp.*,
  358 F.3d 1097 (9th Cir. 2004)........................................................................................................27

*Spann v. Colonial Vill., Inc.*,
  899 F.2d 24 (D.C. Cir. 1990) ..................................................................................................32, 46

*Sprint Nextel Corp. v. Simple Cell Inc.*,
  31 F. Supp. 3d 710 (D. Md. 2014) ................................................................................................33

*SurfJustice Inc. v. DeVos*,
  No. 18-CV-00535, 2018 WL 4770741 (N.D. Cal. Oct. 1, 2018).......................................15

*Trafficante v. Metro. Life Ins. Co.*,
  409 U.S. 205 (1972).........................................................................................................................46

*Tyus v. Urb. Search Mgmt.*,
  102 F.3d 256 (7th Cir. 1996) ........................................................................21

*U.S. v. Balistrieri*,
  981 F.2d 916 (7th Circ. 1992) .........................................................10, 12, 21

*U.S. v. Bob Lawrence Realty, Inc.*,
  474 F.2d 115 (5th Cir. 1973) ........................................................................46

*U.S. v. Hampton Corp.*,
  502 F. Supp. 3d 1376 (D.N.D. 2020) ...........................................................29

*U.S. v. Lepore*,
  816 F. Supp. 1011 (M.D. Pa. 1991) .............................................................33

*U.S. v. Matusoff Rental Co.*,
  494 F. Supp. 2d 740 (S.D. Ohio 2007) .........................................................46

*U.S. v. Mitchell*,
  335 F. Supp. 1004 (N.D. Ga. 1971) .............................................................46

*United States v. Edward Rose & Sons*,
  384 F.3d 258 (6th Cir. 2004) ........................................................................46

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ......................................................................14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .....................................................................................32

*Vill. of Bellwood v. Dwivedi*,
  895 F.2d 1521 (7th Cir. 1990) ................................................................12, 16

*Wagenmann v. Adams*,
  829 F.2d 196 (1st Cir. 1987) ........................................................................34

*Williams v. Poretsky Mgmt., Inc.*,
  955 F. Supp. 490 (D. Md. 1996) .............................................................*passim*

*Woollard v. Gallagher*,
  712 F.3d 865 (4th Cir. 2013) ........................................................................10

*Zuch v. Hussey*,
  394 F. Supp. 1028 (E.D. Mich. 1975), *aff'd and remanded sub nom.*
  *Zuch v. John H. Hussey Co.*, 547 F.2d 1168 (6th Cir. 1977) .................31, 38

**Statutes**

42 U.S.C. § 3613 ..............................................................................................44

**Rules**

Fed. R. Civ. P. 56 ..................................................................................................................10

**Other Authorities**

Clio, *A Guide to Paralegal Billing,* https://www.clio.com/resources/paralegals/a-guide-to-
    paralegal-billing...........................................................................................................................24

*Fenwick-Schafer v. Winchester Homes,*
    No. 90066002/CL 110092, Fair Housing-Fair Lending Rep. (P-H) ¶ 8.3
    (Md. Cir. Ct. Dec. 13, 1993) ...........................................................................................41

Harry Zavos, *Monetary Damages for Nonmonetary Losses: An Integrated Answer to the Problem
    of the Meaning, Function, and Calculation of Noneconomic Damages,*
    43 Loy. L.A. L. Rev. 193 (2009) .....................................................................................41

Margery Austin Turner, *Why Haven't We Made More Progress in Reducing Segregation?,* The
    Dream Revisited: Contemporary Debates about Housing, Segregation, and Opportunity
    98–99 (Ingrid Gould Ellen & Justin Peter Steil eds., 2019) ................................................39

*Spann v. Colonial Village,*
    No. 86-2917, Fair Housing-Fair Lending Rep. (P-H) ¶ 12.1 (D.D.C. May 14, 1992)......................41

## TABLE OF ABBREVIATIONS

| BANA | Bank of America, N.A. |
|---|---|
| CFHC | Connecticut Fair Housing Center |
| Defs.' MSJ | Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Available Remedies (ECF 289) |
| DMFHC | Denver Metro Fair Housing Center |
| FHA | Fair Housing Act |
| FHC | Fair Housing Continuum, Inc. |
| FHCRR | Fair Housing Center for Rights & Research (Housing Research and Advocacy Center) |
| FHCNA | Fair Housing Center of Northern Alabama |
| FHCGPB | Fair Housing Center of the Greater Palm Beaches |
| FHCST | Fair Housing Council of South Texas |
| FHCWM | Fair Housing Center of West Michigan |
| FHANC | Fair Housing Advocates of Northern California |
| FHCCI | The Fair Housing Center of Central Indiana |
| FHOs | Fair Housing Organizations |
| HOPE | Housing Opportunities Project for Excellence, Inc. |
| HOPE FHC | HOPE Fair Housing Center |
| LaFHAC | Louisiana Fair Housing Action Center |
| Metro | Metro Fair Housing Services |
| MMFHC | Metropolitan Milwaukee Fair Housing Council |
| MVFHC | The Miami Valley Fair Housing Center |
| NFHA | National Fair Housing Alliance |
| NTFHC | North Texas Fair Housing Center |
| REOs | Real-estate-owned properties |
| Safeguard | Safeguard Properties Management, LLC |
| SSHC | South Suburban Housing Center |
| TFHC | Toledo Fair Housing Center |

# INTRODUCTION

Even if a jury finds that they violated the Fair Housing Act across 37 different cities over seven-plus years, Bank of America and Safeguard insist that they should escape without consequence. Although a jury will only award damages and the Court will only address injunctive relief *after* finding that Defendants discriminated on the basis of race in their maintenance of bank-owned homes, Bank of America and Safeguard attempt to reframe this as a case "all about money," brought, not by a group of non-profit fair housing organizations dedicated to eradicating housing discrimination and promoting fair housing, but by a calculating group of "executives." Defs.' MSJ at 1, 4. Defendants' disingenuous reframing does not change that, upon a finding of liability, the FHOs may seek compensation for (1) the time and expense they diverted from other endeavors because of Defendants' discrimination ("diversion of resources") and (2) the injury to their missions and the measures necessary to address that injury ("frustration of mission"), as well as injunctive relief.[1] Defendants attempt to overturn over four decades of established law regarding injury-in-fact and damages under the FHA by raising arguments rejected by the Supreme Court, citing to vacated opinions, and relying heavily on an anomalous Fifth Circuit case that conflicts with well-settled Fourth Circuit precedent. The FHOs' injuries here are the same types of harm the Supreme Court has recognized as redressable under the FHA, and, as in their motions to dismiss, Defendants' "effort to distinguish *Havens* and the cases that apply it in this district are not persuasive." *NFHA v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 627 (D. Md. 2019) (hereinafter "*NFHA I*") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).

Only after the FHOs notified Bank of America of their initial findings of racial discrimination and the bank refused to work collaboratively to resolve the problem did they embark on a large-scale investigation into Defendants' maintenance and marketing of their real-estate-owned

---

[1] Defendants' Motion does not address the damages alleged by the Individual Plaintiffs, who were next-door neighbors of Bank of America REO properties and suffered direct harm due to BANA's and Safeguard's poor maintenance of those properties. Nor does it address punitive damages. Presumably, Defendants do not dispute that the Individual Plaintiffs may seek compensation for the damages they suffered and that all Plaintiffs may seek punitive damages.

properties. *See* ECF 185, Pls.' Opp'n to Defs.' Summ. J. Mots. at 15–16. Because Defendants' discriminatory practices immensely hindered their missions to desegregate and stabilize the communities they serve, the twenty FHOs diverted resources away from their core counseling, educational, testing, referral, and enforcement activities to investigate BANA's and Safeguard's discriminatory REO maintenance and marketing. The FHOs invested over 13,600 hours conducting a large-scale investigation, training employees, developing a prima facie case of discrimination, and educating the public, government officials, and real estate professionals to counteract the impact of Defendants' REO discrimination. Exs. 1–20, ¶ 2. Because they would not have had to expend this time and related resources in the absence of Defendants' discrimination, and because they otherwise would have spent the time and resources on other core programs and services (like counseling and education), the FHOs are entitled to compensation for the resources they diverted to uncover, pursue, and counteract Defendants' discrimination. *See* Exs. 1–20, ¶ 2; *Balt. Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456, 464 (D. Md. 2000); *NFHA I* at 627; *see also* Ex. 21 at 9.

BANA's and Safeguard's discriminatory maintenance and marketing of REOs also impaired the FHOs' missions to promote fair housing and eradicate housing discrimination. Defendants' Motion avoids engaging with the FHOs' missions entirely and skirts the questions at issue: if a jury finds that they discriminated by failing to maintain REOs in communities of color comparably to REOs in white communities across 37 cities, to what extent did that discrimination impact the FHOs' missions and core activities to overcome housing discrimination, and what would it take to counteract that impact? The *quantity* of harm BANA and Safeguard caused and the amount of money necessary to remedy the harm are jury questions.

To the extent Defendants challenge the FHOs' methodology for calculating damages rather than the availability of damages, they are putting the cart before the horse. If the jury finds that Defendants discriminated in their maintenance of REO properties, it will then consider what amount will adequately compensate the FHOs for their diversion of resources and the frustration of their missions. The framework offered by Professor Stacy Seicshnaydre, based on her three decades of experience with FHOs, is intended to assist the jury with its consideration of that question. The

appropriateness of any aspect of that framework is best considered in light of the trial evidence. Defendants, however, seek to take this issue away from the jury and instead ask this Court to categorically exclude damages well established in the law. Similarly, Defendants ask to categorically exclude all injunctive relief. Yet courts are empowered to order broad injunctive relief to enforce civil rights, and, after hearing the evidence at trial, the Court may find that such relief is necessary here. Finally, Defendants offer no valid reason to depart from this Court's previous decision to exercise personal jurisdiction. The Court should deny Defendants' attempts to evade responsibility for redressing the harm they have caused should a jury find they engaged in racial discrimination.

## BACKGROUND AND STATEMENT OF FACTS[2]

I.    **This Court has already held that, like the plaintiff in *Havens*, the FHOs' injuries, if proven, entitle them to diversion-of-resources and frustration-of-mission damages.**

In denying Defendants' 2018 motion to dismiss, this Court determined that, under *Havens* and Fourth Circuit precedent, the FHOs had sufficiently pled an injury-in-fact to establish standing—an analysis that mirrors that of entitlement to remedies. *NFHA I* at 626; *see also Balt. Neighborhoods*, 92 F. Supp. 2d at 464–65 (if an organization proves an injury that confers standing "it may collect for it"). It rejected the same arguments Defendants recycle here that "the plaintiffs were not conscripted to perform this investigation" and that "the harm pled is merely a setback to the plaintiffs' 'abstract social interest.'" *NFHA I* at 627. Instead the Court reasoned that: (1) "[m]ost circuits . . . have held that the costs of investigating discriminatory conduct alone can give [FHOs] standing," and *even if* that were not enough on its own, Plaintiffs had "adequately pled the diversion of resources away from other pursuits, frustration of mission, impairment to their community investment programs, and educational and advocacy efforts that were needed to mitigate the downstream effects of the defendants' allegedly discriminatory home maintenance," *id.*; (2) the FHOs had sufficiently demonstrated a drain on their resources that "constitutes far more than

---

[2] A more complete statement of facts is laid out in the Court's summary judgment order, *NFHA v. Bank of Am., N.A.*, No. SAG-18-1919, 2023 WL 2633636, at *1–6 (D. Md. Mar. 24, 2023) ("*NFHA II*"), and in Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, ECF 185 at 3–6, which is incorporated herein by reference.

simply a setback to the organization's abstract social interests," *id.* at 626 (citing *Havens* at 379; *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)); and (3) "defendants' actions have perceptibly impaired the organizational plaintiffs' varied efforts to stem segregated housing in American cities," *id*. The Court found that Defendants' "effort[s] to distinguish *Havens* and the cases that apply it in this district [were] not persuasive." *Id.* at 627.

**II.     The evidence establishes that the FHOs' expenditure of time and resources to investigate Defendants' discriminatory conduct and enforce the FHA has perceptibly depleted their limited resources to provide counseling, testing, and referral services.**

The FHOs' core activities involve programs to ensure equal access to housing and to promote stable, integrated neighborhoods. Ex. 22, Pls.' Resp. to Defs.' First Phase III Interrogs. at Ex. A; Ex. 23, Am. Ex. B to Pls.' Resp. to Defs.' First Phase III Interrogs.; *see also NFHA I* at 626. Their activities and services include counseling, the investigation of complaints of housing discrimination, FHA enforcement, foreclosure prevention, and referral services for home-seekers. *See, e.g.*, Ex. 23 at 28, 74, 81, 115–16. Beginning with the identification of Defendants' racially disparate maintenance and marketing of REOs, the FHOs expended significant time investigating Defendants' practices, educating the public regarding the discriminatory conduct they uncovered, and taking steps to hold Defendants accountable for their violations of the FHA. Ex. 22 at 4–6. They pursued this work because, if BANA were discriminating on the magnitude the initial investigation suggested, it "would have a major impact on people's abilities to gain fair housing opportunities." Ex. 24, NFHA 30(b)(6) (Rice) Dep. 32:6–19, Jan. 10, 2024.

Investigating Defendants' discrimination required the FHOs to divert resources *away* from their routine counseling work and investigation and enforcement of other individual and systemic instances of housing discrimination and *towards* addressing and counteracting the effects of Defendants' discriminatory conduct. Ex. 22 at 4–6. The efforts to which the FHOs had to divert resources included: developing a methodology to systemically investigate potential racial disparities in the maintenance and marketing of Defendants' REOs; training staff on how to conduct the REO investigation; evaluating REOs and documenting the disparate maintenance and marketing; creating, distributing, and analyzing neighbor surveys; training housing providers, municipal housing

employees, and the general public in affected areas on obligations to maintain REOs in a non-discriminatory manner; meeting with local government officials regarding REO maintenance and marketing and neighborhood blight; and participating in community events and engaging with media to raise awareness of, and help counteract, REO discrimination. *See, e.g., id.* at 5–6, Ex. 23 at 1, 4–5, 10–11, 26. As the national organization that developed the investigation methodology, identified the REOs for inclusion, analyzed the results, and managed investigation data, the National Fair Housing Alliance experienced the most significant diversion of resources away from other projects. *See* Ex. 22-A at 1–2.

The diversion reduced the resources the FHOs could invest in other intended projects and programs, and in many cases, forced them to cancel programming altogether. *Id.* at 5. For example, Defendants' discriminatory conduct caused the FHOs to forego consulting opportunities, professional development, attendance at conferences and coalition meetings, education and counseling efforts, additional fair housing investigations, and other core activities in furtherance of their missions. *Id.*; *see also* Ex. 25, MMFHC (Tisdale) 30(b)(6) Dep. 57:13–58:9; 59:20–62:11, 98:2–99:13, Jan. 17, 2024; Ex. 26, CFHC 30(b)(6) Dep. 107:6–112:9, Dec. 13, 2023. To the extent grants designated for the investigation of REO discrimination helped fund the FHOs' investigation, none of those grants was limited to the investigation of BANA, and all of them could have been used for the investigation of other lenders and servicers of REOs. Ex. 27, Pls.' Resps. to Defs.' Third Phase III Interrogs. at 4.

To facilitate the calculation of diversion-of-resources damages, each FHO has produced a log listing the time spent (to at least the tenth of an hour) on activities related to this case, the staff member performing that activity, and the hourly rate of the staff member (hereinafter "diversion logs"). Exs. 1–19, ¶ 4; *see* Ex. 22 at 4–6 (stating that Defendants' discriminatory conduct caused Plaintiffs to divert resources to these activities). The FHOs largely compiled the diversion logs based on contemporaneous time records maintained in the ordinary course of business. Exs. 1–5, ¶ 9; Exs. 7–19, ¶ 9. Their interrogatory responses further detail the actions they undertook because of Defendants' discriminatory REO maintenance and marketing practices. *See* Exs. 22-A & 23. Because

the large-scale REO investigation also included other lenders, Plaintiffs reduced time entries for activities not specific to Defendants alone. Exs. 1–19, ¶ 5. For example, for time spent training staff on how to conduct the REO investigation generally for all lenders, an FHO would attribute only one-third of the time to Defendants (seeking the remainder from the two other lenders in different lawsuits). Similarly, for any activities that partially involved REO discrimination, the FHOs would include only the portion of time attributable to REOs or Defendants (*e.g.*, if only 10% of an hour-long presentation concerned Defendants' REO discrimination, the diversion log would only include a tenth of an hour for that activity). *See, e.g.*, Ex. 1, CFHC Decl. at ¶ 6; Ex. 2, ¶ 12.

**III.    The evidence establishes that the FHOs' missions to increase equal access to housing, eliminate neighborhood segregation and destabilization, eradicate discrimination, and promote fair housing were frustrated by Defendants' discriminatory maintenance and marketing of REOs.**

Defendants also harmed the FHOs by "diminishing [their] range of services and impairing [their] mission[s] to promote an equal housing market and fair housing choice."  Ex. 22 at 6. Defendants' racially disparate maintenance of REOs in communities of color, undermined the FHOs' deep investments in "community development, homeownership promotion, and neighborhood stabilization efforts." *Id.*

The FHOs' missions vary slightly by organization but include the same basic principles: promoting equal housing markets, fair housing choice and access, and fair lending to eradicate discrimination and encourage neighborhood integration. *See* Ex. 21 at 10–21; Ex. 23 at 3, 7, 14, 23, 31–32, 35, 39, 40, 43, 46–47, 68, 75, 82, 86, 91, 99, 104, 109, 114, 122. Their missions include core business activities such as "[e]ducating the public about fair housing, [i]ncreasing the supply of safe, affordable, quality housing," "increasing homeownership access for communities of color, [increasing] the supply of accessible, affordable housing for people with disabilities; [a]dvancing policies to expand access to safe, quality, affordable credit; [and] [p]reventing displacement and housing instability." Ex. 22-A at 6; Ex. 21 at 8; *see also, e.g.*, Ex. 23 at 39, 75; Ex. 20, ¶ 5. The FHOs fulfill their missions through counseling, the investigation of complaints of possible discrimination, and referral services, Ex. 21 at 4–5, as well as by educating the public and housing industry to

promote compliance with the FHA and awareness of discrimination and to counter stereotypes, *see, e.g.*, Exs. 22-A, 23; Ex. 9, ¶ 11; Ex. 2, ¶ 11.

Part of Connecticut Fair Housing Center's mission, for example, is to stabilize neighborhoods and prevent foreclosure—efforts Defendants' conduct impeded. Ex. 23 at 2–3. As CFHC has explained, "[b]ecause Defendants' activities result in lower property values in majority-minority neighborhoods," many homeowners whom CFHC assisted to "keep their homes through the foreclosure crisis [now] have less equity than their peers in majority-white neighborhoods." *Id.* at 3. This resulted in those homeowners "having less (1) of an ability to use that equity to sell and move into a higher-opportunity neighborhood, and (2) opportunity to refinance during the period of lower interest rates into more affordable payments." *Id.* This in turn impacts CFHC's mission by leaving these homeowners "more vulnerable to foreclosure" and "more likely to contact [CFHC] for assistance in preventing foreclosure." *Id.*

### A. Investigating and countering Defendants' REO discrimination impaired the FHOs' missions by causing them to forego other meaningful opportunities.

Pivoting to investigate and counteract Defendants' discriminatory conduct frustrated the FHOs' pursuit of their missions by requiring them to forego other significant opportunities in furtherance of their organizational goals. These opportunities vary by organization:

- For NFHA, the lost opportunities included delaying its "Access to Credit" and "REO/Single Family Home-to-Rental" initiatives, Ex. 22-A at 33.

- FHANC had to forego initiatives included in its strategic plan, including "[p]roduc[ing] education and outreach materials in all appropriate languages to serve Limited English Proficiency clients" and "[p]rovid[ing] education regarding lending discrimination." Ex. 23 at 15–16.

- FHC put off initiatives outlined in its strategic plan, including creating a newsletter to educate the public about fair housing, recruiting staff attorneys, and pursuing special projects from the Urban Institute and Department of Justice. *Id.* at 20–23. FHC also forewent the opportunity to participate in a large "Deaf/Hard of Hearing investigation." *Id.* at 25.

- HOPE, Inc. lost the "opportunity to collaborate with key stakeholders to build upon an infrastructure for the reporting of housing discrimination and expand education of the public, industry, regulators, public policy leaders and others about the perpetuation of discriminatory housing practices," which would have furthered its mission. *Id.* at 83.

- DMFHC was unable to take on all of the fair housing investigations they would have liked to because of the time it spent investigating and counteracting the Defendants' discriminatory conduct. Ex. 3, ¶ 14.

The time spent investigating Defendants' discrimination also precluded the FHOs from pursuing opportunities for additional funding:

- NFHA put off "develop[ing] its consulting services to mortgage lending service providers[,] other banking institutions," and local city agencies, which would have served as a meaningful source of funding. Ex. 22-A at 37.

- FHANC was delayed in developing and offering paid fair lending training. Ex. 23 at 18.

- FHCNA "had to forego submission of local funding applications" and "consultant work." *Id.* at 41.

- FHCGPB lost grant opportunities for outreach to non-English speakers and people with disabilities regarding their fair housing rights. *Id* at 35.

- MMFHC's reduced staff capacity limited its ability to identify and apply for funding. Ex. 25 at 91:9–92:16

- FHCWM lost the chance to apply for up to $325,000 in funding for mortgage lending discrimination initiatives and education. Ex. 23 at 49.

- HOPE FHC "would have applied for a number of additional funding opportunities, the achievement of which could have substantially furthered its organizational goals." *Id.* at 77.

**B.    The programs the FHOs implemented with REO settlement funds exemplify the type of work necessary to remedy Defendants' frustration of their missions.**

The ways in which the FHOs used funds from settlements of similar REO discrimination claims against Fannie Mae and Wells Fargo provide a roadmap for how they would use an award of frustration-of-mission damages to help repair Defendants' harm to their missions. Examples include:

- NFHA endowed the "Inclusive Communities Fund"—issuing grants to over 40 non-profits for projects that fulfilled its community stabilization mission. Ex. 22-D at 1–7. The grants included support for foreclosure prevention and counseling activities, down payment assistance to promote affordable homeownership, renovation of vacant properties, and renovations to support existing homeowners remaining in place, all of which helped to stabilize those communities. *Id.* at 1–12.

- FHANC used $1.51 million dollars in settlement funds to create a community revitalization program that offers "new public financing for affordable housing and housing equity priorities[,] [i]dentif[ies] neighborhoods for anti-displacement zones," advocates for changes to housing policy to benefit marginalized communities, and increases FHANC's capacity to "provide fair housing, foreclosure prevention, and prepurchase assistance." *Id.* at 14.

- FHCWM used $1.42 million in settlement funds to create a neighborhood stabilization program called "49507!," *id.* at 18, which engaged over 250 residents in the zip code to identify "short-term community priorities, needs, and opportunities." Ex. 28, 49507! Project Report at FHCWM 139. The program funded enhancements to the area's infrastructure, created job training and employment opportunities, improved local businesses, and supported efforts to attract new businesses and improve quality of life for existing and prospective residents. *Id.*

- HOPE FHC spent $225,000 on two programs designed to revitalize and promote historically segregated and underfunded communities by dispelling stereotypes, creating demand for prospective homeowners of all races and income levels, and improving community resources and connections. Ex. 22-D at 21; *see generally* Ex. 29, HOPEFHC Community Development Report December 2014.

These and the many other ways in which the FHOs have used their prior settlement funds, *see generally* Ex. 22-D, demonstrate how frustration-of-mission damages would be used in this case to remediate Defendants' harm to the FHOs' missions by investing in mission-critical initiatives: promoting fair housing, stabilizing communities, decreasing racial segregation, and increasing access to safe, affordable, quality housing and to homeownership for communities of color.

## IV. The FHOs seek injunctive relief to remedy the harm Defendants caused and to prevent future discrimination.

To remedy the harms caused by Defendants' discriminatory REO maintenance and marketing and prevent their recurrence, the FHOs seek injunctive relief that would require Defendants to, among other things: implement a more local model of exterior maintenance and marketing, improve the frequency and methodology of quality control measures, expand the types of expenses allowed for exterior maintenance work, require use of "clear boarding" when boarding is necessary, adopt policies and programs that prioritize homeownership and neighborhood stabilization in REO sales, create accessible channels for the public and vendors to report complaints, require training on the FHA, and establish or enhance current data collection practices to gather quantifiable information on the exterior maintenance, marketing, and disposition of REO properties across census tracts, and routinely analyze this data for racial disparities.[3] Ex. 22 at 7–9.

---

[3] The precise terms of the proposed injunctive relief will depend on further factual development in this case, including testimony at trial.

## STANDARD OF REVIEW

Summary judgment is appropriate only when the Court, "view[ing] the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party," determines that "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312–13 (4th Cir. 2013) (quoting *Woollard v. Gallagher*, 712 F.3d 865, 873 (4th Cir. 2013)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986)).

## ARGUMENT

If a jury finds Defendants liable for discrimination, it should be permitted to award the FHOs damages for their diversion of resources and frustration of mission, along with punitive damages (the availability of which Defendants do not challenge),[4] and the Court should fashion appropriate injunctive relief to prevent future legal violations and remedy past harm. "The Supreme Court has held that [FHOs] may recover compensatory damages under the [FHA] for impairment of [their] objectives and diversion of [their] resources." *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1060 (E.D. Va. 1987) (citing *Havens* at 379).[5] To do so, "a plaintiff *need only* allege [and prove] facts that demonstrate that the defendants' actions either caused the organization to divert resources to identify and counteract the defendants' unlawful practices, or that the challenged actions have frustrated plaintiff's mission." *Equal Rts. Ctr. v. Camden Prop. Tr.*, No. 07-2357, 2008 WL 8922896, at *5 (D. Md. Sept. 22, 2008) (emphasis added) (citing *Havens* at 379); *Williams v. Poretsky Mgmt., Inc.*, 955 F. Supp. 490, 493 (D. Md. 1996) (citing *Saunders*, 659 F. Supp. at 1052).

---

[4] Punitive damages are frequently awarded for violations of the FHA but are left for jury determination. *See, e.g.*, *Williams*, 955 F. Supp. at 498.

[5] Because the injury that confers standing may also be compensated, Courts have applied *Havens'* standing analysis to the types of damages available to FHOs. *E.g.*, *Balt. Neighborhoods*, 92 F. Supp. 2d at 464–65 (citing *Havens* at 379; *U.S. v. Balistrieri*, 981 F.2d 916, 933 (7th Cir. 1992)); *FHCCI v. Smitley*, No. 1:16-CV-880, 2018 WL 3237860, at *2 (S.D. Ind. July 3, 2018); *Cmty. House, Inc.*, 2014 WL 345630 at *10 (upholding a jury award that included damages for "frustration of mission" and "past and future diversion of resources"); *Jimenez v. Tsai*, No. 5:16-CV-04434, 2017 WL 4877442, at *3 (N.D. Cal. Oct. 30, 2017) (citing *S. Cal. Hous. Rights Ctr v. Krug*, 564 F. Supp. 2d 1138, 1149 (C.D. Cal. 2007); *Havens* at 379 n.20).

The burden of establishing an organizational injury in an FHA case "is not a particularly heavy one."[6] *Saunders*, 659 F. Supp. at 1053 (explaining that, in *Havens*, the FHO was "injured by the mere fact" of the discriminatory act); *see also Access Living of Metro. Chi., Inc. v. City of Chicago*, 372 F. Supp. 3d 663, 668–69 (N.D. Ill. 2019) ("[T]he 'injury in fact' requirement in the housing discrimination context . . . sets a 'relatively low bar for a[n] [FHO] to establish standing.'" (citing *H.O.P.E., Inc. v. Eden Mgmt. LLC*, 128 F. Supp. 3d 1066, 1079 (N.D. Ill. 2015)).

The FHOs have far exceeded this low threshold. This Court has already found that the FHOs sufficiently alleged that "defendants' actions have perceptibly impaired [their] varied efforts to stem segregated housing in American cities." *NFHA I* at 626. Since that decision, the FHOs have produced documents, testimony, and expert reports that demonstrate the harm caused by Defendants' discriminatory conduct, and they should be allowed to do so at trial.

To rebut that evidence, Defendants rely exclusively on experts who have no experience with FHOs, their missions (a necessity for determining how those missions are impaired or valued), or how damages are typically calculated in FHA cases. *See* Ex. 30, Irwin Dep. 24:17–25:13, Jan. 16, 2024 (Defense damages expert, Carlyn Irwin, admitting that she is not an expert on how housing discrimination diverts the resources and frustrates the mission of FHOs), 47:12–49:17 (she has no experience in FHA cases, with FHOs, or with frustration of mission or diversion of resources damages, and only did a "Google search just trying to understand how [FHOs] are typically funded just generally, like big picture" in advance of forming her opinion), 70:14–21 (she was not familiar with *Havens*); Ex. 31, Calabrese Dep. 15:4–22, Jan. 24, 2024 (Defendants' expert in non-profit financial management conceding that he has no experience with FHOs). Nor do they have any experience calculating nonpecuniary damages or valuing the mission of FHOs—essential background for evaluating frustration-of-mission damages. Ex. 30, 18:13–21:5; Ex. 31, 19:10–22:10;

---

[6] The only in-Circuit case Defendants cite to support their effort to narrow the holding in *Havens*, *CASA de Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020), *vacated, rehearing en banc granted by* 981 F.3d 311 (4th Cir. 2020), has been vacated and has no precedential value. *See Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 504 n.16 (D. Md. 2020).

Ex. 21 at 21. Because Plaintiffs are entitled to pursue remedies universally available under the FHA—diversion-of-resources, frustration-of-mission, and punitive damages, and injunctive relief—summary judgment on those remedies should be denied. The Court should also continue to exercise personal jurisdiction over Defendants.

**I.    The FHOs have diverted significant resources to identify and counteract Defendants' discriminatory maintenance and marketing of REOs, and, if liability is established, are entitled to compensation for that diversion.**

Damages for the diversion of an FHO's resources compensate for the "drain on an organization's interests necessary to 'identify and counteract' discriminatory housing practices." *Balt. Neighborhoods*, 92 F. Supp. 2d at 464–65 (quoting *Havens* at 379). "[I]f the [plaintiff] is able to establish this injury at trial, it may collect for it." *U.S. v. Balistrieri*, 981 F.2d 916, 933 (7th Circ. 1992); *see also City of Chicago v. Matchmaker Real Est. Sales Ctr., Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992) (Plaintiff had standing because it "deflected its time and money from counseling to legal efforts directed against discrimination").

The diversion-of-resources analysis is straightforward: but for expending resources to uncover and counteract Defendants' discriminatory conduct, Plaintiffs "[w]ould have devoted [their] time and money to other activities," entitling them to compensation for the diverted resources. *Williams*, 955 F. Supp. at 493; *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("*Havens* makes clear . . . that the only injury which need be shown . . . is deflection of the [fair housing] agency's time and money from counseling to legal efforts directed against discrimination"); *FHCCI v. Smitley*, No. 1:16-CV-880, 2018 WL 3237860, at *2 (S.D. Ind. July 3, 2018) (awarding damages for the "staff time spent investigating the Defendants' discrimination and counseling" the individual plaintiff about her rights).

Because damages for the diversion of resources may compensate FHOs for time spent both "'identify[ing] *and* counteract[ing]' discriminatory housing practices," *Balt. Neighborhoods*, 92 F. Supp. 2d at 464–65 (emphasis added) (quoting *Havens* at 379), there is a wide range of activities for which FHOs are entitled to compensation. For example, the FHOs are entitled to compensation for the time they spent investigating the extent of Defendants' discrimination, *see, e.g.*, *S. Cal. Hous. Rts. Ctr.*

*v. Krug*, 564 F. Supp. 2d 1138, 1152 (C.D. Cal. 2007), and also for efforts to undo the harm the discrimination caused such as through public education, *CFHC v. CoreLogic Rental Prop. Sols., LLC*, 478 F. Supp. 3d 259, 316 (D. Conn. 2020) (finding sufficient evidence that activities involving education, marketing, and outreach were "necessary to counterbalance the effects of a defendant's discriminatory practices," and were therefore compensable).[7]

As in their motion to dismiss, "[t]he defendants' effort to distinguish *Havens* and the cases that apply it in this district are not persuasive." *NFHA I* at 627. This Court explained that, like the FHO in *Havens*, Plaintiffs have demonstrated that Defendants' conduct, as alleged, has "*perceptibly impaired* [the FHOs'] ability to provide counseling and referral services," and "the consequent drain on [their] resources—constitutes far more than simply a setback to . . . abstract social interests." *id.* [8]; *see also Equal Rts. Ctr. v. Equity Residential*, 483 F. Supp. 2d 482, 487 (D. Md. 2007) (allocation of resources to investigate discrimination were "clearly 'diverted'"); *Equal Rts. Ctr. v. AvalonBay Cmtys., Inc.*, No. 0502626, 2009 WL 1153397, at *6 (D. Md. Mar. 23, 2009) (if defendant violated the FHA, it was "the existence of non-compliant properties" that "caused the ERC to begin its investigation," and upon the investigation confirming non-compliance, plaintiff had "to investigate more properties and further suffer injury"). As discussed below, Defendants' additional attempts to challenge well-settled law in this area also fail.

### A.    Because the FHOs diverted resources in response to discrimination that impaired their missions, they are entitled to compensation for this injury.

In a diversion-of-resources analysis, it is the defendants' thwarting of the plaintiffs' missions "that 'forces' the organization to spend money to alleviate the frustrations; an organization is only 'choosing' to spend money if the defendant's conduct 'does not affect the organization at all.'"

---

[7] Although education and outreach activities may also support a claim for frustration-of-mission damages, here, the FHOs classify compensation for activities that have *already occurred* as diversion-of-resources damages. Compensation for *future* education and outreach efforts intended to remedy harm to the FHOs' missions are classified here as frustration-of-mission damages.

[8] "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988).

*Animal Legal Def. Fund v. USDA*, 223 F. Supp. 3d 1008, 1017 (C.D. Cal. 2016) (citing *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013); *Havens* at 378–79); *see also NFHA v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 27 (D.D.C. 2017) (holding that whether an FHO suffers a diversion-of-resources injury does not depend on "the voluntariness or involuntariness of the plaintiffs' expenditures," but "on whether they undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged discrimination"); *AvalonBay Cmtys.*, 2009 WL 1153397, at *6 (rejecting that plaintiff's diversion was attributable to its "unilateral decision to investigate and litigate").

Defendants' argument that the FHOs were not "forced" to undergo this investigation and litigation is not novel—it has been raised and rejected for over 40 years, including by the Supreme Court. Br. of Pet'rs, *Havens*, 455 U.S. 363 (No. 80-988), 1981 WL 390424, at *19–20 (arguing that "HOME cannot acquire self-conferred standing by voluntarily expending funds."). Undeterred, BANA raised this exact argument in its motion to dismiss, ECF 44-1 at 33, and this Court rejected it. *NFHA I* at 627. Despite this being the law of the case (and the nation), Defendants are emboldened by an outlier decision in the Fifth Circuit that cursorily mentions voluntary-versus-forced diversion, *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC*, 82 F.4th 345, 357 (5th Cir. 2023)—but that does not change how the law is applied here because: (1) this Court is not bound by Fifth Circuit precedent; and (2) the FHOs have provided the necessary evidence to surpass even the Fifth Circuit's overly zealous interpretation of the law.

The Fourth Circuit's holding that "budgetary choices" alone are insufficient to confer standing does not change the analysis. *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012). In *Lane*, the organization "had alleged *only* that the new law resulted in a voluntarily expenditure of its resources . . . [it] did not allege that the new law impaired its organizational mission." *CASA de Md.*, 971 F.3d at 266 (King, J., dissenting); *see also ASPCA v. Feld Ent., Inc.*, 659 F.3d 13, 19, 27 (D.C. Cir. 2011) (distinguishing *Havens* and affirming a lack of organizational standing because plaintiffs did not put forward any evidence of how defendant's conduct impacted its advocacy efforts).

By contrast, Defendants' discriminatory conduct directly impaired the FHOs' missions and interfered with their core business activities—and there is substantial evidence to support that impairment. *See, e.g.*, Ex. 22-A; Ex. 23. Defendants concede that the FHOs have properly alleged that opportunities were "sidelined . . . to invest resources in their REO investigation," but complain that "nothing in NFHA's account of how it reached these decisions reflects being forced to do one over the other." Defs.' MSJ at 22. Yet such evidence is unnecessary. *AvalonBay Cmtys.*, 2009 WL 1153397, at \*6 (rejecting defendant's argument that discretionary diversion does not confer standing where FHO alleged the existence of non-compliant properties caused it to begin its investigation and "nothing more [was] required"); *SurvJustice Inc. v. DeVos*, No. 18-CV-00535-JSC, 2018 WL 4770741, at \*8 (N.D. Cal. Oct. 1, 2018) (rejecting argument that plaintiffs were required to show "diversion of resources was necessary to avoid 'some other injury'" because plaintiffs only need to allege resources would have otherwise been spent furthering its mission in some other way), *order amended on reconsideration*, No. 18-CV-00535-JSC, 2019 WL 1434144 (N.D. Cal. Mar. 29, 2019).

Additionally, Defendants ignore that the FHOs did not *choose* to litigate this case. They *chose* to take steps to end Defendants' discriminatory REO maintenance practices and promote neighborhood stabilization. *Cf. Equal Rights Ctr. v. Post Props., Inc.,* 633 F.3d 1136, 1140 (D.C. Cir. 2011) (the *choice* to redirect resources to investigate discrimination is sufficient to confer standing where an FHO "undertook the expenditures in response to, and to counteract, the effects of the . . . discrimination"). Upon learning of BANA's discriminatory maintenance practices in 2009, NFHA reached out to BANA to try to remedy the problem without a larger investigation or lawsuit. ECF 183-5, ¶ 3. BANA, however, "was unwilling to change its policies or practices." *Id.* Plaintiffs then had to expend resources to develop a large-scale investigation that could lead to enforcement of BANA's obligations under the FHA. *Id.* ¶ 4. Even though it did so, NFHA was not required to inform BANA of its discrimination before bringing this lawsuit. *See Mont. Fair Hous., Inc. v. City of Bozeman*, No. 09-90-BU-RFC-CSO, 2011 WL 7279295, at \*13 (D. Mont. Dec. 7, 2011) (rejecting argument that the FHO plaintiff "created its own damages by pursuing a course of litigation rather than first alerting" defendants to the violations because plaintiff "presented evidence that it ha[d]

suffered injury in fact caused by [defendant's] alleged acts and omissions" and "[t]hat is all that is required"), *R. & R. adopted*, No. CV 09-90-BU-DLC, 2012 WL 461814 (D. Mont. Feb. 13, 2012).[9] Because Defendants' discriminatory conduct hurt the FHOs' missions of fair and equal housing, they are responsible for Plaintiffs' diversion of resources to identify and counteract it.

**B.** **The FHOs may claim diversion-of-resources damages even though the activities are part of their ordinary practices.**

In claiming diversion of resources, it does not matter that some of the FHOs' time and resource expenditures are routine or ordinary for the FHOs, particularly in the fair housing context. *Fair Hous. Just. Ctr., Inc. v. Cuomo*, No. 18-CV-3196, 2019 WL 4805550, at *7 (S.D.N.Y. Sept. 30, 2019) (rejecting defendants' argument that FHO's investigation was part of its "usual activities" and thus could not be claimed as diversion because "[s]uch a 'rigorous' standing inquiry is not required under the FHA"). In *Access Living*, the court rejected the same erroneous argument, "given the well-developed body of law . . . specifically addressing the standing of [FHOs] to bring suit to address alleged housing discrimination," and because there were no cases where an "ordinary expenditures" standard was "applied in the fair housing context." 372 F. Supp. 3d at 668–69 (citing *Eden Mgmt.*, 128 F. Supp. 3d at 1079, and *Havens*). The court reiterated that, under *Havens*, "the only injury which need be shown to confer standing on a fair-housing agency (including nonprofits that promote integrated housing) is deflection of the agency's time and money from counseling to legal efforts directed against discrimination." *Id.* (quoting *Vill. of Bellwood*, 895 F.2d at 1526).

Defendants rely on the non-binding Fifth Circuit *Azalea Garden* decision to argue that, because the FHOs regularly investigate discrimination and litigate violations of the FHA, they cannot claim a cognizable injury for engaging in the same conduct here. Defs.' MSJ at 28. This is directly counter to law within the Fourth Circuit. *See, e.g.*, *Williams*, 955 F. Supp. at 491, 493 ("[A]n

---

[9] Defendants' argument that the FHOs were not *forced* to act because they "have no evidence the alleged discriminatory effects that supposedly forced them into acting ever actually happened," Defs.' MSJ at 24, ignores that the jury will only consider damages after finding liability. It also ignores the expert opinions of Dr. Elizabeth Korver-Glenn, JoAnne Poole, and Albert Poche, discussed *infra*, regarding the harms caused by poor exterior maintenance and marketing of REOs.

organization dedicated to ending discrimination in housing" properly alleged diversion of resources when it "divert[ed] its scarce resources to identifying and counteracting the defendants' discriminatory practices."); *Camden Prop.*, 2008 WL 8922896, at *4, 6 (nonprofit properly alleged diversion-of-resources injury for its investigation of accessibility of properties around the country even though its core activities typically include "identifying, challenging, and eliminating discrimination in housing" for people with disabilities); *Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 499 (E.D. Va. 2002) (same); *cf. FHCCI v. M&J Mgmt. Co.*, No. 1:22-CV-00612, 2024 WL 3859997, at *3 (S.D. Ind. Aug. 19, 2024) ("The Seventh Circuit has not diverged from the standards set forth in *Havens* like the Fifth Circuit has.").[10]

But even under *Azalea Garden*'s standard, the FHOs still have compensable diversion injuries. The *Azalea Garden* court held only that the plaintiff—at the pleadings stage—had not *sufficiently alleged* that the diversion impaired its ability to carry out its purpose. 82 F.4th at 353. The trial court dismissed the case without prejudice, leaving the plaintiff the option of amending its complaint to demonstrate that "it can substantiate a perceptible impairment to its ability to achieve its mission because of Azalea Garden's alleged discriminatory practices." 82 F.4th at 355. As explained in the concurrence, "[r]ather than focus on what a plaintiff has done in response to a defendant's conduct, we instead ask: Will the plaintiff [] be injured if it does nothing?" *id.* at 357. Here, the FHOs have answered that question. NFHA described the large-scale impact of Defendants' discriminatory REO maintenance as an "existential crisis." Ex. 24, 32:6–36:9. And this Court has already held that the FHOs have adequately alleged diversion of resources. *NFHA I* at 627.

---

[10] Defendants' *Azalea* argument also defies *Havens* and common sense. Why would an organization not routinely engaged in housing discrimination investigations have organizational standing to bring an FHA case but not an FHO that, because counteracting housing discrimination is central to its mission, frequently investigates housing discrimination? The Supreme Court rejected the same argument made by the *Havens* petitioners. Br. of Pet'rs, *Havens*, 1981 WL 390424, at *19–20; *Havens* at 379.

Furthermore, even if *Azalea Garden* applied, the investigation in this case differs in many ways from the FHOs' typical investigative efforts—both in substance and in process. *See Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 210 F. App'x 469, 477 (6th Cir. 2006) ("[T]his new focus on disability discrimination very likely means that the organization turned its attention away from other incidents of discrimination."); *see, e.g.*, Ex. 32, NTFHC 30(b)(6) Dep. 80:1–15, Dec. 7, 2023 (prior to this investigation, NTFHC did not have programs relating to the effects of distressed properties and discrimination in REO maintenance and marketing); *NFHA*, 2023 WL 1816902, at *6 ("Ms. Kisch also candidly explains that, because of the plaintiffs' objectives, their 'investigation varies from most' FHA tests."). Defendants have argued that the methods used to investigate their misconduct here "bear no resemblance to traditional fair housing testing." ECF 206-1 at 2. They cannot have it both ways.

Finally, the established law outside of *Azalea* does not require the FHOs to "indicate what the plaintiff would have otherwise done with those resources" or "prove that they cut other services due to the plaintiff's investigation." *Olde St. Andrews, Inc.*, 210 F. App'x at 477. Where it is evident that plaintiffs "used a significant portion of resources that would otherwise be available for fighting [other types of] discrimination," and there was "a shift" in the use of resources during plaintiffs' investigation, "the mere fact that the plaintiff had devoted resources to investigating the alleged discrimination was sufficient" to create an injury in fact. *Id.* Unlike *Azalea Garden*, the FHOs here have not only adequately alleged that they diverted their scare resources, but they have put forward *evidence* that they forewent activities to respond to Defendants' discriminatory practices. As outlined in Facts Sections II and III, *supra*, the FHOs describe how staff were diverted from working with members of the community and point to specific projects that were set aside to investigate and counteract Defendants' discrimination. *See* Ex. 22-A; Ex. 23.

### C.    Defendants' quibbles with individual diversion log entries are classic disputes of fact.

Defendants challenge the relevance of specific line items identified in the FHOs' diversion logs, but Plaintiffs "ha[ve] introduced sufficient evidence to demonstrate a dispute of fact as to

whether those expenses 'are necessary to counterbalance the effects of a defendant's discriminatory practices.'" *CoreLogic*, 478 F. Supp. 3d at 316, 316–17. In response to the FHOs' logs detailing the time they diverted to identify and counteract Defendants' discrimination, Defendants do not identify a single piece of evidence to dispute the relevance or authenticity of any of these records. Their brief does not cite any evidence that the FHOs could not explain the entries now challenged when asked about them. This is because for nearly all of the challenged time entries, Defendants are first alerting the FHOs that they do not understand how the entries relate to this case through their Motion, rather than by asking them about the questioned entries through the normal tools of discovery. *See* Exs. 1–19, ¶ 6. Had Defendants asked the FHOs to explain their entries, they would have received the responses included with each of Plaintiffs' attached declarations. *See* Exs. 1–19 at Exhibit A. As the FHOs explain, each challenged entry relates to their work investigating, counteracting, or litigating Defendants' REO discrimination. *Id.* A jury can decide if it will credit the FHOs' contemporaneous records and explanations of those records. *CoreLogic*, 478 F. Supp. 3d at 316 (CFHC adduced sufficient evidence that diversion log entries for marketing campaigns, trainings, and presentations were relevant to the case to demonstrate a dispute of fact for a jury).

Defendants' argument that the FHOs cannot claim time for investigating properties that have since been removed from the case also fails. As part of its investigation, NFHA identified REOs owned by BANA through "county property records, records kept by the clerks of courts, RealtyTrac, Zillow, [BANA]'s REO listing website, REO auction websites, and confidential data obtained pursuant to a contract with CoreLogic." ECF 183-1, ¶ 11. Plaintiffs cannot be faulted for their good-faith efforts to investigate properties for which BANA had failed to timely update records. For example, NFHA relied on BANA's REO website to identify 5133 Kenton Street, Shawnee, KS, as an REO owned by BANA on February 27, 2014. Ex. 33, Bank of Am. Bank-Owned Properties Printout at PLAINTIFFS 045059. It therefore evaluated that property as part of its investigation on March 5, 2014. Ex. 16, ¶ 12. Once this litigation was initiated, Plaintiffs learned through viewing clerk-filed deeds that BANA took possession of the property on October 17, 2013, Ex. 34, PLAINTIFFS 041532, but transferred it to another entity on October 23, 2013, Ex. 35,

PLAINTIFFS 046329. It is unclear why BANA still listed itself as the owner of this property over four months after it conveyed it, but it was reasonable for NFHA to rely on BANA's own representation that it owned the property.

Allowing recovery for the time spent investigating properties no longer at issue in this case is analogous to the permitted recovery of attorneys' fees for unsuccessful efforts intertwined with successful ones that permitted the party to prevail in litigation. *See Hensley v. Eckerhart*, 461 U.S. 424, 435, 438 (1983) ("[T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit[]," particularly "[g]iven the interrelated nature of the facts and legal theories" in a case); *Bd. of Educ. of Frederick Cnty. v. I.S.* ex rel. *Summers*, 358 F. Supp. 2d 462, 469 (D. Md. 2005) (time spent on unsuccessful motion "is not *per se* unrecoverable"). All the REOs the FHOs visited were part of a reasonably undertaken investigation and, should they prevail, a jury may compensate them for the full time they diverted to uncover and stop Defendants' impairment of their missions.

### D.    In the Fourth Circuit, the time the FHOs spent on litigation activities is compensable as diversion-of-resources damages.

In the Fourth Circuit, like the Second, Sixth, Seventh, and Eighth, "the diversion of an organization's resources to counteract discriminatory practices is a palpable injury, even if such expenditures include litigation costs." *Moseke*, 202 F. Supp. 2d at 497 (citing *Williams*, 955 F. Supp. at 493; *Saunders*, 659 F. Supp. at 1052); *see also Olde St. Andrews, Inc.*, 210 F. App'x at 474. Even in circuits that follow a more stringent approach, the FHOs may recover for time spent on litigation where it is not "the only activity undertaken" that required the FHO to divert its resources, causing it harm. *NFHA v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 52 (D.D.C. 2002); *Fair Hous. of Marin v. Combs*, No. C 97-1247 MJJ, 2000 WL 365029, at *3 (N.D. Cal. Mar. 29, 2000), *aff'd*, 285 F.3d 899 (9th Cir. 2002). That some of the time for which the FHOs seek compensation was spent on activities necessary to prosecuting this case does not diminish their damages claims. *CoreLogic*, 478 F. Supp. 3d at 316. Because the time spent on this lawsuit ultimately "diverted [Plaintiffs'] time and

attention from [their] other programs," Defendants have "caused a concrete injury to [them], which can be adequately redressed by the relief sought." *Saunders*, 659 F. Supp at 1052.[11]

Nor is it relevant that the FHOs had to devote resources to this litigation for many years. *Cf.* Defs.' MSJ at 26. Mitigation is not required under the FHA. *Tyus v. Urb. Search Mgmt.*, 102 F.3d 256, 264–65 (7th Cir. 1996) (citing *Balistrieri*, 981 F.2d at 933; *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904–05 (2d Cir. 1993)) (plaintiffs have no "duty to avoid their damages" because "the [FHA] does not require notification prior to filing a suit" or filing upon the first finding of discrimination). Because only when enough investigation has been completed "to allow a pattern to emerge is a violation likely to become apparent," a prolonged investigation is not "something designed only to run up the damages tab, but instead is normally the only way to tell if [conduct] as a whole violates the [FHA]." *Tyus*, 102 F.3d at 265.

Again, BANA had the opportunity to revise its policies and alter its conduct before the FHOs underwent a years-long investigation and lawsuit, but it declined. ECF 183-5, ¶ 3. This fact distinguishes the cases on which Defendants rely to argue the FHOs are not entitled to diversion damages here. *Fair Housing Council of Oregon v. Travelers Home & Marine Insurance Co.*, stated that in the Ninth, Third, Fifth, and D.C. Circuits, the "critical question" is "whether [plaintiffs] undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged discrimination, rather than in anticipation of litigation" and dismissed the claim because the plaintiff "conceded that its testing of defendants was conducted exclusively for litigation purposes." No. 3:15-CV-00925, 2016 WL 7423414, at *4–5 (D. Or. Dec. 2, 2016), *R. & R. adopted*, 2017 WL 90373 (D. Or. Jan. 10, 2017). *But see Moseke*, 202 F. Supp. 2d at 497 (declining to follow Ninth and D.C. Circuits' approach). Here, the FHOs' goal was to prevent further destabilization of communities of color. That is why their first step was not to file a lawsuit, but to approach BANA with their initial findings.

---

[11] Defendants' argument that time the FHOs spent opposing Defendants' motion for sanctions is not compensable ignores that, while finding some original records should have been preserved, the Court rejected all of Defendants' requested relief, including dismissal. *Compare* ECF 153, *with* ECF 226.

### E.    Defendants are not entitled to an offset of damages because the FHOs received grant money or settlement funds from unrelated entities.

Defendants' argument that the FHOs "cannot be injured by the need to counteract discrimination because they have" received funds to do so is "an argument that borders both on the offensive and absurd." *NFHA v. Prudential*, 208 F. Supp. 2d at 54 (rejecting argument that litigation finances NFHA's operations). There is "no legal authority for the proposition that plaintiff's use of funds recovered through litigation against other private defendants negates plaintiffs' injury." *Id.* Nor is there authority to support that because FHOs fund testing through federal HUD grants, they have not diverted resources. *Id.*; *Balt. Neighborhoods*, 92 F. Supp. 2d at 465 n.9 (applying the collateral source rule to reject defendants' argument that they were entitled to an offset of damages for federal grants because "[t]he grant was not awarded to compensate BNI for the costs it incurred counteracting defendant's discriminatory practices" and "it could have been used for another purpose"). Courts routinely reject arguments that FHOs cannot recover diversion-of-resources damages because they used grant money to fund their investigations. *See Olde St. Andrews*, 210 F. App'x at 477; *CoreLogic*, 478 F. Supp. 3d at 317; *Krug*, 564 F. Supp. 2d at 1152 (citing *Balt. Neighborhoods*, 92 F. Supp. 2d at 465 n.9); *MVFHC v. Connor Grp.*, 805 F. Supp. 2d 396, 404 (S.D. Ohio 2011); *Atl. Channel v. Solomon*, 583 F. Supp. 3d 174, 213–14 (D.D.C. 2022).

The factual record also rebuts Defendants' argument. Unlike the plaintiffs in *Freedom's Path at Dayton v. Dayton Metropolitan Housing Authority*, No. 3:16-cv-466, 2022 WL 1697937, at *3 (S.D. Ohio May 26, 2022)—the only case Defendants cite for this proposition—the FHOs "did not receive any funding that was restricted for use only for their investigation into or litigation involving [Defendants'] REO maintenance and marketing practices." Ex. 27 at 4. The FHOs testified that had Defendants not discriminated, they would have used their grant monies for other counseling and fair housing testing. Ex. 24, 43:11–44:5; Ex. 26, 26:7–29:7.

Nor are Defendants entitled to offset damages because some FHOs in this case received REO settlement money from Fannie Mae or Wells Fargo. First, the settlement money received in those cases was not for work claimed as diversionary damages in this case. *CoreLogic*, 478 F. Supp. 3d

at 317; Exs. 1–19, ¶ 5; Exs. 1–6, ¶ 7; Exs. 8–19, ¶ 7. Second, the Supreme Court has held that "[t]he law contains no rigid rule against overcompensation. Several doctrines, such as the collateral benefits rule, recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 219 (1994). Defendants' argument that they should not have to pay for the injuries it caused to the FHOs because *other entities* paid for the injuries *those entities caused* is illogical. Despite the investments the FHOs made in their communities with those settlement funds to offset Fannie Mae's and Wells Fargo's harm to their missions, the harm caused by Defendants remains. Exs. 1–6, ¶ 7; Exs. 8–19, ¶ 7. Even where a joint tortfeasor *in the same case* settles in return for a release of all claims against it, the joint tortfeasor that remains in the case is not entitled to a reduction in damages, particularly in civil rights cases. *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1453 (4th Cir. 1990). "[W]hen a tort plaintiff's items of damage are reimbursed by a third party who is independent of the wrongdoer, the plaintiff may still seek full compensation from the tortfeasor even though the effect may be a double recovery." *Atl. Channel*, 583 F. Supp. 3d at 213–14; *Balt. Neighborhoods*, 92 F. Supp. 2d at 475; *E.E.O.C. v. Consol Energy, Inc.*, 860 F.3d 131, 150 (4th Cir. 2017); *Fountainhead Title Grp. Corp. v. Courthouse Search of N. Va.*, 122 F. App'x 10, 13 (4th Cir. 2005). Defendants' damages expert agrees. Ex. 30, Irwin Dep. 184:19–185:2 ("Q: If Fannie Mae caused harm and [BANA] caused more harm, and if funds from Fannie do not fully remedy [the] harm, then any additional harm from [BANA] has not been remedied. Correct? A: In theory, correct."). Here, the funds Plaintiffs received from settlements in other cases have no impact on the damages they seek to recover in this case. Exs. 1–6, ¶ 7; Exs. 8–19, ¶ 7.

Defendants quibble with the way the FHOs divided time spent on *general* REO investigative activities (attributing only one-third of the time to Defendants). If anything, the FHOs' reduction of this time by two-thirds was generous; they could have sought compensation from Defendants for *all* time spent on the general investigation. *See Phillips v. Hunter Trails Cmty. Ass'n*, 685 F.2d 184, 190 n.5 (7th Cir. 1982); *Douglass v. Hustler Mag., Inc.*, 769 F.2d 1128, 1146 (7th Cir. 1985). Defendants' argument that they are entitled to a reduction of damages because other lenders also violated the

FHA ignores that a jury will only find Defendants liable upon a determination that they are "the proximate cause of the . . . injury." *Hazle v. Crofoot*, 727 F.3d 983, 993 (9th Cir. 2013) (quoting *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996)). Such a finding would establish that Defendants caused Plaintiffs' injury and would leave "no room for the jury to infer that all of [Plaintiffs'] damages had been caused by persons other than the . . . defendants." *Id.* at 993–94 ("The jury's verdict is no less invalid simply because there were additional persons who were potentially liable for [Plaintiffs'] injuries, *but who were not before the court*." (emphasis added)). This is particularly true where damages are incapable of apportionment. *Id.*; *Carter v. Wallace & Gale Asbestos Settlement Tr.*, 439 Md. 333, 354 (2014).

**F.     The hourly rates the FHOs claim are reasonable and compensable.**

In cases involving FHOs, courts award diversion-of-resources damages based on reasonable rates that "are reflective of the value of services in the marketplace." *Combs*, 2000 WL 365029, at *3; *see also In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992); Ex. 21 at 13–20 (analyzing rates by region and seniority to determine that they were reasonable). "[I]t is completely reasonable to charge an hourly rate that does not match the pro rata salary of the individual; to find otherwise would place into question the fees and costs associated with a litany of professionals (including attorneys) whose hourly rate and salary prorated to the hour bear only passing resemblance to one another." *Combs*, 2000 WL 365029, at *3; *see also Blum v. Stenson*, 465 U.S. 886, 894 (1984) (rejecting notion that public interest attorneys who do not charge their clients should be compensated for their fees at a lesser hourly rate than for-profit attorneys in the same geographical market). Charging market rates that do not conform to actual salaries is a common practice in litigation. *See* Clio, *A Guide to Paralegal Billing*, https://www.clio.com/resources/paralegals/a-guide-to-paralegal-billing ("[F]irms are permitted to charge 'market rates' for paralegal services instead of actual costs" based on experience and geographical location and such rates are "not the same as what a paralegal earns in an hour"). Plaintiffs have testified about the careful steps they took to determine the hourly rates put forward for their staff members and ensure they were reasonable for the market, *see, e.g.*, Ex. 25, MMFHC (Tisdale) 30(b)(6) Dep. 64:1–19 (rates are "based on the experience that each person has in

years working in fair housing, their specific expertise in the area that they've been assigned, and how many years they've actually worked in that area" and consider the rates of "other individuals throughout the country who are doing similar jobs and have hourly rates in place as organizational policy"), and Plaintiffs' expert on FHOs has evaluated the claimed rates and found them to be reasonable based on geography and experience, Ex. 21 at 13–20.

Although it is unnecessary for Plaintiffs to demonstrate that they have charged these rates to other parties in the past, *Combs*, 2000 WL 365029, at *3, Plaintiffs have done so. Ex. 26, 171:13–172:10 (rates used in this case are based on those awarded to CFHC in the past and have been deemed reasonable by courts in other matters); *compare* Ex. 8-A (diversion log from FHCRR detailing the hourly rates of employees), *with* Ex. 36, FHCRR 000065–68 (ALJ opinion approving and recommending the awarding of damages detailed in FHCRR's diversion log); Ex. 24, NFHA (Rice) 30(b)(6) Dep. 132:3–5 (consulting projects are charged at the same rates that were used in this case); Ex. 25, 67:17–68:13 (now-retired executive director of MMFHC testifying that he has consulted for HUD at the rate used in this case and, but for needing to divert resources as a result of Defendants' discrimination, would have charged these rates for other consulting opportunities); Ex. 11, ¶ 12 (former executive director of HOPE FHC charged $400 per hour for consulting—the same rate claimed in this case); Ex. 21 at 3, 9–10.

## II.   Defendants' discrimination frustrated the FHOs' missions to eradicate discrimination and promote equal housing, integration, and neighborhood stabilization.

Courts in this Circuit consistently hold that discriminatory conduct can cause a compensable injury by frustrating the same missions shared by the FHOs: the "mission[s] of identifying, challenging, and eliminating discrimination in housing . . . through education, research, counseling, testing, enforcement and advocacy." *Camden Prop.*, 2008 WL 8922896, at *5–6 (collecting cases confirming that reallocating resources to counteract "extensive discriminatory conduct" can frustrate the missions of FHOs). "[A] defendant's act that reduces the efficiency or success of the organization's activities can be adequate to frustrate an organization's mission," even where "testing

for violations of fair housing laws is part of [the FHO's] mission." *Fair Hous. Just. Ctr., Inc. v. Pelican Mgmt., Inc.*, 2023 WL 6390159, at *20 (S.D.N.Y. Sept. 29, 2023).

If a jury finds that Defendants violated the FHA, it will have ample evidence from which to conclude that Defendants' discrimination hampered the FHOs' ability to provide programs and services in furtherance of their missions. As in *Havens* and *Equity Residential*, Defendants' practices frustrated the FHOs' purpose "to make equal opportunity in housing a reality" through "the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination," *Havens* at 368, and the evidence establishes that time spent investigating Defendants' discriminatory conduct "interfered with [their] existing programs" including "intake and counseling, seminars, public service advertising campaigns, compliance testing, and training materials," *Equal Rts. Ctr. v. Equity Residential*, 798 F. Supp. 2d 707, 722 (D. Md. 2011).

As the FHOs explained in their interrogatory answers, their "community development, homeownership promotion, and neighborhood stabilization efforts have been undermined by the existence of deteriorating and poorly maintained [BANA] REO properties in those communities." Ex. 22 at 6. More specifically, each FHO has identified the components of its mission that Defendants harmed and explained how that harm curtailed work on other core activities. *See* Ex. 22-A at 5–38; Ex. 23. Plaintiffs recount how addressing Defendants' discrimination hampered their ability to reach their intended audience and achieve their mission by, for example, preventing them from creating outreach materials in other languages, Ex. 23 at 15, or attending events to further education and outreach and to expand their network of partners. Ex. 22-A at 37; Ex. 7, ¶ 8. The FHOs' deposition testimony further illustrates how Defendants' conduct has frustrated their missions. *See, e.g.*, Ex. 26, 107:6–112:9 (describing a criminal-records testing project that CFHC had to decline); Ex. 24, 31:6–32:9, 51:1–53:3, 55:16–56:1 (NFHA had to pivot from "working on a major redlining investigation" to investigating Defendants' discriminatory REO maintenance, and Defendants' conduct contravened NFHA's mission of creating fair housing opportunities in all communities.); Ex. 32, 124:14–126:5 (NTFHC had to stop running its fair housing clinic because of resources diverted to this case.); Ex. 25, 88:2–89:5 (Defendants' discriminatory conduct derailed

MMFHC's efforts to promote homeownership and close the wealth gap through counseling, outreach, and education.). This evidence suffices to establish a compensable injury to the FHOs' missions. *See Equity Residential,* 798 F. Supp. 2d at 724–25; *Saunders,* 659 F. Supp. at 1052; *Smitley,* 2018 WL 3237860, at *2. As outlined below, ample evidence supports a causal link between Defendants' discrimination and the frustration of the FHOs' missions, and the nonpecuniary nature of frustration-of-mission damages does not render them speculative.

### A.     Defendants' discrimination directly harmed the FHOs' missions.

The causal connection between Defendants' racially discriminatory maintenance and marketing of REOs and harm to Plaintiffs' missions is straightforward: the FHOs' missions to ensure equal access to housing and integrated, vibrant, and stable neighborhoods are harmed by widespread discrimination in housing. *NFHA I* at 639. This Court has already held that Plaintiffs' claims that they have been "injured . . . by the concrete harm allegedly imposed by the defendants' actions to their mission to end racially segregated housing and its effects . . . provide plausible proximate cause." *Id.* at 637 (citing *Havens* at 379; *NFHA. v. Deutsche Bank*, No. 18 C 0839, 2018 WL 6045216, at *13 (N.D. Ill. Nov. 19, 2018)); *see also NFHA v. Deutsche Bank Nat'l Tr.*, No. 18 CV 839, 2019 WL 5963633, at *7 (N.D. Ill. Nov. 13, 2019) ("The text and history of the FHA indicate that the Act is capable of accommodating the type of causal connection that Plaintiffs have identified between the Defendants' misconduct and damage to Plaintiffs' mission of furthering fair housing.").

It is well settled that if discriminatory conduct impedes an FHO's "efforts to assist equal access to housing through counseling and other referral services," "there can be no question that the organization has suffered injury in fact." *Havens* at 379; *see Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) ("Any violation of the FHAA" would frustrate an FHO's mission where it had "the principal purpose of helping to eliminate discrimination against individuals with disabilities by ensuring compliance with laws intended to provide" accessibility); *see also Centro de la Comunidad Hispanade Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) ("[A]n organization shows injury-in-fact where, as here, 'a policy has impeded, and will continue to impede, the organization's ability to carry out its responsibilities.'" (quoting *New York C.L. Union v. New York*

*City Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012)); *Gay-Straight All. Network v. Visalia Unified Sch. Dist.*, 262 F. Supp. 2d 1088, 1105 (E.D. Cal. 2001) ("[D]efendants' practices have 'perceptibly impaired' the organizational plaintiff's ability to provide the services it was formed to provide."). Similar to *Saunders*, given the FHOs' robust evidence "concerning the paramount importance of non-discriminatory" maintenance and marketing of vacant homes "in furthering [their] mission of ensuring equal housing opportunities," 659 F. Supp. at 1060–61, they are entitled to frustration-of-mission damages.

### 1.   Cases brought by municipalities seeking economic damages are inapposite.

In arguing that the FHOs' frustration-of-mission damages lack sufficient proximate causation, Defendants rely entirely on cases involving municipalities that sought to recover their economic damages in the form of lost tax revenue, increased municipal expenses, and out-of-pocket costs for governmental eviction and foreclosure processes, or for vicarious injury based solely on their residents' harm. *See Cnty. of Cook v. Bank of Am. Corp.*, 78 F.4th 970, 972 (7th Cir. 2023); *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189 (2017); *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030 (9th Cir. 2021); *Johnson v. City of Annapolis*, No. CCB-21-1074, 2023 WL 3390823, at *11 (D. Md. May 11, 2023); *Cnty. of Cook v. HSBC N. Am. Holdings Inc.*, 314 F. Supp. 3d 950, 954 (N.D. Ill. 2018). None of these cases involved an organization's frustration-of-mission damages. And all of these cases depended on the municipalities proving that the defendants caused specific economic damages to their residents (*e.g.*, diminution in property values) that then led to economic harm to the municipalities (*e.g.*, lost property tax revenue).

By contrast, to recover frustration-of-mission damages, the FHOs need not prove that any community members they serve were economically harmed by Defendants' discrimination. *See Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 642 (11th Cir. 2000) (Under *Havens*, an FHO "suffers injury independent of that suffered by individuals in the affected housing market."); *Oxford House, Inc. v. City of Salisbury*, No. RDB-17-1978, 2018 WL 3127158, at *6 (D. Md. June 26,

2018); *U.S. v. Hampton Corp.*, 502 F. Supp. 3d 1376, 1381 (D.N.D. 2020); *Equity Residential*, 798 F. Supp. 2d at 723.

At least since *Havens*, it has been foreseeable that any entity violating the FHA could, in doing so, frustrate an FHO's mission and thereby create a compensable injury. The line between Defendants discriminatorily maintaining and marketing REOs and frustration of the FHOs' mission to end discrimination in housing is direct. No causal leaps are required.

> **2.      The FHOs offer robust evidence that the discriminatory maintenance and marketing of REOs creates the very conditions they are dedicated to combatting.**

Although the connection between housing discrimination and the mission of preventing housing discrimination should be self-evident, the FHOs have put forward substantial evidence to explain the various ways in which Defendants' discriminatory maintenance and marketing of REOs harms specific aspects of their missions. The FHOs offer opinions from experts in: (1) racial and economic inequality and segregation in urban housing markets (Dr. Elizabeth Korver-Glenn), *see* Ex. 37, Korver-Glenn Rep. at 2; (2) the residential real estate industry (JoAnne Poole), *see* Ex. 38, Poole Rep. at 1–2; and (3) property maintenance code enforcement and neighborhood revitalization (Albert Poche), Ex. 39, Poche Rep. at 1–2, to detail the ways in which the poor maintenance of REOs in communities of color exacerbates economic inequality, racial segregation, crime, and neighborhood destabilization in those communities—all of which undermine the FHOs' missions. *See also* Ex. 1, ¶ 12.

Dr. Korver-Glenn opines, based on her extensive scholarship on racial inequality in urban housing markets and, in particular, the residential appraisal process, that "[i]f REO properties in neighborhoods of color are maintained worse than in majority White neighborhoods, this disparity will result in severe economic and social harm to the neighborhoods of color in which these poorly maintained REOs are located." Ex. 37 at 3. This, in large part, is due to the residential appraisal process "tak[ing] into account not only the individual property characteristics of the home being appraised, but the characteristics of other nearby properties, as well as overall neighborhood

conditions and characteristics." *Id.* at 3, 5–6. Because the sale prices of poorly maintained REOs are used as comparators, the value of homes in communities with such REOs is diminished.[12] *Id.* at 9–11. As a result, poorly maintained REOs in communities of color "reduce[] homeowner equity" and "[p]erpetuat[e] racial segregation by making it more difficult for neighbors to sell their homes and move to more integrated communities and by dissuading White homebuyers from purchasing homes in these neighborhoods of color." *Id.* at 3–4. The presence of such REOs also harms, for example, access to education and public safety. *Id.* at 13–14 (identifying several studies that demonstrate that increased blight causes increased crime and decreased school quality). These negative effects are directly at odds with the FHOs' missions. *See, e.g.*, Ex. 24, 35:11–18 (describing NFHA's mission as "ensur[ing] that everyone has fair housing opportunities in the United States and that all neighborhoods are vibrant and healthy and resilient and have the resources and amenities that people need to thrive").

JoAnne Poole's decades of experience as a residential real estate agent lend further support to Dr. Korver-Glenn's opinion. Ms. Poole opined that "[a] home's curb appeal is critical to marketing the home for sale," and, as a result, poorly maintained homes "are more difficult to sell, stay on the market longer," and decrease sales prices in the surrounding community. Ex. 38 at 3, 5. In Ms. Poole's experience, "[p]rospective homebuyers generally do not want to purchase homes that are near poorly maintained properties, making it much more difficult for neighbors of blighted properties to sell their homes." *Id.* at 5. Further, when homes are classified as having deferred

---

[12] Defendants seek to rebut this analysis with economist Morris Davis's attempt to determine whether home values actually declined, but his analysis is deeply flawed (or at least a jury could find it so). Ex. 40, Korver-Glenn Dep. 191:15–192:12 (testifying that "nothing in Morris Davis's report or deposition transcript changed [my] opinions" because "in his difference-in-difference analyses, he did not account for any other explanatory factors," and the public records he relied on, "the American Community Survey 5-year estimates," "are actually not sales prices[,] [t]hey are self-reported home values [by] residents and don't actually consist of past sales prices in the vicinity"); Ex. 41, Davis Dep. 164:12–23 ("I did not include home ownership as a control."); *id.* at 167:1–170:1 (stating that other than controlling for the presence and ownership periods of BANA REOs, his analysis did not assess any other variable despite having the ability to do so); *id.* at 179:21–181:15 (testifying that his difference-in-difference analysis did not control for the presence of non-BANA REOs, crime, foreclosure rates, owner-occupancy rates, or number of deficiencies identified by the FHOs).

maintenance, mortgages are denied—sharply limiting the pool of buyers "to those who do not require traditional mortgages to purchase a home," like investors (not residents). *Id.* at 6. Purchasers also decline properties near poorly maintained vacant homes for fear of those homes attracting squatters, crime, or rodents. *Id.* at 7.

Dr. Korver-Glenn's and Ms. Poole's opinions are consistent with those of Mr. Poche, the previous Director of Code Enforcement for New Orleans, who explained that neglected and distressed properties not only reduce property values in surrounding communities but also harm "the overall health and wellbeing of nearby residents." Ex. 39 at 4. A substantial body of literature documents a "clear causation between property conditions" and the occurrence of crime and public health problems. *Id.* at 4–6. Blight also harms the social cohesion of neighborhoods. *Id.* at 6–7.

Although Defendants argue that the FHOs' experts' opinions are "hypothetical" because they did not perform a data analysis of the properties or neighborhoods at issue, the experts explained that they did not need to examine the data in this case to opine on the effects of poor property maintenance that are well-known and established in their respective fields. Ex. 40, 42:23–45:13; Ex. 42, Poche Dep. at 31:16–34:5, 204:12–205:12, Dec. 18, 2023. By Defendants' logic, despite the universal acceptance of the concept of gravity, it would be hypothetical to state that an apple falling from a tree will fall towards the ground without having studied that particular tree. Courts have long accepted evidence of the well-understood socioeconomic effects of racial discrimination in housing as sufficient to support claims for injuries. *See, e.g., Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110 (1979); *McCardell v. HUD*, 794 F.3d 510, 519 (5th Cir. 2015) (plaintiff's testimony and expert reports "regarding the anticipated socioeconomic effects of the planned redevelopment" on a minority community sufficed to establish injury); *Zuch v. Hussey*, 394 F. Supp. 1028, 1050 (E.D. Mich. 1975 ("This Court is well aware of the racial fears [of white flight]. The testimony in this action has underscored the instability which results from these fears . . . ."), *aff'd and remanded sub nom. Zuch v. John H. Hussey Co.*, 547 F.2d 1168 (6th Cir. 1977).

The FHOs have also shared specific examples of the harms outlined by their experts. Individual Plaintiff Chevelle Bushnell, for instance, has described how Defendants' poor

maintenance of a neighboring REO resulted in water running in her walls, squirrels in her attic, and intruders breaking down her front door and, on a separate occasion, breaking through her bedroom wall. ECF 183-35, ¶¶ 5, 7, 14. CFHC received complaints from community members regarding the deterioration of unoccupied properties and "the impact it was having on the livability of their communities, [and] the local impact upon property values." Ex. 26, 52:5–53:11; *see also id.* 185:8–186:14. MMFHC testified that discriminatory REO maintenance and marketing "contributed further to the discrimination and segregation that has occurred and is still occurring [in the communities it serves] . . . [b]ecause disinvestment in properties based on the racial composition of the neighborhood is a[] . . . cause of segregated neighborhoods." Ex. 25, 108:21–110:17; *id.* 74:13–75:19 (testifying that poorly maintained REOs devalue neighborhoods, increase segregation, encourage divestment, and limit housing choice); *see also* Ex. 2, ¶ 13. This and similar evidence, coupled with the experts' opinions, provide sufficient basis to find that Defendants' conduct created neighborhood conditions directly at odds with the FHOs' missions.

**B.**  **The FHOs' frustration-of-mission damages may be determined by a jury based on trial evidence and with guidance from an expert on FHOs.**

Unlike diversion-of-resources damages, frustration-of-mission damages are largely non-pecuniary. *Havens* at 379 n.20 (emphasis added) (FHO's injury "results from the organization's *noneconomic interest* in encouraging open housing"); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262–63 (1977) ("It has long been clear that economic injury is not the only kind of injury" for an FHO plaintiff because, as a nonprofit, the FHO's interest in the case did not stem "from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce."); *see also Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27, 30 (D.C. Cir. 1990) (FHO's "noneconomic interests" could be harmed by defendants.); Ex. 43, Seicshnaydre Rebuttal Rep. at 5; *Oxford House*, 2018 WL 3127158, at *7 (Nonprofit suffered injury despite its interest being non-economic.). As with damages for emotional distress, reputational

harm,[13] or loss of goodwill from copyright and trademark infringement,[14] courts do not require plaintiffs to link requests for frustration-of-mission damages to an economic cost. *Hous. Works, Inc. v. Turner*, No. 00CIV.1122, 2004 WL 2101900, at *34–35 (S.D.N.Y. Sept. 15, 2004) (Nonprofit's "mission non-fulfillment damages" need not be related to any financial loss.), *R&R adopted as mod.*, 362 F. Supp. 2d 434 (S.D.N.Y. 2005).

The difficulty of calculating nonpecuniary damages does not render them speculative or unavailable. *See Marable v. Walker*, 704 F.2d 1219, 1220–21 (11th Cir. 1983); *U.S. v. Lepore*, 816 F. Supp. 1011, 1023 (M.D. Pa. 1991). Defendants suggest that the FHOs must present evidence of the magnitude of harm Defendants caused communities of color. But the relevant inquiries here are: (1) How much will it cost the organizations that serve those communities to reasonably counteract the damage to their missions to create racially integrated and stable neighborhoods?; and (2) What is the value of the harm to the FHOs' missions (not to the communities they serve)?

Like the *Saunders* defendants, BANA and Safeguard suggest that the FHOs must point to "specific financial expenditures" caused by their violations to claim compensable injury, but "such [an] interpretation is not justified." *Saunders*, 659 F. Supp. at 1052. "There is no requirement in *Havens* . . . that an organization rely on any particular type of evidence to show that its ability to further its mission was perceptibly impaired." *Equity Residential*, 798 F. Supp. 2d at 725; *Akouri v. Fla.*

---

[13] For reputational harm torts such as defamation and slander, damages are frequently based on difficult-to-quantify losses such as community standing. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974). Intellectual property law similarly allows for the award of damages to compensate for "reputational injury." Thomas F. Cotter, *Damages for Noneconomic Harm in Intellectual Property Law*, 72 Hastings L.J. 1055, 1060 (2021).

[14] Despite being "far more difficult to quantify" than economic loss, damages for "loss of goodwill caused by consumer confusion" are routinely awarded in trademark infringement cases. *Days Inns Worldwide, Inc. v. Patel*, No. 04-2259, 2005 WL 4655381, at *5 (S.D. Cal. Feb. 7, 2005); *see also Skydive Az. Inc. v. Quattrocchi*, 704 F. Supp. 2d 841, 850–51, 856–57 (D. Ariz. 2010) (jury awarded $2,500,000 based on instructions allowing consideration of plaintiff company's loss of goodwill, district court doubled award, and circuit court affirmed despite "difficult to quantify"), *damage award aff'd*, 673 F.3d 1105 (9th Cir. 2012); *Sprint Nextel Corp. v. Simple Cell Inc.*, 31 F. Supp. 3d 710, 713 (D. Md. 2014) (plaintiff entitled to damages for loss of goodwill). Loss of goodwill damages have also been upheld for copyright infringement. *See, e.g.*, *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1547 n.10, 1152 (10th Cir. 1996).

*Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005) ("[G]eneral compensatory damages . . . need not be proven with a high degree of specificity"); *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 607 (7th Cir. 1985) ("The calculation is not precise, but unrealistic exactitude is not required in this context and 'ambiguities . . . should be resolved against the discriminating [defendant].'").

The inexact nature of frustration-of-mission damages is why the issue is best decided by a jury. *Wagenmann v. Adams*, 829 F.2d 196, 215 (1st Cir. 1987); *Akouri*, 408 F.3d at 1345. Even Defendants' damages expert agreed that the amount of nonpecuniary damages "should be left to the trier of fact." Ex. 30, 101:17–21.

But the jury need not be left without any guidance. Courts and parties often provide frameworks to aid in the calculation of nonpecuniary damages—and the frameworks need not be exact. *See, e.g.*, *Turner*, 2004 WL 2101900, at *37 (finding an expert appropriate to assist the jury in understanding how to apply the concept of mission non-fulfillment damages); *Barker v. Niles Bolton Assocs.*, 316 F. App'x 933, 939–40 (11th Cir. 2009) (jury in FHA case was properly advised that "there is no exact standard to be applied to determine an amount of compensatory damages" and was appropriately given factors to aid in determining amount); *Murphy v. Nat'l R.R. Passenger Corp.*, 547 F.2d 816, 818 (4th Cir. 1977) (holding that it was error to prohibit attorneys from introducing methods for measuring pain and suffering damages).

One way of evaluating the amount of damages to compensate an FHO for harm to its mission is to consider the costs it would take to remedy that harm in the future. *See, e.g.*, *Cmty. House, Inc. v. City of Boise*, No. 1:05-CV-00283-CWD, 2014 WL 345630, at *10 (D. Idaho Jan. 30, 2014) (finding no error in a jury instruction that frustration-of-mission damages "could include what it would cost the organization to redress the harm done by the defendants"). Because Plaintiffs have used settlements in similar cases to address similar harms, *see supra* Fact Section III.B., the nature and cost of programs to address the harm to the FHOs' missions is known. Indeed, the programs that were put in place with the REO settlement monies may provide the jury a blueprint for what an

award of frustration-of-mission damages could look like in this case. *See* Exs. 1–6, ¶ 8; Exs. 8–19, ¶ 8.

In addition to drawing guidance from the FHOs' use of REO settlement proceeds, the jury may also benefit from a framework for calculating frustration-of-mission damages offered by an expert on FHOs to assist in determining the nature and amount of damages to the FHOs' missions and what it would take to repair that damage. *See Turner*, 2004 WL 2101900, at *37. Prof. Seicshnaydre is such an expert. She is the founding executive director of Greater New Orleans Fair Housing Action Center and has extensive knowledge of fair housing law.[15] Ex. 21 at 1.

Prof. Seicshnaydre has developed a framework to aid the trier of fact in quantifying nonpecuniary frustration-of-mission damages. Ex. 43 at 5–6. She analyzed the missions and service offerings of the FHOs and categorized the services and impairments to mission into five categories. Ex. 21 at 24. Because the "FHOs on average conducted REO investigative and educational programs and services for varying five-year periods between 2011 and 2018[,] [she] used a five-year remedial period" for her calculations. *Id.* at 25; *cf. Pelican Mgmt.*, 2023 WL 6390159, at *20 (finding that "frustration of mission damages for a period of five years" of future monitoring and education was reasonable because "Defendants instituted their discriminatory rental requirements for at least five years"). She based her calculations on "the FHOs' cost of providing programs and services," as reflected on tax forms.[16] Ex. 21 at 24. She then relied on her extensive experience with FHOs[17] to

---

[15] Just as this Court held that Pamela Kisch's FHO work experience made her "well-qualified" to "contextualize the role of fair housing organizations in adducing evidence of housing discrimination," *NFHA v. Bank of Am., N.A.*, No. SAG-18-1919, 2023 WL 1816902, at *6 (D. Md. Feb. 8, 2023), so, too, does Prof. Seicshnaydre's expertise with FHOs render her well-qualified to opine on how harm to their missions can be valued.

[16] That Prof. Seicshnaydre relied on budgets in developing her framework does not transform the FHOs' frustration-of-mission damages into economic damages. Instead, her method of anchoring the valuation of harm to mission to known budget items is intended to assist the jury in quantifying otherwise difficult-to-quantify harm.

[17] Her experience includes serving as the founding Executive Director and General Counsel for the Greater New Orleans Fair Housing Action Center for eight years; litigating fair housing cases for 23 years; teaching fair housing litigation at Tulane Law School since 1998; producing scholarships in the field of fair housing since 2005; and serving on the boards of directors of several FHOs. Ex. 21 at 24.

estimate the amount of money it would take to counteract each way their missions were impaired
and the magnitude of harm caused to the FHOs' overall missions.

Prof. Seicshnaydre's framework exemplifies the different ways that courts consider
frustration-of-mission damages, including both prospectively, *Krug*, 564 F. Supp. 2d at 1152
("Frustration of mission damages are future costs that HRC will be forced to expend to rectify the
effects of Defendants' discriminatory actions."), *and* retrospectively, *Williams*, 955 F. Supp. at 494
(when an FHO plaintiff "devote[s] significant resources to identifying and counteracting the
defendants' practices, and because time was spent on these efforts, the [FHO] was prevented from
spending time on other efforts to end discrimination in the housing area," it has suffered an injury).
The retrospective harm should compensate the FHOs both for the value of the lost opportunities
resulting from Defendants' discrimination and for the harm they suffered because Defendants'
conduct delayed their progress towards fulfilling their missions. Ex. 21 at 32–35.

The first three categories of damages Prof. Seicshnaydre identifies are largely prospective. *See
id.* at 25–31. Because the FHA authorizes the Court to award "affirmative action" to "vindicate 'the
statute's goals of . . . *removing lingering effects* of past discrimination,'" FHOs "may recover for
prospective damages." *CoreLogic*, 478 F. Supp. 3d at 316–17 (citations omitted). Defendants
mischaracterize the FHOs' prospective damages claims. The FHOs do not seek damages for future
harms that have yet to occur, but instead for damages that will allow them to remedy past harms
through new initiatives (such as those developed with the REO settlements, *see supra* Facts Section
III.B); *see* Ex. 21 at 25–31. This is a recognized remedy for violations of the FHA. *See, e.g.*, *Krug*, 564
F. Supp. 2d at 1152; *Cmty. House.*, 2014 WL 345630, at *10 (upholding a jury instruction that
"damages could include what it would cost the organization to redress the harm . . . to the
organization's mission as a result of [any] violation of the [FHA]").

The last two categories of damages (combined into Section 4, *infra*) are retrospective in
nature. *See* Ex. 21 at 32–35. Courts regularly find that organizational plaintiffs' missions are impaired
because of their past diversion of resources to combat discrimination, *Equity Residential*, 798 F. Supp.

2d at 722–23, and award damages based on a jury's valuation of lost opportunities resulting from (and separate from) their diversion, *see, e.g.*, *Cmty. House*, 2014 WL 345630, at *13–14.

The additional damages within each category of Prof. Seicshnaydre's framework address the harm Defendants' discrimination caused the FHOs by preventing progress in each aspect of their missions—above and beyond the amount of staff time or programmatic costs needed to address that area of the mission going forward. As opposed to an estimate of the cost of remedial measures, these damages compensate for the progress that could have been made but for being set back by the harm Defendants caused. In other words, even if the FHOs received funds to create additional programs over the next five years to address the harm caused by Defendants' discrimination, they have still suffered an injury by being delayed in accomplishing their goals. The additional calculation within each of Prof. Seicshnaydre's proposed categories is intended to address that distinct injury.

Based on her valuations, Prof. Seicshnaydre proposes that, in total, the FHOs are entitled to approximately $73 million for Defendants' frustration of their missions. Ex. 21 at 36. Defendants describe this number as "staggering," but neglect to consider that their discriminatory conduct has harmed 20 FHOs for over a decade (and the harm continues). Prof. Seicshnaydre's proposed total amounts to only about $3.6 million per FHO, or $360,000 per year for each FHO over the past decade. Given the scope and duration of Defendants' discriminatory practices, this would be a fair frustration-of-mission damages amount for a jury to award and, at the very least, not unreasonable as a matter of law.

For all of Defendants' complaints about Prof. Seicshnaydre's damages framework, they do not offer an alternative framework for calculating nonpecuniary frustration-of-mission damages, nor any experts qualified to contradict her on how housing discrimination frustrates the missions of the FHOs. *See* Ex. 30, Irwin Dep. 25:10–13; Ex. 31, Calabrese Dep. 24:10–11. If a jury determines that Defendants violated the FHA by failing to equitably maintain and market REOs in communities of color, it is entitled to hear from an expert in FHOs' missions on how harm to those missions could be measured and compensated. The jury may then weigh that evidence—accepting, modifying, or rejecting it—and calculate damages. As set forth below, each of Prof. Seicshnaydre's proposed

categories for compensating the harm to the FHOs' missions offers a well-justified method for awarding frustration-of-mission damages.

        1.       **Impairment of the FHOs' broader missions of overcoming neighborhood stereotypes to achieve housing choice and integration.**

      In large part, the FHOs' missions involve counteracting stereotypes that serve as an impediment to integrated neighborhoods. *See, e.g.*, Ex. 26, 139:9–140:1; 143:11–144:15 (discussing CFHC's efforts "to counteract some of the negative things that people perceived . . . about Hartford, CT [that] are all tied to perceptions about people based on their race and sometimes other protected class statuses"); Ex. 44, Fifth Quarterly Report to the Austin Works Grant, at HOPEFHC 906 (describing programming efforts in Austin, TX as "countering negative stereotypes and media images of the community"). "FHOs suffer direct harm when neighborhood-based discriminatory maintenance and marketing reinforces the stereotypes Plaintiffs are trying to counteract[:] . . . the perception that Black and Brown neighborhoods are inherently less valuable as well as the perception that banks, housing providers, or other players in the marketplace will devalue neighborhoods [of color]." Ex. 21 at 22; *see also Matchmaker Real Est.*, 982 F.2d at 1095 (FHO had standing because the ungrounded fears that cause white flight "cause[] a destabilization of the community"); *Zuch*, 394 F. Supp. at 1048.

      Based on her deep knowledge of FHOs' programs and missions, Prof. Seicshnaydre opines that overcoming such stereotypes "should include broad public outreach campaigns, policy education and advocacy, and a range of future counseling, investigation, and enforcement programs specifically tailored to address neighborhood stigma." Ex. 21 at 25. Drawing on her experience running an FHO, she estimates that this prospective remedy is equivalent to 15% of an FHO's annual programmatic staffing budget. *Id.* at 26. She also recommends that a factfinder consider additional compensation for the delay in advancing the FHOs' mission to counter negative stereotypes over the course of the past ten years—beyond future programmatic expenses. *Id.*

**2.    Impairment of programs designed to train and marshal the housing industry to market and invest in neighborhoods equally.**

"Neighborhood-based discrimination," such as differential maintenance and marketing practices causing homes in communities of color to deteriorate, "frustrates the work of FHOs in training the housing industry to resist its own impulses and those of its client base to use race as a marker or proxy for neighborhood stability or soundness." *Id.* at 27. If a jury finds Defendants liable for violating the FHA, they should be held responsible for repairing the harm to this element of the FHOs' missions. Remedying this harm requires resources to train industry professionals to "address [the] neighborhood racial bias Defendants exhibited and compounded" and to provide "consumers objective information and data to drive their neighborhood decisions rather than using race as a proxy for neighborhood desirability." *Id.* Frustration-of-mission damages should include the cost of "FHO services necessary to counter perceptions of housing industry professionals that others will make housing choices based on race." *Id.* Based on Prof. Seicshnaydre's three decades of fair housing experience, she recommends that a jury consider awarding 10% of the FHOs' annual programmatic staffing expenses for five years to assist in implementing these initiatives. *Id.* She also recommends additional damages for the harm caused by delaying this critical work within the housing industry for years. *Id.* at 28; *see, e.g.*, Ex. 25, 100:8–101:4.

**3.    Impairment of services designed to increase access to homeownership and promote equalization and stabilization of neighborhoods.**

Defendants' discriminatory maintenance and marketing of REOs "set Plaintiffs back in their services and efforts to expand housing choices, stabilize neighborhoods, and narrow racial homeownership and wealth gaps." Ex. 21 at 28 (citing Margery Austin Turner, *Why Haven't We Made More Progress in Reducing Segregation?*, The Dream Revisited: Contemporary Debates about Housing, Segregation, and Opportunity 98–99 (Ingrid Gould Ellen & Justin Peter Steil eds., 2019)) ("[D]iscrimination and disinvestment puts most minority neighborhoods at a significant disadvantage from the perspective of white home seekers for whom alternative choices abound."); Ex. 25, 92:17–93:21 (Defendants' discrimination diminished MMFHC's ability "to engage in neighborhood improvement and stabilization in Milwaukee neighborhoods and to promote racially

39

and economically integrated housing patterns," in furtherance of its mission); Ex. 3, ¶ 13. To repair

that setback to this part of their missions, the FHOs will have to "bolster services that equalize

neighborhoods, promote housing choice and homeownership, and prevent predatory loans and

scams," including the type of "stewarding community investments" that the FHOs engaged in

following their REO settlements. Ex. 21 at 29. The ways the FHOs used the REO settlement

monies "illustrate the types of activities needed to mitigate the perception, reinforced by

Defendants, that African-American and Latino neighborhoods are not worthy of capital, credit, and

stabilization." *Id.* at 30.

Compensation for the frustration of this aspect of the FHOs' missions should address the

"impairment of programs designed to provide equal access to mortgage credit and homeownership"

and "promote housing investments that equalize neighborhoods and counteract segregation." *Id.*

One way of calculating this nonpecuniary damage is to assess the cost of services necessary to

"counsel consumers, address unequal credit markets, promote affirmative marketing and

homeownership in areas affected by neighborhood-based discrimination, address unequal effects of

disposition of REO properties to institutional investors as opposed to homeowners, and

equalize/stabilize neighborhoods." *Id.* Based on Prof. Seicshnaydre's knowledge and experience, that

value is equivalent to "5% of the FHOs' annual programmatic staffing expenses." *Id.* at 30.

As with the other categories of frustration-of-mission damages, Prof. Seicshnaydre opines

that the FHOs should be compensated beyond future programmatic costs for the distinct harm

caused by the years of disruption to their neighborhood equalization services. *Id.* To assist the jury in

quantifying this amount, she looks to the total amount Defendants spent "compounding an unequal

housing market in tested zip codes" ($███████, according to BANA's expert, David Skanderson)

and suggests a multiplier of ██. Ex. 21 at 31; *see* ECF 167-7 at 51. The multiplier is appropriate

because racially disparate maintenance and marketing causes "an exponential type of harm," and "if

neighborhoods are being maintained differently, then it would take more than just an equivalent

amount of spending to remedy that harm." Ex. 45, Seicshnaydre Dep. 236:9–237:14; 241:1–12;

246:15–247:8.

Contrary to Defendants' assertions, Prof. Seicshnaydre has proposed a reasonable method for compensating the FHOs for the harm to their neighborhood stabilization and equalization services based upon the money Defendants spent compounding an unequal housing market. First, this calculation is only considered if a jury determines that Defendants violated the FHA by discriminatorily maintaining and marketing REOs in 37 cities across the country over a period of seven-plus years. Tying damages to the amount Defendants spent executing their discriminatory work is a reasonable way to ensure the amount of damages a jury awards reflects the magnitude of Defendants' discrimination. *See* Harry Zavos, *Monetary Damages for Nonmonetary Losses: An Integrated Answer to the Problem of the Meaning, Function, and Calculation of Noneconomic Damages*, 43 Loy. L.A. L. Rev. 193, 252 (2009) ("People would generally agree that compensation should increase to reflect the increased gravity of the loss being compensated, even if the compensation is symbolic."). Prof. Seicshnaydre's proposal recognizes that "it is Defendants who must [provide funds to] repair the harm using some multiplier of [the] budget" they spent "setting the FHOs back in their broad programmatic mission to increase access to homeownership and promote equal neighborhoods." Ex. 21 at 31 n.56. This theory is not novel. *See* Ex. 46, *Spann v. Colonial Village*, No. 86-2917, Fair Housing-Fair Lending Rep. (P-H) ¶ 12.1 (D.D.C. May 14, 1992) (jury heard evidence of how defendant's expenditures on discriminatory advertising were relevant to cost needed to remedy harms and awarded $650,000 to FHO and housing authority for frustration of mission); Ex. 47, *Fenwick-Schafer v. Winchester Homes*, No. 90066002/CL 110092, Fair Housing-Fair Lending Rep. (P-H) ¶ 8.3 (Md. Cir. Ct. Dec. 13, 1993) (jury heard evidence of the defendant's expenditures on discriminatory advertising and awarded $800,000 to fair housing organization for frustration of mission based on that amount).

Second, Prof. Seicshnaydre's proposed formula ensures that the damages awarded are relative "to *Defendants'* neighborhood-based discrimination, not to other causes or other actors." Ex. 43 at 7 (emphasis added). Defendants argue that relying on their expenditures to award this category of damages produces the absurd result of letting BANA pay nothing if it had "spent *nothing*" and "performed *no* upkeep on any REO properties." Defs.' MSJ at 3. This argument misses a critical

fact: if Defendants had spent no money on maintenance and marketing of REOs (*i.e.*, refrained from this work altogether in all neighborhoods, regardless of race), there would be no case against them. Furthermore, Defendants' argument that expending more funds on REO maintenance resulted in fewer deficiencies is belied by robust evidence that spending more money does not necessarily result in better work or improved property conditions. *See* ECF 285-1 at 16–21.

Finally, while the parties disagree about the proper amount to compensate the FHOs for Defendants' harm to their neighborhood equalization and stabilization services—and the factors to be considered in arriving at that amount—the award of nonpecuniary damages is ultimately within the province of the jury. At this stage, the Court should not permit Defendants to short-circuit the jury's traditional role in awarding non-economic damages based on a robust trial record.

### 4. Diminishment of past complaint-based and community outreach services.

The last two categories of damages consider "the harm to the FHOs resulting from diminishment of past complaint-based and community outreach services essential to increasing fairness and reducing segregation in the housing market over time." Ex. 21 at 32. The two categories include the reduction in the FHOs' capacity to: test for other forms of housing discrimination; deliver effective "educational and outreach programs to raise awareness and increase fair housing literacy"; and counsel consumers to obtain and maintain housing. *Id.* These retrospective categories of damages account for the impact of the FHOs' resource diversion on their missions. These lost opportunity damages—a form of frustration-of-mission damages—"[are] not calculated on the diversion logs." Ex. 43 at 5. Instead, they consider "the value of the *opportunity forgone* by using funds on the [BANA/Safeguard] testing." *Olde St. Andrews, Inc.*, 210 F. App'x at 477 (emphasis added).

The FHOs have put forward evidence that demonstrates that during the period when they spent significant resources to investigate the REO discrimination, their resources to conduct other activities were diminished. *Compare* Ex. 48, MMFHC 0003139 at 4 & 9 (grant report showing how MMFHC's referral numbers were greatly depressed while it was focused heavily on the REO investigation between 2015 and 2017 (and increased significantly the year after)), *with Olde St.*

42

*Andrews, Inc.*, 210 F. App'x at 477 (relying on a grant proposal as evidence of a shift in resources during relevant time period to find that FHO suffered injury as an opportunity cost); *M&J Mgmt. Co.*, 2024 WL 3859997, at *3 ("[D]iversion of resources [is] equivalent to the opportunity costs of pursuing the investigation of the defendant's practices."). According to Prof. Seicshnaydre, 3% of the FHOs' annual programmatic staffing expenses "is on the low end of what would be needed to mount counseling," intake, testing, education, training, enforcement, policy advocacy and other campaigns "tailored to the diminishment in services Defendants have caused." Ex. 21 at 32. She also suggests that Plaintiffs be compensated for the additional harm of the diminution in the services the FHOs could have offered during the REO investigation. *Id.* at 32–33.

The FHOs "had to neglect, scale back, or forego" initiatives essential to their mission[s] because they had to redirect their resources to addressing the ongoing harm from Defendants' discriminatory REO maintenance and marketing practices. *Id.* at 33; *Equity Residential*, 798 F. Supp. 2d at 724 (stating that FHO sufficiently "identified specific projects that it had to curtail in order to investigate and counteract [defendants'] alleged discriminatory practices," but did not need to because "*Havens* does not require that a defendant's actions force an organization to decrease the levels at which it funds other programs," it only requires "that other programs be 'perceptibly impaired'"). For example, the FHOs' investigation into Defendants' discrimination impaired their education, outreach, and investigatory activities:

- MMFHC forewent a planned continuing education program for real estate brokers and agents in 2012. Ex. 23 at 100.

- NTFHC was unable to develop a fair housing certification program for landlords and property managers in 2012. *Id.* at 110.

- NFHA planned to conduct a systemic real estate sales investigation in response to HUD's 2012 Housing Discrimination Study, and even trained 10 FHOs to participate, but was unable to see it through because of the resources diverted to investigating Defendants. Ex. 22-A at 35. Had NFHA been able to pursue that investigation, it likely would have been working towards a remedy for any harms uncovered in that investigation by now. Instead, it must start from scratch and is harmed by the 12 years of lost progress.

- FHANC "identified a need to use its foreclosure prevention counseling program to identify individual and systemic discriminatory lending practices and to increase capacity to conduct complaint-based fair lending investigations" and "to build collaborative relationships with

43

other organizations to ensure better referrals of homeowners with fair lending complaints." Ex. 23 at 16–17. Because it diverted resources to the REO investigation, however, it was only able to engage in these efforts on a very limited basis, if at all. *Id.* ("[S]ince 2013 it has been unable to conduct sales and insurance testing or develop stronger partnerships with relevant organizations serving homeowners" and the "delay in conducting and identifying additional violations . . . is because of [Defendants'] discriminatory conduct.").

- HOPE FHC's diversion of resources prevented it from implementing a partnership with local lenders' Community Reinvestment Act officers to expand its financial literacy curriculum to include the training of school-aged children." *Id.* at 76.

These lost opportunities are "reasonable and consistent with [the FHOs'] broad fair housing missions." Ex. 21 at 34.

Prof. Seicshnaydre further opines that a jury may compensate the FHOs for their lost opportunities related to special initiatives they had to forego to address Defendants' discrimination. *Id.* at 34. To arrive at an appropriate amount, she estimated the value of the typical lost opportunities the FHOs describe as 20% of the budget for one staff member, considering the FHOs in this case have, on average, seven staff members. *Id.* at 35. This amounts to $10,000 per year for each FHO. *Id.* In addition, she estimated the value of the larger, more systemic special initiatives the FHOs forewent because of Defendants' conduct as an additional $1,000,000 total. *Id.* As with the other categories of damages, a jury may also compensate the FHOs for the harm to their missions from the significant delay in executing these initiatives. *Id.*

## III.    A finding of liability would entitle the FHOs to injunctive relief.

If a jury finds that Defendants engaged in years of housing discrimination across 37 different metropolitan areas, the FHOs will be entitled to injunctive relief. Because the FHA "provides that equitable relief is available where there is a violation of the statute, 42 U.S.C. § 3613(c)(1), the traditional showing of irreparable harm is not required." *Cousins v. Bray*, 297 F. Supp. 2d 1027, 1041 (S.D. Ohio 2003); *see Ctr. for Soc. Change, Inc. v. Morgan Prop. Mgmt. Co.*, No. JKB-19-0734, 2019 WL 1118066, at *1 (D. Md. Mar. 11, 2019) (holding that, for the purposes of injunctive relief, "irreparable harm to Plaintiff may be presumed and is, in fact, established based on evidence Defendants have violated the [FHA]"). The FHOs' pursuit of damages to compensate for past

44

injuries does not override this presumption of irreparable harm. Only an injunction would ensure that Defendants do not continue to engage in the same violations and cause new injuries.

Contrary to Defendants' argument, the FHOs have never stated they can be made whole through monetary damages alone. *See* Defs.' MSJ at 47. In support of this spurious assertion, Defendants cite Prof. Seicshnaydre's statement that, for the FHOs to be made whole, Defendants "must not only disavow the machinery of stigma and segregation they implemented, but also equalize and spur reinvestment in the neighborhoods they have harmed; counteract the negative stereotypes, attitudes, and associations about Black and Brown neighborhoods they have fueled through their practices; and reaffirm the FHOs' mission by removing barriers to housing choice and opportunity they have facilitated." Ex. 21 at 36. Nothing about this statement implies that this can be achieved through money alone. Several aspects of the FHOs' requested injunctive relief are intended to achieve these objectives and address Defendants' frustration of their missions. *See* Ex. 22 at 8 (requesting that Defendants "[a]dopt procedures and implement programs that prioritize homeownership and neighborhood stabilization in REO sales, including but not limited to residential mortgage special purpose credit programs" and "[e]xpand and widely promote [BANA]'s First Look program for REO sales to give buyers looking to purchase an owner-occupied primary residence, buyers using public funds, and non-profit partners of a public entity a 60-day exclusivity period from the time the property is listed both on [BANA]'s website and on a publicly available Multiple Listing Service").

Defendants' contention that any injunction must be limited to the 1,405 properties at issue in this case is similarly mistaken. The Court has discretion to fashion broad equitable relief to ensure compliance with federal law. *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 294 (4th Cir. 2020) (affirming grant of statewide injunction to afford relief to Baltimore City). In the fair housing context, courts regularly grant injunctive relief that extends beyond the facts or persons at issue if there is a risk that "the vestiges of [defendants'] discrimination will linger and remain to be eliminated." *Balt. Neighborhoods*, 92 F. Supp. 2d at 467 (ordering the retrofitting inaccessible buildings despite no plaintiff or FHO member seeking accessible housing in the at-issue area); *Pelican Mgmt.*,

2023 WL 6390159, at *19 (injunctive relief was necessary "where a defendant has not brought its policies and practices into compliance with the law and there is a likelihood that the illegal conduct will continue"); *U.S. v. Mitchell*, 335 F. Supp. 1004, 1007 (N.D. Ga. 1971) (enjoining defendants from racial steering even though plaintiff had already been made whole through monetary damages), *aff'd sub nom. U.S. v. Bob Lawrence Realty, Inc.*, 474 F.2d 115 (5th Cir. 1973).

 Courts may order remedies in civil rights cases to vindicate the policies of the statutes, not merely to afford private relief to an individual plaintiff. *Thomas*, 915 F.2d at 925 (stating it was unnecessary for a plaintiff to bring a class action to obtain an injunction against a policy that resulted in racial discrimination). "[T]he settled rule is that '(w)hether plaintiff proceeds as an individual or on a class suit basis, the requested (injunctive) relief generally will benefit not only the claimant but all other persons subject to the practice or the rule under attack.'" *Sandford v. R. L. Coleman Realty Co.*, 573 F.2d 173, 178–79 (4th Cir. 1978) (citation omitted) (ordering the district court to enter injunctive relief "in favor of the plaintiff Issac and any other blacks who, in the future, may be denied equal access to housing under the defendant's control"). Because Defendants' racially discriminatory maintenance and marketing of REOs stems from their nationwide policies and practices (which do not vary by property or by metro area[18]), an injunction is required to change the underlying policies and practices—regardless of the number of properties at issue in this case.

 Finally, Plaintiffs' requested injunctive relief serves the public interest. The strong public interest in eradicating housing discrimination is well recognized. *See U.S. v. Matusoff Rental Co.*, 494 F. Supp. 2d 740, 756 (S.D. Ohio 2007) (citing *United States v. Edward Rose & Sons*, 384 F.3d 258 (6th Cir. 2004) (issuing injunction in FHA case)); *see also Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205 (1972); *Spann*, 899 F.2d at 31 (FHO plaintiffs' "interests [ ] overlap with the public interest . . . embodied in

---

[18] *See, e.g.*, ECF 287-1, BANA's Resps. to Pls.' 1st Phase III Set of Interrogs. at 9 (confirming that property maintenance, preservation and marketing of REOs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮); Ex. 49, Iafigliola Dep., 144:17–149:10, Jan. 28, 2022 (Safeguard's former Vice President and current CFO stating that Safeguard's quality control inspectors were using the same inspection criteria for all properties in Safeguard's portfolio).

the [FHA]"); *Balt. Neighborhoods*, 92 F. Supp. 2d at 467 (FHA enforcement "vindicate[s] the public interest").

Defendants' contention that changing their policies and practices to prevent future racial discrimination would not serve the public interest is baseless. In particular, Defendants' claim that they cannot comply with HUD's requirements while avoiding racial discrimination strains credulity. They point to a single element of the FHOs' requested injunctive relief—the expansion of allowable expenses—to argue that the proposed injunction is incompatible with HUD requirements. Defs.' MSJ at 48. But there is no evidence that BANA is prohibited from self-funding an expanded set of allowable expenses for its REOs. In any event, the details of the Court's injunction are best sorted out following further factual development at trial. As this Court has previously stated, "[w]hile the appropriate type and scale of any remedy may require further discussion, it is within the court's power to issue the injunctive, declaratory, and monetary relief sought." *NFHA I* at 627.

## IV.    This Court should continue to exercise personal jurisdiction over Defendants.

This Court has already held that it can properly exercise personal jurisdiction over Defendants; there is no reason to disturb that prior holding. *See Arizona v. California*, 460 U.S. 605, 618 (1983) (explaining that, under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). Although this case has progressed through discovery since the Court denied Defendants' motion to dismiss for lack of personal jurisdiction, there has been no change to the facts on which that ruling was predicated. In exercising personal jurisdiction over Defendants, the Court did not assume that all or most of the harm in this case occurred in Maryland. Indeed, it acknowledged that only "some of the alleged harm happened" in Maryland and that "the precise fraction of nationwide harm that occurred in Maryland" was irrelevant to the personal jurisdiction analysis. *NFHA I* at 629. Following several years of discovery, there has been no change to the facts on which this Court based its exercise of personal jurisdiction over Defendants: NFHA and the three individual Maryland resident plaintiffs suffered harm in Maryland because of Defendants' conduct in this state—and Defendants do not dispute this fact, s*ee* Defs.' Mem. at 50. Plaintiffs never alleged that

47

FHOs other than NFHA suffered harm in Maryland. *See* ECF 1. There is no new evidence that provides a basis for disturbing this Court's prior ruling.

Furthermore, this Court's holding was not based on uncertainty over the application of *Bristol-Myers*.[19] Judge Blake wrote that *"[e]ven if Bristol-Myers* applies" to this case, "the claims pled here by nonresidents involve injuries that occurred in Maryland and harm to Marylanders, to a degree sufficient to establish personal jurisdiction." *NFHA I* at 628–29 (emphasis added). She explained:

> The fact that some of the alleged harm happened here renders this case more closely analogous to *Keeton* than to *Bristol-Myers*. In *Bristol-Myers*, the Court found that there was no personal jurisdiction because the nonresident plaintiffs' claims "involv[ed] no in-state injury and no injury to residents of the forum State." Here, by contrast, as in *Keeton*, the claims made by nonresident plaintiffs involve harm that is alleged to have occurred in Maryland and to residents of Maryland as a result of actions taken by the defendants in or directed at Maryland. Under the same logic, this court has jurisdiction to entertain this case because it involves in-state injuries and injuries to residents of Maryland, irrespective of the precise fraction of nationwide harm that occurred in Maryland.

*Id.* (quoting *Bristol-Myers*, 582 U.S. at 266). Because this Court's exercise of personal jurisdiction over Defendants was not premised on any "uncertainty" over *Bristol-Myers* applying—it was based on an assumption that it applied—courts' treatment of *Bristol-Myers* since 2019 offers no basis for revisiting this Court's ruling.

Even if the Court's decision had been premised on the inapplicability of *Bristol-Myers* (which it was not), the Supreme Court has not ruled that *Bristol-Myers* applies to federal question jurisdiction cases in federal court, and there remains good cause to hold that it does not. *See Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 859 (N.D. Cal. 2018) ("[W]here a federal court presides over litigation involving a federal question, the due process analysis does not incorporate the interstate sovereignty concerns that animated *Bristol-Myers*.").

Regardless of *Bristol-Myers*' applicability or this Court's reasoning, Defendants have forfeited their personal jurisdiction defense through their extensive participation in the adjudication of this case. The cases Defendants rely on for their claim that the law has changed since this Court's 2019

---

[19] *Bristol-Myers Squibb Co. v. Superior Ct. of Cal..*, 582 U.S. 255, 262 (2017).

decision are from 2020 and 2021. *See* Defs.' Mem. at 50. If Defendants intended to continue contesting the Court's exercise of personal jurisdiction over them, they should have raised arguments based on these 2020 and 2021 cases much earlier, and certainly before moving for summary judgment on the merits of this case in May 2022, ECF Nos. 166 & 167. By failing to challenge personal jurisdiction while affirmatively seeking relief from this Court, Defendants forfeited their personal jurisdiction defense. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704–05 (1982) (Personal jurisdiction defense can be waived where defendants' actions "amount to a legal submission to the jurisdiction of the court"); *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011) ("'[T]he voluntary use of certain [district] court procedures' serve[s] as 'constructive consent to the personal jurisdiction of the [district] court.'"; *PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 460–61 (5th Cir. 2001) ("[W]hen 'a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter.'" (quoting *Bel-Ray Co.*, *v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 443 (3d Cir. 1999))); *Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co.*, No. 99-4042, 2000 WL 147392, at *3 (10th Cir. 2000) ("After its lengthy participation in this litigation, [and] efforts to seek affirmative relief . . . [defendant] may not pull its personal jurisdiction defense out of the hat like a rabbit." (internal quotation marks omitted)).

Finally, given that Defendants concede that this Court can exercise personal jurisdiction over them with respect to claims brought by NFHA and the Individual Plaintiffs, and the other FHO Plaintiffs bring the same claim as NFHA, arising out of a common nucleus of operative fact (the same investigation,[20] the same regression analysis,[21] and the same policies governing Defendants' maintenance and marketing of REOs nationwide[22]), this Court can also exercise pendent personal jurisdiction over Defendants with respect to the other Plaintiffs. The Fourth Circuit recognizes the doctrine of pendent personal jurisdiction, reasoning that "[o]nce [a] set of facts and defendants are

---

[20] *See* ECF 183-1, Decl. of L. Augustine at ¶¶ 6–17; ECF 183-5, Decl. of S. Smith at ¶¶ 4–5.

[21] *See* ECF 183-7, Ex. A, Rev. Expert Rpt. of Jacob Rugh at 2–4; *Id.* at Ex. A-3, 14–16.

[22] *See supra* at n.18.

legitimately before th[e] court . . . little would be gained by not requiring a defendant to defend against a certain type of theory superimposed upon those facts." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 628 (4th Cir. 1997). Although *ESAB* involved the exercise of pendent personal jurisdiction over state law claims, this Court has found that "the Fourth Circuit's rational in *ESAB* applies equally to exercising pendent personal jurisdiction over a fellow federal claim." *Int'l Union, United Mine Workers of Am. v. CONSOL Energy, Inc.*, 465 F. Supp. 3d 556, 580 (S.D.W. Va. 2020). As this Court reasoned, "[t]he defendant is already before the court on a matter with a common nucleus of operative fact, and the minimal burden is equivalent whether the pendent claim is a federal or a state claim." *Id.* The same holds true here. Dismissing the 19 FHOs' common claims and requiring them to file separate lawsuits in 19 different states—each with the same evidence and legal arguments—would create much more of a burden for both Defendants and the federal judiciary than continuing to handle this case before this Court.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion be denied.

Dated: August 28, 2024                    Respectfully submitted,

                                          _/s/ Jessica P. Weber_
                                          Jessica P. Weber (Fed. Bar No. 17893)
                                          Andrew D. Freeman (Fed. Bar No. 03867)
                                          Monica R. Basche (Fed. Bar No. 20476)
                                          Lauren A. DiMartino (Fed. Bar No. 22046)
                                          Brown, Goldstein & Levy, LLP
                                          120 East Baltimore Street, Suite 2500
                                          Baltimore, MD 21202
                                          Phone: 410-962-1030
                                          Fax: 410-385-0869
                                          jweber@browngold.com
                                          adf@browngold.com
                                          mbasche@browngold.com
                                          ldimartino@browngold.com

                                          Morgan Williams (*pro hac vice*)
                                          National Fair Housing Alliance
                                          1101 Vermont Avenue, NW, Suite 710
                                          Washington, DC 20005

Phone: 202-898-1661
mwilliams@nationalfairhousing.org

*Counsel for Plaintiffs*