# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | * |
| | * |
| Plaintiffs, | |
| v. | *    Civil Action No. SAG-18-1919 |
| BANK OF AMERICA, N.A., *et al.*, | * |
| Defendants. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFFS' RESPONSES TO DEFENDANT BANK OF AMERICA, N.A.'S**
**FIRST PHASE III SET OF INTERROGATORIES TO PLAINTIFFS**

Plaintiffs National Fair Housing Alliance; Housing Opportunities Project for Excellence, Inc.; Metro Fair Housing Services, Inc.; North Texas Fair Housing Center; Fair Housing Center of West Michigan; Fair Housing Continuum, Inc.; South Suburban Housing Center; H.O.P.E. Inc. d/b/a Hope Fair Housing Center; Metropolitan Milwaukee Fair Housing Council; Fair Housing Center of Central Indiana; Denver Metro Fair Housing Center; Fair Housing Opportunities of Northwest Ohio, Inc. d/b/a Toledo Fair Housing Center; Louisiana Fair Housing Action Center, Inc.; Fair Housing Advocates of Northern California; Housing Research and Advocacy Center d/b/a Fair Housing Center for Rights and Research; Fair Housing Center of Northern Alabama; Miami Valley Fair Housing Center; Connecticut Fair Housing Center; Fair Housing Council of Greater San Antonio; Fair Housing Center of the Greater Palm Beaches, Inc.

(collectively, the "Plaintiffs"),[1] by and through their undersigned counsel, submit these Answers to Bank of America, N.A.'s First Phase III Set of Interrogatories to Plaintiffs.

## GENERAL STATEMENT AND OBJECTIONS

The information in these Answers is provided in accordance with the provisions and intent of the Federal Rules of Civil Procedure, which require the disclosure of non-privileged facts within the recipient's custody or control that may contain information relevant to claims or defenses or lead to the discovery of relevant and admissible evidence.

By providing the information requested, Plaintiffs do not waive any objections to its admission into evidence, nor do they submit to the instructions and definitions listed at the beginning of the Interrogatories, except as those instructions and definitions specifically conform to the requirements of the Federal Rules and the applicable case law.

The word usage and sentence structure herein may be that of the attorney assisting in the preparation of these Answers, and thus they do not necessarily purport to be the precise language of the executing parties. The Answers set forth herein are based upon information that has been collected and/or reviewed for the purpose of responding to these Interrogatories.

Plaintiffs' objections and Answers to the Interrogatories are based on information now available to them. Plaintiffs reserve the right to amend, modify, or further supplement these objections and Answers if they obtain additional responsive information.

Plaintiffs object to each Interrogatory insofar as it calls for the disclosure of information: (1) protected by the attorney-client privilege; (2) protected as attorney work product; (3) that is trial preparation material; or (4) that was prepared in anticipation of litigation.

---

[1] Because Bank of America, N.A.'s First Phase III Set of Interrogatories to Plaintiffs is addressed only to the 20 Organizational Plaintiffs, only those Plaintiffs, and not the Individual Plaintiffs, supplied Answers to these Interrogatories.

Plaintiffs object to each Interrogatory insofar as it calls for information that is beyond the scope of the Court's Phase III Case Management Order (ECF No. 251).

As used in these Answers the following terms have the following meanings:

- "Bank of America" refers to Defendant Bank of America, N.A. and any of its divisions or subsidiaries.

- "REO" properties refers to residential foreclosure properties for which Bank of America was the owner of record.

- "Defendants" refers to Defendant Bank of America, N.A. and Defendant Safeguard Properties Management, LLC collectively.

Subject to and without waiver of the above general qualifications and objections which are hereby incorporated into each answer, Plaintiff responds to Defendant Bank of America, N.A.'s First Phase III Set of Interrogatories as follows:

## <u>ANSWERS TO INTERROGATORIES</u>

### <u>Interrogatory No. 1:</u>

Identify and describe the legal remedies to which You claim to be entitled in this Lawsuit, including all damages sought in this Lawsuit, any injunctive or non-monetary relief sought, and the legal or factual theories underlying those claimed damages or remedies. Your answer should, among other things, (i) identify, describe, and quantify each of the categories of damages and other remedies identified to the Court by Attorney Weber during the April 11, 2023 conference, including without limitation diversion of resources and money damages, frustration of mission damages, injunctive relief, punitive damages, litigation costs and attorneys' fees (see ECF No. 242-1 at 4–15); (ii) as to each category or damages or other remedies identified, identify the legal or factual theories underlying it; and (iii) if You cannot identify or describe any portion of the monetary and non-monetary damages and other remedies You seek in this Lawsuit or state the legal or factual theories underlying any of them, identify the information You need and from whom You need it to respond to this Interrogatory in full.

**Response to Interrogatory No. 1:**

Plaintiffs object to this Interrogatory on the grounds that discovery is ongoing and Plaintiffs anticipate adducing further information that may be responsive to this Interrogatory. Damages continue to accrue, and, therefore, Plaintiff anticipates obtaining further information that may be responsive to this request and will supplement its response at a later date to include additional information and documents as necessary. Plaintiffs also object to the extent that this Interrogatory calls for premature disclosure of expert opinions that may be presented in an expert report on damages. Plaintiffs further object that the Interrogatory is impermissibly compound. In addition, Plaintiffs object to this Interrogatory to the extent that it seeks information protected by the attorney-client privilege and/or work product. In particular, this Interrogatory's request to provide "the legal . . . theories" underlying certain claims improperly requests protected work product. *See Ferruccio v. Davis*, No. 5:19-CV-346-BO, 2020 WL 6706354, at *3 (E.D.N.C. Nov. 13, 2020) (A party is "not required to do [the opposing party's] legal research for [it]."); *Gilmore v. City of Minneapolis*, No. 0:13-CV-1019-JRT-FLN, 2014 WL 4722488, at *6 (D. Minn. Sept. 22, 2014) (requiring a party "to produce relevant legal authorities goes beyond the permissible scope of a contention interrogatory and constitutes protected work product").

Subject to and without waiver of these objections, Plaintiffs state that they seek to recover damages for:

- **Diversion of resources:** Diversion of resources relates to the time and resources spent identifying and counteracting Defendants' discriminatory conduct—in other words, "the drain on the organization's resources" resulting from having "to identify and counteract the defendant's [sic] racially discriminatory . . . practices." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

    o Plaintiffs expended significant time investigating the Defendants' REO

maintenance and marketing practices and educating the public regarding the discriminatory conduct uncovered. As a result of this expenditure of time and resources, Plaintiffs were forced to divert limited resources and time away from other intended projects and programs, and to delay, suspend, or cancel programming. Defendants' discriminatory conduct caused Plaintiffs to forego opportunities including: consulting opportunities, conferences/education/staff development, coalition meetings, funding applications, education, counseling, investigation, and capacity-building activities and services; executing new fair housing advocacy projects or investigations; conducting additional consulting and training of housing providers; advocacy efforts to help expand fair and equal access to quality, sustainable credit; advocacy and educational activities to address the growing racial homeownership and wealth gap; advocacy and educational activities to reduce the transfer of single-family homes to investors since this transfer greatly and negatively impacts the supply of affordable housing for families and in communities of color; and advocacy and educational efforts to assist municipalities, public housing authorities, federal agencies, and other stakeholders in affirmatively furthering fair housing to reduce housing discrimination and residential segregation in accordance with the Fair Housing Act. Plaintiffs also engaged in significant community outreach and public efforts to address and attempt to counteract the effects of Defendants' discriminatory conduct including: organizing and conducting trainings for housing providers, municipal housing employees, HUD housing counseling agency staff, and the general public in affected areas; meeting with local government officials

regarding REO maintenance and marketing; preparing and publishing brochures/reports on Defendants' discriminatory REO maintenance and marketing practices; creating public service announcements and advertising; designing specialized mailings; and participating in community events and engaging with media to raise awareness of REO-related issues. Plaintiffs will produce non-privileged documents related to this category of damages, including, but not limited to documents reflecting a summary of each organizations' diversion of resources related to damages and identifying activities, staff involved, time spent, and hourly rates; a description of foregone opportunities and funding, the achievement of which would have substantially furthered Plaintiffs' organizational goals; and a description of actions taken to counteract Defendants' discriminatory conduct.

- **Frustration of Mission:** Frustration of mission is the harm the Defendants' discriminatory conduct caused by diminishing the organization's range of services and impairing the organization's mission to promote an equal housing market and fair housing choice. *See Havens Realty*, 455 U.S. at 379.

  o Plaintiffs have expended their own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts in neighborhoods with Bank of America REO properties negatively impacted by foreclosures. Plaintiffs' financial investments in community development, homeownership promotion, and neighborhood stabilization efforts have been undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in those communities. The damage Defendants'

discriminatory conduct inflicted will require Plaintiffs to implement corrective measures to remedy the damage to the minority communities Plaintiffs serve. Plaintiffs will provide documents on a rolling basis related to this category of damages, including, but not limited to documents reflecting a description of harm through frustration of Plaintiffs' mission as a result of interference with Plaintiffs' activities, programs and services; harm to their clients and client communities; and impairment of Plaintiffs' broader goals and organizational missions.

- **Injunctive Relief:** Plaintiffs seek injunctive relief to remedy the harm caused by Defendants' discriminatory maintenance, marketing, and disposition of REO properties for which they are responsible and to prevent this discriminatory conduct from reoccurring in the future. The precise terms of Plaintiffs' proposed injunctive relief will depend on further factual development in this case, including testimony at trial, as well as possible expert testimony on this subject, but will include the following general categories of relief to require Defendants to do the following with respect to the exterior maintenance, marketing, and disposition of REO properties for which they are responsible:

  o Use local vendors for exterior maintenance and marketing work to the extent possible, with a documented increase in the percentage of local vendors used;

  o Increase the frequency of in-person reviews of exterior maintenance work;

  o Increase the percentages of unannounced, in-person quality control inspections for REO homes in majority non-white census tracts;

  o Require exterior maintenance vendors to provide sub-contractor scorecards on a regular basis;

7

o   Expand the types of allowable expenses for exterior maintenance work, including but not limited to include fence repair, high-quality materials for handrail installation, light/doorbell replacement, power washing, gutter repair, windowpane re-glaze, wooden step repair, exterior deck repair, graffiti removal, and exterior door maintenance;

o   Require exterior maintenance vendors to use polycarbonate "clear boarding" as the default method for boarding any windows or doors where boarding rather than re-glazing is needed, such as when boarding is required by local ordinances;

o   Adopt procedures and implement programs that prioritize homeownership and neighborhood stabilization in REO sales, including but not limited to residential mortgage special purpose credit programs;

o   Maintain and widely communicate a toll-free phone number for reporting both public and vendor complaints, (on an anonymous basis if requested) regarding REO homes' preservation, maintenance, or marketing and report to Plaintiffs on a quarterly basis a summary of these complaints and Defendants' responses;

o   Expand and widely promote Bank of America's First Look program for REO sales to give buyers looking to purchase an owner-occupied primary residence, buyers using public funds, and non-profit partners of a public entity a 60-day exclusivity period from the time the property is listed both on Bank of America's website and on a publicly available Multiple Listing Service;

o   Make bulk sales of REOs to investors a disfavored option of last resort, with procedures that must be followed to ensure sufficient efforts were made to market and promote the properties to buyers looking to purchase an owner-occupied

8

primary residence before a bulk sale is permitted;

o   Enhance enforcement of policies requiring compliance with fair housing law;

o   Require training on fair housing law for all of Defendants' employees,
    contractors, or other agents who conduct any work related to the preservation,
    maintenance, or marketing of REO properties, and engaging the National Fair
    Housing Alliance to develop and implement these trainings at NFHA's customary
    hourly rates; and

o   Establish or enhance current data collection practices to gather quantifiable
    information on the exterior maintenance, marketing, and disposition of REO
    properties across census tracts, routinely analyzing this data for racial disparities;
    enhance the review of this data; and share these findings and any remedial actions
    taken in quarterly reports to Plaintiffs.

Plaintiffs will further ask the Court to order monitoring of Defendants' compliance with the Court's injunction, with all monitoring and enforcement fees to be paid by Defendants.

Plaintiffs also seek to recover punitive damages and attorneys' fees and costs as provided for by the Fair Housing Act. 42 U.S.C. § 3613(c).

Plaintiffs will make expert reports available providing further details on the categories listed above in accordance with the Federal Rules of Civil Procedure and the expert discovery schedule set by the Court. Plaintiffs will provide non-privileged information and documents related to the damages they have incurred, including a summary of diversion of resources, information regarding the persons whose time was diverted and their hourly rates, information regarding the frustration of Plaintiffs' missions and other pertinent documents and information. Plaintiffs further state that at this time, Plaintiffs provide the detailed information contained in

Exhibits A and B regarding their claims for damages. Summaries of the time and resources

Plaintiffs diverted as a result of the investigation that led to this Lawsuit are being produced as

part of Plaintiffs' rolling production.

**Interrogatory No. 2:**

Identify the name, address, telephone number, and email address of each individual likely to have evidence or discoverable information that You may use to support Your claims in this Lawsuit, including without limitation all persons with knowledge or information concerning the legal remedies to which You claim to be entitled in this Lawsuit, all damages sought in this Lawsuit, any injunctive or non-monetary relief sought, and the legal or factual theories underlying those claimed damages or remedies.

**Response to Interrogatory No. 2:**

Plaintiffs object to this Interrogatory to the extent that it seeks information protected by

the attorney-client privilege and/or work product. In particular, this Interrogatory's request to

provide "the legal . . . theories" underlying certain claims improperly requests protected work

product. *See Ferruccio v. Davis*, No. 5:19-CV-346-BO, 2020 WL 6706354, at *3 (E.D.N.C.

Nov. 13, 2020) (A party is "not required to do [the opposing party's] legal research for [it].");

*Gilmore v. City of Minneapolis*, No. 0:13-CV-1019-JRT-FLN, 2014 WL 4722488, at *6 (D.

Minn. Sept. 22, 2014) (requiring a party "to produce relevant legal authorities goes beyond the

permissible scope of a contention interrogatory and constitutes protected work product").

Plaintiffs also object to this Interrogatory as overly broad and unduly burdensome because it

arguably encompasses not only the large number of people at each organization who were

involved in the investigation that led to this Lawsuit, but also individuals who happened to be

present when this Lawsuit was discussed or were otherwise exposed to information about this

Lawsuit. Plaintiffs also object that this Interrogatory is premature because it calls for the

disclosure of expert witnesses in advance of the deadline set by the Court in the Phase III Case

Management Order (ECF No. 251); Plaintiffs will disclose Phase III expert witnesses in

accordance with the schedule set by the Court. Further, Plaintiffs object to this Interrogatory to the extent it requests information already in Bank of America's possession, custody, and control. Subject to and without waiving the foregoing objections, Plaintiffs provide the detailed information contained in Exhibit C.

**Interrogatory No. 3:**

Identify the name, address, telephone number, and email address of each individual You, Your counsel, or anyone else acting on Your behalf contacted in an effort to obtain evidence or discoverable information in support of Your claims in this Lawsuit.

**Response to Interrogatory No. 3**:

Plaintiffs object to Interrogatory No. 3 to the extent that it seeks information protected by the attorney-client privilege and work product doctrine. Because it is protected work product, Plaintiffs will not disclose the identities of all individuals they contacted in pursuit of interviews, witness statements, or other evidence. *See Gerber v. Down East Comty. Hosp.l*, 266 F.R.D. 29, 36 (D. Me. 2010). Plaintiffs also object on the grounds that "individual" is not defined, but they interpret it broadly to include both persons and entities. Subject to and without waiving these objections, Plaintiffs have submitted public information requests to the following entities:

- Baltimore City Council

- Prince George's County Police Department

- Baltimore City Fire Department

- Prince George's County Fire Department

- Baltimore City Department of Housing and Community Development

- Prince George's County Department of Permitting, Inspections, and Enforcement

- Prince George's County Council

- Prince George's County Office of Community Relations

11

- Baltimore City Sheriff's Office

- Baltimore City Department of Public Works

- Prince George's County Department of Public Works and Transportation

- Prince George's County Office of the Sheriff

- City of Annapolis

- Anne Arundel County

- Baltimore County

- Howard County Health Department

- City of New Haven

- City of West Haven

- City of Memphis

- Shelby County Attorney's Office

- City of Fort Worth

- District of Columbia

- Town of Collierville, TN

- U.S. Department of Housing and Urban Development

- City of Milwaukee

The contact information for the individuals responsible for information requests at each

of these entities is publicly available.

Plaintiffs further state that they have contacted:

- Justin Chappell, 1220 Orchard Lane, Ennis, TX 75119, (214) 554-8358, bham_style22@yahoo.com

- Neighbors of certain REO properties investigated, as disclosed in their prior production of documents related to communications with REO neighbors.

**Interrogatory No. 4:**

Provide a full accounting of how You spent or allocated Your respective share(s) of any settlement payment You received from anybody arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties (including but not limited to the 2022 Settlement Agreement and General Release with Fannie Mae and the 2013 Conciliation Agreement with Wells Fargo Bank, N.A.), including but not limited to accountings and descriptions of how You spent or intend to spend any amounts therein designated "to address community needs, as determined by Plaintiffs" and for "programs and services to promote home ownership, neighborhood stabilization, property rehabilitation, and development in communities of color."

**Response to Interrogatory No. 4:**

Plaintiffs object to this Interrogatory as seeking information that is not relevant nor likely to lead to the discovery of relevant evidence and is not proportional to the needs of the case because, under the collateral source rule, "a tort award should not be offset by compensation that a plaintiff receives from another source." *Baltimore Neighborhoods, Inc. v. LOB, Inc*., 92 F. Supp. 2d 456, 465 n.9 (D. Md. 2000). Furthermore, Plaintiffs object that the term "full accounting" is vague and ambiguous. Subject to and without waiving these objections, Plaintiffs provide information regarding the use and allocation of the settlement funds referred to in the Interrogatory in Exhibit D. In addition, documents showing the allocation and use of the settlement funds referred to in the Interrogatory are being produced as part of Plaintiffs' rolling production.

**Verification**

I HEREBY AFFIRM under the penalty of perjury that the information contained herein is true to the best of my knowledge, information, and belief.

Lisa Rice, National Fair Housing Alliance

Keenya Robertson, Housing Opportunities Project for Excellence, Inc.

Gail Williams, Metro Fair Housing Services, Inc.

Frances Espinoza, North Texas Fair Housing Center

Nancy Haynes, Fair Housing Center of West Michigan

David Baade, Fair Housing Continuum, Inc.

John Petruszak, South Suburban Housing Center

Michael Chavarria, H.O.P.E. Inc. d/b/a Hope Fair Housing Center

Erika Sanders, Metropolitan Milwaukee Fair Housing Council

14

Amy Nelson, Fair Housing Center of Central Indiana

Veronica Barela, Denver Metro Fair Housing Center

George Thomas, Fair Housing Opportunities of Northwest Ohio, Inc. d/b/a Toledo Fair Housing Center

Cashauna Hill, Louisiana Fair Housing Action Center, Inc.

Caroline Peattie, Fair Housing Advocates of Northern California

Kris Keniray, Housing Research and Advocacy Center d/b/a Fair Housing Center for Rights and Research

Lila Hackett, Fair Housing Center of Northern Alabama

Jim McCarthy, Miami Valley Fair Housing Center

Greg Kirschner, Connecticut Fair Housing Center

Sandra Tamez, Fair Housing Council of Greater San Antonio

Vince Larkins, Fair Housing Center of the Greater Palm Beaches, Inc.

*/s/ Jessica P. Weber*

Jessica P. Weber (Fed. Bar No. 17893)
Andrew D. Freeman (Fed. Bar No. 03867)
Monica R. Basche (Fed. Bar No. 20476)
Lauren A. DiMartino (Fed. Bar No. 22046)
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
jweber@browngold.com
adf@browngold.com
mbasche@browngold.com
ldimartino@browngold.com

*/s/ Morgan Williams*

Morgan Williams (pro hac vice)
NATIONAL FAIR HOUSING ALLIANCE
1101 Vermont Avenue, NW, Suite 710
Washington, DC  20005
Phone: 202-898-1661
mwilliams@nationalfairhousing.org

*Counsel for Plaintiffs*

Dated:  July 14, 2023

16

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 14, 2023, copies of the foregoing Plaintiffs' Answers to Defendant Bank of America, N.A.'s First Set of Phase III Interrogatories to Plaintiffs were served by email on:

> Ava E. Lias-Booker
> Melissa O. Martinez
> MCGUIRE WOODS LLP
> 500 East Pratt Street, Suite 1000
> Baltimore, Maryland 21202
> Phone: 410-659-4430
> Fax: 410-659-4599
> alias-booker@mcguirewoods.com
> mmartinez@mcguirewoods.com
>
> Anthony M. Alexis, Sr.
> Brooks R. Brown
> Keith Eric Levenberg
> Thomas M. Hefferon
> GOODWIN PROCTOR LLP
> 901 New York Avenue, NW
> Washington, DC 20001
> Phone: 202-346-4000
> Fax: 202-346-4444
> aalexis@goodwinlaw.com
> bbrown@goodwinlaw.com
> klevenberg@goodwinlaw.com
> thefferon@goodwinlaw.com
>
> *Counsel for Defendant Bank of America, N.A.*

and

> Maryan Alexander
> WILSON ELSER MOSKOWITZ &
> DICKER LLP
> 500 East Pratt Street, Suite 600
> Baltimore, Maryland
> Phone: 410-962-7385
> Fax: 410-962-8758
> maryan.alexander@wilsonelser.com

David M. Holmes
Jacob Graham
WILSON ELSER MOSKOWITZ &
DICKER LLP
55 W. Monroe Street, Suite 3800
Chicago, IL 60603
Phone: 312-821-6119
Fax: 312-704-1522
david.holmes@wilsonelser.com

*Counsel for Defendant Safeguard Properties Management, LLC*

    */s/ Jessica P. Weber*
Jessica P. Weber

# EXHIBIT A

**EXHIBIT A**

**INFORMATION REGARDING NFHA'S DAMAGES IN RESPONSE TO BANK OF AMERICA'S PHASE III INTERROGATORY NO. 1**

**The information below is supplemental to documents and information provided by NFHA in the form of its diversion summary and expenses, time records, and other documents bearing on diversion of resources and frustration of mission damages, as well as expert testimony that will be presented.**

**NFHA – DIVERSION OF RESOURCES**

Plaintiff NFHA seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance, management, and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From 2009 to 2018, Plaintiff conducted research into REO practices concerning the maintenance, marketing, and management of REO properties and Bank of America's and Safeguard's practices;
- From 2009 to 2017, Plaintiff identified over 1,200 of Defendants' REO properties in its service area and trained its staff to conduct an investigation of those properties;
- From 2010 to 2018, Plaintiff investigated Defendants' REO properties and analyzed the results of that investigation;
- From 2011 to 2021, Plaintiff interviewed witnesses regarding Defendants' discriminatory conduct;
- Since at least 2009 to at least 2017, Plaintiff engaged in periodic meetings with REO property and real estate representatives and service vendors to educate them about issues related to the discriminatory maintenance, marketing, and management of REO units and encourage and ask industry operators to alter their programs, procedures, protocols, and activities in order to comport with fair housing and anti-discrimination laws and regulations;
- From 2009 to present, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign;
- From at least 2011 through the present, Plaintiff met with local, state, and federal government officials (including the Federal Reserve Board, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, public officials, and elected leaders, Maryland House of Representatives, and at least 10 local governments/jurisdictions) to educate them on Defendants' discriminatory conduct and the impact on the communities NFHA serves;
- From 2015 to 2016, Plaintiff provided information about measures municipalities could take to address the negative impacts of Defendants' discriminatory actions;
- From at least 2011 to present, Plaintiff undertook many activities to educate the public about the impacts of Defendants' actions, including meeting with reporters to discuss the

1

harms of discriminatory maintenance, marketing, and management of REO units;

- Plaintiff authored and distributed at least three reports (dated April 11, 2011; April 2, 2012; and August 27, 2014) about discrimination in maintenance and marketing of REO properties, which were subsequently mailed to at least thirty-five local and state governments;
- From 2009 to 2015, Plaintiff conducted numerous fair housing trainings regarding REO maintenance for real estate professionals, bank employees, and other housing industry professionals;
- Plaintiff planned and sponsored a conference on REO maintenance, held on September 8, 2014;
- Plaintiff's staff served as keynote speakers and/or presented on numerous panels regarding the economic impact of discriminatory REO maintenance including but not limited to conferences held by various banking institutions and mortgage market participants, the Center for Community Progress, the National Association of Real Estate Brokers, the National Association of Hispanic Real Estate Professionals, the Association of Real Estate License Law Officials, and the White House;
- Plaintiff authored a book chapter in *From Foreclosure to Fair Lending* regarding discrimination in REO maintenance, entitled "A Tale of Two Recoveries: Discrimination in the Maintenance and Marketing of REO Properties in African American and Latino Neighborhoods Across America"; and
- From 2011 to 2014 (and thereafter 2017, 2018, and 2020), Plaintiff produced annual Fair Housing Trends Reports which highlighted the harms and challenges to communities and consumers caused by the improper and discriminatory maintenance, management, or marketing of REO units.

Plaintiff will provide a summary of diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time, and Plaintiff will also provide an expense log in the course of its rolling production. The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Role | Rate |
|---|---|---|
| Amrita Narasimhan | Special Projects Enforcement Coordinator | $225 |
| Anne Houghtaling | Director of Enforcement and Investigations | $400 |
| Arlene Reidy | Lending Analyst | $200 |
| Ben Clark | Project Coordinator for Public Policy & Communications | FY2011: $43.75 |
| Brynne Madway | Project Coordinator | $200 |
| Cathy Cloud | Senior Advisor to the President and CEO | Pre-FY2018: $400<br>FY2018 Onward: $450 |
| Cedrick Ricks | Communications Associate | FY2012: $38.50<br>FY2013: $38.51 |
| Cheryl Taylor | Senior Administrator | FY2012-2013: $51.66<br>FY2015: $54.24<br>FY2016: $55.88 |
| Chiamaka Chukwu | Product Analyst | $250 |
| Claudia Vila | Enforcement Program Coordinator | $200 |
| Dana Lockwood | Data Engineer | $250 |
| Debby Goldberg | Vice President of Housing Policy & Special Projects | Pre-FY2018: $400<br>FY2018 Onward: $450 |
| Deidre Swesnik | Director of Public Policy and Communications | FY2012: $84.71<br>FY2013-2014: $86.03 |
| Diane Cipollone | Consultant | FY2013-2015: $77.44 |
| Jameel Khan | Associate Data Scientist | $250 |
| Jade Graver | Enforcement Project Specialist | $200 |
| Jessica Aiwuyor | Associate Director of Communications | FY2017-2019: $48.64 |
| Jorge Soto | Associate Vice President of Advocacy & Government Affairs | FY2012: $38.51<br>FY2015: $42.46 |
| Justin Monteiro | Vice President of Enforcement | Pre-FY2018: $200<br>FY2018: $225<br>FY2019: $250<br>FY2020 Onward: $450 |

3

| Katherine Sullivan | Education and Outreach Coordinator | FY2009: $34.41<br>FY2012: $39.70 |
|---|---|---|
| Kevin Paul | Communications Associate | FY2014: $31.81<br>FY2015: $32.35 |
| Lara Adekeye | Project Coordinator | $100 |
| Lindsay Augustine | Senior Associate Director of Enforcement | Pre-FY2018: $200<br>FY2018-FY2020: $225<br>FY2020-Onward: $250 |
| Lisa Govoni | Lending Investigation Specialist | $200 |
| Lisa Rice | President and CEO | Pre-FY2018: $400<br>FY2018-FY2019: $450<br>FY2019 Onward: $500 |
| Madeline Hoffman | Associate Vice President of Compliance | Pre-FY2018: $200<br>FY2018: $225<br>FY2019 Onward: $250 |
| Madeline McBride | Project Coordinator | FY2020: $43.23 |
| Maria Dewees | Research Assistant | FY2015-2016: $30.52 |
| Maria Moreno | Associate Director of Enforcement and Investigations | $200 |
| Michael Akinwumi | Chief Tech Equity Officer | $500 |
| Mornita Dunson-Coleman | Executive Assistant to the President and CEO | $100 |
| Naweed Lemar | Communications Associate | FY2014: $33.00 |
| Pablo Zatarain | Project Coordinator | $200 |
| Pamela Bond | Director of Communications | FY2016-2017: $70.42 |
| Quisharn Hamilton | Fair Housing / Fair Lending Specialist | $200 |
| Rachael Deane | Associate Director of Enforcement and Investigations | $200 |
| Shanna Smith | President and CEO | Pre-FY2018: $400<br>FY2018 Onward: $450 |
| Shanti Abedin | Director of Inclusive Communities | $200 |

| Sherrill Frost Brown | Vice President of Member Services and Community Development | $400 |
|---|---|---|
| Shivaughn Ferguson | Senior Associate Director of Enforcement and Investigations | Pre-FY 2018: $200<br>FY2018 Onward: $225 |
| Yvonne Lewis | Administrative Support | FY2011: $27.14<br>FY2012: $28.61<br>FY2013: $30.04<br>FY2014: $31.54<br>FY2015: $33.13<br>FY2016: $34.79<br>FY2017: $35.83<br>FY2018: $36.89<br>FY2019: $37.64<br>FY2020: $38.77 |

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

**NFHA – FRUSTRATION OF MISSION DAMAGES**

Plaintiff NFHA is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2009 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals. Defendants' discriminatory maintenance, marketing, and managing practices harmed Plaintiff's constituents and constituent communities by hindering Plaintiff's ability to create, develop, and support diverse and inclusive neighborhoods replete with the opportunities and resources people need to thrive. Defendants' actions thwarted Plaintiff's clients' and client communities' access to fair and equal housing and their ability to live in racially-integrated communities, which is part of NFHA's core services.

NFHA has expended its funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts across the nation. NFHA's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in those communities.

Defendants' discriminatory maintenance, marketing, and management practices frustrated Plaintiff's missions and goals of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination;
- Educating the public about fair housing;
- Increasing critical resources, like parks, recreational facilities, bank branches, healthcare facilities, fresh food sites, etc. in under-served communities;
- Increasing the supply of safe, affordable, quality housing;
- Increasing homeownership access for communities of color;
- Increasing the supply of accessible, affordable housing for people with disabilities;
- Advancing policies to expand access to safe, quality, affordable credit;
- Preventing displacement and housing instability; and
- Promoting fair housing and fair lending.

The funds and time expended on the activities undertaken, as described below, are only one factor relevant to the measure of Plaintiff's frustration damages and show the ways that Defendants' conduct frustrated NFHA's mission. The funds and time expended reflect efforts NFHA has pursued to stabilize its constituents' communities and are further relevant to the harm caused by Defendants' conduct. NFHA fulfilled its mission to invest in communities and stabilize neighborhoods by giving grants to local organizations to conduct the community investment and neighborhood stabilization programs described below. NFHA staff, including specifically Shanti Abedin, Sherrill Frost-Brown, Shanna Smith, Lisa Rice, and Cathy Cloud, planned for this grant-making process, identified organizations to conduct this work, made grants, and oversaw their implementation. The following is a non-exhaustive list of grants NFHA made to fulfill its community stabilization mission:

6

- <u>Community Housing Development Corporation, Oakland, California</u>: NFHA gave Community Housing Development Corporation a $100,000 grant to conduct homeownership promotion, neighborhood stabilization, property rehabilitation, and property stabilization in 2013-2014.
- <u>Hello Housing, Oakland, California</u>: NFHA gave Hello Housing a $47,500 grant to implement an anti-displacement program for residents who were in default or foreclosure in 2014.
- <u>Catholic Charities of the East Bay, Oakland, California</u>: NFHA gave Catholic Charities of the East Bay a $250,000 grant to implement a tenant anti-displacement fund to provide rental housing assistance grants for families struggling due to rapidly rising rental housing prices in 2014-2015.
- <u>Martin Luther King Jr. Freedom Center, Oakland, California</u>: NFHA gave Martin Luther King Jr. Freedom Center a $45,000 grant to implement a Summer Leadership Program including ethical leadership and community development civic engagement components. The civic engagement component included having program participants conduct door-to-door foreclosure education and prevention through the program's anti-foreclosure campaign in 2014-2015.
- <u>Oakland Citizens Committee for Urban Renewal, Oakland, California</u>: NFHA gave Oakland Citizens Committee for Urban Renewal a $36,000 grant to implement a foreclosure recovery community outreach program and educate the public on foreclosure and tenant resources in 2014-2015.
- <u>The Unity Council Homeownership Center, Oakland, California</u>: NFHA gave The Unity Council Homeownership Center a $606,693.74 grant to prevent foreclosures through counseling and forgivable loans for distressed borrowers in 2014-2015.
- <u>Urban Strategies Council, Oakland, California</u>: NFHA gave Urban Strategies Council a $16,014.50 grant to create a Housing Equity Roadmap with Policy Link by compiling research on the current demographics and conditions of Oakland's housing market, housing stock, and housing affordability in 2014-2015.
- <u>Policy Link, Oakland, California</u>: NFHA gave Policy Link a $40,000 grant to create a Housing Equity Roadmap with the Urban Strategies Council by compiling research on the current demographics and conditions of Oakland's housing market, housing stock, and housing affordability in 2014-2015.
- <u>Fair Housing Advocates of Northern California, Oakland, California</u>: NFHA gave Fair Housing Advocates of Northern California a $155,000 grant to conduct accessibility modifications in 2015-2020.
- <u>Housing and Economic Rights Advocates, Oakland, California</u>: NFHA gave Housing and Economic Rights Advocates a $135,985 grant to implement a home preservation fund and provide grants to distressed borrowers to avoid foreclosure or other home loss in 2016-2018.
- <u>Denver Metro Fair Housing Center, Denver, Colorado</u>: NFHA gave Denver Metro Fair Housing Center a $234,488.64 grant to conduct accessibility modifications in 2014-2020.
- <u>Home Builders Foundation of Metro Denver, Denver, Colorado</u>: NFHA gave Home Builders Foundation of Metro Denver a $213,949.15 grant to conduct accessibility modifications in 2014-2020.
- <u>Fair Housing Continuum, Orlando, Florida</u>: NFHA gave Fair Housing Continuum a $190,000 grant to conduct accessibility modifications in 2014-2017.

7

- Coalition for Independent Living Options, Inc., Greater Palm Beaches, Florida: NFHA gave Coalition for Independent Living Options, Inc. a $42,500 grant to conduct accessibility modifications in 2015-2016.
- Housing Opportunities Project for Excellence, Inc., Miami, Florida: NFHA gave Housing Opportunities Project for Excellence, Inc. a $137,059 grant to conduct accessibility modifications in 2016-2019.
- Space Coast Center for Independent Living, Orlando, Florida: NFHA gave Space Coast Center for Independent Living a $25,000 grant to conduct accessibility modifications in 2019-2020.
- HOPE Fair Housing Center, Chicago, Illinois: NFHA gave HOPE Fair Housing Center a $5,700 grant to conduct accessibility modifications in 2012.
- Rebuilding Together Indianapolis, Indianapolis, Indiana: NFHA gave Rebuilding Together Indianapolis a $112,052.74 grant to conduct accessibility modifications in 2012-2013.
- Fair Housing Center of Central Indiana, Indianapolis, Indiana: NFHA gave Fair Housing Center of Central Indiana a $299,532.54 grant to conduct accessibility modifications in 2012-2016.
- St. Ambrose Housing Aid Center, Baltimore, Maryland: NFHA gave St. Ambrose Housing Aid Center a $1,154,470 grant to provide closing cost assistance to homebuyers as well as acquire and develop blighted and vacant houses and restore them for quality and affordable homeownership in 2013-2019.
- Housing Initiative Partnership, Prince George's County, Maryland: NFHA gave Housing Initiative Partnership a $754,600 grant to provide homeownership assistance in the form of down payment or closing costs as well as pre-purchase counseling, provide funding for existing homeowners needing home restorations or home repairs, and to subsidize the cost of development for new-construction townhomes from 2014-2020.
- Belair-Edison Neighborhoods Inc., Baltimore, Maryland: NFHA gave Belair-Edison Neighborhoods Inc. a $25,000 grant to conduct block clean-ups and block beautifications led by graduates of their Resident Market Leaders program from 2016-2018.
- Latino Economic Development Corporation, Prince George's County, Maryland: NFHA gave Latino Economic Development Corporation a $135,000 grant to provide homeownership assistance in the form of down payment or closing cost assistance, provide grants to homeowners at risk of losing their homes to foreclosure, and provide grants for security deposits and/or first month's rent to low- and moderate-income residents 2016-2019.
- Yachad, Prince George's County, Maryland: NFHA gave Yachad a $419,659.49 grant to implement a home repair program as well as fund accessibility modifications and home education programs in in 2016-2019.
- Legal Aid Society of Minneapolis, Minneapolis, Minnesota: NFHA gave Legal Aid Society of Minneapolis a $2,142.79 grant to conduct accessibility modifications in 2011.
- Congreso de Latinos Unidos, Philadelphia, Pennsylvania: NFHA gave Congreso de Latinos Unidos a $542,500 grant to provide rental and mortgage assistance in 2014-2019. Mortgage assistance included grants to reinstate loans and avoid foreclosure; rental assistance included grants for renters' first month rent or grants to avoid eviction.
- Ready, Willing, and Able, Philadelphia, Pennsylvania: NFHA gave Ready, Willing, and Able a $100,000 grant to provide rental assistance in the form of utility and security deposit grants as well conduct a housing survey of the organizations' program

8

participants who were entering the workforce and housing market after being homeless, incarcerated, and/or unemployed in 2016-2018.

- <u>United Communities Southeast Pennsylvania, Philadelphia, Pennsylvania</u>: NFHA gave United Communities Southeast Pennsylvania a $387,850 grant to provide rental and mortgage assistance in 2016-2019. Mortgage assistance included down payment and closing cost assistance grants and grants to reinstate loans and avoid foreclosure.
- <u>Pennsylvania Horticultural Society, Philadelphia, Pennsylvania</u>: NFHA gave Pennsylvania Horticultural Society a $184,090 grant to fund its Roots to Reentry program that works with people transitioning back into their communities from the Philadelphia Prison System with the tools and support they need to obtain meaningful employment in the horticulture, landscaping, and building trades in 2017-2019. Roots to Reentry program participants were trained to work with private landscape contractors and community organizations that clean, green, and maintain vacant land in Philadelphia as part of the Pennsylvania Horticultural Society's Philadelphia LandCare program.
- <u>Metanoia Inc., Charleston, South Carolina</u>: NFHA gave Metanoia Inc. a $590,000 grant to provide homeownership assistance in the form of pre-purchase counseling and closing cost assistance, provide grants for home repairs, construct new and accessible affordable housing units, and acquire and redevelop the Old Chicora Elementary School site in 2013-2018.
- <u>P.A.S.T.O.R.S. Inc., Charleston, South Carolina</u>: NFHA gave P.A.S.T.O.R.S., Inc. a $40,500 grant to provide homeownership assistance in the form of pre-purchase counseling and down payment or closing cost assistance in 2015.
- <u>Humanities Foundation, Charleston, South Carolina</u>: NFHA gave Humanities Foundation a $300,000 grant to provide rental assistance in 2016-2018.
- <u>Family Services, Inc., Charleston, South Carolina</u>: NFHA gave Family Services, Inc. a $419,610 grant to provide homeownership assistance in the form of down payment or closing cost assistance, foreclosure prevention grants, and rental assistance grants in 2016-2019.
- <u>North Texas Fair Housing Center, Dallas, Texas</u>: NFHA gave North Texas Fair Housing Center a $150,000 grant to conduct accessibility modifications together with Rebuilding Together Dallas in 2011-2012.
- <u>Home Survey Company</u>: NFHA gave Home Survey Company $1,600 to inspect home repairs, home weatherization, and accessibility modifications in 2009-2010.
- <u>Central American Resource Center, Washington, D.C.</u>: NFHA gave Central American Resource Center a $50,000 grant to provide homeownership assistance in the form of financial counseling and down payment or closing cost assistance as well as funding for emergency home repairs. Central American Resource Center used $25,000 on homeownership assistance and $25,000 on emergency home repairs in 2013-2014.
- <u>Yachad, Washington, D.C.</u>: NFHA gave Yachad a $961,833.01 grant to implement a home repair program as well as fund accessibility modifications and home education programs in 2014-2018. NFHA also gave Yachad a $267,807.43 grant to conduct accessibility modifications in the Washington, D.C. area in 2009-2016, and it gave Yachad a grant of $55,084.13 for 2009-2010 to conduct home repairs, home weatherization, and accessibility modifications there.
- <u>Latino Economic Development Corporation, Washington, D.C.</u>: NFHA gave Latino Economic Development Corporation a $240,608 grant to provide grants for security deposits and/or first month's rent to low- and moderate-income residents as well as hold

fair housing and tenant education clinics in 2016-2019.

- HandyPro of Washington DC, Washington, D.C.: NFHA gave HandyPro of Washington DC an $11,775 grant to conduct accessibility modifications in 2018.
- O'Neill Stairlifts, Washington, D.C.: NFHA gave O'Neill Stairlifts a $3,100 grant to conduct accessibility modifications in 2018.
- Wall to Wall Construction, Washington, D.C.: NFHA gave Wall to Wall Construction a $5,200 grant to conduct accessibility modifications in 2019.
- F&R Construction LLC, Washington, D.C.: NFHA gave F&R Construction LLC a $3,200 grant to conduct accessibility modifications in 2020.
- Homewise, Albuquerque, New Mexico: In January 2023, NFHA gave a $185,000 grant to Homewise to administer 18 down payment assistance grants to low- to moderate income residents of Albuquerque and provide financial education services. Grant funds will be fully disbursed and expended by Spring 2025.
- United South Broadway Corporation (USBC), Albuquerque, New Mexico: In January 2023, NFHA gave a $185,000 award to USBC to support foreclosure prevention and counseling activities. Grant funds will be fully disbursed and expended by Spring 2025.
- Habitat for Humanity of the Chesapeake, Baltimore, Maryland: In January 2023, NFHA awarded $185,000 to Habitat for Humanity of the Chesapeake to build on 9 vacant lots to create new affordable homeownership opportunities and support future residents with financial literacy education. Grant funds will be fully disbursed and expended by Spring 2025.
- St. Ambrose Housing Aid Center, Baltimore, Maryland: In January 2023, NFHA awarded a $185,000 grant to St. Ambrose Housing Aid center to provide 32 down payment assistance grants to create affordable homeownership units in revitalized, formerly vacant lots. Grant funds will be fully disbursed and expended by Spring 2025.
- Southeast CDC, Baltimore, Maryland: In January 2023, NFHA awarded Southeast CDC with $185,000 to serve as subsidy gap funds so that they can do a complete rehabilitation of up to 40 lots with 12 block events and providing housing counseling support. Grant funds will be fully disbursed and expended by Spring 2025.
- Charleston Area Urban League, Charleston, South Carolina: In January 2023, NFHA awarded the Charleston Urban League a grant of $185,000 so that they can provide 20 down payment assistance grants and a robust financial literacy curriculum for new homebuyers. Grant funds will be fully disbursed and expended by Spring 2025.
- Charleston Redevelopment Corporation, Charleston, South Carolina: In January 2023, NFHA awarded the Charleston Redevelopment Corporation a grant of $185,000 to support existing homeowners through a "common cause" loan fund that encourages homeownership preservation, and to provide 4 down payment assistance or construction subsidy grants for Palmetto Community Land Trust properties. Grant funds will be fully disbursed and expended by Spring 2025.
- Origin SC, North Charleston, South Carolina: In January 2023, NFHA awarded Origin SC a grant of $185,000 to provide 20 down payment or foreclosure prevention grants to existing or new homebuyers in Charleston and North Charleston. Grant funds will be fully disbursed and expended by Spring 2025.
- Habitat for Humanity Greater Kansas City, Kansas City, Missouri: In January 2023, NFHA awarded Habitat for Humanity of Greater Kansas City a grant of $185,000 to support 17 new affordable home builds and 80 critical repair projects. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Justine Petersen, Kansas City, Missouri</u>: In January 2023, Justine Petersen received a grant of $185,000 from NFHA to do credit building work, credit counseling services, and ultimately award 10 down payment assistance grants to low- and moderate-income clients in Kansas City. Grant funds will be fully disbursed and expended by Spring 2025.
- <u>Westside Housing Organization (WHO), Kansas City, Missouri:</u> In January 2023, NFHA awarded WHO a grant of $185,000 to conduct critical home repairs for a minimum of 12 existing homeowners in three historically redlined neighborhoods. Grant funds will be fully disbursed and expended by Spring 2025.
- <u>Neighborhood Housing Services of Southern Nevada, Las Vegas, Nevada</u>: In January 2023, NFHA awarded the NHS of Southern Nevada a grant of $185,000 for property acquisition and development of 4 homes for income-qualified families under their Blight to Bright program.

- <u>Homeownership Council of America, Las Vegas, Nevada:</u> In January 2023, NFHA awarded a grant of $185,000 to the Homeownership Council of America to create a new Special Purpose Credit Program that will provide down payment support for 50 new BIPOC homebuyers.
- <u>Community Ventures, Louisville, Kentucky</u>: In January 2023, NFHA awarded Community Ventures with a grant of $185,000 to provide low to moderate income buyers with pre- and post-purchase counseling and fixed-rate, below-market mortgage loans to 7-12 households. Grant funds will be fully disbursed and expended by Spring 2025.
- <u>New Directions, Louisville, Kentucky:</u> In January 2023, NFHA awarded a grant of $185,000 to New Directions to complete construction of affordable housing for homeownership for 3 first-generation buyers. Grant funds will be fully disbursed and expended by Spring 2025.
- <u>The Housing Partnership Inc (HPI), Louisville, Kentucky</u>: In January 2023, NFHA awarded a grant of $185,000 to HPI to renovate up to 40 vacant properties for affordable homeownership (and they are partnered with Community Ventures for affordable financing for qualified buyers). Grant funds will be fully disbursed and expended by Spring 2025.
- <u>Habitat for Humanity Memphis, Memphis, Tennessee</u>: In January 2023, NFHA provided Habitat Memphis with a grant of $185,000 to construct 16 new shared equity homes in formerly vacant lots to buyers with a zero-interest mortgage. Grant funds will be fully disbursed and expended by Spring 2025.
- <u>Center for Transforming Communities, Memphis, Tennessee:</u> In January 2023, NFHA provided a grant of $185,000 to support the construction of 3 new homes in the Binghamton Community Land Trust, plus 8 gap funding grants and 8 grants to support repairs for area existing residents/seniors. Grant funds will be fully disbursed and expended by Spring 2025.
- <u>The Works, Inc., Memphis, Tennessee</u>: In January 2023, NFHA awarded a grant of $185,000 to The Works to provide down payment assistance individual development accounts for 40 families in community land trust homes in the Klondike neighborhood of Memphis. Grant funds will be fully disbursed and expended by Spring 2025.
- <u>Neighborhood Development Alliance (NeDA), Minneapolis/St. Paul, Minnesota</u>: In January 2023, NFHA awarded a grant of $180,000 to NeDA to provide down payment assistance grants for residences with specific challenges to obtaining a mortgage loan due to the fact that they have Individual Tax Identification Numbers. Grant funds will be fully disbursed and expended by Spring 2025.
- <u>NeighborWorks Home Partners, Minneapolis/St. Paul Minnesota</u>: In January 2023, NFHA awarded a grant of $185,000 to support 16 first-generation down payment assistance grants

11

and created a pilot program using the funds that has resulted in a larger commitment from the state for a first-generation program. Grant funds will be fully disbursed and expended by Spring 2025.

- United Renters for Justice / Inquilinx Unidos Por Justicia (IX): In January 2023, NFHA awarded a grant of $185,000 to IX to rehabilitate 6 single-family owner occupied homes in North Minneapolis and support credit building, back payment, and other strategies to make homeowners ready for community land trust homeownership.  Grant funds will be fully disbursed and expended by Spring 2025.

- Housing Partnership, Homeownership Center, Newark, New Jersey: In January 2023, NFHA awarded the Housing Partnership, Homeownership Center (Housing Partnership of Morris County) with a grant of $185,000 to help 20 families through First-Time Homebuyers Matched Savings Program targeted to first-generation homebuyers, Spanish-speaking clients, working families, and BIPOC populations and provide a $10,000 match award to approximately 15 families at purchase. Grant funds will be fully disbursed and expended by Spring 2025.

- New Jersey Community Capital (NJCC), Newark, New Jersey: In January 2023, NFHA awarded NJCC with a grant of $185,000 to provide 5 down payment assistance grants of $30,000 - $35,000 each. Grant funds will be fully disbursed and expended by Spring 2025.

- Invest Newark, Newark, New Jersey: NFHA awarded Invest Newark with a grant of $185,000 in January 2023 to help build 25 rehabilitated properties for affordable homeownership. Grant funds will be fully disbursed and expended by Spring 2025.

- Latino Economic Development Center, Prince George's County, Maryland: NFHA awarded LEDC with a grant of $185,000 in January 2023. These funds will provide for homebuyer education courses, homeowner assistance and foreclosure prevention grants, and one-on-one housing counseling. Grant funds will be fully disbursed and expended by Spring 2025.

- Housing Initiatives Partnership, Prince George's County, Maryland. In January 2023, NFHA awarded a grant of $185,000 to the Housing Initiatives Partnership for the installation of manufactured housing and a pocket park to create an affordable "microgrid" community in the city of Fairmont Heights, Maryland. Grant funds will be fully disbursed and expended by Spring 2025.

- HomeFreeUSA, Prince George's County, Maryland: In January 2023, NFHA awarded HomeFreeUSA a grant of $185,000 to provide credit counseling for homeownership to 50 families. Grant funds will be fully disbursed and expended by Spring 2025.

- Habitat for Humanity Philadelphia, Philadelphia, Pennsylvania: In January 2023, NFHA awarded Habitat for Humanity Philadelphia with a grant of $185,000 to create 11 new units of affordable housing for low-income families to enter into homeownership. Grant funds will be fully disbursed and expended by Spring 2025.

- Mount Vernon CDC, Philadelphia, Pennsylvania: In January 2023, NFHA awarded Mount Vernon CDC a grant of $185,000 to support the development of 17 vacant rowhomes for affordable homeownership that will remain permanently affordable. Grant funds will be fully disbursed and expended by Spring 2025.

- Pennsylvania Horticultural Society (PHS), Philadelphia, Pennsylvania: In January 2023, NFHA awarded PHS with a grant of $185,000 to do "cleaning and greening" activities for 230 vacant lots to green space and engage residents around community gardens and workforce development in the construction and landscaping field.

- Fair Housing Rights Center of Southeastern Pennsylvania, Philadelphia, Pennsylvania: In January 2023, NFHA awarded $11,000 to the Fair Housing Rights Center of Southeastern

Pennsylvania to conduct counseling activities to support the resolution of tangled titles for Philadelphia residents. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Chicanos Por La Causa, Phoenix, Arizona</u>: In January 2023, NFHA awarded a grant of $185,000 to Chicanos Por La Causa to provide 19 low- to moderate-income first-time homebuyers with down payment assistance grants. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>RAIL Community Development Corporation, Phoenix, Arizona</u>: In January 2023, NFHA awarded a grant of $179,000 to the RAIL Community Development Corporation to provide 40 credit building accounts to low- to moderate-income families and to complete 4 placemaking community engagement events. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Trellis, Phoenix, Arizona</u>:    In January 2023, NFHA awarded a grant of $185,000 to Trellis to provide 8 down payment assistance grants to low to moderate income families. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Southwest Fair Housing Council, Phoenix, Arizona</u>: In February 2023, NFHA awarded a grant of $17,000 to the Southwest Fair Housing Council to support their usage of the NFHA Redlining Toolkit to examine redlining in the Phoenix market. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>ONE Neighborhood Builders, Providence, Rhode Island</u>: In January 2023, NFHA awarded a grant of $185,000 to ONE Neighborhood Builders to convert a 40,000 square foot parcel of land to create 8 townhouse style condominiums for affordable home purchase to income qualified buyers. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Providence Revolving Fund, Providence, Rhode Island</u>: In January 2023, NFHA awarded a grant of $185,000 to the Providence Revolving Fund to provide 15 homeowners with forgivable loans to do owner-occupied home repairs for homeownership preservation. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>CSA San Diego County, San Diego, California</u>: In January 2023, NFHA awarded a grant of $185,000 to CSA San Diego County to provide 20 down payment assistance or closing cost assistance grants to income qualified buyers, along with providing both pre- and post-purchase housing counseling.  Grant funds will be fully disbursed and expended by Spring 2025.

- <u>San Diego Housing Commission, San Diego, California</u>: In January 2023, NFHA awarded the San Diego Housing Commission with a grant of $184,000 so that they can provide 30 zero-interest credit building loans, 13 down payment assistance forgivable loans, and credit building services for 80 income-qualified households. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Urban League San Diego County, San Diego, California</u>: In January 2023, NFHA awarded a grant of $185,000 to the Urban League of San Diego County. The grant will provide down payment assistance to 12 clients as well as homeownership and counseling services to nearly 500 clients. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Pima County Land Trust, Tucson, Arizona</u>: In January 2023, NFHA awarded a grant of $185,000 to the Pima County Land Trust to build four 4 units for community land trust property ownership along with an accessory dwelling unit on each property. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Primavera Foundation, Tucson, Arizona</u>: In January 2023, NFHA awarded a grant of $185,000 to the Primavera Foundation to pilot a first-generation down payment assistance

program, rehabilitate three 3 lots for affordable purchase, and provide credit counseling and homebuyer education. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>SERI, Tucson, Arizona:</u> In January 2023, NFHA awarded SERI with a grant of $185,000 to provide owner-occupied and energy efficient repairs for 75 families through a revolving loan fund. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Southwest Fair Housing Council, Tucson, Arizona:</u> In January 2023, NFHA awarded a grant of $11,000 to the Southwest Fair Housing Council so that they can use the NFHA Redlining Toolkit to examine redlining in the Tucson market. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Jubilee Housing, Washington DC:</u> In January 2023, NFHA awarded a grant of $185,000 to Jubilee Housing to support tenant opportunity to purchase-site development. The funds will support three sites with 135 units for affordable ownership by tenants by 2025. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Manna Homes, Washington, DC:</u> In January 2023, NFHA awarded a grant of $185,000 to Manna Homes to complete pre- and early development of 30 units of affordable homeownership in DC's Ward 7. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Yachad, Washington, DC</u>: In January 2023, NFHA awarded a grant of $185,000 to Yachad to provide home remediation projects resulting in homeownership preservation and improved health outcomes for 25-30 intergenerational, owner-occupied households.

Defendants' discriminatory maintenance, marketing, and management practices also undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Establishment of industry best practices for REO maintenance and marketing;
- Training of industry stakeholders on REO best practices;
- Advocacy/outreach to city and state governments; and
- Education of community members regarding foreclosure, homeownership, neighborhood stabilization, etc.

In addition to the activities described above, Plaintiff's efforts to counteract Defendants' discriminatory conduct also included the following advocacy and public education efforts about the effects of REO properties on communities and best practices for managing and marketing REO properties:

- REO-Related News Conferences & News Releases:

| Date | Communications Type | Communication Activity |
|------|---------------------|------------------------|
| April 11, 2011 | News Conference (Online) & Press Release | NFHA published its first REO report titled "Here Comes the Bank, There Goes Our Neighborhood: How Lenders Discriminate in the Treatment of Foreclosed Homes" |
| April 4, 2012 | News Conference (Online) & Press Release | NFHA published its second REO report titled "The Banks Are Back, Our Neighborhoods Are Not: Discrimination in the Maintenance and Marketing of REO Properties" |
| Sept. 3, 2014 | Press Release | NFHA published its third REO report titled "Zip Code Inequality: Discrimination by Banks in the Maintenance of Foreclosed Homes in Neighborhoods of Color" |

- REO Reports:

| Date Published | Report Title |
|----------------|--------------|
| April 11, 2011 | NFHA published its first REO report titled "Here Comes the Bank, There Goes Our Neighborhood: How Lenders Discriminate in the Treatment of Foreclosed Homes" |
| April 4, 2012 | NFHA published its second REO report titled "The Banks Are Back, Our Neighborhoods Are Not: Discrimination in the Maintenance and Marketing of REO Properties" |
| Sept. 3, 2014 | NFHA published its third REO report titled "Zip Code Inequality: Discrimination by Banks in the Maintenance of Foreclosed Homes in Neighborhoods of Color" |
| Aug. 28, 2015 | NFHA published an update to its third REO report titled "2015 Update: Discrimination by Banks in the Maintenance of Homes in Communities of Color Remains a Barrier to Recovery" |

- REO-Related Counteraction & Education and Outreach Activities:
  Note, this list may be supplemented at a later date as additional entries are identified.

| Date | Type of Activity | Activity Title | Location | NFHA Staff |
|---|---|---|---|---|
| Jan. 13, 2011 | Meeting | NFHA held a meeting with Federal Reserve Board (FRB) governors to discuss ways that the FRB can use its authority and influence to prevent unnecessary foreclosures and help keep people in their homes | Washington, DC | Shanna Smith |
| Feb. 16, 2011 | Hearing | NFHA attended a Hearing before the US House of Representatives Committee on Financial Services regarding The Final Report of the Financial Crisis Inquiry Commission | Washington, DC | Shanti Abedin |
| May 4, 2011 | Meeting | NFHA met with New Vista Realty on REO investigation findings | Washington, DC | Shanti Abedin Ben Clark Deidre Swesnik |
| June 13, 2011 | Meeting | NFHA met with Phoenix Property Tours | Phoenix, AZ | Shanti Abedin Lisa Rice |
| Sept. 7, 2011 | Training | NFHA presented to the National Association of Hispanic Real Estate Professionals and provided a certified training on fair housing and REO issues | Phoenix, AZ | Shanna Smith |

| Sept. 13, 2011 | Radio Interview | NFHA interviewed on National Association of Hispanic Real Estate Professionals' radio program, "The Voice of Hispanic Real Estate" - radio piece titled "How Lenders Discriminate in the Treatment of Foreclosures" | Radio Interview | Shanna Smith |
|---|---|---|---|---|
| Sept. 20-21, 2011 | Conference | National Association of Hispanic Real Estate Professionals' Real Estate and Marketing Conference | Los Angeles, CA | Shanti Abedin Shanna Smith Pablo Zatarain |
| March 23, 2012 | Meeting | NFHA presented during a Consumer Federation of America Consumer Lender Roundtable on NFHA's REO investigation findings | Teleconfer-ence | Lisa Rice |
| April 18, 2012 | Online Blog | NFHA wrote Shelterforce Blog titled "From Burden to Boon: REOs Can Expand Housing Choice" | Online Blog | Debby Goldberg |
| April 20, 2012 | Conference | NFHA presented at the Contra Costa Board of Realtors Meeting: "The Banks Are Back— Our Neighborhoods Are Not: Discrimination in the Maintenance and Marketing of REO Properties" | Concord, CA | Shanna Smith |
| April 26, 2012 | Conference | NFHA presented at the Phoenix chapter of National Association of Hispanic Real Estate Professionals Meeting: "Fair Housing Compliance and REO Sales and Financing" | Phoenix, AZ | Shanna Smith |

| April 27, 2012 | Conference | NFHA presented at the Tucson chapter of National Association of Hispanic Real Estate Professionals Meeting: "Fair Housing Compliance and REO Sales and Financing" | Tucson, AZ | Shanna Smith |
|---|---|---|---|---|
| May 1-2, 2012 | Conference | NFHA presented at Hope Now: Foreclosure Alternative & REO Symposium | Washington, DC | Shanti Abedin<br>Lisa Rice |
| May 2, 2012 | Conference | NFHA attended and staffed a booth at the State of Housing in Black America Symposium sponsored by the National Association of Real Estate Brokers | Washington, DC | Sherrill Frost-Brown<br>Lisa Rice |
| May 3, 2012 | Meeting | NFHA met with Federal Reserve Board to present NFHA's REO findings and discuss other fair lending issues | Washington, DC | Shanti Abedin<br>Debby Goldberg<br>Lisa Rice<br>Deidre Swesnik<br>Jorge Soto |
| May 07, 2012 | Meeting | NFHA met with Bank of America to discuss NFHA's discriminatory REO maintenance and marketing concerns | Washington, DC | Shanna Smith<br>Lisa Rice<br>Cat Cloud |
| June 13, 2012 | Meeting | NFHA met with A&D Property Services, Inc. | Chicago, IL | Shanti Abedin<br>Lisa Rice |
| July 21-24, 2012 | Conference | ESRI International User Conference | San Diego, CA | Lindsay Augustine |
| Aug. 5-7, 2012 | Conference | NFHA presented at the annual National Association of Real Estate Brokers National Convention and spoke about recent fair lending and REO actions | Cleveland, OH | Lisa Rice |

| Sept. 13, 2012 | Conference | NFHA co-chaired the Helping Distressed Communities and Neighborhood Stabilization breakout session which focused on REO and Neighborhood Stabilization issues | Washington, DC | Shanna Smith |
|---|---|---|---|---|
| Sept. 13, 2012 | Conference | NFHA presented at the White House Housing Crisis Conference: Session titled "Helping Distressed Communities and Neighborhood Stabilization" | Washington, DC | Lisa Rice |
| Sept. 21, 2012 | Webinar | Freddie Mac/HomeSteps New Bulk Sale Program | Online Webinar | Shanti Abedin Morgan Williams |
| Sept. 21-22, 2012 | Conference | NFHA presented at the Association of Real Estate License Law Officials Annual Conference 2012: Session titled "Fair Housing Session" | Halifax, Nova Scotia | Shanna Smith |
| Sept. 25, 2012 | News Conference & Press Release | NFHA and partners held a webinar news conference and released a press release to announce the filing of its HUD administrative complaint against Bank of America for its discriminatory REO maintenance and marketing | Online | Shanti Abedin Lindsay Augustine Shanna Smith Deidre Swesnik Cedric Ricks |
| Oct. 10, 2012 | News Conference & Press Release | NFHA and partners held a webinar news conference and released a press release to announce the filing of its amended HUD administrative complaint against Bank of America for its discriminatory REO maintenance and marketing | Online | Shanti Abedin Lindsay Augustine Shanna Smith Deidre Swesnik Cedric Ricks |

19

| | | | | |
|---|---|---|---|---|
| Oct. 23, 2012 | News Conference & Press Release | NFHA and partners held a webinar news conference and released a press release to announce the filing of its amended HUD administrative complaint against Bank of America for its discriminatory REO maintenance and marketing | Online | Shanti Abedin Lindsay Augustine Shanna Smith Deidre Swesnik Cedric Ricks |
| Oct. 26, 2012 | Meeting | NFHA met with Amalgamated Bank to discuss REO maintenance and access to credit issues | Washington, DC | Lisa Rice Shanna Smith |
| Dec. 11-12, 2012 | Conference | ESRI Mid-Atlantic User Conference | Baltimore, MD | Shanti Abedin Lindsay Augustine |
| Dec. 18, 2012 | Briefing | NFHA held White House briefing regarding access to credit, foreclosure auctions, FHA & GSE bulk sales, and REO maintenance and marketing issues | Washington, DC | Debby Goldberg Lisa Rice Morgan Williams |
| May 23, 2013 | Conference | NFHA presented at the National Association of Real Estate Brokers' Midyear Meeting | Washington, DC | Lisa Rice |
| July 8-12, 2013 | Conference | ESRI International User Conference | San Diego, CA | Shanti Abedin Lindsay Augustine |
| July 15, 2013 | Meeting | NFHA met with Federal Deposit Insurance Corporation staff to discuss REO maintenance and marketing and fair lending issues | Washington, DC | Lisa Rice Debby Goldberg |
| Sept. 5-7, 2013 | Conference | National Association of Mortgage Field Services 25th Anniversary Conference & Expo | Chicago, IL | Shanti Abedin Lisa Rice |

| Sept. 9-11, 2013 | Conference | Center for Community Progress' Reclaiming Vacant Properties Conference: "Investing in the Future: Unlocking Hidden Values" | Philadelphia, PA | Lindsay Augustine |
|---|---|---|---|---|
| Sept. 23, 2013 | News Conference & Press Release | NFHA and partners held a webinar news conference and released a press release to announce the filing of its amended HUD administrative complaint against Bank of America for its discriminatory REO maintenance and marketing | Online | Shanti Abedin Lindsay Augustine Shanna Smith Deidre Swesnik Naweed Lemar |
| Sept. 30, 2013 | TV Appearance | NFHA discussed REO issues on Prince George's County Community TV | TV Show | Shanti Abedin |
| Oct. 6, 2013 | Meeting | NFHA spoke at Busboys and Poets in Northwest DC, alongside a reporter from the Washington Post, about how poorly maintained REOs are contributing to neighborhood decline | Washington, DC | Shanna Smith |
| Oct. 15, 2013 | Book Chapter | *From Foreclosure to Fair Lending* book published by Chester Hartman and Gregory Squires. NFHA wrote chapter titled "A Tale of Two Recoveries: Discrimination in the Maintenance and Marketing of REO Properties in African American and Latino Neighborhoods across America" | Book Chapter | Shanti Abedin Shanna Smith |

| Nov. 13, 2013 | Meeting | NFHA met with Department of Housing and Urban Development to discuss FHA REO maintenance | Washington, DC | Shanti Abedin<br>Shanna Smith<br>Morgan William |
|---|---|---|---|---|
| Nov. 14, 2013 | News Conference & Press Release | NFHA and partners held a webinar news conference and released a press release to announce the filing of its amended HUD administrative complaint against Bank of America for its discriminatory REO maintenance and marketing | Online | Shanti Abedin<br>Lindsay Augustine<br>Shanna Smith<br>Lisa Rice<br>Deidre Swesnik<br>Naweed Lemar |
| Jan. 30, 2014 | Testimony | NFHA provided testimony to Judicial Proceedings Committee of the Maryland Senate regarding Senate Bill 222 that would create a commission to investigate the treatment of lender-owned properties | Annapolis, MD | Shanti Abedin<br>Lindsay Augustine<br>Deidre Swesnik |
| Feb. 27, 2014 | Testimony | NFHA provided testimony to the Environmental Matters Committee of the Maryland House of Delegates regarding Senate Bill 728, commission to investigate the treatment of lender-owned properties | Annapolis, MD | Shanti Abedin |
| March 14, 2014 | Meeting | NFHA met with development and construction firm, Genesis, to discuss REO maintenance issues | Washington, DC | Lindsay Augustine<br>Lisa Rice<br>Morgan Williams |
| April 10, 2014 | Webinar | Department of Housing and Urban Development: "Vacant and Abandoned Properties: Turning Liabilities into Assets" | Online Webinar | Shanti Abedin |

| June 18, 2014 | Meeting | NFHA met with the White House Domestic Policy Council and discussed REO maintenance and marketing issues | Washington, DC | Lisa Rice<br>Shanna Smith |
|---|---|---|---|---|
| June 23, 2014 | Conference | National Fair Housing Alliance 2014 Conference: REO and Neighborhood Stabilization Plenary | Washington, DC | Shanti Abedin<br>Lindsay Augustine<br>Cathy Cloud<br>Sherrill Frost-Brown<br>Rachael Deane<br>Debby Goldberg<br>Madeline Hoffman<br>Justin Monteiro<br>Maria Moreno<br>Kevin Paul<br>Lisa Rice<br>Shanna Smith<br>Jorge Soto<br>Deidre Swesnik<br>Claudia Vila<br>Morgan Williams |
| July 29-30, 2014 | REO Investiga-tions with Reporter | NFHA conducted REO investigations with reporter Robin Amer, a McCormick Tribune Scholar from the Medill School of Journalism at Northwestern University Amer shadowed NFHA staff and later published an article on REO maintenance and marketing issues titled "Redlining: Redefined" | Minneapolis, MN | Lindsay Augustine<br>Justin Monteiro<br>Maria Moreno<br>Shanna Smith |
| Aug. 27, 2014 | Meeting | NFHA met with Office of the Comptroller of the Currency officials to discuss REO maintenance and marketing and fair lending issues | Washington, DC | Lisa Rice |

| Aug. 29, 2014 | Mailing | NFHA mailed a copy of its third REO report, "Zip Code Inequality: Discrimination by Banks in the Maintenance of Foreclosed Homes in Neighborhoods of Color," and a letter detailing the report's findings and recommendations that jurisdictions may take to combat discriminatory maintenance and marketing of REO properties. This mailing was sent to a total of 35 local jurisdictions. | Mailing | Shanti Abedin Lindsay Augustine Yvonne Lewis Shanna Smith |
|---|---|---|---|---|
| Sept. 8, 2014 | Conference | National Fair Housing Alliance REO Conference: "Maintaining Homes - Maintaining Neighborhoods: REO Management, Fair Housing, and Neighborhood Revitalization" | Baltimore, MD | Shanti Abedin Lindsay Augustine Sherrill Frost-Brown Cathy Cloud Diane Cipollone Shivaughn Ferguson Debby Goldberg Yvonne Lewis Justin Monteiro Maria Moreno Kevin Paul Lisa Rice Shanna Smith Cheryl Taylor Morgan Williams |
| Sept. 30, 2014 | News Conference & Press Release | NFHA and partners held a webinar news conference and released a press release to announce the filing of its amended HUD administrative complaint against Bank of America for its discriminatory REO maintenance and marketing | Online | Lindsay Augustine Shanna Smith |

| | | | | |
|---|---|---|---|---|
| Nov. 3-5, 2014 | Conference | 2014 CRA & Fair Lending Colloquium | San Diego, CA | Lisa Rice<br>Shanna Smith |
| Dec. 9, 2014 | Testimony Provided | NFHA testimony to the Housing, Transportation, and Community Development Subcommittee of the Senate Banking Committee at a hearing titled "Inequality, Opportunity and the Housing Market" | Washington, DC | Debby Goldberg |
| May 19-21, 2015 | Conference | Center for Community Progress' Reclaiming Vacant Properties Conference: "Beyond Blight: Building a Bold Movement" | Detroit, MI | Lindsay Augustine<br>Lisa Rice |
| May 27, 2015 | Webinar | PolicyMap Webinar: "Mapping the Way to Fair Housing and Environmental Justice" | Online Webinar | Lindsay Augustine |
| July 1, 2015 | Meeting | NFHA met with officials from Prince George's County, MD regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Largo, MD | Shanti Abedin<br>Shanna Smith |

| July 13, 2015 | Meeting | NFHA met with Lucas County, OH Commissioners staff regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Toledo, OH | Shanti Abedin Lisa Rice |
|---|---|---|---|---|
| July 21, 2015 | Meeting | NFHA met with City of Baltimore, MD officials regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Baltimore, MD | Shanna Smith Lisa Rice |
| July 22, 2015 | Meeting | NFHA met with City of Indianapolis, IN officials regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Indianapolis, IN | Shanti Abedin Lisa Rice |

| Aug. 11, 2015 | Meeting | NFHA met with City of Denver, CO officials regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Denver, CO | Shanti Abedin Sherrill Frost-Brown |
|---|---|---|---|---|
| Aug. 12, 2015 | Meeting | NFHA met with City of Aurora, CO officials regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Aurora, CO | Shanti Abedin Sherrill Frost-Brown |
| Sept. 10, 2015 | Conference | NFHA presented at the ARELLO Annual Conference: Fair Housing Committee Meeting | Washington, DC | Sherrill Frost-Brown |
| Sept. 15, 2015 | Meeting | NFHA met with City of Aurora, IL officials regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Aurora, IL | Shanti Abedin Lisa Rice |

| Sept. 15, 2015 | Meeting | NFHA met with City of Gary, IN officials regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Gary, IN | Lisa Rice |
|---|---|---|---|---|
| Oct. 14, 2015 | Meeting | NFHA met with A&D Property Services, Inc. | Washington, DC | Lindsay Augustine<br>Shanti Abedin<br>Lisa Rice<br>Shanna Smith |
| Oct. 15, 2015 | Meeting | NFHA met with City of Philadelphia, PA officials regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Philadelphia, PA | Shanti Abedin<br>Lisa Rice |
| Oct. 26-27, 2015 | Conference | National Fair Housing Alliance REO Community Relief Funds Meeting | Chicago, IL | Shanti Abedin<br>Lindsay Augustine<br>Sherrill Frost-Brown<br>Lisa Rice<br>Shanna Smith<br>Morgan Williams |

| Nov. 9, 2015 | Meeting | NFHA met with Franklin County, OH officials regarding NFHA's REO investigations and resulting complaints, and discussed how the jurisdiction can affirmatively further fair housing around the issue of discrimination in REO maintenance and marketing | Columbus, OH | Shanti Abedin Lisa Rice |
|---|---|---|---|---|
| Jan. 25, 2016 | Briefing | Brookings Institute's Screening of "The Big Short" | Washington, DC | Lisa Rice Shanna Smith |
| Jan. 28, 2016 | Meeting | NFHA met with Department of Justice officials to discuss REO maintenance issues and lending discrimination | Washington, DC | Shanti Abedin Lindsay Augustine Justin Monteiro Lisa Rice Morgan Williams |
| July 13, 2016 | Testimony | NFHA submitted testimony to the Financial Services Committee of the US House of Representatives On Changes to HUD's Distressed Asset Stabilization Program (DASP) | Washington, DC | Debby Goldberg Lisa Rice |
| Aug. 31, 2016 | News Conference & Press Release | NFHA and partners held a webinar news conference and released a press release to announce the filing of its amended HUD administrative complaint against Bank of America for its discriminatory REO maintenance and marketing | Online | Shanti Abedin Lindsay Augustine Shanna Smith Pamela Bond |

| Sept. 18-21, 2016 | Conference | NFHA attended National Association of Hispanic Real Estate Professionals' Convention. The convention included a session on the future of the REO and Short Sale property market. | Los Angeles, CA | Shanti Abedin Gregory Parrish |
|---|---|---|---|---|
| Sept. 28-30, 2016 | Conference | Center for Community Progress' Reclaiming Vacant Properties Conference: "In Service of People and Place" | Baltimore, MD | Shanti Abedin Lindsay Augustine |
| Oct. 30, 2016 | Event | NFHA attended the All Together Now Gospel Brunch. At the event, Yachad showcased several projects from the previous year and recognized NFHA for its support through its REO Inclusive Communities funds | Washington, DC | Shanti Abedin |
| Nov. 2, 2016 | Training | NFHA attended the Data Demand Demographics Symposium hosted by the Urban Institute | Washington, DC | Shanti Abedin Lindsay Augustine |
| Nov. 21, 2016 | REO Investi-gations | REO Investigations in Prince George's County, MD with Freddie Mac staff | Prince George's County, MD | Shanti Abedin Lindsay Augustine Lisa Rice Shanna Smith |
| April 19-20, 2017 | Training | NFHA presented at a training hosted by the Iowa City Office of Equity & Human Rights and discussed REO issues | Iowa City, IA | Shanna Smith |
| June 20, 2017 | Meeting | NFHA met with National Vendor Management Services | Manassas, VA | Lindsay Augustine Justin Monteiro Shanna Smith |

| Sept. 28, 2017 | Conference | NFHA presented during a Consumer Lending Roundtable entitled "Community Blight – the Persistency and Efforts to Address It" | Online Webinar | Shanti Abedin |
|---|---|---|---|---|
| Nov. 2, 2017 | Webinar | Webinar held by St. Louis Federal Reserve Board's Connecting Communities series entitled, "Solutions for Mitigating Neighborhood Blight: Innovations and Policy Strategies." | Online Webinar | Shanti Abedin |
| Jan. 16, 2018 | Conference | NFHA presented at the Robert Wood Johnson Foundation event titled "Discrimination in America: Solutions for Health" | Washington, D.C. | Shanti Abedin |
| May 15-17, 2018 | Conference | Center for Community Progress' Reclaiming Vacant Properties Conference: "Groundswell: Rising to the Challenge" | Milwaukee, WI | Lindsay Augustine |
| June 26, 2018 | Press Release | NFHA and partners held a webinar news conference and released a press release to announce the filing of its federal lawsuit against Bank of America and Safeguard Properties for its discriminatory REO maintenance and marketing | Online | Lindsay Augustine Jessica Aiwuyor Lisa Rice |
| July 25, 2018 | Webinar | NFHA Webinar: "Racial Discrimination and Bank-Owned Homes in Memphis" | Online Webinar | Lindsay Augustine Justin Monteiro Morgan Williams |

| Aug. 30, 2018 | Meeting | NFHA met with representatives from Baltimore in county office to discuss issues in Baltimore including REO maintenance and marketing | Baltimore, MD | Sharron Darrow Sherrill Frost-Brown Shanna Smith |
|---|---|---|---|---|
| Sept. 5, 2018 | Webinar | National Housing Center Webinar: "Restoring Neighborhoods: Detroit Neighborhood Housing Compact" | Online Webinar | Lindsay Augustine |
| Sept. 26, 2018 | Meeting | NFHA met with potential funders for the Fair Housing Action Center of Maryland and discussed REO and foreclosure concerns | Baltimore, MD | Shannon Darrow Shanna Smith |
| Oct. 4, 2018 | Webinar | Center for Community Progress Webinar: "The Empty House Next Door" | Online Webinar | Lindsay Augustine |
| July 18, 2019 | News Release | NFHA released a press release titled "Judge Denies Bank of America's Motion to Dismiss in Critical Fair Housing Lawsuit". | Online | Jessica Aiwuyor Lisa Rice |
| Oct. 2-4, 2019 | Conference | Center for Community Progress' Reclaiming Vacant Properties Conference: "Equity First: Revitalizing Communities Together" | Atlanta, GA | Lindsay Augustine Lisa Rice Nicole Turner-Ridley |
| April 23, 2021 | Webinar | NFHA held a webinar with the National Association of Realtors and National Community Stabilization Trust to discuss its joint report titled "Protecting Homeownership From the Impact of COVID-19," which included information and recommendations regarding REOs. | Online | Lindsay Augustine Diane Cipollone Debby Goldberg Lisa Rice |

| Sept. 7-9, 2022 | Conference | Center for Community Progress' Reclaiming Vacant Properties Conference: "Responding to Crisis: Building an Equitable and Resilient Future" | Chicago, IL | Shanti Abedin Lindsay Augustine |
|---|---|---|---|---|
| July 20, 2022 | News Release | NFHA released a press release titled "NFHA and Other Fair Housing Groups Fight Bank of America's Attempt to Toss Out Lawsuit Regarding Bank's Poor Maintenance of Homes in Black and Latino Communities". | Online | Lisa Rice Izzy Woodruff |
| March 27, 2023 | News Release | NFHA released a press release titled "Lawsuit Alleging Racial Discrimination by Bank of America in Its Maintenance of Foreclosed Homes Allowed to Proceed" | Online | Lisa Rice Izzy Woodruff |

Plaintiff further states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- **Access to Credit Initiative:** NFHA has had a long-term goal of expanding access to quality, affordable, and sustainable credit for underserved communities and groups. This work has been ongoing and continues through the present time, and it is nationwide in scope. NFHA's work on this issue has been thwarted and delayed largely due to staff time being diverted to the REO investigation.
- Had it not had to divert resources to investigate and combat Defendants' discriminatory REO maintenance, management, and marketing practices, NFHA would have greatly expanded its access to credit work to include:
  - Collaborating with key stakeholders to build an infrastructure for the reporting and caching of rental housing payment data;
  - Partnering with industry, civil rights, and other organizations to expand the credit score(s) acceptable for use by FHA and the GSEs;

- Educating the public, industry, regulators, public policy leaders and others about the perpetuation of discriminatory outcomes as a consequence of the utilization of outdated credit scoring systems;
- Educating the public, industry, regulators, public policy leaders and others about discrimination and bias associated with the use of certain technological systems; and
- Working with key stakeholders to reduce algorithmic bias in the financial services space.

- In 2012-2013, NFHA attempted to investigate claims that certain lenders in DC were engaging in discrimination by utilizing policies precluding them from working with borrowers using DC's Home Purchase Assistance Program (HPAP). The HPAP provides funds to assist borrowers with down payment and closing costs for home purchases. Because NFHA had to divert resources to investigate and combat Defendants' discriminatory REO maintenance, management, and marketing practices, it was not able to continue these investigations.

- In 2013-2014, NFHA attempted to investigate the DC Open Doors program that provides assistance to borrowers purchasing homes in Washington, DC. NFHA suspected that the program had overly restrictive credit score requirements. Because NFHA had to divert resources to investigate and combat Defendants' discriminatory REO maintenance, management, and marketing practices, it was unable to spend the necessary time to secure and analyze credit score and race data and was therefore unable to further these investigations.

- **REO/Single Family Home-to-Rental Initiative:** NFHA recognized the need to combat the trend of investors, venture capitalists, etc. purchasing single-family homes, including REO homes, for rental. This trend has proved to be a fatal blow to millions of consumers who have been thwarted from purchasing naturally occurring affordable housing. If NFHA had not had to divert resources to combat Defendants' discriminatory REO practices, it would have built a coalition to work on public policy initiatives that would have made it easier for families to purchase single-family houses – particularly single-family REO housing. NFHA's efforts to undertake this work were thwarted for years because of the time and resources needed to investigate and combat Defendants' discriminatory conduct regarding its REOs. For example:
  - In 2012, NFHA planned to monitor the sale of bulk REO properties by investment and property management companies, with a focus on assessing disparate treatment based on the demographics of neighborhoods where the properties were located and on the demographics of those serviced. NFHA was unable to complete these investigations because it had to divert resources to investigate and combat Defendants' discriminatory REO practices.
  - In 2016, NFHA planned to investigate the use of land contracts by companies buying REO properties in bulk, targeted especially in cities hit hardest by the foreclosure crisis and most prevalently occurring in communities of color. NFHA was unable to initiate these investigations because it had to divert resources to investigate and combat Defendants' discriminatory REO practices.

- **REO Regulation:** In 2012-2014, NFHA worked diligently to get federal regulators to either update or adapt their guidance to include warnings to the institutions they oversaw about fair housing violations as they related to REO properties. The Federal Reserve followed suit. NFHA wanted to work more extensively with regulators on this issue, for

34

example, by working with regulators to hold a webinar specifically devoted to the REO issue. NFHA was not able to do this work, including conducting such a webinar, because staff were diverted to investigate and combat Defendants' discriminatory REO activities and did not have enough time to work on the project.

- **Systemic Rental Housing Investigation:** In 2012 and thereafter, NFHA planned to investigate various issues related to the rental housing market but was unable to do so due to diverting its time and resources to focusing on the discriminatory maintenance, management, and marketing of REO properties in communities of color.

- **Affirmatively Furthering Fair Housing Advocacy:** In 2014, NFHA planned to write a letter to the DC Department of Housing and Community Development (DHCD) regarding preliminary research that NFHA had conducted on the current state of Washington DC's multi-family housing. NFHA identified that there was a significant shortage of 3+ bedroom apartment units in DC and that apartment square footage in general was decreasing. Because it had to divert resources to counteract Defendants' discriminatory conduct, NFHA was unable to further this research and was unable to alert the DC DHCD about this important fair housing issue that has affected many families.

- **Systemic Response to Housing Discrimination**: Because of the high rate of discrimination uncovered in NFHA's follow-up sales testing in response to HUD's 2000 Housing Discrimination Study (HDS), NFHA identified a critical need for large scale, systemic real estate sales investigations. In 2012, HUD released the findings of its Housing Discrimination Study in a report entitled "Housing Discrimination Against Racial and Ethnic Minorities 2012." NFHA planned to conduct a comprehensive and systemic follow-up real estate sales investigation (as it had done in follow up on the 2000 HDS) based on these findings, but it was unable to do so due to diverting time and resources to the REO investigations. NFHA trained at least 10 fair housing centers to conduct sales investigations before being diverted by REO issues in communities of color. Had NFHA undertaken this investigation, it would have been a two-pronged approach: (1) Educate people living in predominantly white neighborhoods about the benefits of residential integration and educate the real estate industry about continuing problems with steering and other discriminatory practices as well as their obligations to promote residential integration and comply with anti-discrimination laws; and (2) Conduct systemic investigations across the country in partnership with NFHA members. NFHA received a HUD Fair Housing Initiatives Program grant that it could have used to investigate the discriminatory practices in the real estate sales market, but it could not use those funds for that purpose because it was forced to focus these limited grant resources on developing and implementing its nationwide REO investigations, including its work to investigate Defendants' discriminatory REO practices.

## Education in Predominantly White Neighborhoods and in the Real Estate Industry

In 2008, NFHA put in place a massive national media campaign to encourage people living in predominantly white neighborhoods to welcome African American and Latino buyers into their communities. This major campaign was funded with $750,000 and secured more than $5 million dollars of in-kind media donations from print, billboards, airport indoor ads, mall indoor ads, transit ads, elevator ads and radio public service spots. This project was designed to

lay the foundation to encourage predominantly white communities to think about the value of racial integration and to remind real estate agents of their obligation to abide by fair housing laws.

NFHA's plan was to build off of the 2008 educational campaign to further educate the industry and members of the public about the benefits of living in an integrated society and dismantling the harmful legacy of racially segregated and disinvested neighborhoods.

- Systemic Investigations
1. In or around 2012-2015, NFHA planned to institute nationwide real estate "listing" investigations in response to tips it received about discrimination in this area. NFHA's goal was to determine if discrimination was happening during the listing process and if white agents were avoiding or refusing to list homes for sale in integrated and/or predominantly Black or Latino neighborhoods. NFHA was unable to initiate these investigations, because it had to divert resources to investigate and combat Defendants' discriminatory REO practices.
2. In 2014, NFHA planned to conduct sales investigations in Southeast Washington, DC after being alerted to alarming reports of gentrification and displacement of very low income and predominantly Black residents in DC's Ward 8, but it was unable to initiate these investigations.
3. In 2016, NFHA planned to engage the use of racial demographic data by real estate companies, such as Movoto and Neighborhood Scout, on web sites and apps, to address the fair housing implications of these systems. This issue originated from a complaint in Dayton, OH, but the projected investigation was nationwide in scope. Partnering fair housing organizations as well as reporters alerted NFHA to this matter and asked NFHA to investigate, but NFHA was unable to conclude these investigations due to diverting time and resources to the REO investigations.
4. In 2016, NFHA planned to investigate white-owned real estate companies in Washington, DC and the barriers that are placed on African American real estate agents after speaking with local real estate agents. NFHA was unable to initiate these investigations.
5. In 2016, NFHA planned to conduct a "pocket listings" investigation to review the advertising of homes for sale in fast-moving housing markets to evaluate if homes in middle class white neighborhoods and neighborhoods experiencing gentrification actually hit the Multiple Listing Service (MLS) or if these listings were pocketed with preferential treatment being given to white buyers. NFHA received complaints from multiple Ohio-based partner fair housing organizations that real estate agents were using pocket listings to limit who would have access to certain homes available for sale, but the projected investigation was nationwide in scope. NFHA was unable to engage in advocacy and investigative activities to address this issue because it had to divert resources to investigate and combat Defendants' discriminatory REO practices.

6.   NFHA had also intended to work with the Department of Justice regarding the real estate sales investigations. It was unable to initiate these initiatives due to diverting time and resources to the REO investigations. In subsequent years, as NFHA realized how significant the REO challenges it was witnessing in communities of color throughout the U.S. would be, NFHA dedicated more of its own dollars, as well as available grant funding under the Fair Housing Initiatives Program, to combatting discriminatory conduct in the REO space.

Because it was forced to devote resources to investigating and counteracting Defendants' discriminatory conduct, Plaintiff was also unable to pursue numerous conferences, attendance at which would have served the purposes of education and outreach, expanding Plaintiff's network of partners, and professional staff development.  Moreover, Plaintiff was forced to divert resources from pursuing funding opportunities that would have helped it fulfill its mission. In addition to the activities described above, for which Plaintiff would have sought funding, Plaintiff would also have pursued the following funding opportunities:

- **Lending Consulting Services**: NFHA was forced to forego plans it made to develop its consulting services to mortgage lending service providers and other banking institutions. NFHA was precluded from pursuing these activities due to limited staff capacity that resulted from NFHA needing to focus on developing its REO investigations in the wake of the foreclosure crisis, including its work to investigate Defendants' discriminatory REO practices. NFHA's limited staff, including NFHA senior leadership, was specifically diverted from plans to develop NFHA's consulting program. The funds derived from consulting services would have been separate and additional funds from any resources NFHA was ultimately able to pursue during the period of its REO investigation activities.
- **Baltimore Fair Housing Consulting Services**: Additionally, NFHA planned to work with the City of Baltimore to assist with their efforts to amend their regional Analysis of Impediments, but it was unable to pursue these efforts due to NFHA's investigation and response to Defendants' discriminatory REO practices. Baltimore officials contacted NFHA about providing these consulting services and NFHA met with the officials about the opportunities, but NFHA staff determined it did not ultimately have the capacity to perform these consulting services because their time and resources were required for REO investigations; specifically, the investigation of Defendants' discriminatory REO properties. The funds derived from these Affirmatively Furthering Fair Housing Mandate-related consulting services would have been separate and additional funds from any resources NFHA was ultimately able to pursue during the period of its REO investigation activities.

Because Plaintiff continues to forego opportunities in order to counteract Defendants'

discrimination, Plaintiff reserves the right to, and will, modify and supplement this Interrogatory as the facts require.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

EXHIBIT B

**EXHIBIT B**

**INFORMATION REGARDING LOCAL ORGANIZATIONAL PLAINTIFFS'
DAMAGES IN RESPONSE TO BANK OF AMERICA'S PHASE III
INTERROGATORY NO. 1**

## CONNECTICUT FAIR HOUSING CENTER – DIVERSION OF RESOURCES

Plaintiff Connecticut Fair Housing Center ("CFHC") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From 5/29/2013 to 5/9/2018, CFHC staff was trained on, and conducted, an investigation into 75 BANA REO properties in CFHC's service area and analyzed the results of that investigation;

- From 5/29/2013 to 12/31/2018, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign;

- From 5/29/2013 to 12/31/2018, Plaintiff conducted classes for more than 100 real estate agents on their obligations to maintain REO properties in a non-discriminatory manner;

- From 3/1/2016 to 12/31/2018, Plaintiff researched REO and blight issues and testified at legislative hearings at the Connecticut legislature on blight bills to raise awareness of the problems caused by Defendants' differential treatment of REO properties;

- On January 15, 2014, Plaintiff met with community leaders in New Haven to highlight problems with REO properties; and

- From 1/1/2016 to 12/31/2016, Plaintiff discussed REO maintenance with Connecticut's Congressional delegation during meetings on fair housing problems in Connecticut.

Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its

rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Maria Cuerda | Fair Housing Specialist | $200/hour |
| Claudia Gonzalez | Fair Housing Specialist | $200/hour |
| Erin Kemple | Executive Director | $300/hour (2013–2014) $350/hour (2015–2016) $400/hour (2017–present) |
| Sarah White | Staff Attorney | $275/hour |
| James Dresser | Fair Housing Specialist | $200/hour |

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## CFHC – FRUSTRATION OF MISSION DAMAGES

Plaintiff Connecticut Fair Housing Center is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2013 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services. For example, from 5/29/2013 to present, Plaintiff's programs and activities included foreclosure prevention (*e.g.*, providing advice at volunteer attorney tables in courthouses, appearing for homeowners in foreclosure at Attorney for a Day programs,

representing homeowners in foreclosure, and advocating with Connecticut's legislature for continuation of the State's nationally recognized foreclosure mediation program).

Plaintiff CFHC continues to conduct hundreds of foreclosures intakes per year and all the other foreclosure prevention activities outlined above, in part because of Defendants' activities. Because Defendants' activities result in lower property values in majority-minority neighborhoods, the homeowners who were able to keep their homes through the foreclosure crisis have less equity than their peers in majority-White neighborhoods. Having less equity means having less (1) of an ability to use that equity to sell and move into a higher-opportunity neighborhood, and (2) opportunity to refinance during the period of lower interest rates into more affordable payments. Those homeowners are left more vulnerable to foreclosure and remain more likely to contact the Center for assistance in preventing foreclosure.

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff CFHC's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Working with other fair housing advocates to establish industry best practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices;
- Advocacy/outreach to city and state governments; and
- Education of community members re: foreclosure, homeownership, neighborhood stabilization, etc.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages may be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## DENVER METRO FAIR HOUSING CENTER – DIVERSION OF RESOURCES

Plaintiff Denver Metro Fair Housing Center seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From 2012 to 2016, Plaintiff identified numerous Bank of America REO properties in its service area and trained its staff to conduct an investigation of those properties;
- From 2013 to 2016, Plaintiff investigated 84 Bank of America REO properties in its service area and analyzed the results of that investigation;
- From 2014 to 2018, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign, including brochures and reports, public services announcements and advertisements, and specialized mailings;

4

- From 2014 to 2018, Plaintiff organized and conducted trainings regarding REO maintenance for housing providers, municipal housing employees, HUD housing counseling agency staff, and the general public in the greater Denver Metro region;
- From 2014 to 2018, Plaintiff met with local government officials regarding REO issues, including the Denver Regional Council of Governments, City and County of Denver, City of Aurora, and the State of Colorado Division of Housing; and
- From 2014 to 2016, Plaintiff participated in community events, including the Montbello 50th Anniversary Fair, to raise awareness for REO-related issues.

As a result of this expenditure of time and resources, DMFHC was forced to divert limited resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forego opportunities including: consulting opportunities, conferences/education/staff development, coalition meetings, funding applications.

DMFHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts in neighborhoods with Defendants' REO properties negatively impacted by foreclosures in Metro Denver, and to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties. Plaintiff will produce a summary of diversion of resources, setting forth the time Plaintiff diverted as a result of Defendant's discriminatory maintenance, marketing, and management practices, and will include out-of-pocket expenses and additional time in the course of its rolling production.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Arturo Alvarado | Executive Director | $250.00 |
| Ashley Cloutier | Fair Housing Specialist | $90.00 |
| Christina Miranda | Fair Housing Specialist | $90.00 |

| Trevor Jones | Outreach Specialist | $90.00 |
|---|---|---|
| Tasha Lynch | Interim Enforcement Director | $125.00 |
| Kate Quillin | Enforcement Director | $125.00 |
| Miguel Trujillo | Fair Housing Specialist | $90.00 |
| Kathleen Ferrick | Fair Housing Specialist | $90.00 |
| Elizabeth Campbell | Outreach Specialist | $90.00 |
| Rachel Willis | Fair Housing Specialist | $90.00 |
| Janeth Juarez | Fair Housing Specialist | $90.00 |
| Trevor Jones | Outreach Specialist | $90.00 |
| Renee Robinson | Office Manager | $25.00 |

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## DMFHC – FRUSTRATION OF MISSION DAMAGES

Plaintiff Denver Metro Fair Housing Center is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at

least 2014 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From 2013 to 2018, Plaintiff's programs and activities included homeownership promotion (*e.g.*, down payment assistance; closing cost assistance);
- From 2013 to 2018, Plaintiff's programs and activities included housing rehabilitation;
- From 2013 to 2018, Plaintiff's programs and activities included accessibility modifications;
- From 2013 to 2018, Plaintiff's programs and activities included community enhancement (*e.g.*, construction of parks, gardens, recreation areas); and
- From 2013 to 2018, Plaintiff's programs and activities included community engagement (*e.g.*, summer camps, leadership programs).

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff DMFHC's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including advocacy/outreach to city and state governments as well as education of community members regarding foreclosure, homeownership, and neighborhood stabilization.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future. Plaintiff's financial investments have been undermined by the existence of deteriorating and poorly maintained REO properties in those communities.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Metro Vision 2040 Meeting: The Denver Regional Council of Governments organized this meeting for community leaders to discuss equity and access to opportunity in the context of fair housing. The meeting took place on January 16, 2014, and Plaintiff's executive director was invited to attend. Because Plaintiff had to divert resources to investigate and combat Defendants' discriminatory REO maintenance and marketing practices, Plaintiff was unable to participate.

- Habitat CEO Build: Habitat for Humanity of Metro Denver held a CEO Build Reception for many important community partners in the Denver metro area. The reception took place on October 9, 2014, and Plaintiff's executive director was invited to attend. Because Plaintiff had to divert resources to investigate and combat Defendants' discriminatory REO maintenance and marketing practices, Plaintiff was unable to participate.

- Housing NOW Conference: One staff member from DMFHC attended and presented a Fair Housing Testing PowerPoint presentation at the Housing NOW Conference in Vail, Colorado on October 9, 2014. Two other staff members, including Plaintiff's executive director, planned to attend and participate in the presentation. Because Plaintiff had to divert resources to investigate and combat Defendants' discriminatory REO maintenance and marketing practices, though, these two staff members were unable to participate.

- Colorado Gives – 2015: The Colorado Gives campaign is recognized annually on December 6th and focuses on garnering support for nonprofits in the state of Colorado. In other years, DMFHC targeted their networks with specific appeals related to Colorado Gives Day. Because Plaintiff had to divert resources to investigate and combat Defendants' discriminatory REO maintenance and marketing practices in November and December of 2015, however, it was unable to participate in Colorado Gives Day.

- Anti-Displacement Policy Network: The Denver Anti-Displacement Network conducted monthly meetings to discuss anti-displacement policies, programs, and initiatives.

Plaintiff's executive director was unable to attend the meeting on July 12, 2018, because Plaintiff had to divert resources to investigate and combat Defendants' discriminatory REO maintenance and marketing practices.

In addition to the specific opportunities described above, Plaintiff was also forced to delay numerous tester trainings that would have permitted Plaintiff to conduct additional investigation and enforcement in furtherance of its mission, and to delay numerous reporting obligations as a result of Defendants' discriminatory conduct. Because Plaintiff continues to forego opportunities in order to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement this Interrogatory response as the facts require.

Plaintiff states that in order to counteract Defendants' discriminatory behavior, it engaged in the following community outreach and public education efforts:

Education Outreach Activities

| Event | Activity | Date |
|-------|----------|------|
| News Release | Media Advisory & Press Conference | 9/25/2013 |
| News Release | Media Advisory & Press Conference | 11/14/2013 |
| News Release | Media Advisory & Press Conference | 9/30/2014 |
| News Release | Media Advisory & Press Conference | 8/31/2016 |
| Gala 2015 | Discuss REO Findings | 4/24/2015 |
| Gala 2016 | Discuss REO Findings | 4/21/2016 |
| Gala 2017 | Discuss REO Findings | 4/21/2017 |
| AFFH Summitt | Discuss REO Findings | 11/12/2016 |
| Board of Directors | Discuss REO Findings | Regular Board Meetings |
| DRCOG | NFHA Reports | Multiple Dates |
| Listserv | PSAs - News Releases | Multiple Dates |
| Media List | PSAs - News Releases | Multiple Dates |
| City of Denver Staff | Meeting with NFHA Staff - Shanti and Sherrill Frsot Brown | 8/11/2015 |
| City of Aurora Staff | Meeting with NFHA Staff - Shanti and Sherrill Frsot Brown | 8/12/2015 |
| Councilman Paul Lopez | Discuss REO Findings | 1/21/2015 |
| Councilman Rafael Espinoza | Discuss REO Findings | 9/28/2016 |
| Montbello 50th Fair | Discuss REO Findings | 9/24/2016 |
| DOH - Pat Coyle & Allison George | Discuss Fair Housing and REO Investigations | 2/28/2013 |
| DORA/DOLA Workshop | Discuss REO Findings | 9/15/2014 |
| Tricia Stephens (303-844-4988) from Congresswoman Degette's office | Discuss Fair Housing and REO Investigations | 9/30/2016 |
| Annie Gardner - Senator Bennett | Discuss Fair Housing and REO Investigations | 9/27/2016 |
| Susan Niner w  Div of Housing | Discuss Fair Housing and REO Investigations | 1/20/2017 |
| Office of HOPE - Erik Solivan | Discuss Fair Housing and REO Investigations | 7/7/2017 |
| DOJ/Attorney General | Fair Housing Roundtable | 10/4/2016 |
| Congressional Visits | Meeting with staff from Senators and 4 Congress Representative | 3/8/2018 |

In addition to the specific activities described above, Plaintiff's staff expended time distributing numerous Public Service Announcements and news releases across their media

9

contacts and email lists; speaking with neighbors who lived near Bank of America's REO properties to inquire about their experience and educate them about their fair housing rights; and preparing for and discussing findings related to the investigation into Bank of America's REO properties with the Denver Regional Council of Government at the 2015 Affirmatively Furthering Fair Housing (AFFH) Summit, and at its April 2016 Gala.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA – DIVERSION OF RESOURCES

Plaintiff Fair Housing Advocates of Northern California ("FHANC") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From approximately August 14, 2013 to August 11, 2016, Plaintiff identified numerous Bank of America REO properties in its service area and trained its staff to conduct an investigation of those properties;

- From approximately August 14, 2013 to August 11, 2016, Plaintiff investigated 119 Bank of America REO properties and analyzed the results of that investigation;

- From approximately September 15, 2013 to the present, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach

campaign, including public service announcements and radio campaigns, as well as advertisements in local newspapers;

- On February 27, 2014, September 18, 2014, February 19, 2015, September 17, 2015, September 22, 2016, and September 14, 2017, Executive Director Caroline Peattie held meetings with local government officials regarding REO maintenance, including visits to senators and representatives on Capitol Hill;

- On May 12, 2014 and January 17, 2015, Executive Director Caroline Peattie had a meeting with local service providers to discuss REO maintenance;

- Because of discriminatory maintenance and marketing of REO properties Plaintiff's investigations revealed, Plaintiff was compelled to plan for and execute grants in 2014– 15 to combat systemic lending discrimination in mortgage lending and in the marketing/ maintenance of bank-owned properties, including conducting an education campaign to promote awareness about predatory lending, foreclosure, and loan modification scams to Spanish and English speakers (with activities including ads in regional newspapers, radio PSAs and interviews on Spanish-language radio station, email/social media campaign, distribution of flyers); and

- On November 13, 2016, Education Director Adriana Ames participated in community events to raise awareness of predatory lending and foreclosure prevention. Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties. Plaintiff will provide a summary of diversion of resources and expenses in the course of its rolling production.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Conducting additional consulting and training of housing providers;
- Applying for new grants and funding sources;
- Foregoing previously received grants and funding sources;
- Attending conferences (*e.g.*, annual San Diego Laws and Litigation conferences);
- Professional staff development; and
- Coalition meetings.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

11

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Adriana Ames | Education Director | $200.00 |
| Annya Maskey | Executive Assistant/Paralegal | $100.00 |
| Bailey Fice | REO Investigative Assistant | $50.00 |
| Caroline Peattie | Executive Director | $350.00 |
| Casey Epp | Supervising Attorney | $350.00 |
| Craig Schechter | Associate Director | $250.00 |
| Denise Bashline | Investigation Coordinator/Paralegal | $100.00 |
| Jessica Tankersley | Supervising Attorney | $250.00 |
| Julia Howard-Gibbon | Staff Attorney/Investigation Coordinator | $150.00 |
| Katherine Collado | Investigation Coordinator | $50.00 |
| Matt Oglander | Investigation Coordinator/Paralegal | $100.00 |
| Ray Zamudio | REO Investigations Coordinator/Paralegal | $100.00 |
| Stefanie Taylor | Executive Assistant | $50.00 |
| Karen Crump | Bilingual Intake Coordinator/Foreclosure Counselor | $100.00 |
| Christine Lam | Foreclosure Counselor | $75.00 |

FHANC states that it has engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts included: meeting with local government officials regarding REO maintenance, including visits to senators and representatives on Capitol Hill and correspondence with local elected officials and city attorneys; meeting with local service providers such as Housing and Economic Rights Advocates and the California Reinvestment Coalition; creating and distributing public service announcements and conducting radio campaigns; publishing advertisements in local newspapers; participating in community events and conferences; engaging with media to raise awareness of REO-related issues; conducting Pre-Purchase and Intro to Homebuying workshops; and distributing brochures related to predatory lending.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent

on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## FHANC – FRUSTRATION OF MISSION DAMAGES

Plaintiff Fair Housing Advocates of Northern California is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least January 2013 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From January 2013 to present, Plaintiff's programs and activities included homeownership promotion (*e.g.*, predatory lending/pre-purchase education);
- From January 2013 to present, Plaintiff's programs and activities included foreclosure prevention (*e.g.*, workshops, counsel clients on mortgage modifications or how to bring mortgages current); and
- From January 2013 to present, Plaintiff's programs and activities included accessibility modifications.

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff FHANC's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including advocacy and outreach to city and state governments and education of community members re: foreclosure, homeownership, and neighborhood stabilization.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states the following with regard to opportunities lost as a result of Defendants' conduct:

### *Programmatic opportunities*

As part of its Housing Counseling and Education Strategic Plan of 2013–2016 and 2017–2022, FHANC identified a number of strategies and actions to address needs identified in the communities it serves in Marin, Sonoma, and Solano counties. However, as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities:

- Produce education and outreach materials in all appropriate languages to serve Limited English Proficiency clients – in addition to Spanish, the three counties FHANC serves have a significant number of residents who speak Vietnamese and Tagalog, particularly Vietnamese in Marin County. FHANC expanded its service area outside of Marin County in 2016, but to date FHANC has only been able to provide limited materials in those languages, both in terms of literature, flyers, and webinars developed and posted to the website. In addition, though FHANC has a Spanish web page with literature and resources, it has a very limited page in Vietnamese and none in Tagalog. Because of Defendants' discriminatory conduct, FHANC was unable to produce a complete set of

14

materials, the achievement of which would have substantially furthered Plaintiff's organizational goals.

- Establish greater visibility and accessibility to all potential victims of housing discrimination by producing and distributing educational materials online and through social media – from 2013 – 2017, FHANC was able to expand its website, social media presence, and visibility in local media outlets only to a limited extent, on occasion issuing press releases, participating in interviews and writing articles, and establishing only limited personal relationships with media establishments. To date, FHANC has been unable to develop a blog with monthly updates or conduct monthly Facebook/quarterly website editorial meetings as intended. In 2017, FHANC planned to involve the Board of Directors in agency and community activities to heighten visibility but has only been able to do so to a limited extent. These efforts have been delayed because of Bank of America's discriminatory conduct.

- Assist with the enforcement of legal rights for members of all protected classes – since 2013, FHANC has been able to ensure adequate staff support for its testing coordinator(s) only to a limited extent. Since 2017, FHANC sought to maintain an effective and diverse group of testers but has been unable to do so with regard to testing based on sales and insurance, and has been unable to ensure adequate staff support for training for its testing coordinators in those areas. In summary, FHANC's goal of providing optimal support for its testing goals has been delayed or otherwise impeded by Defendants' discriminatory conduct.

- Affirmatively further fair housing through enforcement – since 2013, the results of FHANC's systemic investigations have revealed significant instances of discrimination throughout the tri-county area. However, FHANC has only been able to pursue enforcement actions based upon the results of these systemic investigations to a limited extent and has only expanded its geographic scope of enforcement efforts to a limited extent. In addition, since 2017, FHANC has only reviewed individual discrimination complaints and has only improved its capacity of database searches for patterns or practices to a limited extent. It was not until 2020 that FHANC began working with an outside consultant to improve database collection and search functions, and finalizing this project has been delayed due to Defendants' discriminatory behavior, with the possibility of losing funding altogether if the project is not completed in June.

- Affirmatively further fair housing through advocacy – since 2013, FHANC has sought to maintain effective relationships with enforcement agencies at the federal, state, and local levels, which it has only been able to do to a limited extent, on occasion participating in meetings/conferences with similarly-situated fair housing organizations. FHANC's  ability to participate has been impeded by the investment of resources by its staff to attend to Bank of America's discriminatory maintenance and marketing practices.

- Provide education regarding lending discrimination – since 2013, FHANC identified a need for increased education for homeowners regarding their protections under fair

housing/lending laws. However, it has only provided fair lending/foreclosure workshops and education and outreach materials in appropriate languages to a very limited extent and has been entirely unable to provide presentations to homeowners and others on such protections. In addition, FHANC has only developed training materials targeted to homeowners to a limited extent since 2017. These efforts have been delayed because of Bank of America 's discriminatory conduct and FHANC's diversion of resources to attend to it.

- Identify violations of fair housing/lending laws – since 2013, FHANC identified a need to use its foreclosure prevention counseling program to identify individual and systemic discriminatory lending practices and to increase capacity to conduct complaint-based fair lending investigations; however, it has only been able to do so on a limited basis. It also intended to build collaborative relationships with other organizations to ensure better referrals of homeowners with fair lending complaints but has been unable to do so. FHANC has only been able to conduct mortgage lending testing and amend data collection processes to facilitate the identification of trends among lenders to a limited extent, and since 2013 it has been unable to conduct sales and insurance testing or develop stronger partnerships with relevant organizations serving homeowners. FHANC's delay in conducting and identifying additional violations as described above is because of Bank of America 's discriminatory conduct.

- Build capacity within the agency to/and assist with enforcement of fair housing/fair lending rights for homeowners – since 2013, FHANC identified a need for assisting homeowners in filing administrative complaints/making referrals to private attorneys and creating a comprehensive referral network; however, FHANC has been unable to do so as a result of its staff's investment into Defendants' discriminatory REO practices. FHANC has been unable to conduct outreach to private practitioners to encourage acceptance of pro bono cases or to engage Board members in outreach. In addition, since 2017, FHANC identified a need for increased capacity within the agency to address fair lending violations, including building expertise within the agency, and advertising its services for homeowners through social media and its website; FHANC has only been able to do so to a very limited extent.

- Assist clients with successfully preventing foreclosures – since 2013, FHANC has identified a need for regular group clinics/workshops on foreclosure prevention strategies; however, because of Defendants' discriminatory conduct, it has only been able to conduct a limited number of foreclosure prevention workshops to date, and failed to meet its goal of training 10 owners through foreclosure prevention workshops in 2019–20. FHANC has been unable to engage in a media campaign to highlight the importance of maintaining homeownership, including letters to the editor, press releases, and social media postings.

- Services for housing providers – since 2013, FHANC identified a greater need for housing providers to understand fair housing principles and practices and the value of fair housing to foster connections with the housing industry for education/outreach purposes. However, FHANC has been unable to develop programs targeted to

various housing industry groups (such as architects, attorneys, or real estate professionals) or meet/communicate with housing providers to address emergent fair housing issues, and has developed tiered/progressive training programs to a limited extent, only producing short modules on certain topics. FHANC has also only partnered with the housing industry to co-sponsor trainings to a limited extent, primarily focused on a few collaborations with local housing authorities. FHANC has offered continuing education credits to a very limited extent, offering such credits at just two annual fair housing conferences in 2018 and 2019 and trainings to a few housing providers' attorneys when the attorneys joined their clients' fair housing trainings. FHANC has had limited capacity to develop and market targeted programs and tiered/progressive training, as FHANC's efforts have been impeded by Defendants' discriminatory conduct.

- <u>Services for the community</u> – since 2013, as a result of its staff's investment into addressing Defendants' discriminatory REO maintenance and marketing practices, the following community-based goals of FHANC have been delayed or otherwise impeded:
  a. Provision of additional educational events and programming for the community.
  b. Provision of advocacy and impact work to maximize housing opportunity for the jurisdictions served. FHANC has only written articles for publication and supported state lobbying efforts to a limited extent.
  c. Development of meaningful relationships with local, state, and national elected officials and other policy makers. FHANC has only collaborated with the Northern California Fair Housing Coalition members for advocacy at the regional and state level to a limited extent.
  d. Review of data and trends to assess whether barriers to housing choice exist in the community and use findings to further advocacy efforts; specifically, FHANC has only publicized findings from investigations in reports for the community to a limited extent and has not published its annual audit reports as intended.
  e. Collaboration with educational institutions to educate students on fair housing concepts; specifically, FHANC has been hampered in its efforts to develop fair housing curriculum appropriate for high schools, colleges, and/or ESL classes.; and
  f. Undertaking of systemic enforcement efforts; specifically, FHANC has only been able to develop enforcement actions based on evidence of systemic violations to a limited extent and has been hampered in its development of enforcement actions based on evidence from systemic investigations..

### ***Funding opportunities:***

On March 24, 2017, FHANC's three managers, Caroline Peattie (Executive Director), Casey Epp (Supervising Attorney), and Adriana Ames (Education Director), met to discuss ideas for funding that the agency had not been able to develop and that it should focus on developing

moving forward. To date, as a result of the investment of its staff's resources to address Defendants' discriminatory REO maintenance and marketing practices, FHANC has either not been able to implement, has implemented on a limited basis, or has been delayed in implementing the following funding strategies.

- Hire a development director who would increase fundraising through writing additional corporate and foundation grants and expanding the donor base.

- Charge a fee for service for the pre-purchase education program and expand the program from Marin County to Sonoma County, Solano County, and the East Bay.

- Hire regular or temporary part-time testers for more regular hours, to improve testing outcomes and build stronger cases, and develop cases geared toward litigation.

- Charge a sliding scale for education services.

- Develop and offer a fair lending training (for which FHANC estimates it would have charged a fee of a minimum of $1,500.00 per training).

- Develop a "Cy Pres" page to be included under "donations" on FHANC's website so as to improve the possibility of receiving such funding.

- Market to corporate law firms and others who donate funding and volunteers to legal services organizations.

- Apply for other untapped foundation funding besides Marin Community Foundation. Although FHANC staff has explored potential funding sources/opportunities, no applications have been submitted with these foundations at this time.

- Expand FHANC's relationship with lenders in Sonoma and Solano County so as to be able to expand foreclosure and pre-purchase services to those counties.

- Look into qualifying for IOLTA (Interest on Lawyer Trust Accounts) funding. FHANC looked into the application process in June 2017 but was unable to complete it; FHANC was unable to follow up as planned in the spring of 2018 and has been unable to do so since.

- Expand Fair Housing Law & Practice seminars for housing providers; offer a fair housing training for attorneys with Mandatory Continuing Legal Education (MCLE) credits; offer MCLE credits for all fair housing conferences; and translate Fair Housing Law & Practice seminars.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego all of the above opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals.  In addition to the specific opportunities described above, Plaintiff was also forced to forego or delay policy and legislative advocacy work such as working on Consolidated Plans and Analysis of Impediments of the jurisdictions it serves in furtherance of its mission, and Plaintiff was forced to delay legislative advocacy for ordinances such as a Fair Chance ordinance like that which passed in the City of Oakland.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages may be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## FAIR HOUSING CONTINUUM – DIVERSION OF RESOURCES

Plaintiff Fair Housing Continuum seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From May 2012 to September 2016, Plaintiff received and organized information regarding REO properties in its service area and underwent training to conduct an investigation of those properties;
- From August 2012 to January 2017, Plaintiff investigated 94 Bank of America REO properties and compiled the results of that investigation;
- From July 2013 to September 2016, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign;

- From July 2013 to September 2016, Plaintiff hosted at least 222 presentations or speaking engagements related to REO issues, including Defendants' discriminatory maintenance and marketing practices;
- From July 2013 to September 2016, Plaintiff engaged with media to raise awareness of REO issues, including Defendants' discriminatory maintenance and marketing practices;
- From July 2013 to September 2016, Plaintiff held meetings with federal, state, and local government officials to discuss REO issues, including meetings with individuals from the Department of Housing and Urban Development, the U.S. Senate, the U.S. House of Representatives, and Fair Housing Assistance Programs; and
- From July 2013 to September 2016, Plaintiff held meetings with local housing service providers, including, for example, the Florida Affordable Housing Coalition, the Community Housing Initiative, Habitat for Humanity, and the Florida Realtors Association.

Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties. Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production.

As a result of this expenditure of time and resources, the Continuum was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forego opportunities which would have substantially furthered Plaintiff's organizational goals including:

- Did not continue systemic Deaf/Hard of Hearing testing program (HUD grant 2014 and 2015)
- Delayed systemic Assisted Living testing goals (HUD grant 2015-2016)
- Decrease in individual complaint enforcements (HUD grant; Averaged 30 per year before REO investigation, now averaging 15 per yr. 2014-2016)
- Decreased contacting Cities and Counties seeking E&O and/or Testing contracts (Strategic Plan)
- Did not conduct attorney recruitment effort (Strategic Plan)
- Limited Continuum marketing efforts (Strategic Plan; the Continuum averaged over $100,000 in contracts up through 2013; only $81,134 in 2014; only $15,356 in 2015; approx. $12,000 for 2016) that equals a loss of at least $191,510 2014-2016
- Did not create newsletter (Strategic Plan)

- Limited seeking contributions from foundations, corporations, etc. (Strategic Plan)
- Did not pursue Special Projects from Urban Institute & DOJ (Strategic Plan)
- Did not attend NCRC National Conference (March 2015 & 2016)
- Did not provide accessibility training at FL Architectural Conference
- Education, counseling, investigation, and capacity-building activities and services

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

**Name, Title, Hourly Rate**
- David Baade, President/CEO, $125 through the end of 2014; $150 as of 1/1/2015
- C.J. Miles, Deputy Director, $125 through the end of 2014; $150 as of 1/1/2015
- Marilyn McAndrew, Lead Test Coordinator, $125 through the end of 2014; $150 as of 1/1/2015
- Adriana Escander, REO Test Coordinator/Fair Housing Specialist, $125 through the end of 2014; $150 as of 1/1/2015
- Rose (Pardey) Miles, Fair Housing Specialist, $125 through the end of 2014; $150 as of 1/1/2015
- Suheil Cuevas, Administrative Assistant, $125 through the end of 2014; $150 as of 1/1/2015

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## THE CONTINUUM – FRUSTRATION OF MISSION DAMAGES

Plaintiff Fair Housing Continuum is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2012 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals. Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From 2013 to 2019, Plaintiff's programs and activities included homeownership promotion (*e.g.*, down payment assistance; closing cost assistance);
- From 2013 to 2019, Plaintiff's programs and activities included emergency repairs;
- From 2013 to 2019, Plaintiff's programs and activities included foreclosure prevention (*e.g.*, anti-displacement grants for renters and/or to bring mortgages current);
- From 2013 to 2019, Plaintiff's programs and activities included housing rehabilitation;
- From 2013 to 2019, Plaintiff's programs and activities included repurposing of blighted or vacant lots;
- From 2009 to 2019, Plaintiff's programs and activities included accessibility modifications;
- In 2017, Plaintiff's programs and activities included community enhancement (*e.g.*, support for the construction of a new Youth Center); and
- In 2015, Plaintiff's programs and activities included community engagement (*e.g.*, a trip to an Orlando business incubator in partnership with the Brevard Neighborhood Development Center).

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Training industry stakeholders on REO best practices, including training the Florida Real Estate Association, the Florida Affordable Housing Coalition, and the Florida Annual Fair Housing Summit on foreclosure, homeownership, and neighborhood stabilization;
- Advocacy/outreach to city and state governments; and
- Education of community members, including housing providers such as Concord Management.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services: From 2012–2019 Plaintiff would have sought and engaged in more local government contracts for education, training, investigation, and counseling, which would have led to capacity building, including increased staffing and services to clients and partners. Plaintiff had undertaken these types of activities on an ongoing basis since 1995, and Plaintiff continually sought to increase the ways in which it served its communities. Plaintiff would have been able to increase such work had it not been forced to divert resources to addressing Defendants' discriminatory REO conduct. All of Plaintiff's staff would have worked on these potential projects, and additional staff may have been hired to assist with the anticipated increase in workload.

- Executing new fair housing advocacy projects or investigations, including but not limited to special projects from the Urban Institute or the Department of Justice: From 2012-2019, Plaintiff would have sought and engaged in more contracts with national organizations, which would have led to capacity building, including increased staffing and services to clients and partners. Plaintiff already conducted investigations for the Urban Institute and the DOJ but did not actively seek work from those entities during the REO investigation even though one of Plaintiff's strategic goals at the time was to increase the ways in which it served its communities. All of Plaintiff's staff would have worked on potential projects, and additional staff may have been hired to assist with the anticipated increase in workload.

- Conducting additional consulting and training of housing providers, including but not limited to an accessibility training at the 2013 Florida Architectural Conference: In 2013 Plaintiff was the first fair housing agency in Florida to conduct investigations into accessibility in new construction buildings. Subsequently, Plaintiff was the first—and considered the best—trainer for the HUD Fair Housing Accessibility Guidelines in New Construction in Florida. Plaintiff conducted numerous accessibility-in-new-construction trainings throughout Florida. Plaintiff was invited to provide a training at the Florida Architectural Conference in Jacksonville in 2013, but the dates conflicted with Plaintiff's REO activities, so Plaintiff forewent the opportunity to attend the conference. President/CEO David Baade and C. J. Miles, Deputy Director would have conducted 6 hours of training at the conference.

- Applying for new grants and funding sources: From 2012-2019, Plaintiff would have applied for more grants for education, training, investigation, and counseling, which would have led to capacity building including increased staffing and services to clients and partners. Plaintiff had undertaken these types of activities in an ongoing basis since 1995, and Plaintiff continually sought to increase the ways in which it served its communities. Plaintiff would have been able to increase its grant applications had it not

been forced to divert resources to addressing Defendants' discriminatory REO conduct. All of Plaintiff's staff would have worked on potential grant projects, and additional staff may have been hired to assist with the anticipated increase in workload.

- Attending conferences, including the NCRC National Community Conference in 2015 and 2016: Attending the National Community Reinvestment Coalition Conference would have been an opportunity to network with others nationally conducting community reinvestment work. Plaintiff was engaged in community reinvestment work at the time, and the 2015 and 2016 conferences, which would have included networking and learning how other community development professionals conduct their work, would have benefited both Plaintiff and its partners in Plaintiff's community reinvestment endeavors. President/CEO and C. J. Miles, Deputy Director, conducted community reinvestment efforts and would have attended the conferences, which Mr. Baade had attended on several occasions in the past.

- Professional staff development, including but not limited to attorney recruitment: From 2012–2019 Plaintiff continually looked for qualified staffing, associations with other fair housing professionals, and partners that served similar communities. Training for Plaintiff's staff and seeking to build fair housing partnerships is integral to assisting Fair Housing Continuum's clientele. Plaintiff's entire staff was engaged in recruiting testers, attorneys, and partners to enhance our mission to ensure equal housing opportunity and eliminate discrimination in Florida. Because Plaintiff had to divert significant resources to investigating Defendants' discriminatory REO conduct, Plaintiff's staff development and recruiting efforts were limited.

- Participation in the Department of Housing and Urban Development's 2015 Deaf/Hard of Hearing testing program: In 2014 Plaintiff partnered with the National Fair Housing Alliance and other fair housing agencies in a Deaf/Hard of Hearing pilot investigation. It was an opportunity for Plaintiff to learn a new testing and investigation methodology and gain the ability to serve a broader spectrum of clients. All staff were trained in the methodology and assisted in the project. In 2015, Plaintiff forewent the opportunity to participate in another larger Deaf/Hard of Hearing investigation due to the resources Plaintiff was forced to divert to addressing Defendants' discriminatory REO conduct. All of Plaintiff's staff would have been involved in the investigation to some degree, although Adriana Escander and Marilyn McAndrew, Plaintiff's Test Coordinators, would have been responsible for the majority of the investigation.

- Marketing efforts, including but not limited to the production of a newsletter: From 2012-2019, Plaintiff would have engaged in more marketing, which would have led to capacity building, including increased staffing and services to clients and partners. Plaintiff had undertaken these types of activities on an ongoing basis since 1995, and Plaintiff continually sought to increase the ways in which it served its communities. All of Plaintiff's staff would have worked on potential projects, and additional staff may have been hired to assist with the anticipated increase in workload. For example, Plaintiff intended to start a newsletter to clients and partners to describe and promulgate Plaintiff's activities, which would have supported Plaintiff's marketing, education & outreach, and

24

fundraising efforts. Each year in the above-mentioned range, Plaintiff considered issuing newsletters but forewent the opportunity in part because of the resources Plaintiff was forced to divert to address Defendants' discriminatory REO conduct. All of Plaintiff's staff would have contributed to all marketing efforts. David Baade, Marilyn McAndrew, and Adriana Escander would have been primarily responsible for the publication and distribution of a newsletter.

All of the above-described efforts were part of Plaintiff's Strategic Plan, and all were affected by Plaintiff's reduced capacity because it was forced to divert resources in response to Defendants' discriminatory REO conduct. The hours of Plaintiff's staff and testers that were dedicated to REO activities were hours diverted from Plaintiff's goals and objectives.

In addition, the Continuum engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: 189 presentation/speaking events dealing with REO issues from July 2013 through April 2018 as well as engaging with media to raise awareness of REO-related issues.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.


**FAIR HOUSING CENTER OF CENTRAL INDIANA – DIVERSION OF RESOURCES**

Plaintiff Fair Housing Center of Central Indiana ("FHCCI") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties

compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From 2012 to 2014, Plaintiff received information regarding REO properties in its service area and underwent training to conduct an investigation of those properties;

- From 2012 to 2016, Plaintiff investigated 29 Bank of America REO properties and compiled the results of that investigation, which is reflected in the data base;

- From 2014 to 2018 and in 2019, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign, including mailings and e-newsletters;

- From 2013 through the present, Plaintiff met with local community development organizations and government officials regarding REO maintenance and marketing issues, including those resulting from Defendants' discriminatory practices;

- From 2013 through the present, Plaintiff met with local service providers regarding REO maintenance and marketing issues, including those resulting from Defendants' discriminatory practices;

- From 2015 to 2016, Plaintiff prepared and/or published 4 reports containing information regarding REO maintenance and marketing issues, including those resulting from Defendants' discriminatory practices; and

- From 2013 through the present, Plaintiff published press releases, engaged with media, and answered media-related inquiries to raise awareness of REO-related issues, including those resulting from Defendants' discriminatory practices.

Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

Plaintiff further states that in order to counteract Defendants' discriminatory behavior, it engaged in the following community outreach and public education efforts, which will be reflected in its summary of diversion:

| Event/Activity | Date | Location | FHCCI Staff | Resources Expended |
|---|---|---|---|---|
| Indiana Consortium of State and Local Human Rights Agencies | 6/23/2016 | Evansville, IN | Amy Nelson | Staff Time |
| Indiana Housing & Community Development Authority (IHCDA) | 8/25/2016 | Indianapolis, IN | Amy Nelson | Staff Time |
| Access to Justice | 10/28/2016 | Indianapolis, IN | Amy Nelson | Staff Time |
| Affordable Housing Association of Indiana (AHAI) | 11/9/2016 | Indianapolis, IN | Amy Nelson | Staff Time |
| Central Indiana Realtist Association (CIRA) Training | 1/4/2017 | Indianapolis, IN | Amy Nelson | Staff Time |
| NEAR (Near Eastside Redevelopment) | 2/9/2017 | Indianapolis, IN | Amy Nelson | Staff Time |
| FHCCI Annual Conference Lending Hot Topics Workshop | 4/6/2017 | Indianapolis, IN | Amy Nelson | Staff Time |
| Greater Indianapolis Progress Committee (GIPC) Race & Cultural Relations Leadership Network | 4/7/2017 | Indianapolis, IN | Amy Nelson | Staff Time |
| Munster Fair Housing Symposium | 4/27/2017 | Munster, IN | Amy Nelson | Staff Time |
| City of Indianapolis Neighborhood Liaisons | 6/15/2017 | Indianapolis, IN | Amy Nelson | Staff Time |
| Indiana Consortium of State and Local Human Rights Agencies | 8/23/2017 | Indianapolis, IN | Amy Nelson | Staff Time |
| MIBOR | 10/18/2017 | Indianapolis, IN | Amy Nelson | Staff Time |
| Bloomington Apartment Association | 4/17/2018 | Bloomington, IN | Amy Nelson | Staff Time |

| | | | | |
|---|---|---|---|---|
| University of Notre Dame Law School | 4/20/2018 | South Bend, IN | Amy Nelson | Staff Time |
| City of Mishawaka Fair Lending Training | 4/24/2018 | Mishawaka, IN | Amy Nelson | Staff Time |
| City of Indianapolis Greater Indianapolis Progress Committee (GIPC) Race & Cultural Relations Leadership Network | 5/4/2018 | Indianapolis, IN | Amy Nelson | Staff Time |
| Indiana Consortium of State and Local Human Rights Agencies | 6/21/2018 | South Bend, IN | Amy Nelson | Staff Time |
| Central Indiana Realtist Association (CIRA) Training | 10/3/2018 | Indianapolis, IN | Amy Nelson | Staff Time |
| City of Indianapolis Sales & Lending | 10/17/2018 | Indianapolis, IN | Amy Nelson | Staff Time |
| FHCCI Legal Seminar | 11/9/2019 | Indianapolis, IN | Amy Nelson | Staff Time |

During the above outreach and education activities, Plaintiff shared updates regarding its REO work to further notify the public about issues uncovered and ways for residents to recognize similar concerns.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|---|---|---|
| Amy Nelson | Executive Director | $250.00 |
| Brady Ripperger | Fair Housing Projects Coordinator | $90.00 |
| Cristina Nape | Test Coordinator | $75.00 |
| Alexis Thomas | Test Coordinator | $75.00 |
| Andrea Kirschling | Test Coordinator | $75.00 |
| Jacqui Langer | Test Coordinator | $75.00 |
| Noe Rojas | Neighborhood Projects Coordinator | $80.00 |
| Ruby Tregnago | Office Operations Coordinator | $95.00 |

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Conducting additional training of housing providers;
- Applying for new grants and funding sources;
- Advocating on state policy changes; and
- Professional staff development.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## FHCCI – FRUSTRATION OF MISSION DAMAGES

Plaintiff Fair Housing Center of Central Indiana is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2012 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From 2014 to 2015, Plaintiff's programs and activities included emergency repairs;
- From 2013 to 2015, Plaintiff's programs and activities included housing rehabilitation;
- From 2013 to 2015, Plaintiff's programs and activities included repurposing of blighted or vacant lots;
- From 2012 to 2016, Plaintiff's programs and activities included accessibility modifications;

- From 2014 to 2015, Plaintiff's programs and activities included community enhancement, including an arts project and creation of a pocket park; and
- From 2014 to 2015, Plaintiff's programs and activities included community engagement, including a bike camp, farmer's market, and urban teaching garden.

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff Fair Housing Center of Central Indiana's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregating;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Establishment of industry best practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices;
- Advocacy/outreach to city and state governments; and
- Education of community members regarding foreclosure, homeownership, and neighborhood stabilization.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

30

| Activity | Date | Description of Project | Staff |
|---|---|---|---|
| Education, counseling, investigation, and capacity-building activities and services | 2012-2015 | Because of its REO work, Plaintiff has been unable to establish an online tester reporting process. Plaintiff was also forced to delay its initiation of updates and upgrades, including but not limited to moving its timekeeping online, switching its investigation methods to electronic means, and obtaining staff cell phones and laptops. | All staff |
| Executing new fair housing advocacy projects or investigations | 2012-2015 | Because of its REO work, Plaintiff has been unable to expand investigations of lending and insurance transactions, start new sales investigations, and fully develop investigations of code enforcement impacting neighborhoods of color. | All staff |
| Conducting additional training of housing providers | 2012-2016 | Because of its REO work, Plaintiff has been unable to create and conduct fair housing trainings that focus on sales and issues around REO maintenance. | Amy Nelson |
| Applying for new grants and funding sources | 2012-2016 | Because of its REO work, Plaintiff has been unable to apply for funds from or develop effective relationships with local funders, including Central Indiana Community Foundation and Lilly Foundation. Plaintiff has also been unable to foster relationships for Community Development Block Grant funding at various entitlement jurisdictions. | Amy Nelson |
| Advocating for state policy changes | 2012-current | Because of its REO work, Plaintiff has been unable to advocate for additional state protections against discrimination based on source of income, gender identity, sexual orientation, age, and criminal history. Plaintiff has also been unable to advocate for better renter-based protections under Indiana Landlord/Tenant laws. | Amy Nelson |

| | | Because of its REO work, Plaintiff has been unable to have staff participate in events and conferences to build their housing knowledge to address larger systemic needs. For example, various members of Plaintiff's staff forewent attending annual conferences held by the National Community Reinvestment Coalition, National Low- Income Housing Coalition, National Legal Aid and Defender Association, National Alliance of Community Economic Development Associations, and John Marshall Law School. | |
|---|---|---|---|
| Professional staff development | 2012-2016 | | All staff |

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages may be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## FAIR HOUSING CENTER OF GREATER PALM BEACHES – DIVERSION OF RESOURCES

Plaintiff Fair Housing of the Greater Palm Beaches seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From December 2013 to December 2014, Plaintiff received information regarding Bank of America's REO properties in its service area and its staff underwent training to conduct an investigation of those properties;
- From February 21, 2014 to March 11 2014, Plaintiff investigated 48 Bank of America REO properties and evaluated the results of that investigation;
- From October 2014 through the present, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign;

- From March 2015 through the present, Plaintiff held workshops for community service providers and local housing providers, including realtors and the Palm Beach County and Delray Beach Housing Authorities, regarding fair housing obligations and REO maintenance issues;
- From May 2015 through the present, Plaintiff counseled members of the greater Palm Beach metropolitan region on their fair housing rights, including the impact of discriminatory REO maintenance practices.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Conducting additional consulting and training of housing providers;
- Applying for new grants and funding sources;
- Attending conferences; and
- Professional staff development.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Vince Larkins | President & CEO | $300 |
| Jennifer Perez | Fair Housing Specialist/Testing Coordinator | $175 |

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and

will, modify and supplement these calculations and demands as further investigation and analysis require.

## FHGPB – FRUSTRATION OF MISSION DAMAGES

Plaintiff Fair Housing of the Greater Palm Beaches is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2013 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From 2000 through the present, Plaintiff's programs and activities have included homeownership promotion; and
- From 2000 through the present, Plaintiff's programs and activities included foreclosure prevention.

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff FHCGPB's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Ensuring equal and affordable housing opportunity for all people by promoting culturally diverse communities through open housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Educating housing providers on REO best practices;
- Educating community members re: foreclosure, homeownership, neighborhood stabilization, etc.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- FHCGPB forewent applications for new grants and funding sources and the execution of new fair housing advocacy projects or investigations because it was forced to divert resources to addressing Defendants' discriminatory REO conduct. More specifically, the FHCGPB was to apply for a HUD grant under the Fair Housing Initiative Program EOI (Education & Outreach) component in 2014 and 2015. The project would have been spearheaded by Vince Larkins, President/CEO, who has been with the FHCGPB since 2000. As a result of the REO investigation Mr. Larkins was not able to write and apply for the grants. These grants, which totaled $200,000 over 2014 and 2015 would have provided resources and critical hiring of staff in order to provide comprehensive outreach to Palm Beach County's non-English speaking communities and people with disabilities regarding their fair housing rights. In addition, this project was to include training for Homeowner and Condo Associations on their obligations and responsibilities under the Fair Housing Act. The FHCGPB has never conducted such a county-wide initiative.

- FHCGPB forewent professional staff development because it was forced to divert resources to addressing Defendants' discriminatory REO conduct. More specifically, Vince Larkins forewent the National Rural Housing Conference on December 2-5, 2014. This missed opportunity deprived Plaintiff of critical training consisting of organizational management, resource development and innovative approaches to housing. In addition, Plaintiff was unable to accomplish the Western County Initiative Project, which would have allowed the FHCGPB to expand its mission of facilitating affordable housing in order to better serve residents in our Western Palm Beach County rural Glades area.

35

- FHCGPB forewent the opportunity to conduct additional consulting and training of housing providers because it was forced to divert resources to addressing Defendants' discriminatory REO conduct. More specifically, FHCGPB would have been able to conduct Education and Outreach to all thirty-nine municipalities of Palm Beach County had it not been for the REO investigation in 2014 and 2015. Those who would have been targeted for this activity include city managers, city and county officials, and planning commissions and building departments regarding expanding fair housing laws concerning several groups and populations that often are denied housing because of sources of income, employment status in relation to military service, and recovery from a history of domestic violence.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## FAIR HOUSING COUNCIL OF GREATER SAN ANTONIO – DIVERSION OF RESOURCES

The Fair Housing Council of Greater San Antonio ("FHCGSA") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From January 2016 to March 2016, Plaintiff received information regarding Bank of America's REO properties in its service area and its staff underwent training to conduct an investigation of these properties;

- From March 24, 2016, to July 12, 2017, Plaintiff investigated 40 Bank of America REO properties, evaluated the results of those investigations, and interviewed one impacted neighbor;

- From February 14, 2017, to June 29, 2017, Plaintiff developed and distributed educational materials and surveys to thirty-one (31) neighbors of Bank of America's REO properties as part of its counteractions to locate impacted neighbors and educate neighbors about discriminatory housing practices involving Bank of America REO properties;

- From August 31, 2016, through the present, Plaintiff shared informative news articles on social media and posted paid educational advertisements on social media in order to counteract Defendants' discriminatory conduct and educate the public regarding discriminatory housing practices involving REOs;

As a result of this expenditure of time and resources, FHCGSA was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forego opportunities which would have substantially furthered Plaintiff's organizational goals including:

- Conducting planned in-person rental testing activities in Cameron County, Hidalgo County, Starr County, and Willacy County;
- Conducting planned in-person education and outreach activities in Cameron County, Hidalgo County, Starr County, and Willacy County;
- Conducting planned in-person new construction home sales testing activities in Nueces County;
- Conducting planned in-person education and outreach activities in Nueces County;
- Conducting tester recruitment activities planned for Cameron County, Hidalgo County, Nueces County, Starr County, and Willacy County;
- Applying for new grants and funding sources;

Plaintiff's staff who diverted time to investigating and counteracting Defendants' discriminatory conduct include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Sandra Tamez | Executive Director | $200 |
| Roxann Contreras | Testing Program Manager/Enforcement Program Manager | $125 |
| Susan Bartik | Enforcement Program Manager | $125 |
| Aleta Runnels | Fair Housing Specialist | $100 |
| Cody Johnson | Fair Housing Specialist | $100 |
| Karla Byrd | Fair Housing Specialist | $100 |
| Sokoiya Thomas | Fair Housing Specialist | $100 |
| Stephanie Hernandez | Intake Specialist | $75 |
| Amanda Gonzalez | Program Assistant | $50 |
| Jo Ann Rodriguez | Program Assistant | $50 |

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## FHCGSA – FRUSTRATION OF MISSION DAMAGES

Plaintiff FHCGSA is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least January 2016 by

interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Defendants have frustrated Plaintiff's mission by interfering with Plaintiff's planned testing, tester recruitment, and education and outreach activities aimed at affirmatively further fair housing in Cameron County, Hidalgo County, Nueces County, Starr County, and Willacy County; harming its clients and client communities; and impairing its broader goals of promoting fair housing and fair lending, promoting the creation of diverse, inclusive, and affordable communities, eliminating racial segregation, eradicating housing discrimination, and ensuring equal housing opportunities for all persons in its service area.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Promoting fair housing and fair lending;
- Promoting the creation of diverse, inclusive, and affordable communities;
- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating housing discrimination; and
- Ensuring equal housing opportunities for all persons in its service area.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Education and outreach to community members regarding foreclosure, homeownership, neighborhood stabilization, and community development;
- Advocacy and outreach to government officials; and
- Identification and comparison of industry best practices to current area practices for REO maintenance and marketing.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Conducting planned in-person rental testing activities in Cameron County, Hidalgo County, Starr County, and Willacy County;
- Conducting planned in-person education and outreach activities in Cameron County, Hidalgo County, Starr County, and Willacy County;
- Conducting planned in-person new construction home sales testing activities in Nueces County;
- Conducting planned in-person education and outreach activities in Nueces County;
- Conducting tester recruitment activities planned for Cameron County, Hidalgo County, Nueces County, Starr County, and Willacy County; and
- Applying for new grants and funding sources.

Because Plaintiff continues to conduct community outreach and public education effort in order to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement this Interrogatory response as the facts require.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.


## FAIR HOUSING CENTER OF NORTHERN ALABAMA – DIVERSION OF RESOURCES

The Fair Housing Center of Northern Alabama ("FHCNA") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties

compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From 2016 to 2017, Plaintiff received information regarding Bank of America's REO properties in its service area and its staff underwent training to conduct an investigation of those properties;
- From 2016 to 2017, Plaintiff investigated approximately 28 Bank of America REO properties in its service area, and analyzed the results of that investigation;
- From 2016 to 2018, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign, including distributing flyers asking residents to contact its office with information regarding poorly maintained REO properties;
- From 2016 to 2018, Plaintiff conducted more than 30 presentations at neighborhood and community meetings and other housing programs on the topic of REO maintenance and marketing issues, including those resulting from Defendants' discriminatory practices.

As a result of this expenditure of time and resources, FHCNA was forced to divert resources and time away from other planned programs and projects. FHCNA had to forego submission of local funding applications due to the time needed to successfully complete and submit including, but not limited to, from the Community Foundation and United Way in both 2017 and 2018.

Defendants' discriminatory conduct also caused Plaintiff to forego opportunities which would have substantially furthered Plaintiff's organizational goals including:

- Staff development through attendance at conferences and other workshops;
- Increased consultant work through conducting trainings for housing providers;
- Education and outreach sessions regarding other fair housing topics.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources

will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## FHCNA – FRUSTRATION OF MISSION DAMAGES

The Fair Housing Center of Northern Alabama is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2016 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- Limiting the number of fair housing presentations to local governments in other communities;
- Limiting participation in community advocacy activities;
- Increasing the need for education on the negative impact of poorly maintained REO properties.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

42

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Education of community members re: foreclosure, homeownership and neighborhood stabilization; and
- Advocacy/outreach to city governments.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## FAIR HOUSING CENTER OF WESTERN MICHIGAN – DIVERSION OF RESOURCES

Plaintiff Fair Housing Center of West Michigan seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From October 2011 to October 2014, Plaintiff's staff underwent training to conduct an investigation of Bank of America REO properties;
- From 2012 to 2017, Plaintiff received information and investigated approximately 225 Bank of America properties;
- On the following dates Plaintiff held workshops regarding Defendants' discriminatory REO practices as part of its annual Fair Housing Luncheon & Workshop Series: May 22, 2014, and May 21, 2015;

- On the following dates, Plaintiff spoke to local code and government officials regarding Defendants' discriminatory REO practices: September 5, 2013, October 16, 2013, March 15, 2016, and September 29, 2016;
- On the following dates, Plaintiff met with local service providers to discuss Defendants' discriminatory REO practices: July 8, 2013, July 9, 2013, July 15, 2013, July 15, 2013, September 26, 2013, February 6, 2014, February 13, 2014, February 19, 2014, March 20, 2014, March 26, 2014, and March 26, 2014;
- On the following dates, Plaintiff met with stakeholders and community groups to discuss Defendants' discriminatory REO practices: July 11, 2013, July 15, 2013, July 18, 2013, July 18, 2013, July 30, 2013, August 6, 2013, August 6, 2013, August 8, 2013, August 12, 2013, August 28, 2013, August 28, 2013, December 4, 2013, December 4, 2013, January 7, 2014, March 4, 2014, March 18, 2014, March 20, 2014, April 23, 2014, May 28, 2014, August 4, 2014, September 22, 2014, January 19, 2015, March 3, 2016, March 29, 2016, March 23, 2017, April 5, 2017, May 14, 2017, August 10, 2017, August 21, 2017, and August 16, 2017;
- In the following months, Plaintiff published newsletters to raise awareness about Defendants' discriminatory REO practices: March 2014, July 2014, March 2015, and June 2015;
- On July 26, 2017 and February 1, 2018, Plaintiff engaged with media to raise awareness about Defendants' discriminatory REO practices; and
- On March 3, 2016, Plaintiff participated in a community event to raise awareness about Defendants' discriminatory REO practices.

As a result of this expenditure of time and resources, the Fair Housing Center of West Michigan was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming. Defendants' discriminatory conduct caused Plaintiff to forego opportunities including community meetings and collaborative efforts, consulting opportunities, conferences and staff development, other systemic investigations, and funding applications.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
| --- | --- | --- |
| Nancy Haynes | Executive Director | $200 |
| Elizabeth Stoddard | Director of Advocacy | $120 |
| Gabe Chapla | Test Coordinator | $100 |
| Mandy Zweifel-Hughes | Fair Housing Specialist II | $100 |

| Megan Derks | Program Assistant | $80 |
| Liz Keegan | Director of Education & Outreach | $120 |
| Madelaine Clapp | Education & Outreach Coordinator | $80 |

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## FHCWM – FRUSTRATION OF MISSION DAMAGES

Plaintiff Fair Housing Center of West Michigan is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least May 2013 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From June 2013 to October 2015, Plaintiff's programs and activities included homeownership promotion (*e.g.*, down payment assistance; closing cost assistance);
- From June 2013 to October 2015, Plaintiff's programs and activities included critical exterior home repairs;
- From June 2013 to October 2015, Plaintiff's programs and activities included housing rehabilitation;

- From June 2013 to October 2015, Plaintiff's programs and activities included repurposing of blighted or vacant lots;
- From June 2013 to October 2015, Plaintiff's programs and activities included accessibility modifications;
- From June 2013 to October 2015, Plaintiff's programs and activities included community enhancement (*e.g.*, construction of green spaces and revitalization of recreation areas);
- From June 2013 to October 2015, Plaintiff's programs and activities included community engagement (*e.g.*, summer camps, leadership programs, community safety initiatives); and
- From June 2013 to October 2015, Plaintiff's programs and activities included environmental health (*e.g.* weatherization, home health hazard assessments, and intervention).

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff Fair Housing Center of West Michigan's core services. For example, Defendants harmed Plaintiff's clients by destabilizing communities of color in West Michigan, rendering them less desirable to potential homebuyers, depressing property values, and exacerbating their slow recovery from the housing market collapse.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Preventing and eliminating illegal housing discrimination;
- Ensuring equal housing opportunity;
- Building an understanding of the value of fair housing;
- Increasing support for fair housing; and
- Promoting diverse, open communities.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Plaintiff's goal of advancing sustainability, universal design, economic development and vibrant communities through fair housing training;
- Plaintiff's goal of establishing strong partnerships with financial institutions; and
- Plaintiff's advocacy and outreach regarding fair housing to city and state governments.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

| Date/Time Period | Category of Foregone Opportunity | Title | Potential Staff Involved | Description |
|---|---|---|---|---|
| 10/3/2013 | Coalition meeting | Seeds of Promise Reception | Nancy Haynes | FHCWM has been involved with Garfield Park Neighborhood Organization and Southeast Community Association since 2006. Seeds of Promise is an offshoot of both of those organizations. Because FHCWM diverted resources to addressing Defendants' discriminatory conduct, Plaintiff had to forego a Coalition Meeting that included discussions of collaborative efforts and projects related to Seeds of Promise. |
| 10/7/2013 – 10/8/2013 | Staff development | Racial Equity Seminar | Nancy Haynes | FHCWM was unable to attend a seminar hosted by the Leadership Collaborative on Civil Rights convened by the Michigan Department of Civil Rights to provide organizations engaged in Civil Rights with training on racial equity as well as opportunities to network and explore potential |
| 12/11/2013 | Coalition Meeting | West Michigan Leadership Collaborative Meeting | Nancy Haynes | FHCWM has been involved in Collaborative since its origin in 2008 and involved in a leadership capacity with the organization since 2010. Because FHCWM diverted resources to addressing Defendants' discriminatory conduct, Plaintiff had to forego a Coalition Meeting that |

| | | | | included discussions about collaborative efforts and projects. |
|---|---|---|---|---|
| 6/5/2014 | Coalition Meeting | Non-Profit Next | Nancy Haynes | FHCWM has been involved with Non-Profit Next since it was started as a program by Ottawa County United Way in 2011. Because FHCWM diverted resources to addressing Defendants' discriminatory conduct, Plaintiff had to forego a coalition meeting that included planning and goal setting sessions for non-profits serving Ottawa County as well as |
| 9/17/2014 | Coalition Meeting | West Michigan Leadership Collaborative Meeting | Nancy Haynes | FHCWM has been involved in Collaborative since its origin in 2008 and involved in a leadership capacity with the organization since 2010. Because FHCWM diverted resources to addressing Defendants' discriminatory conduct, Plaintiff had to forego a coalition meeting that included discussions about collaborative efforts and projects. |
| 12/4/2014 | Coalition Meeting | South Division Corridor Project Meeting | Nancy Haynes | City of Grand Rapids partnered with Garfield Park Neighborhoods Association to engage in detailed visioning and planning for stabilization and redevelopment of the business corridor and neighborhoods surrounding the corridor. FHCWM began involvement with Garfield Park Neighborhoods Association in Spring of 2013, and the Association partnered with the City of Grand Rapids to begin this project. FHCWM missed the coalition meeting because it was forced to divert its resources because of Defendants' discriminatory conduct. |
| January 1 – December 31, 2015 | Grant application/ Project | FY2014 HUD FHIP FHOI Lending grant | Nancy Haynes, Elizabeth Stoddard, Gabe Chapla, Liz Keegan | FHCWM was unable to apply for one-year funding up to $325,000 to build capacity and/or support continued implementation of initiatives addressing mortgage lending discrimination and providing education on enforcement of the Fair Housing Act pertaining to mortgage lending. |

| 6/15/2015 | Staff Development | Traverse City Housing Summit | Nancy Haynes | FHCWM was unable to attend a Day of Workshops with luncheon and keynote speaker to discuss affordable housing and housing policy in 10 counties in northern lower Michigan. |
|---|---|---|---|---|
| 6/30/2015 | Coalition Meeting | West Michigan Leadership Collaborative Meeting | Nancy Haynes | FHCWM has been involved in Collaborative since its origin in 2008 and involved in a leadership capacity with the organization since 2010. Because FHCWM diverted resources to addressing Defendants' discriminatory conduct, Plaintiff had to forego a coalition meeting that included discussions about collaborative efforts and projects. |
| January 1 – December 31, 2016 | Grant application/ Project | FY2015 HUD FHIP Special Emphasis Component/ Systemic Investigations grant | Nancy Haynes, Elizabeth Stoddard, Gabe Chapla, Liz Keegan | FHCWM was unable to apply for one-year funding up to $350,000 to strengthen their enforcement activities and build their capacity to conduct fair housing enforcement activities and fair housing education in Metropolitan Statistical Areas with a population of 1 million or greater and to pursue systemic cases that affect large numbers of people as well as pursue individual complaints. |
| 12/7/2017 | Consulting Opportunity | Amplify Community Meeting | Nancy Haynes | Because FHCWM diverted resources to addressing Defendants' discriminatory conduct, Plaintiff had to forego an opportunity to engage in visioning and planning sessions with a new initiative committed to redeveloping and stabilizing the Southeast side of Grand Rapids and to providing a fair housing perspective to concerns regarding gentrification and displacement. |
| 2008-2017 | Program | Fair Housing Book Club | Nancy Haynes, Liz Keegan | Because FHCWM diverted resources to addressing Defendants' discriminatory conduct, Plaintiff had to indefinitely suspend a FHCWM-led book club regarding fair housing related issues. |

In addition, the Fair Housing Center of West Michigan engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendants' conduct. It engaged in the following community outreach and public education efforts:

| Date | Activity | Location | Staff | Resources Expended | Duration (in Hours) |
|---|---|---|---|---|---|
| 7/8/2013 | FHCWM staff met with a representative from Friends of Grand Rapids Parks to discuss the 49507! Project. | Grand Rapids, MI | Nancy Haynes, Liz Keegan | Staff Time | 1.5 |
| 7/9/2013 | FHCWM staff met with a representative from Friends of Grand Rapids Parks to discuss the 49507! Project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1.5 |
| 7/11/2013 | FHCWM staff met with Rick Chapla of The Right Place and Lee Nelson Weber (49507! Project Coordinator/Dyer Ives Foundation) to discuss economic development in the 49507! target area, including opportunities for job creation and growth, existing assets, and the relationship to housing opportunity. | Grand Rapids, MI | Nancy Haynes, Liz Keegan, Elizabeth Stoddard, Gabe Chapla | Staff Time | 1.5 |

| 7/15/2013 | FHCWM staff met with Darel Ross of LINC to discuss the 49507! neighborhood project, current housing assets and needs, and opportunities for leverage and partnership. | Grand Rapids, MI | Nancy Haynes, Liz Keegan, Elizabeth Stoddard | Staff Time | 1 |
|---|---|---|---|---|---|
| 7/15/2013 | FHCWM staff met with John Helmholdt of GRPS to discuss the 49507! Project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2 |
| 7/15/2013 | FHCWM staff met with Steve Faber of Friends of GR Parks to discuss the 49507! neighborhood project, current housing assets and needs, current green spaces and environmental needs, and opportunities for leverage and partnership. | Grand Rapids, MI | Nancy Haynes, Liz Keegan, Elizabeth Stoddard | Staff Time | 1 |
| 7/18/2013 | FHCWM staff met with Lee Nelson Weber and representatives from GVSU to discuss a multi-disciplinary study and project related to the 49507! Project. | Grand Rapids, MI | Nancy Haynes, Elizabeth Stoddard | Staff Time | 3 |
| 7/18/2013 | FHCWM staff met with Lee Nelson Weber and seven representatives of GVSU to discuss the 49507! neighborhood project and opportunities for partnership and collaboration, particularly as it relates to impact measurement. | Grand Rapids, MI | Nancy Haynes, Elizabeth Stoddard | Staff Time | 1 |

| 7/30/2013 | FHCWM staff met with Ruth Stegeman, of GVSU, and Lee Nelson Weber to discuss the potential partnership between FHCWM and GVSU on the 49507! neighborhood initiative. | Grand Rapids, MI | Nancy Haynes, Liz Keegan, Elizabeth Stoddard | Staff Time | 1 |
|---|---|---|---|---|---|
| 8/6/2013 | FHCWM staff accompanied Board member Michelle Behrenwald to a meeting with Herb Lantinga of Notions Marketing to discuss his interest in the 49507! area and the 49507! project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1 |
| 8/6/2013 | FHCWM staff met with GVSU faculty, staff and Lee Nelson Weber to discuss data collection, student projects and project evaluation with GVSU for the neighborhood revitalization project. | Grand Rapids, MI | Nancy Haynes, Liz Keegan, Elizabeth Stoddard | Staff Time | 2 |
| 8/8/2013 | FHCWM staff met with Kim McClaughlin of the Grand Rapids Area Chamber of Commerce. Staff discussed opportunities for partnership, and FHCWM's systemic initiatives in the 49507! neighborhood. | Grand Rapids, MI | Elizabeth Stoddard | Staff Time | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 8/12/2013 | FHCWM staff met with 3 representatives of GVSU, including two faculty members from the history department, to discuss additional opportunities for partnership in the Fall 2013 semester and ongoing, particularly as it relates to the 49507! neighborhood initiative. | Grand Rapids, MI | Liz Keegan, Elizabeth Stoddard | Staff Time | 1.5 |
| 8/28/2013 | FHCWM staff met with Dan Otten of GRAR to discuss the 49507! neighborhood reinvestment project and his participation on the Advisory Committee. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1.5 |
| 8/28/2013 | FHCWM staff met with Fran Dalton of the Garfield Park Neighborhoods Association to discuss the 49507! project and the impact on opening up housing choice in the area. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2 |
| 9/5/2013 | FHCWM staff and Lee Nelson Weber met with Mayor George Heartwell of the City of Grand Rapids about the 49507! Project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1 |
| 9/18/2013 | FHCWM staff presented fair housing information to GVSU economics and geology students. | Allendale, MI | Liz Keegan | Staff Time | 0.33 |

| | | | | | |
|---|---|---|---|---|---|
| 9/26/2013 | FHCWM staff met with Lee Weber and representatives from organizations interested in partnering on the 49507! Project to discuss a draft plan. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1 |
| 10/16/2013 | FHCWM staff participated in a City of Grand Rapids Design Team walk through of the area covered by the 49507! Project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1 |
| 12/4/2013 | FHCWM staff met with Lee Nelson Weber, consultant, and Ruth Stegeman, GVSU, to discuss the FHCWM partnership with GVSU on efforts related to the 49507! Neighborhood Initiative. | Grand Rapids, MI | Nancy Haynes, Elizabeth Stoddard | Staff Time | 2 |
| 12/4/2013 | FHCWM staff met with a sociology professor from GVSU to discuss plans for student work on the 49507! Project in 2014. | Grand Rapids, MI | Nancy Haynes, Liz Keegan, Elizabeth Stoddard | Staff Time | 2 |
| 1/7/2014 | FHCWM staff met with Ruth Stegeman to discuss GVSU/FHCWM collaboration on 49507! Project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2 |
| 2/6/2014 | FHCWM staff participated in a meeting with Habitat for Humanity Kent County to discuss the possibility of doing more Brush with Kindness work under the 49507! Project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2 |

| 2/13/2014 | FHCWM staff met with representatives from LINC to discuss potential work under the 49507! Project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1.5 |
|---|---|---|---|---|---|
| 2/19/2014 | FHCWM Staff met with representatives from LINC to discuss potential work under the 49507! Project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1 |
| 3/4/2014 | FHCWM staff hosted and participated in a meeting of community stakeholders to discuss the possibility of establishing a park at Southfield. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2.5 |
| 3/18/2014 | FHCWM staff represented FHCWM at a meeting related to the 49507! Project to share and discuss a parks assessment conducted by a GVSU student. | Grand Rapids, MI | Liz Keegan | Staff Time | 1 |
| 3/20/2014 | FHCWM staff met with representatives from Next Step to discuss potential of working with them under 49507! Project to do exterior improvements. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2 |
| 3/20/2014 | FHCWM staff met with professors and project staff from GVSU to discuss the status of student projects under the 49507! Project and plans for the May 22, 2014 event as well as next semester. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2.5 |

| 3/26/2014 | FHCWM staff met with staff of the Healthy Homes Coalition to discuss work being conducted under the 49507! Project. | Grand Rapids, MI | Nancy Haynes, Liz Keegan | Staff Time | 1 |
|---|---|---|---|---|---|
| 3/26/2014 | FHCWM staff met with representatives from the 49507! Project and Healthy Homes to discuss outcomes from the Quick Start grant as well as ideas for how to get the biggest impact from next round of funding for Healthy Homes. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2 |
| 4/23/2014 | FHCWM staff attended a meeting with Huntington Bank president John Irwin, Renee Williams and Lee Nelson Weber regarding work in the 49507! Project area and other ways to partner with Huntington Bank. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1.5 |
| 5/22/2014 | Workshops regarding Defendants' discriminatory REO practices as part of its annual Fair Housing Luncheon & Workshop Series. Speakers included Shanna | Grand Rapids, MI | Liz Keegan | Out-of-pocket expenses | 3 hours of workshops and at least 20 hours of preparation time |

| | | | | | |
|---|---|---|---|---|---|
| | Smith (National Fair Housing Alliance), Lee Nelson Weber (49507! Project Coordinator/Dyer Ives Foundation), Tyler Smith (Wells Fargo), Darel Ross (LINC Community Revitalization), Paul Haan (Healthy Homes Coalition), and Scott Jonkhoff (Next Step of West Michigan). | | | | |
| 5/28/2014 | FHCWM staff met with representatives from Habitat for Humanity to discuss the 49507! Project and opportunities to partner in the future. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1.5 |
| 8/4/2014 | FHCWM staff met with representatives from the 616 Development to discuss the 49507! Project and opportunities for partnering. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2 |
| 9/22/2014 | FHCWM staff (all) participated in a bus tour of the 49507! Project area for Board members, staff, community partners, dignitaries and other community stakeholders to view advancements and opportunities and discuss the impact of the project on the area. | Grand Rapids, MI | Nancy Haynes, Liz Keegan, Gabe Chapla, Mandy Zweifel-Hughes | Staff Time | 3 |

| 1/19/2015 | FHCWM staff (NLH) met with representatives from the City of Grand Rapids, GRPS schools, Dickinson School, and KSSN to discuss the Safe Routes to School Initiative under the 49507! Project. | Grand Rapids, MI | Nancy Haynes | Staff Time | 2 |
|---|---|---|---|---|---|
| 3/3/2016 | FHCWM staff presented fair housing data findings and cases to the CRI VOICE GR by the Johnson Center at the Salvation Army's Kroc Center. | Grand Rapids, MI | Nancy Haynes | Staff Time | 1.33 |
| 3/15/2016 | FHCWM staff presented fair housing data and cases to the City Commission for the City of Grand Rapids. | Grand Rapids, MI | Nancy Haynes, Liz Keegan, Elizabeth Stoddard | Staff Time | 0.17 |
| 3/29/2016 | FHCWM staff presented Fair Housing & Social Stratification to sociology students at Aquinas College. | Grand Rapids, MI | Liz Keegan | Staff Time | 0.5 |
| 9/29/2016 | FHCWM staff presented fair housing information to staff of Muskegon County and the cities of Muskegon, Norton Shores and Muskegon Heights. | Muskegon, MI | Liz Keegan, Elizabeth Stoddard, Nancy Haynes | Staff Time | 0.5 |
| 3/23/2017 | FHCWM staff presented fair housing training and a fair housing update to members of the Michigan Mortgage Lenders Association | Grandville, MI | Liz Keegan | Staff Time | 0.33 |

| | | | | | |
|---|---|---|---|---|---|
| | West Michigan Chapter (MMLA). | | | | |
| 4/5/2017 | FHCWM staff presented Fair Housing & Social Stratification to sociology students at Aquinas College. | Grand Rapids, MI | Liz Keegan and Gabriel Chapla | Staff Time | 0.67 |
| 5/14/2017 | FHCWM staff provided fair housing information to the Westminster Presbyterian Church congregation, all of whom indicated an interest in becoming testing volunteers. | Grand Rapids, MI | Madelaine Clapp | Staff Time | 0.33 |
| 8/10/2017 | FHCWM staff presented information about fair housing laws and rights to GR Homes for All. | Grand Rapids, MI | Liz Keegan | Staff Time | 0.5 |
| 8/16/2017 | FHCWM staff met with members of the Executive Committee of the Muskegon NAACP to discuss a presentation. | Muskegon, MI | Nancy Haynes | Staff Time | 1 |
| 8/21/2017 | FHCWM staff presented to the Muskegon chapter of the NAACP about fair housing and opportunities for partnerships. | Muskegon, MI | Nancy Haynes | Staff Time | 1 |
| March 2014 | Plaintiff published newsletters to raise awareness about discriminatory REO practices. | Grand Rapids, MI | General | Out-of-pocket expenses | 2 |

| March 2015 | Plaintiff published newsletters to raise awareness about discriminatory REO practices. | Grand Rapids, MI | General | Out-of-pocket expenses | 2 |
|---|---|---|---|---|---|
| June 2015 | Plaintiff published newsletters to raise awareness about discriminatory REO practices. | Grand Rapids, MI | General | Out-of-pocket expenses | 2 |

The Fair Housing Center of West Michigan has also expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained REO properties in those communities.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## LOUISIANA FAIR HOUSING ACTION CENTER – DIVERSION OF RESOURCES

Plaintiff Louisiana Fair Housing Action Center ("LAFHAC") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From March 2013 to February 2017, Plaintiff identified Bank of America REO properties in its service area and underwent training to conduct an investigation of those properties;

- From March 2013 to February 2017, Plaintiff investigated 118 Bank of America REO properties and evaluated the results of that investigation;

- From March 2014 to July 2017, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign;

- In 2015 and 2016, Plaintiff organized and conducted trainings to groups of service providers in the Greater New Orleans area, including meeting with BlightsOut, an organization dedicated to eradicating blight;

- In 2014 and 2016, Plaintiff met with government officials regarding REO maintenance, prompted in part by Defendants' discriminatory maintenance and marketing practices;

- In 2014, Plaintiff created public service announcements and advertised in local print and radio to raise awareness of fair lending issues, prompted in part by Defendants' discriminatory maintenance and marketing practices; and

- In 2014 to 2016, Plaintiff participating in community events, including the Mission Possible Conference with over 100 conference attendees, and engaged with media to raise awareness of REO-related issues, prompted in part by Defendants' discriminatory maintenance and marketing practices.

Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations; and
- Applying for new grants and funding sources.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Kate Scott | Assistant Director | $125 through 2/13/2014; $175 as of 2/14/2014 |

| Sophie Rosen | Director of Education and Outreach (former) | $85 as of 2/14/2014 |
|---|---|---|
| Stephanie Sheeley | Outreach Coordinator (former) | $85 as of 2/14/2014 |
| Renee Corrigan | Director of Education and Outreach (current) | $175 as of 2/14/2014 |
| Amber Tucker | Outreach Coordinator (former) | $85 as of 2/14/2014 |
| Monika Gerhart | Policy Director | $125 through 2/13/2014; $175 as of 2/14/2014 |
| Cashauna Hill | Executive Director | $260 as of 2/14/2014 |
| Alexander Bollag | Staff Attorney | $85 as of 2/14/2014 |
| Michelle Morgan | Coordinator of Investigations | $125 through 2/13/2014; $175 as of 2/14/2014 |
| Elizabeth Owen | Legal Director | $160 through 2/13/2014; $225 as of 2/14/2014 |
| Aurora Bryant | Staff Attorney | $75 through 2/13/2014; $85 as of 2/14/2014 |
| Alex Owen | Intake Coordinator/Avodah Fellow (former) | $75 through 2/13/2014 |
| Marlene Theberge | Director of Education and Outreach (former) | $175 as of 2/14/2014 |
| Maxwell Ciardullo | Policy Analyst (06/2014 – 01/2017) Director of Policy & Communications (01/2017 – present) | $85 as of 2/14/2014 $175 as of 1/17/2017 |
| Elana Cohen | Investigations Fellow/Testing Coordinator (09/2016-08/2017) Education Coordinator (03/2018-present) | $85 as of 2/14/2014 |
| Ari Jones | Special Investigations Coordinator (former) | $85 as of 2/14/2014 |
| Lisa Tencer | Testing Coordinator (former) | $85 as of 2/14/2014 |

Plaintiff further states that in order to counteract Defendants' discriminatory behavior, it engaged in the following community outreach and public education efforts:

| Date | Activity | Location | Relevant Staff | Resources Expended | Duration |
|------|----------|----------|----------------|--------------------|----------|
| 11/1/2013 | Attend and present at Mission Impossible Conference, a full-day conference with travel. Plaintiff's presentation discussed discriminatory maintenance of REO properties, and staff activities included hosting an educational table and leading a small group session of 15-20 attendees. | Southern University, Baton Rouge | Stephanie Sheely, Monika Gerhardt, Sophie Rosen | Staff Time | 27 (9 hours for each of 3 staff members) |
| 2/11/2014 | Legislative meeting with Enforcement Team. | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 1 |
| 2/11/2014 | Legislative Research | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 1 |
| 2/19/2014 | Meeting with Legislators re: SB530. | Louisiana State Legislature, Baton Rouge | Monika Gerhart | Staff Time | 2 |
| 2/23/2014 | Legislative Research | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 2 |
| 2/23/2014 | Legislative Drafting | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 1 |
| 3/22/2014 | Staff legislative meeting to discuss SB530. | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 2 |
| 3/28/2014 | Staff legislative meeting to discuss SB530. | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 1 |
| 4/1/2014 | Legislative Research re: SB530. | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 1 |
| 4/1/2014 | Meeting with legislators re: SB530. | Louisiana State Legislature, Baton Rouge | Monika Gerhart | Staff Time | 4 |

| Date | Activity | Location | Relevant Staff | Resources Expended | Duration |
|---|---|---|---|---|---|
| 4/2/2014 | Draft memo in support of SB530. | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 2 |
| 4/2/2014 | Meeting with legislators re: SB530. | Louisiana State Legislature, Baton Rouge | Monika Gerhart | Staff Time | 4 |
| 4/4/2014 | Staff legislative meeting to discuss SB530. | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 1 |
| 4/5/2014 | Draft testimony for legislative hearing. | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 3 |
| 4/8/2014 | Correspondence with legislators re: SB530. | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 1 |
| 4/8/2014 | Preparation for legislative hearing. | Plaintiff's office, New Orleans | Monika Gerhart | Staff Time | 3 |
| 4/9/2014 | Attend legislative hearing on SB530, which was drafted to address REO concerns. | Louisiana State Legislature, Baton Rouge | Monika Gerhart | Staff Time | 4 |
| 4/9/2014 | Meeting with legislators re: SB530. | Louisiana State Legislature, Baton Rouge | Monika Gerhart | Staff Time | 1 |
| 10/20/2015 | Review draft REO Slide Show and information. | Plaintiff's office, New Orleans | Marlene Theberge | Staff Time | 0.83 |
| 10/21/2015 | Reach out to Blights Out, a community organization addressing housing inequality and blight in New Orleans through art and activism, to discuss a potential partnership. | Plaintiff's office, New Orleans | Renee Corrigan | Staff Time | 0.25 |

| Date | Activity | Location | Relevant Staff | Resources Expended | Duration |
|---|---|---|---|---|---|
| 10/28/2015 | Meet with Imani Brown and Lisa Sigal from the community organization Blights Out to discuss a potential partnership to educate the community about the role of racially disparate maintenance of REO properties in causing blight. | Pagoda Café, 1430 N. Dorgenois St, New Orleans | Amber Tucker; Renee Corrigan | Staff Time | 1.5 |
| 1/21/2016 | Meet with members and partners of the community organization Blights Out to prepare for a joint presentation at the Justice and Beyond Coalition entitled Citizens' Development Forum. | Church Alley Coffee, 1618 Oretha Castle Haley Blvd, New Orleans | Renee Corrigan | Staff Time | 1.5 |
| 1/25/2016 | Presentation at Justice and Beyond about the relationship between discriminatory practices, particularly the disparate maintenance of REO properties in communities of color, in maintaining blight and racial inequities. | Christian Unity Baptist Church, 1700 Conti St., New Orleans | Renee Corrigan | Staff Time | 2.75 |
| 1/25/2016 | Prepared for the Citizens' Development Forum presentation with Blights Out for the Justice and Beyond Coalition. | Plaintiff's office, New Orleans | Renee Corrigan | Staff Time | 0.75 |
| 10/4/2016 | Internal meeting to discuss canvassing neighbors of REO properties in New Orleans to discuss their experiences living near those properties. | Plaintiff's office, New Orleans | Amber Tucker, Renee Corrigan, Cashauna Hill | Staff Time | 1 |
| 10/5/2016 | Review REO 1-pager about discriminatory maintenance of REO properties in advance of canvassing. | Plaintiff's office, New Orleans | Renee Corrigan | Staff Time | 0.22 |

| Date | Activity | Location | Relevant Staff | Resources Expended | Duration |
|---|---|---|---|---|---|
| 12/14/2016 | Interview with Consumer Today about discriminatory | Plaintiff's office, New Orleans | Cashauna Hill | Staff Time | 1 |
| | maintenance of REO properties. | | | | |
| 7/12/2017 | Preparing interns for canvassing, making maps, and drafting talking points. | Plaintiff's office, New Orleans | Maxwell Ciardullo | Staff Time | 1 |
| 7/18/2017 | Preparing interns for canvassing, making maps, and drafting talking points. | Plaintiff's office, New Orleans | Maxwell Ciardullo | Staff Time | 1.5 |
| 7/18/2017 | Preparation work for outreach, which included looking for materials on server, meeting with interns, creating new materials. | Plaintiff's office, New Orleans | Renee Corrigan | Staff Time | 2.32 |
| 7/22/2017 | LAFHAC interns canvassed neighbors of REO properties in New Orleans. | New Orleans | Madeleine Lowry; Tiffen McAlister; Sydney Shivers; Emily Grimes | Staff Time | 5 |
| 7/25-7/26/2017 | Maxwell Ciardullo drafted a press release and other materials about Defendants' REO properties in New Orleans. | Plaintiff's office, New Orleans | Maxwell Ciardullo | Staff Time | 5.5 |
| 7/5/2018 | Maxwell Ciardullo drafted a Talking Points Memo for Cashauna Hill for an interview with the publication Louisiana Weekly. | Plaintiff's office, New Orleans | Maxwell Ciardullo | *Staff Time* | 0.5 |
| 8/22/2018 | Interview preparation and interview with Next City. | Plaintiff's office, New Orleans | Maxwell Ciardullo | Staff Time | 2 |

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices.

66

Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## LAFHAC – FRUSTRATION OF MISSION DAMAGES

Plaintiff Louisiana Fair Housing Action Center is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2013 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From 2014 to 2017, Plaintiff's programs and activities included homeownership promotion (e.g., down payment assistance; closing cost assistance);
- From 2015 to 2016, Plaintiff's programs and activities included foreclosure prevention (*e.g.*, anti-displacement grants for renters and/or to bring mortgages current); and
- From 2014 to 2017, Plaintiff's programs and activities included housing rehabilitation.

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff LAFHAC's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Advocacy/outreach to city and state governments; and
- Education of community members regarding foreclosure, homeownership, and neighborhood stabilization.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

| Date | Description | Potential Staff |
|------|-------------|-----------------|
| March 2013 | Plaintiff's REO work limited its ability to conduct an investigation related to allegations of sexual harassment in the Shreveport area, including creating witness lists, locating witnesses, and interviewing witnesses.<br><br>Staff had to schedule around the REO investigation and was not able to spend as much time on the sexual harassment investigation as desired. The sexual harassment investigation was the result of a complaint that had been previously filed with Plaintiff's office prior to the REO investigation beginning. | John Adcock, Cashauna Hill, Aurora Bryant, and Michelle Morgan |

| March–May 2013 | Plaintiff's REO work limited its development of a grant-funded lending testing program (including staff training, tester recruitment, tester training, development of training and testing materials). Staff had to put off this work when conducting REO investigations. Plaintiff had difficulty meeting lending-related deliverables. Plaintiff had begun developing its lending testing program in September 2012.<br><br>Staff attorney Shontee Smothers was assigned to begin conducting the lending testing because Michelle Morgan needed additional support in light of ongoing work on REO investigations and other matters. Ms. Smother's reassignment meant foregoing case work that she had been previously assigned in her role as a staff attorney. | Elizabeth Owen; Michelle Morgan; Shontee Smothers |
| March 2013–May 2013 | Plaintiff's REO work limited its progress on development of a deaf testing program for purposes of conducting a deaf testing audit (including tester recruitment, development of methodology, tester field and classroom training). Staff had to put off this work while conducting REO investigations, which then required Plaintiff to reassign tasks related to the deaf testing program to non-investigative staff members, Alexander Bollag and John Adcock, which in turn affected their ability to complete their own work. | Alexander Bollag, Michelle Morgan, and John Adcock |
| October 2013 | Plaintiff's REO work limited its investigation of a race discrimination complaint because staff had to put off this work when conducting REO work. | Elizabeth Owen, Cashauna Hill, Aurora Bryant, and Michelle Morgan |

| November 2013– November 2014 | Plaintiff's REO work delayed an audit investigation into race discrimination in greater New Orleans area neighborhoods of opportunity (Opportunity Audit Testing and Analysis). Staff had to put off this work when conducting REO work. The Opportunity Audit was funded by a grant that ended in May 2014. Plaintiff initially planned to complete testing by December 2013 and release the audit report in April 2014. However, partially due to REO work, the Opportunity Audit testing was not completed until April 2014, and the report was not completed until November 2014, after the close of the grant. Accordingly, Plaintiff was unable to use the grant funding to complete this investigation.<br><br>In addition, staff hoped to conduct a second audit between May 2013 and May 2014, but those plans were curtailed and a second audit was never conducted. | Kate Scott, Elizabeth Owen, and Michelle Morgan |
|---|---|---|
| February 2015– March 2015 | Plaintiff's REO work delayed and limited an audit on sexual orientation discrimination.  The audit was never published. | Michelle Morgan |
| June 2015 | Plaintiff's REO work delayed and limited tester recruitment of transgendered individuals. | Michelle Morgan |
| January 2016 | Plaintiff's REO work delayed and limited its preparation of a proposal for fair housing training for St. Bernard Parish Government. Plaintiff was not selected to conduct training. | Renee Corrigan |
| November 2017 | Plaintiff's REO work limited its participation in a Mayoral Forum at the New Orleans Jazz Market. Plaintiff was not able to attend. | Cashauna Hill |

In addition to the above, Plaintiff's REO work and the related litigation activities distracted from and interrupted Plaintiff's ongoing casework and activities, including investigations and outreach. The following casework and activities were delayed or diminished to address discriminatory REO conduct:

| Date | Description of Work Affected | Affected Staff |
|---|---|---|
| Late 2013 | Plaintiff's REO work delayed and limited its planning for its 2014 Fit for a King Fair Housing Summit. | Stephanie Sheely, Sophie Rosen |

| | | |
|---|---|---|
| 3/13/2013 | Plaintiff's REO work also detracted from its regular casework—Alexander Bollag was a legal fellow who was pulled from his regularly assigned duties to assist with REO testing. | Alexander Bollag |
| 2014 | Plaintiff's REO work delayed and limited its ability to plan and execute fair housing trainings for architects, realtors, landlords and tenants. Plaintiff's REO work likewise delayed and limited its ability to track and advocate for/against potential legislation during the 2014 Louisiana Legislative Session. | Monika Gerhardt, Sophie Rosen |
| Spring/summer 2015 | Plaintiff's REO work delayed and limited its administrative activities related to staff transitions and staff attorney hiring.<br><br>Plaintiffs' REO work also delayed its work on a criminal background screening audit. The audit was eventually finalized and released, but behind schedule. | Elizabeth Owen; Michelle Morgan |
| Late 2015 | Plaintiff's REO work delayed and limited its ability to plan its 2016 Fit for a King Fair Housing Summit. | Amber Tucker, Renee Corrigan |
| Fall 2016 | Plaintiff's REO work delayed and limited its work on the "Bring Your Own" storytelling event about substandard rentals, its ability to plan the Fair Housing Five fundraiser on October 19, 2016, its research and coordination of the New Orleans Assessment of Fair Housing (AFH), and its efforts to advocate for legislation to address New Orleans' substandard rental crisis through the Healthy Homes campaign. | Amber Tucker, Renee Corrigan, Monika Gerhardt |
| February 2017 | Plaintiff's REO work limited its healthy homes text banking outreach.<br><br>Plaintiff's REO work also interrupted and delayed its regional testing investigation of race-based discrimination. | Cashauna Hill Michelle Morgan, Ari Jones, Lisa Tencer |
| May 2016-May 2017 | Plaintiff's REO work delayed and limited its development of a regional testing audit (methodology, testing forms, analysis forms). | Michelle Morgan, Ari Jones, Lisa Tencer |
| July 2017 | Plaintiff's REO work delayed and limited its preparation for a local candidate forum. | Maxwell Ciardullo |
| March 2018 | Plaintiff's REO work delayed and limited planning for a fair housing training for small landlords for Fair Housing Month 2018. Plaintiff's REO work likewise delayed and limited its review of its fair housing curricula to begin conducting trainings. | Elana Cohen; Renee Corrigan |

| July 2018 | Plaintiff's REO work delayed and limited an investigation into deaf discrimination in assisted living facilities and testing for a complaint of National Origin and Race discrimination. | Michelle Morgan |
|---|---|---|
| July 2018 | Plaintiff's REO work delayed and limited its investigation into predatory lending practices with regard to reverse mortgage discrimination and an investigation into deaf discrimination in assisted living facilities. | Michelle Morgan |
| 7/5/2018 | Plaintiff's REO work delayed and limited its ability to prepare for legislation related to Smart Housing Mix appearing at City Council. | Maxwell Ciardullo |
| 8/22/2018 | Plaintiff's REO work delayed and limited its ability to compile data and talking points for Short Term Rental (STR) advocacy. | Maxwell Ciardullo |
| Late 2019 and early 2020 | Plaintiff's REO work delayed and limited its testing for race discrimination complaints and preparation for deposition in sexual harassment case. | Michelle Morgan |
| February 2020 | Plaintiff's REO work delayed and limited its preparation of a letter for sexual harassment mailing. | Renee Corrigan |

In addition to the above, from 2013 to the present, Plaintiff's REO work delayed and diminished its ability to conduct community outreach, build attendance at events, and recruit testers and advocates. Plaintiff's REO work also limited its capacity to conduct additional legislative outreach work at the local, state, and federal level.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages may be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

**HOPE FAIR HOUSING CENTER – DIVERSION OF RESOURCES**

Plaintiff HOPE Fair Housing Center seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From January 2012 to April 2014, Plaintiff trained its staff on how to conduct investigations of REO properties;
- From February 2012 to November 2017, Plaintiff investigated approximately 68 Bank of America REO properties and analyzed the results of that investigation;
- From April 2012 to August 2019, Plaintiff prepared and published reports, designed targeted websites and specialized mailings, and developed and distributed educational materials as part of its counteractive education and outreach campaign;
- From April 2012 to August 2019, Plaintiff organized and conducted trainings for a regional coalition of housing providers, non-profit service providers and government staff in the greater Chicago metropolitan region;
- From April 2014 to April 2018, Plaintiff met with local code or government officials regarding REO maintenance in Elgin and other local municipalities;
- From April 2012 to November 2018, Plaintiff participated in community events, including the Chicago Urban League Homebuyers Fair;
- From May 2013 to January 2017, Plaintiff engaged with media to raise awareness of REO-related issues.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Conducting additional consulting and training of housing providers;
- Participating in community and coalition meetings;
- Applying for new grants and funding sources;
- Attending conferences; and
- Professional staff development.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Anne Houghtaling | Executive Director | $400 |
| Kamal Ganjalikhani | Data Analyst/Outreach Coordinator | $200 |
| Andrea Juracek | Deputy Director | $200 |
| Rachana Kothari | Lending Analyst | $150 |
| Paula Brkich | Lending and Community Development Program Director | $200 |
| Janet Dermody | Director of Enforcement | $400 |
| Tiffani Wesley | Lending Analyst | $150 |
| June Bishop | Intake Specialist | $150 |
| Shirley Stacy | Executive Assistant | $40 |
| Todd Fuller | Programs Director | $200 |
| Barbara Moran | Systemic Investigations Assistant | $100 |
| Tykeda Smith | Systemic Investigations Coordinator | $200 |

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## HOPE FHC – FRUSTRATION OF MISSION DAMAGES

Plaintiff HOPE Fair Housing Center is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at

74

least 2012 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From September 2013 to June 2018, Plaintiff's programs and activities included homeownership promotion (*e.g.*, down payment assistance and closing cost assistance);
- From September 2013 to December 2019, Plaintiff's programs and activities included foreclosure prevention (*e.g.*, anti-displacement grants for renters and/or to bring mortgages current);
- From September 2013 to June 2018, Plaintiff's programs and activities included housing rehabilitation;
- From October 2013 to June 2015, Plaintiff's programs and activities included community enhancement (*e.g.*, construction of parks, gardens, recreation areas).

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff HOPE Fair Housing Center's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination;
- Promoting fair housing and fair lending;
- Community development efforts in Elgin and Austin (a community within the City of Chicago) to stabilize communities of color harmed by the foreclosure crisis.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Establishment of industry best practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices;
- Advocacy/outreach to city and state governments;
- Education of community members re: foreclosure, homeownership, and neighborhood stabilization;
- Education of community-based organizations invested in community development.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- <u>Design and Construction Investigations and Enforcement Actions</u>: HOPE began a number of investigations in 2013 and 2014 that revealed that several multi-family housing developments were designed and constructed such that they might be inaccessible for individuals with disabilities. HOPE had planned to continue these investigations, but the investigations, and possible enforcement actions, were delayed by the diversion of HOPE's resources to investigating Defendants' REO maintenance and marketing practices.

- <u>Education and Outreach</u>:
    - HOPE had intended to implement a curriculum for young people related to financial literacy, expanding on the lesson plans it had already created for high school and college students. HOPE intended to partner with an advisory board comprised of local lenders' Community Reinvestment Act officers, and it began conversations to pursue this project in 2014 and 2015. Plaintiff was unable to continue this project, however, because it had to divert resources to investigate Defendants' discriminatory REO conduct.
    - HOPE had planned to attend and provide public testimony at various events, such as the Arlington Heights Consolidated Action Plan Public Hearing, but was unable to because of the diversion of time and resources to this matter.
    - HOPE previously issued public newsletters on an annual or semi-annual basis, but it was unable to do so as frequently during the pendency of this investigation.
    - HOPE otherwise would have attended a number of additional conferences, networking events, and educational webinars, but it could not do so due to the time and resources diverted to investigating and remedying Defendants' discriminatory conduct.

- <u>Funding Opportunities</u>: HOPE otherwise would have applied for a number of additional funding opportunities, the achievement of which could have substantially furthered its organizational goals, but it did not do so due to limited staff resources caused by diversion of resources into this investigation. These included:
  - o DuPage Community Foundation;
  - o Fort Wayne, Indiana 2016 request for proposals to conduct fair housing activities related to lending discrimination; and
  - o HUD Community Development Block Grant funding from Aurora, Illinois.

- <u>Advocacy</u>: HOPE regularly submits public comments on issues related to fair housing in municipalities within its service area. During the period in which it was investigating Defendants' REO practices, HOPE received several notices of Consolidated Annual Performance and Evaluation Reports and fair housing reports by local jurisdictions with open public comment periods, including Arlington Heights, Illinois and Aurora, Illinois, and it was unable to submit public comments in these cases because it was diverting resources to the Defendants investigation.

In addition to the specific opportunities described above, Plaintiff was also forced to delay trainings of new testers Plaintiff had planned to use in furtherance of its mission, and Plaintiff was forced to delay numerous reporting obligations as a result of Defendants' discriminatory conduct. Because Plaintiff continues to forego opportunities in order to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement this Interrogatory response as the facts require.

Further, HOPE FHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for a regional coalition of housing providers, non-profit service providers and government staff in the greater Chicago metropolitan region; meeting with local code or government officials regarding REO maintenance in Elgin and other local municipalities; meeting with local service providers and real estate trade organizations; preparing and publishing brochures/reports; designing targeted websites and specialized

mailings; participating in community events, including the Chicago Urban League Homebuyers Fair; and engaging with media to raise awareness of REO-related issues.

Finally, HOPE FHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained REO properties in communities of color in the greater Chicago metropolitan region.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE –DIVERSION OF RESOURCES

Plaintiff Housing Opportunities Project for Excellence ("HOPE, Inc.") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From January 7, 2012 to October 20, 2016, Plaintiff identified Bank of America REO properties in its service area;

- From January 7, 2012 to October 20, 2014, Plaintiff trained its staff to conduct an investigation of those properties;

- From January 7, 2012 to October 20, 2016, Plaintiff investigated 67 Bank of America REO properties and analyzed the results of that investigation;

- From June 1, 2012 to January 31, 2017, Plaintiff developed and distributed newsletter articles and educational materials as part of its counteractive education and outreach campaign; and

- From March 1, 2012 to January 31, 2017, Plaintiff worked with media to raise awareness of REO-related issues.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Public policy advocacy;
- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Conducting additional consulting and training of housing providers;
- Identifying new trends in housing discrimination;
- Applying for new grants and funding sources;
- Attending conferences;
- Professional staff development.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|---|---|---|
| Keenya Robertson | President & CEO | $250 |
| Daniel Howe | Vice President/Fair Lending Initiative Director – July 2013 to present | $250 |
| | Fair Lending Initiative Director – May 2012 to July 2013 | $150 |
| Alyssa Arnell | Vice President/Testing and Investigations Coordinator | $150 |
| Matt Tisdol | Testing and Investigations Coordinator | $150 |
| Efrem Crenshaw | Testing and Investigations Coordinator | $150 |
| Vanester Turner | Testing and Investigations Coordinator | $150 |
| Rita Scott | Education and Outreach Coordinator | $150 |
| Rob Collins | Education and Outreach Coordinator | $150 |
| Noris Caballero | Intake Coordinator | $29.17 |
| Diamond Excell | Program Assistant | $17.70 |

Plaintiff further states that in order to counteract Defendants' discriminatory behavior,

it engaged in the following community outreach and public education efforts:

- Plaintiff's staff expended time conducting a counteractive campaign from 2012–2019 to educate the public about the impacts of Defendants' REO-related practices, including contact with the media to discuss the harms of discriminatory maintenance, marketing, and management of REO units, which resulted in the publication of an op-ed in the Miami Herald on April 27, 2012.

- Plaintiff planned and sponsored local Fair Housing Month Events on April 27, 2012; April 5, 2013; April 4, 2014, April 17, 2015; April 1, 2016; and April 27, 2018, that included information regarding harms of discriminatory maintenance, marketing, and management of REO properties.

- Plaintiff authored and distributed quarterly newsletters about discrimination in maintenance of REO properties which highlighted the harms and challenges to communities and consumers caused by the improper and discriminatory maintenance of REO properties and shared information regarding community relief efforts to counteract effects of discriminatory maintenance, marketing, and management of REO properties (Newsletter editions: 50, 60, and 72).

From 2013 to 2019, Plaintiff conducted community outreach and community relief efforts to counter effects of discriminatory maintenance, marketing, and management of REO properties, and it produced Annual Reports which highlighted that outreach. The reports also highlight ongoing fair housing education and outreach efforts conducted by HOPE, Inc. staff in its service area, Miami-Dade and Broward Counties in Florida. The outreach includes community presentations designed to educate the general public and

housing provider trainings that included information regarding discriminatory maintenance, marketing, and management of REO units.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## HOPE, INC. – FRUSTRATION OF MISSION DAMAGES

Plaintiff HOPE, Inc. is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants' have frustrated Plaintiff's mission since at least January 7, 2012 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From March 6, 2014 to August 14, 2017, Plaintiff's programs and activities included homeownership promotion (*e.g.*, housing counseling, down payment assistance; closing cost assistance);
- From August 27, 2014 to June 16, 2015, Plaintiff's programs and activities included housing rehabilitation;
- From October 16, 2014 to present, Plaintiff's programs and activities included accessibility modifications;
- From May 13, 2014 to February 25, 2016, Plaintiff's programs and activities included community enhancement (*e.g.*, construction of gardens, school programs, and leadership training); and
- From January 7, 2012 to present, Plaintiff's programs and activities included conducting fair housing workshops in Miami-Dade and Broward counties and throughout Florida.

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff HOPE, Inc.'s core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission and goals of:

- Increasing fair and equal access to housing;
- Eliminating racial segregating;
- Eradicating discrimination;
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including education of community members regarding foreclosure, homeownership, and neighborhood stabilization.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that as a result of Defendant's discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals.

HOPE, Inc. serves two major metropolitan areas with nearly five million people. Since 2011, HOPE, Inc. has engaged in a statewide education and outreach initiative to bring fair housing training to underserved parts of Florida. As a result of its work concerning Defendants' REO maintenance and marketing practices, HOPE, Inc. had to forego several opportunities that would have advanced this work. For example, HOPE, Inc. had to forego resource development opportunities to investigate and combat Defendants' discriminatory REO maintenance and marketing practices. Such resource development includes:

- Fundraising, including identifying, soliciting, and applying for funds from private donors and foundations to develop programs that align with HOPE, Inc.'s mission and funders' priorities;

- Expanding HOPE, Inc.'s membership base; and
- Working with local jurisdictions to affirmatively further fair housing through consulting agreements to conduct fair housing planning and action plan activities. HOPE, Inc.'s service area has over twenty jurisdictions required to affirmatively further fair housing through the administration of funds from the U.S. Department of Housing and Urban Development.

HOPE, Inc. also had to forego development of realtor and property management company training programs, certified by the state to offer continuing education credits to licensed professionals.

The opportunity to collaborate with key stakeholders to build upon an infrastructure for the reporting of housing discrimination and expand education of the public, industry, regulators, public policy leaders and others about the perpetuation of discriminatory housing practices was also lost.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages may be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## THE FAIR HOUSING CENTER FOR RIGHTS AND RESEARCH (formerly known as the Housing Research & Advocacy Center) – DIVERSION OF RESOURCES

Plaintiff Housing Research & Advocacy Center dba Fair Housing Center for Rights & Research seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and

marketing of REO properties compelled Plaintiff and its staff to take the following actions in

order to counteract the discrimination:

- From June 27, 2012 to January 23, 2017, Plaintiff participated in discussions about how to counteract Defendants' discriminatory conduct with respect to its REO properties in its service area and trained its staff to conduct an investigation of those properties;
- Planning and facilitating an April 10, 2013 3.5-credit CLE event in partnership with the Cleveland Metropolitan Bar Association and Greater Cleveland (aka Northeast Ohio) Fair Housing Collaborative entitled "Restoring Our Neighborhoods: REO & Financial Institutions Practices that Affect Our Neighborhoods." HRAC's then Executive Director planned and moderated a panel for the event. Attorneys and municipal employees and officials attended.
- From December 4, 2013 to March 1, 2017, Plaintiff investigated 29 Bank of America REO properties and analyzed the results of that investigation;
- From December 4, 2012 to October 11, 2018, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign, including outreach to media and giving over 250 presentations to housing providers and real estate agents in Northeast Ohio;
- Plaintiff's staff, Mandy Mehlman, Michael Lepley, and Doris Honsa, prepared and presented a PowerPoint presentation on June 10, 2015 to the Northeast Ohio Fair Housing Collaborative on the issue of discriminatory maintenance of REO properties. Plaintiff's staff and guests attended.
- Several of Plaintiff's staff participated in community development activities in connection with their membership and/or engagement with the Greater Cleveland Reinvestment Coalition (GCRC), Cuyahoga County Housing Policy Stakeholders (Stakeholders), and the Vacant and Abandoned Property Action Council (VAPAC).

Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract

Defendants' discriminatory maintenance and marketing of REO properties.

Plaintiff will produce a summary of its diversion of resources setting forth the time

Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and

management practices. Plaintiff will supplement its response to include additional time and

expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources

will also reflect staff time spent on education and outreach activities. Plaintiff further states that

it will update information regarding education and outreach activities, as necessary.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego conducting a systemic fair lending analysis and producing a report on its findings, the achievement of which would have substantially furthered Plaintiff's organizational goals.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Darlene English | Director of Education & Outreach | $150.00 |
| Michael Floreth | Fair Housing Investigator | $125.00 |
| | Director of Community Engagement and Development | $150.00 |
| Laura Fogarty | Enforcement Intern | $50.00 |
| Doris Honsa | Program Assistant, Community Engagement Specialist, Fair Housing Community Educator | $100.00 |
| Kris Keniray | Director of Enforcement, Associate Director | $150.00 |
| | Associate Director | $175.00 |
| Hilary King | Executive Director | $200.00 |
| Michael Lepley | Research Associate | $125.00 |
| | Senior Research Associate | $150.00 |
| Lenore Mangiarelli | Research Associate | $100.00 |
| Amanda Mehlman | Fair Housing Community Educator | $125.00 |
| | Senior Research Associate | $150.00 |
| Ryan Meisner | Fair Housing Intern | $50.00 |
| R. Tadd Pinkston | Enforcement Intern | $50.00 |
| Carrie Pleasants | Interim Executive Director, Executive Director | $200.00 |
| Peter Saudek | Investigations Coordinator | $100 |

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## HRAC – FRUSTRATION OF MISSION DAMAGES

Plaintiff Housing Research & Advocacy Center is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least June 27, 2012 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services. From December 4, 2012 to present, Plaintiff's activities included participation in community groups, meetings, and other organized, collective efforts to promote investment and access to credit in Cuyahoga County's low and moderate income communities and communities of color through increased access to affordable financial services, housing credit to facilitate the production and maintenance of affordable housing, equitable access to credit for low and moderate income individuals, and credit for community economic development. Plaintiff has also participated in such groups and efforts in order to inform Cuyahoga County's County-wide housing policy to address the following priorities: (1) Access to capital; (2) Tax Collection and Delinquency; (3) Housing Insecurity; (4) Special Populations; (5) Fair Housing; and (6) Confidence in the Housing Market; and to address blight, foreclosures, predatory lending and extractive property investment, and residential demolition.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission and goals of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination;
- Promoting fair housing and fair lending.

86

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Establishment of industry best practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices;
- Advocacy/outreach to city and state governments;
- Education of community members re: foreclosure, homeownership, and neighborhood stabilization.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals: Research Report on Racial & Ethnic Disparities in Mortgage Lending (CY 2014) – a Home Mortgage Disclosure Act data analysis of racial and ethnic disparities in mortgage lending in Ohio's seven largest metro areas. Housing Research & Advocacy Center produced this report every 11-15 months between 2006 and 2013, but missed the year 2014 and produced a report containing two years of data in 2015 because it was unable to produce a report in 2014. Plaintiff redeveloped the content and produced one subsequent version in 2018.

This report, like all of Plaintiff's reports, would have been produced by its research staff at the time, including Amanda Mehlman and Michael Lepley, both of whom were primary investigators of Plaintiff's REO investigation of Defendants.

Plaintiff further states that in order to counteract Defendants' discriminatory behavior, it engaged in the following community outreach and public education efforts:

1. An April 10, 2013 3.5-credit CLE event in partnership with the Cleveland Metropolitan Bar Association and Greater Cleveland (aka Northeast Ohio) Fair Housing Collaborative entitled "Restoring Our Neighborhoods: REO & Financial Institutions Practices that Affect Our Neighborhoods". Housing Research & Advocacy Center's then Executive Director planned and moderated a panel for the event. Attorneys and municipal employees and officials attended.

87

2. Delivery of more than 250 presentations relating to discriminatory REO property maintenance. Audiences included municipal representatives, private landlords, housing consumers, property management staff, and other members of the community.

3. Housing Research & Advocacy Center staff Amanda Mehlman, Michael Lepley, and Doris Honsa prepared and presented a PowerPoint presentation on June 10, 2015 to the Northeast Ohio Fair Housing Collaborative on the issue of discriminatory maintenance of REO properties. Housing Research & Advocacy Center staff and guests attended.

4. Various Housing Research & Advocacy Center staff participated in community development activities in connection with its membership and/or engagement with the Greater Cleveland Reinvestment Coalition (GCRC), Cuyahoga County Housing Policy Stakeholders (Stakeholders), and the Vacant and Abandoned Property Action Council (VAPAC).

In addition to the specific activities described above, Plaintiff's staff expended time distributing numerous news releases across their media contacts and email lists. Because Plaintiff continues to conduct community outreach and public education effort in order to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement this Interrogatory response as the facts require.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## METRO FAIR HOUSING SERVICES (Atlanta, Georgia) – DIVERSION OF RESOURCES

Plaintiff Metro Fair Housing Services, Inc. ("Metro") seeks to recover for the actions and expenses it was forced to divert as a result of Defendant's discriminatory conduct. For example, Defendant's discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- October 2011 to May 2015, Plaintiff received a list of over 112 Bank of America REO properties in its service area from NFHA and trained and scheduled its staff to conduct an investigation of those properties;
- October 2011 to May 2015, Plaintiff investigated 91 Bank of America REO properties and analyzed the results of that investigation;
- May 2015 to present, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign;
- May 2015 to present, Plaintiff organized and conducted trainings for local jurisdictional staff, private and public housing providers, real estate agents and consumers in the greater Atlanta metropolitan region;
- And the week of December 15, 2016, Plaintiff engaged with the media to raise awareness for REO-related issues by issuing a press release to all local news outlets.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices as soon as practicable. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary. As a result of Defendant's discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Conducting additional consulting and training of housing providers;

- Applying for new grants and funding sources;
- Attending conferences;
- Professional staff development;

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Gail L. Williams | Executive Director | $150/hour |
| Joyce Catrett | Director of Enforcement | $150/hour |
| Sharon Tonge | Office Manager | $24.54/hour |
| Marion Thomas | Program Manager | $22.23/hour |
| Ashley Boone | Fair Housing Specialist | $47.00/hour |
| Joya Green | Intake Specialist | $13.74/hour |

Finally, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## METRO – FRUSTRATION OF MISSION DAMAGES

Plaintiff Metro Fair Housing Services, Inc. is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2011 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals. Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services, including:

- From 8/13/2014 to 01/13/16, Plaintiff's programs and activities included foreclosed property acquisition, rehabilitation and sale in partnership with the Atlanta Neighborhood Development Partnership (ANDP);
- From 11/2014 to 11/2015, Plaintiff's programs and activities included repurposing of blighted blocks and vacant lots in partnership with SUMMECH Community Development Corporation;

- 7/2010 to 5/2019, Plaintiff's programs and activities included accessibility modifications through a ramp installation program that was delayed by 4 years and 9 months due to Plaintiff's efforts to investigate and address Defendants' discriminatory actions; and
- 12/2016 to 3/2019, Plaintiff's programs and activities included promoting homeownership and neighborhood stabilization via down payment and closing cost assistance in partnership with GA Advancing Communities Together, Inc. (GA ACT).

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission and goals of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Identifying and comparing industry best practices to current area practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices; Advocacy/outreach to city and state governments; and
- Education of community members on foreclosure, homeownership, and neighborhood stabilization.

Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including Plaintiff's Community Relief Fund Projects (CRF), which Metro began working on in July 2013. Metro developed the Community Relief Fund initiative, "Restoring Our Neighborhoods, Re-Inspiring Our Neighbors" by organizing and convening a Working Group composed of Board members, staff, city/county representatives, residents, housing industry professionals, and community organizations. The Working Group was convened to evaluate housing needs, establish goals of the CRF, finalize a procedure for identifying and soliciting non-

91

profit organizations to serve as partners, and facilitate grants through those organizations. Metro staff subsequently issued requests for proposals, vetted the applications, and the Board of Directors reviewed and made funding decisions. Metro staff oversaw the implementation of the approved activities/projects.

To counteract Defendants' racially discriminatory maintenance and marketing of REO properties, Metro operated a Community Relief Fund (CRF) initiative in southwest Atlanta and South Dekalb County, Georgia from August 2014 through March 2019. The strategic goals of the CRF were two-fold: (1) to provide programs and services to promote home ownership, property rehabilitation, neighborhood stabilization, and development in communities of color; and (2) to leverage reinvestments to counteract the devastating damage to metropolitan Atlanta neighborhoods resulting from the foreclosure crisis and the ensuing economic meltdown. The CRF assisted a wide array of residents of neighborhoods disproportionately affected by high rates of foreclosure and poorly maintained and marketed REOs, including:

1. Long-time residents of these neighborhoods who had seen the equity in their homes eroded by high numbers of poorly maintained REO properties;
2. Homebuyers willing to relocate to these neighborhoods with plans to live in their homes for at least five years to stabilize the neighborhood and increase home values;
3. Residents who had no other access to capital for home repairs, renovations, and improvements; and
4. Seniors or people with disabilities who lived on fixed incomes needing accessibility features or rehab so that they could age in place and more fully use and enjoy their homes.

Through the CRF, Metro ensured opportunities for all people to receive assistance from innovative programs administered by local organizations and advocates committed to making areas of metropolitan Atlanta most impacted by boarded, blighted properties better places to live, work, and raise a family. The CRF projects, while assisting middle-income individuals and

families, primarily benefited low-to-moderate income families. Metro, through its Community

Relief Fund, provided the following strategic interventions:

- <u>Single Family Scattered Site Redevelopment Program</u> – Metro partnered with Atlanta Neighborhood Development Partnership, the largest non-profit developer of foreclosed properties in the region, to purchase, rehab, and sell 13 foreclosed single-family homes in south Dekalb County, which is 85% minority with 28% of the properties underwater, compared to 14% nationally and 20% in Georgia; 70% of the homes were sold to owner-occupants at or below 80% AMI and 30% were sold to owner-occupants at or below 120% AMI; purchasers were required to complete 8 hours of homebuyer counseling and received $7,500 in down payment/closing cost assistance; where feasible, every home was required to have basic "Visitability" features – at least one no-step entry threshold, all doors on entry level minimum 32" width and on entrance slope not to exceed 12:1 (12 inch length to 1 inch rise); Metro contributed $350,000, which leveraged a total investment of $2,080,000; five (5) of the thirteen (13) properties were purchased from Bank of America.

- <u>Fill in the Gap: Garibaldi Redevelopment Initiative</u> – Metro partnered with SUMMECH Community Development Corporation to restore the second half of Garibaldi Street between Bass and Stephens Streets as a "Model Block" in the historic neighborhood known as *Mechanicsville* located 3 miles south of downtown Atlanta within walking distance of the former Turner Field, now GSU Stadium. Mechanicsville has an African-American population of 93% with 73% of its of families living below the U.S. poverty level. SUMMECH had developed more than 1,000 housing units, including new and renovated multi-family units for rental and homeownership, single-family units, and senior living, and the visual and economic impact of its development success was widely distributed in a community riddled with abandoned properties before the recession. Metro and SUMMECH sought to complete the restoration of the entire second block of Garabaldi where the previously newly-constructed homes met a blighted mix of older owner-occupied homes, vacant/boarded eyesores, empty lots, poorly maintained rental properties and graffiti. Metro awarded SUMMECH a catalyst grant of $220,000 to construct and sell a single-family home on a lot owned by SUMMECH, rolling over the proceeds from the sale to acquire the boarded structure next door for demolition and construction of a second unit; renovate the exteriors of 5 occupied units with resident participation; landscape 8 properties and replace all mailboxes on the block. Homes were sold to owner-occupants with incomes at or below 80% AMI at a maximum sales price of $160,000 with down payment subsidies of up to $30,000 provided by the City of Atlanta. Two additional houses on the block were purchased and renovated under SUMMECH's EDI-Section 108 and Lease-Purchase Program for a total investment of approximately $1.2 million.

- <u>Inclusive Communities Down Payment Assistance Program (ICDPA)</u>: Metro partnered with Georgia Advancing Communities Together, Inc. (Georgia ACT) to launch a down payment assistance project whose goal was to promote homeownership and stimulate reinvestment in metropolitan Atlanta neighborhoods continuing to be adversely impacted by the foreclosure crisis. The ICDPA was administered by Georgia ACT in collaboration with The Institute for Community Pros LLC. Georgia ACT is a statewide membership association of non-profit housing and community development organizations. Its mission is to build and support a statewide network of thriving member organizations and trained professionals engaged in housing and community development serving families with limited housing choices. The program was designed to provide low-to-moderate income individuals with the opportunity to become owner- occupants in designated zip codes of southwest Atlanta, south Dekalb, Fulton, Cobb and Gwinnett County neighborhoods. Up to $7,500 in a non-repayable gift was provided for down payment and/or closing cost assistance to borrowers who qualified for loan products offered by ICDPA's approved mortgage lenders and met the requirements regarding borrower income, property, service area, and homebuyer education/counseling eligibility: up to 120% AMI; $250,000 maximum sales price; primary owner-occupancy; and 6-8 hour homebuyer education certifications. Metro's $250,000 award to Georgia ACT resulted in thirty-six (36) grants being awarded to families all with incomes not exceeding 80% AMI, housing approximately 108 persons.

- <u>Accessibility Modifications</u>: Under its Ramp Project, Metro provided twenty-eight (28) grants totaling $99,773 to existing single-family owner-occupants at or below 80% of AMI, who were disabled or elderly and did not have basic access into and out of their homes, enabling them to age in place and to more fully use and enjoy their residences.

The CRF was a broad organization-wide effort and included many volunteer hours from board members, consultants, and community advocates together with on-the-clock work and volunteer time from paid staff.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future. Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and

Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL – DIVERSION OF RESOURCES

Plaintiff Metropolitan Milwaukee Fair Housing Council ("MMFHC") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- On 8/21/2012 – 8/22/2012, Plaintiff participated in a training with the National Fair Housing Alliance ("NFHA") re: how to conduct REO investigation, at a cost to Plaintiff of $2,000.00;

- On 9/4/2014, Plaintiff participated in a conference entitled Maintaining Homes, Maintaining Neighborhoods: REO Management, Fair Housing, and Neighborhood Revitalization at a total cost to Plaintiff of $1,526.42;

- From 3/8/2013 to 10/30/2017, Plaintiff received the addresses of Bank of America REO properties in its service area from NFHA and trained its staff to conduct an investigation of those properties;

- From 4/24/2013 to 10/5/17, Plaintiff investigated 135 Bank of America REO properties in its service area, and analyzed the results of that investigation;

- From 12/12/2013 to 11/8/2017, Plaintiff interviewed potential witnesses regarding Defendants' discriminatory conduct;

- From 2/12/2013 to 3/8/2018, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign;

- On the dates shown below, Plaintiff conducted REO-related presentations and meetings. These presentations and meetings were with government officials, community organizations, academic institutions, housing providers, individual realtors and realtors' associations, neighborhood associations, lending institutions, community activists, faith-

based institutions, and homeowners and residents of neighborhoods affected by discriminatory REO maintenance and marketing practices:

| Date |
| --- |
| 10/29/2012 |
| 2/1/2013 |
| 3/19/2013 |
| 4/1/2013 |
| 4/6/2013 |
| 4/8/2013 |
| 4/12/2013 |
| 5/10/2013 |
| 5/13/2013 |
| 5/17/2013 |
| 6/18/2013 |
| 6/19/2013 |
| 6/20/2013 |
| 7/9/2013 |
| 7/25/2013 |
| 8/14/2013 |
| 8/27/2013 |
| 9/14/2013 |
| 9/16/2013 |
| 9/20/2013 |
| 9/21/2013 |
| 9/27/2013 |
| 9/28/2013 |
| 10/10/2013 |
| 10/14/2013 |
| 10/24/2013 |
| 10/30/2013 |
| 11/9/2013 |
| 11/20/2013 |
| 4/24/2014 |
| 4/25/2014 |
| 5/2/2014 |
| 5/29/2014 |
| 6/19/2014 |
| 8/14/2014 |
| 9/24/2014 |
| 9/25/2014 |

| Date |
| --- |
| 9/30/2014 |
| 10/24/2014 |
| 11/14/2014 |
| 12/9/2014 |
| 5/27/2015 |
| 5/29/2015 |
| 6/13/2015 |
| 11/12/2015 |
| 11/13/2015 |
| 3/19/2016 |
| 5/24/2016 |
| 6/21/2016 |
| 10/3/2016 |
| 10/10/2016 |
| 10/18/2016 |
| 11/2/2016 |
| 2/15/2017 |
| 2/28/2017 |
| 4/24/2017 |
| 11/6/2017 |
| 11/10/2017 |
| 12/12/2017 |
| 1/11/2018 |
| 1/30/2018 |

Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Conducting consulting and training of housing providers;
- Applying for new grants and funding sources.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Sarah Aragon | Program Assistant (Former) | $50.00 |
| Felita Daniels Ashley | Senior Program Coordinator (Former) | $100.00 |
| Lemuel Eaton | Senior Program Coordinator (Former) | $75.00 initially; increased to $100 on 12/14/14 anniversary date |
| Olena Eichinger | Fiscal Manager | $75.00 |
| Justin Klug | Program Assistant (Former) | $50.00 |
| Deanna Richardson | Senior Administrator – Investigative Services | $100.00 |

97

| Bethany Sanchez | Senior Administrator - Fair Lending Program | $100.00 initially, increased to $150 on 6/18/16 anniversary date |
|---|---|---|
| Rachel Scalise | Executive Assistant | $50.00 initially; increased to $75.00 on 9/12/12 anniversary date; increased to $100 on 9/12/17 anniversary date |
| Christine Schneider | Investigator II | $75.00, increased to $100.00 on 5/19/18 anniversary date |
| Kori Schneider Peragine | Senior Administrator – Inclusive Communities Program | $150.00 |
| Caitlin Taylor | Investigator (Former) | $50.00 |
| William Tisdale | President & CEO | $250.00 |
| Celestine Walker | Support Services Coordinator (Former) | $50.00 |
| Megan Wanke | Administrator – Administrative Services | $75.00 initially; increased to $100.00 on 2/28/15 anniversary date; increased to $125 on 2/28/2020 anniversary date |
| Carla Wertheim | Executive Vice President | $250.00 |

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## MMFHC – FRUSTRATION OF MISSION DAMAGES

Plaintiff Metropolitan Milwaukee Fair Housing Council is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 8/21/2012 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From 8/21/2012 to the present, Plaintiff's programs and activities included homeownership promotion;
- From 8/21/2012 to the present, Plaintiff's programs and activities included foreclosure prevention; and
- From July 22, 2013 to the present, Plaintiff's programs activities included provision of assistance to community organizations to engage in neighborhood improvement and stabilization in Milwaukee neighborhoods and to promote racially and economically integrated housing patterns.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Establishment of industry best practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices;
- Advocacy/outreach to city, county, and state governments; and
- Education of community members re: foreclosure, homeownership and neighborhood stabilization.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

In late 2011 or early 2012, MMFHC planned to re-initiate a housing mobility program to help metropolitan Milwaukee home-seekers rent or purchase housing in high opportunity communities. MMFHC had previously operated such a mobility program from 1989 to 1992, in

which trained housing counselors assisted families in identifying and securing housing to either rent or purchase. The program assisted over 800 households and worked with the Wisconsin Housing and Economic Development Authority to identify developers to allocate $1 million in tax credits to develop affordable housing in suburban communities. MMFHC planned to assign William Tisdale to oversee overall project administration, Carla Wertheim and Erika Sanders to identify funding opportunities and write funding proposals and focus on program development, Kori Schneider Peragine to be responsible for program development and implementation, and Rachel Scalise to provide staff support to administrative staff. Staff were unable to identify funding opportunities for this program because of Defendants' discriminatory behavior.

In late 2011 or early 2012, MMFHC planned to implement a fair housing education program to assist real estate licensees to satisfy the State of Wisconsin's mandatory continuing education requirements. MMFHC planned to develop a training program, curriculum, and materials to provide fair housing training to real estate brokers and agents. As a fair housing expert and real estate licensee, MMFHC staff member Lemuel Eaton was uniquely qualified to develop and provide this training. MMFHC had been approached by members of the real estate industry to provide such training, which also would have generated revenue for MMFHC and could have been replicated throughout the state. MMFHC provided a series of statewide real estate trainings in 1984 and in Milwaukee in 1986. However, the loss of a real estate professional with fair housing expertise to conduct such training caused MMFHC to discontinue these trainings. MMFHC planned to assign Mr. Eaton to develop the program outline, curriculum, and materials from late 2011 or early 2012 and continue until his planned retirement in 2016. MMFHC planned to assign Carla Wertheim to supervise Mr. Eaton and review all aspects of the program through the present. Because of Defendants' discriminatory behavior, Mr. Eaton was unable to develop this program for MMFHC's use.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because

these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## MIAMI VALLEY FAIR HOUSING CENTER – DIVERSION OF RESOURCES

Plaintiff Miami Valley Fair Housing Center ("MVFHC") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From 10/03/2011 to 11/13/2017, Plaintiff identified Bank of America REO properties in its service area and trained its staff to conduct an investigation of those properties;

- From 11/01/2011 to 11/13/2017, Plaintiff investigated 68 Bank of America REO properties and analyzed the results of that investigation;

- From 01/09/2012 to 03/31/2018, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign, including the publication of brochures and reports, the creation of public service announcements and advertising in local print and radio; and designing targeted websites and specialized mailings;

- On 309 dates from 11/01/2010 to 12/31plainit/2018, Plaintiff organized and conducted trainings for real estate agents, property managers, municipal government employees, and the general public in the greater Miami Valley region;

- From 01/15/2010 to 12/15/2017, Plaintiff met with local code or government officials regarding REO maintenance;

- From 01/12/2012 to 2/24/2017, Plaintiff with local service providers regarding REO maintenance; and

- On 238 dates from 11/01/2010 to 12/31/2018, Plaintiff participated in in community events (including presentations to the Latino Connection, the Dayton Area Realtists, Catholic Social Services, the Dayton Mortgage Broker's Association, and the Ahiska Turkish American Community Center) to raise awareness for the problems associated with discriminatory REO maintenance.

Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties. Plaintiff will produce a summary of diversion resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include out-of-pocket expenses and additional time in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Consulting and training opportunities;
- Community and coalition meetings;
- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Applying for new grants and funding sources; and
- Professional staff development.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Jim McCarthy | President/CEO | $250.00 |
| John Zimmerman | Vice President | $230.00 |
| Miranda Wilson | FH Analyst | $115.00 |
| David Lauri | Director of IT | $150.00 |
| Jason Collins | IT Specialist | $150.00 |
| Anita Schmaltz | Director of Investigations & Enforcement | $115.00 |
| Karl Zimmerman | FH Specialist | $50.00 |
| Tom Toberen | Operations Assistant | $50.00 |

Among other things, Plaintiff presented on its organization's mission, promoted the resources and services that Plaintiff offers, and provided education about participants' fair housing rights, including the right to be free from discriminatory REO maintenance and marketing activities. Plaintiff also distributed brochures and educational materials and allowed for an opportunity for participants to ask questions.

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## MIAMI VALLEY FAIR HOUSING CENTER - FRUSTRATION OF MISSION DAMAGES

Plaintiff Miami Valley Fair Housing Center is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2011 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.  Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From 11/2013 to 09/2016, Plaintiff's programs and activities included homeownership promotion (*e.g.*, down payment assistance; closing cost assistance);
- From 11/2013 to 05/2015, Plaintiff's programs and activities included emergency repairs;
- From 06/2011 to 12/2015, Plaintiff's programs and activities included foreclosure prevention (*e.g.*, anti-displacement grants for renters and/or to bring mortgages current);
- From 11/2013 to 05/2015, Plaintiff's programs and activities included housing rehabilitation;
- From 11/2013 to 12/2014, Plaintiff's programs and activities included repurposing of blighted or vacant lots;
- From 11/2013 to 05/2016, Plaintiff's programs and activities included accessibility modifications;

- From 11/2013 to 12/2014, Plaintiff's programs and activities included community enhancement (*e.g.*, construction of parks, gardens, recreation areas); and
- From 11/2013 to 12/2014, Plaintiff's programs and activities included community engagement (*e.g.*, summer camps, leadership programs).

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Miami Valley Fair Housing Center's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission and goals of:

- Increasing fair and equal access to housing;
- Eliminating racial segregating;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Establishment of industry best practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices;
- Advocacy/outreach to city and state governments; and
- Education of community members re: foreclosure, homeownership, and neighborhood stabilization.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that, between 2011 through 2017, as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- MVFHC's participation and leadership on the Montgomery County Ex-Offender Reentry Policy Board's county-wide effort, founded to represent the interests of ex-offenders living in Montgomery County and to set policy around issues of employment, housing, public education and advocacy, supportive services, as well as the Ex-Offender Reentry Policy Board's successor, the Montgomery County Reentry Council, and its Reentry Collaborative. The Collaborative serves as a community education assembly which promotes reentry, providing networking, organizational support via resource building, and long-term sustainability through leveraged partnerships. The collaborative body is comprised of service providers and advocates working cooperatively with the Montgomery County Office of Reentry to promote programs, services, and partnerships that minimize barriers to successful reentry and promote a reduction in recidivism. MVFHC was initially asked by the conveners, Senior United States District Judge Walter Herbert Rice and County Commissioner Debbie Lieberman, to take on a leadership role, but MVFHC lacked the staff and resources to commit to taking on some of the requested leadership activities. As a result of its investigation of discriminatory REO maintenance and marketing practices, MVFHC was unable to take on the requested leadership roles until January 2017. MVFHC's Vice President, John Zimmerman would have been responsible for this work, assisted by Elizabeth Redmon, Fair Housing Specialist.

- MVFHC was unable to achieve its planned goal of organizing and leading a coalition of organizations including the Miami Valley Community Action Partnership, the Access Center for Independent Living, Advocates for Basic Legal Equality, the Dayton Human Relations Council, and others. The coalition's purpose would have been to establish broad community support and secure start-up funding for a revolving loan or grant program that makes funding available to moderate-to-low income people with disabilities in the Miami Valley who need resources to make reasonable modifications to existing rental properties that are occupied or are to be occupied by individuals with disabilities, in furtherance of MVFHC's mission. This work would have been completed by Jim McCarthy, President/CEO, John Zimmerman, Vice President, Anita Schmaltz, Director of Investigations & Enforcement, and Miranda Wilson, Fair Housing Analyst.

- Responding to Requests for Proposals to conduct Analyses of Impediments to Fair Housing Choice (AIs) for the City of Springfield, Ohio; Greene County, Ohio, and Miami County, Ohio. Each of those jurisdictions solicited requests for proposal for an organization or company to conduct the AIs. Because MVFHC has conducted AIs for the City of Hamilton, Ohio, the City of Kettering, Ohio, the City of Dayton, Ohio, and Montgomery County, Ohio, it would have been a top contender. However, because of its investigation into discriminatory REO maintenance and marketing, MVFHC was unable to prepare the requests for proposal. MVFHC earns between $30,000 - $72,000 per AI, depending upon the size of the jurisdiction and the scope of services included in the project. This work would have been completed by Jim McCarthy, President/CEO, John Zimmerman, Vice President, Anita Schmaltz, Director of Investigations & Enforcement, Miranda Wilson, Fair Housing Analyst, Elizabeth Redmon, Fair Housing

Specialist, Karl Zimmerman, Fair Housing Specialist, Tom Toberen, Operations Assistant, David Lauri, Director of IT, and Jason Collins, IT Specialist.

- Promoting and marketing the Miami Valley Fair Housing Center's Earned Income Project—The CE Store—throughout central and southwestern Ohio. The CE Store is a project created to seek out professionals who are in need of continuing education to maintain their professional licensure in Ohio, namely social workers, family therapists, discharge nurses and community nurses. MVFHC offers competitively priced continuing education courses on housing discrimination issues. Professionals who complete the education courses receive continuing education credit to maintain licensure, and are made aware of fair housing rights. As a result of its REO work, MVFHC was unable to devote sufficient staff resources to promoting and marketing the project. MVFHC's Vice President, John Zimmerman would have done the majority of this work. MVFHC's projected annual net revenue from this project was $20,000 per year.

- Publicizing the study Fair Housing Act Compliance Concerns Arising from Zoning Laws of Jurisdictions within Montgomery County, Ohio, and the Impact Upon People with Disabilities, and working with those local municipal jurisdictions within Montgomery County, Ohio to elicit support for voluntary revision of zoning laws that pose obstacles to the establishment of Supported Living Homes. As a result of its REO work, MVFHC was unable to devote staff time to publicizing the study and/or consulting with jurisdictions on possible revised language for the zoning laws. This work would have been completed by Jim McCarthy, President/CEO, John Zimmerman, Vice President, Anita Schmaltz, Director of Investigations & Enforcement, and Karl Zimmerman, Fair Housing Specialist.

- Completing and submitting the necessary paperwork for MVFHC to be recognized and eligible to receive funding from the Better Business Bureau's Wise Giving Alliance Standards for Charity Accountability, and for MVFHC to be eligible to participate and receive funding through the Combined Federal Campaign (CFC). As a result of its REO work, MVFHC was unable to devote staff time to fulfilling this goal. This is work that would have been accomplished by the President/CEO, Jim McCarthy, working with the Vice President, John Zimmerman, and the Fair Housing Center's contracted finance staff.

- Soliciting funding for and establishing an annual scholarship fund for college bound Miami Valley high school seniors who are pursuing a liberal arts education, majoring in an appropriate discipline (Liberal Arts, Sociology, Psychology, Urban Studies, Law, etc.) to encourage and facilitate the future generation of non-profit civil rights leaders and professionals. As a result of its REO work, MVFHC was unable to pursue these solicitations. This is work that would have been conducted by the President/CEO, Jim McCarthy.

- Soliciting grants from local and national philanthropic foundations, which would have been used for the hiring and retention of staff in furtherance of MVFHC's mission. As a

106

result of its REO work, MVFHC was unable to pursue these solicitations. This is work that would have been conducted by the President/CEO, Jim McCarthy.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## NORTH TEXAS FAIR HOUSING CENTER – DIVERSION OF RESOURCES

Plaintiff North Texas Fair Housing Center ("NTFHC") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From September 2013 to April 2017, Plaintiff identified Bank of America REO properties in its service area and trained its staff to conduct an investigation of those properties;

- From September 2013 to April 2017, Plaintiff investigated 154 Bank of America REO properties and analyzed the results of that investigation;

- From September 2013 to present, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign;

- On November 5, 2013, February 11, 2016, April 6, 2016, March 21, 2018, and April 16, 2019, Plaintiff organized and conducted trainings for social service providers and property management personnel in the Dallas-Fort Worth region; and

- On January 16, 2014, May 1, 2014, May 13, 2014, September 15, 2015, September 22, 2015, May 11, 2016, December 16, 2016, January 11, 2017, May 21, 2018, July 31, 2018, August 15, 2018, August 21, 2018, April 9, 2019, July 18, 2019, and July 31, 2019, Plaintiff met with local service providers.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff

diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Conducting additional consulting and training of housing providers;
- Applying for new grants and funding sources;
- Attending conferences;
- Professional staff development;
- Expanded forms of outreach and coalition-building;

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include

| Name | Title | Hourly Rate |
|---|---|---|
| Mari Bower | FH Coordinator | $125 |
| Frances Espinoza | Executive Director | $400 |
| Amy Hydock | FH Coordinator | $125 |
| Janay Bender (Rosenthal) | Tester/Surveyor | $125 |

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

**NORTH TEXAS FAIR HOUSING CENTER – FRUSTRATION OF MISSION DAMAGES**

Plaintiff North Texas Fair Housing Center is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants' have frustrated Plaintiff's mission since at least September 2013 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From September 2013 to February 2015, Plaintiff's programs and activities included homeownership promotion (*e.g.*, down payment assistance; closing cost assistance);
- From September 2013 to February 2015, Plaintiff's programs and activities included emergency repairs; and
- From September 2013 to February 2015, Plaintiff's programs and activities included housing accessibility modifications.

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff North Texas Fair Housing Center's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Establishment of industry best practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices;
- Advocacy/outreach to city and state governments; and
- Education of community members re: foreclosure, homeownership, and neighborhood stabilization.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Beginning in February 2011, NTFHC assigned Diana Terry, the Fair Housing Coordinator, to prepare and deliver a weekly fair housing clinic at its office that allowed consumers to speak one-on-one with a housing counselor about housing problems they were having. Reaching an average of 20 people every month, these clinics became a reliable resource for fair housing advice in the North Texas region. The North Texas clinics were uniquely essential, as they were held in the evenings and were the only resource of its kind available to people who worked during the day. NTFHC discontinued the program in October of 2011, and has been unable to restart the program due to Defendants' discriminatory behavior.

- NTFHC developed a fair housing certification program for landlords and property management staff that it planned to launch in 2012. The fair housing certification program was designed to prevent housing discrimination, rather than merely respond to it. NTFHC planned to conduct outreach and marketing for the program before beginning to deliver it to the area housing industry. But the Executive Director and Fair Housing Coordinators have been unable to devote the necessary staff time and resources to conduct the necessary outreach and marketing and deliver the program due to Defendants' discriminatory behavior.

- NTFHC planned to assign its Fair Housing Coordinator to develop and deliver web and social media-based educational programming beginning in 2011, including writing and posting educational materials on its fair housing blog and posting fair housing educational content on its Facebook and Twitter pages; developing, communicating with, and maintaining an active readership; and building relationships with other fair housing advocacy social properties. Because of Defendants' discriminatory behavior, NTFHC has been unable to fully develop and deliver this programming.

110

- In 2010, NTFHC sent its Fair Housing Coordinators to NFHA's biannual Fair Housing School, which provides a week of in-depth training on fair housing history and relevant caselaw for advocates. The Fair Housing School provides essential training on intake, investigation, and testing that advocates would otherwise be forced to learn on the job. The Fair Housing School creates leading edge fair housing materials that participants can take back to their home organizations and facilitates opportunities to learn from and network with fair housing staff from across the country. NTFHC has not sent any of its Fair Housing Coordinators to the Fair Housing School since 2012 because of Defendants' discriminatory behavior, depriving the Fair Housing Coordinators of valuable professional development opportunities.

- Because of Defendants' discrimination, NTFHC has been unable to send staff to ongoing training programs sponsored by the Dallas Center for Nonprofit Management since Nashla Kalifa, the Test Coordinator, attended a training in 2012. This Center offers essential trainings on volunteer management, staff management, fundraising, and marketing that would have been beneficial both for participants and for NTFHC.

- NTFHC planned to assign the Fair Housing Coordinator to begin participating in the local, countywide, and regional fair housing and homeless coalitions starting in 2012, including but not limited to the Dallas County Homeless Coalition, Tarrant County Homeless Coalition, and Denton County Aid Network. These coalitions provided networking opportunities to connect with other non-profit and advocacy organizations working on fair housing and homelessness issues. Coalitions are important sources of referrals for fair housing organizations, and they provide a seat at the table as local organizations build and develop programming. Coalitions also provide irreplaceable opportunities for collaboration with other like-minded groups. Because of NTFHC's staff investment of time and resources to address Defendants' discriminatory behavior, NTFHC has been unable to participate in coalition-building efforts. NTFHC has intended to apply for funding from the State of Texas Amy Young Barrier Removal Program since 2012. The program provides funding for organizations to assist clients with disabilities in making accessibility modifications to their homes. Available Amy Young funding in North Texas averages approximately $100,000 per year and will amount to over $118,000 in 2020. NTFHC, having conducted similar accessibility programs before, is ideally situated to put the barrier removal funds to good use. Because of this experience, both disability advocates and the Central Texas Council of Governments has encouraged NTFHC to apply. No other organization in North Texas has the qualifications and expertise to meet the grant's requirements, so the State's grant money that is earmarked for North Texas each year reverts back to the State budget for lack of applicants and the money is reallocated to other parts of the state. But because this state grant requires a labor-intensive application process and NTFHC's Executive Director has remained focused on Defendants' discriminatory behavior, NTFHC has been unable to apply.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages may be the subject of expert

testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

## SOUTH SUBURBAN HOUSING CENTER (Homewood, IL) – DIVERSION OF RESOURCES

Plaintiff South Suburban Housing Center seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From June 2012 to October 2017, Plaintiff trained its staff to conduct an investigation of approximately 62 Bank of America REO properties in its service area;
- From June 2012 to October 2017, Plaintiff investigated 57 Bank of America REO properties and analyzed the results of that investigation;
- From September 2014 to November 2016, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign;
- Plaintiff met with municipal and county officials, community organizations, housing providers, individual realtors and realtors' associations, lending institutions, community service agencies, faith-based organization, and homeowners and residents of affected communities.

Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties.

Plaintiff will produce a summary of its diversion of resources setting forth the time Plaintiff diverted as a result of Defendants' discriminatory maintenance, marketing, and management practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiffs' summary of diversion of resources

will also reflect staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Fair housing complaint intake opportunities;
- Performance of field work on systemic investigation functions during prime market conditions in the spring, summer and fall;
- Tester recruitment efforts and ability to identify individuals needed for certain protected classes;
- Development of social media campaign capabilities including: Facebook, Twitter and Instagram;
- Complaint outreach and education efforts in exclusionary and underserved areas;
- Research and investigation of institutional issues adversely impacting the local housing markets such as disparities in Housing Choice Voucher payment standards and real estate assessment practices;
- Review of housing market research to analyze indicators where disparities exist;
- Provision of additional assistance to protected class individuals in mortgage or tax payment distress related to living in the communities victimized by historic segregated housing patterns.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|---|---|---|
| John Petruszak, Esq. | Executive Director | $250 |
| Derek Adkisson | Finance & Operations Director | $125 |
| Leslie Woods | FH Systemic Investigation Coord. | $125 |
| Michael Chavarria | FH Intake Specialist | $75 |
| Susan Reed | FH Test/Outreach Coordinator | $75 |
| Kyiet Lewis | FH Intake Specialist | $75 |
| Carrie Simpson | FH Outreach Specialist | $75 |

Finally, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right

to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## SSHC – FRUSTRATION OF MISSION DAMAGES

Plaintiff South Suburban Housing Center is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2012 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From 2015 to 2017, Plaintiff's programs and activities included homeownership purchase (*e.g.*, down payment assistance; and closing cost assistance);
- From 2008 to the present, Plaintiff's programs and activities included foreclosure prevention, mortgage distress assistance, and real estate tax arrearage assistance; and
- From 2018 to present, Plaintiff's programs and activities included accessibility modifications.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission and goals of:

- Increasing fair and equal access to housing;
- Eliminating racial segregation;
- Eradicating discrimination;
- Promoting fair housing and fair lending, including providing affirmative relief to homeowners in distressed communities of color adversely impacted by the mortgage market collapse to stimulate recovery.
  Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's

efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Establishment of industry best practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices;

114

- Advocacy/outreach to city and state governments; and
- Education of community members re: foreclosure, homeownership, neighborhood stabilization, etc.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

## A.    Address Housing Discrimination Effects of Mortgage Market Collapse

In June 2012, when SSHC began investigating Defendants' REO maintenance and marketing practices, SSHC's programs were focused on providing mortgage and rental distress assistance to clients in its majority African-American service area because of the market collapse of 2008. At this time and continuing through 2018, the south Cook County Chicago suburban communities of color had the highest rate of foreclosure in the metropolitan region. Had SSHC not had to divert resources to investigate and combat Defendants' discriminatory REO maintenance and marketing practices, SSHC's fair housing enforcement and counseling programs would have:

- Expanded investigations of widespread mortgage modification fraud and rescue scams operating to rob distressed African American and Hispanic mortgagors of their equity in their homes and prevent foreclosure actions;
- Assisted a larger number of African American and Hispanic clients to mediate and negotiate successful resolutions to mortgage delinquencies;
- Processed and assisted a larger number of eligible mortgage-distressed African American and Hispanic homeowners in obtaining monetary relief to stay in their homes through SSHC's Inclusive Communities Fund Program and the Illinois Hardest Hit Program;
- Conducted systemic rental housing investigations to monitor race-based discrimination in conjunction with the increased demand and tightening of rental market caused by disproportionately higher foreclosure displacement in communities of color; and

- Further investigated and taken actions to remedy real estate tax assessment inequities involving the inflating of market values assessed to homes in majority African American communities of the south suburbs for taxing purpose by the Cook County Assessor's Office.

**B.**   **Conduct Systemic Housing Discrimination Investigations to Identify Violations of Fair Housing Act Accessibility Standards**

Throughout the period SSHC was investigating Defendants' discriminatory REO maintenance and marketing practices, it was prevented from monitoring the new construction of most multi-family residential buildings in its primary and extended service areas for violations of the Fair Housing Act Accessibility Standards. High levels of violations had been identified from sites SSHC staff had been able to investigate, causing numerous complaint actions to remedy and create additional accessible units needed to address severe area housing shortages for disabled individuals. SSHC's effort to undertake this work was thwarted for years because of the time and resources needed to investigate and combat Defendants' discriminatory conduct regarding its REOs.

**C.**   **Advocate for Affirmatively Furthering Fair Housing Compliance**

In 2015, SSHC had conducted outreach to two entitlement jurisdictions in SSHC's service area – Joliet, Illinois, and Hammond, Indiana – to assist them in fulfilling their Affirmatively Furthering Fair Housing obligations to receive federal community development and housing funding. SSHC noted from examining Analysis of Impediments to Fair Housing and Assessment of Fair Housing documents being prepared by them that additional updated mortgage lending analysis was needed to adequately assess these issues. SSHC staff provided Plaintiff's research and analysis of Home Mortgage Disclosure Act data for both municipalities. SSHC had planned on conducting further outreach to these local governments, but because it had

to divert resources to counteract Defendants' discriminatory conduct, it was unable to provide this research assistance, hindering the development of partnerships with these jurisdictions.

**D.**     <u>**Resources to Accomplish Fair Housing Mission**</u>

SSHC was forced to divert resources from pursuing funding opportunities that would have helped it fulfill its mission. In addition to the activities described above, for which Plaintiff would have sought funding, SSHC would also have pursued the following funding opportunities since 2012:

- Additional annual outreach and follow-up with at least an additional 25 local municipalities and townships where SSHC's programs are providing substantial services for their residents, to monetarily support SSHC's program activities.
- Working with major lending institutions and other philanthropic foundations to obtain mortgage assistance funds to continue and replenish community relief funds for its Inclusive Communities Fund down payment assistance and mortgage distress assistance grants to households in distressed communities of color.

In addition to the specific opportunities described above, Plaintiff was also forced to delay numerous trainings Plaintiff had intended to lead to train new testers in furtherance of its mission, and Plaintiff was forced to delay numerous reporting obligations, as a result of Defendants' discriminatory conduct. Finally, because Plaintiff continues to forego opportunities in order to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement this Interrogatory response as the facts require.

Plaintiff also participated in numerous public education events concerning discriminatory REO maintenance and marketing activities, including meetings of the Lake County (Indiana) Housing Task Force, Chicago Area Fair Housing Alliance, the Gary Human Relations Commission, the Kankakee Housing Task Force, the Southland Housing Collaborative, and the Park Forest League of Women Voters. Plaintiff continues to conduct community outreach and public education effort in order to counteract Defendants' discrimination.

117

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages will be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations as further investigation and analysis require.

**TOLEDO FAIR HOUSING CENTER – DIVERSION OF RESOURCES**

Plaintiff Toledo Fair Housing Center ("TFHC") seeks to recover for the actions and expenses it was forced to divert as a result of Defendants' discriminatory conduct. For example, Defendants' discriminatory maintenance and marketing of REO properties compelled Plaintiff and its staff to take the following actions in order to counteract the discrimination:

- From 11/7/2012 to 11/30/2016, Plaintiff identified numerous Bank of America REO properties in its service area and trained its staff to conduct an investigation of those properties;
- From 11/7/2012 to 11/30/2016, Plaintiff investigated 50 Bank of America REO properties and analyzed the results of that investigation;
- From 9/6/2016 to 11/19/2016, Plaintiff interviewed witnesses regarding Defendants' discriminatory conduct;
- From 2014 through 2019, Plaintiff developed and distributed educational materials as part of its counteractive education and outreach campaign in the form of "back on track" classes which occurred on 7/29/14, 8/4/14, 8/6/14, 1/8/15, 1/12/15, 1/13/15, 1/16/15, 2/4/15, 4/7/15, 4/8/15, 4/13/15, 4/14/15, 4/15/15, 6/30/15, 7/1/15, 7/13/15, 7/16/15, 7/20/15, 8/13/15, 8/5/15, 8/27/15, 9/16/15, 9/17/15, 9/14/15, 9/21/15, 9/23/19, 9/29/19;
- Plaintiff organized and conducted trainings for housing industry professionals and the general public in the Northwest Ohio region;
- On April 9, 2014, January 27, 2015, March 6, 2015, May 12, 2015, July 13, 2015, October 29, 2015, and June 28, 2016, Plaintiff met with government officials regarding REO maintenance;
- In December 2014, Plaintiff prepared and published a report on "REO Properties in the Toledo Region – Investigation Report";
- On April 9, 2014, Plaintiff participated in community events and meetings;
- Between 9/6/2016, and 11/19/2016, Plaintiff interviewed neighbors regarding REO maintenance;
- Between 4/26/2013, and 9/7/2019, Plaintiff participated in neighborhood beautification and revitalization efforts; and

118

- On July 7, 2016, Plaintiff participated in a call regarding Defendants' REO practices.

Plaintiff was also forced to expend out-of-pocket funds to investigate and counteract Defendants' discriminatory maintenance and marketing of REO properties.

Plaintiff will provide a diversion of resources summary setting forth the time Plaintiff diverted and the out-of-pocket resources Plaintiff expended as a result of Defendants' discriminatory maintenance and marketing practices. Plaintiff will supplement its response to include additional time and expenses in the course of its rolling production. Plaintiff will also provide a summary of diversion of resources reflecting staff time spent on education and outreach activities. Plaintiff further states that it will update information regarding education and outreach activities, as necessary.

As a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

- Education, counseling, investigation, and capacity-building activities and services;
- Executing new fair housing advocacy projects or investigations;
- Conducting additional consulting and training of housing providers;
- Applying for new grants and funding sources;
- Attending conferences; and
- Professional staff development.

The individuals who diverted time to investigating and addressing Defendants' discriminatory conduct, including their job titles and hourly rates, include:

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Casandria Parker | Intake and Referral Specialist (former) | $150 |
| Diana Patton | Vice President, Chief Operating Officer, General Counsel (former) | $350 |
| Leah Mullen | General Counsel (former) | $350 |
| Michael Marsh | President and CEO (former) | $350 |

| | | |
|---|---|---|
| Zachary Hillyer | Foreclosure Prevention Specialist | $150 |
| Susan Jester | Intake and Client Relations Specialist (former) | $150 |
| Fannie Hall | Senior Fair Housing Specialist (former) | $200 |
| Harrison Shuneh | Fair Housing Specialist | $150 |
| Jen Teschner | Senior Director of Systemic Investigations | $250 |
| Karen Plocek | Director of Enforcement | $250 |
| Linda Skowronek | Executive Assistant / Grants Administrator | $250 |
| Mike Fehlen | Controller | $250 |
| Sarah M. Jenkins | Director of Communications and Outreach | $250 |
| Christina Rodriguez | Staff Attorney (7/1/2017 onward) | $350 ($150 prior to 7/1/2017) |
| George Thomas | Vice President and General Counsel | $350 |
| Marie M. Flannery | President and CEO | $350 |
| Silma Espinosa | Fair Housing Specialist | $150 |
| Caren Hinton | Accounting Assistant (former) | $150 |
| Keith Foster | Director of Enforcement and Compliance (former) | $250 |
| Steve Repka | Fair Housing Specialist (former) | $150 |
| Norman Hinton | Lending Specialist, Director of Enforcement and Compliance (former) | $250 |
| Lisa Lawson Lapointe | Senior Fair Housing Specialist, Outreach and Development (former) | $200 |
| Ryan Hedges | Lending Specialist (former) | $150 |
| Katherine Broka | President and CEO (former) | $350 |
| Renea Wilson | Director of MLK Inclusive Communities Program (former) | $250 |
| Eric Ricker | Intern | $50 |
| Kristen Angelo | Intern | $50 |
| Tyler Jechura | Intern | $50 |
| Elvis Shuneh | Fair Housing Specialist (former) | $150 |
| Edith Lui | Intern | $50 |
| Sena Friedman | Director of Development and Communications | $250 |

| Annie Cieslukowski | Intake and Client Relations Specialist | $150 |
| Patricia Smith | Controller (former) | $250 |
| Chelsea Meister | Intern | $50 |

Because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will, modify and supplement these calculations and demands as further investigation and analysis require.

## TOLEDO FAIR HOUSING CENTER – FRUSTRATION OF MISSION DAMAGES

Plaintiff Toledo Fair Housing Center is entitled to damages to compensate it for Defendants' frustration of its mission. Defendants have frustrated Plaintiff's mission since at least 2014 by interfering with its activities, programs, and services; harming its clients and client communities; and impairing its broader goals.

Specifically, Defendants' discriminatory maintenance and marketing practices impeded Plaintiff's community investment and neighborhood stabilization programs, activities, and services including:

- From 3/18/2014 to 12/31/2016, Plaintiff's programs and activities included homeownership promotion (*e.g.*, homeowners' insurance and back taxes programming, down payment assistance; closing cost assistance);
- From 3/18/14 to 12/31/16, Plaintiff's programs and activities included emergency repairs;
- From 12/2009 to 9/2015, Plaintiff's programs and activities included foreclosure prevention (*e.g.*, anti-displacement grants for renters and/or to bring mortgages current);
  - For example, TFHC's MLK Inclusive Communities foreclosure prevention program funded emergency mortgage assistance in the very same zip codes where TFHC investigated discriminatory REO maintenance and marketing practices.
- From 3/18/2014 to 12/31/2016, Plaintiff's programs and activities included housing rehabilitation;
- From 4/26/2013 to 9/7/2019, Plaintiff's programs and activities included repurposing of blighted or vacant lots;
- From 3/18/2014 to 12/31/2016, Plaintiff's programs and activities included accessibility modifications;
  - For example, TFHC partnered with The Ability Center of Greater Toledo for expansion of the latter organization's home modification program in the same zip

121

codes where TFHC investigated discriminatory REO maintenance and marketing practices.

- TFHC also facilitated the installation of grab bars, handrails, and ramps, the widening of doors, and the repair of stairs in order to make homes more accessible to people with mobility impairments.
- From 4/26/2013 to 9/7/2019, Plaintiff's programs and activities included community enhancement (*e.g.*, construction of parks, gardens, recreation areas).

Defendants' discriminatory maintenance and marketing practices harmed Plaintiff's clients and client communities by hindering their access to fair and equal housing and their ability to live in racially integrated communities, which are part of Plaintiff TFHC's core services.

Defendants' discriminatory maintenance and marketing practices frustrated Plaintiff's mission(s) and goal(s) of:

- Increasing fair and equal access to housing;
- Eliminating racial segregating;
- Eradicating discrimination; and
- Promoting fair housing and fair lending.

Defendants' discriminatory maintenance and marketing practices undermined Plaintiff's efforts to advance its mission and goals through education, advocacy, and training programs, including:

- Establishment of industry best practices for REO maintenance and marketing;
- Training industry stakeholders on REO best practices;
- Advocacy/outreach to city and state governments; and
- Education of community members re: foreclosure, homeownership, neighborhood stabilization, etc.

Plaintiff is entitled to damages to compensate it for this frustration of mission, including the costs that it has expended to rectify and counteract the effects of Defendants' discriminatory conduct, as well as costs it will be forced to expend in the future.

Plaintiff states that as a result of Defendants' discriminatory conduct, Plaintiff was forced to forego the following opportunities, the achievement of which would have substantially furthered Plaintiff's organizational goals:

One of the most important services that TFHC provides on an ongoing basis is assistance to individual complainants who have encountered discrimination in violation of the Fair Housing Act. This assistance can remedy past discrimination and prevent further discrimination. From November 2019 to the present, TFHC staff have, on multiple occasions, been unable to timely assist several fair housing complainants due to Defendants' discriminatory conduct, resulting in considerable delays and difficulties in remedying and preventing housing discrimination. Ms. Christina Rodriguez and Ms. Karen Plocek were assigned to complete these projects.

In July 2019, TFHC planned to create a brochure for housing professionals to help them understand fair housing issues. Providing accurate information about fair housing compliance is central to TFHC's mission and goals, and this brochure would have helped hundreds of housing professionals better and more fairly serve the Toledo metropolitan area. Production of the brochure was delayed by six months due to Defendants' discriminatory conduct. Ms. Karen Plocek was assigned to work on the brochure.

In October 2014, TFHC was updating its Human Resources policies so it could more effectively and efficiently serve the community. Due to Defendants' discriminatory conduct, TFHC was unable to update its policies for 14 months. Ms. Diana Patton was assigned to update these policies.

Plaintiff cannot at this time perform a precise calculation of its monetary frustration of mission damages. Plaintiff's frustration of mission damages may be the subject of expert testimony, and the amount of such damages is to be determined by a jury. Furthermore, because these damages are ongoing and Plaintiff continues to incur costs and will expend additional resources to counteract Defendants' discrimination, Plaintiff reserves the right to, and will,

modify and supplement these calculations and demands as further investigation and analysis require.

EXHIBIT C

EXHIBIT C

**INFORMATION REGARDING NAMES AND CONTACT INFORMATION OF INDIVIDUALS FROM ORGANIZATIONAL PLAINTIFFS RESPONSIVE TO BANK OF AMERICA'S PHASE III INTERROGATORY NO. 2**

## NATIONAL FAIR HOUSING ALLIANCE

| Name | Address | Phone Number | Email Address |
|------|---------|--------------|---------------|
| Ahmed Soussi | --- | --- | ahmedsoussi@yahoo.com |
| Alayne Hersh | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | ahersh@nationalfairhousing.org |
| Amanda M Zannoni | --- | 716-512-4671 | amandazann6@gmail.com |
| Amrita Narasimhan | --- | 415-309-3718 | amrita.narasimhan@gmail.com |
| Andrea Lau | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | aolau@nationalfairhousing.org |
| Andrew Nuñez | --- | --- | --- |
| Anne Houghtaling | --- | 240-426-6710 | --- |
| Arlene Reidy | --- | 202-841-6902 | --- |
| Ashlee Washington | --- | --- | --- |
| Ben Clark | --- | --- | --- |
| Brandon Small | --- | --- | bsmall6@fordham.edu |
| Brynn Madway | --- | --- | --- |
| Catalina Guzman | --- | --- | a.catalina.guzman@gmail.com |
| Catherine Cozzolino | --- | --- | --- |
| Cathy Cloud | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | ccloud@nationalfairhousing.org |
| Cedrick Ricks | --- | 260-415-8554 | --- |
| Cheryl Taylor | --- | 301-742-4177 | cdt1962@icloud.com |
| Chiamaka Chukwu | --- | --- | --- |

1

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| Claudia Vila | --- | 909-261-0953 | claudiapvila@gmail.com |
| Courtney Williams | --- | --- | |
| Creadell Webb | --- | --- | Creadell.Webb@gmail.com |
| Dana Lockwood | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | dlockwood@nationalfairhousing.org |
| David Loesberg | --- | --- | daloesberg@gmail.com |
| Debby Goldberg | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | dgoldberg@nationalfairhousing.org |
| Deidre Swesnik | --- | 202-277-4437 | --- |
| Diane Cipollone | --- | 410-693-0943 | diane@cipollonelegalconsults.com |
| Erick Hoffman | --- | --- | --- |
| Geoffrey Leonard | --- | --- | geoffreylnrd@gmail.com |
| Halim Rasalat | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | hrasalat@nationalfairhousing.org |
| Izzy Woodruff | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | iwoodruff@nationalfairhousing.org |
| Jade Graver | --- | 404-444-5458 | jadekiragraver@gmail.com |
| Jameel Khan | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | jkhan@nationalfairhousing.org |
| Jamila Shand | --- | --- | jamila.shand@gmail.com |
| Janelle Brevard | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | jbrevard@nationalfairhousing.org |
| Jessica Aiwuyor | --- | --- | jessicamitchellpr@gmail.com |
| Jessica Baker | --- | --- | --- |
| Jorge Soto | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | jsoto@nationalfairhousing.org |
| Justin Monteiro | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | jmonteiro@nationalfairhousing.org |
| Katherine Sullivan | --- | 708-415-7879 | --- |

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| Kathy Burns | --- | 419-277-0117 | --- |
| Kevin Paul | --- | 301-461-5540 | --- |
| Kody Glazer | --- | --- | kody.glazer@gmail.com |
| Lara Adekeye | --- | 617-909-2723 | laradekeye.118@gmail.com |
| Laurie Benner | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | lbenner@nationalfairhousing.org |
| Lauren Tootle | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | ltootle@nationalfairhousing.org |
| Lindsay Augustine | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | laugustine@nationalfairhousing.org |
| Lisa Govoni | --- | --- | lisagovoni@gmail.com |
| Lisa Rice | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | lrice@nationalfairhousing.org |
| Liz Hines | --- | --- | ehines2@gmail.com |
| Mackenzie Vergason | --- | --- | mavergas@buffalo.edu |
| Madeline Hoffman | --- | 541-844-4275 | --- |
| Madeline McBride | --- | 540-333-0726 | mcbmadel@gmail.com |
| Malcolm Peyton-Cook | --- | --- | --- |
| Maria Dewees | | 301-648-2345 | dewees.maria@gmail.com |
| Maria Moreno | --- | 617-272-6250 | mariadcmp@gmail.com |
| Mary Strayhorne | --- | 202-304-8393 | mstrayhorne@gmail.com |
| Michael Akinwumi | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | makinwumi@nationalfairhousing.org |
| Michael Parker | --- | --- | --- |
| Mohsin Mizra | --- | --- | mohsin965@yahoo.com |
| Morgan Williams | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | mwilliams@nationalfairhousing.org |

**CONFIDENTIAL**

| | | | |
|---|---|---|---|
| Mornita Dunson-Coleman | --- | --- | --- |
| Nana-Yaw Owusu | --- | --- | nowusu@law.gwu.edu |
| Naweed Lemar | --- | --- | --- |
| Nicole Turner-Ridley | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | nridley@nationalfairhousing.org |
| Nisha Arekapudi | --- | --- | n.arekapudi@gmail.com |
| Olivia Grob-Lipkis | --- | --- | obg5@georgetown.edu |
| Pablo Zatarain | --- | 650-815-6199 | pezan42@gmail.com |
| Pamela Bond | --- | 240-997-5627 | --- |
| Quisharn Hamilton | --- | 301-636-3699/240-438-6445 | quisharn_hamilton@yahoo.com |
| Rachael Deane | --- | 804-543-2275/804-873-0783 | rachael.deane@gmail.com |
| Sabrina Carter | --- | --- | --- |
| Salome Aringo | --- | 202-250-4948 | --- |
| Samuel Tope-Ojo | ------ | --- | samtopeojo@gmail.com |
| Sarah Connor | --- | --- | --- |
| Scott Chang | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | schang@nationalfairhousing.org |
| Sean Downey | --- | --- | --- |
| Shanna Smith | --- | 202-421-4446 | shanna1016@aol.com |
| Shanti Abedin | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | sabedin@nationalfairhousing.org |
| Sherrill Frost Brown | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | sbrown@nationalfairhousing.org |
| Shivaughn Ferguson | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | sferguson@nationalfairhousing.org |
| Skye Nadel | --- | 718-781-5315 | skye.nadel@gmail.com |

4

**CONFIDENTIAL**

| Tariq Hardiman | --- | --- | tariq.hardiman@law.bison.howard.edu |
|---|---|---|---|
| Tiffany Cebrun | --- | 281-732-5144 | tiffany.cebrun@law.bison.howard.edu |
| Victoria Finkle | --- | --- | victoria.finkle@gmail.com |
| Yvonne Lewis | 1331 Pennsylvania Ave NW, Ste 650 Washington, DC 20004 | 202-898-1661 | ylewis@nationalfairhousing.org |
| Zachary Brown | --- | 409-789-0192 | zmb5ch@virginia.edu |
| Zubin Kapadia | --- | --- | --- |

## CONNECTICUT FAIR HOUSING CENTER

- Maria Cuerda, Testing Coordinator
  mcuerda@ctfairhousing.org
  60 Popieluszko Court
  Hartford, CT 06106
  860-263-0727

- Sarah White, Staff Attorney, Foreclosure Prevention
  swhite@ctfairhousing.org
  60 Popieluszko Court
  Hartford, CT 06106
  860-263-0726

- Jeff Gentes, Managing Attorney
  jgentes@ctfairhousing.org
  60 Popieluszko Court
  Hartford, CT 06106

- Erin Kemple, former Executive Director
  ekemple59@gmail.com
  413-627-3916

- John McGrath, former Staff Attorney
  mcgrath.john.a@gmail.com

- James Dresser, former Testing Coordinator
  Jdresser9@gmail.com
  860-209-1774
  26 Clemens Court
  Rocky Hill, CT 06067

- Melvin Kelley, former Staff Attorney, Fair Housing
  me.kelley@northeastern.edu

5

**CONFIDENTIAL**

617-373-7806

- Claudia Dresser (now Claudia Gonzalez), former Fair Housing Specialist/Testing Coordinator
  cmgonz2018@gmail.com
  860-781-5494

**DENVER METRO FAIR HOUSING CENTER**

Veronica Barela
vbarela@dmfhc.org
720-320-3174
Denver Metro Fair Housing Center
2701 Lawrence St
Suite 119
Denver, CO 80205

Arturo Alvarado
atalvarado48@gmail.com
720-232-6578

Rita Lewis
formernaacpdenverprez@gmail.com
Plaintiff Denver Metro Fair Housing Center further states that contact information for the below individuals will be provided in the near future:
Janeth Juarez
Ashley Cloutier
Kathryn Quillin
Christina Miranda
Elizabeth Campbell
Trevor Jones
Tasha Lynch
Miguel Trujillo

**FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA**

1. Adriana Ames: adriana@fairhousingnorcal.org
   Education Director
   Fair Housing Advocates of Northern California
   (415) 457-2390

2. Annya Maskey: annya@sonomalandtrust.org
   Operations Manager
   Sonoma Land Trust
   822 5th Street
   Santa Rosa, CA, 95404

6

**CONFIDENTIAL**

3. Bailey Fice: Last known information: baileyfice@yahoo.com, 858-472-6453

4. Caroline Peattie: peattie@fairhousingnorcal.org
   Executive Director
   Fair Housing Advocates of Northern California
   (415) 483-7552

5. Casey Epp: caseyepp@gmail.com
   Partner
   Epp & Sons, Inc. & Louis Epp Joint Venture
   1890 Broadway St., Apt. 208
   San Francisco, CA, 94109
   (415) 990-1025

6. Craig Schechter: crschechter@gmail.com; cschechter@unioncounsel.net
   Weinberg, Roger & Rosenfeld
   1375 55th St, Emeryville, CA 94608-2609
   510-337-1001

7. Denise Bashline: No available information beyond the address last left in 2016:
   1514 Hill Road #46, Novato, CA,
   415-209-9787

8. Jessica Tankersley: jessicatankersley@gmail.com
   Commission on Judicial Performance
   455 Golden Gate Ave, Ste 14400
   San Francisco, CA 94102

9. Julia Howard-Gibbon: julia@fairhousingnorcal.org
   Supervising Attorney
   Fair Housing Advocates of Northern California
   (415) 483-7516

10. Katherine Collado: kbcollado@ucdavis.edu

11. Matt Oglander: matthew.oglander@sfgov.org
    Investigator / Mediator
    San Francisco Human Rights Commission
    25 Van Ness Avenue, Suite 800
    San Francisco, CA 94102
    415.252.2543

7

**CONFIDENTIAL**

12. Ray Zamudio: rayzamudio@gmail.com

13. Stefanie Taylor: stefanie.taylor24@gmail.com
    Chicago Best Buddies

14. Karen Crump: karen@fairhousingnorcal.org
    Foreclosure Prevention Counselor
    Fair Housing Advocates of Northern California
    (415) 483-7494

15. Christine Lam: last known email/phone:
    calam4@gmail.com
    (415) 306-3279

16. Noelle Ticman: noelle@fairhousingnorcal.org
    Data Administrator
    Fair Housing Advocates of Northern California
    (415) 484-1264

17. Jeff Bissell: jeff@fairhousingnorcal.org
    Accountant / Bookkeeper
    Fair Housing Advocates of Northern California
    (415) 483-7597

18. Jillian Cosby: jillian@fairhousingnorcal.org
    Executive Assistant & Development Coordinator
    Fair Housing Advocates of Northern California
    (415) 483-7566

**FAIR HOUSING CONTINUUM**

David Baade
President/CEO, Fair Housing Continuum, Inc. (Continuum)
dbaade@fhccentralfl.org
321-243-9137
Fair Housing Continuum, Inc.
571 Haverty Court
Suite A
Rockledge, FL 32955
C. J. Miles
cmiles8852@gmail.com
321-507-0024

**CONFIDENTIAL**

Marilyn McAndrew
mmcandrew@fhccentralfl.org
321-243-9138
A.D. Escander
aescander@gmail.com
407-873-1591
Rose Pardey (Miles)
rmiles@fhccentralfl.org
386-561-7175
Suheil Cuevas (lost contact)

**FAIR HOUSING CENTER OF GREATER PALM BEACHES**
Vince Larkins
vincefhcpalmbch@gmail.com
561 533-8717
Fair Housing Center of the Greater Palm Beaches
2328 10th Ave. North
Suite 101
Lake Worth FL. 33461

Jennifer Perez (No longer with agency)
jennyofheak@gmail.com
561-283-6703
2328 10th  Ave. North
Suite 101
Lake Worth FL. 33461

**FAIR HOUSING COUNCIL OF GREATER SAN ANTONIO**
Sandra Tamez
Executive Director
Fair Housing Council of Greater San Antonio
4414 Centerview Drive, Suite 229
San Antonio, Texas 78228
sandra@fairhousingtx.org
(210) 733-3247, ext. 106

Roxann Contreras
Enforcement Program Manager
Fair Housing Council of Greater San Antonio
4414 Centerview Drive, Suite 229
San Antonio, Texas 78228
roxann@fairhousingtx.org
(210) 733-3247, ext. 105

**CONFIDENTIAL**

Stephanie Hernandez
Intake Specialist
Fair Housing Council of Greater San Antonio
4414 Centerview Drive, Suite 229
San Antonio, Texas 78228
stephaniea@fairhousingtx.org
(210) 733-3247, ext. 101

Jo Ann Rodriguez
Program Assistant
Fair Housing Council of Greater San Antonio
4414 Centerview Drive, Suite 229
San Antonio, Texas 78228
joann@fairhousingtx.org
(210) 733-3247, ext. 107

Aleta Runnels (no longer employed)
Fair Housing Specialist
cell: (918) 521-9229
Amanda Gonzalez (no longer employed)
Program Assistant
cell: (956) 489-2395
Cody Johnson (no longer employed)
Fair Housing Specialist
cell: (713) 557-2660
Karla Byrd (no longer employed)
Fair Housing Specialist
cell: (210) 857-0733
Sokoiya Thomas (no longer employed)
Fair Housing Specialist
cell: (210) 687-5610
Susan Bartik (no longer employed)
Enforcement Program Manager
cell: (210) 289-3806

**FAIR HOUSING CENTER OF NORTHERN ALABAMA**
Lila Hackett, Executive Director
1820 7th Avenue North Ste. 110
Birmingham, Alabama 35203
205-324-0111 (office)
lila1343@aol.com

Jacqueline Betts,

10

**CONFIDENTIAL**

Administrative Assistant/Intake Specialist
1820 7th Avenue North Ste. 110
Birmingham, Alabama 35203
205-324-0111 (office)
Mail4jdb5964@yahoo.com

Charlena Morton, FHNCA Testing Coordinator (no longer employed with center)
205-447-5504 (cell)
Drcmorton.cc@mail.org

Genise Boyd, Intern (assignment ended)
205-585-6229 (cell)

Richard Savage, FHCNA Testing Coordinator (no longer employed with center)
Has relocated, no forwarding address
323-331-8834 (cell)

Youit Lyde, Tester
1508 Avenue K
Birmingham, Alabama 35218
205-703-9066

Robert Dickerson, Board of Directors
1500 1st Avenue North Birmingham, Alabama 35217
205-218-1003
bdickerson@brc.biz

Henry Ray, Board of Directors
3800 Forest Glen Drive Mountain Brook,
Alabama35213
205-563-8248
hray@raypoynor.com

Nadine Smith, Board of Directors
1552 17th Street, SW
Birmingham, Alabama 35211
205-925-1198 / 205-910-1081
naysmi12@aol.com

Ronald Truss, Board of Directors
856-A 8th Street West
Birmingham, Alabama 35204
205-382-3435

**CONFIDENTIAL**

Retruss47@gmail.com

Carolyn Culpepper, Ex-Board of Directors
4208 Bitoak Trail
Ager, Alabama 35006
Crculpepper3@gmail.com
205-602-3081

Sherry McClain, Board of Directors
1801 3rd Avenue North - Room 303 Bessemer Court House
Bessemer, Alabama 35020
shmcclain@ymail.com
205-481-4192

Dr. George Munchus, Board of Directors
Ctr. For Research of Human Rights
P.O. Box 130417
Birmingham, Alabama 35213
205-934-8840
munchus@icloud.com

Judy Davis, Ex- Board of Directors
144 Red Bay Drive
Maylene, Alabama 35114
214-912-8013

Buffy Murphy, Board of Directors
4680 Highway 280
Birmingham, Alabama 35242
205-437-2712
buffymurphy@bxs.com

**FAIR HOUSING CENTER OF WESTERN MICHIGAN**

| First Name | Last Name | Address 1 | Address 2 | City | State | Zip | Telephone Number | Email |
|---|---|---|---|---|---|---|---|---|
| Nancy | Haynes | Fair Housing Center of West Michigan | 20 Hall Street SE | Grand Rapids | MI | 49507 | 616-451-2980 | nhaynes@fhcwm.org |
| Liz | Keegan | Fair Housing Center of West Michigan | 20 Hall Street SE | Grand Rapids | MI | 49507 | 616-451-2981 | lkeegan@fhcwm.org |

12

**CONFIDENTIAL**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Elizabeth | Stoddard | Fair Housing Center of West Michigan | 20 Hall Street SE | Grand Rapids | MI | 49507 | 616-451-2982 | estoddard@fhcwm.org |
| Mandy | Zweifel Hughes | | 2161Wilmont Dr. SE | Kentwood | MI | 49508 | (309) 255-0060 | Mandyz01@yahoo.com |
| Megan | Derks | | 2710 Marquette Ave | Muskegon | MI | 49442 | 616-318-0308 | derksme@gmail.com |
| Madelaine | Clapp | | 1503 Sherwood Ln | Lansing | MI | 48917 | (517) 335-0109 | madelaineclapp@gmail.com |

## HOPE FAIR HOUSING CENTER (Wheaton, Illinois)

| Name | Business Address | Telephone | Email Address |
|---|---|---|---|
| Anne Houghtaling | 700 14th Street N.W. Ste. 600, Washington, DC 20005 | (202) 682-1300 | ahoughtaling@naacpldf.org |
| Kamal Ganjalikhani | Department of Housing and Urban Development, Chicago Regional Office 77 W Jackson Boulevard, Room 2202 Chicago, Illinois 60604 | 202-247-6736 | Kamal.Ganjalikhani@hud.gov |
| Shirley Stacey | 1041 Ridgefield Circle Carol Stream, IL 60188 | 630-483-1216 | shirleystacy29@gmail.com |
| Michael Chavarria | 202 W. Willow Ave., Suite 203, Wheaton, IL 60187 | 630-690-6500 | michael.chavarria@hopefair.org |
| Josefina Navar | 202 W. Willow Ave., Suite 203, Wheaton, IL 60187 | 630-690-6500 | josefina.navar@hopefair.org |
| Evelyn Sanguinetti | 2014 Stoddard Avenue Wheaton, Il 60187. | 630-306-3367 | epacino@gmail.com |
| Rachana Kothari | last known home address: 1509 92nd Street Unit 80, WI 53177 | 262-324-1610 | rkothari@uwm.edu |
| Paula Brkich | 727 Naperville Rd, Wheaton, IL 60187 | (630) 871-5725 | Not available |
| Janet Dermody | 7404 Madden Dr, IN 46038 | (802) 276-6840 | jdermody@gmart.net |
| Tiffani Wesley | 2121 Euclid Ave Rolling Meadows, IL 60008-1500 | Not available | Not available |

**CONFIDENTIAL**

| Tykeda Smith | 2813 Gypsum Circle, Naperville 60564 | Not available | Not available |
| June Bishop | 202 W. Willow Ave., Suite 203, Wheaton, IL 60187 | 630-690-6500 | june.bishop@hopefair.org |
| Tara Waterlander | 2205 N Lincoln Ave Apt 102, Chicago IL 60614 | Not available | Not available |
| Kathy Clark | Not available | 708 218-4463 | kathleen.sealark@yahoo.com |
| Barbara Moran | 444 Spring Rd #15, Elmhurst, IL 60126 | (630) 808-3338 | Not available |
| Carol O'Neill | 21W470 Fairway St., Glen Ellyn, IL 60137 | 630-469-4370 | cobopoto@sbcglobal.net |
| Alex Majestic | Not available | 630-715-9660 | amajestic18@gmail.com |

## HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.

Keenya Robertson
11501 NW 2nd Avenue
Miami, FL 33168
(305) 651-4673
keenya@hopefhc.com

Daniel Howe
11501 NW 2nd Avenue
Miami, FL 33168
(305) 651-4673
daniel@hopefhc.com

Rob Collins
11501 NW 2nd Avenue
Miami, FL 33168
(305) 651-4673
rob@hopefhc.com

Noris Caballero
11501 NW 2nd Avenue
Miami, FL 33168
(305) 651-4673
noris@hopefhc.com

Luxmy Panzardi, Testing and Investigations Coordinator
6491 Sunset Strip, Suite 8
Sunrise, FL 33313
(954) 567-0545
luxmy@hopefhc.com

14

**CONFIDENTIAL**

No longer employed with HOPE, Inc., contact information unknown:

- Alyssa Arnell
- Matthew Tisdol
- Efrem Crenshaw
- Rita Scott
- Diamon Excell

## THE FAIR HOUSING CENTER FOR RIGHTS AND RESEARCH (formerly known as the Housing Research & Advocacy Center)

- Carrie Pleasants, Executive Director, cpleasants@thehousingcenter.org
- Kris Keniray, Associate Director,  kkeniray@thehousingcenter.org
- Michael Lepley, Mobility Program Director, mlepley@cuyahogamobility.org

All three of the above employees can be contacted through Housing Research & Advocacy Center, 2728 Euclid Avenue., Suite 200, Cleveland, OH 44115, 216-361-9240

- Amanda Mehlman, mandymehlman@gmail.com, 614-577-0251, 1600 St. Charles Ave., Lakewood, OH 44107
- Doris Honsa, dhonsa2@yahoo.com, 216-882-2925, 1834 W. 44th St., Cleveland, OH 44113
- Lenore Mangiarelli, lenoremhealy@gmail.com, 740-381-3788, 3267 Pheasant Run Rd., Unit A, Cortland, OH 44110
- Darlene English, denglish@nationalfairhousing.org, 216-280-2183, 15332 Lake Shore Blvd., Cleveland, OH 44110
- Hilary Mason-King, info@creativemovesllc.com, 216-832-7053, 2267 Lamberton Rd., Cleveland Heights, OH 44118
- Peter Saudek, petersaudek@gmail.com, 781-686-4740, 7107 Franklin Blvd., Cleveland, OH 44102
- Frank Ford, fford@thehousingcenter.org, 2728 Euclid Avenue., Suite 200, Cleveland, OH 44115, 216-361-9240

## LOUISIANA FAIR HOUSING ACTION CENTER

| Kate Scott | Assistant Director (former) akatescott@gmail.com |
|---|---|
| Sophie Rosen | Director of Education and Outreach (former) sophie.rosen6@gmail.com |
| Stephanie Sheeley | Outreach Coordinator (former) |

15

**CONFIDENTIAL**

| | |
|---|---|
| | Stephanie.sheeley@gmail.com<br>216 308 8251 |
| Renee Corrigan | Director of Education and Outreach (current)<br>rcorrigan@lafairhousing.org<br>504 717 4571 |
| Amber Tucker | Outreach Coordinator (former)<br>504 319 0984 |
| Monika Gerhart | Policy Director (former)<br>Monika.a.gerhart@gmail.com<br>504 258 9294 |
| Cashauna Hill | Executive Director (current)<br>chill@lafairhousing.org<br>504 708 5671 |
| Alexander Bollag | Staff Attorney (former)<br>919 923 5973 |
| Michelle Morgan | Coordinator of Investigations (current)<br>mmorgan@lafairhousing.org<br>(504) 717-4257 |
| Elizabeth Owen | Legal Director (former)<br>elizowen@gmail.com |
| Aurora Bryant | Staff Attorney (former) |
| Alexander Owen | Intake Coordinator/Avodah Fellow (former)<br>917 834 8035 |
| Marlene Theberge | Director of Education and Outreach (former)<br>603 858 1265 |
| Maxwell Ciardullo | Policy Analyst (06/2014 – 01/2017)<br>Director of Policy & Communications (01/2017 – present) |

16

**CONFIDENTIAL**

| | |
|---|---|
| | mciardullo@lafairhousing.org |
| | (504) 266-2494 |
| Elana Cohen | Investigations Fellow/Testing Coordinator (09/2016-08/2017) |
| | Education Coordinator (03/2018-06/11/2021) |
| Ari Jones | Special Investigations Coordinator (former) |
| | Ariennejones15@gmail.com |
| | 251 423 8383 |
| Lisa Tencer | Testing Coordinator (former) |
| | ltencer@vera.org |
| | 248 909 5277 |

## METRO FAIR HOUSING SERVICES (Atlanta, Georgia)

- Gail Williams, gail.williams@metrofairhousing.com, (404) 524-0000 Ext. 15
- Joyce Catrett, joyce.catrett@metrofairhousing.com, (404) 226-0749
- Sharon Tonge, sharon.tonge@metrofairhousing.com, (404) 524-0000 Ext. 14
- Marion Thomas, marion.thomas@metrofairhousing.com, (404) 524-0000 Ext. 11
    Metro Fair Housing Services, Inc.
    215 Lakewood Way, S.W.
    Suite 106
    Atlanta, Georgia 30315
- Ashley Boone, (404) 387-8195
- Joya Green (No longer with agency and no forwarding contact information available)

## METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL

William R. Tisdale
President & CEO (Retired)
Programs Operation Officer (Current)
2926 N. 68th St.
Milwaukee, WI 53210
(414) 278-1240 (Office)
(414) 315-2065 (cell)
Email: wrtisdale@fairhousingwisconsin.com

Carla Wertheim
Executive Vice President

**CONFIDENTIAL**

2926 N. 68th St.
Milwaukee, WI 53210
(414) 278-1240 (office)
(414) 315-1515 (cell)
Email: cjwertheim@fairhousingwisconsin.com

Sarah Aragon
(Former) Program Assistant
4147 N Bartlett Ave.
Milwaukee, WI  53211
(414) 704-7483

Felita Daniels-Ashley
(Former) Senior Program Coordinator
Contact details below are the last known information MMFHC has on file.
9190 N. Brandybrook Tr.
Brown Deer, WI  53223
414-446-4885 (home)
414-587-4790 (cell)

Deanna Richardson
Senior Program Administrator – Investigative Services
7048 W. Lima St. Milwaukee, WI 53223
(414) 278-1240 (office)
(414) 708-4776 (cell)
Email: drichardson@fairhousingwisconsin.com

Rachel Scalise
Executive Assistant
3829 S. 15th St.
Milwaukee, WI 53221
(414) 278-1240 (office)
(414) 659-4702 (cell)
Email: rscalise@fairhousingwisconsin.com

Christine Schneider
Investigator
21530 Doneswood Dr.
Waukesha, WI 53186
(414) 278-1240 (office)
(414) 899-8797 (cell)
Email: cschneider@fairhousingwisconsin.com

Caitlin Taylor
(Former) Investigator

18

**CONFIDENTIAL**

Contact details below are the last known information MMFHC has on file.
3113 N. Dousman St.
Milwaukee, WI 53212

Celest Walker
(Former) Support Services Coordinator
Contact details below are the last known information MMFHC has on file.
2350A S Howell Ave.
Milwaukee, WI 53207
(414) 748-8884 (cell)

Megan Wanke
Senior Administrator – Administrative Services
3735 S. 90th Street
Milwaukee, WI 53228
(414) 278-1240 (office)
(414) 350-9959 (cell)
Email: mwanke@fairhousingwisconsin.com


## MIAMI VALLEY FAIR HOUSING CENTER

Jim McCarthy
2230 S. Patterson Blvd., Unit 118
Dayton, OH 45409
jim.mccarthy@mvfhc.com
937-937-313-7803

John Zimmerman
2210 E Central Ave.
Miamisburg, OH 45342
john.zimmerman@mvfhc.com
937-937-313-7813

Miranda Wilson
8 W. Sunrise Ave.
Trotwood, OH 45426
miranda.wilson@mvfhc.com
513-267-1091

David C. Lauri, Jr.
2230 S. Patterson Blvd., Unit 115
Dayton, OH 45409
david.lauri@mvfhc.com
937-902-8054

Jason Collins

19

**CONFIDENTIAL**

4345 Blue Rock Rd.
Dayton, OH  45432
jason.collins@mvfhc.com
937-877-6171

Tom Toberen
1043 Bentgrass Lane
Dayton, OH  45458
tom.toberen@mvfhc.com
937-478-3187

Anita Schmaltz
24 Pleasant Avenue
Trotwood, OH  45426
aschmaltz24@yahoo.com
937-684-7617

Karl Zimmerman
2210 E Central Ave.
Miamisburg, OH  45342
karljzimmerman@gmail.com
937-613-8124

**NORTH TEXAS FAIR HOUSING CENTER**

- Frances Espinoza, Executive Director
  2626 Cole Avenue, Suite 300
  Dallas, TX 75204
  469-941-0375 x304
  fespinoza@northtexasfairhousing.org

- Mari (Bower) Houlihan, Fair Housing Coordinator
  3117 Brookhaven Club Drive
  Farmers Branch, TX 75234
  972-965-9820
  marihoulihan@gmail.com

- Janay Bender (Rosenthal), Tester/Surveyor
  7862 La Cabeza
  Dallas, TX 75248
  469-585-6114

**SOUTH SUBURBAN HOUSING CENTER (Homewood, IL)**
- John Petruszak, SSHC Executive Director, 18220 Harwood Ave., Suite 1, Homewood, IL, 60430, (708) 957-4674, x 105, john@southsuburban.net

20

**CONFIDENTIAL**

- Leslie Woods, SSHC Systemic Investigations Coordinator (retired 12/31/22), 460 Highland Rd., Matteson IL 60443, (708) 506-3745
- Susan Reed, SSHC Testing Outreach Coordinator (retired 12/15/22), 17139 Park Ave., Lansing, IL 60438, (708) 418-3475
- Michael Chavarria, former SSHC Fair Housing/Lending Intake Specialist (2014-2018) currently Executive Director of HOPE Fair Housing Center, (630) 690-6500,x 114, michael.chavarria@hopefair.org
- Carrie Simpson, SSHC Senior Fair Housing Intake Specialist, 18220 Harwood Ave., Suite 1, Homewood, IL, 60430, (708) 957-4674, x 112, carrie@southsuburban.net
- Derek Adkisson, SSHC Director of Finance and Operations, 18220 Harwood Ave., Suite 1, Homewood, IL, 60430, (708) 957-4674, x 101, derek@southsuburban.net

## TOLEDO FAIR HOUSING CENTER

| Name | Title | Notes on current information |
|------|-------|------------------------------|
| Casandria Parker | Intake and Referral Specialist (former) | No longer with TFHC Do not have any current information. |
| Diana Patton | Vice President, Chief Operating Officer, General Counsel (former) | No longer with TFHC Last known contact information: diana@riseadvocates.com PO Box 1445 Maumee, Ohio 43537 |
| Leah Mullen | General Counsel (former) | No longer with TFHC Last known contact information: lsmullen23@gmail.com |
| Michael Marsh | President and CEO (former) | No longer with TFHC Last known contact information: 419-345-4633 |
| Zachary Hillyer | Foreclosure Prevention Specialist | No longer with TFHC Do not have any current information. |
| Susan Jester | Intake and Client Relations Specialist (former) | No longer with TFHC Do not have any current information. |
| Fannie Hall | Senior Fair Housing Specialist (former) | No longer with TFHC Do not have any current information. |
| Harrison Shuneh | Fair Housing Specialist (former) | No longer with TFHC Do not have any current information. |
| Jen Teschner | Senior Director of Systemic Investigations (former) | No longer with TFHC Last known contact information: 419-509-2000 |

21

**CONFIDENTIAL**

| Karen Plocek | Director of Enforcement (former) | No longer with TFHC Last known contact information: 419-410-3206 |
| Linda Skowronek | Executive Assistant / Grants Administrator | lindaskowronek@toledofhc.org 419-243-6163 |
| Mike Fehlen | Controller | No longer with TFHC Last known contact information: 419-619-5063 fehlen15@gmail.com |
| Sarah M. Jenkins | Director of Communications and Outreach (former | No longer with TFHC Last known contact information: 419-503-0529 |
| Christina Rodriguez | Staff Attorney (7/1/2017 onward) | christinar@toledofhc.org 419-243-6163 |
| George Thomas | Vice President and General Counsel | gthomas@toledofhc.org 419-243-6163 |
| Marie M. Flannery | President and CEO (former) | No longer with TFHC Last known contact information: 951-237-3035, marie.flannery@outlook.com |
| Silma Espinosa | Fair Housing Specialist | No longer with TFHC Last known contact information: silma.espinosa@gmail.com, 419-386-7314 |
| Caren Hinton | Accounting Assistant (former) | No longer with TFHC Do not have any current information. |
| Keith Foster | Director of Enforcement and Compliance (former) | No longer with TFHC Do not have any current information. |
| Steve Repka | Fair Housing Specialist (former) | No longer with TFHC Do not have any current information. |
| Norman Hinton | Lending Specialist, Director of Enforcement and Compliance (former) | No longer with TFHC Do not have any current information. |
| Lisa Lawson Lapointe | Senior Fair Housing Specialist, Outreach and Development (former) | No longer with TFHC Do not have any current information. |
| | | |

22

**CONFIDENTIAL**

| Ryan Hedges | Lending Specialist (former) | No longer with TFHC<br>Do not have any current information. |
|---|---|---|
| Katherine Broka | President and CEO (former) | No longer with TFHC<br>Last known contact information:<br>kathybroka@gmail.com |
| Renea Wilson | Director of MLK Inclusive Communities Program (former) | No longer with TFHC<br>Do not have any current information.. |
| Eric Ricker | Intern | No longer with TFHC<br>Do not have any current information. |
| Kristen Angelo | Intern | No longer with TFHC<br>Do not have any current information. |
| Tyler Jechura | Intern | No longer with TFHC<br>Last known contact information:<br>419-960-2997<br>tyler.jechura@tnjlaw.com |
| Elvis Shuneh | Fair Housing Specialist (former) | No longer with TFHC<br>Do not have any current information. |
| Edith Lui | Intern | No longer with TFHC<br>Do not have any current information. |
| Sena Friedman | Director of Development and Communications | No longer with TFHC<br>Last known contact information:<br>smouradfriedman@gmail.com<br>419-654-2021 |
| Annie Cieslukowski | Intake and Client Relations Specialist | anniec@toledofhc.org<br>419-243-6163 |
| Patricia Smith | Controller (former) | No longer with TFHC<br>Do not have any current information. |
| Chelsea Meister | Intern | No longer with TFHC<br>Do not have any current information. |

23

**CONFIDENTIAL**

# EXHIBIT D

**EXHIBIT D**

**INFORMATION REGARDING PLAINTIFFS' USE AND ALLOCATION OF THE SETTLEMENT FUNDS REFERRED TO IN BANK OF AMERICA'S PHASE III INTERROGATORY NO. 4**

**The information below is supplemental to documents provided by Plaintiffs in response to Bank of America's Phase III Request for Production of Documents No. 1.**

<u>**National Fair Housing Alliance**</u>

Plaintiff the National Fair Housing Alliance ("NFHA") states that it has allocated its Fannie Mae and Wells Fargo REO settlement funds to fulfill its community stabilization mission and pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish this allocation.

The following is a non-exhaustive list of grants NFHA made to fulfill its community stabilization mission in 2023, originating from NFHA's Fannie Mae REO settlement funds:

- <u>Homewise, Albuquerque, New Mexico</u>:  In January 2023, NFHA gave a $185,000 grant to Homewise to administer 18 down payment assistance grants to low- to moderate income residents of Albuquerque and provide financial education services. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>United South Broadway Corporation (USBC), Albuquerque, New Mexico</u>: In January 2023, NFHA gave a $185,000 award to USBC to support foreclosure prevention and counseling activities.  Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Habitat for Humanity of the Chesapeake, Baltimore, Maryland</u>: In January 2023, NFHA awarded $185,000 to Habitat for Humanity of the Chesapeake to build on 9 vacant lots to create new affordable homeownership opportunities and support future residents with financial literacy education. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>St. Ambrose Housing Aid Center, Baltimore, Maryland</u>: In January 2023, NFHA awarded a $185,000 grant to St. Ambrose Housing Aid center to provide 32 down payment assistance grants to create affordable homeownership units in revitalized, formerly vacant lots. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Southeast CDC, Baltimore, Maryland</u>: In January 2023, NFHA awarded Southeast CDC with $185,000 to serve as subsidy gap funds so that they can do a complete

1

rehabilitation of up to 40 lots with 12 block events and providing housing counseling support. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Charleston Area Urban League, Charleston, South Carolina</u>: In January 2023, NFHA awarded the Charleston Urban League a grant of $185,000 so that they can provide 20 down payment assistance grants and a robust financial literacy curriculum for new homebuyers. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Charleston Redevelopment Corporation, Charleston, South Carolina</u>: In January 2023, NFHA awarded the Charleston Redevelopment Corporation a grant of $185,000 to support existing homeowners through a "common cause" loan fund that encourages homeownership preservation, and to provide 4 down payment assistance or construction subsidy grants for Palmetto Community Land Trust properties. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Origin SC, North Charleston, South Carolina</u>: In January 2023, NFHA awarded Origin SC a grant of $185,000 to provide 20 down payment or foreclosure prevention grants to existing or new homebuyers in Charleston and North Charleston. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Habitat for Humanity Greater Kansas City, Kansas City, Missouri</u>: In January 2023, NFHA awarded Habitat for Humanity of Greater Kansas City a grant of $185,000 to support 17 new affordable home builds and 80 critical repair projects. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Justine Petersen, Kansas City, Missouri</u>: In January 2023, Justine Petersen received a grant of $185,000 from NFHA to do credit building work, credit counseling services, and ultimately award 10 down payment assistance grants to low- and moderate-income clients in Kansas City. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Westside Housing Organization (WHO), Kansas City, Missouri</u>: In January 2023, NFHA awarded WHO a grant of $185,000 to conduct critical home repairs for a minimum of 12 existing homeowners in three historically redlined neighborhoods. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Neighborhood Housing Services of Southern Nevada, Las Vegas, Nevada</u>: In January 2023, NFHA awarded the NHS of Southern Nevada a grant of $185,000 for property acquisition and development of 4 homes for income-qualified families under their Blight to Bright program.

- <u>Homeownership Council of America, Las Vegas, Nevada</u>: In January 2023, NFHA awarded a grant of $185,000 to the Homeownership Council of America to create a new Special Purpose Credit Program that will provide down payment support for 50 new BIPOC homebuyers.

2

- <u>Community Ventures, Louisville, Kentucky</u>: In January 2023, NFHA awarded Community Ventures with a grant of $185,000 to provide low to moderate income buyers with pre- and post-purchase counseling and fixed-rate, below-market mortgage loans to 7-12 households. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>New Directions, Louisville, Kentucky:</u> In January 2023, NFHA awarded a grant of $185,000 to New Directions to complete construction of affordable housing for homeownership for 3 first-generation buyers. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>The Housing Partnership Inc (HPI), Louisville, Kentucky</u>: In January 2023, NFHA awarded a grant of $185,000 to HPI to renovate up to 40 vacant properties for affordable homeownership (and they are partnered with Community Ventures for affordable financing for qualified buyers). Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Habitat for Humanity Memphis, Memphis, Tennessee</u>: In January 2023, NFHA provided Habitat Memphis with a grant of $185,000 to construct 16 new shared equity homes in formerly vacant lots to buyers with a zero-interest mortgage. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Center for Transforming Communities, Memphis, Tennessee</u>: In January 2023, NFHA provided a grant of $185,000 to support the construction of 3 new homes in the Binghamton Community Land Trust, plus 8 gap funding grants and 8 grants to support repairs for area existing residents/seniors. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>The Works, Inc., Memphis, Tennessee</u>: In January 2023, NFHA awarded a grant of $185,000 to The Works to provide down payment assistance individual development accounts for 40 families in community land trust homes in the Klondike neighborhood of Memphis. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Neighborhood Development Alliance (NeDA), Minneapolis/St. Paul, Minnesota</u>: In January 2023, NFHA awarded a grant of $180,000 to NeDA to provide down payment assistance grants for residences with specific challenges to obtaining a mortgage loan due to the fact that they have Individual Tax Identification Numbers. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>NeighborWorks Home Partners, Minneapolis/St. Paul Minnesota:</u> In January 2023, NFHA awarded a grant of $185,000 to support 16 first-generation down payment assistance grants and created a pilot program using the funds that has resulted in a larger commitment from the state for a first-generation program. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>United Renters for Justice / Inquilinx Unidos Por Justicia (IX):</u> In January 2023, NFHA awarded a grant of $185,000 to IX to rehabilitate 6 single-family owner occupied homes in North Minneapolis and support credit building, back payment, and other strategies to make homeowners ready for community land trust homeownership. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Housing Partnership, Homeownership Center, Newark, New Jersey</u>: In January 2023, NFHA awarded the Housing Partnership, Homeownership Center (Housing Partnership of Morris County) with a grant of $185,000 to help 20 families through First-Time Homebuyers Matched Savings Program targeted to first-generation homebuyers, Spanish-speaking clients, working families, and BIPOC populations and provide a $10,000 match award to approximately 15 families at purchase. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>New Jersey Community Capital (NJCC), Newark, New Jersey:</u> In January 2023, NFHA awarded NJCC with a grant of $185,000 to provide 5 down payment assistance grants of $30,000 - $35,000 each. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Invest Newark, Newark, New Jersey</u>: NFHA awarded Invest Newark with a grant of $185,000 in January 2023 to help build 25 rehabilitated properties for affordable homeownership. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Latino Economic Development Center, Prince George's County, Maryland</u>: NFHA awarded LEDC with a grant of $185,000 in January 2023. These funds will provide for homebuyer education courses, homeowner assistance and foreclosure prevention grants, and one-on-one housing counseling. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Housing Initiatives Partnership, Prince George's County, Maryland.</u> In January 2023, NFHA awarded a grant of $185,000 to the Housing Initiatives Partnership for the installation of manufactured housing and a pocket park to create an affordable "microgrid" community in the city of Fairmont Heights, Maryland. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>HomeFreeUSA, Prince George's County, Maryland:</u> In January 2023, NFHA awarded HomeFreeUSA a grant of $185,000 to provide credit counseling for homeownership to 50 families. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Habitat for Humanity Philadelphia, Philadelphia, Pennsylvania:</u> In January 2023, NFHA awarded Habitat for Humanity Philadelphia with a grant of $185,000 to create 11 new units of affordable housing for low-income families to enter into homeownership. Grant funds will be fully disbursed and expended by Spring 2025.

4

- <u>Mount Vernon CDC, Philadelphia, Pennsylvania</u>: In January 2023, NFHA awarded Mount Vernon CDC a grant of $185,000 to support the development of 17 vacant rowhomes for affordable homeownership that will remain permanently affordable. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Pennsylvania Horticultural Society (PHS), Philadelphia, Pennsylvania</u>: In January 2023, NFHA awarded PHS with a grant of $185,000 to do "cleaning and greening" activities for 230 vacant lots to green space and engage residents around community gardens and workforce development in the construction and landscaping field.

- <u>Fair Housing Rights Center of Southeastern Pennsylvania, Philadelphia, Pennsylvania</u>: In January 2023, NFHA awarded $11,000 to the Fair Housing Rights Center of Southeastern Pennsylvania to conduct counseling activities to support the resolution of tangled titles for Philadelphia residents. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Chicanos Por La Causa, Phoenix, Arizona</u>: In January 2023, NFHA awarded a grant of $185,000 to Chicanos Por La Causa to provide 19 low- to moderate-income first-time homebuyers with down payment assistance grants. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>RAIL Community Development Corporation, Phoenix, Arizona</u>: In January 2023, NFHA awarded a grant of $179,000 to the RAIL Community Development Corporation to provide 40 credit building accounts to low- to moderate-income families and to complete 4 placemaking community engagement events. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Trellis, Phoenix, Arizona:</u> In January 2023, NFHA awarded a grant of $185,000 to Trellis to provide 8 down payment assistance grants to low to moderate income families. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Southwest Fair Housing Council, Phoenix, Arizona</u>: In February 2023, NFHA awarded a grant of $17,000 to the Southwest Fair Housing Council to support their usage of the NFHA Redlining Toolkit to examine redlining in the Phoenix market. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>ONE Neighborhood Builders, Providence, Rhode Island</u>: In January 2023, NFHA awarded a grant of $185,000 to ONE Neighborhood Builders to convert a 40,000 square foot parcel of land to create 8 townhouse style condominiums for affordable home purchase to income qualified buyers. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Providence Revolving Fund, Providence, Rhode Island</u>: In January 2023, NFHA awarded a grant of $185,000 to the Providence Revolving Fund to provide 15

homeowners with forgivable loans to do owner-occupied home repairs for homeownership preservation. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>CSA San Diego County, San Diego, California:</u> In January 2023, NFHA awarded a grant of $185,000 to CSA San Diego County to provide 20 down payment assistance or closing cost assistance grants to income qualified buyers, along with providing both pre- and post- purchase housing counseling. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>San Diego Housing Commission, San Diego, California</u>: In January 2023, NFHA awarded the San Diego Housing Commission with a grant of $184,000 so that they can provide 30 zero-interest credit building loans, 13 down payment assistance forgivable loans, and credit building services for 80 income-qualified households. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Urban League San Diego County, San Diego, California:</u> In January 2023, NFHA awarded a grant of $185,000 to the Urban League of San Diego County. The grant will provide down payment assistance to 12 clients as well as homeownership and counseling services to nearly 500 clients. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Pima County Land Trust, Tucson, Arizona:</u> In January 2023, NFHA awarded a grant of $185,000 to the Pima County Land Trust to build four 4 units for community land trust property ownership along with an accessory dwelling unit on each property. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Primavera Foundation, Tucson, Arizona:</u> In January 2023, NFHA awarded a grant of $185,000 to the Primavera Foundation to pilot a first-generation down payment assistance program, rehabilitate three 3 lots for affordable purchase, and provide credit counseling and homebuyer education. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>SERI, Tucson, Arizona:</u> In January 2023, NFHA awarded SERI with a grant of $185,000 to provide owner-occupied and energy efficient repairs for 75 families through a revolving loan fund. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Southwest Fair Housing Council, Tucson, Arizona:</u> In January 2023, NFHA awarded a grant of $11,000 to the Southwest Fair Housing Council so that they can use the NFHA Redlining Toolkit to examine redlining in the Tucson market. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Jubilee Housing, Washington DC:</u> In January 2023, NFHA awarded a grant of $185,000 to Jubilee Housing to support tenant opportunity to purchase-site

development. The funds will support three sites with 135 units for affordable ownership by tenants by 2025. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Manna Homes, Washington, DC:</u> In January 2023, NFHA awarded a grant of $185,000 to Manna Homes to complete pre- and early development of 30 units of affordable homeownership in DC's Ward 7. Grant funds will be fully disbursed and expended by Spring 2025.

- <u>Yachad, Washington, DC</u>: In January 2023, NFHA awarded a grant of $185,000 to Yachad to provide home remediation projects resulting in homeownership preservation and improved health outcomes for 25-30 intergenerational, owner-occupied households.

NFHA also directs Bank of America to the following pages from its website discussing disbursement of the Fannie Mae REO settlement funds:

- https://nationalfairhousing.org/national-fair-housing-alliance-awards-8-3-million-for-inclusive-communities-fund-grants/
- https://nationalfairhousing.org/program/inclusive-communities/

The following is a non-exhaustive list of grants NFHA made to fulfill its community stabilization mission between 2009 and 2020, including funds that originated from the Wells Fargo REO Settlement:

- <u>Community Housing Development Corporation, Oakland, California</u>: NFHA gave Community Housing Development Corporation a $100,000 grant to conduct homeownership promotion, neighborhood stabilization, property rehabilitation, and property stabilization in 2013-2014.

- <u>Hello Housing, Oakland, California</u>: NFHA gave Hello Housing a $47,500 grant to implement an anti-displacement program for residents who were in default or foreclosure in 2014.

- <u>Catholic Charities of the East Bay, Oakland, California</u>: NFHA gave Catholic Charities of the East Bay a $250,000 grant to implement a tenant anti-displacement fund to provide rental housing assistance grants for families struggling due to rapidly rising rental housing prices in 2014-2015.

- <u>Martin Luther King Jr. Freedom Center, Oakland, California</u>: NFHA gave Martin Luther King Jr. Freedom Center a $45,000 grant to implement a Summer Leadership Program including ethical leadership and community development civic engagement components. The civic engagement component included having program participants

conduct door-to-door foreclosure education and prevention through the program's anti-foreclosure campaign in 2014-2015.

- <u>Oakland Citizens Committee for Urban Renewal, Oakland, California</u>: NFHA gave Oakland Citizens Committee for Urban Renewal a $36,000 grant to implement a foreclosure recovery community outreach program and educate the public on foreclosure and tenant resources in 2014-2015.

- <u>The Unity Council Homeownership Center, Oakland, California</u>: NFHA gave The Unity Council Homeownership Center a $606,693.74 grant to prevent foreclosures through counseling and forgivable loans for distressed borrowers in 2014-2015.

- <u>Urban Strategies Council, Oakland, California</u>: NFHA gave Urban Strategies Council a $16,014.50 grant to create a Housing Equity Roadmap with Policy Link by compiling research on the current demographics and conditions of Oakland's housing market, housing stock, and housing affordability in 2014-2015.

- <u>Policy Link, Oakland, California</u>: NFHA gave Policy Link a $40,000 grant to create a Housing Equity Roadmap with the Urban Strategies Council by compiling research on the current demographics and conditions of Oakland's housing market, housing stock, and housing affordability in 2014-2015.

- <u>Fair Housing Advocates of Northern California, Oakland, California</u>: NFHA gave Fair Housing Advocates of Northern California a $155,000 grant to conduct accessibility modifications in 2015-2020.

- <u>Housing and Economic Rights Advocates, Oakland, California</u>: NFHA gave Housing and Economic Rights Advocates a $135,985 grant to implement a home preservation fund and provide grants to distressed borrowers to avoid foreclosure or other home loss in 2016-2018.

- <u>Denver Metro Fair Housing Center, Denver, Colorado</u>: NFHA gave Denver Metro Fair Housing Center a $234,488.64 grant to conduct accessibility modifications in 2014-2020.

- <u>Home Builders Foundation of Metro Denver, Denver, Colorado</u>: NFHA gave Home Builders Foundation of Metro Denver a $213,949.15 grant to conduct accessibility modifications in 2014-2020.

- <u>Fair Housing Continuum, Orlando, Florida</u>: NFHA gave Fair Housing Continuum a $190,000 grant to conduct accessibility modifications in 2014-2017.

- <u>Coalition for Independent Living Options, Inc., Greater Palm Beaches, Florida</u>: NFHA gave Coalition for Independent Living Options, Inc. a $42,500 grant to conduct accessibility modifications in 2015-2016.

- <u>Housing Opportunities Project for Excellence, Inc., Miami, Florida</u>: NFHA gave Housing Opportunities Project for Excellence, Inc. a $137,059 grant to conduct accessibility modifications in 2016-2019.

- <u>Space Coast Center for Independent Living, Orlando, Florida</u>: NFHA gave Space Coast Center for Independent Living a $25,000 grant to conduct accessibility modifications in 2019-2020.

- <u>HOPE Fair Housing Center, Chicago, Illinois</u>: NFHA gave HOPE Fair Housing Center a $5,700 grant to conduct accessibility modifications in 2012.

- <u>Rebuilding Together Indianapolis, Indianapolis, Indiana</u>: NFHA gave Rebuilding Together Indianapolis a $112,052.74 grant to conduct accessibility modifications in 2012-2013.

- <u>Fair Housing Center of Central Indiana, Indianapolis, Indiana</u>: NFHA gave Fair Housing Center of Central Indiana a $299,532.54 grant to conduct accessibility modifications in 2012-2016.

- <u>St. Ambrose Housing Aid Center, Baltimore, Maryland</u>: NFHA gave St. Ambrose Housing Aid Center a $1,154,470 grant to provide closing cost assistance to homebuyers as well as acquire and develop blighted and vacant houses and restore them for quality and affordable homeownership in 2013-2019.

- <u>Housing Initiative Partnership, Prince George's County, Maryland</u>: NFHA gave Housing Initiative Partnership a $754,600 grant to provide homeownership assistance in the form of down payment or closing costs as well as pre-purchase counseling, provide funding for existing homeowners needing home restorations or home repairs, and to subsidize the cost of development for new-construction townhomes from 2014-2020.

- <u>Belair-Edison Neighborhoods Inc., Baltimore, Maryland</u>: NFHA gave Belair-Edison Neighborhoods Inc. a $25,200 grant to conduct block clean-ups and block beautifications led by graduates of their Resident Market Leaders program from 2016-2018.

- <u>Latino Economic Development Corporation, Prince George's County, Maryland</u>: NFHA gave Latino Economic Development Corporation a $135,000 grant to provide homeownership assistance in the form of down payment or closing cost assistance, provide grants to homeowners at risk of losing their homes to foreclosure, and provide grants for security deposits and/or first month's rent to low- and moderate-income residents 2016-2019.

- <u>Yachad, Prince George's County, Maryland</u>: NFHA gave Yachad a $419,659.49 grant to implement a home repair program as well as fund accessibility modifications and home education programs in 2016-2019.

- <u>Legal Aid Society of Minneapolis, Minneapolis, Minnesota</u>: NFHA gave Legal Aid Society of Minneapolis a $2,142.79 grant to conduct accessibility modifications in 2011.

- <u>Congreso de Latinos Unidos, Philadelphia, Pennsylvania</u>: NFHA gave Congreso de Latinos Unidos a $542,500 grant to provide rental and mortgage assistance in 2014-2019. Mortgage assistance included grants to reinstate loans and avoid foreclosure; rental assistance included grants for renters' first month rent or grants to avoid eviction.

- <u>Ready, Willing, and Able, Philadelphia, Pennsylvania</u>: NFHA gave Ready, Willing, and Able a $100,000 grant to provide rental assistance in the form of utility and security deposit grants as well conduct a housing survey of the organizations' program participants who were entering the workforce and housing market after being homeless, incarcerated, and/or unemployed in 2016-2018.

- <u>United Communities Southeast Pennsylvania, Philadelphia, Pennsylvania</u>: NFHA gave United Communities Southeast Pennsylvania a $387,850 grant to provide rental and mortgage assistance in 2016-2019. Mortgage assistance included down payment and closing cost assistance grants and grants to reinstate loans and avoid foreclosure.

- <u>Pennsylvania Horticultural Society, Philadelphia, Pennsylvania</u>: NFHA gave Pennsylvania Horticultural Society a $184,090 grant to fund its Roots to Reentry program that works with people transitioning back into their communities from the Philadelphia Prison System with the tools and support they need to obtain meaningful employment in the horticulture, landscaping, and building trades in 2017-2019. Roots to Reentry program participants were trained to work with private landscape contractors and community organizations that clean, green, and maintain vacant land in Philadelphia as part of the Pennsylvania Horticultural Society's Philadelphia LandCare program.

- <u>Metanoia Inc., Charleston, South Carolina</u>: NFHA gave Metanoia Inc. a $590,000 grant to provide homeownership assistance in the form of pre-purchase counseling and closing cost assistance, provide grants for home repairs, construct new and accessible affordable housing units, and acquire and redevelop the Old Chicora Elementary School site in 2013-2018.

- <u>P.A.S.T.O.R.S. Inc., Charleston, South Carolina</u>: NFHA gave P.A.S.T.O.R.S., Inc. a $40,500 grant to provide homeownership assistance in the form of pre-purchase counseling and down payment or closing cost assistance in 2015.

- <u>Humanities Foundation, Charleston, South Carolina</u>: NFHA gave Humanities Foundation a $300,000 grant to provide rental assistance in 2016-2018.

- <u>Family Services, Inc., Charleston, South Carolina</u>: NFHA gave Family Services, Inc. a $419,610 grant to provide homeownership assistance in the form of down payment or closing cost assistance, foreclosure prevention grants, and rental assistance grants in 2016-2019.

- <u>North Texas Fair Housing Center, Dallas, Texas</u>: NFHA gave North Texas Fair Housing Center a $150,000 grant to conduct accessibility modifications together with Rebuilding Together Dallas in 2011-2012.

- <u>Home Survey Company</u>: NFHA gave Home Survey Company $1,600 to inspect home repairs, home weatherization, and accessibility modifications in 2009-2010.

- <u>Central American Resource Center, Washington, D.C.</u>: NFHA gave Central American Resource Center a $50,000 grant to provide homeownership assistance in the form of financial counseling and down payment or closing cost assistance as well as funding for emergency home repairs. Central American Resource Center used $25,000 on homeownership assistance and $25,000 on emergency home repairs in 2013-2014.

- <u>Yachad, Washington, D.C.</u>: NFHA gave Yachad a $961,833.01 grant to implement a home repair program as well as fund accessibility modifications and home education programs in 2014-2018. NFHA also gave Yachad a $267,807.43 grant to conduct accessibility modifications in the Washington, D.C. area in 2009-2016, and it gave Yachad a grant of $55,084.13 for 2009-2010 to conduct home repairs, home weatherization, and accessibility modifications there.

- <u>Latino Economic Development Corporation, Washington, D.C.</u>: NFHA gave Latino Economic Development Corporation a $240,608 grant to provide grants for security deposits and/or first month's rent to low- and moderate-income residents as well as hold fair housing and tenant education clinics in 2016-2019.

- <u>HandyPro of Washington DC, Washington, D.C.</u>: NFHA gave HandyPro of Washington DC a $11,775 grant to conduct accessibility modifications in 2018.

- <u>O'Neill Stairlifts, Washington, D.C.</u>: NFHA gave O'Neill Stairlifts a $3,100 grant to conduct accessibility modifications in 2018.

- <u>Wall to Wall Construction, Washington, D.C.</u>: NFHA gave Wall to Wall Construction a $5,200 grant to conduct accessibility modifications in 2019.

- <u>F&R Construction LLC, Washington, D.C.</u>: NFHA gave F&R Construction LLC a $3,200 grant to conduct accessibility modifications in 2020.

NFHA also directs Bank of America to the following webpage and report discussing disbursement of the Wells Fargo REO settlement funds:

- https://nationalfairhousing.org/program/inclusive-communities/
- https://nationalfairhousing.org/wp-content/uploads/2017/04/Investing-in-Inclusive-Communities-FINAL-8-26-2016.pdf

NFHA further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## CONNECTICUT FAIR HOUSING CENTER

Plaintiff Connecticut Fair Housing Center states that it has allocated its Fannie Mae REO settlement funds to community development and pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish this allocation. CFHC further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## DENVER METRO FAIR HOUSING CENTER

Plaintiff Denver Metro Fair Housing Center ("DMFHC") states that the settlement funds from Wells Fargo REO case were used to start the Fair Housing Action Fund which distributed money to nonprofit groups in the Denver Metropolitan area. Those groups used the funds to promote home ownership and educate neighborhoods on fair housing laws. $100,000 of the settlement was utilized by DMFHC to support the administrative costs of continuing its work educating the community, advocating for the rights of the community, and enforcing fair housing laws in the Denver Metro area.

12

DMFHC further states that it received $1,057,547.86 from the Fannie Mae REO settlement. It allocated $755,000 to three non-profit housing developers to address community needs, including home ownership, neighborhood and/or community stabilization, access to credit, property rehabilitation, residential development in African American and Latino communities, fair housing education and outreach, counseling, and other fair housing activities (with 20% of that amount used for fund administration). The three non-profit housing developers who received or were allocated Fannie Mae REO settlement funds and the amounts they received are as follows:

- Northeast Denver Housing Center, Inc.
  Total Amount of Grant: $201,333.00
- Del Norte Neighborhood Development Corporation
  Total Amount of Grant: $201,333.00
- NEWSED Community Development Corporation, Inc.
  Total Amount of Grant: $201,333.00

The remaining funds were used to support the continued work of DMFHC, including testing and community outreach.

DMFHC also states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Fannie Mae and Wells Fargo REO settlements.

DMFHC further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## FAIR HOUSING ADVOCATES OF NORTHERN CALIFORNIA

Plaintiff Fair Housing Advocates of Northern California states that it received $1,998,187.82 from the Fannie Mae settlement, $1.51 million of which has been allocated to a

13

community revitalization program that will run through June 30, 2025. As part of the community

revitalization program, these funds have been or will be spent on the following:

1) Funding of the Community Collaboration Partners (which include long-standing housing justice organizations) through Just Cities in the City of Richmond to:
   - Create new public financing for affordable housing and housing equity priorities;
   - Identify neighborhoods for anti-displacement zones;
   - Research the legal and public policy framework for conducting a Fair Housing Impact Assessment and local preference and right to return policies;
   - Design a Housing Reparations program;
   - Adopt new Equitable Public Land policy Community Land Trusts, Limited Equity Cooperatives, and other non-profit entities that prioritize permanently affordable housing and support homeowner equity attainment and renter stabilization;
   - Design potential new tenant anti-displacement policies;
   - Hold two annual forums for LGBTQ+ Housing Issues;
   - Produce recommended changes to Richmond's Fair Chance Housing policy to benefit formerly incarcerated residents and their families;
   - Address discrimination against undocumented residents;
   - Identify potential policies to incentivize developers to produce affordable larger units for families with children;
   - Assess and produce recommended policy changes to the City's inclusionary zoning and community benefits ordinances;
   - Produce recommended strategies for the City to pilot resident advisory councils in determining development projects and priorities for their neighborhoods.

2) Downpayment Assistance in Solano County through the Community Housing Development Corporation (CHDC)

3) Staffing for FHANC to provide fair housing, foreclosure prevention, and prepurchase assistance throughout Solano County

   FHANC has no specific plans to spend the remaining Fannie Mae REO settlement funds

beyond generally supporting the ongoing operation of the agency.

   Pursuant to Federal Rule of Civil Procedure 33(d)(1), FHANC will produce responsive,

non-privileged documents sufficient to establish the allocation and spending of the settlement

funds it received in the Fannie Mae REO case.

FHANC further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## FAIR HOUSING CONTINUUM (CENTRAL FLORIDA)

Plaintiff Fair Housing Continuum ("Continuum") states that it received $1,421,052.00 from the Wells Fargo REO settlement, which it allocated and/or spent on grant programs to promote home ownership, neighborhood stabilization, property rehabilitation, and development in communities of color. The Continuum further states that these grant programs included: renovation efforts for homes in foreclosure; programs to increase homeownership and neighborhood stabilization; and down payment and/or purchase assistance to owner-occupants seeking to purchase homes in the targeted neighborhoods.

The Continuum states that it has partnered with two organizations that it has worked with for two decades to utilize the funds it received from the Fannie Mae REO settlement that it has allocated for Fannie Mae Community Reinvestment: Community Housing Initiative, Inc., ("CHI") and Resource Center for Disability Solutions, Inc. ("RCDS"). The Continuum contracted with and distributed half of the Fannie Community Reinvestment funds to CHI ($240,000.00) and RCDS ($125,000.00).

CHI provides development services necessary and advisable to facilitate the Continuum's acquisition rehabilitation, new construction, and down payment assistance program for households with incomes at or below 80% Area Median Income. RCDS's provides services necessary to determine accessibility needs of individual homeowners and facilitates the

acquisition of licensed contractors to assist with making necessary accessibility modifications and/or renovations to the home.

The Continuum states that it has allocated $10,000.00 of the Fannie Mae REO settlement funds for its administrative costs.

The Continuum also states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Fannie Mae and Wells Fargo REO settlements.

The Continuum further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.


**FAIR HOUSING CENTER OF CENTRAL INDIANA**

Plaintiff Fair Housing Center of Central Indiana ("FHCCI") states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Wells Fargo and Fannie Mae REO settlements. FHCCI further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

**FAIR HOUSING CENTER OF GREATER PALM BEACHES**

Plaintiff Fair Housing Center of the Greater Palm Beaches ("FHCGPB") received $1,025,614.86 as a result of the Fannie Mae REO settlement. To date, $183, 857.93 has been spent in alignment with FHCGPB's efforts to foster programs and services to promote home

ownership, neighborhood stabilization, property rehabilitation, and development in communities of color. These efforts have included:

- Conducting 24 home-buyer seminars, which are designed to widen housing choices, support the promotion of culturally diverse communities, and provide education on available opportunities in the housing market and the means to live the American dream of homeownership, free from housing discrimination.

- Providing housing counseling to 247 families regarding homeownership, affordable rental housing, landlord tenant disputes, mortgage scams, mediation, as well as the right to equal housing opportunities under the Fair Housing Act;

- Conducting 140 fair housing tests with the goal of fostering neighborhood stabilization and ensuring equal housing opportunities. In addition, the tests ensure compliance by the local housing industry with the Fair Housing Act.

Then FHCGPB staff continues to work at developing programs and services to promote home ownership, neighborhood stabilization, property rehabilitation, and development in communities of color with the settlement funds, including the development of a comprehensive service that will facilitate down payment assistance to first-time homebuyers.

FHCGPB states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Fannie Mae REO settlement.

FHCGPB further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

**FAIR HOUSING COUNCIL OF GREATER SAN ANTONIO**

17

Plaintiff Fair Housing Center of Greater San Antonio states that it has not received any settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## FAIR HOUSING CENTER OF NORTHERN ALABAMA

Plaintiff Fair Housing Center of Northern Alabama states that it has not received any settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## FAIR HOUSING CENTER OF WESTERN MICHIGAN

The Fair Housing Center of Western Michigan ("FHCWM") states that it received $1.42 million for a neighborhood stabilization effort and $170,000 for administrative costs from the Wells Fargo REO settlement. FHCWM states that it spent the $1.42 million in neighborhood stabilization funds on a program called "49507!," which focused on the 49507 zip code, bounded by Eastern, Burton, Division and Hall on Grand Rapid's southeast side.

FHCWM states that it has identified and is in the process of identifying programs, grantees, and activities to which it has or will allocate its Fannie Mae REO settlement funds. FHCWM further states that it has allocated funds to the following organizations:

In Grand Rapids, Michigan:

- Next Step Tiny Homes & Community Center ($350,000) ;
- FHCWM/Diatribe Writing to Right Wrongs- support for 10-week programming in 2 classrooms for 2 years ($30,000);
- ICCF - down payment assistance totaling $45,000 in the form of Individual Development Accounts (IDAs); and

- LINC Up – down payment assistance totaling $15,000 to three low-to-moderate income homebuyers of homes on Gilbert SE at $5,000 per household.

In Muskegon Heights, Michigan:

- Lakeshore Regional Community Development Corporation – Homeowners Resource Application Assistance totaling $10,000 to assist 15 homeowners in identifying, applying for and accessing resources for exterior home repairs;
- City of Muskegon Heights – Support roof repair or replacement totaling $180,000 for 10-15 low-income homeowners through private contractors at a cost up to $15,000 per home for homeowners up to 120% Area Median Income;
- City of Muskegon Heights Code and Public Services Departments - Fund area-specific community clean-ups totaling $14,500 in connection with planned summer clean ups;
- City of Muskegon Heights – Neighborhood association grants of $2,000 to 4 organizations totaling $8,000;
- FHCWM/Diatribe Writing to Right Wrongs- support for 10-week programming in 1 classroom ($7,500).

In Muskegon, Michigan:

- City of Muskegon – exterior home repairs totaling $295,000 for a cost up to $15,000 per home for homeowners up to 120% AMI;
- City of Muskegon – neighborhood association grants of $2,000 - $3,000 up to a total of 10 organizations totaling $29,000; and
- City of Muskegon – Purchase and distribution of 125 homeowner beautification cards totaling $25,000; and
  FHCWM/Diatribe Writing to Right Wrongs – support for 10-week programming in 1 classroom for 2 years ($15,000).

FHCWM has received a Project Profile, executed the MOU and sent the check for the

following:

- Lakeshore Regional Community Development Corporation – Homeowners Resource Application Assistance totaling $10,000 to assist 15 homeowners in identifying, applying for and accessing resources for exterior home repairs.
- City of Muskegon Heights - Support roof repair or replacement totaling $180,000 for 10-15 low-income homeowners through private contractors at a cost up to $15,000 per home for homeowners up to 120% AMI;
- City of Muskegon Heights Code and Public Services Departments - Fund area-specific community clean-ups totaling $14,500 in connection with planned summer clean ups; and
- City of Muskegon Heights – Neighborhood association grants of $2,000 to 4 organizations totaling $8,000.

- FHCWM/Diatribe Writing to Right Wrongs- support for 10-week programming in 1 classroom ($7,500)

At this time, FHCWM has received Project Profiles and negotiations are underway with:

- Community enCompass- funding will support the purchase and distribution of 70 homeowner beautification cards totaling $20,000 that will be made available on a for homeowners in the entire City of Muskegon who are interested in doing some external spruce up projects.
In Muskegon, negotiations/discussions to allocate the $364,000 are underway. FHCWM

has received a Project Profile, executed the MOUs and sent the checks for the following:

- City of Muskegon - exterior home repairs totaling $295,000 for a cost up to $15,000 per home for homeowners up to 120% AMI;
- City of Muskegon – neighborhood association grants of $2,000 - $3,000 up to a total of 10 organizations totaling $29,000; and
- City of Muskegon - Purchase and distribution of 125 homeowner beautification cards totaling $25,000.
- FHCWM/Diatribe Writing to Right Wrongs- support for 10-week programming in 1 classroom for 2 years ($15,000)

FHCWM also states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will

produce responsive, non-privileged documents sufficient to establish how it allocated and/or

spent funds from the Fannie Mae and Wells Fargo REO settlements.

FHCWM further states that it has not received any other settlement proceeds arising out

of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO

properties.


**HOPE FAIR HOUSING CENTER (Wheaton, Illinois)**

Plaintiff HOPE Fair Housing Center ("HOPE FHC") states that it has not yet allocated or

spent the funds it received from the Fannie Mae REO settlement. HOPE FHC further states that

the Fannie Mae REO settlement funds will likely be allocated towards down payment assistance

programs and possibly to support home ownership voucher programs.

HOPE FHC states that below is an approximation of how its Wells Fargo REO settlement funds were spent.

| Program | Costs |
|---|---|
| **Pilot Rent Assistance Program (in collaboration with Project Access and School District U-46)** | $111,840.00 |

This partnership provided scaling rental assistance for 21 individuals – 6 adults and 15 children in 5 families – for up to two years. Project Access identified struggling families within the district in need of rent assistance and invited them to apply and go through a selection process. For accepted families, HOPE paid 100% of the first year's rent for each family, with an additional agreement to pay 50% of the rent for each family in the second year, if needed. Project Access also provided wraparound services to the selected families.

| | |
|---|---|
| **Elgin EAH** | $300,793.00 |

Down payment assistance for home purchases in Elgin, IL. $300k in direct assistance that supported 32 homebuyers with an average down payment assistance award of $9,375.

| | |
|---|---|
| **Austin Coming Together** | $100,000.00 |

New block clubs formed, neighborhood clean-ups and barbecues were held, and taskforces addressed issues of importance to residents. A community survey of properties was completed, and outreach was conducted to help people obtain assistance with foreclosure prevention, property rehabilitation, business development, and workforce training.

| | |
|---|---|
| **Austin Coming Together Fund /FCDCA Property Development Project** | $125,000.00 |

The ACT/FCDCA Property Development Project addressed issues with the built environment in the Levin Park MMRP Neighborhood of Austin, including the persistent problems of vacant bull dings, low homeownership rates, declining property values, and high unemployment rates in Austin. To address these issues, Friendship Community Development Corporation of Austin rehabilitated vacant buildings, facilitated the sale of those rehabbed buildings to low-moderate income buyers, and mentored and utilized local contractors to rehabilitate the vacant buildings.

| | |
|---|---|
| **ELGIN-STEAD** | $100,000.00 |

HOPE FHC produced a multi-layered marketing program called "ElgInstead" to promote the great features and amenities that living in Elgin could provide. This unique marketing strategy incorporated billboards, posters, radio, and website ads, to promote the strengths of Elgin's diversity, access to public transit, scenic natural location, high ranking high schools, and affordable historic homes. ElgInstead was designed to enhance other investments HOPE

FHC has made in Elgin and create demand for Elgin as a community of choice for all races and income levels.

**Habitat Northern Fox Valley**                    $100,000.00

HOPE FHC partially sponsored Habitat for Humanity of the Northern Fox Valley to rehabilitate four historic, foreclosed properties in the Elgin area. These homes were completed in 2015 and currently provide housing for four low-income families who would not otherwise have the opportunity to own a home

**Elgin Area Historical Society**                    $2,500.00

Partially funded Project 2-3-1: The Story of Elgin's African American Heritage Documentary and Exhibit

**Neighborhood Housing Services/Down
Payment and Closing Costs**                    $172,500.00

Ten new homeowners used the program to purchase housing in Austin.

**Austin Ascending**                    $250,550.00

HOPE FHC partnered with Oak Park Regional Housing Center to help 15 building owners rehab units or take advantage of technical assistance and training. This helped create 48 units of affordable rental housing and improved the economic stability of households and neighborhoods. Cooperative lenders created low-interest loans for participants in this program to accomplish larger cost repairs, such as adding new HVAC or roofing to homes.

**The Newsome Park Project**                    $2,000.00

HOPE FHC was a partial sponsor of The Newsome Park Project commemorative signage to mark the historic Settlement neighborhood.

**South East Elgin Neighborhood Initiatives**

A group of Elgin non-profits and HOPE FHC joined forces with residents to build and strengthen the community in the South East Elgin Neighborhood. Community planning sessions were held, and projects included: Improving lighting in the neighborhood; Forming block clubs and neighborhood watch groups; Creating a more beautiful river front south of the Grand Victoria Casino; Attracting more businesses to South East Elgin; Creating a newsletter, SEEN-IT, to keep up to date on what is going on; holding monthly meetings where community members could network, get to know their neighbors, and hear presentations about interesting topics.

**Elgin Neighbors Program**

 HOPE FHC provided funds for two Elgin Symphony employees to purchase long-vacant foreclosed homes in need of extensive repair. As a result, these purchases enhanced the racial and economic integration of their neighborhoods.

HOPE also states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Fannie Mae and Wells Fargo REO settlements.

HOPE further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.


## <u>HOUSING OPPORTUNITIES PROJECT FOR EXCELLENCE, INC.</u>

Plaintiff Housing Opportunities Program for Excellence, Inc. states that it received $1,421,052.75 from the Wells Fargo REO settlement, $1,240,147.00 of which was spent on projects (down payment/closing cost assistance, modifications for accessibility, home rehab, community gardens, housing counseling, and other miscellaneous community development efforts), and $180,905.18 was spent on administrative costs.

HOPE, Inc. further states that it received approximately $775,000.00 from the Fannie Mae settlement. HOPE, Inc. has allocated $604,000.00 to an accessibility project and downpayment and closing costs assistance, of which $261,634.89 has been disbursed to fund these projects. Plaintiff has also allocated $151,000.00 to cover administrative costs.

Pursuant to Federal Rule of Civil Procedure 33(d)(1), HOPE, Inc. will produce responsive, non-privileged documents sufficient to establish the allocation and spending of the settlement funds it received in the Wells Fargo and Fannie Mae REO cases.

HOPE, Inc. further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## THE FAIR HOUSING CENTER FOR RIGHTS AND RESEARCH (formerly known as the Housing Research & Advocacy Center)

Plaintiff Fair Housing Center for Rights and Research ("FHCRR") received $1,060,159.14 in funds from the Fannie Mae REO settlement, $755,000 of which it has allocated for community reinvestment. FHCRR intends to devote most of the community reinvestment funds to home repair assistance in majority Black and Latinx communities throughout Cuyahoga County, Ohio. FCCHR further states that, to date, it has spent $1,422.68 of the allocated community reinvestment funds for costs incurred advertising the listening sessions regarding how it should spend the funds.

FHCRR states that it has allocated $58,016.28 of its Fannie Mae REO settlement funds to directly promoting fair housing and $247,142.86 to support fair housing activities and programs in its community. FHCRR further states that, to date, it has spent $765.37 in fair housing activities and program funds to pay for staff to attend fair housing training.

FHCRR also states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Fannie Mae REO settlement.

24

FHCRR further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## LOUISIANA FAIR HOUSING ACTION CENTER

Plaintiff Louisiana Fair Housing Action Center states that it has allocated its Fannie Mae and Wells Fargo REO settlement funds to community development; it has not spent any of the Fannie Mae REO settlement funds and it has spent only a portion of the Wells Fargo settlement funds. LAFHC further states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish the allocations and expenditures of the Wells Fargo REO settlement funds. NTFHC further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## METRO FAIR HOUSING SERVICES  (Atlanta, Georgia)

Plaintiff Metro Fair Housing Services ("Metro") states that it has allocated its Fannie Mae REO settlement funds to supporting the development of more than 20 new affordable homes primarily throughout south Fulton and Dekalb counties in partnership with Atlanta Neighborhood Development Partnership ("ANDP") and other stakeholders. ANDP is the largest non-profit developer of affordable housing in the Metropolitan Atlanta region and a partner in previous community relief projects. This project will leverage/maximize Metro's community relief investment; benefit low-to-moderate income individuals and census tracts; provide "visitability" access features for aging in place; utilize minority contractors, sub-contractors and

25

neighborhood workers; and provide down payment/closing and certified housing counseling assistance.

Metro states that it spent the funds it received from the Wells Fargo REO settlement on reinvestment in neighborhoods of color. Metro states that for these reinvestment efforts, it used the funds to: provide programs and services to promote home ownerships, property rehabilitation, neighborhood stabilization, and development in communities of color; and leverage reinvestments that counteract the devastating damage to metropolitan Atlanta neighborhoods resulting from the foreclosure crisis and the ensuing economic meltdown.

Metro states that it has disbursed Wells Fargo REO settlement funds to the following organizations, programs, and projects in the following amounts:

- ANDP, $350,000: ANDP's project targeted neighborhoods in southwest DeKalb County, hardest hit by foreclosures and vacancies. It plans to acquire, rehabilitate and sell 13 houses over the grant period. Specifically, Metro's funding was used to acquire/rehab vacant, foreclosed properties at market value, including soft costs, the plus rehab costs, including soft costs.

- SUMMECH Community Development Corporation, Inc. ("SUMMECH"), $288,000: SUMMECH's project targeted the neighborhood commonly known as Mechanicsville located in southwest Atlanta, restoring the second half of Garibaldi Street between Bass and Stephens Street as a Model Block with the following outcomes: developed two (2) homes for sale to owner-occupants and provided needed exterior improvements and landscaping to existing properties on the block.

Metro also states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Fannie Mae and Wells Fargo REO settlements.

Metro further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## METROPOLITAN MILWAUKEE FAIR HOUSING COUNCIL

Plaintiff Metropolitan Milwaukee Fair Housing Council states that it pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Wells Fargo and Fannie Mae REO settlements. MMFHC further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## MIAMI VALLEY FAIR HOUSING CENTER

Plaintiff Miami Valley Fair Housing Center states that it received funds from the Fannie Mae REO settlement in the amount of $775,000 for neighborhood stabilization efforts in neighborhoods of color that foreclosures in the Dayton and Montgomery County area have negatively impacted. The initiative in Dayton was a continuation of MVFHC's efforts begun with the settlement of the Wells Fargo REO matter and named the 2022–2023 Inclusive Community Fund (ICF), to best brand MVFHC efforts from the project and promote the positive impact that of MVFHC's mission and work to ensure equal housing opportunity to all people in Miami Valley region.

MVFHC has focused most of the Fannie Mae REO settlement proceeds on Down Payment Assistance to strategically assist homebuyers willing to relocate to impacted neighborhoods with plans to live in their homes for at least 5 years to stabilize the neighborhood and increase home values.

Through the 2022–2023 ICF, MVFHC ensured homeownership opportunities for those who want to make the Miami Valley their home. The ICF-funded Down Payment Assistance

program was open to many middle-income individuals and families who typically cannot be assisted by government programs reserved for moderate-to-low-income residents.

MVFHC entered into an agreement with the Homeownership Center of Greater Dayton on June 24, 2022, worth $200,000, and subsequently, based upon the high utilization rate, decided to increase the amount to $500,000. In less than nine months, the Down Payment Assistance program provided $458,611.00 in down payment assistance to Black homebuyers. To qualify for downpayment assistance, applicants were required to:

- Live in the property as their primary residence for at least 60 months from the date of first occupancy.
- Contribute a minimum amount toward the purchase as follows:
  Purchase Price $0 - $50,000 = $500
  Purchase Price $50,001 - $100,000 = $1,000
  Purchase Price greater than $100,000 = 1% of the purchase price
- Complete Homebuyer Education, which includes an Individual Session through the Homeownership Center (first-time homebuyers).
- Complete a Home Maintenance Class in partnership w/ Habitat for Humanity within 180 days of closing.
- Provide a complete application and supporting documentation.
- Required to be a fixed rate mortgage with a lender and loan approved by the Homeownership Center.

In addition, MVFHC provided the Homefull Healthy Living in West Dayton project with a $125,000.00 contribution to support the development and construction of this ambitious project. The Homefull Healthy Living in West Dayton project includes affordable housing— Homefull Housing will include 144 1, 2, and 3-bedroom units of affordable housing for households earning less than 80% Average Median Income. The lovely walkable community will be a pillar of healthy living in West Dayton and will include these essential resources:

Food— The Grocery will be a full-service conventional store with fresh, local produce and budget-friendly grocery selections. The Regional Food Hub creates a network for connecting local growers to institutional buyers for a thriving local food system.

Jobs— Create and conduct entry-level skilled trade jobs, professional job training, and workforce development programming, including warehouse management, logistics, retail and property facility, and maintenance and management. Health— Kettering Health's Primary Care Center, a 2,400 square foot facility with culturally sensitive state-of-the-art accessible health care services and education. ZIKS Family Pharmacy, a comprehensive local pharmacy, and educator, is centrally located in the heart of the health campus.

The Fair Housing Center has also decided to assist some individuals with small grants of less than $1,000, to prevent the individual or family from becoming homeless. MVFHC has not yet disbursed any of these grants but has several individuals identified as in need and we are awaiting confirmation that the grant will be used to secure stable housing for the individual or family.

As of May 30, 2023, MVFHC has allocated and disbursed $625,000.00 or 81% of the total funding of $775,000 realized from the settlement with Fannie Mae. The Ad Hoc Committee formed to guide the allocation and disbursement of the Fannie Mae settlement funds has not yet decided how to allocate the remaining funds.

MVFHC also states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Fannie Mae and Wells Fargo REO settlements.

MVFHC further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.


## NORTH TEXAS FAIR HOUSING CENTER

Plaintiff North Texas Fair Housing Center states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and spent the Wells Fargo and Fannie Mae REO settlement funds. NTFHC also states that it has allocated its Fannie Mae settlement funds to three separate community development programs for: (1) home repairs; (2) first-time homebuyer downpayment assistance; and (3) renters' security deposits and moving costs. NTFHC further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## SOUTH SUBURBAN HOUSING CENTER (Homewood, IL)

Plaintiff South Suburban Housing Center ("SSHC") states that it received $1,491,053 in in funds from the Wells Fargo REO settlement, $1,421,053 of which were allocated to community relief and $70,000 of which were applied to the costs of conducting ongoing fair housing enforcement programs. SSHC states that it used the community relief funds to establish and implement SSHC's own in-house Inclusive Communities Fund ("ICF") program to provide mortgage downpayment assistance grants and mortgage distress assistance grants to individuals living in slowly recovering communities of color to revitalize and stabilize the homeownership markets that had been profoundly impacted by the highest concentrations of foreclosure rates in the Chicago metropolitan region. SSHC further states that since 2014, its ICF program has issued 116 grants, averaging $9,845 per family in mortgage loan assistance, and has distributed $1.1 million in community relief funds. The grants have generated an estimated $6.2 million in real estate transaction volume, which has resulted in a total of $3.05 million in both direct and indirect economic impact for these struggling communities.

SSHC states that it received $1,822,340.14 in funds from the Fannie Mae REO settlement received, $1,757,143.00 of which is allocated to community relief, $247,143.00 of which is allocated to fair housing program use, and $60,197.28 which is allocated to administrative costs. SSHC states that it has allocated its community relief funds to expanding its ICF program into northwest Indiana, including the City of Gary, Hammond, and East Chicago. Using the historical metrics of the Wells Fargo ICF program experience, SSHC expects the expanded ICF program grants over the next two years will generate approximately $7.3 million in real estate transaction volume, which in turn will result in approximately $3.6 million in both direct and indirect economic impact within the targeted distressed communities of color.

SSHC also states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Fannie Mae and Wells Fargo REO settlements.

SSHC further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.

## TOLEDO FAIR HOUSING CENTER

Plaintiff Toledo Fair Housing Center states that pursuant to Federal Rule of Civil Procedure 33(d)(1), it will produce responsive, non-privileged documents sufficient to establish how it allocated and/or spent funds from the Wells Fargo and Fannie Mae REO settlements. TFHC further states that it has not received any other settlement proceeds arising out of any claims, whether asserted or threatened, relating to the maintenance or marketing of REO properties.