**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. SAG-18-1919 |
| BANK OF AMERICA, N.A., *et al.*, | |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DISPARATE-IMPACT FRAMEWORK AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON BURDEN-SHIFTING FRAMEWORKS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................iii

INTRODUCTION ........................................................................................................................1

ARGUMENT................................................................................................................................2

I.      Plaintiffs relied on the correct legal standard—the HUD rule in effect—in their Motion for Partial Summary Judgment..................................................................................2

II.     Defendants attempt to obfuscate their summary judgment burden.............................................4

III.    Defendants fail to meet their burden under Step Two of the disparate-impact framework of demonstrating that their policies serve a legitimate business interest. ...............6

        A.     Defendants' arguments rehash issues this Court has already decided. ..........................6

              1.     Continuing to deny the existence of the policies and practices Plaintiffs have identified does not constitute a Step Two legitimate-business-interest defense. ....................................................................................................7

              2.     Defendants rehash their Step One argument contesting Plaintiffs' evidence of robust causation by erroneously asserting that Plaintiffs must connect each individual property-level deficiency with a specific policy. ................................................................................................................10

              3.     Defendants' argument that Plaintiffs' inspection criteria are invalid because they are not required by HUD or investor guidelines is still incorrect...................................................................................................................14

        B.     Defendants have failed to put forward evidence that their policy of undue delegation and failure to supervise furthers their business interests in a significant way. .................................................................................................................16

              1.     Defendants offer only naked assertions of business necessity.........................16

               2.     In attempting to rebut Plaintiffs' examples of inefficiencies, Defendants both confuse the burden of production on Step Two and misrepresent the evidence...........................................................................................................19

IV.    Plaintiffs' ample evidence of less discriminatory alternatives to Defendants' policy of undue delegation and failure to supervise precludes summary judgment on Step Three of the disparate-impact framework........................................................................................21

              1.     The Local Model............................................................................................23

               2.     Frequent, In-Person Checks.............................................................................25

3.      Increasing Allowable Expenses for Exterior Maintenance ...............................28

4.      The Use of Clear Boarding as the Default Method for Boarding Windows and Doors ................................................................................28

5.      Create More Effective Lines of Communication ..................................................30

6.      Fair Housing Training ............................................................................................30

7.      Gather and Routinely Analyze Data for Racial Disparities .............................31

V.      Because Defendants have not sufficiently articulated a non-discriminatory reason for the challenged conduct and their recycled arguments are pretextual, they are not entitled to summary judgment on disparate treatment. ...............................................................32

CONCLUSION .........................................................................................................................35

Appendix ............................................................................................................................... A-1

# TABLE OF AUTHORITIES

## Cases

*Allen v. City of Yonkers,*
   803 F. Supp. 679 (S.D.N.Y. 1992) ............................................................... 33, 34

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ...................................................................................... 4

*Angel v. Seattle-First Nat. Bank,*
   653 F.2d 1293 (9th Cir. 1981) ...................................................................... 5

*Bush v. Lone Star Steel Co.,*
   373 F. Supp. 526 (E.D. Tex. 1974) ........................................................... 15–16

*Dews v. A.B. Dick Co.,*
   231 F.3d 1016 (6th Cir. 2000) ...................................................................... 33

*Diaz v. Am. Tel. & Tel.,*
   752 F.2d 1356 (9th Cir. 1985) ...................................................................... 35

*Diaz v. Pan Am. World Airways, Inc.,*
   442 F.2d 385 (5th Cir. 1971) ........................................................................ 16

*El v. Se. Pa. Transp. Auth.,*
   479 F.3d 232 (3d Cir. 2007) ......................................................................... 16

*Fair Hous. Ctr. of Cent. Ind., Inc. v. M&J Mgmt. Co., LLC,*
   No. 1:22-CV-00612-TAB-JPH, 2024 WL 3859997 (S.D. Ind. Aug. 19, 2024) ............... 16

*Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.,*
   801 F. Supp. 2d 12 (D. Conn. 2011) ............................................................. 5

*Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n,*
   508 F.3d 366 (6th Cir. 2007) ........................................................................ 32

*Guessous v. Fairview Prop. Invs., LLC,*
   828 F.3d 208 (4th Cir. 2016) ........................................................................ 35

*Heiko v. Colombo Sav. Bank, F.S.B.,*
   434 F.3d 249 (4th Cir. 2006) ........................................................................ 33

*Ibrahim v. N.Y. State Dep't of Health,*
   904 F.2d 161 (2d Cir. 1990) .......................................................................... 33

*Inclusive Cmtys. Project, Inc. v. Tex. Dept. of Hous. & Cmty. Affs.,*
   747 F.3d 275 (5th Cir. 2014) ........................................................................ 3

*Insight Psychology & Addiction, Inc. v. City of Costa Mesa,*
No. 8:20-CV-00504, 2024 WL 1198465 (C.D. Cal. Mar. 20, 2024) ....................5

*Jersey Cent. Power & Light Co. v. Twp. of Lacey,*
772 F.2d 1103 (3d Cir. 1985) ....................................................5

*Khalil v. Farash Corp.,*
260 F. Supp. 2d 582 (W.D.N.Y. 2003) ....................................................4

*Loeb v. Textron,*
600 F.2d 1003 (1st Cir. 1979) ............................................... 33, 34

*Loper Bright Enters. v. Raimondo,*
144 S. Ct. 2244 (2024)....................................................3

*Mass. Fair Hous. Ctr. v. United States Dep't of Hous. & Urb. Dev.,*
496 F. Supp. 3d 600 (D. Mass. 2020) ....................................................2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ....................................................4

*Meiri v. Dacon,*
759 F.2d 989 (2d Cir. 1985) ....................................................33

*N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue,*
665 F.3d 464 (3d Cir. 2011) ...................................16, 17, 18

*Nat'l Fair Hous. All. v. Bank of Am., N.A.,*
No. 18-1919, 2023 WL 2633636 (D. Md. Mar. 24, 2023) ("*NFHA II*") ....................................*passim*

*Newark Branch, N.A.A.C.P. v. Town of Harrison,*
940 F.2d 792 (3d Cir. 1991) ....................................................16

*Oliver v. Digit. Equip. Corp.,*
846 F.2d 103 (1st Cir. 1988) ....................................................33

*Prop. Cas. Insurers Ass'n of Am. v. Todman,*
No. 13 C 8564, 2024 WL 1283581 (N.D. Ill. Mar. 26, 2024) ....................................................2

*Register v. Honeywell Federal Manufacturing & Technologies., LLC,*
397 F.3d 1130 (8th Cir. 2005)....................................................19

*Reyes v. Waples Mobile Home Park Ltd. P'ship,*
91 F.4th 270 (4th Cir. 2024)....................................................*passim*

*Reyes v. Waples Mobile Home Park Ltd. P'ship,*
903 F.3d 415 (4th Cir. 2018) ....................................................21

*Ricci v. DeStefano,*
    557 U.S. 557 (2009) ................................................................................................... 21, 23

*Robinson v. Lorillard Corp.,*
    444 F.2d 791 (4th Cir. 1971) ...................................................................................16, 27–28

*S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.,*
    690 F.2d 1235 (9th Cir. 1982) ................................................................................................5

*Salute v. Stratford Greens Garden Apartments,*
    136 F.3d 293 (2d Cir. 1998) ...................................................................................................4

*Short v. Manhattan Apartments, Inc.,*
    916 F. Supp. 2d 375 (S.D.N.Y. 2012) ..................................................................................31

*St. Mary's Honor Ctr. v. Hicks,*
    509 U.S. 502 (1993) ................................................................................................................4

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.,*
    17 F.4th 95 (9th Cir. 2021) ...........................................................................................*passim*

*Sweeney v. Rsch. Found. of State Univ. of N.Y.,*
    711 F.2d 1179 (2d Cir. 1983) ..............................................................................................33

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
    576 U.S. 519 (2015) .......................................................................................................*passim*

*Texas Dep't of Cmty. Affs. v. Burdine,*
    450 U.S. 248 (1981) ...................................................................................... 4, 32–33, 33, 34

*United States ex rel. Gugenheim v. Meridian Senior Living, LLC,*
    36 F.4th 173 (4th Cir. 2022) ..................................................................................................4

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
    429 U.S. 252 (1977) ..............................................................................................................32

*W. Easton Two, LP v. Borough Council of W. Easton,*
    489 F. Supp. 3d 333 (E.D. Pa. 2020) .....................................................................................5

*W. World Ins. Co. v. Stack Oil, Inc.,*
    922 F.2d 118 (2d Cir. 1990) ...................................................................................................5

*Wards Cove Packing Co. v. Atonio,*
    490 U.S. 642 (1989) ......................................................................................................16, 16–17

*Wilson v. Sw. Airlines Co.,*
    517 F. Supp. 292 (N.D. Tex. 1981) ......................................................................................16

**Other Authorities**

Bank of America, Annual Report 2023,
    *available at* https://investor.bankofamerica.com/regulatory-and-other-filings/annual-
    reports/content/0000070858-24-000135/0000070858-24-000135.pdf ............................................27

Charles C. Branas et al., *Urban Blight Remediation as a Cost-Beneficial Solution to Firearm Violence*,
    106 Am. J. of Pub. Health 2158 (2016) ..................................................................................................29

Deborah A. Cohen et al., *Neighborhood Physical Conditions and Health*,
    93 Am. J. of Pub. Health 467 (2003) ......................................................................................................29

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................................................... 4, 5

**Regulations**

24 C.F.R. § 100.500 ............................................................................................................................2, 16, 21

24 C.F.R. pt. 100 ...........................................................................................................................................3

78 Fed. Reg. 11460 (2013) ...........................................................................................................................3

88 Fed. Reg. 19450 (Mar. 31, 2023) ........................................................................................ 2, 2–3, 3, 28

## INTRODUCTION

In their Cross-Motion and Opposition, Defendants ask this Court to travel back in time about four years. To a time when it appeared HUD's 2020 Disparate Impact Rule would go into effect and there was no 2023 Rule formally reinstating the long-recognized disparate-impact standard. To a time before this Court considered Defendants' summary judgment arguments on Plaintiffs' *prima facie* claims of disparate impact and treatment and rejected them. Most of Defendants' arguments—that Plaintiffs have identified non-existent policies, failed to show how those policies caused the observed racial disparity in maintenance and marketing, and held Defendants responsible for property conditions they did not cause—sound familiar because they are. The Court considered extensive briefing on these issues two years ago and decided that these were factual disputes best decided by a jury. Defendants retain the right to argue all of these points at trial in opposition to Plaintiffs' *prima facie* case, but absent a time machine, they cannot relitigate these issues with the Court.

What Defendants are not entitled to do, however, is assert a legitimate-business-interests defense with no evidentiary support. Although Defendants have named legitimate interests like business efficiency and compliance with HUD and investor guidelines, that is *all* they have done. They do not point to a single piece of evidence explaining how these interests were furthered by the policy of undue delegation and failure to supervise. This is fatal to their Step Two defense.

Defendants misunderstand the current posture of the case. Plaintiffs retain the burden of proving discrimination (Step One) at trial. But if Plaintiffs meet that burden, Defendants, having offered no evidence in support of a legitimate-business-interests defense in discovery, should not be allowed to make arguments or concoct new evidence in support of that defense at trial. Accordingly, this Court should grant summary judgment in Plaintiffs' favor on Step Two.

This Court should also deny Defendants' request for summary judgment on Steps Two and Three of the *McDonnell Douglas* burden-shifting framework for Plaintiffs' disparate treatment claim. Here, too, Defendants offer only rehashed arguments against Plaintiffs' *prima facie* case, with no evidence of how any legitimate, nondiscriminatory reasons justified the racial disparity in

maintenance and marketing. Furthermore, there is substantial evidence that Defendants' proffered rationales do not in fact justify the racial disparity and are thus pretextual.

In seeking summary judgment as to Step Three of the disparate-impact burden-shifting framework, Defendants rely solely on a strawman: asserting that Plaintiffs believe they should stop using contractors and make all vendors in-house employees. Plaintiffs have never suggested such a thing. To the contrary, had Defendants reviewed Plaintiffs' robust evidence of alternative policies and practices that would serve Defendants' business interests while reducing or eradicating racially discriminatory maintenance and marketing, they would have seen that contractors remain an important part of Plaintiffs' alternatives. Plaintiffs simply propose that those contractors be properly supervised, delegated to, and trained. Defendants ignore all of this—including the opinions of Plaintiffs' experts (based on their substantial professional experience marketing and maintaining REOs) on how other lenders have managed to market and maintain properties well across all communities, regardless of racial composition, with the use of contractors. Plaintiffs have ample evidence of less discriminatory, alternative policies from which a jury could find that they have satisfied Step Three of the burden-shifting framework if the Court denies Plaintiffs' Motion and Defendants somehow later prevail on Step Two. Defendants' Cross-Motion should be denied.

## ARGUMENT

I. **Plaintiffs relied on the correct legal standard—the HUD rule in effect—in their Motion for Partial Summary Judgment.**

Defendants misstate the legal standard governing the disparate-impact burden-shifting framework. In their Motion for Partial Summary Judgment, Plaintiffs applied the standard set forth in HUD's disparate impact rule, 24 C.F.R. § 100.500. Although, in 2020, HUD published a rule that would have altered the disparate impact standard, that rule never went into effect.[1] *See* Reinstatement of HUD's Discriminatory Effects Standard, 88 Fed. Reg. 19450 (Mar. 31, 2023) (to be codified at 24

---

[1] HUD's 2020 Proposed Rule that would have revised the 2013 standard was found to be arbitrary and capricious, and its enforcement was stayed, leaving the 2013 rule in effect. *See Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 611–12 (D. Mass. 2020); *Prop. Cas. Insurers Ass'n of Am. v. Todman*, No. 13 C 8564, 2024 WL 1283581, at *6 (N.D. Ill. Mar. 26, 2024).

C.F.R. pt. 100). ("In 2020, HUD published a rule that would have altered the standards set forth in the 2013 rule. However, a preliminary injunction prevented the 2020 rule from ever going into effect."). Then, on March 31, 2023, HUD reinstated the 2013 disparate impact rule.[2] *Id.* HUD recodified the 2013 rule because it is "consistent with judicial precedent construing the Fair Housing Act, including *Inclusive Communities*, as well as the Act's broad remedial purpose." *Id.*; *see also Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 541 (2015) (citing Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460, 11470 (2013)); *Inclusive Cmtys. Project, Inc. v. Tex. Dept. of Hous. & Cmty. Affs.*, 747 F.3d 275, 282 (5th Cir. 2014) (relying on HUD's 2013 Rule explanation and affirming the lower court's decision to "adopt the burden-shifting approach found in 24 C.F.R. § 100.500 for claims of disparate impact under the FHA"). With this rule, HUD "formalized a burden-shifting test for determining whether a given practice has an unjustified discriminatory effect." 88 Fed. Reg. at 19450.

Nearly ten months after HUD reinstated the 2013 rule, the Fourth Circuit affirmed the long-standing requirement laid out in *Inclusive Communities* in *Reyes v. Waples Mobile Home Park Ltd. Partnership*, 91 F.4th 270 (4th Cir. 2024). Under this standard, after a plaintiff has established a *prima facie* case of disparate impact, defendants must "state and explain the valid interest served by their policies," and provide evidence that the challenged policies "'serve[ ], in a significant way,' its legitimate interests." *Reyes*, 91 F.4th at 277 (citing *Inclusive Cmtys.*, 576 U.S. at 541; *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 967 (9th Cir. 2021)). The Fourth Circuit emphasized that the business interest "cannot be a phony" and must be "legitimate."

---

[2] Defendants completely overlook the 2023 HUD Rule, or at least imply that it is not entitled to any deference. *See* Defs.' Opp'n at 17 n.1 (citing *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024)). But Defendants have not brought an Administrative Procedure Act challenge to HUD's 2023 disparate impact rule, nor has anyone else. Moreover, to the extent HUD's 2023 Rule is intended to codify the ruling in *Inclusive Communities*, the Supreme Court's interpretation of the FHA in that case—and the Fourth Circuit's application of *Inclusive Communities* in *Reyes*—means that those courts, the ones that "determine the best reading," *Loper Bright*, 144 S. Ct. at 2261, have already interpreted the FHA consistently with the 2023 HUD Rule.

*Id.* (quoting *Inclusive Cmtys.,* 576 U.S. at 524, 527). This is the standard upon which Plaintiffs appropriately relied in their Motion for Partial Summary Judgment.

## II.     Defendants attempt to obfuscate their summary judgment burden.

Defendants play fast and loose with their summary judgment burden. Plaintiffs do not dispute that the Step Two burden is one of *production* (not proof or persuasion). Defendants nevertheless attempt to minimize their burden. Defs.' Mem. in Opp'n to Pls' Mot. for Partial Summ. J. & ISO Defs.' Cross-Mot. for Summ. J. on Burden-Shifting Frameworks (hereinafter "Defs.' Opp'n" or "Defs.' Opp'n & Cross-Mot.") at 2 (asserting that they "need only point to deposition testimony or an interrogatory response to carry their burden" (citing *Celotex v. Catrett*, 477 U.S. 317, 324 (1986))). Defendants omit that, as the nonmoving party, they "must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and that "'[a] scintilla of evidence'" in support of the nonmoving party's position is insufficient to defeat summary judgment.'" *United States ex rel. Gugenheim v. Meridian Senior Living, LLC,* 36 F.4th 173, 178 (4th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Under the disparate-impact burden-shifting framework, to rebut a *prima facie* case of discrimination, Defendants have "the burden of 'producing *evidence*' that the adverse [ ] actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–55 (1981)). To meet that burden, Defendants must put forward evidence demonstrating the "reasons for [their] actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the [discriminatory] action." *Id*.; *see also Khalil v. Farash Corp.*, 260 F. Supp. 2d 582, 588–89 (W.D.N.Y. 2003) (quoting *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 302 (2d Cir. 1998)) ("'Once a plaintiff establishes a prima facie case [of disparate impact], the burden shifts to the defendant[s] to 'prove that [their] actions furthered, in theory and in practice, a legitimate, bona fide . . . interest and that no alternative would serve that interest with less discriminatory effect.'").

When defendants offer a legitimate business interest, they "must do more than vaguely assert 'the existence of some unspecified disputed material facts' or present 'mere speculation or conjecture.'" *Gashi v. Grubb & Ellis Prop. Mgmt. Servs., Inc.*, 801 F. Supp. 2d 12, 17 (D. Conn. 2011) (quoting *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)). Yet that is exactly what Defendants do in their Opposition and Cross-Motion. At this stage, Defendants must demonstrate that their policy of undue delegation and lack of supervision "serves, in a significant way" or is highly correlated with the business necessity they have vaguely articulated. *Reyes*, 91 F.4th at 277 (quoting *Sw. Fair Hous. Council*, 17 F.4th at 967). Defendants have failed to do so. Instead, Defendants conflate "burden of production" with simply naming their business interests, unaccompanied by any evidence as to how the policies and practices Plaintiffs have identified as causing the racially disparate maintenance and marketing serve Defendants' stated interests. This is not sufficient to survive summary judgment on this issue. *See, e.g.*, *Insight Psych. & Addiction, Inc. v. City of Costa Mesa*, No. 8:20-CV-00504, 2024 WL 1198465, at *5 (C.D. Cal. Mar. 20, 2024) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." (quoting Fed. R. Civ. P. 56(e)(2)); *see also id.* ("A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. Rather, there must be specific, admissible evidence identifying the basis for the dispute." (citing *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982)); *W. Easton Two, LP v. Borough Council of W. Easton,* 489 F. Supp. 3d 333, 348–49 (E.D. Pa. 2020) ("[A]rguments made in briefs 'are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion.'" (quoting *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985)).

As explained further below, Defendants "ha[ve] not cited any portion of the record that demonstrates . . . the validity of [their] propositions." *Angel v. Seattle-First Nat'l Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981) ("A motion for summary judgment cannot be defeated by mere conclusory allegations unsupported by factual data." (citations omitted)). Accordingly, this Court should grant

Plaintiffs' Motion and deny Defendants' Cross-Motion on Step Two of the burden-shifting framework.

### III. Defendants fail to meet their burden under Step Two of the disparate-impact framework of demonstrating that their policies serve a legitimate business interest.

#### A. Defendants' arguments rehash issues this Court has already decided.

Defendants spend a significant portion of their Motion relitigating whether the policies Plaintiffs identified exist and whether those policies caused the disparate impact Plaintiffs uncovered. Yet this Court has already considered these arguments—which relate to Step One of the disparate-impact framework—and held that there is a sufficient dispute of material fact to warrant their determination by a jury. *See Nat'l Fair Hous. All. v. Bank of Am., N.A.*, No. 18-1919, 2023 WL 2633636, at *13–15 (D. Md. Mar. 24, 2023) ("*NFHA II*"). In May 2022, Defendants moved for summary judgment on whether Plaintiffs had sufficient evidence to proceed to a jury on Step One of the FHA's disparate-impact framework. ECF 167 & 171. Defendants argued that Plaintiffs had failed to put forward sufficient evidence to make out a *prima facie* case of discrimination under Step One, but this Court rejected Defendants' arguments. *See NFHA II* at *13–15. Instead, this Court held that Plaintiffs had: (1) successfully "carried their burden of introducing sufficient evidence to create a genuine issue of material fact as to whether a statistical disparity exists in the defendants' maintenance of the properties at issue," *NFHA II* at *13; (2) "succeeded in providing enough evidence of a specific policy to survive" summary judgment and that Defendants' protestations regarding the existence of the policies were "a quintessentially factual dispute," *id.*; and (3) presented evidence "sufficient to create a genuine issue of material fact as to robust causation," *id.* at *15. In other words, this Court has already decided that Plaintiffs may proceed to trial on Step One of the disparate-impact framework (and Defendants may offer their arguments against Plaintiffs' *prima facie* case to the jury).

This round of summary judgment motions is meant to address Steps Two and Three of the disparate-impact framework. *See* ECF 282 (approving a briefing schedule for "summary judgment motions on Steps Two and Three of the *McDonnell Douglas* test"). It is not intended as an

opportunity to relitigate the essential elements of Plaintiffs' *prima facie* case: the existence of a racial disparity, the policies and practices that led to it, and the causal link between the two. Defendants will have another chance to contest Plaintiffs' *prima facie* case: at trial.

In compliance with the Court's directive, because Defendants have failed to put forward any evidence that would connect the identified policies to their legitimate business interests, Plaintiffs have moved for partial summary judgment on Step Two. *See* ECF 287. But Defendants refuse to accept the posture of the case, maintaining that "it would be premature for the Court to hold that Defendants can't carry their burden on Step Two when Plaintiffs have yet to carry their burden on Step One." *See, e.g.,* Defs.' Opp'n at 37. Instead of acknowledging this Court's conclusions regarding the policies Plaintiffs identified in Step One, Defendants assert that "[i]t's not possible to state the reason for a policy until it's been established what the policy actually is." *Id.* In refusing to accept this Court's holdings and the current posture of this case, Defendants have effectively conceded that, if a jury concludes that they have a policy of undue delegation and lack of supervision, they cannot put forth sufficient evidence from which the jury could find that they have a meritorious business-necessity defense for that policy.

### 1. Continuing to deny the existence of the policies and practices Plaintiffs have identified does not constitute a Step Two legitimate-business-interest defense.

Defendants attempt to deflect from their burden at Stage Two by arguing that Plaintiffs' framing of their policies and practices contravenes this Court's previous ruling, Defs.' Opp'n at 18, and by spending eight pages disputing the existence of six policies and practices Plaintiffs identified, *id* at 23–30. Neither strategy establishes a valid Step Two legitimate business interest to justify any of the policies or practices identified by Plaintiffs.

First, framing Defendants' policies as either ten distinct policies or one overarching policy makes no difference to whether Defendants have a legitimate justification for any of those policies. Plaintiffs have pointed to ten policies and practices that resulted in disparate REO maintenance and marketing in communities of color. *NFHA II* at *13; Pls.' Combined Opp'n to Defs.' Mots. for

Summ. J. at 43–61, ECF 182. In denying Defendants' motions for summary judgment, this Court stated that Plaintiffs' "ten purported policies are better understood in 'combination'" because, in practice, "each is simply a different permutation of an overarching policy of undue delegation and failure to supervise." *NFHA II* at *13. This Court never rejected the ten policies Plaintiffs cited. Plaintiffs' breakdown of the overarching policy into the ten "different permutation[s]" gives context to the overarching policy of "undue delegation and failure to supervise."

Even if the ten specific policies Plaintiffs identified are subsumed by the overarching policy of undue delegation and failure to supervise, Defendants still have not produced any evidence to show that this policy is tied to a legitimate business necessity. Once Defendants' arguments that rehash issues related to the *prima facie* stage of the framework are stripped away from their Opposition and Cross-Motion, all that remains are conclusory assertions, devoid of any supporting evidence that their asserted interests "serve[ ], in a significant way" the business necessities they put forward. *Reyes*, 91 F.4th at 277 (quoting *Sw. Fair Hous. Council*, 17 F.4th at 967).

Second, the significant space Defendants devote to denying the existence of six of the policies and practices Plaintiffs identify also does not offer them a legitimate business interest defense. This Court has already held that Defendants' denials of the policies "present a quintessentially factual dispute" inappropriate for summary judgment. *NFHA II* at *13. Nevertheless, Defendants re-argue such factual disputes as whether windows are boarded more often in communities of color, whether Safeguard's reliance on photographs for quality control was effective, and whether they emphasized timeliness over quality, among other disputed factual issues. Defs.' Opp'n at 23–30. In their summary judgment opposition filed more than two years ago, Plaintiffs offered substantial evidence in support of each of the six policies Defendants again dispute, *see* ECF 182 at 43–61, and incorporate that evidence here by reference.

Furthermore, as detailed in the Appendix to this brief responding to the factual disputes Defendants highlight in the Appendix to their brief, Defendants' attempts to undermine Plaintiffs' asserted policies with purported counter examples of their own and supposedly contradictory evidence are either misleading, false, or simply beside the point. *See, e.g.*, App. at A-6–A-11

(explaining why the photographs and incomplete stories Defendants offer about boarded properties on pages 23–26 of their brief and on pages A-3–A-6 of their Appendix do not rebut Plaintiffs' assertion that Defendants boarded windows more often in communities of color). For example, in denying that they boarded more often in communities of color and did so based on beliefs that homes in those communities were more prone to break-ins and vandalism, Defendants claim they "follow[ed] procedures to enhance security at properties that were actually broken into." Defs.' App. at A-5. A more complete review of the record, however, reveals that ██████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ECF 301-31, Safeguard 30(b)(6) (Greenbaum) Dep. at 67:19–68:10, July 26, 2021. Moreover, the policy Defendants cite is from 2018 (after the completion of Plaintiffs' investigation), does not refer to ████████████████, and applies only to ████████████. ECF 301-43 at SG0018880–01.

This is but one example of Defendants' misleading and incomplete individual property stories that, upon closer examination, does not in fact rebut the existence of the policies Plaintiffs allege. Because the Court has already determined this issue to be factually disputed, Plaintiffs respond to each of Defendants' inaccuracies in the attached Appendix, rather than devote more space in this brief to issues already decided. Although the existence of certain policies is a factual dispute, there is no dispute on the subject of Plaintiffs' Motion: Defendants have offered no evidence in support of a single legitimate business objective justifying the policies Plaintiffs have identified.

Relatedly, Defendants also continue to argue that a policy of undue delegation and failure to supervise cannot provide a basis for liability under the disparate-impact framework. Defs.' Opp'n at 1–2. Not only is this argument irrelevant at this stage, it is also legally incorrect. Rejecting this same argument from Defendants, this Court, relying on Supreme Court precedent, has twice held that a policy of undue delegation and failure to supervise can provide the basis for liability under a disparate-impact theory. *NFHA II* at *13 (according to the Supreme Court and "[e]very judge to have addressed the question in the context of lawsuits based on NFHA's investigation," "an

overarching policy of undue delegation and failure to supervise" can provide the basis for liability under a disparate-impact framework.). Instead of respecting this Court's holding, Defendants continue to challenge this "uniform precedent," *id.*, and fail to respond to Plaintiffs' Motion with any evidence of a legitimate business interest for this overarching policy. *See* Defs.' Opp'n at 36–37 (stating that "the point at *this* stage is that none of the alleged 'defects' are attributable to 'undue delegation and failure to supervise'" and "[i]t's not possible to state the reason for a policy until it's been established what the policy actually is").

Although Defendants are entitled to deny the existence of policies while, in the alternative, providing legitimate business reasons for them, they have not done so here. Instead, Defendants have put all their eggs into the basket of disputing Plaintiffs' *prima facie* case (which they are entitled to do at trial), foregoing their opportunity to put forward sufficient evidence to meet their burden on Step Two. The Court should grant Plaintiffs' Motion on this basis alone. *See Reyes*, 91 F.4th at 277 (quoting *Sw. Fair Hous. Council*, 17 F.4th at 967).

2. **Defendants rehash their Step One argument contesting Plaintiffs' evidence of robust causation by erroneously asserting that Plaintiffs must connect each individual property-level deficiency with a specific policy.**

As in their summary judgment motions on Step One, Defendants again argue that Plaintiffs have insufficient evidence of robust causation between the policies they identify and the racial disparity they observed. Once again, Defendants attempt to litigate this case as though each deficiency on each property exists in its own bubble. *See* Defs.' Opp'n at 37 (arguing that the evidence supporting the statistical disparity is not related to "a single policy" because the "records reflect a variety of one-time decisions with one-time reasons"). But, as this Court has already determined, Plaintiffs have "introduced sufficient evidence, at this stage of the case, connecting the defendants' policies to the racial disparity." *NFHA II* at *14. This Court has also already observed that the results of Plaintiffs' investigation—of which each deficiency was a piece of evidence—show a pattern that *in total* demonstrates a statistically significant disparity in the maintenance and

marketing of REOs in white communities as compared to communities of color that is sufficient to reach a jury on Step One of the disparate-impact framework. *NFHA II* at \*10 ("*At trial*, the plaintiffs will of course be required to show that a significant racial disparity exists across only those criteria the defendants in fact maintained or should have maintained. For now, though, they have adduced sufficient evidence to suggest that whatever the ultimate scope of the defendants' responsibilities, they may be able to show that a racial disparity exists across those particular criteria." (emphasis added)); *id.* at \*12 ("[A]lthough the plaintiffs' investigation may not have been two-dimensional on a *per-property* basis, it had two-dimensional features in the *aggregate*."). Defendants continue to argue that grass was properly cut or fences were repaired, but as Plaintiffs established, no single criterion drives the disparity. Plaintiffs' "raw data demonstrates that a racial disparity persists across nearly every criterion they considered." *NFHA II* at \*10 (citing ECF 171-20, Revised Rugh Report at 4, 13, 15–16; ECF 183-1, Augustine Decl. Ex. F; ECF 183-11, Rugh Dep. at 242:5–245:14).

Despite this Court's holding, Defendants devote much of their brief to disputing the existence of individual deficiencies on individual properties or denying the connection between individual deficiencies and a specific policy. *See, e.g.*, Defs.' Opp'n at 23–26, 33–38. But as this Court has already concluded, those arguments are disputes of fact best left for the jury to determine. *NFHA II*, at \*10, \*15. Plaintiffs have substantial evidence that contravenes Defendants' arguments centering on individual deficiencies or properties and that establishes that the policy of undue delegation and failure to supervise was responsible for the racial disparities observed.

For example, as Plaintiffs address in their Appendix, the two properties Defendants cite to show that their policy of undue delegation and failure to supervise did not lead to vendors boarding more windows in communities of color that in white communities does not rebut Plaintiffs' point. The first property, 2123 Scott Key Drive, is in a majority-Black community. ECF 285-27, Pls.' Mot. Part. Summ. J. Ex. 25, SG00204723. Defendants maintain that this property was boarded because the windows were "repeatedly broken during multiple instances of vandalism and break-ins at the property itself." Defs.' Opp'n app. at A-4 (citing ECF 299-92–299-98, Defs.' Opp'n Exs. 89–95).

But the evidence in the record reflects that 2123 Scott Key Drive had a main window boarded as early as March 12, 2013. Ex. 1, SG00202904. The vendor left the back door and several windows open during the same visit (which are visible in pictures that the Safeguard vendor submitted, yet Safeguard's "robust quality control process" failed to notice). *Id.* The first confirmed break-in (when the basement windows were broken) was nearly a year later, in February 2014, Ex. 2, SG00203151, meaning that at least one boarded window pre-dated any of the break-ins and vandalism Defendants claim as the reason for the boarding. The second property, 1232 Lombard Street, is located in a majority-white community. ECF 285-28, Pls.' Mot. Part. Summ. J. Ex. 26, SG00367387. Defendants contend that a window there was boarded because "it was broken during one of the break-ins at the property. Defs.' Opp'n app. at A-4 (citing ECF 299-37, Defs.' Opp'n Ex. 34 at 6266–67).[3] Although it is true that as of February 11, 2017, the *bottom third* of a window that takes up only the top half of the back door was boarded, it was boarded to match the color of the door and, because it was on the back door, it was not visible from the front of the house and thus would not have affected the home's curb appeal. Ex. 3, SG00305272. More importantly, however, on November 28, 2017, the plywood was replaced with *clear boarding.* Ex. 4, SG00497398. So the boarding of a window in a majority-white community that Defendants highlight was minimal, matched the color of the door, was not visible to passersby, and was later replaced with clear boarding.[4]

Defendants gaslight the Court by suggesting that they could not have had a policy of using plywood boarding more often in communities of color than in majority-white communities because clear boarding was not available for part of the relevant timeframe and because they used clear boarding on three properties in communities of color. Defs.' Opp'n at 25–26. Specifically, Defendants claim that Secureview clear boarding "wasn't used everywhere" because it was "still in

---

[3] As Plaintiffs note in their Appendix, Defendants cite to Ex. 34 (ECF 300-28 & 300-29) at 6266–67, but Exhibit 34 does not contain these Bates ranges.

[4] Over two years ago, Plaintiffs cited multiple examples of deficiencies they observed on properties that a finder of fact could attribute to Defendants' policy. *See* Pls.' Opp'n to Defs.' Mots. for Summ. J. at 31–33. Plaintiffs could cite to more examples in the record, but this case is not about individual deficiencies on individual properties—it is about how those deficiencies in the aggregate demonstrate racial disparities in the maintenance and marketing of REOs.

its 'pilot project' phase as late as 2013." Defs.' Opp'n at 26. According to the article cited by Defendants, as of April 29, 2013, Secureview had completed its pilots and had started taking orders for the product. Defs.' Opp'n at A-5 (citing "One man's window into blight; Developer Wedren pitches a clear plastic for building board-ups," Crain's Chi. Bus. (Apr. 29, 2013)). But even giving Defendants the benefit of the doubt and using 2015 as the time when Secureview became readily available, Ex. 5, Iafigliola Dep. 258:4–260:11, Jan. 28, 2022, evidence shows that once Secureview was available, the use of plywood boarding decreased in majority-white communities, as one might expect, but it *increased* in communities of color. From the start of 2011 (when the investigation began) through the end of 2014, and from 2015 (when Mr. Iafigliola states clear boarding was readily available) through 2018, the percentage of investigated properties with boarded windows remained steady at around 27%. *See* ECF 183-1 at ¶ 31 & Ex. 1-H. After 2015, when Defendants claim clear boarding became readily available, plywood boarding in majority-white communities decreased from 14% to 10%. *Id.* In communities of color, however, the use of plywood boarding increased from 33% to 35%, even with clear boarding available as an option to vendors. *Id.*

Based on this evidence, as well as evidence Plaintiffs cited two years ago in opposing summary judgment, a jury could infer that Defendants' policy of undue delegation and lack of supervision led vendors to rely on their own biases about neighborhoods when deciding whether to board, re-glaze, or use clear boarding, resulting in the racial disparity in maintenance Plaintiffs observed.

Defendants also contend that local permitting requirements, rather than their own shortcomings, resulted in delays in necessary exterior maintenance work. Defs.' Opp'n at 37–38. But permitting requirements are ostensibly an obstacle to performing exterior maintenance work in all communities regardless of racial composition. Defendants offer no explanation for why it would take longer to obtain a permit in a community of color than in a majority white community. Nor do they provide any specifics regarding the *cause* of the delays, instead implying that the cities and localities were always the ones to blame. Defendants also make a related, but nonsensical, argument about how complying with local code requirements resulted in delays. *Id.* at 38. They point to a

property that a code official required them to power wash, which they did. It is unclear what, if any, delay was caused by this code requirement or why local codes would be enforced differently depending on the racial composition of the neighborhood. What is clear, however, is that Defendants' arguments contesting Plaintiffs' showing of robust causation between the policies identified and the racial disparity observed offer no support for their Step Two legitimate-business-interest defense.

> ### 3. Defendants' argument that Plaintiffs' inspection criteria are invalid because they are not required by HUD or investor guidelines is still incorrect.

Undeterred by this Court's 2023 ruling, Defendants continue to argue that Plaintiffs' inspection criteria are invalid because they are not required by HUD or investor guidelines. Defs.' Opp'n at 33–37; *NFHA II*, at *9. Defendants contend that one of their "valid interests" served by the policy of undue delegation and failure to supervise is "compliance with legal and investor guidelines" and that "there are certain tasks [BANA] does not undertake because they are not among the tasks they are supposed to undertake under HUD's or investor guidelines." Defs.' Opp'n at 32–33. These arguments are incorrect and irrelevant for three reasons.

First, Defendants continue to dispute issues relevant to Step One of the disparate-impact framework—issues that this Court has already addressed. *See NFHA II* at *9. Indeed, this Court rejected BANA's argument that Plaintiffs' inspection criteria should be set aside as a matter of law because they did not entirely align with "source[s] like HUD's 2010 and 2016 Preservation and Protection Requirements." *Id.*; *see also id.* at *10 (explaining that evidence "suggests that BANA may have held itself, and Safeguard, to a higher standard that the plaintiffs' criteria more closely reflect" and that the "evidence is enough to create a factual dispute as to whether the plaintiffs' statistical

disparity appropriately represents the scope of defendants' maintenance work").[5] This point is not relevant to Step Two.

Second, nothing about any of the HUD or investor guidelines to which Defendants point requires *undue* delegation or a failure to supervise in order to comply with those guidelines. As the Fourth Circuit explained, defendants "cannot . . . claim business necessity by rattling off inapplicable statutes as their justification for promulgating a challenged policy." *Reyes*, 91 F.4th at 277 (citing *Inclusive Cmtys.*, 576 U.S. at 524, 527). Rather, to successfully rely on a legal obligation as a business-necessity defense, "the risk of prosecution or liability under a statute must at least be plausible" and cannot be "based on speculative, or even imagined, liability." *Id.* Here, there is no risk that Defendants will be prosecuted or held liable under HUD guidelines or local laws for appropriately delegating and adequately supervising. Accordingly, the Court should reject Defendants' attempt to rely on HUD guidelines and local laws as a justification for their policies of undue delegation and the failure to supervise their employees and agents. *Id.* (rejecting "the anti-harboring statute" relied on by defendants because the "risk of prosecution [was] too attenuated to cross the threshold of a plausible concern"). As in *Reyes*, Defendants' purported concern about liability for failing to comply with the law "is too attenuated to cross the threshold of a plausible concern" and cannot serve as a "legitimate interest." *Reyes*, 91 F.4th at 277.

Third, the legal and investor guidelines, such as the HUD requirements, to which Defendants point represent the floor—not the ceiling—of the work Defendants must perform. *See* ECF 182 at 4–5. "When doing the bare minimum results in a racial disparity, it is insufficient.

---

[5] Plaintiffs have already demonstrated that the criteria Defendants challenge as irrelevant to FHA properties—such as "for sale" signs—do not drive the outcome of the statistical disparity. *See* ECF 182 at 67 ("Defendants' complaints about being penalized for peeling paint, allegedly legally required instances of boarding, and (for properties being conveyed to HUD) absent 'for sale' signs, ignore the depth of the racial disparity in the data. As Dr. Rugh has testified, no single deficiency drives the racial disparity.") (citing to ECF 183-11 at 242:5–243:6, 243:20–245:14); *see also* ECF 183-7-B at 2 ("Although some of Defendants' experts have pointed to different requirements or practices governing the maintenance of REOs secured by Federal Housing Administration ('FHA') loans versus other types of mortgages, . . . difference in loan type does not explain the racial disparity in observed deficiencies.").

Neither the expense involved in changing from a discriminatory system nor the conformance with industry practice constitutes a business necessity that would justify the continuation of racial discrimination." *Bush v. Lone Star Steel Co.*, 373 F. Supp. 526, 532–33 (E.D. Tex. 1974) (citing *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971)); *see also Wilson v. Sw. Airlines Co.*, 517 F. Supp. 292, 304 (N.D. Tex. 1981) ("[A] potential loss of profits or possible loss of competitive advantage following a shift to non-discriminatory hiring does not establish business necessity under *Diaz*. To hold otherwise would permit employers within the same industry to establish different hiring standards based on the financial condition of their respective businesses." (citing *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir. 1971)).

**B.    Defendants have failed to put forward evidence that their policy of undue delegation and failure to supervise furthers their business interests in a significant way.**

**1.    Defendants offer only naked assertions of business necessity.**

Although Defendants name legitimate business interests, they offer no evidence showing how the policy of undue delegation and failure to supervise serves those interests. This falls far below their Step Two burden of production. Under Step Two of the disparate-impact framework, courts cannot "accept bare or 'common-sense'-based assertions of business necessity." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 240 (3d Cir. 2007). Instead, defendants must provide "empirical proof that challenged" policy supports their business goals. *Id.*; *see also N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 477 (3d Cir. 2011). In other words, "[a] legally sufficient justification 'must be supported by evidence and may not be hypothetical or speculative.'" *Fair Hous. Ctr. of Cent. Ind., Inc. v. M&J Mgmt. Co., LLC*, No. 1:22-CV-00612-TAB-JPH, 2024 WL 3859997, at *7 (S.D. Ind. Aug. 19, 2024) (citing 24 C.F.R. § 100.500(b)(2)). And defendants "must demonstrate that the [policy] furthers legitimate business goals 'in a significant way.'" *Newark Branch, N.A.A.C.P. v. Town of Harrison*, 940 F.2d 792, 803 (3d Cir. 1991) (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659 (1989)). Accordingly, "[c]ourts evaluating business justifications are required to subject those justifications to a 'reasoned review' rather than simply defer to them." *Id.* (citation omitted); *see also*

*Wards Cove*, 490 U.S. at 659 ("A mere insubstantial justification in this regard will not suffice, because such a low standard of review would permit discrimination to be practiced through the use of spurious, seemingly neutral . . . practices.").

*North Hudson Regional Fire & Rescue* exemplifies why simply stating a business interest, even one that the parties agree is legitimate, without evidence connecting that interest to the policy in question is insufficient at Step Two.[6] 665 F.3d at 482. In that case, the fire department had adopted a residency requirement for firefighters, and the NAACP and African-American firefighter candidates sued, arguing that this policy had a disparate impact on African-American candidates. *Id.* at 479. The fire department claimed that the residency requirement was essential to its operations for several reasons, including that it "increases the number of Spanish-speaking firefighters in a department that serves a 69% Hispanic population." *Id.* at 482. The Third Circuit rejected this interest as "insufficient to invoke the business-necessity defense" because although it was "a plausible justification in the abstract," the fire department "failed to establish that the residency requirement leads to a greater number of Spanish-speaking firefighters." *Id.* Defendants' stated justifications fail for the same reasons here: they have neglected to connect the dots.

First, Defendants' mere recitation of their business interests fails to justify the policy alleged, nor is it supported by evidence. As outlined in Section III.A.3 *supra*, Defendants raise compliance with legal and investor guidelines as a legitimate business interest without offering a scintilla of evidence that the alleged policy of undue delegation and failure to supervise furthered compliance with these guidelines.

Defendants also argue they had a legitimate business interest in hiring contractors as a more efficient alternative to hiring employees. Defs.' Opp'n at 31–32; *see also id.* at 19. Defendants contend that the efficiencies of hiring contractors "served the broader goals of 'preserving, maintaining, and securing properties in accordance with all applicable laws" and obligations, and

---

[6] Although *North Hudson Regional Fire & Rescue* is a Title VII case, "business necessity in the context of the FHA is 'analogous to the business necessity standard under Title VII,'" *Reyes*, 91 F.4th at 277 (quoting *Inclusive Cmtys.*, 576 U.S. at 541).

"mitigating losses associated with delinquent loans." *Id.* at 19. The central problem with this argument, however, is that the business interest in using contractors for efficiency does not explain how maintaining a policy of undue delegation and failure to supervise furthers that interest. Defendants never assert that they could not use contractors with appropriate levels of delegation and supervision. Plaintiffs have never opposed the use of contractors; the policy they identify as causing the disparate impact is one of *undue* delegation—not delegation altogether, and particularly not when done appropriately with sufficient supervision. At no point in Plaintiffs' Motion did they assert that Defendants must hire full-time employees to remedy the disparate impact caused by their policy of undue delegation and lack of supervision. *See generally* ECF 285-1, Pls.' Mot. Part. Summ. J. In fact, Plaintiffs stated exactly the opposite. *Id.* at 16 ("Nor do organizations necessarily have to employ in-house staff to supervise contractors effectively."). Defendants' justifications for hiring contractors fail to respond to the policy in question: undue delegation and failure to supervise.

Moreover, Defendants provide no evidentiary support for their contention that using contractors is more efficient. Defendants simply state that this justification is "fully supported by the record," *id.* at 32, asserting that "[t]he substantial evidence they presented that hiring contractors is more efficient than employing full-time workers in every corner of the country is undisputed, *id.* at 19. But the "substantial evidence" Defendants cite in a footnote is their conclusory and self-serving Answers to Plaintiffs' First Phase III Interrogatories, *see id.* at 19 n.3 (quoting Defs.' Opp'n & Cross-Mot. Exs. 26 & 27), and deposition testimony from Brandon Silvey, who speculated as to why BANA contracted exclusively with Safeguard in 2012,[7] *see id.* at 32 (citing Defs.' Opp'n & Cross-Mot. Ex. 8); *see also id.* at 6 (same). This is not enough—as a matter of law—to justify Defendants' policy of undue delegation and failure to supervise. *Reyes*, 91 F.4th at 277 (citing *Inclusive Cmtys.*, 576 U.S. at 541; *Sw. Fair Hous. Council*, 17 F.4th at 967); *N. Hudson Reg'l Fire & Rescue*, 665 F.3d at 482.

---

[7] Defendants cite to deposition testimony from Mr. Silvey in which he stated that BANA contracted exclusively with Safeguard for the maintenance and marketing of REOs in 2012, "[p]robably for efficiency gains, right, so imagine you're doing three times the amount of work to manage three different vendors, right, so we could consolidate and be more efficient. And Safeguard was the industry leader in the field." ECF 299-9 at 36:9–18 (emphasis added).

Second, Defendants' assertion that their proffered business interests are valid does not cure the lack of evidence connecting those interests to the policy in question. Defs.' Opp'n at 19–20. They observe that Plaintiffs do not "dispute that operating efficiency, compliance with contractual and legal requirements, and mitigating losses are valid interests and valid reasons to use contractors." *Id.* at 19. This is correct. Plaintiffs do not take issue with Defendants' business interests themselves. Plaintiffs take issue with the lack of any evidence tying Defendants' interests to the policy of undue delegation and failure to supervise, let alone evidence demonstrating that the policy at issue furthers their business goals "in a significant way." *Reyes*, 91 F.4th at 277 (citing *Inclusive Cmtys.*, 576 U.S. at 541; *Sw. Fair Hous. Council*, 17 F.4th at 967).[8] Defendants must put forward *evidence* that their goals are advanced in some way by the identified policies. They have failed to do so. Accordingly, this Court should grant Plaintiffs' Motion as to Step Two of the disparate-impact framework.

### 2. In attempting to rebut Plaintiffs' examples of inefficiencies, Defendants both confuse the burden of production on Step Two and misrepresent the evidence.

Rather than supply any evidence of how the policy of undue delegation and failure to supervise furthered their interest in efficiency, Defendants argue that "Plaintiffs have no evidence connecting their grievances to 'inefficiencies' of managing outside contractors," Defs.' Opp'n at 38, and devote five-and-a-half pages to disputing the examples Plaintiffs offered illustrating how Defendants' policies led to inefficiencies, *id.* at 38–44. As an initial matter, Defendants appear to confuse which party bears the burden of production on Step Two. Plaintiffs need not disprove a negative—it is Defendants' obligation to supply evidence showing how the alleged policy furthers their legitimate business interests. Nevertheless, although they were not required to do so, Plaintiffs took the additional step in their Motion of highlighting evidence showing the opposite of what

---

[8] For this reason, Defendants' strong reliance on a single Eighth Circuit case, *Register v. Honeywell Federal Manufacturing & Technologies., LLC*, 397 F.3d 1130 (8th Cir. 2005), is misplaced. *Register* is inapposite both because it applied the Title VII disparate treatment standard and because Plaintiffs do not dispute the validity of efficiency or outsourcing for efficiency as a business interest. Instead, Plaintiffs maintain that Defendants have failed to establish that their policy of undue delegation and failure to supervise leads to the efficiency Defendants claim.

Defendants claim in their legitimate-business-interest defense: that Defendants' policy of undue delegation and failure to supervise hurt, rather than advanced, their interest in business efficiency. Plaintiffs' harnessing of evidence for this point does not change that it is Defendants' burden to establish, through evidence, that their policy of undue delegation and failure to supervise furthered their legitimate interest in efficiency.

Furthermore, Defendants' challenges to Plaintiffs' examples of inefficiencies largely misrepresent the evidence in this case. For example, Plaintiffs cited evidence of how Safeguard's policies and practices led to it failing to address ████████████████████████████ ████████████████████████████████████████████████████████████████. Pls.' Mot. at 20–21 (citing ECF 287-17). Defendants mischaracterize Plaintiffs' assertion, contending that "[t]he insinuation [of Plaintiffs' argument] is that Bank of America incurred an avoidable $173,620.97 loss because of neglected yardwork." Defs.' Opp'n & Cross-Mot at 40. This is not the case, and Plaintiffs' point that Defendants incurred between $4,000 and $9,400 in avoidable losses due to severely neglected yard work remains valid. Defendants do not dispute that *after* the property was reconveyed to BANA from HUD in 2017, HUD issued a demand letter "████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ ECF 287-17, BANA-NFHA-LIT 0344596-97. The ████ ████████████████████████████████████████████████████████ ECF 287-18, BANA-NFHA-LIT_0344562-64. As detailed in Plaintiffs' Appendix, the record also supports the other examples Plaintiffs highlighted in their motion.[9] Although Plaintiffs' examples of

---

[9] The one exception is that, based on a document Safeguard produced, it appeared that Defendants' failure to timely resolve code violations led to more than $25,000 in accumulated code violations at 2411-2413 West Mitchell Street. ECF 287-5, Pls.' Mot. for Part. Summ. J. Ex. 7. Based on the document Defendants cite showing a breakdown of the code violations, Defs.' Opp'n, Exs. 67 & 68, this number included code violations attributable to other properties. What remains undisputed is that more than $10,000 in code violations unnecessarily accrued on the West Mitchell Street property because of Defendants' poor maintenance practices. *See* Defs.' App. at A-9 (admitting that "West Mitchell Street accounted for $10,347.81" in accrued code violation fines).

Defendants' inefficiencies are well supported by the record, it is ultimately Defendants' burden to produce evidence establishing that the policies Plaintiffs identified furthered their legitimate business interests. They have failed to do so.

## IV. Plaintiffs' ample evidence of less discriminatory alternatives to Defendants' policy of undue delegation and failure to supervise precludes summary judgment on Step Three of the disparate-impact framework.

Even if Defendants put forth sufficient evidence to connect their claimed business necessities to their overarching policy of undue delegation and failure to supervise (which they have not), Plaintiffs "may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c)(3); *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 432 (4th Cir. 2018) (quoting *Inclusive Cmtys.*, 576 U.S. at 527 (quoting 24 C.F.R. § 100.500(c)(3))); *see also Sw. Fair Hous. Council, Inc.*, 17 F.4th at 970 (stating that "the plaintiff must demonstrate that an alternative practice (1) would serve the defendant's legitimate interests, and (2) would not have a similarly undesirable effect on members of protected groups" (internal quotations omitted)). Plaintiffs only need to demonstrate that there is "*an* available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs." *Inclusive Cmtys.*, 576 U.S. at 533 (alterations in original) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)).

Despite Defendants' efforts to impute to Plaintiffs things they have not said, *compare* Defs.' Opp'n & Cross-Mot. at 32 ("Plaintiffs insist . . . [Defendants] make all the local workers full-time employees."), *with* Pls.' Mot. at 16 ("Nor do organizations necessarily have to employ in-house staff to supervise contractors effectively."), and ignore the things they have, *see* ECF 295-23, Pls.' Ans. to BANA's 1st Phase III Interrog. No. 1 at 7–9 (outlining the injunctive relief Plaintiffs seek to remedy the disparate impact), Plaintiffs have more than met their evidentiary Step Three burden to proceed to a jury.

Plaintiffs have put forward substantial evidence outlining alternatives to Defendants' overarching policy of undue delegation and failure to supervise, as well as the ten individual policies and practices Plaintiffs identified, that would have less of a disparate impact and still serve

Defendants' purported interests. In response to BANA's First Phase III Interrogatories, Plaintiffs laid out their proposed injunctive relief: an alternative model for performing REO maintenance and marketing that would have a less discriminatory impact but achieve the same goals. ECF 295-23 at 7–9. Plaintiffs developed this proposal by drawing upon their (and their experts') significant experience in the fields of fair housing, property maintenance and marketing, and urban housing markets and revitalization. *See* Ex. 6, NFHA 30(b)(6) Dep. (Rice) 102:7–111:5, Jan. 10, 2024 (explaining how— based on conversations with experts in property maintenance and preservation— a local model would decrease racial disparities among communities).

In addition to Plaintiffs' injunctive relief proposal, several of Plaintiffs' experts have provided evidence of less discriminatory policies and practices. Deavay Tyler is a property preservation and maintenance expert who formerly served as the Executive Vice President and Chief Financial Officer for A&D Property Services, Inc., a property preservation and maintenance company that has worked as a prime contractor for government-sponsored enterprises, banks, and municipalities as a vendor responsible for preserving and maintaining REO and FHA properties. ECF 167-13, Tyler Rep. ¶¶ 2–3. Based on his experience working with other lenders, Mr. Tyler offered opinions on the local model of property preservation and maintenance—an alternative to the national model Defendants currently use—and highlighted the importance of in-person verification that work was performed to quality standards. ECF 299-84, Tyler Supp. Rep. ¶¶ 4, 11–22; ECF 167-13, Tyler Rep. ¶¶ 18-20, 30–32.

Joanne Poole is a veteran real-estate agent with extensive experience marketing and selling REOs. ECF 285-8, Poole Rep. at 1–2. Her opinion supports Plaintiffs' proposed alternatives, including the importance of "routine in-person checks on the home, the ability to quickly contact someone to resolve problems, and working with local real estate agents and property managers with good knowledge of the neighborhood" to avoid "negatively impact[ing] the surrounding community." *Id.* at 3.

Albert Poche, an expert in property maintenance code enforcement and neighborhood revitalization, offered insight into the adverse impact boarding with plywood has on communities

and how reglazing broken windows or using "clear boarding" avoids this disparity. ECF 285-29, Poche Rep. at 1–3.

As outlined in greater detail below, Plaintiffs have put forth ample evidence of numerous changes Defendants could make to their policies and practices that would reduce or eliminate the racial disparity in maintenance and marketing of REO properties between white communities and communities of color. Even if only one of the proposed measures identified below decreases discriminatory impact though, Plaintiffs have still met their Step Three burden. *Inclusive Cmtys.*, 576 U.S. at 533 (quoting *Ricci*, 557 U.S. at 578) (noting that plaintiffs have met their burden if they can show "that there is *an* available alternative . . . practice that has *less* disparate impact and serves the [entity's] legitimate needs").

### 1.    The Local Model

As discussed in Section II(B)(1) of Plaintiffs' 2022 Opposition to Defendants' Motions for Summary Judgment, ECF 182 at 43–47, Defendants adhere to a national model of property preservation, maintenance, and marketing. *See, e.g.*, ECF 183-53, Silvey Dep. 22:9–21, Aug. 11, 2021. Plaintiffs have identified an alternative: changing to the local model. ECF 295-23 at 7. The local model "approaches property preservation from a boots-on-the-ground perspective," and involves vendors from the local community to the extent possible, more regular in-person visits by asset managers, real estate agents, and vendors, and in-person, "*unannounced* monthly quality control visits to review a [preservation and maintenance] vendor's work," rather than relying heavily "on photo documentation to monitor property condition" and infrequent in-person inspections that vendors are typically notified of in advance. ECF 299-84, Tyler Supp. Rep. ¶ 12 (emphasis added) (adding that under its current model, "Safeguard relies on its vendors to perform quality control of their own work, which leads to improper and inadequate work being performed"); *see also* ECF 183-14 at 265:9–266:5; ECF 182 at 44.

Plaintiffs' experts opine that the local model offers a less discriminatory alternative to Defendants' policies. Mr. Tyler explained how the local model is focused on "the collaborative

efforts of relevant stakeholders—the bank, real estate agents, and P&M [preservation and maintenance] vendors." ECF 299-84, Tyler Supp. Rep. ¶ 12. In comparing the local model to the national model of property preservation and maintenance, Mr. Tyler highlighted the local model's emphasis on shared responsibility, vendor retention, and accountability. *Id.* As a result of such collaboration, "safety, security and or preservation issues are promptly and properly addressed, including, when necessary, by escalating issues to the appropriate decisionmakers so they can determine what should be addressed and in what manner." *Id.* As a result, a switch to the local model of property preservation and maintenance will result in a decrease (or eradication) of racial disparities in the exterior maintenance of REO properties. *See id.* ¶ 19.

Ms. Poole opines on "what works (and what does not work) to ensure [REO properties are] well maintained and marketed." ECF 285-8, Poole Rep. at 8. According to Ms. Poole, one of "the three most important components of ensuring bank-owned properties are well maintained and marketed" is "utilizing real estate agents and property managers with knowledge of the local community." *Id*▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬ *Cf.* ECF 300-2, Montelongo Dep. 39:21–41:3, Nov. 4, 2021. Delegating property management to agents unfamiliar with certain neighborhoods results in a higher likelihood of racial bias impacting the properties' management or work not getting completed. For example, a real estate agent  assigned to inspect ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, emailed the property's asset manager to say that the neighborhood was ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 289-15, BANA-NFHA-LIT_0447074[10] at Row 1141, and when the house had been broken into, the agent stated that she did not call the police "because it was getting late," she "wanted to be out of the area before dark," and "the area is an unsafe area," *id.* at Rows 1153, 1089. First, according to Ms. Poole—a lifelong Baltimore resident and real estate agent in Baltimore for over 30 years—▬▬▬▬▬▬▬▬▬▬▬ "is not located in a particularly

---

[10] Ms. Poole's report erroneously referred to this document as "BANA-NFHA-LIT_044074." *See* Ex. 7, Poole Dep. 80:19–81:5, Dec. 1, 2023.

dangerous neighborhood." ECF 285-8, Poole Rep. at 10; Ex. 7, Poole Dep. 241:8–242:2, Dec. 1, 2023 (stating that she visits this neighborhood four-to-six times a month and "feel[s] perfectly safe going in[to] that neighborhood"). "Second, feeling scared to visit a property is not a valid reason to neglect one's duties as the real estate agent assigned to a home to market and sell it." ECF 285-8 at 11 ("[I]t is a dereliction of duty to simply refuse to visit a property for which you have taken on the responsibility to market and sell because you are afraid of the neighborhood."). "This should have raised a red flag for the asset manager receiving this email to demand that the police be notified and assign a new real estate agent to the property." *Id.* There is no evidence that such action took place.

A model focused on the local community, on the other hand, would consider more than ███████████████ in assigning a real estate agent, *see* ECF 300-2, Montelongo Dep. at 40:3–22, or limit a real estate agent's role to property sales alone, *see* ECF 183-3-B ¶ 24 (citing Bryar Suppl. Rep. ¶ 49). A local model would involve assigning agents to a neighborhood based on their experience with the particular area—not just the city as a whole. ECF 285-8 at 11. This is especially true in metropolitan areas that differ drastically from neighborhood to neighborhood. *See, e.g.*, Ex. 7, Poole Dep. 241:8–243:5, 249:7–252:3 (stating that, for someone raised in Baltimore, homicides more than two blocks away from a property would not be considered to have occurred within the same neighborhood as the property). Ensuring that agents assigned to a property are familiar with and frequently working within the vicinity of the property will increase the likelihood that they are able to "assess P&M vendors' ongoing maintenance," and "determin[e] whether the work meets Safeguard or industry standards." ECF 299-84 ¶ 15.

### 2. Frequent, In-Person Checks

Defendants' existing "quality control measures . . . have gaps and exposures that render them insufficient to ensure that P&M vendors and subcontractors are properly and completely performing their work." ECF 167-13, Tyler Rep. ¶ 41. "[T]here is simply no substitute for having people on the ground to check the maintenance work being performed and the condition of the home on a regular basis to prevent blight." ECF 285-8 at 8. Therefore, as an alternative to

Defendants' current policies of undue delegation and failure to supervise, Plaintiffs propose an "[i]ncrease [in] the frequency of in-person reviews of exterior maintenance work," and an "[i]ncrease [in] the percentages of unannounced, in-person quality control inspections for REO homes in majority non-white census tracts." ECF 295-23 at 7.

In contrast to Defendants' current quality control measures, lenders "that require frequent, in-person checks of their properties by real estate agents and local property managers are more successful in keeping their properties well maintained." ECF 285-8 at 8 (stating that one of the "most important components of ensuring bank-owned properties are well maintained and marketed" is "having someone on the ground check on the property in-person on a regular basis"); *see also* ECF 167-13 ¶¶ 16–20 (discussing the importance of the "'three-legged stool,' which refers to the collaborative efforts that should exist between the bank, listing agent, and P&M vendor" and that when "all the relevant stakeholders or 'legs of the stool' are properly doing their jobs, someone should be reviewing the condition of the property at least every week").

Many lenders, such as a community bank that contracted with Ms. Poole, have required local real estate agents "to do a drive-by at least weekly to make sure the property was secure (for example, no unsecured doors or signs of a break-in), that the mail had not accumulated from the outside, that there was no exterior damage, and that the outside of the property did not stand out negatively from the rest of the neighborhood (for example, through the poor condition of the lawn or the presence of trash outside)." ECF 285-8 at 8. These lenders also hire real estate agents "to check the interior of the property every three to four weeks" in the rare occasion the homes "stay[ed] on the market that long." *Id.* Agents would also "provide necessary recommendations so the property would be safe, secure, and not an eyesore to the neighborhood." *Id.* at 9.

Lenders that use a more vigilant, local model hire "property managers (a position separate from the real estate agent, asset manager, and vendors performing maintenance work) to visit the property every two weeks, especially in spring and summer," and perform relevant seasonal or weather-related checks such as checking for timely snow removal after storms in winter or "visit[ing] the properties to make sure the homes were still secure and the For Sale signs up" after a

windstorm. *Id.* at 9. As Mr. Tyler opines, when there are more frequent, in-person visits to a property, "safety, security and or preservation issues are promptly and properly addressed," ECF 299-84 ¶ 12, which, in turn, decreases the likelihood of poor maintenance in communities of color going unnoticed or unresolved.

Defendants misconstrue Plaintiffs' proposed alternative of more frequent, in-person inspections, claiming that Plaintiffs "insist[ ] that *every* job (not just a statistically valid sampling) be inspected by a separate crew in person in lieu of auditing the photographs." Defs.' Opp'n & Cross-Mot. at 48. Defendants contend that they cannot inspect every REO because HUD does not provide a budget for it. *Id.* Defendants' arguments are not persuasive. First, Plaintiffs are not proposing that Defendants inspect every property after every job to ensure that maintenance work has been performed properly and in a timely manner. *See* ECF 295-23 at 7 (proposing that Defendants "*[i]ncrease the frequency* of in-person reviews" and "*[i]ncrease the percentages* of unannounced, in-person quality control inspections for REO homes in majority non-white census tracts" (emphasis added)).

Second, as addressed above, *see supra* Section II(A)(3)*,* the HUD guidelines and the allowable spending limits HUD sets for certain exterior property maintenance items are a floor, not a ceiling, and compliance with HUD's guidelines and spending limits is not a defense to policies that result in discrimination. Furthermore, the properties Plaintiffs visited that were not backed by FHA loans were not subject to HUD's guidelines.

Notably, Defendants have offered no evidence as to the cost of conducting or increasing in-person inspections. For BANA, a company that generated more than $98 billion in revenue and more than $26 billion in net income last year alone,[11] it is difficult to believe that increasing the number of in-person inspections to remedy racial disparities in maintenance and marketing would be too expensive to achieve. *Cf. Robinson*, 444 F.2d at 800 ("[A]voidance of the expense of changing

---

[11] Bank of America, Annual Report 2023 at 64, *available at* https://investor.bankofamerica.com/regulatory-and-other-filings/annual-reports/content/0000070858-24-000135/0000070858-24-000135.pdf.

employment practices is not a business purpose that will validate the racially differential effects of an otherwise unlawful employment practice."). And if cost were truly an issue, Defendants could focus the increase of in-person inspections on communities of color instead of all communities. Ultimately, however, HUD has explained that "a proposed less discriminatory alternative [does not] fail simply because there will be some amount of increased cost associated with the alternative policy." 88 Fed. Reg. at 19491.

### 3. Increasing Allowable Expenses for Exterior Maintenance

Plaintiffs also propose that BANA "[e]xpand the types of allowable expenses for exterior maintenance work, including but not limited to include fence repair, high-quality materials for handrail installation, light/doorbell replacement, power washing, gutter repair, windowpane re-glaze, wooden step repair, exterior deck repair, graffiti removal, and exterior door maintenance." ECF 295-23 at 8. Defendants frequently cite limitations on allowable expenses as a reason for the racial disparity in REO maintenance. *See, e.g.*, Defs.' Opp'n & Cross-Mot. at 33–35; *id.* at 29 (citing ECF 300-2). An increase to those limits—which would expand the type of work that could be completed without the delay of waiting for a bid to be approved—would therefore help resolve the disparity. While BANA might argue that allowable expenses are governed by investor guidelines, there is no evidence that BANA is prohibited from self-funding an expanded set of allowable expenses for its REOs.

### 4. The Use of Clear Boarding as the Default Method for Boarding Windows and Doors

As an additional alternative measure, Plaintiffs propose "[r]equir[ing] exterior maintenance vendors to use polycarbonate 'clear boarding' as the default method for boarding any windows or doors where boarding rather than re-glazing is needed, such as when boarding is required by local ordinances." ECF 295-23 at 8. Doing so will decrease the racial disparity in windows and doors boarded with plywood among communities and prevent additional harm to communities of color.

Research has shown that "opting for boarding, rather than reglazing (or using clear boarding instead of wooden boarding), has a particularly pernicious impact on the surrounding neighborhood." ECF 285-29, Poche Rep. at 17 (citing Charles C. Branas et al., *Urban Blight Remediation as a Cost-Beneficial Solution to Firearm Violence*, 106 Am. J. of Pub. Health 2158 (2016)). Boarded windows are highly correlated with poor public health outcomes such as "gonorrhea rates, premature mortality broadly, and premature mortality due to diabetes, homicide, and suicide." ECF 285-29 at 5–7 (citing Deborah A. Cohen et al., *Neighborhood Physical Conditions and Health*, 93 Am. J. of Pub. Health 467 (2003)). They also escalate otherwise small issues into costly problems that harm communities. ECF 285-29 at 8–9. As a result, "[j]urisdictions are banning the use of plywood to board windows." ECF 285-29 at 17. Indeed, even HUD "state[s] a clear preference for reglazing over boarding." *Id.* at 17 (citing Ex. 8, HUD Mortgagee Letter 2010-18 Updated Property & Preservation Requirements & Cost Procedures FAQs, at SG00504067) ("Re-glazing is the preferred method of securing a broken window or glass opening, unless required to be boarded by local code or ordinance.").

Clear boarding is readily accessible to Defendants. Ex. 5, Iafigliola Dep. 181:8–14 (stating that Safeguard vendors were trained "on how to do clear boarding and where to put the bolts so that the clear boarding from the street made it look like the property and the windows were still intact to minimize community blight"). Whether clear boarding is used is simply a matter of BANA choosing to authorize it. *Id.* at 258:4–260:11 (stating that clear boarding was available starting around 2015 and BANA was responsible for deciding when to authorize it); *see also id.* 264:14–266:15 (Safeguard policy states that clear boarding "provide[s] better curb appeal, and serve[s] to reduce blight," but it was up to BANA to determine whether to prioritize curb appeal in their services). Considering that a property with clear boarding is "just as secure as with a plywood board," *id.* 276:15–21, there is no reason that Defendants could not increase its use to reduce blight in communities of color.

### 5.    Create More Effective Lines of Communication

An additional (and simple) measure that would help reduce the number of poorly maintained REOs in communities of color, while still furthering Defendants' business interests, would be for Defendants to "[m]aintain and widely communicate a toll-free phone number for reporting both public and vendor complaints, (on an anonymous basis if requested) regarding REO homes' preservation, maintenance, or marketing." ECF 295-23 at 8.  To ensure the maintenance and marketing of properties is being performed properly and to timely address urgent issues, it is essential that agents and community members know who to call about outstanding issues. *Id.* at 8–9 (stating that creating clear lines of communication is one of the most important things a lender can do to ensure properties are consistently and properly maintained and marketed).  Members of the local community need to know who to contact when there are safety or appearance concerns with nearby properties and should feel confident that their concerns about the maintenance of a BANA REO will be addressed.

Under Defendants' current policy, neighbors' complaints about insufficient work causing health and safety issues in communities of color can go unanswered or take months to address. *See, e.g.*, ECF 183-35 ¶¶ 12, 15 (Individual Plaintiff Chevelle Bushnell describing multiple unsuccessful attempts to contact Defendants to address health and safety issues of a neighboring property); ECF 183-37 (███████████████████████████████████████████████████ ███████████████████████). An alternative practice that Defendants may use to decrease unaddressed maintenance issues and minimize the racial disparity among communities is to provide more straightforward options for neighbors to make reports about issues and for Defendants to monitor a line that specifically attends to such complaints.

### 6.    Fair Housing Training

Plaintiffs have put forward, as an alternative policy (or a new policy altogether), that Defendants take steps to "[e]nhance enforcement of policies requiring compliance with fair housing law," in particular by "[r]equir[ing] training on fair housing law for all of Defendants' employees,

contractors, or other agents who conduct any work related to the preservation, maintenance, or marketing of REO properties. . . ." ECF 295-23 at 9. Courts have held that ordering housing discrimination training is appropriate where a defendant "lack[ed] any written policies or procedures regarding housing discrimination and d[id] not offer any training to their employees on such matters." *Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 403 (S.D.N.Y. 2012). Such is the case here. Although Safeguard has online training for its vendors regarding how to properly perform maintenance work on REOs, neither Safeguard nor BANA specifically trains vendors or employees on the requirements of fair housing law. ECF 183-4, Iafigliola Dep. 173:7–14, 180:5–181:19, 182:12–183:3; ECF 183-52, Chappell Decl. ¶ 6; ECF 183-13, BANA 30(b)(6) Dep. (Silvey) 269:7–270:1, Nov. 17, 2021. Adding a training component on the FHA would help vendors and employees understand and comply with their obligations under the law and more readily identify problems, impediments, and discrepancies. *See* Ex. 6, NFHA 30(b)(6) Dep. (Rice) 111:6–112:20; 117:15–125:16 (explaining the importance of providing FHA training to vendors, the topics that would be covered in such trainings, and the impact of the trainings on vendors' performance).

### 7.    Gather and Routinely Analyze Data for Racial Disparities

Because the best way to determine whether a policy results in a disparate impact is through data analysis, Plaintiffs propose that Defendants "[e]stablish or enhance current data collection practices to gather quantifiable information on the exterior maintenance, marketing, and disposition of REO properties across census tracts, [and] routinely analyz[e] this data for racial disparities." ECF 295-23 at 9.

Despite NFHA alerting Defendants to the discriminatory impact of their maintenance and marketing practices, Defendants never ███████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ Ex. 9, Chance Dep. 144:16–20, Jan. 23, 2024 ██████████ ████████████████████████████████████████████████████████████ ████████████ ; *id.* 213:14–22 ████████████████████████████████

███████████████████████████████ Ex. 5, Iafigliola Dep. 128:14–129:9 (Safeguard did not analyze quality control data based on zip code); ECF 183-91 at 2-3; ECF 183-13, 265:19–267:17; ECF 183-14, 265:19–267:17. Defendants have the data—in their records and through the same publicly available sources relied upon by NFHA—to track potential racial disparities in maintenance and marketing to ensure their practices comply with the FHA. Using that data is the most useful way to ferret out discriminatory conduct and to ensure properties in all communities are equally maintained. A routine data analysis practice that considers neighborhood racial composition—an alternative to Defendants' current policy—would alert Defendants to emerging racial disparities in maintenance and marketing, so they could then act quickly to remediate those disparities.

Because Plaintiffs have put forward numerous alternative practices, each of which would reduce the racial disparities in maintenance and marketing of Defendants' REOs while still serving Defendants' business interests, they have more than sufficient evidence to satisfy their Step Three burden.

**V.    Because Defendants have not sufficiently articulated a non-discriminatory reason for the challenged conduct and their recycled arguments are pretextual, they are not entitled to summary judgment on disparate treatment.**

Under the *McDonnell Douglas* framework of disparate treatment,[12] after the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to show a legitimate, nondiscriminatory basis for the challenged conduct. *NFHA II* at *15 (citing *Graoch Assocs. # 33, L.P. v. Louisville/Jefferson Cnty. Metro Hum. Rels. Comm'n*, 508 F.3d 366, 374 (6th Cir. 2007)). If Plaintiffs prove their *prima facie* case of a disparate treatment claim at trial (where this Court has already held that Plaintiffs may present it), *id.*, the burden will shift to Defendants to "articulate a legitimate non-discriminatory basis for its challenged" conduct, *Graoch Assocs.*, 508 F.3d at 371

---

[12] Although Plaintiffs also based their disparate treatment claim on the totality-of-the-circumstances framework laid out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), ECF 182 at 74–75, this Court addressed only the sufficiency of evidence under *McDonnell Douglas*. *NFHA II*, at *15. Because Defendants do not challenge the *Arlington Heights* basis for Plaintiffs' disparate treatment claim, Plaintiffs do not address it here.

(citation omitted), "through the introduction of admissible evidence," *Burdine*, 450 U.S. at 254 ("An articulation not admitted into evidence will not suffice"). If the defendant satisfies its obligation at Step Two, the plaintiff may rebut the reason by showing it is pretextual. *Id.* A plaintiff may demonstrate pretext "by amassing circumstantial evidence that otherwise undermines the credibility of the [defendant]'s stated reasons." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006) (citations omitted); *see also Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) ("A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.").

As an initial matter, for plaintiffs to have "'a full and fair opportunity to demonstrate pretext'—*i.e.*, that the non-discriminatory reason advanced by the defendant was not the true reason for the rejection," *Sweeney v. Rsch. Found. of State Univ. of N.Y.*, 711 F.2d 1179, 1185 (2d Cir. 1983) (citing *Burdine*, 450 U.S. at 254–56), "[t]he reasons articulated by the defendant must be clear and specific so that the plaintiff is provided with a fair opportunity to show that they are not the true reasons for the [defendant's] action," *Allen v. City of Yonkers*, 803 F. Supp. 679, 704 (S.D.N.Y. 1992) (citing *Burdine*, 450 U.S. at 254–56, *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985); *Sweeney*, 711 F.2d at 1185; *Loeb v. Textron*, 600 F.2d 1003, 1012 n. 5 (1st Cir. 1979), *abrogated on other grounds by Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985); *Ibrahim v. N.Y. State Dep't of Health*, 904 F.2d 161, 167 (2d Cir. 1990)). "The plaintiff can hardly be expected to discredit defendant's reasons unless he possesses some understanding of what they are. Therefore, defendant must offer more than vague, general averments of good faith." *Oliver v. Digit. Equip. Corp.*, 846 F.2d 103, 109 (1st Cir. 1988).

Just as Defendants have failed to clearly articulate and put forth evidence in support of their business necessity defense, so, too, have they failed to provide sufficient support for any non-discriminatory reasons that justify their disparate treatment of REOs in communities of color. This is particularly true because the Step Two obligations of defendants in a disparate *impact* analysis are distinct from those in a disparate *treatment* analysis. In a disparate treatment analysis, there is no facially neutral policy to justify with a legitimate business interest. In alleging they have "carr[ied]

their burden under *McDonnell Douglas*," Defendants state that their legitimate non-discriminatory reasons are "the same justifications" that they claim carried their burden for the disparate impact analysis, "in addition to all the other reasons for the purported disparity that have nothing to do with the policies alleged by Plaintiffs." Defs.' Opp'n & Cross-Mot. at 49. This is anything but clear and specific. *Cf. Allen*, 803 F. Supp. at 705-06 (stating that "general, vague and non-objective" reasons that do not include specifics support a finding that the reasons are pretextual). As a result, factual issues remain and summary judgment cannot be granted in Defendants' favor on Steps Two or Three because Plaintiffs have not had a "fair opportunity" to respond.

Even assuming the reasons were articulated, Defendants are still not entitled to summary judgment on this issue. First, to the extent Defendants are relying on the business interests identified for disparate impact—business efficiency and HUD or investor obligations—their arguments fail for the same reasons outlined above: they have provided no supporting evidence to connect the discriminatory conduct with the stated interests. *See supra* Section III(B). The lack of evidence tying Defendants' stated business interests to their practices that resulted in discriminatory maintenance and marketing also demonstrates that they are merely pretextual.

To the extent Defendants rely on their challenges to Plaintiffs' *prima facie* case as their non-discriminatory explanations (*e.g.*, they were not responsible for the inspection criteria or pre-existing property conditions caused the disparity), this Court has already held that those arguments involve issues of fact, *NFHA II* at *10, or are simply not viable, *id.* at *12 ("[S]ome number of the plaintiffs' deficiency criteria are largely independent of a property's initial condition."). The Court may rely on Defendants' "proffered explanation[s] [being] unworthy of credence" to determine that they are in fact pretextual. *Burdine*, 450 U.S. at 256; *see Loeb*, 600 F.2d at 1012 n.6 ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext . . . .").

At Step Three, Plaintiffs' evidence of their *prima facie* claim "and inferences properly drawn therefrom may be considered by the trier of fact on the issue of whether the defendant's explanation is pretextual." *Burdine*, 450 U.S. at 255 n.10. The evidence Plaintiffs put forward to establish their

*prima facie* case demonstrates that Defendants' recycled arguments fail to supply a non-discriminatory reason for the observed racial disparity and are therefore pretextual. *See, e.g.*, ECF 182 at 74 ("In this case, Defendants have hypothesized about a number of potential non-racial causes for the racial disparity in deficiencies (local crime and vacancy rates, holdover occupants, etc.)—yet Dr. Rugh has found, following careful analysis, that the stark racial disparity remains even after controlling for these non-racial factors."); *see also Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1363 (9th Cir. 1985) ("A plaintiff is also entitled to use statistical evidence to show that a defendant's articulated nondiscriminatory reason for the employment decision in question is pretextual.") .

Because—when viewing the facts in the light most favorable to Plaintiffs—a reasonable jury could reject Defendants' "legitimate, non-discriminatory" reasons for the discriminatory maintenance and marketing of REO properties and otherwise find such reasons pretextual, Defendants are not entitled to summary judgment on Steps Two or Three of the *McDonnell Douglas* disparate-treatment framework. *Cf. Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016) (citations omitted) (stating that to survive summary judgment, a plaintiff need only "demonstrate[e] a genuine dispute of material fact on the question of pretext sufficient to make [defendant's] proffered justification a triable issue").

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment and deny Defendants' Cross-Motion.


Dated: October 2, 2024                        Respectfully submitted,


                                        */s/ Jessica P. Weber*
                                        Jessica P. Weber (Fed. Bar No. 17893)
                                        Andrew D. Freeman (Fed. Bar No. 03867)
                                        Monica R. Basche (Fed. Bar No. 20476)
                                        Lauren A. DiMartino (Fed. Bar No. 22046)
                                        Brown, Goldstein & Levy, LLP
                                        120 East Baltimore Street, Suite 2500
                                        Baltimore, MD 21202
                                        Phone: 410-962-1030
                                        Fax: 410-385-0869

jweber@browngold.com
adf@browngold.com
mbasche@browngold.com
ldimartino@browngold.com

Morgan Williams (*pro hac vice*)
National Fair Housing Alliance
1101 Vermont Avenue, NW, Suite 710
Washington, DC 20005
Phone: 202-898-1661
mwilliams@nationalfairhousing.org

*Counsel for Plaintiffs*

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| "BANA's contract with Safeguard measured 'the timeliness of the work being completed,' as opposed to the quality." Mot. at 22 (citing Iafigliola Dep. at 24:6–22; BANA-NFHA-LIT 0011407–08). | **FALSE. Bank of America's contract with Safeguard measured both timeliness and quality.** The very same page of the contract Plaintiffs cite addresses both timeliness and quality and states:<br><br><br><br>Ex. 37 at 1407 (emphases added).<br>The Iafigliola transcript does not contain any testimony to the contrary. In fact, Iafigliola testified at length about measuring both timeliness and quality.<br><br> | **Defendants mischaracterize the contract between them, as well as Iafigliola's deposition testimony.**<br><br>The contract between Defendants requires and emphasizes timeliness. The single line Defendants cite refers to *escalations* of issues, not to the routine monitoring of vendors. On the very same page Defendants cite, there is a chart containing quality assurance criteria. *See* ECF 300-32, Ex. 37 at 11412. One of the criteria is ▮▮▮▮▮▮▮ which has nothing to do with the quality of the work. *Id.* All of the other items measure timeliness. *Id.* (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ etc.). Another quality assurance checklist in the contract also emphasizes the timeliness of the work. *Id.* at 11407–408 ▮▮▮▮▮▮▮▮▮▮▮▮▮ etc.). The only QC item in the list is ▮▮▮▮. *Id.*<br><br>Contrary to Defendants' assertions, the deposition testimony from Safeguard's former Vice President of Operations, Vendor Management, and Quality Assurance and current Chief Financial Officer, Joe Iafigliola, also supports Plaintiffs' statement. According to Mr. Iafigliola, Safeguard had different roles for employees who monitored the timeliness of the work its contractors performed, the vendor account manager, and for employees who checked the quality of the work performed, the field quality person, but timeliness was the priority:<br><br>Q What about if a vendor was always slow, and late, never on time, or rarely on time with their work orders, but the field quality control representative said the quality of their work was quite good, what would happen in those situations?<br>A So we would try to have the field quality person and the vendor account manager work with the person, understand why they weren't able to meet the client timelines. Ultimately, **most client scorecards were very heavily focused on on-time performance**, and so |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| | ████████████████████<br>████████████████<br>████████████<br>Ex. 18 at 55.<br>Plaintiffs asked, ████████████<br>████████████████████<br>████████████████████<br>████████<br><br>Plaintiffs' citation to Iafigliola's testimony appears to be a mistake. He did not mention timeliness or quality at the cited pages, but another witness, Bank of America's Brandon Silvey, did, at the same page numbers in his transcript. But Silvey did not say what Plaintiffs claim.<br>████████████████████<br>████████████████████<br>████████████<br>████████████████<br>████████<br>████████████████<br>████████████████████<br>████████████████<br>████████████████████ | unfortunately we would have to help the vendor get to on time. We would not be able -- **our clients would simply not accept, you know, high quality, not on time. We'd have to get the vendor up to delivering on time**.<br>. . . But **we really did have to have the on time, because that's just a client requiremen**t. ECF 300-16, Ex. 18, 58:2–59:1.<br><br>Brandon Silvey's deposition testimony also supports Plaintiffs' statement. First, Mr. Silvey, who was the BANA employee tasked with overseeing Safeguard's work, stated that his role did not involve the *maintenance* of REOs, but instead he became involved only where vendors underperformed on "the timeliness of the work being completed." Ex. 10, Silvey Dep. 19:14–20:6, 24:6–22 (Aug. 11, 2021). Second, the scorecard Mr. Silvey testified about is tied to the quality assurance metrics in the contract discussed above. He testified that "some" of the categories involve the "quality of the work performed." *Id.* at 39:11–14. The scorecard example Defendants provided as Exhibit 12 to their Opposition & Cross-Motion for Summary Judgment, ECF 300-10, supports Mr. Silvey's testimony and Plaintiffs' statement. Out of ██ categories, only about ██ involve quality—a mere ██. *Id.* |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| | Ex. 11 at 24, 39. | |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| "Safeguard may let a vendor go if it works too slowly—even if the vendor does quality work—because clients are 'very heavily focused on on-time performance.'" Mot. at 22 (citing Iafigliola Dep. at 57:19– 59:1). | **PARTIALLY FALSE.** Iafigliola never said that "Safeguard may let a vendor go if it works too slowly—even if the vendor does quality work." Mot. at 22. He said Safeguard would work with the vendor to improve its timeliness. He did say that "on-time" performance was "a client requirement," so it is presumably *possible* that a vendor unable to improve its timeliness would eventually be let go, but Iafigliola did not actually say that. He testified: <br><br> Q. What about if a vendor was always slow, and late, never on time, or rarely on time with their work orders, but the field quality control representative said the quality of their work was quite good, what would happen in those situations? <br><br> A. So we would try to have the field quality person and the vendor account manager work with the person, understand why they weren't able to meet the client timelines. Ultimately, most client scorecards were very heavily focused on on-time performance, and so unfortunately we would have to help the vendor get to on time. We would not be able -- our clients would simply not accept, you know, high quality, not on time. We'd have to get the vendor up to delivering on time. And generally, you could do that by lowering the number of concurrent work orders or helping them with how they dispatched work orders. So that if you had a work order that was assigned at, say, 3:00 p.m. and the vendor typically didn't look at their queue of potential work until the next morning, you'd say, well, let's do a check-in process, you know, at 6:00 p.m. so you can get that assignment going so you can get out to the property on a timely basis. <br><br> But we really did have to have the on-time, because that's just a client requirement. <br><br> Ex. 18 at 54–59. | **Defendants mischaracterize Mr. Iafigliola's deposition testimony.** <br><br> The deposition testimony that Defendants cite supports, rather than rebuts, Plaintiffs' point. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| Boarded windows were caused by "[t]he frequency with which Defendants permitted windows to be boarded, instead of reglazed, in communities of color versus white communities." Mot. at 7. | **FALSE.** Plaintiffs have no evidence about the "frequency" with which windows were boarded or reglazed. Plaintiffs' inspections noted only whether a property had "Damaged windows (broken, boarded)." Plaintiffs do not have any data on how many windows that were *not* broken had previously been reglazed. Plaintiffs do not have any data on how many broken windows were secured with boards or secured by reglazing. Plaintiffs do not even furnish any data on how many of the "broken" or "boarded" windows they observed were boarded as opposed to broken.<br><br>Rules regarding window-boarding changed during the relevant time period implicated by this case. HUD's requirements from 2010 to 2016 provided that "All openings shall be boarded," except where "local codes differ from HUD requirements." Ex. 1 at 10. HUD specified that "[w]indows" shall be "[s]ecured with ½" plywood or equivalent." Id. at 10. In 2016, HUD changed its requirements to require vandalized windows to be "re- glaze[d]" instead of boarded, except where local law required boards. Ex. 2 at 9. Some of the boarded windows Plaintiffs complain about were not boarded by Defendants. For example, the City of Milwaukee itself applied boards to vacant properties and billed the property owners for it, including Bank of America. See Ex. 31–32. | **Defendants overlook Plaintiffs' evidence.**<br><br>Defendants ignore that, two years ago, in Plaintiffs' opposition to Defendants' motions for summary judgment, Plaintiffs cited to evidence from *Defendants' records* to show that they boarded more frequently in communities of color. *See* ECF 184-49, Ex. 82 to Pls.' Opp'n to BANA's Mot. Summ. J., SG00303938; ECF 184-50, Ex. 83 to Pls.' Opp'n to BANA's Mot. Summ. J., BANA-NFHA-LIT_0038310. Defendants' "evaluation" of the evidence at this stage in the litigation does not change the evidence Plaintiffs put forward two years ago.<br><br>In addition, although Plaintiffs' property inspection checklist had a category for "Damaged windows (broken, boarded)," Plaintiffs reviewed the property photos and identified broken versus boarded windows. ECF No. 183-1 ¶ 31 (referring to Exhibit H).<br><br>It is unclear how changes to HUD's requirements negate Plaintiffs' finding that Defendants boarded more often with plywood in communities of color. Furthermore, the fact that cities and municipalities, not Defendants, sometimes boarded windows supports Plaintiffs' point. That others were forced to board windows on properties Defendants were responsible for maintaining demonstrates that Defendants were not regularly visiting the properties and were not timely performing maintenance on the properties.<br><br>Finally, it is worth nothing that Defendants mischaracterize Plaintiffs' statement from their brief. Plaintiffs stated that the frequency with which Defendants boarded windows in communities of color versus in white communities disparately impacted communities of color. This practice caused a racial disparity in boarded windows. Plaintiffs do not contend that all boarded windows in general—regardless of the community in which the property is located—were caused by Defendants' practice. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| "Defendants based their decision to board windows in communities of color on vendors' descriptions of the properties as being in 'high crime' or 'high vandalism' areas." Mot. at 25. | **FALSE.** Defendants did not base their decision to board windows in any location on vendors' descriptions of the properties as being in "high crime" or "high vandalism" areas. ████████████████ ████████████████  Ex. 30 at 1532. | **Defendants' evidence does not rebut Plaintiffs' statement.** Defendants conflate "securing" with "boarding," which are not the same. Defendants cite to Safeguard's vendor policies manual to support their rebuttal, but the options for securing broken windows in the manual are boarding, clear boarding, or reglazing. The vendor policies manual implicitly supports—and certainly does not rebut— Plaintiffs' assertion that Safeguard vendors based their decision regarding whether to board or reglaze (or use clear boarding) on their own racial biases about the neighborhoods because Defendants gave vendors the discretion to choose how to secure a broken window. |
| "Defendants based their decision to board windows" at "2123 Scott Key Dr., District Heights, MD, located in a majority-Black community," "on vendors' descriptions of the propert[y] as being in [a] 'high crime' or 'high vandalism' area[]." Mot. at 25. | **FALSE.** 2123 Scott Key Drive *was* in a high-vandalism area, but that is not why Defendants boarded the windows. Defendants boarded the windows because they were repeatedly broken during multiple instances of vandalism and break-ins at the property itself, not just in the "area." Vandals broke a basement window in February 2014. Ex. 89 Thieves "kicked in" a door and stole copper, ducting, and HVAC equipment in March 2014. Ex. 90. The HVAC was replaced in June 2014 (Ex. 91) and stolen again in September 2014. Ex. 92. Another window was broken in June 2015. Ex. 93. Another theft occurred in August 2015. Ex. 94. Basement windows were broken again in April 2016. *See* Ex. 95. | **Defendants' evidence does not rebut Plaintiffs' statement.** First, evidence in the record reflects that 2123 Scott Key Drive had interior boarding on a main window as early as March 12, 2013. Ex. 1, SG00202904. The vendor appears to have left the back door and several windows open during the same visit. *Id.* The first confirmed break-in (when the basement windows were broken) was nearly a year later, in February 2014. Ex. 2, SG00203147, SG00203151. Second, 1232 Lombard Street, a home in a majority white neighborhood and discussed below, was also broken into multiple times, *see* Ex. 11, at SG00333561 and Ex. 12, at SG00303260, yet it received clear boarding, Ex. 4, SG00497395, SG00497398–400. |
| Defendants did "not board[]" windows at 1232 West Lombard Street in a "majority- white neighborhood . . . in Baltimore . . . despite several break-ins and | **FALSE.** Defendants *did* board a window at 1232 Lombard Street, because it was broken during one of the break-ins at the property. *See* Ex. 34 at 6266–67. | **The evidence Defendants cite does not rebut Plaintiffs' statement.** First, Defendants cite to their Ex. 34, ECF 300-28 & ECF 300-29, at 6266–67, but Ex. 34 does not contain these Bates ranges. Second, as of February 11, 2017, the bottom third of the back door of 1232 West Lombard Street was boarded so that it was similar to the color of the door. Ex. 3, SG00305272. But on November 28, 2017, the |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| reports of vandalism." Mot. at 26 (citing nothing). | | plywood was replaced with *clear boarding*. Ex. 4, SG00497395, SG00497398–400. |
| "[T]o the extent BANA argues it boarded more often in communities of color because, based on stereotypes rather than data, it believed homes in these neighborhoods were more prone to break-ins and property damage, that is not a 'nondiscriminatory' justification." Mot. at 25. | **FALSE.** Bank of America did not "board[] more often in communities of color," and has never "maintained" that it did so because "it believed homes in these neighborhoods were more prone to break-ins and property damage." Defendants did follow procedures to enhance security at properties that were actually broken into. See Ex. 97 at 8800– 01 ███████████████████ ███████████████████████ ██████████████ | **The evidence Defendants cite does not rebut Plaintiffs' statement.** First, the policy Defendants cite (ECF 301-43, Ex. 97) is dated March 3, 2018, which is after Plaintiffs had completed their investigation. Even if this policy had been in place during Plaintiffs' investigation, it is not evidence that Defendants and their vendors were following the policy. Second, the policy does not address boarding with wood at all; it only provides ███████████████████ ██████████████. Finally, the policy only applies to ███████████, not ███████████ ██████████ so it does not apply to all of BANA's bank-owned properties. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| "BANA had the discretion to order use of clear boarding instead of plywood to secure properties but has not explained why it opted against it in communities of color." (Mot. at 28 (citing Iafigliola Dep. at 258:12–15; Greenbaum Dep. at 69:7–19, for the proposition that "client [] guidance" "dictated whether SecureView or plywood was used to board windows"). | **FALSE AND MISSING KEY CONTEXT. Bank of America did not "opt[] against" using SecureView's polycarbonate boarding "in communities of color."** Defendants installed SecureView polycarbonate boarding in several of the properties "in communities of color" that Plaintiffs cite in their brief. *See* Ex. 86–88 (2123 Scott Key Dr., 2410 N. Sherman Blvd., 2751 Clearbrook St.). A 2013 article in *Crain's Chicago Business* reported that SecureView inventor Howard Wedren developed the product after seeing boarded-up properties during the foreclosure crisis. *See* "One man's window into blight; Developer Wedren pitches a clear plastic for building board-ups," CRAIN'S CHI. BUS. (Apr. 29, 2013). Safeguard gave "startup financing" to the venture because of its ability to improve neighborhoods. *See id.* ("After initially rejecting the SecureView system as too expensive, [Safeguard chairman] Robert Klein got onboard after Mr. Wedren cut its cost."). As of the date of the report, SecureView had completed "a series of pilot projects at 10 cities across the country" and was now "taking orders." *Id.* Once SecureView became available for use, Bank of America did not "opt[] against" using it as Plaintiffs claim. Mot. at 28. ████████████ ████████████████████ Neither Iafigliola nor Greenbaum testified to the contrary. | **The evidence Defendants cite supports, and does not rebut, Plaintiffs' statement.** First, Defendants gloss over the fact that SecureView was available for use in 2013—only a year into Plaintiffs' investigation—and that Safeguard opted not to use it because it was "too expensive." CRAIN'S CHI. BUS. (Apr. 29, 2013). Second, Defendants' Opposition and Cross-Motion does not have an Exhibit 104. Therefore, Plaintiffs are unable to address Defendants' contentions related to that specific citation. However, based on the portions quoted, it appears that Defendants are citing to the policy that is in Exhibit 97. *See* ECF 301-43, Ex. 97 at 8800–01 ████ ████████████████████████████████ Therefore, if Defendants intended to cite to Exhibit 97, Plaintiffs' responses to that exhibit, stated in the row above, also apply here. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| "Safeguard has admitted that this decision" whether "to board rather than reglaze" "was sometimes made by its contractors—it was not one purely governed by investor guidelines." Mot. at 30 (citing Greenbaum Dep. at 65:18–66:1). | **FALSE AND MISSING KEY CONTEXT.** Plaintiffs cite to a portion of Greenbaum's testimony to create a misimpression dispelled by the subsequent portion, which they neglect to cite. Greenbaum actually testified that the policy on when to "reglaze versus board" was "invariable," but described circumstances in which contractors had to board based on those guidelines. In the portion Plaintiffs cite, Greenbaum testified:<br><br> | **The evidence Defendants cite supports, rather than rebuts, Plaintiffs' statement.**<br><br>Defendants merely provided an extended excerpt from Mr. Greenbaum's deposition testimony. The extended excerpt does not change or rebut Mr. Greenbaum's earlier testimony that contractors play a role in deciding whether to board or reglaze a broken window. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| | ███████████████████████<br>███████████████████████<br>███████████████████████<br><br>Id. at 66–67. | |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| Bank of America employee Lawrence Chance testified that "only two-to-four managers oversaw approximately sixty associates." Mot. at 18 (citing Chance Dep. at 52:16–53:14, 72:16–73:7, 54:9–55:2). | **PARTIALLY FALSE AND MISSING KEY CONTEXT.** Chance testified that the number of managers and associates fluctuated over time. It did have sixty associates at one time. ███████████ Ex. 28 at 55. ███████████ Id. at 143–44. That accounts for the fluctuating size of the department. | **The evidence Defendants cite supports, rather than rebuts, Plaintiffs' statement.** The deposition testimony Defendants cite supports, rather than rebuts, Plaintiffs' point. Plaintiffs began their investigation in 2012—at the same time BANA had the manager-to-associate ratio Plaintiffs cite in their Motion. At some point between 2012 and 2018, the number of managers and associates went down, but it is not clear that the ratio of manager-to-associate changed and Plaintiffs' investigation concluded in 2018 as well. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| Former Bank of America employee Robert Bromley testified "he was unsure what would have caused an 18-month delay in repairing gutters to resolve a pending code violation, but it would not have raised a red flag and he would not have looked into the reasons." Mot. at 14. | **FALSE.** Plaintiffs told Bromley there was an "18 month delay in getting gutters repaired" at 3951 N. 30th St. in Milwaukee, and Bromley did respond, "I'm not sure. I'm not sure what would cause that." It is not true that he did not "look[] into" it.<br>Q. So this violation that we're dealing with is still open as November 1st, 2016 and Page 100 references the gutters not being in compliance as of December 30th. In your experience what could have caused an 18--18 month delay in getting gutters repaired?<br>MR. LEVENBERG: Objection. Calls for speculation.<br>A. I'm not sure. I'm not sure what would cause that.<br>Q. And would this have raised red flag for you?<br>MR. LEVENBERG: Objection to the form. Calls for speculation.<br>A. I can't say that it would.<br>Ex. 29 at 83.<br><br>It is not correct that Bromley said he "would not have looked into the reasons" for a delay addressing the code violation. The communication history shows Bromley following up 48 times to resolve the code violation. Plaintiffs made specific reference to 8 of them during the deposition. See id. at 59– 72, 78.<br><br>Milwaukee cited the gutters at the property for the first time in November 2015, stating they needed repairs and a reconnected downspout. Ex. 74 at 1098–99. When Plaintiffs visited the property in August 2016, they assigned a "miscellaneous" deficiency for "rusted gutters," but did not claim an out-of-place downspout or any other gutter condition still requiring repairs at that time. See ECF 167-20; ECF 167-55.<br><br>Plaintiffs' assertion to Bromley that a document "references the gutters not being in compliance as of | **Defendants mischaracterize Robert Bromley's testimony and the documentary evidence.**<br><br>First, there is no dispute that there was an 18-month delay in repairing the gutters at 3951 N. 30th Street. Nor can Defendants dispute that Mr. Bromley testified that he was not sure what would have caused the delay and that it would not have raised any red flags for him.<br><br>Second, Mr. Bromley further testified that he would not have looked at the work orders to see what was causing the delay:<br><br>Q. Would you have reviewed work orders yourself to pinpoint the issues?<br>MR. LEVENBERG: Objection to the form.<br>A. Like violation issues?<br>Q. Would you have looked at work orders to see what was causing the delay?<br>A. Oh, no.<br>ECF 300-24, Ex. 29, Bromley Dep. 84:2–8 (Feb. 9, 2024).<br><br>Third, that Mr. Bromley's communication history shows that he followed up 48 times about resolving the code violation does not mean that he looked into the reasons for the delay. Additionally, Defendants point to *no evidence* that Mr. Bromly followed up 48 times, let alone the substance of Mr. Bromley's follow-up communications.<br><br>Fourth, Plaintiffs do not need to tie the rusted gutters back to a specific deficiency from their investigation to note that this maintenance failure—identified through a review of Defendants' own documents—led to a long-unremedied code violation. Here, the evidence shows that the City of Milwaukee cited BANA for both the rusted gutters and the disconnected downspout. *See* Ex. 13, SG00651098-99 (fining BANA for needing paint on ferrous metal services). There are then vendor bids to replace gutters, explaining that the paint they had was chipping and it would not be appropriate to repaint them. *Id.* at SG00650996. Therefore, even if a vendor |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| | December 30th" was false. The document was an email from Safeguard to the code official stating that Safeguard's photos "completion photos provided by [Safeguard's] local vendor verify compliance." See Ex. 74 at 1101. It did take time to obtain this confirmation that the code citation was resolved, but not "18 month[s]." | reconnected the downspout, it would not have cured the gutter that needed repainting or replacing. The deficiency Plaintiffs noted as "rusted gutters" in August 2016 *was the violation* of unpainted ferrous metal. The disconnected downspout was not the issue at that time. *Compare id.* at SG00651098–99 (original citation from the City of Milwaukee), *with id.* at SG00651095–96 (showing all violations except downspout and unpainted ferrous metal were dismissed as of 08/02/16); *see also id.* at SG00650997 (showing that the only bids approved to bring the property into compliance was masonry work, tuck pointing, and replacing defective siding; these bids were submitted on June 13, 2016, but Mr. Bromley did not respond to them until July 2016—over a month later). In August 2016, when Plaintiffs investigated the property, the gutters still had not been painted or replaced. As of November 3, 2016, the code violations for violations for the lack of paint and downspout were still active. *Id.* at SG00650998.<br><br>Finally, the document Defendants cite for the proposition that the gutters had been repaired by December 30, 2016, does not support this assertion. Exhibit 74 at 1101 is a letter from Safeguard to the City of Milwaukee stating that "The completion photos provided by our local vendor verify compliance at this property (for gutter violation). Unless notified otherwise, the case is considered resolved." ECF 301-22, Ex. 74 at SG00651101. Safeguard did not provide the vendor photos to the City of Milwaukee, and Defendants do not point to any evidence that the gutters were repaired and that the city considered the violation remedied. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| Former Bank of America employee Robert Bromley "testif[ied] that it was likely the large volume of properties he was assigned that caused months-long delays to approve simple repairs." Mot. at 18 (citing Bromley Dep. at 115– 16). | **FALSE. Bromley agreed he had "to deal with a large volume of properties," but he never said "it was likely" this "caused months-long delays to approve simple repairs."** The cited passage of testimony came in response to a question in reference to a single property. ███████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████ | **Defendants dispute Plaintiffs' characterization of Mr. Bromley's testimony, but this dispute is without substance.** <br><br> Mr. Bromley testified that the large volume of properties was one of the reasons for delays in repair work being completed, and further testified that he could not think of any other reasons: <br><br> ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ <br><br> ECF 300-24, Bromley Dep. at 116:2–21. <br><br> In addition, the work order at issue for which there was a two-week delay involved an inspection. ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| | | ██████████████████████████████ Ex. 14, SG00399502. Therefore, Mr. Bromley's own email exchange with Safeguard shows that he responded to Safeguard more than two weeks after he put in the work order for an initial inspection. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| Safeguard employee Michael Hamm "testif[ied] about how a code violation issued on September 13, 2013, was not addressed as of March 6, 2015" at 4463 N. Hopkins St. in Milwaukee. Mot. at 15. | **FALSE. The code violation was addressed well before March 6, 2015. Defendants could have addressed it even sooner, but the work was delayed by municipal permitting requirements. Defendants completed the repairs within two months of receiving the permits.** Milwaukee cited the property for 25 issues involving severe structural damage requiring permits to repair, including a collapsed front porch, a defective roof, and damaged masonry. See Ex. 63, 83. HUD delayed approving the repair bids, the city delayed issuing the permits, and when Safeguard's vendor was ready to start work in the summer of 2014, city officials told them they could not start without engaging a structural engineer, but failed to provide the written documentation of that request necessary to get the expense approved by HUD. See Ex. 65 at 4723, 4738–81. Safeguard's code-compliance staff repeatedly followed up and finally obtained the documentation in September 2014. Safeguard's vendor repaired all the cited damage, including fully rebuilding the two-story porch, in just two months, finishing in November 2014—not March 6, 2015, as alleged. See Ex. 65 at 4595–4696. Plaintiffs' inspection report on the property confirms the issues were all repaired by the time Plaintiffs inspected it on December 9, 2014. Plaintiffs did not observe any of the conditions the city had cited the property for. Plaintiffs' inspector reported four defects on the property: "Unsecured/broken doors and locks," "Damaged windows (broken, boarded)," "For Sale sign missing," and "Utilities: Exposed or tampered with." ECF 167-20. At least three of the four are invalid. The "For Sale" sign defect is invalid because it was being maintained for conveyance to HUD, not for sale. Exs. 1-2. The two defects relating to the windows and doors are also invalid because they were secured with the boards to | **Defendants failed to remedy the code violations for 22 months, and did not pay off their fines until March 6, 2015.**<br><br>On January 24, 2013, the City of Milwaukee cited 4463 N. Hopkins Street for 27 separate issues (not 25), including the collapsed front porch, defective roof, and damaged masonry noted by Defendants, as well as an unsecured door. *See* ECFs 301-11 & 301-29, Defs.' Opp'n to Pls.' Mot. for P. Summ. J. Exs. 63 & 83. Plaintiffs acknowledge that the 27 code violations were fixed by November 26, 2014 (about 22 months after they were first issued). However, Plaintiffs' overarching point that there were serious delays in remedying code violation still stands, as it took Defendants nearly two years to fully address them. It then took Defendants about five more months—until March 6, 2015—to pay off the fines on the property due to all the unremedied code violations.<br><br>Defendants assert that it could not remedy the code violation on the property for 22 months because HUD delayed in approving repair bids and the city delayed in issuing permits, but they do not cite to any evidence in the record to support these assertions. Defendants cite no evidence of what the permitting requirements were or how those permitting requirements prevented them from performing the work. Defendants also cite no evidence to show that it was the City of Milwaukee that prevented them from getting the necessary permits, as opposed to delays on their part in taking the steps necessary to obtain permits. In addition, Defendants secured the door on May 9, 2013—nearly five months after the code violation—and there is no reason to believe that they failed to secure the door because HUD did not approve a repair bid or the city did not issue a permit. Indeed, this is a safety and security issue that, ███████████████████ ███████████████████████     *See* ECF  183-5, Ex. 5 at ¶ 9 & Ex. 5-B-4, BANA's REO Vendor Training at 8. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| | which Plaintiffs object by the City of Milwaukee, not Defendants. See Ex. 31–32. (Plaintiffs increased their alleged defect count on the property from four to six at some point after their inspection, adding claims of "Trash" and "Overgrown grass or leaves," but these were also not among the conditions the city cited the property for. See ECF No. 167-20.) The supposed "delay" to March 6, 2015 in "address[ing]" the code violation was not a delay in doing any repairs, but the city's delay issuing invoices for reinspection fees that had to be paid to close the matter. Ex. 66 at 1801–02. But the code violation itself had long been addressed and the repairs completed. | |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| "In one case, each accumulated code violation ended up costing more than $10,000, amounting to more than $25,000 in unnecessary expenses wasted on a single property" (2411–2413 W. Mitchell St. in Milwaukee). Mot. at 16. | **FALSE. The $25,000 in expenses were not on "one case" or "a single property," but on five different properties, according to Plaintiffs' own exhibit.** Ex. 67. 2411–2413 West Mitchell Street accounted for $10,347.81. Ex. 68. | **Defendants' evidence supports, rather than rebuts, Plaintiffs' point.**<br><br>Plaintiffs acknowledge that Defendants spent $10,347.81, not $25,000, on this single property. According to the work order that Plaintiffs cited, however, there was no indication that the $25,000 was attributable to more than one property. ECF 287-5, Pls.' Mot. for Part. Summ. J. Ex. 7. Moreover, the document Defendants cite, Ex. 68, shows that Defendants accumulated code violations totaling $25,000 on just three properties—two of them with $10,000 in fines and one with $5,000 (while Defendants did have fines on a total of five properties, two only had fees of $52.53 and $35.59). These are still unnecessary and wasted expenses—they were just spread across three properties. If anything, this is evidence that Defendants let three properties fester, as opposed to just one, supporting Plaintiffs' overarching point that reducing costs does not justify Defendants' policy of undue delegation and lack of supervision. |
| "Safeguard had to pay for remediation work when the failures were noticed by BANA or HUD." Mot. at 20 (citing Hamm Depp. at 47:1–5). | **PARTIALLY FALSE AND MISSING KEY CONTEXT.** Hamm testified that whether Safeguard had to pay for remediation work would depend who was at fault. Plaintiffs omit the portion of testimony where Hamm explained that if a vendor was responsible, the vendor would have to reimburse Safeguard.<br><br>Q. Okay. What is an SPI loss?<br>A. We were taking a loss on that. Something that we might've done wrong.<br>Q. So something Safeguard did wrong?<br>A. Right.<br>Ex. 84 at 47.<br>Q. What does it mean, the part that says is there a chargeback to be processed?<br>A. If--if it was the vendor's responsibility for the--the fine, we would charge them back.<br>Id. at 51. | **The deposition testimony Defendants quote supports, and does not rebut, Plaintiffs' statement.**<br><br>Per Defendants' own excerpt, Mr. Hamm testified that Safeguard would "tak[e] a loss" when it did something wrong. ECF 301-30, Ex. 84, Hamm Dep. 47:1–2. Safeguard then charged it back to the vendor if the vendor was wholly or partially at fault. Mr. Hamm's testimony does not address whether Safeguard was actually able to recoup the costs of its loss from the vendors, and that is a separate issue. Plaintiffs' point stands that Safeguard had to pay for remediation work when there were deficiencies in that work. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| Safeguard CFO Joe Iafigliola "admit[ed] that 'creative photography' is a problem and can be difficult to detect because 'the vendors are only going to show you what they want [you] to see.'" Mot. at 22 (citing Iafigliola Dep. at 98:15– 99:17). | **FALSE.** Iafigliola did not "admit" that "'creative photography' is a problem." He testified that it happened rarely because Safeguard had effective procedures to "detect it" and "root it out."<br>Q. . . . What are commission errors?<br>A. So commission errors would be I said I cut the grass but really I cut two strips of the lawn and took a creative photo to make it seem like I cut the whole grass.<br>Q. When you say creative photo, what do you mean by that?<br>A. I mean trying as a vendor to pretend like I did work and bill for it.<br>Q. Is that something that happens quite a bit in this industry?<br>A. I wouldn't necessarily characterize it as quite a bit, because you root it out and eliminate the vendors that are doing that, so-- but it does happen.<br>Q. And so the folks who were doing the order auditing at Safeguard, would they be responsible for spotting these examples of creative photography to find commission errors?<br>A. They would be, but sometimes it's very hard for them because they're only receiving the photos that a particular--you know, if a vendor is intending to commit fraud, they're going to only show you what they want you to see. So ███████████████████████<br>████████████████████████████████<br>████████████████████████████████<br>████████████████████████████████<br>████████████████████████████████<br>████████████████████████████████<br>Ex. 18 at 98–99. | **Defendants mischaracterize Mr. Iafigliola's testimony, which supports Plaintiffs' assertion.**<br><br>Mr. Iafigliola did not testify that creative photography happened "rarely" because Safeguard had "effective procedures to" "root it out"; nowhere in the quoted deposition testimony does Mr. Iafigliola discuss the efficacy of Safeguard's procedures. Instead, he states that "it's very hard" for the Safeguard employees who review photos of the vendors' work to spot creative photography. ECF 300-16, Ex. 18, Iafigliola Dep. 98:12–99:12. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| Bank of America "reli[ed] solely on Safeguard's photos to determine whether an FHA property was in conveyance condition. For REO properties that were not backed by FHA loans, BANA's asset managers did not even look at the photos." Mot. at 23 (citing Priesmeyer Dep. at 77:6–15). | **FALSE.** The cited deposition testimony does not relate to whether an FHA property was in conveyance condition. Plaintiffs were asking Priesmeyer about the procedures for reporting on whether a property was vacant or occupied. And Priesmeyer specifically said that Bank of America employees "*would* review the photos":  | **The deposition testimony Defendants quote supports, rather than rebuts, Plaintiffs' statement.**<br><br>Andrew Priesmeyer, one of BANA's 30(b)(6) designees, testified that only an eviction specialist—not an asset manager—would view photos—and only if there was personal property left behind:<br><br>Q. Is there any requirement that the asset managers – and I mean vendor asset managers or internal asset managers at Bank of America – look at the photos of the REO property?<br>A. No. If -- if there was -- if it's vacant, no. If it's -- if there was, you know, personal property left behind, then the eviction specialist would review the photos to determine if an eviction is needed or a post-restore or any other action.<br>Q. So just the eviction specialist would look at the photos?<br>A. If there was – if, when Safeguard went out to the property, they identified that the property has personal property, yes. ECF No. 300-3, BANA 30(b)(d) (Priesmeyer) 77:6–20.<br><br>Mr. Priesmeyer later testified that asset managers would only review photos of a property if the realtor assigned to the property sent them pictures of a repair that was not completed properly:<br><br>Q. So does that mean that every repair is reviewed?<br>MR. LEVENBERG: Objection to the form.<br>A. Are you asking for every repair that was completed by the preservation vendor?<br>Q. Yes.<br>A. It would be -- every repair would be reviewed by the listing agent, correct.<br>Q. And then does the asset manager review the information that the listing agent provided?<br>A. If the listing agent provided information, yes, they would review that information, correct.<br>Q. And is the listing agent required to provide information of completed repairs? |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| | ████████████████████████████████████████████<br><br>Ex. 5 at 76–78. | A. I would have to look at the procedures during the whole scope period here to determine if there was a requirement assigned to the agent to do so.<br>Q. So would anybody else be reporting on the completed repairs?<br>A. Not the -- not if the repairs are satisfactory or anything like that. But Safeguard would notify us that the repairs were completed through the system of record.<br>Q. And what happens if a repair wasn't completed or wasn't completed properly?<br>A. The agent would notify the asset manager and provide photo proof, which, at that time, the asset manager would reach out to the property preservation company. Ex. 15, BANA 30(b)(d) (Priesmeyer) at 234:7–235:15.<br><br>With regard to properties pending conveyance to HUD, Mr. Silvey testified that BANA relied solely on Safeguard's photos to determine whether the property was in conveyance condition:<br><br>Q. So does Safeguard make the initial determination that something's in conveyance condition, that a home is in conveyance condition?<br>A. They do.<br>Q. Okay. And then who -- strike that. Does somebody at Bank of America review that to make sure they agree?<br>A. They do.<br>Q. Who would do that?<br>A. The mortgage servicing specialist.<br>Q. What would they review in order to make that determination?<br>A. The photo evidence that Safeguard provided.<br>ECF 300-4, BANA 30(b)(6) Dep. (Silvey) at 89:4–18. |

| Claim in Plaintiffs' Motion | Defendants' Evaluation | Plaintiffs' Response |
|---|---|---|
| Brandon Silvey testified "that in making the decision to transfer an FHA property to REO, BANA would rely on photographs from third parties without any contact with agents on the ground who had visited the properties in person." Mot. at 23 (citing Silvey Dep. at 89:4–18). | **FALSE.** The cited deposition testimony does not relate to the decision whether to transfer an FHA property to REO, but rather how Bank of America confirmed that a home is in "conveyance condition" for HUD. The referenced "photographs" came from the "agents on the ground."<br>Q. So does Safeguard make the initial determination that something's in conveyance condition, that a home is in conveyance condition?<br>A. They do.<br>Q. Okay. And then who--strike that. Does somebody at Bank of America review that to make sure they agree?<br>A. They do.<br>Q. Who would do that?<br>A. The mortgage servicing specialist.<br>Q. What would they review in order to make that determination?<br>A. The photo evidence that Safeguard provided.<br>Ex. 6 at 89. | **The deposition testimony supports Plaintiffs' point.**<br><br>Although the specific line in Mr. Silvey's 30(b)(6) deposition testimony is about confirming that an FHA property is in conveyance condition, this is a step in the process in determining if HUD will accept the property or reject it. ECF No. 300-4, BANA 30(b)(6) (Silvey) 89:4–92:13. Mr. Silvey then testified that if HUD will not accept a property, it goes into BANA's REO inventory. *Id.* at 92:11–13.<br><br>Ultimately, Defendants fail to refute Plaintiffs' point that BANA relied on photographs Safeguard provided to make determinations about HUD properties. Defendants cite to no evidence that the mortgage servicing specialists or any other BANA employee reviewed anything more than photographs—and possibly did not even look at photographs—to determine whether to transfer an FHA property to REO. |