**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA, N.A., *et al.*, <br><br> Defendants. | Civil Action No. SAG-18-1919 |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FOR LACK OF SUBJECT-MATTER JURISDICTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ii

TABLE OF ABBREVIATIONS.....................................................................................................v

INTRODUCTION...........................................................................................................................1

STANDARD OF REVIEW .............................................................................................................2

ARGUMENT...................................................................................................................................3

I.      *Havens* remains good law. ..................................................................................................3

        A.      As the Fourth Circuit has recognized, *Hippocratic Medicine* reaffirmed, rather
                than upended, the key holdings of *Havens*. ...........................................................3

        B.      Defendants' reliance on out-of-circuit case law does not change *Havens'*
                continued application to this case. ..........................................................................7

II.     The injuries that Defendants caused to the FHO Plaintiffs fall within the "unique
        context" of *Havens*.............................................................................................................12

        A.      Defendants' discrimination undermined the core business activities the FHO
                Plaintiffs conduct in furtherance of their missions. .........................................13

                1.      Defendants impaired the FHO Plaintiffs' ability to provide counseling
                        in furtherance of stable, integrated communities. ................................18

                2.      Defendants' discrimination directly undermined the FHO Plaintiffs'
                        financial investments in the impacted communities. ..........................19

        B.      Because of the injury Defendants caused to the FHO Plaintiffs' core
                activities in furtherance of their missions, the FHO Plaintiffs diverted
                resources away from their core activities and towards counteracting the harm
                Defendants' misconduct caused, further injuring the FHO Plaintiffs.........................21

CONCLUSION..............................................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Adams v. Bain,*
    697 F.2d 1213 (4th Cir. 1982) ..................................................................................... 3, 20

*Ariz. All. for Retired Ams. v. Mayes,*
    117 F.4th 1165 (9th Cir. 2024) ...................................................................................*passim*

*Arlington Heights v. Metro. Hous. Corp.,*
    429 U.S. 252 (1977) ............................................................................................................14

*Aten v. Scottsdale Ins. Co.,*
    511 F.3d 818 (8th Cir. 2008) ..............................................................................................3

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................................18

*Caicedo v. DeSantis,*
    No. 6:23-CV-2303-JSS-RMN, 2024 WL 4729160 (M.D. Fla. Nov. 8, 2024) ....................... 10, 15, 24

*Carolina Youth Action Project; D.S. by & through Ford v. Wilson,*
    60 F.4th 770 (4th Cir. 2023) ...............................................................................................13

*Demetres v. E. W. Const., Inc.,*
    776 F.3d 271 (4th Cir. 2015) ...............................................................................................3

*Durden v. United States,*
    736 F.3d 296 (4th Cir. 2013) ...............................................................................................2

*Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.,*
    210 F. App'x 469 (6th Cir. 2006) .......................................................................................24

*Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC,*
    124 F.4th 990 (6th Cir. 2025) ...........................................................................................*passim*

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) .........................................................................................................*passim*

*FHCCI v. M&J Mgmt. Co., LLC,*
    No. 1:22-CV-00612-TAB-JPH, 2024 WL 3859997 (S.D. Ind. Aug. 19, 2024) ......................... 9, 10

*Get Loud Ark. v. Thurston,*
    No. 5:24-CV-5121, 2024 WL 4142754 (W.D. Ark. Sept. 9, 2024) ....................................... 10, 18

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) .........................................................................................................*passim*

*Kerns v. United States,*
    585 F.3d 187 (4th Cir. 2009) ................................................................................2

*Lane v. Holder,*
    703 F.3d 668 (4th Cir. 2012) ................................................................6, 6–7, 14

*Legal Aid Chi. v. Hunter Props., Inc.,*
    No. 23-CV-4809, 2024 WL 4346615 (N.D. Ill. Sept. 30, 2024) ........................9

*March for Our Lives Idaho v. McGrane,*
    --- F. Supp. 3d ---, No. 1:23-CV-00107-AKB, 2024 WL 4226912 (D. Idaho Sept. 17, 2024) .......17

*Mayor & City Council of Balt. v. Trump,*
    416 F. Supp. 3d 452 (D. Md. 2019) ...........................................................2, 3, 21

*N. Va. Hemp & Agric., LLC v. Virginia,*
    No. 23-2192, 2025 WL 37238 (4th Cir. Jan. 7, 2025) .....................................13

*N.C. All. for Retired Ams. v. Hirsch,*
    No. 5:24-CV-275-D, 2024 WL 3507677 (E.D.N.C. July 19, 2024) ...................24

*N.C. State Conf. of the NAACP v. Raymond,*
    981 F.3d 295 (4th Cir. 2020) ................................................................................5

*Nat'l Fed'n of the Blind, Inc. v. Wal-Mart Assocs., Inc.,*
    566 F. Supp. 3d 383 (D. Md. 2021) ...................................................................13

*NFHA v. Bank o fAm., N.A.,*
    401 F. Supp. 3d 619 (D. Md. 2019) ............................................................1, 2, 3

*NFHA v. Bank of Am., N.A.,*
    No. SAG-18-1919, 2023 WL 1816902 (D. Md. Feb. 8, 2023) .........................24

*People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.,*
    843 F. App'x 493 (4th Cir. 2021) .....................................................................5–6

*Republican Nat'l Comm. v. Benson,*
    --- F. Supp. 3d ---, No. 24-0262, 2024 WL 4539309 (W.D. Mich. Oct. 22, 2024) .................9, 21–22

*Republican Nat'l Comm. v. N.C. State Bd. of Elections,*
    120 F.4th 390(4th Cir. 2024)..........................................................................*passim*

*S.C. State Conf. of NAACP v. S.C. Dep't of Juv. Just.,*
    No. 0:22-CV-1338-JDA-PJG, 2024 WL 5153170, (D.S.C. Dec. 18, 2024) ..................6, 19

*Sarafin v. Haw. Pub. Hous. Auth.,*
    No. CV 24-00066 LEK-WRP, 2024 WL 5246597 (D. Haw. Dec. 30, 2024)......................10, 11, 24

*Sierra Club v. Morton,*
    405 U.S. 727 (1972) ..........................................................................................................4

*Spann v. Colonial Vill., Inc.,*
    899 F.2d 24 (D.C. Cir. 1990) ..........................................................................................24

*Town of Chester v. Laroe Ests., Inc.,*
    581 U.S. 433 (2017) ........................................................................................................13

*Travelers United, Inc. v. Hyatt Hotels Corp.,*
    No. CV 23-2776 (CKK), 2025 WL 27162 (D.D.C. Jan. 3, 2025) ......................................14

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ...................................................................................................... 1, 4

*Walters v. McMahen,*
    684 F.3d 435 (4th Cir. 2012) ..........................................................................................18

*Wikimedia Found. v. Nat'l Sec. Agency,*
    857 F.3d 193 (4th Cir. 2017) ..........................................................................................13

*Younie v. City of Hartley,*
    97 F. Supp. 3d 1058 (N.D. Iowa 2015) .............................................................................3

## Statutes

42 U.S.C. § 3616a ....................................................................................................................14

## Other Authorities

Br. of Pet'rs, *Havens Realty Corp. v. Coleman,*
    No. 80-988, 1981 WL 390424 (July 1, 1981) ...................................................................24

## TABLE OF ABBREVIATIONS

| BANA | Bank of America, N.A. |
|------|----------------------|
| CFHC | Connecticut Fair Housing Center |
| DMFHC | Denver Metro Fair Housing Center |
| FHA | Fair Housing Act |
| FHC | Fair Housing Continuum, Inc. |
| FHCRR | Fair Housing Center for Rights & Research (Housing Research and Advocacy Center) |
| FHCNA | Fair Housing Center of Northern Alabama |
| FHCGPB | Fair Housing Center of the Greater Palm Beaches |
| FHCST | Fair Housing Council of South Texas |
| FHCWM | Fair Housing Center of West Michigan |
| FHANC | Fair Housing Advocates of Northern California |
| FHCCI | The Fair Housing Center of Central Indiana |
| FHOs | Fair Housing Organizations |
| HOME | Housing Opportunities Made Equal of Virginia (*Havens* plaintiff) |
| HOPE | Housing Opportunities Project for Excellence, Inc. |
| HOPE FHC | HOPE Fair Housing Center |
| LaFHAC | Louisiana Fair Housing Action Center |
| Metro | Metro Fair Housing Services |
| MMFHC | Metropolitan Milwaukee Fair Housing Council |
| MVFHC | The Miami Valley Fair Housing Center |
| NFHA | National Fair Housing Alliance |
| NTFHC | North Texas Fair Housing Center |
| REOs | Real-estate-owned properties |
| Safeguard | Safeguard Properties Management, LLC |
| SSHC | South Suburban Housing Center |
| TFHC | Toledo Fair Housing Center |

## INTRODUCTION

It has been nearly seven years since Plaintiffs—including twenty Fair Housing Organizations ("FHO Plaintiffs")—filed their complaint outlining how Defendants Bank of America and Safeguard's discriminatory treatment of REO homes in communities of color was "interfering with [the FHO Plaintiffs'] efforts and programs intended to bring about equality of opportunity in housing" by impairing their "usual activities and services, such as . . . counseling[.]" Compl. ¶ 301, ECF 1. It has been nearly six years since this Court relied on 35-year-old Supreme Court precedent, *Havens Realty Corp. v. Coleman*, to rule that Plaintiffs had standing to bring this case because Defendants' conduct had indeed "perceptibly impaired" the organizations' "varied efforts to stem segregated housing in American cities," as in *Havens. NFHA v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 626–27 (D. Md. 2019) ("*NFHA I*") (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)) (finding that "Plaintiff HOME ha[d] been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services")).

Dissatisfied with that ruling, Defendants now attempt to convince this Court that the Supreme Court's recent decision in *Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), abrogated *Havens* to such an extent that it rendered the FHO Plaintiffs in this case newly distinguishable from the FHO plaintiff in *Havens*. But—as the Fourth Circuit has confirmed—*Hippocratic Medicine* is not the sea change Defendants make it out to be. *See Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396 (4th Cir. 2024) ("*RNC*"). The Supreme Court simply reaffirmed the long-standing principle that for the purposes of organizational standing, an organization must show that a defendant's actions "perceptibly impaired" or "interfered with" the organization by impairing its core business activities in furtherance of its mission or activities, and that an organization's "moral, ideological, and policy objection[s]" *alone* are insufficient to establish organizational standing. *Id.* at 395, 397; *id.* at 409–10 (Diaz, C.J., concurring). This is not new law. *See, e.g., Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, 487 (1982); *see also RNC*, 120 F.4th at 396 (observing that, even before *Hippocratic Medicine*, the court has recognized limits to the organizational standing principles outlined in *Havens*).

Defendants are unable to distinguish the well-pleaded facts in this case from those that conferred standing on the FHO in *Havens*, nor can they reconcile the Fourth Circuit's interpretation of *Hippocratic Medicine* with their legal theory. Instead, they grasp at straws by flagging out-of-circuit cases that apply *Hippocratic Medicine* to deny organizational standing (albeit none deny standing for a traditional FHO like the Plaintiffs here), and advance a patently unreasonable interpretation of a footnote in Plaintiffs' surreply on *remedies* (that pointed to the fundamental difference between standing and remedies) as some form of a concession from Plaintiffs that they do not have standing. Even a cursory review of the case law requires their arguments be rejected.

Because the FHO Plaintiffs in this case mirror the FHO in *Havens* in terms of the core business activities they conduct and the ways in which Defendants' discriminatory conduct directly impaired that work (and differ from the issue advocacy groups in *Hippocratic Medicine*), nothing has changed to warrant a reversal of this Court's 2019 decision holding that the FHO Plaintiffs have organizational standing. This Court's previous holding remains apt: "Here, the defendants' actions have perceptibly impaired the organizational plaintiffs' varied efforts to stem segregated housing in American cities. The defendants' effort to distinguish *Havens* and the cases that apply it in this district are not persuasive." *NFHA I*, 401 F. Supp. 3d at 626–27 (citation to *Havens* omitted). As such, the Court should deny Defendants' Motion to Dismiss.

## STANDARD OF REVIEW

Defendants assert a *facial* challenge to this Court's subject-matter jurisdiction over Plaintiffs. Defs.' Mem. of L. in Supp. of Mot. to Dismiss for Lack of Subject-Matter Jurisdiction ("Defs.' Mem.") at 3 ("In this case, subject-matter jurisdiction is *facially lacking* because the material facts are either affirmatively *alleged in the Complaint*, or undisputed." (emphasis added)), ECF 343-1. "In a facial challenge, 'the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction.'" *Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)); *see also Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013) (under a facial

2

challenge to the complaint, plaintiffs are afforded the protections promised under Rule 12(b)(6), such as assuming the truthfulness of the facts). Plaintiffs need only prove the existence of subject-matter jurisdiction by a preponderance of evidence. *See Mayor & City Council of Balt.*, 416 F. Supp. at 479 (citing *Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015)). In addressing facial challenges (as opposed to factual challenges), courts do not resolve any disputes of fact, "and dismissal is appropriate 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Younie v. City of Hartley*, 97 F. Supp. 3d 1058, 1060 (N.D. Iowa 2015) (quoting *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008)).

If, however, a defendant "contended that the jurisdictional allegations of the complaint were not true"—a factual challenge—"[a] trial court may then go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

## ARGUMENT

I.    *Havens* remains good law.

### A.    As the Fourth Circuit has recognized, *Hippocratic Medicine* reaffirmed, rather than upended, the key holdings of *Havens*.

Defendants premise their entire argument on the notion that *Hippocratic Medicine* upended the law of organizational standing established in *Havens* to such a degree as to require the Court to reverse its prior holding that the FHO Plaintiffs had adequately pled organizational standing. *NFHA I*, 401 F. Supp. 3d at 627. Yet, as the Fourth Circuit made clear in *RNC*, *Hippocratic Medicine* did no such thing.

In 1982, the Supreme Court analyzed whether a fair housing organization, HOME, had Article III standing to bring suit under the Fair Housing Act ("FHA") where it had been "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services," and, as a result "had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices." *Havens*, 455

U.S. at 379. The Court held that the defendants' conduct, as alleged, had "perceptibly impaired" HOME's activities conducted in furtherance of its "noneconomic interest in encouraging open housing," such as "counseling and referral services for low- and moderate-income homeseekers." *Id.*; *id.* at n.20. That injury, the Court explained—along "with the consequent drain on the organization's resources" to identify and counteract the defendants' practices—"constitute[d] far more than simply a setback to the organization's abstract social interests," and was sufficient to satisfy Article III standing requirements. *Id.* at 379.

Forty-two years later, the Supreme Court reviewed the Fifth Circuit's decision concluding that a group of anti-abortion medical associations—organized with the goal of issue-advocacy—had standing to enjoin the U.S. Food and Drug Administration's approval of an abortion drug, mifepristone. *Hippocratic Med.*, 602 U.S. at 377. In *Hippocratic Medicine*, the medical association plaintiffs, the Supreme Court explained, were "unregulated parties who [sought] to challenge FDA's regulation *of others.*" *Id.* at 385 . None of the plaintiffs manufactured, sold, prescribed, advertised, or used mifepristone, and instead had only "sincere legal, moral, ideological, and policy objections to mifepristone being prescribed and used *by others.*" *Id.* at 368 (emphasis in original); *id.* at 374 ("[A] plaintiff's desire to make a drug less available *for others* does not establish standing to sue." ). The Court held that the Fifth Circuit was too "expansive" in its "theory of standing"—in other words it strayed too far from the unique context of *Havens. Id.* at 395. Far from overruling *Havens*, the Court distanced issue-advocacy groups from groups like FHOs with core business activities like counseling services, and unanimously reaffirmed the validity of the Court's previous finding that the FHO in *Havens* had standing to sue a realtor for racial discrimination in violation of the FHA because the discriminatory conduct "directly affected and interfered with HOME's core business activities." *Id.* at 395–96 ("[T]his Court has been careful not to extend the *Havens* holding beyond its context. So too here.").

In arriving at its decision, the Court relied on longstanding precedent to clarify the law. *Id.* (citing *Valley Forge*, 454 U.S. at 486; *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972); *Havens*, 455 U.S. at 379)). The brief paragraphs in *Hippocratic Medicine* distinguishing *Havens* do not pull the rug out

from under the FHO Plaintiffs as Defendants suggest. *See Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1189 (9th Cir. 2024) (Nguyen, J., dissenting in part) ("*Hippocratic Medicine* is hardly a sea change in the law of organizational standing.").

In addressing organizational standing post-*Hippocratic Medicine*, the Fourth Circuit has confirmed that *Havens* remains good law. In *RNC*, the Fourth Circuit explained that *Hippocratic Medicine* simply "declined to 'extend the *Havens* holding beyond its context,'" allowing courts to "screen[ ] out plaintiffs who might have *only* a general legal, moral, ideological or policy objection to a particular . . . action." *RNC*, 120 F.4th at 396, 409 (emphasis added) (quoting *Hippocratic Med.*, 602 U.S. at 395, 381). The *RNC* court considered whether two Republican political organizations had organizational standing to sue a state board of elections for its alleged violations of election law, which the organizations claimed required them to divert their resources away from core activities like voter outreach towards combatting election fraud. 120 F.4th at 396–97. In holding that the organizations had sufficiently alleged that the state board's failures had "concretely impaired their core missions" in a manner sufficient to confer standing, the Fourth Circuit considered the impact of *Hippocratic Medicine* on organizational standing law. *Id.*

The Fourth Circuit relied on its pre-*Hippocratic Medicine* precedent holding that "when an action 'perceptibly impair[s]' an organization's ability to carry out its mission and 'consequent[ly] drain[s] . . . the organization's resources,' 'there can be no question that the organization has suffered' an injury-in-fact.'" *RNC*, 120 F.4th at 395–96 (quoting *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (alterations in original) (quoting *Havens*, 455 U.S. at 379)); *see also Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992–93 (6th Cir. 2025) (citing *Hippocratic Med.*, 602 U.S. at 394–95) (explaining that under *Havens* and *Hippocratic Medicine*, if "a defendant's actions interfered with the counseling and referral services that a housing organization provided, that conduct could suffice to establish standing"). The court further cited a 2021 case finding that an organization had standing "because its diversion of resources in response to defendant's actions impeded the organization's 'efforts to carry out its mission.'" *RNC*, 120 F.4th at 395–96 (citing *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*,

843 F. App'x 493, 496–97 (4th Cir. 2021)). The court emphasized that *Hippocratic Medicine*'s restrictions on organizational standing were not new in the Fourth Circuit. It noted that in *Lane v. Holder*, it had explained "that 'mere expense' does not constitute an injury in-fact where the decision to divert resources is not in response to a threat to the organization's core mission." *Id.* (quoting *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012)); *see also id.* ("We have consistently held that standing cannot be established on the sole basis of an organization's uncompelled choice to expend resources."); *see also Fair Hous. Ctr. of Metro. Detroit*, 124 F.4th at 992 ("*[Hippocratic Medicine]* thus clarified that the expenditure of resources in opposition to a defendant's actions, standing alone, is insufficient to establish standing under *Havens*."). Accordingly, the Fourth Circuit concluded that *RNC* was not a case of an organization simply trying to "spend its way into standing," but instead was akin to *Havens*, where the organization's "core mission is directly 'affected and interfered with.'" *RNC*, 120 F.4th at 397 (quoting *Hippocratic Med.*, 602 U.S. at 394, 395).

Recognizing how damaging *RNC* is to their position, Defendants suggest that this Court should disregard *RNC* because the plaintiffs there maintained "that they hadn't pleaded enough" in an effort to have the case remanded back to state court. Defs.' Mem. at 7. Yet *RNC* is a published opinion of a unanimous panel of the Fourth Circuit, which reviewed the pleadings and the pertinent law, and found that the political-organization plaintiffs had organizational standing to proceed in federal court. *RNC*, 120 F.4th at 397; *see also id.* at 408, 408 n.1 (Diaz, C.J., concurring). The procedural posture of that case offers no reason to cast aside this binding precedent.

Applying *RNC*—along with *Lane* and *Havens*—the District of South Carolina recently held that a nonprofit organization that provided services in support of its mission to "promote fairness, reliability, and transparency in the criminal justice system" had organizational standing. *S.C. State Conf. of NAACP v. S.C. Dep't of Juv. Just.*, No. 0:22-CV-1338-JDA-PJG, 2024 WL 5153170, at *1, *6 (D.S.C. Dec. 18, 2024). The court held that "allegations of how Defendants' actions impede Justice 360's efforts to help their clients and increase the resources Justice 360 is required to expend to do so are closely analogous to the allegations the *Havens Realty* Court held were sufficient to establish organizational standing." *Id.* at *6 (citing *Havens*, 455 U.S. at 379; *RNC*, 120 F.4th at 396; *Lane*, 703

6

F.3d at 674) ("Plaintiffs detail how the complained-of conditions significantly increase the time it takes Justice 360 to represent their juvenile clients, thereby hampering their mission by reducing the number of children Plaintiffs can represent."). As with Justice 360 and the plaintiffs in *RNC* and *Havens*, the FHO Plaintiffs in this case "sufficiently allege that the [Defendants' conduct] has concretely impaired their core missions." *RNC*, 120 F.4th at 397.

In summary, *Hippocratic Medicine* did not alter organizational standing jurisprudence—it clarified two principles of organizational standing announced in *Havens*. First, plaintiffs cannot be solely an "issue-advocacy organization," but instead must allege a mission-aligned pre-existing core business activity with which defendants' conduct interfered. *Hippocratic Med.*, 602 U.S. at 409. "In other words, 'Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action.' An organization couldn't show standing simply because it 'believes that the government is acting illegally' or 'based only on an asserted right to have the [g]overnment act in accordance with law.'" *RNC*, 120 F.4th at 409 (Diaz, C.J., concurring) (quoting *Hippocratic Med.*, 602 U.S. at 409).

Second, "the expenditure of resources in opposition to a defendant's actions, *standing alone*, is insufficient to establish standing under *Havens*." *Fair Hous. Ctr. of Metro. Detroit*, 124 F.4th at 992; *RNC*, 120 F.4th at 396 (explaining that *Hippocratic Medicine* requires "more than simply an organization's efforts to 'spend its way into standing'"). As the Fourth Circuit explained in *RNC*, when a defendant's actions cause an organization to divert significant resources *away* from core activities—such as counseling consumers or voters and education/outreach efforts—and *towards* combatting the problem created by the defendant, an organization has standing. *RNC*, 120 F.4th at 396.

**B.** **Defendants' reliance on out-of-circuit case law does not change *Havens*' continued application to this case.**

Because Defendants cannot reconcile their arguments with binding Fourth Circuit precedent, they bet the house on the Ninth Circuit's decision in *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165, 1177 (9th Cir. 2024) (**petition for rehearing *en banc* pending**). But the

Ninth Circuit's interpretation of *Hippocratic Medicine* in *Mayes* does not change that Plaintiffs' injuries remain squarely within the bounds of well-settled Supreme Court precedent. Rather than upending organizational standing, as Defendants contend, *Mayes* highlighted key principles from *Havens* that demonstrate its continued relevance to this case. First, the *Mayes* court stated that *Havens* was never really about "frustrating an *abstract* organizational mission," instead, "it discussed the direct impact of racial steering on HOME's 'core business activities.'" 117 F.4th at 1175 (emphasis added) (citing *Hippocratic Med.*, 602 U.S. at 395); *see id.* at 1189 (Nguyen, J., dissenting in part) ("[I]t was *Havens Realty*—not *Hippocratic Medicine*—which established that a mere 'setback to the organization's abstract social interests' is insufficient to confer standing."). The Ninth Circuit distinguished instances where organizations "define their missions 'with hydra-like or extremely broad aspirational goals'" from instances, as in *Havens*, of "direct interference with the organization's core *activities*." *Mayes*, 117 F.4th at 1175.

    Second, the Ninth Circuit recognized that the "*mere* diversion of resources in response to a policy" alone cannot confer standing. *Id* (emphasis added). It found that in some cases the Ninth Circuit had "loosened" the diversion of resources requirement and found "standing wherever an organization alleged that it spent (or would spend) resources on new activities in response to a challenged policy—even if those new activities consist only of educational and advocacy efforts in ideological opposition to the challenged policy." *Id.* The court explained that "the organization must show that the new policy directly harms its *already-existing* core activities." *Id.* at 1177 (emphasis added); *id.* at 1175 ("HOME spent resources offsetting policies that harmed its then-existing activities—specifically, its ongoing activities in counseling its constituents on available housing."). In applying this rule to determine whether the organizational plaintiffs—political nonprofits—had standing to challenge one of the policies at issue, the court rejected the plaintiffs' arguments because: (1) plaintiffs anticipated "that they *might in the future* need to divert resources," and did not provide any evidence that the challenged action also interfered with pre-existing activities; and (2) the claimed harm was completely speculative—plaintiffs anticipated harm the government's action

would cause in the future, rather than a harm that had already been caused. *Id.* at 1178 (emphasis added). As with *Hippocratic Medicine*, *Mayes* did not upend the continued application of *Havens*.

By declaring much of the Ninth Circuit's precedent on organizational standing irreconcilable with *Hippocratic Medicine*, the Ninth Circuit became an outlier. 117 F.4th at 1177. As the dissent in *Mayes* explained, the court erred by "improperly conflat[ing] standing with the merits" and erroneously overruling cases despite the fact that *Hippocratic Medicine* "breaks no new ground on the standing doctrine." *Id.* at 1189 (Nguyen, J., dissenting in part) ("These restrictions find no support in *Hippocratic Medicine* or any other case. Instead, the majority grafts third-party standing principles onto a case of first-party standing."); *Id.* at 1190.

Defendants claim that there has been a "cascade of cases dismissing organizational plaintiffs' claims for lack of standing based on *FDA*," but of the nine cases they list, seven are unpublished opinions within the Ninth Circuit that follow the outlier position taken in *Mayes*. Defs.' Mem. at 5–6. The other two out-of-circuit cases are readily distinguishable. *Legal Aid Chi. v. Hunter Props., Inc.*, No. 23-CV-4809, 2024 WL 4346615, at *10–11 (N.D. Ill. Sept. 30, 2024) (holding that an eviction policy did not divert a legal services nonprofit from its usual work and plaintiff failed to allege what activities were reduced or eliminated); *Republican Nat'l Comm. v. Benson*, --- F. Supp. 3d ---, No. 24-0262, 2024 WL 4539309, at *11, *12 (W.D. Mich. Oct. 22, 2024) (distinguishing cases involving political organizations from those involving FHOs and finding that the RNC did not have standing because it "allege[d] only the *potential* of a diversion of resources" and because it diverted resources "to discover whether any controversy exists" and not to "ameliorate and counteract the challenged practices" like in *Havens*), *appeal docketed*, No. 24-1985 (6th Cir. Nov. 8, 2024). *But see FHCCI v. M&J Mgmt. Co., LLC*, No. 1:22-CV-00612-TAB-JPH, 2024 WL 3859997, at *4 (S.D. Ind. Aug. 19, 2024) (holding that diversion of resources to investigate the defendant's policies was sufficient to confer standing under *Havens* and *Hippocratic Medicine* because plaintiff could have otherwise spent those hours implementing "affirmative proactive policies designed to promote and protect equal opportunities in housing in Central Indiana and beyond").

Notably, district courts in several circuits continue to hold that injuries to organizations' missions remain sufficient to find standing under *Hippocratic Medicine*. For example, in *Get Loud Arkansas v. Thurston*, a voter-registration nonprofit sued the government defendant over a rule barring digital voter registration, which, had it been legal, was expected to increase voter registration. No. 5:24-CV-5121, 2024 WL 4142754, at *6–7 (W.D. Ark. Sept. 9, 2024). Plaintiffs alleged that because of the new rule, "the pace at which [GLA was] able to register new voters declined precipitously." *Id.* at *6. As a result, the defendant "'impair[ed]' the organization's ability to accomplish its mission' of registering Arkansans to vote, increasing the likelihood that Arkansas will continue to have the lowest registration rate in the nation." *Id.* at *7. The court held that plaintiffs had standing because the defendant "perceptibly impaired" the mission of the organization as contemplated by *Havens* and *Hippocratic Medicine. Id.* at *13; *see also Caicedo v. DeSantis*, No. 6:23-CV-2303-JSS-RMN, 2024 WL 4729160, at *5 (M.D. Fla. Nov. 8, 2024) (finding standing where defendant's removal of voters from the rolls "caused many voters . . . to feel as if their votes did not matter," which harmed plaintiff's mission of "facilitating civic engagement" and encouraging members of marginalized communities to "engage in politics") (cleaned up); *FHCCI*, 2024 WL 3859997, at *3 (holding that its previous ruling that "[a] fair housing organization may also suffer redressable injury to its non-economic interest in encouraging open housing, or frustration of mission" is still good law under *Hippocratic Medicine* (citation omitted)).

Most glaringly, Defendants have not pointed to a single case where a court has applied *Hippocratic Medicine* to deny organizational standing to a traditional FHO in an FHA case. This is because there are none. Defendants attempt to liken the organizational plaintiff in *Sarafin v. Hawai'i Public Housing Authority* to the FHO Plaintiffs in this case simply because the case involved an FHA claim. No. CV 24-00066 LEK-WRP, 2024 WL 5246597 (D. Haw. Dec. 30, 2024). But, as Defendants point out, the District of Hawai'i—in an unpublished decision—applied the Ninth Circuit's holding in *Mayes* to dismiss the claims of "*a nonprofit law firm*," Legal Aid Society of Hawai'i,

whose "claimed mission" is to "provide[] *legal assistance* to qualified applicants" in a variety of areas.[1]
Defs.' Mem. at 4; *Sarafin*, 2024 WL 5246597, at *4, *6 (emphasis added) ("[Legal Aid's] mission is to
address critical legal needs through high quality legal advocacy, outreach, and education in the
pursuit of fairness and justice."). Legal Aid's standing argument rested in large part on the fact that
although housing cases typically only require "a supervising attorney, a staff attorney, and a
paralegal," defendants' behavior was so egregious that it required "an additional attorney" be
assigned to the matter. *Sarafin*, 2024 WL 5246597, at *4. The court held that because "[p]roviding
*legal representation* to Sarafin in his attempts to secure an accessible housing unit is squarely within one
of the aspects of [Legal Aid]'s mission," it did not have standing. *Id.* at *8 (emphasis added) ("[T]he
fact that Sarafin's case has been more complicated than the cases that [Legal Aid]'s Housing &
Consumer Unit typically handles does not constitute interference with [Legal Aid]'s core business
activities. [Legal Aid] was only required to assign one additional attorney from within the Housing &
Consumer Unit to Sarafin's case . . . ."). The court also rejected Legal Aid's diversion argument—but
Legal Aid never alleged that it diverted its resources *to* anything other than the provision of legal
services to the individual plaintiff against the defendant. *Id.* at *7–8. In essence, the court rejected
the idea that Legal Aid's mission could be frustrated simply because the defendant's violation of the
FHA is counter to the position for which the attorneys at Legal Aid advocate. *Id.* at *8–9.

As courts across the country have recognized, *Hippocratic Medicine* further clarifies, but does
not alter, the holding of *Havens*. A ruling that the FHO Plaintiffs in this case lack organizational
standing would be a departure from Fourth Circuit precedent and would be the first post-*Hippocratic*

---

[1] Although the plaintiff in *Sarafin* received funding from HUD's Fair Housing Initiative Program and
thus "receives fair housing complaints, conducts fair housing investigations, and seeks enforcement
of fair housing laws by pursuing administrative complaints and lawsuits that result in consent decrees
and legal settlements," it is a legal services organization—not specifically an FHO—that provides legal
services across of a variety of areas beyond housing and does not provide counseling or services not
focused primarily on legal issues. 2024 WL 5246597, at *8 ("[Legal Aid] 'provides assistance to
qualified applicants in the areas of family law, immigration, public benefits, simple estate planning,
landlord-tenant, consumer, and fair housing, among others' and 'engages in extensive outreach and
education throughout Hawai'i to increase awareness and knowledge about many legal issues that affect
Hawai'i's lowest income residents.'").

*Medicine* case in the nation to find that a traditional FHO was outside of the unique context addressed in *Havens*.

## II.    The injuries that Defendants caused to the FHO Plaintiffs fall within the "unique context" of *Havens*.

The injuries the FHO Plaintiffs allege in this case fall squarely within those the Supreme Court recognized in *Havens* as sufficient to confer organizational standing. The plaintiff in *Havens*, HOME—like the twenty FHO Plaintiffs in this case—was "a nonprofit corporation" "whose purpose was 'to make equal opportunity in housing a reality.'" *Havens*, 455 U.S. at 368; Compl. at ¶ 2 ("The [FHOs] work to eliminate housing discrimination and to ensure equal housing opportunity for all persons . . . ."). HOME's "activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination," *Havens*, 455 U.S. at 368—much like the FHO Plaintiffs here. Compl. ¶ 151. HOME alleged that the defendants' "practices . . . had frustrated [HOME]'s counseling and referral services, with a consequent drain on resources," and injured "the organization's noneconomic interest in encouraging open housing." *Havens*, 455 U.S. at 369, 379 n.20. So too here. Compl. ¶ 301 ("Defendants' unlawful, discriminatory actions will continue to injure Plaintiffs by . . . interfering with the [FHOs]' efforts and programs intended to bring about equality of opportunity in housing [and] requiring the commitment of scarce resources . . . to counteract Defendants' discriminatory conduct . . . , thus diverting resources away from the [FHOs]' usual activities and services, such as . . . counseling[.]").

Defendants' discriminatory treatment of REOs in communities of color interfered with and undermined the FHO Plaintiffs' core mission-driven activities and harmed all FHO Plaintiffs[2] in

---

[2] Desperate for a way to dismiss this case, Defendants create a sideshow with a hyperbolic claim that Plaintiffs somehow conceded that not all of the FHO Plaintiffs have standing. Defs.' Mem. 1–2, 11, 14. This claim is patently false. Defendants read a footnote in Plaintiffs' surreply opposing Defendants' summary judgment motion on damages that explains how recovery of damages is not limited only to injuries that confer standing as somehow conceding that some or all Plaintiffs lack standing. ECF 322-1 at 2 n.1. Plaintiffs make no such concession. Further, Plaintiffs have sufficiently demonstrated how Defendants' discriminatory conduct inflicted a concrete injury to the core business activities of every FHO Plaintiff in this case. Any argument that Plaintiffs have admitted otherwise is a distraction.

two distinct ways recognized in *Havens*: (1) it directly harmed their missions—and the core activities furthering those missions—by undermining decades of work and financial investments intended to stabilize communities of color and encourage neighborhood integration; and (2) it caused the FHO Plaintiffs to divert resources away from their core business activities to address the harm Defendants were causing to their mission-driven activities and their years of work to reduce harm in communities of color. Under *Havens*, *Hippocratic Medicine*, and *RNC*, these harms constitute injuries sufficient to confer organizational standing. *See Hippocratic Med.*, 602 U.S. at 395; *Havens*, 455 U.S. at 379; *RNC*, 120 F.4th at 397 (finding sufficient injury to establish standing under *Hippocratic Medicine* where plaintiffs had "seen their mission frustrated" by the actions of the defendant because defendant's conduct "affected and interfered with" the work plaintiffs were doing to further their mission).

### A. Defendants' discrimination undermined the core business activities the FHO Plaintiffs conduct in furtherance of their missions.

Under *Hippocratic Medicine* and *Havens*, because BANA and Safeguard's discriminatory conduct directly impaired the FHO Plaintiffs' core activities in furtherance of their missions, they have suffered an Article III injury. *Hippocratic Medicine*, 602 U.S. at 395; *Havens*, 455 U.S. at 379; *see also RNC*, 120 F.4th at 379 ("Plaintiffs sufficiently allege that the State Board's failure to act has concretely impaired their core missions."). The FHO Plaintiffs have demonstrated that their work is not an "abstract social interest[ ]"; they engage in core business activities—including counseling and referrals for discrimination complaints—that Defendants have harmed. *Hippocratic Med.*, 602 U.S. at

---

Defendants seem to concede, however, that where all plaintiffs uniformly seek one form of relief, a finding that one plaintiff demonstrates standing is sufficient for all plaintiffs to proceed. *See* Defs.' Mem. at 12; *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). For the purposes of a motion to dismiss, "since none of the organizational Plaintiffs are situated any differently from any of the other ones so far as the rule of *FDA* is concerned," Defs.' Mem. at 13, only one FHO need have standing to pursue the identical relief they all request. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 217 (4th Cir. 2017); *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023); *N. Va. Hemp & Agric., LLC v. Virginia*, No. 23-2192, 2025 WL 37238, at *8 (4th Cir. Jan. 7, 2025); *Nat'l Fed'n of the Blind, Inc. v. Wal-Mart Assocs., Inc.*, 566 F. Supp. 3d 383, 391 (D. Md. 2021). Because all the FHO Plaintiffs seek identical injunctive relief, as well as compensatory and punitive damages, this Court need only find one FHO Plaintiff has standing for these forms of relief for all the other FHO Plaintiffs to remain in the case in pursuit of the same remedies.

394–95; *Havens*, 455 U.S. at 379; *Lane*, 703 F.3d at 674–75 (explaining that an organization can have standing "when a defendant's actions impede its efforts to carry out its mission," such as by impairing the organization's ability to carry out "a key component of" that mission, such as "counseling and referral services"); *Fair Hous. Ctr. of Metro. Detroit*, 124 F.4th at 992 ("In distinguishing *Alliance* from *Havens*, the Court emphasized the '[c]ritical[ ]' fact that the *Havens* plaintiff, HOME, 'not only was an issue-advocacy organization, but also operated a housing counseling service.'" (quoting *Hippocratic Med.*, 602 U.S. at 395)).

Here, like in *Havens*, the FHO Plaintiffs' missions are defined by federal law.[3] The FHO Plaintiffs, like HOME, are designated under federal law to enforce the FHA and, in accordance with that mission, engage in education and outreach activities to further the goals of the Act. 42 U.S.C. § 3616a; *see RNC*, 120 F.4th at 396 (explaining that the plaintiff organizations in *Hippocratic Medicine* lacked standing because they "expended resources only relevant to 'abstract social interests' in response to the FDA's approval of mifepristone, and not to their core mission"); *cf. Travelers United, Inc. v. Hyatt Hotels Corp.*, No. CV 23-2776 (CKK), 2025 WL 27162, at *11 (D.D.C. Jan. 3, 2025) (declining to find standing under *Hippocratic Medicine* because plaintiff was "principally 'an issue-advocacy organization'" that could "not identify any 'core business activities'" harmed by the challenged conduct). Nor are the FHO Plaintiffs like the organization referenced in *Mayes*, that loosely "define[s] its mission as, say, ensuring equal protection or safeguarding property rights—and easily assert that a governmental policy in the abstract frustrates that mission, even if the challenged policy has no direct impact on the organization's carrying out of its existing core activities." 117 F.4th at 1175.

Instead, the FHO Plaintiffs here—established organizations operating continuously, through permanently employed management and staff—engage in tangible activities (as they have for

---

[3] The Court in *Havens* specifically addressed whether HOME's mission to "encourage[e] open housing" was an "abstract social interest" and concluded that the fact that HOME's injury resulted from that mission "does not deprive the organization of standing." *Havens*, 455 U.S. at 379 n.20 (citing *Arlington Heights v. Metro. Hous. Corp.*, 429 U.S. 252, 263 (1977); *cf.* Compl. ¶ 35 (FHCGPC's mission includes "promoting culturally diverse communities through open housing").

decades) in furtherance of their missions of "promoting equal housing opportunities," Compl. ¶ 29 (FHANC), and fair housing choice, *id.* ¶ 28 (LaFHAC), "eradicating housing discrimination," *id.* ¶ 231 (FHCNA), and encouraging "residential integration and neighborhood stabilization," *id.* ¶ 16 (NFHA). The FHO Plaintiffs' core activities[4] advancing those missions include "education, outreach, membership services, . . . investigation of fair housing complaints and violations, investment in neighborhood community development and stabilization projects, and fair housing enforcement," *id.* ¶ 2 (all FHO Plaintiffs), and involve counseling to homeowners, home-seekers, and people facing discrimination in housing as a central component of their mission-driven activities, *see, e.g., id.* ¶¶ 19 (NTFHC), 22 (SSHC), 23 (HOPE FHC), 27 (TFHC), 29 (FHANC), 30 (FHCRR), 34 (FHCGSA).[5]

---

[4] "[A]lthough the amended complaint does not speak of [Plaintiffs'] operations in terms of 'core business activities,' it contains enough allegations about [Plaintiffs] for the court to infer what those activities are." *Caicedo*, 2024 WL 4729160, at *5 (finding standing under *Hippocratic Medicine*).

[5] Although the pleadings in the Complaint are more than sufficient to survive a *facial* challenge, there is additional support for the contentions in the record. That evidence is provided in footnotes throughout this brief for the Court's reference. *See* Pls.' Resp. to Defs.' First Phase III Interrogs., ECF 295-23, Ex. A at 3–5, ECF 295-24, Am. Ex. B at 2, 3, 5–7, 12–14, 21–23, 29, 31–32, 34–35, 38–40, 43, 45–47, 62–63, 68, 74–75, 80, 82, 85–86, 90–91, 97–99, 102, 104, 108–09, 113–14, 119–20, 122; ECF 295-10 ¶ 11 ("FHCWM's mission is furthered through counseling, the investigation of complaints of possible discrimination, referral services, and educating the public about housing discrimination to promote diverse communities and counter stereotypes. Some of our public education includes activities for children such as school programming designed to educate them early about fair and inclusive housing."); ECF 295-19 ¶ 10 ("SSHC's mission is to address all forms of housing discrimination that we find in our service area by conducting counseling programs and to investigate claims of discrimination to foster diverse communities throughout our service area."); ECF 295-21 ¶ 5 ("FHCST's mission is to promote fair housing and non-discrimination in housing across the South Texas area by ensuring equal housing opportunities and advocating for open, accessible, and inclusive communities. We do this through free services offered to housing consumers, including complaint investigation, testing, housing counseling, advocacy, mediation efforts, enforcement actions, outreach activities, and educational trainings."). Should the Court decide that more information on the FHOs' core business activities—including counseling—is warranted, Plaintiffs request leave to amend the Complaint to add additional allegations related to the FHO Plaintiffs' core business activities or to supplement the record with additional evidence of such activities. *See Fair Hous. Ctr. of Metro. Detroit*, 124 F.4th at 992.

15

As in *RNC*, this is not a case where Defendants merely ran afoul of the FHO Plaintiffs'

ideals; Defendants directly undermined the core business activities the FHO Plaintiffs conducted to

further their missions.[6] For example:

> [Defendants'] failure to maintain and market REO dwellings in communities of color according to the same standards employed in predominantly white neighborhoods has stigmatized communities of color as less desirable than predominantly white communities. The prospects for integration in the affected communities have been reduced because buyers are deterred from purchasing properties in neighborhoods with poorly maintained REO properties, leaving the segregated racial composition of these neighborhoods unchanged. . . . The existence of poorly maintained REO dwellings in minority neighborhoods diminishes home values for surrounding homeowners. Lower home values in communities of color restrict the ability of minority homeowners to move to majority-white or integrated neighborhoods by reducing the equity they can utilize to buy a new home.[7]

Compl. ¶¶ 144–45. Because all of the Plaintiff FHOs engage in activities with the intention of

strengthening integrated communities, Defendants' actions discouraging integration and stigmatizing

communities of color are directly counter to and, thus, have directly impaired the core business

activities of the FHOs. *See, e.g.*, Compl. ¶ 150 (Defendants' discriminatory conduct has

"undermin[ed] the Organizational Plaintiffs' education, advocacy, and training programs designed to

promote fair housing and fair lending," frustrated their mission of "increasing fair housing for all

Americans and in all neighborhoods, regardless of race, color, or national origin" and of "eliminating

---

[6] In their surreply opposing Defendants' motion for summary judgment on remedies, the FHO Plaintiffs included a non-exhaustive summary of the record evidence illustrating many of their core activities that Defendants impaired through their discriminatory maintenance and marketing of REOs. *See* ECF 322-1, App'x A. The Appendix outlines, for example, FHANC's homeownership promotion work, designed both to promote equal housing markets and counteract racial segregation in housing— two goals impeded by Defendants' discriminatory conduct, *see* Pls.' Resp. to Defs.' First Phase III Interrogs., Am. Ex. B at 14, ECF 295-24, NFHA's work training industry stakeholders on REO best practices, part of the organization's work to promote fair housing through educating and collaborating with housing industry members—a goal undermined by Defendants' discriminatory REO maintenance and marketing, *see* Pls.' Resp. to Defs.' First Phase III Interrogs., Ex. A at 34, ECF 295- 23, and FHCGSA's non-REO-related testing work aimed at eradicating housing discrimination— another goal set back by Defendants' discrimination, *see* Pls.' Resp. to Defs.' First Phase III Interrogs., Am. Ex. B at 39, ECF 295-24.

[7] Although the Court must accept allegations in the complaint as true at this stage, Plaintiffs' allegations of harm are also supported by expert opinions. *See* Pls.' Opp'n to Defs.' Summ. J. Mot. re Available Remedies at 29–30, ECF 295.

racial segregation in their communities," and has "imped[ed] the Organizational Plaintiffs' community investment programs designed to stabilize neighborhoods of color and increase home ownership for all persons in these same neighborhoods."); *id.* ¶ 301 (all FHO Plaintiffs); *id.* ¶ 16 (stating that in furtherance of its goal to "eliminat[e] [ ] segregation in housing," NFHA has "launched numerous educational campaigns to address housing discrimination designed to teach both consumers and housing, lending, and insurance professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering and redlining, and the benefits of residential diversity"); *id.* ¶ 22 ("SSHC's primary goal is the elimination of segregation in housing and the promotion of residential integration" and in furtherance of that goal engages in the core activity of "provid[ing] grants in recovering communities of color to first-time homebuyers.").[8]

Just as the Republican political organizations maintained that the state board of elections' allegedly unlawful conduct negatively impacted work central to their missions, such as promoting voter engagement, "counsel[ing] voters to support Republican candidates," electing Republicans to office, advocating for election security, "staffing voting protection hotlines, [and] investigating reports of voter fraud and disenfranchisement," so, too, did Defendants' REO discrimination negatively impact the FHO Plaintiffs' core mission-central work. 120 F.4th at 397; *see also March for Our Lives Idaho v. McGrane*, --- F. Supp. 3d ---, No. 1:23-CV-00107-AKB, 2024 WL 4226912, at *6 (D. Idaho Sept. 17, 2024) (distinguishing *Hippocratic Medicine* because the organizational plaintiff had "submitted evidence showing it is in the 'business' of educating and registering voters—not merely gathering information and advocating against the law").

---

[8] *See also* ECF 295-2 ¶ 12 ("Through its 30 years of existence, CFHC has found that foreclosed homes that are poorly maintained and/or marketed, negatively impact neighborhoods by, among other things, reducing property values and quality of life. The poor maintenance and marketing of REO properties in communities of color therefore harms CFHC's mission of ensuring that all people have equal access to housing opportunities in Connecticut, and makes it more difficult for CFHC to conduct its daily operations."); ECF 295-16 ¶ 12 ("BANA's discriminatory REO maintenance and marketing practices have depressed home values in minority neighborhoods in the Miami Valley. The poorer maintenance of REOs in communities of color affects appraisals of nearby homes, making securing conventional residential mortgages for houses in communities of color difficult. This situation has made it more difficult for MVFHC to conduct its operations and pursue its mission.").

The injuries FHO Plaintiffs allege to their core business activities in furtherance of their missions remain sufficient to establish standing under *Hippocratic Medicine*. Like in *Get Loud Arkansas*, Defendants' conduct "impaired the [FHO Plaintiffs'] ability to accomplish [their] mission of" integrating communities, "increasing the likelihood" that the areas they support will remain segregated and the communities of color will continue to be stigmatized. 2024 WL 4142754, at *6–7.

### 1.    Defendants impaired the FHO Plaintiffs' ability to provide counseling in furtherance of stable, integrated communities.

Defendants' conduct impaired the FHO Plaintiffs' counseling activities by making them less effective. In the course of normal business, the FHO Plaintiffs provide "affirmative housing counseling programs to foster stable, racially and economically diverse communities," Compl. ¶ 22 (SSHC), and "homebuying counseling" with the goal of developing inclusive communities, *id.* ¶ 23 (HOPE FHC).[9] Defendants' conduct depleted the availability of housing stock in communities of color and destabilized the communities in which the FHO Plaintiffs intended to direct home-seekers. *See, e.g.*, *Id.* ¶ 295 ("As shoddy maintenance and neglect result in deteriorating appearances and physical conditions for REO properties, their availability for sale is adversely affected, constraining housing options in impacted communities."); *id.* ¶¶ 296–99 (explaining how poorly maintained and marketed REOs are "significantly more likely to end up in the hands of an investor rather than an owner-occupant," and [c]ommunities with high investor ownership are more likely to have increasingly high rental rates, to become less stable communities, and to afford fewer opportunities for owner-occupied purchases," and, overall "detrimentally affect property values and encourage divestment in neighborhoods"). Additionally, Defendants' "failure to maintain and market REO dwellings in communities of color according to the same standards employed in

---

[9] The allegations outlined in the complaint are more than sufficient to "advance the plaintiff[s'] claim[s] 'across the line from conceivable to plausible.'" *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("[A] plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable' . . . ."). If, however, this Court should decide that more information on the FHO Plaintiffs' counseling practices and other core activities is warranted because of the intervening Supreme Court precedent, Plaintiffs request leave to amend the Complaint to further flesh out their allegations of organizational standing. *Fair Hous. Ctr. of Metro. Detroit*, 124 F.4th at 992.

predominantly white neighborhoods has stigmatized communities of color as less desirable than predominantly white communities." *Id.* ¶ 144. As a result, Defendants have undermined the FHO Plaintiffs' ability to counsel home-seekers in a way that integrates communities, rendering the counseling less effective and efficient, not unlike "a retailer who sues a manufacturer for selling defective goods to the retailer." *Hippocratic Med.*, 602 U.S. at 395. As FHANC explained, investments in counseling for the purpose of neighborhood stabilization "have been and are continuing to be undermined by the existence of deteriorating and poorly maintained [BANA] REO properties in neighborhoods of color in the greater Solano and Contra Costa counties." Compl. ¶ 226.

The District of South Carolina found this type of harm sufficient to support standing under *Hippocratic Medicine* and *RNC. S.C. State Conf. of NAACP*, 2024 WL 5153170, at *6. In *South Carolina State Conference of NAACP*, plaintiff Justice 360 was a nonprofit organization with a mission to "promote fairness, reliability, and transparency in the criminal justice system for children facing lengthy sentences and individuals facing the death penalty in South Carolina," a mission achieved, in part, through providing direct representation to juveniles in the custody of the defendant. *Id.* at *1. Justice 360 alleged that the challenged conduct of the defendant caused its "'[j]uvenile clients [to] show up to attorney visits sleep-deprived, exhausted, and anxious' such that they 'struggle to focus' when Justice 360's attorneys attempt to meet with them about their cases." *Id.* at *6. As a result, the defendant's conduct "significantly increase[d] the time it [took] Justice 360 to represent [them], thereby hampering their mission by reducing the number of children Plaintiffs can represent." *Id.* So, too, here did Defendants' REO discrimination harm the FHO Plaintiffs by limiting the availability of housing and rendering their housing counseling services less effective.

### 2. Defendants' discrimination directly undermined the FHO Plaintiffs' financial investments in the impacted communities.

Defendants' conduct also injured the FHO Plaintiffs by undermining their financial investments in their communities. "Over a course of years, the Organizational Plaintiffs have provided millions of dollars to promote residential integration and increase home ownership and accessible housing" in their respective communities. Compl. ¶ 154. This includes financial support

for efforts "to foster home ownership, to assist with rebuilding predominantly African-American and Latino neighborhoods affected by the foreclosure crisis, to promote diverse, inclusive communities, and to provide employment opportunities for persons living in these neighborhoods." *Id.* The FHO Plaintiffs have used funds "to establish pocket parks and implement neighborhood beautification programs to make communities desirable and the focus of increased interest by real estate agents." *Id.*; *see also id.* ¶ 24 ("MMFHC's inclusive communities projects include providing grants to neighborhood non-profit partners to expand access to affordable and responsible homeownership while improving neighborhoods that were damaged by the foreclosure crisis."); *Id.* ¶ 25 (explaining that FHCCI used grants "to beautify neighborhoods" in support of its mission to "help, serve, revitalize, stimulate, and invest resources to rebuild an affordable, safe, and vital community"). These financial investments, however, "have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America-owned homes in the same communities." *Id.* ¶ 155. There are various examples of the type of investments directly counteracted by Defendants' conduct throughout the Complaint. *See, e.g.*, *id.* ¶ 165 ("NFHA has expended more than $5.5 million of its own funds to engage in community development, home ownership promotion, and neighborhood stabilization efforts across the nation. NFHA's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in those communities."); *id.* ¶ 173 (Metro); *id.* ¶ 178 (NTFHC); *id.* ¶ 183 (FHCWM); *id.* ¶ 192 (SSHC); *id.* ¶ 197 (HOPE FHC); *id.* ¶ 206 (FHCCI); *id.* ¶ 211 (DMFHC). In short, Defendants' conduct has decreased the value of every dollar the FHO Plaintiffs have spent to integrate neighborhoods and stabilize communities of color.

It is more than *plausible* that poorly maintained homes directly harm investments in neighborhood beautification. *Cf. Adams*, 697 F.2d at 1216 ("A complaint should not be thus dismissed merely because the court doubts that the plaintiff will ultimately prevail; so long as a plaintiff colorably states facts which, if proven, would entitle him to relief, the motion to dismiss should not be granted." (citation omitted)). Defendants' disagreement over whether this harm is worthwhile does not defeat the standard for a facial challenge on a motion to dismiss. *See* Defs.'

20

Mem. at 9 (scoffing at Plaintiffs' references to "neighborhoods of opportunity"); *Mayor & City Council of Balt.*, 416 F. Supp. at 479 (explaining that assertions that allegations in a complaint are untrue amounts to a factual—not facial—challenge).

These harms remain sufficient to establish an injury-in-fact in the Fourth Circuit under *Hippocratic Medicine* and *Havens*.

> **B.    Because of the injury Defendants caused to the FHO Plaintiffs' core activities in furtherance of their missions, the FHO Plaintiffs diverted resources away from their core activities and towards counteracting the harm Defendants' misconduct caused, further injuring the FHO Plaintiffs.**

Because Defendants' racial discrimination harmed the FHO Plaintiffs' mission-central work, they diverted resources away from their core activities towards counteracting the harm—a drain on their resources that created an additional injury to the FHO Plaintiffs sufficient to confer standing. *Hippocratic Medicine* clarified that, under *Havens*, an organization cannot establish standing based solely on "expending money to gather information and advocate against" a policy it opposes. 602 U.S. at 394. Rather, *Havens* held that because HOME's "efforts to assist equal access to housing through counseling and other referral services" were "frustrated by defendants' racial steering practices," the "consequent drain on [their] resources" to "identify and counteract the defendant's" discriminatory practices "constitute[d] far more than simply a setback to the organization's abstract social interests" and established an injury-in-fact. *Havens*, 455 U.S. at 379. The *Havens* Court understood that when challenged conduct injures an organization's activities in furtherance of its mission, the organization is not voluntarily choosing to respond—it is taking the necessary steps to counteract the actions that are harming it. For example, HOME would have continued to be harmed by Havens Realty's policy of racial steering if the organization did nothing. *Hippocratic Medicine* does not do away with this part of *Havens'* holding; it clarifies only that spending money to oppose or advocate against a defendant's policy, *alone*, is insufficient. *Hippocratic Med.*, 602 U.S. at 394–95.

Like HOME in *Havens*, Plaintiffs "had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory [ ] practices." *Havens*, 455 U.S. at 379; *Benson*, 2024 WL 4539309, at *12 (stating that plaintiffs in *Havens* and *Miami Valley* sufficiently alleged

"personal stake in the outcome of a controversy" because plaintiffs' resources "were diverted to ameliorate and counteract the challenged practices"). To stop the harm Defendants were causing to their missions, the FHO Plaintiffs had to divert resources from their core business activities "to address and attempt to counteract the effects of Defendants' discriminatory conduct prior to the filing of this action." Compl. ¶ 156; *see id.* ¶ 301 ("Until remedied, Defendants' unlawful, discriminatory actions will continue to injure Plaintiffs by . . . requiring the commitment of scarce resources, including substantial staff time and funding, to counteract Defendants' discriminatory conduct in the communities identified above, thus diverting resources away from the [FHO Plaintiffs]' usual activities and services, such . . . counseling.").

In their Complaint, the FHO Plaintiffs explain both what they had to divert their resources *towards* to counteract the harm Defendants were causing, and what that diversion took resources away *from*. To counteract Defendants' discriminatory conduct, the FHO Plaintiffs diverted resources away from their core activities and towards a variety of actions in direct response to Defendants' discriminatory maintenance and marketing of REOs in an effort to protect their core business activities. *See* Compl. ¶ 157 ("The diversion and expenditure of financial resources and staff time included, but was not limited to: time and costs associated with drafting and distributing educational materials; mailing costs and graphic design expenses; travel time and expenses; and staff hours diverted from other work to conduct research activities."); *id.* ¶ 151 ("By causing the [FHO Plaintiffs] to expend substantial time and resources . . . counteracting Defendants' unlawful conduct, Defendants have harmed the [FHO Plaintiffs] economically by forcing them to divert resources away from their usual education, counseling, investigation, and capacity-building activities and services."). Specific examples include:

- "engaging in an education and outreach campaign, and developing educational materials to identify and address Defendants' racially discriminatory maintenance practices," *id.* ¶ 150, including "creating public service announcements for local print and radio; designing specialized mailings; and engaging with media to raise awareness of REO-related issues and answer media related inquiries," *id.* ¶ 204 (FHCCI); *see also id.* ¶ 247 (FHCGSA);

- "presenting numerous fair housing trainings regarding REO maintenance to real estate professionals and bank employees," *id.* ¶ 163 (NFHA), including "creating and reviewing mandatory fair housing curricula for real estate agents renewing their licenses and ensuring that the courses included information on non-discriminatory marketing of REO properties," *id.* ¶ 243 (CFHC); *see also id.* ¶¶ 171 (Metro), 186 (FHC), 214 (TFHC), 229 (FHCRR);

- meeting "with municipal and county officials, community organizations, housing providers, individual realtors and realtors' associations, lending institutions, community service agencies, faith-based institutions, and homeowners and residents of communities affected by discriminatory REO maintenance and marketing practices," *id.* ¶ 190 (SSHC); *see also id.* ¶ 195 (HOPE FHC) ("meeting with local code or government officials regarding REO maintenance in Elgin and other local municipalities");

- "participating in neighborhood beautification and revitalization efforts," *id.* ¶ 214 (TFHC);

- meeting with "organization[s] dedicated to eradicating blight," *id.* ¶ 219 (LaFHAC), *see also id.* ¶ 243 (CFHC);

- developing comprehensive reports analyzing the findings of the investigation into Defendants and "offering recommendations that would minimize or eliminate discriminatory issues of differing treatment," *id.* ¶ 105 (NFHA);

- "sending specialized mailings to neighbors of REO properties," *id.* ¶ 224 (FHANC);

- "promoting MVFHC's Inclusive Community Fund [] in an attempt to stabilize the communities of color that have been disproportionately impacted by . . . REO properties that are not properly maintained and marketed," *id.* ¶ 238 (MVFHC);

- and "networking with affordable housing providers to determine whether the blight caused by REO properties could be addressed by turning those properties into affordable housing," *id.* ¶ 243 (CFHC).[10]

---

[10] ECF 295-9 ¶ 13 ("As a result of the strong adverse impact that the racially disparate maintenance and marketing of REOs had on communities of color in Cuyahoga County and to FHCRRs mission, FHCRR became involved in the Greater Cleveland Vacant and Abandoned Property Action Council ("VAPAC")—a consortium of government and civic leaders formed in 2011 to address the foreclosure crisis in Cuyahoga County. . . . The decision to bring this program in-house was a direct result of the harm Defendants caused to FHCRR's mission."); *id.* ¶ 15 ("As an additional response to the harm poorly-maintained REOs caused, FHCRR joined the Greater Cleveland Reinvestment Coalition ("GCRC"), a coalition of governmental entities and community organizations with a mission to promote investment and access to credit in Cuyahoga County's low- and moderate-income communities and communities of color. As part of its involvement with GCRC, FHCRR chaired the Home Mortgage Disclosure Act ("HMDA") Data Committee which, among other things, evaluated

The above examples sufficiently demonstrate that Defendants' "illegal action increase[d] the resources the group[s] must devote to programs independent of [their] suit challenging the action." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 28 (D.C. Cir. 1990); *see also Caicedo*, 2024 WL 4729160 at *5 (finding that, under *Hippocratic Medicine* and *Mayes*, a nonprofit plaintiff had standing where the "complaint state[d] that to counteract the voter apathy caused by Defendant's conduct, [plaintiff] diverted resources to 'extensive campaigns, outreach programs[,] and educational initiatives'").[11]

FHO Plaintiffs also detail in the Complaint what their resources would have been spent on had they not been diverted to address the harm Defendants' conduct was causing. *Cf. N.C. All. for Retired Ams. v. Hirsch*, No. 5:24-CV-275-D, 2024 WL 3507677, at *5–6 (E.D.N.C. July 19, 2024) (holding that the plaintiff did not have standing because it neglected to identify what the resources would have otherwise been spent on). For example, "Defendants' discriminatory conduct caused NFHA to forego opportunities, including executing new fair housing advocacy projects and investigations, conducting additional consulting and training of housing providers, applying for new grants and funding sources, attending conferences, and engaging in professional staff development." Compl. ¶ 162. CFHC was pulled away from "consulting opportunities, staff development, recruitment of interns and new Board members, and funding applications." *Id.* ¶ 242. "Defendants' discriminatory conduct caused FHCGSA to forego opportunities and planned activities including:

HMDA data in support of GCRC's work. FHCRR's involvement in GCRC was part of its efforts to address the harm Defendants caused to FHCRR's mission.").

[11] Unlike the law firm plaintiff in *Sarafin* that claimed diverted resources for providing legal services to the individual plaintiff, 2024 WL 5246597, at *8, the work the FHOs had to do to counteract the type of harm Defendants were causing differed in many ways from the FHOs' typical core activities—both in substance and in process. *See Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 210 F. App'x 469, 477 (6th Cir. 2006) ("[T]his new focus on disability discrimination very likely means that the organization turned its attention away from other incidents of discrimination."); *NFHA v. Bank of Am., N.A.*, No. SAG-18-1919, 2023 WL 1816902, at *6 (D. Md. Feb. 8, 2023) ("Ms. Kisch also candidly explains that, because of the plaintiffs' objectives, their 'investigation varies from most' FHA tests."). In any event, the reasoning in *Sarafin* defies *Havens* and common sense. Why would an organization not routinely engaged in housing discrimination investigations have organizational standing to bring an FHA case but not an FHO that, because counteracting housing discrimination is central to its mission, frequently investigates housing discrimination? The Supreme Court rejected the same argument made by the *Havens* petitioners. Br. of Pet'rs, *Havens Realty Corp. v. Coleman*, No. 80-988, 1981 WL 390424, at *19–20 (July 1, 1981); *Havens*, 455 U.S. at 379.

implementing education and outreach campaigns, updating its Directory of Accessible Housing, recruiting new testers and Board Members, conducting staff development activities, and applying for new grants, and funding sources." *Id.* ¶ 246. Defendants' conduct caused HOPE "to forego opportunities including resource development, . . . identifying opportunities to educate underserved and un-served populations, [and] utilizing research and technology to identify discriminatory trends in housing." *Id.* ¶ 167; *see also id.* ¶¶ 151–53 (all FHOs), 223 (FHANC).[12]

Several other FHO Plaintiffs lost funding as a result of diverting limited staff resources away from other revenue-generating opportunities and applications for new funding sources to focus on counteracting the harm Defendants were causing to their communities. *Id.* ¶¶ 175 (NTFHC), 180 (FHCWM), 194 (HOPE FHC), 234 ("Due to the size of its staff and the need to increase activities in addressing these properties, it became necessary to divert FHCNA's already limited resources. FHCNA . . . missed deadline dates for submitting new proposals for community funds . . . ."), 246 (FHCGSA).

The FHO Plaintiffs' injuries go far beyond "simply [ ] expending money to gather information and advocate against the defendant's action" to gain standing. *Cf. Hippocratic Med.*, 602 U.S. at 394. The FHO Plaintiffs properly alleged how they diverted resources from core business activities to a variety of activities aimed at counteracting the harm Defendants were causing to their missions. This suffices to confer organizational standing.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction.

---

[12] *See also* ECF 295-18 ¶ 4 ("Because of the magnitude of the REO investigations, I was unable to do consulting work for outside organizations that I otherwise would have been able to do. Investigating and countering the Defendants' discrimination also prevented NTFHC from developing a fair housing certification training for property management personnel, developing internet and social media programs related to fair housing, and sending its Fair Housing Coordinators to the National Fair Housing Alliance's biannual Fair Housing School, which trains individuals on how to conduct fair housing investigations.").

Dated: February 12, 2025

Respectfully submitted,

_/s/ Jessica P. Weber_
Jessica P. Weber (Fed. Bar No. 17893)
Andrew D. Freeman (Fed. Bar No. 03867)
Monica R. Basche (Fed. Bar No. 20476)
Lauren A. DiMartino (Fed. Bar No. 22046)
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, MD 21202
Phone: 410-962-1030
Fax: 410-385-0869
jweber@browngold.com
adf@browngold.com
mbasche@browngold.com
ldimartino@browngold.com

Morgan Williams (*pro hac vice*)
National Fair Housing Alliance
1101 Vermont Avenue, NW, Suite 710
Washington, DC 20005
Phone: 202-898-1661
mwilliams@nationalfairhousing.org

*Counsel for Plaintiffs*