**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*,<br><br>  *Plaintiffs*,<br><br>v.<br><br>BANK OF AMERICA, N.A., *et al.*,<br><br>  *Defendants*. | Case No.: 1:18-CV-1919 |

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
FOR LACK OF SUBJECT-MATTER JURISDICTION**

## TABLE OF CONTENTS

Page

ARGUMENT ................................................................................................................ 2

I.   Plaintiffs Are *Not* Relying on Good Law. ........................................................ 2

   A.  Plaintiffs continue to rely on extensions of *Havens* that have been roundly
       rejected by all levels of federal courts. ...................................................... 3

   B.  There is no "fair-housing organization" exception to Article III of the
       Constitution ................................................................................................ 7

II.  Plaintiffs Are *Not* in the Same "Unusual" Context as the *Havens* Plaintiff. ....................... 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ariz. All. for Retired Ams. v. Mayes*,
117 F.4th 1165 (9th Cir. 2024) ..................................................................2, 3, 6, 7

*City of Chi. v. Matchmaker Real Est. Sales Ctr., Inc.*,
982 F.2d 1086 (7th Cir. 1992) ..........................................................................6, 7

*Equal Rts. Ctr. v. AvalonBay Cmtys., Inc.*,
2009 WL 1153397 (D. Md. Mar. 23, 2009)..........................................................6

*Equal Rts. Ctr. v. Equity Residential*,
483 F. Supp. 2d 482 (D. Md. 2007) ..................................................................3, 6

*Equal Rts. Ctr. v. Equity Residential*,
798 F. Supp. 2d 707 (D. Md. 2011) .....................................................................6

*Equal Rts. Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ...........................................................................5

*Fair Hous. Ctr. of Metro. Detroit v. Am. House Grosse Pointe, LLC*,
2025 WL 66747 (6th Cir. Jan. 10, 2025) ...........................................................10

*Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*,
124 F.4th 990 (6th Cir. 2025) ............................................................................10

*Fair Hous. of Marin v. Combs*,
2000 WL 365029 (N.D. Cal. Mar. 29, 2000),
*aff'd*, 285 F.3d 899 (9th Cir. 2002)...................................................................6, 7

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024)...................................................................................... *passim*

*Get Loud Arkansas v. Thurston*,
748 F. Supp. 3d 630 (W.D. Ark. 2024)...........................................................7, 15

*Gladstone Realtors v. Vill. of Bellwood*,
441 U.S. 91 (1979)................................................................................................9

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982).................................................................................... *passim*

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
985 F.2d 1148 (2d Cir. 1993)...............................................................................9

*La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC*,
    82 F.4th 345 (5th Cir. 2023) ...............................................................12

*Legal Aid Chi. v. Hunter Props., Inc.*,
    2024 WL 4346615 (N.D. Ill. Sept. 30, 2024) ................................. *passim*

*Moseke v. Miller & Smith, Inc.*,
    202 F. Supp. 2d 492 (E.D. Va. 2002) .......................................................6

*NFHA v. Deutsche Bank Nat'l Trust*,
    2019 WL 5963633 (N.D. Ill. Nov. 13, 2019) .........................................15

*Online Merchants Guild v. Cameron*,
    995 F.3d 540 (6th Cir. 2021) .................................................................11

*RNC v. Benson*,
    2024 WL 4539309 (W.D. Mich. Oct. 22, 2024).....................................11

*Sarafin v. Hawai'i Pub. Hous. Auth.*,
    2024 WL 5246597 (D. Haw. Dec. 30, 2024).........................................8, 9

*Saunders v. Gen. Servs. Corp.*,
    659 F. Supp. 1042 (E.D. Va. 1987) ..........................................................6

*Share Our Selves v. City of Santa Ana*,
    2024 WL 4866815 (C.D. Cal. Sept. 30, 2024) ..........................................7

*Sierra Club v. Morton*,
    405 U.S. 727 (1972)..................................................................................5

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ..................................................................6

*Spann v. Colonial Village, Inc.*,
    899 F.2d 24 (D.C. Cir. 1990) ...........................................................12, 14

*Vill. of Bellwood v. Dwivedi*,
    895 F.2d 1521 (7th Cir. 1990) ..................................................................6

**Statutes**

42 U.S.C. § 3616a...........................................................................................8

When they brought this lawsuit, Plaintiffs spent over a hundred paragraphs of their Complaint trying to allege the concrete injuries they need for standing to sue in federal court. *See* Compl. ¶¶ 147–252. Each Plaintiff alleged "divert[ing] time and resources away from other intended projects and programs" to bring this lawsuit. *E.g.*, *id*. ¶ 162. Each Plaintiff claimed to have invested in "community outreach" and "education" to advocate against the Defendants. *E.g.*, *id*. ¶ 163. Each alleged their "mission and purpose" were "frustrated." *E.g.*, *id*. ¶ 164.

Then last year, the Supreme Court decided *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), rejecting all of these theories as a basis for Article III standing. There, as here, organizational plaintiffs complained that they were "'forced' . . . to 'expend considerable time, energy, and resources'" that they "divert[ed]" from other priorities. *Id*. at 394. There, as here, the organizational plaintiffs also claimed to have "engag[ed] in public advocacy and public education." *Id*. And there, as here, they claimed that the defendant "'impaired' their 'ability to provide services and achieve their organizational missions.'" *Id*. But the Supreme Court held that none of this gives an organizational plaintiff Article III standing, concluding that (i) "divert[ing]" an organization's "resources in response to a defendant's actions" does not demonstrate standing; (ii) "engaging in public advocacy and public education" does not demonstrate standing; and (iii) claiming an "impair[ment]" of an organization's "ability to provide services and achieve their organizational missions" also does not demonstrate standing. *Id*. at 394-95.

The question Plaintiffs face now is: ***What do they have left?*** Their answer is that *FDA* threw them a life preserver by acknowledging that *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), gives a plaintiff standing where a defendant "directly affected and interfered with [the plaintiff's] core business activities." 602 U.S. at 395. So Plaintiffs insist that they, too, have core business activities with which Defendants allegedly interfered. *FDA* called *Havens* an "unusual case" that should not be "extend[ed] . . . beyond its context." *Id*. at 396. So Plaintiffs insist that

this case and *Havens* are in the same context, just because both involve fair-housing organizations.

The real answer is that Plaintiffs have *nothing* left to meet Article III's concrete-injury requirement. They have never alleged any interference with their core business activities, and they have never tried to evidence it, either. This is unsurprising. Before *FDA*, Plaintiffs thought they would be able to rely on cases extending *Havens* far beyond its "unusual" context and upholding standing based on claims of diverted resources and frustrated missions. Those cases are no longer good law. *See, e.g., Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1177–78 (9th Cir. 2024) (calling prior case law "allow[ing] plaintiffs to satisfy Article III using the sort of frustration-of-mission and diversion-of-resource theories the Supreme Court rejected in [*FDA*] . . . irreconcilable with [*FDA*]—and thus overruled"). And neither *FDA* nor *Havens* carves out special privileges for fair-housing organizations exempting them from the same Article III standing requirements that apply to any other plaintiff in federal court.

## <u>ARGUMENT</u>

### I.  Plaintiffs Are *Not* Relying on Good Law.

Plaintiffs' opening argument is that "*Havens* remains good law." ECF No. 352 ("Opp.") at 3. Defendants have never argued otherwise. *Havens* of course remains good law—but only in its "unusual . . . context." *FDA*, 602 U.S. at 396. The question here is not whether *Havens* itself remains good law, but whether subsequent cases relied on by Plaintiffs, extending *Havens* well beyond that unusual context, remain good law. *FDA* answers that. They do not. *See* 602 U.S. at 396. The other question at issue here is whether Plaintiffs are in the same "unusual . . . context" as the Plaintiff in *Havens*. Plaintiffs' own arguments, purported expert reports, and discovery responses answer that question, too. They are not.

### A.  Plaintiffs continue to rely on extensions of *Havens* that have been roundly rejected by all levels of federal courts.

*FDA* makes clear that "the *Havens* holding" cannot be extended "beyond its context." 602

U.S. at 396. As the Ninth Circuit recognized when it expressly "overruled" *decades* of precedent in *Mayes*, cases that allowed organizational plaintiffs to plead Article III standing simply by alleging a "diversion of resources" or a "frustration of mission" are "irreconcilable" with *Havens*. 117 F.4th at 1178. But Plaintiffs have relied on those cases and theories from the beginning.

As detailed in Defendants' motion for summary judgment on available remedies (ECF No. 288-1 at 6), Plaintiffs avoided dismissal at the pleading stage by relying on cases holding that "[n]othing more is required" to plead a concrete injury than "the very fact that plaintiff undertook a nationwide investigation" and "devoted" "resources" to it. ECF No. 66 at 7 (quoting *Equal Rts. Ctr. v. Equity Residential*, 483 F. Supp. 2d 482, 486–87 (D. Md. 2007)). But as *FDA* makes clear, something more *is* required—a "perceptibl[e] impair[ment]" to a "core business activit[y]" that occurs separate and apart from the organization's decision to "divert[] its resources." 602 U.S. at 395. *Equal Rights Center*'s holding that the plaintiff need only allege it "divert[ed] resources to identify and counteract the defendants' [] practices, or that the challenged actions have frustrated plaintiff's mission," is now bad law. 483 F. Supp. 2d at 486–87.

At its April 2023 status conference, this Court asked Plaintiffs' counsel what "types and categories of damages [] the plaintiffs are envisioning," Plaintiffs identified two categories:

> One is diversion of resources, so the funding that they would have spent on other objectives that they had to spend on the investigation. . . .
>
> There are frustration of mission damages, given the harm that these policies have done to the communities that these organizations serve and the goals that they have of promoting fair housing. So it is possible—and we will have an expert issue a detailed report about how you can assign numbers to that, how you can theorize the different ways in which the purpose—what the organization seeks to do, the whole purpose for the organization has been frustrated. The goals have been set back by the discriminatory conduct, apart from just the resources they invested in the investigation, because they exist to promote racial integration, racial equity; and by harming these communities that the organizations advocate on behalf of, that sets back the mission.

ECF No. 242-1 at 4–7. Neither category survives *FDA*. Plaintiffs' theory that they were injured by

spending money investigating Defendants instead of "on other objectives" is foreclosed by *FDA*'s holding that "[a]n organization cannot manufacture its own standing" by "incurring costs to oppose [the defendant]'s actions . . . to the detriment of other spending priorities." 602 U.S. at 394. Plaintiffs' theory that they were injured because their "mission" was "set[] back" is foreclosed by *FDA*'s holding that alleging an "impair[ment]" to an organization's "ability to provide services and achieve their organizational missions . . . does not work to demonstrate standing." *Id*.

In July 2023, Plaintiffs responded to discovery requests on the factual bases for their claims of injury. *See* ECF No. 288-11. Every theory of injury they set forth in their 238-page interrogatory response rested on the expansive reading of *Havens* that has now been rejected by *FDA*:

- Plaintiffs claimed they "expended significant time investigating the Defendants." *Id*. at 4. But in *FDA*, the Supreme Court held that "spend[ing] 'considerable resources'" was not an Article III injury. 602 U.S. at 394.

- Plaintiffs claimed they spent resources "educating the public" about the supposed discrimination they claim to have "uncovered." ECF No. 288-11 at 5. But in *FDA*, the Supreme Court held that "inform[ing] . . . the public" about the results of the plaintiff's "studies" was not an Article III injury. 602 U.S. at 394.

- Plaintiffs claimed they "engaged in significant community outreach and public efforts" to address the supposed discrimination. ECF No. 288-11 at 5. But in *FDA*, the Supreme Court held that "engaging in public advocacy and public education" was not an Article III injury. 602 U.S. at 394.

- Plaintiffs claimed they "were forced to divert limited resources and time away from other intended projects and programs." ECF No. 288-11 at 5. But in *FDA*, the Supreme Court held that spending resources "to the detriment of other spending priorities" was not an Article III injury. 602 U.S. at 394.

- Plaintiffs claimed that they experienced "[f]rustration of mission . . . harm" because this case "diminish[ed]" their "range of services." ECF No. 288-11 at 6. But that's just another way of alleging the "detriment [to] other spending" priorities that is not an Article III injury. 602 U.S. at 394.

- Plaintiffs claimed Defendants "impair[ed] the organization[s'] mission." ECF No. 288-9. But in *FDA*, the Supreme Court reaffirmed that "a setback to the organization's abstract social interests" is not an Article III injury, "no matter how longstanding the interest and no matter how qualified the organization." 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379; *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).

In October 2023, Plaintiffs proffered one of their former executives (now a law professor), Stacy Seicsnaydre, as their damages "expert." Her arguments tracked Plaintiffs' two theories of injury and *also* relied on legal conclusions now foreclosed by *FDA*:

> The established caselaw on organizational damages in fair housing cases provides for recovery of two general types of compensatory damages. The first relates to the time and resources spent identifying and counteracting the defendant's [alleged] discrimination ("diversion of resources"); the second is the harm the defendant's [alleged] discrimination caused by diminishing the organization's range of core services and impairing the organization's mission to promote an equal housing market and fair housing choice ("frustration of mission").

ECF No. 288-9 at 9. Again, Seicsnaydre's argument that Plaintiffs can sue based on "the time and resources" they spent "counteracting the defendant[s]" is foreclosed by *FDA*'s holding that "incurring costs to oppose [the defendant]'s actions" is not an Article III injury. 602 U.S. at 394. Her argument that Plaintiffs can sue based on deciding to "diminish[] [their] range of core services" to fund litigation is foreclosed by *FDA*'s holding that funding litigation "to the detriment of other spending priorities" is not an Article III injury. *Id*. And her argument that Plaintiffs can sue based on an alleged impairment to their "mission" is foreclosed by *FDA*'s holding that "a setback to the organization's abstract social interests" is not an Article III injury. *Id*.

In August 2024, Plaintiffs opposed Defendants' motion for summary judgment on available remedies with a brief ignoring the recently decided *FDA* case, and packed with citations to rulings that are manifestly bad law in light of *FDA*. These include, but are not limited to:

- *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) (cited by Plaintiffs for the proposition that "the *choice* to redirect resources to investigate discrimination is sufficient to confer standing, if "in response to, and to counteract, the effects of the . . . discrimination") (ECF No. 295 at 15);

- *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (cited by Plaintiffs for the proposition that fair-housing plaintiffs are harmed by "[a]ny violation of the FHA" so long as their mission is to "ensur[e] compliance") (ECF No. 295 at 27);

- *City of Chi. v. Matchmaker Real Est. Sales Ctr., Inc.*, 982 F.2d 1086, 1095 (7th Cir. 1992) (cited by Plaintiffs for the proposition that "deflect[ing] time and money from

counseling to legal efforts" suffices for standing) (ECF No. 295 at 12);

- *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) (cited by Plaintiffs for the proposition "that the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination") (ECF No. 295 at 12);

- *Equal Rts. Ctr. v. Equity Residential*, 798 F. Supp. 2d 707 (D. Md. 2011) (cited by Plaintiffs for the proposition that "organizational plaintiffs' missions are impaired because of their past diversion of resources") (ECF No. 295 at 36);

- *Equal Rts. Ctr. v. AvalonBay Cmtys., Inc.*, 2009 WL 1153397, at *6 (D. Md. Mar. 23, 2009) (cited by Plaintiffs for the proposition that the mere "existence of non-compliant properties" that a plaintiff decides "to investigate" is an injury) (ECF No. 295 at 13);

- *Equal Rts. Ctr. v. Equity Residential*, 483 F. Supp. 2d 482, 487 (D. Md. 2007) (cited by Plaintiffs for the proposition that "allocation of resources to investigate discrimination" suffices for standing) (ECF No. 295 at 13);

- *Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492, 497 (E.D. Va. 2002) (cited by Plaintiffs for the proposition that "the diversion of an organization's resources to counteract discriminatory practices is a palpable injury") (ECF No. 295 at 20);

- *Fair Hous. of Marin v. Combs*, 2000 WL 365029, at *3 (N.D. Cal. Mar. 29, 2000) (cited by Plaintiffs for the asserted proposition that Plaintiffs are "harm[ed]" by their "litigation" expenses, and that the harm can be measured by rates exceeding "pro rata" salaries), *aff'd*, 285 F.3d 899 (9th Cir. 2002) (ECF No. 295 at 20, 24);

- *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1060 (E.D. Va. 1987) (cited by Plaintiffs for the propositions that "impairment of [their] objectives and diversion of [their] resources" suffice for standing and that fair-housing plaintiffs are "'injured by the mere fact' of the discriminatory act") (ECF No. 295 at 10–11);

Each of these cases extend *Havens* beyond its "unusual . . . context" and are irreconcilable with *FDA*'s ruling that *Havens* "does not stand for the expansive theory that standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 370.

Courts have already begun making this explicit. In *Mayes*, the Ninth Circuit called out *Combs* as an erroneous "expansion" of *Havens* and criticized it for "not even bother[ing] [to] mention[] the traditional three-part Article III standing inquiry." 117 F.4th at 1175–76. A district court soon thereafter ruled "*Combs* . . . has been limited by the Supreme Court's recent decision, *FDA*." *Share Our Selves v. City of Santa Ana*, 2024 WL 4866815, at *5 (C.D. Cal. Sept. 30, 2024). The

same day, a court called the *Matchmaker* ruling relied on by Plaintiffs "foreclosed" by *FDA* and prior Supreme Court precedent, and stated: "To the extent that the Seventh Circuit's reasoning was predicated on the existence of *Havens*'s theory of standing, it would no longer be good law." *Legal Aid Chi. v. Hunter Props., Inc.*, 2024 WL 4346615, at *13 n.3 (N.D. Ill. Sept. 30, 2024).

Yet Plaintiffs continue arguing propositions foreclosed by *FDA* in their present opposition brief. Plaintiffs inaccurately describe post-*FDA* cases "in several circuits" (but not *this* one) as "continu[ing] to hold that injuries to organizations' missions remain sufficient to find standing under [*FDA*]." Opp. at 10. They hold no such thing. For example, Plaintiffs characterize *Get Loud Arkansas v. Thurston*, 748 F. Supp. 3d 630 (W.D. Ark. 2024), as finding standing because "the defendant 'impair[ed] the organization's ability to accomplish its mission' of registering Arkansans to vote." Opp. at 10. Plaintiffs' quoted language comes from the Background section of the case summarizing the complaint's allegations, not the Court's analysis. The Court's actual standing analysis found a concrete injury "because of the costs of complying with the Rule" the plaintiff was suing to invalidate—a straightforward out-of-pocket injury. *Get Loud*, 748 F. Supp. 3d at 653. Nothing like that is alleged here. There, as in all of the other cases Plaintiffs cite in which organizational plaintiffs' standing was upheld under *FDA*, the courts relied on claims of direct impairments of the plaintiffs' business—not on mere setbacks to their "missions."

## B.  There is no "fair-housing organization" exception to Article III of the Constitution.

Plaintiffs argue that *FDA* involved "issue-advocacy groups" in contrast to "groups like FHOs." Opp. at 4. Then they contend that "Defendants have not pointed to a single case where a court has applied [*FDA*] to deny organizational standing to a traditional FHO in an FHA case." *Id.* at 10. The first argument misreads *FDA*, which sets forth basic Article III standing principles in no way limited to "issue-advocacy groups," and would be unavailing even if it *didn't* misread *FDA*, because Plaintiffs are *obviously* issue-advocacy groups. The second argument is just false.

Defendants cited multiple cases denying organizational standing to fair-housing groups just like Plaintiffs. *See* Mot. at 4–6 (citing *Sarafin v. Hawai'i Pub. Hous. Auth.*, 2024 WL 5246597, at *8–9 (D. Haw. Dec. 30, 2024); *Hunter*, 2024 WL 4346615, at *11).

Plaintiffs' effort to distinguish themselves from "issue-advocacy groups" is meritless. While *FDA* recognized that "an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the [defendant]'s conduct," it also recognized the plaintiff was *not* simply claiming a setback to their advocacy interests and alleged "that they have demonstrated something more here." 602 U.S. at 394. Specifically, they claimed standing "not based on their mere disagreement with FDA's policies, but based on their incurring costs to oppose FDA's actions." *Id*. That puts them in the same boat as Plaintiffs here, who also claim an injury based on their "costs," not just their advocacy interests. Regardless, *of course* Plaintiffs are "issue-advocacy groups." Plaintiffs describe *themselves* that way, and some of them even put it in their names ("Fair Housing *Advocates* of Northern California," "Housing Research and *Advocacy* Center"). NFHA claims "public policy" and "advocacy" as part of its mission. *See* https://nationalfairhousing.org/. Forms of the word "advocacy" appear *131* times in Plaintiffs' interrogatory responses setting forth the alleged injury to their "missions."[1]

There is no merit to Plaintiffs' assertion that *FDA* does not apply to them just because they describe the issue for which they advocate as "fair housing." They claim they are "designated under federal law to enforce the FHA" (Opp. at 14 (citing 42 U.S.C. § 3616a)), but that statute merely authorizes HUD to give them grants for their investigations and lawsuits. That does not

---

[1] *See* ECF No. 288-11, *passim* (boasting of "housing advocacy projects," "advocacy efforts," "advocacy and educational activities," "advocacy[] and training programs," "[a]dvocacy/outreach to city and state governments," "Affirmatively Furthering Fair Housing Advocacy," "advocating with Connecticut's legislature," "advocacy/outreach to city and state governments," "[a]ffirmatively further fair housing through advocacy," "[p]rovision of advocacy and impact work," "legislative advocacy for ordinances," "[a]dvocating on state policy changes," *etc.*, *etc.*, *etc.*).

"abrogate the Art. III minima," *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979), "for Congress cannot waive the constitutional minimum of injury-in-fact." *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp*., 985 F.2d 1148, 1154 (2d Cir. 1993).

Plaintiffs' contention that no court has applied *FDA* to fair-housing groups is simply wrong. For example, Defendants already cited *Sarafin*, where the Legal Aid Society of Hawai'i alleged a "frustration of LASH's mission" to further "[f]air housing." 2024 WL 5246597, at *4. Plaintiffs try to distinguish *Sarafin* on the feeble ground that even though LASH "received funding from HUD," "receives fair housing complaints, conducts fair housing investigations, and seeks enforcement of fair housing laws," it is "not specifically an FHO" because it is also "a legal services organization" that "provides legal services across of [*sic*] a variety of areas beyond housing." Opp. at 11 n.1. This is not a point of distinction given that *Sarafin* was exclusively concerned with LASH's fair-housing mission, not any of those other "areas." And Plaintiffs, just like LASH, are using their legal services as an advocacy tool, which does not confer standing.

Defendants also already cited *Hunter*, where the organizational plaintiff alleged harm to its "mission" of "ensur[ing] fair access to housing." 2024 WL 4346615, at *10.  Plaintiffs call *Hunter* "readily distinguishable," but do not distinguish it, only mischaracterize it. Opp. at 9. They insinuate *Hunter* was limited to "holding that an eviction policy did not divert a legal services nonprofit from its usual work and plaintiff failed to allege what activities were reduced or eliminated." *Id*. In fact, the plaintiff in *Hunter* repeatedly alleged diversion from its usual work.[2] It's true that the court criticized the plaintiff for failing to specify "what activities are getting the short end of the

---

[2] *See* 2024 WL 4346615, at *6 (claiming it "divert[ed] . . . limited resources from[] maximizing low-income Cook County residents' access to safe, decent and affordable housing"; "had to use staff time and financial resources . . . to assess the discriminatory harm caused by Hunter's actions," and "would have devoted more resources to promoting its mission and representing tenants in eviction cases, if not for the" defendant).

stick," but the Court never suggested that more specificity could have cured the standing defect.

*Id.* at \*12. To the contrary, the case contained an extended discussion of why the plaintiff lacked

standing even if its allegations of diverting resources from other priorities were true:

> Think about it this way: Legal Aid Chicago is like an emergency-room physician. Hunter Properties is creating more patients, with more severe illnesses, for that doctor. That makes the doctor's job harder. The doctor might have to devote more resources of time, energy, and attention to her patients. But that's not a diversion of resources.
>
> It's not even "an impairment of its ability to do work *within* its core mission." It doesn't stop the doctor from doing her job. It is what creates and deepens the need for the job.
>
> Hunter Properties hasn't turned off the lights in the ER or locked a medicine cabinet. In other words, Hunter Properties hasn't done anything that would force the doctor to stop her work and do something well outside her job description before she could resume treating patients. *That* would be an impairment of the doctor's "core mission" of treating patients. Merely giving a doctor more patients to treat is not.
>
> Similarly, a streetsweeper is not injured by pedestrians who throw a few candy wrappers on the ground. That extra litter makes the streetsweeper's job harder, but it doesn't impair the streetsweeper's ability to *work toward* his job. It just makes the end goal of clean streets slightly further away. So extra litter wouldn't be an Article III injury for the streetsweeper.

*Id.* at \*10–11 (citations omitted).

Moreover, as Plaintiffs themselves concede by reference to *Fair Housing Center of Metropolitan Detroit v. Singh Senior Living, LLC*, 124 F.4th 990 (6th Cir. 2025), the Sixth Circuit twice held *FDA* applicable to fair-housing groups. *See also Fair Hous. Ctr. of Metro. Detroit v. Am. House Grosse Pointe, LLC*, 2025 WL 66747 (6th Cir. Jan. 10, 2025). In those cases, the district courts originally found the plaintiff's diversion-of-resources allegations sufficient to plead standing under "a line of precedent arising out of" *Havens*—but then "the Supreme Court decided *FDA*." 124 F.4th at 992. Based on *FDA*, the Sixth Circuit vacated the judgments to let the district courts reassess standing in light of "further discovery and argument." *Id.* at 993.[3]

---

[3] Plaintiffs ignore how *Singh* and *Grosse Pointe* undermine their argument that *FDA* does not apply to "a traditional FHO in an FHA case" (Opp. at 10), and instead cite *Singh* for the proposition that they, too, should be allowed to "amend the Complaint" or "supplement the record with additional evidence" about their "core business activities." *Id.* at 15 n.5. But, unlike in *Singh* and *Grosse*

In a final push, Plaintiffs pretend that their manufactured distinction between fair-housing groups and other organizations actually has a basis in case law. They mischaracterize *RNC v. Benson*, 2024 WL 4539309 (W.D. Mich. Oct. 22, 2024), as "distinguishing cases involving political organizations from those involving FHOs." Opp. at 9. *Benson* drew no such distinction. The court distinguished the plaintiff's claims from *Havens* and two other cases, one of which involved a fair-housing group and one of which did not. *See* 2024 WL 4539309, at *12 (citing *Online Merchants Guild v. Cameron*, 995 F.3d 540 (6th Cir. 2021)). The court attached no significance whatsoever to the fact that the RNC was a "political organization"—the dispositive fact was that the plaintiff was trying to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm." *Id*. Nor did it attach any significance to the fact that *Havens* involved a fair-housing group. *Id*. Simply put, there is no merit to Plaintiffs' argument that fair-housing groups are materially different from other organizational plaintiffs.

## II.  Plaintiffs Are *Not* in the Same "Unusual" Context as the *Havens* Plaintiff.

Plaintiffs conclude their Opposition arguing that they "properly alleged how they diverted resources from core business activities to a variety of activities aimed at counteracting the harm Defendants were causing to their missions." Opp. at 25. But this is just another example of Plaintiffs claiming they spent "resources[] to the detriment of other spending priorities, which "does not work to demonstrate standing." 602 U.S. at 394. And it is not what *Havens* allowed.

The "unusual" context in which *Havens* still furnishes a basis for organizational standing is this: The plaintiff, HOME, "operated a housing counseling service" as one of its "core business activities." 602 U.S. at 395-96. And when HOME sent testers to the defendant's building, the

---

*Pointe*, that result would be wholly unnecessary and inappropriate in this case, because the parties already had an entire phase of discovery on "[a]ny issues relevant to the Plaintiffs' claimed damages," and have an ample record on which to argue the issue now. ECF No. 251 at 1.

defendant "gave HOME's employees false information about apartment availability," prompting HOME to sue. *Id* at 395. The Supreme Court analogized HOME to "a retailer who sues a manufacturer for selling defective goods to the retailer." *Id*.

As *Hunter* pointed out, the fact that the defendant directly interacted with the plaintiff and gave it false information was crucial to making this analogy work. *See* 2024 WL 4346615, at *11 (no standing because "[t]he complaint includes no allegation that Legal Aid Chicago dealt directly with Hunter Properties, or spent any resources helping potential tenants who dealt with Hunter Properties"). Absent that "direct[]" interaction, a plaintiff would *not* be anything like "a retailer who sues a manufacturer for selling defective goods to the retailer." *FDA*, 602 U.S. at 395. At best, the plaintiff would be like a retailer who sues a manufacturer for selling defective goods to *someone else*—failing the basic "What's it to you?" standing question. *Id.* at 379; *see also Hunter*, 2024 WL 4346615, at *11 ("It's like a streetsweeper on the south side of Chicago, suing someone who threw a candy bar wrapper on the street in the north side of Chicago.").

Another "unusual" aspect of *Havens* is that the *Havens* plaintiff alleged that the defendant "directly affected and interfered with HOME's core business activities" *independently* of the plaintiff's decision to devote resources to investigating and suing. 602 U.S. at 395–96.[4] In other words, the plaintiff alleged it would have been injured even "if it d[id] nothing." *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC*, 82 F.4th 345, 357 (5th Cir. 2023) (Ho, J., concurring).

Overlooking both the dispositive "selling defective goods" analogy and the "independent" injury question, Plaintiffs instead fixate on the "counseling service" aspect of *Havens*, and draw from it the superficial conclusion that any organization that operates a counseling service

---

[4] *Accord, e.g., Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) ("*Havens* makes clear . . . that an organization establishes Article III injury if it alleges that purportedly illegal action increases the resources the group must devote *to programs independent of its suit* challenging the action.") (Ginsburg, J.) (emphasis added).

automatically has standing. That does not work as a matter of law, because it takes more than operating a counseling service to state a claim akin to buying defective goods, or to show a perceptible *impairment* to that service. It does not work as a matter of fact, either. Plaintiffs *never* based their concrete-injury claims on any kind of impairment to their counseling services. It is only *now* that *FDA* has defined that impairment as the eye of the needle through which Plaintiffs need to pass that Plaintiffs are hastily attempting to retcon their standing theory to involve "counseling," instead of the diversion-of-resources and frustration-of-mission theories they spent several years arguing. *See* Opp. at 18–19, 21–22. So now they declare that "Defendants' conduct impaired the FHO Plaintiffs' ability to provide counseling." *Id*. at 18. This is too little, too late.

Plaintiffs' Complaint never alleged any impairment to their "ability to provide counseling." *Id*. It barely mentioned "counseling" at all. The sum total of its references to "counseling" are:

(i)   mentioning "counseling" as among the services some of the Plaintiffs provide (Compl. ¶¶ 19, 22, 23, 27, 29, 30, 34);

(ii)  generally alleging that "Defendants have harmed the Organizational Plaintiffs economically by forcing them to divert resources away from their usual education, counseling, investigation, and capacity-building activities and services" (*id*. ¶ 151);

(iii) mentioning "counseling" as among the "other intended projects and programs" from which a single one of the Plaintiffs "diverted resources" (*id*. ¶ 189).

But the mere existence of "counseling" services does not establish a perceptible impairment of them. Claiming to have "divert[ed] resources away" from them does not establish a perceptible impairment, either, since "[a]n organization cannot manufacture its own standing" by "spend[ing] 'considerable resources' to the detriment of other spending priorities." *FDA*, 602 U.S. at 394.

Plaintiffs' Interrogatory responses also peppered in a series of "counseling" references. Again, however, none of these references came in the context of claiming a perceptible *impairment* to those activities. Most of them just echoed the Complaint's allegation that counseling was among the other spending priorities Plaintiffs elected to deprioritize to fund this lawsuit instead. *See* ECF

No. 288-11, Ex. B (repeated boilerplate assertions that Plaintiffs were "forced to forego . . . [e]ducation, counseling, investigation, and capacity-building activities and services"). The remainder of the "counseling" references were pure non-sequiturs. NFHA supplied a bullet-point list of millions of dollars' worth of grants it gave other organizations for "counseling activities." *Id*. Ex. D at 1–13 (*e.g.*, $185,000 grant to a group to "support foreclosure prevention and counseling activities"). Obviously, the fact that NFHA funded these grants is not evidence that any of those activities were *impaired*. If anything, it is evidence that those activities were thriving.[5]

The Seicshnaydre report is similarly bereft of any showing that Plaintiffs' "counseling" activities were impaired. The only thing it offers is an *ipse dixit* statement that "Defendants reduced the capacity of FHOs" to conduct their whole range of operations and thereby "reduced the capacity and effectiveness of counseling programs to assist housing consumers in obtaining and maintaining housing." ECF No. 288-9 at 32. But Seicshnaydre's statement of *how* Defendants supposedly "reduced the capacity and effectiveness" of Plaintiffs' counseling programs is exactly the logic prohibited by *FDA*. She does not claim there was any perceptible impairment to these programs "independent" of Plaintiffs' decision to divert resources from them to fund this lawsuit. *Spann*, 899 F.2d at 27. To the contrary, she attributes the "reduced . . . capacity and effectiveness" to "the period during which the FHOs were forced to divert resources to research, investigate, and prosecute the Defendants." ECF No. 288-9 at 32. This theory is foreclosed by *FDA*'s ruling that a plaintiff "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant[]." 602 U.S. at 394.

Further undermining Plaintiffs' claims is Seicshnaydre's account of *how* Plaintiffs must

---

[5] It's also not evidence that any of those "counseling" activities were relevant to any issue raised by this case. For example, "foreclosure prevention" counseling (*id*.) is not the same thing as "homebuying" counseling and is not relevant to Plaintiffs' unsupported theory that Defendants somehow made housing "unavailable." Compl. ¶ 313.

show the supposed impairment to their counseling activities. She opines that "a fact finder should include valuations of the complaint based FHO activities, including counseling," and "consider" "any particular factors" that made the "diminishment" of those services "particularly harmful." ECF No. 288-9 at 32. The record is devoid of all of these things. Plaintiffs neither conducted nor presented any "valuation" of their counseling activities. Nor did Plaintiffs perform or present any analysis of how those services were "diminish[ed]" or how the alleged "diminishment" harmed them. This contrasts with their own cited authorities finding perceptible impairment only where the plaintiffs *did* evidence these things. For example, unlike *Get Loud*, 748 F. Supp. 3d at 653, where the perceptible impairment was "evidenced by the precipitous decline in [voter] registrations through [plaintiff] since the [challenged] Rule was put into place," Plaintiffs here allege no decline in people they "counseled." The bottom line is that Plaintiffs' own purported expert claims the alleged harm to their "counseling" services can only be shown by evidence that does not exist.

In one last effort to save their claims, Plaintiffs introduce a new theory not rooted in either *Havens* or *FDA*: that Defendants somehow "undermined the FHO Plaintiffs' financial investments in the impacted communities." Opp. at 19. This theory accounts for exactly $0 of the $75,817,728 Plaintiffs claim as damages, as Seicshnaydre did not even mention it. Plaintiffs cannot avoid dismissal on the basis of a $0 injury. The theory fails as a matter of law in any event. The same claim was twice dismissed in their other pending lawsuit. *See NFHA v. Deutsche Bank Nat'l Trust*, 2019 WL 5963633, at *7 (N.D. Ill. Nov. 13, 2019) ("Even under a broader understanding of proximate cause that looks beyond simple 'step counting,' the line from Defendants' alleged discriminatory conduct to the 'undermining' of Plaintiffs' investments winds through too many other potential causes."). The same rationale bars the theory here. Because Plaintiffs have no theory of injury compatible with the Supreme Court's Article III injury or proximate-causation precedents, the motion to dismiss should be granted.

Respectfully submitted this 18th day of March, 2025,

/s/ *Melissa O. Martinez*
Ava E. Lias-Booker (No. 05022)
Melissa Martinez (No. 28975)
MCGUIRE WOODS LLP
500 E. Pratt St., Ste. 1000
Baltimore, Md. 21202
Tel.: (410) 659-4430
Fax: (410) 659-4558
alias-booker@mcguirewoods.com
mmartinez@mcguirewoods.com

/s/ *Thomas M. Hefferon*
Thomas M. Hefferon (No. 15109)
Brooks R. Brown (*pro hac vice*)
Keith Levenberg (No. 11957)
GOODWIN PROCTER LLP
1900 N St. N.W.
Washington, D.C. 20036
Tel.: (202) 346-4248
Fax: (202) 346-4444
thefferon@goodwinlaw.com
bbrown@goodwinlaw.com
klevenberg@goodwinlaw.com

*Counsel for Defendant Bank of America, N.A.*

/s/ *Maryan Alexander*
Maryan Alexander (No. 29158)
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
500 E. Pratt St., Ste. 600
Baltimore, Md. 21202-3173
Tel.: (410) 962-7385
Fax: (410) 962-8758
Maryan.alexander@wilsonelser.com

/s/ *Celena R. Mayo*
Celena R. Mayo (*pro hac vice*)
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
150 E. 42nd St.
New York, N.Y. 10017
Tel.: (212) 490-3000
Fax: (212) 490-3038
celena.mayo@wilsonelser.com

*Counsel for Defendant Safeguard Properties Management, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and be sent to the non-registered participants as known this 18th day of March, 2025.

/s/ *Ava E. Lias-Booker*
Ava E. Lias-Booker