**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*, | |
| v. | Civil Action No. SAG-18-1919 |
| BANK OF AMERICA, N.A., *et al*. | |

**MEMORANDUM OPINION**

The Plaintiffs in this action, a coalition of twenty fair housing advocacy groups and three individual homeowners,[1] assert that Bank of America, N.A. ("BANA") and its servicer, Safeguard Properties Management, LLC ("Safeguard") (collectively, "the Defendants"), discriminated in their maintenance and marketing of real estate owned properties ("REOs") in a manner that violated the Fair Housing Act ("FHA").

Several motions are currently pending before this Court. Plaintiffs move for summary

---

[1] This Court will refer to the individual homeowner plaintiffs as "Individual Plaintiffs," the coalition of fair housing advocacy groups as "Organizational Plaintiffs," and the Individual Plaintiffs and Organizational Plaintiffs collectively as "Plaintiffs." The twenty Organizational Plaintiffs are: National Fair Housing Alliance, Inc. ("NFHA"), Housing Opportunities Project for Excellence, Inc., Metro Fair Housing Services, Inc., North Texas Fair Housing Center, Fair Housing Center of West Michigan, Fair Housing Continuum, Inc., South Suburban Housing Center, H.O.P.E. Inc., d/b/a HOPE Fair Housing Center, Metropolitan Milwaukee Fair Housing Council, Fair Housing Center of Central Indiana, Denver Metro Fair Housing Center, Fair Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair Housing Center, Greater New Orleans Fair Housing Action Center  Fair Housing Advocates of Northern California, Housing Research & Advocacy Center d/b/a Fair Housing Center for Rights & Research, Fair Housing Center of Northern Alabama, Miami Valley Fair Housing Center, Connecticut Fair Housing Center, Fair Housing Council of Greater San Antonio, and Fair Housing Center of the Greater Palm Beaches, Inc. ECF 1.

judgment on step two of the FHA's disparate impact framework. ECF 285, 287.[2] Defendants filed a cross-motion for summary judgment on steps two and three of the disparate impact framework, ECF 299. The parties filed oppositions and replies. ECF 311, ECF 328. The Court held a hearing on these motions on January 27, 2025. ECF 342, 347. Defendants also filed a motion for summary judgment regarding available remedies, ECF 288. Plaintiffs filed an opposition, ECF 296, and Defendants filed a reply, ECF 304. Both parties also moved to exclude the testimony of various proposed experts under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). ECF 310, 314. The parties filed oppositions and replies. ECF 324, 327, 333, 334. Defendants moved to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1). ECF 343. Plaintiffs opposed, ECF 352, and Defendants filed a reply, ECF 358. The parties submitted various supplemental authorities, notices, and correspondence relevant to the standing motion, ECF 359, 360, 361, 364, 365, 371. This Court held a hearing on the standing motion on May 15, 2025. ECF 369. *See* Loc. R. 105.6 (D. Md. 2025). Following another order issued by this Court after that hearing, ECF 373, Plaintiffs filed a motion for reconsideration, ECF 374. Defendants filed an opposition, ECF 376, and Plaintiffs filed a reply, ECF 379.

For the reasons stated below, Defendants' Motion to Dismiss for Lack of Subject-Matter Jurisdiction, ECF 343, is GRANTED and the FHA claims for damages brought by the Organizational Plaintiffs are dismissed. Because Plaintiffs' FHA claims otherwise remain viable, this Court proceeded to evaluate certain of the remaining motions. Plaintiffs' Motion to Exclude Defendants' Proposed Experts, ECF 310, is DENIED AS MOOT. Defendants' Motion to Exclude

---

[2] Plaintiffs erroneously filed both the redacted and unredacted versions of their summary judgment motions as separate motions on the docket. *See* ECF 285 and 287. This Court will obviously rule the same way as to both pending motions.

Plaintiffs' Experts, ECF 314, is GRANTED IN PART AND DENIED IN PART as to Joanne Poole, and DENIED AS MOOT as to the remaining experts. Plaintiffs' Motion for Partial Summary Judgment on Step Two of the Disparate-Impact Framework, ECF 285, 287, is DENIED, and Defendants' Cross-Motion for Summary Judgment on Burden-Shifting Frameworks, ECF 299, is GRANTED. Defendants' Motion for Summary Judgment on Available Remedies, ECF 288, and Plaintiffs' Motion for Reconsideration, ECF 374, are both DENIED AS MOOT.

## I.    BACKGROUND

### A.  Nature of Claims

This Court will defer a factual recitation and will discuss facts relevant to the specific pending motions below. This Court notes, however, that this case consists of various FHA claims brought on behalf of the Organizational Plaintiffs and three Individual Plaintiffs, along with private nuisance claims brought by each of the Individual Plaintiffs against the Defendants. ECF 1 at 105-112.[3] To date, this litigation has focused exclusively on the FHA claims, which are brought pursuant to both disparate impact and disparate treatment theories. Neither party has sought summary judgment (or filed any other motions) relating to the Individual Plaintiffs' private nuisance claims.

### B.  Procedural History

Plaintiffs initially filed an administrative complaint against BANA with the Department of Housing and Urban Development ("HUD") on September 25, 2012. ECF 169-15. Plaintiff NFHA and other groups also filed administrative complaints against other banks, including U.S. Bank. *See NFHA v. U.S. Bank N.A.*, No. 01-12-0283-8 (HUD Jan. 8, 2016), ECF 167-6 ("*U.S. Bank*").

---

[3] For pincites, this Court uses the ECF page numbers in the header at the top of the filing. In the case of citations to depositions, this Court uses the deposition transcript's original page numbers.

In January 2016, HUD concluded that there was "no reasonable cause to believe that" U.S. Bank "engaged in a pattern or practice of discriminatory treatment as alleged, engaged in individual instances of discrimination as would be indicated by testing, or violated Sections 804(a), (b), (c), or (d) of the Fair Housing Act." *Id.* at 30. HUD's conclusion rested largely on its determination that the plaintiffs' testing methodology was fatally flawed. *Id.*

After HUD's decision in *U.S. Bank*, Plaintiffs withdrew their administrative complaint against BANA and filed this lawsuit on June 26, 2018. ECF 1. Plaintiffs' claims include FHA claims alleging violations of 42 U.S.C. § 3604(a) (Count I), 42 U.S.C. § 3604(b) (Count II), 42 U.S.C. § 3605 (Count III), 42 U.S.C. § 3601 (Count IV), 42 U.S.C. § 3617 (Count V), and private nuisance claims by the Individual Plaintiffs (Counts VI & VII). *Id.* Investigations by NFHA and other fair housing organizations into maintenance and marketing of REO properties by other lenders and servicers resulted in two other federal lawsuits, *NFHA v. Fannie Mae*, No. C 16-6969 (N.D. Cal. 2018) and *NFHA v. Deutsche Bank*, No. 18-cv-839 (N.D. Ill. 2018).

The original district judge assigned to this case, Judge Catherine C. Blake, denied Defendants' initial motions to dismiss, which contained arguments regarding the sufficiency of Plaintiffs' pleadings and a variety of legal questions on standing, personal jurisdiction, and timeliness. ECF 66, 67. Judge Blake then ordered phased discovery focused on Plaintiffs' methodology. ECF 115, 117. Upon the conclusion of two phases of discovery, Defendants filed several motions, including motions for summary judgment challenging the methodology and validity of the Plaintiffs' investigation under step one of the disparate impact framework. ECF 166, 167. After these motions were filed, but before they were decided, this case was reassigned to the undersigned judge. Paperless Entry, Jan. 18, 2023. This Court denied Defendants' motions for summary judgment, concluding that Plaintiffs had adduced "sufficient evidence to create a

genuine issue of material fact as to whether a statistical disparity exists in the defendants' maintenance of the properties at issue." ECF 235 at 29. At that time, this Court specifically noted, however, "that steps two and three of the [FHA's] disparate impact framework" had not "yet been fully explored through discovery," and contemplated "subsequent motions for summary judgment on other issues." *Id.* at 16 n.4. The Court ordered discovery on these issues as well as "Plaintiffs' claimed damages…the legal remedies to which the Plaintiffs claim to be entitled…and the legal and factual theories underlying those claimed damages or remedies." ECF 251.

After another round of discovery, the parties filed the pending cross-motions for summary judgment, ECF 285, 287, ECF 299, on steps two and three of the "burden-shifting framework" for disparate impact claims set forth by the Supreme Court in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) ("*Inclusive Cmtys.*") and for disparate treatment claims set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Court held a hearing on these motions on January 27, 2025. ECF 347. Defendants also filed an additional motion for summary judgment relating to recoverable damages, ECF 288, and the parties filed motions regarding the admissibility of expert opinions, ECF 310, 314.

While these motions were pending, and following the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*Hippocratic Medicine*"), Defendants moved to dismiss under Rule 12(b)(1), asserting a facial attack to Organizational Plaintiffs' standing. ECF 343. Given the potentially case dispositive nature of Defendants' motion to dismiss and for case management purposes, the Court administratively closed all pending motions for summary judgment, ECF 285, 287, 288, and 299, subject to reopening without further briefing following its ruling on the standing motion. ECF 350. After hearing oral argument on Defendants'

motion to dismiss for lack of standing, the Court found that additional briefing and evidence was not necessary to evaluate the challenge to Organizational Plaintiffs' standing,  and reopened the motions for summary judgment, ECF 285, 287, 288, and 299. ECF 370, 373. Because Plaintiffs wanted to provide additional briefing and evidence on the standing motion, they filed a motion for reconsideration of this Court's May 21, 2025 Order. ECF 374.[4]

## II.    ARTICLE III STANDING

This case has been proceeding for seven years and has reached its second round of summary judgment briefing. Nevertheless, because of the intervening Supreme Court decision in *Hippocratic Medicine*, 602 U.S. 367, 370 (2024), Defendants now reframe an argument typically presented at the earliest stages of a case: that Organizational Plaintiffs lack standing because they have not pleaded an injury in fact as required under Article III, thus depriving the Court of subject-matter jurisdiction. ECF 343-1. Specifically, Defendants contend that Organizational Plaintiffs have failed to show "a 'concrete and demonstrable injury' to themselves as organizations," and instead have alleged only "a setback to [their] abstract social interests," which is insufficient to establish their standing. ECF 289 at 24-25 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)).

### A.  Legal Standards

Article III of the Constitution extends the "judicial Power" of the federal courts only to "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1; *see TransUnion LLC v. Ramirez*, 594

---

[4] At the time this Court denied additional briefing and evidence, it contemplated considering the existing evidentiary record to address what it perceived to be a factual challenge to the Organizational Plaintiffs' standing to sue argued within Defendants' motion for summary judgment on available remedies, ECF 288. ECF 373. Ultimately, this Court decided that it would resolve only the facial challenge Defendants presented in their motion to dismiss for lack of standing, ECF 343.

U.S. 413, 423 (2021). There is a case or controversy only where the plaintiff has standing to assert his claim. *TransUnion*, 594 U.S. at 423; *see also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) ("the requirement that a claimant have 'standing is an essential and unchanging part of the case-or-controversy requirement of Article III.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The objection that a federal court lacks subject-matter jurisdiction…may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006) (citing Fed. R. Civ. P. 12(b)(1)).

Because "standing to maintain a suit implicates the court's jurisdiction," the Court is "bound to address the subject matter jurisdiction issue . . . before the merits." *Beyond Sys., Inc. v. Kraft Foods, Inc.*, 777 F.3d 712, 715–16 (4th Cir. 2015) ("Article III standing" is a "subject matter jurisdiction issue"). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). Under Rule 12(h)(3), "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed in one of two ways: either a facial challenge ... or a factual challenge." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016) (citations omitted) (internal quotations omitted). A facial challenge asserts "that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction." *Id.* A defendant's facial challenge "will be evaluated in accordance with the procedural protections afforded under Rule 12(b)(6), which is to say that the facts alleged in the Complaint will be taken as true…," *In re Jones v. Md. Dept. of Pub. Safety*, No. 1:21-cv-01889-

JRR, 2024 WL 493269 at *2 (D. Md. Feb. 8, 2024), and the trial court will deny the motion "if the complaint alleges sufficient facts to invoke subject matter jurisdiction," *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Defendants specify that they make only a facial challenge here.[5] ECF 343-1 at 8.

To establish standing, a plaintiff must show "(1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury would likely be redressed by judicial relief." *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024) (citing *Lujan*, 504 U.S. at 560-61). The plaintiff bears the burden of establishing those elements. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). Organizations may have standing "to sue on their own behalf for injuries they have sustained," but they must satisfy the same standards for injury in fact, causation, and redressability that apply to individuals. *Havens*, 455 U.S. at 378-79, n.19.

### B. Organizational Plaintiffs' Standing

Because the Organizational Plaintiffs sue Defendants "in [their] own right," the individual standing requirements apply. *See Havens*, 455 U.S. at 378-79; *Hippocratic Med.*, 602 U.S. at 393-94. The Organizational Plaintiffs must allege an injury in fact that is fairly traceable to the challenged conduct of Defendants and likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). These requirements are "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560-61.

---

[5] Defendants' facial challenge puts this case in a particularly unusual posture, because a facial challenge is focused on the adequacy of the allegations in the Complaint and not on the extensive evidentiary record the parties have amassed after seven years of litigation. However, in their briefing, both parties cite to the evidentiary record. As this is a facial challenge, this Court has confined its review to the allegations in the Complaint for purposes of evaluating this motion. *See In re Jones*, 2024 WL 493269 at *2-3.

The existence of an injury is the first step of standing. To establish injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). An injury is particularized when it "affect[s] the plaintiff in a personal and individual way." *Id.* (citations omitted). An injury is concrete when it actually exists and is "real, not abstract." *Straubmuller v. Jetblue Airways Corp.*, Civ. No. DKC-23-384, 2023 WL 5671615, at *2 (D. Md. Sept. 1, 2023) (quoting *Spokeo*, 578 U.S. at 337) (cleaned up). Concrete injuries can be tangible, like money, or intangible, like reputational harm. *Id.* (citing *TransUnion*, 594 U.S. at 414).

The Complaint alleges that Defendants' conduct injured Plaintiffs by "interfering with the Organizational Plaintiffs' efforts and programs intended to bring about equality of opportunity in housing;" "diverting resources away from the Organizational Plaintiffs' usual activities and services;" and "frustrating the Organizational Plaintiffs' missions and purposes." ECF 1 ¶ 301. In her ruling adjudicating Defendants' initial motion to dismiss, Judge Blake discussed the Supreme Court's decision in *Havens* and found that the Organizational Plaintiffs had "sufficiently pled an injury-in-fact to establish standing at [that] stage." ECF 66 at 6-7 (citing *Havens*, 455 U.S. at 379 (finding that if the defendants' "steering practices have *perceptibly impaired* [the organizational plaintiff's] ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered an injury in fact") (emphasis added)).

Judge Blake's finding at the pleading stage that Defendants' actions "have perceptibly impaired" the Organizational Plaintiffs' "varied efforts to stem segregated housing in American cities," relied in part on cases holding that "the costs of investigating discriminatory conduct alone

can give fair housing organizations standing." ECF 66 at 7-8 (citing cases). She further reasoned that "the plaintiffs have adequately pled the diversion of resources away from other pursuits, frustration of mission, impairment to their community investment programs, and educational and advocacy efforts that were needed to mitigate the downstream effects of the defendants' allegedly discriminatory home maintenance." *Id.* This reasoning, along with Organizational Plaintiffs professing injury based on "frustration of mission" and "diversion of resources" theories, *see id.* at 8, has since been contextualized and cabined by the Supreme Court in *Hippocratic Medicine*. 602 U.S. at 370 ("[T]he Court's decision in *Havens Realty Corp.* v. *Coleman* does not stand for the expansive theory that standing exists when an organization diverts its resources in response to a defendant's actions.").

A brief review of the facts of *Havens* and *Hippocratic Medicine* will aid in the analysis of the facts of this case. In *Havens*, plaintiff Housing Opportunities Made Equal (HOME) sent its employees, acting as testers, to Havens Realty to inquire about available apartments. Havens told HOME's Black employee that no apartments were available but told HOME's white employee that it had apartments available. 455 U.S. at 366-68. HOME filed its lawsuit after those interactions between Havens and its employees, alleging that the provision of false information to its Black employee violated § 3604 of the Fair Housing Act. *Id.* The Supreme Court reasoned that defendants' racial steering practices "perceptibly impaired HOME's ability to provide counseling and referral services for low-and-moderate-income homeseekers" because the Black employee had been given inaccurate information about availability and that defendants' actions caused a "consequent drain on the organization's resources," which sufficed as injury in fact to establish Article III standing. *Id.* at 379. In finding that HOME had established injury in fact, the Court

specifically noted that mere setbacks to an organization's "abstract social interests" are insufficient to demonstrate the concrete harm necessary for standing. *Id*.

Historically, *Havens* was the seminal case on organizational standing. While the principles articulated in *Havens* remain authoritative, in June 2024, the Supreme Court clarified the requirements for organizational standing in *Hippocratic Medicine*. 602 U.S. at 395. In that case, the plaintiffs were individual doctors and medical associations opposed to mifepristone, a drug that can induce a medical abortion during pregnancy. The plaintiffs filed a lawsuit challenging new FDA regulations loosening the requirements for the drug's prescription and use. The medical associations asserted standing under *Havens* "based on their incurring costs to oppose [the] FDA's actions" because the FDA "caused the associations to conduct their own studies," "forced the associations to expend considerable time, energy, and resources drafting citizen petitions" and to divert resources "to the detriment of other spending priorities." *Id*. at 394 (internal quotations omitted). In rejecting this argument, the Supreme Court held that expenditure of resources in opposition to a defendant's action was insufficient to establish standing. *Id*. ("[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action"). The Court stated that it is "incorrect" under *Havens* that "standing exists when an organization diverts its resources in response to a defendant's actions." *Id*. at 395. It reaffirmed that a "plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" *Id*. at 394-95 (quoting *Havens*, 455 U.S. at 379). Instead, the Court found, standing

requires "a perceptibl[e] impair[ment] to a "core business activit[y]" that is independent of the organization's decision to "divert[] its resources." *Id*. at 395.

The Court in *Hippocratic Medicine* explained that organizational standing had been present in *Havens* because HOME suffered injury "when Havens gave HOME's employees false information about apartment availability." *Id.* That direct interaction impaired HOME's ability to provide counseling to its clients about available apartments. *Id.* But the Supreme Court further noted that it "has been careful not to extend" *Havens* "beyond its context" because it "was an unusual case." *Id*. at 396. As a result, "*Havens* tells us what type of organizational injury is legally cognizable, and *Hippocratic Medicine* tells us what's not."[6] *NFHA v. Deutsche Bank*, No. 18-cv-839, 2025 WL 975967, at *6 (N.D. Ill. Mar. 31, 2025).

In their Complaint, Organizational Plaintiffs describe various types of injuries that they have subsequently sorted into two buckets: "diversion of resources" and "frustration of mission."

[6] Plaintiffs cite *Republican National Committee v. North Carolina Board of Elections* ("*RNC*"), 120 F.4th 390 (4th Cir. 2024), suggesting that the Fourth Circuit has not construed *Hippocratic Medicine* to have altered the *Havens* standard in a meaningful way. ECF 352 at 7, 9-12. In *RNC*, the Fourth Circuit found that the plaintiffs, national and state Republican political organizations, had standing to challenge the defendant state board of elections' refusal to comply with the Help America Vote Act of 2002. Because the state board of elections refused to remove persons who failed to provide "their driver's license number or the last four digits of their social security number on their application" to vote, plaintiffs alleged that they were "unable to ascertain which of the 225,000 people who they allege registered improperly will be able to vote in the upcoming election." *Id.* at 397, 399. That uncertainty "stymied" plaintiffs' preexisting core missions to engage in "get out the vote" efforts for Republican voters, because they would have to expend efforts on persons who will be ineligible. *Id.* at 396-98. The *RNC* plaintiffs, then, like the plaintiffs in *Havens*, pointed to actual direct impact defendants' actions had on their ability to perform their core activities. In contrast, the Organizational Plaintiffs in this case have not shown that Defendants' actions harmed their ability to conduct their pre-existing activities, other than the harm flowing from their voluntary reallocation of resources. *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) ("mere expense to [the organization] d[id] not constitute an injury in fact" because "[a]lthough a diversion of resources might harm the organization by reducing the funds

ECF 296 at 13. The Complaint summarizes the injuries suffered by the Organizational Plaintiffs as follows:

> (a) undermining the Organizational Plaintiffs' education, advocacy, and training programs designed to promote fair housing and fair lending; (b) requiring the Organizational Plaintiffs to divert scarce resources away from their usual activities and instead to devote substantial time to evaluating properties, reviewing data, interviewing witnesses, engaging in an education and outreach campaign, and developing education materials to identify and address Defendants' racially discriminatory maintenance practices; (c) frustrating the Organizational Plaintiffs' mission of increasing fair housing for all Americans and in all neighborhoods, regardless of race, color, or national origin; (d) frustrating the Organizational Plaintiffs' mission of eliminating racial segregation in their communities; (e) harming the communities that the Organizational Plaintiffs serve; and (f) impeding the Organizational Plaintiffs' community investment programs designed to stabilize neighborhoods of color and increase home ownership for all persons in these same neighborhoods.

ECF 1 ¶ 150.

These assertions are insufficient, under *Hippocratic Medicine,* to establish injury in fact. The Court begins by addressing Organizational Plaintiffs' "diversion of resources" injury, *i.e.*, that they were forced to divert their resources to counteract Defendants' discriminatory REO maintenance and marketing practices. The alleged diversions are of two types: the time and resources spent investigating "the extent of Defendants' discrimination," and the diversion of resources away from other organizational purposes in response to the discrimination. ECF 296 at 24-25. "[N]ot every diversion of resources rises to an injury sufficient to confer standing." *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 351 (5th Cir. 2023). Courts have recognized that "self-inflicted," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416-18

---

available for other purposes, it results not from any actions taken by the defendant, but rather from the organization's own budgetary choices.").

(2013), and "self-referential" injuries, *Fair Employment Council of Greater Washington v. BMC Marketing Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994), cannot establish injury in fact for standing.

Organizational Plaintiffs assert that their ability to claim injury based on identifying and counteracting Defendants' discrimination is "well-settled law." ECF 296 at 25. But the Supreme Court in *Hippocratic Medicine* made clear that an organization that has not already suffered a concrete injury caused by a defendant's action cannot manufacture Article III standing by expending money to gather information and advocate against the defendant's action. 602 U.S. at 370 (finding that *Havens* "does not stand for the expansive theory that standing exists when an organization diverts its resources in response to a defendant's actions."). Organizational Plaintiffs claim that they were forced to "divert resources away from their usual education, counseling, investigation, and capacity-building activities and services" in order to "devote substantial time to evaluating properties, reviewing data, interviewing witnesses, engaging in an education and outreach campaign, and developing educational materials to identify and address Defendant's racially discriminatory maintenance practices." ECF 1 ¶ 150, 151.  These alleged injuries parallel the harms that the Supreme Court found insufficient to confer standing in *Hippocratic Medicine*. 602 U.S. at 394 ("incurring cost to oppose [defendant's] actions," "conduct[ing]" studies to "better inform…members and the public," "expend[ing] considerable time, energy, and resources…engaging in public advocacy and public education" did not establish concrete injury for standing). "To determine that an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation . . . suffers a cognizable injury would be to imply standing for organizations with merely abstract concerns with a subject that could be affected by an adjudication." *Lane*, 703 F.3d at 675 (citation omitted). *Havens* and

*Hippocratic Medicine* draw the line at these "abstract social interests." *Hippocratic Med.*, 602 U.S. at 394 (quoting *Havens*, 455 U.S. at 379).

Under *Havens* and *Hippocratic Medicine*, plaintiffs demonstrate concrete injury if defendant's conduct "perceptibly impaired," *Havens*, 455 U.S. at 379, or "directly affected and interfered with…core business activities." *Hippocratic Med.*, 602 U.S. at 395. Here, Organizational Plaintiffs have not shown direct injuries to their preexisting core business activities that are separate and apart from their response to Defendants' actions. *See Deep South Ctr. for Env't Justice v. EPA*, 138 F.4th 310, 320 (5th Cir. 2025) ("Even under the pre-[*Hippocratic Medicine*] regime, standing based on diversion of resources required that the organization's activities in response to defendant's conduct detract or differ from its routine activities" (cleaned up)). Instead, Organizational Plaintiffs proffer as their claimed "harms" activities to which resources *could* have been devoted (e.g., "new fair housing advocacy projects and investigations, conducting additional consulting and training of housing providers, applying for new grants and funding sources, attending conferences, and engaging in professional staff development"). ECF 1 ¶ 162; *see Knowledge Ecology Int'l v. NIH*, No. 18-1130, 2019 WL 1585285, at *6 (D. Md. Apr. 11, 2019) (finding plaintiff's injury "manufactured" because its "core purpose as an organization is pursuing precisely the type of advocacy it undertook here" and "[a]ny resources [it] spent on this specific case and the underlying events . . . seem very much in line with [its] core mission rather than a diversion of resources away from it"); *NAACP v. City of Kyle*, 626 F.3d 233, 238–39 (5th Cir. 2010) (holding that performing studies, lobbying, preparing for litigation, and diverting time does not "concretely and perceptibly impair[ ]" an organization's activities as required by *Havens*). The Organizational Plaintiffs' mission is to combat racial segregation and

housing discrimination and their decision to pursue this investigation instead of others is in furtherance of that mission, not an injury to it.

Particularly telling is the fact that Organizational Plaintiffs' "comprehensive investigation of Defendants' activities related to foreclosed-properties in middle- and working-class neighborhoods in communities of color…and in middle- and working-class neighborhoods in predominately white neighborhoods" was not triggered by a specific action by Defendants or even a discovery regarding specific REO properties owned by BANA. ECF 1 ¶ 5. Rather, Organizational Plaintiffs specifically pleaded that their investigation was prompted by "the national foreclosure crisis" and "complaints, public outcry, and industry trends and observations regarding the maintenance of foreclosed properties in African-American and Latino communities."[7] *Id.*

The lack of connection between conduct specific to the Defendants and the initiation of the investigation that led to this lawsuit further evidences that Organizational Plaintiffs have not pleaded that Defendants' actions caused the necessary particularized and concrete injury to their core missions as required under established Supreme Court precedent. *Compare Havens*, 455 U.S. at 363-64, 368-69 (defendant directly interacted with plaintiff and directly interfered with plaintiff's core mission by providing false information about apartment availability, independent of any decision by plaintiff to devote resources to an investigation or lawsuit) *with* ECF 296 at 30-

---

[7] This Court also takes judicial notice that this case is one of a series of similar investigations, charges, and lawsuits filed by these and other fair housing organizations against a number of defendants around the same time, making near-identical claims about discriminatory maintenance of foreclosed properties. *See NFHA v. Fannie Mae*, No. C 16-6969 (N.D. Cal. 2018); *NFHA v. Deutsche Bank*, No. 18-cv-839 (N.D. Ill. 2018). The organizations decided, quite legitimately, to investigate the widespread problem they perceived: that poorly maintained foreclosed homes created issues in majority-minority communities. But their decision to pursue that investigation and overarching goal of remedying the societal problem does not confer them standing under the direct injury-and-causation standard explained in *Hippocratic Medicine* and *Havens.*

31 (describing Organizational Plaintiffs' "logs detailing the time they diverted to identify and counteract Defendants' discrimination"). Thus, Organizational Plaintiffs' claims of "diversion of resources" do not describe "a personal stake in the outcome of a controversy" sufficient to "warrant [their] invocation of federal-court jurisdiction." *Havens*, 455 U.S. at 378-79 (citation omitted); *see also Fair Hous. Council v. Montgomery Newspapers*, 141 F.3d 71 (3d Cir. 1998) ("The record does not support the conclusion that [plaintiff] in conducting its investigation, responded to the advertisements at issue or that it would not have undertaken the same investigative efforts in the absence of these advertisements.").

Organizational Plaintiffs' second category of alleged harms based on "frustration of mission" fares no better. Both this Court and the *Deutsche Bank* court have questioned the difference between this category of harms that "diminished the [Organizational] Plaintiffs' overall capacity and impaired the effectiveness of their services in achieving their missions," ECF 296-1 at 23, and the "diversion of resources" damages Organizational Plaintiffs claim for foregoing projects that promote their missions. *See* ECF 242-1 at 3 ("I guess I'm a little bit confused on how [frustration of mission] differs from diversion of resources."); *Deutsche Bank*, 2019 WL 5963633, at *7-*8 (finding that "damages caused by 'frustration of…mission'…seem[] likely to present difficulty in assessing and attributing damages…and may be an unnecessary extension of the 'diversion of resources' category").

Organizational Plaintiffs attempt to differentiate the diversion of resources and frustration of mission categories by "classify[ing] compensation for activities that have *already occurred* as diversion-of-resources" or pecuniary damages and "[c]ompensation for *future* education and outreach efforts intended to remedy harm to the FHOs' missions…as "frustration-of-mission" or nonpecuniary damages. ECF 296 at 25 n.7 (emphasis in the original), 44. In their briefing, they

provide examples of the ways in which they have "used their prior settlement funds" to demonstrate how "frustration-of-mission damages would be used in this case to remediate Defendants' harm to the [Organizational] Plaintiffs' missions by in mission-critical initiatives: promoting fair housing, stabilizing communities, decreasing racial segregation, and increasing access to safe, affordable, quality housing and to homeownership for communities of color." *Id*. at 21. While the laudable goals of any public interest organization could be furthered with more funding, a plaintiff's plans for using any prospective recovery cannot serve as a measure of existing injury in fact.

In fact, there is established Supreme Court precedent that a plaintiff "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper v. Amnesty In'tl USA*, 568 U.S. 398, 402 (2013). "If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear." *Id*. at 417. The Supreme Court reiterated this principle in *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 202 (2017), finding that "a violation of the FHA may…be expected to cause ripples of harm to flow far beyond the defendant's misconduct…[but] [n]othing in the statute suggests that Congress intended to provide a remedy whenever those ripples travel." (cleaned up).[8] In other words, to the extent that Organizational

---

[8] For example, the broad-ranging "ripple effects" alleged in the Complaint include the following:

> [Defendants'] failure to maintain and market REO dwellings in communities of color according to the same standards employed in predominantly white neighborhoods has stigmatized communities of color as less desirable than predominantly white communities. The prospects for integration in the affected communities have been reduced because buyers are deterred from purchasing properties in neighborhoods with poorly maintained REO properties, leaving the segregated racial composition of these neighborhoods unchanged. . . . The existence of poorly maintained REO dwellings in minority neighborhoods diminishes home values for surrounding homeowners. Lower home values in communities of color

Plaintiffs claim that Defendants' actions have an overall detrimental impact on neighborhood stability and housing equality, injury in fact is not thereby conferred on all organizations who work in the fair housing realm.

On this basis, the *Deutsche Bank* court found that harms substantially identical to those that Organizational Plaintiffs allege as their "frustration of mission damages" were too speculative and attenuated from defendants' alleged misconduct to establish standing. *See* 2019 WL 5963633, at *8 (barring organizational plaintiffs from recovering harms based on "diminished property values, safety, habitability, housing opportunities, lending opportunities, and community redevelopment"). The "noneconomic" frustration of mission harms that Organizational Plaintiffs claim, "economic inequality, racial segregation, crime, and neighborhood destabilization," ECF 296 at 41, 44, "are precisely the 'ripples' that [the Supreme Court] cautions 'flow far beyond a defendant's misconduct,' which risk massive and complex damages litigation, and involve too many intricate, uncertain inquiries to establish proximate cause." *Deutsche Bank*, 2019 WL 5963633, at *8 (citing *Bank of Am. Corp. v. City of Miami*, 581 U.S. at 202); *see* ECF 1 ¶¶ 150, 301. Past harms to others or future initiatives to which Organizational Plaintiffs may devote resources, *see* ECF 296 at 20-21, "do not support a finding of [] 'actual or imminent' injury" necessary for standing. *Lujan v. Defs. of Wildlife*, 505 U.S. 555, 564 (1992). *See also Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 904 (6th Cir. 2024) ("[O]rganizations cannot establish their standing by diverting resources to eliminate a risk of harm to third parties that is not imminent."); *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 387 (6th Cir. 2020) ("When the

---

restrict the ability of minority homeowners to move to majority-white or integrated neighborhoods by reducing the equity they can utilize to buy a new home.

ECF 1 ¶¶ 144–45.

plaintiffs' allegations of future injury are based on past human errors, the plaintiffs face a high bar to demonstrate standing.").

Because Organizational Plaintiffs have failed to satisfy their burden of showing a concrete or particularized injury in fact, they do not have Article III standing to bring their claims for damages, and those claims must be dismissed.[9] However, despite that dismissal, this Court retains subject matter jurisdiction over both the Individual Plaintiffs' FHA claims (which have not been challenged on standing grounds), and the Organizational Plaintiffs' FHA claims for injunctive relief, which were not discussed in Defendants' 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, ECF 343. *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (noting that standing is assessed on a remedy-by-remedy basis). This Court therefore proceeds to address the parties' motions to exclude expert testimony and motions for summary judgment addressing the merits of the FHA claims.

## III.    MOTIONS TO EXCLUDE EXPERT TESTIMONY

Defendants move to exclude four of Plaintiffs' experts: Joanne Poole, Albert Poche, Elizabeth Korver-Glenn, and Stacy Seicshnaydre. ECF 314.  And Plaintiffs move to exclude two of Defendants' expert witnesses: Carlyn Irwin and Thad Calabrese. ECF 310.

Three of the proposed experts opine on damages alone. Professor Seicshnaydre opines on "how a factfinder could assign value to the harm suffered by the [Organizational Plaintiffs] in this

---

[9] Of course, Rule 12(b)(1) dismissal is without prejudice, typically affording the plaintiff an opportunity to seek leave to amend the pleading to establish standing. *See Ali v. Hogan*, 26 F.4th 587, 600 (4th Cir. 2022) (finding that a "'dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits'" (citing *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013)). This case, though, is in the unusual posture of having fully briefed summary judgment motions on the merits. This Court determines herein, in connection with the identical FHA claims brought by the Individual Plaintiffs and the claims of all Plaintiffs seeking injunctive relief, that summary

case. *Id*. Defendants responded with testimony from Mr. Irwin and Professor Calabrese to rebut the methods Professor Seicshnaydre used in "substantiat[ing] Plaintiffs' claims of harm and quantify[ing] [Plaintiffs'] alleged damages." ECF 324 at 5. Mr. Irwin and Professor Calabrese address "whether the damages quantification offered by…[Professor] Seicshnaydre are consistent with (i) generally accepted principles for quantifying losses and (ii) generally accepted budgeting and reporting for nonprofit organizational revenues and expenditures." *Id*.

Ruling on the admissibility of Professor Seicshnaydre's opinions as to the amount of Organizational Plaintiffs' damages, and Mr. Irwin and Professor Calabrese's testimony rebutting those opinions, is not necessary to resolve the motions for summary judgment on steps two and three of the disparate impact and disparate treatment burden-shifting frameworks. The merits of Plaintiffs' disparate impact and disparate treatment claims do not depend on the *quantification* of their alleged damages. *See* ECF 327 at 26 (stating that Professor Seicshnaydre "provides a framework for assessing [diversion of resources and frustration of mission] damages *if* liability is established"); ECF 296 at 14 ("If the jury finds that Defendants discriminated in their maintenance of REO properties, it will then consider what amount will adequately compensate the FHOs for their diversion of resources and the frustration of their missions."). Defendants' motion to exclude Plaintiffs' damages expert, Professor Seicshnaydre, and Plaintiffs' motion to exclude the

---

judgment should be granted in Defendants' favor. The Court will of course consider that ruling when evaluating any motion for leave to amend that may be filed by the Organizational Plaintiffs relating to their claims for monetary damages.

responsive defense experts, Mr. Irwin and Professor Calabrese, are denied without prejudice as moot in light of the rulings made herein.

The testimony offered by Plaintiffs' experts Ms. Poole, Mr. Poche, and Ms. Korver-Glenn addresses "how poor maintenance of REOs in communities of color negatively impacts these communities – in ways that undermine the [Organizational Plaintiffs'] missions." ECF 327 at 9. Mr. Poche offers testimony regarding "[p]roperty maintenance code enforcement and neighborhood revitalization," and specifically the impact of "[n]eglected and distressed properties" in surrounding communities, the "criteria used in Plaintiffs' REO evaluation checklist," and the impact of Defendants' allegedly improper poor REO maintenance on the surrounding communities. *Id.* at 3-4. Ms. Korver-Glenn offers "opinions on racial inequality and segregation in the context of housing and rental markets and the real estate appraisal process and effects." ECF 310 at 12. The Court finds that these two experts' opinions are not relevant to assessing the pending summary judgment motions focusing on the legitimate non-discriminatory reason for Defendants' policies and evidence of viable less discriminatory alternatives or pretext. This Court therefore also denies the motion to exclude testimony from Mr. Poche and Ms. Korver-Glenn without prejudice as moot.

However, because Plaintiffs expressly rely on Ms. Poole's opinion to support their proposed alternatives of less discriminatory policies at step three of the disparate impact analysis, the Court will resolve Defendants' motion to exclude her testimony before turning to the motions for summary judgment on the burden-shifting frameworks.

### A. Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony. A qualified expert may give testimony if:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In essence, the trial court must ensure the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). In *Daubert*, the Supreme Court provides five non-exhaustive factors a court may weigh in making this assessment: (1) "whether a theory or technique . . . can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error," (4) "the existence and maintenance of standards controlling the technique's operation," and (5) whether the technique or theory has gained "general acceptance." 509 U.S. at 592–94; *Pugh v. Louisville Ladder, Inc.*, 361 F. App'x 448, 452 (4th Cir. 2010). However, ultimately, the inquiry is "a flexible one" and relevant factors can vary with the needs of each case. *Daubert*, 509 U.S. at 594.

For the proffered evidence to be sufficiently reliable it "must be derived using scientific or other valid methods" and not based on mere "belief or speculation." *Casey v. Geek Squad Subsidary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 340 (D. Md. 2011) (first quoting *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); then quoting *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005)). The court's analysis focuses on experts' methods, not their conclusions, but an expert opinion that relies on "assumptions which are speculative and not supported by the record," is inadmissible. *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A

court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). For the proffered opinion to be relevant, it "must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey*, 823 F. Supp. 2d at 340 (quoting *Daubert*, 509 U.S. at 591). Expert testimony "is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Anderson v. Home Depot U.S.A., Inc.*, No. GJH-2615, 2017 WL 2189508, at *4 (D. Md. May 16, 2017) (quoting *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)).

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under Daubert." *Id.* at *3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. CIV JFM-08-3292, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n.10 (explaining admissibility must be established by a "preponderance of proof").

In determining the admissibility of expert testimony, the court considers two "guiding, and sometimes competing, principles." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Id.* (explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)). On the other hand, "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). The court must determine whether the disputed expert testimony "has greater potential to mislead than to enlighten." *Id.* If so, the

testimony should be excluded. *Id.*; *see also Casey*, 823 F. Supp. 2d at 340 (noting such testimony would be barred by Federal Rule of Evidence 403).

### B. Analysis

Ms. Poole has been a licensed real estate agent in the State of Maryland since 1986. ECF 314-19 at 2. Her report offers expert opinions on "[f]actors impacting curb appeal," the "[i]mpact of poorly-maintained homes on local real estate market," and the "marketing and sale of bank-owned properties." *Id.* at 3. Plaintiffs proffer Ms. Poole to support their proposed alternatives on step three of the disparate impact framework, "including the importance of 'routine in-person checks on the home, the ability to quickly contact someone to resolve problems, and working with local real estate agents and property managers with good knowledge of the neighborhood' to avoid 'negatively impact[ing] the surrounding community.'" ECF 312 at 29 (citing ECF 314-19 at 4).

Defendants argue that Ms. Poole's opinions should be excluded for several reasons. First, Defendants contend that her opinions are irrelevant because they focus largely on the marketing and sale of REOs and the "majority of properties at issue in this case" were "FHA properties Defendants were maintaining for conveyance to HUD" that "were not being marketed for sale by Defendants." ECF 315 at 31-32. Plaintiffs counter that Ms. Poole's opinions are relevant to all of the properties because "how a poorly maintained FHA property impacts the surrounding properties and neighborhood are broadly relevant to the neighborhood harm sustained due to Defendants' discriminatory maintenance practices." ECF 327 at 33.

Federal Rule of Evidence 702 permits expert testimony if, among other requirements, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Ms. Poole's opinions are based on her "residential real estate industry experience" and are thus focused on the selling and marketing of homes. ECF 314-19 at 3. The parties agree that Defendants do not market or sell FHA properties that are

conveyed to HUD. Ms. Poole's report does not account for any distinction between Defendants' FHA properties and REO properties, only referring generally to "bank-owned properties." *See* ECF 314-19. Ms. Poole's experience is confined to buying and selling real estate and is thus not relevant to the FHA properties in this case. *See* ECF 300 at 10 (BANA "does not sell or 'market' any properties associated with FHA loans. Its role ends with conveyance to HUD, and HUD markets them."); ECF 314-19 at 6 ("Based on my real estate industry experience, I know that poorly maintained homes have worse curb appeal, are more difficult to sell, stay on the market longer, and bring lower sales prices.").

Defendants contend that Ms. Poole's opinions regarding "curb appeal" and "blight" do not fit the facts of the case and lack a basis in "sufficient facts or data" under Rule 702(b). ECF 315 at 33. Ms. Poole opines that "[t]he negative effects of a home's poor exterior maintenance… extend beyond the home itself [to] depress[] market prices in the surrounding area." ECF 314-19 at 7. While this opinion could be substantiated by data from an empirical study, Ms. Poole provides no such evidence, either of the properties at issue or properties in neighboring communities, to support her opinion. Experience alone is not a "sufficient foundation rendering reliable any conceivable opinion the expert may express." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). Rather, an expert relying on experience in lieu of testing or empirical analysis must explain how her experience is reliably applied to the facts of the case. *See* Fed. R. Evid. 702 advisory committee's note to 2000 Amendments ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied

to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" (citing *Daubert v. Merrell Dow Pharms. Inc*., 43 F.3d 1311, 1319 (9th Cir. 1995)).

Here, Ms. Poole did not evaluate records for any of the properties at issue in this case, aside from limited information regarding one property, so she cannot and does not speak to value changes in the subject properties or their neighboring properties. *See* ECF 314-20 at 206-08 ("Q: Are you offering an opinion as to what the quantitative impact curb appeal has on the properties neighboring the properties that are issue in this case? A: That's at issue in this case, no."). Ms. Poole's experience alone, which is localized to Baltimore and is anecdotal without "sufficient facts or data," Fed. R. Evid. 702(b), is not enough to substantiate her conclusions as to whether any of the subject properties, located in cities across the country, qualify as "poorly maintained" or how the "curb appeal" of those properties affected the value of their surrounding properties.[10] Those opinions will therefore be excluded.

Lastly, Ms. Poole opines regarding "the three most important components of ensuring bank-owned properties are well-maintained and marketed," which are "(1) having someone on the ground check on the property in-person on a regular basis; (2) having an effective way for maintenance issues to be reported and quickly addressed; and (3) utilizing real estate agents and property managers with knowledge of the local community." ECF 314-19 at 9. Ms. Poole bases this opinion on her "years of experience working to sell bank-owned properties for different

---

[10] Ms. Poole also proffers generalized opinions on appraisal and insurance underwriting for which she lacks any expertise. *See* ECF 314-19 at 7 ("Although I am not an appraiser, through my work, I am aware of some of the criteria appraisers consider."), 8 ("Based on my years of experience talking with insurance company representatives, I know that insurance companies factor in neighborhood risk when deciding insurance rates and consider the condition of neighboring homes and the numbers of investor-owned homes in the neighborhood in this analysis"). As a real estate agent, such opinions extend beyond Ms. Poole's area of training and expertise. Her opinions as to these topics will be excluded.

banks," including handling "many REO properties for a community bank." *Id*. Plaintiffs rely on Ms. Poole's opinions regarding the maintenance and marketing of bank-owned properties to support several of their proposed alternative practices on the third step of the disparate impact framework. *See* ECF 312 at 31-33. Defendants do not address this aspect of Ms. Poole's opinion other than to contend that her review of marketing communications for one subject property was inaccurate. ECF 315 at 37-38. This objection goes to the weight of Ms. Poole's testimony but does not require that the testimony be excluded in its entirety. The Court finds that Ms. Poole's experience with selling and marketing REO properties renders her opinions on this topic admissible and relevant to the analysis at step three of the disparate impact framework.

## IV.    MOTIONS FOR SUMMARY JUDGMENT ON BURDEN-SHIFTING FRAMEWORKS

### A. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party carries the burden of showing there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). Should the moving party establish that no evidence supports the non-moving party's case, the burden shifts to the non-movant to proffer specific facts that create a genuine factual dispute. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). A mere scintilla of evidence supporting the non-moving party's position is not enough; there must evidence sufficient for a reasonable jury to find in its favor. *Casey*, 823 F. Supp. 2d at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material

fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Summary judgment is also warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010). In ruling on a motion for summary judgment, a court must view all the facts, and any reasonable inferences that can be drawn therefrom, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### B.  Clarification of Earlier Ruling

The parties' briefing of their summary judgment motions highlights a need for clarification of this Court's earlier "step one" summary judgment ruling, ECF 235, particularly on the issue of the "specific policy" of the Defendants "that caused the disparity." *Id*. at 30 (citing *Deutsche Bank*, 2019 WL 5963633, at *13). Plaintiffs' approach to this case has created a procedural muddle and, while this Court attempted to address it in its earlier opinion, it is evident that more specificity is required for this case to be resolved in a logical way.

To establish a prima facie FHA disparate impact case based on statistical disparity, Plaintiffs must identify, among other things, the specific policy of the Defendants that they are challenging. *Id*. In most cases of this ilk, the plaintiffs have pointed to an indisputable policy that the defendants have employed, such as an employer's hiring system that uses subjective selection

criteria, a practice of allowing supervisor discretion over employment matters, or a policy requiring

all residents to present proof of legal status, that produces a disparate impact on a protected group.

*See, e.g.*, *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990 (1988); *Wal-Mart Stores Inc. v.*

*Dukes*, 564 U.S. 338, 355 (2011); *Reyes v. Waples Mobile Home Park Ltd. P'Ship*, 91 F.4th 270,

273-74 (4th Cir. 2024).

      In this case, however, Plaintiffs proffered a wide-ranging list of ten purported "policies"

framed in lawyerly language designed to advocate, not just identify. ECF 185 at 43-62; ECF 287

at 4-7. As written, the ten "policies" are not policies that the Defendants maintain. *See* ECF 300 at

17. They are simply grievances that Plaintiffs have with the systems and practices Defendants

employ. And several of the ten "policies," those couched as "failures" to do something, object to

"the lack of a policy," which is not actionable. *See* ECF 235 at 30; *Inclusive Cmtys.*, 576 U.S. at

533, 543 ("disparate-impact liability must be limited" so that regulated entities are able "to make

[] practical business choices," and that "private policies are not contrary to the disparate-impact

requirement unless they are artificial, arbitrary, and unnecessary barriers" (citation omitted)); *City*

*of L.A. v. Wells Fargo & Co.*, No. 2:13-cv-09007, 2015 WL 4398858, at *8 (C.D. Cal. July 17,

2015) ("Guidance from the Supreme Court is unambiguous that disparate impact claims must

solely seek to *remove* barriers," so a disparate-impact claim cannot proceed "[w]ithout identifying

an actual policy that creates a barrier."), *aff'd* 691 F. App'x 453 (9th Cir. 2017).

      This attempt to attribute "policies" to the Defendants that are not their actual policies has

led to the procedural muddle in which this case is now mired. Plaintiffs set forth the ten "policies"

they allege; Defendants respond, "those aren't our policies;" Plaintiffs accuse Defendants of

insufficient specificity in providing "legitimate, non-discriminatory reasons" for maintaining

policies they insist they do not maintain, *see* ECF 287 at 17-18, ECF 300 at 17, 24, 28, and it becomes impossible for this Court to employ the *Inclusive Communities* framework.

This Court attempted to rectify this issue in its earlier opinion, ECF 235, but based on the events that have since transpired, needs to provide additional clarity. This Court premised its earlier ruling on the identification of specific policies that have, in this case and in other cases, been deemed actionable. Here, there are two such policies: delegation of discretion (BANA's delegation to Safeguard and Safeguard's delegation to independent contractors) and the supervision mechanisms employed by BANA and Safeguard to oversee the decisionmakers. ECF 235 at 30. Policies of that sort have been permitted, by this Court and other courts, to be considered as the basis of liability under a disparate-impact theory. *See* ECF 66 at 18 & n.11 (a policy of "undue delegation of maintenance discretion . . . or a failure to properly supervise" is cognizable); *Wal-Mart,* 564 U.S. at 355 ("giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory"); *Deutsche Bank*, 2019 WL 5963633, at *16 (a policy of "abdicating responsibility" is cognizable); *NFHA v. Fannie Mae*, 294 F. Supp. 3d 940, 948 (N.D. Cal. 2018) (a "policy of delegation of discretion or failure to supervise" is cognizable). A plaintiff can also, as Plaintiffs have done here, "offer[] proof that defendant [did] not consistently follow the policies that it has established." *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 335 (N.D. Cal. 1992).

The only policies that this Court concludes survived summary judgment as to step one of the *prima facie* case are those two policies: the Defendants' respective delegation of discretion and methods of supervision of their delegees.[11] ECF 235 at 30. Those are policies actually maintained

---

[11] This Court also perhaps contributed to the confusion by labeling the policies in question "undue delegation and failure to supervise." ECF 235 at 30. That phrasing contains inherent advocacy rendering it easy to deny the existence of those policies. Obviously, Plaintiffs do contend that the

by the Defendants that are subject to the challenge and application of the burden-shifting framework. Plaintiffs' other proposed "policies" simply constitute one framework or example that Plaintiffs use in describing the larger delegation and supervision issues. *See City of Joliet, Illinois v. New West, L.P.*, 827 F.3d 827, 830 (7th Cir. 2016) (noting that *Inclusive Communities* "stressed the importance of considering both whether a policy exists and whether it is justified" (citing 576 U.S. at 539-543)). This clarification disposes of Plaintiffs' argument that summary judgment should be granted in their favor as to any policies "Defendants simply deny…[to] exist and fail to offer any reason for." ECF 287 at 17, 7; *see City of Los Angeles*, 2015 WL 4398858, at *8 ("[T]he City fails to actually identify any policy that created an artificial, arbitrary, or unnecessary barrier. Instead, the City argues that a *lack* of a policy produced the disparate impact…Without identifying an actual policy that creates a barrier, the City cannot base its disparate impact claim on Wells Fargo's practice of issuing high-cost loans." (emphasis in original)). This Court will proceed to analyze the motions for summary judgment relating to step two and step three as to BANA's and Safeguard's overarching policies of "delegation of discretion" and "methods of supervision."

### C. Plaintiffs' Motion for Partial Summary Judgment on Step Two of the Disparate Impact-Framework

Plaintiffs move for partial summary judgment on step two of their disparate impact claim.[12]

Under the standard set forth by the Supreme Court in *Inclusive Communities*, 576 U.S. 519 (2015),

---

delegation was undue and the supervision failed. But moving forward, this Court will define the only policies to have survived the step one analysis as BANA's and Safeguard's "delegation of discretion" and "methods of supervision." *See* ECF 300 at 24. This framing does not affect Plaintiffs' ability to argue that those policies produced a disparate impact, that those policies were unnecessary to achieving any legitimate nondiscriminatory interests, or that the interests could be served through less discriminatory means. *See Reyes*, 91 F.4th at 275.

[12] In their own motion for summary judgment, Defendants also ask for summary judgment at step two. ECF 300 at 26. The step two standard, which is an interim burden of production borne by the defendant, does not readily lend itself to "summary judgment" in a defendant's favor. As will be

a FHA disparate impact claim proceeds under a three-step burden-shifting framework: (1) the plaintiff must establish a prima facie case of disparate impact; (2) if the plaintiff establishes a prima facie case, the defendant may then offer a legitimate objective that justifies the policy responsible for the disparate outcome; and (3) the plaintiff must ultimately identify a less discriminatory alternative to serve the defendant's legitimate goals. *See Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 274 (4th Cir. 2024). The plaintiffs bears the ultimate burden of persuasion on the disparate impact claim. *See NFHA v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 28 (D.D.C. 2017).

The parties first dispute the applicable legal standard to use in the disparate impact analysis. Defendants contend that Plaintiffs' motion for summary judgment, which cites a regulation promulgated by HUD at 24 C.F.R. § 100.500(b)(1), rests on the wrong standard and incorrectly imposes on Defendants the burden of proving that their challenged policies are "necessary" to achieve a legitimate interest. Defendants argue that, under the standard articulated by the Supreme Court in *Inclusive Communities*, they are not required "to show that any practice is 'necessary' to avoid summary judgment…on Step Two," ECF 300 at 23, but have "leeway to state and explain the valid interests served by their policies." 576 U.S. at 541. The ultimate burden of proving discrimination under the FHA, Defendants emphasize, remains with Plaintiffs at all times. ECF 300 at 24-25. They contend that they have met their burden of production by presenting evidence in the form of deposition testimony, interrogatory answers, and accompanying evidence to show that "operating efficiency, compliance with contractual and legal requirements, and mitigating losses are valid interests and valid reasons to use contractors." *Id*. at 25.

---

described herein, this Court concludes that Defendants have met their burden of production, under the summary judgment standard, to advance to a step three analysis. But it declines to "grant summary judgment" for Defendants at step two.

This Court agrees with Defendants' position. The Fourth Circuit has reasoned that, "Without deciding whether there are meaningful differences between the frameworks, we note that the standard announced in *Inclusive Communities* rather than the HUD regulation controls our inquiry." *Reyes*, 903 F.3d at 424 n.4. Given that analysis and the Supreme Court's recent decision in *Loper Bright Enterprises. v. Raimondo*, 603 U.S. 369, 391 (2024), this Court will not defer to the burden-shifting language set forth by HUD in 24 C.F.R. § 100.500(b)(1). *See* ECF 287 at 7. Rather, this Court will adhere to the framework articulated by the Supreme Court in *Inclusive Communities*, 576 U.S. at 527, 534, and espoused by the Fourth Circuit.

At step two of this framework, Defendants bear a burden of production to demonstrate that the allegedly discriminatory policies identified by Plaintiffs were "necessary to achieve a legitimate nondiscriminatory interest," *Reyes*, 91 F.4th at 275, by "stat[ing] and explain[ing] the valid interest served by [those] policies," *Inclusive Cmtys.*, 576 U.S. at 541. *See also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, (2000) ("This burden is one of production, not persuasion; it can involve no credibility assessment." (citation omitted)); *EEOC v. Joint Apprenticeship Comm. of the Joint Indus. Bd. of the Elec. Indus.*, 186 F.3d 110, 120 (2d Cir. 1998) ("ultimate burden of persuasion…remains at all times with the plaintiffs").

Plaintiffs argue that they are entitled to summary judgment under step two because Defendants have failed to produce "any evidence of a legitimate business interest for the identified policies." ECF 287 at 17. Explaining the "valid interest served by their policies," *Inclusive Cmtys.*, 576 U.S. at 541, Defendants state that "hiring contractors is more efficient than employing full-time workers in every corner of the country," and using contractors serves the broader goals of "operating efficiency, compliance with contractual and legal requirements and mitigating losses." ECF 300 at 25. As an initial matter, minimizing expense, improving business efficiency, and

complying with contracts and regulations are valid interests under the disparate impact framework. *See New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587 n.31 (1979) ("efficiency" was a "legitimate" goal that was "significantly served" by the policy at issue even if the policy was not required by that goal); *Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 340 (4th Cir. 2022) ("[C]omplying with ... legally binding federal regulation[s] is, by definition, a business necessity."); *Jarvis v. Analytical Lab'y Servs., Inc.*, No. 10-cv-154, 2011 WL 3680257, at *8 (D. Md. Aug. 19, 2011) ("cost-saving measure" was consistent with a "valid, nondiscriminatory" business decision). In fact, Plaintiffs do not contest that "operating efficiency, compliance with contractual and legal requirements, and mitigating losses" are valid business interests. ECF 311 at 19.

However, Plaintiffs argue that even if those are legitimate objectives, Defendants have not provided evidence that their delegation of discretion and methods of supervision supported these objectives. ECF 287 at 19. This Court disagrees.

Safeguard and BANA have explained how delegating maintenance and marketing responsibilities of REO properties to subcontractors was essential to their business interests because they are both national companies that operate across the country. Safeguard described how, as a national property preservation business, using local independent contractors instead of employees allows it to take advantage of local knowledge and adjust to fluctuations in service needs without taking on unnecessary overhead. *See* ECF 299-30 at 6-8 (interrogatory responses describing Safeguard's business objectives for using independent contractors as (1) having familiarity with the neighborhoods where they work and applicable local codes, (2) being able to cover properties in "practically every square mile of the country," and (3) limiting overhead, including full-time salary and equipment for employees, in light of fluctuating need in various

areas of the country; and its business objectives for supervision as creating an economically feasible way to instruct, direct, and oversee the contractors' work). Similarly, BANA explained that because it is "a national bank with a national portfolio of REO properties," ECF 300-22 (interrogatory responses) at 10, "it was more efficient to contract with Safeguard exclusively than to incur the expense of vetting, monitoring, and quality-controlling multiple vendors," ECF 300 at 38. From approximately 2011-2012, BANA had a single affiliate overseeing the work of three property management vendors (including Safeguard) who operated in different regions, but it decided to consolidate this work exclusively with Safeguard for "efficiency gains." ECF 300-4 at 29-32, 38 ("[I]magine you're doing three times the amount of work to manage three different vendors…so we could consolidate and be more efficient."); *see also* ECF 300-9 at 22 (centralizing work from three vendors to one was "much more manageable"). Centralizing operations to increase efficiency is a legitimate business justification. *See Anderson v. Duncan*, 20 F. Supp. 3d 42, 56-57 (D.D.C. 2013) ("preference for central oversight and reduced cost" was a legitimate business necessity even if plaintiffs preferred a different decision). Both BANA and Safeguard have shown how their nationwide business models benefit from central oversight and reduced cost.

Plaintiffs offer several arguments attacking the nexus between Defendants' delegation and supervision policies and their professed business interests. Plaintiffs argue that "BANA offers a business interest in outsourcing generally—not in selecting Safeguard specifically." ECF 287 at 19 n.7. Plaintiffs also contend that Defendants have not offered specific evidence of "economic cost savings or business efficiencies," *id* at n.8, and that the lack of effectiveness of Defendants' policies in achieving the professed objectives takes away from the legitimacy these objectives, *id*. at 20-27. But the Fourth Circuit has found that "[a] business necessity need not be a do-or die matter" and "the defendant need not demonstrate that the challenged policy is essential or

indispensable to its business—only that the policy serves, in a significant way, its legitimate interests." *Reyes*, 91 F.4th at 277 (internal quotations omitted). BANA's rationale that it selected Safeguard for the exclusive contract because "Safeguard was the industry leader in the field" and it had previous experience working with Safeguard is enough to survive summary judgment on step two.[13] ECF 300-4 at 38.

Defendants have offered sufficient evidence, in the form of interrogatory responses and deposition testimony, showing that outsourcing their REO maintenance and management serve legitimate business objectives. *See* ECF 300-22 at 9 ("[T]he maintenance of a portfolio of REO properties requires the efforts of an organization (not a single individual), and organizations by their nature must delegate responsibilities in order to function."). BANA is a bank, not a property management company. Safeguard is a property management servicer operating nationwide. Defendants' "business justification evidence need not include studies or scholarly work." *Joint Apprenticeship*, 186 F.3d at 122. The specifics of which company (or contractors) to use and how that delegation is accomplished are to be assessed by the factfinder at trial. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment."); *Joint Apprenticeship*, 186 F.3d at 122 (finding that it was "the province of the fact-finder" to "weigh the persuasiveness of defendant's evidence" on business justifications).

---

[13] This would be true even if Plaintiffs had shown that some other nationwide property management service provider would perform better than Safeguard under Plaintiffs' chosen standards. But they have not even attempted to do so, as their apparent desire is to eliminate the nationwide service provider that BANA finds preferable for its business model.

Similarly, the successfulness (or lack thereof) of Defendants' policies in achieving their professed business objectives does not fall within the purview of the step two analysis. *See Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1139 (8th Cir. 2005) (holding that increasing competitiveness of bid for government contract and increasing chances of retaining a contract were "legitimate, nondiscriminatory reasons for [defendant's] outsourcing," and outsourcing was no less legitimate from the business perspective even if did not have the intended effects). Instead, once a defendant explains the interest served by its policies under its burden of production at step two, the court subjects that interest to a "reasoned review," *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 659 (1989) *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k), but the court does "not evaluate whether the reason was wise, fair, or even correct." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 257 (4th Cir. 2025) (citation omitted)). Subjectivity as to the weight of this evidence is not a basis for summary judgment.

On the supervision side, Plaintiffs attack both Defendants' "reliance on photographs as the central means of quality control"[14] and Defendants' overall lack of emphasis on the quality of contractor work. ECF 287 at 28. Plaintiffs argue that "Safeguard's reliance on photographic quality control gave vendors opportunities to cut corners and deploy 'creative photography' to hide poor workmanship," and "BANA's reliance solely on Safeguard's photos to determine whether an FHA property was in conveyance condition" led to "incorrect determinations" regarding the completeness and quality of work. *Id*. at 28-29. According to Plaintiffs, "no rational factfinder could determine that the national model's reliance on photographs for quality control and prioritization of timeliness, rather than quality, of work completed is necessary to drive quality."

---

[14] Like Defendants, Court notes the irony of Plaintiffs' argument, as the method of conducting Plaintiffs' investigation also relied on photographic assessment. *See* ECF 300 at 32-33; ECF 235 at 4-5 (describing a database containing over 30,000 photographs of the properties at issue).

*Id*. at 30. Defendants counter that they relied on both review of "photographs" and "unannounced, in-person verification," among other methods, to validate the quality of work completed by vendors. ECF 300-22 at 10. Safeguard's corporate designee, CFO Joe Iafigliola, testified that Safeguard effectuated "photo standards" and "additional controls" through audits and field quality inspectors to assess quality and detect "omission or commission errors by vendors." ECF 300-16 at 98-99. Iafigliola explained that, as part of its vendor evaluation process, Safeguard used in-person visits and auditors to check the vendor's "work versus the requirement" and a "quality assurance team" to check the auditors' work. *Id*. at 51, 55, 99-106. He further testified that Safeguard "segment[ed]" its vendor management so that its "account managers were responsible for on-time performance and the field quality control folks were responsible for the quality in the field," which allowed for "a better overall result from a quality standpoint." *Id*. at 54-56. BANA, in turn, provided testimony that it hired independent auditors, such as ServiceLink and Altisource, to review Safeguard's work on the REO properties and "confirm that it ha[d] been done according to [BANA] standards." ECF 300-9 at 66-67. This evidence undermines Plaintiffs' arguments regarding Defendants' reliance on photographs and prioritization of timeliness over work quality, and it suffices to present a quintessential factual dispute that is inappropriate for summary judgment.

Plaintiffs list examples of decline and delayed repairs on an individual property basis, through which they seek to attack the validity of Defendants' delegation and supervision policies. ECF 287 at 22-26. But Plaintiffs' findings, amounting to less than a dozen properties out of the 1,405 at issue, are not material to the necessity (or even the success) of those policies. *See Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 876 (1984) ("isolated or sporadic discriminatory acts" are not enough to show a "pattern or practice of discrimination"). And Defendants heavily

dispute them and provide rebuttal evidence, including individual property records, to create a factual dispute about whether the alleged property defects can be traced to the challenged policies or whether they are the result of "one-time decision[s]" that "may not be a policy at all." *Inclusive Cmtys.*, 576 U.S. at 543; *see* ECF 300 at 46-50.

In their attempt to attribute several "defects" on an individual-property basis to Defendants' alleged "undue delegation and failure to supervise," Plaintiffs fail to address other factors that contribute to the complained conditions. Defendants state that, in addition to business efficiency and cost-savings, their objectives included "compliance with legal and investor guidelines, securing REO properties against damage, deterioration, and unauthorized occupancy, and mitigation of losses to investors and government insurers like FHA." ECF 300 at 38 (citation omitted). Defendants explain that they did not undertake certain tasks because they did not fall within applicable HUD or investor guidelines or local ordinances. *Id*. at 38-39. For example, Plaintiffs' investigation cited "dead grass" on a subject property as a defect, but, Defendants assert, "HUD did not require replanting grass and did not have any allowable expense for it." ECF 300 at 40; *see also* ECF 299-4 at 11-12 (HUD requirements for yard maintenance). All told, Plaintiffs' cited deficiencies of individual properties rest on disputed factual premises that cannot serve as a basis for summary judgment at step two.

This Court notes that Plaintiffs also argue that "discretion, rather than contractual obligations" or preventing property damage drove Defendants to board, rather than reglaze, windows "as a general policy" in communities of color versus in majority-white communities. ECF 287 at 31-36. Specifically, Plaintiffs contend that "Defendants based their decision to board windows in communities of color on vendors' descriptions of the properties as being in 'high crime' or 'high vandalism' areas" rather than on actual crime rates, and thus Defendants failed to

identify a legitimate objective under step two. *Id*. at 31. Plaintiffs' assertions are undermined by their failure (even under a step one standard) to evidence a "policy of boarding [windows] more often in communities of color." *Id*. Again, Plaintiffs offer a few examples at the individual property level of boarded windows in communities of color, ECF 287 at 31-32, which Defendants dispute, ECF 300 at 29-31. But these limited examples do not suffice to show that Defendants maintained a policy of boarding windows more frequently in communities of color or that Defendants actually boarded windows more frequently in these communities as opposed to in majority-white communities, or that Defendants ever "opted against" using otherwise permissible clear boarding in communities of color. ECF 287 at 34.

Plaintiffs have not marshalled the evidence to substantiate that Defendants had a policy "for the unequal boarding of windows" or that, even had there been such a policy, Defendants' stated objective of "securing REO properties against damage, deterioration, and unauthorized occupancy," was illegitimate. *Id*. at 34, 31. Plaintiffs may lack this evidence because their property inspections were limited to assessing whether a window was or was not broken or boarded. *See* ECF 183-5 at 7. Defendants proffered evidence showing that they "secure windows *when they are broken*," such as when a property has been vandalized. ECF 300 at 29-30; *see also id*. at 61 (describing properties where Defendants boarded windows that had been broken during break-ins). Defendants also explained that the decision on whether to board versus reglaze a window depended on investor guidelines as well as varying property conditions assessed by the contractor. ECF 300 at 62-63. Indeed, the parties' dueling appendices on the record evidence show the multiple disputes of fact that preclude summary judgment on step two, even if a policy of boarding windows could be shown to exist. ECF 300 at 58-69; ECF 312 at 44-65.

Ultimately, Defendants have introduced ample evidence to create factual disputes as to their legitimate business justifications for the challenged policies. Summary judgment on Plaintiffs' partial motion for summary judgment as to step two of the burden-shifting framework is denied.

### D. Defendants' Cross-Motion for Summary Judgment on Burden-Shifting Frameworks

Defendants move for summary judgment on the burden-shifting frameworks, contending that Plaintiffs have not met their burden at step three for either their disparate impact or disparate treatment claims. ECF 299. The Court addresses each theory in turn.

### i.    Disparate Impact

Having concluded that Defendants have met their step two burden of attributing their delegation of discretion and methods of supervision to legitimate business reasons, the Court turns to assessing whether Plaintiffs can meet their burden on the third step of the disparate impact framework. At step three, Plaintiffs must "show the availability of an alternative practice that has less discriminatory impact yet is still equally effective in serving [Defendants'] legitimate goals." *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 961 (9th Cir. 2021). Defendants contend that Plaintiffs have not adduced sufficient evidence to carry their burden of establishing less discriminatory alternatives that also further Defendants' valid interests. ECF 300 at 51.

In analyzing a plaintiff's proposed alternatives under the third step of the disparate impact framework, the Court looks at two prongs: whether the alternatives are "equally effective" at achieving the defendant's articulated objectives and whether they result in "less disparate impact." *Hardie v. Nat'l Collegiate Athletic Ass'n*, 876 F.3d 312, 320 & n.9 (9th Cir. 2017). While Plaintiffs need only demonstrate "an available alternative ... practice that has less disparate impact and serves

the [entity's] legitimate needs," here they propose seven alternative practices, all of which fail to meet both prongs of their burden. *See Inclusive Cmtys.*, 576 U.S. at 533 (alterations in original) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)). The Court reviews each of Plaintiffs' proposed alternatives in turn.

First, Plaintiffs suggest changing Defendants' "national model of property preservation, maintenance, and marketing" to a "local model." ECF 312 at 30. But Plaintiffs have not sufficiently explained how the "boots-on-the-ground" approach of their proposed local model differs from Defendants' current method of operation. *Id*. Plaintiffs call for Defendants to use "vendors from the local community" and local real estate agents. *Id*. As with many of their proposed "alternatives," however, Plaintiffs' proposal is less of a specific alternative practice and more of an overall criticism of methods Defendants already employ. The phraseology "local model" appears to come from one of the Defendants' experts, Deavay Tyler, who worked in property preservation and maintenance for nine years in a company servicing communities in Illinois and Indiana. ECF 169-6 ¶ 2. In his rebuttal report, ECF 299-84, Mr. Tyler describes a "local model" of property management which "approaches property preservation from a boots-on-the-ground perspective." *Id.* ¶ 12. He describes that the "bank would hire the [property preservation and maintenance ("P&M")] vendors directly from the local community instead of contracting with large, national P&M contractors like Safeguard."[15] *Id.* Without explaining from where he derived these criteria, Mr. Tyler offered a table that "shows the characteristics" of each model, using buzzwords like "shared responsibility," "results focused," "collaborative," "accountability/responsibility," and "decision-making based on facts" to describe the local model,

---

[15] Obviously, as the "local model" envisions no role for Safeguard, it would not be an alternative that is "equally effective" in achieving Safeguard's business objectives.

while using buzzwords like "don't ask/don't tell," "decision-making based on conjecture," and "blind billing" to describe the national model. *Id.* ¶ 16. But other than eliminating Safeguard from the chain of command and adding perhaps additional local vendors, Mr. Tyler provided no suggestion as to how the "attitude adjustment" contemplated in his chart would occur simply from asking BANA to hire and supervise all of the P&M contractors itself. Safeguard has explained that its vendors *are* local independent contractors because building its supply chain "around sourcing local coverage to work on the properties" served its objective of business efficiency. ECF 299-30 at 6-8 ("Independent contractors had local knowledge in the locations they worked…and were required and expected to be familiar with the local codes that applied in a given area."). Safeguard's independent contractors (who, indirectly, are also BANA's independent contractors) are using a local, "boots-on-the-ground" approach. Plaintiffs simply do not like the results.

Plaintiffs also rely on Ms. Poole's testimony to support their argument that "utilizing real estate agents…with knowledge of the local community" is an "important component[] of ensuring bank-owned properties are well maintained and marketed." ECF 312 at 31. This argument fails for multiple reasons. Ms. Poole's testimony does not establish that inserting local real estate agents into the process as another level of property management would be "equally effective" at achieving Defendant's business objectives of controlling costs and improving efficiencies. Plaintiffs also fail to acknowledge that the subject properties include a significant number that BANA maintained for conveyance to HUD and did not market for sale, and thus real estate agents did not need to be involved with these properties until after they left BANA's portfolio. *See* ECF 300 at 10; ECF 328-4 ¶ 49. And for the subset of properties that it did market for sale, BANA worked with local real estate agents. ECF 300 at 10; ECF 300-2 at 37-41. BANA had no reason to employ a real estate agent to be involved with a property it did not intend to sell.

Plaintiffs also have not adduced sufficient evidence from which a reasonable jury could conclude that requiring BANA to contract directly with local providers, as opposed to contracting with Safeguard (which in turn contracts with local providers), would be "equally effective" at achieving Defendants' goals as the current policies. Indeed, Plaintiffs' proposal of a "local model" of REO maintenance also fails to address business efficiency or centralization of efforts at all. This is primarily because in arguing against the "national model," Plaintiffs ignore the nature of Defendants' businesses, which are national in scope. BANA is "a national bank that services a national loan portfolio" and is thus dependent on a centralized model of REO marketing and maintenance. ECF 300 at 53. Similarly, Safeguard has explained that operating nationally is one of its business objectives, and thus it would be inherently inefficient for it to hire and perpetuate a staff of full-time maintenance employees due to the nationwide nature of its workload and the fluctuations in the amount and types of property maintenance work in the various regions in which it operates. ECF 299-30 at 7 ("Safeguard had a legitimate business objective…to cover properties in practically every square mile of the country…In doing so, Safeguard had a legitimate business objective to utilize independent contractors.").

Plaintiffs also do not explain how the internal department at BANA, which Plaintiffs allege inefficiently and inadequately supervises Safeguard, would be better at managing and overseeing a vast staff of fully employed or independently contracted local providers. Indeed, Plaintiffs do not address who would find, hire, or manage the local vendors and local real estate agents in their proposed "local model" or how the efficiencies BANA gained after centralizing its property management operations with Safeguard would be replaced. BANA in fact tried and rejected its prior, more diversified system after years of having multiple property management vendors and contracting with local maintenance companies. *See* ECF 300 at 11-12; ECF 300-4 at 29-31; ECF

300-5 through ECF 300-7; ECF 299-30 at 9 (describing some of the efficiencies of contracting with Safeguard, including "[t]echnology and communications efficiencies that reduced the number of database systems clients interfaced with"; [u]niformity in standards and quality across every state"; "[r]elationship building and communication with single client account team"); *Hardie*, 876 F.3d at 320 ("The plaintiff's proposed alternative(s) must be equally effective as the defendant's chosen policy at serving the defendant's interest(s), taking into account factors such as the cost or other burdens that alternative policies would impose." (cleaned up)). Lacking such critical information, Plaintiffs have not adduced sufficient evidence to create a genuine issue of material fact that their proposed "local model" accomplishes Defendants' legitimate business interests. *See id.* at 323 ("While we recognize that the plaintiff's burden at the alternatives stage is a demanding one, courts must take caution before displacing reasonable business judgments.").[16]

Plaintiffs' second proposed alternative is "an increase in the frequency of in-person reviews of exterior maintenance work" and "an increase in the percentages of unannounced, in-person quality inspections for REO homes in majority non-white census tracts." ECF 312 at 33 (citation and brackets omitted). Plaintiffs argue that this is an alternative to "Defendants' current quality control measures." *Id*. Plaintiffs assert that because smaller lenders, "such as a community bank that contracted with Ms. Poole," use local real estate agents and "property managers" to conduct "more frequent, in-person inspections," Defendants should do the same. ECF 312 at 33. However, Defendants' process already includes in-person visits to review the quality of maintenance work

---

[16] Because Plaintiffs' proposed "local model" falters on the "equally effective" prong, the Court need not address in detail the "less disparate impact" prong. *See id.* at 320 n.9 & 323. However, because the "local model" is not clearly fleshed out, Plaintiffs have not shown a genuine issue of fact that it would avoid the same statistical disparities, particularly because it is likely that the lawn service and repair professionals hired in various locales might be the same as those presently used by Safeguard. Nothing about the "local model" would create new rosters of local lawn servicers or repair professionals in the relevant neighborhoods.

on the properties. *See* ECF 299-30 at 6; ECF 300-16 at 51; ECF 300-4 at 159-60. Plaintiffs'

proposal is, again, less of an alternative and more of a critique. It ignores the inherent nationwide

nature of Defendants' businesses, as opposed to practices more easily employed by local banks

operating on a smaller scale. And while Plaintiffs state that they "are not proposing that Defendants

inspect every property after every job," their proposal contains no specificity as to what "more

frequent, in-person inspections" would include, instead generically referring to "increas[ing]"

"frequency" and "percentages" of in-person reviews and quality control inspections. ECF 312 at

34.

Plaintiffs also fail to address Defendants' cost-saving objectives, let alone whether their

proposed alternative is "equally effective" in controlling costs. While they bear the burden at step

three, Plaintiffs do not provide any evidence demonstrating how increased in-person inspections

can be accomplished at the same or similar price point as Defendants' current policies. Instead,

they simply state that "HUD guidelines and the allowable spending limits HUD sets for certain

exterior property maintenance items are a floor, not a ceiling," and that "it is difficult to believe

that increasing the number of in-person inspections…would be too expensive to achieve" given

BANA's profitability. *Id.*[17] But the burden rests with Plaintiffs, not BANA. Rather than meeting

Plaintiffs' burden of showing that their alternative is equally cost effective, this argument rests on

pure speculation and ignores Defendants' business objectives. *See Davis v. Dist. of Columbia*, No.

---

[17] In a weak attempt to address Defendants' business objectives, Plaintiffs suggest that "if cost were truly an issue, Defendants could focus the increase of in-person inspections on communities of color instead of all communities." ECF 312 at 35. Plaintiffs offer no specificity as to how this would be accomplished, let alone in a "race-neutral" way. *See Inclusive Cmtys.*, 576 U.S. at 521 ("Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision" and should "strive to design race neutral remedies.").

10-1564, 2024 WL 756640, at *18 (D.D.C. Feb. 23, 2024) ("Plaintiffs may not rest on speculation about these alternatives… and are obligated to prove that they are equally effective" (cleaned up)).

As their third alternative, Plaintiffs again misfire by proposing that BANA "self-fund[] an expanded set of allowable expenses for its REOs." ECF 312 at 35. First, it is unclear how "[e]xpand[ing] allowable expenses for exterior maintenance work" is an alternative to Defendants' delegation of discretion and supervision policies. How much is spent on the work does not necessarily change who does the work or how they are supervised. Moreover, Plaintiffs do not explain how spending more than what is currently allocated and dictated by investor guidelines and HUD requirements is equally as cost-effective as or has less disparate impact than Defendants' current policies. *See Clady v. Cnty. of Los Angeles*, 770 F.2d 1421, 1432 (9th Cir. 1985) ("Financial concerns are legitimate needs of the employer."); *Johnson v. City of Memphis*, 770 F.3d 464, 474 (6th Cir. 2014) (the court must account for defendants' legitimate interests in assessing plaintiffs' proffered alternatives).

As their fourth "alternative," Plaintiffs propose requiring clear board instead of using plywood for boarding windows and doors and argue that this will "decrease racial disparity" and "prevent additional harm to communities of color." ECF 312 at 35. They claim that "whether clear boarding is used is simply a matter of BANA choosing to authorize it." *Id.* at 36. But Plaintiffs offer no support for this assertion. As discussed in analyzing Plaintiffs' partial motion for summary judgment, Plaintiffs' investigation of BANA properties in this case asked, *inter alia*, whether a property had broken or boarded windows. *See* ECF 183-5 at 7. It did not look at, or collect data on, whether the subject properties had windows that had been reglazed or supported by clear board, so its findings were misleadingly skewed. *See id.* Thus, Plaintiffs have never established that Defendants had a policy of boarding rather than reglazing broken windows in communities of

color or a policy of using wooden boarding as opposed to clear boarding in certain neighborhoods. As this Court has established, without evidence, Plaintiffs cannot simply attribute a policy to Defendants that Defendants profess not to have. *See supra* Section IV.B; ECF 235 at 23 ("[P]laintiffs will of course be required to show that a significant racial disparity exists across only those criteria that defendants in fact maintained or should have maintained."); *Inclusive Cmtys.*, 576 U.S. at 542 (finding that a "disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing [the alleged] disparity"). Plaintiffs' "clear board" proposal is not an alternative but rather a new policy, and it is impermissible under the disparate impact framework. *See Wells Fargo*, 2015 WL 4398858, at *8 ("There is no authority that suggests that disparate impact claims are designed to impose new policies on private actors.").

The final three measures Plaintiffs propose are also not alternatives to Defendants' delegation and supervision of REO maintenance. Plaintiffs propose that Defendants "maintain and widely communicate a toll-free phone number for reporting both public and vendor complaints…regarding REO homes' preservation, maintenance, or marketing." ECF 312 at 37. Plaintiffs also "put forward, as an alternative policy (*or a new policy altogether*)," that Defendants specifically train their vendors and employees on the requirements of fair housing law. *Id*. at 38 (emphasis added). Finally, Plaintiffs propose that Defendants "establish or enhance current data collection practices to gather quantifiable information on exterior maintenance, marketing, and disposition of REO properties across census tracks, and routinely analyze this data for racial disparities." *Id*. (brackets omitted)

These three "alternatives" fail step three of the disparate impact framework in multiple respects. First, they are not alternatives to the challenged delegation and supervision policies but

instead are generalized critiques of Defendants' other existing practices and the results of those practices. And because they offer critiques rather than alternatives, Plaintiffs put forth no evidence of how these three proposals would be equally effective and less discriminatory than Defendants' current policies. *See Hardie*, 876 F.3d at 320.

Second, Plaintiffs' proposals are not alternatives because they either suggest something Defendants already do or propose a new policy altogether – and neither can satisfy step three. For example, Defendants offer evidence that they have maintained a toll-free number to field complaints from neighbors to REO properties. *See* ECF 328-26 to ECF 328-30. Defendants also explain that they have platforms for communication with vendors and real estate agents regarding property maintenance, including Safeguard's SafeView and BANA's Equator platforms. *See* ECF 300-4 at 149-151; ECF 300-3 at 73-80. The record includes evidence from these platforms regarding property maintenance issues raised by vendors and real estate agents. *See* ECF 329-9, ECF 329-10. Plaintiffs do not introduce evidence of communication methods that Defendants could use in lieu of these platforms or the existing toll-free number. Instead, Plaintiffs' proposed "alternative practice" is for Defendants "provide more straightforward options for neighbors to make reports about issues and for Defendants to monitor a line that specifically attends to such complaints." ECF 312 at 37. This is a conclusory assertion of dissatisfaction with Defendants' current method but offers no specific alternative. The same goes for Plaintiffs' proposal of fair housing training. The record contains evidence that Defendants already provide their asset managers and vendors with such training, *see, e.g.*, ECF 300-2 at 30, ECF 300-16 at 79-81, 180, which Plaintiffs do not address. Instead, Plaintiffs suggest specific training on fair housing law as a "new policy altogether," which is contrary to the disparate impact framework. *See Wells Fargo*, 2015 WL 4398858, at *8. Similarly, Plaintiffs' proposal that Defendants implement "a routine data

analysis practice that considers neighbor racial composition" in REO maintenance and marketing is not an alternative but a vaguely articulated new policy with constitutionally problematic implications. *See Inclusive Cmtys.*, 576 U.S. at 540, 543, 545 (warning that disparate impact liability should not be "based solely on a showing of a statistical disparity," should not lead to the adoption of racial quotas or targets, and should not "perpetuate race-based considerations").

At step three, Plaintiffs have failed to adduce evidence sufficient to carry their burden of showing an alternative that would be both equally effective at serving Defendants' business interests and less discriminatory than Defendants' current delegation and supervision policies. Having fully analyzed all three steps of the *Inclusive Communities* framework, the Court concludes that Defendants are entitled to summary judgment as to Plaintiffs' disparate impact claims because Plaintiffs' have not adduced sufficient evidence to meet their step three burden.

### ii.    Disparate Treatment

In contrast to a disparate impact theory of liability, a plaintiff alleging a disparate treatment FHA claim "must establish that the defendant had a discriminatory intent or motive." *Reyes*, 903 F.3d at 421. Discriminatory intent or motive can be shown in at least three ways: (1) "directly, through direct or circumstantial evidence;" (2) "indirectly, through the inferential burden shifting method known as the *McDonnell Douglas* test;" or (3) through the totality of the circumstances, applying the framework set out in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). *See Corey v. HUD*, 719 F.3d 322, 325 (4th Cir. 2013) (quoting *Kormoczy v. HUD*, 53 F.3d 821, 823-24 (7th Cir. 1995)); *see* ECF 66 at 15 n.8; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Defendants move for summary judgment on Plaintiffs' disparate treatment claim under the *McDonnell Douglas* framework. ECF 300 at 55.[18] This Court previously found that Plaintiffs' evidence as to step one was sufficient to survive summary judgment under *McDonnell Douglas*. ECF 235 at 35-36. The facts supporting disparate impact and disparate treatment theories of liability often overlap, especially given that the disparate-impact liability framework established in *Inclusive Communities* borrows from the *McDonnell Douglas* framework. *See id.*; *Inclusive Cmtys.*, 576 U.S. at 521 ("[D]isparate-impact liability under the FHA plays an important role in uncovering discriminatory intent."). Thus, the business justifications Defendants offered to meet their burden under step two of the disparate impact framework, namely business efficiency and cost-control driven by HUD and investor guidelines, also suffice under the disparate treatment framework as the legitimate, nondiscriminatory explanations for Defendants' maintenance practices. As to step three, a plaintiff may rebut a defendant's reasons by showing that they are pretextual, *i.e.*, "by amassing circumstantial evidence that otherwise undermines the credibility of the [defendant]'s stated reasons." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006) (citations omitted). Plaintiffs have not amassed any evidence to create a genuine issue of material fact as to discriminatory intent or motive in Defendants' maintenance practices or whether Defendants' legitimate nondiscriminatory reasons for their actions were pretextual for intentional race discrimination.

---

[18] While Plaintiffs allege that they also base their disparate treatment claim on the *Arlington Heights* test, Defendants' motion does not challenge that basis of Plaintiffs' claim, and the parties do not address it. Both the *McDonnell Douglas* framework and the *Arlington Heights* test are just different ways of determining "whether a reasonable jury could find that the relevant decision was motivated in part by an unlawful criterion," here that race was a "motivating factor" in Defendants' challenged conduct. *Deutsche Bank*, 2025 WL 975967, at *42 (citation omitted). The Court finds that Plaintiffs have not adduced any evidence of Defendants' discriminatory intent or motive and thus cannot succeed on their disparate treatment claim under any standard.

This Court has repeatedly noted that "the nature of the [P]laintiffs' claims seems closer to a disparate impact theory." ECF 235 at 34; ECF 66 at 15 n.8. As Judge Blake stated "[t]his is not a case where plaintiffs have uncovered a hidden trove of direct evidence evincing discriminatory motives." ECF 66 at 15 n.8. Plaintiffs did not plead any allegations of motive or intent "beyond the statistics themselves," and they have not adduced any evidence of pretext at this stage to recast their discrimination claims as disparate treatment. *Id.* Instead, Plaintiffs rely on "[t]he evidence [they] put forward to establish their *prima facie* case," which is that their investigation reveals a discriminatory motive because "a reasonable jury could reject Defendants' 'legitimate, non-discriminatory' reasons for the discriminatory maintenance and marketing of REO properties and otherwise find such reasons pretextual." ECF 312 at 41-42. This does not suffice to meet Plaintiffs' burden at step three of the *McDonnell Douglas* framework. *See Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 722 (D.D.C. 1991) ("To overcome a motion for summary judgment, the plaintiff must at least point to some evidence establishing a reasonable inference that the defendant's proffered explanation is unworthy of credence."); *Chauhan v. M. Alfieri Co., Inc.*, 897 F.2d 123, 128 (3d Cir. 1990) ("The fact that a judge or jury might disbelieve the defendant's asserted nondiscriminatory reason is not enough, by itself, to preclude summary judgment…the plaintiff must be able to adduce evidence, whether direct or circumstantial, from which a reasonable jury could conclude that the defendant's explanation is incredible."). Simply calling into question the effectiveness of Defendants' cost-saving measures is not enough, particularly using the piecemeal, property-by-property approach Plaintiffs have generally employed.

Because Plaintiffs have failed to carry their burden as to both disparate impact and disparate treatment, summary judgment must be granted for Defendants on all of Plaintiffs' FHA claims.

## V.     CONCLUSION

For the reasons explained above, Organizational Plaintiffs lack standing to pursue their claims for damages and Defendants' motion to dismiss for standing, ECF 343, is GRANTED. Plaintiffs' motion to exclude Defendants' proposed experts, ECF 310, is DENIED AS MOOT; Defendants' motion to exclude Plaintiffs' proposed experts, ECF 314, is GRANTED IN PART and DENIED IN PART as to the testimony of Joanne Poole and DENIED AS MOOT as to the remaining experts; Plaintiffs' motion for partial summary judgment on step two of the disparate impact framework, ECF 285, 287, is DENIED; and Defendants' motion for summary judgment on burden-shifting frameworks, ECF 299, is GRANTED. Defendants' motion for summary judgment on available remedies, ECF 288, and Plaintiffs' motion for reconsideration, ECF 374, are DENIED AS MOOT.[19]

A separate order follows.

Date: July 21, 2025                                     _____/s/_____
                                                        Stephanie A. Gallagher
                                                        United States District Judge

---

[19] The private nuisance claims brought by the three Individual Plaintiffs remain for disposition. Despite the length of time this case has been pending, this Court has never been asked to address any issues pertaining to these claims, which seem better suited for disposition in state court. This Court is therefore inclined to decline to exercise supplemental jurisdiction but will schedule a teleconference to discuss this issue with counsel before deciding how to proceed.