# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

NATIONAL FAIR HOUSING ALLIANCE          *
1331 Pennsylvania Avenue, NW, #650
Washington, DC 20004,                   *

HOUSING OPPORTUNITIES PROJECT FOR       *
EXCELLENCE, INC.
11501 NW 2nd Ave.                       *
Miami, FL 33168,
                                        *
METRO FAIR HOUSING SERVICES, INC.             Case No. 1:18-CV-1919-SAG
215 Lakewood Way, S.W., Suite 106       *
Atlanta, GA 30315,
                                        *
NORTH TEXAS FAIR HOUSING CENTER
8625 King George Drive                  *
Dallas, TX 75235,
                                        *
FAIR HOUSING CENTER OF WEST
MICHIGAN                                *
20 Hall St. SE
Grand Rapids, MI 49507,                 *

FAIR HOUSING CONTINUUM, INC.            *
4760 US-1
Melbourne, FL 32935,                    *

SOUTH SUBURBAN HOUSING CENTER           *
18220 Harwood Ave. # 1
Homewood, IL 60430,                     *

H.O.P.E. INC. D/B/A HOPE FAIR HOUSING   *
CENTER
202 W. Willow Ave.                      *
Wheaton, IL 60187,
                                        *
METROPOLITAN MILWAUKEE FAIR
HOUSING COUNCIL                         *
759 N. Milwaukee St. #500
Milwaukee, WI 53202,                    *

FAIR HOUSING CENTER OF CENTRAL              *
INDIANA
429 N. Pennsylvania St. #401                *
Indianapolis, IN 46204,

                                            *

DENVER METRO FAIR HOUSING CENTER
3280 N. Downing Street B                    *
Denver, CO 80205,

                                            *

FAIR HOUSING OPPORTUNITIES OF
NORTHWEST OHIO, INC. D/B/A TOLEDO           *
FAIR HOUSING CENTER
432 N. Superior Street                      *
Toledo, OH 43604,

                                            *

LOUISIANA FAIR HOUSING ACTION
CENTER, INC. F/K/A GREATER NEW              *
ORLEANS FAIR HOUSING ACTION
CENTER, INC.                                *
404 S. Jefferson Davis Pkwy
New Orleans, LA 70119,                      *

FAIR HOUSING ADVOCATES OF NORTHERN          *
CALIFORNIA
1314 Lincoln Ave. Ste. A                    *
San Rafael, CA 94901,

                                            *

HOUSING RESEARCH AND ADVOCACY
CENTER D/B/A FAIR HOUSING CENTER FOR        *
RIGHTS AND RESEARCH
2728 Euclid Ave.                            *
Cleveland, OH 44115,

                                            *

FAIR HOUSING CENTER OF NORTHERN
ALABAMA                                     *
1728 3rd Ave. N # 400C
Birmingham, AL 35203,                       *

MIAMI VALLEY FAIR HOUSING CENTER            *
505 Riverside Drive
Dayton, OH 45405,                           *

CONNECTICUT FAIR HOUSING CENTER          *
60 F J Popieluszko Court
Hartford, CT 06106,                      *

FAIR HOUSING COUNCIL OF GREATER SAN      *
ANTONIO
4414 Centerview Dr. #229
San Antonio, TX 78228,                   *

FAIR HOUSING CENTER OF THE GREATER       *
PALM BEACHES, INC.
2328 10th Ave N.                         *
Suite 101
Lake Worth Beach, FL 33461               *

WANDA ONAFUWA                            *
4712 Amberley Avenue
Baltimore, MD 21229                      *
(Baltimore City),
                                         *
CHEVELLE BUSHNELL
6086 S. Hil Mar Circle                   *
District Heights, MD 20747
(Prince George's County),                *

and                                      *

JALEN BUSHNELL                           *
6086 S. Hil Mar Circle
District Heights, MD 20747               *
(Prince George's County),
                                         *
                    Plaintiffs,
                                         *
            v.
                                         *
BANK OF AMERICA, NATIONAL
ASSOCIATION                              *
100 North Tryon Street
Charlotte, N.C. 28255                    *

            **Serve on:**                *
            The Corporation Trust, Inc.
            2405 York Road, Suite 201    *
            Lutherville Timonium, MD 21093
                                         *

3

and

                                    *

SAFEGUARD PROPERTIES MANAGEMENT,
LLC                                   *
2711 Centerville Road
Wilmington, DE 19808                   *

                  **Serve on:**         *
                  CSC-Lawyers Incorporating Service
                  Company          *
                  7 St. Paul Street, Suite 820
                  Baltimore, MD 21202,     *

                  Defendants.        *

    *     *     *     *     *     *     *     *     *     *     *     *

## <u>FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

## I.    INTRODUCTION AND SUMMARY OF CLAIMS

1.    This complaint is filed under the Fair Housing Act of 1968, as amended, 42

U.S.C. § 3601, *et seq.*, and common law, for compensatory and injunctive relief arising out of

Defendants' racially discriminatory conduct affecting communities of color in numerous cities

around the country.  The case arises from overwhelming objective evidence that Defendants

discriminated against communities of color in 37 metropolitan areas in the exterior maintenance

and marketing of properties owned by Bank of America after foreclosure.  Defendants' actions

have had a devastating impact on these communities, and, despite being advised of the problem

on numerous occasions, Defendants have refused to alter their behavior.  Plaintiffs' claims are

based on intentional discrimination, including Defendants' intentional discriminatory acts,

Defendants' responsibility for the intentional acts of their agents, and Defendants' deliberate

indifference to the discriminatory effect of their and/or their agents' acts.  Plaintiffs' claims are

also based on disparate impact, as Defendants' policies and practices have a disparate impact

because of race and national origin. The Individual Plaintiffs (Wanda Onafuwa, Chevelle Bushnell, and Jalen Bushnell) also bring private nuisance claims against Defendants.

2.     The Organizational Plaintiffs, National Fair Housing Alliance, Housing Opportunities Project for Excellence, Inc., Metro Fair Housing Services, Inc., North Texas Fair Housing Center, Fair Housing Center of West Michigan, Fair Housing Continuum, Inc., South Suburban Housing Center, H.O.P.E., Inc. d/b/a HOPE Fair Housing Center, Metropolitan Milwaukee Fair Housing Council, Fair Housing Center of Central Indiana, Denver Metro Fair Housing Center, Fair Housing Opportunities of Northwest Ohio, Inc. d/b/a Toledo Fair Housing Center, Louisiana Fair Housing Action Center f/k/a Greater New Orleans Fair Housing Action Center[1], Fair Housing Advocates of Northern California, Fair Housing Center for Rights & Research, Fair Housing Center of Northern Alabama, The Miami Valley Fair Housing Center, Connecticut Fair Housing Center, Fair Housing Council of Greater San Antonio, and Fair Housing Center of the Greater Palm Beaches, Inc. ("the Organizational Plaintiffs"), are private, non-profit fair housing organizations dedicated to ending housing discrimination on the basis of race, color, national origin, disability, religion, sex, family status and other protected categories, promoting residential integration in their communities and around the nation, and building stable, diverse neighborhoods of opportunity.

3.     The Organizational Plaintiffs do their mission-driven work through education, outreach, community development, membership services, public policy initiatives, advocacy, and investigation and enforcement of fair housing complaints and violations. Their core services and

---

[1] On January 2, 2020, Plaintiff Greater New Orleans Fair Housing Action Center ("GNOFHAC") announced that it changed its name to the Louisiana Fair Housing Action Center ("LAFHAC"). Subsequent references to GNOFHAC in this Amended Complaint have been changed to LAFHAC.

programs include counseling prospective and current homeowners and renters on housing opportunities and homeownership; making monetary investments in community development and stabilization projects to beautify neighborhoods and increase neighborhood services; counseling and investments to promote homeownership and preservation of ownership (such as, foreclosure prevention, financial literacy, home repairs and maintenance, and accessibility modifications to allow people to stay in their homes); and training real-estate industry players, including lenders, listing providers, government officials, insurance companies, appraisers, real estate brokers, and architects, on fair housing compliance, including REO specific trainings, and fair housing investigation and enforcement.

4.      Plaintiffs Wanda Onafuwa, Chevelle Bushnell, and Jalen Bushnell ("the Individual Plaintiffs") are Maryland residents and African-American homeowners in minority communities who live next door to properties that were owned and/or poorly maintained by Defendants. The Individual Plaintiffs have been damaged by Defendants' discrimination in failing to properly maintain and market those properties.

5.      At all times material to the allegations in this Complaint, Defendants Bank of America, National Association ("Bank of America, N.A.") and Bank of America Corp. (together, the "Bank of America Defendants")[2] are or were the owners of record of thousands of foreclosed homes in metropolitan areas across the country, commonly referred to as "REO" or "Real Estate Owned" properties ("the Bank of America REO properties" or "Bank of America-owned

---

[2] Each reference to Bank of America in this Complaint refers collectively to Bank of America, N.A, Bank of America Corp., and any other subsidiary or division of these entities that plays a role in owning, preserving, maintaining, or selling REO properties. This includes BAC Home Loan Servicing, LP, which was merged with and into Bank of America, N.A. in July 2011, and Countrywide Financial Corporation and Merrill Lynch, both of which Bank of America acquired in 2008.

homes").[3]  At all relevant times, Defendant Safeguard Properties Management, LLC ("Safeguard") has provided, and continues to provide, property preservation and maintenance and other services for all or almost all Bank of America REO properties.

6.    In the wake of the national foreclosure crisis, and in response to complaints, public outcry, and industry trends and observations regarding the maintenance of foreclosed properties in African-American and Latino communities, the Organizational Plaintiffs investigated and examined the routine exterior maintenance and marketing of Bank of America-owned homes with the purpose of determining whether particular neighborhoods in certain cities were being treated equally, regardless of the racial composition of the neighborhoods.  In or around June 2009, Plaintiff National Fair Housing Alliance ("NFHA") reached out to Bank of America to express concerns regarding its failure to maintain its REO inventory in communities of color. Because Bank of America refused to take corrective action, between 2009 and the present and using traditional and sound fair housing testing methodologies, the Organizational Plaintiffs conducted a comprehensive investigation of Defendants' activities related to foreclosed properties in middle- and working-class neighborhoods in communities of color (predominantly African-American and Latino neighborhoods) and in middle- and working-class neighborhoods in predominantly white communities in the metropolitan areas that are the subject of this Complaint.

7.    During the course of the investigation, the Organizational Plaintiffs examined 1,677 properties owned by Bank of America after foreclosure, collected evidence on 37 objective aspects of the routine exterior maintenance of each property investigated, and accumulated over

---

[3] Bank of America, N.A. obtained title to the vast majority of the dwellings at issue in this Complaint after mortgages owned by Bank of America went into default and foreclosure.  In a few instances, the Bank of America is or was the owner of record as trustee.

35,400 photographs of the pertinent conditions of those properties, such as unsecured doors; damage to steps, handrails, windows, and fences; graffiti; the accumulation of trash and mail; and overgrown grass and shrubbery. The Organizational Plaintiffs' investigation also documented marketing deficiencies, such as the failure to post or maintain appropriate "For Sale" signage, permitting negative signage and warnings to deter prospective owner-occupant buyers (e.g. "Bank-owned," "Auction," or "Foreclosed" signs), failure to identify on the bank-owned home a real estate agent or broker or point of contact, failure to adequately display property listings on Realtor or Multiple Listing Services or other websites, and displaying on-line or other auction sites in different states in lieu of utilizing a local real estate agent or company familiar with the neighborhood. The Organizational Plaintiffs' investigation revealed that there are significant disparities in the routine exterior maintenance and marketing of the Bank of America-owned homes in communities of color as compared to white communities.

8.     The Organizational Plaintiffs' investigation of the properties in these metropolitan areas indicates that Defendants treated properties differently depending upon the racial/ethnic composition of the neighborhoods in which they were located. In each of the 37 metropolitan areas examined, the Bank of America-owned homes located in predominantly white census block groups were better-maintained and exhibited fewer objective routine maintenance and marketing deficiencies than the Bank of America-owned homes located in neighborhoods comprised primarily of African Americans and/or Latinos. Across the board, properties located in communities of color were much more likely to have numerous objective routine maintenance and marketing deficiencies than the Bank of America-owned homes located in white areas. Accordingly, in each of the metropolitan areas and across the country, the Organizational

Plaintiffs revealed a systemic and particularized pattern of differential treatment by Defendants in maintaining and marketing REO properties on the basis of race, color, and/or national origin.

9.    The disparities documented between the maintenance of the Bank of America REO properties in white communities and the Bank of America REO properties in communities of color are stark, highly probative, and statistically significant.

10.    As a result of Defendants' discriminatory conduct and perpetuation of residential segregation, municipalities, individuals, neighbors, and homeowners in the communities served by the Organizational Plaintiffs, including the Individual Plaintiffs, have been: (a) denied equal housing opportunities and had housing made unavailable; (b) subjected to deteriorating and dilapidated living conditions in their neighborhoods; (c) denied opportunities for neighborhood stabilization and economic recovery; and (d) harmed in the value of their home investments.

11.    As a result of Defendants' failure to properly maintain and market REOs in communities of color, the Individual Plaintiffs have also suffered damage to their homes and experienced emotional distress and mental anguish.

12.    Defendants' systemic and particularized practice of maintaining and marketing bank-owned homes in a state of disrepair in communities of color, while maintaining and marketing similar homes in predominantly white communities in materially better condition, violates the Fair Housing Act, 42 U.S.C. §§ 3604(a), (b), (c) and (d), § 3605, § 3617, and HUD's implementing regulations.  Defendants' discriminatory conduct has also had the effect of perpetuating segregation, in violation if the Fair Housing Act.  Defendants' discriminatory conduct has also caused substantial and unreasonable interference with the Individual Plaintiffs' use and enjoyment of their homes, creating a private nuisance.

13.     Defendants' conduct has caused particularized and concrete injury to the Organizational Plaintiffs.  Defendants' discriminatory practices of failing to maintain and effectively market bank-owned homes have impaired and/or interfered with the Organizational Plaintiffs' activities and programs, including counseling and referral services for renters and homeowners to promote equal housing opportunity, market equalization and stabilization, residential integration, and reduction of the racial wealth gap; monetary investments to enhance and stabilize communities that have experienced discrimination and segregation to counter negative stereotypes, and to ensure equal treatment for underserved communities so that they can become places of opportunity; fair housing training of housing industry actors, including specific REO training, to promote compliance with fair housing laws; and investigations and enforcement activities of potential fair housing violations to ensure compliance with the FHA.

14.     Defendants' discriminatory practices have frustrated the Organizational Plaintiffs' missions by perpetuating unlawful discrimination and segregation and reinforcing negative stereotypes about and destabilizing communities of color—all of which the Organizational Plaintiffs actively work to counteract through their core activities in furtherance of their missions. Defendants' discriminatory conduct has systematically undermined and impaired the Organizational Plaintiffs' missions and core institutional functions.  The Organizational Plaintiffs' purposes and interests fall squarely within the zone of interests protected by the Fair Housing Act.  Because it has harmed and threatens to continue to harm the Organizational Plaintiffs' missions, Defendants' discriminatory behavior has caused the Organizational Plaintiffs to divert substantial time and resources away from their usual activities and instead to detecting, investigating, and counteracting Defendants' unlawful conduct, and engaging in outreach and education efforts specifically to address Defendants' ongoing discrimination—all

with the goal of ending and counteracting Defendants' harm to their missions.  These efforts go above and beyond the Organizational Plaintiffs' normal operational activities and expenses.

## II.     JURISDICTION

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367, 2201, and 2202, and 42 U.S.C. § 3613(a).

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants do business in this District, Defendants are subject to personal jurisdiction in this District, a substantial part of the events giving rise to these claims occurred in this District, and a substantial portion of the property that is the subject of these claims is located in this District.

17.     Organizational Plaintiffs National Fair Housing Alliance, Housing Opportunities Project for Excellence, Inc., Metro Fair Housing Services, Inc., North Texas Fair Housing Center, Fair Housing Center of West Michigan, Fair Housing Continuum, Inc., South Suburban Housing Center, H.O.P.E. Inc. d/b/a HOPE Fair Housing Center, Metropolitan Milwaukee Fair Housing Council, Fair Housing Center of Central Indiana, Denver Metro Fair Housing Center, Fair Housing Opportunities of Northwest Ohio, Inc. d/b/a Toledo Fair Housing Center, Louisiana Fair Housing Action Center, Fair Housing Advocates of Northern California, Fair Housing Center for Rights & Research, The Miami Valley Fair Housing Center, and Fair Housing Center of the Greater Palm Beaches, Inc. filed an administrative housing discrimination complaint with the U.S. Department of Housing and Urban Development Office of Fair Housing and Equal Opportunity ("HUD FHEO") concerning Defendants' conduct.  The first complaint was filed on September 25, 2012, and it was subsequently amended to update the results of the Organizational Plaintiffs' ongoing investigation on October 10, 2012, October 23, 2012, September 25, 2013,

November 14, 2013, September 30, 2014, and August 31, 2016.[4] It was withdrawn from the

HUD administrative process on July 11, 2018.

### III.    PARTIES

**A.    PLAINTIFFS**

18.    Plaintiff NFHA is a national, nonprofit public service organization founded in

1988 and incorporated under the laws of the Commonwealth of Virginia with its principal place

of business at1331 Pennsylvania Avenue, NW, #650, Washington, D.C. 20004.  NFHA is a

nationwide alliance of private, nonprofit, fair housing organizations, including organizations in

30 states and the District of Columbia.  NFHA is the only national organization dedicated solely

to ending housing discrimination not only on the basis of race, color, and national origin, but also

disability, religion, sex, families with children, and other categories protected under federal,

state, or local laws. NFHA's mission has been to expand equal housing opportunities for all

people, promote stable, diverse well-resourced communities, and address all forms of housing

discrimination through the implementation of core program activities that include responsible AI,

consulting and compliance, public policy, membership services, fair housing enforcement,

education and outreach, and housing and community development.

19.    Over the past three decades, primarily through its education and outreach and

housing and community development programs, NFHA has provided housing counseling and

---

[4] The original administrative complaint was filed by National Fair Housing Alliance, Housing Opportunities Project for Excellence, Inc., Metro Fair Housing Services, Inc., Miami Valley Fair Housing Center, North Texas Fair Housing Center, and Fair Housing Center of Western Michigan.  During subsequent amendments, other Organizational Plaintiffs joined the complaint as complainants and added evidence regarding Defendants' discrimination in other cities.  The only Organizational Plaintiffs who are not Complainants in the HUD administrative action are the Fair Housing Center of Northern Alabama, the Fair Housing Council of Greater San Antonio, and the Connecticut Fair Housing Center.

referral assistance to prospective home buyers and renters, as well as grant assistance to consumers and communities throughout the United States.

20.    NFHA has also undertaken numerous programs to further its mission of stabilizing communities of color and supporting them in becoming and continuing to be desirable places of opportunity. For instance, NFHA implemented a community development program by providing grants to homeowners and persons living in rental properties to renovate homes to make them accessible to persons with disabilities, and to senior homeowners in Prince George's County, Maryland and Washington, D.C.'s African-American neighborhoods to bring their homes up to code so that their homes would be safe and could qualify for replacement coverage from homeowner's insurance companies.  This program was expanded to several states and added grant assistance to veterans with disabilities. This community development program directly furthers NFHA's goal of stabilizing communities to ensure that they are attractive places of opportunity for all.

21.    NFHA's Inclusive Communities grant program, implemented in 2013, provides grants to ameliorate some of the adverse effects of discriminatory practices prevalent during and after the foreclosure crisis and to stablize communities of inclusion and opportunity. The program focuses on predominantly African-American and Latino neighborhoods to provide investments that promote new homeownership opportunities through direct down payment and closing cost assistance, funding for emergency repairs and accessibility modifications, grants to homeowners to prevent foreclosure to preserve existing homeownership, and home renovation programs to reduce neighborhood blight. As of 2016, NFHA and its partners (14 of the fair housing organization plaintiffs in this case) had invested $27 million in community support funds in 18 cities: Atlanta, GA; Baltimore, MD; Baton Rouge, LA; Charleston, SC; Chicago, IL

13

Metro Area (Western and Southern Suburbs); Dallas, TX; Dayton, OH; Denver, CO; Grand Rapids, MI; Indianapolis, IN; Miami, FL; Milwaukee, WI; Oakland, CA; Orlando, FL; Prince George's County, MD; Philadelphia, PA; Toledo, OH; Washington, D.C. NFHA has also partnered with its member fair housing organizations to provide millions of dollars of grants to communities across the United States to assure accessible housing opportunities for people with disabilities and facilitate general quality of life improvements to support greenspace development, parks, and fresh food access–all to stabilize and help communities become places of opportunity.

22.    Plaintiff Housing Opportunities Project for Excellence, Inc. ("HOPE, Inc.") is the first nonprofit fair housing agency organized in the state of Florida.  HOPE, Inc.'s mission is to fight housing discrimination in Miami-Dade and Broward Counties and to ensure equal housing opportunities throughout Florida.  One of HOPE, Inc.'s goals is the elimination of segregation in housing and the promotion of residential integration.  HOPE, Inc.'s core activities in service of its mission include homeownership promotion in communities of color through housing counseling, workshops, housing rehabilitation, and down-payment assistance; grants to revitalize neighborhoods of color; and housing repairs, including accessibility retrofits for individuals with disabilities, with the goal of keeping people in their homes and stabilizing communities of color. For example, in partnership with churches, government, and corporations, HOPE, Inc.'s grants helped develop an edible garden in a community of color and transform an empty lot in a community of color into a park and garden area. HOPE, Inc. has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

23.     Plaintiff Metro Fair Housing Services, Inc. ("Metro") is a private, nonprofit fair housing organization whose primary purpose is to prevent housing discrimination in the metropolitan Atlanta area and throughout the state of Georgia.  Metro was founded in 1974 to promote social justice and eliminate housing and lending inequities for all people, including those with disabilities, through leadership, education and outreach, public policy advocacy, and enforcement.  One of Metro's goals is the elimination of segregation in housing and the promotion of residential integration.  Metro's core activities in service of its mission and goals include promoting homeownership and neighborhood stabilization in communities of color through housing counseling, down payment and closing cost assistance, rehabilitation of foreclosed properties, repurposing blighted blocks and vacant lots, and accessibility modifications for individuals with disabilities.  Metro has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

24.     Plaintiff North Texas Fair Housing Center ("NTFHC") is a nonprofit organization dedicated to eliminating housing discrimination in North Texas.  The organization provides housing counseling, discrimination complaint investigation, and outreach and education programs with the goal of ensuring that all persons have the opportunity to secure the housing they desire and can afford.  One of NTFHC's goals is the elimination of segregation in housing and the promotion of residential integration.  NTFHC's core activities in service of its mission include housing counseling and homeownership promotion through down payment and closing cost assistance, emergency repairs, and accessibility modifications. NTFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative

consequences that flow from racial steering, and the benefits of residential diversity.  NTFHC offers grants to persons with disabilities so that they can remain in their homes by making them safe and accessible.

25.     Plaintiff Fair Housing Center of West Michigan ("FHCWM") is a private, non-profit fair housing organization committed to providing comprehensive fair housing services, including education, outreach, research, advocacy, and enforcement.  FHCWM serves 12 counties in western Michigan.  FHCWM's mission is to prevent and eliminate housing discrimination, ensure equal housing opportunity, and promote inclusive communities.  Core activities to support this mission include housing counseling and community investment for neighborhood stabilization in communities of color. In addition, through education, research, and advocacy, FHCWM prevents housing discrimination, removes barriers that allow it to persist, and restores housing choice when discrimination happens.  FHCWM has launched multiple educational activities to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

26.     Plaintiff Fair Housing Continuum, Inc. ("the Continuum") is a private, nonprofit fair housing agency dedicated to the elimination of housing discrimination in Florida.  The Continuum serves Brevard, Indian River, Seminole, Osceola, Orange, and Volusia Counties. One of the Continuum's goals is the elimination of segregation in housing and the promotion of residential integration.  Core activities to support this mission include homeownership promotion and community-investment programs, including supporting housing rehabilitation, repurposing blighted or vacant lots, and accessibility modifications, as well as providing housing counseling to individuals and guidance on housing issues to local governments upon request. The

16

Continuum has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. The Continuum's Inclusive Communities Program provides grants for down payments, loan reduction, and home rehabilitation and modification to support homeownership and neighborhood stabilization. If the buyer is a veteran, active duty military, disabled, or willing to be the owner-occupant of a home in a distressed neighborhood, the Continuum will provide a grant to assist with the purchase or building of a home.

27.    Plaintiff South Suburban Housing Center ("SSHC") is a nonprofit community organization that primarily serves the south metropolitan Chicago area, including underserved areas of northwest Indiana. SSHC is dedicated to eliminating all forms of discrimination in the housing market through the operation of fair housing enforcement and affirmative housing counseling programs to foster stable, racially and economically diverse communities. SSHC's primary goal is the elimination of segregation in housing and the promotion of residential integration through expanding housing and mortgage lending choices. To achieve its mission and primary goal, SSHC's core activities include housing counseling and grant provision. SSHC has launched multiple educational activities to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. SSHC provides grants in recovering communities of color to first-time homebuyers to purchase housing, to persons in housing payment distress allowing them to stabilize homeownership, and to persons forced to rent due to displacement caused by foreclosure.

28.    Plaintiff H.O.P.E. Inc. d/b/a HOPE Fair Housing Center ("HOPE FHC"), established in 1968, is the oldest fair housing center in Illinois.  HOPE FHC primarily serves 40+ counties in Northern and North Central Illinois.  HOPE FHC's mission is to create greater housing opportunities for all, and to end the negative effects of housing discrimination and segregation because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under federal, state, or local laws.  HOPE FHC's core activities in furtherance of its mission include client counseling and referral services, as well as community investment in communities of color through grants, housing rehabilitation, and campaigns designed to market communities of color as desirable places to live. One of HOPE FHC's goals is the elimination of segregation in housing and the promotion of residential integration.  HOPE FHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. HOPE FHC's inclusive community development initiatives have provided grants either directly to individual households or local non-profits to renovate homes, receive down payment and closing cost assistance, complete community enhancement initiatives, offer rent assistance to homeless families, create marketing materials to affirmatively market communities of color, and for other organizations to provide homebuying counseling.

29.    Plaintiff Metropolitan Milwaukee Fair Housing Council ("MMFHC"), established in 1977, is a private, nonprofit organization that operates a full-service fair housing program. MMFHC serves numerous counties in Wisconsin.  The purpose of MMFHC is to promote fair housing throughout the State of Wisconsin by combating illegal housing discrimination and by creating and maintaining racially and economically integrated housing patterns.  One of

MMFHC's goals is the elimination of segregation in housing and the promotion of residential integration.  MMFHC's core activities in service of its mission include housing counseling, homeownership promotion, foreclosure prevention, and provision of grant assistance to community organizations to engage in neighborhood improvement and stabilization and to promote racially and economically integrated housing. MMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  MMFHC's inclusive communities projects include providing grants to neighborhood non-profit partners to expand access to affordable and responsible homeownership while improving neighborhoods that were damaged by the foreclosure crisis.

30.    Plaintiff Fair Housing Center of Central Indiana ("FHCCI") is a private, nonprofit fair housing organization based in Indianapolis, Indiana and primarily serving 24 counties in Central Indiana.  FHCCI's mission is to ensure equal housing opportunities by eliminating housing discrimination.  One of FHCCI's goals is the elimination of segregation in housing and the promotion of residential integration.  FHCCI's core activities in service of its mission include housing counseling; grants for home modification, repairs, vacant lot purchases, and new construction; and neighborhood stabilization and beautification efforts, including the creation of pocket parks, community gardens, and arts projects.  FHCCI has also launched multiple educational campaigns in furtherance of its mission to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity. FHCCI's inclusive communities work includes connecting neighborhood partners to help, serve,

revitalize, stimulate, and invest resources to rebuild an affordable, safe, and vital community.  In its targeted neighborhoods, FHCCI has funded acquisition and major rehabilitation of single-family homes to be sold to owner-occupants.  It has previously provided grants to ensure rehabilitated homes are accessible and grants for persons with disabilities to afford them full access to their homes and yards.  Grants are also used to modify and improve pocket parks to beautify neighborhoods and provide recreational space, among other activities for neighborhood vitalization.

31.     Plaintiff Denver Metro Fair Housing Center ("DMFHC"), established in 2012, is a private, nonprofit fair housing enforcement agency serving six Denver Metro Counties: Adams, Arapahoe, Broomfield, Denver, Douglas, and Jefferson.  DMFHC is dedicated to eliminating housing discrimination and promoting housing choice for all through education, advocacy, and enforcement of fair housing laws.  DMFHC's goals include the elimination of segregation in housing and the promotion of residential integration.  DMFHC's core activities in service of its mission include housing counseling, homeownership promotion through down payment and closing cost assistance; housing rehabilitation; accessibility modifications; community revitalization through construction of parks, gardens, and recreation areas; and community engagement through programming and summer camps.  DMFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  DMFHC established the Fair Housing Action Fund to promote neighborhood development and stabilization.  The Fund has supported construction of new homes in partnership with Habitat for Humanity and other

local nonprofits and it provides grants for critical repair of existing homes, including grants to make homes and apartments accessible.

32.    Plaintiff Fair Housing Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair Housing Center ("TFHC") is a non-profit public service agency organized under the laws of the State of Ohio, with its principal place of business in Toledo, Ohio.  The purposes of TFHC are to eliminate all forms of unlawful discrimination in housing in the greater Toledo area, including discriminatory advertising, marketing, sales, and lending practices; to expand equal housing opportunities for all persons; and to eliminate racial segregation in housing.  Core activities to support this mission include: homeownership promotion and providing grants to prevent foreclosure, rehabilitating housing, repurposing blighted or vacant lots, and enhancing communities with the goal of stabilizing them through construction of parks and recreation areas; providing counseling and referral services to the public with respect to housing discrimination matters; and educating the public about housing discrimination laws, discriminatory housing practices, and the availability of administrative and legal remedies to challenge discriminatory practices. TFHC operated the MLK Inclusive Communities Program from 2014 through 2015 to provide grants to help homeowners in African-American and Latino neighborhoods with roof replacement and other renovations to their homes to stabilize neighborhoods and remove blight. TFHC also provided emergency mortgage assistance grants and foreclosure prevention counseling to homeowners in communities of color to become and remain current on their mortgage payments.  Finally, through the MLK Inclusive Communities Program, TFHC partnered with Ability Center of Greater Toledo to provide home accessibility modification grants to homeowners with disabilities to allow them to age in place and/or to fully enjoy their dwellings.

33.     Plaintiff Louisiana Fair Housing Action Center, Inc. ("LAFHAC") is a private, nonprofit civil rights organization established in 1995.  For more than 20 years, LAFHAC has been dedicated to eradicating housing discrimination throughout Southeast Louisiana.  Its service area now includes the entire state of Louisiana.  LAFHAC has been responsible for fighting housing discrimination that arose in the wake of Hurricane Katrina and, in recent years, from the effects of the economic recession.  One of LAFHAC's goals is the elimination of segregation in housing and the promotion of residential integration.  LAFHAC's core activities in service of its mission and goals include homeownership promotion through down payment assistance and closing cost assistance, foreclosure prevention through anti-displacement grants and housing counseling, and housing rehabilitation.  LAFHAC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.  LAFHAC's Inclusive Communities Program has been instrumental in addressing longstanding patterns of segregation and promoting fair housing choice in the metropolitan Baton Rouge area through activities designed to stabilize poor and minority neighborhoods impacted by predatory lending and high foreclosure rates, and to support affordable rental housing and homeownership opportunities in communities of color.

34.     Plaintiff Fair Housing Advocates of Northern California ("FHANC") (formerly Fair Housing of Marin) is a nonprofit fair housing organization incorporated under the laws of the State of California with its principal place of business in San Rafael, California.  FHANC's primary objectives are: to promote equal opportunity in the renting, purchasing, financing, and advertising of housing; to educate persons regarding federal and state fair housing laws; to promote racially integrated communities and neighborhood diversity; and to eliminate

discriminatory housing practices. To achieve this mission, FHANC's core activities include grantmaking as well as free fair housing, pre-purchase, and mortgage distress counseling to tenants and homeowners.  It is also engaged in several different activities to further its mission of promoting equal housing opportunities and educating communities on the value of diversity, including: education programs in schools and in the community regarding fair housing and diversity; training programs for real estate professionals; pre-purchase education for homebuyers; advocacy for affordable housing; and foreclosure prevention and fair housing counseling.  FHANC also provides grants to homeowners and renters to make their living space accessible and to promote integration.

35.     Plaintiff Housing Research and Advocacy Center d/b/a Fair Housing Center for Rights and Research ("FHCRR") is a private, non-profit organization incorporated under the laws of Ohio and located in Cleveland, Ohio.  Its mission is to protect and expand fair housing rights, eliminate housing discrimination, and promote integrated communities.  To further this goal, FHCRR's core activities include counseling to individuals searching for housing and guidance and support to individuals who encounter discrimination in their search for housing. This may include investigation of their complaints. In furtherance of its mission, FHCRR participates in local coalitions whose work enhances equitable access to credit for low- and moderate-income individuals and supports the creation and maintenance of affordable housing in communities of color. FHCRR also engages in activities designed to encourage fair housing practices by educating consumers regarding their rights and professionals regarding their responsibilities under the Fair Housing Act, and by working with elected and government representatives to protect and improve fair housing laws.  FHCRR also conducts research into housing and lending patterns and related fair housing matters throughout Northeast Ohio to

educate government officials, individuals who work in the housing industry, and the public as a whole regarding housing discrimination and segregation.

36.     Plaintiff Fair Housing Center of Northern Alabama ("FHCNA") is a private, nonprofit corporation located in Birmingham, Alabama.  FHCNA seeks to ensure that all who seek housing are given fair and equal access to housing of their choice based upon their ability to acquire.  FHCNA works to further its mission of eliminating housing discrimination and ensuring equal housing opportunity for all people in northern Alabama through its core activities of housing counseling, education, outreach, public policy initiatives, advocacy, and enforcement. FHCNA has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

37.     Plaintiff Miami Valley Fair Housing Center ("MVFHC") is a private, nonprofit corporation based in Dayton, Ohio.  MVFHC recognizes the importance of "home" as a component of the American dream and seeks to eliminate housing discrimination against all persons because of race, color, religion, national origin, sex, disability, familial status, or any other characteristic protected under state or local laws.  One of MVFHC's goals is the elimination of segregation in housing and the promotion of residential integration.  MVFHC's core activities in service of its mission and goals include counseling; homeownership promotion through down payment assistance and closing cost assistance; emergency repairs; foreclosure prevention through anti-displacement grants; housing rehabilitation; repurposing blighted or vacant lots; accessibility modifications; community enhancement including construction of parks, gardens, and recreation areas; and community engagement.  MVFHC has launched

multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

38.    Plaintiff Connecticut Fair Housing Center ("CFHC") is a nonprofit organization dedicated to ensuring that all people have equal access to housing opportunities in Connecticut. CFHC provides investigative and legal services to those who believe that they have been the victims of housing discrimination and additionally works with state and local government, as well as housing providers, to promote compliance with federal fair housing laws.  One of CFHC's goals is the elimination of segregation in housing and the promotion of residential integration. Core activities in service of this mission include neighborhood stabilization and foreclosure prevention through counseling and mediation.  CFHC has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

39.    Plaintiff Fair Housing Council of Greater San Antonio ("FHCGSA") is a private, nonprofit corporation based in San Antonio, Texas, and serving 37 counties in South Texas. FHCGSA is dedicated to eliminating discriminatory housing practices, promoting residential integration, and advancing accessible and affordable housing in South Texas.  To advance its mission, FHCGSA's core programs include, but are not limited to, investigating housing discrimination complaints through various investigative strategies including systemic surveys and testing, providing housing counseling to consumers, submitting reasonable accommodation and modification requests to housing providers on behalf of consumers with disabilities, maintaining a Directory of Accessible Housing, implementing educational social media

campaigns to combat housing discrimination, and conducting various education and outreach activities for housing consumers, housing providers, community groups, and government agencies and officials, among others.

40.    Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. ("FHCGPB") is a nonprofit corporation dedicated to ensuring fair and affordable housing opportunities for all people by promoting culturally diverse communities through open housing and the elimination of all barriers to that goal.  FHCGPB's primary purpose is the elimination of housing discrimination on the basis of race, color, national origin, religion, sex, familial status, disability, marital status, age, sexual orientation, and gender identity or expression throughout the Greater Palm Beaches area.  FHCGPB seeks the eradication and elimination of direct and indirect obstacles that limit full access to the housing market throughout Florida and seeks to end unlawful housing discrimination through enforcement, education, public awareness, and helping victims enforce their rights.  One of FHCGPB's goals is the elimination of segregation in housing and the promotion of residential integration.  FHCGPB' s core activities in support of its mission and goals include facilitating homeownership by collaborating to provide first-time homebuyer workshops and housing counseling that addresses the ongoing affordable housing crisis in the Palm Beach County and the Greater Palm Beach Area.  FHCGPB has launched multiple educational campaigns to address housing discrimination designed to teach both consumers and housing professionals about equality of treatment of neighborhoods, the negative consequences that flow from racial steering, and the benefits of residential diversity.

41.    Plaintiff Wanda Onafuwa is a resident of Baltimore, Maryland.  She has owned her home located at 4712 Amberley Avenue, Baltimore, Maryland, 21229, for approximately 23 years.  On information and belief, in or about September 2016, Bank of America began the

process of foreclosing on the property located at 4714 Amberley Avenue, Baltimore, Maryland, 21229 ("4714 Amberley"), which is the house immediately next door to Ms. Onafuwa's residence. Bank of America, N.A. became owner of 4714 Amberley on or about February 27, 2017, and sold the property on or about March 20, 2018. During the time that Bank of America, N.A. owned 4714 Amberley, Defendants failed to adequately care for and maintain the property, which caused damage to Ms. Onafuwa, her home, and her neighborhood.

42.     Plaintiff Chevelle Bushnell is a resident of Prince George's County, Maryland. She has owned her home located at 6086 S. Hil Mar Circle, District Heights, Maryland, 20747, for approximately 28 years. On information and belief, in or about August 2014, Bank of America began the process of foreclosing on the property located at 6088 S. Hil Mar Circle, District Heights, Maryland, 20747 ("6088 S. Hil Mar"), which is the house immediately next door to Ms. Bushnell's residence. Bank of America, N.A. became owner of 6088 S. Hil Mar on or about July 20, 2015, and transferred the property to the United States Department of Housing and Urban Development on or about April 29, 2016. During the time that Bank of America, N.A. owned 6088 S. Hil Mar, Defendants failed to adequately care for, secure, and maintain the property, which caused damage to Ms. Bushnell, her home, and her neighborhood.

43.     Plaintiff Jalen Bushnell is the son of Chevelle Bushnell. Mr. Bushnell has lived with Ms. Bushnell at 6086 S. Hil Mar Circle, District Heights, Maryland, 20747, for all of his 24 years, except for a period in 2010-13 when he lived part-time with his father. Defendants' failure to adequately care for, secure, and maintain the property located at 6088 S. Hil Mar caused damage to Mr. Bushnell.

**B.     DEFENDANTS**

44.     Defendant Bank of America, N.A. is a wholly-owned subsidiary of Bank of America Corp. and the entity through which Bank of America Corp. conducts its banking

activities.  Bank of America owns and maintains REO properties in metropolitan areas in Washington, D.C./Prince George's County, MD; Baltimore, MD; Richmond, Oakland, and Concord, CA; Grand Rapids, MI; Atlanta, GA; Dayton, OH; Columbus, OH; Miami, FL; Dallas, TX; Orlando, FL; Chicago, IL; Milwaukee, WI; Indianapolis, IN; Denver, CO; Memphis, TN; Philadelphia, PA; Toledo, OH; Kansas City, MO; New Orleans, LA; Vallejo, CA; Cleveland, OH; Suburban Detroit, MI; Gary, IN; Minneapolis, MN; Newark, NJ; Tampa, FL; Hartford, CT; New Haven, CT; Waterbury, CT; Fort Worth, TX; Louisville, KY; Muskegon, MI; Providence, RI; San Antonio, TX; West Palm Beach, FL; Baton Rouge, LA; and Birmingham, AL.  Plaintiffs allege that Bank of America engaged in a pattern and practice of discrimination in maintaining and marketing bank-owned homes in white communities more favorably than similar bank-owned homes located in predominantly African-American and Latino neighborhoods in the same metropolitan area.  During the time period of this Complaint, Bank of America contracted with Safeguard to provide property maintenance services for most of the homes owned or controlled by Bank of America.

45.     Defendant Safeguard Properties Management, LLC ("Safeguard") is a Delaware limited liability company registered to do business in the State of Maryland.  At all times relevant to this Complaint, Safeguard has conducted business in this District and in the metropolitan areas that are the subject of this Complaint directly and/or through its operating contractors.  Safeguard's business activities include providing services and products related to the management, preservation, maintenance, and marketing of REO properties.  Plaintiffs allege that Safeguard has engaged in a pattern and practice of discrimination through the discriminatory performance of routine maintenance activities with regard to Bank of America-owned homes in communities of color as compared to white communities.

## IV.    FACTS

### A.    BACKGROUND OF DISCRIMINATION AGAINST MINORITY NEIGHBORHOODS AND COMMUNITIES OF COLOR (HISTORICAL CONTEXT OF DEFENDANTS' VIOLATIONS)

46.    The failure to maintain real estate owned by banks in minority communities is a continuation of the well-documented history of residential discrimination against minorities and minority neighborhoods in this country by many financial institutions.  First mortgages were withheld from neighborhoods of color by redlining; more recently, neighborhoods of color were targeted for expensive, predatory, and unfair mortgages; and now a few financial institutions, like Bank of America, are allowing bank-owned homes in neighborhoods of color to deteriorate, become eyesores, create health and safety hazards, and lose value due to lack of routine maintenance.  Defendants' failure to take the minimal actions necessary to maintain and monitor bank-owned homes in African-American and Latino communities equally to bank-owned homes in white communities occurred with full knowledge that their actions and omissions would severely harm minority communities – the very communities that have been repeatedly damaged by discriminatory housing practices and conditions in the past.

47.    Discrimination against persons of color by financial institutions and mortgage lenders is entrenched.  For much of the 20th century, banks did not issue mortgages in minority neighborhoods, literally drawing a red line around these neighborhoods on lending maps and thereby forcing minority homebuyers into the high-price lending arms of finance companies, hard money lenders, and land contracts.

48.    Although the Fair Housing Act of 1968 sought to eliminate these practices, decades later communities of color still lacked access to sound and fair lending products available to white communities.  As such, these minority communities were ripe for exploitation by predatory lenders during the subprime lending boom of the 1990s and early 2000s.

49.     During this period some lenders and investment banks, including the Bank of America Defendants, sought to profit from the exploding mortgage securitization business. When a residential mortgage is securitized, the original mortgage note is sold immediately to an investment bank, which pools the mortgage with thousands of others to create a Residential Mortgage-Backed Security.  This security is then sold to investors, including hedge funds.

50.     Bank of America played key funding and trustee roles in the securitized loan pools that fueled the lending boom.[5]

51.     To profit from this market, certain lenders sought to expand markets for subprime mortgage products.  These lenders pushed subprime mortgage products, with increasingly unfavorable and risky loan terms, in minority neighborhoods ("reverse redlining").

52.     With reverse redlining, borrowers in neighborhoods of color who qualified for prime loans were deliberately steered into more onerous subprime and predatory loans.  As a result, borrowers who would have been able to keep up with mortgage payments under the terms of a less expensive prime loan became unable to make the more demanding payments required by subprime loans with adjustable rate mortgage ("ARM") terms that raised the monthly mortgage payment every six months.  These types of loans were called "exploding ARMs" because monthly payments would double and even triple within a year.  This practice caused foreclosures and eventual vacancies in properties that otherwise would have remained occupied had the borrowers been given prime loans for which they qualified.

53.     During the subprime boom, African-American and Latino borrowers were nearly twice as likely as white borrowers to have one or more "high risk" features or conditions in their

---

[5] Lindsey, Thompson, Cohen, Williamson, *Why Responsible Mortgage Lending Is a Fair Housing Issue*, National Consumer Law Center, n.34 (2012).

loans, such as higher interest rates, teaser rates, interest-only mortgages, adjustable rates, or a prepayment penalty. Even after controlling for factors such as credit scores and income, African-American and Latino home buyers were 80% and 70% more likely, respectively, to receive a subprime loan than white home buyers.

54.     In 2003, subprime lending accounted for 8% of all mortgage lending, including home refinancing. By 2006, subprime lending accounted for 28% of the market. The disparate subprime lending to persons of color was reflected in Home Mortgage Disclosure Act ("HMDA") data.

55.     One of the lenders most involved with pushing subprime mortgage products, and the eventual fallout that resulted, was Countrywide Financial, which Bank of America acquired in 2008.

56.     The subprime lending boom collapsed in 2008, leading to an unprecedented foreclosure crisis. The crisis hit minority communities especially hard. During the first years of the crisis, African-Americans and Latinos were nearly 50% more likely to be facing foreclosure than whites, regardless of income. Foreclosure rates were also directly related to residential segregation:  the more segregated a metropolitan area, the higher its foreclosure rate. Lenders and investors, such as the Bank of America Defendants, became reluctant owners of properties in communities of color that were disproportionately affected by the foreclosure crisis.

57.     The foreclosure crisis continues to have significant effects across the country. Since mid-2007, more than 7.5 million foreclosures have been completed and 5 million properties are reported to be substantially underwater, meaning that owners owe 25% more on their mortgages than their homes are worth.

58.    The large volume of foreclosures created a large inventory of vacant homes possessed by banks.  These REO properties surfaced in unprecedented numbers in communities of color after the foreclosure crisis hit.  REO properties present a substantial obstacle for recovery in the communities in which they are located, which suffer negative effects such as a depleted tax base, neighborhood blight, health and safety concerns, and decreased market values, resulting in wealth loss for homeowners who live near foreclosed homes.

59.    Because African-American and Latino homeowners faced disproportionately adverse actions on their loans, the neighborhoods and communities they lived in disproportionately felt the impact.  Estimates are that families affected by nearby foreclosures have lost or will lose a total of 8.8% of their home value.  For residents in African-American or Latino communities, that number doubles to 16% of home value.  The total loss in home equity stripped from communities of color is estimated to be approximately $1.1 trillion.

60.    The Defendants in this case knew or should have known the foregoing facts, including that a large proportion of the Bank of America-owned homes were in neighborhoods of color.  Against this historical backdrop, Defendants are now allowing REO properties in minority communities to deteriorate due to a lack of proper routine exterior maintenance and marketing, causing more damage to these communities.

B.    **DEFENDANTS' REO MAINTENANCE AND MARKETING CONDUCT DISCRIMINATES AGAINST COMMUNITIES OF COLOR**

1.    **Bank of America's Ownership and Defendants' Obligations Relating to REO Properties**

61.    Bank of America is one of the Big Four banks in the United States (along with Citigroup, JPMorgan Chase, and Wells Fargo), as well as one of the largest companies in the world.  The Bank of America Defendants engage in a wide variety of banking and financial

services activities, including those related to consumer real estate services such as mortgage lending and packaging, refinancing, home equity lines of credit, and home equity loans.[6]

62.    When a mortgage owned by Bank of America goes into default and foreclosure, Bank of America eventually obtains title to the dwelling securing the mortgage.  The property is thereafter referred to as a Real Estate Owned or "REO" dwelling.  As a consequence of the foreclosure crisis, Bank of America has obtained title to hundreds of thousands of REO dwellings across the country covered by the Fair Housing Act.

63.    Once Bank of America becomes the owner of an REO property, it assumes all duties and responsibilities of ownership, including routine exterior maintenance, while the property is marketed for sale.  As a property owner, Bank of America has an affirmative duty to know the conditions existing at the foreclosed properties to which it holds title, to maintain all such properties in compliance with all applicable laws, and to take all actions necessary to prevent or abate any unlawful conditions at such properties.

---

[6] Bank of America also has been one of the financial institutions with the greatest involvement in the formation and development of mortgage-backed securities transactions.  One of the parties to mortgage-backed securities transactions is a trustee, who typically receives the assets in exchange for certificates issued to investors evidencing beneficial interests in the assets. Relevant to the properties at issue in this Complaint, the Bank of America Defendants have at times acted in this capacity.  The trustee in an asset-backed securities transaction is the legal owner of the assets underlying the transaction for the benefit of the holders of the asset-backed securities.  Foreclosure and other legal actions with respect to trust properties must be brought in the name of the trustee as the legal owner of the loans.  Any claims against the trust must be brought against the trustee as the trust's legal representative.  When a foreclosure occurs on a property that has been packaged under the security, the trustee becomes the legal owner of record of the property and becomes responsible for all legal obligations as owner.  Thus, the Bank of America Defendants are liable for any REO dwellings for which they hold title as trustee.  As Safeguard has acted as the property preservation company for Bank of America REOs for which the Bank of America Defendants serve as trustee, and thus as Bank of America's agent, Safeguard is liable for any discrimination in the maintenance and marketing of those properties, as well.

64.     As legal owner of the home, Bank of America is required under the Fair Housing Act to maintain all REO properties, regardless of their location, without regard to race, color, religion, sex, disability, familial status, or national origin.  This responsibility is non-delegable under the Fair Housing Act, whether or not there has been a contractual designation of maintenance and marketing responsibilities to a preservation management company such as Safeguard.

65.     Other parties tasked with preserving and maintaining an REO property, such as Safeguard, also bear responsibility for complying with local laws and regulations and the requirements of the Fair Housing Act.

66.     According to the Federal Reserve Board, "[i]institutions should have policies and procedures in place to ensure that properties are maintained in compliance with federal, state and local laws, including laws governing health and safety, property preservation, fair housing, and property registration…. Further, institutions engaging third-party vendors to carry out functions related to these requirements should ensure that vendors maintain appropriate compliance controls.  Reliance on third-party vendors does not relieve an institution of its compliance responsibilities or liability."  Federal Reserve, Q&As re REOs, No. 20.

67.     Under standard industry practice, the routine exterior maintenance that Defendants are required to perform on all REO properties is objectively measurable, verifiable, and externally visible.  Such maintenance activities include, but are not limited to, mowing, edging, and weeding; trimming shrubs and trees; removing snow, trash, and debris; securing doors and windows; repairing or replacing loose handrails and steps; and covering holes in the dwelling.  These routine exterior maintenance functions must be addressed readily and regularly at every bank-owned home, regardless of the age or value of the property.

68.     There is no public data available to identify when a property preservation company (and its subcontractors or agents) has been contractually retained for any specific REO property titled in the name of a bank.  REO owners do not make this information available to the public.  It is not retrievable from tax or land records.

> **2.     The Organizational Plaintiffs' Investigation of Defendants' Exterior Maintenance and Marketing of Properties**

69.     In the aftermath of the foreclosure crisis, NFHA was approached by real estate and property preservation industry professionals with concerns about banks' and property preservation companies' failure to properly maintain and market REOs in communities of color to the same standards they were maintaining REOs in majority-white communities. Because of the recent foreclosure crisis, their concerns and the possible impact on affected communities made this an urgent issue. In response to those complaints and consistent with their missions, the Organizational Plaintiffs acted to investigate the existence and scope of this problem.

70.     In one of the most extensive fair housing testing programs conducted under the Fair Housing Act, the Organizational Plaintiffs investigated Defendants' maintenance and marketing of Bank of America-owned homes in certain metropolitan areas from 2011 to May 2018.[7]  The Organizational Plaintiffs' investigation was conducted in the following metropolitan areas: Washington, D.C./Prince George's County, MD; Baltimore, MD; Richmond, Oakland, and Concord, CA; Grand Rapids, MI; Atlanta, GA; Dayton, OH; Columbus, OH; Miami, FL; Dallas, TX; Orlando, FL; Chicago, IL; Milwaukee, WI; Indianapolis, IN; Denver, CO; Memphis, TN; Philadelphia, PA; Toledo, OH; Kansas City, MO; New Orleans, LA; Vallejo, CA;

---

[7] NFHA first documented differing maintenance between Bank of America-owned homes in communities of color as opposed to white communities in 2009, and immediately notified Bank of America of its findings.

Cleveland, OH; Suburban Detroit, MI; Gary, IN; Minneapolis, MN; Newark, NJ; Tampa, FL; Hartford, CT; New Haven, CT; Waterbury, CT; Fort Worth, TX; Louisville, KY; Muskegon, MI; Providence, RI; San Antonio, TX; West Palm Beach, FL; Baton Rouge, LA; and Birmingham, AL.

71.    The investigation included 1,677 residential dwellings covered by the Fair Housing Act. For purposes of this Complaint and the statistical analyses set out below, "predominantly white neighborhoods" refers to those census block groups with more than 50% non-Hispanic white residents, and the phrase "communities of color" refers to census block groups with less than 50% non-Hispanic white residents.

72.    In each of these metropolitan areas, the Organizational Plaintiffs identified the zip codes within the metropolitan area that were racially concentrated (e.g. predominantly white or communities of color) with the highest foreclosure rates. From those zip codes, the Organizational Plaintiffs chose the zip codes with high homeownership rates that qualified as working- or middle-class neighborhoods, based on comparing the zip codes' median income to those of the metropolitan statistical area and the state. The Organizational Plaintiffs then inspected all (100%) of the Bank of America-owned homes in those zip codes within the same relative time period, unless the properties appeared to be occupied, someone at the property said they were the new owners, or work was actively occurring at the time of the site visits. The exclusion of properties where work was ongoing was to avoid recording adverse conditions that might be temporary or related to the work being conducted by a new owner.

73.    Bank of America's ownership of the properties was determined by using county property records, records kept by the clerks of courts, RealtyTrac, Bank of America's REO listing website, and other database sources. Because county recorders occasionally delay

recording ownership titles, the data was also crosschecked with other records to verify the ownership of the homes.

74.    The Organizational Plaintiffs evaluated Defendants' maintenance and marketing of these properties according to specific and objective routine exterior maintenance requirements that are standard in the REO property preservation industry and clearly visible by exterior inspection.  The Organizational Plaintiffs' checklist of possible exterior deficiencies is based on standard industry practice as to what constitutes "routine" maintenance, or "minimal" property safety conditions, and is consistent with Freddie Mac requirements, as well as the policies of other banking institutions with REO properties.

75.    All properties can be equally maintained in terms of these routine exterior maintenance requirements, whatever other issues a particular property may have (e.g., interior renovation or other non-routine repair needs), and there is no justification for not conducting routine exterior maintenance.  Thus, no reason exists to expect racial disparities in terms of the observed routine exterior maintenance of properties.  At the same time, exterior maintenance failures drastically affect property sales rates and values of not only the REO property, but also neighboring properties, as well as neighborhood quality of life.

76.    The Organizational Plaintiffs' investigators observed, documented, and photographed the routine exterior maintenance and marketing conditions of the Bank of America-owned homes with respect to over three dozen exterior features.  The Organizational Plaintiffs examined the Bank of America REO properties for the following maintenance or marketing categories: curb appeal, structure, signage and occupancy, paint and siding, gutters, water damage, and utilities.  Curb appeal factors included trash and/or debris, accumulated mail, overgrown or dead grass, accumulated dead leaves, overgrown or dead shrubbery, invasive

plants, and broken or missing mailboxes.  Structural factors included unsecured, broken, or boarded doors, damaged steps or handrails, unsecured, broken, or boarded windows, damaged roofs, damaged fences, holes in the structure of the home, and wood rot.  Signage and occupancy factors included trespassing or warning signs, signage marketing the home as a distressed property, the absence of a professional "for sale" sign, broken or discarded signage, and unauthorized occupancy of the REO property.  Paint and siding factors included peeling or chipped paint, missing or damaged siding, missing or damaged shutters, and graffiti.  Gutter and downspout factors included missing or out of place gutters or downspouts, broken or hanging gutters, and obstructed gutters.  Water damage factors included water damage and the presence of mold, algae, or discoloration.  Utility factors included utilities that were exposed, damaged, or missing.  The Organizational Plaintiffs also utilized a miscellaneous factor under each category for any maintenance or marketing issue that did not fall into any of the other factors (e.g. failure to shovel snow, an unsecured and undrained swimming pool, or dead animals on the property).

77.    To ensure consistency, investigators were thoroughly trained and provided with examples and field terminology.  Training included classroom and field investigations where new investigators were accompanied by NFHA staff or experienced staff from the local fair housing center.  NFHA staff taught investigators how to evaluate a deficiency, complete forms, take photographs, and upload all photos into a central database.  Investigators utilized a glossary of terminology developed by NFHA and its partners at the beginning of this investigation, with pictures and descriptions to illustrate various examples for documenting deficiencies.  The glossary accounted for and illustrated variations in severity for certain deficiency criteria.

78.    The investigators also photographed the routine exterior maintenance and marketing conditions observed.  The investigators took photographs of the front of each

property, both sides of the property, and the back view of the property when access was available.  Whether or not deficiencies were documented, these photographs were taken in order to show the state of REO maintenance at the time of the visit.  Investigators also took photographs of the homes across the street and on both sides of the Bank of America-owned home to provide context regarding general routine maintenance of homes in the neighborhood.  The investigators' reports and pictures were uploaded into a central database, and each property was assigned a neighborhood designation based on racial or ethnic makeup of the census block group where the address was located.

79.    The Organizational Plaintiffs' tests were conducted over time at different Bank of America-owned homes.  In addition, the Organizational Plaintiffs allowed a period of time for the property to be owned by Bank of America so initial maintenance and security could be performed.  This grace period provided Bank of America the opportunity to complete its initial maintenance procedures and bring the home up to sale condition standards, as well as to compensate for any routine exterior maintenance problems in the condition of the home at the time the bank took possession.

80.    The Organizational Plaintiffs designed and implemented their testing to assess whether any patterns of differing treatment were apparent across a particular metropolitan area between predominately white neighborhoods and neighborhoods that were predominantly African-American and/or Latino, as well as whether, when aggregated, the evidence showed a pattern of differing treatment.

81.    The unequal and poor routine exterior maintenance and marketing of the Bank of America-owned homes in communities of color directly caused and resulted in the various harms alleged in this Complaint.

### 3. Summary of the Overall Results of the Organizational Plaintiffs' Investigation (Aggregate National Findings)

82.     The Organizational Plaintiffs' investigation of Bank of America's REO properties across the nation establishes that Defendants and their agents knowingly and purposefully treated properties differently depending on the racial composition of the neighborhoods in which the properties were located.  In each of the metropolitan areas identified in this Complaint, the REO properties located in predominantly white neighborhoods were better maintained and exhibited fewer maintenance deficiencies than the REO properties located in communities of color. Moreover, the exterior maintenance and marketing deficiencies observed in communities of color were significantly worse than those observed in predominantly white neighborhoods.

83.     In their totality, the data and pictures collected by the Organizational Plaintiffs establish that Defendants failed to perform adequate routine exterior maintenance and marketing of the Bank of America REO properties in communities of color, thereby leaving those Bank of America-owned homes in a state of neglect, while satisfactorily performing routine exterior maintenance and marketing of the Bank of America REO properties in white neighborhoods, thereby leaving those Bank of America-owned homes in a materially better condition.  The Organizational Plaintiffs' testing results support an inference that the differences in exterior maintenance in predominantly African-American and Latino communities and predominantly white communities were not the result of chance or happenstance, but rather were caused by Defendants' intent to treat predominantly African-American and Latino neighborhoods differently.  The Organizational Plaintiffs have provided Bank of America with photographic evidence clearly showing the failed maintenance in specific neighborhoods of color compared with standard maintenance in white neighborhoods in the same cities/metro area – and even within the same census tracts – yet Bank of America still has refused to change its policies or

practices. And regardless of Defendants' intent, the results of the Organizational Plaintiffs' investigation support a finding that Defendants' policies and practices actually and predictably caused the resulting discriminatory effects experienced by neighborhoods of color.

84. Examples of Defendants' disparate maintenance and marketing based upon the predominant race or national origin of a neighborhood include the following aggregate findings:

a) 45.0 % of the Bank of America REO properties in communities of color had 10 or more maintenance or marketing deficiencies, while only 11.0% of the Bank of America REO properties in predominantly white neighborhoods had 10 or more maintenance or marketing deficiencies.

b) 91.1% of the Bank of America REO properties in communities of color had five or more maintenance or marketing deficiencies, while only 60.5% of the Bank of America REO properties in predominantly white neighborhoods had five or more maintenance or marketing deficiencies.

c) 64.4% of the Bank of America REO properties in communities of color had trash or debris visible on the property, while only 31.4% of the Bank of America REO properties in predominantly white neighborhoods had trash visible on the property.

d) 53.3% of the Bank of America REO properties in communities of color had overgrown grass or dead leaves, while only 37.5% of the Bank of America REO properties in predominantly white neighborhoods had overgrown grass or dead leaves.

e) 52.5% of the Bank of America REO properties in communities of color had overgrown or dead shrubbery, while only 35.4% of the Bank of America

REO properties in predominantly white neighborhoods had overgrown or dead
shrubbery.

f)    37.0% of the Bank of America REO properties in communities of color
had unsecured or broken doors, while only 16.2% of the Bank of America REO
properties in predominantly white neighborhoods had unsecured or broken doors.

g)    49.6% of the Bank of America REO properties in communities of color
had damaged, boarded, or unsecured windows, while only 23.5% of the Bank of
America REO properties in white neighborhoods had damaged, boarded or
unsecured windows.

85.    On an aggregate basis across the communities investigated, the disparities
between the routine exterior maintenance and marketing of Bank of America-owned homes in
communities of color and the routine exterior maintenance and marketing of Bank of America-
owned homes in predominantly white neighborhoods are substantial and statistically significant.

86.    Defendants' racially discriminatory treatment of the Bank of America REO
properties is prevalent in each of the cities included herein.  In each of the metropolitan areas
identified in this Complaint, the REO properties located in predominantly white neighborhoods
were better maintained and exhibited fewer routine exterior maintenance and marketing
deficiencies than the REO properties located in communities of color.

87.    Defendants' racially discriminatory treatment of REO properties is continuous
throughout the period of the Organizational Plaintiffs' investigation.  Whether analyzed on a
year-to-year basis or over the entire period of the investigation, the same pattern of
discriminatory treatment is evident.  From 2011 through 2018, Defendants' continuous practice
had the purpose and effect of providing inferior routine exterior maintenance and marketing to

REO properties in communities of color, while providing better routine exterior maintenance and marketing to REO properties in predominantly white neighborhoods.

88.    Statistical analysis of the Organizational Plaintiffs' evidence shows a large difference in the average number of exterior maintenance and marketing deficiencies between communities of color and predominantly white neighborhoods, with Bank of America REO properties in communities of color having on average 9.1 deficiencies, while Bank of America REO properties in predominantly white neighborhoods have on average 6.4 deficiencies.



89.    Similarly, the average number of deficiencies in neighborhoods that are over 75% minority is 9.4, the average in neighborhoods that are 25-75% minority is 7.6, and the average in neighborhoods that are less than 25% minority is only 5.9.



90.    Further demonstrating the role of race in Defendants' REO maintenance efforts,

properties with a large number of deficiencies were disproportionately concentrated in

communities of color: 46% of properties in communities of color, but only 17% of those in

predominantly white neighborhoods, had ten or more deficiencies.



91.    Similarly, 48% of properties in communities that are over 75% minority had ten

or more deficiencies and 28% of properties in communities that are 25-75% minority had ten or

more deficiencies, while only 13% of properties that are less than 25% minority had ten or more deficiencies.



92.    The disparities in the maintenance and marketing of the Bank of America-owned homes are not explained by non-racial factors.  The Organizational Plaintiffs have conducted a regression analysis taking into account and controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until the Organizational Plaintiffs' site visit, and property values) that indicates that routine exterior maintenance and marketing deficiencies at the Bank of America REO properties in communities of color remain higher by a statistically significant margin as compared to Bank of America REO properties in predominantly white neighborhoods.[8]

93.    The disparities in maintenance at Bank of America-owned homes are consistent in metropolitan areas regardless of their location in the country.  Whether analyzed on a national or

---

[8] All of the disparities identified in paragraphs 88 through 91 are statistically significant at a 99% confidence level (p<0.001) based on a two-tailed t-test.

a metropolitan area basis, the same pattern of discriminatory treatment is evident.  The consistent and repetitive pattern of discriminatory treatment across cities and throughout the period of the Organizational Plaintiffs' investigation indicates that Defendants' practices are the intended and purposeful result of Defendants' intentional behavior and/or the result of policies and practices set at a management level with responsibility for Defendants' policies nationwide.

94.     These statistical disparities are merely representative of the numerous forms of data and observational evidence collected by the Organizational Plaintiffs establishing the differential treatment by Defendants of communities of color as compared to predominantly white neighborhoods.

95.     Additionally, these statistical disparities are confirmed by the experiences of the Individual Plaintiffs Ms. Onafuwa and the Bushnells, who live next to properties in Maryland that were previously Bank of America-owned homes and who have been harmed by Defendants' poor maintenance of those REOs.

96.     No valid business purposes are served by, or constitute valid excuses for, Defendants' differing maintenance of REO properties based on neighborhood racial composition.

97.     The disparities identified above flow directly from Defendants' discriminatory conduct.  They are traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision.  They are directly related to the zone of interests protected by the Fair Housing Act.

**4.    Comparisons of Similarly Situated REO Properties in Specific Cities Demonstrate that Defendants Have Engaged in a Pattern and Practice of Systemic Racial Discrimination in the Cities Served by the Organizational Plaintiffs**

98.    In 37 metropolitan areas, the Organizational Plaintiffs examined Bank of America-owned homes in predominantly white communities and in communities of color that were similarly situated, observed during the same time period, and serviced by Safeguard. Depending on the racial composition of the communities in which they were located, those properties differed strikingly in the level of maintenance they had received. This pattern remained the same across all 37 metropolitan areas. Taken together, it is clear that Defendants maintained and treated such properties differently based on the racial composition of the neighborhood. Defendants' discrimination is exemplified by, but not limited to, the following comparisons of similarly situated properties:

*Baltimore, MD*

99.    In Baltimore, MD:

a.    On November 21, 2017, NFHA visited a Bank of America REO property located at 1232 West Lombard Street, Baltimore, MD, 21223. This property is in a census block group with a white population of 62.03%. This property had three maintenance deficiencies: a missing for-sale sign, leaves in the window well, and a missing lower downspout. 

b.  On November 21, 2017, NFHA visited a Bank of
America REO property located at 4714 Amberley
Avenue, Baltimore, MD, 21229, next door to Ms.
Onafuwa's house.  This property is in a census block
group with an African-American population of
93.95%.  This property had six maintenance deficits: a
missing for-sale sign, marketed as distressed with an
auction sign, boarded windows front and back, trash,
leaves, and a missing downspout.




c.  In August 2017, prior to NFHA's investigation of
4714 Amberley, the City of Baltimore condemned and demolished the
collapsing, rat-infested garage at the property.  Defendants also routinely
failed to conduct basic maintenance at 4714 Amberley, such as cutting the
grass and cleaning up trash and debris in the front and back yards, as
demonstrated by the following photos taken by Ms. Onafuwa and her
neighbors.






*Baton Rouge, LA*

100.   In Baton Rouge, LA:

a.   On May 7, 2013, GNOFHAC visited a Bank of America REO property

located at 4044 Meadow Ridge Dr., Baton 

Rouge, LA, 70817.  This property is in a

census block group with a white population

of 83.22%.  This property had only one

maintenance deficit: a missing for-sale sign.

b.   On May 8, 2013, GNOFHAC visited a Bank of America REO property

located at 6987 Rio Dr., Baton Rouge, LA, 

70812.  This property is in a census block

group with an African-American population

of 85.36%.  This property had 13

deficiencies: accumulated mail, uncapped electrical cables, a missing for-sale

sign, overgrown grass, invasive weeds, overgrown shrubbery, trash around the

property, missing planks on the deck, and an uncovered hole where a light

fixture had been with dangling wires.

*Birmingham, AL*

101.　In Birmingham, AL:

    a.　On June 12, 2016, FHCNA visited a Bank of America REO property located at 8801 Sharit Dairy Road, Gardendale, AL, 35071.  This property is in a census block group with a white population of 96.55%. This property had three maintenance deficiencies: a missing for-sale sign, accumulated mail, and overgrown shrubs.



    b.　On June 12, 2016, FHCNA visited a Bank of America REO property located at 8020 5th Avenue South, Birmingham, AL, 35206.  This property is in a census block group with an African-American population of 79.55%.  This property had 10 deficiencies: an unsecured door, trash, a missing for-sale sign, dirt instead of grass in the yard, overgrown shrubbery, invasive weeds, damaged fence, peeling paint, and unprotected electrical utilities.  The door had a lockbox, but it was unlocked.

*Chicago, IL*

102.    In Chicago, IL:

a.    On October 4, 2013, HOPE FHC visited a Bank of America REO property

located at 2311 Brookwood Ct., Aurora, Il, 60504.  This property is in a census block group with a white population of 67.61%. This property had only one maintenance deficiency: an out-of-place downspout.



b.    On October 4, 2013, HOPE FHC visited a Bank of America REO property

located at 921 Talma St., Aurora, Il, 60505. This property is in a census block group with a Latino population of 77.4%.  The neighbors' homes were well maintained.  This Bank of



America REO had 13 maintenance deficits: boarded windows, uncovered

broken windows, trash in the backyard, a missing fencing/gate, a

missing/broken shutter, invasive plants, an ajar back door, missing utility

meters, and overgrown shrubbery.

*Denver, CO*

103.    In Denver, CO:

a.    On October 7, 2014, DMFHC visited a Bank of

America REO property located at 15064 East

Crestridge Drive, Centennial, CO, 80015.  This

property is in a census block group with a white

population of 73.32%. This property had only two maintenance deficiencies: a missing for-sale sign and a screen left in the window well.

b. On October 9, 2014, DMFHC visited a Bank of America REO property

 

located at 13821 Randolph Place, Denver, CO, 80239. This



property is in a census block group with a Latino population of 67.12%. This property had 13 maintenance deficiencies: a cracked window, broken basement windows, excessive amounts of trash/debris, a graffiti-covered shed, overgrown weeds, overgrown grass, and trash in window wells with a broken window.

*Fort Worth, TX*

104. In Fort Worth, TX:

a. On February 2, 2016, NTFHC visited a Bank of America REO property located at 4668 Feathercrest Drive, Fort Worth, TX, 76137. This property is in a census block group with a white population of 52.29%. This property had three maintenance deficiencies: a missing for-sale sign, some dead grass, and chipped paint on the garage trim.

52

b.  On February 2, 2016, NTFHC visited a Bank of America REO property

located at 5549  

Eisenhower Drive, Fort

Worth, TX, 76112.  This

property is in a census

block group with an African-American population of 98.52%.  This property

had nine maintenance deficiencies: a missing for-sale sign, a broken light

fixture, overgrown grass, invasive weeds, boarded windows, and

exposed/uncapped electrical lines.

*Grand Rapids, MI*

105.  In Grand Rapids, MI:

a.  On August 14, 2013, FHCWM visited a Bank of America REO property

located at 457 Mae-Thy, Wyoming, MI,

49548.  This property is in a census block 

group with a white population of 62.45%.

This property had only one maintenance

deficit: a missing for-sale sign.

b.  On August 14, 2013, FHCWM visited a Bank of America REO property

located at 1325  

Dickinson St

SE, Grand

Rapids, MI

49507.  This property is in a census block group with an African-American

population of 51.77%.  This property had nine maintenance deficiencies: a missing for-sale sign, trash, accumulated mail, overgrown shrubbery, damaged siding, chipped paint, dead leaves, and a boarded window pane on the storm door.

*West Palm Beach, FL*

106.    In West Palm Beach, FL:

a.    On January 21, 2014, FHCGPB visited Defendant's REO property located at 219 Bilbao Street, Royal Palm Beach FL 33411. This property is in a census block group with a White population of 51.7%.  This property had five maintenance deficiencies: trash and debris, overgrown shrubbery, missing shutters, missing gutters, and pervasive mold.



b.    On January 21, 2014, FHCGPB visited Defendant's REO property located at 905 Bunker Road, West Palm Beach FL 33405. This property is in a census block group with a non-White population of 76.6%.  This property had 10 maintenance deficits: trash and debris, an uncovered and undrained pool, broken and boarded windows, a damaged roof, no







"for sale" sign, ripped window screens, eviction signage, peeling and chipped paint, pervasive mold, and exposed or tampered-with utilities.

*Newark, NJ*

107. In Newark, NJ:

a. On August 4, 2015, NFHA visited Defendant's REO property located at 16 Van Wagoner Avenue, Clinton NJ 07013. This property is a census block group with a White population of 69.2%. This property had three maintenance deficiencies: trash and debris, overgrown or dead shrubbery, and a damaged roof.



b. On August 5, 2015, NFHA visited Defendant's REO property located at 147 7th Avenue, Roselle NJ 07203. This property is in a census block group with an African American population of 57.1%. This property had 12 deficiencies: trash and debris, accumulated mail, overgrown grass or dead leaves, overgrown or dead shrubbery, invasive plants, unsecured doors, boarded windows, a damaged fence, no "for sale" sign, peeling and chipped paint, missing gutters, and obstructed gutters.





*Providence, RI*

108.    In Providence, RI:

a.    On July 8, 2015, NFHA visited Defendant's

REO property located at 108 Rome Avenue,

Providence RI 02908.  This property is in a

census block group with a White population of



69.5%.  This property had four maintenance deficiencies: missing handrails, no

"for sale" sign, peeling and chipped paint, and missing gutters.

b.    On July 8, 2015, NFHA visited Defendant's REO property located at 118-120

Progress Avenue,

Providence RI 02909.  This

property is in a census

block group with a Latino

population of 66.5%.  This




property had 13 maintenance deficits: trash and

debris, accumulated mail, overgrown or dead

shrubbery, invasive plants, fireworks debris left in

the yard, unsecured and boarded doors, wood rot, no

"for sale" sign, graffiti, peeling and chipped paint,



damaged siding, missing gutters, and exposed or tampered-with utilities.

C.     **THE ORGANIZATIONAL PLAINTIFFS INFORMED DEFENDANTS OF THE RACIALLY DISPARATE CONDITION OF THE BANK OF AMERICA REO PROPERTIES, BUT DEFENDANTS HAVE NOT ALTERED THEIR DISCRIMINATORY BEHAVIOR**

109.     When the National Fair Housing Alliance initially decided to look into the issue of maintenance of bank-owned homes, it examined REOs owned by Bank of America and two other entities.  As early as June 2009, NFHA contacted each entity and shared information and photographs demonstrating the nature and extent of the difference in treatment of REO properties in neighborhoods of color as compared to white neighborhoods, and provided each entity with recommendations for correcting the discriminatory treatment.  Only one of those entities (Freddie Mac) decided to review its REO maintenance, which resulted in the company implementing major changes to guarantee that routine exterior maintenance would be conducted at every Freddie Mac-owned home, regardless of neighborhood.  After many meetings with high-level representatives and counsel from Bank of America over 18 months in 2009 and 2010, it became clear that Bank of America would not improve its REO maintenance practices or polices.  NFHA then decided to expand its investigations of Bank of America-owned homes, working with the other Organizational Plaintiffs.  The results of these additional investigations confirm that there has been no change in the pattern of disparities between maintenance and marketing of REO properties in predominantly white neighborhoods as compared to neighborhoods of color.

110.     As part of its investigation efforts, in 2011 NFHA held a national webinar-based news conference and released a report analyzing and describing the discriminatory maintenance and marketing of white and non-white REO properties, as well as offering recommendations that would minimize or eliminate discriminatory issues of differing treatment.  The release of this comprehensive report placed Defendants on notice again that their discriminatory conduct and

practices violate the Fair Housing Act.  NFHA released additional comprehensive reports addressing these issues in 2012 and 2014.

111.    The Organizational Plaintiffs also alerted the Bank of America Defendants that their discriminatory conduct and practices violate the Fair Housing Act through the previously mentioned HUD administrative complaint filed on September 25, 2012, and amended on October 10, 2012, October 23, 2012, September 25, 2013, November 14, 2013, September 30, 2014, and August 31, 2016.

112.    On information and belief, at all times since 2012, the Bank of America Defendants have kept Safeguard informed regarding the Organizational Plaintiffs' findings, contentions, and allegations.  Additionally, since NFHA named Bank of America in the reports released in 2012 and 2014, Safeguard has been aware of the Organizational Plaintiffs' findings, as Safeguard is the preservation management company for nearly all Bank of America-owned homes.

113.    Despite the Organizational Plaintiffs' attempts to persuade the Bank of America Defendants to voluntarily comply with the Fair Housing Act, the Bank of America Defendants and Safeguard did not and have not changed their behavior.  With deliberate indifference to the purpose and effects of their discriminatory policies, practices, and conduct, Defendants have continued to maintain Bank of America-owned homes in a discriminatory manner based on the predominant race and national origin of neighborhoods, as evidenced by the most recent investigations conducted in November 2017 and May 2018.  Defendants' discriminatory maintenance and marketing of REO properties in communities of color violates the rights of homeowners and residents in these neighborhoods, causes particularized and concrete injury to

these homeowners and residents, and otherwise makes housing unavailable in communities of color.

### D. DEFENDANTS HAVE ENGAGED IN A PATTERN AND PRACTICE OF SYSTEMIC AND INTENTIONAL RACE DISCRIMINATION IN EACH OF THE CITIES SERVED BY THE ORGANIZATIONAL PLAINTIFFS

114. A "pattern or practice" of discrimination refers to systemic intentional discrimination affecting a large group of persons. Statistical evidence of a sufficiently gross disparity over time between the affected population and the general population may establish an inference of intentional discrimination.

115. To prove systemic discrimination, a plaintiff must show that the discrimination was the defendant's standard operating procedure, more than the mere occurrence of isolated or sporadic discriminatory acts. A plaintiff can establish that discrimination was the defendant's standard operating procedure by, among other things, presenting statistical evidence of similarly situated persons not in the protected class who were treated better than those in the protected class.

116. The Organizational Plaintiffs' findings by metropolitan area reveal Defendants' systemic pattern and practice of providing manifestly inferior routine exterior maintenance and marketing services for REO properties in African-American and Latino communities, thereby discriminating on the basis of race and national origin. The extensive testing evidence generated by the Organizational Plaintiffs displays a clear and consistent pattern and regular practice of differing routine exterior maintenance and marketing based on neighborhood racial composition. There is no business or other justification for this conduct.

117. Defendants' policies, practices, and intentional conduct actually and predictably caused the gross statistical disparities in the maintenance and marketing of properties in neighborhoods with different racial and ethnic compositions.

118.    The differences in routine exterior maintenance and marketing at the Bank of America REO properties are consistent in metropolitan areas regardless of their location in the country.  Whether analyzed on a national or metropolitan area basis, the same pattern and practice of discriminatory treatment is evident.  The consistent and repetitive pattern of discriminatory treatment across cities and over the span of time indicates that practices resulting in discrimination at the Bank of America REO properties were approved, occurred, or condoned at a high level of management.

119.    Defendants failed to comply with state and local laws regarding property maintenance, in that the Organizational Plaintiffs' observations of various deficiencies during their investigation of the Bank of America-owned homes included many examples of conduct typically violating local codes and ordinances.  Indeed, the garage of the Bank of America-owned home next door to Plaintiff Wanda Onafuwa's home was in such poor condition that the City of Baltimore condemned and demolished the building, after Defendants ignored requests from Ms. Onafuwa and her neighbors to deal with the garage.

120.     In communities of color, Defendants deviated from well-established practices concerning property maintenance and preservation, which include upkeep of the routine exterior maintenance items the Organizational Plaintiffs visually investigated during their testing of Bank of America-owned homes.

121.    Appendix A to this Complaint, incorporated herein by reference, sets forth the Organizational Plaintiffs' detailed findings by Metropolitan Area and violation type.

122.    In every metropolitan area except for Dayton, Ohio and Hartford, Connecticut, there were substantially more REO properties in white neighborhoods than in neighborhoods of color that had fewer than five routine exterior maintenance or marketing deficiencies.

123.    In all areas, there were substantially more REO properties in neighborhoods of color than in predominantly white neighborhoods that had more than 10 deficiencies.

124.    In many cities, certain REO properties in neighborhoods of color had more than 15 deficiencies (a condition seen far less often in white communities).

125.    The Organizational Plaintiffs investigated Bank of America REO properties in the following metropolitan areas and found substantial differing treatment and disparities in properties as between neighborhoods of color and white neighborhoods with respect to the number of properties (a) having fewer than five deficiencies, (b) having more than five deficiencies, and (c) having more than 10 deficiencies, as follows:

| Metropolitan Area / City | # of Bank of America REOs Investigated | More White REOs with Less than 5 Deficiencies | More Non-White REOs with More than 5 Deficiencies | More Non-White REOs with More than 10 Deficiencies |
|---|---|---|---|---|
| Atlanta, Georgia | 116 | X | X | X |
| Baltimore, Maryland | 62 | X | X | X |
| Baton Rouge, Louisiana | 33 | X | X | X |
| Birmingham, Alabama | 29 | X | X | X |
| Chicago, Illinois | 90 | X | X | X |
| Cleveland, Ohio | 23 | X | X | X |
| Columbus, Ohio | 40 | X | X | X |
| Dallas, Texas | 88 | X | X | X |
| Dayton, Ohio | 39 | | | X |
| Denver, Colorado | 65 | X | X | X |
| Detroit, Michigan | 51 | X | X | X |
| Fort Worth, Texas | 15 | X | X | X |
| Gary, Indiana | 22 | X | X | X |
| Grand Rapids, Michigan | 134 | X | X | X |
| Greater Palm Beaches, FL | 25 | X | X | X |
| Hartford, Connecticut | 15 | | | X |
| Indianapolis, Indiana | 24 | X | X | X |
| Kansas City, Missouri | 28 | X | X | X |
| Louisville, Kentucky | 31 | X | X | X |
| Memphis, Tennessee | 50 | X | X | X |
| Miami / Ft Lauderdale, FL | 43 | X | X | X |
| Milwaukee, Wisconsin | 134 | X | X | X |
| Minneapolis, Minnesota | 20 | X | X | X |

| | | | | |
|---|---|---|---|---|
| Muskegon, Michigan | 28 | X | X | X |
| New Haven, Connecticut | 16 | X | X | X |
| New Orleans, Louisiana | 33 | X | X | X |
| Newark, New Jersey | 34 | X | X | X |
| Oakland, Richmond, & Concord, California | 61 | X | X | X |
| Orlando, Florida | 38 | X | X | X |
| Philadelphia, Pennsylvania | 65 | X | X | X |
| Providence, Rhode Island | 12 | X | X | X |
| San Antonio, Texas | 23 | X | X | X |
| Tampa, Florida | 42 | X | X | X |
| Toledo, Ohio | 44 | X | X | X |
| Vallejo, California | 24 | X | X | X |
| Washington, D.C. & Prince George's Cty., MD | 63 | X | X | X |
| Waterbury, Connecticut | 17 | X | | X |

### E.    DEFENDANTS HAVE ACTED WITH DISCRIMINATORY INTENT

126.    Fair housing testing evidence, by itself or in conjunction with other evidence, is a well-established method of proving discrimination in cases alleging violations of the Fair Housing Act.  The facts revealed by fair housing testing evidence may be sufficient on their own to establish intentional discrimination, as they are in this case.

127.    Intentional discrimination occurs when a defendant acts, at least in part, because of the actual or perceived race or national origin of the alleged targets of discriminatory treatment.  Various factors are probative of intent to discriminate, including, but not limited to, statistics demonstrating a clear pattern unexplainable on grounds other than discriminatory ones, the historical background of a decision, the specific sequence of events leading up to the challenged decision, and the defendant's departures from its normal procedures or substantive considerations.  Evidence of a consistent pattern of actions that have a much greater harm on persons of color than on white persons is highly probative.

128.    Defendants committed intentional discrimination by acting and/or failing to act on the basis of race and national origin in their provision of inferior and unequal routine exterior

maintenance and marketing to Bank of America REO properties in communities of color.  This intentional discrimination is evidenced by various facts including, but not limited, to the following:

a.  The severity and pervasiveness of the disparities between the maintenance and marketing of Bank of America REO properties in communities of color and the maintenance and marketing of Bank of America REO properties in white neighborhoods, as found by the comparative testing described above;

b.  The absence of credible, non-pretextual explanations for the disparities other than race;

c.  Defendants' knowledge of systemic racial disparities between the maintenance and marketing of Bank of America REO properties in communities of color and the maintenance and marketing of Bank of America REO properties in white neighborhoods, and their refusal to take responsive actions;

d.  Defendants' failure to comply with state and local laws governing property maintenance in African-American and Latino communities;

e.  Defendants' lack of responsiveness to complaints regarding REO maintenance in communities of color;

f.  Statistical analysis controlling for non-racial factors (prior sales dates and prices, additional property transfer history, local crime statistics, local housing market data, property age, dwelling size, lot size, the length of time from ownership until the Organizational Plaintiffs' site visit, and property value), which indicates that routine exterior maintenance and marketing deficiencies at Bank of America REO

properties in communities of color cannot be explained on the basis of factors

other than race;

g.   Defendants' knowledge of the foreseeable and continuing consequences of

Defendants' conduct on communities of color;

h.   Defendants' deviation in communities of color from well-established standards

and practices regarding exterior property maintenance;

i.   Evidence of prior intentional discriminatory conduct by Defendants toward

African-Americans and Latinos including, but not limited to, predatory loan

practices, which created the conditions based upon which the discriminatory

conduct in this case could occur;

j.   Defendants' knowledge of the historical and continuing pattern of discrimination

against African Americans and Latinos by the financial and property service

provider industries, including Defendants;

k.   Evidence of a general pattern of intentional unlawful conduct and corrupt

corporate culture with respect to Bank of America extending to such matters as

race discrimination in lending and hiring, money laundering, market rigging,

securities fraud, violating United States Government-imposed sanctions, and

concealing financial losses.

129.   This is not the first time Defendants have been found to have acted unlawfully in

the housing finance context.  In 2011, Bank of America paid $335 million to settle charges that

Countrywide Financial Corporation, which Bank of America acquired in 2008, had discriminated

against minority customers by charging them higher fees and interest rates on mortgages.

130.     In 2014, Bank of America reached a $16.65 billion settlement with the

Department of Justice – the largest civil settlement with a single entity in U.S. history – to

resolve claims that Bank of America and its subsidiaries Countrywide Financial Corporation and

Merrill Lynch misled investors in their packaging, marketing, sale, arrangement, structuring, and

issuance of mortgage-backed securities (RMBS), committed fraud related to collateralized debt

obligations (CDOs), and engaged in improper underwriting and origination of mortgage loans.

131.     Safeguard has faced claims across the country that it has illegally entered people's

homes, removed their belongings, and locked them out before the foreclosure process is

complete.  The Illinois attorney general settled a suit against Safeguard regarding these practices

for $1 million in June 2015, and Safeguard settled a similar suit with the attorney general of

Maryland in August of the same year.

132.     Moreover, the evidence establishing that Defendants' policies and practices have

a disparate impact on communities of color is also highly probative of Defendants' motives,

because "a racial imbalance is often a telltale sign of purposeful discrimination."  *Int'l Bhd. of*

*Teamsters v. U.S.,* 431 U.S. 324, 339-40 n.20 (1977).  Evidence of a disproportionate outcome

can provide an important starting point in establishing a claim of intentional discrimination.

Thus, Defendants' maintenance policies and practices, discussed below, are also relevant to

Plaintiffs' claim that Defendants' inferior and inadequate maintenance disproportionately

occurring in communities of color is intentional.

F.     **DEFENDANTS' REO MAINTENANCE AND MARKETING POLICIES
       AND PRACTICES HAVE A DISPROPORTIONATELY
       DISCRIMINATORY IMPACT ON COMMUNITIES OF COLOR**

133.     Policies and practices based on race-neutral factors may cause an unjustified

adverse impact on homeowners in communities of color.  In this case, the pervasiveness of the

discriminatory conditions relating to the Bank of America REO properties indicates that

Defendants operate under policies and practices regarding the maintenance of REO properties that have an unjustified adverse disparate impact on communities of color.

134. The Bank of America Defendants have adopted a uniform policy of outsourcing to third parties compliance with the statutory and common law obligations that are placed on owners of real property, without appropriate monitoring or review.

135. The Bank of America Defendants have a policy of not investigating or assessing the fitness or ability of the retained third parties to act in compliance with obligations imposed under the Fair Housing Act.

136. The Bank of America Defendants have a policy of not providing guidance, oversight, or review of the activities left to the discretion of retained third parties.

137. The foregoing policies have a disproportionately adverse impact on communities of color, as shown by the statistical disparities and regression analysis described in this complaint. These policies have operated in combination with the known higher foreclosure rates in neighborhoods of color resulting from predatory lending to minority borrowers during the subprime lending boom. The policies and practices of the Bank of America Defendants have adversely impacted communities of color by causing retention of unqualified and unsupervised third parties who lack incentives to comply with legal obligations regarding the maintenance of the Bank of America properties in communities of color and who are unsupervised and unmonitored by a property owner in the performance of their duties.

138. No valid business purposes are served by the foregoing policies, and there is no business justification for failing to undertake basic maintenance of REO properties on a regular basis in communities of color.

139.    Based on available information, it appears that the Bank of America Defendants have employed other standard policies and practices in connection with the operation of their businesses that have a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color.  For example, the Bank of America Defendants have deliberately outsourced routine exterior maintenance work to a large national company without community ties, knowledge, or expertise to service REO properties in communities of color.

140.    Further, the Organizational Plaintiffs' data establishes that Bank of America based exterior maintenance of REO properties on the age and/or the value of the properties. Policies and practices based on the age or value of residential property can result in an adverse impact in communities of color, which HUD and other federal financial regulatory agencies noted as early as 1994.  The Bank of America Defendants' maintenance practices and policies that are linked to an REO property's age and/or value cause inferior maintenance to occur disproportionately in communities of color.

141.    Defendant Safeguard also appears to have employed standard policies and practices in the operation of its business that have had a disparate impact on the routine exterior maintenance and marketing of REO properties in communities of color, although the details of their policies are not publicly disseminated.  Based on available information, it appears that these policies include:

      a.    Adopting and following the Bank of America policy of outsourcing REO maintenance to third parties without appropriate monitoring or review;

      b.    Adopting and following the Bank of America policy of basing exterior maintenance practices and policies on the age and/or value of an REO property;

    c.   Employing arbitrary methods of allocating resources to the maintenance of REO properties;

    d.   Avoiding customary real estate brokers, listings, and channels in favor of Internet sites used primarily for auctions and by investors, with the predictable result of cash sales or bulk sales to investors, which adversely impact neighborhoods of color by decreasing sales to homeowner-occupants; and

    e.   Allowing third-party contractors and lower-level employees to exercise very significant levels of discretion with inappropriately minimal input or oversight from Defendants.

142.    Separately and in combination, Defendants' maintenance policies and practices are a cause of inferior and inadequate maintenance disproportionately occurring in communities of color.

143.    The parameters of these policies are material to this litigation and constitute proper subjects of discovery.  Based upon the pervasiveness of the discriminatory conditions relating to the Bank of America REO properties, there is a substantial likelihood that additional policies and practices of Defendants have a disproportionately adverse impact on communities of color.

### G. DEFENDANTS' DISCRIMINATORY MAINTENANCE AND MARKETING OF REO PROPERTIES PERPETUATES SEGREGATION

144.    One of the fundamental purposes of the Fair Housing Act is to eliminate segregated housing patterns and to increase integration.

145.    The "dissimilarity index" is a well-recognized standard for evaluating a community's level of segregation.  The index measures whether one particular racial group is distributed across census tracts in a metropolitan area in the same way as another racial group.  A

high dissimilarity index indicates that the two groups tend to live in different tracts. The index ranges from 0 to 100. A value of 60 or more is considered a very high level of segregation. It means that 60% (or more) of the members of one group who reside in the area would need to move to a different tract within that area for the two groups to be equally distributed. Values between 40 and 50 demonstrate a moderate level of segregation, and values of 30 or below indicate a low level of segregation.

146. The cities in which the Organizational Plaintiffs investigated Defendants' maintenance of the Bank of America REO properties are in metropolitan areas that are racially segregated, as indicated by having the following dissimilarity indices:[9]

| Metropolitan Area | 2010 Black-White Dissimilarity Index | 2010 Hispanic-White Dissimilarity Index |
|---|---|---|
| Atlanta, Georgia | 58.4 | 49.4 |
| Baltimore, Maryland | 64.3 | 39.8 |
| Baton Rouge, Louisiana | 57.2 | 32.7 |
| Birmingham, Alabama | 65.2 | 44.5 |
| Chicago, Illinois | 75.2 | 56.3 |
| Cleveland, Ohio | 72.6 | 52.3 |
| Columbus, Ohio | 60.0 | 41.4 |
| Dallas, Texas | 55.5 | 50.3 |
| Dayton, Ohio | 63.3 | 27.3 |
| Denver, Colorado | 59.4 | 48.8 |
| Detroit, Michigan | 79.6 | 51.8 |
| Fort Worth, Texas | 56.3 | 45.6 |
| Gary, Indiana | 76.8 | 43.7 |
| Grand Rapids, Michigan | 61.4 | 50.4 |
| Greater Palm Beaches, Florida | 57.3 | 42.6 |
| Hartford, Connecticut | 62.3 | 58.4 |
| Indianapolis, Indiana | 64.5 | 47.3 |
| Kansas City, Missouri | 58.6 | 44.4 |
| Louisville, Kentucky | 56.2 | 38.7 |
| Memphis, Tennessee | 62.2 | 50.7 |
| Miami, Florida | 64.0 | 57.4 |
| Milwaukee, Wisconsin | 79.6 | 57.0 |
| Minneapolis, Minnesota | 50.2 | 42.5 |

[9] Source: https://s4.ad.brown.edu/projects/diversity/segregation2010/.

| | | |
|---|---|---|
| Muskegon, Michigan | 71.2 | 30.4 |
| New Haven, Connecticut | 62.2 | 54.4 |
| New Orleans, Louisiana | 63.3 | 38.3 |
| Newark, New Jersey | 78.0 | 62.6 |
| Oakland, Richmond, and Concord, California | 56.6 | 48.3 |
| Orlando, Florida | 49.3 | 40.2 |
| Philadelphia, Pennsylvania | 67.0 | 55.1 |
| Providence, Rhode Island | 50.8 | 60.1 |
| San Antonio, Texas | 47.7 | 46.1 |
| Toledo, Ohio | 63.2 | 31.4 |
| Tampa, Florida | 54.3 | 40.7 |
| Vallejo, California | 41.5 | 29.2 |
| Washington, D.C. & Prince George's County, Maryland | 61.0 | 48.3 |
| Waterbury, Connecticut | 39.0 | 44.8 |

147.    The cities in which the Defendants' maintenance and marketing of Bank of America REO properties were investigated are moderately or highly segregated under the dissimilarity index measure.  The fact of high rates of segregation in these cities was known to Defendants.

148.    By failing to maintain and market REO dwellings in communities of color according to the same standards they employ for REO dwellings in predominantly white neighborhoods, Defendants have perpetuated segregation in several ways.

149.    This failure to maintain and market REO dwellings in communities of color according to the same standards employed in predominantly white neighborhoods has stigmatized communities of color as less desirable than predominantly white communities.  The prospects for integration in the affected communities have been reduced because buyers are deterred from purchasing properties in neighborhoods with poorly maintained REO properties, leaving the segregated racial composition of these neighborhoods unchanged.

150.    The existence of poorly maintained REO dwellings in minority neighborhoods diminishes home values for surrounding homeowners.  Lower home values in communities of

color restrict the ability of minority homeowners to move to majority-white or integrated

neighborhoods by reducing the equity they can utilize to buy a new home.

151.    As a result of Defendants' discriminatory maintenance and marketing of the Bank

of America REO properties, Defendants have thwarted Congressional efforts to eradicate

segregated housing patterns, and neighborhood residents have been deprived of the social,

economic, and professional benefits of living in an integrated community.

### H.    DEFENDANTS' DISCRIMINATORY REO POLICIES DESTABILIZE COMMUNITIES

152.    The proper maintenance and marketing of REO dwellings is vital to the stability

of neighborhoods and to the economic, social, physical, and emotional well-being of their

residents.  REO properties that are poorly maintained have significant, negative effects on a

neighborhood, affecting the health and safety of surrounding residents and otherwise interfering

with the rights of homeowners and renters in communities of color to enjoy their homes in a

manner free of discrimination.  Academic and government reports acknowledge the negative

effects of neglected vacant properties on nearby homeowners, neighborhoods, and local

governments.[10]

153.    REO properties that are poorly maintained lead to increased crime.  A home with

unsecured doors, broken windows, overgrown grass, or trash around the property signals to

vandals and thieves that the property is abandoned and makes the home and neighborhood a

target for illegal activity.

---

[10] *See*, *e.g.*, Government Accountability Office, Vacant Properties:  Growing Number Increases
Communities' Costs and Challenges, GAO-12-34 (Nov. 4, 2011), *available at*
http://www.gao.gov/products/GAO-12-34).

154.    REO properties that are poorly maintained create health and safety issues, leading to an increase in accidents, rodent and insect infestations, mold, and decay.  According to a report by the American Heart Association, living near a foreclosed home can also increase a person's blood pressure "due in part to unhealthy stress from residents' perception that their own properties are less valuable, their streets less attractive or safe and their neighborhoods less stable."[11]

155.    REO properties that are poorly maintained and marketed stigmatize communities and significantly diminish home values for surrounding homeowners.  Failure to carry out basic maintenance of REO properties decreases the likelihood of timely sales–increasing the period of vacancyand decreasing the value and sale price of REO properties, which, in turn, decreases property values in the neighborhood.  Homes that appear abandoned and look unsightly due to poor maintenance often deter real estate agents from showing the REO properties or surrounding homes to owner-occupant homebuyers.  As shoddy maintenance and neglect result in deteriorating appearances and physical conditions for REO properties, their availability for sale is adversely affected, constraining housing options in impacted communities. This, in turn, impairs Organizational Plaintiffs' core business activities, such as housing counseling and referrals and promotion of stable, diverse, well-resourced places of opportunity for all.

156.    Poor maintenance and marketing of an REO property also make the property significantly more likely to end up in the hands of an investor rather than an owner-occupant. Investor-purchased REOs often result in a number of negative outcomes for the surrounding area, including a decrease in property values and a higher risk of abandonment.  Communities

---

[11] See Mariana Arcaya, et al., *Effects of Proximate Foreclosed Properties on Individuals' Systolic Blood Pressure in Massachusetts, 1987–2008*, Circulation, June 3, 2014, at 2262, available at http://circ.ahajournals.org/content/129/22/2262.

with high investor ownership are more likely to have increasingly high rental rates, to become less stable communities, and to afford fewer opportunities for owner-occupied purchases. Investor-owned properties detrimentally affect property values and encourage divestment in neighborhoods.

157.    In addition, when Bank of America auctions a property rather than selling it on the traditional market, the buyer is required to pay in cash.  This model is designed to attract primarily investors who have cash resources for purchase.  The typical owner-occupant buyer must secure a mortgage loan, which limits such purchases of Bank of America-owned foreclosures. For instance, based upon NFHA's review of property records for the sale outcomes of 79 properties in Memphis, Tennessee in 2018, 70% of REO properties that were poorly maintained (i.e., had 10 or more maintenance or marketing deficiencies) were sold to investors, while only 46% of well-maintained homes went to investors.  Considering this data together with neighborhood race, of the REOs in communities of color in Memphis, 70% went to investors, while only 18% in white communities were sold to investors.

## V.    INJURIES CAUSED BY DEFENDANTS' BEHAVIOR

158.    Based on local complaints and information received from neighbors of bank-owned homes, as well as their own observations, and consistent with and to prevent further harm to their missions, the Organizational Plaintiffs investigated the maintenance and marketing of REO properties and determined that a larger, systemic problem existed.  Prior to pursuing administrative action or litigation directed toward this problem, Plaintiff NFHA published and disseminated reports describing the Organizational Plaintiffs' findings and held news conferences in the hope that Defendants would voluntarily undertake remedial actions.

159.    As described in more detail below, the failure of Defendants to respond to this situation has led the Organizational Plaintiffs to incur substantial expenditures and damages that might have otherwise been avoided.

160.    Defendants' failure to properly maintain and market REO properties in communities of color has also harmed Ms. Onafuwa and the Bushnells by causing physical damage to their homes, as well as causing them emotional distress and mental anguish due to the insecurity and danger of living next door to neglected, vacant properties.

A.    **INJURY TO THE ORGANIZATIONAL PLAINTIFFS**

161.    Defendants' unlawful, discriminatory conduct has proximately caused injury to each of the Organizational Plaintiffs by: (a) impairing the Organizational Plaintiffs' counseling and referral services; housing and community development investment activities; education, outreach, and training programs; and fair housing investigation and enforcement activities; (b) frustrating the Organizational Plaintiffs' mission of ensuring equal housing opportunities for all regardless of race, color, or national origin and making all neighborhoods stable, diverse, well-resourced places of opportunity; and c) causing Organizational Plaintiffs to divert their resources to investigate Defendants' REO maintenance and marketing and to develop education, outreach, and training programs to counteract Defendants' discriminatory conduct, and in doing so, causing the Organizational Plaintiffs to forego other programmatic and operations activities that they would have otherwise initiated.

162.    Defendants' discriminatory REO maintenance and marketing impaired Organizational Plaintiffs' housing counseling and referral activities by making housing unavailable or unequal in terms and conditions for prospective home buyers and renters in multiple ways. Some of the REOs were razed, some were too dilapidated for occupancy. Many required expensive repairs that were difficult to fund via a traditional mortgage for an owner

occupant but made the homes attractive targets for investors. Many of the homes were simply made unattractive places to live due to delayed maintenance and some were not marketed or were poorly marketed, making it hard to include as options for potential buyers; most homes would drive potential home buyers away from the neighborhoods because they made the neighborhood look rundown and blighted. All of these harms were proximately caused by the challenged actions and perceptively impaired Organizational Plaintiffs' counseling and referral services.

163.    Defendants' discriminatory REO maintenance and marketing also impaired Organizational Plaintiffs' community development investments. The conduct injured the Organizational Plaintiffs economically by hindering and undermining the Organizational Plaintiffs' existing financial investments designed to further their missions of promoting diverse, stable, well-resourced communities.  Over the course of years, the Organizational Plaintiffs have provided millions of dollars to promote residential integration and increase homeownership and accessible housing through grant programs to local housing non-profit organizations in communities included within this Complaint.  The Organizational Plaintiffs also provided funding through non-profit organizations to neighborhoods in cities that are part of this Complaint to conduct education and outreach regarding REO best practices, to foster homeownership, to assist with eliminating blight and beautifying predominantly African-American and Latino neighborhoods affected by the foreclosure crisis, and to provide employment opportunities for persons living in these neighborhoods.  These funds have been leveraged to obtain additional corporate funding and foundation grants for the same communities of color.  These efforts have allowed homeowners and renters to remain in their homes through foreclosure prevention, accessibility modification or home repair grants; have rehabilitated

abandoned or blighted dwellings; and have made housing units accessible to persons with disabilities, including veterans. The funds have also been used to establish pocket parks and implement neighborhood beautification programs to make communities desirable and the focus of increased interest by real estate agents and home buyers.

164.    These financial investments to stabilize communities of color and develop them as attractive, diverse communities of opportunity have been and continue to be undermined by the existence of deteriorating and poorly maintained Bank of America-owned homes and by the decline in owner-occupants in these communities.

165.    Defendants' poor maintenance and marketing of REO properties in communities of color have impaired the Organizational Plaintiffs' community investment efforts by depressing the appraised values of other homes in the neighborhoods where the Organizational Plaintiffs have invested substantial resources. These lower appraisal values create market conditions that favor cash-flush investors, who do not require traditional mortgage financing, over individual homeowners, who depend on mortgage lending tied to property appraisals. This market distortion has undermined the Organizational Plaintiffs' missions to promote owner-occupancy and residential stability by making it more difficult for prospective owner-occupants to obtain financing to purchase homes in these communities and for existing homeowners to refinance or sell their properties—two of the populations to whom the Organizational Plaintiffs provide counseling and direct services. The consequences of Defendants' discriminatory maintenance practices have created a destructive cycle that has further injured the Organizational Plaintiffs' community investments. As investor-owned properties have increased in these neighborhoods, the Organizational Plaintiffs have faced additional challenges because absentee investor-owned properties typically have more code violations and are more likely to become

abandoned properties, creating additional blight that further depresses property values and neighborhood stability. This cycle has not only directly impaired the Organizational Plaintiffs' investments, it also requires them to need additional funding to counter the blight and stigma created by poorly maintained REOs.

166.    Defendants' racially discriminatory maintenance and marketing of REO properties has also directly harmed the Organizational Plaintiffs by impairing their fair housing and fair lending education and outreach to the public and their training of real estate industry professionals to ensure they are knowledgeable about and comply with fair housing laws.  For example, Defendants' failure to maintain REOs in communities of color as well as they do in majority-white neighborhoods perpetuates the very negative neighborhood stereotypes that the Organizational Plaintiffs have been working to counteract.  The Organizational Plaintiffs counteract the racial bias and stigma through programs that market communities of color by working with real estate industry professionals to educate them about these communities and fair housing laws so that they will not steer prospective homebuyers away and by investing in projects designed to stabilize communities of color and showcase them as inviting and attractive neighborhoods for all.

167.    Organizational Plaintiffs' fair housing investigations and fair housing enforcement activities were also adversely impacted by the challenged discriminatory behavior. In order to protect the work they had been doing and to guard against additional harm to communities of color from discriminatory actions, Organizational Plaintiffs were required to divert scarce resources away from their usual investigatory and enforcement activities in order to prevent further harm to their missions.  They were instead required to devote substantial time to

developing a process to investigate REO properties, evaluate properties, review data, interview witnesses, and report the discriminatory REO maintenance and marketing they had documented.

168.    The challenged conduct also frustrates the Organizational Plaintiffs' longstanding missions to promote diverse, stable, owner-occupied, well-resourced communities for all, eliminate residential segregation, and expand equal housing opportunity. Defendants' failure to maintain and market REO homes in communities of color as well as they have in majority-white neighborhoods is conduct perpetuating the very negative race- and national origin-based neighborhood stereotypes that the Organizational Plaintiffs have been working to eliminate. Defendants' discriminatory conduct has also reduced the amount of available and appealing homes on the market in communities of color, thereby impairing the Organizational Plaintiffs' efforts to promote homeownership and racial integration in these neighborhoods through their housing counseling programs. The increase in investor-owned properties in communities of color, resulting from Defendants' discriminatory maintenance and marketing, significantly undermines and frustrates the missions of the Organizational Plaintiffs by decreasing opportunities for homeownership, destabilizing the communities, fostering negative stereotypes, and undermining home values for community residents.

169.    Defendants have harmed the Organizational Plaintiffs economically by forcing them to divert resources from their usual education, counseling, investigation, policy, advocacy, and capacity-building activities and services to investigate Defendants' REO maintenance and marketing.  The Organizational Plaintiffs had to spend substantial amounts of staff time and funds to design an REO investigation, develop an REO investigations training module for investigators, train NFHA staff and the staff of other plaintiff organizations, conduct both onsite and records investigations of over 1000 homes across 37 cities, document and analyze the results

of those investigations, and report those results. Plaintiffs were harmed by having to divert resources to investigate Defendants' widespread failure to maintain and market their REOs in a non-discriminatory manner.

170.    Organizational Plaintiffs' core fair housing education and outreach activities have been impaired by having to expend substantial time and resources counteracting Defendants' unlawful activities. Organizational Plaintiffs had to develop new educational programs directed at REO maintenance and marketing and they had to spend substantial amounts of time educating the public and training the real estate industry about how this conduct violated the Fair Housing Act. This harmed the Organizational Plaintiffs economically and programmatically by forcing them to divert resources from their usual education and outreach activities and services to counter the Defendants' discriminatory conduct.

171.    In an effort to address and attempt to counteract the effects of Defendants' discriminatory conduct prior to the filing of this action, each of the Organizational Plaintiffs engaged in community outreach and public efforts to raise awareness of these discriminatory practices in the communities they serve. The diversion and expenditure of financial resources and staff time to mitigate the harm to the Organizational Plaintiffs' missions included, but was not limited to: time and costs associated with drafting and distributing educational materials; mailing costs and graphic design expenses; travel time and expenses; and staff hours diverted from other work to conduct research activities.

172.    To investigate and counteract Defendants' discriminatory conduct and to prevent further harm to their operations and their missions, the Organizational Plaintiffs had to divert scarce resources and time away from other projects and activities.  These expenditures were not initially included in the Organizational Plaintiffs' operational plans or budgets.  As a result, each

Organizational Plaintiff had to pull resources away from other planned and budgeted projects to garner the resources necessary to counteract Defendants' behavior. Considering the magnitude of damage that the conduct was causing to the work of the Organizational Plaintiffs, new grant applications had to be refocused from longstanding needs to address the immediate problems caused by Defendants' failure to maintain Bank of America-owned homes in minority neighborhoods. NFHA had to forego conducting sales investigations to combat racial steering because staff was needed to conduct REO investigations across the country. Despite this effect on the Organizational Plaintiffs' other programs and services, the Organizational Plaintiffs nevertheless diverted resources to these counteractive measures because, if left unaddressed, Defendants' discriminatory policies and practices would detrimentally impact the missions of the Organizational Plaintiffs and harm individuals and communities.

173.    As Defendants' discriminatory activities persist, addressing and counteracting Defendants' REO discrimination will continue to require a substantial diversion of resources by the Organizational Plaintiffs away from their usual activities.

174.    The foregoing injuries have caused the Organizational Plaintiffs to incur costs that are above and beyond their normal operational activities and costs.

175.    The foregoing injuries that the Organizational Plaintiffs have suffered as a result of Defendants' conduct fall within the zone of interests protected by the Fair Housing Act.

### B.    INJURIES TO INDIVIDUAL ORGANIZATIONAL PLAINTIFFS

176.    Each Organizational Plaintiff has suffered particularized and concrete injuries caused by Defendants' discriminatory conduct.

**Plaintiff National Fair Housing Alliance**

177.    NFHA's mission has been to expand equal housing opportunities for all people, promote stable, diverse, well-resourced communities that are places of opportunity, eliminate

residential segregation, and address all forms of housing discrimination. NFHA carries out its mission through the implementation of core program activities that include housing counseling, responsible AI, consulting and compliance, public policy, membership services, fair housing enforcement, education and outreach, and housing and community development.

178.    Over the past three decades, primarily through its education and outreach and housing and community development programs, NFHA has provided housing counseling and referral assistance as well as grant assistance to consumers and communities throughout the United States. This includes:

    a.    Providing assistance and referral services to consumers via housing intakes and referrals;

    b.    Educating and counseling consumers at housing fairs, foreclosure prevention forums, homeownership events, housing counseling programs, and other events;

    c.    Developing consumer-facing materials to provide education and counseling to consumers about developing financial literacy in support of home purchases, avoiding predatory lending scams and harmful mortgage loss mitigation schemes, and obtaining loss mitigation services through appropriate avenues;

    d.    Providing direct assistance to homeowners to help them in obtaining loan mitigation to avoid foreclosure;

    e.    Helping homeowners improve their homes in a safe and sustainable fashion;

    f.    Implementing programs to help homeowners become adequately insured to protect their home;

g.  Helping families, people with disabilities, and other vulnerable groups avoid eviction;

h.  Assisting people with finding rental assistance funds to avoid eviction;

i.  Assisting people with finding down payment assistance to access homeownership opportunities; and

j.  Providing critical information to consumers who contact NFHA about fair housing opportunities.

179.  NFHA also provides supportive services, technical assistance, and training to HUD-certified housing counseling agencies.

180.  Moreover, NFHA has long engaged in many activities to increase and expand the supply of fair and affordable housing in the U.S.; improve the accuracy of data-driven systems to increase access to safe credit and equal homeownership opportunities; eliminate bias in systems that provide information to the public about homeownership opportunities (e.g. listing services); enhance neighborhood stability; improve the accuracy of property appraisals; and provide educational programs to teach industry professionals and governmental entities about best practices for expanding fair and affordable housing opportunities, increasing homeownership opportunities, and stabilizing communities.

181.  NFHA has helped provide grants to over 850 people, enabling them to become homeowners. It has facilitated the improved maintenance of 750,000 foreclosed properties and the rehabilitation of over 800 abandoned homes. It has facilitated 10,000 financial literacy workshops for more than 200,000 consumers. Since 2009, NFHA has provided over $9,350,000 in grants pursuant to its mission to invest in and stabilize neighborhoods and communities.

182.    Over the course of eight years of investigating Defendants' REO maintenance and marketing, Plaintiff NFHA conducted hundreds of tests of Bank of America REO properties across the nation.  NFHA has also trained the staff of and conducted joint inspections with all of the other Organizational Plaintiffs listed below.  In total, NFHA has expended over 6,630 hours on its investigation into Defendants' discriminatory maintenance and marketing of the Bank of America REO properties and resulting from and attributable to Defendants' conduct.

183.    Defendants' poor maintenance of REO properties in communities of color directly impeded NFHA's core activities in service of its mission. NFHA's housing counseling and referral services were impeded by Defendants' discriminatory REO conduct, which reduced the available housing stock in neighborhoods, made available housing and neighborhoods in communities of color less attractive to home buyers relative to predominately white communities due to blight, and made houses for sale in communities of color more difficult to identify for home buyers due to poor marketing.

184.    In many of the cities in which NFHA investigated Defendants' REO properties in this case, NFHA has made substantial financial investments in communities of color to promote neighborhood stabilization and to counter negative neighborhood stereotypes. For example, in Baltimore, Maryland, NFHA funded efforts to provide closing cost assistance to homebuyers, to acquire and develop blighted and vacant houses and restore them for homeownership, and to conduct block clean-ups and block beautification. In Oakland, California, NFHA funded efforts to prevent foreclosures through counseling and forgivable loans for distressed borrowers and to implement a tenant anti-displacement fund. In Philadelphia, Pennsylvania, NFHA funded the provision of rental and mortgage assistance, including grants to reinstate loans and avoid foreclosure, as well as work to clean, green, and maintain vacant land. These investments in

neighborhood stabilization and revitalization, which are only a small sample of the investments NFHA has made nationwide, were directly undermined by Defendants' poor maintenance and marketing of its REO properties in communities of color.

185.    Defendants' poor maintenance of REO properties have counteracted NFHA's stabilization efforts by decreasing the value of these properties and surrounding properties and reducing the amount of available and appealing housing in communities of color for prospective individual homeowners, thus increasing the purchase of homes by investors. For example, as of 2025, 77% of Defendants' REO properties that NFHA investigated in communities of color in Memphis, Tennessee were owned by investors, while none of Defendants' REO properties NFHA investigated in majority-white communities in Memphis were investor-owned. Similarly, as of 2025, 62% of Defendants' REO properties that NFHA investigated in communities of color in Kansas City were owned by investors, while only 22% of Defendants' REO properties NFHA investigated in majority-white communities in Kansas City were investor-owned. Defendants' actions thwarted NFHA's work to ensure access to fair and equal housing, to promote diverse, stable neighborhoods through homeownership, and to combat negative stereotypes about communities of color.

186.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, NFHA diverted time and resources away from other intended projects and programs and was required to delay, suspend, or even cancel such programming to stop further harm.  Defendants' discriminatory conduct caused NFHA to forego opportunities, including executing new fair housing advocacy projects and investigations, conducting additional consulting and training of housing providers, applying for new grants and funding sources, attending conferences, and engaging in professional staff development.

187.     In addition, NFHA engaged in significant community outreach and public

education efforts to address and attempt to counteract the effects of Defendants' conduct.

NFHA's efforts include:  meeting with local, state, and federal government officials (including

the Federal Reserve Board, legislators, and at least ten local governments/jurisdictions);

authoring and distributing reports about discrimination in the maintenance of REO properties[12],

which were subsequently provided to local and state governments; presenting numerous fair

housing trainings regarding REO maintenance to real estate professionals and bank employees;

planning and sponsoring a national conference on REO maintenance; and serving as keynote

speaker and making presentations on numerous panels regarding the economic impact of

discriminatory REO maintenance.

188.     NFHA's financial investments have been and are continuing to be undermined by

the existence of deteriorating and poorly maintained Bank of America REO properties in those

communities.

**Plaintiff Housing Opportunities Project for Excellence, Inc.**

189.     Plaintiff Housing Opportunities Project for Excellence, Inc. conducted

approximately 44 tests of Bank of America-owned homes and expended over 215 hours

investigating Bank of America's REO properties.  (HOPE, Inc. spent 82 hours on on-site visits to

the properties and 79 hours uploading of photos into database.  The remaining 55 hours represent

time spent on activities such as strategy and planning, education, outreach, and awareness, staff

training, and administration and management.)

---

[12] For example, NFHA produced reports regularly on its REO investigations, see, e.g.,
https://nationalfairhousing.org/resource/discrimination-by-banks-in-the-maintenance-of-homes-
in-communities-of-color-remains-a-barrier-to-recovery/at note 2; and "The Banks are Back –
Our Neighborhoods are not," April 12, 2014.

190.    HOPE, Inc.'s mission is to increase fair and equal access to housing, eliminate racial segregation and discrimination, and to promote fair housing and fair lending. Defendants' discriminatory maintenance and marketing of REO properties in HOPE, Inc.'s service area in Florida directly undermined this mission.

191.    Defendants' poor maintenance of REO properties in communities of color directly interfered with HOPE Inc.'s core activities in service of its mission, which include homeownership promotion through housing counseling, workshops, housing rehabilitation, and down payment assistance; grants to revitalize neighborhoods; and housing repairs, including accessibility retrofits for individuals with disabilities. Defendants' poor maintenance of REO properties in communities of color decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined HOPE, Inc.'s work to encourage homeownership in and rehabilitation of these neighborhoods.

192.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, HOPE, Inc. was forced to divert resources and time away from other intended projects and programs and to delay, suspend, or even cancel such programming to stop further harm. Defendants' discriminatory conduct caused Plaintiff to forego opportunities including resource development, public policy advocacy, identifying opportunities to educate underserved and un-served populations, utilizing research and technology to identify discriminatory trends in housing, and furtherance of the organization's Strategic Plan.

193.    In addition, HOPE, Inc. engaged in significant community outreach and public efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include:  preparation and publication of newsletter articles promoting community awareness;

engaging with media to raise awareness of REO-related issues; and educational presentations inclusive of REO-related topics, including homebuyer/foreclosure prevention workshops, housing provider trainings, and local (Miami-Dade and Broward County) and statewide (Florida) fair housing workshops.

**Plaintiff Metro Fair Housing Services, Inc.**

194.    Plaintiff Metro Fair Housing Services, Inc. conducted approximately 112 tests of Bank of America-owned homes over the course of five years and expended over 423 hours investigating Bank of America's REO properties.

195.    Metro's mission is to increase fair and equal access to housing, eliminate racial segregation, eradicate discrimination, and promote fair housing and fair lending. Defendants' discriminatory maintenance and marketing of REO properties in Metro's service area in Atlanta, Georgia directly undermined this mission.

196.    Defendants' poor maintenance of REO properties in communities of color in and around Atlanta directly interfered with Metro's core activities in service of its mission, which include promoting homeownership and neighborhood stabilization in communities of color through housing counseling, down payment and closing cost assistance, rehabilitation of foreclosed properties, repurposing blighted blocks and vacant lots, and accessibility modifications for individuals with disabilities. Specifically, Metro worked to purchase, rehabilitate, and sell foreclosed properties in communities of color to increase homeownership and neighborhood stability. Defendants' poor maintenance of REO properties in communities of color decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined Metro's work to encourage homeownership in and rehabilitation of these neighborhoods. For example, as of 2025, 42% of Defendants' REO

properties investigated in communities of color in Atlanta were owned by investors, while only 25% of Defendants' REO properties investigated in majority-white communities in Atlanta were owned by investors.

197.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, Metro was forced to divert resources and time away from other intended projects and programs and to delay, suspend, or even cancel such programming to stop the harm. Defendants' discriminatory conduct caused Plaintiff to forego opportunities including: consulting opportunities, conferences/education/staff development, coalition meetings, and funding applications.

198.    In addition, Metro engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendants' conduct.  Plaintiff's efforts include:  organizing and conducting trainings for jurisdictional staff, housing providers, real estate agents, and consumers in the metropolitan region; meeting with local code or government officials regarding REO maintenance; preparing and publishing brochures and reports; participating in community events, including the annual fair housing events, partnership fairs, workshops and professional education and outreach; and engaging with media to raise awareness of REO-related issues.

199.    Finally, Metro has also expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America properties in those communities.

**Plaintiff North Texas Fair Housing Center**

200.    Plaintiff North Texas Fair Housing Center conducted inspections of Bank of America REO properties across the greater Dallas-Fort Worth metropolitan region, expending

over 247 hours throughout the course of the investigation and resulting from and attributable to Defendants' conduct.

201.    NTFHC's mission is to increase fair and equal access to housing, eliminate racial segregation, eradicate discrimination, and promote fair housing and fair lending. Defendants' discriminatory maintenance and marketing of REO properties in NTFHC's Dallas-Fort Worth service area directly undermined this mission.

202.    Defendants' poor maintenance of REO properties in communities of color directly interfered with NTFHC's core activities in service of its mission, which include housing counseling, homeownership promotion through down payment and closing cost assistance, emergency repairs, and accessibility modifications. Defendants' poor maintenance of REO properties in communities of color in the Dallas-Fort Worth metropolitan region decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined NTFHC's work to encourage homeownership in and rehabilitation of these neighborhoods.

203.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, NTFHC diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming to stop the harm.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including expanded forms of outreach and coalition-building, professional staff development, and new funding applications.

204.    In addition, NTFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct.

Plaintiff's efforts include: organizing and conducting trainings for social service providers and property management personnel in the Dallas-Fort Worth region; meeting with local government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures; creating public service announcements and advertising in local print and radio; designing specialized mailings; participating in community events, including community resource fairs; and engaging with media to raise awareness of REO-related issues.

205.    NTFHC has also spent its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater Dallas-Fort Worth region.

**Plaintiff Fair Housing Center of West Michigan**

206.    Plaintiff Fair Housing Center of West Michigan conducted inspections of Bank of America REO properties across the Western Michigan region, expending over 290 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

207.    FHCWM's mission is to prevent and eliminate illegal housing discrimination, to ensure equal housing opportunity, and to promote inclusive communities. Defendants' discriminatory maintenance of REO properties in communities of color in Grand Rapids, Muskegon and Muskegon Heights, Michigan, directly undermined this mission.

208.    Specifically, Defendant's poor maintenance of REO properties in communities of color in the Western Michigan region interfered with FHCWM's core business activities in furtherance of its mission, which include housing counseling and community investment for neighborhood stabilization in communities of color. In particular, FHCWM's "49507!"

campaign sought to encourage families to move into the 49507 zip code area, near Grand Rapids, through programming such as grants for downpayment assistance, rehabilitation of single-family homes, neighborhood beautification and cleanup, and home health assessments. This project was intended to build excitement and celebrate investment in this zip code, which includes a high concentration of communities of color and over 40 Bank of America REO properties investigated in this case. Defendants' poor maintenance of these properties led to boarded-up homes, unkempt lawns, and accumulation of trash in these neighborhoods, which made both these properties and their surrounding neighborhoods less desirable to individual homeowners, directly harming FHCWM's ability to encourage families to move into this zip code and undermining the success of the 49507! campaign. Defendants' poor maintenance also interfered with FHCWM's efforts to train realtors to show homes in and around this zip code.

209.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, FHCWM had to divert resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming to stop further harm.  Defendants' discriminatory conduct caused FHCWM to forego opportunities, including community meetings and collaborative efforts, consulting opportunities, conferences and staff development, other systemic investigations, and applications for funding.

210.    In addition, FHCWM engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: holding workshops regarding REO issues at its Fair Housing Luncheon & Workshop Series; meeting with local code or government officials regarding REO maintenance; meeting with local service providers, stakeholders, and community groups;

preparing and publishing newsletters; participating in community events; and engaging with media to raise awareness of REO-related issues.

211.    Finally, FHCWM has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the Western Michigan region.

**Plaintiff Fair Housing Continuum, Inc.**

212.    Plaintiff Fair Housing Continuum, Inc. conducted 92 tests of Bank of America REO properties in the central Florida region, expending over 643 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

213.    The Continuum's mission is to ensure equal housing opportunity and eliminate housing discrimination in Florida. The Continuum's core work in furtherance of this mission includes homeownership promotion, counseling, foreclosure prevention, and community enhancement. Defendants' discriminatory maintenance of REO properties in the central Florida region directly undermined that mission and the associated core activities. For example, the Continuum worked to rejuvenate communities of color in central Florida, including in Parramore, a historically Black neighborhood in Orlando, Florida. Through the Heroes Commons project in Parramore, the Continuum built accessible single-family homes for veterans with disabilities as part of its work to stabilize and promote homeownership in this community. Defendants' discriminatory maintenance of REOs in and around Parramore made these communities less attractive to prospective homeowners and directly harmed the Continuum's core work of community enhancement and homeownership promotion.

214.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, the Continuum diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming to stop further harm.  Defendants' discriminatory conduct caused Fair Housing Continuum to forego opportunities, including: systemic testing programs; individual complaint enforcement; new or additional fair housing investigations; professional staff recruitment and development; and new contracts.

215.    In addition, the Continuum engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include 189 presentations or speaking engagements related to REO issues from July 2013 through April 2018, as well as engaging with media to raise awareness of REO-related issues.

**Plaintiff South Suburban Housing Center**

216.    Plaintiff South Suburban Housing Center conducted inspections of Bank of America REO properties across the greater Chicago metropolitan area, and the Gary, northwest Indiana area, expending over 264 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

217.    Defendants' poor maintenance and marketing of REOs in communities of color throughout SSHC's south suburban Chicago and northwest Indiana service area directly undermined SSHC's 50-year mission to combat housing discrimination and promote stable, diverse communities.

218.    Defendants' failure to maintain and market their REO properties in communities of color exacerbated the market distress SSHC was actively fighting to redress through its core programs and services. Defendants' conduct caused homes to become undesirable to anyone

except large investors who purchased them at bargain prices, made minimal repairs, and then charged exorbitant rental rates to former owner families that had been displaced. For example, as of 2025, in Gary, Indiana, 46% of the Bank of America REOs in communities of color that were investigated as part of this case are now investor-owned, while only 29% of the Bank of America REOs investigated in majority-white neighborhoods are investor-owned.

219.    Defendants' discrimination also caused homes to be valued far below market. For example, a poorly maintained Bank of America REO in Dolton, Illinois—a majority Black community in SSHC's service area—sold for $28,000 despite surrounding well-maintained homes being valued over $100,000 (homes that would likely be valued even higher if not for the dilapidated REOs in the area). This devaluation of properties harmed SSHC's mission and work in furtherance of stabilizing diverse communities and making them attractive investments for prospective homeowners.

220.    Defendants' discriminatory conduct perpetuated negative community stereotypes, decreased property values, and reduced available and appealing housing stock for prospective homebuyers in communities of color. By making the REOs they were responsible for in communities of color less desirable, Defendants directly thwarted SSHC's core activities such as housing counseling and grant-making–activities it undertook to promote homeownership in communities of color in furtherance of its mission to stabilizes and overcome negative stereotypes associated with these communities. Because prospective homebuyers are less likely to want to purchase a home that has been poorly maintained or that is near a poorly maintained home, the poor maintenance of Bank of America REOs in communities of color in SSHC's service area made its work promoting homeownership in these communities much more difficult.

221.    Defendants' conduct not only devalued properties and reinforced negative stigma about these communities, but it decreased the housing stock available and appealing to the prospective homebuyers that SSHC counsels. Defendants' conduct thus directly harmed SSHC's mission of promoting fair housing and stable, diverse communities.

222.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, SSHC diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming to stop further harm.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including additional fair housing complaint intakes and investigations, fair housing presentations for the general public and housing providers, counseling and advocacy on behalf of mortgage-distressed discrimination victims, and expanded forms of outreach and coalition-building.

223.    In addition, SSHC has engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include conducting REO-related presentations and meetings with municipal and county officials, community organizations, housing providers, individual realtors and realtors' associations, lending institutions, community service agencies, faith-based institutions, and homeowners and residents of communities affected by discriminatory REO maintenance and marketing practices.

224.    Finally, SSHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including down payment assistance and mortgage distress assistance programs.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly

maintained Bank of America REO properties in communities of color in the greater Chicago and Gary, Indiana metropolitan areas.

**Plaintiff HOPE Fair Housing Center**

225.     Plaintiff HOPE Fair Housing Center conducted inspections of Bank of America REO properties across the greater Chicago metropolitan region, expending over 436 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

226.     Defendants' poor maintenance and marketing of REO properties in communities of color throughout HOPE FHC's service area directly undermined the organization's mission to create greater housing opportunities for all. Defendants' actions interfered with HOPE FHC's core business activities in furtherance of that mission, including housing counseling and community investment, providing grants for downpayment and closing cost assistance, rehabilitating homes, and marketing campaigns to promote homeownership. HOPE FHC's core activities are undertaken to increase housing opportunity, residential diversity, and economic vitality within communities of color. Defendants' failure to properly maintain properties in Black and Latino communities decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined HOPE FHC's financial investments, homeownership promotion, and neighborhood stabilization efforts in those communities.

227.     For example, Defendants' discriminatory actions interfered with HOPE FHC's significant efforts to revitalize the city of Elgin, Illinois, which is majority non-white. Through a marketing program called "ElgInstead," HOPE FHC used billboards, posters, radio, and website ads to promote the features and amenities of living in Elgin, including the community's diversity, scenic natural location, and affordable historic homes. ElgInstead was designed to enhance other

investments HOPE FHC made in Elgin and to create demand for Elgin as a community of choice for all races and income levels. In addition to ElgInstead, HOPE FHC provided funds for Elgin Symphony employees to purchase vacant and foreclosed homes in Elgin through the Elgin Neighbors Program to enhance diversity and economic integration in Elgin. However, Defendants' poor maintenance of REOs in and around Elgin made HOPE FHC's neighborhood stabilization work more difficult, because it decreased property values and reduced the availability, safety, and appeal of housing to prospective homeowners.

228.    HOPE FHC also invested resources into the revitalization of the Austin neighborhood of Chicago. HOPE FHC conducted an intake with a resident of that neighborhood who reported living next door to a Bank of America REO for five years. Not only was the property an eyesore, it damaged the value of her home and caused her homeowner's insurance to rise. At one point, the resident tried to purchase the home, but Bank of America never responded to her offer. Soon after she learned that the home—which has not had a for-sale sign in the yard for years—sold to an investor. Another REO in her community sold to an investor for just $6,000. Bank of America's conduct directly undermined the investments HOPE FHC made in this community.

229.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, HOPE FHC diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such programming to stop further harm.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including consulting opportunities, new funding applications, professional staff development, and community and coalition meetings.

230.     In addition, HOPE FHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for a regional coalition of housing providers, non-profit service providers and government staff in the greater Chicago metropolitan region; meeting with local code or government officials regarding REO maintenance in Elgin and other local municipalities; meeting with local service providers and real estate trade organizations; preparing and publishing brochures/reports; designing targeted websites and specialized mailings; participating in community events, including the Chicago Urban League Homebuyers Fair; and engaging with media to raise awareness of REO-related issues.

231.     Finally, HOPE FHC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater Chicago metropolitan region.

**Plaintiff Metropolitan Milwaukee Fair Housing Council**

232.     Plaintiff Metropolitan Milwaukee Fair Housing Council conducted inspections of Bank of America REO properties across the greater Milwaukee metropolitan area, expending over 299 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

233.     MMFHC's mission is to promote fair housing throughout the State of Wisconsin and to combat illegal housing discrimination, including by creating and maintaining racially and economically integrated communities. Defendants' discriminatory maintenance and marketing of REO properties in MMFHC's service area directly undermined this mission.

234.    Defendants' poor maintenance of REO properties in communities of color directly interfered with MMFHC's core activities in service of its mission, which include housing counseling, homeownership promotion, foreclosure prevention, and provision of grant assistance to community organizations to engage in neighborhood improvement and stabilization in Milwaukee neighborhoods and to promote racially and economically integrated housing. Defendants' poor maintenance of REO properties in communities of color in Milwaukee contributed to neighborhood blight, reduced the availability of housing, and decreased the value of REO properties and surrounding properties, making them less desirable to individual homeowners. Defendants' actions undermined MMFHC's work to encourage homeownership in and to stabilize these neighborhoods.

235.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, MMFHC diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming to stop the harm.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including fair lending outreach and education, fair housing outreach and education, fair housing investigations, data collection activities, and housing industry trainings.

236.    In addition, MMFHC engaged in community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct.  Plaintiff's efforts include conducting REO-related presentations and meetings with government officials, community organizations, academic institutions, housing providers, individual realtors and realtors' associations, neighborhood associations, lending institutions, community activists, faith-based institutions, and homeowners and residents of neighborhoods affected by discriminatory REO maintenance and marketing practices.

**Plaintiff Fair Housing Center of Central Indiana**

237.     Plaintiff Fair Housing Center of Central Indiana, Inc. ("FHCCI") conducted inspections of Bank of America REO properties across the greater Indianapolis metropolitan region, expending over 181 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

238.     Defendants' poor maintenance and marketing of REO properties in communities of color throughout FHCCI's Indianapolis service area directly undermined the organization's mission to ensure equal housing opportunities by eliminating housing discrimination, and to eliminate racial segregation in housing.

239.     Defendants' poor maintenance and marketing of REO properties in communities of color interfered with FHCCI's core business activities in service of its mission, including housing counseling; providing grants for home modification, repairs, vacant lot purchases, and new construction; and neighborhood stabilization and beautification efforts, including through the creation of pocket parks, community gardens, and arts projects. Defendants' poor maintenance of properties in communities of color decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color prospective individual homeowners, all of which undermined FHCCI's work to encourage homeownership in, rehabilitation of, and stabilization of these neighborhoods.

240.     In addition, Defendants' conduct caused several of Defendants' REO properties in communities of color in FHCCI's service area to become undesirable to anyone except large investors, who purchased a large percentage of them to rent, thus reducing homeownership opportunities in those neighborhoods. For example, as of 2025, 50% of Defendants' REO properties investigated in communities of color in Indianapolis were owned by investors, while none of Defendants' REO properties investigated in majority white communities in Indianapolis

are.  Investor-owned properties in FHCCI's service area also had high incidences of code violations and further contributed to neighborhood blight, harming FHCCI's neighborhood stabilization efforts. FHCCI produced multiple reports on the troubling effects of investor-owned properties on Indianapolis's housing stock and the ability of residents to build wealth and stability through homeownership. Because Defendants' discriminatory conduct was directly undermining work central to its mission, FHCCI diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming to stop the harm.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including fair housing training opportunities, new funding applications, professional staff development, and expanded forms of education and outreach.

241.    In addition, FHCCI engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. FHCCI's efforts include: organizing and conducting trainings for community development and neighborhood organizations in the greater Indianapolis region; meeting with local community development organizations and government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; creating public service announcements for local print and radio; designing specialized mailings; and engaging with media to raise awareness of REO-related issues and answer media related inquiries.

242.    Finally, FHCCI has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater Indianapolis metropolitan region.

**Plaintiff Denver Metro Fair Housing Center**

243.    Plaintiff Denver Metro Fair Housing Center conducted inspections of Bank of America REO properties across the greater Denver metropolitan area, expending over 262 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

244.    DMFHC's mission is to increase fair and equal access to housing, eliminate racial segregation, eradicate discrimination, and promote fair housing and fair lending. Defendants' discriminatory maintenance and marketing of REO properties in DMFHC's Denver metropolitan service area directly undermined this mission.

245.    Defendants' poor maintenance of REO properties in communities of color directly interfered with DMFHC's core activities in service of its mission, which include housing counseling, homeownership promotion through down payment and closing cost assistance; housing rehabilitation; accessibility modifications; community revitalization through construction of parks, gardens, and recreation areas; and community engagement through programming and summer camps. Defendants' poor maintenance of REO properties in communities of color in the Denver metropolitan area decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined DMFHC's work to encourage homeownership in and to revitalize and stabilize these neighborhoods.

246.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, DMFHC diverted limited resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming to stop the harm.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities

including consulting and training opportunities, new funding applications, professional staff

development, and new or additional fair housing investigations.

247.    In addition, DMFHC engaged in significant community outreach and public

education efforts to address and attempt to counteract the effects of Defendants' conduct.

DMFHC's efforts include: organizing and conducting trainings regarding REO maintenance for

housing providers, municipal housing employees, HUD housing counseling agency staff, and the

general public in the greater Denver Metro region; meeting with local government officials

regarding REO issues, including the Denver Regional Council of Governments, City and County

of Denver, City of Aurora, and the State of Colorado Division of Housing; preparing and

publishing brochures/reports; creating public service announcements and advertising; designing

specialized mailings; participating in community events, including the Montbello 50th

Anniversary Fair; and engaging with media to raise awareness for REO-related issues.

248.    Finally, DMFHC has expended its own funds to engage in community

development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's

financial investments have been and are continuing to be undermined by the existence of

deteriorating and poorly maintained Bank of America REO properties in communities of color in

the greater Denver metropolitan region.

**Plaintiff Fair Housing Opportunities of Northwest Ohio, Inc., d/b/a Toledo Fair Housing Center**

249.    Plaintiff Toledo Fair Housing Center conducted inspections of Bank of America

REO properties across the greater Toledo metropolitan area, expending over 49 hours throughout

the course of this investigation and resulting from and attributable to Defendants' conduct.

250.    TFHC's mission is to increase fair and equal access to housing, eliminate racial

segregation, eradicate housing discrimination, promote fair housing and fair lending, and create

inclusive communities of opportunity. Defendants' discriminatory maintenance and marketing of REO properties in TFHC's service areas of Lucas and Wood counties in Ohio directly undermined this mission.

251.    Defendants' poor maintenance of REO properties in communities of color directly interfered withTFHC's core program activities in service of its mission, which include homeownership promotion, housing counseling, foreclosure prevention through grants, housing rehabilitation, repurposing blighted or vacant lots, and community enhancement for neighborhood stabilization through construction of parks and recreation areas. Specifically, through the MLK Inclusive Communities Program, TFHC provided grants to homeowners in African-American and Latino neighborhoods to remove blight. Defendants' poor maintenance of REO properties in communities of color, however, led to boarded-up windows, garbage strewn across property, and general disrepair. The maintenance condition decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined TFHC's work to encourage homeownership in and rehabilitation of these neighborhoods.

252.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, TFHC diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming to stop further harm.  Defendants' discriminatory conduct caused Plaintiff to forgo opportunities, including providing fair housing training to community partners, attending conferences and other forms of professional staff development, and advocating for housing discrimination victims.

253.    In addition, TFHC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct.

Plaintiff's efforts include:  organizing and conducting trainings for housing industry professionals and the general public in the Northwest Ohio region; meeting with government officials regarding REO maintenance; meeting with local service providers; preparing and publishing reports; participating in community events and meetings; engaging with media to raise awareness of REO-related issues; interviewing neighbors; and participating in neighborhood beautification and revitalization efforts.

254.    Finally, TFHC has expended its own funds to engage in community development, homeownership promotion, neighborhood stabilization, foreclosure prevention, and beautification efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater Toledo metropolitan region.

**Plaintiff Louisiana Fair Housing Action Center, Inc.**

255.    Plaintiff Louisiana Fair Housing Action Center, Inc. conducted inspections of Bank of America REO properties across the New Orleans and Baton Rouge metropolitan areas, expending over 225 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

256.    LAFHAC's mission is to ensure equal housing opportunities, eradicate housing discrimination and segregation across Louisiana, and promote residential integration. Defendants' discriminatory maintenance and marketing of REO properties in Louisiana directly undermined this mission.

257.    Defendants' poor maintenance of REO properties in communities of color directly interfered with LAFHAC's core activities in service of its mission, which include homeownership promotion through down payment assistance and closing cost assistance, foreclosure prevention through anti-displacement grants and housing counseling, and housing

rehabilitation. Defendants' poor maintenance of LAFHAC's properties in communities of color decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined LAFHAC's work to encourage homeownership in and to stabilize these neighborhoods. Because Defendants' discriminatory conduct was directly undermining work central to its mission, LAFHAC diverted resources and time away from other intended projects and programs, and was required to delay or suspend such programming, to stop the harm. Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including presenting fair housing courses, and to delay work related to its annual outreach and education events, as well as planned investigations.

258.    In addition, LAFHAC engaged in significant community outreach and public efforts to address and attempt to counteract the effects of Defendants' conduct.  LAFHAC's efforts include: organizing and conducting trainings to groups of service providers in the Greater New Orleans area, including meeting with BlightsOut, an organization dedicated to eradicating blight; meeting with government officials regarding REO maintenance; creating public service announcements and advertising in local print and radio; participating in community events, including the Mission Possible Conference with over 100 conference attendees; and engaging with media to raise awareness of REO-related issues.

259.    Finally, LAFHAC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in communities of color in the greater New Orleans metropolitan region.

**Plaintiff Fair Housing Advocates of Northern California**

260.    Plaintiff Fair Housing Advocates of Northern California conducted inspections of Bank of America REO properties across the greater Solano and Contra Costa counties, expending over 450 hours throughout the course of this investigation and resulting from and attributable to Defendants' conduct.

261.    FHANC's mission is to ensure equal housing opportunity, promote racially integrated communities and neighborhood diversity, and to eliminate discriminatory housing practices. To achieve this mission, FHANC's core activities include grantmaking, as well as free fair housing, pre-purchase, and mortgage distress counseling to prospective and current tenants and homeowners. Defendants' discriminatory maintenance of REO properties in communities of color in FHANC's service area directly undermined FHANC's mission and core activities.

262.    FHANC's housing counseling and grantmaking programs were aimed at stabilizing communities of color harmed by the 2008 foreclosure crisis. FHANC sought to prevent foreclosure and support affordable housing options in these communities through monetary relief programs, including the Keep Your Home California program and the California Mortgage Relief Program. However, Defendants' poor maintenance of REOs in communities of color in Solano and Contra Costa counties made these neighborhoods less desirable to prospective homeowners, which harmed FHANC's ability to effectively counsel and support homeownership.

263.    In addition, Defendants' failure to equitably maintain and market their REO properties in communities of color in FHANC's service area exacerbated the market distress FHANC was actively fighting to redress, resulting in prolonged abandonment and devaluation in these communities, making them vulnerable to large investors who purchased homes at bargain prices, made minimal repairs, and then charged very high rental rates to renters or former owner

families that had been displaced. This made housing less available and less desirable to prospective homebuyers and tenants, directly undermining FHANC's counseling work and other core activities intended to integrate and stabilize communities of color.

264.     Because Defendants' discriminatory conduct was directly undermining work central to its mission, FHANC diverted resources and time away from other intended projects and programs and was required to delay, suspend, or even cancel such programming to stop further harm.  Defendants' discriminatory conduct caused Plaintiff to forego opportunities, including consulting opportunities, professional staff development, coalition and advocacy meetings, work on local and regional housing policies, expansion of fair housing programs, and new or additional funding applications. This includes $10,000 per year in funding from Bank of America that FHANC had been receiving for its foreclosure prevention program, as FHANC was no longer able to apply for funding due to conflict of interest.

265.     In addition, FHANC engaged in significant community outreach and public education efforts to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include:  meeting with government officials regarding REO maintenance, including visits to senators and representatives on Capitol Hill; communicating with City of Vallejo attorney (working on a Neighborhood Stabilization program) about Bank of America REOs; meeting with local service providers such as Housing and Economic Rights Advocates; creating and distributing public service announcements and conducting radio campaigns; publishing advertisements in local newspapers; sending specialized mailings to neighbors of REO properties; participating in community events; and engaging with media to raise awareness of REO-related issues.

266.    Finally, FHANC has expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts, including foreclosure prevention, counseling, and education.  Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in neighborhoods of color in the greater Solano and Contra Costa counties.

**Plaintiff Fair Housing Center for Rights & Research**

267.    Plaintiff Fair Housing Center for Rights & Research conducted inspections of Bank of America Bank REO properties across the greater Cleveland metropolitan area between December 2013 and February 2017, expending over 87 hours over the course of this investigation and resulting from and attributable to Defendants' conduct.

268.    Defendants' poor maintenance and marketing of REO properties in communities of color throughout Cuyahoga County, including in its principal city, Cleveland, where FHCRR is located, and within its primary service area of Cuyahoga and Lorain Counties in Northeast Ohio, directly undermined the organization's mission to protect and expand fair housing rights, eliminate housing discrimination, and promote integrated communities. Defendants' discriminatory actions interfered with FHCRR's core business activities, including housing counseling and referrals, neighborhood stabilization, and community reinvestment.

269.    For example, FHCRR sought to stabilize communities of color through providing fair housing counseling and investments designed to stabilize communities by assisting homeowners with eliminating safety hazards through grant-funded home improvements and accessibility modifications to keep people in their homes. Defendants' failure to maintain and market REOs in communities of color within FHCRR's service areas caused property devaluation, vacant and abandoned properties, and blight, which made these communities less

desirable to homeowners, harming FHCRR's ability to stabilize these neighborhoods and encourage families to move into these communities.

270.     Defendants' conduct made purchasing homes within FHCRR's service area less desirable to owner-occupants and increased investor ownership. In FHCRR's service area, investor owners are less likely to obtain permits to perform necessary maintenance work and they typically aim to maximize income from rental housing, making it difficult for FHCRR to increase homeownership and build the stable, integrated communities that are central to its organizational mission.

271.     Because Defendants' discriminatory conduct was directly undermining work central to its mission, FHCRR diverted resources and time away from other intended projects and programs, and was required to delay, suspend, or even cancel such activities to stop further harm.

272.     In addition, FHCRR engaged in significant community outreach and public education efforts in order to address and attempt to counteract the effects of Defendants' conduct.  FHCRR's efforts include the discussion of REO maintenance issues in more than 250 presentations to housing providers and real estate agents in Northeast Ohio and engaging with media to raise awareness of REO-related issues.

**Plaintiff Fair Housing Center of Northern Alabama**

273.     Plaintiff Fair Housing Center of Northern Alabama tested 17 of Bank of America's REO properties across the Birmingham, Alabama metropolitan area between June 2016 and October 2017, and expended 27 hours in its investigation.

274.     FHCNA's mission is to increase fair and equal access to housing, eliminate racial segregation, eradicate discrimination, and promote fair housing and fair lending. Defendants' discriminatory maintenance and marketing of REO properties in FHCNA's service area directly

undermined this mission. Defendants' poor maintenance of REO properties in communities of color directly interfered with FHCNA's core activities in service of its mission, which include counseling, education, and advocacy centered on foreclosure, homeownership and neighborhood stabilization. Defendants' poor maintenance of REO properties in communities of color decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined FHANC's work to encourage homeownership in and stabilize these neighborhoods.

275.    FHCNA's education and outreach activities increased in an effort to counteract the negative effects of Defendants' actions.  FHCNA participated in and conducted eight additional education and outreach trainings for community groups and housing providers. It increased its distribution of literature and increased its media campaign, all to override the negative impact of Bank of America's REO properties in its communities.

276.    Because Defendants' discriminatory conduct was directly undermining work central to its mission and due to the size of its staff and the need to increase activities in addressing these properties, it became necessary to divert FHCNA's already limited resources to stop the harm. FHCNA had to cancel and reschedule community presentations to address other concerns, missed deadline dates for submitting new proposals for community funds, and increased the cost of its media campaign to address this issue.

277.    Bank of America's lack of properly maintaining its REO properties has and will continue to frustrate the mission of FHCNA and will continue to cause a need for the diversion of resources until these properties are maintained in a safe and sanitary manner that will support the communities in which they are located.

**Plaintiff Miami Valley Fair Housing Center**

278.    Plaintiff Miami Valley Fair Housing Center conducted approximately 68 tests of Bank of America REO properties over the course of seven years and expended over 198 hours investigating Bank of America's REO properties resulting from and attributable to Defendants' conduct.

279.    MVFHC's mission is to increase fair and equal access to housing, eliminate racial segregation and discrimination, and to promote fair housing and fair lending. Defendants' discriminatory maintenance and marketing of REO properties in MVFHC's service area directly undermined this mission.

280.    Defendants' poor maintenance of REO properties in communities of color directly interfered with MVFHC's core activities in service of its mission, which include counseling; homeownership promotion through down payment assistance and closing cost assistance; emergency repairs; foreclosure prevention through anti-displacement grants; housing rehabilitation; repurposing blighted or vacant lots; accessibility modifications; community enhancement including construction of parks, gardens, and recreation areas; and community engagement. Defendants' poor maintenance of REO properties in communities of color decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined MVFHC's work to encourage homeownership and rehabilitation of these neighborhoods.

281.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, MVFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming to stop the

harm. Defendants' discriminatory conduct caused Plaintiff to forego opportunities including: consulting opportunities, staff development, coalition meetings, and funding applications.

282.     In addition, MVFHC engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendants' conduct. Plaintiff's efforts include: organizing and conducting trainings for real estate agents, property managers, municipal government employees, and the general public in the Miami Valley region; meeting with local code or government officials regarding REO maintenance; meeting with local service providers; preparing and publishing brochures/reports; creating public service announcements and advertising in local print and radio; designing targeted websites and specialized mailings; participating in community events, including a three-hour presentation as part of the 2015 Fair Housing Month event in April, presentations to the Latino Connection, the Dayton Area Realtists, Catholic Social Services, the Dayton Mortgage Broker's Association, and the Ahiska Turkish American Community Center; engaging with media to raise awareness of REO-related issues; and promoting MVFHC's Inclusive Community Fund (ICF) in an attempt to stabilize the communities of color that have been disproportionately impacted by foreclosure and REO properties that are not properly maintained and marketed.

283.     Finally, MVFHC has also expended its own funds to engage in community development, homeownership promotion, and neighborhood stabilization efforts. Plaintiff's financial investments have been and are continuing to be undermined by the existence of deteriorating and poorly maintained Bank of America REO properties in those communities.

**Plaintiff Connecticut Fair Housing Center**

284.     Plaintiff Connecticut Fair Housing Center conducted approximately 64 tests and took 998 pictures of Bank of America REO properties over the course of five years and

expended over 128 hours investigating Bank of America's REO properties resulting from and attributable to Defendants' conduct.

285.    CFHC's mission is to increase fair and equal access to housing, eliminate racial segregation, eradicate discrimination, and promote fair housing and fair lending. Defendants' discriminatory maintenance and marketing of REO properties in CFHC's service area directly undermined this mission.

286.    Defendants' poor maintenance of REO properties in communities of color directly interfered with CFHC's core activities in service of its mission, which include neighborhood stabilization and foreclosure prevention through counseling and mediation. Defendants' poor maintenance of REO properties in communities of color decreased the value of these properties and surrounding properties and reduced the amount of available and desirable housing in communities of color for prospective individual homeowners, all of which undermined CFHC's work to stabilize and support homeownership in these neighborhoods.

287.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, CFHC was forced to divert resources and time away from other intended projects and programs, and to delay, suspend, or even cancel such programming to stop the harm.  Some of the tasks which CFHC was unable to do over years included systemic testing of landlords who denied applicants based on the criminal records, systemic race investigations of landlords in towns where there are high numbers of police stops, and mortgage lending discrimination investigations.  Defendants' discriminatory conduct caused CFHC to forego opportunities including: consulting opportunities, staff development, recruitment of interns and new Board members, and funding applications.

288.    In addition, CFHC engaged in significant community outreach and public efforts to address and attempt to counteract the effects of Defendants' conduct.  CFHC's education and outreach efforts have taken approximately 30 hours and include: creating and reviewing mandatory fair housing curricula for real estate agents renewing their licenses and ensuring that the courses included information on non-discriminatory marketing of REO properties; answering requests for information and working with Connecticut municipalities with extensive blight on the issues surrounding REO properties and the parties responsible for REO maintenance; working with and responding to requests for information from Connecticut legislators trying to address the blight caused by REO properties; and networking with affordable housing providers to determine whether the blight caused by REO properties could be addressed by turning those properties into affordable housing.

**Plaintiff Fair Housing Council of Greater San Antonio**

289.    Plaintiff Fair Housing Council of Greater San Antonio conducted approximately 30 tests of Bank of America REO properties over the course of two years and expended over 262 hours investigating Bank of America's REO properties and implementing counteractive measures resulting from and attributable to Defendants' conduct.

290.    Defendants' poor maintenance and marketing of REOs in communities of color throughout FHCGSA's San Antonio service area directly undermined the organization's mission to increase equitable housing opportunities, eliminate discriminatory housing practices, and promote open, accessible, and inclusive communities. Defendant's actions interfered with FHCGSA's core business activities such as housing counseling and efforts to promote homeownership in communities of color.

291.    Defendant's failure to maintain REOs in communities of color in FHCGSA's service area made FHCGSA's work counseling and promoting homeownership in these

communities of color much more difficult because Defendants' REOs and the surrounding homes became less desirable, since prospective homebuyers are less likely to want to purchase a home that has been poorly maintained or that is located near a poorly maintained home. In addition, Defendants' failure to maintain their REOs in communities of color decreased property values and reduced available and appealing housing stock for prospective homebuyers.

292.    Furthermore, Defendants' poorly maintained REO properties perpetuated negative stereotypes about these communities of color and caused neighbors to feel unsafe and insecure in their own homes, harming FHCGSA's ability to promote homeownership and stabilize these communities. For example, a neighbor of one of Defendants' REOs, located at 6218 Lark Valley Drive, San Antonio, Texas 78242, felt insecure and uncomfortable living next door to the REO due to the darkness and overgrown shrubbery caused by Defendants' poor maintenance of their property. In addition, the neighbor reported to FHCGSA that she was worried about her great-grandchildren playing in her backyard because the REO had tall grass, trash, and vermin that encroached on the neighbor's property. This neighbor worried about the potential for criminal activity on Defendants' REO property since the front door had been left unsecured and windows were broken. Because Defendants' discriminatory conduct was directly undermining work central to its mission, FHCGSA was forced to divert resources and time away from other intended projects and programs to stop the harm.  Defendants' discriminatory conduct caused FHCGSA to forego opportunities and planned activities including: implementing education and outreach campaigns, updating its Directory of Accessible Housing, recruiting new testers and Board Members, conducting staff development activities, and applying for new grants, and funding sources.

293.    In addition, FHCGSA engaged in significant community outreach and public efforts in order to address and attempt to counteract the effects of Defendants' conduct, including submitting 31 neighbor surveys, distributing educational REO fliers to consumers at community events, posting paid advertisements on social media regarding REO issues, and sharing informative articles regarding Bank of America REO practices on social media.

**Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc.**

294.    Plaintiff Fair Housing Center of the Greater Palm Beaches, Inc. conducted approximately 26 tests of Bank of America-owned homes over the course of three years and expended over 92 hours investigating Bank of America's REO properties.

295.    Defendants' poor maintenance and marketing of REO properties in communities of color throughout the FHCGPB's Greater Palm Beach service area has directly undermined the FHCGPB's 25-year mission to ensure fair and affordable housing opportunities for all people, by promoting culturally diverse communities through open housing and the elimination of all barriers to that goal.

296.    Defendants' actions interfered with the FHCGPB' s core business activities, which include facilitating homeownership by collaborating to provide first-time homebuyer workshops and housing counseling that addresses the ongoing affordable housing crisis in the Palm Beach County and the Greater Palm Beach Area. Defendants' poor maintenance of REO properties in communities of color led to neighborhood blight, property damage, and decreased values of the REOs themselves and surrounding properties. Because prospective homebuyers are less likely to want to purchase a home that has been poorly maintained or next to a poorly maintained home, the poor maintenance of Defendants' REOs in FHCGPB's service area made promoting homeownership in these communities much more difficult. Defendants' conduct not only devalued properties and reinforced negative stigma about these communities, but it

decreased the housing stock available and made them less appealing to the prospective homebuyers that FHCGPB counsels. Defendants' conduct thus directly harmed FHCGPB's mission of promoting fair and affordable housing through open housing for all people.

297.    Because Defendants' discriminatory conduct was directly undermining work central to its mission, the FHCGPB was forced to divert resources and time away from other intended projects and programs, suspend, or even cancel such programming, to stop the harm. Defendants' discriminatory conduct caused FHCGPB to forego opportunities, including fair housing education consulting opportunities with housing providers and municipalities, funding applications for education and outreach media campaigns, and anti-predatory lending efforts.

298.    In addition, the FHCGPB engaged in significant community outreach and public efforts to address and attempt to counteract the effects of Defendants' conduct.  FHCGPB's efforts included workshops, disseminating anti-discrimination literature, and counseling citizens of the Greater Palm Beaches on their fair housing rights under federal, Florida, and local fair housing laws.  FHCGPB conducted 21 workshops for nine community service providers and local housing providers regarding REO maintenance.

### C.    INJURIES TO INDIVIDUAL PLAINTIFFS

299.    Each Individual Plaintiff has suffered particularized and concrete injuries caused by Defendants' discriminatory conduct.

**Wanda Onafuwa**

300.    Plaintiff Wanda Onafuwa bought her home in the Tremont neighborhood of Baltimore City in 1988 and has lived there ever since.

301.    Ms. Onafuwa lives with her sister, Valerie Stewart, and their mother.  Ms. Stewart moved in with Ms. Onafuwa in October of 2016 to help her care for their mother, who is in the advanced stages of Alzheimer's disease.

302. Ms. Onafuwa knows her neighbors, including the previous owner of the house next door to her at 4714 Amberley.

303. In 2016, the family who had previously lived at 4714 Amberley moved out, after which the brother of the owner of 4714 Amberley moved in.

304. Unbeknownst to Ms. Onafuwa and her neighbors, Bank of America filed a foreclosure action against the owner of 4714 Amberley on or about September 23, 2016. Bank of America purchased 4714 Amberley at auction on or about February 17, 2017. The deed for 4714 Amberley was transferred to Bank of America on or about August 7, 2017.

305. Despite Bank of America's purchase of 4714 Amberley, it allowed the previous owner's brother to continue to illegally live in the house until August 2017. On information and belief, the squatter stole electricity from Ms. Onafuwa's neighbor living at 4716 Amberley Avenue. He also contributed to the trash accumulating on the outside of the property.

306. In late 2016 or early 2017, Ms. Onafuwa learned that 4714 Amberley was in foreclosure. The property continued to deteriorate. On or about February 13, 2017, 4714 Amberley's fence fell on Ms. Stewart's car and damaged it. The fence remained broken on the ground for some time.

307. Ms. Onafuwa and her neighbors also became very concerned about the garage at 4714 Amberley, which was in terrible condition and had become a haven for rats. Due to the deteriorating garage, Ms. Onafuwa and her neighbors saw rats in their yards and alley on a regular basis for the first time since moving into their homes. Also, in early 2017 a wind storm caused the metal roof on the garage to fly up, and Ms. Onafuwa worried that the roof could detach from the garage and injure someone.

308.    Due to their concerns about the condition of 4714 Amberley, and especially the garage on that property, Ms. Onafuwa and her neighbors began contacting Baltimore City officials in early 2017.  On or about January 25, 2017, the City issued several citations for the condition of the property, giving the owner until February 24, 2017, to remediate the violations.

309.    The conditions at 4714 Amberley did not improve, and on or about March 10, 2017, the City posted an Emergency Condemnation and Demolition Notice on the garage.  The City eventually boarded up the garage.

310.    Ms. Onafuwa had had problems with water coming into her basement from the side where 4714 Amberley is located since 2016, and these problems persisted and became worse in 2017.  In the spring or early summer of 2017, Ms. Onafuwa paid a contractor to patch the cement and repair the gutters at 4714 Amberley to try to abate the water damage to her home, but she continued to have water in her basement.

311.    In or about the spring of 2017, Ms. Onafuwa saw a notice posted on the garage of 4714 Amberley indicating that Bank of America owned the property.  She called Bank of America to ask that it address the cause of the water in her basement.  The customer service representative for Bank of America indicated that she would forward Ms. Onafuwa's complaint to the mortgage preservation department.

312.    Ms. Onafuwa and her neighbors also contacted Safeguard to voice their concerns about the state of 4714 Amberley and to request that Defendants remediate the dilapidated garage and the associated rodent problem, remove the squatter, and mow the grass.  A Safeguard representative e-mailed in response: "The decision for the garage has to be reviewed by the bank. Same decision regarding the grass."

313.     On or about June 26, 2017, Ms. Onafuwa paid an exterminator to address the rat problem outside her house, stemming from 4714 Amberley.

314.     On or about July 14, 2017, because she had received no response from Bank of America, Ms. Onafuwa requested that Baltimore City officials assist her with removing the squatter from 4714 Amberley and getting relief from the water entering her basement.

315.     In July 2017, the City of Baltimore demolished the garage at 4714 Amberley. After the demolition of the garage, a large amount of trash and debris remained on the property.

316.     On or about August 15, 2017, employees of the Baltimore Department of Housing boarded up the house at 4714 Amberley.  The squatter returned shortly thereafter to remove his belongings, and the City re-secured the house after he left.  After the City boarded and secured 4714 Amberley, Ms. Onafuwa ceased having problems with water in her basement.

317.     Throughout August and September 2017, Ms. Onafuwa and her neighbors continued to contact Safeguard, asking that Defendants remove the trash left after the demolition of the garage, exterminate the rats, and mow the grass.  On or about August 14, 2017, a Safeguard representative e-mailed in response: "Please be advised that we are still working with our client to address your concerns regarding the squatters and detached garage that is fallen.  As soon as our client is able to approve for us to address work we will have our contractors out to the property to provide bids to address any issues they find."  On or about September 27, 2017, in response to a complaint from Ms. Onafuwa's neighbor regarding the continuing rat problem, a Safeguard representative e-mailed: "At this time, the City has boarded the property and we have no access.  Our contractor did advise of a rodent issue on the exterior which was sent to our client to review."

318.    In or about October 2017, Safeguard sent workers to 4714 Amberley to gut and clean the property.

319.    On or about March 20, 2018, Bank of America sold 4714 Amberley.

320.    Defendants' failure to maintain 4714 Amberley has caused Ms. Onafuwa monetary damages, as well as emotional distress and mental anguish.  Ms. Onafuwa's damages include, but are not limited to: spending her own money to mitigate the effects from living next door to an unsecured and dilapidated vacant property; the fear and anxiety precipitated by an infestation of rats in her community that she had never before experienced; the distress resulting from the water that entered her basement from 4714 Amberley; and the worry that she would not be able to sell her own home for a fair price upon her retirement.

**Chevelle and Jalen Bushnell**

321.    Chevelle Bushnell bought her townhome in District Heights, Prince George's County, Maryland when it was built in 1990 and has lived there ever since.

322.    Jalen Bushnell, who is now 24, has lived in the home his entire life, except for time he spent with his father weekdays during high school and time he spent away at college.

323.    In or around 2010, the previous owners of the house next to Ms. Bushnell, located at 6088 S. Hil Mar, abandoned the home.  On information and belief, they did so in response to Bank of America, the mortgage holder on the house, threatening foreclosure.

324.    In January 2013, Ms. Bushnell's home was broken into.  The perpetrators kicked in her front door and stole personal property belonging to her and Mr. Bushnell, causing damages and losses valued at over $1,500.  The police officers who responded to Ms. Bushnell's 911 call after the break-in said it had likely occurred due to 6088 S. Hil Mar sitting vacant next door to her.

325.     In August 2013, Ms. Bushnell's home was broken into again while Ms. Bushnell was at work.  This time, the perpetrators broke through her bedroom wall from a room in 6088 S. Hil Mar.  The perpetrators ransacked Ms. Bushnell's bedroom and again stole personal property belonging to her and Mr. Bushnell.  The damages and losses from this second break-in exceeded $3,000.

326.     In or about March 2014, thieves again attempted to break through Ms. Bushnell's bedroom wall from 6088 S. Hil Mar.  Mr. Bushnell was home at the time and saw approximately four people enter 6088 S. Hil Mar, after which he heard banging on the wall of Ms. Bushnell's bedroom and called the police.  By the time the police arrived, the perpetrators had left.

327.     As a result of the multiple break-ins to her house due to 6088 S. Hil Mar being vacant, Ms. Bushnell bought a doorbell with a camera, a security system, and heavy-duty security doors.

328.     Bank of America filed a foreclosure action against the owner of 6088 S. Hil Mar on or about August 14, 2014 – four years after it had first been abandoned – and purchased the house on or about February 5, 2015.

329.     On or about November 5, 2015, in response to an inquiry from an acquaintance of Ms. Bushnell, Bank of America's REO Vendor Management stated that 6088 S. Hil Mar "is not a property being marketed by Bank of America."

330.     After Bank of America became responsible for 6088 S. Hil Mar, the property was frequently unsecured, with doors and windows left open.  Ms. Bushnell and Mr. Bushnell continued to hear people inside 6088 S. Hill Mar periodically, as well.  This made them very uncomfortable due to the break-ins they had experienced from people accessing their home from 6088 S. Hil Mar.

331.    As recently as early February 2017, 6088 S. Hil Mar was unsecured, the door having been kicked in.

332.    On or about February 14, 2017, Ms. Bushnell contacted Safeguard regarding the door to 6088 S. Hil Mar being unsecured.  Safeguard responded that it had "generated a work order sending a vendor out to secure the property."

333.    During the time that Bank of America owned 6088 S. Hil Mar, the outside of the house also remained uncared for.  Weeds grew up the walls, the yard was not maintained, and there were holes in the structure.

334.    Due to holes in the side and roof of 6088 S. Hil Mar and in the attic between the vacant house and Ms. Bushnell's home, Ms. Bushnell had problems with squirrels entering her attic.  On or about February 22, 2017, Ms. Bushnell hired a trapping service to trap these squirrels and prevent them from entering her attic again.  The trapping service informed Ms. Bushnell that the squirrels were entering from 6088 S. Hil Mar and that she could have problems with squirrels again unless Bank of America repaired 6088 S. Hil Mar.

335.    On or about February 23, 2017, Ms. Bushnell contacted Safeguard to ask that it fix the holes in 6088 S. Hil Mar so that she would not have any more problems with squirrels in her attic.  When she did not receive a response by March 6, 2017, Ms. Bushnell contacted Safeguard again.  On or about the same date, Safeguard responded that Ms. Bushnell's "email was sent to the client and bids are being obtained."

336.    On or about June 16, 2017, Bank of America conveyed title to 6088 S. Hil Mar to the U.S. Department of Housing and Urban Development.

337.    As a result of Defendants' failure to properly maintain 6088 S. Hil Mar, Ms. Bushnell has had to spend her own money to remediate problems stemming from rodents

entering her attic. Ms. Bushnell and Mr. Bushnell have also experienced emotional harm from living next door to an unsecured property. The Bushnells know from experience the danger associated with living next to a vacant house that is not properly secured and monitored. Defendants' failure to meet even the most basic aspects of their REO maintenance responsibilities by properly securing 6088 S. Hil Mar and ensuring that it remained secure caused the Bushnells monetary and emotional damages, including anxiety, fear, and stress.

### D.    INJURIES CAUSED BY DEFENDANTS' CONDUCT CONTINUE

338.    Until remedied, Defendants' unlawful, discriminatory actions will continue to injure Plaintiffs by, *inter alia*: (a) interfering with the Organizational Plaintiffs' efforts and programs intended to bring about equality of opportunity in housing; (b) frustrating the Organizational Plaintiffs' missions and core activities in furtherance of their missions of promoting the equal availability of housing to all persons without regard to any protected category, including race and the racial composition of a neighborhood; (c) frustrating the Organizational Plaintiffs' missions and core activities in furtherance of their missions of promoting racial integration, eliminating racial segregation in their communities, and promoting stable, diverse communities; (d) requiring the commitment of scarce resources, including substantial staff time and funding, to stop and counteract the harm to their missions caused by Defendants' discriminatory conduct, thus diverting resources away from the Organizational Plaintiffs' usual activities and services, such as education, outreach, and counseling; (e) impeding the numerous accomplishments of the Organizational Plaintiffs' investment programs; (f) perpetuating segregation in the Individual Plaintiffs' communities; (g) forcing the Individual Plaintiffs to expend their own financial resources to mitigate damage to their homes precipitated by Defendants' failure to maintain the REO properties next door; and (h) causing the Individual

Plaintiffs emotional distress and mental anguish from the stress, fear, and anxiety of living next door to an unsecured, unmaintained REO property.

339.    All of these injuries flow directly from Defendants' conduct.  All of these injuries are fairly traceable to Defendants' discriminatory behavior in Plaintiffs' communities, and they are likely to be redressed by a favorable judicial decision.  The injuries suffered by Plaintiffs fall directly within the zone of interests protected by the Fair Housing Act.

### E.    CONTINUING VIOLATION

340.    Defendants engaged in the conduct alleged herein on a continuing and ongoing basis from at least June 2009 to the present.  Defendants' alleged conduct involves discriminatory violations that injured Plaintiffs within the two-year Fair Housing Act statute of limitations and the evidence in this investigation that occurred prior to the two-year statute of limitations is of a similar pattern to the evidence put forward within the statute of limitations period.  At the time of the filing of the original Complaint, the two-year statute of limitations period had been tolling under the -then pending HUD administrative complaint since its filing on September 25, 2012.

### VI.    PLAINTIFFS' CLAIMS

341.    Plaintiffs adopt and re-allege each of the preceding paragraphs of this Complaint as to each count set forth below.

342.    The Bank of America properties investigated by the Organizational Plaintiffs are "dwelling[s]" within the meaning of 42 U.S.C. § 3602(b).

343.    The term "person" in the Fair Housing Act is defined to include "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries."  42 U.S.C. § 3602(d).

344.    Under the express provisions of the Fair Housing Act and applicable agency principles, banks, trustees, investors, servicers, and any other responsible contractors or vendors must maintain and market REO properties without regard to the race or national origin of the residents of a neighborhood.  It is unlawful to treat a neighborhood or its residents differently because of the race or national origin of the residents.

### Count I – Section 804(a) of the Fair Housing Act, 42 U.S.C. § 3604(a)
### (All Plaintiffs v. All Defendants)

345.    The allegations in the preceding paragraphs are incorporated as if stated here.

346.    Section 804(a) of the Fair Housing Act makes it unlawful to "otherwise make unavailable or deny, a dwelling to any person because of race [or] national origin[.]"  42 U.S.C. § 3604(a).  HUD regulations provide in pertinent part that "[i]t shall be unlawful, because of race [or] national origin . . . to discourage or obstruct choices in a community, neighborhood or development."  24 C.F.R. § 100.70(a).  Such acts "include, but are not limited to: (1) Discouraging any person from inspecting, purchasing, or renting a dwelling . . . because of the race [or] national origin . . . of persons in a community, neighborhood or development."  24 C.F.R. § 100.70(c)(1).

347.    The discriminatory provision of maintenance and marketing services to the Bank of America REO properties in communities of color adversely affects their availability for purchase in the following ways, among others: (a) by making properties uninhabitable; (2) by discouraging buyers from looking at or purchasing the property; and (3) by interfering with the closing of a sale where the appraisal does not support the loan amount requested.

348.    Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

349.    Defendants' policies and practices, including: (a) the policy of the Bank of America Defendants to outsource their responsibilities as real property owners to third parties retained by the Bank of America Defendants to maintain those properties without guidance, oversight, or review of the activities of those third parties; (b) Safeguard's policy of outsourcing REO maintenance to third parties without appropriate monitoring or review; and (c) Defendants' policy of basing routine, exterior REO maintenance on the age and value of a property, have had an unlawful disproportionate impact on communities of color.

350.    Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin, in violation of 42 U.S.C. § 3604(a) and its implementing regulations, 24 C.F.R. § 100.70(a) and (c).

### Count II – Section 804(b) of the Fair Housing Act, 42 U.S.C. § 3604(b) (All Plaintiffs v. All Defendants)

351.    The allegations in the preceding paragraphs are incorporated as if stated here.

352.    Section 804(b) of the Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin.  42 U.S.C. § 3604(b).

353.    HUD's regulations implementing § 3604(b) specify that "[p]rohibited actions under this section include, but are not limited to . . . failing or delaying maintenance or repairs of sale or rental dwellings" because of race or national origin.  24 C.F.R. § 100.65.

354.    The maintenance of REO properties constitutes "the provision of services" in connection with dwellings.  Moreover, sales transactions involving poorly maintained REOs in communities of color result in the transfer of title to the dwelling under less favorable "terms"

and "conditions" that place on buyers the responsibility of remedying delayed maintenance and upkeep of the property to avoid code violations.

355.    Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

356.    Defendants' policies and practices, including: (a) the policy of the Bank of America Defendants to outsource their responsibilities as real property owners to third parties retained by the Bank of America Defendants to maintain those properties without guidance, oversight, or review of the activities of those third parties; (b) Safeguard's policy of outsourcing REO maintenance to third parties without appropriate monitoring or review; and (c) Defendants' policy of basing routine, exterior REO maintenance on the age and value of a property, have had an unlawful disproportionate impact on communities of color.

357.    Accordingly, Defendants have discriminated in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race or national origin in violation of 42 U.S.C. § 3604(b) and its implementing regulation, 24 C.F.R. § 100.65.

### Count III – Section 805 of the Fair Housing Act, 42 U.S.C. § 3605
### (All Plaintiffs v. All Defendants)

358.    The allegations in the preceding paragraphs are incorporated as if stated here.

359.    Section 805 of the Fair Housing Act makes it unlawful for any entity "whose business includes engaging in residential real estate-related transactions" to discriminate against any person in making available such a transaction because of race or national origin.  42 U.S.C. § 3605.

360.    Defendants are persons whose business includes engaging in residential real estate-related transactions.

361.    As described above, the discriminatory provision of maintenance and marketing services to REO properties in communities of color creates significant barriers to the sale or purchase of these properties.

362.    Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

363.    Defendants' policies and practices, including: (a) the policy of the Bank of America Defendants to outsource their responsibilities as real property owners to third parties retained by the Bank of America Defendants to maintain those properties without guidance, oversight, or review of the activities of those third parties; (b) Safeguard's policy of outsourcing REO maintenance to third parties without appropriate monitoring or review; and (c) Defendants' policy of basing routine, exterior REO maintenance on the age and value of a property, have had an unlawful disproportionate impact on communities of color.

364.    Accordingly, Defendants have discriminated in the marketing and sale of, or otherwise made unavailable or denied, dwellings to persons because of race or national origin in violation of 42 U.S.C. § 3605.

**Count IV – Perpetuation of Segregation in Violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* (All Plaintiffs v. All Defendants)**

365.    The allegations in the preceding paragraphs are incorporated as if stated here.

366.    Discriminatory conduct that perpetuates or furthers segregation also violates the Fair Housing Act.

367.    HUD's regulations implementing the Fair Housing Act state that "[a] practice has a discriminatory effect where it…creates, increases, reinforces, or perpetuates segregated housing patterns because of race[.]"  24 C.F.R. § 100.500(a).

368.    Racial disparities in REO maintenance and marketing act to perpetuate segregation through their effects on property values and the stability of minority neighborhoods. As a proximate and foreseeable consequence of such conduct, white buyers are discouraged from purchasing homes in the affected communities of color.

369.    Additionally, the presence of deteriorated and/or dangerous REOs in a neighborhood affects the home values of surrounding homeowners.  This, in turn, restricts the ability of minority homeowners to move into majority white or integrated neighborhoods by reducing the equity they can use to buy a new home.

370.    Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

371.    Defendants' policies and practices, including the policy of the Bank of America Defendants to disavow and abrogate their responsibilities as real property owners, without guidance, oversight, or review of the activities of retained third parties, have had an unlawful disproportionate impact on communities of color.

372.    Accordingly, Defendants' conduct and practices that perpetuate and encourage patterns of racial segregation violate the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and its implementing regulation, 24 C.F.R. § 100.500(a).

### Count V – Section 818 of the Fair Housing Act, 42 U.S.C. § 3617
### (All Plaintiffs v. All Defendants)

373.    The allegations in the preceding paragraphs are incorporated as if stated here.

374.    Section 818 of the Fair Housing Act makes it unlawful, among other things, to "interfere with any person in the exercise or enjoyment of . . . any right granted or protected by" other provisions of the Act.  42 U.S.C. § 3617.

375.     Persons living in communities adversely affected by Defendants' practices and conduct have seen their property values and enjoyment of their homes diminished.  By poorly maintaining and marketing REO properties in predominantly minority communities, Defendants have interfered with the rights of neighboring residents and homeowners (predominantly persons of color) to use and enjoy their homes and communities.

376.     The health and safety risks caused by Defendants with respect to the Bank of America REO properties in communities of color and the deleterious effects of those properties on their surrounding neighborhoods create an unhealthy and hostile living environment for neighborhood residents.

377.     Defendants' conduct constitutes intentional discrimination on the basis of race and national origin.

378.     Defendants' policies and practices have had an unlawful disproportionate impact on communities of color.

379.     Accordingly, Defendants have interfered with the exercise of rights granted or protected by the Fair Housing Act, in violation of 42 U.S.C. § 3617.

### Count VI – Private Nuisance
### (Wanda Onafuwa v. All Defendants)

380.     The allegations in the preceding paragraphs are incorporated as if stated here.

381.     Bank of America owned the house located at 4714 Amberley Avenue, Baltimore, Maryland, 21229, next door to Ms. Onafuwa, from on or about February 17, 2017, to on or about March 20, 2018.

382.     During Bank of America's ownership of 4714 Amberley, its neglect of that property caused Ms. Onafuwa to suffer from rats on her property, water entering her basement,

and the negative effects of living next door to a property with a condemned garage, accumulated trash, unmown grass, unsecured windows and doors, and the presence of a squatter.

383.   The conditions at 4714 Amberley during Bank of America's ownership caused substantial and unreasonable interference with Ms. Onafuwa's use and enjoyment of her home.

384.   The interference was so substantially unreasonable that Ms. Onafuwa suffered a diminution in her use and enjoyment of her property.

385.   Defendants' conduct in failing to properly maintain 4714 Amberley constituted a nuisance.

386.   As a proximate result of this nuisance, Ms. Onafuwa has suffered injuries, including damage to her home, emotional distress, and mental anguish.

### Count VII – Private Nuisance
### (Chevelle and Jalen Bushnell v. All Defendants)

387.   The allegations in the preceding paragraphs are incorporated as if stated here.

388.   Bank of America owned the house located at 6088 S. Hil Mar Circle, District Heights, Maryland, 20747, next door to the Bushnell's home, from on or about February 5, 2015, to on or about June 16, 2017.

389.   During the time when Bank of America owned 6088 S. Hil Mar, the property was often unsecured, and the Bushnells could hear people inside the property.  The house was also uncared for, with an unmaintained yard, weeds growing up the walls, and holes in the structure that permitted rodents to enter the Bushnells' attic.

390.   The conditions at 6088 S. Hil Mar caused substantial and unreasonable interference with the Bushnells' use and enjoyment of their home.

391.   The interference was so substantially unreasonable that the Bushnells suffered a diminution in the use of their property.

392.     Defendants' conduct in failing to properly maintain 6088 S. Hil Mar constitutes a nuisance.

393.     As a proximate result of this nuisance, the Bushnells have suffered injuries, including the costs of extermination for the rodents in their attic, emotional distress, and mental anguish.

## VII.    JURY TRIAL DEMANDED

394.     Plaintiffs hereby demand a jury trial on all counts.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court grant judgment in their favor and against Defendants as follows:

a)     Declare, pursuant to 28 U.S.C. § 2201, that the conduct of Defendants in the maintenance of the Bank of America REO properties in communities of color, as alleged herein, violates the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, and the applicable regulations;

b)     Enjoin, pursuant to 42 U.S.C. § 3613(c)(1), Defendants, their officers, directors, employees, agents, successors, assigns, and all other persons in active concert or participation with any of them, both temporarily during the pendency of this action and permanently, from violating the Fair Housing Act;

c)     Award such damages as would fully compensate Plaintiffs for their injuries caused by Defendants' discriminatory housing practices and conduct, pursuant to 42 U.S.C. § 3613(c)(1);

d)     Award such damages as would fully compensate the Individual Plaintiffs for their injuries caused by the nuisance created by Defendants;

e)     Award such punitive damages against Defendants as is proper under the law, pursuant to 42 U.S.C. § 3613(c)(1);

f)     Award Plaintiffs their costs and attorneys' fees incurred herein, pursuant to 42 U.S.C. § 3613(c)(2); and

g)     Award Plaintiffs such other relief as this Court deems just and proper.

Respectfully submitted,

Andrew D. Freeman (Fed. Bar No. 03867)
Jessica P. Weber (Fed. Bar No. 17893)
Monica R. Basche (Fed. Bar No. 20476)
Lauren A. DiMartino (Fed. Bar No. 22046)
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 2500
Baltimore, MD 21202
Phone: 410-962-1030
Fax: 410-385-0869
jweber@browngold.com
adf@browngold.com
mbasche@browngold.com
ldimartino@browngold.com

*Counsel for Plaintiffs*

Janell M. Byrd-Chichester (Fed. Bar No. 16564)
Morgan Williams (*pro hac vice*)
National Fair Housing Alliance
1101 Vermont Avenue, NW, Suite 710
Washington, DC 20005
Phone: 202-898-1661
jbyrd-chichester@nationalfairhousing.org
mwilliams@nationalfairhousing.org

*Counsel for Plaintiff National Fair Housing Alliance*

August 21, 2025

135